**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARVEL CHARACTERS, INC., <br><br> Plaintiff and Counterclaim-Defendant, <br><br> v. <br><br> LAWRENCE D. LIEBER, <br><br> Defendant and Counterclaimant. | Case No.: 1:21-cv-7955-LAK <br> and consolidated cases <br> 21-cv-7957-LAK and 21-cv-7959-LAK <br><br> Hon. Lewis A. Kaplan <br><br> **MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY PLAINTIFF AND COUNTERCLAIM-DEFENDANT MARVEL CHARACTERS, INC.** <br><br> Oral Argument Requested |
| MARVEL CHARACTERS, INC., <br><br> Plaintiff and Counterclaim-Defendant, <br><br> v. <br><br> KEITH A. DETTWILER, in his capacity as Executor of the Estate of Donald L. Heck, <br><br> Defendant and Counterclaimant. | |
| MARVEL CHARACTERS, INC., <br><br> Plaintiff and Counterclaim-Defendant, <br><br> v. <br><br> PATRICK S. DITKO, in his capacity as Administrator of the Estate of Stephen J. Ditko, <br><br> Defendant and Counterclaimant. | |

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ........................................................................... 1

THE COPYRIGHT TERMINATION REGIME AND WORKS MADE FOR HIRE .................. 3

THE UNDISPUTED FACTS ............................................................................. 5

    A.    Marvel's Owner And Editors Controlled Marvel's Creative Process. .................. 6

    B.    Steve Ditko Worked On Assignment Under Stan Lee's Control. ......................... 8

    C.    Marvel Paid Ditko By The Page And Assumed The Financial Risk For Its Comic Books.................................................................................. 10

    D.    Ditko's Work On Doctor Strange And Spider-Man Illustrates That He Worked At Marvel's Instance and Expense. ...................................................... 10

    E.    Frustrated With The Constraints On His Creative Process And Output, Ditko Left Marvel. ............................................................................... 13

    F.    Defendant Served Termination Notices On MCI, Seeking To Uproot MCI's Rights In And To The Works............................................................. 14

ARGUMENT ............................................................................................... 15

    A.    The Works Were Created At Marvel's Instance................................ 16

    B.    The Works Were Created At Marvel's Expense................................. 22

    C.    Steve Ditko And Marvel Did Not Reach A Contrary Agreement. ...................... 24

CONCLUSION.............................................................................................. 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Celotex Corp. v. Catrett,*
    477 U.S. 317, 106 S. Ct. 2548 (1986) .................................................................................. 15

*Cole v. Artuz,*
    1999 WL 983876 (S.D.N.Y. Oct. 28, 1999) ...................................................................... 16

*D'Antonio v. Metro. Transp. Auth.,*
    2010 WL 1257349 (S.D.N.Y. Mar. 31, 2010) .................................................................. 15

*Est. of Burne Hogarth v. Edgar Rice Burroughs, Inc.,*
    342 F.3d 149 (2d Cir. 2003) .................................................................................................. 4

*Gottlieb v. County of Orange,*
    84 F.3d 511 (2d Cir. 1996) .................................................................................................. 15

*In re Marvel Ent. Grp., Inc.,*
    254 B.R. 817 (D. Del. 2000) ............................................................................................... 16

*Markham Concepts, Inc. v. Hasbro, Inc.,*
    1 F.4th 74 (1st Cir. 2021), *cert. denied*, 142 S. Ct. 1414 (2022) ............................................ 3

*Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemp.*
*Dance, Inc.,*
    380 F.3d 624 (2d Cir. 2004) ............................................................................................. 3, 4

*Marvel Characters, Inc. v. Kirby,*
    726 F.3d 119 (2d Cir. 2013) ....................................................................................... passim

*Marvel Worldwide, Inc. v. Kirby,*
    777 F. Supp. 2d 720 (S.D.N.Y. 2011) ............................................................................... 16

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,*
    475 U.S. 574, 106 S. Ct. 1348 (1986) ........................................................................... 15, 16

*Myun-Uk Choi v. Tower Rsch. Cap. LLC,*
    2020 WL 1503446 (S.D.N.Y. Mar. 30, 2020) ................................................................. 15

*Playboy Enters., Inc. v. Dumas,*
    53 F.3d 549 (2d Cir. 1995) ...................................................................................... 3, 4, 5, 18

*Rimini St., Inc. v. Oracle USA, Inc.,*
    139 S. Ct. 873 (2019) ............................................................................................................ 3

*Rule v. Brine, Inc.,*
    85 F.3d 1002 (2d Cir. 1996) ............................................................................................... 16

*Twentieth Century Fox Film Corp. v. Entm't Distrib.,*
    429 F.3d 869 (9th Cir. 2005) ................................................................................................ 3

## <u>TABLE OF AUTHORITIES</u>
*(continued)*

**Page(s)**

**Statutes**

17 U.S.C. § 304(c) ........................................................................................................... 3, 13, 25

**Rules**

Fed. R. Civ. P. 56(a) .............................................................................................................. 15

## PRELIMINARY STATEMENT

This case concerns whether Marvel Characters, Inc. ("MCI") can be divested of its future rights under domestic copyright law to stories and characters within the Marvel universe simply because the late artist Stephen "Steve" Ditko did exactly what Marvel[1] hired him to do: make creative contributions to Marvel's comic book series under Marvel's supervision and control in return for fixed per-page compensation.  The record is replete with uncontradicted evidence establishing that Steve Ditko worked under the direction of Stan Lee, Marvel's editor-in-chief, and subject to Lee's editorial discretion.  In fact, he chafed under Lee's control and ultimately left the company in pursuit of greater artistic independence.  Not surprisingly, then, Steve Ditko never claimed to own any of the contributions he made to Marvel comics.  To the contrary, he affirmatively admitted that he was not—in his own words—the "legal creator" of the works to which he contributed.  Only after Steve Ditko passed away a few years ago did Defendant attempt to claim otherwise.

Defendant is Patrick Ditko, the brother of Steve Ditko and administrator of his estate.  He seeks to invoke the special process established by the Copyright Act of 1976 to enable authors and heirs to terminate certain prior grants of copyright.  Patrick Ditko has filed termination notices (the "Notices") as to copyrights in stories and characters to which Steve Ditko contributed while working for Marvel (the "Works").

The Notices are legally invalid because the 1976 Act's copyright termination regime does not apply to works "made for hire," including the Works to which Steve Ditko contributed.  When a work is made for hire, the artist does not "grant" the copyright; rather, the hiring party is the statutory "author" ab initio.  As a result, in the case of a work made for hire, there is no prior

---

[1] As the term is used herein, "Marvel" refers to MCI and its predecessors and affiliates.

"grant" of copyright that can be later subject to termination.  Indeed, Defendant himself does not actually have any of the purported "grants" of copyright from Steve Ditko to Marvel.

Settled law dooms Defendant's termination efforts, just as it has doomed previous termination efforts aimed at other Marvel characters and stories, including those created by the great Jack Kirby.  Despite the widely-recognized significance of Kirby's contributions, this District and the Second Circuit correctly held that because he did his work at Marvel's "instance" and at Marvel's "expense," the creations were all works for hire under the controlling test and thus not subject to the termination regime.  *See Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 140-43 (2d Cir. 2013).  Exactly the same is true for Steve Ditko's contributions.

In fact, as one-sided as the *Kirby* record was, MCI's case here is even stronger.

As the evidence conclusively shows, Ditko's contributions—like Kirby's—were made at the direction and under the supervision of Marvel (generally through editor Stan Lee), to fit within the needs of Marvel's growing comic book publishing business, for a preset per-page compensation rate, in the course of a longstanding working relationship.  Marvel assigned the freelance talent, determining who would script, pencil, ink, letter, and color each book.  And ultimately, it was Marvel that bore the financial risk of whether a comic book made or lost money.

In *Kirby*, on essentially the same facts, Marvel was granted summary judgment and a declaration that the artist's heirs' termination notices were invalid.  As in *Kirby*, the undisputed evidence here demonstrates that the Works at issue were made for hire at Marvel's instance and expense outside the copyright termination statutes.  As in *Kirby*, Marvel's motion for summary judgment should be granted.

## THE COPYRIGHT TERMINATION REGIME AND WORKS MADE FOR HIRE

Under Section 304(c) of the 1976 Copyright Act, authors or specified heirs can terminate prior "grants" of domestic copyrights made for pre-1978 works under limited circumstances.  17 U.S.C. § 304(c).  The copyright in a work "made for hire," however, is not eligible for termination.  *Kirby*, 726 F.3d at 137; *see also* 17 U.S.C. § 304(c) (limiting the statutory termination right to copyrights "other than a copyright in a work made for hire").  When it is determined that a work is made for hire, the hiring party is conclusively deemed to be the "author" of the work, even though the artist or "hired party" might be described as "the 'author' in the colloquial sense."  *Kirby*, 726 F.3d at 137; *see also Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemp. Dance, Inc.*, 380 F.3d 624, 634 (2d Cir. 2004).  As a result, the hired party "never owned the copyrights" in the first place.  *Kirby*, 726 F.3d at 137.

Although the termination right was established in the Copyright Act of 1976, it is the Copyright Act of *1909* that governs whether pre-1978 works (like those at issue here) fall outside the termination regime as works made for hire.  *Id.*  And for decades, the Second Circuit (like other circuits) has applied the "instance and expense test" to determine whether a work was made for hire under the 1909 Act.  *See id.*; *Martha Graham*, 380 F.3d at 634-35; *Playboy Enters., Inc. v. Dumas*, 53 F.3d 549, 554 (2d Cir. 1995).[2]  A work is created at an employer's "instance and expense" when the "motivating factor in producing the work was the employer who induced the creation."  *Playboy Enters.*, 53 F.3d at 554.  The same analysis applies whether the artist is an "employee" or an "independent contractor"—the sole issue is whether the work

---

[2] *See also, e.g.*, *Markham Concepts, Inc. v. Hasbro, Inc.*, 1 F.4th 74, 83 (1st Cir. 2021), *cert. denied*, 142 S. Ct. 1414 (2022); *Twentieth Century Fox Film Corp. v. Entm't Distrib.*, 429 F.3d 869, 878 (9th Cir. 2005), *abrogated on other grounds by Rimini St., Inc. v. Oracle USA, Inc.*, 139 S. Ct. 873 (2019).

was created at the hiring party's "instance and expense."  *See Est. of Burne Hogarth v. Edgar Rice Burroughs, Inc.*, 342 F.3d 149, 156, 163 (2d Cir. 2003); *Kirby*, 726 F.3d at 124-26 (holding that Kirby worked "for hire" even though he "was a freelancer, i.e., he was not a formal employee of Marvel").  And the instance and expense test is satisfied if the hiring party "induces the creation of the work and has the right to direct and supervise the manner in which the work is carried out."  *Kirby*, 726 F.3d at 139.

*Instance* refers to "the extent to which the hiring party provided the impetus for, participated in, or had the power to supervise the creation of the work."  *Id.*  "Actual creative contributions or direction" by an employer "strongly suggest that the work [was] made at the hiring party's instance."  *Id.*  In addition, the employer's "power to reject" and to require a "redo" or alteration of work—"a power it exercise[s] from time to time"—supports a finding that the work was created at the hiring party's instance.  *Id.* at 141.  And while the right to "direct and supervise" is relevant, *Playboy Enters.*, 53 F.3d at 554, the "instance" prong can be satisfied even when that right is not actually exercised, *Kirby*, 726 F.3d at 139 (explaining that "prior dealings between the parties on similar assignments, as part of an ongoing arrangement" may have rendered employer's "fine-grained supervision unnecessary").

The fact that an artist is a "self-motivator" who holds "remarkable sway" over the hiring party's decisions is "beside the point" under the instance and expense test.  *Martha Graham*, 380 F.3d at 640.  So too is the artist's "ingenuity and acumen."  *Kirby*, 726 F.3d at 142.  After all, these very traits are bound to be "a substantial reason for the hiring party to have enlisted him" in the first place.  *Id.*

*Expense* refers to the "resources the hiring party invests in the creation of the work."  *Id.* at 139.  When the hiring party "pays an independent contractor a sum certain for his or her

work," that arrangement favors satisfaction of the expense prong. *Playboy Enters.*, 53 F.3d at 555. By contrast, "where the creator of a work receives royalties as payment, that method of payment generally weighs against finding a work-for-hire relationship." *Id.* The expense prong also includes factors such as who bore the financial risk of creation and what monetary and non-monetary resources the hiring party invested. In *Kirby*, the Second Circuit concluded that "payment of a flat rate and [] contribution of both creative and production value" by the hiring party was "enough to satisfy the expense requirement." 726 F.3d at 143.

When the instance and expense test is satisfied, the work is presumed to have been made for hire. *Playboy Enters.*, 53 F.3d at 554. To rebut that presumption, the artist or heirs must "demonstrate by a preponderance of the evidence" the parties at the time entered into "a contrary agreement" that the parties "intended a relationship other than work for hire." *Id.* at 554-55, 557. Any such contrary agreement must be "contemporaneous with the creation of the works." *Kirby*, 726 F.3d at 143.

## THE UNDISPUTED FACTS

The Notices are directed at Works that Marvel published from 1962 to 1966. (Statement of Undisputed Facts ("SUF") ¶¶ 3, 8.) The Works include the early appearances of such now-iconic characters as Spider-Man and Doctor Strange. (SUF ¶¶ 8, 33, 44.)

Promptly after each of the Works was created, Marvel filed copyright registrations for the Works with the U.S. Copyright Office. (SUF ¶ 5.) Marvel likewise filed renewal copyright registrations for each Work with the Copyright Office, with each Work identified as a work made for hire and Marvel as its author.[3] (SUF ¶ 6.) The express designation of the Works as

---

[3] The Copyright Office's renewal registration form included a new field for a "statement of claim" by the renewal claimant—i.e., the basis for the registrant's claim of rights in the work—which did not exist on the standardized form for initial registrants for the class of works at issue

made for hire is consistent with the undisputed facts concerning the creation of the Works, as follows.

### A.   Marvel's Owner And Editors Controlled Marvel's Creative Process.

Marvel owner and publisher Martin Goodman and editor-in-chief Stan Lee oversaw and controlled the creation of Marvel's comic books from conception through distribution for the time period relevant to Defendant's claims until 1972 when Stan Lee was promoted to publisher and Roy Thomas replaced him as editor-in-chief.  (SUF ¶¶ 9-30.)  As publisher, Goodman was the "ultimate boss."  (SUF ¶¶ 22, 30; Ex. 13 to Lens Decl.,[4] Stan Lee *Kirby* Dep. Tr. 18:17-19:17.)  He approved Marvel's comic book issues before they were published, and sometimes nudged Marvel's series in one direction or another to try to boost the company's competitiveness in the market.  (SUF ¶¶ 22, 30.)  If a comic book did not sell well, Goodman bore the loss, and it was up to him to decide whether to cancel a series.  (SUF ¶¶ 22, 52.)

While Goodman oversaw the business at a high level, editors Stan Lee, and later Roy Thomas, supervised the day-to-day operations.  (SUF ¶¶ 9-22.)  As editor, Stan Lee was responsible for overseeing the creative direction and all other aspects of Marvel's comic books, characters, and stories.  (SUF ¶¶ 10, 12-30, 32-35, 38, 40-42.)  Stan Lee would seed new ideas, supervise the creation process, and manage the contributors who would help bring the comic book issues to life.  (SUF ¶¶ 12-30, 32-35, 38, 40-42.)  Stan Lee would also assign writers and artists—including Steve Ditko—to contribute to specific Marvel comic books and would re-assign artists and writers to different projects as he saw fit.  (SUF ¶¶ 23, 32-33, 41-42.)  Work for

---

at the time the Works were registered.  It also contained a new field for identification of the author.

[4] All exhibit references denote exhibits to the Declaration of Molly M. Lens, filed concurrently herewith.

Marvel was done pursuant to job assignments from Marvel; during the relevant time period, Marvel did not solicit or accept work "on spec."  (SUF ¶¶ 23, 32-33, 41-42, 48.)

Not only did Stan Lee help manage the big picture of Marvel's business operation, but also he was deeply involved in the details of story after story.  Stan Lee had primary responsibility to formulate the main character and story ideas.  (SUF ¶¶ 13, 24, 40.)  From there, he would typically give an artist or writer (when Lee was not himself writing the script) a synopsis from which to draw panels or write out the narrative.  (SUF ¶¶ 12-14, 24-25.)

Under the Marvel Method, the artist (called a "penciller") would begin drawing directly from Lee's plot, with the accompanying captions and dialogue to come later.  (SUF ¶¶ 12-14, 24-25.)  While story and character ideas typically came from Marvel through Lee, part of a contributor's assignment on ongoing series was to propose new characters, plot elements, and other details.  (SUF ¶¶ 13, 24-25.)  Marvel's editors, though, had ultimate discretion on whether and how to include those characters or plot elements.  (SUF ¶¶ 25, 29-30.)  And they could demand edits to contributors' work product as desired.  (SUF ¶¶ 28-30.)

Once the writing and artwork were finalized in pencil, Marvel assigned a letterer who lettered the captions and dialogue, and an inker who went over the pencil drawings in ink.  (SUF ¶¶ 16-17, 22.)  Marvel sent these pages to an engraver, then to a colorist, and finally to the printer.  (SUF ¶¶ 16, 18-19, 22, 26.)

Marvel had to reserve print times in advance, so it kept the various contributors to a tight schedule.  (SUF ¶¶ 21-22.)  If contributors missed their deadlines, Marvel lost its print slot but had to pay regardless, and therefore lost money.  (SUF ¶¶ 21-22.)  Marvel's editors and production manager coordinated among the many contributors to turn their isolated contributions into a cohesive saleable work.  (SUF ¶¶ 16-19, 21-22.)  In contrast, Marvel's freelance

contributors—like Ditko—seldom communicated among one another, and indeed often did not even know who would come next in the creation process.  (SUF ¶ 20.)

**B.      Steve Ditko Worked On Assignment Under Stan Lee's Control.**

Steve Ditko worked as a freelancer for Marvel when he made his contributions to the Works.  (SUF ¶¶ 2, 23; Ex. 54 at 4.)  He worked extensively for Marvel from 1955 to 1965, including a stretch from 1963 to 1965 during which he worked nearly exclusively for Marvel.[5] (SUF ¶¶ 2, 45.)  Like his peers, Ditko worked on assignment from Marvel and under Stan Lee's supervision and direction.  (SUF ¶¶ 14, 22-30, 33-35, 38, 41-42.)  Lee typically provided Ditko with a synopsis for a story, from which Ditko would illustrate panels in greater detail.  (SUF ¶¶ 13-14, 23-24, 40-41.)  After Ditko had the chance to read the synopsis, Lee and Ditko often would go over it together to provide any clarification, consider further plot points, and so forth. (SUF ¶¶ 15, 26.)  Then Ditko would start drawing.  (SUF ¶¶ 14-15.)

Ditko was accorded some creative freedom in how Lee's story would manifest on paper, but Lee maintained ultimate control over the pages.  As Ditko himself explained, once Ditko had work to show, he and Lee "would go over the penciled story/art pages" together and, with Lee's consult, implement edits as needed.  (SUF ¶¶ 15, 26, 28; Ex. 48 at 2.)  Lee's requested edits could get quite granular—like replacing waffles with pancakes in a breakfast scene, or adjusting the placement of a character's hand.  (SUF ¶¶ 26, 28; Ex. 29 at 3-4.)  Others were more significant, like reimagining a cover to depict Spider-Man leaping across a villain and off the page instead of leaping towards the villain.  (SUF ¶¶ 26, 28; Ex. 53 at 3.)  Ditko could disagree with Stan Lee's editorial decisions, but ultimately Lee had the final say.  (SUF ¶¶ 29-30; Ex. 54

---

[5] The last Marvel comic book issues to which Ditko contributed, however, were published in 1966 due to the lag in the production process between when an artist turned in his penciled pages and when the finalized issue was distributed.

at 4.)  Of course, Marvel could also go a step further and decide not to publish Ditko's pages

altogether, but Marvel seldom opted to exercise that authority.[6]  (SUF ¶¶ 22, 27, 30; Ex. 13, Lee

*Kirby* Dep. Tr. 22:11-23:19.)

After Ditko finished drawing and revising his assigned panels, Lee would input dialogue

and captions to bring together the story.  (SUF ¶¶ 16, 46; Ex. 48 at 2.)  And Lee would usher the

story through the remainder of the production process.  (SUF ¶¶ 16-22; Ex. 7, Roy Thomas

*Friedrich* Dep. Tr. 201:24-203:16.)  As Ditko explained, "Once I did the job, turned it in, got

paid, my involvement ended."  (SUF ¶ 20; Ex. 57 at 4.)  Ditko often found himself dissatisfied

with Marvel's choices—for example, Spider-Man's coloration or Lee's "corny captions" and

"'humor' dialogue"—but understood that such decisions fell well outside his domain as a

contributing artist.  (SUF ¶ 29; Ex. 52 at 4; Ex. 58 at 3.)

Overall, Stan Lee decided to give Ditko greater creative freedoms as compared to certain

other artists at Marvel—similar to how Marvel treated the prolific Jack Kirby.  (SUF ¶ 47.)  Lee

trusted Ditko, and Ditko, in turn, understood that Lee—the "only [writer] [he] ever worked

for"—had "many characters, titles to handle, write for."  (SUF ¶¶ 30, 47; Ex. 44 at 7; Ex. 59 at

3.)  But to the extent Marvel's treatment of Ditko and Kirby differed from its treatment of other

artists, it was only because they were among Marvel's most experienced and skilled artists.

(SUF ¶¶ 45-47.)  Ditko thus was "allowed to drift" from an assigned script, for example, much

like Kirby was allowed "a freer hand within th[e] [comic creation] framework than . . .

comparable artists."  *Kirby*, 726 F.3d at 126.  (SUF ¶ 47; Ex. 45 at 8.)  Yet the general

---

[6] Even in the rare instances where Marvel did not use Ditko's work—such as when it decided against using Ditko's Spider-Man cover and instead assigned the task to Kirby—there is no evidence to suggest that Marvel did not pay Ditko in full for it.  (SUF ¶ 50; Ex. 1, Patrick Ditko Dep. Tr. 28:24-29:3.)

parameters remained in place:  Ditko always worked on assignment, and he was always subject to the supervision and editorial control of Marvel.  (SUF ¶¶ 14, 23-30, 33-35, 37-38.)  Marvel, in short, was in charge from start to finish.

### C.    Marvel Paid Ditko By The Page And Assumed The Financial Risk For Its Comic Books.

Like Marvel's other artists, Ditko was paid a per-page rate for his work.  (SUF ¶¶ 49-50.) The compensation for artists and writers was unaffected by a book's sales.  (SUF ¶¶ 50-52.)  If a comic book sold poorly, a contributing artist would be paid just the same—even if Marvel took a net loss.  (SUF ¶¶ 51-52.)  And likewise if a comic book turned out to be a success.  (SUF ¶¶ 51-52.)  In fact, Marvel did not even share sales figures with its artists; they had no financial interest because they never received royalties.  (SUF ¶¶ 51-52; Ex. 79 at 4.)

### D.    Ditko's Work On Doctor Strange And Spider-Man Illustrates That He Worked At Marvel's Instance and Expense.

Ditko generated a large body of work, but his legacy centers on drawing Doctor Strange and Spider-Man for Marvel.  As with his other assignments, Ditko worked closely with Stan Lee and at his behest with respect to both characters.

Ditko began regularly contributing to a Marvel series entitled *Strange Tales* in 1956, with Ditko working on all 79 issues from February 1959 (*Strange Tales* #67) to July 1966 (*Strange Tales* #146).  (SUF ¶ 31.)  As part of his ongoing work on the *Strange Tales* series and for Marvel more generally, Ditko penciled and inked the first Doctor Strange story, which was dialogued, captioned, and "rush[ed]" out by Lee as a "5-page filler," i.e., a short and shallow story intended mostly to take up unused space in the comic book.  (SUF ¶¶ 32-33; Ex. 27 at 2.) Lee chose the name "Doctor Strange" for the character because the story was published in Marvel's *Strange Tales* series and to avoid confusion with "Mr. Fantastic," another Marvel Super Hero.  (SUF ¶ 34.)

-10-

The Doctor Strange character first appeared in *Strange Tales*, Vol. 1, No. 110, published with a cover date of July 1963.  (SUF ¶ 33; Ex. 25 at 11; Ex. 31E at 2-4.)  Doctor Strange first appeared without a backstory—after all, the character was just filler.  (SUF ¶ 35.)  But fan mail soon urged the publication of a backstory, and Marvel eventually responded by giving Doctor Strange a more complete personality and origin story in *Strange Tales*, Vol. 1, No. 115.  (SUF ¶ 35.)  That origin story—Doctor Strange was revealed to be a doctor who underwent a series of tests in Tibet and developed mystical abilities to combat magical forces—actually recycled the essence of another Marvel character named Doctor Droom that Marvel had introduced years prior in another series.  (SUF ¶ 36.)  Exactly like Doctor Strange, Doctor Droom was a doctor who underwent a series of tests in Tibet and developed mystical abilities to combat magical forces.  (SUF ¶ 36.)  But the Doctor Droom character "was a one-shot thing," so the material was ripe for Marvel to repurpose.  (SUF ¶ 36; Ex. 41 at 8.)  From that foundation, Doctor Strange developed into the modern character.

Ditko routinely penciled the early Doctor Strange stories, but Lee and others handled much of the plotting and writing—to Ditko's chagrin.  Although the Doctor Strange character proved to have longevity, Ditko was often dissatisfied by the way the stories were produced; Ditko had no control over what he perceived as "poor plots by Stan [Lee]," the formulaic "haunted house[]" stories that Lee scripted for Doctor Strange, the "incompetent inkers" who broke from his vision, and the lack of a "consistent look" due to the revolving door of inkers who drew over Ditko's pencils.  (SUF ¶¶ 29, 36-37; Ex. 55 at 4; Ex. 59 at 3; Ex. 60 at 3.)  Indeed, Ditko was never even permitted to draw the cover art for a Doctor Strange story; Lee hand-selected other Marvel artists to carry that responsibility, which played a key role in how well a book would sell.  (SUF ¶ 38.)

-11-

Ditko's contributions to Spider-Man further illustrate how he worked under Marvel's control.  Marvel launched the 15-issue *Amazing Adventures*[7] comic book series in 1961, with Ditko contributing to every issue alongside Stan Lee and Jack Kirby.  (SUF ¶ 32.)  In 1962, Lee had conceived of an idea for the ongoing *Amazing Fantasy* series: a new character named Spider-Man, who was a realistic and nerdy teenage hero with the ability to stick to walls and ceilings like an insect.  (SUF ¶¶ 40-41.)  This new character first appeared in *Amazing Fantasy*, Vol. 1, No. 15, published in the summer of 1962.  (SUF ¶ 40; Ex. 25 at 3; Ex. 31A at 2-3.)

Ditko was <u>not</u> the first artist that Stan Lee assigned to draw Spider-Man.  (SUF ¶ 41.)  Jack Kirby was, but when Lee saw Kirby's initial pencil drawings, he decided that Kirby was the wrong man for the job.  (SUF ¶ 41.)  Kirby, who was known to "glamorize[] everything," had drawn a version of Spider-Man that looked "a little bit too heroic" for Lee.  (SUF ¶ 41; Ex. 13, Lee *Kirby* Dep. Tr. 37:3-38:3.)  Lee's vision—a "wimpy," "nerdy," and relatable teenage hero—was just "n[o]t Jack's style."  (SUF ¶¶ 40-41; Ex. 13, Lee *Kirby* Dep. Tr. 75:9-23.)

So Lee paid Kirby for his work, took him off the comic, and reassigned him to other books.  (SUF ¶ 41; Ex. 10, Lee *Kirby* Dep. Tr. 376:3-15.)  Lee replaced Kirby with Ditko, which proved a better match.  (SUF ¶ 41.)  Ditko's art had "that kind of awkward feeling" that was "just right for Spider-Man."  (Ex. 13, Lee *Kirby* Dep. Tr. 75:9-23.)  But while Lee accepted Ditko's work on the interior Spider-Man pages, Lee then decided not to use Ditko's cover art.  (SUF ¶¶ 41-42.)  Instead, Lee assigned the cover art *back* to Kirby, leaving the final artwork for the comic book an amalgamation of the two artists' work.[8]  (SUF ¶ 42.)  Spider-Man would soon

---

[7] The series was renamed *Amazing Adult Fantasy* for issue seven, then *Amazing Fantasy* for issue fifteen.  (SUF ¶ 39.)

[8] Notably, Jack Kirby's heirs also served a copyright termination notice as to this issue of *Amazing Fantasy*, but that notice was held invalid because Kirby's contributions to it were made for hire.  *Kirby*, 726 F.3d at 143.  (Ex. 77.)

become an unexpected hit, and, based on assignments from Lee, Ditko would go on to draw many more issues.  (SUF ¶¶ 43-44.)

Ditko was never satisfied with his role, lamenting that "Stan [Lee]'s writing style was completely wrong for SM [Spider-Man]," though he had no choice but to acquiesce to Marvel's editorial decisions.  (SUF ¶ 29; 54 at 4.)  Ditko thought that "Stan [Lee's] 'humor' dialogue undercut Peter Parker," that Lee's style prevented the teenage hero from "more serious growth" as a character, and that Lee pandered too much to the comic's readers.  (SUF ¶ 29; Ex. 52 at 4; Ex. 58 at 3.)  But those choices were not Ditko's to make, and Spider-Man developed into the character we know today.

### E.    Frustrated With The Constraints On His Creative Process And Output, Ditko Left Marvel.

Ultimately Ditko parted ways with Marvel in 1965, in favor of career opportunities that accorded him more independence.  (SUF ¶ 2.)  He went on to work for Charlton Comics, which was "low paying" compared to Marvel and other industry leaders but gave him "a lot more freedom."  (Ex. 54 at 4; Ex. 59 at 3.)  Ditko recalled that, despite the inferior compensation, he "got more out of working for them in developing [his] own art style, etc. tha[n] [he] got at Marvel, DC with their picky editors, 'corrections,' etc."  (Ex. 54 at 4.)  Ditko later turned to self-publishing, at which point he finally enjoyed the unchecked creative freedom he craved.

Steve Ditko died on June 29, 2018.  (Ex. 66 at 2.)  Although he could have lodged his own termination attempt as early as 2008,[9] he never pursued any copyright terminations in his lifetime.  To the contrary, Ditko expressly recognized that he had no right to terminate, as

---

[9] Marvel published the earliest work covered in the Notices in 1962, making the termination window (if any) run from 2018 to 2023.  *See* 17 U.S.C. § 304(c)(3).  A termination notice can be served up to 10 years in advance of its effective date.  *Id.* § 304(c)(4)(A).

-13-

memorialized in a written agreement in January 1979 acknowledging that all of the work he did for Marvel was made for hire.  (SUF ¶ 53; Ex. 23C at 24.)  Ditko reiterated that view in correspondence, writing that he understood he "had no real right to" any ideas he contributed "when published" by Marvel.  (SUF ¶ 54; Ex. 59 at 3.)  Although Ditko felt a certain "[m]oral creator[ship]" over his contributions, he recognized that the "[l]egal creator [was] Marvel comics."  (SUF ¶¶ 53-55; Ex. 57 at 3.)

Steve Ditko never married, had no children, and left no will.  As Patrick Ditko readily acknowledged, his brother was a very "private" person, and the two never once discussed his work for Marvel.  (Ex. 1, Patrick Ditko Dep. Tr. 21:3-9.)  With no first-hand knowledge, Defendant is in no position to question the work-made-for-hire status of Steve Ditko's contributions.  (Ex. 1, Patrick Ditko Dep. Tr. 31:5-17) (Q: "Do you think you're qualified, Mr. Ditko, to testify on whether Steve Ditko's work for Marvel from 1962 to 1966 was done on a work made for hire basis?" A: "I have no idea, no knowledge."  Q: "Do you know what it means to, for work to have been made on a work for hire basis?  A: "No."  Q: "Did you ever discuss with your brother Steve whether his work for Marvel was done on a work made for hire basis?" A: "No.").

### F.    Defendant Served Termination Notices On MCI, Seeking To Uproot MCI's Rights In And To The Works.

Between May 28 and July 16, 2021, Defendant served four notices[10] on MCI purporting to terminate alleged grants of the domestic copyright rights in various illustrated comic book stories to which Steve Ditko had allegedly contributed during his tenure as a Marvel freelancer.  (SUF ¶ 8.)  Defendant asserts that these supposed "grants" are comprised of the language "on the

---

[10] For this purpose, MCI counts both of Defendant's notices directed at *Amazing Fantasy*, Vol. 1 , No. 15 as a single notice.

back of the check(s) issued by Marvel Entertainment, LLC's predecessor company to Stephen J. Ditko."  (Ex. 62, Counterclaim Ex. A; Ex. 78, Complaint Exs. 2-6.)  Defendant, however, produced no such checks, much less the purported language on the back of them.  (SUF ¶ 57; Ex. 1, Patrick Ditko Dep. Tr. 28:12-23.)

Because the Notices created a cloud on Marvel's intellectual property rights, MCI initiated the instant litigation to affirm its long-held status as author and continued owner of the Works.  MCI thus seeks a declaratory judgment that the Notices are invalid and, as such, have no effect on MCI's ownership of the Works.

Defendant, in turn, filed a mirror-image counterclaim as to the claimed validity of the Notices.  Because they represent two sides of the same coin, the legal issues presented by the Complaint and Counterclaim can be readily decided in tandem.

## <u>ARGUMENT</u>

Summary judgment must be granted where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party may satisfy its burden by "pointing to the absence of evidence to support the nonmovant's claims."  *Myun-Uk Choi v. Tower Rsch. Cap. LLC*, 2020 WL 1503446, at *3 (S.D.N.Y. Mar. 30, 2020) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554 (1986)).  Once the moving party meets its burden, the non-moving party must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'"  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986) (emphasis in original).

A motion for summary judgment cannot be defeated "on the basis of conjecture or surmise."  *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996); *see D'Antonio v. Metro. Transp. Auth.*, 2010 WL 1257349, at *3 (S.D.N.Y. Mar. 31, 2010) (party cannot "escape

-15-

summary judgment" by "vaguely asserting the existence of some unspecified disputed material

facts").  Rather, the non-moving party must bring forward "affidavits, depositions, or other

sworn evidence" showing that a genuine issue of material fact exists.  *Rule v. Brine, Inc*., 85 F.3d

1002, 1011 (2d Cir. 1996).  When "the record taken as a whole could not lead a rational trier of

fact to find for the non-moving party, there is no genuine issue for trial," and summary judgment

is warranted.  *Cole v. Artuz*, 1999 WL 983876, at *2 (S.D.N.Y. Oct. 28, 1999) (quoting

*Matsushita*, 475 U.S. at 587, 106 S. Ct. at 1356 (internal quotation marks omitted)).

Marvel seeks summary judgment because, as the undisputed facts show, the Works were

all made for hire and thus not subject to the copyright termination regime.  Courts in other cases

have consistently found that works created by Marvel's comic book writers and artists—

including the prolific Jack Kirby—constitute works made for hire outside the reach of copyright

termination.  *See Kirby*, 726 F.3d at 143; *Marvel Worldwide, Inc. v. Kirby*, 777 F. Supp. 2d 720,

725 (S.D.N.Y. 2011); *In re Marvel Ent. Grp., Inc*., 254 B.R. 817, 834 (D. Del. 2000).  The *Kirby*

case in fact addressed several of the very same characters and comics at issue here.[11]  There is no

legal or factual basis for treating Steve Ditko's contributions any differently.  As in *Kirby*, the

Works here were created at Marvel's "instance" and at Marvel's "expense" and thus constitute

works made for hire.

### A.      The Works Were Created At Marvel's Instance.

The undisputed facts of this case align closely with those in *Kirby*.  Steve Ditko had a

"close and continuous" working relationship with Marvel when the Works were created.  *Kirby*,

726 F.3d at 141.  (SUF ¶ 45.)  Although he was a freelancer, Ditko was not simply hired for one-

---

[11] Among the many points of overlap, Jack Kirby's heirs served a copyright termination
notice for Issue 15 of *Amazing Fantasy*, which featured the first appearance of Spider-Man.  (Ex.
77.)  That notice was held invalid because Kirby's contributions to it were made for hire.

off projects here and there.  Rather, as with Jack Kirby, Ditko was "kept busy with assignments from Marvel" during the relevant time period, working predominantly for Marvel.  *Kirby*, 726 F.3d at 141.  (SUF ¶ 45.)

Ditko did not work on "spec," that is, creating a finished work and then looking for a potential buyer.  *See Kirby*, 726 F.3d at 141.  (SUF ¶ 48.)  At all relevant times, Marvel did not solicit or accept work on "spec"; it sought out talent—artists and writers—not pre-made content.  (SUF ¶¶ 23, 48.)  When Ditko penciled for the Works, he did so "pursuant to Marvel's assignment or with Marvel specifically in mind."  *Kirby*, 726 F.3d at 141.  (SUF ¶¶ 14, 23, 31, 33, 41-42, 44.)  He worked in concert with Marvel's universe of characters and narratives at the direction of Stan Lee or Marvel's other editors—and indeed could not have marketed his Marvel-centric drawings elsewhere.  (*E.g.*, SUF ¶ 43.)  It was thus his "ongoing partnership with Marvel"—and the resulting specific assignments from Marvel—that "induced" any contributions he made.  *Kirby*, 726 F.3d at 141.  (SUF ¶¶ 23, 31-33, 39, 41, 45-46.)

Ditko "worked within the scope of Marvel's assignments and titles," just like Jack Kirby and Marvel's other freelance artists.  *Kirby*, 726 F.3d at 141.  (SUF ¶¶ 23, 31-33, 39, 41-42.)  It was only after receiving an assignment from Marvel that Ditko would begin diving meaningfully into his work.  (SUF ¶¶ 23, 48.)  The entire process was driven by Marvel, whose editors dictated which artist would be working in which capacity on which comic book featuring which core characters.  (SUF ¶¶ 23, 31-33, 41-42.)  Marvel also dictated the method pursuant to which its artists would work: in the early years, a straightforward sequence from Stan Lee's plot to scripting (that is, if Lee did not write the script himself) to penciling to inking to lettering to coloring; and later, increasingly the innovative "Marvel Method" which progressed from Stan Lee's plot straight to penciling and only then to dialoguing and captioning.  (SUF ¶¶ 12-22.)

As with the works of Jack Kirby, Marvel performed a foundational "creative role" in the creation of the Works. *Kirby*, 726 F.3d at 141. Marvel's Stan Lee created or co-created most of the characters and titles that came to define Marvel's comic books. (SUF ¶¶ 13, 24, 40.) As Marvel's editor, Lee established a creative vision for what a given comic book would look like, thought up plot lines, and dreamed new characters into existence. (SUF ¶¶ 13, 24, 40.) Stan Lee's imagination and his own creative contributions as Marvel's editor thus laid the essential groundwork for Steve Ditko's subsequent contributions.

Marvel generally provided its freelancers with "specific instructions" at the outset of an assignment, shaping the work the freelancers would create. *Kirby*, 726 F.3d at 139; *Playboy Enters.*, 53 F.3d at 556. (SUF ¶¶ 13, 24, 40-41.) The editor (usually Stan Lee) would provide a synopsis, laying out the parameters for the script or the panels to be created. (SUF ¶¶ 13, 24.) He would instruct the contributor on what deliverable to produce—for example, 20 pages of penciled panels for *The Amazing Spider-Man* or a 5-page filler story for *Strange Tales*. (*See, e.g.*, Ex. 48 at 2.) Lee would frequently also dictate the narrative arc that should animate a given story, as well as the characters that should feature in it. (SUF ¶¶ 13, 24.) Often, the editor would specify some of the more granular details too, whether choreographing a fight scene or dictating the physical traits of characters or their surroundings. (SUF ¶ 24; *see, e.g.*, Ex. 70.) Typically, the editor would hold a plotting conference with the contributor to discuss the editor's vision and/or include further written notes to guide the contributor. (SUF ¶ 24; Ex. 13, Lee *Kirby* Dep. Tr. 41:13-19.) And the editor or production manager would set the deadlines by which each contributor's work had to be completed. (SUF ¶ 21.)

Marvel's freelance artists were accorded certain creative freedoms within the scope of their work—how to best manifest a plot element or build up to the climax, or the artistic style of

the drawings.  (SUF ¶¶ 14, 25; Ex. 13, Lee *Kirby* Dep. Tr. 20:11-21:22.)  But ultimately Marvel (again usually through Stan Lee) ran the show.  (SUF ¶¶ 15, 22-26, 28-30.)  Creativity, of course, is not antithetical to an artist-for-hire's work; to the contrary, it is central to the artist's role.

Indeed, work-for-hire artist Jack Kirby represented the pinnacle of creative discretion at Marvel, but his distinctive creativity did not render him any less of a work-made-for-hire contributor.  The Second Circuit had no trouble finding that Kirby worked at Marvel's instance, even though it was "beyond dispute" that he "made many of the creative contributions" that characterized the implicated works, "often thinking up and drawing characters on his own, influencing plotting, or pitching fresh ideas."  *Kirby*, 726 F.3d at 126-27.  As the Second Circuit observed, "the hired party's ingenuity and acumen are a substantial reason for the hiring party to have enlisted him," so the simple fact that "the hired artist indeed put his exceptional gifts to work for the party that contracted for their benefit" cannot undercut a work-made-for-hire finding.  *Kirby*, 726 F.3d at 142.  Even "[q]uestions of who created the characters"—which, in any event, was routinely Stan Lee—"are mostly beside the point."  *Id.*

Moreover, freelancers' creative leeway was always subject to the oversight of Marvel's editors and publisher.  (SUF ¶¶ 14, 22-30, 41-42, 47.)  Marvel both possessed and exercised the right to supervise the creation of the Works.  (SUF ¶¶ 14, 22-30, 41-42, 47.)  Marvel could and did demand changes and even reroute assignments where an artist's work product did not align with Marvel's vision or business needs.  (SUF ¶¶ 23, 26, 28, 41-42.)  Some changes were small, like wordsmithing a line of dialogue or adjusting the shape of a background character's body. (SUF ¶¶ 26, 28; Ex. 3, Larry Lieber Dep. Tr. 133:16-25; Ex. 29, at 2-4.)  Others were fundamental, like when Lee swapped Ditko for Kirby as Spider-Man's penciler because Lee preferred the former's nerdier and less glamorized depiction of the character.  (SUF ¶ 41; Ex. 13,

-19-

Lee *Kirby* Dep. Tr. 37:3-38:3.)  On rarer occasions, Marvel could and did decide not to publish unsatisfactory pages altogether.  (SUF ¶ 27.)  While Marvel gave its freelancers plenty of creative input, ultimately Marvel held the control.  (SUF ¶¶ 22, 30.)

In addition to direct control by Marvel's editors, artists were also subject to the control of the publisher, who had the ultimate authority over Marvel's operations—whether directing that a certain type of story be made, or vetoing a character idea or story element.  (SUF ¶¶ 22, 30; Ex. 13, Lee *Kirby* Dep. Tr. 18:17-19:17.)  For example, publisher Martin Goodman famously wanted Marvel to have its own team of Super Heroes that could rival the success of DC Comics' then-nascent Justice League, which prompted the creation of the Fantastic Four.  (Ex. 13, Lee *Kirby* Dep. Tr. 36:7-18.)  Goodman also had some idiosyncratic preferences about covers, for instance, decreeing that rats should never appear on them.  (*See* Ex. 55 at 4.)  As publisher, Goodman not only had say at the outset, but also approved every comic book issue before publication.  (SUF ¶¶ 22, 30.)  He could also approve a new comic book series or cancel one.  (SUF ¶¶ 22, 30; Ex. 4, Lee *SLMI* Dep. Tr. 124:3-125:4.)

Steve Ditko's work on Spider-Man exemplifies how Marvel operated during the relevant time period—and indeed, what it looks like to work for hire.  Ditko did not come up with the Spider-Man character or even ask to work on it; he "was given the job of drawing Spider-Man" at Stan Lee's behest.  (SUF ¶¶ 40-41; Ex. 48 at 3.)  By the time Ditko was brought onto the project, Lee had already conceived of Spider-Man—a new character who would bring "something different" to the universe of Marvel's comics.  (SUF ¶¶ 40-41; Ex. 13, Lee *Kirby* Dep. Tr. 74:6-75:5.)  Lee "felt it would be fun to do a teenager who isn't a sidekick but who is the real hero," and he also wanted the character to have a unique superpower that had not been seen in other characters before.  (SUF ¶ 40; Ex. 13, Lee *Kirby* Dep. Tr. 74:6-75:5.)  Lee recalled

struggling to "dream[] up a superpower," when "it finally occurred to [him], a guy who could stick to walls like an insect, crawl on a wall and stick to a ceiling." (SUF ¶ 40; Ex. 13, Lee *Kirby* Dep. Tr. 74:6-75:5.)

Ditko got the penciling assignment for Spider-Man only after Jack Kirby tried, and failed, to execute Lee's vision; Kirby's original pencils looked "a little bit too heroic" for the "nebbishy" and "nerdy" character Lee dreamed up. (SUF ¶ 41; Ex. 13, Lee *Kirby* Dep. Tr. 37:3-38:3, 75:9-11.) So Lee took Kirby off and assigned Ditko—for whom an "awkward" type of character came more naturally—to do the principal artwork instead. (SUF ¶ 41; Ex. 13, Lee *Kirby* Dep. Tr. 75:18-23.) Ditko drew the interior artwork for Spider-Man from Lee's synopsis and, as Ditko wrote in his own hand, "never claimed creating Spiderman." (SUF ¶¶ 41, 54; Ex. 57 at 3.)

Even when Marvel's artists were more involved with a character's origins, their contributions were made within the scope of ongoing relationships with Marvel, in the context of existing titles to which they were assigned to generate content, subject always to Marvel's supervision and editorial control. (SUF ¶¶ 22-30, 31-38, 45, 47.) This paradigm is illustrated by the creation of Doctor Strange, whose first appearance (albeit not his backstory or name) was crafted in large part by Ditko—but in the context of Ditko's longstanding work on the *Strange Tales* series and within the scope of his assignment from Marvel to produce a filler story for Issue 110, just like Ditko had done for Lee countless times before. (SUF ¶¶ 31-35; Ex. 27; Ex. 31.) And to any extent Marvel's supervisory powers were not exercised, that leeway was due to contributors' (including Ditko's) prior dealings with Marvel that "rendered fine-grained supervision unnecessary." *Kirby*, 726 F.3d at 139. (SUF ¶ 47.) Contributions of this nature readily fall within the settled work-made-for-hire framework. Indeed, no Marvel artist could lay

claim to more character creation than Jack Kirby, who was found to be an artist-for-hire even though he would "often think[] up and draw[] characters on his own, influenc[e] plotting, or pitch[] fresh ideas." *Id.* at 126-27.

In sum, precisely as the Second Circuit held in *Kirby*, "Marvel's inducement, right to supervise, exercise of that right, and creative contribution with respect to [Ditko's] work during the relevant time period is more than enough to establish that the works were created at Marvel's instance." *Kirby*, 726 F.3d at 141.

## B.    The Works Were Created At Marvel's Expense.

The undisputed facts likewise demonstrate that the Works were created at Marvel's "expense" in the sense relevant here. Marvel maintained consistent payment practices with its freelancers across the 1960s, so the evidence on this prong is *exactly* the same as it was in *Kirby*. *See id.* at 142-43. Each of Marvel's freelancers was paid a flat per-page rate for the work they performed; royalties were not part of the compensation structure. (SUF ¶¶ 49-51.) Marvel bore the entire risk of financial loss in a comic book's sales. (SUF ¶¶ 51-52.) Freelancers' compensation was not contingent upon sales; whether a book was a hit or a flop, the contributing writers and artists were paid just the same. (SUF ¶ 52.) In fact, the compensation scheme for freelancers was so divorced from sales that Marvel did not even share its sales figures with its writers and artists. (SUF ¶ 52; Ex. 79.)

Marvel had an ongoing working relationship with Steve Ditko, just as it did with Kirby. And it was in the context of this broader and longstanding relationship that Ditko made his contributions to the subject works. (SUF ¶¶ 45-47.) He worked on assignment and was paid for the pages he generated—by no means did he confront "materially uncertain prospects for payment" for his work. *Kirby*, 726 F.3d at 142. (SUF ¶¶ 49-50, 52.) Instead, like Kirby, when he "sat down to draw," "it was not in the hope that Marvel or some other publisher might one

day be interested enough in them to buy, but with the expectation, established through their ongoing, mutually beneficial relationship, that Marvel would pay him." *Kirby*, 726 F.3d at 142-43. And as with Kirby, "in the run of assignments, this expectation proved warranted." *Id.* at 143.

Even if certain pages never made it to publication, Marvel still paid its contributors for creating them—so long as Marvel had assigned the work, it paid the contributors their per-page rate. (SUF ¶ 50.) As Stan Lee explained, if he asked an artist to draw a story, but Marvel later decided not to use that story, "the artist would still keep the money because he had done the work." (SUF ¶ 50; Ex. 13, Lee *Kirby* Dep. Tr. 18:6-16.) After all, if Marvel changed its mind about whether to publish a story, "[i]t wasn't [the artist's] fault." (SUF ¶ 50; Ex. 13, Lee *Kirby* Dep. Tr. 18:6-16.) The same was true if Marvel simply did not like a given artist's interpretation and opted to swap him out for another contributor. (SUF ¶ 50.) Indeed, there is no evidence that Ditko was not paid for all the pages he submitted to Marvel. (SUF ¶ 50; Ex. 1, Patrick Ditko Dep. Tr. 28:24-29:3.)

Nor were Ditko's drawings "free-standing creative works, marketable to any publisher as a finished or nearly finished product." *Kirby*, 726 F.3d at 143. To the contrary, those works featured ideas and plots seeded by Stan Lee, built on themes and titles developed over Marvel's history, and were grounded in the Marvel universe and the suite of characters it comprised.

It was *Marvel* that expended the resources to establish and market its line of titles and characters. It was *Marvel* that held the rights to the characters that graced the pages of Ditko's drawings. It was *Marvel* that invested in other contributors to a given work—Ditko did not create a complete product on his own—and managed the work flow for each comic among writers, pencilers, inkers, and more. And it was *Marvel* that spearheaded the production process:

coloring, engraving, printing, and so on.  (SUF ¶¶ 12-22.)  Marvel hired, directed, supervised, coordinated, and compensated the suite of individuals who would step-by-step turn ideas into tangible comic book series.  (SUF ¶¶ 12-30, 49-50.)  In short, the Works "required both creative contributions and production work that Marvel supplied" and "[t]hat the [W]orks are now valuable is therefore in substantial part a function of Marvel's expenditures over and above the flat rate it paid" per page of drawings to Ditko.  *Kirby*, 726 F.3d at 143.

Ditko did shoulder some of the expense attached to creation—he paid for his own supplies like paper and pencils—but his expenditures paled in comparison to Marvel's investment.  (SUF ¶ 52.)  Of course, the same was true of Jack Kirby: it was undisputed that Marvel "did not pay for Kirby's supplies or provide him with office space," yet the Second Circuit held that his works were created at Marvel's expense.  *Kirby*, 726 F.3d at 142-43.

Thus, exactly as the Second Circuit held in *Kirby*, "Marvel's payment of a flat rate and its contribution of both creative and production value, in light of the parties' relationship as a whole, is enough to satisfy the expense requirement."  *Id.* at 143.  On the undisputed facts, Marvel has thus satisfied both the instance and expense prongs of the work-made-for-hire test.

### C.     Steve Ditko And Marvel Did Not Reach A Contrary Agreement.

Because Steve Ditko worked at Marvel's instance and expense, "a presumption arises that the works in question were 'works made for hire' under section 304(c)."  *Id*.  Defendant can overcome that presumption only by identifying "an agreement to the contrary"—i.e., stating that the works were *not* made for hire—that was entered "contemporaneous with the creation of the works."  *Id.*  No such contemporaneous agreement exists.

In fact, Defendant does not have a copy of a single written agreement, much less a grant, between Ditko and Marvel from the relevant time period.  (SUF ¶ 57; Ex. 1, Patrick Ditko Dep. Tr. 72:15-19.)  Rather, Defendant merely extrapolates from the legends on the back of

paychecks, from outside the relevant time period, provided to other artists featuring catch-all language about Marvel's ownership of the copyright, including statements that any copyright was assigned to Marvel.  To be clear, Defendant has not identified any paychecks provided to Steve Ditko in particular.  (SUF ¶ 57; Ex. 1, Patrick Ditko Dep. Tr. 28:12-23.)  But even if some or all of his paychecks included the same legends, the Second Circuit already held in *Kirby* that such legends were merely belt-and-suspenders language, not mutual agreements contrary to work-made-for-hire status:  "It is all too likely that, if the parties thought about it at all, Kirby's assignments at the time he was paid or later were redundancies insisted upon by Marvel to protect its rights; we decline to infer from Marvel's suspenders that it had agreed to give Kirby its belt."  *Kirby*, 726 F.3d at 143.  The same analysis applies here.

*       *       *

The instance and expense test yields a clear result in this case:  Steve Ditko made his contributions to the Works on a work-made-for-hire basis.  And because his contributions were works made for hire, they are statutorily exempt from termination.  17 U.S.C. § 304(c).  Defendant's termination notices are thus invalid.

Just as noteworthy as the factors that bear on the work-made-for-hire analysis are those that do not.  This case is not about the value of or artistry behind Ditko's work; working for hire does not demean one's talents.  MCI does not contest Ditko's skill with a pencil or his knack for storytelling.  Nor does MCI disagree that Ditko added value to its repertoire of comics over the years.  Defendant's emphasis on Ditko's talents and the import of his work is, for the inquiry at hand, nothing more than a distraction.  Indeed, so are the equities of the deal that Ditko originally struck; work performed at the instance and expense of the hiring party is work made for hire, no matter "how[] unbalanced and under-remunerative to the artist" that relationship may be (though,

-25-

to be clear, freelancing for Marvel offered a steady middle-class living for regular contributors). *Kirby*, 726 F.3d at 141.  (*See* Ex. 1, Patrick Ditko Dep. Tr. 153:3-6.)

The central issue in this litigation—and the one now before this Court—is remarkably narrow.  And it requires no value judgment on Steve Ditko's worth.  As the *Kirby* Court rightly pronounced, it is "beyond question" that "Marvel owes many of its triumphs" to its freelance contributors.  726 F.3d at 142.  It is equally beyond question that those artists made their skilled contributions on a work-for-hire basis.  Steve Ditko worked both at Marvel's instance and at Marvel's expense, putting the core of this litigation to rest.

## <u>CONCLUSION</u>

For the foregoing reasons, MCI's Motion for Summary Judgment should be granted. Judgment should be entered in favor of MCI and against Defendant on the Complaint and the Counterclaim in their entirety.

Dated:  May 19, 2023

**O'MELVENY & MYERS LLP**


By:        */s/ Daniel M. Petrocelli*
                Daniel M. Petrocelli

Daniel M. Petrocelli*
dpetrocelli@omm.com
Molly M. Lens
mlens@omm.com
Matthew Kaiser*
mkaiser@omm.com
1999 Avenue of the Stars, 8th Floor
Los Angeles, California 90067
Telephone:  (310) 553-6700
Facsimile:  (310) 246-6779

Allen Burton
aburton@omm.com
Danielle Feuer
dfeuer@omm.com
Times Square Tower
7 Times Square
New York, NY 10036
Telephone:  (212) 326-2000
Facsimile:  (212) 326-2061

* Admitted *pro hac vice*

*Attorneys for Marvel Characters, Inc.*