# EXHIBIT 4

1                  IN THE UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF COLORADO

3

4       _____

                                        )

5       STAN LEE MEDIA, INC.,           )

                                        )

6                 Plaintiff,            )

                                        )

7            vs.                        )  Civil Action No.

                                        )  1:12-cv-02663-WJM-KMT

8       THE WALT DISNEY COMPANY,        )

                                        )

9                 Defendants.           )

        _____)

10

11

12

13

14              VIDEOTAPED DEPOSITION OF STAN LEE

15                  Beverly Hills, California

16                  Thursday, March 14, 2013

17                         Volume 2

18

19

20

21      Reported by:

        ALENE M. CASTRO

22      CSR No. 4847

23      Job No. 1619771

24

25      PAGES 71 - 133

                                              Page 71

2021MARVEL-0131405

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                FOR THE DISTRICT OF COLORADO
 3
 4    _____
                                    )
 5    STAN LEE MEDIA, INC.,         )
                                    )
 6              Plaintiff,          )
                                    )
 7        vs.                       ) Civil Action No.
                                    ) 1:12-cv-02663-WJM-KMT
 8    THE WALT DISNEY COMPANY,      )
                                    )
 9              Defendants.         )
      _____)
10
11
12
13
14         Videotaped deposition of STAN LEE, Volume 2,
15    taken on behalf of Plaintiff, at 9601 Wilshire
16    Boulevard, Suite 700, Beverly Hills, California,
17    beginning at 8:55 a.m. and ending at 10:09 a.m. on
18    Thursday, March 14, 2013, before ALENE M. CASTRO,
19    Certified Shorthand Reporter No. 4847.
20
21
22
23
24
25
```

Page 72

2021MARVEL-0131406

```
 1    APPEARANCES:

 2

 3    For Plaintiff Stan Lee Media, Inc.:

 4         EISNER CAHAN GORRY CHAPMAN ROSS & JAFFE

 5         BY:  ROBERT S. CHAPMAN

 6         BY:  JAMES MOLEN

 7         Attorneys at Law

 8         9601 Wilshire Boulevard, Suite 700

 9         Beverly Hills, California 90210

10         (310) 855-3200

11         rchapman@eisnerlaw.com

12         jmolen@eisnerlaw.com

13

14    For Defendant The Walt Disney Company:

15         WEIL, GOTSCHAL & MANGES LLP

16         BY:  BRUCE R. RICH

17         BY:  RANDI W. SINGER

18         Attorneys at Law

19         767 Fifth Avenue

20         New York, New York 10153-0119

21         (212) 310-8152

22         bruce.rich@weil.com

23         randi.singer@weil.com

24

25
```

Page 73

2021MARVEL-0131407

```
 1    APPEARANCES (continued):

 2

 3    For Stan Lee Individually:

 4         SHERMAN & HOWARD

 5         BY:  MARK W. WILLIAMS

 6         Attorney at Law

 7         633 Seventeenth Street, Suite 3000

 8         Denver, Colorado  80202-3622

 9         mwilliams@shermanhoward.com

10         (303) 299-8211

11

12         --and--

13

14         GANFER & SHORE LLP

15         BY:  IRA BRAD MATETSKY

16         Attorney at Law

17         360 Lexington Avenue

18         New York, New York  10017

19         (212) 922-9250

20         imatetsky@ganfershore.com

21

22

23

24

25
```

Page 74

2021MARVEL-0131408

1    APPEARANCES (Continued):

2

3    Also Present:

4         MICHAEL WOLK, Walt Disney Corporate Representative

5         ELI BARD, Deputy Chief Counsel, Marvel

6         Entertainment

7

8    Videographer:

9         GRANT CIHLAR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 75

2021MARVEL-0131409

```
 1                          INDEX
 2    WITNESS                           EXAMINATION
 3    STAN LEE
 4    Volume 2
 5
 6                  BY MR. RICH                 82
 7                  BY MR. CHAPMAN             128
 8
 9
10                       EXHIBITS
11    NUMBER                                 PAGE
12    Exhibit 11   Excerpt from the Origins of    100
13                 Marvel Comics by Stan Lee
14
15    Exhibit 12   100 New Yorkers of the 1970s by   102
16                 Max Millard
17
18    Exhibit 13   Stan Lee Conversations        104
19
20    Exhibit 14   LexisNexis document, Stan Lee    108
21                 Abloom at 80; Marvel's Dad Plants
22                 Comics on Internet
23
24
25
```

Sarnoff, A VERITEXT COMPANY
877-955-3855

2021MARVEL-0131410

```
1    INDEX (Continued):

2                         EXHIBITS

3    NUMBER                                      PAGE

4    Exhibit 15   LexisNexis document, Superhero    110

5                 Worship; Stan Lee, The Original

6                 X-Man

7

8    Exhibit 16   Letter agreement dated April 9,    113

9                 1976 to Stan Lee from Marvel

10                Entertainment; M_CJ7 14477-14479

11

12   Exhibit 17   Letter agreement dated April 1,    115

13                1980, to Stan Lee from Marvel

14                Entertainment; Lee 0054-0062

15

16   Exhibit 18   Letter agreement dated April 1,    116

17                1980, to Stan Lee from Marvel

18                Entertainment; Lee 0067

19

20   Exhibit 19   Letter agreement dated March 28,   117

21                1988, to Peter Bierstedt from

22                Engel & Engel; Lee 0071-0072

23

24

25
```

Sarnoff, A VERITEXT COMPANY
877-955-3855

2021MARVEL-0131411

```
 1   INDEX (Continued):

 2                         EXHIBITS

 3   NUMBER                                      PAGE

 4   Exhibit 20   Employment Agreement dated       118

 5                12/22/89 between Stan Lee and

 6                Marvel Entertainment Group; Lee

 7                0083-0085

 8

 9   Exhibit 21   Employment Agreement dated 4/1/94  120

10                between Stan Lee and Marvel

11                Entertainment; Lee 0095-0097

12

13   Exhibit 22-A Employment Agreement dated April   121

14                1, 1994, between Stan Lee and

15                Marvel Entertainment Group; Lee

16                0101-0105

17

18   Exhibit 22-B Employment Agreement dated April   122

19                12, 1994 between Stan Lee and New

20                World Family Filmworks Ltd.; Lee

21                0106-0109

22

23   Exhibit 23   Excelsior The Amazing Life of      128

24                Stan Lee by Stan Lee and George

25                Mair
```

Sarnoff, A VERITEXT COMPANY
877-955-3855

2021MARVEL-0131412

```
1    INDEX (Continued):

2

3              PREVIOUSLY MARKED EXHIBITS*

4                NUMBER              PAGE

5                  2                 111

6

7              * Retained by Counsel

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Sarnoff, A VERITEXT COMPANY
877-955-3855

2021MARVEL-0131413

```
1    called Timely.  Actually, the parent company I think
2    was Magazine Management or something like that.  And
3    they had other books.  They had movie books, men's
4    books and so forth.  And I went up there, and I
5    found out -- I didn't know until I got up there that   08:58:12
6    the job they had was in the comic book department.
7    So a job was a job, and I took the job.  I was an
8    assistant to the two people who really ran the
9    department, Joe Simon and Jack Kirby.
10        Q    And am I correct that Timely, over time      08:58:29
11   through various corporate changes, became what we
12   know to be Marvel Comics today?
13        A    That's right.
14            MR. CHAPMAN:  Objection; leading the
15   witness.                                              08:58:40
16   BY MR. RICH:
17        Q    And who at the time was running Timely?
18   Who was the ultimate boss?
19        A    The ultimate boss at that time was Martin
20   Goodman, the publisher.                               08:58:48
21        Q    Now, so for a period of time you were an
22   assistant to, you indicated, two individuals, one of
23   whom, as I recall, is Jack Kirby; is that correct?
24        A    That's right.
25        Q    And did there come a time when you were     08:58:59
```

Page 83

2021MARVEL-0131417

```
 1        Q    And as a rule, what was the rule with

 2    respect to a writer like you being paid on a work,

 3    did it depend on whether the work, for example, was

 4    actually published?

 5        A    Well, they were all published.  There were     09:08:00

 6    no exceptions.  Everything that I wrote was

 7    published.  And just about everything the other

 8    writers wrote was published -- were published.

 9        Q    Did you --

10        A    Was.                                            09:08:12

11        Q    -- did you receive, during the period of

12    time we've been discussing, any other compensation,

13    for example, any profit participations in connection

14    with creating these various characters?

15            MR. CHAPMAN:  Objection; compound.              09:08:23

16    BY MR. RICH:

17        Q    You can answer.

18        A    No, not that I can recall.

19        Q    Did you receive any promise of any such

20    other compensation at the time you created these       09:08:30

21    works?

22        A    No.

23        Q    Now, beginning at the time that you took on

24    these multiple roles that you described, were you

25    supervising other contributors?                        09:08:44
```

Page 93

2021MARVEL-0131427

```
 1        A   Other writers?

 2        Q   Yes.

 3        A   Oh, sure.

 4        Q   And other artists?

 5        A   Yes.                                09:08:51

 6        Q   And what was -- would you describe

 7   generally the process by which a particular issue or

 8   project came together and what your role was in

 9   supervising that project.

10        A   Well, the books had to be published on a   09:09:03

11   regular basis.  Most of them were monthly.  So after

12   one book had been published, we needed another book

13   all ready to go to the printer 30 days later.  If

14   that book didn't make the printing date, the

15   publisher would have to pay for the printing time   09:09:23

16   anyway.  So it was like life or death that no book

17   be late.  I remember in my -- I had a small office.

18   I had a clock on all four walls so wherever I was

19   facing, I could see what time it was because this

20   artist had to come up at this time, this writer had   09:09:42

21   to be up.

22            And I would read the script, and I would

23   make some suggestions -- there's too much dialogue

24   here or this doesn't sound like what this fellow

25   would really say or -- whatever suggestions I would   09:09:56
```

Page 94

2021MARVEL-0131428

```
 1    course.  And in the artwork, the penciller was the

 2    most important one.  He drew the script.  But then

 3    in order for it to be photographed and reproduced

 4    well, somebody had to go over his pencil drawings

 5    with ink, and that was the inker.  I don't know how      09:12:35

 6    I could have forgotten him.

 7        Q    And what was your role in seeing how all

 8    these various pieces came together?

 9        A    It was my responsibility, the whole thing.

10        Q    And did anything ever see the light of day,      09:12:48

11    so to speak, that is, become published without your

12    oversight and approval of the elements and the

13    outcome and the end of that process?

14        A    Not while I was there, working there, no.

15        Q    And were you the ultimate person to make        09:13:02

16    the decision whether the final work was published,

17    or were you in turn subject to the oversight in

18    terms of the ultimate publishing decision of anyone

19    else?

20        A    I was always subject to the oversight and       09:13:15

21    the ultimate decision of Martin Goodman, the

22    publisher, always.

23        Q    Now, throughout your career and your

24    development of the many characters, some of which

25    you've identified specifically this morning, what       09:13:32
```

Page 97

2021MARVEL-0131431

```
 1    contributions of the other people who also

 2    contributed?  You testified as to your understanding

 3    as to your contributions.  What about as to the

 4    other?

 5           MR. CHAPMAN:  Same objection.            09:14:37

 6           THE WITNESS:  Well, Martin Goodman was the

 7    publisher.  He owned the company.  And the company

 8    issued the checks.  And we all worked -- including

 9    me -- we all worked for Martin Goodman.  I always

10    assumed he's the fellow who owns everything.      09:14:50

11    BY MR. RICH:

12        Q    Now, through the period of the 1960s, did

13    you have any written agreements with Timely or,

14    later, any of the other Marvel entities?

15        A    I had agreements.  I don't know if they    09:15:05

16    were as early as the 1960s.  I can't think of any.

17        Q    Did you ever tell Mr. Goodman during the

18    period of your work at -- during the time he was

19    supervising your activities that you had an

20    understanding that you, Mr. Lee, had an            09:15:26

21    understanding that you personally owned copyright

22    rights in any of your work?  Did you ever have that

23    conversation or make that statement to Mr. Goodman?

24           MR. CHAPMAN:  Objection; leading.

25    BY MR. RICH:                                       09:15:40
```

                                                    Page 99

2021MARVEL-0131433

```
 1    I recall, of something called "Amazing Fantasy"?

 2        A    Right.

 3        Q    What was "Amazing Fantasy"?

 4        A    Well, that was a book I worked on with an

 5    artist called Steve Ditko, and I loved that book.  I      10:00:12

 6    wrote little unusual stories.  They weren't horror

 7    stories.  They were -- but they were like a mixture

 8    of science fiction and horror.  And they were all

 9    about five pages, and they had a lot per issue.  And

10    they were for older readers.  I tried to use a            10:00:34

11    better vocabulary, and we tried to get very surprise

12    endings in every story.  The people who read the

13    book loved them, but not enough people bought

14    because they weren't superhero books as such.  They

15    were books with five separate stories of incidents,      10:00:53

16    and they didn't sell that well.  So even though I

17    loved the books, Mr. Goodman decided to cancel them

18    because they weren't selling.

19        Q    So it was his decision -- it was

20    Mr. Goodman's ultimate decision whether to publish       10:01:03

21    one or more editions of those books, and he

22    exercised that authority, is that what you're

23    saying?

24        A    He always had that, yes.  It was always his

25    decision.                                                10:01:16
```

Page 124

2021MARVEL-0131458

```
1        Q    And he exercised the authority ultimately
2    to publish the last edition of "Amazing Fantasy";
3    correct?
4        A    Right.
5            MR. CHAPMAN:  Objection; leading.          10:01:24
6    BY MR. RICH:
7        Q    And were you paid your usual per page rate
8    for the contribution you made, the Spider-Man
9    contribution that appeared in that last issue of
10   "Amazing Fantasy"?                                 10:01:34
11       A    Yes, I was paid my usual rate for
12   everything I wrote.
13       Q    Including that contribution?
14       A    Yes.
15       Q    And was Mr. Ditko, to your knowledge, paid 10:01:40
16   his per page rage for his contribution to that
17   insertion of Spider-Man?
18       A    As far as I remember.
19       Q    Okay.  Now, you testified at some length
20   earlier this morning to the overall process by which 10:01:52
21   many of the characters in which you played a
22   creation role came to be.  There is much written
23   generally about something called the "Marvel
24   method."  Are you familiar with that term?
25       A    Oh, yes.  I started it.                    10:02:10
```

Page 125

2021MARVEL-0131459

```
 1        Q    Sir, this is an excerpt of the
 2   autobiography.  Is this the autobiography that you
 3   were talking about?
 4        A    Yes, it is.
 5        Q    So this fellow George Mair was the writer    10:06:57
 6   who you said you had to rewrite about 75 percent of
 7   it?
 8        A    Right.
 9        Q    Okay.  Now, sir, I want to talk to you
10   briefly about memory.                                  10:07:09
11        A    About what?
12        Q    Memory.  When you say you were paid for
13   something in the 1960s, that's a long time ago.
14        A    Yeah, it sure is.
15        Q    And when you say you were paid, say, for    10:07:22
16   creating Galactus, do you actually have a
17   recollection that you received your paycheck, or are
18   you just assuming that you got paid because that's
19   what happened normally?
20            MR. WILLIAMS:  Object to the form of the     10:07:40
21   question.
22   BY MR. CHAPMAN:
23        Q    You can go ahead and answer.
24        A    Well, I can't remember specifically being
25   paid for any one thing.  But I do know that every     10:07:47
```

Page 129

2021MARVEL-0131463

1     story that I wrote, and Galactus was no exception, I

2     would put in a voucher for it, and I would get a

3     check.  So I have no reason to think I wasn't paid

4     for that.

5         Q   Okay.  No reason to think you weren't paid,   10:08:04

6     but you don't have a specific recollection of being

7     paid?

8         A   I don't have a recollection of being paid

9     for any specific story.

10        Q   In the '60s?                                 10:08:16

11        A   Pardon me?

12        Q   We're talking about the 1960s?

13        A   At any time.

14            MR. CHAPMAN:  I have no more questions.

15    Anything else?                                       10:08:43

16            MR. RICH:  Nothing further from us.

17            MR. WILLIAMS:  Okay.  Mr. Lee, your

18    deposition is concluded.

19            THE WITNESS:  Oh, thank you.

20            MR. WILLIAMS:  The witness is released?       10:08:50

21            MR. CHAPMAN:  You made some privilege

22    objections yesterday, which, as I mentioned, were

23    not proper.  We may have to choose to test those, in

24    which case Mr. Lee would have to come back.  So he's

25    not released if that's going to go forward.  So with  10:09:05

2021MARVEL-0131464

1
2
3
4          I, STAN LEE, do hereby declare under
5     penalty of perjury that I have read the foregoing
6     transcript; that I have made any corrections as
7     appear noted, in ink, initialed by me, or attached
8     hereto; that my testimony as contained herein, as
9     corrected, is true and correct.
10         EXECUTED this 22 day of April 2013,
11    at _____ , _____.
                  (City)                    (State)
12
13
14
15
                    _____
16                  STAN LEE
                    Volume 2
17
18
19
20
21
22
23
24
25

                                        Page 132

2021MARVEL-0131466

# ACKNOWLEDGMENT

State of California
County of _Los Angeles_                    )

On _April 22, 2013_ before me, _Kimberly Luperi_
_____
(insert name and title of the officer)

personally appeared _Stan Lee_
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____    (Seal)

KIMBERLY LUPERI
Commission # 1949954
Notary Public - California
Los Angeles County
My Comm. Expires Aug 27, 2015

2021MARVEL-0131467

```
 1              I, the undersigned, a Certified Shorthand

 2    Reporter of the State of California, do hereby

 3    certify:

 4              That the foregoing proceedings were taken

 5    before me at the time and place herein set forth;

 6    that any witnesses in the foregoing proceedings,

 7    prior to testifying, were administered an oath; that

 8    a record of the proceedings was made by me using

 9    machine shorthand which was thereafter transcribed

10    under my direction; that the foregoing transcript is

11    a true record of the testimony given.

12              Further, that if the foregoing pertains to

13    the original transcript of a deposition in a Federal

14    Case, before completion of the proceedings, review

15    of the transcript [ ] was [ ] was not requested.

16              I further certify I am neither financially

17    interested in the action nor a relative or employee

18    of any attorney or any party to this action.

19              IN WITNESS WHEREOF, I have this date

20    subscribed my name.

21

22    Dated: March 16th, 2013

23    _____

24              ALENE M. CASTRO

25              CSR No. 4847
```

                                                  Page 133

2021MARVEL-0131468