# EXHIBIT 6

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

```
---------------------------x
GARY FRIEDRICH ENTERPRISES)
LLC et al,                )
                          )
            Plaintiffs,   )
                          )
      -against-           )No. 08-CV-01533(BSJ)(JCF)
                          )
MARVEL ENTERPRISES, INC., )
et al.,                   )
                          )
            Defendants.   )
---------------------------x
```

REVISED

VIDEOTAPED DEPOSITION OF STAN LEE

Beverly Hills, California

Wednesday, May 4, 2011

Reported by:

SUSAN A. SULLIVAN, CSR #3522, RPR, CRR

JOB NO. 38463

May 4, 2011

9:09 a.m.

VIDEOTAPED DEPOSITION OF STAN LEE, taken by Defendants, at the offices of Rosenfeld Meyer ,9601 Wilshire Boulevard, Beverly Hills, California, before Susan A. Sullivan, CSR, RPR, CRR, State of California.

A P P E A R A N C E S:

RIEZMAN BERGER

Attorneys for the Plaintiffs

7700 Bonhomme Avenue

St. Louis, Missouri 63105

BY: CHARLES S. KRAMER, ESQ.

HAYNESBOONE

Attorneys for the Defendants

30 Rockefeller Plaza

New York, New York 10112

BY: DAVID FLEISCHER, ESQ.

-and-

ELI BARD, Deputy General Counsel

Marvel Entertainment, LLC

135 West 50th Street

New York, New York 10020

ROSENFELD, MEYER & SUSMAN

Attorneys for the Witness

9601 Wilshire Boulevard

Beverly Hills, California 90210

BY: TODD W. BONDER, ESQ.

VIDEOGRAPHER: BRENT JORDAN

Q And do you have any present intention to move from that location in the near future?
A No.
Q At some point were you employed with a company that published comic books under the Marvel trade name?
A Yes.
Q When did you first become associated with a company that published Marvel Comics?
A Oh, golly. It was 1940; '39, '40, something like that.
Q Do you recall the name of that company?
A At the time it was called Timely Comics, at least the comics section was. They also published other books. I don't know what name they used.
Q And at some point did Timely Comics sell or transfer the Marvel comic book business to another company?
A Well, they were bought by a company called Perfect Film and Chemical which later became Cadence Industries and that was later sold to New World and then it ended up with where it is now.
Q Was Timely Comics a division of a company known as Magazine Management Company?
A It was, yes.

Q So to the best of your recollection when you first began work for a company that published Marvel Comics the company name was Magazine Management Company?

A When I started working?

Q Right.

A I don't remember. I just knew it as Timely Comics.

Q In the late 1960s into the early 1970s was the company that was publishing Marvel Comics known as Magazine Management Company?

A I really am not good at dates. They change their name so often, I'm not sure when it was.

Q When Perfect Film acquired the Marvel Comics business did that acquisition affect the day-to-day operations in any way?

A Not really. Not that I know of.

Q What was the position that you held with the company at the time that Perfect Film acquired the Marvel Comics business?

MR. FLEISCHER: Objection; form.

THE WITNESS: Pardon me?

MR. FLEISCHER: I'm just making an objection for the record, Stan.

THE WITNESS: I was head writer, editor and art

director.

Q BY MR. KRAMER: Just to clean up the record a second, let me back up a little bit.

At the time that Perfect Film acquired the Marvel Comics business you were employed in connection with that business, correct?

A Yes.

Q And at that time you have indicated your position was head writer, editor?

A And art director.

Q And art director.

During the time period immediately before the sale of the company to Perfect Film, do you recall which company or companies issued the checks that you received in conjunction with your employment?

A Oh, no.

Q After the acquisition by Perfect Film do you know which company issued the checks?

A No.

Q Do you recall whether you ever received any checks that came from the company Perfect Film and Chemical?

A No.

Q Do you recall whether you ever received

checks that came from a company known as Cadence?

A No.

Q And by no, you don't remember?

A I don't. I never looked at the checks, who they came from.

Q Are you aware that after the time that Cadence or Perfect Film acquired the Marvel Comics business they established a division known as the Marvel Comics Group?

MR. FLEISCHER: Objection.

THE WITNESS: Yeah. I mean, I don't know when it happened, but I know there was a Marvel Comics Group.

Q BY MR. KRAMER: After the establishment of the Marvel Comics Group do you know what types of business activities were done by the Marvel Comics Group and which activities were still done by Magazine Management Company?

MR. FLEISCHER: Objection.

THE WITNESS: Can I answer?

MR. FLEISCHER: Yes.

THE WITNESS: As far as I know, Marvel Comics Group did the comic books and Magazine Management was the overall company that did all the other magazines. They had all different kinds of

magazines.

Q BY MR. KRAMER: In the period between 1969 and 1972-73, were you involved in any way in determining whether or not any trademarks would be registered in conjunction with Marvel Comics?

A No.

Q During that same time period were you involved in any way in determining whether or not a copyright would be registered with respect to a comic book when it was published?

A No.

Q Do you know who made those decisions?

A Pardon me?

Q Do you know who made those decisions?

A I assume someone in the business office but no, I don't.

Q In the late 1960s, early 1970s could you generally describe what your day-to-day activities were as head writer, editor and art director?

A Well, I wrote a lot of the books. I also worked with the artists, I gave out assignments, I gave out writing assignments, I gave out art assignments, I checked all the artwork to make sure it was the way I wanted it to be. I didn't have time really to read scripts that other people had

Q And do you recall when approximately you became publisher?

A No, I don't. It was somewhere in the early seventies or middle seventies.

Q Was that shortly after the period when you were doing a lot of lecturing?

A After the what?

Q The period after you were doing the traveling and lecturing.

MR. FLEISCHER: Objection.

THE WITNESS: They happened almost the same -- when I became publisher I did more and more traveling and lecturing.

Q BY MR. KRAMER: Are you familiar with a man named Gary Friedrich?

A Yes.

Q When did you first meet Gary Friedrich?

A I don't know.

Q What were the circumstances in which you came to meet him?

A Well, he did some writing for us so I had met him but, I mean, there was nothing special about my meetings with him that I would remember. We had so many freelance writers.

Q So Mr. Friedrich was a freelance writer who

or artist be paid?

MR. KRAMER: Object to form, foundation.

THE WITNESS: Well, according to the artist and writer, not enough. They were -- I don't know what you mean. They were usually paid per page, they had a page rate. A writer would get so much a page for a story and a penciller would get so much, an inker would, a letterer would, and so forth.

Q BY MR. FLEISCHER: And at what point in time in the process that you've described would the writer and/or the artist receive payment for the pages comprising this story?

MR. KRAMER: Object to form and foundation.

THE WITNESS: I missed the verb. At what point did they what?

Q BY MR. FLEISCHER: At what point in the process would the artist or writer be paid for the work embodied in the comic book?

MR. KRAMER: Object to form and foundation.

THE WITNESS: I assume when they handed in the work or very -- we had things called vouchers. They would fill out a voucher saying what they did and what the price per page was and what the total was and they would hand in the voucher and then whenever, a week later, two weeks, whatever the

company's rule was, they would get the check.

Q BY MR. FLEISCHER: Okay. Would they get the check before the comic book actually went on sale?

MR. KRAMER: Objection; foundation.

THE WITNESS: I would think so but I'm not sure because it depended how quickly the comic went on sale and what the company's policy was. I never really paid any attention to that type of thing.

Q BY MR. KRAMER: Okay. Was the artist or writer receiving a page rate for the work on a comic book paid anything in the 1992 period and before based on the success or failure at the newsstand of the comic book?

MR. KRAMER: Object to form and foundation.

THE WITNESS: Not. Not that I know of, no.

Q BY MR. KRAMER: I think I may have said '92. I mean 1972 and earlier.

A Say the whole thing again because I forgot it.

Q Okay.

In the period from the time you started with Marvel through 1972 --

A Until 1972, you mean.

Q Yeah.

-- would the artist or writer receiving a page rate receive any compensation in addition to that dependent on the success of the sales of the comic book?

MR. KRAMER: Object to form and foundation.

THE WITNESS: It wasn't our policy. I can't think of any case where that happened.

Q BY MR. FLEISCHER: Okay.

Now after the colorist did the work that you've described with the silver prints, et cetera, the book would go to a printer; is that correct?

A Well, it would actually go to the engraver and then to the printer. There was even somebody in between, I don't remember the name, it was complicated in those days. But essentially, yeah.

Q And can you give me a range --

A I think it was called a mat maker. It also went to a mat maker. Sorry.

Q How long after a story was penciled, lettered and inked would it typically take before it hit the newsstands?

MR. KRAMER: Objection; form and foundation.

THE WITNESS: I'm not sure. I'd say probably a couple of months. It could vary.

Q BY MR. FLEISCHER: I think you mentioned

is paying the printer who is not printing the book. So my biggest responsibility next to making the books good was making sure those books were delivered to the printer on time every month.

Q And just so the record is clear, who paid the printer?

A The publisher.

Q Can you recall any instance during your tenure as editor from the beginning of your employment by Marvel in 1939 or 1940 through 1972 where a writer or artist brought a work to you and asked you if you wanted to publish it?

MR. KRAMER: Objection; form and foundation.

THE WITNESS: I don't recall any, no.

Q BY MR. FLEISCHER: Do you recall any comic book that Marvel published prior to 1972 and including 1972 that was created other than pursuant to a specific assignment by an editor to a writer and an artist?

MR. KRAMER: Objection to form and foundation.

THE WITNESS: Not in our regular comics, no.

Q BY MR. FLEISCHER: When you say not in our regular comics, what do you mean?

A I mean he had other books that, you know, that were different, men's magazines and other

things, but with the comics, no, I don't recall any.

Q Would you describe what the role of the art director and the editor was, what the function of editing and art directing a comic book is.

MR. KRAMER: Objection; form and foundation.

THE WITNESS: Well, essentially what the title says. The art director, which was usually me until I stopped being active, looked over the artwork and said, "Gee, I think that ought to be a closeup instead of a long shot or it is a little hard to understand what he is doing, can you clarify that panel." You know, you would discuss the artwork with the artist. The editor did the same thing. He said, "I think that dialogue, it doesn't sound like this guy would really talk, he is out of character," or "This is too difficult for a younger reader to understand" or "You are putting in too much dialogue, I can't see the illustration clearly enough." I mean, anything that had to do with the dialogue or the artwork, that's what they worked on.

Q BY MR. FLEISCHER: Were there any artists or writers who were not subject to the review by an editor and/or an art director?

A No.

MR. KRAMER: Objection; form and foundation.

THE WITNESS: No, absolutely not.

Q BY MR. FLEISCHER: Did the editor have the authority to make changes in dialogue or captions that had been written by a writer?

A That was his job.

Q And did the art director have the authority to make changes in artwork or modify artwork?

A Yes.

Q And did the editor have the authority to remove a writer or an artist from a particular book and assign another writer or artist to that book?

MR. KRAMER: Objection; form and foundation.

THE WITNESS: Yes.

Q BY MR. FLEISCHER: Now in your capacity as a writer you were paid separately from your salary as an editor; is that correct?

A Right.

Q And as a writer how were you paid?

A Per page on a freelance basis like all the other writers.

Q Okay. And when you received your payments for your freelance work, was that by check?

A Yes.

Q And during the period of, say, 1971-1972, do you recall whether there was any kind of legend

on the reverse side of the checks?

MR. KRAMER: Objection; form and foundation.

THE WITNESS: That legend was on the checks for a long time, I can't tell you exactly what dates, but I remember those legends, yeah.

Q BY MR. FLEISCHER: And I'm not going to ask you to recite verbatim what the legend was but do you recall what the gist of the legend was?

A Yeah. That you were -- you were drawing -- I guess it was that work for hire thing. You were just somebody who is doing something that the company owned and you didn't own it. That was the intent of it.

Q Did artists or writers have the ability to assign themselves comic book stories at Marvel?

A To assign themselves? What do you mean by that?

Q Could an artist or a writer decide to write a comic book or draw a story without first receiving an assignment from an editor?

MR. KRAMER: Form and foundation.

THE WITNESS: Not for us. I mean, they can do whatever they wanted but everything that we published was an assignment we gave them.

Q BY MR. FLEISCHER: Do you have any

Q And you have received at least that million dollars a year for at least the last five years?

A Oh, more than that.

MR. KRAMER: That's all I have.

MR. FLEISCHER: No further questions.

MR. KRAMER: Thank you.

THE WITNESS: Now your turn.

MR. FLEISCHER: I'm done.

THE WITNESS: Now I guess you want to.

MR. BONDER: If you want.

THE VIDEOGRAPHER: This marks the end of the deposition. Off video at 10:03 a.m.

///

///

///

________________________
STAN LEE

Subscribed and sworn to

Before me this day

of 20 .

______________________________

State of California )
) ss.
County of Los Angeles )

I, SUSAN A. SULLIVAN, CALIFORNIA CSR No. 3522, RPR, CRR, do hereby certify:

That prior to being examined STAN LEE, the witness named in the foregoing deposition, was, before the commencement of the deposition, duly administered an oath in accordance with C.C.P. Section 2094;

That the said deposition was taken before me at the time and place therein set forth, and was taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision; that the said deposition is a true and correct record of the testimony given by the witness;

I further certify that I am neither counsel for, nor in any way related to any party to said action, nor in any way interested in the outcome thereof.

IN WITNESS WHEREOF, I have subscribed my name on this 16th day of May, 2011.

Sue Sullivan

Sue SUllivan, CSR

INDEX

| TESTIMONY OF STAN LEE | PAGE |
| --- | --- |
| Examination by Mr. Kramer | 5 |
| Examination by Mr. Fleischer | 28 |
| Examination by Mr. Kramer | 42 |

| EXHIBITS: | PAGE |
| --- | --- |
| Lee Exhibit 1, a copy of a comic book | 16 |
| Lee Exhibit 1, a copy of a comic book | 24 |
| Lee Exhibit 3, a copy of a comic book, Bates Nos. MVL-00014499 to MVL-00014533 | 25 |