# EXHIBIT 16

# In The
# United States District Court
# District of Delaware

IN RE: MARVEL ENTERTAINMENT GROUP, INC., et al.,

*Debtors,*

-vs-

MARVIN WOLFMAN,

*CASE NO. 97-638 (RRM)*

## DEPOSITION OF ROY THOMAS
### October 13, 1999



TRAVELING TRANSCRIPT™

# A W R
PROFESSIONALS SERVING PROFESSIONALS

## A. WILLIAM ROBERTS, JR. & ASSOCIATES

CHARLESTON (843) 722-8414     COLUMBIA (803) 731-5224
GREENVILLE (864) 234-7030     CHARLOTTE (704) 573-3919

**1-800-743-DEPO**

2021MARVEL-0051131

Page 1

```
         UNITED STATES DISTRICT COURT
              DISTRICT OF DELAWARE

IN RE: MARVEL ENTERTAINMENT GROUP, INC., ET AL.,
          Debtors,
                              CASE NO. 97-638 (RRM)
         vs.
MARVIN WOLFMAN


PARTIAL TELEPHONE
DEPOSITION OF:       ROY THOMAS

DATE:                October 13, 1999

TIME:                6:30 PM

LOCATION:            Fairfield Inn
                     663 Citadel Road
                     Orangeburg, SC

TAKEN BY:            Counsel for the Debtors

REPORTED BY:         LESLIE TOOLE STANLEY,
                     Certified Shorthand Reporter


         A. WILLIAM ROBERTS, JR., & ASSOCIATES

Charleston, SC                   Columbia, SC
(843) 722-8414                   (803) 731-5224

Greenville, SC                   Charlotte, NC
(864) 234-7030                   (704) 573-3919
```

Page 2

```
APPEARANCES OF COUNSEL:

  ATTORNEYS FOR THE DEBTORS/PLAINTIFF
    MARVEL ENTERTAINMENT GROUP:

     BATTLE, FOWLER
     BY: JODI KLEINICK
     75 East 55th Street
     New York, NY 10022
     (212) 856-7034

  ATTORNEYS FOR MARVIN WOLFMAN:

     KLEINBERG & LERNER
     BY: MICHAEL DILIBERTO
         ADRIAN ASKARIEH
     2049 Century Park East
     Suite 1080
     Los Angeles, CA 90067-3112
     (310) 557-1511
     (Appearing via telephone)











         (INDEX AT REAR OF TRANSCRIPT)
```

Page 3

1  STIPULATION
2      It is stipulated by and among Counsel that
3  this deposition is being taken in accordance with the
4  Federal Rules of Civil Procedure, that all objections
5  as to Notice of this deposition are hereby waived; that
6  all objections except as to form are reserved until the
7  time of trial; and that the deponent does not waive
8  reading and signing of this deposition.
9        *  *  *  *  *  *  *  *  *  *
10         ROY THOMAS,
11 being first duly sworn, testified as follows:
12         EXAMINATION
13 BY MS. KLEINICK:
14     Q. Can you please state your full name and
15 address for the record, please?
16     A. Roy William Thomas, Junior. My address is
17 Route 3, Box 468, St. Matthews, South Carolina 29135.
18     Q. Mr. Thomas, I'm going to show you a
19 document. I'd like to have this marked as Thomas
20 Exhibit 1 for identification. And I'll ask you if you
21 recognize it.
22         MS. KLEINICK: This is a subpoena, Michael.
23         MR. DILIBERTO: Okay.
24         THE WITNESS: Okay --
25         (THOMAS EXH. 1, U.S. District Court

Page 4

1  Subpoena, was marked for identification.)
2  BY MS. KLEINICK:
3      Q. Okay --
4      A. Because I didn't pay much attention to it --
5  it looks like the subpoena.
6      Q. Are you testifying here pursuant to a
7  subpoena?
8      A. Yes.
9      Q. Mr. Thomas, describe your educational
10 background.
11     A. Regular school, high school, went to college
12 at Southeast Missouri State College, now University, in
13 Cape Gerardo, Missouri. Graduated there in 1961.
14     Q. What was your degree in?
15     A. BS, Bachelor of Science, in Education.
16         (Off-the-record conference.)
17 BY MS. KLEINICK:
18     Q. When you graduated from college, what did you
19 do for employment?
20     A. I taught high school English for four years
21 in a couple of high schools in Missouri.
22     Q. So that would be until 1965, approximately?
23     A. 1965, yes.
24     Q. And what did you do -- what subjects did you
25 teach while you were teaching between '61 and '65?

Page 37

1 from what you thought Marv should publish --
2     A. Yes.
3         MR. DILIBERTO: Objection, irrelevant.
4 BY MS. KLEINICK:
5     Q. If Wolfman had submitted a script that Marvel
6 believed was unacceptable for some reason, was Marvel
7 required to obtain Wolfman's approval before changing
8 that script?
9         MR. DILIBERTO: Objection, calls for
10 conclusion, incomplete, hypothetical.
11        THE WITNESS: No.
12 BY MS. KLEINICK:
13    Q. If Wolfman and Marvel had a disagreement with
14 respect to either the direction a series should take or
15 the contents of any particular issue, who was the
16 one -- who would have the final authority to determine
17 what got published?
18    A. The final authority was Stan. Since Stan
19 would not involve himself in the day-to-day work,
20 unless there was something he personally saw or
21 something he took an interest in, that was my
22 responsibility.
23    Q. Was that true with respect to all of the
24 freelance writers at Marvel?
25    A. Well --

Page 38

1         MR. DILIBERTO: Objection, no foundation.
2         THE WITNESS: Yes, it was.
3 BY MS. KLEINICK:
4     Q. Did Marvel have any practice with respect to
5 who had the right to make final determinations as to
6 what got published, the freelance writer or the
7 company?
8     A. There wasn't any doubt that Stan or I could
9 make any change that we needed to have in a story or
10 anything else, subject only to the fact that we had to
11 have the book out of there on some kind of schedule.
12 But Stan or I could do that. No one else had the
13 authority to make changes without checking with me.
14 The Assistant Editors did not. They might sometimes
15 could take that authority, but they didn't really have
16 it, unless it was a typo or an obvious word thing or
17 something.
18    Q. If Marvel disagreed with language contained
19 in the script submitted by a freelance artist, and that
20 freelance -- the freelance writer, and that writer
21 refused to revise the script, what recourse, if any,
22 did Marvel have?
23        MR. DILIBERTO: Irrelevant.
24        THE WITNESS: We would have changed the
25 script. I would say if a writer really objected

Page 39

1 strongly to some change, and you have a lot of respect
2 for the writer, then you are a fool if you don't at
3 least try to find out why the writer objects to having
4 that changed. You may have a reason you haven't
5 thought of. Nobody is perfect. In the end, it was my
6 responsibility and my authority to make any change I
7 felt like I needed to make.
8 BY MS. KLEINICK:
9    Q. As part of your responsibilities as an editor
10 of a series or in your capacity as Editor-in-Chief, did
11 you have the authority to supervise the freelance
12 writers with respect to any characters that they wanted
13 to introduce into the scripts they submitted to
14 Marvel?
15        (Off-the-record conference.)
16        MR. DILIBERTO: Could you repeat the
17 question?
18        (Question read back.)
19 BY MS. KLEINICK:
20    Q. As part of your responsibility as an Editor
21 of a series or in your capacity as Editor-in-Chief of
22 Marvel, did you have the right to direct or supervise a
23 freelance writer with respect to any new characters
24 that they wanted to introduce into the scripts they
25 were writing for Marvel?

Page 40

1         MR. DILIBERTO: Objection, irrelevant.
2         THE WITNESS: Yes, I did have that authority
3 if I wanted to exercise it.
4 BY MS. KLEINICK:
5     Q. Did that authority include the right to
6 changes in features or back story of any new character
7 that a writer wanted to introduce into a Marvel
8 series?
9         MR. DILIBERTO: Objection, irrelevant.
10        THE WITNESS: Yes, it did.
11 BY MS. KLEINICK:
12    Q. Did that authority also include to write, to
13 supervise and direct how that writer would use the
14 characters in a script?
15        MR. DILIBERTO: Same objection.
16        THE WITNESS: If I wanted to yes, I had that
17 right, that authority.
18 BY MS. KLEINICK:
19    Q. If a writer had wanted to make a change to a
20 character that Marvel did not agree with, who would
21 have the final say in how that character would be
22 depicted in the issue?
23        MR. DILIBERTO: Objection, incomplete,
24 hypothetical.
25        THE WITNESS: Well, Marvel would have that

Page 41

1 right, which meant Stan or me that particular time.
2 BY MS. KLEINICK:
3    Q. Would that be true even for characters that
4 the writer himself or herself had created?
5    A. Well --
6    MR. DILIBERTO: Objection, vague and
7 irrelevant.
8    THE WITNESS: As far as I was concerned, and
9 I'm sure as far as Stan was concerned, yes, we had that
10 authority. We didn't exercise it particularly, but --
11 but we had it, we felt.
12 BY MS. KLEINICK:
13    Q. Did you ever have occasion to exercise it?
14    A. Yes.
15    Q. Okay --
16    MR. DILIBERTO: Objection, vague.
17 BY MS. KLEINICK:
18    Q. Did you and Marv Wolfman ever come to any
19 agreement where Wolfman would have complete control
20 over either the story lines or the characters he
21 created for the Tomb of Dracula series?
22    MR. DILIBERTO: Objection, no foundation.
23    THE WITNESS: I don't remember any specific
24 discussion in that regard. He had authority to do
25 whatever he wanted to do as the writer as long as Stan

Page 42

1 or I didn't object, as far as I was concerned, and I
2 felt he understood that, but other than that, I don't
3 know. I don't remember any specific conversations
4 about it, really.
5 BY MS. KLEINICK:
6    Q. Did you reach -- did you ever reach an
7 agreement with any freelance writer where -- where you
8 would give complete control over a story line or
9 character to that writer?
10    A. Well --
11    MR. DILIBERTO: Objection; vague and no
12 foundation.
13 BY MS. KLEINICK:
14    Q. Okay --
15    A. You mean during this period when I was
16 Editor-in-Chief?
17    Q. Yes.
18    A. No.
19    Q. Do you recall ever reaching any agreement
20 with Marv Wolfman where he would have complete control
21 over either the stories or the characters or -- that he
22 was introducing or the stories for any other series he
23 wrote for Marvel?
24    MR. DILIBERTO: Objection, irrelevant.
25    THE WITNESS: He had the complete control as

Page 43

1 long as it was subject to me and Stan. He was the next
2 in line, serving as an unpaid editor.
3 BY MS. KLEINICK:
4    Q. Okay.
5    A. Whether we used those terms or not, we joked
6 about it from time to time.
7    Q. Did Marv Wolfman have any agreement with
8 Marvel that prohibited Marvel from allowing other
9 writers from using characters that he introduced into
10 the Tomb of Dracula series in other Marvel
11 publications?
12    MR. DILIBERTO: Objection; vague as to
13 agreement and no foundation.
14    THE WITNESS: Not that I'm aware of.
15 BY MS. KLEINICK:
16    Q. Did you ever have any discussion with Marv
17 Wolfman where he demanded and you agreed to allow him
18 to prevent any other writers from using characters that
19 he introduced into Marvel story lines in other
20 publications?
21    MR. DILIBERTO: Objection, irrelevant.
22    THE WITNESS: I don't recall any such
23 conversation; however, in many cases, there might be
24 characters that were so ingrained in a particular
25 series that a writer might, for at least a certain

Page 44

1 indefinite period of time, might not want that
2 character used in another book.
3    And I would listen to those arguments and
4 maybe have gone along with it, if there was a good
5 reason. I don't recall whether we did or not. We
6 didn't want this character used in another book right
7 then because it would mess things up and so forth. But
8 whether I had such a conversation with Marv or not, I
9 don't recall.
10 BY MS. KLEINICK:
11    Q. Did you ever reach an agreement with any
12 freelance writer where that freelance writer could
13 forever prevent Marvel from allowing another writer to
14 use the characters they introduce into the story
15 lines?
16    MR. DILIBERTO: Objection; irrelevant and no
17 foundation.
18    THE WITNESS: We never talked in terms of
19 forever. We were always thinking of the next issue or
20 two, was the furthest ahead we ever thought. I don't
21 know how to answer a question that deals with forever
22 exactly, except to say if it was forever, the answer
23 had to be no. We just didn't think in terms of
24 guaranteeing anything that far ahead. But maybe I
25 didn't understand the question properly.

Page 97

1 You said Pacific Comics?
2    A. Yes.
3    Q. What were the years of that?
4    A. That started about -- that would have been
5 about '86, '87, somewhere around in there. I might
6 have been doing a little for them while I still worked
7 at Marvel, or D. C. -- Might have been doing comics for
8 them a little earlier. It didn't seem to compete.
9    Q. Then you mentioned -- there was First Comics?
10   A. Yes, that started about 1986, and I did four
11 issues of a character called Alter Ego named after my
12 fans -- for them.
13   Q. Next there was Dark Horse?
14   A. Dark Horse was in the early '90s. I had the
15 license to do some Robert E. Howard characters. There
16 were about seven or eight comics.
17   Q. And there was one after that I didn't get --
18   A. Cross Plains is the company I'm working for
19 now with Robert E. Howard characters.
20   Q. That was in the 1990s?
21   A. Yes, just a year or so. There are only a few
22 issues out --
23   Q. There was something like Feed Comics or --
24   A. There was Dude Comics in Spain that I'm doing
25 a little work for now. Could it be Dude Comics?

Page 98

1    Q. Dude Comics is also in the 1990s?
2    A. Yes, that is a Spanish company. It's not
3 printed in English, only Spanish. There was a little
4 company called Blue Comet that I did one or two comics
5 for.
6    Q. When was that?
7    A. '86, '87. I forgot, because my wife did most
8 of that. But both of our names are on it.
9    Q. Are there any names we left out in the comic
10 book field?
11   A. Let's see. I'm trying the think. I don't
12 think I ever did anything for Eclipse. I don't think I
13 ever did that. So I can't -- I can't think of any
14 others. I just can't recall.
15   Q. Apart from Marvel Comics --
16   A. I'm sorry, I mentioned Heroic before, Heroic
17 Publishing, which Stan and I made up a character or
18 two.
19   Q. That was when?
20   A. That was also '86 and '87. This was after
21 any exclusive contract ran out. I kept working for
22 D. C., but also started working for other companies.
23   Q. When was your time period at D. C. Comics?
24   A. Under the contract -- six years. It was a
25 six-year period there. Two- or three-year contracts, I

Page 99

1 believe.
2    Q. You also mentioned Planeta?
3    A. That's something that now, in the last couple
4 of years -- I just do articles for them about my Conan
5 comics. They pay me for one or two a month.
6    Q. You were at Marvel from 1965 to 1974; is that
7 correct?
8    A. I was with Marvel from 1965 until the end of
9 1980, exclusively. I'm not sure the date the contract
10 ran out -- it was no earlier than '80. From '74 until
11 '80, I was under two writer/editor contracts.
12   Q. Okay.
13   A. And then two writer contracts, one was sort
14 of writer/editor.
15   Q. Why were there two contracts at Marvel? Were
16 they different terms?
17   A. They were three-year terms. Just renewed
18 without much change, I think.
19   Q. The first contract, I think was when --
20   A. '74 until -- after I stepped down. Stan
21 suggested that so I wouldn't go to D. C.
22   Q. Okay.
23   A. He knew that I had some characters I wanted
24 to write.
25   Q. So you never worked for Ward Publications?

Page 100

1    A. No.
2    Q. I'm sorry?
3    A. No.
4    Q. You never worked at Skywold Publications?
5    A. No, I suggested one or two ideas to Saul
6 Broadski, who was the Editor -- when he became Editor
7 and a partner there. I suggested one or two comic
8 ideas he did, but it was just informal. I was working
9 for Marvel. I wanted to help Saul, because he was a
10 friend. But I never worked for them or got a dime from
11 them.
12   Q. Are you aware of any creators at D. C. making
13 arrangements that might be different from other
14 creators at D. C.?
15       MS. KLEINICK: Objection.
16       THE WITNESS: It was sort of a vague general
17 knowledge that Bob Cane had some special deal on
18 Batman, but I didn't have any particulars about it. It
19 was sort of like things you heard, but I didn't have
20 any special knowledge of it.
21 BY MR. DILIBERTO:
22   Q. When Jodi showed you the declaration, which
23 has been marked as exhibit 3 -- if you could put that
24 before you, please.
25   A. Which declaration?

Page 133

1 your time. I have no further questions.
2      MS. KLEINICK: We've agreed that we are going
3 to dispense with the requirement that Mr. Thomas sign
4 the transcript of the deposition before a notary and
5 only send a copy of the transcript to Mr. Thomas, and
6 he is going to sign it and send it back. We're off,
7 thank you.
8      (THOMAS EXH. 5, Declaration of Roy Thomas,
9 Jr., submitted by Mr. Diliberto, was marked for
10 identification.)
11     (The deposition was concluded at 10:15 p.m.)

Page 134

1           SIGNATURE OF DEPONENT
2
3      I, the undersigned, ROY THOMAS, do hereby
4 certify that I have read the foregoing deposition and
5 find it to be a true and accurate transcription of my
6 testimony, with the following corrections, if any:
7
8 PAGE   LINE     CHANGE           REASON
...
19         ROY THOMAS        Date

Page 135

1           CERTIFICATE OF REPORTER
2
3
4      I, Leslie Toole Stanley, Certified Shorthand
5 Reporter and Notary Public for the State of South
6 Carolina at Large, do hereby certify:
7      That the foregoing deposition was taken before me
8 on the date and at the time and location stated on page
9 1 of this transcript; that the witness was duly sworn
10 to testify to the truth, the whole truth, and nothing
11 but the truth; that the testimony of the witness and
12 all objections made at the time of the examination were
13 recorded stenographically by me and were thereafter
14 transcribed by computer-aided transcription; that the
15 foregoing deposition as typed is a true, accurate, and
16 complete record of the testimony of the witness and of
17 all objections made at the time of the examination.
18     I further certify that I am neither related to nor
19 counsel for any party to the cause pending or
20 interested in the events thereof.

Page 136

1      Witness my hand, I have hereunto affixed my
2 official seal this 18th day of October, 1999, at
3 Columbia, Richland County, South Carolina.

        Leslie Toole Stanley
        Certified Shorthand Reporter
        Notary Public
        My Commission expires
        February 12, 2001

Page 137

```
 1          I N D E X
 2                              Page
 3  WITNESS/EXAMINATION
 4  STIPULATION........................................... 3
 5  ROY THOMAS,........................................... 3
 6  EXAMINATION
 7  BY MS. KLEINICK....................................... 3
 8  EXAMINATION
 9  BY MR. DILIBERTO..................................... 81
10  EXAMINATION
11  BY MS. KLEINICK..................................... 120
12  EXAMINATION
13  BY MR. DILIBERTO.................................... 127
14  SIGNATURE OF DEPONENT............................... 134
15  CERTIFICATE OF REPORTER............................. 135
16
17
18       REQUESTED INFORMATION INDEX
19
20          (No Information Requested)
21
22
23          E X H I B I T S
24                              Page
25  THOMAS EXH. 1, U. S. District Court Subpoena......... 3
```

Page 138

```
 1  THOMAS EXH. 2, Declaration.......................... 51
 2  THOMAS EXH. 3, Agreement/outline of
 3  responsibility...................................... 59
 4  THOMAS EXH. 4, Letter from Roy Thomas to Bob
 5  Harris............................................. 123
 6  THOMAS EXH. 5, Declaration of Roy Thomas, Jr....... 133
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```