# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARVEL CHARACTERS, INC., | Case No.: 1:21-cv-7955-LAK |
|        Plaintiff and Counterclaim-Defendant, | and consolidated cases |
| | 21-cv-7957-LAK and 21-cv-7959-LAK |
|        v. | |
| | |
| LAWRENCE D. LIEBER, | Hon. Lewis A. Kaplan |
| | |
|        Defendant and Counterclaimant. | |
| | |
| MARVEL CHARACTERS, INC., | **DEFENDANT AND COUNTERCLAIMANT PATRICK S. DITKO'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT** |
|        Plaintiff and Counterclaim-Defendant, | |
| | |
|        v. | |
| | |
| KEITH A. DETTWILER, in his capacity as Executor of the Estate of Donald L. Heck, | Oral Argument Requested |
| | |
|        Defendant and Counterclaimant. | |
| | |
| MARVEL CHARACTERS, INC., | |
| | |
|        Plaintiff and Counterclaim-Defendant, | |
| | |
|        v. | |
| | |
| PATRICK S. DITKO, in his capacity as Administrator of the Estate of Stephen J. Ditko, | |
| | |
|        Defendant and Counterclaimant. | |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................. 1

STATUTORY BACKGROUND AND CASELAW ................................... 5

    A.    The Copyright Act's Termination Right ...................................... 5

    B.    "Work for Hire" Under the 1909 Copyright Act .......................... 7

          1.    *The Original Work-For-Hire Doctrine* ........................... 7

          2.    *Doctrinal Drift Resulting in the "Instance and Expense" Test* ...... 7

UNDISPUTED MATERIAL FACTS ...................................................... 12

LEGAL STANDARD FOR SUMMARY JUDGMENT ........................ 21

ARGUMENT ......................................................................................... 21

    A.    The Estate's Termination Complied with the Copyright Act ..................... 21

    B.    The Undisputed Facts and Record Evidence Demonstrate that Ditko's Works Could Not Be "Works For Hire" ..................... 22

    C.    Ditko's Artwork Was Not "Work For Hire" As a Matter of Law Because It Was Not Created at the "Instance" or "Expense" of the Shell Companies Registered as Its "Authors" ..................... 24

    D.    "Work for Hire" Under the 1909 Act Applies to Employment of Independent Contractors, But Marvel Intentionally Avoided Hiring Ditko in the Period ..................... 27

    E.    The Undisputed Facts Are Irreconcilable with the "Work for Hire" Doctrine and Fundamental Copyright Principles ..................... 29

    F.    Marvel Cannot Satisfy the "Expense" Prong ..................... 31

          1.    *Ditko, Not Marvel, Bore the Financial Risk of Creating His Artwork* ..................... 31

          2.    *Marvel's Conscious Avoidance of the Simple Legal Commitment to Pay Ditko for Conforming Services is Fatal to the "Expense" Prong* ..................... 33

    G.    Marvel Cannot Establish "Instance" ..................... 34

1.  *Marvel Lacked the Legal Right to Direct and Supervise Ditko* .................... 34

2.  *In Practice, Marvel Was Far Removed from Ditko's Creative Process* ........................................................................................ 36

    a.  Steve Ditko's Dr. Strange ................................................ 37

    b.  Steve Ditko's Spider-Man ............................................... 38

H.  Marvel and Ditko Could Not Have Intended that Ditko's Material was "Work for Hire" ........................................................................... 40

I.  The Undisputed Facts Show that Ditko Assigned to Marvel the Copyrights in Artwork Marvel Opted to Purchase .................................... 41

CONCLUSION ........................................................................................................... 44

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242, 106 S. Ct. 2505 (1986) ...................................................................... 21

*Bleistein v. Donaldson Lithographing Co.*,
188 U.S. 239, 23 S. Ct. 298 (1903) ............................................................................ 7

*Brattleboro Publishing Co. v. Winmill Publishing Co.*,
369 F.2d 565 (2d Cir. 1966) ................................................................................. 9, 27

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ................................................................................................. 21

*Cmty. for Creative Non-Violence v. Reid*,
490 U.S. 730, 109 S. Ct. 2166 (1989) ............................................................... passim

*Dolman v. Agee*,
157 F.3d 708 (9th Cir. 1998) ............................................................................. 40, 42

*Donaldson Publishing Co. v. Bregman, Vocco & Conn, Inc.,*
375 F.2d 639 (2d Cir.1967) ..................................................................................... 37

*Easter Seal Soc'y for Crippled Children & Adults of La., Inc. v. Playboy Enterprises.*,
815 F.2d 323 (5th Cir. 1987) .................................................................................. 8, 9

*Epoch Produc'g Corp. v. Killiam Shows, Inc.,*
522 F.2d 737 (2nd Cir. 1975) ................................................................................. 34

*Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.,*
342 F.3d 149 (2d Cir. 2003) .............................................................................. passim

*Fifty-Six Hope Rd. Music Ltd.,*
2010 U.S. Dist. LEXIS 94500 (S.D.N.Y. September 10, 2010) ........................... 33, 35

*Fourth Estate Pub. Benefit Corp. v. Wall-Street.com, LLC,*
139 S. Ct. 881, 203 L.Ed.2d 147 (2019)................................................................. 26

*Gary Friedrich Enterprises, LLC v. Marvel Enterprises, Inc.*,
837 F. Supp. 2d 337 (S.D.N.Y. 2011) ..................................................................... 42

*Graham-Sult v. Clainos*,
No. 15-17204 (9th Cir. Dec. 13, 2017) (unpublished) .................................................. 26

*Harper & Row Publishers, Inc. v. Nation Enterprises*,
471 U.S. 539, 105 S. Ct. 2218 (1984) ......................................................................... 29

*Lin-Brook Builders Hardware v. Gertler*,
352 F.2d 298 (9th Cir. 1965) ......................................................................................... 8

*M.G.B. Homes, Inc. v. Ameron Homes, Inc.*,
903 F.2d 1486 (11th Cir. 1990) ................................................................................... 10

*Martha Graham School v. Martha Graham Center*,
380 F.3d 624, (2d Cir. 2004) ................................................................................ passim

*Marvel Characters, Inc. v. Kirby*,
726 F.3d 119 (2d Cir. 2013) .................................................................................. passim

*Mazer v. Stein*,
347 U.S. 201, 74 S. Ct. 460 (1954) ............................................................................... 5

*Mills Music, Inc. v. Snyder*,
469 U.S. 153, 105 S. Ct. 638 (1985) ............................................................................. 6

*Murray v. Gelderman*,
566 F.2d 1307 (5th Cir. 1978) ..................................................................................... 33

*N.Y. Times Co. v. Tasini*,
533 U.S. 483, 121 S. Ct. 2381 (2001) ........................................................................... 6

*Picture Music, Inc. v. Bourne, Inc.*,
457 F.2d 213 (2d Cir. 1972) .......................................................................................... 9

*Playboy Enterprises, Inc. v. Dumas*,
53 F.3d 549 (2d Cir. 1995) ............................................................................... 9, 29, 40

*Playboy Enterprises, Inc. v. Dumas*,
960 F. Supp. 710 (S.D.N.Y. 1997) ......................................................................... 27, 33

*Pye v. Mitchell*,
574 F.2d 476 (9th Cir. 1978) ....................................................................................... 22

v

*Shapiro v. Jerry Vogel Music Co.*,
    221 F.2d 569 (2d Cir. 1955) ...................................................................................... 41

*Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.*,
    161 F.2d 406 (2d Cir. 1946) *cert. denied*, 67 S.Ct. 1310 (1947) ................................. 22, 31, 39, 43

*Siegel v. National Periodical Publications, Inc.*,
    508 F.2d 909 (2d Cir. 1974) ...................................................................................... 27

*Siegel v. Time Warner Inc.*,
    496 F. Supp. 2d 1111 (C.D. Cal. 2007) ..................................................................... 31, 36

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
    464 U.S. 417, 104 S. Ct. 774 (1984) ......................................................................... 5

*Stewart v. Abend*,
    495 U.S. 207, 110 S. Ct. 1750 (1990) ....................................................................... 5, 36

*TCA Television Corp. v. McCollum*,
    839 F.3d 168 (2d Cir. 2016) ...................................................................................... 27

*Thomson v. Larson*,
    147 F.3d 195 (2d Cir. 1998) ...................................................................................... 7

*Twentieth Century Fox Film Corp. v. Enter. Distrib'n*,
    429 F.3d 869 (9th Cir. 2005) ..................................................................................... 29, 33, 35, 36

*Urantia Found. v. Maaherra*,
    114 F.3d 955 (9th Cir. 1997) ..................................................................................... 27

*Urbont v. Sony Music Entm't*,
    831 F.3d 80 (2d Cir. 2016) ........................................................................................ 12, 32, 34

*Waite v. UMG Recordings, Inc.*,
    450 F. Supp. 3d 430 (S.D.N.Y. 2020) ....................................................................... 26

*Ward v. National Geographic Soc.*,
    208 F. Supp. 2d 429 (S.D.N.Y. 2002) ....................................................................... 27, 33

*Woods v. Bourne Co.*,
    60 F.3d 978 (2d Cir. 1995) ........................................................................................ 23

*Wright v. Goord*,
    554 F.3d 255 (2d Cir. 2009) ............................................................................................ 21

*Yardley v. Houghton Mifflin Co.*,
    108 F.2d 28 (2d Cir. 1939) ............................................................................................... 8

## STATUTES

17 U.S.C. § 24 ........................................................................................................................ 5

17 U.S.C. § 26 ................................................................................................................. passim

17 U.S.C. § 203 ...................................................................................................................... 1

17 U.S.C. § 304 ............................................................................................................... passim

## RULES AND REGULATIONS

37 C.F.R. § 201.10 ............................................................................................................... 22

Compendium of U.S. Copyright Office Practices § 1802 ................................................... 25

Fed. R. Civ. P. 56 ................................................................................................................ 21

## TREATISES

M. Nimmer, *Nimmer on Copyright* § 114.4 (1969) ........................................................... 41

M. Nimmer, *Nimmer on Copyright* § 62.4 (1963) ............................................................ 41

M. Nimmer, *Nimmer on Copyright* § 63 (1963) ............................................................... 40

Nimmer on Copyright § 11.02 ............................................................................................... 6

Nimmer on Copyright § 5.03 .................................................................................... 10, 11, 31

Nimmer on Copyright § 6.03 ............................................................................................... 22

Nimmer on Copyright § 6.12 ................................................................................................. 7

Nimmer on Copyright § 7.16 ............................................................................................... 24

Nimmer on Copyright § 9.03 ........................................................................................ 10, 11

Nimmer on Copyright § 11.02 ............................................................................................... 6

Nimmer on Copyright § 11.08 ............................................................................................... 6

Patry on Copyright § 5:45 ................................................................................................... 11

Patry on Copyright § 5:54 ............................................................................................ 32, 35

Patry on Copyright § 5:61 ................................................................................................... 29

**OTHER AUTHORITIES**

B. Varmer, *Works Made for Hire and On Commission*,

   1 Studies on Copyright 717 (1963) ................................................................41

Catherine L. Fisk, *Authors at Work: The Origins of  the Work-for-Hire Doctrine*,

   15 Yale J.L. & Humans. 1 (2003) ................................................................10

H.R. Rep. No. 94-1476 (1976) ..............................................................5, 6

Defendant and Counterclaimant Patrick S. Ditko, as Administrator of the Estate of Stephen J. Ditko (the "Estate") respectfully submits this Memorandum of Law in Support of His Motion for Summary Judgment.

## PRELIMINARY STATEMENT

Steve Ditko ("Ditko"), who died in 2018, is a celebrated comic book artist and writer, most famous for creating Dr. Strange and co-creating Spider-Man. In 2021, his Estate duly exercised his rights under Section 304(c) of the 1976 Copyright Act to recover his joint copyright interest in the stories he co-authored, serving notices of termination of Ditko's copyright assignments to Marvel in 1962 to 1966 (the "Period") when it purchased and published his works.

The termination right is arguably *the* most important authorial right in the 1976 Act, after copyright itself. It was expressly designed to remedy authors' unequal bargaining position and to enable authors and their families to finally participate in the value of their creations once it was no longer conjectural. The termination provisions also reflect a deliberate balance of competing interests determined by Congress.[1] The sole statutory exemption is "work made for hire." Thus, Marvel asserted, in retrospect, that all Ditko's creations were "works made for hire" under the 1909 Copyright Act, and it is Marvel that carries the burden of proving this statutory exception.

For nearly six decades, *including in the Period*, "work for hire" under the 1909 Act applied exclusively to traditional employment. *See* 17 U.S.C. § 26 ("the word 'author' shall

---

[1] For instance, the 1976 Act gives a terminated grantee a competitive advantage in reacquiring copyrights recaptured via termination. *See* 17 U.S.C. § 304(c)(6)(D). Further, as the Estate will recover Ditko's undivided *joint* copyright interest in the stories, Marvel, as the other co-owner, can continue to freely exploit all such copyrights, and all prior derivative works (e.g., films) worldwide. 17 U.S.C. § 203(b)(1). Furthermore, as the 1976 Act has no extra-territorial application, all foreign rights to the stories also remain with Marvel. *Update Art, Inc. v. Modiin Pub., Ltd.,* 843 F.2d 67, 72 (2d Cir. 1988). Accordingly, the Estate's terminations do not prevent Marvel's continued exploitation of the stories Ditko co-authored, they simply allow his Estate to participate, to some degree, in the financial rewards of his creations, just as Congress intended. H.R. Rep. No. 94-1476, at 124 (1976).

include an employer in the case of works made for hire"). The copyrights to work produced by independent contractors (i.e., freelance work) were acquired by assignment. But, toward the end of the 1909 Act's tenure, courts expanded the definition of "employer" in Section 26 to include employers of independent contractors. The initial cases, seemingly by inadvertence, turned a presumption of an *implied copyright assignment,* gleaned from an "instance and expense" test, into a dramatic expansion of the work-for-hire doctrine well beyond its historic boundaries and the text of Section 26. And, while later cases expressly recognized this contradiction, courts viewed themselves bound by that accidental precedent and stuck to it, never reconciling the shift with the text and legislative history of the 1909 Act.

In all instances, however, work-for-hire analysis is still fact-intensive, requiring courts to determine the parties' true legal relationship and the actual circumstances of the subject works' creation. Here, Marvel's "work for hire" defense fails for many independent reasons.

Marvel alleges that Ditko created his works—the subject of the Estate's termination notices (Dkt. 24-1) (the "Works")—at the "instance and expense" of its alleged predecessors which registered the copyrights. *See* Dkt. 1 ¶¶ 1, 11, 22. But the copyrights were all registered as the "works made for hire" of shell companies (e.g., *Non-Pareil Publishing Corp.*) which Marvel represented to be the "author[s]." The shell companies, however, had no connection to Ditko, never communicated with him, and never paid him. Ditko, therefore, could not have created his Works at either the "instance" or "expense" of these shell companies with whom he had no contact. Marvel cannot now disavow its own copyright registrations from which it benefitted for decades, and relies on here, nor can it be permitted to fudge the distinction between separate juridical entities and play its own shell game with the "instance and expense" test. *See* Dkt. 1 ¶ 14. Marvel's defense thus fails as a matter of law.

2

Additionally, the cases extending "work for hire" under Section 26 to independent contractors involve, as they must, the actual employment of these contractors, and as such, invariably refer to the publisher as the "hiring party" or "employer." Though Marvel portrays itself as the "hiring party" handing out "assignments," it is undisputed that Marvel purposefully did not hire Ditko in the Period. Due to the dire state of its business, Marvel specifically avoided the bilateral obligations "hiring" entails. Ditko had no legal obligation to create for Marvel and, by design, Marvel had no legal obligation to pay Ditko for freelance work he submitted, which it could reject at will. Tellingly, Marvel did not own, nor purport to own, freelance material it chose to reject. Because "work for hire" is a *legal* fiction—deeming an employer the "author" of another's creative labor—these *legal* distinctions are of great importance and cannot be hand-waved away by Marvel.

The undisputed facts are irreconcilable with basic copyright precepts and the "work for hire" doctrine, itself. It is central to our law that copyright vests in the actual or statutory "author" of a work *at creation*. Thus, "authorship" cannot be based on *contingent, post-creation* events like Marvel's option to pay for only that Ditko work it chose to accept. Marvel's option to buy or to reject Ditko's work makes clear that the relationship was that of a purchase and assignment of rights. No such contingency exists in a true "work for hire" relationship, where an actual *hiring* party is legally obligated to pay for the conforming services or work commissioned.

As to the "expense" prong of the test, Ditko rented his own art studio, paid for all his own overhead, instrumentalities and materials, and simultaneously sold his work to different publishers. It is undisputed that none of the expenses Ditko incurred in creating *his* Works were paid for or reimbursed by Marvel. And, because Marvel's purchase of Ditko's work was purposefully not guaranteed—i.e., Marvel had the option to reject and not pay for Ditko's

3

material, at will—it is clear that Ditko, not Marvel, bore the financial risk of *creation* of the

Works, for if Marvel rejected Ditko's work, he would be out the time, materials, and labor, not

Marvel. Moreover, as to "instance," Marvel's assertions are wobbly. Ditko was well known to be

a fiercely independent artist. He kept a large chart in his studio, mapping out his ideas for the

future development of his characters and stories. When he submitted artwork to editor Stan Lee,

Ditko wrote extensive margin notes, suggesting captions and dialogue, so that Lee could

dialogue the story consistent with the way Ditko had plotted and drawn it. Ditko would reject

story suggestions proposed by Lee or others he disagreed with, and in 1964, Ditko and Lee

famously had a falling out over the direction of *Spider-Man* and refused to communicate any

longer. From then, until 1966 when Ditko stopped selling to Marvel, he was in complete control

over how he plotted and drew his stories, with Lee left only to dialogue and finalize captions

based on Ditko's margin notes.

Moreover, as to key characters, there are other important facts militating against "work

for hire." For example, a Ditko drawing of Dr. Strange sent to his brother in an envelope post-

marked "1946" shows that he conceived the character long before ever meeting Marvel. And

Lee, himself, has repeatedly admitted that the first *Dr. Strange* story was Ditko's creation.

Further, the only contemporaneous agreement between the parties consisted of Marvel's

own check legends, which forced freelancers to expressly *assign* their copyrights to Marvel for

that work it chose to buy. It is well settled that whether a work is "for hire" under the 1909 Act

turns on the parties' objective intent and indeed, the "instance and expense" test itself seeks to

inferentially discover such intent. Because "work for hire" in the Period applied only to

traditional employment, and Ditko was undisputedly an independent contractor during those

years, Marvel thus asks this Court to retroactively *invent* an intent the parties could *not* have had

4

in the Period. Marvel's "work for hire" revisionism contradicts the record, contravenes basic copyright law, leads to absurd results, and thus must fail as a matter of law.

## STATUTORY BACKGROUND AND CASELAW

### A.     The Copyright Act's Termination Right

"The economic philosophy behind the [Constitution's copyright] clause … is the conviction that encouragement of individual effort by personal gain is the best way to advance the public welfare through the talents of authors [] in '[] useful Arts.'" *Mazer v. Stein*, 347 U.S. 201, 219, 74 S. Ct. 460, 471 (1954). Under the Constitution, it is "Congress that has been assigned the task of defining the scope of the limited monopoly that should be granted to authors." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429, 104 S. Ct. 774, 782 (1984). Since the Copyright Act of 1831, Congress has used this power to provide authors or their families with the right to recover transferred copyright interests and has strengthened those rights over time. *See Stewart v. Abend*, 495 U.S. 207, 217-20, 110 S. Ct. 1750, 1758-60 (1990).

Under the Copyright Act of 1909, copyright was divided into two separate 28-year terms—the "initial" and "renewal" terms—with Congress intending that the renewal copyright benefit authors and their families. *Id*. at 219; *see* 17 U.S.C. § 24. Effective January 1, 1978, the Copyright Act of 1976 significantly enhanced authors' rights.  In extending the renewal term from 28 to 47 years, 17 U.S.C. §304(a), Congress intended to give the benefit of these additional years to authors, rather than grantees for whom the automatic grant of the extension would be a windfall. *See* H.R. Rep. No. 94-1476 at 140 (1976). It therefore coupled the extension with a new right of authors to recapture their copyrights for the renewal term by terminating decades-old copyright transfers "notwithstanding any agreement to the contrary." 17 U.S.C. §304(c)(5).

"The principal purpose … was to provide added benefits to authors. ... More particularly, the termination right was expressly intended to relieve authors of the consequences of ill-advised

and unremunerative grants." *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 172-73, 105 S. Ct. 638, 649 (1985). Congress recognized that publishers held far greater bargaining power and that, consequently, authors commonly agreed to one-sided grants precluding them from sharing in their work's success. *Id*. The results were often supremely unfair, as when a work proved to have enduring commercial value, but solely enriched the grantee. Congress created termination rights to "safeguard[] authors against unremunerative transfers" made before their works were exploited, and to give authors or their families a chance to obtain a more equitable portion of their work's value, once it was proven. H.R. Rep. No. 94-1476, at 124 (1976); *N.Y. Times Co. v. Tasini*, 533 U.S. 483, 495 n.3, 121 S. Ct. 2381, 2389 (2001) (Congress intended to re-adjust "the author/publisher balance" via an "inalienable authorial right to revoke a copyright transfer").

Authors or their families may terminate pre-1978 grants by serving advance notice of termination on the original grantee or its successor, during a five-year window beginning 56 years after copyright was secured by publication. 17 U.S.C. § 304(c)(3), (4)(A). The termination provisions reflect a deliberate balance of competing interests determined by Congress. Thus, it is no coincidence that the 1909 Act provided 56 years of copyright protection, and that the 1976 Act provided for termination of pre-1978 transfers after 56 years. That symmetry ensured that transferees were not deprived of any benefits for which they bargained under the 1909 Act.

The 1976 Act also gives a terminated grantee a competitive advantage in reacquiring any copyright interests recaptured by termination. *See id.* § 304(c)(6)(D); Nimmer on Copyright ("Nimmer") § 11.08[A], n.6. As the 1976 Act has no extra-territorial application, termination also applies solely to U.S. copyright interests, not to foreign rights, which are retained by a terminated grantee. Nimmer § 11.02[B][2]. As to joint works, like comic books, a terminating co-author recovers only his joint-authorship share of the copyright. The terminated grantee can

continue to freely exploit both pre-termination derivative works, 17 U.S.C. § 304(c)(6)(A), and, as here, when termination is by the co-author of a joint work, new derivative works as well (e.g., films) subject only to a duty to account to the terminating co-author. *See* Nimmer § 6.12[A]; *Thomson v. Larson*, 147 F.3d 195, 199 (2d Cir. 1998).

"Works for hire" are the sole exemption to statutory termination. 17 U.S.C. §§ 304(c), (d), 203(a). The 1909 Act governs whether a work published before 1978 is a "work for hire." 17 U.S.C. § 26 (repealed 1976).

### B.   "Work for Hire" Under the 1909 Copyright Act

#### 1.   *The Original Work-For-Hire Doctrine*

At common law, copyrights vested with the creator, except when the work was made by an employee within the scope of employment, in which case the copyright was bestowed on the employer. *Cmty. for Creative Non-Violence v. Reid* ("*Reid*"), 490 U.S. 730, 743-44, 109 S. Ct. 2166, 2174 (1989); *Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 248, 23 S. Ct. 298, 299 (1903). The "work for hire" doctrine did not extend to independent contractors. *Id*. Congress first codified the doctrine in the 1909 Act, providing that "the word 'author' shall include an employer in the case of works made for hire." 17 U.S.C. § 26 ("Section 26"). Congress did not expressly define "employer" or "works made for hire," but for the first six decades of the 1909 Act, including during the Period, courts uniformly construed the statute to limit "works for hire" to traditional common law employment, and to exclude independent contractors. *See e.g., Reid*, 490 U.S. at 749, 109 S. Ct. at 2177 (until 1966, "courts had applied the work for hire doctrine under the 1909 Act exclusively to traditional employees" and not to "commissioned works").

#### 2.   *Doctrinal Drift Resulting in the "Instance and Expense" Test*

Towards the end of the 1909 Act, the Second Circuit expanded the work-for-hire doctrine and the interpretation of "employer" in Section 26 to include the employment of independent

contractors. Through improvisation and precedential drift, the courts arrived at the "instance and expense" test at the center of this case. *See Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.* ("*Hogarth*")*, 342 F.3d 149, 161 n.14 (2d Cir. 2003) (recounting contradictory history of the "instance and expense" test), *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119 ("*Kirby*"), 139, 137-40 (2d Cir. 2013) (canvassing the test: "Our case law is, however, not so tidy").

The initial cases, seemingly by inadvertence, extended what had been a presumption about *implied assignments* into a dramatic expansion of the work-for-hire doctrine well beyond its historic boundaries and the text of Section 26. And, while later cases recognized the shift, courts viewed themselves bound by that accidental precedent and stuck to it, never reconciling the shift with the text and legislative history of the 1909 Act.

Ironically, the "instance and expense" test began in cases that accepted that works by independent contractors were *not* works for hire. In *Yardley v. Houghton Mifflin Co.*, 108 F.2d 28 (2d Cir. 1939), the Second Circuit declared that the law implies an *assignment* of copyright to the hiring party. Unless agreed otherwise, the freelancer was still considered the author of his work and retained key rights under the 1909 Act. *Id.* at 32. Even though the work-for-hire doctrine was well established, *Yardley* made no mention of it. In the years that followed, *Yardley's implied-assignment* rule was widely adopted. *See Reid*, 490 U.S. at 744, 109 S. Ct. at 2175. Then, as several courts of appeals have since recounted, that precedent began to drift in the mid-1960s. *See Kirby*, 726 F.3d at 138; *Hogarth*, 342 F.3d at 158-62; *Easter Seal Soc'y for Crippled Children & Adults of La., Inc. v. Playboy Enterprises.*, 815 F.2d 323, 326 (5th Cir. 1987). It began with a reference to the "instance and expense" test in *Lin-Brook Builders Hardware v. Gertler*, 352 F.2d 298, 300 (9th Cir. 1965), which relied on *Yardley* but was unclear

8

whether it intended the test to imply an assignment or to expand "work for hire" under Section 26, as neither of which it mentioned. *See Easter Seal*, 815 F.2d at 328 n.8 (noting ambiguity).

The following year, *Brattleboro Publishing Co. v. Winmill Publishing Co.*, 369 F.2d 565 (2d Cir. 1966) "appl[ied] the instance and expense test to determine that a party commissioned to create a work should be deemed to have *assigned* the copyright to the commissioning party." *Hogarth*, 342 F.3d at 161 n.14 (emphasis in original). In dicta, *Brattleboro* conflated the test with "the 'work-for-hire' doctrine" citing authorities that held no such thing. 369 F.2d at 567-68. *Compare id.* (attributing test to Nimmer), *with Kirby*, 726 F.3d at 138 ("discussion does not appear to have been necessary to the result" and test was "not to be found" in Nimmer); *compare Brattleboro*, 369 F.2d at 568 (relying on *Yardley*) *with Hogarth,* 342 F.2d at 158-59 (*Yardley* and *Brattleboro* were "*implied* assignment" cases).

Then, just four years before the 1976 Act was enacted, *Picture Music, Inc. v. Bourne, Inc.* ("*Picture Music*"), 457 F.2d 213 (2d Cir. 1972) departed from decades of precedent and used the "instance and expense" test to expressly extend the "work for hire" doctrine to independent contractors, based on erroneous interpretations of the prior two *implied assignment* cases—*Yardley* and *Brattleboro*—as "work for hire" precedent. *See Hogarth*, 342 F.3d at 161, n.14.

In turn, *Playboy Enterprises, Inc. v. Dumas* ("*Playboy*"), 53 F.3d 549, 554-55 (2d Cir. 1995), both relied on *Yardley* and "repeated the overstatement in *Picture Music* that *Brattleboro* had 'held' that a party commissioning a work at its instance and expense" qualified as work for hire "under the 1909 Act." *Hogarth*, 342 F.3d at 161, n.15.

In *Reid*, the Supreme Court unanimously *rejected* the "instance and expense" test, relying instead on the common law of agency, to define an "employee" under the 1976 Act. 490 U.S. at

749-50, 109 S. Ct. at 2177-78.[2] *See* Nimmer § 5.03[B][1][a][iii]. *See also* Catherine L. Fisk, *Authors at Work: The Origins of the Work-for-Hire Doctrine*, 15 Yale J.L. & Humans. 1, 62-67 (2003). The textual question under the 1909 Act is materially *identical* to the one answered in *Reid*. The 1909 Act gives rights in works for hire to an "employer." 17 U.S.C. § 26. The question in *Reid* was whether work of an independent contractor is "prepared by an employee" under the 1976 Act. 490 U.S. at 732, 109 S. Ct. at 2169-70. *Reid* held that both terms—employer and employee—refer to a traditional employment relationship, under the common law of agency, thereby excluding independent contractors. *Id*. at 739-43, 751, 109 S. Ct. at 2172-75.[3] In explaining its decision, the Court directly addressed the 1909 Act, explaining that courts had "long concluded that the work for hire doctrine codified in [the 1909 Act] referred only to works made by employees in the regular course of employment," and that "[a]s for commissioned works, the courts generally presumed that the commissioned party had impliedly agreed to convey the copyright, along with the work itself, to the hiring party." *Id*. at 744, 748-49, 109 S. Ct. at 2170, 2176-78.

Leading commentators read *Reid* as effectively overruling the "instance and expense" test under both the 1976 and 1909 Acts. *See* Nimmer § 9.03[D]. For the same reasons, the Eleventh Circuit has held that the "instance and expense" test did not survive *Reid*. *See M.G.B. Homes, Inc. v. Ameron Homes, Inc.*, 903 F.2d 1486, 1490-91 (11th Cir. 1990).

---

[2] For over a century, federal courts have followed the "principle that where words are employed in a statute which had at the time a well-known meaning at common law … they are presumed to have been used in that sense unless the context compels to the contrary." *Standard Oil Co. v. United States*, 221 U.S. 1, 59, 31 S. Ct. 502, 515 (1911). This endures as a "cardinal rule of statutory construction." *Molzof v. United States*, 502 U.S. 301, 307, 112 S. Ct. 711, 716 (1992).

[3] The common law definition of employment *excludes* commissioning relationships. *See Nat'l Labor Relations Bd. v. Town & Country Elec. Inc.*, 516 U.S. 85, 92-93, 116 S. Ct. 450, 454-55 (1995); *Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 445 n.5, 123 S. Ct. 1673, 1677 n.5 (2003) (the common law "draw[s] a line between independent contractors and employees").

In *Hogarth*, the Second Circuit was "given pause by the Supreme Court's opinion in [*Reid*]" but treated its analysis as "dictum" with respect to the 1909 Act and did not address it. 342 F.3d at 163. After conceding *Picture Music*'s (and by extension, *Playboy*'s) misconstruction of implied assignment cases (*Yardley* and *Brattleboro*) as work-for-hire precedent, *Hogarth* continued to apply the "instance and expense" test. *Id*. at 161-62.

Then, in *Kirby*, the "instance and expense" test was applied to effectively determine "termination rights" under the 1976 Act as to works created under the 1909 Act. 726 F.3d at 139. *Kirby* followed *Hogarth* and, while noting their contradictions, continued to quote the above cases, including *Picture Music*, *Playboy*, *Yardley*, and *Brattleboro*. *Id*. In *Kirby*, the Second Circuit once again acknowledged that its approach had been "called into question by language in [*Reid*]," but also did not address *Reid*'s compelling analysis. *Id*. at 139 n.8. Thus, the incongruity between the "instance and expense" test and the 1909 Act's limitation of "work for hire" to an "employer," the common law definition of that term, and the cardinal rule of statutory construction emphasized in *Reid* and other Supreme Court cases, has never been reconciled.

The two most influential treatises on copyright law have roundly criticized the expansion of the 1909 Act's "work for hire" provision to independent contractors (via a test for implied copyright assignments) as untethered to the text and legislative history of Section 26. According to Nimmer*,* the decisions extending "works for hire" under Section 26 to independent contractors are "wrong both on principle and under the rule of early cases." Nimmer § 9.03[D] (footnotes omitted); *see also id*. § 5.03[B]. Patry explains that the approach highlights the "worst features" of the instance and expense test and created "a football field wide loophole for work for hire treatment under the 1909 Act." 2 W. Patry, *Patry on Copyright* ("Patry") § 5:45.

The issue in most prior "instance and expense" cases had been a publisher's copyright

*ownership*—thus the line between ownership by "implied assignment" or as "work for hire" was less critical and, as shown above, often blurred. The distinction makes all the difference, however, with regard to the 1976 Act's termination provisions. Under 17 U.S.C. § 304(c), ownership is *not* the issue—the statute presumes the publisher *owns* the copyright in question by express or implied assignment, as that is the very thing being terminated. The issue under Section 304(c) and in this case, is *authorship*.

As "work for hire" is the sole exception to statutory termination, overbroad application of the "instance and expense" test guts the 1976 Act's remedial termination provisions, and the consistent pro-authorial policies behind it, casting a pall over the copyright interests of innumerable creators and their families. The Estate is cognizant that this Court must apply the "instance and expense" test, but respectfully submits that, for the above reasons, it should be applied circumspectly in the context of statutory termination rights with a critical eye to the facts which evince the true *legal* relationship between the freelancer Ditko and "Marvel" in the relevant Period.

"Ultimately, '[o]ur case law counsels against rigid application of these principles. Whether the instance and expense test is satisfied turns on the parties' creative and financial arrangement as revealed by the record in each case.'" *Urbont v. Sony Music Entm't*, 831 F.3d 80, 90 (2d Cir. 2016) (quoting *Kirby*, 726 F.3d at 140).

## UNDISPUTED MATERIAL FACTS

### "Marvel" Comics and the Comic Book Industry

From its beginnings in the Great Depression to the 1960s, the comic book business was a "fly-by-night" operation where publishers came and went at an alarming rate. *See* L.R. 56.1 Stmt. of Material Facts ("SMF") ¶ 1. In the 1930s-1940s, at some publishers, artists

worked as employees, usually at long rows of desks, resembling a "sweatshop." *Id*. ¶ 2. At others, freelancers submitted completed work and the publisher purchased what it chose to publish. *Id*. ¶ 3. Comic book publishers saw little value in their disposable product beyond monthly sales. *Id*. ¶ 4. Little to no attention was paid to copyright issues by the publishers or artists. *Id*. ¶ 5.

In 1939, Martin Goodman ("Goodman") founded Marvel's predecessor, Timely Comics ("Timely"). *Id*. ¶ 6. Since 1947, Goodman's Magazine Management Company ("Magazine Management") published several pulp magazines. *Id*. ¶ 7. In 1951, Goodman began operating his comics business through Magazine Management under the label "Atlas Comics" and later, "Marvel Comics." *Id*. ¶ 8. From the 1940s until June 1968, Goodman also shuffled his comics through dozens of unrelated shell companies. *Id*. ¶ 9. These shell companies had no employees, no actual business activities, no corporate affiliation with Magazine Management, and, aside from being the name listed on the comic book cover copyright indicia, had no connection whatsoever to the works they purported to register for copyright and publish. *Id*. ¶ 10.

Stan Lee ("Lee"), who was Goodman's relative, started at Timely as an office boy. SMF ¶¶ 12-13. In 1941, Goodman promoted Lee, then 18, to the role of editor of his fledgling comics business. *Id*. ¶ 14. By the mid-1940s, Timely had staff artists on salary, but in 1949, Goodman discovered surplus artwork, and fired his entire staff. *Id*. ¶ 15. Then, in 1954-57, Senate hearings on the corrupting influence of comics nearly bankrupted Timely, now Magazine Management. *Id*. ¶ 16. So, in 1957, it again fired essentially all its employees except Lee. *Id*. ¶ 17. Magazine Management went from publishing 45 comics per month to 8. *Id*. ¶ 18.

In 1958, to keep its operations afloat, Magazine Management resumed buying freelance material at a per-page rate, but purposefully had no written contracts with freelancers in the 1960s

nor any obligation to buy freelancers' submissions, which it could reject at will. *Id*. ¶ 19. While it was understood that "Marvel" *owned* the work created by freelance artists once it purchased and paid for such work, neither Magazine Management (nor Goodman's shell companies) nor the freelancers viewed their creations as "work made for hire" or "Marvel" as the "author." *Id*. ¶ 20.

"Marvel," with its revolving door of corporate identities, questionable shell companies, cyclical firings, and improvised, slapdash business practices from its inception through the 1960s, was unique in its informality and disorganization. *Id*. ¶ 11.

In June 1968, Goodman sold Magazine Management and all his shell companies to publicly traded Perfect Film and Chemical Corporation, later renamed Cadence Industries ("Cadence"). *Id*. ¶ 21. Faced with Magazine Management and Goodman's haphazard business practices, Cadence sought to shore up its assets, though it also had no contracts with freelance creators until 1974. *Id*. ¶¶ 22-23. These contracts, which only began to appear in the mid-1970s, still contained *assignment* language only. *Id*. ¶¶ 23-24. No contract during this time used the term "work for hire" nor identified Marvel as the "author" of any of the works created by the talented freelancers who sold to them, even though, by the mid-1960s, it was the norm for publishers to do so. *Id*. ¶ 24.

**Marvel's "Work for Hire" Revisionism**

The "work for hire" doctrine became the focus of attention when the 1976 Act established an explicit "work for hire" regime under which work by an independent contractor may be "made for hire," under certain conditions. SMF ¶ 25. 17 U.S.C. § 101. Commencing in the late 1970s, Marvel thus attempted to re-label as "work for hire" the freelance material its predecessors had purchased and published decades earlier, even though it had *not* been treated or viewed as such previously. SMF ¶ 26. Nonetheless, Marvel began insisting that freelancers

14

sign contracts that retroactively re-characterized the freelance material its predecessors had purchased as "work for hire," decades after creation. *Id*. ¶ 27. In apparent concern over its legal position, Marvel has regularly engaged in this revisionist practice to this day.

In the late 1970s and 1980s, for example, after Marvel's competitor, DC Comics, began returning to freelancers their physical art so they could improve their unstable finances by selling autographed art to fans, Marvel was under pressure to do the same. *Id*. ¶ 28. Marvel, however, conditioned its return of art on the freelancers signing retroactive releases and purported acknowledgements that everything they had created, which Marvel published decades earlier, was all "work for hire."[4] *Id*. ¶ 29.

### Steve Ditko

Ditko was a prolific comic book creator and artist who revolutionized the artform, and created or co-created in the Period some of Marvel's most enduring and profitable superheroes including, without limitation, Spider-Man and Dr. Strange. SMF ¶ 35.

Unlike most freelancers in the Period, Ditko rented a separate art studio at his expense. He also paid for all his own materials and instruments and created his freelance artwork solely as an independent contractor on his own time, and at his own volition with the intention and hope of selling his material to Magazine Management, Charlton Comics, or other publishers. *Id*. ¶ 36. None of Ditko's expenses in creating his Works were paid for or reimbursed by Magazine Management, or the shell companies that copyrighted the Works. *Id*. ¶ 39.

It is undisputed that Ditko played a key role in the creation of the characters and stories

---

[4] As another example, in the early 1980s, Marvel ran a public competition for aspiring artists and writers. SMF ¶ 30. One amateur entrant, Randy Schueller, submitted a story with Spider-Man in a stealthy black costume instead of his usual red, black, and blue. *Id*. ¶ 31. A few months later, then Marvel editor, Jim Shooter, wrote to Schueller on August 3, 1982, offering to buy the story for $220 and told him to sign a "Work-made-for-hire Agreement." *Id*. ¶ 32. Schueller signed the agreement—the same form Marvel had other freelancers sign in and around 1978. *Id*. ¶ 33. Like those, Schueller's "agreement" provided that "all work … which have been or are in the future created … [were] a work made for hire," to transform Schueller's work which, by definition, he had created "on spec." *Id*. ¶ 34.

featured in his Works. *Id*. ¶¶ 40-42, 53, 71, 73, 78, 82, 85, 89. For example, Ditko kept a large chart in his studio, mapping out his ideas for the future development of his characters so he could plant narrative seeds and introduce elements in current comic book issues whose importance would be revealed and come to fruition in issues many months down the line. *Id*. ¶ 40. When submitting his artwork to Lee, Ditko would often write extensive margin notes, including suggested captions and dialogue, so that when Lee dialogued Ditko's story, he would know what story points Ditko intended in each panel and what the characters would likely say consistent with the story Ditko had plotted. *Id*. ¶ 41. Ditko, in essence, acted as both the co-writer/plotter and artist of the Works. *Id*. ¶ 42. Lee would then dialogue the balloons and add some captions based on Ditko's illustrated story, notes, and suggestions. *Id*.

In the Period, Ditko was not paid a fixed wage nor was he paid for services. SMF ¶ 43. He was paid by the page for that material Magazine Management chose to purchase subsequent to its creation. *Id*. If work was rejected, Ditko was not compensated, and personally took the loss. *Id*. ¶ 44. If Ditko was asked to redraw pages, he was not compensated for his extra labor or materials, but was paid only for the final, completed pages Magazine Management decided to buy. *Id*. ¶ 45. Ditko often refused to make changes to his work outright, and in that event, any changes Lee wanted were either ignored, or had to be made by production staff *after* Ditko had sold his work to the company. *Id*. ¶ 46. Magazine Management did not provide Ditko with any security or benefits, and Ditko was free to sell, and did sell, his work to other publishers, like Charlton Comics, while also selling to Magazine Management. *Id*. ¶¶ 47-48.

On those occasions when Ditko and Lee would exchange story ideas, Ditko was free to incorporate ideas from the exchange or reject them altogether, as Marvel and Ditko were under no legal obligations to one another. *Id*. ¶ 49. Indeed, if Ditko did not wish to work on a project

offered by Lee, he was free to reject it without consequence. *Id*. ¶ 50. Ditko, an extremely independent-minded artist, supervised himself, edited his own work, and created the Works after little or no discussion with Lee. *Id*. ¶¶ 51, 78 (Lee writing concerning *Dr. Strange*, "After [Ditko] did the hard part—after he dreamed up the story and illustrated it in his own unique style—I then got to the fun part … the dialog balloons and captions"), 90 (Lee writing that Ditko was co-creator of Spider-Man and that Ditko did most of the plotting of *Spider-Man* and just left Lee to do the dialogue and captions). In 1964, Ditko and Lee had a falling out over the future direction of the *Spider-Man* stories, and they refused to speak anymore. *Id*. ¶ 52 (Thomas testifying that Ditko, on his own, plotted and drew *Spider-Man* for more than one year before he left in 1966 and that Lee would not even know anything about the story until it was penciled and submitted by Ditko). From that point until Ditko left Marvel in 1966, Ditko was in complete creative control over how he plotted and drew his stories, leaving Magazine Management with little or no control over the stories, aside from Lee's dialoguing the balloons and finalizing the captions. *Id*. ¶ 53.

Notably, when Lee composed the final captions and dialogued Ditko's Works, he too did so as a freelancer, not as Marvel's editor, as writing was not an editorial function. SMF ¶ 57. Lee's editor salary did not cover his writing for which he was paid by the page, like Ditko.[5] *Id*. ¶ 58. In fact, Lee went to Magazine Management's office to serve as editor only three of the five workdays each week, reserving the other days for freelance writing at home. *Id*. ¶ 60.

In the Period, Ditko had no employment (or other) contract with Magazine Management or any Marvel predecessor. *Id*. ¶ 54. Ditko had no contact or relationship with any of the shell

---

[5] Even towards the end of the Period, it was Marvel's policy that those employed in editorial or production roles, who also created material as artists or writers, did the latter on a freelance basis, on their own time, usually at home, and were paid only for those pages Marvel chose to buy in its discretion. SMF ¶ 59.

companies (e.g., Vista Publications, Inc. ("Vista"), Atlas Magazines, Inc. ("Atlas"), Non-Pareil

Publishing Corp. ("Non-Pareil")) which purported to copyright the magazines publishing his

Works. *Id*. ¶ 55. Ditko received no direction or communication from any of the shell companies

or any employee of theirs, as they had none, nor was Ditko ever paid by any of them. *Id*. ¶ 56.

In the Period, Magazine Management was the only alleged Marvel predecessor that

bought work from writers/artists or employed editors like Lee. SMF ¶ 61. The shell companies

(e.g., Vista, Atlas, Non-Pareil) had no legal or corporate affiliation to one another or to

Magazine Management. *Id*. ¶ 62. Most importantly, these shell companies—which Marvel later

claimed in the copyright renewal registrations of the comic books (containing the Works) were

the "authors" of Ditko's creative material as "works made for hire"—made no payments to and

had no interaction with Ditko or Lee. *Id*. ¶ 63. Lee too was only paid by Magazine

Management. *Id*. ¶ 64. Like Ditko, Lee was not employed by, did not work for, and had no

contact with any of the shell companies. *Id*. ¶¶ 64-65.

It is also undisputed that freelancers in the Period were paid with Magazine

Management checks for those freelance pages it chose to purchase in its sole discretion. *Id*. ¶

66. It stamped legends on the back of its checks, which freelancers had to sign to cash them. *Id*.

¶ 67. Notably, Magazine Management's check legends acknowledged the freelancer's

contemporaneous "assignment to it of any copyright, trademark and any other rights in or

related to the material, including [his] assignment of any rights to renewal copyright." *Id*. ¶ 68.

As late as 1975, Marvel's check legends contained such "assignment" language and no "work

for hire" language. *Id*. ¶ 69.

In 1966, Ditko, frustrated with Lee and Magazine Management's failure to credit and

fairly pay him for his enormous role in creating the *Spider-Man* and *Dr. Strange* stories, refused

to sell any more of his material to the company. *Id*. ¶ 70.

### Steve Ditko's Dr. Strange

In 1963, Ditko created, plotted, and drew the first story of his celebrated character, the supernatural magician, Dr. Strange, published in *Strange Tales* No. 110. SMF ¶ 71. Ditko independently originated the character in 1946, more than a decade before he met Lee and began selling his work to Magazine Management. *Id*. ¶ 72. Later, Lee acknowledged that Ditko was the originator of the character, which flowed from concepts Ditko had been playing with for years. *Id*. ¶ 73. Ditko's early Dr. Strange sketches clearly depict what would later become the character he created and sold to Magazine Management. *Id*. ¶ 74.



Left: Ditko sketch dated August 6, 1946. SMF ¶ 74; Declaration of Marc Toberoff ("Toberoff Decl.") Ex. 33. Right: Dr. Strange's debut in *Strange Tales* No. 110, cover date July 1963. SMF ¶ 74; Toberoff Decl. Ex. 49.

Ditko plotted and drew completely "on spec" a five-page story introducing Dr. Strange, which he presented to Lee. SMF ¶ 75. Magazine Management bought the story, which was "published" by Vista. *Id*. Had Lee not decided to purchase Ditko's story, Ditko, who was selling his freelance work to Charlton Comics at that same time, could and likely would have sold his independent creation elsewhere. *Id*. ¶ 77. The world of Dr. Strange was strikingly different from other Marvel series of the time, but Lee liked it, and bought it, and many more unusual tales of Ditko's Dr. Strange followed. *Id*. ¶ 76. Ditko thereafter created a host of

supporting characters and an entire mythology of Dr. Strange before he stopped selling his

works to Magazine Management in 1966. *Id*. ¶ 78.

### Steve Ditko's Spider-Man

In 1962, as Magazine Management cast about for new superhero ideas, Jack Kirby and

Lee worked on a character named "Spider-Man," which Kirby said was based on an idea he

developed with Joe Simon in the mid-1950s. SMF ¶ 79. At some point, it was decided to toss

this version, though Kirby insisted he was never paid for the pages he had drawn. *Id*. ¶¶ 80-81.

Ditko then devised and pitched to Lee a new costume, and a new direction was charted

for a very different Spider-Man character. *Id*. ¶ 82. The difference between Ditko's conception of

the character and Kirby's shows just how little the character was developed before the two

pitched their ideas to Lee. *Id*. ¶ 83. Indeed, Ditko wrote on several occasions that the character

and stories were all worked out without Lee ever writing an actual script. *Id*. ¶ 84. The first

*Spider-Man* story introduced not only Peter Parker (aka Spider-Man) but also his Aunt May and

a rival at school, Flash Thompson—the first two members of what would eventually grow into a

large supporting cast of friends and foes. *Id*. ¶ 85.

In later interviews and essays, Lee often admitted that Goodman did not think the new

character would sell and forbade Lee to continue with it. *Id*. ¶ 86. Lee, enthusiastic about Ditko's

Spider-Man, flouted Goodman's authority and published the story in *Amazing Fantasy* No. 15,

anyway. *Id*. ¶ 87. Months later, after its success became known, Spider-Man got its own title and

an *Amazing Spider-Man* comic was launched. *Id*. ¶ 88. In short order, the cast swelled with

supporting characters in Peter Parker's life, like J. Jonah Jameson and Mary Jane Watson, and

Spider-Man foes, like Dr. Octopus, The Sandman, The Green Goblin, Kraven the Hunter, The

Vulture, The Scorpion and many more. *Id*. ¶ 89. All these and many others were co-created by

20

Ditko, and were firmly established well before Ditko left the comic, and stopped selling work to "Marvel" in 1966. *Id*. ¶ 90.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

The Estate is entitled to summary judgment when the pleadings and evidence show that there is "no genuine issue as to any material fact and that the [Estate] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S. Ct. 2505, 2511 (1986). A fact is "material" if it affects the outcome of the suit under the governing substantive law. *Id.* at 248, 2510. The moving party bears the initial burden of identifying evidence that demonstrates the absence of a genuine issue of material fact for trial. *Id.* at 256, 2514. The movant is not required to disprove unsupported assertions by the non-movant. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986). The burden then shifts to the non-movant to establish "specific facts showing a genuine issue for trial," not "merely[] allegations or denials." *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). Rule 56(a) "mandates the entry of summary judgment … against the party who fails to make a showing sufficient to show the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322-23, 106 S. Ct. at 2553.

This Motion seeks summary judgment affirming the validity of the Estate's termination notices, Dkt. 24-1 ("Terminations") under 17 U.S.C. § 304(c) ("Section 304(c)"). There are no genuine issues of material fact because the basic facts of the Terminations are undisputed, and Marvel cannot meet its burden, as a matter of law, on its purported "work for hire" defense.

## ARGUMENT

### A.    The Estate's Termination Complied with the Copyright Act

As the Ditko Estate fully satisfied the requirements for statutory termination set forth

in Section 304(c), its Terminations should be declared effective.[6] The full published stories,

which incorporated Ditko's Works (the "Stories"), constitute classic joint works.[7] Pursuant to

the Terminations, the Estate will recapture, on the respective termination dates set forth

therein, Ditko's undivided joint-authorship interest in the copyrights to the Stories for the

extended renewal term. 17 U.S.C. § 304(c)(1).

**B.** **The Undisputed Facts and Record Evidence Demonstrate that Ditko's Works Could Not Be "Works For Hire"**

As "work for hire" is a statutory exemption from the Estate's termination rights under

the 1976 Act, Marvel bears the significant burden of proving by "credible evidence" that the

---

[6] Although Marvel has not challenged the more technical aspects of the Terminations under 17 U.S.C. § 304(c), for the sake of completeness, they are summarized here. Section 304(c) applies to "any copyright subsisting in either its first or renewal term on January 1, 1978. *Id.* The relevant copyrights all were in their first term on January 1, 1978. Dkt. 24-1.

Section 304(c) applies to "the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it … before January 1, 1978 by" "the author." 17 U.S.C. § 304(a)(1)(C)(i), (c). Ditko's express or implied assignments to Marvel and the publication of his works were all before January 1, 1978.

If the author is deceased, Section 304(c) allows termination by "the author's executor[], if such author['s] widow, or children are not living. *Id*. § 304(a)(1)(C)(iii), (c). Ditko died on June 29, 2018, with no surviving widow or children. The Terminations were exercised by his duly appointed administrator, Patrick S. Ditko. Dkt. 24-1.

The termination notice must "state the effective date of termination … within the five-year period" "beginning at the end of 56 years from the date copyright was originally secured," and "served not less than two or more than ten years" before the termination date. 17 U.S.C. § 304(d)(1), (c)(4)(A). The Terminations stated the effective dates of termination (June 2, 2023 to July 17, 2023), which fell within the proper timeframe from the respective dates the relevant copyrights were originally secured (June 5, 1962 to May 10, 1966), respectively. Dkt. 24-1. 17 U.S.C. § 304(d)(1), (c)(4)(A). The Terminations were all timely served (June 1, 2021 to July 16, 2021), by First Class Mail, postage pre-paid, per 37 C.F.R. § 201.10(d). Dkt. 24-1. 17 U.S.C. § 304(c)(4)(A).

A copy of the termination notice must be "recorded in the Copyright Office before the effective date of termination," 17 U.S.C. § 304(c)(4)(A), and comply with the Register of Copyrights' regulations, 37 C.F.R. § 201.10. The Terminations were recorded with the Copyright Office on August 26, 2021, before the first effective termination date of June 2, 2023, and complied with 37 C.F.R. § 201.10. SMF ¶ 91; Toberoff Decl. Ex. 66.

[7] The 1909 Act did not contain a definition of "joint authorship" or "joint work," which was left to the courts to define. *Shapiro, Bernstein & Co. v. Jerry Vogel Music Co*. ("*Shapiro*"), a leading joint-authorship case, defined a "joint work" as "a work by two or more authors who merge their contributions into a single composition which is perceived by the audience as a unit." 161 F.2d 406, 409 (2d Cir. 1946) *cert. denied*, 67 S.Ct. 1310 (1947). The Stories satisfy this definition—merging Ditko's Works with Lee's dialogue and captions—and were perceived as a unified composition. Joint authors of literary works are entitled to an undivided pro-rata interest in the copyrights therein as tenants-in-common. *See Pye v. Mitchell*, 574 F.2d 476, 480 (9th Cir. 1978); Nimmer § 6.03.

freelance material Ditko created and thereafter sold to Marvel by the page was "work for hire," owned at inception by Marvel's shell companies. *See* 17 U.S.C. § 304(c); *Woods v. Bourne Co.*, 60 F.3d 978, 993 (2d Cir. 1995) (a terminated grantee has the burden of proving exception to Section 304(c) under the rule that the burden falls on a party claiming a statutory exception).

The following critical facts are undisputed and supported by the record. In the Period (1962-1966): (i) Ditko rented his own art studio and paid all the overhead and expenses of creating his artwork, which Marvel did not reimburse (SMF ¶¶ 36-37, 39); (ii) Marvel never hired Ditko to render services in the Period, had no contract with Ditko, and thus no legal right to "assign" work to or direct Ditko (*id.* ¶¶ 38, 50, 54-55); (iii) Marvel had no legal obligation to pay Ditko for his work, and was free to reject Ditko's submissions at will, nor did Marvel pay Ditko for pages it wanted redone as a condition to its purchase (*id.* ¶¶ 43-45); (iv) *after* Ditko had created his artwork, Marvel paid him at a page rate for only those pages Marvel chose to purchase in its sole discretion (*id.* ¶ 43); (v) Marvel paid Ditko with Magazine Management checks containing a legend it placed on the back, which stated that the parties' agreed that Ditko was *assigning* to Magazine Management all rights in his material, including "the copyright and renewal copyright" (*id.* ¶¶ 66-69); (vi) in 1962-1966, the copyrights registrations of the Stories, authored or co-authored by Ditko, were registered with the U.S. Copyright Office in the name of various shell companies—one by Atlas, and the rest by Vista, or Non-Pareil (the "Shell Company(ies)")—which had no employees, no operations, and did not employ, direct, or pay Ditko or Lee (*Id.* ¶¶ 10, 62-63); and (vii) Marvel's registrations in 1990-1996 of the renewal copyrights covering the Stories, represented that they were "works made for hire" and that the respective Shell Company in whose name the copyright was originally registered, was the statutory "author" thereof (*id.* ¶ 63).

23

**C.    Ditko's Artwork Was Not "Work For Hire" As a Matter of Law Because It Was Not Created at the "Instance" or "Expense" of the Shell Companies Registered as Its "Authors"**

The starting point for the "work for hire" analysis are the relevant certificates of copyright registration. Indeed, Marvel's renewal registrations claiming the relevant copyrights were owned as the Shell Companies' "work made for hire" are relied on by Marvel in its Complaint.[8] The Stories incorporating Ditko's Works were published by "Marvel" in comic book magazines ("Comic Books"), which often contained additional stories. *See e.g.*, SMF ¶ 71; Toberoff Decl. Ex. 49. The copyright registrations of these magazines served to register and protect the copyright(s) to the Stories therein. Nimmer § 7.16[A][2][c].

Here, the copyrights to the Comic Books were *all* registered in the name of Shell Companies, one by Atlas, and the rest by Vista or Non-Pareil and, in the 1990s, Marvel represented in its copyright *renewal* registrations that the Shell Companies owned the copyrights as the "author[s]" of purported "work[s] made for hire." *Id*. Moreover, in an illuminating example of Marvel's shell game and "work for hire" revisionism, Marvel acknowledged and represented in its initial registration of the "Amazing Spider-Man Annual" that the sole "author" was "Stan Lee," but then later claimed in its renewal registration that the "author" was "STAN LEE, EMPLOYEE FOR HIRE OF NON-PAREIL PUBLISHING CORPORATION." SMF ¶¶ 22, 26; Toberoff Decl. Ex. 48 (caps in original). Marvel's actions have consequences—particularly as its legal filings restrict contrary assertions.

As a matter of law, Ditko's Works could not have been created at the "instance and expense" of the Shell Companies because those entities (e.g., Non-Pareil and Vista) had no

---

[8] *See* Dkt. 1 ¶ 4 (alleging Marvel owns "the copyrights in the famous Marvel characters and comics on which Ditko worked" "as evidenced by the relevant copyright registration notices themselves"), ¶ 14 (again relying on Marvel's relevant copyright registrations and documenting them as Exhibit 1 to its Complaint).

actual operations or employees. SMF ¶¶ 10, 62-63. Marvel's "instance" arguments boil down to the alleged supervision of Lee, its editor in the Period—but Lee was employed by Magazine Management, not by any of the Shell Companies which had nothing to do with Lee or Ditko. SMF ¶ 64. For this reason, Ditko was not "supervised" by any of the Shell Companies and thus, could not have created his Works at their "instance." For similar reasons, Ditko's artwork could not have been created at the "expense" of any Shell Company because he was never paid by any of them. SMF ¶¶ 55-56. Nor did any Shell Company bear any financial risk associated with Ditko's Works or the Stories. Thus, because Ditko's Works were not created at either the "instance" or "expense" of the Shell Companies, they cannot be considered legal "authors" of his Works under the "instance and expense" test. Marvel has no admissible record evidence rebutting these indisputable facts.

This then is the *Achilles heel* of Marvel's revisionist "work for hire" defense as Marvel cannot disavow its own copyrights registrations from which it has benefitted for decades—e.g., tax/liability benefits (the Shell Companies' obvious purpose) and benefits from its public filings with the Copyright Office. Marvel has taken no steps to correct its registrations (*see* Compendium of U.S. Copyright Office Practices, chapter 1800 § 1802), and relies on these very registrations in this action. *See e.g.*, Dkt. 1 ¶ 14 (Marvel registered copyrights in and to the Works … The Register of Copyrights recorded the registrations as set forth in Exhibit 1").

Marvel cannot dismiss, as a technicality, its conscious use of these Shell Companies in the Period. Nor should it be permitted to fudge the distinction between the Shell Companies and Magazine Management, an alleged "partnership" between Goodman and his wife. SMF ¶¶ 10, 62. It is undisputed that the Shell Companies had no corporate relation to Magazine Management—as neither was a subsidiary or affiliate of the other. *Id*. ¶ 62. Nor has Marvel

produced any evidence of any contractual relationship between Magazine Management and the Shell Companies in the Period regarding Ditko's Works or the Stories. That both Magazine Management and the Shell Companies were allegedly owned by Goodman is an insufficient basis to ignore their intentionally separate corporate status or to conflate their activities.[9]

Nor do the Goodmans' obvious use of the Shell Companies for tax and liability purposes vitiate the legal implications of their distinct use. The Shell Companies were separate juridical entities used to book assets and revenues, which likely included the Stories they purportedly "published." SMF ¶¶ 9, 62. "[P]eople cannot use a corporate structure for some purposes— *e.g.*, taking advantage of tax benefits—and then disavow it for others." *Waite v. UMG Recordings, Inc.*, 450 F. Supp. 3d 430, 441-42 (S.D.N.Y. 2020) (J. Kaplan) (disallowing termination under the Copyright Act of grants by recording artists' solely-owned loan-out companies, and emphasizing that "courts must adhere to the text of the Copyright Act") (*citing Fourth Estate Pub. Benefit Corp. v. Wall-Street.com, LLC*, 139 S. Ct. 881, 892, 203 L.Ed.2d 147 (2019) (affirming copyright *registration* as an absolute prerequisite to filing an infringement action) (emphasis added)).[10] *See also Martha Graham School v. Martha Graham Center* ("*Martha Graham*"), 380 F.3d 624, 640-41 (2d Cir. 2004) (refusing to disregard Graham's own charitable Foundation as her "employer" in finding her choreography to be "work for hire"). Finally, the Shell Company issue is not just about Marvel's copyright registrations. Marvel claims *ownership* of the Stories' copyrights, as the successor-in-interest to the Shell Companies, as it must. Dkt. 1, Ex. 1-1; SMF ¶¶ 9, 63.

---

[9] *See Graham-Sult v. Clainos*, No. 15-17204, at *4 (9th Cir. Dec. 13, 2017) (holding posters were not "work for hire" under the 1909 Act. "Plaintiffs raise no triable issue of fact as to whether the posters were created at Graham's personal instance and expense … There is no evidence Graham paid any poster artist from *personal* funds. To the contrary, there is substantial evidence Graham's companies paid some poster artists.") (unpublished).

[10] *See* Nimmer § 5.03[B][1][a][v] ("Judge Kaplan rejected that argument" (quoting *Waite*, 450 F. Supp. 3d at 441)).

Notably, this dispositive Shell Company issue was neither adjudicated by, nor before, the panel deciding *Kirby*, 726 F.3d 119.

### D. "Work for Hire" Under the 1909 Act Applies to Employment of Independent Contractors, But Marvel Intentionally Avoided Hiring Ditko in the Period

Whether a pre-1978 work was "made-for-hire' is governed by the 1909 Act. *See* 17 U.S.C. § 26 (solely defining "work for hire" as "[t]he word author shall include an employer in the case of works made for hire"). The only cognizable explanation for extending Section 26 to independent contractors is that the term "employer" encompasses the employment of independent contractors as well as traditional employees. *See e.g., Brattleboro*, 369 F.2d at 568 ("We see no sound reason why these same principles are not applicable when the parties bear the relationship of employer and independent contractor."). Unsurprisingly then, in nearly all cases which hold that the work of an independent contractor was "for hire," that person was actually *hired* to create the work.[11]

By contrast here, the undisputed facts show that, not only was Ditko not hired by the Shell Companies, represented to be the "authors" of his Stories in Marvel's renewal registrations, Ditko was intentionally *not hired* by Marvel due to the precarious state and slim margins of Marvel's business in the Period.[12] SMF ¶¶ 54-55, 63. Indeed, Marvel never alleges in its carefully crafted Complaint that it ever actually *hired* Ditko. Instead, it says that it "engaged

---

[11] *See e.g., Martha Graham,* 380 F.3d at 636-37 (choreographer was formally "employed" by her School; opinion repeatedly referencing "the hiring party"); *Siegel v. National Periodical Publications, Inc.,* 508 F.2d 909, 914 (2d Cir. 1974) (defining "instance and expense" test: "when the motivating factor in producing the work was the employer who induced the creation"); *Hogarth,* 342 F.3d at 151 (written contract "establish[ing] the terms for the creation of the first and subsequent books"); *Ward v. National Geographic Soc.,* 208 F. Supp. 2d 429, 431 (S.D.N.Y. 2002) (J. Kaplan) ("Fred Ward was hired by NGS as an independent contractor"); *Playboy Enterprises, Inc. v. Dumas,* 960 F. Supp. 710, 713 (S.D.N.Y. 1997) (J. Kaplan) ("Playboy … hired Nagel;" repeatedly referencing "the hiring party").

[12] *See Urantia Found. v. Maaherra,* 114 F.3d 955, 961 (9th Cir. 1997) ("An employment (or commissioning) relationship at the time the work is created is a condition for claiming renewal as the proprietor of a work made for hire.") (quotation marks omitted) (quoted in *TCA Television Corp. v. McCollum*, 839 F.3d 168, 190 (2d Cir. 2016)).

numerous writers and artists" and "assigned [] Ditko stories to illustrate"—giving the illusion of employment, when none existed. *See* Dkt. 1 ¶¶ 1, 4 ("when Ditko worked for Marvel"). This sleight of hand and cunning wording runs throughout Marvel's attempt to disguise itself as "the hiring party."

In the early 1960s, when Ditko created or co-created the characters in question, "Marvel" was a tiny, haphazard operation with one editorial employee—Lee. SMF ¶¶ 11, 18 (Flo Steinberg explaining that, when she was hired at Marvel in March 1963, Marvel had the "teeniest little office"). Due to the seismic downturn of its business in the 1950s, Marvel had fired all its staff artists and writers. *Id*. ¶ 17. Marvel thus avoided legal commitments to freelancers like Ditko, because it was concerned by the volatile market in the Period. *Id*. ¶ 19. Therefore, the only control Marvel had over any freelancer was its ability to purchase or not purchase their artwork. Marvel cleverly used this purchasing power to extract the benefits it previously enjoyed (i.e., comic book material), without the detriments (i.e., financial obligations and overhead). While Lee purported to hand Ditko "assignments," these, in reality, were optional proposals and not legally cognizable employment of any kind. SMF ¶ 50.

It is undisputed that Ditko had no legal obligation to create material for Marvel and Marvel had no legal obligation to buy and pay for it. SMF ¶¶ 43-44, 50, 54-55. To the contrary, Marvel made certain it could reject Ditko's work at will. *Id*. ¶¶ 43-44. Of course, when Marvel accepted Ditko's material for publication, it paid for the pages it chose to purchase, as in any sale. *Id*. ¶ 43. But this sale of artwork by the page is something entirely different from the bilateral legal obligations that "hiring" entails, whether it be of a traditional employee *or* an independent contractor. This fatal defect in Marvel's revisionist "work for hire" theory is not obscured by its cloaked references to Lee's "assignments" and Ditko's "working for" Marvel.

28

Dkt. 1 ¶¶ 1, 4. The cases extending "work for hire" under the 1909 Act to independent contractors involve, and repeatedly refer to, the "hiring party" or the "employer" of the independent contractor because, without that, there can be no "work for hire." *See* n.11, *supra.*

> **E.      The Undisputed Facts Are Irreconcilable with the "Work for Hire" Doctrine and Fundamental Copyright Principles**

The undisputed facts are incompatible with the "work for hire" doctrine and basic copyright principles. It is central to our copyright law that copyright "vest[s] in the author of an original work from the time of its creation." *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 547, 105 S. Ct. 2218, 2223-24 (1984). Under the 1909 Act, the author of a "work for hire" is the "employer." 17 U.S.C. § 26. Accordingly, "with a true work for hire, copyright ownership … [is] with the employer automatically upon the employee's creation of the work," and the employer is the "author" *at inception. Hogarth*, 342 F.3d at 163.

Thus, authorship of a "work for hire" cannot be based on *contingent*[13] *post-creation* events like Marvel's payment for only that Ditko work it chose to buy. While of course *ownership* can change, *authorship* is fixed and immutable *at creation*. It is undisputed that Marvel, by design, was under no legal obligation to pay Ditko for services or the work he submitted and could reject it in Marvel's sole discretion. SMF ¶¶ 19, 44, 54. It is further undisputed that Marvel neither owned, nor purported to own, the freelance material it rejected. SMF ¶ 44. As Marvel admittedly did not own Ditko's material "upon creation," it follows that he did not create such material within a "work for hire" relationship. *See Hogarth*, 342 F.3d at 163.

By contrast, no such question exists in a true "work for hire" relationship, wherein a

---

[13] Even contractual *contingent* compensation in the form of a royalty weighs against "work for hire." *See Playboy*, 53 F.3d at 555 ("where the creator of a work receives royalties as payment, that method of payment generally weighs against finding a work-for-hire relationship"); *Twentieth Century Fox Film Corp. v. Enter. Distrib'n*, 429 F.3d 869, 881 (9th Cir. 2005) (finding that "expense" met when publisher agreed to pay author "a lump sum for writing the book, instead of negotiating a royalty deal"); § 5:61 ("Where payment is solely by royalties, this fact weighs against an employment relationship.").

hiring party commissions an independent contractor to create a work and is legally obligated to pay for his conforming services or work. *See* n.11, *supra*. This legal distinction is critical and may not be hand-waved away by Marvel, which specifically avoided such payment obligations in the Period. SMF ¶¶ 19, 44, 54. After all, the "work for hire" doctrine—crowning a putative employer the "author" and owner of a work at inception—is a purely legal construct and an exception to the "general rule, [that] the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *Reid*, 490 U.S. at 737, 109 S. Ct. at 2171.

Because Marvel's revisionist "work-for-hire" defense is irreconcilable with the doctrine itself and basic precepts of copyright, it leads to absurd results. For example, it means that Marvel somehow "authored" and owned at inception those Ditko creations it subsequently decided to purchase, but that Ditko authored/owned the artwork Marvel opted to reject. Alternatively, Marvel was the "author" of all such freelance material as "work for hire," but upon rejection, it transmorphed, was no longer "work for hire," and Ditko, became its "author" and owner. If this makes no sense, it is because Marvel's *post-hoc* labelling of Ditko's freelance material as "work for hire" makes no sense. Neither Marvel nor any court has ever reconciled these irreconcilable contradictions or the absurdities they lead to.[14]

Marvel's revisionism is even more problematic since the natural alternative—Marvel's purchase and Ditko's assignment of his artwork to Marvel—is both reflected by the record and leads to no legal contradictions or absurdities.

---

[14] Overbroad use of "instance and expense" leads to further contradictions with well-settled law, e.g., the work of *a traditional employee* "as a special job assignment, outside … [his] regular duties" is not "work for hire," even when the employer pays for and supervises it. *Martha Graham,* 380 F.3d at 635. This means it would be much easier under the 1909 Act for *independent* freelance work to qualify as "for hire" than that of a traditional employee.

### F.      Marvel Cannot Satisfy the "Expense" Prong

#### 1.      *Ditko, Not Marvel, Bore the Financial Risk of Creating His Artwork*

The crux of the "expense" prong is who bore the entire financial risk associated with the creation of the Works. *See Kirby*, 726 F.3d at 139 ("The 'expense' component refers to the resources the hiring party invests in the creation of the work."); *Twentieth Century Fox Film Corp. v. Entm't Distrib.*, 429 F.3d 869, 881 (9th Cir. 2005) ("expense" test met if a party takes on "all the financial risk"). The issue here is whether Ditko created *his material* as "work for hire," owned at inception by Marvel.[15] It is not about Marvel's subsequent assemblage and publication of the comic books containing the Ditko Works or the risk that a particular comic book might not sell well or be successful, because that is a risk all publishers bear, regardless of whether a work was done "on spec" or was "work made for hire."

For these reasons, the "expense" prong must necessarily focus on who bore the financial risk associated with Ditko's *creation of his material* at issue, *not* Marvel's subsequent production and publication of the *comic books* featuring the Stories.[16] Nimmer § 5.03[B][2][d] at n.171 ("Plainly, it is the expense of creation, rather than publication, that is relevant.").  The "expense" prong is not about the risk of Marvel's publications being profitable *first*, because

---

[15] *See* Dkt. 1 ¶ 1 (alleging "the contributions Steve Ditko made were at Marvel's instance and expense, rendering his contributions 'work made for hire'"), ¶¶ 10-13, 23, 24 (purporting to apply "instance and expense" test to Ditko's "contributions" to certain comic books, not to the comic books themselves). *See also* Dkt. 24 ¶¶ 28-29, 31, 33-37, 46 (focusing on why the Ditko Material is not "work for hire"), ¶¶ 55-58 (seeking a declaration that the *Ditko Material* was not Marvel's "work for hire").

[16] To put this and the Terminations in perspective, a graphic comic book story comprised of artwork by one author (Ditko) and text by another (Lee) is a classic joint work in which its co-authors own an undivided share of the copyright in the story. *See Shapiro*, 161 F.2d at 409. Ditko's contributions qualify him as a co-author of the Stories. Upon termination under 17 U.S.C. § 304(c), Ditko's undivided co-author share in those joint works revert to his Estate. Lee's employment (or failure to exercise termination rights as to his freelance writing) does not render Ditko's contributions "work for hire." *See Siegel v. Time Warner Inc.*, 496 F. Supp. 2d 1111, 1144 (C.D. Cal. 2007) (As to [Siegel/Shuster's] joint work, [DC] would own half of the copyright [] as the author of Shuster's alleged work for hire or … given his [] failure to … terminat[e]".).

the focus is on Ditko's creation of material and *second*, because a publisher always bears the financial risks of publication, regardless of whether a work is "for hire," or as here, purchased and assigned. *Id.* ("[I]f funding publication could convert a manuscript into a work for hire, then the category would soon subsume all published material—given the universal custom of publishers to fund printing, distribution, advertising, etc. of their wares."); Patry § 5:54.

It is undisputed that Marvel did not advance Ditko any money to cover his work. It is further undisputed that Ditko rented his own art studio, paid the associated overhead (maintenance, utilities), paid for his own materials (paper, ink) and instrumentalities used to create his artwork (pens, pencils, brushes, erasers, drafting tables, lights, magnifiers), which Marvel neither reimbursed nor was obligated to reimburse. SMF ¶¶ 37, 39. *See Urbont*, 831 F.3d at 90 (finding that artist's provisions of "his own tools and resources in[] a recording studio he rented … supports an inference that [he] b[ore] the risk with respect to the work's success.") (internal quotation marks and cites omitted).[17] It is further undisputed that *after* Ditko created his artwork and submitted it, Marvel could reject any of it at will, and in that event, *Ditko* bore the loss of his labor and materials. SMF ¶¶ 43-44. Whether Marvel did this often or seldom is irrelevant as a matter of law. What *is* relevant is that Marvel had no legal obligation to pay Ditko for conforming services. *Id*. ¶ 43-45. Marvel now portrays itself as the "hiring party," but in the Period, Marvel avoided the financial obligations *and the risk* that "hiring" entails. *Id*. ¶ 19.

Ditko, who invested his own time and financial resources in creating his material, without *guaranteed* compensation, by definition, assumed the financial risk of its *creation.* Whatever

---

[17] *See also Kirby*, 726 F.3d at 139 (noting that the Second Circuit has "suggested that the hiring party's provision of tools, resources, or overhead may be controlling"); *Martha Graham,* 380 F.3d at 638 ("It may well be that the resources of the Center—notably, its rehearsal space and the dancers enrolled at the School—significantly aided Graham in her choreography, thereby arguably satisfying the 'expense' component.").

financial risk Marvel incurred afterward, as a publisher, is inherent to all publishing and, as such, does nothing to differentiate "work for hire," and is thus legally irrelevant.

### 2. Marvel's Conscious Avoidance of the Simple Legal Commitment to Pay Ditko for Conforming Services is Fatal to the "Expense" Prong

In most cases finding "work for hire" based on payment of a sum certain, the employer had hired the independent contractor to perform creative services and was legally obligated to pay for conforming work.[18] Conversely, even where payment was contractually agreed but *contingent* in nature (e.g., a royalty), this weighs heavily against "work for hire," as the author technically bore the risk of creation. *Martha Graham*, 380 F.3d at 641.[19] Here it is undisputed that payment was expressly contingent on whether Marvel chose, in its discretion, to buy Ditko's work. SMF ¶¶ 43-44. And as shown above, this destroys the logic of the "work for hire" doctrine and the "instance and expense" test which seeks to assess "if the copyright … vested in [the employer] from the moment it was created." *Twentieth Century,* 429 F.3d at 887.

"Expense" thus necessarily entails a prior legal obligation of a *hiring party* to pay a non-contingent, fixed sum for the work commissioned. This is a critical function of the "expense" prong, as it serves to distinguish "work from hire" from the "purchase and assignment" of created material. *See Playboy Enterpr's, Inc. v. Dumas*, 960 F. Supp. at 715-16 (J. Kaplan) (publisher's obligation to pay "'turn-down'" fee for "unused work" weighs in favor of "work for

---

[18] *See e.g., Hogarth*, 342 F.3d at 163 (finding "expense" due to publisher's contractual obligation to pay a guaranteed fixed sum); *Twentieth Century,* 429 F.3d at 881 (finding "expense" based on publisher's contractual obligation to pay "nonrefundable" cash advance); *Murray v. Gelderman*, 566 F.2d 1307, 1309-11 (5th Cir. 1978) (finding "expense," as employee was "to be compensated for her services" and publisher "reimbursed her for out-of-pocket expenses"); *Fifty-Six Hope Rd. Music Ltd.,* 2010 U.S. Dist. LEXIS 94500, at *26-27 (S.D.N.Y. September 10, 2010) (*see* Toberoff Decl. Ex. 61) (employer was contractually obligated to "pa[y] [artist non-refundable] advances against royalties for the creation of the [works]" and to pay "the recording costs"); *Ward*, 208 F. Supp. 2d at 433-34 (J. Kaplan) (finding "expense" as (1) terms of many work assignments "memorialized in writing," "(2) NGS paid Ward a minimum guarantee for his contributions … and (3) NGS paid Ward's expenses")).

[19] *See also Playboy,* 53 F.3d at 555 (contingent "royalty" "weighs against finding a work-for-hire relationship"); *Twentieth Century*, 429 F.3d at 881(same); Nimmer § 5.03[B][2][d] (same).

hire"; "if Playboy had never published the work … no reason to pay anything for it absent a

work for hire relationship, as it would have no need for any rights in such a case"). By contrast,

Marvel, by design, could reject Ditko's submissions *at will*, without any payment. SMF ¶¶ 19, 43-

44. Thus, the "expense" prong is not satisfied by Marvel's payment of a "sum certain" for that

work it wished to publish, as such payment would apply equally to a *purchase* of Ditko's Works,

and does nothing to evince "work for hire." *See Epoch Produc'g Corp. v. Killiam Shows, Inc.*,

522 F.2d 737, 745 (2nd Cir. 1975) ("evidence that is [equally] consistent with" non-work for hire

"cannot be bootstrapped"). As Marvel cannot establish the "expense" prong of the "instance and

expense" test, the Estate's Motion should be granted.

### G.    Marvel Cannot Establish "Instance"

#### 1.    *Marvel Lacked the Legal Right to Direct and Supervise Ditko*

"'Instance' refers to the extent to which the hiring party provided the impetus for,

participated in, or had the power to supervise the creation of the work." *Urbont*, 831 F.3d at 89

(quoting *Kirby*, 726 F.3d at 139 in turn quoting *Martha Graham*, 380 F.3d at 635 (holding that

"instance" requires that "the *employer* … has the *right* to direct and supervise the manner in

which the work is carried out," *i.e.*, the creative process)  (emphasis added)).

*First*, "instance" is not an abstraction, instead, it is adjudged in the context of the actual

employment of an independent contractor, which is absent here. *Second*, and relatedly, the

Second Circuit's reference to the "right to direct and supervise" the artist's work, could only refer

to a *legal right*, not mere purchasing power. *See e.g.*, *Martha Graham,* 380 F.3d at 635 ("The

*right* to direct and supervise the manner in which work is created need never be exercised.")

(emphasis in original). Furthermore, the legal right to control necessarily refers to the *creation*

of Ditko's material—the focal point of the work-for-hire analysis—not to Marvel's decision to

purchase and publish Ditko's artwork after it was created. Because authorship of a true "work

for hire" vests at creation, creation is the touchstone of the doctrine, not contingent events subsequent to it. *Hogarth*, 342 F.3d at 163. *See* Patry § 5:54 ("Any hiring party [Marvel was not even that] ultimately has the ability to 'control' the work in the sense of accepting or rejecting it."). Nor does "instance" refer to Marvel's obvious right *after* it purchased/owned Ditko's artwork to revise it, or to Marvel's right, like any publisher, to control its publication.[20]

Whereas Marvel could decide whether to buy the artwork Ditko submitted, and naturally had editorial and other control over the comic books it published, it is undisputed that Marvel had no *legal right* to control Ditko's *creation* of material. SMF ¶¶ 19, 54. Marvel can cite no evidence that it had any "right" to direct Ditko's services or to edit or modify Ditko's artwork unless and until Marvel bought it. And just as Marvel had no legal obligation to buy Ditko's submissions, Ditko had no obligation to provide work to Marvel, to revise his material or to even finish work he started.  SMF ¶¶ 46, 48-50, 54. Marvel may have had the practical economic power to set parameters or make requests as a condition of purchase, but that does not legally equate to the "right to direct or supervise" Ditko's creation of his Works. *Martha Graham,* 380 F.3d at 635.

Moreover, Marvel cannot rely on its ownership of any underlying rights or allegedly preexisting characters or material to challenge Ditko's authorship of the Works. *First*, as to the characters at issue, like Dr. Strange or Spider-Man, Ditko himself authored or co-authored the original Stories in which the main superhero character and/or key supporting characters first

---

[20] *See Twentieth Century*, 429 F.3d at 880 (distinguishing "[Publisher's] significant degree of supervision over [author's] writing" from "[publisher's] typical process for most books [that] involved waiting for the manuscript to be completed, and then discussing possible improvements with the author. … [T]he degree of in-person supervision was much greater than usual, including regular face-to-face meetings between [author] and [publisher] during the writing process where its editorial board provided him with extensive notes and comments. [Publisher] also hired a fact checker who 'offered suggestions for modifications and additions . . . where the original draft did not conform with historical facts.'"); *Fifty-Six Hope Rd. Music Ltd.,* 2010 U.S. Dist. LEXIS 94500, at *29 ("[Employer] had the *contractual right* to accept, reject, modify and otherwise control the creation of the [works].") (emphasis added).

appeared. SMF ¶¶ 71, 75, 85, 87. And, in any event, under the 1909 Act, like the 1976 Act, "[t]he aspects of a derivative work added by the derivative author [here, Ditko] are that author's property." *Stewart*, 495 U.S. at 223, 110 S. Ct. at 1761-62. *See also Siegel,* 496 F. Supp. 2d at 1142 (holding as to *Superman*: "Were the Court to adopt defendants' [DC Comics] approach every derivative work would also be [] a work made for hire.").

### 2.     *In Practice, Marvel Was Far Removed from Ditko's Creative Process*

The "instance" analysis is not black and white. Rather, "the issue is one of degree"—the less supervision and control the hiring party has over an independent contractor's creative process, the less likely it is that the work was created at the hiring party's instance. *Twentieth Century*, 429 F.3d at 877.

Ditko created his freelance artwork on his own time and at his volition, with the hope or intention of selling it. SMF ¶¶ 38, 48. It is undisputed that Ditko played a key leadership role in both the creation and development of the characters and Stories at issue. For example, Ditko kept a large chart in his studio, mapping out his ideas for the future development of his characters so he could plant narrative elements in a current story, the importance of which would be revealed in later issues. *Id*. ¶ 40. When submitting his artwork to Lee, Ditko often wrote extensive margin notes, including suggested captions and dialogue, so that when Lee, or later, Roy Thomas ("Thomas"), dialogued Ditko's story, they would know the story beats Ditko intended in each panel, not vice versa, and what the characters would likely say consistent with the story Ditko had plotted. *Id*. ¶¶ 41-42. Ditko was uniquely independent-minded and functioned as both the co-writer/plotter and artist of the Stories. *Id*. ¶¶ 42, 46, 51. All this weighs quite heavily against a finding of "instance."

Ditko, as an independent artist with his own studio, was free to sell, and sold, work to other publishers, like Charlton Comics, while also selling to Magazine Management. SMF ¶ 48.

This also weighs against "instance."[21] Ditko was fiercely independent, and edited his own stories, which he created after little or no discussion with Lee; Ditko often refused, outright, to change his work, when and if suggested by Lee. *Id.* ¶¶ 42, 46, 49, 51. In that event, any changes Lee desired were either ignored, or had to be made by a production assistant *after* Ditko's work was purchased. *Id.* ¶ 46. And because Marvel avoided legal commitments to Ditko, and, in turn, was owed no duties by him, on those occasions when Ditko and Lee exchanged ideas, Ditko was free to incorporate or reject them altogether. *Id.* ¶¶ 19, 49, 51, 54. Indeed, if Ditko did not wish to work on a project offered by Lee (which Marvel now styles as an "assignment"), Ditko was free to decline it without consequence. *Id.* ¶ 50. In sum, Marvel cannot point to anything giving it a *legal right* to direct or control Ditko's creative process, nor did Marvel do so in practice, as all Marvel ever had in the Period was simple purchasing power.

### a.    Steve Ditko's Dr. Strange

In 1963, Ditko created, plotted, and drew the first story of his celebrated character, Dr. Strange, published in *Strange Tales* No. 110. SMF ¶ 71. Ditko originated the character in 1946 more than a decade before he met Lee and began selling his work to Magazine Management. *Id.* ¶¶ 72, 74. Lee acknowledged that Ditko originated the character, which he had been playing with for years. *Id.* ¶ 73. Importantly, Ditko plotted and drew the first five-page story introducing Dr. Strange completely "on spec" and presented it to Lee. *Id.* ¶ 75. This could not be "work for hire." *See Siegel,* 508 F.2d at 914 (holding that the Superman comic strip was not created at the employer's instance where the character "had been spawned by the [authors] four years before

---

[21]*See Kirby*, 726 F.3d at 140 (noting that, in *Donaldson Publishing Co. v. Bregman, Vocco & Conn, Inc.,* 375 F.2d 639, 643 (2d Cir.1967), the Second Circuit found relevant an "employee['s] 'freedom to engage in profitable outside activities without sharing the proceeds with [the hiring party]'").

the relationship between [the] authors and the [employer]").

Magazine Management purchased the story which was then "published" by Vista, with Marvel later registering it as Vista's "work made for hire." SMF ¶ 75. Had Lee not bought Ditko's story, Ditko, who was also selling his freelance work to Charlton Comics, could and likely would have sold his independent creation elsewhere. *Id*. ¶ 77. The world of Dr. Strange was strikingly different from other "Marvel" superheroes of the time, but Lee liked it, bought it, and many more of Ditko's strange *Dr. Strange* stories followed. *Id*. ¶ 76. Ditko thereafter created a host of supporting characters and an entire *Dr. Strange* mythology before he stopped selling his works to Magazine Management in 1966. *Id*. ¶ 78.

### b.   Steve Ditko's Spider-Man

In 1962, Kirby and Lee worked on a character named "Spider-Man," which Kirby said was based on a concept of his and Joe Simon's in the 1950s. SMF ¶ 79. At some point, it was decided to toss this version and start over, though Kirby was allegedly never paid for his work. *Id*. ¶¶ 80-81. Ditko then devised a new costume, and a new direction was charted for a very different Spider-Man character. *Id*. ¶ 82. The stark differences between Ditko's conception and Kirby's shows just how little the character was developed before each presented their work to Lee. *Id*. ¶ 83. Indeed, Ditko wrote on several occasions that the character and stories were all worked out without Lee ever writing a single script. *Id*. ¶ 84. The first *Spider-Man* story introduced not only Peter Parker (Spider-Man), but also his Aunt May and a school rival Flash Thompson—the first of what evolved into a large supporting cast of friends and foes. *Id*. ¶ 85.

In later interviews and essays, Lee often admitted that Goodman did not believe the character would sell and forbade Lee to publish *Spider-Man*. *Id*. ¶ 86. Lee, enthusiastic about Ditko's Spider-Man, flouted Goodman's authority and published the story in *Amazing Fantasy* No. 15, anyway. *Id*. ¶ 87. Thus, it is difficult to reconcile how the first *Spider-Man* story could

38

have been at Marvel's "instance," if its owner, Goodman, opposed it, and Lee proceeded without Marvel's authorization. Months later, in success, Spider-Man got its own title, and the *Amazing Spider-Man* comic was launched. *Id.* ¶ 88. Soon the cast swelled with supporting characters like J. Jonah Jameson and Mary Jane Watson, and foes like Dr. Octopus, The Green Goblin, The Sandman, Kraven the Hunter, The Vulture, The Scorpion and many more. *Id.* ¶ 89. All these and many others were created or co-created by Ditko and were firmly established well before Ditko stopped selling work to "Marvel" in 1966. *Id.* ¶ 90.

Importantly, Marvel's "instance" arguments rely on Lee's alleged creative contributions to the Stories. But *writing* was not part of Lee's editorial function. SMF ¶ 57-58. An editor's job is to edit, not to create or write stories. *Id.* ¶ 57. Thus, when Lee wrote the dialogue and final captions of the Stories, he, like Ditko, did so as a *freelancer*, not as Marvel's editor/ employee. *Id.* ¶¶ 57-58. Marvel agrees—Lee's editor's salary expressly did not cover writing, for which Lee was paid by the page, just like Ditko.[22] *Id.* ¶ 58. Tellingly, Lee stayed at home to write comics two or three of the five workdays each week. *Id.* ¶¶ 59-60. And Lee, the editor, can hardly be said to have directed and supervised Lee, the writer. *Id.* ¶ 57. Marvel's use of Lee's creative writing input as its surrogate to argue that it directed Ditko and thereby satisfies the "instance" prong is thus, unavailing. Since Ditko and Lee's creative contributions were both made as independent freelancers, neither can be said to have created the Stories they co-authored at *Marvel's* "instance."

Moreover, in 1964, Ditko and Lee had a falling out over the future direction of the *Spider-Man* stories and the two refused to speak anymore. *Id.* ¶ 52. From that point until Ditko

---

[22] *See Martha Graham,* 380 F.3d at 635 n.19 (describing *Shapiro,* 221 F.2d at 570: "[T]he employer had purchased the copyright … Because this payment was in addition to his salary and the lyric-writing was a special job assignment, the lyric was not considered a work for hire").

left Marvel in 1966, Ditko was in complete creative control over how he plotted and drew his *Spider-Man* and *Dr. Strange* stories, leaving Magazine Management with little or no control over the stories, aside from Lee's freelance dialoguing, which he did after Ditko had already created and submitted his material—hardly the paradigm of "instance." *Id*. ¶ 53.

### H.   Marvel and Ditko Could Not Have Intended that Ditko's Material was "Work for Hire"

It is well settled that whether a work is "made for hire" under the 1909 Act turns on the objective understanding of the parties *at the time the works were created*. *Playboy,* 53 F.3d at 556-57 ("work for hire" is always a question of "the intent of the parties"); Nimmer § 5.03[B][2][c] ("work for hire" under the 1909 Act "always turn[s] on the intention of the parties"). The "instance and expense" test itself seeks to inferentially derive the "mutual intent of the parties." *Id. See also Dolman v. Agee*, 157 F.3d 708, 712 (9th Cir. 1998) (the "instance and expense" test seeks to determine "the presumed intent of the parties, and does not operate as a matter of law").

Courts should not retroactively and inferentially impute an intent the parties could *not* possibly have had. Until 1966, "the courts had applied the work for hire doctrine under the 1909 Act exclusively to traditional employees." *Reid*, 490 U.S. 730 at 749, 109 S. Ct. 2177-78. Thus, even if Ditko or Marvel had retained Melville B. Nimmer himself in the Period (1962-1966) they would have been advised that Ditko's freelance work was *not* "work for hire" under Section 26 of the 1909 Act—as construed for over five decades, including in the Second Circuit, to solely apply to traditional employment. *See* M. Nimmer, *Nimmer on Copyright* § 63 at 245 n.80 (**1963**) (SMF ¶ 20; Toberoff Decl. Ex. 64) ("Sec[tion] 26 expressly renders an employer for hire an 'author' but makes no comparable provision with respect to commissioned works."). For "independent contractor[s]" like Ditko, the publisher's ownership was "by virtue of an

40

assignment." *Id*. § 62.4 at 242; *id*. § 114.4 at 470 (1969). *See also Shapiro*, 221 F.2d 569, 570 (2d Cir. 1955), modified on other grounds, 223 F.2d 252 (2d Cir. 1955); B. Varmer, "Works Made for Hire and On Commission," in 1 Studies on Copyright 717, 722 n.7 (1963). Unsurprising, then, nearly all the record evidence points to the conclusion that Magazine Management actually intended that Ditko simply assign to it the rights to his freelance work that Magazine Management chose to purchase for publication.

I.   **The Undisputed Facts Show that Ditko Assigned to Marvel the Copyrights in Artwork Marvel Opted to Purchase**

There is no reason to indulge Marvel's strained use of the "instance and expense" test to assert retroactively that the Ditko Works Magazine Management chose to purchase and have *assigned to it*, were somehow owned at inception as "works made for hire" (by Goodman's Shell Companies no less). The undisputed facts lead to the natural conclusion that Marvel owned all rights, including the copyright, in the Ditko Works Marvel purchased by express or implied *assignment*. Accordingly, no court should have to bend over backwards, as Marvel demands, to find that Ditko's imaginative creations were "works made for hire" when a thoroughly consistent legal explanation—ownership by assignment—is more than evident.

*"Marvel's" Checks Expressly Assigned the Renewal Copyright*

Marvel's alleged predecessor, Magazine Management, placed a legal acknowledgement or "legend" on the backs of its checks, forcing freelancers to sign underneath to cash them. SMF ¶¶ 66-67. Marvel claims it has no freelancer checks before 1973, and no checks to Ditko, however, 1973-1975 Marvel checks to freelancers Stephen Gerber and Richard ("Dick") Ayers contained this assignment "legend":

> By endorsement of this check, I, the payee, acknowledge full ***payment … for my assignment to it of any copyright***, trademark and any other rights in or related to the material, and ***including my assignment of any rights to renewal copyright***.

41

SMF ¶¶ 68-69 (emphasis added). Freelancers Gene Colan, Ayers, Joe Sinnott, James Steranko and Neal Adams specifically recalled and directly testified that Marvel's checks in the 1950s and 1960s contained such explicit language of purchase and assignment, *not* "work for hire." *Id*. ¶ 68. This, again, is no surprise, as prior to 1966, the "work for hire" doctrine only applied to traditional employees, not to freelancers like them or Ditko.

Marvel *chose* the clear language of copyright "assignment" in its legends—the antithesis of "work for hire"—and Marvel *intended* the legend to be an agreement by the freelancer endorsing the check in payment for his product.[23] Furthermore, Marvel has consistently relied on its check legend assignments to successfully assert ownership.[24] "Work for hire" language is completely absent from Marvel's check legends or any agreements in the record until long after the Period, further evidencing *Marvel's* intent.[25]

The foregoing is also consistent with the understanding and intent of numerous freelancers in the Period that "Marvel" simply *purchased* their work. SMF ¶ 68; Toberoff Decl. Ex. 8 ¶ 15 (e.g., Sinnott: "In the 1950's through the 1960's, I certainly did not consider my freelance artwork to be 'work for hire.' Nor did the other freelance artists I knew. No one was thinking along those lines."). Even Marvel's witnesses including Lee and Thomas admitted that Marvel just "purchased" that submitted material it accepted for publication. SMF ¶ 66 (Lee

---

[23] *See Dolman*, 157 F.3d at 712 ("[Author] assigned his rights to the subject songs to [Subsidiary], which was owned by [Company]. Had the works been intended to be works for hire for [Company], there would have been no reason for [Subsidiary] to accept an invalid assignment of rights from [Author], knowing that its parent company already owned those rights.").

[24] *See e.g.*, *Gary Friedrich Enterprises, LLC v. Marvel Enterprises, Inc.*, 837 F. Supp. 2d 337, 341-42 (S.D.N.Y. 2011) ("Friedrich conceded that the [Magazine Management] checks he received during the time period in which he created the Character and the Work contained the assignment legend … the record evidence is that freelance work was paid for with separate checks containing that legend [] and there is no evidence in the record that the freelance checks he received for the Work varied from typical practice and did not contain the legend.").

[25] The earliest check Marvel could produce with a legend mentioning "work for hire" was from 1986 and applied to traditional employment.

testifying that Marvel "would only buy what [it] needed"). *See Shapiro,* 221 F.2d at 570 (not "work for hire," employer simply *purchased* song which was assigned). Marvel claims all this purchase and assignment stuff is simply "belt and suspenders," when the "belt" of assignment was the only thing holding up their copyright pants.

### *Marvel's Later Agreements with Freelancers Also Feature Pure Assignment Language*

Marvel's consistent purchase-and-assignment language can even be found in the contracts it began making with freelancers in mid-to-late 1970s, in which, notably, the term "work for hire" still does not appear. SMF ¶ 24. For example, Marvel's agreement with freelancer Gene Colan, dated March 22, 1975, emphasizes assignment language. *Id.*. Therein, Colan "grants to Marvel the sole and exclusive right to all Material delivered to Marvel hereunder…" *Id.*; Toberoff Decl. Ex. 43 ¶ 7. The 1975 agreement further provides that Colan shall "deliver such further documents … for the purpose of confirming the rights herein granted to Marvel." Toberoff Decl. Ex. 43 ¶ 11.

Marvel's October 7, 1977 agreement with Gerber, its March 22, 1975 agreement with Colan, and its September 1, 1974 and August 27, 1976 agreements with Thomas, all use the same *grant* or assignment language. SMF ¶ 24. In Marvel's lawsuit with Gerber, *Gerber v. Cadence Industries Corp.*, No. 80-3840 (C.D. Cal. Aug. 29, 1980), it emphasized that his agreement *granted* to Marvel "the sole and exclusive right to all Material delivered to Marvel hereunder, including … the exclusive right to secure copyrights in the Material." SMF ¶ 24; Toberoff Decl. Ex 52 ¶ 7. Marvel President James Galton similarly informed Thomas on February 24, 1978 that "it was our intent that all copyrights be assigned to Marvel." SMF ¶ 24; Toberoff Decl. Ex 54.

Thus, as late as 1976-1977, Marvel *still* viewed its freelancer relationships in terms of the

purchase/assignment of copyright, not "work for hire," in *both* the agreements and check legends Marvel drafted—all of which comports with Marvel's *contingent* purchase and payment for only those freelance pages it accepted *after* creation. And contemporaneous freelancers all viewed it the same way as Marvel. SMF ¶¶ 24, 68-69.

There is no doubt that Marvel *owned* the copyrights to that material Ditko submitted which Marvel chose to buy. Marvel's past ownership is not the issue. The record evidence all points to Marvel's ownership via an express or implied assignment by Ditko of the copyright and renewal copyright to the artwork Marvel opted to purchase for publication. Those grants or assignments are indisputably subject to termination under 17 U.S.C. § 304(c) as a matter of law.

## CONCLUSION

For all the foregoing reasons, the Estate respectfully requests that the Court grant summary judgment in its favor. The Estate requests a declaratory judgment that its Terminations are valid under the Copyright Act, and that it will thereby recover, as of the effective termination dates therein, Ditko's undivided share of the U.S. copyright to the Stories he co-authored.

Respectfully submitted,

Date: May 19, 2023

By: _____*/s/ Marc Toberoff*_____
        Marc Toberoff
TOBEROFF & ASSOCIATES, P.C.
*mtoberoff@toberoffandassociates.com*
23823 Malibu Road, Suite 50-363
Malibu, CA 90265
Tel: (310) 246-3333; Fax: (310) 246-3101

*Attorneys for Patrick S. Ditko*

44