Exhibit 20

Page 1

1         UNITED STATES DISTRICT COURT
      FOR THE SOUTHERN DISTRICT OF NEW YORK
2

3    _____
     MARVEL CHARACTERS, INC.,          )  No. 1:21-cv-7955-LAK
            Plaintiff and              )  and consolidated cases
4       Counterclaim-Defendant,        )  1:21-cv-7957-LAK and
            vs.                        )  1:21-cv-7959-LAK
5    LAWRENCE D. LIEBER,               )
            Defendant and              )
6           Counterclaimant.           )
                                       )
     _____)
7    MARVEL CHARACTERS, INC.,          )
            Plaintiff and              )
8       Counterclaim-Defendant,        )
            vs.                        )
9    KEITH A. DETTWILER, in his        )
     capacity as Executor of the       )
10   Estate of Donald L. Heck,         )
            Defendant and              )
11          Counterclaimant.           )
                                       )
     _____)
12   MARVEL CHARACTERS, INC.,          )
            Plaintiff and              )
13      Counterclaim-Defendant,        )
            vs.                        )
14   PATRICK S. DITKO, in his          )
     capacity as Administrator of      )
15   the Estate of Stephen J.          )
     Ditko,                            )
16          Defendant and              )
            Counterclaimant.           )
17   _____)
18          VIDEOTAPED DEPOSITION OF MARK EVANIER
19               Los Angeles, California
20              Friday, March 3, 2023
21                    Volume I
22   Reported by:
     NADIA NEWHART
23   CSR No. 8714
24
25

```
 1              UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF NEW YORK
 2
     _____
 3   MARVEL CHARACTERS, INC.,       )
              Plaintiff and         )
 4       Counterclaim-Defendant,    )
              vs.                   )
 5   LAWRENCE D. LIEBER,            )
              Defendant and         )  No. 1:21-cv-7955-LAK
 6            Counterclaimant.      )  and consolidated cases
     _____)  1:21-cv-7957-LAK and
 7   MARVEL CHARACTERS, INC.,       )  1:21-cv-7959-LAK
              Plaintiff and         )
 8       Counterclaim-Defendant,    )
              vs.                   )
 9   KEITH A. DETTWILER, in his     )
     capacity as Executor of the    )
10   Estate of Donald L. Heck,      )
              Defendant and         )
11            Counterclaimant.      )
                                    )
     _____)
12   MARVEL CHARACTERS, INC.,       )
              Plaintiff and         )
13       Counterclaim-Defendant,    )
              vs.                   )
14   PATRICK S. DITKO, in his       )
     capacity as Administrator of   )
15   the Estate of Stephen J.       )
     Ditko,                         )
              Defendant and         )
16            Counterclaimant.      )
17   _____)
18
19       Videotaped deposition of MARK EVANIER,
20   Volume I, taken on behalf of Plaintiff and
21   Counterclaim-Defendant, at 1999 Avenue of the Stars,
22   8th Floor, Los Angeles, California, beginning at
23   9:37 a.m. and ending at 3:25 p.m. on Friday,
24   March 3, 2023, before NADIA NEWHART, Certified
25   Shorthand Reporter No. 8714.
```

Page 3

1   APPEARANCES:
2   For Marvel, Inc.:
3       O'MELVENY & MYERS, LLP
4       BY:  DANIEL M. PETROCELLI, ESQ.
5       BY:  BRITTANY FOWLER, ESQ.
6       BY:  Salvatore J. Cocchiaro, ESQ. (Remote)
7       1999 Avenue of the Stars, 8th Floor
8       Los Angeles, California 90067
9       310-553-6700
10      dpetrocelli@omm.com
11      bfowler@omm.com
12      scocciaro@omm
13
14  For Patrick S. Ditko, in his capacity as
15  Administrator of the Estate of Stephen J. Ditko:
16      TOBEROFF & ASSOCIATES, P.C.
17      BY:  MARC TOBEROFF, ESQ.
18      23823 Malibu Road, Suite 50-363
19      Malibu, California 90265
20      310-246-3333
21      info@toberoffandassociates.com
22
23  Also Present:
24      JACOB FLORES, videographer
25      ELI BARD, Marvel in-house counsel

1    Q   Would you agree that you are an advocate for
2    the rights of comic creators?
3             MR. TOBEROFF:  Objection; vague.
4             THE WITNESS:  I think I'm an advocate for
5    truth here.  I know that sounds corny, but, yeah,
6    I -- for -- yes, I have -- I have felt that these
7    people --
8    BY MR. PETROCELLI:
9        Q   You can answer the question, yes or no.
10       A   Yeah, the -- the -- I'm -- I'm a little fuzzy
11   on your definition of advocate here, but -- but I do
12   take their sides at times.
13       Q   No.  My question is, do you consider yourself
14   an advocate for comic creators' rights?
15            MR. TOBEROFF:  Objection as to form, vague.
16            THE WITNESS:  My answer is yes, at times.
17   BY MR. PETROCELLI:
18       Q   Okay. And do you -- and do you remain an
19   advocate today?
20       A   Nothing has changed.
21       Q   Okay.  Now, in your prior answer, you said,
22   "The head of the company thought the stuff was
23   worthless."
24       A   Yes.
25       Q   Which company?

Page 51

1  A   Well, the company that we now know as
2  Marvel Comics.
3  Q   Okay.  And which head?
4  A   Martin Goodman.
5  Q   Okay.  What -- what stuff?
6  A   The properties that are controlled now --
7  well, the -- the properties that were created in the
8  1960s and in the '70s and probably other ones after
9  that that are now part of the Marvel universe that
10 are exploited in motion pictures and merchandising
11 and -- and, you know, many places.  The -- the
12 characters, obviously, have an enormous value.
13 Q   Did he personally tell you that?
14 A   Did Martin Goodman tell me that --
15 Q   Yeah.
16 A   -- personally?  No.
17 Q   Okay.  In fact, you only met him once in
18 passing?
19 A   I met him briefly.
20     MR. TOBEROFF:  Object- -- excuse me.
21     Objection as to form.
22     THE WITNESS:  Yes.  I met Mr. Goodman once in
23 passing.  I also knew his son.
24 BY MR. PETROCELLI:
25 Q   Chip Goodman, right?

Page 52

1    A    Charles.  I -- I knew him as Charles.
2    Q    Charles?  Okay.
3    A    I have trouble calling a grown man Chip.
4    Q    Who -- did anybody tell you that
5  Martin Goodman said the contributions of these five
6  contributors involved in this case were worthless?
7    A    Okay.  I'm exaggerating with the word
8  "worthless."  Obviously, they were worth to him, at
9  the time, to publish those comics, which he profited
10 from.
11         It is a virtual unanimous opinion of people
12 I've dealt with who worked for Marvel briefly in the
13 '60s that Mr. Goodman did not appreciate the value
14 of the material, that he thought it was going to --
15 you know, the -- the history of Marvel Comics -- and
16 I know you aren't interested in certain amounts of
17 this, but --
18   Q    Yeah.
19   A    -- I have --
20   Q    We have to keep --
21   A    -- I have to say it to -- just to -- to
22 answer your question, was that they published war
23 comics for a while, and then when those went out of
24 fad, they published love comics for a while.  When
25 those went out, they published westerns, and -- they

Page 53

1  just kept jumping on trends.
2          And every single person I think I ever talked
3  to who talked about working -- or selling stuff to
4  Marvel in the '60s said Martin's always thought it
5  was just another fad that would just last for a
6  short period of time.
7          And when he finally got an offer to sell
8  Marvel, he sold it for way, way below what he
9  thought it was -- what -- what anybody would
10  reasonably now say it was worth.
11     Q   Did you have direct conversations with any
12  of -- Lieber, Ditko, Heck, Rico or Colan on that
13  subject?
14     A   Probably.
15     Q   And they told you what you just explained to
16  me?
17     A   If you want to go specifically one by one,
18  Larry Lieber certainly said that to me.
19     Q   And said that Mr. Goodman did not appreciate
20  his work?
21     A   Yes.
22     Q   Okay.
23     A   Well, no, no, that's not what -- you're --
24  you're -- I said he did not value the work
25  sufficiently.

1                I believe that there were verbal promises
2       made to some of them that they would be paid, that
3       those verbal promises were not honored.  And I
4       believe that they believed that they were only doing
5       comic books.
6                And in some cases, I believe they -- they
7       were doing it for one-time publication.  And then
8       regardless of anything that might have been signed,
9       which I have never seen anything that gave --
10      that -- that said, you know, well, you understand
11      we may use these on television?  I think they were
12      undercompensated.
13          Q    Did anybody ever -- of these five folks, did
14      any one of them tell -- tell you that there had been
15      verbal promises made to them to pay them that had
16      been broken?
17          A    Yes.
18          Q    Who -- who told you that?
19          A    Steve Ditko.
20          Q    And what was the promise that he said was
21      made that was broken?
22          A    That if the material had another life outside
23      of the comic books, he would be compensated, that
24      something would be negotiated.
25          Q    And when did he tell you that?

Page 58

1    A   He told me this in June of 1970.
2    Q   Okay.  And have you written about that
3    promise in some of your writings or talks?
4    A   I'm not sure if I wrote about that.
5    Q   Why do you -- how do you happen to remember
6    that specific date?
7    A   Well, in July -- in -- in 1970, my
8    then-partner and I went to New York, and I visited
9    the offices of DC Comics and Marvel Comics and a few
10   other companies for a few days.  And I -- on that
11   trip, I spent two days with -- with Steve Ditko.
12   Q   And he -- and who did he say made the promise
13   to him?
14   A   Martin Goodman -- well, excuse me,
15   Martin Goodman through intermediaries.
16   Q   Did he say who the intermediaries were?
17   A   Stan Lee and others.
18   Q   And did he say what specific promise was
19   broken?
20   A   The specific promise was that if the
21   materials had a life outside of being published in
22   comic books the way they were being published, that
23   Martin would -- I think the term he used was take
24   care of him.  There would be additional money paid.
25   Q   So at that time, Mr. Ditko was aware that the

1    promises had already been broken?
2        A    He said that was the reason he had stopped
3    working -- doing work with Marvel.
4        Q    Okay.  Do you know -- did you ever discuss
5    with him why he didn't bring a lawsuit?
6        A    I don't think there were any comic book
7    creators at that time who dared bring a lawsuit or
8    could afford to bring a lawsuit.
9        Q    No.  My question was, did he tell you?
10       A    No, he didn't tell me that.
11       Q    Okay.  Besides Ditko telling you about that
12   promise that he claimed was broken, as early as June
13   of 1970, are you -- did you have any other
14   conversations with either him or -- or Lieber, Heck,
15   Rico and Colan about broken promises?
16       A    Let me think.  Not with -- I don't think with
17   them.  With other people, but not with them.  Let me
18   think for a second.  Not with Larry.
19            Don Heck told me that he was promised that
20   Marvel would always buy work from -- for him -- from
21   him and that -- that, at times, that was not
22   honored.
23       Q    In what year did he tell you that?
24       A    I spoke with him -- the first time I spoke
25   with him was on the phone in late '69 or early 1970.

Page 73

1   A   All right. I worked for all those companies
2   before '78. And I'm trying to think. There's a
3   couple of jobs I did for Harvey, but I think that
4   was after '78.
5   Q   Harvey is another publishing company?
6   A   Harvey is another publisher.
7   Q   Okay. Comic book --
8   A   No. I -- I take that back. I worked in it
9   for Archie Comics.
10  Q   Archie?
11  A   Because it was the editor who had been at
12  Harvey and was now working for Archie. I believe
13  that's a complete list.
14  Q   Okay. The ones for Marvel, which ones were
15  those?
16  A   I wrote some -- well, the first thing I wrote
17  for Marvel -- I wrote some articles for their
18  black-and-white horror magazines, and I -- I
19  submitted some stuff to them a couple of times. I
20  was -- I was asked to submit stuff, and they ended
21  up not publishing it or buying it from me.
22  Q   When you said they asked you to submit stuff
23  that they ended up not buying from you, are you
24  talking for their comic book publications?
25  A   Yes.

Page 74

1  Q   Do you recall what it was they asked you to
2  submit on?
3  A   The first thing I was asked to submit was
4  they were doing a magazine -- they had a comic book
5  character named Iron Fist. It was a kung fu
6  superhero, and they were spinning him off into a
7  black-and-white magazine, comic book magazine. They
8  published both color and black-and-white comics
9  during this period.
10      And they wanted a backup feature of -- one of
11 the editors sent me a sketch of two teenaged brother
12 and sister twin kung fu teenagers, and they had the
13 name the Dragons Two. They wanted a strip about --
14 that would run in every issue of the Iron Fist
15 black-and-white magazine of the Iron -- of the
16 Dragons Two.
17      And I was to create everything else about
18 them, besides the name and the -- the look of these
19 sketches, and I wrote an outline and a couple of
20 story ideas and submitted them.
21      And then they informed me they changed their
22 mind. They weren't publishing the magazine at all,
23 and my material was never read -- excuse me, I don't
24 think it was ever read.
25  Q   Did you ever submit anything to Marvel that

Page 154

1    more time, please.
2           (Record read as follows:
3           "Q: Is it true that it was an
4           inconsistent policy, that some
5           checks had occasionally things
6           stamped on them and others, people
7           crossed them out, and that there was
8           no particular firm policy?")
9           MR. TOBEROFF: Same objection as to form,
10   calls for speculation.
11          THE WITNESS: I believe that is true.
12   BY MR. PETROCELLI:
13      Q   With respect to your -- your report, you
14   state that (as read):
15          "Comic book publishers did not see
16          any lasting value in their product
17          beyond monthly sales figures."
18          What's the basis of that statement?
19      A   Talking to people throughout the -- the comic
20   book industry for much of my life, hearing people
21   say this stuff is going to be worthless someday.  I
22   mean, it's -- if you want me to give you -- do you
23   want me to give you specific examples?
24      Q   Well, to be clear, Marvin [sic] Goodman never
25   told you this, right?

Page 155

1    A    No.  Martin Goodman.
2    Q    Excuse me, Martin Goodman, correct.
3    A    No.
4    Q    Okay.
5    A    No.
6    Q    Nobody at Marvel ever told you this, right?
7    A    Stan Lee told me that.
8    Q    He told you this, "Comic book publishers did
9    not see any lasting value in their product beyond
10   monthly sales figures"?
11   A    Not -- no, not beyond monthly sale figures.
12   He just, at times, told me that he thought that the
13   business was going to crumble one of these days soon
14   and -- and none of this stuff would be remembered.
15   Q    Is that written down in some of your
16   publications?
17   A    I don't recall.
18   Q    You also said there were no -- (as read):
19        "There was no expectation that it
20        would ever be reprinted and little
21        thought that the characters would be
22        merchandised or exploited in other
23        media."
24        And, again, you're talking about the relevant
25   time period here, right, '62 to '75, in making these

Page 156

1    statements in your report, right?
2        A   I believe I'm talking, in that particular
3    thing, about early in the -- early in the period.
4    Because by the time -- the -- the Batman TV show
5    went on in 1966.  That changed the industry a lot,
6    because people woke up and suddenly decided that
7    characters could be on TV, and they could be on
8    T-shirts and such.
9        Q   And that was 1966, you said?
10       A   '66, I believe, yes.
11       Q   Did anybody at Marvel tell you that there was
12   no expectation that it would ever be reprinted and
13   little thought that the characters would be
14   merchandised or exploited in the media?
15       A   In -- in the mid-'70s, Sol Brodsky told me
16   that that was the attitude when the Marvel superhero
17   books first started in '62 -- '61, actually.
18       Q   And is that written down someplace?
19       A   I don't know.
20       Q   You say in your report that freelance -- that
21   the Marvel method was used by freelance artists to
22   plot and draw comic book stories to reduce costs.
23           MR. TOBEROFF:  What's the question?
24   BY MR. PETROCELLI:
25       Q   Who told you that?

Page 160

1     A    I -- I would tell -- yeah.
2     Q    Okay.
3     A    There might -- there might have been others.
4     Q    You don't recall, though?
5     A    I don't recall right this minute --
6     Q    Okay.
7     A    -- others.
8     Q    In your report, you state that (as read):
9          "Cadence/Marvel strained to
10         retroactively fit within the new
11         Copyright Act's explicit work-for-
12         hire provisions, by having
13         freelancers sign 'work-for-hire'
14         releases in and around mid-1978 —
15         just after the Copyright Act of 1976
16         had taken effect — as to prior work
17         long after the work had been created."
18         How do you know they strained in the way that
19    you wrote in your report?
20         MR. TOBEROFF:  Objection as to form.
21         THE WITNESS:  Because there was such a tumult
22    in the business about that, because there were
23    meetings at comic conventions discussing the fact
24    that they were hauling out all these forms, asking
25    them to -- saying -- that said, in effect, we --

1   Marvel owns this, we want you to say that we owned
2   it, and -- and change -- and retroactively altering
3   the understanding or the -- the arrangements.
4   BY MR. PETROCELLI:
5       Q   So this is just your interpretation of
6   Marvel's state of mind?
7           MR. TOBEROFF:  Objection as to form.
8           THE WITNESS:  This is my recollection of a
9   topic that was discussed quite a bit in the industry
10  at the time about comic book publishers, not just
11  Marvel, coming to terms with the new copyright
12  regulations and changing some of the terms, asking
13  people, when they sign new paperwork, to also affirm
14  that old work was done under a certain arrangement.
15  BY MR. PETROCELLI:
16      Q   I'm focused more on your statements about why
17  Marvel did it and its state of mind.
18          To that end, you also write, in the very next
19  sentence, (as read):
20          "Cadence thereby tried to revise and
21          transform prior freelance material
22          purchased by Marvel by the page into
23          works made for hire, obviously, to
24          hold on to what had become valuable
25          intellectual property."

```
 1            Did anybody at Marvel tell you any of these
 2     things that I just read to you from your report?
 3        A    "Anybody at Marvel," are you talking about
 4     executives or freelancers or -- or who are you
 5     talking -- who is anyone at Marvel in that question?
 6        Q    Anyone at Marvel, did they tell you that
 7     Marvel was straining to retroactively fit within the
 8     new copyright provisions?  Did they tell you that
 9     they were trying to transform prior freelance
10     material?
11        A    Quite --
12            MR. TOBEROFF:  Objection as to form.
13            THE WITNESS:  Quite a few writers and artists
14     who had done work for Marvel told me that.
15     BY MR. PETROCELLI:
16        Q    Did any of the Marvel management tell you
17     that?
18        A    No, I don't think so.
19        Q    And did any of these five contributors tell
20     you that?
21            MR. TOBEROFF:  Objection as to form.
22            THE WITNESS:  No.
23     BY MR. PETROCELLI:
24        Q    Okay.  You write in -- in your report that
25     (as read):
```

Page 196

1  Q   And did they state that they were shell
2  companies?
3  A   I don't know -- remember if the term "shell
4  company" was used.  That's a term I -- that might be
5  the way that I described them based on what I read.
6  Q   And what does that --
7  A   I actually had heard the term "shell
8  companies" applied to those companies long before I
9  ever met Mr. Toberoff or any of this.
10 Q   Why --
11 A   That's the term Sol Brodsky used to describe
12 them.
13 Q   Why did you -- what did you understand this
14 has to do, if at all, with works made for hire?
15     MR. TOBEROFF:  Asked and answered, calls for
16 a legal conclusion.
17     THE WITNESS:  I didn't understand that it was
18 necessarily related to work for hire.  I understood
19 that it was -- it was related to this proceeding.
20 BY MR. PETROCELLI:
21 Q   Why did you include the statement in here
22 about works made for hire?
23 A   Let me read -- let me read it.
24     Because that's what I understood to be the
25 case.  I wasn't saying -- because I understood that