# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARVEL CHARACTERS, INC.,<br><br>     Plaintiff,<br><br>v.<br><br>PATRICK S. DITKO, in his capacity as Administrator of the Estate of Stephen J. Ditko,<br><br>     Defendant. | Case No.: 1:21-cv-07957-LAK<br><br>Hon. Lewis A. Kaplan<br><br>**DEFENDANT PATRICK S. DITKO'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE THE EXPERT REPORTS AND TESTIMONY OF MARK EVANIER**<br><br>Oral Argument Requested |
| PATRICK S. DITKO, in his capacity as Administrator of the Estate of Stephen J. Ditko,<br><br>     Counterclaimant,<br><br>v.<br><br>MARVEL CHARACTERS, INC. and DOES 1-10, inclusive,<br><br>     Counterclaim-Defendants. | |

## **TABLE OF  CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

LEGAL STANDARD ............................................................................................................ 3

EVANIER'S EXPERT REPORTS.......................................................................................... 4

ARGUMENT ....................................................................................................................... 8

I.       EVANIER IS WELL QUALIFIED AS AN EXPERT COMIC BOOK HISTORIAN
         GIVEN HIS EXTENSIVE KNOWLEDGE AND EXPERIENCE; HIS OPINIONS
         AND TESTIMONY ARE ADMISSABLE.................................................................. 8

         A.       The Second Circuit Espouses a Liberal Standard for the Admissibility of
                  Expert Opinions................................................................................... 8

         B.       Evanier Is A Leading Comic Book Industry Historian ..................................... 10

         C.       Marvel's Immoderate Arguments Do Not Merit the Exclusion of Evanier ..... 13

                  1.       Evanier's Detailed Opinions Covering the History of the Comic Book
                           Industry and Marvel Are Not a Mere Conduit for Hearsay ................... 13

                  2.       Evanier's Opinions Are Helpful to the Trier of Fact and Do Not Supplant
                           the Role of Counsel or the Jury.................................................. 17

                  3.       Evanier's Opinions Cannot Fairly Be Characterized As Concerning  the
                           Parties' "Motives and Intent"................................................... 20

                  4.       Marvel's Claim that Evanier Purports to Offer Legal Opinions is
                           Frivolous .......................................................................... 23

                  5.       Marvel Mischaracterizes Evanier's Opinions as Making Credibility
                           Determinations ................................................................... 24

         D.       Evanier's Testimony Will Assist the Trier of Fact .......................................... 25

CONCLUSION ................................................................................................................ 26

# TABLE OF AUTHORITIES

## Federal Cases

*Adams v. Liberty Mar. Corp.*,
407 F.Supp.3d 196 (E.D.N.Y. 2019) ............................................................... 19

*Arista Records LLC v. Usenet.com, Inc.*,
608 F. Supp. 2d 409 (S.D.N.Y. 2009) ............................................................. 24

*Amorgianos v. National R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002) ........................................................................ 1, 8

*Bayway Ref. Co. v. Oxygenated Mktg. & Trading A.G.*,
215 F.3d 219, 225 (2d Cir. 2000) .................................................................... 18

*Berkeley Investment Group, Ltd. v. Colkitt*,
455 F.3d 195 (3d Cir. 2005) ............................................................................ 18

*Borawick v. Shay*,
68 F.3d 597 (2d Cir. 1995) ............................................................................... 8

*Boucher v. United States Suzuki Motor Corp.*,
73 F.3d 18, 21 (2d Cir. 1996) ........................................................................... 9

*Campbell v. Metropolitan Property Cas. Ins. Co.*,
239 F.3d 179 (2d Cir. 2001) ............................................................................ 26

*Cayuga Indian Nation v. Pataki*,
165 F. Supp. 2d 266, (N.D.N.Y. 2001) ........................................................... 18

*Chavez v. Carranza*,
559 F.3d 486 (6th Cir. 2009) ..................................................................... 18, 24

*Chen-Oster v. Goldman, Sachs & Co.*,
114 F.Supp.3d 110 (S.D.N.Y. 2015) ................................................................ 8

*Colon v. BIC USA, Inc.*,
199 F. Supp. 2d 53 (S.D.N.Y. 2001) ............................................................. 8, 9

*Commercial Union Ins. Co. v. Seven Provinces Ins. Co.*,
217 F.3d 33 (1st Cir. 2000) .............................................................................. 23

*Cortes-Irizarry v. Corporacion Insular De Seguros*,
111 F.3d 184 (1st Cir. 1997) ............................................................................ 10

*Cree v. Flores*,
157 F.3d 762 (9th Cir. 1998) ........................................................................ 23

*Daubert v. Merrell Dow Pharmaceuticals*,
509 U.S. 579 (1993) ............................................................................... passim

*In re Fosamax Prods. Liab. Litig.*,
645 F.Supp.2d 164 (S.D.N.Y. 2009) ............................................................ 19

*In re Joint E. S. Dist. Asbestos Litig.*,
52 F.3d 1124 (2d Cir. 1995) ........................................................................... 8

*In re Pineapple Antitrust Litigation*,
407 F. App'x 520, 522 (2d Cir. 2010) ......................................................... 13

*In re Rezulin Prods. Liab. Litig.*,
309 F. Supp. 2d 531 (S.D.N.Y. 2004) .......................................................... 19

*In re Terrorist Attacks on Sept. 11, 2001*,
2023 WL 3116763 (S.D.N.Y. Apr. 27, 2023) .............................................. 17

*Jenson v. Eveleth Taconite Co.*,
130 F.3d 1287 (8th Cir. 1997) ........................................................................ 9

*Katt v. City of New York*,
151 F. Supp. 2d 313 (S.D.N.Y. 2001) ..................................................... 22, 25

*Kingsdown Medical Consultants, Ltd. v. Hollister, Inc.*,
863 F.2d 867 (Fed. Cir. 1988) ..................................................................... 23

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) ............................................................................... passim

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
525 F. Supp. 2d 558 (S.D.N.Y. 2007) ............................................................ 8

*Marvel Worldwide, Inc. v. Kirby*,
777 F. Supp. 2d 720 (S.D.N.Y. 2011) ..................................................... passim

*May v. Morganelli-Heumann & Assocs.*,
618 F.2d 1363 (9th Cir. 1980) ...................................................................... 18

*McCullock v. H.B. Fuller Co.*,
61 F.3d 1038 (2d Cir. 1995) ................................................................... 16, 17

*New York v. Shinnecock Indian Nation*,
523 F. Supp. 2d 185, 262 (E.D.N.Y. 2007) ................................................. 17

*Nimely v. City of New York*,
414 F.3d 381 (2d Cir. 2005) ................................................................. 8, 19, 26

*Oneida Indian Nation v. New York*,
691 F.2d 1070 (2d Cir. 1982) ................................................................. 18, 24

*Playboy Enters. v. Dumas*,
53 F.3d 549 (2d Cir. 1995) ................................................................. 18

*POM Wonderful LLC v. Organic Juice USA, Inc.*,
2011 U.S. Dist. LEXIS 1534 (S.D.N.Y. Jan. 3, 2011) ....................................... 8

*Riegel v. Medtronic, Inc.*,
451 F.3d 104 (2d Cir. 2006) ................................................................. 17

*Sec. Litig. Teachers' Ret. Sys. of La. v. Pfizer, Inc.*,
819 F.3d 642 (2d Cir. 2016) ................................................................. 26

*Siegel v. Warner Bros. Ent. Inc.*,
542 F. Supp. 2d 1098 (C.D. Cal. 2008) ................................................................. passim

*SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*,
467 F.3d 107 (2d Cir. 2006) ........................................................ 18, 22, 25, 26

*Travelers Indem. Co. v. Scor Reinsurance Co.*,
62 F.3d 74 (2d Cir. 1995) ................................................................. 18, 22, 25

*United States v. Abu-Jihaad*,
553 F. Supp. 2d 121 (D. Conn. 2008) ................................................................. 15

*United States v. Hankey*, 203 F.3d 1160
 (9th Cir. 2003) ................................................................. 9, 16

*United States v. Idaho*,
210 F.3d 1067, 1069 (9th Cir. 2000) ................................................................. 18

*United States v. Joseph*,
542 F.3d 13 (2d Cir. 2008) ................................................................. passim

*United States v. Locascio*,
6 F.3d 924 (2d Cir. 1993) ................................................................. 15

*United States v. Napout*,
963 F.3d 163 (2d Cir. 2020) ................................................................. 19, 26

*United States v. Paracha*,
2006 WL 12768 (S.D.N.Y. Jan. 3, 2006) ................................................................. 17

*Valentin v. New York City*,
1997 U.S. Dist. LEXIS 24059 (E.D.N.Y. Sept. 9, 1997) ............................................. 9, 22

*Velasquez v. Frapwell,*
160 F.3d 389 (7th Cir.1998) *vacated in part,* 165 F.3d 593 (7th Cir.1999).......... 17, 19, 24

## **Federal Statutes, Rules and Regulations**

F.R.C.P. 26(a) ...................................................................................................................... 2

F.R.E. 702 .................................................................................................................. passim

F.R.E. 703 ................................................................................................................ 5, 14, 15, 26

F.R.E. 703, Notes of Advisory Committee on Rules.................................................... 15, 26

## **Other Authorities**

1 M. Nimmer & D. Nimmer, *Nimmer on Copyright*
§ 5.03[D].......................................................................................................................... 2, 18

Jones, Rosen, Wegner, Jones, *Federal Civil Trial and Evidence* (2008)
§ 11:37 ............................................................................................................................... 3

Learned Hand, *Historical and Practical Considerations Regarding Expert Testimony*,
15 Harv. L. Rev. 40, 54 (1901)......................................................................................... 16

## **PRELIMINARY STATEMENT**

Plaintiff Marvel Characters, Inc.'s ("Marvel") motion to exclude the expert report and testimony of Mark Evanier ("Evanier") attempts to restrict the Court's ability to assess this case within the true historical context of Marvel's haphazard business operations during the 1962-1965 period at issue (the "Period"). Its motion recycles the "Greatest Hits" for attacking an expert in the soft sciences. For each tune, Marvel cherry-picks a phrase or two plucked out of context from Evanier's expert reports and uses it to tar and feather his entire opinions. To prop up this false construct, Marvel then leans on *Marvel Worldwide Inc. v. Kirby*, 777 F. Supp.2d 720 (S.D.N.Y. 2011) regarding a different artist, different works, a different period, and a materially different expert opinion. In so doing, Marvel ignores the "broad discretion" accorded each trial court in exercising its gatekeeping function "under the circumstances of each case." *Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002).  Closer examination of Evanier's actual expert reports (ECF No. (Dkt.) 79-1,79-2) reveal that Marvel's exaggerated attacks border on the frivolous.

 This case concerns events and practices at Marvel sixty years ago and Evanier, without doubt, qualifies as a leading comic book industry historian. His deep-seated knowledge and experience will aid the Court and the trier of fact to place the subject matter of this case and available evidence in its historical context. Marvel does not want that. Instead, it seeks to narrow the Court's view to witnesses with whom Marvel has had long-standing economic relationships (e.g., Stan Lee and Roy Thomas) and explicitly prepared to support its revisionist perspective.

Evanier's opinions are reasonably based on his knowledge, experience and expertise regarding the history of the comic book industry and its customs and practices—all legitimate subjects for expert testimony. Notably, under the 1909 Copyright Act, industry "custom and

practice" can rebut the "work for hire" presumption under the "instance and expense" test, making such testimony especially pertinent.  *See* 1 M. Nimmer & D. Nimmer, *Nimmer on Copyright* ("Nimmer") § 5.03[D] at 5-56.12.

Marvel itself designated an alleged comic book historian as its expert, Paul Levitz ("Levitz") of DC Comics, who it is apparently saving for trial. *See* Dkt. 80-15. Levitz was a young child in the Period, and thus purports to base his opinions on hearsay, i.e., conversations and interviews of comic book freelancers and staff working in the Period and beyond, and on research. *Id*. While Marvel's counsel took great pains to bookend Levitz's report by rephrasing all his conclusions as about industry "custom and practices" (*see* Dkt. 80-15 at 9: "Summary of Opinions") Levitz's resources and approach are quite similar to Evanier's. The key difference, however, is that Evanier's conclusions are not just tied to his extensive knowledge of the comic book industry but explicitly to facts and data as required by Fed. R. Civ. Proc. 26(a)(2)(B)(ii), including cites to record evidence he reviewed. Dkt. 79-1. Levitz, by contrast, supplies little more than broad conclusions and an appendix listing documents that, in general, he says he considered. Dkt. 80-15 at 9. Interestingly, as shown below, Levitz agrees with several of Evanier's conclusions. *See* Dkt. 79-1 at 2; Dkt. 80-15.

Evanier has been properly admitted as an expert comic book historian in prior cases and trials.  In its motion, Marvel repeatedly misrepresents or misleadingly implies that the trial courts in two other cases—*In re Marvel Entertainment Group, Inc.*, No. 97-638-RMM (D. Del.) and *Siegel* v. *Warner Bros. Ent., Inc*., Case No. CV 04-8400 SGL (RZx) (C.D. Cal. 2009) — excluded Evanier, when they did nothing of the sort.  *In re Marvel Entertainment Group, Inc..* undermines Marvel's position, as the court admitted Evanier as an expert to opine and testify at trial based his "experience and from his knowledge of the community."  Declaration of Marc

2

Toberoff ("Toberoff Decl."), Ex. 2 at B-214-215.

The district court in the long-running *Siegel* case not only *denied* Warner Bros' motion to exclude Evanier from a 2009 trial and permitted Evanier to testify regarding Superman's history, it cited Evanier as one of the more credible and helpful witnesses in the trial:

> In assessing the testimony at trial, the Court found some of the witnesses very credible and others not credible at all. The Court found the testimony by [the Siegels'] comic book historian expert, Mark Evanier … both credible and persuasive. Considering [his] demeanor and testimony, the Court observed that [he] attempted to answer directly and honestly the questions put to [him] without equivocation or evasion, even when [his] answers resulted … in the admission of certain facts that were not altogether beneficial to [his side].

Toberoff Decl., Ex. 1 at 6.

## LEGAL STANDARD

Federal Rule of Evidence 702 broadly provides that if specialized knowledge "will assist the trier of fact to understand the evidence or to determine a fact in issue," a qualified expert witness may testify "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." F.R.E. 702. The trial court acts as a "gatekeeper" in deciding whether expert testimony satisfies Rule 702. *Daubert v. Merrell Dow Pharma ceuticals*, 509 U.S. 579, 582, 113 S.Ct. 2786, 2789, 125 L.Ed.2d 469 (1993). Trial courts have wide discretion in admitting expert testimony. As "too much depends upon the particular circumstances of the particular case … the trial judge must have considerable leeway in deciding … whether particular expert testimony is reliable." *Kumho Tire*, 526 U.S. at 152; *see also* Jones, Rosen, Wegner, Jones, *Federal Civil Trial and Evidence* (2008) § 11:37 ("There is no hard and fast rule for qualification of experts. The determinative issue in each case is whether the witness has sufficient knowledge, skill or experience in the field so that his or her testimony would be

likely to assist the [trier of fact] in its search for the truth.").

## EVANIER'S EXPERT REPORTS

As an expert historian Evanier provides useful information on the history of the comic book business in general and of Marvel in particular, and on the customs and practices in the industry, leading up to and in the Period in question. As stated, this should be helpful to both the Court and the trier of fact in viewing decades-old evidence in its true historical context. *See e.g.* Dkt. 79-1 at 7 ("From its beginnings in the 1930s to the 1960s and beyond, comic book publishing was very much a fly-by-night business that germinated during the Great Depression. The first comic books were merely reprints of contemporary newspaper comic strips … When publishers could not acquire reprint rights to newspaper strips … they purchased content from young, aspiring writers and artists.").[1]

Evanier also carefully explains the so-called "Marvel Method" which "relieve[d] the short-staffed Lee of his heavy workload" while "tak[ing] advantage of the artists' skills as storytellers. Normally in the 1960s at a company like DC Comics, a detailed, panel-to-panel script would be handed to an artist to literally 'fill in.' The writer of the script would have little (usually no) contact with the artist. … The artist contributed little to the plot, and what the characters said and did, and the artist certainly did not add new characters. This was not the case at Marvel from the early 1960s on and during the relevant Period." *Id*. at 10-11. Evanier proceeds to describe the Marvel Method.[2] His credible specificity is a far-cry from Marvel's quick

---

[1] *Id*. at 10 ("In 1954, Fredric Wertham's book *Seduction of the Innocent* was among numerous public voices that accused comic books, particularly those featuring crime and horror stories, of poisoning the minds of America's youth. This sparked a number of Senate hearings, and the resulting public backlash and boycott brought the comic book business to the brink of ruin."; "By 1958 …[Marvel] slowly resume[d] the purchase of freelance scripts and artwork at a low page rate. By the decade's end, Marvel/Atlas had virtually no staff other than Stan Lee, who acted as both editor and art director in a cramped office on Madison Avenue, publishing only a handful of titles per month.")

[2] *Id.* (Instead, under what he called the "Marvel Method," they deviated proudly from common industry practice of the time. Lee would simply talk to the artists about potential story ideas. Sometimes Lee would come up with the

mischaracterization of the Marvel Method as a form of purported control in its summary judgment motion and much more illuminating. *Id*.

Evanier's sources of information over the last four decades—including extensive interviews, conversations and relationships with the leading industry figures, his review of documentary evidence, his historical research and observations regarding the comic book industry over the last three decades, and experience as a comic book creator— are all "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject" and therefore qualify under Rule 703. Perhaps the best evidence of this is the report of Marvel's own expert historian in this case, Paul Levitz, who was six years old at the outset of the Period in question. *See* Dkt. 80-15.

Marvel insists that because Evanier notes that Marvel's custom and practices in the Sixties differed from the practices at DC Comics and other companies it is not admissible expert opinion as to industry custom and practice. Dkt. 77 at 7. But, of course, opinion as to industry custom and practice naturally entails relevant variations from it. Notwithstanding Marvel's straw man, its own expert Levitz comes to the very same conclusion. Dkt. 80-15 at 12 ("Marvel departed from this practice to use a methodology developed earlier at a then-defunct publisher named Fox. Marvel's practice became known throughout the industry as the "Marvel method").

Evanier explains that "consistent with the custom and practice at the time in the comic book industry" "Marvel, in the 1960s—which was microscopic in comparison to the behemoth international corporation it is today—was struggling financially with slim margins and very few

---

basic idea but sometimes the artist would, and other times, the idea would be a collaborative effort. In any event, the artist would then plot a detailed story as well as illustrate the story in panels, plus suggest dialogue to be included in the balloons and descriptions to be included in the captions. Following these informal meetings in person or over the phone, the artist would draw out the entire comic in pencil, working out the actual storyline and deciding what the action should be in each panel to tell that story. If a situation seemed to require a new character, the artist would add in a new character.")

employees. As the comic book market was in a period of flux and triage from the major downturn that began in the 1950s … Marvel avoided any firm employment or engagement agreements … with the writers and artists who created comic book stories in the relevant Period." Dkt. 79-1 at 13; Dkt. 79-2 at 4. Marvel's expert describes these slim profit margins throughout the comic book business and concludes similarly. Dkt. 80-15 at 24 ("Indeed, it was uncommon for publishers to enter into written agreements with contributors at all during the [] Period, and publishers very rarely deviated from this practice.").

Evanier explains that "[i]n the Period (and until approximately 1978), the custom and practice in the comic book industry, including at Marvel, was for the publisher to simply purchase from the freelancer at a page rate those completed pages the publisher chose to accept in its sole discretion. The publisher could, and at times, did reject freelance pages and in that instance would not purchase and pay for such rejected pages." Dkt. 79-1 at 18.[3] Marvel's expert concludes similarly. Dkt. 80-15 at 20 (Comic book publishers also had the absolute right to reject material"), 23 (contributors were generally paid on a per-page rate and that their work was subject to rejection by the publisher").

In attacking Evanier's candid opinions regarding industry "customs and practices" as a mere "pretext" to render his opinions admissible, Marvel "doth protest too much." One need only glance at Marvel's expert report to see that it was groomed and bookended, presumably by Marvel's counsel, to re-state every single Levitz opinion/conclusion as about industry "custom and practice" and adding for each that "Marvel's practices during the Relevant Time Period were

---

[3] *See also id*. at 15 ("Consistent with the custom and practice of the comic book industry in the Period, Marvel did not pay freelancers any sort of guaranteed salary, wage or fee for their services. Freelance artwork and plotting was purchased by the page on a piecework basis—a set amount for each page accepted for publication. If a page or story was rejected … the freelancers were not compensated for their time or services and personally withstood the financial loss for it. If Marvel rejected a freelancer's pages, which he then redrew, the freelancer was only paid for the pages approved for purchase.")

consistent with industry custom and practice" (Dkt. 80-15 at 9 (Summary of Opinions), 26)—
oblivious to the fact that Levitz opined that Marvel's practices were *not*. *Id*. at 12. Closer
examination of Levitz's actual expert report also reveals that Levitz delves into particulars and
events at "Marvel" far beyond industry-wide "custom and practices" despite its convenient
framing.

After Evanier examined from the record (a) the earlier Magazine Management checks to
freelancers with legends that expressly state "By endorsement of this check, I, the payee,
acknowledge … my assignment of any rights to renewal copyright" and (b) the later Marvel
checks from the 1980's that state "all payee's works are and shall be considered as works made
for hire" with no mention of any assignment, Evanier aptly stated: "this is consistent with my
understanding that the legends on the back of Marvel's checks to freelancers contained such
assignment of all rights language until at least the late 1970s." This then is hardly a legal
conclusion. And Marvel's expert would not appear to disagree. *See* Dkt. 80-15 at 25 ("When the
1976 Copyright Act was enacted, publishers began to use the term 'work made for hire'".). *Also
compare* Evanier: "Cadence/Marvel" had "freelancers sign 'work-for-hire' releases in and
around mid-1978—just after the Copyright Act of 1976 had taken effect—as to prior work long
after the work had been created." (Dkt. 79-1 at 17) to Levitz: "While industry custom and
practice varied in 1977 and 1978 … I am aware that Marvel asked contributors to sign a
document affirming that all previous contributions to Marvel were 'works made for hire' and that
all future contributions would be as well." Dkt. 80-15 at 25.

It is easy to see why Marvel would want to stifle statements from a notable comic book
industry historian that shines light on the true and sometimes unflattering history, custom and
practices of their business decades ago but that does not render the entirety of Evanier's opinions

and testimony inadmissible. This is even more so given the notable similarities between

Evanier's sources, methodology and conclusions and those of Marvel's own expert historian.

## ARGUMENT

**I.**     **EVANIER IS WELL QUALIFIED AS AN EXPERT COMIC BOOK HISTORIAN GIVEN HIS EXTENSIVE KNOWLEDGE AND EXPERIENCE; HIS OPINIONS AND TESTIMONY ARE ADMISSABLE.**

### A.     The Second Circuit Espouses a Liberal Standard for the Admissibility of Expert Opinions

"[T]he Federal Rules of Evidence favor the admissibility of expert testimony, and [the

court's] role as gatekeeper is not intended to serve as a replacement for the adversary system."

*POM Wonderful LLC v. Organic Juice USA, Inc.*, Ca2011 U.S. Dist. LEXIS 1534, at *19

(S.D.N.Y. Jan. 3, 2011) (citing *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp.

2d 558, 561 (S.D.N.Y. 2007)). As such, Courts are to adhere to a "liberal standard of

admissibility for expert opinions," *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005),

starting with "a presumption that expert evidence is admissible."  *Borawick v. Shay*, 68 F.3d 597,

610 (2d Cir. 1995) ("*Daubert* reinforces the idea that there should be a presumption of

admissibility of evidence. Second, it emphasizes the need for flexibility in assessing whether

evidence is admissible"). *See Chen-Oster v. Goldman, Sachs & Co.*, 114 F.Supp.3d 110,

115 (S.D.N.Y. 2015) (same); *Colon v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 75 (S.D.N.Y. 2001)

(same).

The Second Circuit has also "cautioned … that the court's *Daubert* gatekeeping

role does not permit the district court, in ruling on evidentiary sufficiency, to reject

admissible expert testimony." Amorgianos, 303 F.3d at 267-68 (citing *In re Joint E. S.*

*Dist. Asbestos Litig.,*52 F.3d 1124, 1132-34 (2d Cir. 1995). "Once the district court has

deemed the evidence sufficiently reliable so as to be admissible, it is 'bound to consider the evidence in the light most favorable to [the non-movant]' when deciding motions for summary judgment or judgment as a matter of law." *Id.*

"A review of the case law after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule." *Colon,* 199 F. Supp. 2d at 75. Notably, "the Second Circuit espouses a particularly broad standard for the admissibility of expert testimony." *Id.* (citing *Boucher v. United States Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)). In *Boucher*, the Second Circuit held that expert testimony is admissible unless purely "speculative or conjectural" or based on "assumptions that are so unrealistic and contradictory to suggest bad faith," neither of which are true here. *Id.* Marvel's "contentions that the assumptions are unfounded go the weight, not the admissibility, of the testimony." *Id.* (internal cites omitted)).

Expert testimony such as Evanier's, grounded in the social sciences, "cannot have the exactness of hard science methodologies," *United States v. Joseph,* 542 F.3d 13, 21 (2d Cir. 2008) (quoting *Jenson v. Eveleth Taconite Co.*, 130 F.3d 1287 (8th Cir. 1997)), and its reliability depends heavily on the knowledge and experience of the expert, rather than the methodology of theory behind it." *Id.* at 21–22 (quoting *United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000)).

"[C]ourts have held that any doubts about whether an expert's testimony will be useful should be resolved in favor of admissibility." *Valentin v. New York City*, 1997 U.S. Dist. LEXIS 24059, at *53 (E.D.N.Y. Sept. 9, 1997) (citations omitted). In accordance with "the liberalizing purpose of Rule 702," experts may properly testify "even as to the ultimate issue in a case, so long as there are sufficient facts already in evidence or disclosed by the witness … to take such [expert opinion] testimony out of the realm of guess work and speculation." *Id.* at *53–54 (internal

citations omitted).  It is "[o]nly if the expert testimony is so fundamentally unsupported that it cannot help the factfinder should a trial court exclude an expert opinion." *Id.* at *54. Other Circuits have similarly noted that while *Daubert* applies on summary judgment, it must be used cautiously and sparingly.  *See e.g., Cortes-Irizarry v. Corporacion Insular De Seguros*, 111 F.3d 184, 188 (1st Cir. 1997).[4]

"Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking" allegedly "shaky but admissible evidence," not exclusion. *Daubert*, 509 U.S. at 596, 113 S.Ct. at 2798n

### B.  Evanier Is A Leading Comic Book Industry Historian

Evanier easily qualifies as an expert on the subject matter of his opinions, namely the history and custom and practices of Marvel and the comic book industry up to, during and after the 1962-65 Period in question, including Marvel's and the industry's historical publishing practices with respect to freelance contributors like Steve Ditko. *See* Dkt. 79-1 (Evanier expert report); 79-2 (Evanier rebuttal report). Evanier's opinion and testimony will aid the Court and the trier of fact to evaluate the subject matter of this action within its true historical context. Marvel can hardly claim that these are not proper subjects for expert testimony when Marvel itself designated Paul Levitz, the former publisher of DC Comics, as Marvel's expert to testify on the same historical subjects and practices as Evanier. *See* Dkt. 80-15.

Notwithstanding Marvel's caustic portrayal, Evanier is one of the most well-known and

---

[4] "The fact that *Daubert* can be used in connection with summary judgment motions does not mean that it should be used profligately.  A trial setting normally will provide the best operating environment for the triage which *Daubert* demands.  *Voir dire* is an extremely helpful device in evaluating proffered expert testimony, and this device is not readily available in the course of summary judgment proceedings.  Moreover, given the complex factual inquiry required by *Daubert*, courts will be hard-pressed in all but the most clear-cut cases to gauge the reliability of expert proof on a truncated record.  Because the summary judgment process does not conform well to the discipline that *Daubert* imposes, the *Daubert* regime should be employed only with great care and circumspection at the summary judgment stage." *Id.*

widely respected historians of the comic book industry. *See* Dkt. 79-1 at 1-7. He has been involved in the industry for over fifty years as a noted historian, writer and columnist. *Id*. As a comic book historian, Evanier has written six books, including the award-winning definitive biography of Jack Kirby, <u>Kirby: King of Comics</u> (2008), and <u>Mad Art</u> (2002), a history of Mad Magazine. *Id*. at 5.  Evanier has also written numerous forewords and introductions for books about comics, including many collections published by industry leaders DC Comics ("DC") and, notably, Marvel, itself.  *Id*. at 5-7.  For Marvel, Evanier has written such material for:  *Marvel Masterworks: Rawhide Kid* Volume 2 (2006), *Fantastic Four Omnibus* Vol. 2 (2007), *Marvel Masterworks: The Mighty Thor* No. 6 (2007) and, most recently, *Marvel Masterworks: The Inhumans* Volume 1 (2009). *Id*. at 2. For DC he has written introductions and/or forwards for the *Justice League of America Archives*, Vol. 6 (2000), *The Blackhawk Archives* Vol. 1 (2001), *Jack Kirby's Fourth World Omnibus* Vol. 1 (2007), Vol. 2 (2007), Vol. 3 (2007) and Vol. 4 (2008). *Id.* at 5.

Evanier has also acted as an advisor and historian for Marvel over the last two decades. *Id*. at 3.  For example, Evanier's knowledge and expertise is so acute that Marvel asked him to determine who actually "inked" particular Marvel comic book issues, and to determine the identity of pseudonymous contributors to various Marvel comic books. *Id.*

Evanier has appeared on all sorts of television programs and supplemental DVD materials regarding comics. *Id.* at 4  At Stan Lee's ("Lee") request, Evanier appeared on A&E's "Biography" program on Lee's life. *Id.* at 4.  Evanier also was interviewed for the documentary "With Great Power – The Stan Lee Story," which Lee also asked him to review for factual accuracy. *Id.* Evanier worked as Jack Kirby's ("Kirby") assistant in the early 1970s, before Kirby stopped working with Marvel in favor of DC.  Afterwards Evanier assisted Kirby in art

production, mockups and presentations; served as a sounding board for Kirby as he created his works and Evanier edited the "fan letters" section of Kirby's comics.  *Id.* at 3. Evanier has also worked for Stan Lee as Vice President of Creative Affairs at Stan Lee Media.  *Id.*

Evanier worked as a comic book writer for The Walt Disney Company and Gold Key Comics (*Bugs Bunny*, *Daffy Duck*, *Porky*, etc.).  *Id.* Shortly after that, he became the editor and head writer for the Edgar Rice Burroughs estate (*Tarzan*). *Id*. From 1977 to 1982, Evanier ran the comic book division of Hanna-Barbera Studios, as editor and head writer. *Id.* at 4. He has since written for numerous other comic books.[5] *Id.*

As a result of his decades of experience and work as an historian, Evanier has served as panel moderator at hundreds of comic book industry events, including at the industry-leading Comic-Con International in San Diego, WonderCon in San Francisco, the Los Angeles Comics and S-F Convention, and the Mid-Ohio Con in Columbus, Ohio. *Id.* at 2. At each annual San Diego Comic-Con, Evanier usually moderates 5-6 panels and events where he interviews comic book "greats" about their work.  For his efforts in recording and preserving comic book history, Evanier was awarded the prestigious Bob Clampett Humanitarian Award in 2001. *Id.*

Evanier has also been admitted as an expert in cases and trials regarding comic book history.  *Id.* at 4-5. Evanier testified as an expert witness in the long-running *Superman* copyright litigation in the Central District of California, for the family of Jerry Siegel, the co-creator of *Superman*, *id*. at 4, contrary to Marvel's misleading innuendo (Dkt. 77 at 12). *See* Toberoff Decl., Ex. 1 at 6.

---

[5] These *Superman Adventures, The New Gods* and *Blackhawk* for DC Comics, *Blackhawk*, *Groo the Wanderer* (with Sergio Aragonés), *Crossfire, Hollywood Superstars*, and *The DNAgents*. *Id.*

**C.**　　　**Marvel's Immoderate Arguments  Do Not Merit the Exclusion of Evanier**

　　**1.**　　**Evanier's Detailed Opinions Covering the History of the Comic Book Industry and Marvel Are Not a Mere Conduit for Hearsay**

Marvel erroneously argues that Evanier is not testifying as an expert historian but is just repeating hearsay. Dkt. 77 at 1. However, Evanier's experience and multiple sources of knowledge, which include numerous interactions and interviews with top freelance artists and writers who sold their work to Marvel during Period, Marvel staff and other industry figures from the Period; review of relevant documents and record evidence; years of research and historical study of the comic book industry; and his own experience as a comic book creator, are all valid bases for expert opinion. *See, e.g.*, Dkt. 79-1 at 2-8.  Unsurprisingly, Marvel cannot point to much in support of its sweeping remarks, offering hyperbole in its place.[6] *See* Dkt. 77 n. 3.  From there, Marvel simply relies on the trial court's decision in *Marvel Worldwide, Inc. v. Kirby*, 777 F. Supp. 2d 720 (S.D.N.Y. 2011) regarding a different artist, work and period, and a materially different expert opinion, as Marvel does throughout its summary judgment motion. In so doing, Marvel ignores the "broad discretion" accorded *each* district court in exercising its gatekeeping function "under the circumstances of each case." *In re Pineapple Antitrust Litigation*, 407 F. App'x 520, 522 (2d Cir. 2010).

Marvel falsely suggests that the trial courts in two other cases excluded Evanier's expert opinion—*In re Marvel Entertainment Group, Inc.*, No. 97-638-RMM (D. Del.)(regarding Marv Wolfman) and *Siegel v. Warner Bros. Ent. Inc.*, 542 F. Supp. 2d 1098 (C.D. Cal. 2008)—when they did nothing of the sort. *See e.g.* Dkt, 77 at 6 ("His testimony was stricken the first two times

---

[6] Instead, Marvel culls snippets from Evanier's deposition where he states that "'I have been fortunate to meet most of the people'" or argues he "admits" to conducting "numerous interviews" of leading comic book figures. From there Marvel claims that Evanier "repeatedly seeks" to introduce inadmissible hearsay into the record, but cites only three weak examples of alleged hearsay from Evanier's 25-page expert report and 17-page rebuttal report. Dkt. 77 at 11-12.

and should fare no better in this case"). But the district court in the long-running *Siegel* case not only *denied* Warner Bros' motion to exclude Evanier from a 2009 bench trial and permitted Evanier to testify regarding Superman's history, it cited Evanier as one of the more credible and helpful witnesses in the case:

> In assessing the testimony at trial, the Court found some of the witnesses very credible and others not credible at all. The Court found the testimony by [the Siegels'] comic book historian expert, Mark Evanier … both credible and persuasive. Considering [his] demeanor and testimony, the Court observed that [he] attempted to answer directly and honestly the questions put to [him] without equivocation or evasion, even when [his] answers resulted … in the admission of certain facts that were not altogether beneficial to [his side].

Toberoff Decl., Ex. 1 at 6.  In *Siegel*, 542 F. Supp. 2d at 1122-23, cited by Marvel, the same district court did not exclude Evanier as an expert or hold that his opinion was inadmissible, as Marvel implies; it simply found that one aspect of his opinion (regarding the publication dates of promotional announcements) was not sufficiently probative to overcome the presumption of validity accorded to the dates in certain copyright registrations. *Id*.

Marvel's repeated references to *In re Marvel Entertainment Group, Inc., et al.*, No. 97-638-RMM (D. Del.)) as excluding Evanier under *Daubert* are also misleading. The case actually undermines Marvel's position.  The bankruptcy court admitted Evanier as an expert to testify at trial and asked him to opine on "the general concepts of [comic book] industry practice," based on "examples from his experience and from his knowledge of the community," statements deliberately omitted by Marvel.  Toberoff Decl., Ex. 2 at B-213-14. The trial court correctly instructed that whereas "it's typical … under Rule 703 [for an historical expert] …to rely on hearsay for the purpose of bolstering opinions the expert offers" such hearsay itself does not establish the facts therein. *Id.* (an expert can rely on hearsay "to establish … industry practice.").

Marvel's trial court's statements in *Siegel* and *In re Marvel Entertainment Group* evoke a

larger point. Rule 703 dictates that an expert may base his opinion on any "facts or data," whether admissible or not, that "experts in the particular field would reasonably rely on." *U.S. v. Abu-Jihaad*, 553 F. Supp. 2d 121 (D. Conn. 2008); Fed. R. Evid. 703 ("If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted.") *id*., Notes of Advisory Committee on Rules (Rule 703 allows an expert witness to rely on "facts and data" presented "outside of court and other than by his own perception."); *U.S. v. Locascio*, 6 F.3d 924, 938 (2d Cir. 1993) (same). Otherwise, hearsay is admissible as provided in Rules 802 and 803, Fed.R.Evid.

It is equally well-settled that historians and experts in the social sciences commonly rely on hearsay, including that contained in interviews**.** *See Joseph*, 542 F.3d at 21-22 (allowing expert as to social interaction on the internet: "To the extent that the District Court was concerned that [expert's] testimony would rely on hearsay, that would not be a valid objection. Fed.R.Evid. 703.").

Tellingly, the knowledge and opinions of Marvel's own expert witness Levitz is also based on "relationships with individuals working staff and freelance positions with each of Marvel, DC Comics," etc. and "reading and research" Dkt. 80-15 at 8, 10; *id*. at 1 ("I became good friends with a large number of professionals in the comics field"). As Levitz was born on October 21, 1956 and only age 6 to 9 in the Period, the extensive factual statements in his expert report could only be based on hearsay, underscoring the hypocrisy of Marvel's castigation of Evanier. Dkt. 80-15 at 1. Whereas, Evanier, cites to record evidence to support his opinions (*see e.g.,* Dkt. 79-1 at 14, 15, 17, 18-23), in addition to Evanier's extensive knowledge and experience, Levitz does not, furthering the conclusion that Levitz's factual narrative is based on

hearsay. Dkt. 80-15. That any express reference to third-party statements were edited out of Levitz's report does not obscure this conclusion.

Marvel repeatedly emphasizes (Dkt. 77) that Evanier, in part, bases his opinion on the hundreds of interviews he has conducted over the years of the most notable comic book figures[7] and Evanier's service as the key moderator of informative panels on comic book history, including the Period. *See* Dkt. 79-1 at 3. Contrary to Marvel's arguments, "[s]ocial science experts commonly base their opinions on interviews." *Joseph*, 542 F.3d at 22 (such expert "opinions appear to be highly likely to assist the jury 'to understand the evidence'" (quoting Fed.R.Evid. 702)).

"Experts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called 'general truths derived from …specialized experience.'" *Kumho Tire Co.*, 526 U.S. at 148–49, 119 S.Ct. 1167 (quoting Learned Hand, *Historical and Practical Considerations Regarding Expert Testimony*, 15 Harv. L. Rev. 40, 54 (1901)). "Social science 'research, theories and opinions cannot have the exactness of hard science methodologies,' and 'expert testimony need not be based on statistical analysis in order to be probative'" *Id.* (internal cites omitted). "'[P]eer review, publication, potential error rate, etc. . . . are not applicable to this kind of testimony, whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it.'" *Id*. quoting *United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000). In such cases, Marvel's opportunity to "'quibble' is 'on cross-examination' and goes to [Evanier's] 'testimony's weight . . . not its admissibility.'" *Id*. quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995).

---

[7] Evanier's interviewees include Stan Lee, Jack Kirby, Ray Bradbury, Gene Colan, Larry Lieber, Roy Thomas, John Buscema, Sal Buscema, Joe Sinnott, Gil Kane, Neal Adams, Marie Severin, John Romita, Don Rico, Joe Kubert, and may more. Dkt. 79-1 at 2.

Reliance on interviews and secondary sources is commonly accepted by the courts with respect to historical experts and there can be no doubt that Evanier qualifies as a comic book historian. *See e.g.*, *United States v. Paracha,* 2006 WL 12768, at *20–21 (S.D.N.Y. Jan. 3, 2006) (finding historian's method "consist[ing] of gathering multiple sources ..., including original and secondary sources" involving hearsay to reach conclusions about historical facts to be reliable); *New York v. Shinnecock Indian Nation*, 523 F. Supp. 2d 185, 262 (E.D.N.Y. 2007) (finding that historical "experts' testimony was sufficiently reliable to be admissible under *Daubert* and, as with the objections to qualifications, the purported weaknesses complained of by the parties regarding methodology were the proper subject of cross-examination and went to the weight of these witnesses' testimony, not the admissibility." )

As aptly stated by Judge Posner in *Velasquez v. Frapwell,* 160 F.3d 389, 393 (7th Cir.1998) *vacated in part,* 165 F.3d 593 (7th Cir.1999):

> "[J]udges do not have either the leisure or the training to conduct responsible historical research or competently umpire historical controversies. The term 'law-office history' is properly derisory and the derision embraces the efforts of judges and law professors, as well as of legal advocates, to play historian. . . . Judges don't try to decide contested issues of science without the aid of expert testimony, and we fool ourselves if we think we can unaided resolve issues of historical truth."

Evanier has offered more than "'some explanation as to how [he] came to his conclusion[s] and what methodologies or evidence substantiate' them." *In re Terrorist Attacks on Sept. 11, 2001,* 2023 WL 3116763, at *6 (S.D.N.Y. Apr. 27, 2023) (quoting *Riegel v. Medtronic, Inc.,* 451 F.3d 104, 127 (2d Cir. 2006)." "That is enough to admit his testimony, and [Marvel is] free to attack his 'testimony's weight' by 'quibbl[ing]' with his citations on cross-examination." *Id*. (quoting *Joseph,* 542 F.3d at 21 (quoting *McCulloch,* 61 F.3d 1038 at 1043)).

### 2.  Evanier's Opinions Are Helpful to the Trier of Fact and Do Not Supplant the Role of Counsel or the Jury

Marvel's mantra that Evanier merely provides the Estate's "narrative" is also without merit. As set forth above, experts can properly offer the type of "historical" reconstruction provided by Evanier.  The cases cited by Marvel stand for a different proposition:  that it is improper for an expert to simply provide a "narrative" of the record evidence.  Marvel omits, however, that an expert can properly testify as to the historical context in which to place such evidence and can draw inferences from such evidence based on his/her expertise.

Evanier's opinions are reasonably based on his knowledge, experience and expertise regarding the history[8] of the comic book industry and its customs and practices,[9] which are legitimate subjects for expert testimony. *See* Dkts. 79-1; 79-2. And throughout his expert reports, Evanier supports his opinions. *Id.*  Notably, under the 1909 Copyright Act, the "custom and practice" of an industry can rebut the "work for hire" presumption (under the "instance and expense" test), making such testimony particularly pertinent.  *See Nimmer,* § 5.03[D] at 5-56.12 ("[A] custom or usage … would become an implied in fact term of the contract of employment," and can rebut any "work for hire" presumption); *Playboy Enters. v. Dumas*, 53 F.3d 549, 557 (2d Cir. 1995) (considering evidence of industry custom and practice in determining if a work was "made for hire"); *May v. Morganelli-Heumann & Assocs.*, 618 F.2d 1363, 1369 (9th Cir. 1980) (relying on "prevailing custom and usage" in order "to determine whether the parties intended to contract contrary to the presumption of the 'works for hire' doctrine").

---

[8] *See, e.g., Oneida Indian Nation v. New York*, 691 F.2d 1070, 1086 (2d Cir. 1982) (expert testimony on history); *Cayuga Indian Nation v. Pataki*, 165 F. Supp. 2d 266, 304-357 (N.D.N.Y. 2001) (considering expert historian's testimony); *Chavez v. Carranza*, 559 F.3d 486, 497 (6th Cir. 2009) (same); *United States v. Idaho*, 210 F.3d 1067, 1069 (9th Cir. 2000) (same).

[9] *See, e.g., SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 133-134 (2d Cir. 2006) (approving testimony re: "custom and practice in the property insurance industry"); *Bayway Ref. Co. v. Oxygenated Mktg. & Trading A.G.*, 215 F.3d 219, 225 (2d Cir. 2000) (adopting expert testimony as evidence of "the custom and practice in the petroleum industry"); *Travelers Indem. Co. v. Scor Reinsurance Co.*, 62 F.3d 74, 78 (2d Cir. 1995) (approving expert testimony on "industry custom and practice," including historical testimony that it remained "the same before and after" the contractual provisions at issue "came into general use"); *Berkeley Investment Group, Ltd. v. Colkitt*, 455 F.3d 195, 218 (3d Cir. 2005) (expert testimony as to industry custom and practices is admissible).

Evanier conveys his opinions based on his deep-seated knowledge and expertise, and all or nearly all of the subjects Evanier discusses implicates his expertise, satisfying *Daubert*'s reliability objective. *Kumho Tire*, 526 U.S. at 141–42. Accordingly, Evanier does not invade the province of the jury. On the contrary, as this case concerns events 60 years ago, Evanier's knowledge and experience as a top comic book historian will help both the Court and the trier of fact to place the available evidence in its proper historical context. This is something a jury is not equally capable of doing. Nor does Evanier purport to present legal conclusions to the jury. Contrary to Marvel's spin, Evanier neither serves as an advocate nor invades the province of the Court or jury. *See generally* Dkt. 79-1.

Marvel obviously tries to mimic this Court's decision in *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 550 (S.D.N.Y. 2004). However, unlike Evanier, the problem with Dr. Gale in *In re Rezulin* was that his highly selective rendition of the facts ("reciting selected regulatory events" concerning the drug Rezulin) did not implicate his expertise and thus had no indicia of reliability. *Id.*

As posed, Marvel's overbroad "narrative" argument would result in the near-total exclusion of every expert in the soft sciences, contrary to precedent and the "'liberal standard of admissibility for expert opinions.'" *United States v. Napout,* 963 F.3d 163, 187 (2d Cir. 2020) (quoting *Nimely v. City of New York,* 414 F.3d 381, 395 (2d Cir. 2005)). *See also In re Fosamax Prods. Liab. Litig.*, 645 F.Supp.2d 164, 173 (S.D.N.Y. 2009) ("[I]n accordance with the liberal admissibility standards of the Federal Rules of Evidence, only serious flaws in reasoning or methodology will warrant exclusion."); *Adams v. Liberty Mar. Corp.*, 407 F.Supp.3d 196, 202 (E.D.N.Y. 2019) (same); *Velasquez,* 160 F.3d at 393 (emphasizing the value of expert historians in helping to resolve "issues of historical truth").

For its argument, Marvel again relies on the district court's decision in *Kirby*. Dkt. 77 at 14 (quoting *Kirby*, 777 F. Supp. 2d at 729 ("Nothing . . . Evanier . . . says concerns technical or scientific matters that lay jurors need help to understand. [His] proffered testimony therefore is inadmissible[.]"). Respectfully, this runs contrary to Supreme Court and Second Circuit precedent. *Kumho Tire*, 526 U.S. at 141–42; *Joseph*, 542 F.3d at 21.

### 3. Evanier's Opinions Cannot Fairly Be Characterized As Concerning the Parties' "Motives and Intent"

Throughout it motion, Marvel cherry-picks random words or phrases from Evanier's reports, out of context to the points made in the paragraphs or sections where they appear, and uses that to mischaracterize Evanier's entire opinion. To argue that Evanier opinions are about the parties "intent and motive" Marvel is left quoting trivial examples, often amounting to a single word, while exclaiming that Evanier's entire expert opinion is "riddled" with such infirmities. *See* Dkt. 77 at 15-16 (citing a handful of random bare page cites that do nothing to support Marvel's exaggerated attack). Evanier's detailed opinions hardly stand for this, nor would be introduced for that purpose.

The following addresses Marvel mole-hill mountain. In his rebuttal to Levitz's report, Evanier writes that *"Stan Lee, in particular, regardless of the degree to which he contributed to a work, was known to put his name on most everything Marvel published. Lee, as both an Editor-in-Chief and a writer, self-appointed his own credits at his discretion … to enhance his own reputation …".*  Dkt. 79-2 at 16. Yes, the last bit implicates intent but is a rhetorical flourish (i.e., everyone who promotes their own credits does so to enhance their reputation) and this is hardly the point of Evanier's rebuttal. *Id*. Marvel's expert Levitz had stated that "[i]ndividual contributors' names were not publicized to sell comics" and implicated *Marvel's* motive and

thought processes (contrary to its admonition here) stating "using contributor's names was generally considered detrimental … by giving talent leverage over the publisher." Dkt. 80-15 at 18. Levitz concluded that Marvel sought to "promote" its editor Lee "more than freelance contributors." Evanier disagreed citing numerous examples of Marvel's use of freelance creators' names/personas in promoting its comic books. Dkt. 79-2 at 16.

Next Marvel quibbles over two words ("to placate") in a lengthy paragraph citing numerous examples of Marvel's ever-shifting credits to freelance artists, where the obvious point is to describe the credits Marvel gave freelance artists like Ditko in the Period and afterwards, retroactively. Dkt. 79-1 at 12-13. Other than the above, Marvel harps on one sentence, where Evanier notes that in the Period freelancers had no "cause to believe" that their material was "already owned by the publisher from the moment of the material's creation." Dkt. 79-1 at 18. This appears in a lengthy paragraph that begins with the sentence—"In the Period (and until approximately 1978), the custom and practice in the comic book industry, including at Marvel, was for the publisher to simply purchase from the freelancer at a page rate those completed pages the publisher chose to accept in its sole discretion." —and is obviously about the parties' working relationship not their mental processes. *Id*.

Lastly, Marvel isolates just one other sentence: "Some artists working this way felt that they were co-writing the comics without pay or credit …". *Id*. at 12. As Evanier has known and interviewed hundreds of freelancers over decades it is only natural that some reference to their views may find its way into an historical report like his, but, again, the obvious point of these paragraphs is to describe Marvel's chaotic ever-changing credit practices, not to opine as to motive and intent. *Id*. This brings up a larger point: it is quite difficult for an expert in the social sciences to describe human behavior without an occasional tangential reference to a belief,

thought process or intent. Ironically, one need only view the reports of Marvel's expert to see that it actually *is* "riddled" with such references.[10]

Evanier's testimony is based on his knowledge of the culture and history of the comic book industry, gleaned from hundreds of interviews (including Stan Lee's) and other acceptable sources of expert knowledge and opinion. Whereas, Evanier's opinions hardly dwell on this, expert testimony is not excluded merely because it may implicate credibility, motive or intent. *See e.g.*, *Joseph*, 542 F.3d at 22 n.11 ("[W]hen the Government implores a jury to find the defendant and his explanation not credible, we think the presentation of that explanation from a qualified expert would be significant, especially where the explanation is not one with which jurors are likely to have familiarity."); *see also id*. at 22 (urging the district court to allow expert testimony on "the distinct realities and motivations" of online participants); *SR Int'l Bus. Ins. Co.,* 467 F.3d at 132; (approving expert testimony on contractual intent); *Travelers Indem. Co.,* 62 F.3d at 78 (same); *Katt*, 151 F. Supp. 2d at 359 (permitting expert testimony "to assist the jury to understand why … [plaintiff]  might reasonably have chosen not to take advantage of established [] procedures"); *Valentin v. New York City*, No. 94 CV 3911 (CLP), 1997 WL

---

[10] *See e.g*. Dkt. 80-15 at 2 ("My fanzine … was *considered* by the industry to be a preeminent source for information"); *id*. at 3 n. 1("practices generally (and *deliberately*) deviated"); *id* at 12 ("among writers … there was a *commonly held belief*"); *id.* at14 ("covers *were considered to be* the most important element in selling the comic and *thus given considerable thought*."); *id*. ("Most lettering was *considered* a "craft" rather than a "creative" form"); *id*. ("so talent were expected to add to the mythologies to maintain public interest"); *id.* ("and editors would generally have *preferences* for which combinations they assigned."); *id*. at 15 ("*Given the importance* of the cover to sales, it was far more common for cover artwork to go through revision. *For the same reason*, many of the companies had higher rates for cover artwork.") *id*. ("different levels of nudity or violence were deemed acceptable"); *id*. at 18 ("The pulp magazines developed this practice *because* it allowed publishers to pay lower salaries for employees …."); *id*. ("Material that was accepted but unpublished *because* a title was cancelled or because other publishing shifts were made…"); *id*. (*Because* comics were produced by multiple contributors … comic book publishers generally worked with contributors directly, rather than through … agents."); *id*. at 23 ("Indeed, *because* editors generally tried to provide regular assignments…); *id*. ("working on a freelance basis for the comic book publishers *was an attractive option for contributors*"); *id*. (While creative talent received occasional raises …, sometimes *reflecting an editor's view* of their utility or value to the publisher, these raises were often arbitrary…"); *id*. at 25 ("When the 1976 Copyright Act was enacted, publishers began to use the term "work made for hire" … to document the creation of work…").

22

33323099 at *15-16 (E.D.N.Y. Sept. 9, 1997) (permitting expert testimony as to the potential

motivations of persons within defendant organization); *Kingsdown Medical Consultants, Ltd. v.*

*Hollister, Inc.*, 863 F.2d 867, 872 (Fed. Cir. 1988) (experts permitted to testify as to "no

evidence of deceptive intent" in patent application).

This is particularly true when the matter in question is decades old.  *See Commercial*

*Union Ins. Co. v. Seven Provinces Ins. Co.*, 217 F.3d 33, 38-39 (1st Cir. 2000) (permitting expert

testimony on intent "because the policy was several decades old," and the experts "could testify

to what the terms in the policy must have meant in light of industry practice" at the relevant

time). *See also Cree v. Flores*, 157 F.3d 762, 767-768 (9th Cir. 1998) (considering historical

testimony as to meaning and intent of an old treaty).

Notwithstanding all of the above, the trier of fact, will ultimately decide the weight to

assign the testimony and evidence in this case.

### 4.  Marvel's Claim that Evanier Purports to Offer Legal Opinions is Frivolous

Marvel's accusation that Evanier seeks to offer legal opinions is unsupported in his

reports and testimony. As Marvel notes, Evanier is the first to admit that he is not comfortable

offering any opinions as to the ultimate "work for hire" issue.  Dkt. 77 at 19. Contrary to

Marvel's hype, Evanier's perception that once the "new Copyright Act's explicit work-for hire

provisions" were enacted Marvel demanded artists to sign retroactive "work for hire releases" if

they wanted their artwork back is not a legal conclusion. *Id*. Marvel's expert Levitz stated similar

things. Dkt. 80-15 at 25 ("When the 1976 Copyright Act was enacted, publishers began to use

the term 'work made for hire'…".) Marvel's legends on the back of its checks to freelancer's

*expressly state* that by endorsement the freelancer "assigns to it [] any copyright including my

assignment of any rights to renewal copyright." Dkt. 79-1 at 16. Evanier's passing statement that

23

he reviewed such checks containing "assignment of all rights language" is hardly a "legal

opinion." *Id*. Nor does Evanier's note that Martin Goodman was well-known to use "shell

corporations," rise to the level of offering expert opinion on "corporate structure or commercial

transactions," as trumpeted by Marvel. Dkt. 77 at 19.

### 5. Marvel Mischaracterizes Evanier's Opinions as Making Credibility Determinations

Marvel's sweeping attacks on Evanier's expert opinions are, upon closer inspection,

unsupported. Marvel is correct that the assessment of witness credibility is not the province of an

expert, but Evanier does not do this. Marvel cannot even find a snippet on which to purportedly

hang its hat. Dkt. 77 at 16-18. Evanier is a comic book historian which is permissible. *Oneida*

*Indian Nation*, 691 F.2d at 1086; *Chavez*, 559 F.3d at 497. Marvel has designated a similar expert

historian, Paul Levitz. *See* Dkt. 80-15. There is nothing improper about Evanier's statement that

he hopes to "place the subject matter of the actions in their true historical context." Dkt. 79-1 at 2.

*See Velasquez,* 160 F.3d at 393. Nor is Evanier's passing statement at his deposition that he often

disagrees with Roy Thomas on Marvel's history, testimony about "the credibility of witnesses."

*Id*. at 17. Marvel yet again quotes *Kirby*, 777 F.Supp.2d 730, but nowhere here does Evanier

"purport[] to opine on the credibility of [Stan Lee's] testimony," *id*., or as to any other witness.

Marvel's claim that Evanier usurps the role of the jury because he has conducted

hundreds of interviews in researching the history of the comic book industry is equally

erroneous. "Social science experts commonly base their opinions on interviews" and such

"opinions appear to be highly likely to assist the jury 'to understand the evidence'." *Joseph*, 542

F.3d at 22 (quoting Fed.R.Evid. 702). *See also Arista Records LLC,* 608 F. Supp. 2d at 424 ("In

forming their opinions, experts, of course, often rely on interviews of people with knowledge of

relevant facts."); *Chavez*, 559 F.3d at 497 (social science expert permitted to testify based upon

"interviews, … documentary research, and field research" about historical events in the preceding decades); *Katt,* 151 F. Supp. 2d at 356 (social science expert may testify based on "interviews" and academic research).

### D.      Evanier's Testimony Will Assist the Trier of Fact

Evanier, despite Marvel's suggestion, does not opine as to the ultimate legal issue of whether Ditko's iconic work was "made for hire."  Instead, Evanier focuses on the conditions, customs and practices of the comic book industry leading up to and during the Period when Ditko created his works, based on Evanier's experience as both an industry scholar and participant.

For instance, Evanier explains why the comic book business, and Marvel in particular, was on the brink of ruin by the mid-1950s, and how, in slowly starting up again in 1958, it purchased freelance work, curtailing its overhead.  Dkt. 79-1 at 9-11, 15, 17, 19.  Evanier explains the history of the endorsement "legends" Marvel placed on the back of its freelancer checks and how this changed over time.  *Id*. at 17-18.  Evanier describes DC Comics' and then Marvel's sudden return of original artwork to freelancers in the 1970s and later in the 1980's (provided artists sign purportedly retroactive "work for hire" releases). *Id*. at 23-25.  Courts routinely admit this sort of evidence.  *See Travelers Indem. Co.,* 62 F.3d at 78 (approving expert testimony on industry practices over time, to shed light on a new contract clause); *Ting Ji,* 538 F. Supp. 2d at 358 (expert permitted to testify, based on her "obvious familiarity with the industry," as to custom and practice and the meaning of language in a "payment voucher" and "release form"); *SR Int'l Bus. Ins. Co.*, 467 F.3d at 132; *Pension Comm.*, 691 F. Supp. 2d at 448.

The Rules welcome the testimony of knowledgeable experts like Evanier, provided it assists the trier of fact.  F.R.E. 702 ("If … specialized knowledge will assist the trier of fact to

understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify"); F.R.E. 703, Notes of Advisory Committee on Rules ("The third source contemplated by the rule consists of presentation of data to the expert outside of court and other than by his own perception.")

Collectively, the Rules "'embod[y] a liberal standard of admissibility for expert opinions.'" *Napout,* 963 F.3d at 187 (quoting *Nimely,* 414 F.3d at 395). Courts faced with questions regarding expert witness testimony therefore opt for the mildest effective remedy, bearing in mind that weaknesses often "'go to the weight of the evidence, not to its admissibility'", *SR Int'l Bus. Ins. Co., LLC,* 467 F.3d at 134 (quoting *Campbell v. Metropolitan Property Cas. Ins. Co*., 239 F.3d 179 (2d Cir. 2001)), and, as stated, can be adequately addressed by "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert,* 509 U.S. at 596, 113 S.Ct. at 2798.

If testimony has more substantial reliability issues, courts resolve these by excising "only the unreliable testimony" and permit the jury to hear the remainder. *Sec. Litig. Teachers' Ret. Sys. of La. v. Pfizer, Inc.*, 819 F.3d 642, 665 (2d Cir. 2016).

Evanier's "specialized knowledge" based on his experience and vast knowledge of the comic book industry, both its history and its practices, will be an invaluable aid to the trier of fact as it provides, among other things, the historical context in which to properly evaluate the bits and pieces of testimonial and documentary evidence regarding Ditko's relationship with Marvel in the relevant Period—sixty years ago.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that Marvel's unfounded motion to exclude the expert reports and testimony of Mark Evanier be denied in its entirety.

Dated:  June 24, 2023                    **TOBEROFF & ASSOCIATES, P.C.**


By:        *Marc Toberoff*
                    Marc Toberoff

Marc Toberoff (MT 4862)
*mtoberoff@toberoffandassociates.com*
23823 Malibu Road, Suite 50-363
Malibu, CA 90265
Telephone: (310) 246-3333
Facsimile: (310) 246-3101

*Attorneys for Patrick S. Ditko.*