### UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARVEL CHARACTERS, INC., | Case No.: 1:21-cv-07957-LAK |
| Plaintiff, | |
| v. | Hon. Lewis A. Kaplan |
| PATRICK S. DITKO, in his capacity as Administrator of the Estate of Stephen J. Ditko, | **DEFENDANT AND COUNTERCLAIMANT PATRICK S. DITKO'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGEMENT** |
| Defendant. | |
| PATRICK S. DITKO, in his capacity as Administrator of the Estate of Stephen J. Ditko, | Oral Argument Requested |
| Counterclaimant, | |
| v. | |
| MARVEL CHARACTERS, INC. and DOES 1-10, inclusive, | |
| Counterclaim-Defendants. | |

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ........................................................................................................ 1

DISPUTED MATERIAL FACTS ................................................................................................... 3

LEGAL STANDARD FOR SUMMARY JUDGMENT .................................................................. 9

ARGUMENT ................................................................................................................................... 9

    A.    Marvel Cannot Show that Ditko's Artwork Was Created at the "Instance" or "Expense" of the Shell Companies Registered as Its "Authors." ................................... 10

    B.    Marvel's Total Reliance on the *Kirby* Case is Misplaced. ............................................. 17

    C.    The Credibility of Marvel's Key Witnesses Stan Lee and Roy Thomas is in Sharp Dispute Rendering Its Case Unsuitable for Summary Judgment. .................................. 20

    D.    Issues of Fact Pervade Marvel's "Instance" Arguments. ............................................... 24

    E.    Marvel Cannot Satisfy the "Expense" Prong. ............................................................... 36

    F.    Marvel and Ditko Could Not Have Intended that His Work was "For Hire." .............. 39

    G.    The Undisputed Facts Show that Ditko Expressly or Impliedly Assigned to Marvel the Copyrights in the Works Marvel Purchased. ........................................................... 37

    H.    Even if the "Instance and Expense" Test Were Satisfied Sufficient Evidence Exists for the Trier of Fact to Find A "Contrary Agreement.". ................................................ 42

CONCLUSION .............................................................................................................................. 45

## <u>TABLE OF AUTHORITIES</u>

**FEDERAL CASES**

*Adams v. Master Carvers of Jamestown, Ltd.*,
   91 Fed. Appx. 718 (2d Cir. 2004) .................................................................................22

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242, 106 S. Ct. 2505 (1986) ........................................................................9, 20

*Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*,
   757 F.2d 523 (2d Cir.1985) .......................................................................................11

*Bickerstaff v. Vassar College*,
   196 F.3d 435 (2d Cir. 1999) .....................................................................................45

*Blonder-Tongue Laboratories v. University of Illinois Foundation*,
   402 U.S. 313, 91 S. Ct. 1434 (1971) ..........................................................................20

*Blue Cross and Blue Shield v. Philip Morris*,
   141 F. Supp. 2d 320 (E.D.N.Y. 2001) .......................................................................14

*Brooklyn Ctr. for Indep. of Disabled v. Metro. Transp. Auth.*,
   11 F.4th 55 (2d Cir. 2021) ........................................................................................21

*Cabrera v. Jakabovitz*,
   24 F.3d 372 (2d Cir. 1994) .......................................................................................14

*Cedric Kushner Promotions, Ltd. v. King*,
   533 U.S. 158, 121 S. Ct. 2087 (2001) ........................................................................15

*Clarex Ltd. v. Natixis Sec. Am. LLC*,
   2012 WL 4849146 (S.D.N.Y. Oct. 12, 2012) .......................................................... 15-16

*Cleveland v. Caplaw Enters.*,
   448 F.3d 518 (2d Cir. 2006) .................................................................................. 13-14

*Columbia Broad. Sys., Inc. v. Stokely-Van Camp, Inc.*,
   522 F.2d 369 (2d Cir. 1975) .....................................................................................14

*Community for Creative Non-Violence v. Reid*,
   90 U.S. 730, 109 S. Ct. 2166 (1989) .....................................................................19, 43

*Dole Food Co. v. Patrickson*,
   538 U.S. 468, 474, 123 S.Ct. 1655 (2003) ..................................................................15

*Dolman v. Agee*,
   157 F.3d 708 (9th Cir. 1998) ................................................................................39, 41

*Donaldson Publishing Co. v. Bregman, Vocco & Conn, Inc.*,
   375 F.2d 639 (2d Cir.1967) ...................................................................................17, 27

*Epoch Produc'g Corp. v. Killiam Shows, Inc.,*
  522 F.2d 737 (2nd Cir. 1975)........................................................................................39

*Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.,*
  342 F.3d 149 (2d Cir. 2003)....................................................................25, 38, 43

*Fifty-Six Hope Rd. Music Ltd.,*
  2010 U.S. Dist. LEXIS 94500 (S.D.N.Y. Sept. 10, 2010).........................................38

*Gary Friedrich Enterprises, LLC v. Marvel Characters, Inc.,*
  716 F.3d 302 (2d Cir. 2013).........................................................................23

*Gayle v. MMC Company,*
  153 F. Supp. 861 (D. Md. 1957).....................................................................14

*Heublein, Inc. v. United States,*
  996 F.2d 1455 (2d Cir. 1993)..........................................................................9

*Hudson Optical Corp. v. Cabot Safety Corp.,*
  1998 WL 642471 (2d Cir. Mar. 25, 1998).............................................................16

*In re Beck Indus., Inc.,*
  479 F.2d 410 (2d Cir. 1973).........................................................................16

*Jaegly v. Couch,*
  439 F.3d 149 (2d Cir. 2006)....................................................................20, 21

*Martha Graham School v. Martha Graham Center,*
  380 F.3d 624 (2d Cir. 2004)...................................................................passim

*Marvel Characters, Inc. v. Kirby,*
  726 F.3d 119 (2d Cir. 2013)...................................................................passim

*Marvel Characters, Inc. v. Simon,*
  310 F.3d 280 (2d Cir. 2002)..........................................................................9

*Murray v. Gelderman,*
  566 F.2d 1307 (5th Cir. 1978).......................................................................38

*Nipper v. Snipes,*
  7 F.3d 415 (4th Cir. 1993).......................................................................14, 20

*Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP,*
  322 F.3d 147 (2d Cir. 2003).....................................................................11, 12

*Pinto v. Allstate Ins. Co.,*
  221 F.3d 394 (2d Cir. 2000)..........................................................................9

*Playboy Enterprises, Inc. v. Dumas,*
  53 F.3d 549 (2d Cir.1995)......................................................................12, 38

*Reeves v. Sanderson Plumbing Products, Inc.*,
   530 U.S. 133, 120 S. Ct. 2097 (2000) ........................................................................20

*Roth v. Pritikin*,
   710 F.2d 934 (2d Cir. 1983) ........................................................................................43

*Schwabenbauer v. Board of Educ. of Olean*,
   667 F.2d 305 (2d Cir. 1981) ..........................................................................................9

*Self-Realization Fellowship Church v. Ananda Church of Self-Realization*,
   206 F.3d 1322 (9th Cir. 2000) ....................................................................................21

*Shapiro, Bernstein & Co., Inc. v. Jerry Vogel Music Co., Inc.*,
   221 F.2d 569 (2d Cir. 1955) ..................................................................................passim

*Siegel v. Time Warner Inc.*,
   496 F. Supp. 2d 1111 (C.D. Cal. 2007) ................................................................26, 36

*Soo Line R.R. Co. v. St. Louis Southwestern Ry. Co.*,
   125 F.3d 481 (7th Cir. 1997) ......................................................................................11

*Stewart v. Abend*,
   495 U.S. 207, 110 S. Ct. 1750, 109 L. Ed. 2d 184 (1990) ..........................................26

*Twentieth Century Fox Film Corp. v. Entm't Distrib.*,
   429 F.3d 869 (9th Cir. 2005) ................................................................................passim

*United States v. Rem*,
   38 F.3d 634 (2d Cir. 1994) ..........................................................................................21

*Urbont v. Sony Music Entm't*,
   831 F.3d 80 (2d Cir. 2016) ....................................................................................17, 37

*Waite v. UMG Recordings, Inc.*,
   450 F. Supp. 3d 430 (S.D.N.Y. 2020) ........................................................................16

*Ward v. National Geographic Soc.*,
   208 F. Supp. 2d 429 (S.D.N.Y. 2002) ........................................................................38

## FEDERAL STATUTES, RULES AND REGULATIONS

17 U.S.C. § 101 ..................................................................................................................6

17 U.S.C. § 403 ....................................................................................................36, 43, 45

17 U.S.C. § 408 ................................................................................................................11

17 U.S.C. § 409 ................................................................................................11

Fed. R. Civ. P. 56 ...........................................................................................3, 9

Fed. R. Evid. 803 .........................................................................................14, 20

**OTHER AUTHORITIES**

B. Varmer, "Works Made for Hire and On Commission," in 1 *Studies on Copyright* 717 (1963)..................40

Melville B. Nimmer & David Nimmer, 1 *Nimmer on Copyright*

  § 3.01 ......................................................................................................26

  § 3.03 ......................................................................................................26

  § 3.05 ......................................................................................................26

  § 5.03 ...................................................................................................passim

*Restatement (Second) of Agency* 1 cmt. b (1958).........................................13

William F. Patry, 2 *Patry on Copyright* § 5:54 (2023 rev. ed.) ....................26

## PRELIMINARY STATEMENT

Steve Ditko is celebrated for creating *Dr. Strange* and co-creating *Spider-Man*. In 2021, Ditko's estate (the "Estate) exercised Ditko's right under the Copyright Act to terminate his decades-old assignments to Marvel's alleged predecessor Magazine Management Co. ("MMC") of all rights in his works. Marvel's motion for summary judgment attempts to evade that authorial right and the vital legislative objectives behind it through the only means available, arguing that Ditko (an iconoclastic creator of the first order) was not the author of his works and did everything as "works made for hire" at Marvel's "instance and expense."

Well, not *Marvel's* instance and expense, exactly. That is the first of many hurdles the company cannot clear. The relevant copyrights to Ditko's works were acquired from a bunch of shell companies—Vista Publications, Inc., Atlas Magazines, Inc., and Non-Pareil Publishing Corporation. Marvel necessarily relies in its Complaint on these shell companies' copyright registrations, which it renewed as "works made for hire" calling the shell companies the "authors." Now Marvel must prove that Ditko created his works at the "instance and expense" of those shell companies. But Ditko's only dealings were with MMC, and its employee Stan Lee. The independent shell companies had no operations or employees, and Ditko had nothing to do with them. Marvel also has no evidence that the inoperative shell companies somehow acted as principals and MMC, as their agent, which makes no sense and, at any rate, is a fact-intensive inquiry ill-suited for summary judgment. This glaring issue is enough to reject Marvel's motion without further ado. But even if it passes that significant hurdle, several more must be overcome.

Some of Ditko's characters, in fact, like Dr. Strange, were conceived *long* before he ever met Lee or the company; others have their precursors in Ditko's stories published by Charlton Comics. Marvel calls itself Ditko's "employer," and says he was given "assignments," but the

truth is that the MMC avoided hiring freelancers and, by design, was not legally obligated to pay for Ditko's work. For one thing, that means that Ditko who created his works with his own materials at an art studio he rented—all without guaranteed compensation—did so at *his* expense and risk and on his own volition. But this evokes an even more fundamental problem. Who was the *author* of Ditko's work *before* MMC decided to buy it? Surely, it cannot be the company—how could it own work it still had the right to turn down and refuse to pay for? Not even Marvel argues that. It must, therefore, be Ditko who authored and owned his work at inception. The legal author of a work is fixed *permanently* on creation, however; that is hornbook copyright law. Put differently, ownership of a copyright can change upon transfer, but *authorship* never does.

That Ditko expressly or impliedly assigned his copyright to MMC in the work it chose to purchase makes common and legal sense and comports with the record evidence. It also resolves another major difficulty for Marvel. In 1962-1965 when Ditko created his works—and five decades before that—the "work for hire" doctrine solely applied to traditional employees. Given all of the above, and Marvel's consistent use of "assignment of copyright" language in its check legends and later contracts with freelancers (all with no reference to "work for hire"), a jury could undoubtedly draw the inference that the parties' mutual intent and understanding was that Marvel simply purchased and Ditko simply assigned all rights in his works.

The record is also replete with disputed questions of fact regarding "instance"—the legal "right" (not the economic power) to direct and supervise a creator's process. As Marvel conspicuously avoided having any contract with Ditko, and the bilateral obligations that entails, it is hard to imagine how it held this "right." The record is rich with evidence that Ditko was fiercely independent and to Lee's chagrin often refused to alter his work or take direction.

On balance, whether works were "made for hire" turns on the creative and financial

arrangement as revealed by the specific record in *each case*. But the parties do not agree on the facts and Marvel's account depends almost entirely on the deposition testimony of two witnesses whose memory and credibility is disputed, chief among them Stan Lee. As shown below, there are strong reasons to doubt whether Marvel's witnesses are accurately recalling the relevant events. Marvel's near total reliance on those witnesses' testimony, is fatal to is motion as a court does not make credibility determinations or weigh the evidence on summary judgment.

Truth be told, Marvel's motion is mostly a vehicle to remind this Court—often only a few times per page—that it prevailed in *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119 (2d Cir. 2013). But *Kirby* involved a different artist and working relationship, creation of different works, a different period, and materially different legal arguments. Other than Marvel being a party, the two have as much in common as Kirby's Captain America has with Ditko's Dr. Strange.

Finally, it is not enough for Marvel to overcome some of the hurdles presented. On summary judgment, it must run the table, and persuade this Court with hard evidence that it is right on *all* of these difficult issues. Marvel has not done that, and its motion for summary judgment must therefore be denied.

## THE 1976 COPYRIGHT ACT'S TERMINATION RIGHT AND THE "WORK-FOR-HIRE" DOCTRINE UNDER THE 1909 COPYRIGHT ACT

Due to page limits, relevant discussion of the legislative objectives and effect of the 1976 Copyright Act's termination provisions, "work for hire" under the 1909 Copyright Act, and the doctrinal drift resulting in the "instance and expense" test thereunder can all be found in the Estate's summary judgment motion (Dkt. 76 at 5-12) and are incorporated herein by reference.

## DISPUTED MATERIAL FACTS

Marvel's "The Undisputed Material Facts" (Dkt. 68 ("Motion") at 9-19) are replete with material facts it knows are disputed, ensuring its Motion's failure. Fed. R. Civ. P. 56.

**"Marvel's" Troubled History**

From his beginnings in the Great Depression to the 1960s, Martin Goodman ("Goodman") worked hard, often outside the law, to make a quick profit. AMF ¶¶ 1-3. Along with comics, Goodman published whatever was selling (e.g., men's magazines, sado-masochism, pulp fiction, science fiction). *Id*. He saw little value in the comic books he published beyond monthly sales, and cut legal corners to maximize his profits. *Id*. Goodman's shifty dealings got him in trouble with the federal government on at least four occasions and sued civilly several times. *Id.* ¶ 3. As early as 1942, the FTC slammed Goodman for (among other things) "stripping the original copyrights" on material he published and "claiming the work as [his] own." *Id*.

For these and tax reasons, Goodman—whose fly-by-night publishing business was a partnership with his wife, Magazine Management Company ("MMC")—shuffled his publications through dozens of shell companies. *Id.* ¶ 7-8. To minimize Goodman's legal exposure, these shell companies (e.g., Vista Publications, Inc. ("Vista"), Atlas Magazines, Inc. ("Atlas"), Non-Pareil Publishing Corp. ("Non-Pareil")) were unrelated to one another or to MMC. *Id.* ¶ 60. The shells had no no employees, no actual business activities, and indeed, the people MMC staff, like Roy Thomas, did not know what these shells even did. *Id.* ¶¶ 8, 53-54.

Stan Lee was Goodman's relative, and although hired as an office boy, was promoted at the age of 18 to the role of editor of his fledgling comics business at MMC. *Id.* ¶¶ 11-12. After Senate hearings in 1954–57 on the corrupting influence of comics, nearly bankrupted his business, Goodman fired his comics staff, save Lee, and went from publishing 45 comics per month to 8. *Id.* ¶¶ 14-16. In 1958, Magazine Management began to buy freelance material at a per-page rate, though it did not contract with freelancers or guarantee purchase of submitted material. *Id.* ¶ 17; Toberoff Decl., Ex. 5 at 371:3-25 (Lee testifying that MMC "would only buy

what [it] needed"). By design, MMC and its revolving door of corporate identities and questionable shell companies, seldom maintained business records, and was unique in its informality and disorganization. *Id.* ¶¶ 8-9. Lee, however, flourished amidst this disarray throughout the 1960s, including 1962 to 1965 (the "Period")[1] Lee, who served as MMC's editor three days per week and as a freelance writer from home the other days, was able to collect both an editor's salary and a freelance writer's page rate for the comics. *Id.* ¶¶ 55-58. To maximize his freelance income, Lee promoted what the "Marvel Method," whereby artists would pencil and plot out a story, and then Lee would add dialogue and captions, and have himself credited and paid as *the* "writer." *Id.* ¶¶ 55-60. Lee, who attributed credits on the comics was free to jigger them to favor himself; or as he put it, "I'll take any credit that isn't nailed down"—a point of contention which caused many freelancers, including Ditko, to stop selling to MMC. *Id.* ¶ 95.

"Marvel" now claims, as it must, to be the successor of this shaky and fraught lineage.

In 1968, Goodman decided to flee the publishing business and to sell MMC and his shell companies to publicly-traded Perfect Film and Chemical Corporation, later renamed Cadence Industries ("Cadence"). *Id.* ¶¶ 19-20. To push through the sale, Goodman was forced to try to patch together a cogent chain of title to the intellectual property assets. Still no one at "Marvel" called the freelance material it had purchased "work for hire" or "Marvel," its "author." *Id.* ¶¶ 18, 67. The sale closed in June 1968, and faced with Goodman's haphazard business practices, Cadence sought to shore up its assets, though it also had no contracts with freelance creators until 1974. *Id.* ¶¶ 20-21. These contracts, appearing in the mid-1970s, still contained *assignment* language only and did not use the term "work for hire" nor identified Marvel as the "author" of any of the works created by the talented freelancers who sold to them. *Id.* ¶ 22.

---

[1] Marvel is correct that the Period regarding Ditko's *creation* of his Works (the focus here) is 1962 to late 1965, when Ditko left, not 1966 as previously defined, due to the time lag between creation and publication in 1966.

### Marvel's "Work for Hire" Revisionism

The "work for hire" doctrine became the focus of attention when the 1976 Copyright Act established an explicit "work for hire" regime which included independent contractors under certain conditions. 17 U.S.C. § 101; AMF ¶ 23. Commencing in the late 1970s, Marvel attempted to re-label as "work for hire" the freelance material its predecessors had purchased decades earlier, even though it had *not* been intended or treated as such previously. *Id.* ¶ 24. Nonetheless, Marvel began insisting that freelancers sign contracts that retroactively re-characterized their material as "work for hire," *decades after creation. Id.* ¶¶ 25-27. In apparent concern over its legal position, Marvel has regularly engaged in this revisionist practice to this day.

In the late 1970s and 1980s, for example, after DC Comics began returning to freelancers their physical art so they could sell autographed art to fans, Marvel was under pressure to do the same. *Id.* ¶ 26. Marvel, however, conditioned its return of art on the freelancers signing releases and purported retroactive acknowledgements that everything they had created, which Marvel published decades earlier, was all "work for hire." *Id.* ¶ 27.

### Steve Ditko

Steve Ditko was a prolific comic book artist/writer known for his unique ideas and for creating or co-creating some of Marvel's most enduring and profitable superheroes including, without limitation, Spider-Man and Dr. Strange and their rogue's gallery of supervillains. *Id.* ¶ 33.

Ditko had a strong personal vision for his characters and stories and was not easily swayed by trends or external influences. He often created characters and concepts that reflected his own philosophical beliefs, such as the emphasis on personal responsibility and the consequences of one's actions. Ditko insisted on maintaining a high level of creative control over his work and would often write, draw, and even ink his own stories, allowing him to

maintain a consistent artistic vision. Ditko's fierce independence was a defining aspect of his career and is what allowed him to create iconic characters and stories that defied mainstream conventions and showcased his unique artistic voice.

Unlike most freelancers in the Period, Ditko rented a separate art studio at his expense. *Id.* ¶ 34. He also paid for all his own materials and instruments and created his freelance artwork solely as an independent contractor on his own time, and at his own volition with the intention and hope of selling his material to MMC, Charlton Comics, or other publishers. *Id.* ¶¶ 35-36. None of Ditko's expenses in creating his Works were paid for or reimbursed by MMC or the shell companies. *Id.* ¶ 37. Ditko kept a large chart in his studio, mapping out his ideas for the future development of his characters so he could plant narrative elements in current comics whose importance would not come to fruition until many issues down the line. *Id.* ¶ 38. When submitting his artwork to Lee, Ditko would write extensive margin notes, including suggested captions and dialogue, so that when Lee dialogued Ditko's story, he would know what story points Ditko intended in each panel and what the characters would likely say consistent with the story Ditko had plotted. *Id.* ¶ 39. Ditko, in essence, acted as both the co-writer/plotter and artist of his Works. Lee then dialogued the balloons and add some captions based on Ditko's illustrated story, notes, and suggestions. *Id.* ¶¶ 40, 51.

In the Period, Ditko was not paid a fixed wage nor was he paid for services. *Id.* ¶ 41. He was paid by the page for that material MMC chose to purchase after its creation. *Id.* ¶ 43. If work was rejected, Ditko was not compensated, and personally took the loss. *Id.* ¶ 42. If Ditko was asked to redraw pages, he was not compensated for his extra labor or materials but was paid for only the final product MMC chose to buy. *Id.* ¶ 43. Ditko often refused to make changes to his work outright, and in that event, any changes Lee wanted were either ignored, or

made by staff *after* Ditko had sold his work to MMC. MMC did not provide Ditko with any security, and Ditko was free to sell, and did sell, his work to other publishers in the Period, like Charlton Comics, while also selling to MMC. Toberoff Decl., Exs. 103-107.

On those occasions when Ditko and Lee would exchange ideas, Ditko was free to incorporate them or reject them altogether, as Marvel and Ditko were under no legal obligations to one another. *Id.* ¶ 47. Indeed, if Ditko did not wish to work on a project offered by Lee, he was free to reject it without consequence. *Id.* ¶ 48. Ditko, an extremely independent-minded artist, supervised himself, edited his own work, and created the Works after little or no discussion with Lee. *Id.* ¶ 49.

In the Period, Ditko had no employment (or other) contract with MMC or any Marvel predecessor. *Id.* ¶¶ 52-53, 63. Ditko had no relationship with any of the shell companies which purported to copyright the magazines publishing his Works. Ditko received no direction or communication from any of the shell companies or any employee of theirs, as they had none. *Id.* ¶ 54. In the Period, MMC was the only alleged Marvel predecessor that bought work from writers/artists or employed its editor Lee. *Id.* ¶ 59. The shell companies (e.g., Vista, Atlas, Non-Pareil) had no legal or corporate affiliation to one another or to MMC. *Id.* ¶ 60. Most importantly, these shell companies made no payments to and had no interaction with Ditko or Lee. *Id.* ¶ 61. Lee too was only paid by MMC. *Id.* ¶ 62. Like Ditko, Lee did not work for, and had no contact with any of the shell companies. *Id.* ¶ 63.

Freelancers in the Period were paid with MMC checks for the pages it chose to purchase in its sole discretion. It stamped legends on the back of its checks, which freelancers had to endorse to deposit them. *Id.* ¶ 65. MMC's check legends expressly acknowledged the freelancer's contemporaneous "assignment to it of any copyright, trademark and any other

rights in or related to the material, including [his] assignment of any rights to renewal copyright." *Id.* ¶ 66.  As late as 1975, Marvel's check legends contained this "assignment" language and no "work for hire" language whatsoever. *Id.* ¶¶ 66-67.

By the end of 1965, Ditko, frustrated with Lee and MMC's failure to credit and fairly pay him for his enormous role in creating the *Spider-Man* and *Dr. Strange* stories (*see* Section D., *infra*), refused to sell any more of his creative material to the company. *Id.* ¶ 69.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate only if there is "no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250, 106 S. Ct. 2505, 2511-12 (1986). At summary judgment, a court "must examine the evidence in the light most favorable to" and "draw all inferences in favor of" the non-moving party (here, the Estate). *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002). If there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment is improper. *Pinto v. Allstate Ins. Co.,* 221 F.3d 394, 398 (2d Cir. 2000).

"[W]hen both sides move for summary judgment, neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it." *Heublein, Inc. v. U.S.*, 996 F.2d 1455, 1461 (2d Cir. 1993). In that circumstance, "a district court is not required to grant judgment as a matter of law for one side or the other," but rather should "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *Id.* at 1461 (quoting *Schwabenbauer v. Board of Educ. of Olean*, 667 F.2d 305, 314 (2d Cir. 1981)).

## ARGUMENT

Marvel's Motion fails for numerous independent reasons. *First*, its Motion and proffered evidence focus, in large part, on facts which are completely *irrelevant* to the proper application of the substantive legal standard for "work for hire." *Next*, as to the Motion's limited relevant analysis, genuine issues of material fact prevent summary judgment in Marvel's favor. This is particularly true when examining the evidence and drawing all inferences therefrom in the light most favorable to the Estate. *Further*, and fundamentally, Marvel fails to adduce admissible evidence to support essential elements of its case, on which it bears the burden of proof, again dooming its Motion. For these reasons, and those that follow, Marvel's Motion must be denied.

I.   **MARVEL HAS FAILED TO ESTABLISH THAT DITKO CREATED HIS MATERIAL IN 1962-1965 AS "WORK MADE FOR HIRE."**

   A.   **Marvel Cannot Show that Ditko's Artwork Was Created at the "Instance" or "Expense" of the Shell Companies Registered as Its "Authors."**

Marvel failed to show that Ditko created his artwork at either the "instance" or "expense" of the various Shell Companies, which Marvel claims were the "authors" of the Works.

For decades, Marvel has relied on its copyright registrations of the comic books[2] publishing Ditko's Works. The initial copyright registrations were made in the name of the Shell Companies (one by Atlas, the rest by Vista or Non-Pareil) but tellingly, did *not* state that they were "works made for hire." *See* Dkts. 71-28 to 71-32. Twenty-eight years later, when Marvel filed the renewal copyright registrations, it claimed for the first time that the works were "made for hire," and listed the Shell Companies as the "authors." *Id.*  Marvel relies on these copyright

---

[2] The Stories incorporating Ditko's Works were published by "Marvel" in comic book magazines ("Comic Books"), often containing more than one story. The magazine's copyright registrations served to register and protect the copyright(s) to the Stories. *See* Melville B. Nimmer & David Nimmer, 1 *Nimmer on Copyright* § 7.16[A][2][c].

registrations in this lawsuit,[3] and has never filed any supplementary registration. *See* 17 U.S.C. § 408(d) (allowing the filing of a supplementary registration to correct any errors).[4]

To escape termination, therefore, Marvel must prove that Ditko's Works were made-for-hire by the *Shell Companies*—Non-Pareil, Atlas, and Vista. This is so for several reasons. *First*, Marvel's Complaint alleges that it "registered copyrights in and to the Works," and "complied in all relevant respects with all laws governing copyright." Dkt. 1 ¶ 14. The most fundamental requirement of copyright registration is the obligation to truthfully state the facts in the registration, including whether the work is "made for hire," and, if so, for whom. 17 U.S.C. § 409(4). Marvel alleged in its Complaint that it truthfully discharged that obligation when it listed the Shell Companies as the work-for-hire authors and is now bound by that assertion. Dkt. 1 ¶ 14. *Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP* ("*Color Tile*"), 322 F.3d 147, 167 (2d Cir. 2003) (allegations of a complaint are "judicial admissions" by which parties are "bound throughout the course of the proceeding") (quoting *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 528 (2d Cir.1985) (party cannot contradict its own pleading with affidavits)). *See also Soo Line R.R. Co. v. St. Louis Southwestern Ry. Co.*, 125 F.3d 481, 483 (7th Cir. 1997) (a "plaintiff can plead himself out of court by alleging facts which show that he has no claim, even though he was not required to allege those facts," because "judicial efficiency demands that a party not be allowed to controvert what it has already unequivocally told a court by the most formal and considered

---

[3] *See* Dkt. 1 ¶ 4 (alleging Marvel owns "the copyrights in the famous Marvel characters and comics on which Ditko worked" "as evidenced by the relevant copyright registration notices themselves"), ¶ 14 (again relying on Marvel's relevant copyright registrations and documenting them as Exhibit 1 to its Complaint).

[4] For example, when Marvel registered the "Amazing Spider-Man Annual," it listed Stan Lee as the sole author; but later, in the renewal registration, the author was listed as "STAN LEE, EMPLOYEE FOR HIRE OF NON-PAREIL PUBLISHING CORPORATION." SMF ¶ 48; Toberoff Decl. Ex. 48.

means possible") (quoted approvingly by *Color Tile*, 322 F.3d at 167).

As such, under the Second Circuit's interpretation of "work made for hire" under the 1909 Act, Marvel must prove that Ditko's Works were created at the "instance and expense" of the Shell Companies. *Playboy Enterprises, Inc. v. Dumas*, 53 F.3d 549, 554 (2d Cir.1995). This is something Marvel cannot do. Its principal argument in its Motion is that *Lee* directed Ditko's work—but, even if that were true, Marvel put forth zero evidence to show Lee was employed by the Shell Companies, nor does Marvel argue that he was. AMF ¶¶ 52, 63. The only evidence in the record shows that Lee was employed as an editor by an entirely different legal entity, MMC. *Id.* ¶¶ 12, 55. The record shows the Shell Companies had nothing whatsoever to do with Lee or Ditko or the creation or purchase of the Works. *Id.* ¶¶ 37, 53-54. Accordingly, Ditko was not "supervised" by any Shell Company and thus, could not have created his Works at their "instance," and Ditko was never paid by them so his artwork could not have been created at their "expense." *Id.* ¶ 61. Nor did any Shell Company bear any financial risk associated with Ditko's creation of his Works. Indeed, the Shell Companies were designed to curtail risk. Thus, because Ditko's Works were not created at either the "instance" or "expense" of the Shell Companies, they cannot be considered legal "authors" of his Works under the "instance and expense" test.

Faced with the consequences of Goodman's shifty business practices, Marvel first argues that MMC essentially acted as the "servicing" agent of the Shell Companies. For this, its only purported evidence is a 1967 letter returning a "list of Martin Goodman's Corporations." *Id.* ¶¶ 7, 19, 60. The letter, which was manufactured for the anticipated sale of Goodman's publishing businesses, attaches an unelaborated list of many corporations, with no details about any of them

other than their ownership, fiscal year net worth and net profits. Toberoff Decl., Ex. 46.[5] One

entry appears for "Magazine Management Co. (Servicing Partnership)," but neither the 1967 list,

nor any other contemporaneous document describes, at all, what "servicing partnership" means,

when that began, what its terms were, or anything else. *Id.*; AMF ¶¶ 59-63. It is literally just an

entry on a list. Marvel has produced no agreement between MMC and any Shell Company, nor

any corroborating correspondence, nor any document memorializing this purportedly key

arrangement in the Period, nor at any other time. *Id.*

It is undisputed that the Shell Companies were independent, and not subsidiaries or

affiliates of MMC, and further, there is no evidence that any agency relationship existed between

the Shell Companies and MMC. *Id.* ¶ 60. Agency "is a legal concept that depends on the

existence of three elements." *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 522 (2d Cir. 2006).

*First*, there must be a "manifestation by the principal that the agent shall act for him." *Id.*

*Second*, the agent must manifest "acceptance of the undertaking." *Id.* "*And*," the Second Circuit

has confirmed, there must be an "understanding of the parties that the principal is to be in control

of the undertaking." *Id.* (emphasis in original). *See also* Restatement (Second) of Agency 1 cmt.

b (1958). The 1967 list does not demonstrate or *purport* to demonstrate any of this. AMF ¶ 60.

Moreover, the "question whether an agency exists is *highly factual*." *Caplaw Enterprises*,

448 F.3d at 522 (emphasis added). And it "turns on a number of factors." *Id.* [6]

---

[5] Goodman had approximately 48 corporate entities, most of which appear to be shell companies used to divert income and assets. *Id.* Tellingly, his 1967 list shows MMC, which had actual operations, with a 1966 net worth of $84,700 and profits of $138,252; whereas the Shell Companies Non-Pareil and Vista (with no employees and no actual operations) each show a net worth of $120,000 each for fiscal years ending 03/31/1966 and 12/31/1966, and the *same* purported profits of $82,750 each. *Id.* It is thus evident that Goodman simply used these Shell Companies as shell companies are intended, to shift money and assets around for tax and asset protection purposes. *Id.*

[6] These include, without limitation: (1) "the situation of the parties," (2) "their relations to one another," (3) "the business in which they are engaged," (4) "the general usages of the business in question," (5) "the purported principal's business methods," (6) "the nature of the subject matters," and (7) "the circumstances under which the

Because the question of an agency relationship is a "mixed question of law and fact," that question "should be submitted to the jury" unless "the facts are insufficient to support a finding of agency or there is no dispute as to the historical facts." *Cabrera v. Jakabovitz*, 24 F.3d 372, 386 (2d Cir. 1994). Improvised arguments, like Marvel's, are no substitute for admissible evidence demonstrating the legal factors that govern whether an agency relationship exists.

Marvel also attempts to manipulate a snippet from *Gayle v. MMC Company*, 153 F. Supp. 861 (D. Md. 1957), which stated "MMC … renders administrative services to and exercises the over-all control of the other defendants [Atlas and Non-Pareil (two of the Shell Companies)]." But this contradicts Marvel's argument that MMC serviced the Shell Companies, because, if, as *Gayle* stated, MMC exercised control over the Shell Companies, that would make *MMC* the principal*, and the Shell Companies *its* agents. *Caplaw Enterprises*, 448 F.3d at 522 ("the principal is to be in control of the undertaking"). For Ditko to have been working at the instance and expense of the Shell Companies, MMC—the only entity Ditko ever had contact with— would have to be *the agent of the Shell Companies.* AMF ¶¶ 52-54, 62-63.

Marvel's reliance on *Gayle* is further misplaced, as Lee's alleged creative direction would not qualify as an "administrative service." In any event, *Gayle* is from 1957 (well before the Period), and its dictum is in the background section of an opinion dedicated to an entirely unrelated issue. *Gayle*, 153 F. Supp. at 864. Finally, "judicial findings in one case … are inadmissible hearsay" when proffered as evidence in another. *Blue Cross and Blue Shield v. Philip Morris*, 141 F. Supp. 2d 320, 323 (E.D.N.Y. 2001) (citing *Nipper v. Snipes*, 7 F.3d 415, 417-18 (4th Cir. 1993) (denying FRE 803(8)(C) exception). Thus, to the extent *Gayle* is relevant at all, it only serves to undermine Marvel's unfounded "servicing partnership" argument.

---

business is done." *Columbia Broad. Sys., Inc. v. Stokely-Van Camp, Inc.,* 522 F.2d 369, 375-76 (2d Cir. 1975). *See also Caplaw Enterprises*, 448 F.3d at 522 (enumerating the *Stokley-Van Camp* factors).

Marvel's fallback is even worse. According to Marvel, because Goodman[7] partially owned both MMC and the Shell Companies, the distinctions make no difference. AMF ¶ 60. But this argument cannot be taken seriously. "Corporate form matters. Here, there were distinct legal entities, whose separate nature cannot simply be ignored when inconvenient." *Clarex Ltd. v. Natixis Sec. Am. LLC*, 2012 WL 4849146, at *6 (S.D.N.Y. Oct. 12, 2012). Indeed, "incorporation's basic purpose is to create a distinct legal entity, with legal rights, obligations, powers, and privileges different from those of the natural individuals who created it, who own it, or whom it employs." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163, 121 S. Ct. 2087, 2091 (2001). "A basic tenet of American corporate law is that the corporation and its shareholders are distinct entities." *Dole Food Co. v. Patrickson,* 538 U.S. 468, 474, 123 S.Ct. 1655 (2003). *See Hutson v. Notorious B.I.G., LLC*, 2015 WL 9450623, at *5-6 (S.D.N.Y. Dec. 22, 2015) (the alleged owner and officer of a corporation which registered the copyright in a musical composition does not share an interest therein).

Marvel further tries to fudge the legal distinctions between these separate entities by claiming they are all part of "Marvel Comics Group." But, as Marvel admits, this is not a legal entity. RSMF 1; AMF ¶¶ 59-60. Prior to 1973 "Marvel Comics Group" was just a branding name sporadically appearing on some comic books. *Id.* In 1973, well after the Period, Perfect (which bought MMC) renamed itself Cadence and renamed MMC, Marvel Comics Group. AMF ¶ 19.

There was no cognizable corporate relationship between MMC and the distinct Shell Companies, but even if there had been, "[i]t is black-letter law that one corporation cannot assert an affiliate's legal rights." *Clarex Ltd. v. Natixis Sec. Am. LLC*, 2012 WL 4849146, 2012 U.S.

---

[7] In using Goodman as a linchpin to fudge the obvious corporate distinctions, Marvel also exaggerates Goodman's role in the creation of comic book stories. It is well known that Goodman published *numerous* magazines, and that comic books in the Period comprised a tiny percentage of his wide-ranging business interests. AMF ¶¶ 1-5.

Dist. LEXIS 147485, at *18 citing *Hudson Optical Corp. v. Cabot Safety Corp.,* 1998 WL 642471, at *3 (2d Cir. Mar. 25, 1998) (unpublished) (subsidiary is a "separate corporation," and thus the parent "has no standing to assert [the subsidiary's] legal rights"). "Where a parent corporation desires the legal benefits to be derived from organization of a subsidiary that will function separately and autonomously in the conduct of its own distinct business, the parent must accept the legal consequences, including its inability later to treat the subsidiary as its alter ego because of certain advantages that might thereby be gained. In short, the parent cannot 'have it both ways.'" *In re Beck Indus., Inc.,* 479 F.2d 410, 418 (2d Cir. 1973).

As aptly stated by this Court in the copyright termination context, "people cannot use a corporate structure for some purposes—*e.g.*, taking advantage of tax benefits—and then disavow it for others." *Waite v. UMG Recordings, Inc*., 450 F. Supp. 3d 430, 441-42 (S.D.N.Y. 2020) (disallowing termination under the Copyright Act of grants by recording artists' solely-owned loan-out companies).[8] *See also Martha Graham School v. Martha Graham Center* ("*Martha Graham*"), 380 F.3d 624, 640-41 (2d Cir. 2004) (refusing to disregard Graham's own charitable Foundation as her "employer" in finding her choreography to be "work for hire"). The same applies with equal force to the legally distinct Shell Companies. Marvel cannot now blur the lines between distinct legal entities, or argue it was all "Goodman," to scrape together its "work for hire" case. The Shell Companies, which *Marvel* claimed were the "authors" in its renewal registrations did not exercise any control over Ditko's creation of the Works and paid him nothing. *Id.* ¶¶ 52-54, 62-63. These plain facts necessitate a finding that the Works were not done as "work for hire" for the Shell Companies, which binds their purported successor, Marvel.

---

[8]*See* Nimmer § 5.03[B][1][a][v] ("Judge Kaplan rejected that argument" (quoting *Waite*, 450 F. Supp. 3d at 441)).

Marvel's "shell company" conundrum, lack of a cognizable legal theory, and failure to adduce evidence for it, in any event, brings its "work for hire" defense, for which it bears the burden, to a grinding halt. This dispositive Shell Company issue was also not adjudicated by, nor before, the panel which decided *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119 (2d Cir. 2013).

**B.   Marvel's Total Reliance on the *Kirby* Case is Misplaced.**

Marvel's obvious ambition is to convert this litigation into a *Kirby* sequel. But whether "the instance and expense test is satisfied turns on the parties' creative and financial arrangement as revealed by the record in *each case*.'" *Urbont v. Sony Music Entm't*, 831 F.3d 80, 90 (2d Cir. 2016) (quoting *Kirby*, 726 F.3d at 140) (emphasis added). And the record in this case is quite different from the one in *Kirby*. Start with the fact that this action concerns Steve Ditko. Ditko and Kirby—like all people, but perhaps especially all artists—were remarkably different in how they did their work, in ways that are deeply relevant to the "instance and expense" test. Kirby, for his part, was a "company man," working closely with Stan Lee and Marvel for years. *Kirby*, 726 F.3d at 140. And that mattered: the Second Circuit relied repeatedly on Kirby's "working relationship with Marvel" being "close and continuous," his "ongoing partnership with Marvel," and the fact that Lee "wanted to use [Kirby] for everything." *Id.* at 141. Kirby had a family to feed, worked from home, and was generally willing to do as he was asked. *Id.* at 126.

Ditko was, in every respect, the opposite. For one thing, he sold his comic book material to other publishers, like Charlton Comics, throughout the Period. Toberoff Decl., Exs. 103-107; AMF ¶ 46. *Compare Kirby*, 726 F.3d 141 (relying on the fact that "most of Kirby's work during this period was published by Marvel and for established Marvel titles"). *See also Donaldson Publishing Co. v. Bregman, Vocco & Conn, Inc.*, 375 F.2d 639, 643 (2d Cir. 1967) (finding relevant a creator's "freedom to engage in profitable outside activities without sharing the proceeds with [the hiring party]") (cited by *Kirby*, 726 F.3d at 140). Unlike Kirby, and unique

among comic book artists, Ditko maintained his own studio—with all the attendant overhead and expense that entails. AMF ¶ 34.

Where Kirby was a company man, Ditko was an eccentric lone wolf, whose priority was his artistic aesthetic and strong individualist beliefs and morals—so much so that Lee stopped communicating with Ditko *entirely* in 1964-1965. *Id.* ¶ 49-52. Ditko thereafter refused to sell any more of work to MMC, when Goodmen and Lee proved not to be men of their word. *Id.* ¶ 50. Even when he and Lee were on speaking terms, Ditko edited his own stories, created them after little to no discussion with Lee, and often refused outright to make changes Lee suggested. *Id.* ¶ 49. Whereas Kirby occasionally wrote brief notes on his artwork, Ditko would write out entire story plots on separate pages like a writer. *Id.* ¶¶ 39-41, 51, 70. And Lee would have no idea what was in Ditko's stories until he received Ditko's material.  *Id.* ¶¶ 70, 75, 78, 84, 90, 92, 93, 94. All of which has been corroborated by Lee. *Id*. Kirby did not even "ink" his penciled drawings, whereas, Ditko, by contrast, almost always insisted on doing this himself, to control the finished product. *Id.* ¶ 93.  Ditko, in other words, was an independent iconoclast, and as such, worked and created in a very different way than Kirby. Indeed, the reason Lee wanted "wanted to use Jack [Kirby] for everything" was that Kirby did what Lee told him to, whereas Ditko would not. *Kirby*, 726 F.3d at 141.

Marvel knows all of this perfectly well. The company claims that *Kirby* "addressed several of the very same characters and comics at issue here," but that is a deceptive *non sequitur*, because all that matters is the relationship between the artist and "Marvel," and the record demonstrates that Ditko's was very different from Kirby's. AMF ¶¶ 82-83. The only crossover between Kirby's and Ditko's work is that Kirby, using Ditko's design and plotted story, penciled the first *Spider-Man* cover. RUMF ¶ 40-41. Moreover, *Kirby* concerned "works

published by Marvel between 1958 and 1963," 726 F.3d at 126, and while there is some overlap, the Period differs.

Not only are the facts different, the legal questions differ as well. The *Kirby* court did not decide, or have before it, the question of whether an artist like Ditko could create his works at the "instance and expense" of Shell Companies with whom he had no contact. Also, the question in *Kirby* was whether the *published comic books* (containing Kirby's artwork and the work of others) were "works for hire." That considerably expanded the "instance and expense" inquiry, such that the *Kirby* panel relied on Marvel's "creative contributions and production work" and the "resources" that "Marvel had expended" to turn Kirby's "pencil drawings" into a "finished product." 726 F.3d at 143. By contrast, the focus here is *solely* on Ditko's creative material and whether that copyrightable expression was "work for hire"—not the Comic Books that were later assembled and published after Ditko's Works were purchased. *See* n.16, *infra*.

The *Kirby* panel also did not decide a pair of crucial temporal questions concerning when a work's "for-hire" status is to be evaluated. *First,* the panel did not decide whether a work must qualify as "for-hire" under the law as it existed at the time of creation. When Ditko created his Works, and for five decades prior, the law defined "work for hire" under the 1909 Act as solely applicable to traditional employees, and not independent contractors. *See Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 749, 109 S. Ct. 2166, 2177 (1989). The "instance and expense" test did not exist at the time Ditko created the Works at issue—and the *Kirby* court did not decide whether this made a difference. *Id*. *Kirby* also did not address whether a work can be deemed "for-hire" at the time of creation when the putative employer has not yet decided to buy it. As discussed in Section E., *infra*, MMC was not legally obligated to pay for conforming

freelance work and could reject it at will, but since "authorship" vests at creation, "work for-hire" cannot depend on post-creation contingencies.

To the extent Marvel attempts some sort of "collateral estoppel," this Court must not permit it. As a non-party to the *Kirby* litigation, the Ditko Estate may not be "collaterally estopped" because it has "never had a chance to present their evidence and arguments on the claim," and so even an adjudication of "*the identical issue*" in a way that is "*squarely against their position*" cannot preclude their opportunity to litigate it afresh. *Blonder-Tongue Laboratories v. University of Illinois Foundation*, 402 U.S. 313, 329, 91 S. Ct. 1434, 1443 (1971) (emph. added). To the extent Marvel argues that *Kirby* findings of fact are evidence here, judicial findings of fact in another case are inadmissible hearsay, not subject to any exception. Fed. R. Evid. 803; *Nipper*, 7 F.3d at 417-18. To Marvel's dismay, this case is not *Kirby*.

C.     **The Credibility of Marvel's Key Witnesses Stan Lee and Roy Thomas is in Sharp Dispute Rendering Its Case Unsuitable for Summary Judgment.**

Marvel relies repeatedly on the deposition testimony of two witnesses—Stan Lee and Roy Thomas ("Thomas")—whose credibility is in sharp dispute. This dooms their summary judgement motion because when "determining whether a case presents triable issues of fact," a district court "may not make credibility determinations or weigh the evidence." *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006) (internal citations omitted).

It is well-settled that "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions" and thus improper on summary judgment. *Anderson*, 477 U.S. at 255. Therefore, on summary judgment, a district court "must disregard all evidence favorable to the moving party that the jury is not *required to believe*." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151, 120 S. Ct. 2097, 2010-11 (2000) (emphasis added). Any "ambiguity" about the witness' credibility must be

resolved in favor of the non-moving party. *Jaegly*, 439 F.3d at 151. Put differently, if there is "*any evidence* in the record" upon which a "reasonable" jury could disbelieve the evidence of the non-moving party, "summary judgment is improper." *Brooklyn Center for Independence of the Disabled v. Metropolitan Transit Authority*, 11 F.4th 55, 64 (2d Cir. 2021). *See also United States v. Rem*, 38 F.3d 634, 645 (2d Cir. 1994) (reversing entry of summary judgment because "the weighing of the evidence and the assessment of credibility were not appropriate").

   *Self-Realization Fellowship Church v. Ananda Church of Self-Realization* is illustrative. 206 F.3d 1322, 1330 (9th Cir. 2000). There, the plaintiff claimed that it owned valid copyrights to certain photographs that it argued had been "made for hire." Because the case was governed by the Copyright Act of 1909, the plaintiff was required to introduce evidence that the photographs were taken by one of the plaintiff's employees or otherwise at its "instance or expense." *Id.* The district court granted summary judgment "by making a determination of credibility" of the evidence on this point, and the Ninth Circuit reversed, concluding that this "is something the court should not undertake at the summary judgment stage." *Id.*

   The same result is appropriate here, and for the same reasons. Marvel relies extensively on Lee and Thomas's testimony to establish that the works at issue were made for-hire. But the credibility and memory of those witnesses is in serious doubt for the reasons set forth below— certainly, a jury is not *required to believe* their testimony. *Reeves* 530 U.S. at 151.

   **<u>Stan Lee</u>**: Marvel's "undisputed facts" rest largely on the rehearsed and self-aggrandizing hearsay-laden testimony of Marvel's man, Stan Lee. *See, e.g.,* Dkt. 69 (Marvel's Rule 56.1 Statement), ¶¶ 1-2, 9-10, 12-19, 21-30, 33, 39-41, 45-53. But Lee's deep financial ties to both Marvel *and* Disney, coupled with the contradictions between his testimony and prior statements, raise serious concerns about his memory and credibility. For instance, Lee established POW! in

2001 to produce films and television, and POW! had a "first look" deal with Disney since 2006. AMF ¶ 97. Yet, it over a decade POW! did not produce a single film or scripted live-action TV show, only a small animated show. *Id.* ¶ 98. Nonetheless, on December 31, 2009, shortly after the Kirby family served notices of termination and just before Marvel filed its lawsuit against them, Disney bought a 10% stake in POW! for $2,500,000. *Id.* ¶ 99. On December 18, 2009, Disney also gratuitously extended Lee's deal to January 1, 2015, even though it had just been extended the year before and was not due to expire, and Disney *quadrupled* POW's compensation. *Id.* ¶ 100. Under this amendment, POW! was to receive a minimum of $11,000,000 over five years, even if it produces no films or television shows. *Id.* ¶ 101.

Lee's bias and motive to help Marvel at all costs is exemplified by his contradictory testimony on many other key points. For instance, Lee testified on direct examination that Marvel's checks always had "work for hire" language on the back and on June 11, 2007 Lee signed under oath an affidavit for Marvel stating: "I received checks from Timely and its successors that bore a legend acknowledging that the payment was for 'works for hire'" for works published in the 1950s and 1960s, and that he "can recall no checks that [he] received that did not bear this legend." *Id.* ¶ 102. This contradicts all the record evidence. *Id.* ¶ 103. On cross, Lee was forced to admit that, as late as 1974, Marvel's checks contained "assignment" language, *not* "work for hire" language and that he did not know when the "work for hire" legend first appeared. *Id.* ¶ 104; *see Adams v. Master Carvers of Jamestown, Ltd.*, 91 Fed. Appx. 718, 725 (2d Cir. 2004) ("inconsistencies" in testimony "raise a genuine issue of material fact as to the credibility of the defendants' assertions").[9] Lee has also repeatedly acknowledged in many

---

[9] The credibility of Lee's testimony is further undermined by his taking *sole* credit therein for the creation of nearly all of Marvel's iconic characters.  Declaration of Marc Toberoff ("Tob. Dec.") Ex. J at 333:25-336:11; 378:8-379:3. This is inconsistent with both the record and Lee's prior authenticated statements.

authenticated statements that he has a very poor memory. AMF ¶ 105.

Lee's treatment of his brother, Lieber, regarding his testimony is also telling. Lieber has worked on Lee's syndicated *Spider-Man* strip for 23 years. *Id.* ¶ 106.  This is Lieber's sole livelihood, for which Lee pays him $38,000 a year. *Id.* ¶ 107. To recruit witnesses after the Termination, Marvel invited Lieber to a "reunion of old-timers," but Lieber declined. *Id.* ¶ 108. Thereafter, Stan Lee leaned on his brother. *Id.* ¶ 109 (Lieber: "He didn't tell I shouldn't, but he sort of said, 'Well I hope you don't lose the [*Spider-Man*] strip because of it or something.'").

***Roy Thomas***: Roy Thomas ("Thomas") is not a percipient witness with respect to the creation of Ditko's Works or relationship with MMC in the Period. Thomas did not start working at MMC as an assistant until the summer of 1965, long after Spider-Man (1962) and Dr. Strange (1946, 1963) had been co-created and created, respectively, by Ditko. *Id.* ¶ 57, 61, 110-12. Unsurprisingly, then his deposition testimony on which Marvel heavily relies is riddled with inadmissible hearsay. Secondly, Thomas's credibility, like Lee's, is at issue—he is hardly a neutral witness. Thomas has served as a Marvel witness *in every one* of the last five cases between Marvel and the creators of key characters it published. Toberoff Decl. Ex. 99 ¶ 2, Exs. 6, 7, 17, 99.  Those included In *Gary Friedrich Enterprises, LLC v. Marvel Characters, Inc*., 716 F.3d 302 (2d Cir. 2013) Thomas even testified for Marvel against his long-time friend, Gary Friedrich ("Ghostrider") with whom he grew up in their small Missouri town. *Id.*, Exs. 6,7. Here, even though Marvel "subpoenaed" Thomas's deposition, Marvel's counsel represented Thomas "for purposes of the deposition," shrouding Marvel's lengthy preparation of Thomas by both Marvel's in-house and outside counsel as purportedly "attorney-client privileged." *Id.*, Ex, 22. In fact, Marvel attorneys represented Thomas in all but the first of the four prior cases in which he testified on Marvel's behalf, even though Thomas was not a party and had no liability exposure.

Furthermore, Marvel has been a primary source of Thomas's income. AMF ¶ 11.

*Larry Lieber*:  Other than Lee and Thomas, Marvel relies on deposition testimony of Lee's brother who turned 92, the day after his October 25, 2022 deposition. Marvel took clear advantage of this, to lead Lieber (who was often bewildered) throughout his deposition. *Id.* ¶ 106-09.

In sum, the record evidence demonstrates Lee's deep financial ties to *both* Marvel and Disney, coupled with the contradictions between Lee's testimony, his prior authenticated statements, and much of the record evidence, raises very serious concerns about Lee's credibility. *Id.* ¶¶ 97-109. The evidence likewise places the credibility of Marvel's serial witness-advocate Thomas, whose livelihood has depended on Marvel for decades, in dispute. *Id.* ¶¶ 110-112. As Marvel's case throughout largely depends on their testimony, it is ill-suited for summary judgment, and Estate must be permitted to makes these arguments before the trier of fact.

### D.    Issues of Fact Pervade Marvel's "Instance" Arguments.

Marvel asserts that the "instance" prong turns on whether "the hiring party 'induces the creation of the work and has the right to direct and supervise the manner in which the work is carried out.'" Dkt. 68 at 8 (quoting *Kirby*, 726 F.3d at 139 (quoting *Martha Graham*, 380 F.3d at 635). It argues that  " ' [a]ctual creative contributions or direction' by an employer 'strongly suggest that the work [was] made at the hiring party's instance.'" *Id.* (quoting *Kirby*, 726 F.3d at 139). But, no sooner does Marvel say this then it starts backpedaling: "while the right to 'direct and supervise' is relevant" that right need "not actually [be] exercised." *Id.*

The Court must set aside Marvel's clever "heads we win, tails you lose" approach, because it consciously avoids the relevant point that "[t]he *right* to direct and supervise" a worker's creative process must mean a *legal* right. *Martha Graham*, 380 F.3d at 460 (emphasis

in original). While such a legal right accompanies the actual employment, it did not exist with respect to Ditko. No matter how many times Marvel refers to itself as the "hiring party" or Ditko's "employer" to align with the facts of the precedent it quotes, throughout the Period "Marvel" intentionally *avoided* hiring Ditko and the bilateral obligations that would entail, preferring to always keep its options open. AMF ¶¶ 47.

       "Instance" is not an abstraction, it is adjudged in the context of the actual employment of an independent contractor— absent here.  Marvel misportrays itself as handing out "assignments" but, as a matter of law, these were just proposals. Ditko had no obligation to provide any work to Marvel, to revise his material, or to even finish work he started.  *Id.* ¶¶ 47-48.  In fact, Ditko is known to have rejected Lee's proposals from time to time. For instance, Ditko famously turned down providing material for Daredevil and Ka-zar, and refused to do any futher work on *Dr. Strange* or *Spider-Man* stories after 1965. *Id.* ¶ 50.

       The legal right to control necessarily refers to the *creation* of Ditko's material—the focal point of the work-for-hire analysis—not to Marvel's decision to purchase and publish or to reject Ditko artwork after it was created. Because authorship of a true "work for hire" vests at creation, it is the touchstone of the doctrine, not contingent events subsequent to it. *Hogarth*, 342 F.3d at 163. *See also* William F. Patry, 2 *Patry on Copyright* § 5:54 (2023 rev. ed.) ("Any hiring party [Marvel was not even that] ultimately has the ability to 'control' the work in the sense of accepting or rejecting it."). Nor does "instance" refer to Marvel's obvious right *after* it purchased/owned Ditko's artwork to revise it, or to Marvel's right, like any publisher, to control its publication. *See Twentieth Century*, 429 F.3d at 880 (distinguishing supervision of author's writing from the process of revision after the manuscript's submission).

       Whereas MMC could decide whether to buy the artwork Ditko submitted, and naturally

had editorial and other control over the comic books it published, it is undisputed that it had no *legal right* to control Ditko's *creation* of material. Marvel can cite no evidence that it had any "right" to direct Ditko's services or to edit or modify Ditko's artwork unless and until "Marvel" purchased it. Ditko created his freelance artwork on his own time and at his volition, with the hope and intention of selling it to MMC. *Id.* ¶ 36. Marvel had the practical economic power to set parameters or make requests as a condition of purchase, but that does not equate to a legal right to direct Ditko's creation of his Works.

Marvel argues that Ditko "worked in concert with Marvel's universe of characters and narratives." Dkt. 68 at 21. But Ditko himself authored or co-authored the original Stories in which the main superhero character and all the key supporting characters *first* appeared. AMF ¶ 70-71, 75. Furthermore, as a matter of copyright law, Marvel cannot rely on ownership (via purchase) of Ditko's (or Lee's) contributions to challenge Ditko's continuing *authorship*. Under the 1909 Act, like the 1976 Act, "[t]he aspects of a derivative work added by the derivative author [e.g., Ditko] are that author's property." *Stewart*, 495 U.S. at 223, 110 S. Ct. at 1761-62. 1 *Nimmer on Copyright* §§ 3.01, 3.03[A], 3.05; *see also Siegel,* 496 F. Supp. 2d at 1142 (holding re: *Superman*: "Were the Court to adopt defendants' approach every derivative work would also be [] a work made for hire.").

The "instance" analysis is not black and white. Rather, "the issue is one of degree"—the less supervision and control the hiring party has over an independent contractor's creative process, the less likely it is that the work was created at the hiring party's "instance." *Twentieth Century*, 429 F.3d at 877. As shown below abundant issues of fact emerge from that analysis.

It is undisputed that Ditko played a key leadership role in both the creation and development of the characters and Stories at issue. For example, Ditko kept a large chart in his

studio, mapping out his ideas for the future development of his characters so he could plant narrative elements in a current story, the importance of which would be revealed in later issues. AMF ¶ 38. When submitting his artwork to Lee, Ditko was one of the only freelance artists who would write out the plots of his stories on separate pages, in addition to Ditko's extensive margin notes that included suggested captions and dialogue, so that when Lee dialogued Ditko's story, they would know the story beats *Ditko* intended in each panel, not vice versa, and what the characters would likely stay consistent with the story Ditko had plotted. *Id.* ¶ 80-81. Ditko was uniquely independent-minded and functioned as both the co-writer/plotter and artist of the Stories. *Id.* ¶ 40. All this weighs quite heavily against a finding of "instance."

Ditko, as an independent artist with his own art studio and business, was free to sell, and sold, work to other publishers, like Charlton, throughout the Period, while also selling to MMC. Toberoff Decl., Exs. 103-107. This also weighs against "instance."[10] Ditko was fiercely independent, and edited his own stories, which he created after little or no discussion with Lee; Ditko often refused, outright, to change his work, when and if suggested by Lee. *Id.* ¶ 44. Changes Lee desired were often either ignored, or had to be made by a production assistant *after* Ditko's work was purchased. *Id.* Because Marvel avoided contracts and legal commitments to Ditko, and, in turn, was owed no duties by him, even when Ditko and Lee exchanged ideas, Ditko was free to incorporate or reject them altogether. Indeed, if Ditko did not wish to work on a project offered by Lee (which Marvel styles an "assignment"), Ditko was free to decline it without consequence, and did so.  *Id.* ¶ 48. In sum, Marvel cannot point to

---

[10]*See Kirby*, 726 F.3d at 140 (noting that, in *Donaldson Publishing Co. v. Bregman, Vocco & Conn, Inc.,* 375 F.2d 639, 643 (2d Cir.1967), the Second Circuit found relevant an "employee['s] 'freedom to engage in profitable outside activities without sharing the proceeds with [the hiring party]'").

anything giving it a *legal right* to direct or control Ditko's creative process, nor did Marvel do so in practice, as all Marvel ever had in the Period was purchasing power.

When it comes to Ditko, all of this trends against "instance," so Marvel quickly shifts gears to broad generalizations about Marvel and freelancers, untethered to the Period. For example, Marvel refers to the dictates of its "editors" plural (Dkt. 68 at 21), when for most of the Period, "Marvel's" tiny comic book publishing business essentially consisted of Lee. *Id.* ¶¶ 10, 15. Marvel refers to "Lee's creative contributions as Marvel's editor" (Dkt. 68 at 21) to benefit "instance." But this "tell" betrays a weakness in Marvel's near total reliance on Lee's alleged creative input and contributions to the Stories. Writing was not part of Lee's editorial function. *Id.* ¶ 55. An editor's job is to edit, not to create or write stories. Thus, Lee's creative contributions were done as a *freelancer*, not as MMC's editor and employee. *Id.* 55-56. In fact, Lee stayed at home to write the dialogue and captions of comics two or three of the five workdays each week. *Id.* 56. Marvel agrees—Lee's editor's salary expressly did not cover writing, for which Lee was paid by the page, just like Ditko.[11] *Id.* And Lee, the editor, can hardly be said to have directed and supervised Lee, the writer. *Id.* ¶ 49. Marvel's reliance on Lee's creative input as its surrogate to argue that it thereby satisfies the "instance" prong is unavailing. It only begs the "work for hire" question but does little to resolve it. Since Ditko and Lee's collaborative creative contributions were done as freelancers, neither can be said to have created the Stories they co-authored at *Marvel's* "instance."

Marvel also twists the "Marvel Method"—a term popularized by Lee. In reality, it was this: comic books are a visual medium, so the artists plotted (i.e., conceived) the stories, beat-by-

---

[11] *See Martha Graham,* 380 F.3d at 635 n.19 (describing *Shapiro,* 221 F.2d at 570: "[T]he employer had purchased the copyright … Because this payment was in addition to his salary and the lyric-writing was a special job assignment, the lyric was not considered a work for hire").

beat, in their artwork panels. RSMF ¶ 12. The artist submitted his material, and in Ditko's case, written story summaries, margin notes, suggested dialogue and captions, and after Marvel purchased it, Lee, would dialogue the balloons and finalize the captions following *the artist's* pictorial story. AMF ¶ 40. This benefitted Lee, as well, by enabling him to capture the freelance "writer's share" of the per-page rate on multiple comic books, without having to conceive and write a story script like in the 1940s and 1950s. *Id.* ¶ 55. Naturally, it also led to tensions between Lee and artists, including Ditko, who felt they were not being fairly compensated or credited for the stories and characters they created or co-created. *Id.* ¶¶ 69, 90, 95.

As the characters grew in popularity, credit, money and corporate insecurity as to "Marvel's" intellectual property, led Marvel to promote Lee and Lee to promote his creative role in numerous ways. Lee promoted the purported general "idea" for a character/story as its "creation," variously claiming, in retrospect, that Marvel's characters and stories were all his "idea" and that he created virtually everything Marvel published. Lee also artificially divorced the "plotting" of a story by the artist (a key literary function) from the "writing" of the story, which invariably consisted of Lee filling in the dialogue balloons and captions to coincide with the story told by the artist, panel by panel. *Id.* ¶¶ 39, 40. Any other definition would have required that the writer's per-page rate, paid to Lee, be shared with the artist.

Marvel assertion that "Marvel's Stan Lee" created "most of its characters" and "[a]s Marvel's editor … dreamed new characters into existence" (Dkt. 73 at 22) steps into one of the mostly hotly-contested factual issues regarding Marvel's superheroes. AMF, ¶¶ 50-51, 70-76, 78, 80, 85, 89-96.

Lee's plotting sessions with artists, like Ditko were well known to be perfunctory and often superficial. *Id*. ¶¶ 94, 96 As to Lee's brother Larry Lieber whom he was teaching to write,

Lee often provided Lieber with a basic plot summary. RSMF ¶ 13.  However, this was not the norm with Ditko who usually went his own way, not adhering to Lee's spontaneous suggestions. Increasingly, Ditko functioned independently to Lee's annoyance, reaching a point where in the last two years of the four-year Period, Lee stopped communicating with Ditko. MMC, however, from continuing to purchase Ditko's Works because it needed the content.

Significantly, every one of Marvel's factual assertions regarding "instance" are just as or more readily a function of its purchasing power and standard role as a publisher. Marvel's control over what to publish; the ability to reject and not purchase content, editorial feedback and revisions, publishing deadlines, page constraints, and the management of the production of the magazines it published are all part and parcel of publishing. In proper context it is not of great significance that "ultimately Marvel held the control." Dkt. 68 at 23.  As these common aspects of publishing do little to differentiate "work for hire," from non-work for hire, and could equally apply to either, they do not support a judicial declaration that Ditko's Works were "made for hire." The trier of fact could just as easily conclude the opposite.

The more granular one gets in the analysis of Ditko's Works the more apparent it becomes that the "work for hire" issue is ill-suited for summary judgment in *Marvel's* favor.

### Steve Ditko's Dr. Strange

In late 1962, Ditko created, plotted, and drew the first story of his celebrated character, Dr. Strange, published in *Strange Tales* No. 110. AMF ¶ 70. Ditko originated the character as far back as 1946 long before he met Lee and began selling work to MMC. *Id*. ¶¶ 71, 73. Lee acknowledged that Ditko originated the character he had been playing with for years. *Id*. ¶ 72. Ditko's 1946 Dr. Strange sketches clearly depict what became the character he sold to MMC.



Left: Ditko sketch dated August 6, 1946. AMF ¶ 73. Right: Dr. Strange's debut in
*Strange Tales* No. 110, cover date July 1963. *Id.*

Ditko plotted, drew and inked the first five-page story introducing Dr. Strange completely "on spec" and presented it to Lee. *Id.* ¶ 75. This could not be "work for hire." *See Siegel,* 508 F.2d at 914 (Superman comic strip was not created at the employer's instance, but rather had been "spawned by the [authors] four years before the relationship between [the] authors and the [employer]"). MMC purchased Ditko's "spec" story — but if they hadn't bought it, Ditko almost certainly would have sold it elsewhere (like to Charlton Comics, to whom he also often sold his work). *Id.* ¶ 77; Toberoff Decl., Exs. 103-107. The world of Dr. Strange was strikingly different from other "Marvel" superheroes at the time but Lee liked it, bought it, and many more of Ditko's strange *Dr. Strange* stories followed. AMF ¶ 76. Ditko created a host of supporting characters and an entire *Dr. Strange* mythology before he stopped selling his works to MMC in 1966. *Id.* ¶ 78.

Indeed, along with Ditko's 1946 conception, the Dr. Strange he sold to MMC in the 1960s synthesized elements Ditko had developed in stories he created and sold to Charlton Comics in the 1950s. For example, Ditko's Dr. Strange used his hands to cast teleportation and other spells in *Strange Tales* Nos. 126, 129, and 139 in 1964 and 1965, a move Ditko created years earlier in 1959 as shown in Charlton Comics' *Space Adventures* No. 27. In addition, Ditko's Dr. Strange used a mystical artifact—the Eye of Agamotto—to transport through space

and time, a narrative device which expanded on an artifact Ditko introduced years earlier in

Charlton Comics' *Out of this World* No. 7 (1958), which could transport characters in a swirl of

visual effects into any time or place. As another example, Ditko's Dr. Strange regularly

traversed different dimensions, another character-defining stunt Ditko created years earlier in

Charlton Comics' *Strange Suspense Stories* (1957).

Marvel's attempt to detract by citing Ditko's previous "five-page filler stories" in

*Strange Tales* does little to contradict Ditko's origination of Dr. Strange "on spec" and Ditko's

1946 rendition of Dr. Strange a decade before ever working with Lee and Marvel. AMF ¶¶ 73,

75. Nor does it matter that Ditko and Lee co-authored an origin story in Strange Tales, No. 116

(Dkt. 71-49 at 3-10) where the good doctor studies mystical powers in Tibet under a mystic, or

that an earlier fleeting Dr. Droom character was handed powers in Tibet. Dkt. 71-34 at 3-7.

Contrary to Marvel's mischaracterizations the two stories are very different, aside from doctors

and Tibet.[12] The short-lived Dr. Droom is not comparable to the enormously successful Dr.

Strange character Ditko originated and developed.[13] It is also clear from Lee's candid

description in a January 1, 1963 letter that Ditko's surprise creation of the first Dr. Strange story

was not pursuant to any "assignment" by Lee. AMF 75, Ex. 30 (Lee; "'twas Steve's idea, and I

figgered we'd give it a chance") AMF 75 (Ditko: "On my own, I brought in to Lee a five-page,

---

[12] Marvel's "exactly like Dr. Strange" which "recycled the essence of Dr. Droom" assertions are frivolous. Nor does Dr. Strange undergo "a series of tests in Tibet" like Dr. Droom. Dkt. 73 at 15. Whereas Dr. Droom gets mystical powers at the touch of a hand, Dr. Strange becomes a serious student of mystical powers in his origin story and over time. Marvel's claim is easily refuted by the comic books themselves (e.g., Dr. Doom turns from Caucasian to Oriental (Dkt. 71-34 at 7)). Furthermore, Tibetan mysticism was a popular trope in the 1960's. RSMF 35-37.

[13] Dr. Strange is a long-time student of mystical and martial arts, and a sorcerer, Earth's protector against magical and mystical threats. Along the way he acquires an assortment of powerful mystical objects (e.g, the Eye of Agamotto, the Cloak of Levitation). As co-plotter and then sole plotter of these stories Ditko took Dr. Strange on adventures in increasingly surreal other worlds and dimensions he can enter, populated by mystical characters. For instance, in a 17-issue story arc in *Strange Tales* #130–146 (March 1965 – July 1966), *See e.g.*, Toberoff Decl., Exs. 67, 70, 73. Ditko famously introduced the cosmic character Eternity in *Strange Tales* #138 (November 1965), who personified the universe and was depicted as a silhouette filled with the cosmos. *Id.*, Ex. 109.

penciled story with a page/panel script of my idea of a new, different kind of character for variety in Marvel Comics.").[14] This was further confirmed by Lee in his 1979 book <u>Dr. Strange</u>. Toberoff Decl., Ex. 26 at 83 ("After Steve did the hard part—after he dreamed up the story and illustrated it in his own unique style—I then got to do the fun part … the dialog balloons and captions …"); see also *id.* Ex. 25 (Ditko: "Dr. Strange has always been a contradiction to Marvel heroes ... He is my creation and at one point I took over all stories, writing, art.").

Around 1964, Lee refused to communicate with Ditko any longer, at which point Ditko had complete control of the Dr. Strange series, as reflected in Marvel's recent reprint payments to Ditko with repeated "Plot," "Pencil," and "Ink" entries for Dr. Strange ("DRS") stories. *Id.* ¶¶ 50–51, 70, 93; Ex. 25 (Ditko: "Dr. Strange has always been a contradiction to Marvel heroes … He is my creation, and at one point I took over all stories, writing, [and] art.").

### Steve Ditko's Spider-Man

In 1962, Kirby and Lee worked on a character named "Spider-Man," which Kirby said was based on a character he and Joe Simon had developed in the 1950s called The Silver Spider. *Id.* ¶ 79. At some point, it was decided to toss this version and start over, and Kirby was not paid for his sample pages consistent with Marvel's practices. *Id.* ¶¶ 80-81. Ditko then devised a completely new look and costume, and a new direction was charted for a very different Spider-Man character. *Id.* ¶ 82. The stark differences between Ditko's conception and Kirby's shows just how little the character was developed before each submitted their material to Lee. *Id.* ¶ 83. Indeed, Ditko wrote on several occasions that the character and stories were all worked out without Lee ever writing a single script. *Id.* ¶ 84. The first *Spider-Man* story introduced not only

---

[14] Not much stock can be placed in Lee's marketing Ditko's character as "Dr. Strange" because he was first published in "Strange Tales" magazine #101, similar to Lee's reference to Spider-Man as the "Amazing Spider-Man" because he first appeared in "Amazing Fantasy" magazine #15. AMF ¶¶ 70, 85–87.

Peter Parker (Spider-Man), but also his Aunt May and school rival Flash Thompson—the first of what evolved into a large supporting cast of friends and foes. *Id*. ¶ 85.

As with Dr. Strange, many of the characters and elements Ditko created for his *Spider-Man* stories took root years earlier. For example, the precursor for the Aunt May character, who appeared in Ditko's *Amazing Fantasy* No. 15, first appeared in Ditko's *Out of This World* No. 6 in 1957 published by Charlton Comics five years earlier. *Id.* ¶¶ 85, 91.

 

Left: Ditko's "Aunt May," *Amazing Fantasy* No. 15 (1962). Toberoff Decl., Ex. 60. Right: Ditko's "Mary," *Out of this World* No. 6 (1957). Toberoff Decl., Ex.79.

In addition, the Chameleon character in *Amazing Spider-Man* No. 1 (1963) had as its precursor a spy character in a story Ditko sold to Charlton Comics for *Out of This World* No. 6 (1957), both of whom were faceless villains who used various masks in their espionage with similar spy origins. Further, Ditko created an electrically powered character in Charlton Comics' *Strange Suspense Stories* No. 48 (1960), which became the basis for the Electro character that later appeared in 1964 in *Amazing Spider-Man* No. 9. Further still, Ditko planted Norman Osborn, the alter ego of the Green Goblin villain, in *Amazing Spider-Man* No. 23 (1965), whose identity he later revealed in issue No. 37 (1966). Osborn, including both his corporate villainy and distinct curled hairstyle have links to Ditko's pre-Marvel period with Charlton Comics as seen in Ditko's *Director of the Board* in *Strange Suspense Stories* No. 33 (1957).

 

Left: Ditko's "Norman Osborn," *Amazing Spider-Man* No. 37 (1966). Toberoff Decl. Ex. 74. Right: Ditko's "Mr. Lang," *Strange Suspense Stories* No. 33 (1957). *Id.* Ex. 75.

In later interviews and essays, Lee often admitted that Goodman did not believe the character would sell and forbade Lee to publish *Spider-Man*. *Id*. ¶ 86. Lee, enthusiastic about Ditko's Spider-Man, flouted Goodman's authority and published the story in the anthology book, *Amazing Fantasy* No. 15, anyway. *Id*. ¶ 87. Thus, it is difficult to reconcile how the first *Spider-Man* story was at "Marvel's" "instance," if its owner, Goodman, opposed it, and Lee proceeded without Marvel's authorization. Months later, in success, Spider-Man got its own title, and the *Amazing Spider-Man* comic was launched. *Id*. ¶ 88. Around 1964, Lee, bristling at Ditko's independence refused to speak to him any longer, at which point Ditko maintained complete control over the Spider-Man stories. *Id*. ¶ 50-51. In Lee's words "I don't plot Spider-Man any more. Steve Ditko, the artist, has been doing the stories. … He won't let anybody else ink his drawings either. He just drops off the finished pages with notes at the margins and I fill in the dialogue. I never know what he'll come up with next." In short order, the cast swelled with supporting characters like J. Jonah Jameson and Mary Jane Watson, and foes like Dr. Octopus, The Green Goblin, The Sandman, Kraven the Hunter, The Vulture, The Scorpion and many more. *Id*. ¶ 89. All these and many others were created or co-created by Ditko and were firmly established well before he stopped selling work to "Marvel" in 1966. *Id*. ¶ 90.

From 1964, when Lee and Ditko stopped speaking, Ditko was in complete creative control over his *Spider-Man* and *Dr. Strange* stories, aside from Lee's freelance dialoguing,

*after* Ditko's material had been purchased, which is hardly the paradigm of "instance." *Id*. ¶ 51.

      **E.**      **Marvel Cannot Satisfy the "Expense" Prong.**

            **1.**      ***Ditko, Not Marvel, Bore the Financial Risk of Creating His Works.***

The crux of the "expense" prong is who bore the entire financial risk associated with the creation of the Works. *See Kirby*, 726 F.3d at 139 ("The 'expense' component refers to the resources the hiring party invests in the creation of the work."); *Twentieth Century Fox Film Corp. v. Entm't Distrib*., 429 F.3d 869, 881 (9th Cir. 2005) ("expense" test met if a party takes on "all the financial risk"). The issue here is whether Ditko created *his material* (the Works) as "work for hire," owned at inception by Marvel.[15] This case is not about MMC's production and publishing of the Stories[16] in Comic Books *after* Ditko created and sold his Works to MMC.

The "expense" prong therefore focuses on who bore *the financial risk* associated with Ditko's creation of his material at issue, *not* Marvel's subsequent production and publication of the Stories or the risk that a particular Comic Book might not sell well. *See* Nimmer § 5.03[B][2] [d] at n.171 ("Plainly, it is the expense of creation, rather than publication, that is relevant."). That is a risk all publishers bear, regardless of whether a work was purchased and assigned or "work for hire." *Id*. ("[I]f funding publication could convert a manuscript into a work for hire, then the category would soon subsume all published material—given the universal custom of

---

[15] *See* Dkt. 1 (Complaint) ¶ 1 (alleging "the contributions Steve Ditko made were at Marvel's instance and expense, rendering his contributions 'work made for hire'"), ¶¶ 10-13, 23, 24 (purporting to apply "instance and expense" test to Ditko's "contributions" to comic books, not to the comic books themselves). *See also* Dkt. 24 (Counterclaims) ¶¶ 2 (focusing on "Ditko's creative material (the 'Ditko Material')", 24, 28-37 (focusing on the Ditko Material) 55-58 (seeking a declaration that the *Ditko Material* was not Marvel's "work for hire").

[16] A comic book story comprised of artwork by one author (Ditko) and text by another (Lee) is a classic joint work in which its co-authors own an undivided interest. *See Shapiro*, 161 F.2d at 409. Ditko's contributions qualify him as a co-author of the Stories. Upon termination under 17 U.S.C. § 304(c), Ditko's undivided co-author share in those joint works revert to his Estate. Lee's employment (or failure to exercise termination rights as to his freelance writing) does not render Ditko's contributions "work for hire." *See Siegel v. Time Warner Inc.*, 496 F. Supp. 2d 1111, 1144 (C.D. Cal. 2007) (As to [Siegel/Shuster's] joint work, [DC] would own half of the copyright [] as the author of Shuster's alleged work for hire or … given his [] failure to … terminat[e]".).

publishers to fund printing, distribution, advertising, etc. of their wares.").

It is undisputed that (i) Marvel did not advance Ditko any money to cover his work; (ii) Ditko rented his own art studio, paid the associated overhead (maintenance, utilities), paid for his own materials (paper, ink) and instrumentalities (pens, pencils, brushes, erasers, drafting tables, lights, magnifiers) used to create his artwork; and (iii) Marvel neither reimbursed nor was obligated to reimburse these expenses. AMF ¶¶ 34-37, 41-42. *See Urbont*, 831 F.3d at 90 (finding that artist's provisions of "his own tools and resources in[] a recording studio he rented … supports an inference that [he] b[ore] the risk with respect to the work's success.") (quotation marks and citations omitted).[17] It is further undisputed that *after* Ditko created and submitted his artwork, Marvel had no legal obligation to accept it for publication, could reject any of it at will, and in that event, *Ditko* would bear the loss of his labor and expenses. AMF ¶¶ 43-44. Whether Marvel did this often or seldom is irrelevant as a matter of law. What *is* relevant is that Marvel had no legal obligation to pay Ditko for conforming services. *Id*. ¶ 36, 41. If this were immaterial, as Marvel suggests, then why did it insist on keeping its options open and always avoid financial guarantees?  Marvel now portrays itself as the "hiring party," but in the Period, when it mattered, Marvel specifically avoided the financial obligations and *the risk* that "hiring" entails. *Id*. ¶ 8, 13, 35-37, 41-43, 45, 59, 63.

Thus, Ditko, who invested his own time and resources in creating his Works, without *guaranteed* compensation, assumed the financial risk of the Works' *creation*. The financial risk Marvel incurred afterward, as a publisher, is inherent to all publishing, does nothing to differentiate "work for hire" and is legally irrelevant.

> **2.**  ***Marvel's Conscious Avoidance of the Simple Legal Commitment to Pay***

---

[17] *See also Kirby*, 726 F.3d at 139 (noting that the Second Circuit has "suggested that the hiring party's provision of tools, resources, or overhead may be controlling") citing *Martha Graham,* 380 F.3d at 638.

***Ditko for Conforming Services is Fatal to the "Expense" Prong.***

In most cases finding "work for hire" based on payment of a sum certain, the employer actually hired the independent contractor to perform services and thus was legally obligated to pay for conforming services.[18] But even where payment was contractually obligated but *contingent* (e.g., a royalty), this weighs heavily against "work for hire," as the author technically bore the risk of creation. *Martha Graham*, 380 F.3d at 641.[19] Here, payment was expressly *contingent* on whether "Marvel" chose, in its sole discretion, to buy Ditko's work. AMF ¶¶ 42-43. Marvel's choice of this post-creation contingency destroys the logic of the "work for hire" doctrine and the "instance and expense" test which assesses "if the copyright … vested in [the employer] from the moment it was created," *Twentieth Century,* 429 F.3d at 887, and contradicts the fundamental copyright principle that authorship of a work vests *at creation*.[20]

"Expense" thus necessarily entails a legal obligation of a *hiring party* to pay a *non-contingent* sum for the work commissioned. This is a critical function of the "expense" prong, as it serves to distinguish "work from hire" from the "purchase and assignment" of created material. *See Playboy Enterp'r's, Inc. v. Dumas*, 960 F. Supp. at 715-16 (J. Kaplan) (publisher's obligation to pay "'turn-down'" fee for "unused work" weighs in favor of "work for hire"; "if Playboy had

---

[18] *See e.g., Ward,* 208 F. Supp. 2d at 433-34 (J. Kaplan) (finding "expense" as (1) terms of many work assignments "memorialized in writing," "(2) NGS paid Ward a minimum guarantee for his contributions … and (3) NGS paid Ward's expenses")); *Hogarth*, 342 F.3d at 163 (finding "expense" due to publisher's contractual obligation to pay a guaranteed fixed sum); *Twentieth Century,* 429 F.3d at 881 (finding "expense" based on publisher's contractual obligation to pay "nonrefundable" cash advance); *Murray v. Gelderman*, 566 F.2d 1307, 1309-11 (5th Cir. 1978) (finding "expense," as employee was "to be compensated for her services" and publisher "reimbursed her for out-of-pocket expenses"); *Fifty-Six Hope Rd. Music Ltd.,* 2010 U.S. Dist. LEXIS 94500, at *26-27 (S.D.N.Y. September 10, 2010) (*see* Toberoff Decl. Ex. 61) (employer was contractually obligated to "pa[y] [artist non-refundable] advances against royalties for the creation of the [works]" and to pay "the recording costs"),

[19]*See also Playboy,* 53 F.3d at 555 (contingent "royalty" "weighs against finding a work-for-hire relationship"); *Twentieth Century*, 429 F.3d at 881(same); Nimmer § 5.03[B][2][d] (same).

[20] *See Hogarth*, 342 F.3d at 163 ("[W]ith a true work for hire, copyright ownership … [is] with the employer automatically upon the employee's creation of the work"); *see also discussion in* Dkt. 76 (MSJ) at 37-38.

never published the work … no reason to pay anything for it absent a work for hire relationship, as it would have no need for any rights in such a case"). By contrast, Marvel, by design, could reject Ditko's submissions *at will*, without any payment. AMF ¶¶ 41-42. Thus, the "expense" prong is not satisfied by Marvel's after-the-fact payment of a "sum certain" for that work it wished to publish, as that amounts to a *purchase* of Ditko's Works, and does nothing to evince "work for hire." *See Epoch Produc'g Corp. v. Killiam Shows, Inc.,* 522 F.2d 737, 745 (2nd Cir. 1975) ("evidence that is [equally] consistent with" non-work for hire "cannot be bootstrapped").

As Marvel cannot satisfy the "expense" prong, its motion must be denied.

### F.     Marvel and Ditko Could Not Have Intended that His Work was "For Hire."

It is well settled that whether a work is "made for hire" under the 1909 Act turns on an objective understanding of the parties *at the time the works were created*. *Playboy,* 53 F.3d at 556-57 ("work for hire" always a question of "the intent of the parties"); Nimmer § 5.03[B][2] [c] ("work for hire" under the 1909 Act "always turn[s] on the intention of the parties"). The "instance and expense" test itself seeks to inferentially derive the "mutual intent of the parties." *Id. See also Dolman v. Agee,* 157 F.3d 708, 712 (9th Cir. 1998) (the "instance and expense" test seeks to determine the "intent of the parties, and does not operate as a matter of law").

Courts must not retroactively impute an intent the parties could <u>*not*</u> possibly have had. Until 1966, "the courts had applied the work for hire doctrine under the 1909 Act exclusively to traditional employees." *Reid*, 490 U.S. 730 at 749, 109 S. Ct. 2177-78. Thus, even if the parties had retained Melville B. Nimmer himself in the Period (1962-1965) they would have been advised that Ditko's freelance work was <u>*not*</u> "work for hire" under Section 26 of the 1909 Act— construed for over five decades, including in the Second Circuit, to solely apply to traditional employment. *See* M. Nimmer, *Nimmer on Copyright* § 63 at 245 n.80 (**1963**). *See* Toberoff Decl. Ex. 64 n. 80) ("Sec[tion] 26 expressly renders an employer for hire an 'author' but makes no

comparable provision with respect to commissioned works."). For "independent contractor[s]"
like Ditko, the publisher's ownership was "by virtue of an assignment." *Id*. § 62.4 at 242; *id*. §
114.4 at 470 (1969). *See also Shapiro*, 221 F.2d 569, 570 (2d Cir. 1955), mod'd on other
grounds, 223 F.2d 252 (2d Cir. 1955); B. Varmer, "Works Made for Hire and On Commission,"
1 Studies on Copyright 717, 722 n.7 (1963). Unsurprising, then, nearly all the record evidence in
this case points to the conclusion that MMC simply intended that Ditko assign to it all rights to
his freelance Works that MMC purchased for publication.

### G.   The Undisputed Facts Show that Ditko Expressly or Impliedly Assigned to Marvel the Copyrights in the Works Marvel Purchased.

There is no reason to indulge Marvel's tortured revisionism that Ditko's Works were
owned at inception as "works made for hire" (by Goodman's Shell Companies, no less). The
undisputed facts and evidence lead to the far more natural legal conclusion that "Marvel"
owned the copyright in the Ditko Works it *purchased* via an express or implied *assignment*.

### *MMC's Checks Expressly Assigned the Copyright and Renewal Copyright*

MMC placed am endorsement "legend" or legal acknowledgement on the backs of its
checks, which freelancers had to sign to deposit them. AMF ¶¶ 66-67. Marvel claims it has no
freelancer checks before 1973, and no checks to Ditko[21], however, 1973-1975 Marvel checks to
freelancers Stephen Gerber and Richard Ayers contained this assignment legend:

> By endorsement of this check, I, the payee, acknowledge full **payment** … **for my
> assignment to it of any copyright**, trademark and any other rights in or related to
> the material, and **including my assignment of any rights to renewal copyright**.

AMF ¶¶ 68-69 (emphasis added). Ayers along with freelancers Gene Colan, Joe Sinnott, James
Steranko and Neal Adams each specifically attested that Marvel's checks in the 1960s, inclusive

---

[21] Marvel blames Ditko's Estate for this deficiency but, unlike Marvel, freelancers who deposited their checks in the
Period would hardly be expected to have them.

of the Period, contained such language of purchase and assignment, *not* "work for hire." *Id*. ¶ 68. This, again, is no surprise because, as noted, the "work for hire" doctrine before 1966 only applied to traditional employees, not to freelancers.

The assignment of copyright is the antithesis of "work for hire"—owned by inception. And it was Marvel which *chose* this express "assignment" of "copyright" language and obviously intended it to be an agreement by the freelancer endorsing the check in payment for his pages.[22] Marvel has consistently relied on such check legend assignments to assert copyright ownership.[23] "Work for hire" language is completely absent from Marvel's check legends or any agreements in the record until long after the Period, further evidencing *Marvel's* actual intent.[24]

The foregoing is also consistent with the understanding and intent of numerous freelancers in the Period that Marvel simply *purchased* their work. AMF ¶¶ 18, 68; Toberoff Decl. Ex. 8 ¶ 15 (e.g., Sinnott: "In the 1950's through the 1960's, I certainly did not consider my freelance artwork to be 'work for hire.' Nor did the other freelance artists I knew. No one was thinking along those lines."). Even Marvel's witnesses including Lee and Thomas admitted that Marvel just "purchased" the freelance material it accepted for publication. AMF ¶ 64 (Lee testifying: "[Marvel] would only buy what [it] needed"). *See Shapiro,* 221 F.2d at 570 (holding song was not "work for hire," employer simply *purchased* the song which was assigned to it).

---

[22] *See Dolman*, 157 F.3d at 712 ("[Author] assigned his rights to the subject songs … Had the works been intended to be works for hire for [Company], there would have been no reason … to accept an invalid assignment of rights from [Author], knowing that [Company] already owned those rights.").

[23] *See e.g.*, *Gary Friedrich Enterprises, LLC v. Marvel Enterprises, Inc.*, 837 F. Supp. 2d 337, 341-42 (S.D.N.Y. 2011) ("Friedrich conceded that The [MMC] checks he received during the time period in which he created the Character and the Work contained the assignment legend … the record evidence is that freelance work was paid for with separate checks containing that legend [] and there is no evidence in the record that the freelance checks he received for the Work varied from typical practice and did not contain the legend."), vacated on other grounds, 716 F.3d 302 (2d Cir. 2013).

[24] The earliest check Marvel could produce with a legend mentioning "work for hire" was from 1986. AMF ¶ 68.

### *Marvel's Later Agreements with Freelancers Also Feature Pure Assignment Language*

In the late 1950's and early 1960s Marvel had little to no infrastructure, was informal, if not haphazard, and was struggling to survive. AMF ¶ 4, 15-16. Marvel was bought by Perfect Film and Chemical Corp. in 1968, which changed its name to Cadence Industries in 1973. *Id.* ¶ 19; Dkt. 79-1 at 17. Cadence naturally endeavored to shore up Marvel's intellectual property and in the late 1970s it started demanding that artists sign agreements *assigning* to Marvel all previous and future work it published consistent with the purchase-and-assignment legends on MMC's checks. *Id.* ¶¶ 24-25, 66-68.[25] And still the term "work for hire" did not appear. *Id.*

In Marvel's lawsuit with Steven Gerber ("Howard the Duck"), *Gerber v. Cadence Industries Corp.*, No. 80-3840 (C.D. Cal. Aug. 29, 1980), Marvel emphasized that his agreement *granted* to it "the sole and exclusive right to all Material delivered to Marvel hereunder, including … the exclusive right to secure copyrights in the Material." AMF ¶ 22; Toberoff Decl. Ex 52 ¶ 7. Marvel President James Galton similarly informed Thomas on February 24, 1978 that "it was our intent that all copyrights be assigned to Marvel." AMF ¶ 22-24; Toberoff Decl. Ex 54.  Thus, as late as 1976-1977, Marvel *still* considered its freelancer relationships / agreements as involving the purchase and assignment of copyright, not "work for hire," as confirmed by *both* the agreements and check legends *Marvel* drafted—all of which comports with Marvel's *contingent* purchase and payment for only those freelance pages it accepted *after* creation. *Id.* ¶¶ 22, 57, 64-67. And the freelancers understood this the same way as Marvel. *Id.* ¶¶ 24, 64, 66-67.

### H. <u>Even if the "Instance and Expense" Test Were Satisfied Sufficient Evidence Exists for the Trier of Fact to Find A "Contrary Agreement."</u>

---

[25] *See e.g.*, Marvel's March 22, 1975 agreement with freelancer Gene Colan, emphasizing an assignment. *Id.* Colan "grants to Marvel the sole and exclusive right to all Material delivered to Marvel …" and that Colan shall "deliver such further documents … for the purpose of confirming the rights herein granted to Marvel." *Id.*; Toberoff Decl. Ex. 43 ¶¶ 7, 11. Marvel's October 7, 1977 agreement with Gerber, its March 22, 1975 and its September 1, 1974 and August 27, 1976 agreements with Thomas, all use the same *grant* or assignment language. AMF ¶ 22.

As shown above, Marvel cannot meet its burden of satisfying the "instance and expense" test with regard to its predecessor Shell Companies in whose names it registered the relevant copyrights as the "authors" of "works made for hire." There is no justification to overlook Marvel's Shell Company copyright registrations on which it has relied for decades, but even if there were, issues of material fact abound as to whether Ditko created his material at MMC's "instance" and "expense." Finally, even if Marvel surmounted these significant obstacles (it cannot) the record evidence evokes genuine issue of fact as to a contrary understanding and agreement in the Period that all rights in the Works were purchased and assigned to "Marvel."

To rebut the presumption of mutual intent under the "instance and expense" test, the Estate must demonstrate "a contrary agreement, either written or oral." *Playboy Enters.*, 53 F.3d. at 554-55 (citing *Roth v. Pritikin*, 710 F.2d 934, 938 n.3 (2d Cir. 1983) ("In the absence of evidence to the contrary, ownership of the copyright would be presumed to lie" with the hiring party); *Martha Graham*, 380 F.3d at 634 ("the applicable principles operate as default rules, determining who owns the copyright").[26] As reflected in these "instance and expense" cases and many more, the issue has been a publisher's copyright *ownership*. Thus, the line between ownership by "implied assignment" or as "work for hire" was not critical and often blurred.[27] Here, however, the distinction makes all the difference. The 1976 Copyrights Act's termination right presumes the publisher *owns* the copyright by express or implied assignment, as that is what is being terminated. 17 U.S.C. § 304(c). Therefore, in the termination context, if the "instance and

---

[26] Marvel argues that the Estate must show that the parties "intended a relationship other than work for hire." *Id.* at 557; Dkt. 79 at 9 (quoting Playboy, 53 F.3d at 557). As "work for hire" was construed by the courts to solely apply to traditional employees, there would be no reason for the parties in the Period (1962-1965) to have any sort of *literal* agreement that Ditko's works were *not* "made for hire." *See Reid*, 490 U.S. 730, 749, 109 S. Ct. 2166, 2177 (recounting history of "work for hire"). By contrast, *Playboy* concerned works created in and after 1974. *Id.* at 552.

[27] *See Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.* 342 F.3d 149, 161 n.14 (2d Cir. 2003) (recounting contradictory history of the "instance and expense" test); *see also discussion in* Dkt. 76 (MSJ) at 16-18.

expense" test were satisfied, the logical inquiry is whether the record evinces a "contrary agreement" that the freelance author transferred his copyrights to the publisher. In other words, the focus is not on whether Marvel "owns" the copyrights but on how it secured ownership.

Here, strong inferences as to the parties' actual understanding and intent can be gleaned from Marvel's consistent inclusion of *express contemporaneous* "assignment" of "copyright" and "renewal copyright" language in both its "check legend" agreements with freelancers *and* in the written agreements for freelance material it started using in the mid-1970s. AMF ¶¶ 21-22, 66-68, 104. This is further supported by the total absence of any reference to freelance "work for hire" by Marvel in the 1960's and most of the 1970's.[28] Again, the earliest checks Marvel could produce with a "work for hire" legend are from 1986, showing that when this was Marvel's intention it knew how to say so. *Id.* ¶ 68; Toberoff Decl. Ex. 98 ("By acceptance and endorsement of this check, payee acknowledges … that all payee's works are and shall be considered as works made for hire"). Unlike Marvel check legends in the 1960s and 1970s, its "work for hire" check legends have no "assignment of copyright" language, undercutting its "belt and suspenders" argument as well. *Id*.

On top of and consistent with all of this, is the sworn testimony from five percipient freelancers who worked with Marvel in and around the Period that their contemporaneous understanding and agreement was that they were granting to Marvel all rights in their work that Marvel chose to purchase for publication, and that there was never any mention of "work for

---

[28] As aptly stated by the Estate's expert comic book historian Mark Evanier: "In the Period (and until approximately 1978), the custom and practice in the comic book industry, including at Marvel, was for the publisher to simply purchase from the freelancer at a page rate those completed pages the publisher chose to accept in its sole discretion. … All indicia in the industry and at Marvel was of a simple purchase by the publisher and grant to the publisher of the freelance pages it accepted for publication. Marvel's practice of limiting its financial exposure by simply buying all rights to completed pages it approved for publication is a paradigmatic example of how comic book publishers throughout the industry, getting by with the slimmest of margins, were operating." Dkt. 79-1 at 18.

hire" by Marvel until in the late 1970's. AMF ¶¶18, 22, 67. Even Marvel's editors and prepared witnesses, Stan Lee and Roy Thomas admitted on cross that throughout the 1960s the mutual understanding was that freelancers *granted* to Marvel all rights in the works that Marvel purchased and that it was not until 1978 or so that "work for hire" even entered the parties' lexicon.[29] *Id.* ¶¶ 18, 22, 41, 104.

All of this record evidence taken together permits a "reasoned logical" conclusion that the parties' mutual understanding was that Ditko, as the author, assigned his copyrights to MMC when it purchasing his Works. *Bickerstaff v. Vassar College,* 196 F.3d 435, 448 (2d Cir. 1999). And "[a]s a jury would be entitled to review the evidence as a whole, courts must not view the evidence in piecemeal fashion in determining whether there is a trial-worthy issue." *Id*.

There is no doubt that Marvel *owned* the copyrights to the Ditko Works Marvel chose to buy. *How* it came to own those copyrights is the issue. All the record evidence points to Marvel's ownership via an express or implied assignment by Ditko. Those grants or assignments are unequivocally subject to termination under 17 U.S.C. § 304(c).

## **CONCLUSION**

For all the foregoing reasons, the Estate respectfully requests that the Court deny Marvel's summary judgment motion in its entirety.

Date: June 30, 2023                   Respectfully submitted,

By:   ____*/s/ Marc Toberoff*_____
        Marc Toberoff
TOBEROFF & ASSOCIATES, P.C.
*mtoberoff@toberoffandassociates.com*
23823 Malibu Road, Suite 50-363
Malibu, CA 90265

*Attorneys for Patrick S. Ditko*

---

[29] Even, Marvel's paid expert Paul Levitz (formerly of DC Comics) had to acknowledge that it was not until "the 1976 Copyright Act was enacted, [that] publishers began to use the term "work made for hire." Dkt. 80-15 at 25.