# Exhibit 21

```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE SOUTHERN DISTRICT OF NEW YORK
 3    MARVEL CHARACTERS, INC.,
 4         Plaintiff and
           Counterclaim-Defendant,
 5
                vs.           Case No. 1:21-cv-7955-LAK
 6                            and consolidated cases
      LAWRENCE D. LIEBER,     21-cv-7957-LAK and
 7                            21-cv-7959-LAK
           Defendant and
 8         Counterclaimant.
     ──────────────────────────────
 9    MARVEL CHARACTERS, INC.,
10         Plaintiff and
           Counterclaim-Defendant,
11
                vs.
12
      KEITH A. DETTWILER, in his
13    capacity as Executor of the
      Estate of Donald L. Heck,
14
           Defendant and
15         Counterclaimant.
     ──────────────────────────────
16    MARVEL CHARACTERS, INC.,
17         Plaintiff and
           Counterclaim-Defendant,
18
                vs.
19
      PATRICK S. DITKO, in his
20    capacity as Administrator of
      the Estate of Stephen J.
21    Ditko,
22         Defendant and
           Counterclaimant.
23   ──────────────────────────────
24
25    caption(cont'd)
```

Page 2

1              ZOOM DEPOSITION OF JAMES F. STERANKO

2      (Reported Remotely via Video & Web Videoconference)

3          Reading, Pennsylvania (Deponent's location)

4                  Friday, February 10, 2023

5                        Volume 1

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

    STENOGRAPHICALLY REPORTED BY:

21  REBECCA L. ROMANO, RPR, CSR, CCR

    California CSR No. 12546

22  Nevada CCR No. 827

    Oregon CSR No. 20-0466

23  Washington CCR No. 3491

24  JOB NO. 5753867

25  PAGES 1 - 108

Page 3

```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE SOUTHERN DISTRICT OF NEW YORK
 3    MARVEL CHARACTERS, INC.,
 4         Plaintiff and
           Counterclaim-Defendant,
 5
                vs.            Case No. 1:21-cv-7955-LAK
 6                             and consolidated cases
      LAWRENCE D. LIEBER,      21-cv-7957-LAK and
 7                             21-cv-7959-LAK
           Defendant and
 8         Counterclaimant.
      _____
 9    MARVEL CHARACTERS, INC.,
10         Plaintiff and
           Counterclaim-Defendant,
11
                vs.
12
      KEITH A. DETTWILER, in his
13    capacity as Executor of the
      Estate of Donald L. Heck,
14
           Defendant and
15         Counterclaimant.
      _____
16    MARVEL CHARACTERS, INC.,
17         Plaintiff and
           Counterclaim-Defendant,
18
                vs.
19
      PATRICK S. DITKO, in his
20    capacity as Administrator of
      the Estate of Stephen J.
21    Ditko,
22         Defendant and
           Counterclaimant.
23    _____
24
25    caption(cont'd)
```

Page 4

1        DEPOSITION OF JAMES F. STERANKO, taken on

2   behalf of the Plaintiff and Counterclaim-Defendant,

3   with the deponent located in Reading, Pennsylvania,

4   commencing at 12:53 p.m., Friday,

5   February 10, 2023, remotely reported via Video &

6   Web Videoconference before REBECCA L. ROMANO, a

7   Certified Shorthand Reporter, Certified Court

8   Reporter, Registered Professional Reporter.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1                    APPEARANCES OF COUNSEL

2    (All parties appearing via Web Videoconference)

3

4    For the Plaintiff and Counterclaim-Defendant:

5          O'MELVENY & MYERS LLP

6          BY:  MOLLY M. LENS

7          BY:  MATTHEW KAISER*Admitted pro hac vice

8          Attorneys at Law

9          1999 Avenue of the Stars

10         8th Floor

11         Los Angeles, California 90067

12         (310) 553-6700

13         mlens@omm.com

14         mkaiser@omm.com

15

16

17

18

19

20

21

22

23

24

25    /////

```
1              APPEARANCES OF COUNSEL
2    (All parties appearing via Web Videoconference)
3
4    For the Defendant and Counterclaimant and Deponent:
5         TOBEROFF & ASSOCIATES, P.C.
6         BY:  MARC TOBEROFF
7         BY:  JAYMIE PARKKINEN
8         Attorneys at Law
9         23823 Malibu Road
10        Suite 50-363
11        Malibu, California 90265
12        (310) 246-3333
13        info@toberoffandassociates.com
14
15
16
17   ALSO PRESENT:
18        Soseh Kevorkian, Videographer
19
20
21
22
23
24
25   /////
```

1    than maybe an hour's work, I think I inked the

2    figure of Daredevil and he did the background on

3    it.  But it wasn't an assignment.

4         Q.   (By Ms. Lens)  I understand -- I

5    apologize.

6              Continue.

7         A.   And what was the rest of your question,

8    please?

9         Q.   Yeah.

10             So I understand that your work on the

11   Daredevil comic -- cover, excuse me, was not in an

12   assignment as you testified you were helping a

13   friend with his assignment.

14             I'm trying to understand for the other

15   work that you did with Marvel, those were pursuant

16   to assignments that come from Stan Lee; is that

17   correct?

18             MR. TOBEROFF:  Objection as to form.

19   Assumes facts.

20             THE DEPONENT:  I always worked through --

21             MR. TOBEROFF:  Lacks foundation -- excuse

22   me.

23             Go ahead.

24             THE DEPONENT:  I always worked through

25   Stan -- as -- as my connection at Marvel.  But it

Page 30

```
 1   was not a matter of assignments.  It was more like,
 2   I would call them options.  I had the -- I had the
 3   choice to make to -- to --  to work on some of
 4   their books or, you know, pursue my -- my other
 5   interests.  And in terms of assignments, unlike
 6   perhaps many other situations that Stan had with
 7   other artists, writers, inkers, letters, colorists,
 8   where he often submitted information to them that
 9   he wanted material done.
10             Stan and I never worked in that manner.
11   He never provided me with plot ideas, character
12   ideas, story ideas.  I was strictly on my own.
13             So that's why I wouldn't call my work
14   there real assignments.  I was doing that -- I
15   would say on -- on speculation and there were times
16   when Stan rejected the work.
17             Did that help clarify that point?
18       Q.   (By Ms. Lens)  Yes, I appreciate that.
19   Thank you.
20             You testified before that you worked on
21   the -- the Nick Fury comic, correct?
22       A.   We split Strange Tales, notice it wasn't
23   called S.H.I.E.L.D Tales.  It was called
24   Strange Tales after Doc Strange, and I -- I did a
25   series of -- of those books splitting the book with
```

Page 41

1    was there on a permanent basis.  John Verpoorten

2    was there working in -- in-house.  Herb Trimpe

3    often worked in the -- in the bullpen.  I met

4    Dick Ayers -- although, I don't think he actually

5    worked in the bullpen.  I think he was just

6    visiting like -- like I was.

7         Q.   (By Ms. Lens)  And who was John

8    Verpoorten?

9         A.   John Verpoorten was an artist and inker

10   and he may have -- he may have done cleanup work at

11   Marvel.

12            In other words, when artists would submit

13   pages, if there were -- if the elements on the page

14   that Stan or Roy would object to, you know, clean

15   up this face.  Take these lines off of, you know,

16   of this character.  They are confusing.  John would

17   do some of that -- some of that kind of adjustment

18   work.

19        Q.   How about Sol Brodsky, was he someone

20   else that worked in the Marvel bullpen regularly?

21        A.   Yes, he -- he was an administrator of the

22   bullpen.  He was Stan's right-hand man.  And -- and

23   I think he was probably there almost every time I

24   came into the -- into the -- into the bullpen.

25        Q.   And were Stan Lee and Roy Thomas also

Page 61

1    give you a treatment or synopsis of the material

2    that it was looking for?

3         A.    Never.

4         Q.    There was supervision, was there not, at

5    Marvel particularly in the early part of your tour

6    at Marvel?

7              MR. TOBEROFF:  Objection as to form.

8    Vague.

9              THE DEPONENT:  There was no supervision.

10        Q.    (By Ms. Lens)  Your paychecks from Marvel

11   were stamped "work made for hire," correct?

12             MR. TOBEROFF:  Objection as to form.

13   Assumes facts.

14             THE DEPONENT:  I -- I -- I don't -- I

15   don't think that phrase appeared on my checks,

16   especially the early checks.  The early checks

17   didn't have a condition, an agreement stamped on

18   them.

19             That came in perhaps in the -- in the

20   middle of -- of my Marvel tour, and I believe

21   that -- that the -- that condition changed its

22   wordage as time went on.

23        Q.    (By Ms. Lens)  When you joined -- strike

24   that.

25             When you started working with Marvel in

Page 62

1    the 1960s, were your paychecks stamped "work for

2    hire"?

3          A.    They were not.

4                MR. TOBEROFF:  Objection as to form.

5                THE DEPONENT:  Let me put it another way,

6    Molly.

7                I don't remember that happening in my --

8    in my earliest work at Marvel, maybe it didn't

9    happen for an entire year.

10               I remember I -- I was somewhat appalled

11   or shocked when I began to receive Marvel checks

12   that had that verbiage on it.

13         Q.   (By Ms. Lens)  At some point in the

14   1960s, though, you started receiving checks from

15   Marvel that had the verbiage "work for hire"?

16               MR. TOBEROFF:  Objection as to form.

17   Misstates his testimony.  Calls for speculation.

18               THE DEPONENT:  I am not sure the words

19   "work for hire" were on those checks, Molly.  It

20   may have -- it may have been stated in -- in

21   another way.

22               We can easily check on that by -- by,

23   you know, looking at, you know, at those very

24   checks at that documentation.

25         Q.   (By Ms. Lens)  Do you have your checks

Page 63

1   from Marvel from the 1960s?

2          A.    Certainly --

3                MR. TOBEROFF:  Objection as to form.

4                THE DEPONENT:  I took them all to the

5   bank.

6          Q.   (By Ms. Lens)  So when you say "that you

7   could easily check," do you have any way to check

8   your checks from Marvel from the 1960s?

9          A.    I was hoping you had a way to check.

10         Q.    Fair enough.

11               When you took your checks from Marvel to

12  the bank to cash them in the 1960s, you would cross

13  the language off on the back of the checks before

14  you signed them?

15               MR. TOBEROFF:  Objection as to form.

16  Lacks foundation.

17               THE DEPONENT:  I may have done that once

18  or twice because I thought creating a condition on

19  a check after the work had been done and turned in,

20  and then I would get my check a week or two later.

21  I thought that that was bad business to add a

22  condition after, after the work was done and used.

23               It was my way of saying, I -- I don't

24  like this way of doing business.

25               We actually had no contract.  I never had

Page 64

1   a Marvel contract.  We never even had an agreement.

2   We never even had a discussion about the work,

3   particularly about work for hire.

4           I did all of my Marvel stories on my own

5   cognizance.

6           MS. LENS:  Okay.  I'm going to move the

7   last part of that answer as nonresponsive.

8       Q.   (By Ms. Lens)  The question,

9   Mr. Steranko, is whether you would cross the

10  language off on the back of the checks before you

11  would cash them?

12          MR. TOBEROFF:  Objection as to form.

13  Assumes facts.

14          THE DEPONENT:  I did that -- I did that

15  for several -- for several checks as -- as -- as a

16  statement about the way business was being done.

17  Yes.

18      Q.   (By Ms. Lens)  You were paid by Marvel

19  regardless of whether you crossed the language off

20  on the back of the check, correct?

21      A.   The checks were cashed.

22          MR. TOBEROFF:  Objection -- excuse me.

23  Give me time to object.  Thank you.

24          Objection -- objection as to form.  Lacks

25  foundation.  Assumes facts.

Page 91

1  you know, this advertising thing that I talked

2  about and music.  Music and art became my life at

3  that point and that was the end of that -- of that

4  period forever.

5          I was never charged for -- with another

6  crime again because there weren't any, except maybe

7  my comic book work.

8          So that was the essence of -- that was

9  the essence of that period that -- that, you know,

10 that -- that I -- I discussed earlier.

11    Q.    Thank you.

12          There's one area of your testimony that

13 was not clear to me and that had to do with

14 language on the back of the checks.

15          Has -- has any of that -- can you clarify

16 that for -- what you recall for me please, in terms

17 of time period?

18          MS. LENS:  Objection to form.

19          THE DEPONENT:  Well, since we talked

20 about, you know, 20 minutes ago.  I've been trying

21 to -- trying to recollect more details about --

22 about the -- the situation with the checks that I

23 got from Marvel.

24          I'm not sure when those statements began

25 to appear on -- on the checks.  I don't remember

Page 92

1    the term "work for hire."   Particularly with --
2    particularly with the checks that I got in the
3    beginning of my Marvel tour, maybe -- maybe they
4    showed up at the end of -- at the end of my Marvel
5    situation there.   Maybe in the '70s sometimes.
6              But there was a caption typed on the back
7    that had to do with Marvel purchasing the rights to
8    the material that I had just created; and, of
9    course, in order to cash the check, I had to sign
10   it and most of the time I did exactly that.   I
11   signed where they wanted me to and -- and gave them
12   the rights to the work, sold them the rights to the
13   work.
14             There were times when I crossed that --
15   when I crossed that out because I thought I was, as
16   I mentioned earlier, bad business to make an
17   agreement after the work is done and used.
18             You know, the check would come in
19   following my submitting it to -- to the company.
20   And I thought that was -- I thought that was kind
21   of -- well, kind of slippery business to take
22   advantage of people who were not businessmen like
23   me and most of the other guys, Jack Kirby, Romita,
24   and so forth.
25             I'm sure we had the -- had the same thing

1   stamped -- stamped or typed on the back of our

2   checks.

3          But I did -- I did -- I did sign those

4   and -- and I think there was another document

5   sometime later in the '70s that -- that I -- that I

6   gave up rights to the material because they were

7   giving artwork back to -- to creators and that was

8   another source of income for me.  And that's about

9   -- and that's about all I can tell you at the

10  moment, Marc.

11         "Work for hire" -- "work for hire" that

12  phrase -- that phrase I don't remember being on,

13  particularly my early checks, but maybe later when

14  I did very few things for Marvel, you know, maybe

15  just like covers or, you know, some fill-in work or

16  whenever.

17      Q.   (By Mr. Toberoff)  When you started

18  working with Marvel that was in 1966?

19      A.   Yes, it was.

20      Q.   And in -- in -- in -- at that time in

21  1966, do you have a recollection as to how many

22  people were full-time employees of Marvel?

23         MS. LENS:  Objection to form.

24         THE DEPONENT:  I'm not sure who was an

25  employee of Marvel, except I believe Stan Lee told

```
 1              THE DEPONENT:  I never discussed that
 2    with Stan Lee, my boss.
 3         Q.   (By Ms. Lens)  When you worked for Marvel
 4    in the 1960s, Mr. Steranko, you believe that you
 5    were on a work for hire basis, correct?
 6              MR. TOBEROFF:  Asked and answered.
 7    Objection.  Calls for legal conclusion.  Objection
 8    as to form.
 9              THE DEPONENT:  I did not know the meaning
10    of "work for hire."  We never used that term.
11              As I -- as I saw the situation, I would
12    create the work in my studio, with my materials,
13    doing my own sketch work, background, writing, and
14    that work would belong to me until I cashed the
15    check.
16              So when I brought it into Marvel's
17    offices, they didn't own the work yet.  They hadn't
18    paid for it.  They hadn't commissioned it to me.
19    It was simply an option that they gave me.
20              And I availed myself of that option.  But
21    there was no discussions of "work for hire."  I
22    never even heard that term until much later, maybe
23    in the '70s.
24              MS. LENS:  Okay.  I'm going to move to
25    strike that answer as nonresponsive.
```