# Exhibit 24

                                                        Page 1

1                    UNITED STATES DISTRICT COURT
2               FOR THE SOUTHERN DISTRICT OF NEW YORK
3

4    _____)
                                     )
     MARVEL CHARACTERS, INC.,        )
5                 Plaintiff and      )
         Counterclaim-Defendant,     )
6       vs.                          )
     LAWRENCE D. LIEBER,             )No. 1:21-cv-7955-LAK
7             Defendant and          )and consolidated cases
              Counterclaimant.       )21-cv-7957-LAK and
8    _____)21-cv-7959-LAK
     MARVEL CHARACTERS, INC.         )
9                 Plaintiff and      )
         Counterclaim-Defendant,     )
10      Vs.                          )
     KEITH A. DETTWILER, in his      )
11   capacity as Executor of the     )
     Estate of Donald L. Heck,       )
12                Defendant and      )
              Counterclaimant.       )
13   _____)
     MARVEL CHARACTERS, INC.         )
14            Plaintiff and          )
         Counterclaim-Defendant,     )
15      Vs.                          )
     PATRICK S. DITKO, in his        )
16   capacity as Administrator of    )
     the Estate of Stephen J.        )
17   Ditko,                          )
                  Defendant and      )
18            Counterclaimant.       )
     _____)
19
                    VIDEOTAPED DEPOSITION OF
20                       PAUL LEVITZ
                    Los Angeles, California
21                  Friday, March 3, 2023
                        Volume I
22
23   Reported by:
     ALEXIS KAGAY
24   CSR No. 13795
25

Page 2

1                    UNITED STATES DISTRICT COURT
2                 FOR THE SOUTHERN DISTRICT OF NEW YORK
3
4    _____
                                     )
5    MARVEL CHARACTERS, INC.,        )
                     Plaintiff and   )
6         Counterclaim-Defendant,    )
         vs.                         )
7    LAWRENCE D. LIEBER,             )No. 1:21-cv-7955-LAK
               Defendant and        )and consolidated cases
8            Counterclaimant.        )21-cv-7957-LAK and
     _____)21-cv-7959-LAK
9    MARVEL CHARACTERS, INC.         )
                     Plaintiff and   )
10        Counterclaim-Defendant,    )
         Vs.                         )
11   KEITH A. DETTWILER, in his      )
     capacity as Executor of the    )
12   Estate of Donald L. Heck,       )
                     Defendant and   )
13           Counterclaimant.        )
     _____)
14   MARVEL CHARACTERS, INC.         )
                     Plaintiff and   )
15        Counterclaim-Defendant,    )
         Vs.                         )
16   PATRICK S. DITKO, in his        )
     capacity as Administrator of   )
17   the Estate of Stephen J.        )
     Ditko,                          )
18                   Defendant and   )
                 Counterclaimant.    )
19   _____)
20           Videotaped deposition of PAUL LEVITZ,
21   Volume I, at 1999 Avenue of the Stars, Los Angeles,
22   California, beginning at 9:38 a.m. and ending at 2:24
23   p.m., on Friday, March 3, 2023, before ALEXIS KAGAY,
24   Certified Shorthand Reporter No. 13795.
25   APPEARANCES:

Page 3

```
 1
 2    For Marvel Characters, Inc.:
 3        O'MELVENY & MYERS, LLP
 4        BY:  MOLLY M. LENS
 5        BY:  MATTHEW KAISER
 6        Attorney at Law
 7        1999 Avenue of the Stars
 8        8th Floor
 9        Los Angeles, California 90067
10        310.553.6700
11        Mlens@omm.com
12        Mkaiser@omm.com
13
14    For Patrick Ditko, executor of the Estate of Steve
15    Ditko, and Mark Ditko:
16        TOBEROFF & ASSOCIATES, P.C.
17        BY:  JAYMIE PARKKINEN
18        Attorney at Law
19        23823 Malibu Road
20        Suite 50-363
21        Malibu, California 90265
22
23    Videographer:
24        Jon Manuel
25
```

Page 14

1    rejected without being paid for.

2            At the other extreme, a piece of work, most

3    often typified by a cover, would be done

4    professionally, acceptably, paid for by the company,

5    but a decision would be made at one level of the

6    company, possibly above the person who had initially

7    commissioned the work, that it was not going to be used

8    for its intended purpose and it would be -- I'm using

9    air quotes -- rejected for that purpose, but it would

10   be paid for and probably ultimately used in some other

11   fashion by the company.

12       Q   Understood.  So -- but you agree that Marvel

13   had the right to reject it and had the right to not pay

14   for work that it did not want to use and did not

15   accept?

16       A   The custom and practice of the industry at the

17   time was that the editor had the right to reject

18   material that was not done professionally, and in that

19   instance, it would not be paid for.

20       Q   Okay.  So because the work that was rejected

21   completely would not be paid for, would you agree with

22   me, then, that compensation for freelance contributors

23   in the relevant period was not guaranteed?

24       A   No.

25           MS. LENS:  Objection.

1   some financial minority interest in them.  Whether they

2   were subsidiaries or affiliated in some other fashion,

3   I wouldn't have -- I wouldn't have the knowledge of.

4   BY MR. PARKKINEN:

5       Q    And did Marvel eventually get acquired by a

6   public company in the relevant period?

7       A    I believe Marvel was acquired by Perfect Film

8   & Chemical, again, approximately the same time, maybe

9   about a year later.  I believe Perfect Film & Chemical

10  was public.

11      Q    But prior to Perfect Film's acquisition of

12  Marvel, Marvel was not public.

13          MS. LENS:  Objection.

14  BY MR. PARKKINEN:

15      Q    Is that your understanding?

16          MS. LENS:  It's beyond the scope.

17          You can answer.

18          THE WITNESS:  I believe it was not.

19  BY MR. PARKKINEN:

20      Q    And you never freelanced or worked for Marvel

21  in the relevant period; is that right?

22      A    I did not.

23      Q    So is it true, then, that your understanding

24  of how Marvel operated in the relevant period is from

25  knowledge from people you spoke to or things that you

Page 49

```
 1              MS. LENS:  He's answered it three times.  He
 2      said, I do not rendering legal opinions.
 3              He's not rendering legal opinions.
 4              THE WITNESS:  I've answered the question, sir.
 5              MR. PARKKINEN:  And, Molly, I would just like
 6      to make sure that you keep your objections brief and to
 7      form.
 8              MS. LENS:  I think I am.  And I would just ask
 9      that you not keep asking the same question over and
10      over again when you've gotten a clear answer.
11              MR. PARKKINEN:  Because you know speaking
12      objections are improper; right?
13              MS. LENS:  I believe that I'm behaving myself
14      consistently with the rules, Jaymie.  Let's keep
15      moving.
16      BY MR. PARKKINEN:
17          Q   Has the subject of work for hire for
18      Vista Publications, Inc., from 1962 to 1968, ever been
19      the subject of any of your publications?
20          A   No.
21          Q   Do you know what Vista Publications, Inc., is?
22              MS. LENS:  Objection; outside the scope.
23              You can answer.
24              THE WITNESS:  I believe it was one of the
25      shell corporations that Martin Goodman used for
```

```
                                            Page 50

 1    publishing some of the Marvel comics.

 2    BY MR. PARKKINEN:

 3        Q    Do you know what Atlas Magazines, Inc., is?

 4             MS. LENS:  Beyond the scope.

 5             You can answer.

 6             THE WITNESS:  I don't know whether that was

 7    one that he used for publishing or whether it was one

 8    that he used for distribution.

 9             And did he use that again for the Seaboard

10    publications as a corporate name at some point?  I'm

11    not sure.

12    BY MR. PARKKINEN:

13        Q    Do you know what Canam Publishers Sales

14    Corporation is?

15             MS. LENS:  It's beyond the scope.

16             You can answer.

17             THE WITNESS:  Same answer as for Vista, a

18    shell corporation.  I forget which of the titles it was

19    attached to.

20    BY MR. PARKKINEN:

21        Q    And what about Non-Pareil Publishing Corp.?

22        A    Same answer.

23             MS. LENS:  Same objection.

24    BY MR. PARKKINEN:

25        Q    What about Magazine Management Company?
```

1           MS. LENS:  Same objection.

2           THE WITNESS:  I believe Magazine Management

3    Company was the holding company that Goodman used for

4    most of his entities in the relevant time period.

5    BY MR. PARKKINEN:

6       Q    So your understanding is that

7    Magazine Management Company was the umbrella company

8    for the Vistas and the Atlases we just talked about?

9           MS. LENS:  It's beyond the scope.

10          You can answer.

11          THE WITNESS:  I have no idea whether -- how

12   the corporate chain was organized.  Magazine Management

13   appeared to be the parent company of all of Goodman's

14   efforts, as well as his slick magazine operations.

15   BY MR. PARKKINEN:

16      Q    What gave that appearances to you?

17      A    The name on the directory of the building.

18   The way it was communicated around the office.

19      Q    Did you ever visit Vista's offices?

20          MS. LENS:  Objection to form.  It's beyond the

21   scope.

22          You can answer.

23          THE WITNESS:  I visited the office of

24   Marvel Comics repeatedly.  I don't believe that there

25   was ever a separate office for Vista or any of the

```
                                                    Page 52

1    other entities you've mentioned, other than

2    Magazine Management.

3    BY MR. PARKKINEN:

4        Q   Now, you had mentioned that the first time you

5    physically visited a Marvel office was in 1971; is that

6    right?

7        A   I believe that's correct.

8        Q   And Martin Goodman, are -- you're aware --

9    strike that.

10           And you're aware that Martin Goodman sold

11   Magazine Management Company, his shell companies, to

12   Perfect Film in approximately 1968; is that right?

13       A   It sounds correct.

14           MS. LENS:  Objection; outside the scope.

15           You can answer.

16   BY MR. PARKKINEN:

17       Q   So is it true that you never visited

18   Magazine Management Company's offices because it had

19   been sold already to Perfect Film in 1968?

20           MS. LENS:  Misstates the record.

21           You can --

22           It's beyond the scope.

23           You can answer.

24           THE WITNESS:  The offices were still labeled

25   "Magazine Management" when I was there.
```

1    BY MR. PARKKINEN:

2        Q    What about for publishers other than DC?

3        A    I don't think I -- written -- written

4    agreements were so uncommon in the industry between

5    roughly 1945 and 1978 that I don't believe I saw

6    anything prior to the agreements in the mid-'70s that

7    Marvel used for their -- their -- their contract

8    employees.

9        Q    Do you know why there are no written contracts

10    in this -- essentially, the entire relevant time

11    period?

12            MS. LENS:  Objection; outside the scope.

13    Objection to form.

14            THE WITNESS:  My belief is that the publishers

15    did not feel they were required.

16    BY MR. PARKKINEN:

17        Q    And when you were writing freelance at DC in

18    the 1970s, what was that writing process like?

19            MS. LENS:  Objection; overly broad.

20            You can answer.

21            THE WITNESS:  I would get an assignment from

22    an editor.  I would offer up a plot idea in -- either

23    verbally or in writing, depending on the editor and the

24    length of the material being asked for.

25            Depending on the editor and the project and

```
                                                      Page 89
 1   tell it.  Someone will buy it somewhere.

 2        Q    And freelancers, in the period, could decline

 3   assignments; right?

 4             MS. LENS:  Objection; asked and answered.

 5             You can answer.

 6             THE WITNESS:  If you're asking the question as

 7   to the custom and practice in the comic book industry,

 8   in the relevant time period, freelancers could decline

 9   assignments.  They very rarely did because that's how

10   they made a living, and assignments were the necessary

11   life blood.

12   BY MR. PARKKINEN:

13        Q    How long would it take to -- I have to give

14   you some parameters.  Strike that.

15             In the period, how long would it take for an

16   artist working Marvel style to draw enough pages to

17   fill the comic book story?

18             MS. LENS:  Objection.  It's overly broad.

19   It's vague.

20             THE WITNESS:  It's a radical range between

21   artists.  Jack Kirby and Steve Ditko were probably the

22   fastest artists working for Marvel at that time and

23   were probably capable of doing perhaps five or

24   six pages a day.

25             A more typical artist -- of pencils.
```

```
                                      Page 97
 1              book publishers acted uniformly in
 2              ways that established that — from
 3              inception — they held copyrights to
 4              published works well before the
 5              Relevant Time Period."
 6              Did I read that correctly?
 7       A    Yes.
 8       Q    So when you're talking about that moment of
 9   inception, what are you talking about?
10       A    The inception of the comic book industry.
11       Q    So not from the inception of the creation of
12   any work, you're talking about the inception of a
13   specific time period?
14       A    Correct.
15       Q    Thank you.
16              Now, once Marvel paid for the pages
17   freelancers submitted to them -- strike that.
18              Once Marvel paid for the pages of freelance
19   material submitted to it, Marvel could do whatever it
20   wanted with those pages afterward; correct?
21              MS. LENS:  Objection to form.
22              THE WITNESS:  I would define it as once an
23   assignment was delivered to Marvel and paid for,
24   accepted and paid for, Marvel could do whatever they
25   wanted to alter the pages and often did.
```

1  on a book.  I don't think it's humanly possible to lose

2  $200 million on a television program.

3          But you could certainly lose more money on a

4  comic book than you could on an issue of Entertainment

5  Weekly.

6      Q   How much did Marvel pay you for your

7  Avengers: War Across Time work?

8      A   So it's roughly -- roughly $12,000, $13,000.

9      Q   Is there any outstanding balance, or is it all

10  paid up?

11      A   I haven't gotten the last check yet because I

12  just turned in the last piece.  Spent most of it on

13  buying some of the original art from the artist.

14      Q   Which one?

15      A   Alan Davis.

16      Q   Now, moving to talk about freelance

17  contributors, what was the financial risk or -- or any

18  risk that the freelance contributors risked?

19          MS. LENS:  Objection to form.

20          THE WITNESS:  If you're speaking in the

21  relevant time period, of the probably 200 or so active,

22  regular freelance contributors to the mainstream

23  publishers, the contributors took essentially no risk.

24          The maximum risk that most of them would take

25  is that they would be asked to revise the work enough

1    that they might lose some hours of work.

2              If you're talking about someone who had not

3    previously been published by a particular company or

4    maybe not been published anywhere at all previously,

5    then they certainly had a risk that they might have an

6    assignment completely rejected and not get paid, but

7    that was only true at the very, very beginning of

8    people's working relationship with any specific

9    company, because you wouldn't get invited back.  Or

10   maybe you would get invited back once -- once or twice.

11   And if you flunked out twice, who the hell needs you.

12   BY MR. PARKKINEN:

13       Q    Fair enough.

14            Would that then mean that more experienced

15   artists bore less risk than newer artists?

16       A    Absolutely.

17       Q    And those extra hours to make the changes that

18   had been requested, would those be compensated extra

19   hours?

20       A    That was within -- that was part of what you

21   were being paid for.  You were being paid for the pages

22   being acceptable to the editorial control and

23   principals.

24       Q    Can you, in the relevant time period, think of

25   any example of a comic book that had been submitted on

1    spec, that somebody just came to a publisher with a

2    more or less completed piece?

3              MR. PARKKINEN:  Outside the scope.

4              You can answer.

5              THE WITNESS:  A completed comic book?

6    BY MR. PARKKINEN:

7        Q    Well, something that, you know, was drawn and

8    basically had all the components.  Maybe it wasn't

9    inked or it wasn't colored or lettered and that wasn't

10   fully printed yet, but it was -- the creative process

11   had been completed.

12       A    No.

13             MS. LENS:  Same objection.  And it's an

14   incomplete hypothetical, but he's answered, so...

15   BY MR. PARKKINEN:

16       Q    In the time period we're discussing, when was

17   the first time you remember hearing the term "work for

18   hire" or "work made for hire"?

19             MS. LENS:  Outside the scope.

20             You can answer.

21             THE WITNESS:  I don't have a clear memory of

22   the specific time.  I would guess that it would be 1974

23   or 1975.

24   BY MR. PARKKINEN:

25       Q    And in what context had you heard that term in

Page 107

1    '74 or '75?

2              MS. LENS:  Same objection.

3              You can answer.

4              THE WITNESS:  I don't remember specifically.

5              It began -- it began to be part of the

6    language of discussion within the field in the -- as

7    the new copyright act was -- was coming in.

8    BY MR. PARKKINEN:

9         Q    What was the discussion in the field?

10             MS. LENS:  It's overly broad.  It's beyond the

11   scope.

12             You can answer.

13             THE WITNESS:  In the late '60s and the early

14   1970s, there was significant frustration among the

15   freelance contributor community as to their income,

16   their economic status in the world.  There was no

17   discussion about the rights structure of the business.

18             As the new copyright law began to come into

19   place, the term "work for hire" became part of the

20   discussion of what is not -- what is not -- what is not

21   wonderful for us.

22   BY MR. PARKKINEN:

23        Q    And in and around 1978, '79 and '80, there was

24   a -- somewhat of an exodus of artists from Marvel to

25   DC; is that right?

1      Q   So DC had checks from the mid-1950s?

2      A   I believe so.

3      Q   And the 1960s?

4      A   (No audible response.)

5      Q   Okay.  And did you see those checks,

6   physically, or did you --

7      A   I --

8      Q   -- just hear about them?

9      A   No, I saw old checks.  I -- I can't remember

10   exactly how old the checks were that I saw.

11      Q   Why did DC hold on to checks from so long ago?

12          MS. LENS:  Objection; outside the scope.

13   Objection to the extent that it calls for speculation

14   or lacks foundation.

15          THE WITNESS:  DC had record retention policies

16   that I assume were evolved in consultation with the

17   legal counsel for the company, the generally accepted

18   accounting principles at the time.

19   BY MR. PARKKINEN:

20      Q   Do you know if Marvel had any comparable

21   document retention policies?

22      A   I would be surprised if Marvel had any

23   competent policies on document retention at any point.

24      Q   Why is that?

25          MS. LENS:  Objection; outside the scope.

1          THE WITNESS:  My impression of Marvel's

2    ability to track their documents, even the published

3    copies of their comics, is that they utterly inadequate

4    to the standards that I was used to.

5    BY MR. PARKKINEN:

6        Q   How much time did you spend writing the

7    rebuttal report, approximately?

8        A   I -- I don't remember specifically.  I

9    would -- if I had to guess, between five and ten hours,

10   maybe less.

11       Q   What was your process in rebutting Evanier's

12   report?

13          I imagine you received a copy of Evanier's

14   report, read it.  And then what did you do?

15          MS. LENS:  If you're asking him his

16   methodology, I think that's within the bounds.  But if

17   you're asking him his drafting process, I believe

18   that's outside of the bounds.

19          Do you want to clarify your question?

20          MR. PARKKINEN:  Let's start with methodology.

21          THE WITNESS:  I tried to identify the issues

22   that should be rebutted and then tried to figure out

23   the best -- the best way to make my argument on them.

24   BY MR. PARKKINEN:

25       Q   Do you recall which issues you thought needed

Page 123

```
 1   with respect to copyright law?
 2              MS. LENS:  Objection to the extent it calls
 3   for a legal conclusion.
 4              You can answer.
 5              THE WITNESS:  I have, at best, a laymen's
 6   knowledge about it.
 7   BY MR. PARKKINEN:
 8        Q    What's your laymen's knowledge about it?
 9        A    That a work that exists and is copyrighted is
10   transferred from one party to another.
11        Q    Now, you said that you would consider yourself
12   an expert on Steve Ditko's working conditions,
13   freelance working conditions, at Marvel between 1962
14   and 1966; is that right?
15        A    Sounds right.
16        Q    Do you know whether Steve Ditko did his
17   creative work in the Marvel offices or somewhere else?
18        A    I believe Steve always did his art in his own
19   studio.
20        Q    Did you ever speak with Mr. Ditko about the
21   Doctor Strange character?
22        A    Probably, to some extent, along the way, a
23   conversation.  I can remem- -- I can certainly remember
24   the name being mentioned in our conversations.
25        Q    What did Steve Ditko tell you about his
```

1    time -- his work at Marvel between 1962 and 1966?

2        A    I can't recall with -- with any accuracy,

3    detail, of what he conveyed in any particular

4    conversation in that time.

5        Q    Were you aware that he and Stan Lee were not

6    on speaking terms for some of that time?

7            MS. LENS:  Objection to form.

8            THE WITNESS:  I'm -- I'm aware that for, I

9    think, the last year or so, they were not on speaking

10   terms.

11   BY MR. PARKKINEN:

12       Q    Do you have any understanding of why that was?

13           MS. LENS:  Objection; outside the scope.

14           You can answer.

15           THE WITNESS:  I think there was ample

16   discomfort between the two on their working process and

17   the allocation of credit on work.

18   BY MR. PARKKINEN:

19       Q    What was that disagreement about?  Do you

20   know?

21           MS. LENS:  Same objections, outside the scope.

22           THE WITNESS:  My impression was that Steve

23   felt he was not getting adequate credit and Stan was

24   getting more credit than was deserved.

25   ///

1  about Mark's appearances on a program and -- whether

2  that's the Biography or the With Great Power.  I do

3  know that Mark worked with Stan at Stan Lee Media.  I

4  will certainly take his word for it that his title was

5  vice president of creative affairs, though I have no

6  independent knowledge of that.

7  BY MR. PARKKINEN:

8      Q   Let me ask this, jumping to page 7 --

9      A   But you're letting me miss out on dissecting

10 the next 20 pages.

11     Q   Oh, well, you should have already done that

12 before you wrote your rebuttal report.

13         MS. LENS:  Jaymie, let's not be rude, shall

14 we.

15 BY MR. PARKKINEN:

16     Q   The comic book business was extremely

17 volatile, under V(a)1.

18         Would you agree with that, the comic book

19 business was extremely volatile, at least in the

20 relevant period, should we say?

21     A   No.

22     Q   No?  Did -- what about in the 1950s?

23         MS. LENS:  Outside the scope.

24         You can answer.

25         THE WITNESS:  The comic book industry had a

Page 139

1    very rough time in the mid to late 1950s.  I don't know

2    that I would use the word "volatile" for it, but it was

3    definitely a very difficult business time, on a number

4    of levels.

5    BY MR. PARKKINEN:

6        Q    Why was it difficult?

7             MS. LENS:  Outside the scope.

8             You can answer.

9             THE WITNESS:  One of the major distributors

10   servicing the magazine distribution industry,

11   American News, went out of business precipitously.  As

12   distributors are the primary funding source, in terms

13   of cash flow for the industry, that damaged many of the

14   publishers.

15            At the same time, America was experiencing

16   what is known as either a Comstock panic or a media

17   panic, named after a man named Anthony Comstock who in

18   the late 19th century, as a postmaster in America,

19   noticed that information about birth control was being

20   sent through the mails and felt that this was causing

21   the decline of morality in America and started a -- a

22   public panic about it.

23            This kind of repetitive moral panic has

24   occurred around virtually every media form that we've

25   ever had in America, at different times, movies,

1   television, rock and roll, video games and more -- hip

2   hop music in more recent times.

3           In the 1950s, this was affecting comics, and

4   you had book burnings of comics and laws being passed

5   restricting certain kinds of comics and a great --

6   great deal of potential damage to the industry and some

7   actual damage.

8   BY MR. PARKKINEN:

9       Q   And in the 1950s, were publishers looking to

10  cut costs?

11          MS. LENS:  Objection to -- outside the scope.

12          THE WITNESS:  For the most part, cutting costs

13  has never been an enormously important element within

14  the comic book industry compared to many other

15  industries.  There are relatively few variable costs.

16          There were periods in the 19- -- late 1940s

17  and through the 1950s where publishers occasionally cut

18  the page rates paid to artists because sales were less

19  successful than they had previously been.  So in that

20  sense, they did -- they took steps that reduced that

21  particular cost.

22          Page counts of some of the comics were reduced

23  and the price -- when the price was being maintained,

24  but it is not -- as opposed to say modern media, where

25  you'll have a Disney announcing that they're going to