# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARVEL CHARACTERS, INC., | Case No.: 1:21-cv-7957-LAK |
| Plaintiff, | Hon. Lewis A. Kaplan |
| v. | **MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT BY DEFENDANT AND COUNTERCLAIMANT PATRICK S. DITKO** |
| PATRICK S. DITKO, in his capacity as Administrator of the Estate of Stephen J. Ditko, | |
| Defendant. | |
| PATRICK S. DITKO, in his capacity as Administrator of the Estate of Stephen J. Ditko, | Oral Argument Requested |
| Counterclaimant, | |
| v. | |
| MARVEL CHARACTERS, INC. and DOES 1-10, inclusive, | |
| Counterclaim-Defendants. | |

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ...........................................................................................1

THE COPYRIGHT TERMINATION REGIME...............................................................2

THE INSTANCE AND EXPENSE TEST .......................................................................2

THE UNDISPUTED FACTS ............................................................................................5

    A.    Marvel's Owner And Editors Controlled Marvel's Creative Process. ..................5

    B.    Steve Ditko Worked On Assignment Under Stan Lee's Control. .........................7

    C.    Marvel Paid Ditko By The Page And Assumed The Financial Risk For Its Comic Books. .............................................................................................................. 9

    D.    Ditko's Work On Doctor Strange And Spider-Man Illustrates That He Worked At Marvel's Instance and Expense. ......................................................... 10

    E.    Frustrated With The Constraints On His Creative Process And Output, Ditko Left Marvel. ................................................................................................. 13

    F.    Defendant Served Termination Notices On MCI, Seeking To Uproot MCI's Rights In And To The Works. ................................................................................. 14

ARGUMENT .................................................................................................................15

    A.    Ditko Worked At Marvel's Instance And Expense.. ............................................. 15

    B.    The Best Examples Of Ditko's Independence That Defendant Can Muster Still Fall Firmly Within The Instance And Expense Framework... .............................. 24

    C.    Marvel's Corporate Structure Does Not Bear On The Instance And Expense Analysis.................................................................................................................. 30

    D.    Under The 1909 Copyright Act, The Instance And Expense Test Applies To Independent Contractors—Including Those Who Worked Before Courts Clarified That Legal Precept.. .............................................................................................. 35

CONCLUSION................................................................................................................36

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Archie Comic Publications, Inc. v. DeCarlo*,
258 F. Supp. 2d 315 (S.D.N.Y. 2003) ................................................................................. 30

*Buday v. New York Yankees P'ship*,
2011 WL 13176013 (S.D.N.Y. Oct. 20, 2011) .................................................................... 17

*Est. of Burne Hogarth v. Edgar Rice Burroughs, Inc.*,
342 F.3d 149 (2d Cir. 2003) ......................................................................................... 32, 33

*Est. of Burne Hogarth v. Edgar Rice Burroughs, Inc.*,
342 F.3d 149 (2d Cir. 2003) ............................................................................................... 3

*Harper & Row Publishers, Inc. v. Nation Enterprises*,
471 U.S. 539, 105 S. Ct. 2218 (1984) ............................................................................... 17

*In re Marvel Ent. Grp., Inc.*,
254 B.R. 817 (D. Del. 2000) ........................................................................................ 15, 26

*M.G.B. Homes, Inc. v. Ameron Homes, Inc.*,
903 F.2d 1486 (11th Cir. 1990) ......................................................................................... 3

*Markham Concepts, Inc. v. Hasbro, Inc.*,
1 F.4th 74 (1st Cir. 2021), *cert. denied*, 142 S. Ct. 1414 (2022) ....................................... 3, 36

*Markham Concepts, Inc. v. Hasbro, Inc.*,
142 S. Ct. 1414 (2022) ....................................................................................................... 3

*Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemp.
Dance, Inc.*,
380 F.3d 624 (2d Cir. 2004) ............................................................................................ 2, 4

*Marvel Characters, Inc. v. Kirby*,
726 F.3d 119 (2d Cir. 2013) ....................................................................................... passim

*Marvel Worldwide, Inc. v. Kirby*,
777 F. Supp. 2d 720 (S.D.N.Y. 2011) ................................................................................ 15

*National Comics Publications v. Fawcett Publications*,
191 F.2d 594 (2d Cir. 1951) .............................................................................................. 30

*Niss v. Columbia Pictures Indus., Inc.*,
2000 WL 1862814 (S.D.N.Y. Dec. 20, 2000), *aff'd*, 25 F. App'x 76 (2d Cir.
2002) ............................................................................................................................ 27, 33

*Picture Music, Inc. v. Bourne, Inc.*,
314 F. Supp. 640 (S.D.N.Y. 1970) .................................................................................... 32

*Picture Music, Inc. v. Bourne, Inc.*,
 457 F.2d 1213 (2d Cir. 1972) ................................................................. 32

*Playboy Enters., Inc. v. Dumas*,
 53 F.3d 549 (2d Cir. 1995) ............................................................. passim

*Siegel v. National Periodical Publications, Inc.*,
 508 F.2d 909 (2d Cir. 1974) ................................................................. 27

*Twentieth Century Fox Film Corp. v. Dastar Corp.*,
 2000 WL 35503105 (C.D. Cal. Jan. 4, 2000) ....................................... 32

*Twentieth Century Fox Film Corp. v. Entm't Distrib.*,
 429 F.3d 869 (9th Cir. 2005) ...................................................... 3, 33, 36

*Waite v. UMG Recordings, Inc.*,
 450 F. Supp. 3d 430 (S.D.N.Y. 2020) .................................................. 34

**Statutes**

17 U.S.C. § 304(c) .................................................................................... 2

17 U.S.C. § 304(c)(3) .............................................................................. 13

17 U.S.C. § 304(c)(4)(A) ........................................................................ 13

## PRELIMINARY STATEMENT

Defendant seeks to litigate this case from a blank slate, as if it presented issues of first impression for this Court's consideration.  That is willed blindness.  This case is essentially a replay of a previous suit between Marvel[1] and the heirs of artist Jack Kirby, where this Court granted and the Second Circuit upheld summary judgment for Marvel that Kirby's works were all produced for Marvel as works made for hire.[2]  If anything, the facts here even more clearly establish work-for-hire status.  The Court should deny the motion of Ditko's estate for summary judgment and should grant MCI's cross-motion.

The parties agree on the basic parameters of the dispute: (1) the validity of Defendant's termination notices hinges on whether the works at issue were made for hire; and (2) the controlling test for a work's made-for-hire status is whether it was made at the hiring party's "instance and expense."  The evidence permits only one answer:  Like Kirby, Ditko worked at Marvel's instance and expense when he contributed to Marvel's comic books, and thus his estate cannot divest Marvel of its copyright ownership.  Ditko's contributions—like Kirby's—were made at Marvel's direction and under its supervision, pursuant to a longstanding working relationship.  Marvel assigned the freelance talent, determining who would script, pencil, ink, letter, and color each book.  As with its other creators, Marvel paid Ditko a fixed per-page compensation rate.  And ultimately, it was Marvel that bore the financial risk of whether a comic book made or lost money.

Remarkably, Defendant barely mentions *Kirby* in his brief, even though that case concerned application of essentially the same facts, during the same time period, to the identical

---

[1] As the term is used herein, "Marvel" refers to Plaintiff Marvel Characters, Inc. ("MCI") and its predecessors and affiliates.

[2] Defendant is represented by the same counsel as the Kirby Heirs.

legal framework.  Defendant likewise advances one argument after another that is squarely

foreclosed by Second Circuit authority, often recycling the very same arguments presented and

rejected in *Kirby*.  Ultimately Defendant does little more than complain about the Second

Circuit's work-for-hire jurisprudence.  But he cannot escape it.  *Kirby* and other precedents

compel summary judgment for Marvel.

## THE COPYRIGHT TERMINATION REGIME

Under Section 304(c) of the 1976 Copyright Act, authors or specified heirs can terminate

prior "grants" of domestic copyrights made for pre-1978 works under limited circumstances.  17

U.S.C. § 304(c).  The copyright in a work "made for hire," however, is not eligible for

termination.  *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 137 (2d Cir. 2013); *see also* 17

U.S.C. § 304(c) (limiting the statutory termination right to copyrights "other than a copyright in a

work made for hire").  When it is determined that a work is made for hire, the hiring party is

conclusively deemed to be the "author" of the work, even though the artist or "hired party" might

be described as "the 'author' in the colloquial sense."  *Kirby*, 726 F.3d at 137; *see also Martha

Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemp. Dance, Inc.*, 380 F.3d

624, 634 (2d Cir. 2004).  As a result, the hired party "never owned the copyrights" in the first

place.  *Kirby*, 726 F.3d at 137.

## THE INSTANCE AND EXPENSE TEST

The Copyright Act of 1909 governs whether pre-1978 works, like those at issue here,

constitute works made for hire (and thus fall outside the termination regime).  *Id.*  For decades,

the Second Circuit has applied the "instance and expense test" to determine whether a work was

made for hire under the 1909 Act.  *See id.*; *Martha Graham*, 380 F.3d at 634-35; *Playboy

Enters., Inc. v. Dumas*, 53 F.3d 549, 554 (2d Cir. 1995).  So has every other circuit to address the

matter.  *See, e.g., Markham Concepts, Inc. v. Hasbro, Inc.*, 1 F.4th 74, 83 (1st Cir. 2021), *cert.*

*denied*, 142 S. Ct. 1414 (2022); *Twentieth Century Fox Film Corp. v. Entm't Distrib*., 429 F.3d 869, 878 (9th Cir. 2005), *abrogated on other grounds by Rimini St., Inc. v. Oracle USA, Inc*., 139 S. Ct. 873 (2019).[3]  Defendant himself agrees "that this Court must apply the 'instance and expense test,'" Mem. at 12, despite the various complaints about the test in his oversize brief.

A work is created at an employer's "instance and expense" when the "motivating factor in producing the work was the employer who induced the creation." *Playboy Enters.*, 53 F.3d at 554.  The same analysis applies whether the artist is an "employee" or an "independent contractor"—the sole issue is whether the work was created at the hiring party's "instance and expense." *Est. of Burne Hogarth v. Edgar Rice Burroughs, Inc*., 342 F.3d 149, 156, 163 (2d Cir. 2003); *Kirby*, 726 F.3d at 124-26 (holding that Kirby worked "for hire" even though he "was a freelancer, i.e., he was not a formal employee of Marvel").  And the instance and expense test is satisfied if the hiring party "induces the creation of the work and has the right to direct and supervise the manner in which the work is carried out." *Kirby*, 726 F.3d at 139.

*Instance* refers to "the extent to which the hiring party provided the impetus for, participated in, or had the power to supervise the creation of the work." *Id*.  "Actual creative contributions or direction" by an employer "strongly suggest that the work [was] made at the hiring party's instance." *Id*.  In addition, the employer's "power to reject" and to require a

---

[3] Defendant incorrectly asserts that the Eleventh Circuit's decision in *M.G.B. Homes, Inc. v. Ameron Homes, Inc*., 903 F.2d 1486 (11th Cir. 1990), deviates from this consensus.  (Mem. at 10.)  It does not.  *M.G.B.* stands only for the uncontroversial proposition that the instance and expense test does not apply to works governed by the *1976* Act.  903 F.2d at 1489-92.  Indeed, Defendant has a habit of wrongly relying on 1976 Act jurisprudence in the discrete 1909 Act context, *e.g.*, *infra* note 13.

Moreover, the Supreme Court has shown no interest in disrupting the uniformity of circuit decisions on application of the instance and expense test to works governed by the 1909 Act, denying review as recently as last year in *Markham Concepts, Inc. v. Hasbro, Inc.*, 142 S. Ct. 1414 (2022).  (Defendant filed an amicus brief in *Markham Concepts*, urging the Court to overturn the instance and expense test.)

"redo" or alteration of work—"a power it exercise[s] from time to time"—supports a finding that the work was created at the hiring party's instance. *Id.* at 141. And while the right to "direct and supervise" is relevant, *Playboy Enters.*, 53 F.3d at 554, the "instance" prong can be satisfied even when that right is not actually exercised, *Kirby*, 726 F.3d at 139 (explaining that "prior dealings between the parties on similar assignments, as part of an ongoing arrangement" may have rendered employer's "fine-grained supervision unnecessary").

That an artist is a "self-motivator" who holds "remarkable sway" over the hiring party's decisions is "beside the point" under the instance and expense test. *Martha Graham*, 380 F.3d at 640. So too is the artist's "ingenuity and acumen." *Kirby*, 726 F.3d at 142. After all, these very traits are bound to be "a substantial reason for the hiring party to have enlisted him" in the first place. *Id*.

*Expense* refers to the "resources the hiring party invests in the creation of the work." *Id.* at 139. When the hiring party "pays an independent contractor a sum certain for his or her work," that arrangement favors satisfaction of the expense prong. *Playboy Enters.*, 53 F.3d at 555. By contrast, "where the creator of a work receives royalties as payment, that method of payment generally weighs against finding a work-for-hire relationship." *Id*. The expense prong also includes factors such as who bore the financial risk of creation and what monetary and non-monetary resources the hiring party invested. In *Kirby*, the Second Circuit concluded that "payment of a flat rate and [] contribution of both creative and production value" by the hiring party was "enough to satisfy the expense requirement." 726 F.3d at 143.

When the instance and expense test is satisfied, the work is presumed to have been made for hire. *Playboy Enters.*, 53 F.3d at 554. To rebut that presumption, the artist or heirs must "demonstrate by a preponderance of the evidence" the parties at the time entered into "a contrary

agreement" that the parties "intended a relationship other than work for hire." *Id.* at 554-55, 557. Any such contrary agreement must be "contemporaneous with the creation of the works." *Kirby*, 726 F.3d at 143.

## THE UNDISPUTED FACTS

The Notices are directed at Works that Marvel published from 1962 to 1966. (MCI's Statement of Undisputed Facts ("SUF"), Dkt. 69 ¶¶ 3, 8.)[4] The Works include the early appearances of such now-iconic characters as Spider-Man and Doctor Strange. (SUF ¶¶ 8, 33, 44.)

Promptly after each of the Works was created, Marvel filed copyright registrations for the Works with the U.S. Copyright Office. (SUF ¶ 5.) Marvel likewise filed renewal copyright registrations for each Work with the Copyright Office, with each Work identified as a work made for hire and Marvel as its author.[5] (SUF ¶ 6.) The express designation of the Works as made for hire is consistent with the undisputed facts concerning the creation of the Works, as follows.

### A.    Marvel's Owner And Editors Controlled Marvel's Creative Process.

Marvel owner and publisher Martin Goodman and editor-in-chief Stan Lee oversaw and controlled the creation of Marvel's comic books from conception through distribution for the time period relevant to Defendant's claims until 1972 when Stan Lee was promoted to publisher

---

[4] The same facts that demonstrate why MCI's motion for summary judgment should be granted also demonstrate why Defendant's mirror-image motion should be denied. Therefore, MCI includes the same factual background in both of its legal memoranda.

[5] The Copyright Office's renewal registration form included a new field for a "statement of claim" by the renewal claimant—*i.e.*, the basis for the registrant's claim of rights in the work—which did not exist on the standardized form for initial registrants for the class of works at issue at the time the Works were registered. It also contained a new field for identification of the author.

and Roy Thomas replaced him as editor-in-chief.  (SUF ¶¶ 9-30.)  As publisher, Goodman was the "ultimate boss."  (SUF ¶¶ 22, 30; Ex. 13 to Lens Decl.,[6] Stan Lee *Kirby* Dep. Tr. 18:17-19:17.)  He approved Marvel's comic book issues before they were published, and sometimes nudged Marvel's series in one direction or another to try to boost the company's competitiveness in the market.  (SUF ¶¶ 22, 30.)  If a comic book did not sell well, Goodman bore the loss, and it was up to him to decide whether to cancel a series.  (SUF ¶¶ 22, 52.)

While Goodman oversaw the business at a high level, editors Stan Lee, and later Roy Thomas, supervised the day-to-day operations.  (SUF ¶¶ 9-22.)  As editor, Stan Lee was responsible for overseeing the creative direction and all other aspects of Marvel's comic books, characters, and stories.  (SUF ¶¶ 10, 12-30, 32-35, 38, 40-42.)  Stan Lee would seed new ideas, supervise the creation process, and manage the contributors who would help bring the comic book issues to life.  (SUF ¶¶ 12-30, 32-35, 38, 40-42.)  Stan Lee would also assign writers and artists—including Steve Ditko—to contribute to specific Marvel comic books and would re-assign artists and writers to different projects as he saw fit.  (SUF ¶¶ 23, 32-33, 41-42.)  Work for Marvel was done pursuant to job assignments from Marvel; during the relevant time period, Marvel did not solicit or accept work "on spec."  (SUF ¶¶ 23, 32-33, 41-42, 48.)

Not only did Stan Lee help manage the big picture of Marvel's business operation, but also he was deeply involved in the details of story after story.  Stan Lee had primary responsibility to formulate the main character and story ideas.  (SUF ¶¶ 13, 24, 40.)  From there, he would typically give an artist or writer (when Lee was not himself writing the script) a synopsis from which to draw panels or write out the narrative.  (SUF ¶¶ 12-14, 24-25.)

---

[6] Except where otherwise noted, all exhibit references denote exhibits to the Declarations of Molly M. Lens—the first of which was filed with MCI's affirmative motion at docket entry 71 and the second of which is filed concurrently herewith.

Under the Marvel Method, the artist (called a "penciller") would begin drawing directly from Lee's plot, with the accompanying captions and dialogue to come later.  (SUF ¶¶ 12-14, 24-25.)  While story and character ideas typically came from Marvel through Lee, part of a contributor's assignment on ongoing series was to propose new characters, plot elements, and other details.  (SUF ¶¶ 13, 24-25.)  Marvel's editors, though, had ultimate discretion on whether and how to include those characters or plot elements.  (SUF ¶¶ 25, 29-30.)  And they could demand edits to contributors' work product as desired.  (SUF ¶¶ 28-30.)

Once the writing and artwork were finalized in pencil, Marvel assigned a letterer who lettered the captions and dialogue, and an inker who went over the pencil drawings in ink.  (SUF ¶¶ 16-17, 22.)  Marvel sent these pages to an engraver, then to a colorist, and finally to the printer.  (SUF ¶¶ 16, 18-19, 22, 26.)

Marvel had to reserve print times in advance, so it kept the various contributors to a tight schedule.  (SUF ¶¶ 21-22.)  If contributors missed their deadlines, Marvel lost its print slot but had to pay regardless, and therefore lost money.  (SUF ¶¶ 21-22.)  Marvel's editors and production manager coordinated among the many contributors to turn their isolated contributions into a cohesive saleable work.  (SUF ¶¶ 16-19, 21-22.)  In contrast, Marvel's freelance contributors—like Ditko—seldom communicated among one another, and indeed often did not even know who would come next in the creation process.  (SUF ¶ 20.)

**B.    Steve Ditko Worked On Assignment Under Stan Lee's Control.**

Steve Ditko worked as a freelancer for Marvel when he made his contributions to the Works.  (SUF ¶¶ 2, 23; Ex. 54 at 4.)  He worked extensively for Marvel from 1955 to 1965,

including a stretch from 1963 to 1965 during which he worked nearly exclusively for Marvel.[7]

(SUF ¶¶ 2, 45.)  Like his peers, Ditko worked on assignment from Marvel and under Stan Lee's

supervision and direction.  (SUF ¶¶ 14, 22-30, 33-35, 38, 41-42.)  Lee typically provided Ditko

with a synopsis for a story, from which Ditko would illustrate panels in greater detail.  (SUF ¶¶

13-14, 23-24, 40-41.)  After Ditko had the chance to read the synopsis, Lee and Ditko often

would go over it together to provide any clarification, consider further plot points, and so forth.

(SUF ¶¶ 15, 26.)  Then Ditko would start drawing.  (SUF ¶¶ 14-15.)

      Ditko was accorded some creative freedom in how Lee's story would manifest on paper,

but Lee maintained ultimate control over the pages.  As Ditko himself explained, once Ditko had

work to show, he and Lee "would go over the penciled story/art pages" together and, with Lee's

consult, implement edits as needed.  (SUF ¶¶ 15, 26, 28; Ex. 48 at 2.)  Lee's requested edits

could get quite granular—like replacing waffles with pancakes in a breakfast scene, or adjusting

the placement of a character's hand.  (SUF ¶¶ 26, 28; Ex. 29 at 3-4.)  Others were more

significant, like reimagining a cover to depict Spider-Man leaping across a villain and off the

page instead of leaping towards the villain.  (SUF ¶¶ 26, 28; Ex. 53 at 3.)  Ditko could disagree

with Stan Lee's editorial decisions, but ultimately Lee had the final say.  (SUF ¶¶ 29-30; Ex. 54

at 4.)  Of course, Marvel could also go a step further and decide not to publish Ditko's pages

altogether, but Marvel seldom opted to exercise that authority.[8]  (SUF ¶¶ 22, 27, 30; Ex. 13, Lee

*Kirby* Dep. Tr. 22:11-23:19.)

---

[7] The last Marvel comic book issues to which Ditko contributed, however, were published in 1966 due to the lag in the production process between when an artist turned in his penciled pages and when the finalized issue was distributed.

[8] Even in the rare instances where Marvel did not use Ditko's work—such as when it decided against using Ditko's Spider-Man cover and instead assigned the task to Kirby—there is no evidence to suggest that Marvel did not pay Ditko in full for it.  (SUF ¶ 50; Ex. 1, Patrick Ditko Dep. Tr. 28:24-29:3.)

After Ditko finished drawing and revising his assigned panels, Lee would input dialogue and captions to bring together the story.  (SUF ¶¶ 16, 46; Ex. 48 at 2.)  And Lee would usher the story through the remainder of the production process.  (SUF ¶¶ 16-22; Ex. 7, Roy Thomas *Friedrich* Dep. Tr. 201:24-203:16.)  As Ditko explained, "Once I did the job, turned it in, got paid, my involvement ended."  (SUF ¶ 20; Ex. 57 at 4.)  Ditko often found himself dissatisfied with Marvel's choices—for example, Spider-Man's coloration or Lee's "corny captions" and "'humor' dialogue"—but understood that such decisions fell well outside his domain as a contributing artist.  (SUF ¶ 29; Ex. 52 at 4; Ex. 58 at 3.)

Overall, Stan Lee decided to give Ditko greater creative freedoms as compared to certain other artists at Marvel—similar to how Marvel treated the prolific Jack Kirby.  (SUF ¶ 47.)  Lee trusted Ditko, and Ditko, in turn, understood that Lee—the "only [writer] [he] ever worked for"—had "many characters, titles to handle, write for."  (SUF ¶¶ 30, 47; Ex. 44 at 7; Ex. 59 at 3.)  But to the extent Marvel's treatment of Ditko and Kirby differed from its treatment of other artists, it was only because they were among Marvel's most experienced and skilled artists.  (SUF ¶¶ 45-47.)  Ditko thus was "allowed to drift" from an assigned script, for example, much like Kirby was allowed "a freer hand within th[e] [comic creation] framework than . . . comparable artists."  *Kirby*, 726 F.3d at 126.  (SUF ¶ 47; Ex. 45 at 8.)  Yet the general parameters remained in place:  Ditko always worked on assignment, and he was always subject to the supervision and editorial control of Marvel.  (SUF ¶¶ 14, 23-30, 33-35, 37-38.)  Marvel, in short, was in charge from start to finish.

### C.  Marvel Paid Ditko By The Page And Assumed The Financial Risk For Its Comic Books.

Like Marvel's other artists, Ditko was paid a per-page rate for his work.  (SUF ¶¶ 49-50.)  The compensation for artists and writers was unaffected by a book's sales.  (SUF ¶¶ 50-52.)  If a

comic book sold poorly, a contributing artist would be paid just the same—even if Marvel took a net loss.  (SUF ¶¶ 51-52.)  And likewise if a comic book turned out to be a success.  (SUF ¶¶ 51-52.)  In fact, Marvel did not even share sales figures with its artists; they had no financial interest because they never received royalties.  (SUF ¶¶ 51-52; Ex. 79 at 4.)

### D.   Ditko's Work On Doctor Strange And Spider-Man Illustrates That He Worked At Marvel's Instance and Expense.

Ditko generated a large body of work, but his legacy centers on drawing Doctor Strange and Spider-Man for Marvel.  As with his other assignments, Ditko worked closely with Stan Lee and at his behest with respect to both characters.

Ditko began regularly contributing to a Marvel series entitled *Strange Tales* in 1956, with Ditko working on all 79 issues from February 1959 (*Strange Tales* #67) to July 1966 (*Strange Tales* #146).  (SUF ¶ 31.)  As part of his ongoing work on the *Strange Tales* series and for Marvel more generally, Ditko penciled and inked the first Doctor Strange story, which was dialogued, captioned, and "rush[ed]" out by Lee as a "5-page filler," i.e., a short and shallow story intended mostly to take up unused space in the comic book.  (SUF ¶¶ 32-33; Ex. 27 at 2.)  Lee chose the name "Doctor Strange" for the character because the story was published in Marvel's *Strange Tales* series and to avoid confusion with "Mr. Fantastic," another Marvel Super Hero.  (SUF ¶ 34.)

The Doctor Strange character first appeared in *Strange Tales*, Vol. 1, No. 110, published with a cover date of July 1963.  (SUF ¶ 33; Ex. 25 at 11; Ex. 31E at 2-4.)  Doctor Strange first appeared without a backstory—after all, the character was just filler.  (SUF ¶ 35.)  But fan mail soon urged the publication of a backstory, and Marvel eventually responded by giving Doctor Strange a more complete personality and origin story in *Strange Tales*, Vol. 1, No. 115.  (SUF ¶ 35.)  That origin story—Doctor Strange was revealed to be a doctor who underwent a series of

tests in Tibet and developed mystical abilities to combat magical forces—actually recycled the essence of another Marvel character named Doctor Droom that Marvel had introduced years prior in another series.  (SUF ¶ 36.)  Exactly like Doctor Strange, Doctor Droom was a doctor who underwent a series of tests in Tibet and developed mystical abilities to combat magical forces.  (SUF ¶ 36.)  But the Doctor Droom character "was a one-shot thing," so the material was ripe for Marvel to repurpose.  (SUF ¶ 36; Ex. 41 at 8.)  From that foundation, Doctor Strange developed into the modern character.

Ditko routinely penciled the early Doctor Strange stories, but Lee and others handled much of the plotting and writing—to Ditko's chagrin.  Although the Doctor Strange character proved to have longevity, Ditko was often dissatisfied by the way the stories were produced; Ditko had no control over what he perceived as "poor plots by Stan [Lee]," the formulaic "haunted house[]" stories that Lee scripted for Doctor Strange, the "incompetent inkers" who broke from his vision, and the lack of a "consistent look" due to the revolving door of inkers who drew over Ditko's pencils.  (SUF ¶¶ 29, 36-37; Ex. 55 at 4; Ex. 59 at 3; Ex. 60 at 3.)  Indeed, Ditko was never even permitted to draw the cover art for a Doctor Strange story; Lee hand-selected other Marvel artists to carry that responsibility, which played a key role in how well a book would sell.  (SUF ¶ 38.)

Ditko's contributions to Spider-Man further illustrate how he worked under Marvel's control.  Marvel launched the 15-issue *Amazing Adventures*[9] comic book series in 1961, with Ditko contributing to every issue alongside Stan Lee and Jack Kirby.  (SUF ¶ 32.)  In 1962, Lee had conceived of an idea for the ongoing *Amazing Fantasy* series: a new character named

---

[9] The series was renamed *Amazing Adult Fantasy* for issue seven, then *Amazing Fantasy* for issue fifteen.  (SUF ¶ 39.)

Spider-Man, who was a realistic and nerdy teenage hero with the ability to stick to walls and ceilings like an insect.  (SUF ¶¶ 40-41.)  This new character first appeared in *Amazing Fantasy*, Vol. 1, No. 15, published in the summer of 1962.  (SUF ¶ 40; Ex. 25 at 3; Ex. 31A at 2-3.)

Ditko was <u>not</u> the first artist that Stan Lee assigned to draw Spider-Man.  (SUF ¶ 41.) Jack Kirby was, but when Lee saw Kirby's initial pencil drawings, he decided that Kirby was the wrong man for the job.  (SUF ¶ 41.)  Kirby, who was known to "glamorize[] everything," had drawn a version of Spider-Man that looked "a little bit too heroic" for Lee.  (SUF ¶ 41; Ex. 13, Lee *Kirby* Dep. Tr. 37:3-38:3.)  Lee's vision—a "wimpy," "nerdy," and relatable teenage hero— was just "n[o]t Jack's style."  (SUF ¶¶ 40-41; Ex. 13, Lee *Kirby* Dep. Tr. 75:9-23.)

So Lee paid Kirby for his work, took him off the comic, and reassigned him to other books.  (SUF ¶ 41; Ex. 10, Lee *Kirby* Dep. Tr. 376:3-15.)  Lee replaced Kirby with Ditko, which proved a better match.  (SUF ¶ 41.)  Ditko's art had "that kind of awkward feeling" that was "just right for Spider-Man."  (Ex. 13, Lee *Kirby* Dep. Tr. 75:9-23.)  But while Lee accepted Ditko's work on the interior Spider-Man pages, Lee then decided not to use Ditko's cover art. (SUF ¶¶ 41-42.)  Instead, Lee assigned the cover art *back* to Kirby, leaving the final artwork for the comic book an amalgamation of the two artists' work.[10]  (SUF ¶ 42.)  Spider-Man would soon become an unexpected hit, and, based on assignments from Lee, Ditko would go on to draw many more issues.  (SUF ¶¶ 43-44.)

Ditko was never satisfied with his role, lamenting that "Stan [Lee]'s writing style was completely wrong for SM [Spider-Man]," though he had no choice but to acquiesce to Marvel's editorial decisions.  (SUF ¶ 29; 54 at 4.)  Ditko thought that "Stan [Lee's] 'humor' dialogue

---

[10] Notably, Jack Kirby's heirs also served a copyright termination notice as to this issue of *Amazing Fantasy*, but that notice was held invalid because Kirby's contributions to it were made for hire.  *Kirby*, 726 F.3d at 143.  (Ex. 77.)

undercut Peter Parker," that Lee's style prevented the teenage hero from "more serious growth" as a character, and that Lee pandered too much to the comic's readers.  (SUF ¶ 29; Ex. 52 at 4; Ex. 58 at 3.)  But those choices were not Ditko's to make, and Spider-Man developed into the character we know today.

### E.   Frustrated With The Constraints On His Creative Process And Output, Ditko Left Marvel.

Ultimately Ditko parted ways with Marvel in 1965, in favor of career opportunities that accorded him more independence.  (SUF ¶ 2.)  He went on to work for Charlton Comics, which was "low paying" compared to Marvel and other industry leaders but gave him "a lot more freedom."  (Ex. 54 at 4; Ex. 59 at 3.)  Ditko recalled that, despite the inferior compensation, he "got more out of working for them in developing [his] own art style, etc. tha[n] [he] got at Marvel, DC with their picky editors, 'corrections,' etc."  (Ex. 54 at 4.)  Ditko later turned to self-publishing, at which point he finally enjoyed the unchecked creative freedom he craved.

Steve Ditko died on June 29, 2018.  (Ex. 66 at 2.)  Although he could have lodged his own termination attempt as early as 2008,[11] he never pursued any copyright terminations in his lifetime.  To the contrary, Ditko expressly recognized that he had no right to terminate, as memorialized in a written agreement in January 1979 acknowledging that all of the work he did for Marvel was made for hire.  (SUF ¶ 53; Ex. 23C at 24.)  Ditko reiterated that view in correspondence, writing that he understood he "had no real right to" any ideas he contributed "when published" by Marvel.  (SUF ¶ 54; Ex. 59 at 3.)  Although Ditko felt a certain "[m]oral

---

[11] Marvel published the earliest work covered in the Notices in 1962, making the termination window (if any) run from 2018 to 2023.  *See* 17 U.S.C. § 304(c)(3).  A termination notice can be served up to 10 years in advance of its effective date.  *Id.* § 304(c)(4)(A).

creator[ship]" over his contributions, he recognized that the "[l]egal creator [was] Marvel comics."  (SUF ¶¶ 53-55; Ex. 57 at 3.)

Steve Ditko never married, had no children, and left no will.  As Patrick Ditko readily acknowledged, his brother was a very "private" person, and the two never once discussed his work for Marvel.  (Ex. 1, Patrick Ditko Dep. Tr. 21:3-9.)  With no first-hand knowledge, Defendant is in no position to question the work-made-for-hire status of Steve Ditko's contributions.  (Ex. 1, Patrick Ditko Dep. Tr. 31:5-17) (Q: "Do you think you're qualified, Mr. Ditko, to testify on whether Steve Ditko's work for Marvel from 1962 to 1966 was done on a work made for hire basis?" A: "I have no idea, no knowledge."  Q: "Do you know what it means to, for work to have been made on a work for hire basis?"  A: "No."  Q: "Did you ever discuss with your brother Steve whether his work for Marvel was done on a work made for hire basis?" A: "No.").

### F. Defendant Served Termination Notices On MCI, Seeking To Uproot MCI's Rights In And To The Works.

Between May 28 and July 16, 2021, Defendant served four notices[12] on MCI purporting to terminate alleged grants of the domestic copyright rights in various illustrated comic book stories to which Steve Ditko had allegedly contributed during his tenure as a Marvel freelancer. (SUF ¶ 8.)  Defendant asserts that these supposed "grants" are comprised of the language "on the back of the check(s) issued by Marvel Entertainment, LLC's predecessor company to Stephen J. Ditko."  (Ex. 62, Counterclaim Ex. A; Ex. 78, Complaint Exs. 2-6.)  Defendant, however, produced no such checks, much less the purported language on the back of them.  (SUF ¶ 57; Ex. 1, Patrick Ditko Dep. Tr. 28:12-23.)

---

[12] For this purpose, MCI counts both of Defendant's notices directed at *Amazing Fantasy*, Vol. 1 , No. 15 as a single notice.

Because the Notices created a cloud on Marvel's intellectual property rights, MCI initiated the instant litigation to affirm its long-held status as author and continued owner of the Works.  MCI thus seeks a declaratory judgment that the Notices are invalid and, as such, have no effect on MCI's ownership of the Works.  Defendant, in turn, filed a mirror-image counterclaim as to the claimed validity of the Notices.

<u>**ARGUMENT**</u>

MCI opposes Defendant's motion for summary judgment because, as the undisputed facts show, the Works were all made for hire and thus not subject to the copyright termination regime. Courts in other cases have consistently found that works created by Marvel's comic book writers and artists constitute works made for hire outside the reach of copyright termination.  *See Kirby*, 726 F.3d at 143; *Marvel Worldwide, Inc. v. Kirby*, 777 F. Supp. 2d 720, 725 (S.D.N.Y. 2011); *In re Marvel Ent. Grp., Inc*., 254 B.R. 817, 834 (D. Del. 2000).  *Kirby* in fact addressed several of the very same characters and comics at issue here, including the first appearance of Spider-Man in Issue 15 of *Amazing Fantasy*.  There is no legal or factual basis for treating Steve Ditko's contributions any differently.  As in *Kirby*, the Works here were created at Marvel's "instance" and at Marvel's "expense" and thus constitute works made for hire as a matter of law. Defendant's motion for summary judgment should be denied, and MCI's cross-motion should be granted.

**A. Ditko Worked At Marvel's Instance And Expense.**

*i. Ditko Worked at Marvel's Expense.*

Defendant begins by arguing that the Works were not created at Marvel's expense, but that argument is foreclosed by *Kirby*.  The facts on the expense prong are identical to the facts in *Kirby*, because Marvel used consistent payment practices during the 1960s—the time period in

-15-

which both cases are situated.  Indeed, Ditko's name can be substituted directly for Kirby's in every relevant passage from *Kirby* on the "expense" prong:

- "Marvel paid [Ditko] a flat rate per page for those pages it accepted, and no royalties."  (SUF ¶¶ 49-51.)

- "Marvel and [Ditko] had a standing engagement whereby [Ditko] would produce drawings designed to fit within specific Marvel universes that his previously purchased pages had helped to define."  (SUF ¶¶ 2-3, 23, 31-37, 41-45.)

- "When [Ditko] sat down to draw, then, it was not in the hope that Marvel or some other publisher might one day be interested enough in them to buy, but with the expectation, established through their ongoing, mutually beneficial relationship, that Marvel would pay him."  (SUF ¶¶ 23, 45, 48-52.)

- "[I]n the run of [Ditko's] assignments, this expectation proved warranted."  (SUF ¶¶ 49-50, 52.)

726 F.3d at 142-43.  As in *Kirby*, those facts are sufficient to satisfy the "expense" prong, especially coupled with Marvel's "contribution of both creative and production value" on top of Ditko's artwork.  *Id.*

Defendant inexcusably ignores *Kirby*'s analysis of the expense prong.  He instead asserts that Ditko actually bore the entire financial risk of his work, citing the facts that Marvel did not pay for his studio or his supplies and did not pay him an advance for his work.  (Mem. at 32.) But the same facts were true for Jack Kirby, and the Second Circuit nevertheless held that Kirby worked at Marvel's expense.  726 F.3d at 142 (acknowledging that Marvel "did not pay for Kirby's supplies or provide him with office space" and "was free to reject Kirby's pages and pay him nothing for them" and that Kirby incurred "all of the costs of producing the drawings—time, tools, overhead").  Defendant's argument reflects nothing more than disagreement with the Second Circuit's analysis of the expense prong in *Kirby*.

Defendant also asserts that Ditko was not paid for rejected pages, but he cites no evidence whatsoever in support of that assertion.  None of the evidence he cites concerns Steve Ditko.  *See*

Def.'s Statement of Material Facts, Dkt. 78 ¶ 44.  To be sure, there *is* evidence that Marvel rejected one page by Ditko—his original cover for *Amazing Fantasy* #15—but the evidence shows that Marvel still paid Ditko for it.  (*E.g.*, Ex. 57 at 3 (Ditko writing: "What I did with Spider-man, I was paid for.  Marvel's property."); Ex. 48 at 5 (Ditko writing that his "original first cover" for *Amazing Fantasy* #15 "has been printed (in *Marvelmania* #2, 1970 and several comics)").)  Further, Marvel rejected the cover art only for its initial intended purpose; Marvel ultimately published it elsewhere, which Ditko himself acknowledged.  (Ex 30; Ex. 41 at 5; Ex. 48 at 5.)

Even if Defendant could cite evidence showing that Marvel sometimes rejected pages without paying for them, it would not compel a different result from *Kirby*.  Again, *Kirby* already resolved the issue:  The Second Circuit there found for Marvel on the expense prong *even assuming* that it "was free to reject Kirby's pages and pay nothing for them," and that Kirby therefore "might occasionally not be paid for the labor and materials for certain pages."[13]  726 F.3d at 142-43; *see also id.* at 142 (citing "anecdotal evidence" in the record "that Marvel did in fact reject Kirby's work or require him to redo it on occasion").

_____

[13] In this same vein, Defendant argues that, because he contends Marvel could reject pages without payment, Marvel's position would somehow mean that the copyright springs back and forth between Ditko and Marvel depending on whether Marvel accepted or rejected the pages. That argument fails.  Defendant cites a *1976 Act* decision in support of the proposition that "copyright 'vest[s] in the author of an original work from the time of its creation.'"  (Mem. at 29 (quoting *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 547, 105 S. Ct. 2218, 2223-24 (1984)).)  But under the *1909 Act*, there is no federal copyright until *publication*. *See Buday v. New York Yankees P'ship*, 2011 WL 13176013, at *2 (S.D.N.Y. Oct. 20, 2011), *aff'd*, 486 F. App'x 894 (2d Cir. 2012) ("After the passage of the 1909 Copyright Act and prior to promulgation of the 1976 Copyright Act, an author could claim a common-law property right, sometimes termed a common-law copyright, to prevent others from exploiting an unpublished work.  By contrast, statutory copyright protection during that period was only available if the works were 'published' within the meaning of the 1909 Copyright Act." (internal citations omitted)).  Thus, Defendant errs in asserting that the federal copyright would "transmorph[]" upon Marvel's theoretical rejection without payment of a page.  (*See* Mem. at 30.)

Defendant's final "expense" argument is—once again—a legal contention squarely rejected in *Kirby*.  According to Defendant, "the 'expense' prong must necessarily focus on who bore the financial risk associated with Ditko's *creation of his material* at issue," and not on "Marvel's subsequent assemblage and publication of the comic books containing the Ditko Works or the risk that a particular comic book might not sell well or be successful."  (Mem. at 31 (emphasis in original).)  Defendant thus insists that Marvel's financial risk is "legally irrelevant" to the expense analysis.  (Mem. at 32-33.)  The Second Circuit held otherwise in *Kirby*, expressly addressing the "risks" that Marvel "took on . . . with respect to the works' success," including "that the pages [Marvel] did pay for might not result in a successful comic book."  726 F.3d at 143; *see also id.* at 140 (explaining that the expense prong aims to "reward[] with ownership the party that bears the risk with respect to the work's success").  And it found material that Kirby's drawings "built on preexisting titles and themes that Marvel had expended resources to establish—and in which Marvel held rights—and [] required both creative contributions and production work that Marvel supplied."  *Id.* at 143.  The same is true here.  *Kirby* thus again resolves the issue.

> ii.  *Ditko Worked at Marvel's Instance.*

Defendant's arguments on the "instance" prong are no more successful.  Once again, Defendant begins by attacking settled Second Circuit law, arguing that "the 'right to direct and supervise' the artist's work, could only refer to a *legal* right" of control, which he contends Marvel did not have.  (Mem. at 34 (emphasis in original).)  To replay *Kirby* yet again:  The heirs there similarly argued that "the 'right to supervise' referred to in [Second Circuit] case law requires a legal, presumably contractual, right," but the Second Circuit itself could "find no hint of this requirement in [its] case law applying the instance and expense test."  726 F.3d at 141-42.

As the *Kirby* Court recognized, the instance and expense test does not hinge on contractual rights at all; it is about the *actual reality* of the relationship between the hiring and hired parties. Defendant ignores this distinction.

Defendant also plays fast and loose with his evidentiary support.  MCI invites the Court to look closely at Defendant's Statement of Material Facts, and MCI's response thereto, to evaluate for itself whether the stated "facts" actually find support in the cited evidence.[14] Moreover, to compensate for the dearth of evidence supporting his position, Defendant is left to rely heavily on his purported expert, Mark Evanier, for the vast majority of his "facts."  But for the many reasons discussed in MCI's pending motion to exclude, Evanier's inadmissible opinions cannot substitute for bona fide factual evidence.

Even if the Court were to look past the lack of any evidence supporting Defendant's flawed factual narrative, Defendant still fails to show how his so-called facts could yield judgment in his favor.  Indeed, on the facts concerning the "instance" prong, Defendant again tries to escape from the shadow of *Kirby* as controlling precedent—all while failing to distinguish or even discuss it.  But *Kirby*, which addressed virtually identical factual circumstances, is dispositive.  As in that case, "Marvel's inducement, right to supervise, exercise of that right, and creative contribution with respect to [Ditko's] work during the relevant time period is more than enough to establish that the works were created at Marvel's instance."  726 F.3d at 141.

Ditko had a "close and continuous" working relationship with Marvel when the Works were created.  *Id.*  (SUF ¶ 45.)  Although he was a freelancer, Ditko was not simply hired for

---

[14] Further still, the bulk of Defendant's proffered evidence is inadmissible, as laid out in MCI's concurrently filed evidentiary objections.

one-off projects here and there.  Rather, like Kirby, Ditko was "kept busy with assignments from Marvel" during the relevant time period, working predominantly for Marvel.  *Kirby*, 726 F.3d at 141.  (SUF ¶ 45.)

Ditko did not work on "spec," that is, creating a finished work and then looking for a potential buyer.  *Kirby*, 726 F.3d at 141.  (SUF ¶¶ 23, 48.)  At all relevant times, Marvel did not solicit or accept work on "spec" at all.[15]  (SUF ¶¶ 23, 48.)  When Ditko penciled for the Works, he did so "pursuant to Marvel's assignment or with Marvel specifically in mind."  *Kirby*, 726 F.3d at 141.  (SUF ¶¶ 14, 23, 31, 33, 41-42, 44.)  He worked in concert with Marvel's universe of characters and narratives at the direction of Stan Lee or Marvel's other editors—and indeed could not have marketed his Marvel-centric drawings elsewhere.  (*E.g.*, SUF ¶¶ 41-44.)  He could not, for example, have sold a Spider-Man drawing or an Avengers battle scene to DC Comics.  It was thus Ditko's "ongoing partnership with Marvel"—and the resulting specific assignments from Marvel—that "induced" any contributions he made.  *Kirby*, 726 F.3d at 141.  (SUF ¶¶ 23, 31-33, 39, 41, 45-46.)

Ditko "worked within the scope of Marvel's assignments and titles," just like Kirby and Marvel's other freelance artists.  *Kirby*, 726 F.3d at 141.  (SUF ¶¶ 23, 31-33, 39, 41-42.)  It was only after receiving an assignment from Marvel that Ditko would begin diving meaningfully into his work.  (SUF ¶¶ 23, 48.)  Marvel drove the entire process, and its editors dictated which artist would be working in which capacity on which comic book featuring which core characters.  (SUF ¶¶ 23, 31-33, 41-42.)

---

[15] Defendant's reference to a public contest that Marvel ran in the 1980s is inapposite; Defendant's own brief defines the relevant time period to be "1962 to 1966."  (Mem. at 1, 15 n.4.)  That Defendant needs to reach two decades past the relevant time period to find a single example where Marvel allegedly solicited work without a preexisting assignment says everything.

As with Kirby's works, Marvel performed a foundational "creative role" in the creation of the Works. *Kirby*, 726 F.3d at 141.  Marvel's Stan Lee created or co-created most of the characters and titles that came to define Marvel's comic books.  (SUF ¶¶ 13, 24, 40.)  As Marvel's editor, Lee established a creative vision for what a given comic book would look like, thought up plot lines, and dreamed new characters into existence.  (SUF ¶¶ 13, 24, 40.)  Stan Lee's imagination and his own creative contributions as Marvel's editor laid the essential groundwork for Steve Ditko's subsequent contributions.

Marvel generally provided its freelancers with "specific instructions" at the outset of an assignment, shaping the work the freelancers would create.  *Kirby*, 726 F.3d at 139; *Playboy Enters.*, 53 F.3d at 556.  (SUF ¶¶ 13, 24, 40-41.)  In the ordinary course, the editor (usually Stan Lee) would provide a synopsis, laying out the parameters for the script or the panels to be created.  (SUF ¶¶ 13, 24.)  And he would instruct the contributor on what deliverable to produce—for example, 20 pages of penciled panels for *The Amazing Spider-Man* or a 5-page filler story for *Strange Tales*.  But even if, as Defendant contends, there were exceptions to this rule of thumb as Ditko grew more experienced, that would not change the calculus.  After all, "where prior dealings between the parties on similar assignments, as part of an ongoing arrangement, have rendered fine-grained supervision unnecessary," the "instance" prong will be satisfied amid a lesser degree of direction and supervision.  *Kirby*, 726 F.3d at 139.

Defendant attempts to rebut the inescapable conclusion that the Works were created at Marvel's instance by focusing on Ditko's creative discretion and acumen, but that is part and parcel of the role of an artist-for-hire.  Work-for-hire artist Jack Kirby represented the pinnacle of creative discretion at Marvel, but his distinctive creativity did not render him any less of a work-made-for-hire contributor.  And the Second Circuit had no trouble finding that Kirby

worked at Marvel's instance, even though it was "beyond dispute" that he "made many of the creative contributions" that characterized the implicated works, "often thinking up and drawing characters on his own, influencing plotting, or pitching fresh ideas." *Id.* at 126-27.  As the Second Circuit observed, "the hired party's ingenuity and acumen are a substantial reason for the hiring party to have enlisted him," so the simple fact that "the hired artist indeed put his exceptional gifts to work for the party that contracted for their benefit" cannot undercut a work-made-for-hire finding. *Id.* at 142.  In the Second Circuit's words, even "[q]uestions of who created the characters are mostly beside the point." *Id*.

Moreover, freelancers' creative leeway was always subject to the oversight of Marvel's editors and publisher.  (SUF ¶¶ 14, 22-30, 41-42, 47.)  Marvel both possessed and exercised the right to supervise the creation of the Works.  (SUF ¶¶ 14, 22-30, 41-42, 47.)  Marvel could and did demand changes and even reroute assignments where an artist's work product did not align with Marvel's vision or business needs.  (SUF ¶¶ 23, 26, 28, 41-42.)  Some changes were small, like changing a line of dialogue or adjusting the shape of a background character's body.  (SUF ¶¶ 26, 28; Ex. 3, Lieber Dep. Tr. 133:16-25; Ex. 29 at 2-4.)  Others were fundamental, like when Lee swapped Ditko for Kirby as Spider-Man's penciler because Lee preferred the former's nerdier and less glamorized depiction of the character.  (SUF ¶ 41; Ex. 13, Lee *Kirby* Dep. Tr. 37:3-38:3.)  On rarer occasions, Marvel could and did decide not to publish unsatisfactory pages altogether.  (SUF ¶ 27.)  While Marvel gave its freelancers plenty of creative input, ultimately Marvel held control.  (SUF ¶¶ 22, 30.)  Just like Jack Kirby, Ditko worked at Marvel's instance.

\*     \*     \*

Finally, in an effort to salvage his position, Defendant contends that a work-for-hire finding would be inconsistent with purported "assignment language" on two checks issued to

freelancers *other than Ditko*, from well outside the relevant time period, and several agreements,

again with other contributors, and again from outside the relevant time period.  (Mem. at 41.)

Those checks and agreements—which have nothing to do with Ditko or the relevant time

period—are irrelevant.  But in any event, the Second Circuit has already dispensed with

Defendant's very argument, which is recycled from the *Kirby* litigation, and even relies on the

same two checks:[16]

> [The Kirby Heirs] point to a 1975 assignment executed by Jack Kirby that
> purported to transfer interests in certain works to Marvel (but also averred that
> all of his work was for hire), which they say suggests the parties' understanding
> that Marvel did not already own the rights.  They also call to our attention
> evidence that indicates that Marvel paid Kirby during the relevant time periods
> with checks that contained a legend with assignment, instead of work-for-hire,
> language.  This evidence is not enough . . . . It is all too likely that, if the parties
> thought about it at all, Kirby's assignments at the time he was paid or later were
> redundancies insisted upon by Marvel to protect its rights; we decline to infer
> from Marvel's suspenders that it had agreed to give Kirby its belt.

726 F.3d at 143 (internal citations omitted).  This argument is no more convincing a

decade later.[17]

---

[16] The only practical difference between the Kirby Heirs' briefing on this point and
Defendant's briefing is that Defendant misleadingly replaces the checks' express employment
language with an ellipsis.  (*Compare* Mem. at 41 (quoting the Stephen Gerber and Dick Ayers
check legends: "By endorsement of this check, I, the payee, acknowledge full ***payment*** … ***for my
assignment to it of any copyright***, trademark and any other rights in or related to the material,
and ***including my assignment of any rights to renewal copyright***.") (ellipsis and emphases in
original), *with* Ex. 98, Kirby Heirs' Opp'n Mem. at 17 (quoting the Stephen Gerber and Dick
Ayers check legends: "By endorsement of this check, I, the payee, acknowledge full ***payment*** for
my employment by Magazine Management Company, Inc. and ***for my assignment to it of any
copyright***, trademark and any other rights in or related to the material, and including my
***assignment of any rights to renewal copyright***.") (emphases in original).)

[17] It is unclear from Defendant's papers whether he also suggests the check legends constitute
an "agreement to the contrary" that would rebut the work-made-for-hire presumption, as did the
Kirby Heirs before him.  *See Kirby*, 726 F.3d at 143.  Any such argument is squarely foreclosed
by *Kirby*, as explained herein.  Moreover, Defendant concedes that—apart from Marvel's checks
to Ditko that no party possesses—there are no "contemporaneous agreements between the
parties" at all.  (Mem. at 4.)  Thus, he can advance no alternative "agreement to the contrary"
argument either.

**B.  The Best Examples Of Ditko's Independence That Defendant Can Muster Still Fall Firmly Within The Instance And Expense Framework.**

Unable to escape the facts showing Ditko created the Works at Marvel's instance and expense as a general matter, Defendant tries to narrow the focus to the Doctor Strange and Spider-Man characters.  According to Defendant, those characters, at least, were not created at Marvel's instance and expense, which further shows—Defendant says—that none of the others were either.  Even leaving aside that dubious inferential leap, the argument actually proves the opposite:  Because both characters unambiguously were developed at Marvel's instance and expense, they only further confirm the work-made-for-hire status of all the Works.

*i.  Doctor Strange*

Defendant claims that Ditko "independently originated the [Doctor Strange] character in 1946," that the iteration of the character that appeared in *Strange Tales* "flowed from concepts Ditko had been playing with for years," and that Ditko "plotted and drew the first five-page story introducing Dr. Strange completely 'on spec.'"  (Mem. at 19, 37.)  Defendant, however, has no evidence to support those assertions.  Defendant cites only three pieces of evidence, amidst much irrelevant and unsupported commentary.  His only real facts are: (i) that Ditko plotted and drew the first Doctor Strange story to appear in *Strange Tales*; (ii) that Lee once wrote Doctor Strange "'twas [Ditko's] idea"; and (iii) that circa 1946, Ditko drew a sketch of a face that Defendant contends looks very similar to Doctor Strange's visage.

These three facts do not support the logical leaps Defendant takes from them.  For example, while it is true that Ditko worked on the 110th issue of *Strange Tales*, in which Doctor Strange first appeared, he did so only as a continuation of the ongoing work he did for *every single issue* of the series dating back to issue number 67.  (SUF ¶¶ 31-33.)  Given that clear pattern of long-term assignment by Marvel, there is no basis for concluding—as Defendant

claims—that Ditko worked on "spec" for just the 110th issue.  Indeed, Marvel did not even

accept work on spec during the relevant time period—and Defendant has no evidence to the

contrary.  (SUF ¶ 48.)

Defendant takes even greater liberties in characterizing Ditko's 1946 facial sketch.[18]  At

the outset, the only connection between the sketch and Doctor Strange is Defendant's postulation

that it depicts the same character.  (Ex. 81, Patrick Ditko Dep. Tr. at 62:7-12.)  Defendant admits

that Ditko never told him the sketch was supposed to be the Doctor Strange character; Defendant

simply "assumed it."  (*Id.* at 62:3-10.)  And while Defendant baldly asserts that the sketch

"clearly depict[s]" Doctor Strange, Mem. at 19, that is far from clear.  Both have oblong faces,

mustaches, streaked hair, and capes.  (*See id.*)  Those similarities are hardly so distinctive as to

draw a conclusive connection between the images.  (*Compare id. with* Ex. 99.)



| Mandrake the Magician (1937) | Zatara the Magician (1939) | Merlin the Magician (1941) | Tor the Magic Master (1942) | Mandrake the Magician (1944) | S. Ditko Sketch (1946) | Doctor Strange (1963) |

As Roy Thomas observed, the sketch "looks like any number of comic book magicians

over the years imitating Mandrake going back into the '40s," adding that "any character [Ditko]

drew in a cloak and mustache would have a resemblance to Doctor Strange and also to Mandrake

the Magician and 100 other comic book magicians that existed between 1940 and 1960."[19]  (Ex.

84, Thomas Dep. Tr. at 303:14-304:19; *see also* Ex. 2, Thomas Dep. Tr. at 305:5-6 ("Almost

---

[18] Defendant actually misleadingly refers to "sketches," plural, Mem. at 19, but he does not and cannot identify any sketch beyond the one 1946 sketch.

[19] The *Doctor Strange* comic itself alludes to this origin.  In Issue 181, for example, Doctor Strange's adversary refers to him as "Mandrake."  (Ex. 100 at 11.)

every [comic book] company had a couple of magicians, many of them with mustaches and capes.").) Nor is there any evidence that Ditko was "playing with" the concepts for Doctor Strange "for years." (Mem. at 19.) There is only the (ambiguous) sketch from 1946 and then the first Doctor Strange story in 1963. There is absolutely no evidence that Ditko did any refining of the sketch, or any other work on it at all, during the intervening 17 years.

Nonetheless, even if Defendant could show a linkage between the sketch and Doctor Strange, apart from their shared artist, a sketch is just that—it does not reflect a fully formed *character*. In fact, even if Ditko had developed both the basic characteristics of Doctor Strange's visage *and* the broad contours of his storyline,[20] that would still be insufficient to overcome the evidence showing that the character was developed at Marvel's instance and expense. At best, Ditko "had a nascent idea for a character or story," and not a "fully developed" character or publication-ready comic book story. *See In re Marvel Ent. Grp., Inc.* ("*Wolfman*"), 254 B.R. 817, 830-32 (D. Del. 2000). Where that is the case, the employer is still considered the "motivating factor" for the fleshed-out character or story that is later ready for publication. *Id.*

*Wolfman* is instructive. There, Marvel and freelance writer Marv Wolfman disputed whether characters he had begun to develop—which would come to feature prominently in Marvel's comic books—were produced at Marvel's instance and expense. Wolfman claimed that he created several of the characters before even he began working for Marvel, and that Marvel therefore could not have been the motivating factor for that content. *Id.* at 830. He relied on the Second Circuit's decision in *Siegel v. National Periodical Publications, Inc.*, 508

---

[20] And to be clear, this is wholly unsupported by the evidence. To the contrary, the evidence suggests that Doctor Strange's storyline simply repurposed the backstory of an earlier Marvel character, Doctor Droom, who had fallen into obscurity in the intervening years. (*See* pages 10-11, *supra.*)

F.2d 909 (2d Cir. 1974), which held the original Superman comic strip was not a work for hire because it had been created years before its authors' relationship with the defendant publishing company, and the only "revisions directed by the defendants were simply to accommodate Superman to a magazine format."  *Id.* at 914.

The *Wolfman* Court was unconvinced.  It contrasted Wolfman's early-stage work with "the publication-ready Superman comic strips in *Siegel*," which had been "completely developed . . . prior to the plaintiffs['] sale of their work to Detective Comics."  254 B.R. at 832.  And it emphasized that Wolfman "made more than superficial changes to the character[s]" since his claimed pre-Marvel creations—in contrast to the mere format change that was undertaken in *Siegel. Id.* at 831.  Ultimately, it concluded that none of the characters Wolfman claimed to have created in his pre-Marvel days fell "within the ambit of the *Siegel* exception."  *Id.* at 831-32.  This conclusion held even as to a character for which Wolfman had "produced a half-page write up of the character's background and look," since he "had not completely developed the character[]" like the *Siegel* plaintiffs.  *Id.* at 832.  Wolfman's argument, the court highlighted, did "not account for the transition from a story idea to a story ready for publication."  *Id.*  And the same was true where Wolfman had shopped a character around to competitor DC Comics previously, for at the time, he "had little more than a concept for the character."  *Id.*

The *Wolfman* rationale applies here.  Even if the Court were to speculate from Defendant's shaky evidence that Ditko developed the basic concept and appearance for Doctor Strange prior to working for Marvel, that would fall far short of a "completely developed" or "publication-ready" character as required to satisfy the *Siegel* exception.  *Id.* at 831-32; *see also Niss v. Columbia Pictures Indus., Inc.*, 2000 WL 1862814, at *9 (S.D.N.Y. Dec. 20, 2000) (no

work for hire exception where claimant created only "the 'bare bones' of a story" before his contract, and "the 28-page screenplay was incomplete"), *aff'd*, 25 F. App'x 76 (2d Cir. 2002).

### ii.  *Spider-Man*

Defendant also tries to lay claim to what he presumptuously dubs "Steve Ditko's Spider-Man," Mem. at 38, but that argument likewise fails.  As Defendant concedes, the idea for Spider-Man predated Ditko's assignment by Stan Lee to draw the character.  (Mem. at 20.)  Ditko was not even the first artist to draw Spider-Man; that was Jack Kirby.  (SUF ¶ 41.)  Ditko only wound up working on Spider-Man because Stan Lee thought that Kirby's artwork looked "a little bit too heroic" for a character who was supposed to be nerdy and relatable, and therefore drafted Ditko for the task instead.  (SUF ¶ 41; Ex. 13, Lee *Kirby* Dep. Tr. 37:3-38:3, 75:9-11.)  That is classic work made for hire.

Defendant contends that Ditko, in his capacity as the assigned artist for Spider-Man, "pitched" a new costume for the character, as well as several story ideas for him, and pushed the character in "a new direction."  (Mem. at 20.)  Defendant seems to suggest that these creative contributions mean that the character was not a work made for hire.  That suggestion misunderstands the applicable legal framework.  Working for hire does not mean that an artist lacks "creative discretion," or that he must function as an interchangeable cog.  *Kirby*, 726 F.3d at 141-42.  Quite to the contrary.  As the Second Circuit put it, because "the hired party's ingenuity and acumen are a substantial reason for the hiring party to have enlisted him" in the first place, it would "make[] little sense to foreclose a finding that work is made for hire because the hired artist indeed put his exceptional gifts to work for the party that contracted for their benefit."  *Id.* at 142.  For that reason, the Second Circuit held that Jack Kirby's contributions were made on a work-for-hire basis, even though it was "beyond dispute" that Kirby was "often

thinking up and drawing characters on his own, influencing plotting, or pitching fresh ideas." *Id.* at 126-27.  Defendant yet again merely rehashes the same arguments rejected in *Kirby*.

Defendant also makes no headway by citing Ditko's purported independence in plotting later Spider-Man stories.  (Mem. at 39-40.)  As *Kirby* makes clear, the instance and expense test recognizes that working relationships evolve over time, and that a contractor may not require as much direction from his employer after years of working together than he did at the outset.  726 F.3d at 139.  Thus, the "instance" prong is satisfied "where prior dealings between the parties on similar assignments, as part of an ongoing arrangement, have rendered fine-grained supervision unnecessary." *Id.*  That type of arrangement is precisely what Defendant describes.

Finally, Defendant contends that Ditko's contributions to Spider-Man somehow could not be works made for hire because Martin Goodman originally did not like the idea for the character. [21]  (Mem. at 38-39.)  This argument fails both factually and legally.  As an initial matter, there is no evidence showing that Goodman refused even to give the character a try if readers had a different reaction—which, it turned out, they did.  In fact, the undisputed evidence shows that Goodman approved Marvel's comic book issues before they went to print.  (SUF ¶¶ 22, 30.)  And in any event, it was Stan Lee who Marvel vested with the direct authority over the day-to-day operations and the creative direction of Marvel's comic books.  (SUF ¶¶ 10, 12-22.)  And it is undisputed that Ditko worked on the Spider-Man stories at Lee's express direction. (SUF ¶¶ 41-44.)  Goodman's own initial reaction is irrelevant.

---

[21] To be clear, this argument applies only to the first appearance of Spider-Man.  It is undisputed that Goodman quickly came around to the character after seeing his popularity with Marvel's readers—that is how Spider-Man wound up with his own series.

### C. Marvel's Corporate Structure Does Not Bear On The Instance And Expense Analysis.

Defendant next proposes a last-ditch argument that Marvel used a series of "shell companies" over the years to manage its intellectual property assets, which somehow deprives the Works of the made-for-hire status they would otherwise possess.  (Mem. at 24-26.)  The argument is both factually baseless and legally wrong.

### i.  Defendant's Theory Fails on the Facts.

To start, Defendant gets the facts wrong.  There is no genuine evidentiary dispute; Defendant simply misinterprets or ignores the substantial evidence that does exist.  The companies that Marvel has historically comprised—including Magazine Management Company, Atlas Magazines, Inc., Canam Publisher Sales Corp., Non-Pareil Publishing Corp., Vista Publications, Inc., and Magazine Management Company, Inc. (New York)—were commonly owned and controlled by Martin Goodman (sometimes with, and sometimes without, his wife Jean Goodman).  (SUF ¶ 1.)  Magazine Management Company, in turn, served as the "managing organization" for the other companies, and it both "render[ed] administrative services" to them and "exercise[d] the over-all control" of them.  (SUF ¶ 1; Declaration of Eli Bard ("Bard Decl."), Dkt. 70, Ex. 5 at 2-3; Bard Decl., Ex. 6 at 3.)  To say that Magazine Management had no affiliation with these other companies, as Defendant claims, is a brazen rewriting of history.

Marvel, like other comic book companies at the time,[22] was structured as a going concern comprising related entities that published and copyrighted comic books, all operating together as one comic book publishing enterprise with Magazine Management Company as the servicing

---

[22] *See, e.g.*, *Archie Comic Publications, Inc. v. DeCarlo*, 258 F. Supp. 2d 315, 322 n.49 (S.D.N.Y. 2003) (referencing comic published in the name of one of Archie Comics' publishing entities); *National Comics Publications v. Fawcett Publications*, 191 F.2d 594, 602 (2d Cir. 1951) (referencing comic published in the name of one of DC Comics' publishing entities).

partnership.  (SUF ¶ 1.)  And as Ditko's own communications reveal, Ditko plainly understood that he was working for Martin Goodman and Marvel Comics when he was making contributions to Spider-Man, Doctor Strange, and other comics under Stan Lee's direction.  *See, e.g.*, Ex. 45 at 3 (Ditko recounting that, in "[l]ate '55, [he] returned to NY and did 1st work for Stan Lee and Marvel," and in 1958, "Stan Lee [again] asked me to do some work, returned to Marvel"); Ex. 57 at 3 (Ditko writing that Spider-Man was "Marvel's property" and that the "[l]egal creator" was "Marvel comics" as "[t]hey own the art pages, the published material").  The evidence does not support Defendant's narrative.

Regardless, the parties agree that Martin Goodman stood at the helm of all of these companies.  (*See* Mem. at 13.)  At minimum, then, Ditko ultimately worked at Martin Goodman's instance and expense.  Whether one can *also* say that Ditko worked at the instance and expense of Lee, or Marvel, or another entity, the relevant result is the same:  Ditko himself cannot be considered the statutory "author" of the contributions he made, and his estate accordingly has no termination right to exercise.[23]

### ii.  Defendant's Theory Fails as a Matter of Law.

Zooming out, Defendant's theory is disconnected from why the instance and expense test exists in the first place.  The point of the test is to determine authorship and ownership of a copyright when certain formalities *do not exist*.  It is not concerned with technicalities.  Just the opposite:  "The purpose of the [1909 Act] is *not* to be frustrated by conceptualistic formulations

---

[23] The same would be true even if, as Defendant insinuates, the Works were made at Magazine Management's instance and expense.  To any extent Magazine Management itself held rights in the Works, it was permitted to assign those rights to the relevant Marvel entities that registered the copyrights.  And more to the point, all that matters for purposes of this copyright termination case is that Ditko is *not* the Works' "author" under copyright law—another entity is.

of the employment relationship." *Picture Music, Inc. v. Bourne, Inc.*, 457 F.2d 1213, 1216 (2d Cir. 1972) (emphasis added).

The instance and expense test accordingly does not depend on precisely which corporate entity affiliated with Marvel "hired" Ditko or registered the copyrights in the Works but instead focuses more broadly on the relationship between the contributor and the party that commissioned the work. *See Est. of Burne Hogarth v. Edgar Rice Burroughs, Inc.*, 342 F.3d 149, 161 (2d Cir. 2003) ("[A]s long as the 'instance and expense' test is met, the work is a work for hire, and the party commissioning the work is regarded as the 'author,' entitled to all rights of copyright.").[24]  Accordingly, that other Marvel-related entities may have been involved in the creative (or administrative) process is of no import, as courts have routinely found work to be done at the instance and expense of the commissioning party even when other entities *completely independent of the commissioning party* provided direction or supervision. *See, e.g.*, *Picture Music, Inc. v. Bourne, Inc.*, 314 F. Supp. 640, 642-43, 653 (S.D.N.Y. 1970), *aff'd*, 457 F.2d 1213 (2d Cir. 1972) (songwriter's work deemed Disney's work for hire even though it was "reviewed and revised by [intermediary] Berlin's music editor and arranger" before being "sent on to Disney" with the "inten[tion] to become Disney's property exclusively"); *Twentieth Century Fox Film Corp. v. Dastar Corp.*, 2000 WL 35503105, at *9 (C.D. Cal. Jan. 4, 2000) (writer's work deemed Doubleday's work for hire even though New York Herald personnel discussed the

---

[24] Defendant also quibbles with language in MCI's Complaint that says Marvel "'engaged numerous writers and artists' and 'assigned [] Ditko stories to illustrate,'" rather than using "hired" as the operative verb in those sentences.  (Mem. at 27-28 (quoting Compl. ¶¶ 1, 4).)  But these words do not convey substantively different concepts—that is, unless Defendant leans on the notion of "hiring" to convey a traditional employer-employee relationship, which is unnecessary under the 1909 Act.  Moreover, as in *Hogarth*, courts routinely use the concept of "commissioning" rather than "hiring" when conducting a work-made-for-hire analysis as to independent contractors under the 1909 Act.

preparation and content of the memoirs and provided editing services), *aff'd sub nom., Twentieth Century Fox Film Corp. v. Ent. Distrib.*, 429 F.3d 869, 873 (9th Cir. 2005).

As *Picture Music* and *Twentieth Century Fox* illustrate, the work-for-hire analysis is concerned with the party that "commission[ed] the work," *Est. of Burne Hogarth*, 342 F.3d at 160-61, *i.e.*, the "ultimate employer," *Niss v. Columbia Pictures Indus., Inc.*, 2000 WL 1862814, at *11 (S.D.N.Y. Dec. 20, 2000), *aff'd*, 25 F. App'x 76 (2d Cir. 2002). And if other persons or entities may play some role in the creative process without severing the connection between a contributor and his ultimate employer, then the mere registering of the copyrights by commonly-owned entities surely does not either. Indeed, this very argument was rejected by the Southern District of New York—in a decision later affirmed by the Second Circuit—in another 1909 Act case, *Niss v. Columbia Pictures Industries*. After screenwriter Stanley Niss wrote and produced a film for Columbia, the copyright in that film was registered in the name of "Pendulum Productions," a distinct entity owned by Niss. 2000 WL 1862814, at *1. Applying the instance and expense test, the court concluded that the film was Columbia's work for hire even though Niss acted as a producer; "at all times Columbia retained the right to direct and supervise the manner in which the work was performed," for example by retaining control over the editing process, schedule, and advertising of the film. *Id*. at *11 (internal quotation marks omitted). That the original copyright was registered to Pendulum Productions rather than Columbia was irrelevant: "Columbia was the 'ultimate employer.' The film was paid for by Columbia, and the work was ultimately done for Columbia." *Id*.

Copyright law does not limit the rights of companies to delegate certain tasks to vendors or other entities, nor does copyright law make such delegations relevant to work-made-for-hire status. When a delegatee performs a designated function, its conduct is attributable to the

delegator, and the work-for-hire question remains the same:  Was the work created at the delegator's instance and expense?  For example, Defendant observes that payments to contributors were made by Magazine Management rather than by, say, Non-Pareil.  But Magazine Management's role was to act as a servicing partnership contracted by the other entities to carry out various services for them, including administrative functions like issuing payments.  (Bard Decl., Ex. 5 at 2-3; Bard Decl., Ex. 6 at 3; Bard Decl., Ex. 7 at 5.)  That a check came from Magazine Management does not preclude one of the other entities from being the true payor.

Finally, Defendant can find no support in this Court's decision in *Waite v. UMG Recordings, Inc.*, 450 F. Supp. 3d 430 (S.D.N.Y. 2020).  In *Waite*, various recording artists sought to terminate prior grants of the copyrights in their recordings to the defendant record company.  Certain of the grants were contracts between so-called loan-out companies and the defendant—the recording artists were not themselves parties to those contracts at all.  450 F. Supp. 3d at 441.  Instead, the recording artists used a nested structure, whereby the artist worked under contract with the loan-out company, and the loan-out company would, in turn, "'loan' out an artist's services to employers."  *Id.*  This Court found that the use of loan-out companies defeated the artists' copyright termination notice, because, under Section 203 of the Copyright Act,[25] "the statutory text is clear: termination rights exist only if the *author* executed the grant."  *Id.* at 442 (emphasis in original).  The Court explained that it was obliged to "adhere to the text the Copyright Act"—and the Act's " unambiguous text precludes [the artists] from terminating the copyrights granted by third parties."  *Id.*

---

[25] Section 203, rather than Section 304, applied in *Waite* because the works at issue were comparatively newer than those disputed here.

That principle has no application here.  Defendant's "shell company" theory does not implicate any statutory text—much less unambiguous text—stating that work-for-hire status depends on corporate formalities like which specific entity wrote a check or registered a copyright.  As shown above, work-for-hire status under the 1909 Act instead depends on the practical questions about whether the artist, or someone else, directed and paid for the creation of the work.  Defendant's technical argument is directly at odds with that well-established practical standard.

### D.  Under The 1909 Copyright Act, The Instance And Expense Test Applies To Independent Contractors—Including Those Who Worked Before Courts Clarified That Legal Precept.

Defendant throws one final argument at the wall:  That Marvel and Ditko "could not have intended" his contributions to be classified as work made for hire, because at the time, courts generally applied the doctrine only to "traditional employees."  (Mem. at 40.)  This argument is nothing more than a distraction.  And it was already raised and rejected in *Kirby*, which dealt with work performed during the same pre-1966 time period.

Defendant even borrows much of the Kirby Heirs' phraseology for this argument, making it all the more audacious to rehash it here after the Second Circuit has already spoken.  (*E.g.*, *compare* Mem. at 40 ("Until 1966, 'the courts had applied the work for hire doctrine under the 1909 Act exclusively to traditional employees.' . . . Thus, even if Ditko or Marvel had retained Melville B. Nimmer himself in the Period (1962-1966) they would have been advised that Ditko's freelance work was *not* 'work for hire' under Section 26 of the 1909 Act."), *with* Ex. 98, Kirby Heirs' Opp'n Mem. at 20-21 ("[U]ntil 1965-66, 'the courts had applied the work for hire doctrine under the 1909 Act exclusively to traditional employees.' . . . In short, even if Marvel or Kirby had retained sophisticated counsel in the operative Period, even Melville B. Nimmer, himself, they would have been advised that Kirby's work was *not* 'for hire.'").)  Of course, both

the district court and the Second Circuit held that Kirby *did* work for hire, even though all the contributions at issue were made before courts clarified that the instance and expense test applied to independent contractors more than half a century ago.

Even if it were not foreclosed by *Kirby*, Defendant's argument would prove too much. Any contrary holding would displace the settled rule of law that the instance and expense test applies to independent contractors under the 1909 Act, as no employer of an independent contractor would be able to establish the purportedly required "intent" for works created during the first 57 years of the Act's history.  That is not—and could not be—the rule.  *See, e.g.*, *Kirby*, 726 F.3d at 124-25 (holding that contributions made between 1958 and 1963 were made for hire, notwithstanding lack of traditional employer-employee relationship); *Markham Concepts*, 1 F.4th at 77 (same as to board game developed from 1959 to 1960); *Twentieth Century Fox Film Corp.*, 429 F.3d at 872-77 (same as to book written from 1947 to 1948).

*     *     *

This Court should reject Defendant's repeated efforts to circumvent settled jurisprudence. At base, this case is quite simple.  The holdings that applied to Kirby apply in equal force to Ditko, and mandate summary judgment in favor of MCI and against Defendant.

## **<u>CONCLUSION</u>**

For the foregoing reasons, MCI respectfully requests that the Court deny Patrick S. Ditko's Motion for Summary Judgment in its entirety.

Dated:  June 30, 2023

**O'MELVENY & MYERS LLP**

By:        */s/ Daniel M. Petrocelli*
                Daniel M. Petrocelli

Daniel M. Petrocelli*
dpetrocelli@omm.com
Molly M. Lens
mlens@omm.com
Matthew Kaiser*
mkaiser@omm.com
1999 Avenue of the Stars, 8th Floor
Los Angeles, California 90067
Telephone:  (310) 553-6700
Facsimile:  (310) 246-6779

Allen Burton
aburton@omm.com
Danielle Feuer
dfeuer@omm.com
Times Square Tower
7 Times Square
New York, NY 10036
Telephone:  (212) 326-2000
Facsimile:  (212) 326-2061

* Admitted *pro hac vice*

*Attorneys for Marvel Characters, Inc.*