# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARVEL CHARACTERS, INC.,<br><br>                Plaintiff,<br><br>v.<br><br>PATRICK S. DITKO, in his capacity as Administrator of the Estate of Stephen J. Ditko,<br><br>                Defendant. | Case No.: 1:21-cv-7957-LAK<br><br>Hon. Lewis A. Kaplan<br><br>**MARVEL CHARACTERS, INC.'S OPPOSITION TO DEFENDANT PATRICK S. DITKO'S LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT**<br><br>Oral Argument Requested |
| PATRICK S. DITKO, in his capacity as Administrator of the Estate of Stephen J. Ditko,<br><br>                Counterclaimant,<br><br>v.<br><br>MARVEL CHARACTERS, INC. and DOES 1-10, inclusive,<br><br>                Counterclaim-Defendants. | |

Pursuant to Local Civil Rule 56.1(b) of the Local Rules of the United States District Court for the Southern District of New York, Plaintiff Marvel Characters, Inc. ("MCI"), by and through its undersigned counsel, respectfully submits the following opposition to Defendant Patrick S. Ditko's statement of material facts in support of his motion for summary judgment.

MCI objects to the "facts" in Defendant's statement that are immaterial and/or irrelevant to the legal standards governing this case. *See, e.g.*, *Marvel Worldwide, Inc. v. Kirby*, 777 F. Supp. 2d 720, 748 (S.D.N.Y. 2011) (rejecting evidence from outside "the relevant time period" as "not admissible evidence of anything"); *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 139-40 (2d. Cir. 2013) (relevant principles of the instance-and-expense test); *Kinsella v. Rumsfeld*, 320 F.3d 309, 311 (2d Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (facts are immaterial unless they "affect the outcome of the suit under the governing law").

MCI further objects to the "facts" in Defendant's statement that mischaracterize evidence, ignore relevant record evidence, or reflect unsupported legal assertions and/or conclusions. By responding, MCI does not concede that any of Defendant's "facts" are: (1) facts, (2) supported by evidence that is admissible at trial, (3) proper facts under Rule 56, or (4) material or relevant to any issue in this action.

1.      **From its beginnings in the Great Depression to the 1960s, the comic book business was a "fly-by-night" operation where publishers quickly came and went.** *See* May 19, 2023 Declaration of Marc Toberoff ("Toberoff Decl."), Ex. 1 at 7 (Supplemented Expert Report of Mark Evanier ("Evanier Rep."), providing historical background and explaining volatile historical context of comic book business from the 1930s to the 1960s); Ex 3 at 204:6-23, 242:16-243:8 (John V. Romita ("Romita") testifying that Goodman would open and close his comic book business at the drop of a hat and that Romita had no employment security); Ex. 13 ¶ 13 (Neal Adams ("Adams") attesting that the comic book business was hand-to-mouth and the early years were a confusing time when one was not sure whether any particular comic book would still be around in a year).

**RESPONSE:  Disputed in part**, but **immaterial**.  Defendant does not identify which publishers he is referring to.  To the extent Defendant is referring to Marvel, this contention is **disputed** because Marvel's business continues to the present day.

Regardless, this contention is **immaterial** because it refers in significant part to events decades outside the relevant time period and, in any event, has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 777 F. Supp. 2d at 748 (rejecting evidence from outside "the relevant time period" as "not admissible evidence of anything"); *Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).

MCI also **objects** to Toberoff Exhibits 1 and 13.  *See* Memorandum Of Law In Support Of Plaintiff And Counterclaim-Defendant Marvel Characters, Inc.'s Motion To Exclude The Expert Reports And Testimony of Mark Evanier ("MTE Evanier") [Dkt. 77]; MCI's Evidentiary Objection Nos. [1] & [16].

2.     **In the 1930s-1940s, at some publishers, artists worked as employees, usually at long rows of desks, resembling a "sweatshop."**  *See* Toberoff Decl., Ex. 1 at 8 (Evanier Rep. describing common custom and practices by which comic books were created in the comic book industry's early years and explaining that some companies hired staff artists and writers to work on premises and were paid by the hour or week to create stories, usually sitting at long rows of desks resembling a "factory sweatshop").

**RESPONSE:  Disputed in part**, but **immaterial**.  Defendant does not identify which publishers he is referring to.  To the extent Defendant is referring to Marvel, MCI does not dispute that Marvel employed artists in the late 1930s into the 1940s, but **disputes** the characterization of it as a "sweatshop."  *See* June 30, 2023 Declaration of Molly Lens ("Lens Opp. Decl."), Ex. 83 72:25-73:7 (Marvel artist Don Rico's wife, Michele Hart-Rico, testifying that "his work for Marvel enabled him to have not only an apartment in the city

3

but also a house outside [the] city," as he "did very well when he was in New York"); Lens

Opp. Decl., Ex. 83 207:24-208:1 (Hart-Rico testifying that she and Don Rico had an

enormous apartment" in New York in the 1960s); Lens Opp. Decl., Ex. 94 at 3 (Marvel

artist Gene Colan stating, "I've had fifty years in comics. I've earned a decent living. And

I've loved every minute of it.").  Moreover, Marvel's business continues to the present day.

Regardless, this contention is **immaterial** because it refers entirely to events

decades outside the relevant time period and, in any event, has no bearing on the Court's

application of the work-made-for-hire test, as this Court's grant of summary judgment for

Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 777 F. Supp.

2d at 748 (rejecting evidence from outside "the relevant time period" as "not admissible

evidence of anything"); *Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-

expense test).

MCI also **objects** to the evidence cited in support of this contention.  *See* MTE

Evanier [Dkt. 77]; MCI's Evidentiary Objection No. [1].

3.    **In the 1930s-1940s, at some publishers, freelancers submitted completed work
and the publisher purchased what it chose to publish.**  *See* Toberoff Decl., Ex. 1 at 8 (Evanier
Rep. describing common custom and practices by which comic books were created in the industry's
early years and explaining that some companies paid freelancers for their work, which was often
created at home, and which the publisher could choose to purchase, or not purchase, by the page);
Ex. 2 at 71:17-74:5 (Lawrence Lieber ("Lieber") testifying that he sold freelance work to Marvel in
the 1950s-1960s, had no contract with Marvel, and that Marvel was not obligated to buy his
submitted material).

**RESPONSE:  Disputed in part**, but **immaterial.**  Defendant does not identify which

publishers he is referring to.  To the extent Defendant is referring to Marvel, while MCI

does not dispute that freelancers worked for Marvel on a freelance basis,  MCI **disputes**

Defendant's suggestion that Marvel "purchased" "completed work" "on spec," which is not

only an issue of law but also inaccurate.  To the contrary, freelance contributors, including

Ditko, contributed to Marvel's comic books pursuant to assignments from Stan Lee, who directed the creation of the works listed in Defendant's termination notices (the "Works"), and they were compensated by Marvel on an agreed per-page basis for completed assignments. *See* May 19, 2023 Declaration of Molly Lens (Dkt. 71, "Lens Decl."), Ex. 2 152:1-154:7 (Thomas testifying that he could not "think of any instances" in which "artists start[ed] working on pages for a comic before discussing the plot or synopsis with Stan or the writer," or, more specifically, in which Ditko "submitted artwork to Marvel for an existing comic book series that he hadn't been assigned to," or otherwise sold plots, synopses, scripts, dialogue, artwork, or characters "on spec" to Marvel); Lens Decl., Ex. 12 56:12-15 (Thomas testifying that artists did not "start working on pages before discussing the plot or synopsis with Stan or the writer"); Lens Decl., Ex. 12 57:25-58:9 (Thomas confirming that he was not "aware of any instance where a writer came in and actually started working on a new series before Stan said: Go ahead and write the series," nor was he "aware of any instances where an artist began work on a comic book issue before getting the assignment to do the issue from Stan"); Lens Decl., Ex. 12 58:14-23 (Thomas confirming that, during the relevant period, Marvel did not "ever buy any work created on spec by freelance artists"); Lens Decl., Ex. 7 217:13-21 (same); Lens Decl., Ex. 13 41:20-42:9 (Lee testifying that he could not recall "Marvel ever buy[ing] work that was created by one of the writers or freelancers on spec as opposed to having the material being part of an assignment that [Lee] would give him" during the relevant time period); Lens Decl., Ex. 10 383:18-21 (Lee confirming that Kirby did not "ever begin work on a book published by Marvel before [Lee] had assigned him that work"); Lens Decl., Ex. 6 38:8-21 (Lee confirming that he could not "recall any comic book that Marvel published prior to 1972 . . . that was created other than pursuant to a specific assignment by an editor to a writer and an artist"—at least,

in Marvel's "regular comics"); Lens Decl., Ex. 48 at 3 (Ditko admitting that he "was given

the job of drawing Spider-Man" but could not speak to "[w]hy, exactly"); Lens Decl., Ex.

51 at 3 (Ditko explaining that, "[a]s a freelancer, [his] focus had to be on what is next, what

has to be done," as "[t]he last job is history"); Lens Decl., Ex. 54 at 4 (Ditko acknowledging

that, "[s]ince [he] was a freelancer, Stan Lee could have taken [him] off S[pider]-M[an]

anytime he wanted—he did it for a S[pider]-M[an] story pencilled by Jack Kirby"); Lens

Decl., Ex. 2 27:19-28:7 (Thomas testifying that his "responsibilities as a freelance writer"

were "[j]ust to write whatever Stan told [him] to write"); Lens Decl., Ex. 2 56:2-57:7

(Thomas testifying that Marvel artists did not "have the ability to select which comics they

were going to work on" or "the ability to select which artists, letterers, or colorists they were

going to be working with" during the relevant time period); Lens Decl., Ex. 12 56:16-18

(Thomas confirming that it was Lee who "decided which writer and artist would work on a

particular comic book or issue"); Lens Decl., Ex. 2 148:22-151:25 (Thomas testifying about

why freelancers might be removed from certain comic books, including for "lateness,

undependability," or the editor's decision that "they just weren't doing the right job, or even

if they were okay . . . [that] a little bit of musical chairs might get us a better arrangement of

people"); *see also* Lens Decl., Ex. 2 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens

Decl., Ex. 12 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15

16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13 14:5-8, 23:18-

21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-10, 224:15-23,

241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl., Ex. 2 17:8-18:13 (Thomas

testifying that "subject to the publisher, [Lee] was in charge of everything. He oversaw the

writing, he oversaw the artists and the art that came in. You know, everything went through

him with the help of the production manager in particular."); Lens Decl., Ex. 2 24:17-23

(Thomas testifying how Marvel production manager Sol Brodsky "would call a freelancer in . . . to keep an eye on him to make sure he finished the job on deadline or . . . had something that had to be corrected or changed"); Lens Decl., Ex. 2 37:10-39:6 (Thomas testifying that when he became editor-in-chief, he was "in charge of, you know, all the artists, the writers, the colorists, the letterers and so forth"); Lens Decl., Ex. 12 67:16-68:6 (Thomas testifying that Lee "decided which artist would do a cover for a particular issue[,] . . . they were reviewed by Stan, . . . then they were all reviewed eventually by Martin Goodman as publisher"); Lens Decl., Ex. 13 44:4-17 (Lee testifying that because "we considered the covers the most important part of the book," he "spent a lot of time on" their look and layout); Lens Decl., Ex. 13 16:3-19 (Lee testifying that he would "give instructions to the artists as to how [he] wanted the story to go" and "oversaw . . . creative editorial aspects of the comic books that were created, . . . because [he] had to answer to the publisher, Martin Goodman, and he had to be happy with what I was doing"); Lens Decl., Ex. 4 97:7-9 (Lee testifying that comic book production "was [his] responsibility, the whole thing"); Lens Decl., Ex. 4 93:23-94:5 (Lee testifying that he supervised Marvel's writers and artists); Lens Decl., Ex. 2 80:24-81:12 (Thomas testifying that "[s]ubject to the publisher, [Lee had] complete authority" over artwork in Marvel comics); Lens Decl., Ex. 2 125:18-126:1 (Thomas testifying that Lee "was always the ultimate authority unless Martin Goodman stepped in, and that was mostly on covers"); Lens Decl., Ex. 7 219:11-220:11 (Thomas testifying that "the ultimate say, as far as I know, was the publisher, . . . Martin Goodman"); Lens Decl., Ex. 13 97:8-11 (Lee testifying that he "couldn't do any book unless Martin approved of it"); Lens Decl., Ex. 4 124:19-125:4 (Lee testifying that "[i]t was always [Goodman's] decision" as to what to publish, and "he exercised the authority ultimately to publish the last edition of 'Amazing Fantasy'"); Lens Decl., Ex. 4 124:3-18 (Lee testifying

that he "loved" the "Amazing Fantasy" books but "Mr. Goodman decided to cancel them because they weren't selling"); Thomas Decl. ¶¶ 7-8 ("As part of [Marvel's] established framework [for creating comics in the 1960s], Stan Lee supervised and directed Marvel's comic book-creation process subject only to Martin Goodman"); *see also* Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15 (Thomas testifying that freelance writers, artists, pencilers, inkers, letterers, and colorists all were paid by Marvel on a per-page rate); Lens Decl., Ex. 4 125:15-18 (Lee confirming that, to his recollection, Ditko was paid a per-page rate "for his contribution to . . . Spider-Man"); Lens Decl., Ex. 2 292:18-293:4 (Thomas explaining Marvel's per-page rate system, in that compensation "was based entirely on the page, whether it took ten minutes to write or an hour to write or five hours to write"); Lens Decl., Ex. 2 332:23-333:4 (Thomas testifying that he understood that Marvel had "always" used "a page rate kind of system for writers and for artists" during the relevant time period); Lens Decl., Ex. 13 30:11-14 (Lee confirming that freelancers "were paid on a per page rate" during the relevant time period); Lens Decl., Ex. 13 58:13-21 (same as to Kirby); Lens Decl., Ex. 39 at 5 (Thomas recounting that the day Ditko quit Marvel, noting that Marvel production manager Sol Brodsky "had a memo on his desk for a $5 a page raise for Steve, which was fairly substantial for 1965"); Lens Decl., Ex. 57 at 3 (Ditko writing "What I did with Spider-man, I was paid for. Marvel's property."); Lens Decl., Ex. 68A-G (freelance writer Don Heck's payment ledger reflecting extensive entries on per-page basis for his work for "Mag. Management," "Maga. Management," "Magazine Management," and "Marvel" from 1954 to 1972 and intermittently until 1994, when all entries end); Lens Decl., Ex. 2 137: 8-16 (Thomas testifying that he was "paid on a per-page basis for [his] freelance writing assignments from Marvel"); Lens Decl., Ex. 10 396:1-10 (Lee testifying that for his work as a writer, he "was paid on a freelance basis, like any

8

freelancer writer . . . paid by the page"); Lens Decl., Ex. 6 40:14-20 (Lee testifying that as a

writer he was paid"[p]er page on a freelancer basis like all the other writers."); *see also* Lens

Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7, 226:7-11, 249:7-9,

258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.

Additionally, Toberoff Exhibit 2 **does not support** this contention, as the cited

material refers to Lieber's work at Marvel in the 1950s and 60s, not the 1930s and 40s.

Regardless, this contention is **immaterial** because it refers entirely to events

decades outside the relevant time period and, in any event, has no bearing on the Court's

application of the work-made-for-hire test, as this Court's grant of summary judgment for

Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 777 F. Supp.

2d at 748 (rejecting evidence from outside "the relevant time period" as "not admissible

evidence of anything"); *Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-

expense test).

MCI also **objects** to the evidence cited in support of this contention. *See* MTE

Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1] & [2].

4.    **Comic book publishers saw little value in their disposable product beyond
monthly sales figures.** *See* Toberoff Decl. Ex. 1 at 7 (Evanier Rep. describing the custom and
practice of comic book publishers attributing little value to comic books in the industry's early
years); Ex 3 at 78:21-79:21, 254:2-25 (Romita testifying that no one at Marvel cared about the
comic book characters until the 1950s and he never thought the art would be worth anything or that
the comic book industry would last); Ex. 20 at 50:21-53:25, 154:13-155:14, 156:11-17 (Mark
Evanier ("Evanier") testifying that Goodman saw little value in the work being done in the 1960s
and was just following trends, that Stan Lee ("Lee") told Evanier that comics would crumble and
nothing would be remembered, and that Sol Brodsky ("Brodsky") told Evanier that, in the 1960s,
no one expected the comics books to ever be reprinted).

**RESPONSE:** **Disputed**, but **immaterial**.  Because Defendant fails to provide any time

period or identify which "[c]omic book publishers" he is referring to in this contention, it is

unclear as written.  To the extent Defendant is referring to Marvel, MCI **disputes** this

contention as Marvel clearly saw value in its comics, as it registered copyrights in the
comics, sought out advertising across its publishing portfolio, and otherwise capitalized on
its comics through merchandising and licensing.  *See* Lens Decl., Ex. 24A-E (Marvel's
contemporaneous copyright registrations in the Works); Lens Opp. Decl., Ex. 93 at 4-5
(1966 advertising rate card for Marvel Comics Group soliciting advertisements across its
magazines, reflecting that Marvel Comics Group "consists principally of the following
magazines . . . [including] Amazing Spider-Man and Strange Tales"); Lens Opp. Decl., Ex.
92 at 3-8 (1947 advertising rate card for Marvel Comics Group); Lens Opp. Decl., Ex. 96 at
2 (Martin Goodman authorizing his son, Charles Goodman, to act as an agent to "sign
licensing and related contracts both for domestic accounts and foreign" on behalf of
Magazine Management Company); Lens Opp. Decl., Ex. 97 at 2-4 (schedules of assorted
Marvel licensing contracts for radio programs, television productions, and merchandising
during the relevant time period).  Additionally, Toberoff Exhibit 3 **does not support** this
contention, as the cited material refers to the 1950s, *i.e.,* before the relevant time period.

Regardless, this contention is **immaterial** because it refers at least in part to events
outside the relevant time period and, in any event, has no bearing on the Court's application
of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the
*Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 777 F. Supp. 2d at 748
(rejecting evidence from outside "the relevant time period" as "not admissible evidence of
anything"); *Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).

MCI also **objects** to Toberoff Exhibits 1 and 20.  *See* MTE Evanier [Dkt. 77];
MCI's Evidentiary Objection Nos. [1] & [19].

5.    **Little to no attention was paid to copyright issues by the publishers or artists.**
*See* Toberoff Decl., Ex. 1 at 7 (Evanier Rep. describing the custom and practice of comic book
publishers attributing little value to comic books in the industry's early years and the lack of

attention paid to copyrights of the material); Ex 3 at 78:21-79:21, 254:2-25 (Romita testifying that
no one at Marvel cared about the characters until the 1950s and he never thought the art would be
worth anything or that the comic book industry would last).

**RESPONSE:  Disputed**, but **immaterial**.  Because Defendant fails to identify any time

period or identify which "publishers or artists" he is referring to in this contention, it is

unclear as written.  To the extent Defendant is referring to Marvel, MCI **disputes** this

contention because Marvel clearly paid attention to copyright issues as it registered

copyrights in its comics and published appropriate copyright notices reflecting such

registration.  *See* Lens Decl., Ex. 23A at 2 (agreement between Marvel and Ditko whereby

Ditko "acknowledges, agrees and confirms that any and all work, writing, art work material

or services (the 'Work') which have been or are in the future created, prepared or performed

by [him] for the Marvel Comics Group have been and will be specially ordered or

commissioned for use as a contribution to a collective work and that as such Work was and

is expressly agreed to be considered a work made for hire."); Lens Decl., Ex. 57 at 3 (letter

from Ditko stating that he "never claimed creating Spider-Man" and that Marvel "own[s]

the art pages, the published material"); Lens Decl., Ex. 52 at 3 (Ditko voicing dismay with

the movie depiction of Doctor Strange but agreeing that "whoever has the rights can add and

subtract from the original any way he chooses"); Lens Decl., Ex. 59 at 3 (Ditko critiquing

Marvel's editorial choices, but acknowledging that, even if certain "ideas" were his, he "had

no real right to them when published"); Lens Decl., Ex. 50 at 3 (letter from Ditko explaining

that "[t]he who 'created' Spider-man etc., issues, controversies were created by fan

publication interviewers"); *compare* Lens Decl., Ex. 56 at 2 (Ditko writing that "Wally

Wood's Witzend [] gave writers, artists the opportunity to copyright their original ideas,

created material when published"), Lens Decl., Ex. 61 at 3 (Ditko describing Wally Wood

as "a stand-out in many ways" including that "[h]e published witzend—where one could

copyright his own ideas, creations—I took advantage of it, my Mr. A, etc."), Lens Decl., Ex. 49 at 2 (Ditko writing that the "[m]ost important" thing about "Witzend" "was that one could copyright, own one's creative ideas, work"); Lens Decl., Ex. 60 at 3 (Ditko writing that "Wally Wood did an astounding thing for writers and artists, an opportunity to create and copyright what one creates, protecting and able to cash in on it at any future time"); Lens Decl., Ex. 51 at 3 (Ditko writing that "Wally Wood who created WITZEND wanted a publication for creators to copyright their ideas, creations"), and Lens Decl., Ex. 61 at 2 (Ditko writing that "Mr. A is my copyrighted PROPERTY" and that "NO ONE, but me, has any right" to it), *with* Lens Decl., Ex. 44 at 4 (Ditko acknowledging that "Spider-Man & Doctor Strange are copyrighted by the Magazine Management company").  Additionally, Toberoff Exhibit 3 **does not support** this contention, as the cited material from 78:21-79:21 refers to the 1950s, *i.e.,* before the relevant time period.

Regardless, this contention is **immaterial** because it refers at least in part to events outside the relevant time period and, in any event, has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 777 F. Supp. 2d at 748 (rejecting evidence from outside "the relevant time period" as "not admissible evidence of anything"); *Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).

MCI also **objects** to Toberoff Exhibit 1.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection No. [1].

6.    **In 1939, Martin Goodman ("Goodman") founded Marvel's purported predecessor, Timely Comics ("Timely").**  *See* Toberoff Decl., Ex. 1 at 8 (Evanier Rep. providing historical context and describing Goodman's founding of Timely); Ex. 4 at 11:24-12:3 (Lee testifying that Timely changed names many times, but eventually became Marvel); Ex. 56 at 82:23-83:13 (Lee testifying he started working at Timely, which was somehow related to Magazine Management, and which eventually became "Marvel").

12

**RESPONSE:  Undisputed**, except MCI **disputes** Defendant's characterization of Timely as Marvel's "purported" predecessor.  Indeed, the evidence cited by Defendant explains that Timely was a predecessor to Marvel.

MCI, however, **objects** to Toberoff Exhibit 1.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection No. [1].

7.      **Since 1947, Goodman's Timely Comics, which later became Magazine Management Company ("Magazine Management"), published a number of pulp magazines.** *See* Toberoff Decl. Ex. 1 at 8 (Evanier Rep. providing historical context and explaining that Goodman started out publishing "pulp" magazines, which were cheaply printed periodicals printed on pulp paper); Ex. 56 at 82:23-83:13 (Lee testifying he started working at Timely, which was somehow related to Magazine Management, and which eventually became "Marvel").

**RESPONSE:  Disputed**, but **immaterial**.  While MCI does not dispute that Goodman's comic book business, then known as Timely Comics, published a number of pulp magazines, MCI **disputes** that it only published pulp magazines and that Timely "became" Magazine Management Company.  *See infra* Response No. 9, *citing* May 19, 2023 Eli Bard Declaration (Dkt. 70, "Bard Decl.") ¶ 2; Bard Decl., Ex. 5 at 2-3; Bard Decl., Ex. 7 at 5; Bard Decl., Ex. 10 at 2; Lens Decl., Ex. 18 72:25-73:11; Lens Opp. Decl., Ex. 90 5:11-19; Bard Decl., Ex. 8 at 5-6; Lens Decl., Ex. 75; Lens Decl., Ex. 76; Lens Opp. Decl., Ex. 93 at 4-5; Lens Opp. Decl., Ex. 92 at 3-8; Bard Decl., Ex. 6 at 3; Bard Decl., Ex. 5 at 3; Lens Decl., Ex. 68A-G.  Additionally, Toberoff Exhibit 56 **does not support** this contention, as Lee's testimony does not establish that Timely "later became" Magazine Management Company or that either entity published "pulp" magazines.

Regardless, this contention is **immaterial** because it refers at least in part to events outside the relevant time period and, in any event, has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 777 F. Supp. 2d at 748

13

(rejecting evidence from outside "the relevant time period" as "not admissible evidence of anything"); *Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).

MCI also **objects** to Toberoff Exhibit 1.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection No. [1].

8.      **In 1951, Goodman began operating his comics business through Magazine Management under the label "Atlas Comics" and later, "Marvel Comics."**  *See* Toberoff Decl., Ex. 11 ¶ 4 (Gene Colan ("Colan") attesting that he was originally hired in 1946 as a staff artist for Timely, which became Atlas, then Marvel); Ex. 17 at 34:21-35:25 (Roy Thomas ("Thomas") testifying that Goodman kept changing names of his companies and the public was confused as to what the name of "Marvel" actually was.  The company started as "Timely," but that "Atlas," which was Goodman's distributing company, had its name on the magazines, which made the public think the company's name was "Atlas."  Finally, "Marvel" began being used sometime in 1961 to 1963.); Ex. 56 at 82:23-83:13 (Lee testifying he started working at Timely, which was somehow related to Magazine Management, and which eventually became "Marvel").

RESPONSE:  **Undisputed**, except MCI **disputes** Defendant's suggestion that "Atlas Comics" and "Marvel Comics" were the only names under which Goodman's comics business published comics.

MCI, however, **objects** to Toberoff Exhibit 11.  *See* MCI's Evidentiary Objection No. [14].

9.      **In addition, from the 1940s until June 1968, Goodman also operated his comic book business through dozens of unrelated shell companies.**  *See* Toberoff Decl., Ex. 14 at 4 (Rebuttal Expert Report of Mark Evanier ("Evanier Rebuttal Rep.") providing historical context and explaining that Goodman registered the copyright to comic books under the names of various shell corporations that were unrelated to each other); Ex. 17 at 317:18-318:18 (Thomas testifying that Goodman ran "Marvel" as a bunch of small companies rather than just as a unified Magazine Management for some unknown business or legal reasons); Ex. 20 at 196:1-12 (Evanier testifying that Brodsky described Goodman's shell companies as "shell companies"); Ex. 24 at 49:21-50:22 (Paul Levitz ("Levitz") testifying that Vista Publications, Inc. ("Vista") was one of Goodman's shell companies); Ex. 46 at 1-3 (list of Goodman's shell companies dated October 4, 1967 showing no legal or corporate relationship to one another or Magazine Management).

RESPONSE:  **Disputed**, but **immaterial**.  While MCI does not dispute that Goodman operated his comic book business through various companies until he sold those assets in June 1968, MCI **disputes** Defendant's characterization of such companies as "unrelated

14

shell companies."  As relevant here, Goodman's various comic book entities conducted

business as "Marvel" or "Marvel Comics Group" and engaged with Magazine Management

Company for administrative services, including payments to those providing services to

Marvel.  *See* Bard Decl. ¶ 2; Bard Decl., Ex. 5 at 2-3 (reporting on Magazine Management

Company, a "[p]artnership formed 1942" that acts as "the managing organization for the

various publishing corporations in which Martin Goodman is a principal or a stockholder");

Bard Decl., Ex. 7 at 5 ("Through th[e] partnership, Magazine Management Company,

respondent Martin Goodman controls and operates approximately forty-eight corporations

engaged, among other things, in the business of publishing and distributing various

publications.  Martin Goodman . . . formulates, directs and controls the acts and practices of

each corporate respondent either directly or through the partnership, Magazine Management

Company . . . ."); Bard Decl., Ex. 10 at 2 (June 28, 1968 agreement for sale of the

Goodmans' Marvel Comics business (the "June 28, 1968 Sale"), reflecting the Marvel

entities in existence during the early 1960s and their common ownership by Martin

Goodman); Lens Decl., Ex. 18 72:25-73:11 (Goodman discussing his publishing entities,

explaining that "each corporation st[ood] on its own" but he "own[ed] them either

completely or [his] wife may [have] own[ed] some stock in some of them"); Lens Opp.

Decl., Ex. 90 5:11-19 (Goodman testifying how a comic book would have been published

by "one of [his] corporations" and would have been copyrighted "[u]nder the corporation

that published it."); Bard Decl., Ex. 8 at 5-6 (A "group of commonly owned and controlled

corporations collectively known as the Marvel Comics Group" published comic books

"frequently includ[ing] material concerning characters featured in other publications of the

Group."); Lens Decl., Ex. 75 (Goodman certifying as president of various publishing

corporations that he, Jean Goodman, and said corporations conducted business as

"Marvel"); Lens Decl., Ex. 76 (same); Lens Opp. Decl., Ex. 93 at 4-5 (1966 advertising rate card for Marvel Comics Group soliciting advertisements across its magazines, reflecting that Marvel Comics Group "consists principally of the following magazines . . . [including] Amazing Spider-Man and Strange Tales"); Lens Opp. Decl., Ex. 92 at 3-8 (1947 advertising rate card for Marvel Comics Group); Bard Decl., Ex. 6 at 3 ("The defendant Magazine Management Company . . . partnership is composed of two New York citizens with offices in New York City, and renders administrative services to and exercises the over-all control of the other defendants.  The costs of these services are charged to the corporation, for which and to the extent said services are rendered."); Bard Decl., Ex. 5 at 3 (explaining that Magazine Management Company acts as the "managing organization for the various publishing corporations" and its "[i]ncome is mainly derived from services rendered on a contract basis"); Lens Decl., Ex. 68A-G (freelance writer Don Heck's payment ledger reflecting extensive entries on per-page basis for his work for "Mag. Management," "Maga. Management," "Magazine Management," and "Marvel" from 1954 to 1972 and intermittently until 1994, when all entries end).

Regardless, this contention is **immaterial** because it refers at least in part to events outside the relevant time period and, in any event, has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 777 F. Supp. 2d at 748 (rejecting evidence from outside "the relevant time period" as "not admissible evidence of anything"); *Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).

MCI also **objects** to Toberoff Exhibits 14 & 20.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [17] & [19].

10.    **These shell companies had no employees, no actual offices or business activities, and, aside from being the name listed on the comic book cover copyright indicia, had no connection whatsoever to the works they purportedly copyrighted and published.** *See* Toberoff Decl. Ex. 14 at 4-5 (Evanier Rebuttal Rep. providing historical context and explaining that the shell companies had no employees, offices, or business activities, and had no contact with any freelancer); Ex. 17 at 244:15-23, 278:20-279:20 (Thomas testifying that the door to "Marvel's" office in 1965 only said "Magazine Management" and "Marvel's" employees worked in Magazine Management's offices); *id.* at 318:4-322:14 (Thomas testifying that Vista, Atlas Magazines, Inc. ("Atlas"), Non-Pareil Publishing Corp. ("Non-Pareil"), and others were just used as names on the comic book cover copyright indicia, but other than the indicia, no one knew what those entities did); *id.* at 320:10-322:14 (Thomas testifying that no one knew what Vista, Atlas, or Non-Pareil did and that Thomas did not receive any money from them, does not know anyone who did, does not know if they had any employees or any offices, or "of [them] having any existence" whatsoever); Ex. 22 at 252:23-254:24, 303:15-19 (Lieber testifying that he never heard of Vista or other shell companies, did not know if they had any employees and that he was paid by, and believed he was working with, Magazine Management); Ex. 24 at 51:19-52:2 (Levitz testifying that Goodman's shell companies had no actual offices and that only Magazine Management had offices); Ex. 50 at DETTWILER-0044-0058 (Don Heck's payment records identifying "Magazine Management" as the only entity that paid him for his freelance material from 1962 to 1966 (the "Period")).

**RESPONSE: Disputed**, but **immaterial**. MCI **disputes** Defendant's characterization of such companies as "shell companies" with "no connection whatsoever to the works" they published and copyrighted. As relevant here, Goodman's various comic book entities conducted business as "Marvel" or "Marvel Comics Group" and engaged with Magazine Management Company for administrative services, including payments to those providing services to Marvel. *See supra* Response No. 9, *citing* Bard Decl. ¶ 2; Bard Decl., Ex. 5 at 2-3; Bard Decl., Ex. 7 at 5; Bard Decl., Ex. 10 at 2; Lens Decl., Ex. 18 72:25-73:11; Lens Opp. Decl., Ex. 90 5:11-19; Bard Decl., Ex. 8 at 5-6; Lens Decl., Ex. 75; Lens Decl., Ex. 76; Lens Opp. Decl., Ex. 93 at 4-5; Lens Opp. Decl., Ex. 92 at 3-8; Bard Decl., Ex. 6 at 3; Bard Decl., Ex. 5 at 3; Lens Decl., Ex. 68A-G.

Regardless, this contention is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).

MCI also **objects** to Toberoff Exhibits 14 and 22. *See* MTE Evanier [Dkt. 77];

MCI's Evidentiary Objection Nos. [17], [26], & [31].

11.    **"Marvel" from its inception through the 1960s, was unique in its informality and disorganization.** *See* Toberoff Decl. Ex. 24 at 112:20-113:4 (Levitz testifying that Marvel was disorganized and did not have document retention policies and could not even keep track of its published comic books, which was very different than the more-organized DC Comics); Ex. 8 ¶ 10 (Joe Sinnott ("Sinnott") attesting that Marvel was very small and disorganized in the 1950s and 1960s); Ex. 65 at 8-9 (Flo Steinberg ("Steinberg") explaining that, when she was hired at Marvel in March 1963, she and Lee were the only employees and noting that Marvel had the "teeniest little office" and that there "was just a small amount of comics to get out").

<u>**RESPONSE:**</u>  **Disputed**, but **immaterial**.  While MCI does not dispute that Marvel, as a

creative comic book publisher, may have had an informal workplace in certain aspects, MCI

**disputes** that its organization was "unique[ly]" informal and disorganized among all comic

book publishers.  Indeed, none of the cited evidence establishes this contention.  To the

contrary, Exhibits 24, 8, and 65 merely indicate that Marvel had a small office or less robust

document retention policies than DC Comics, one of Marvel's competitors.

Regardless, this contention is **immaterial** because it refers at least in part to events

outside the relevant time period and, in any event, has no bearing on the Court's application

of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the

*Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 777 F. Supp. 2d at 748

(rejecting evidence from outside "the relevant time period" as "not admissible evidence of

anything"); *Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).

MCI also **objects** to Toberoff Exhibit 8.  *See* MCI's Evidentiary Objection No.

[11].

12.    **Lee started at Timely as an office boy.**  *See* Toberoff Decl. Ex. 1 at 9 (Evanier Rep. describing Lee's role as an office boy at Timely); Ex. 4 at 10:23-11:17 (Lee testifying that he got hired at Timely in 1939 or 1940); Ex. 56 at 82:13-22 (Lee testifying he started at Timely around 1940 when he was 17 years old).

**RESPONSE**:  **Undisputed**, but **immaterial** because this paragraph refers to events outside the relevant time period and, in any event, has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 777 F. Supp. 2d at 748 (rejecting evidence from outside "the relevant time period" as "not admissible evidence of anything"); *Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).

MCI, however, **objects** to Toberoff Exhibit 1.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection No. [1].

13.    **Lee was the nephew of Goodman's business manager who married into the Goodman family, making Lee, Goodman's relative.**  *See* Toberoff Decl. Ex. 1 at 9 (Evanier Rep. describing Lee's familial connection to Goodman); Ex. 5 at 296:10-14 (Lee testifying he was Goodman's wife's cousin).

**RESPONSE**:  **Undisputed**, but **immaterial** because this paragraph has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).

MCI, however, **objects** to Toberoff Exhibit 1.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection No. [1].

14.    **In 1941, Goodman promoted Lee, then 18, to the role of editor of his fledgling comic book business.**  *See* Toberoff Decl. Ex. 1 at 9 (Evanier Rep. describing Lee's promotion from office boy and apprentice writer to editor); Ex. 4 at 14:2-17 (Lee testifying that he got promoted to editor).

**RESPONSE**:  **Undisputed**.

MCI, however, **objects** to Toberoff Exhibit 1.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection No. [1].

15.    **By the mid-1940s, Timely had staff artists on salary, but in 1949, Goodman discovered surplus artwork, and fired his entire staff.**  *See* Toberoff Decl. Ex. 1 at 9 (Evanier Rep. providing historical context giving rise to Marvel's use of freelance creators and explaining

that Goodman's discovery of surplus, unpublished artwork in 1949 caused him to fire the staff artists); Ex. 5 at 368:11-369:14, 371:3-25 (Lee testifying that Goodman discovered excess artwork and had Lee fire almost everyone and that artists went from having guarantees from Goodman for a certain amount of work, to working freelance where Marvel "would only buy what [it] needed"); Ex. 11 ¶ 4 (Colan attesting that he was originally hired in 1946 as a staff artist for Timely, but was let go in the late 1940s, at which point he "sold artwork on a freelance basis to Timely").

**RESPONSE:  Undisputed**, but **immaterial**, except MCI **disputes** that Goodman fired "his

entire staff."  *See* Toberoff Ex. 5 369:3-8 (Lee testifying that "[m]ost of the salaried creative

people were let go, while I was ordered to use up all the inventory material.").

Regardless, this paragraph is **immaterial** because it has no bearing on the Court's

application of the work-made-for-hire test, as this Court's grant of summary judgment for

Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 777 F. Supp.

2d at 748 (rejecting evidence from outside "the relevant time period" as "not admissible

evidence of anything"); *Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-

expense test).

MCI, however, **objects** to Toberoff Exhibits 1 and 11.  *See* MTE Evanier [Dkt.

77]; MCI's Evidentiary Objection Nos. [1] & [14].

16.    **In 1954-57, Senate hearings on the corrupting influence of comics nearly bankrupted Timely, now Magazine Management.**  *See* Toberoff Decl. Ex 3 at 200:4-202:4 (Romita testifying that, around 1957, Timely/Atlas was having financial troubles because of Congressional hearings so the company cut artists and cut the number of comic book issues it was publishing); Ex. 24 at 138:16-140:7 (Levitz testifying that the comic book industry underwent great unrest in the 1950s).

**RESPONSE:  Disputed**, but **immaterial**.  Defendant cites no evidence that Senate hearings

occurred in the years 1954-57, nor that such hearings "nearly bankrupted Timely."  The

evidence establishes, at most, that the comic industry underwent financial troubles and

"unrest."

Regardless, this contention is **immaterial** because it refers to events outside the

relevant time period and, in any event, has no bearing on the Court's application of the

work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby*

case, as upheld by Second Circuit, confirms. *See Kirby*, 777 F. Supp. 2d at 748 (rejecting

evidence from outside "the relevant time period" as "not admissible evidence of anything");

*Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).

17.    **In 1957, Magazine Management again fired essentially all its employees except
Lee.** *See* Toberoff Decl. Ex. 1 at 9 (Evanier Rep. providing historical context giving rise to
Marvel's relationship with freelancers and describing Goodman's decision to fire all writers and
artists except Lee); Ex 3 at 123:18-125:12 (Romita testifying that he was fired around 1957 and was
not paid for the work he was in the middle of completing); Ex. 5 at 372:19-373:13 (Lee testifying
that Goodman had Lee fire everyone a second time in response to the Senate comic book
controversy); Ex. 8 ¶ 10 (Sinnott attesting that Marvel fired its staff in 1957).

   **RESPONSE:  Undisputed**, but **immaterial** because this paragraph refers to events outside

the relevant time period and, in any event, has no bearing on the Court's application of the

work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby*

case, as upheld by Second Circuit, confirms. *See Kirby*, 777 F. Supp. 2d at 748 (rejecting

evidence from outside "the relevant time period" as "not admissible evidence of anything");

*Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).

   MCI, however, **objects** to Toberoff Exhibits 1 and 8. *See* MTE Evanier [Dkt. 77];

MCI's Evidentiary Objection Nos. [1] & [11].

18.    **Magazine Management went from publishing 45 comics per month to 8.** *See*
Toberoff Decl. Ex. 1 at 9 (Evanier Rep. providing historical context and describing Magazine
Management's severe reduction in the number of books it published during the 1950s); Ex 3 at
123:18-125:12, 200:4-202:4 (Romita testifying that, around 1957, Timely/Atlas was having
financial troubles so the company cut artists and cut the number of titles it published); Ex. 17 at
110:11-23 (Thomas testifying that Marvel was publishing only 8 comics per month in the 1960s);
Ex. 65 at 8-9 (Flo Steinberg explaining that, when she was hired at Marvel in March 1963, she and
Lee were the only employees and noting that Marvel had the "teeniest little office" and that there
"was just a small amount of comics to get out").

   **RESPONSE:  Disputed**, but **immaterial**.  Because Defendant fails to provide any time

period in this contention, it is unclear when or for how long Defendant suggests Magazine

Management went from publishing 45 to 8 comics per month.  While MCI does not dispute

that Marvel reduced its comics output in the late 1950s, MCI **disputes** that it specifically

reduced its output from 45 to 8 comics.

Additionally, Toberoff Exhibit 17 **does not support** this contention because it

states that when accounting *just* for Super Hero titles in 1965,"[t]here were around eight or

so"—not that Marvel only published 8 comics in total or that this occurred at or near the

time of the 1957 Congressional hearings, which Defendant seems to suggest.  Toberoff

Exhibit 3 **does not support** this contention because it says nothing about the specific

number of titles Magazine Management was publishing (merely that it cut the total number

of titles), and Toberoff Exhibit 65 **does not support** this contention because it says nothing

at all about the number of titles Marvel published at any time.

Regardless, this contention is **immaterial** because it refers at least in part to events

outside the relevant time period and, in any event, has no bearing on the Court's application

of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the

*Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 777 F. Supp. 2d at 748

(rejecting evidence from outside "the relevant time period" as "not admissible evidence of

anything"); *Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).

MCI also **objects** to Toberoff Exhibit 1.  *See* MTE Evanier [Dkt. 77]; MCI's

Evidentiary Objection No. [1].

19.    **In 1958, to keep its operations afloat, Magazine Management  resumed buying
freelance material at a per-page rate, but purposefully had no written contracts with
freelancers, including Steve Ditko ("Ditko").**  *See* Toberoff Decl. Ex. 1 at 10, 13 (Evanier Rep.
providing historical context giving rise to Marvel's use of freelance creators and explaining that,
when Magazine Management ran out of surplus artwork to publish, it began to purchase artwork
and scripts from freelancers at a low page rate and that freelancers did not have written contracts
with Magazine Management during the 1950s or 1960s); Ex. 14 at 10-11 (Evanier Rebuttal Rep.
explaining that it was not the custom and practice of Marvel or other publishers in the comic book
industry to have written contracts with freelance creators during the Period); Ex. 2 at 71:17-74:5
(Lieber testifying that he sold freelance work to Marvel in the 1950s and 1960s, had no contract
with Marvel, and that Marvel was not obligated to buy his submitted freelance material); Ex. 3 at

159:24-160:4, 194:11-195:3, 211:7-212:3 (Romita testifying that he did not have a contract with Marvel as a freelancer); Ex. 5 at 371:3-25 (Lee testifying that Marvel "would only buy what [it] needed"); Ex. 6 at 36:17-21, 202:2-20 (Thomas testifying that he had no contract with Marvel until 1974); Ex. 8 ¶ 10 (Sinnott attesting that he had no contract with Marvel and Marvel was very small and disorganized in the 1950s and 1960s); Ex. 8 ¶ 11 (Sinnott attesting that Marvel had no obligation to buy pages of his work and that Marvel paid only for the pages it wanted); Ex. 9 ¶ 8 (James Steranko ("Steranko") attesting that he did not have a contract with Marvel when he was submitting freelance material to it from 1966 to 1973; Ex. 10 ¶ 12 (Richard Ayers ("Ayers") attesting that he had no contract with Marvel from 1959 to 1975); Ex. 11 ¶ 9 (Colan attesting that he had no contract with Marvel until 1975); Ex. 13 ¶ 7 (Adams attesting that he had no contract with Marvel in the 1960s or 1970s); Ex. 17 at 39:25-40:4, 51:20-52:4 (Thomas testifying that he had no written contract from 1965 to 1974); Ex. 22 at 287:22-288:12 (Lieber testifying that he had no contract with Marvel in the 1950s or 1960s); Ex. 24 at 79:2-8 (Levitz testifying that Marvel did not have contracts with any freelancer until the mid-1970s).

        **RESPONSE:** **Disputed**, but **immaterial**. MCI **disputes** Defendant's suggestion that

Marvel was "buying" work "on spec," which is not only an issue of law but also inaccurate.

To the contrary, freelance contributors, including Ditko, contributed to Marvel's comic

books pursuant to assignments from Lee, who directed the creation of the Works, and they

were compensated by Marvel on an agreed per-page basis for completed assignments for

Marvel—even if, as of 1958, Marvel freelancers did not have written employment

agreements with Marvel. *See supra* Response No. 3, *citing* Lens Decl., Ex. 2 152:1-154:7;

Lens Decl., Ex. 12 56:12-15, 57:25-58:9, 58:14-23; Lens Decl., Ex. 7 217:13-21; Lens

Decl., Ex. 13 41:20-42:9; Lens Decl., Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21; Lens

Decl., Ex. 48 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2 27:19-

28:7, 56:2-57:7, 148:22-151:25, 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens

Decl., Ex. 12 56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens

Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13

14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-10,

224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl., Ex. 2 17:8-

18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 44:4-17;

Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-9, 93:23-94:5; Lens Decl., Ex. 2 80:24-81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15; Lens Decl., Ex. 4 125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens Decl., Ex. 13 30:11-14, 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 68A-G; Lens Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens Decl., Ex. 6 40:14-20; Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7, 226:7-11, 249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.

Regardless, this contention is **immaterial** because it refers at least in part to events outside the relevant time period and, in any event, has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 777 F. Supp. 2d at 741-42, 748 (rejecting the Kirbys' "entirely unpersuasive" argument that the lack of a written contract with Marvel meant it "lacked the legal right to control Kirby's work and rejecting evidence from outside "the relevant time period" as "not admissible evidence of anything"); *Kirby*, 726 F.3d at 141-142 (rejecting the Kirbys' argument that "the 'right to supervise' referred to in our case law requires a legal, presumably contractual, right" because there is "no hint of this requirement in our case law applying the instance and expense test"— "Marvel's active involvement in the creative process, coupled with its power to reject pages and request that they be redone" suffices).

MCI also **objects** to Toberoff Exhibits 1, 2, 3, 8, 9, 10, 11, 13, 14, and 22.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [2], [9], [11], [12], [13], [14], [16], [17], [25], & [30].

24

20.      **While it was understood that "Marvel"** *owned* **the work created by freelance writers/artists once it purchased and paid for such work, neither Magazine Management (nor Goodman's shell companies) nor the freelancers viewed their creations as "work made for hire" or "Marvel" as the "author."** *See* Toberoff Decl. Ex. 8 ¶¶ 14-15 (Sinnott attesting that in the 1950s and 1960s, he did not consider his freelance work submitted to Marvel to be done as "work made for hire"); Ex. 9 ¶ 8 (Steranko attesting that no one at Marvel ever informed him that his work was being created as "work made for hire" from 1966 to 1973; Ex. 10 ¶ 13 (Ayers attesting that he thought Marvel owned his work because it bought the material he submitted, but that he never heard the term "work for hire" and did not think his work was created as "work made for hire"); Ex. 11 ¶ 12 (Colan attesting that he believed Marvel owned the work it purchased from him, but that he never heard the term "work for hire"); Ex. 13 ¶¶ 12-13 (Adams attesting that he did not consider the work he submitted to Marvel to be done as "work made for hire"); Ex. 21 at 97:3-23 (Steranko testifying that he believed that when he walked into Marvel to deliver his freelance material, he still owned the work and that his work belonged to him until he cashed the check Marvel wrote to him); Ex. 22 at 266:13-267:2 (Lieber testifying that he believed he owned his freelance material until Marvel bought it from him); Ex. 54 at 2021MARVEL-0070259 (Marvel President James Galton ("Galton") correspondence to Thomas dated February 24, 1978 stating "it was our intent that all copyrights be assigned to Marvel, I assume this is acceptable to you … I would appreciate your signing … to confirm that all right to claim renewal and extension of copyrights are assigned to Marvel"); Ex. 64 at 245 n.80 (Nimmer explaining in 1963 "that 17 U.S.C. Sec. 26 expressly renders an employer for hire an 'author' but makes no comparable provision with respect to commissioned works").

> **RESPONSE: Disputed**, but **immaterial**. MCI **disputes** Defendant's characterization of
>
> such companies as "shell companies." As relevant here, Goodman's various comic book
>
> entities conducted business as "Marvel" or "Marvel Comics Group" and engaged with
>
> Magazine Management Company for administrative services, including payments to those
>
> providing services to Marvel. *See supra* Response No. 9, *citing* Bard Decl. ¶ 2; Bard Decl.,
>
> Ex. 5 at 2-3; Bard Decl., Ex. 7 at 5; Bard Decl., Ex. 10 at 2; Lens Decl., Ex. 18 72:25-73:11;
>
> Lens Opp. Decl., Ex. 90 5:11-19; Bard Decl., Ex. 8 at 5-6; Lens Decl., Ex. 75; Lens Decl.,
>
> Ex. 76; Lens Opp. Decl., Ex. 93 at 4-5; Lens Opp. Decl., Ex. 92 at 3-8; Bard Decl., Ex. 6 at
>
> 3; Bard Decl., Ex. 5 at 3; Lens Decl., Ex. 68A-G.
>
> MCI also **disputes** Defendant's suggestion that Marvel "purchased" work "on
>
> spec," which is not only an issue of law but also inaccurate. To the contrary, freelance
>
> contributors, including Ditko, contributed to Marvel's comic books pursuant to assignments

from Lee, who directed the creation of the Works, and they were compensated by Marvel on an agreed per-page basis for completed assignments.  *See supra* Response No. 3, *citing* Lens Decl., Ex. 2 152:1-154:7; Lens Decl., Ex. 12 56:12-15, 57:25-58:9, 58:14-23; Lens Decl., Ex. 7 217:13-21; Lens Decl., Ex. 13 41:20-42:9; Lens Decl., Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21; Lens Decl., Ex. 48 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2 27:19-28:7, 56:2-57:7, 148:22-151:25, 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens Decl., Ex. 12 56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13 14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl., Ex. 2 17:8-18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 44:4-17; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-9, 93:23-94:5; Lens Decl., Ex. 2 80:24-81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15; Lens Decl., Ex. 4 125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens Decl., Ex. 13 30:11-14, 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 68A-G; Lens Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens Decl., Ex. 6 40:14-20; Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7, 226:7-11, 249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.

MCI further **disputes** that Marvel and Marvel freelancers did not view freelancer work as Marvel's "work made for hire" or that Marvel was the "author" of such work.  *See* Lens Decl., Ex. 24A-E (Marvel's contemporaneous copyright registrations generally listing each respective Marvel publishing entity as "Copyright Claimant" and renewal registrations

generally listing each such Marvel publishing entity as "Author").  The evidence establishes that Marvel viewed the Works as works made for hire and itself as the author, and that freelancers, including Steve Ditko, understood their work for Marvel during the relevant time period was done on a work for hire basis.  *See id*.; Lens Decl., Ex. 2 40:24-41:8 (Thomas testifying that "I understood when I came into the company that Marvel . . . would own the characters, the stories, the writing, whatever I was doing, and that was also made clear by the statement on the back of the check from the earliest days"); Lens Decl., Ex. 2 48:11-49:4 (Thomas testifying that he "didn't like creating many characters for Marvel, because [he] knew [he] wouldn't own them"); Lens Decl., Ex. 2 60:19-61:6 (Thomas agreeing that, "for the entire tenure that [he] worked with Marvel," he understood "that Marvel would have all of the rights, including copyrights and anything that [he] worked on at Marvel"); Lens Decl., Ex. 13 at 26:22-28:6 (Lee testifying that "it was typical in the industry for comic book publishers to own the rights to the materials that were created for them for publication" during the relevant time period); Lens Decl., Ex. 13 at 100:25-101:17 (Lee testifying that he "always felt the company" owned the characters he created or co-created); Lens Decl., Ex. 20 at 2 (Marvel artist Gene Colan writing that "[p]ages were stamped on the back 'work for hire' . . . In the narrow field of comic art, one either worked 'for hire' or didn't work!"); Lens Decl., Ex. 19 at 2 (agreement between Marvel and Colan that his contributions to Marvel's comic books "were created as works made for hire"); Lens Decl., Ex. 23A-E (documentation reflecting hundreds of freelancers' "express[] agree[ment]" that their work would "be considered a work made for hire."); Lens Decl., Ex. 7 355:18-23 (Thomas testifying that the popularization of "the term 'work-for-hire'" in the mid-1970s only formalized "the same general situation that had already existed"); Lens Opp. Decl., Ex. 88 120:3-9 (Lee testifying that he "did [Marvel characters] as a work for

27

hire."); Lens Opp. Decl., Ex. 87 109:19-25 (Lee testifying that "[a]t Marvel I was an employee, a writer for hire. No one who worked for a comics company back then owned anything they created."); *see also supra* Response No. 5, *citing* Lens Decl., Ex. 23A at 2; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 52 at 3; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 50 at 3; Lens Decl. Ex. 56 at 2; Lens Decl., Ex. 61 at 3; Lens Decl., Ex. 49 at 2; Lens Decl., Ex. 60 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex. 61 at 2; Lens Decl., Ex. 44 at 4.

Additionally, Toberoff Exhibits 9 and 21 **do not support** this contention, because over a decade ago, when Mr. Steranko was retained as an expert witness for Defendant's counsel, he testified that "[w]hen [he] worked at Marvel, [he] was on a work for hire basis." Lens Opp. Decl., Ex. 89 82:3-23. As Mr. Steranko explained, he understood this based on his "experience at Marvel," as Marvel "provided him with [a] description of the character," gave him "treatment[s] [or] synops[e]s of the material that they were looking for," "supervis[ed]" him, and "stamped [his checks] work for hire." *Id*. And after Marvel "editted [*sic*] some of [his] work" and "changed certain things that [he] didn't feel should be changed," Steranko, like Ditko, who "faced the same frustrations," left Marvel. Lens Opp. Decl., Ex. 95 at 4-5. Toberoff Exhibit 64 **cannot provide factual support**, as the cited material is a treatise purportedly summarizing the law, not a fact. Toberoff Exhibit 13 also **does not support** this contention, as the cited material refers to a period of time beginning in late 1960s, not the relevant time period.

Regardless, this contention is **immaterial** because how Marvel or Marvel freelancers "viewed" their relationship to the Works has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).

MCI also **objects** to the evidence cited in support of this contention.  *See* MCI's

Evidentiary Objection Nos. [11], [12], [13], [14], [16], [23], [28], [51], & [58].

21.    **In June 1968, Goodman sold Magazine Management and all his shell companies to publicly traded Perfect Film and Chemical Corporation ("Perfect Film") which was later renamed Cadence Industries ("Cadence").**  *See* Toberoff Decl. Ex. 1 at 17 (Evanier Rep. providing historical context of Marvel's sale to Perfect Film in 1968, which was later renamed Cadence in 1973; Ex. 7 at 273:19-274:3 (Thomas testifying that Marvel was taken over by Perfect Film/Cadence); Ex. 17 at 246:1-12 (Thomas testifying that Perfect Film bought Marvel and later changed its name to "Cadence"); Ex. 24 at 37:5-18, 52:8-13 (Levitz testifying Marvel was a privately held company until it was sold to Perfect Film, which was a public company); Ex. 46 at 1-3 (list of Goodman's shell companies drafted in preparation of the sale to Perfect Film, dated October 4, 1967).

**RESPONSE:  Disputed**, but **immaterial**.  MCI **disputes** Defendant's characterization of

such companies as "shell companies."  As relevant here, Goodman's various comic book

entities conducted business as "Marvel" or "Marvel Comics Group" and engaged with

Magazine Management Company for administrative services, including payments to those

providing services to Marvel.  *See supra* Response No. 9, *citing* Bard Decl. ¶ 2; Bard Decl.,

Ex. 5 at 2-3; Bard Decl., Ex. 7 at 5; Bard Decl., Ex. 10 at 2; Lens Decl., Ex. 18 72:25-73:11;

Lens Opp. Decl., Ex. 90 5:11-19; Bard Decl., Ex. 8 at 5-6; Lens Decl., Ex. 75; Lens Decl.,

Ex. 76; Lens Opp. Decl., Ex. 93 at 4-5; Lens Opp. Decl., Ex. 92 at 3-8; Bard Decl., Ex. 6 at

3; Bard Decl., Ex. 5 at 3; Lens Decl., Ex. 68A-G.

MCI also **disputes** that Goodman sold Magazine Management and his commonly

owned and controlled entities to Perfect Film.  Rather, Goodman sold only the *assets*

relating to the Marvel Comics Group business (including the copyrights in and to the

Works) to Perfect Film.  *See* Bard Decl., Ex. 10 at 3 (June 28, 1968 Sale agreement,

reflecting the "transfer to Perfect" of "certain of the property and assets and business").

MCI further **disputes** Defendant's suggestion that Toberoff Exhibit 46 was

"drafted in preparation of the sale to Perfect Film"—a characterization unsupported by any

evidence.

Regardless, this contention is **immaterial** because it refers to events outside the

relevant time period and, in any event, has no bearing on the Court's application of the

work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby*

case, as upheld by Second Circuit, confirms. *See Kirby*, 777 F. Supp. 2d 720, 748

(S.D.N.Y. 2011) (rejecting evidence from outside "the relevant time period" as "not

admissible evidence of anything"); *Kirby*, 726 F.3d at 139-40 (relevant principles of the

instance-and-expense test).

MCI also **objects** to Toberoff Exhibit 1. *See* MTE Evanier [Dkt. 77]; MCI's

Evidentiary Objection No. [1].

22.    **When it took over, Cadence sought to shore up Magazine Management's assets.**
*See* Toberoff Decl. Ex. 1 at 17 (Evanier Rep. describing historical context concerning Cadence's
difficult task of trying to solidify Marvel's intellectual property assets after it purchased Marvel in
the 1960s because of Marvel's haphazard business practices in the 1950s and 1960s); Ex. 3 at
226:8-227:3 (Romita testifying that, when Cadence purchased Marvel, it came in and tried to nail
down all the freelancers and rights to the works); Ex. 48 at (Certificate of Registration of a Claim
for Copyright dated August 31, 1964 for *Amazing Spider-Man Annual* Vol. 1, No. 1 filed by
Magazine Management and identifying Lee as the "Author" and Non-Pareil as the "Copyright
Claimant." Compared to the Certificate of Renewal Registration for *Amazing Spider-Man Annual*
Vol. 1, No. 1 filed by Cadence's purported successor, Marvel Entertainment Group, dated
December 15, 1992 and now claiming Lee as an "Employee for Hire of Non-Pareil").

**RESPONSE:  Disputed**, but **immaterial**.  While MCI does not dispute that Perfect Film

"took over" Marvel's comic book business, and that Perfect Film changed its name to

Cadence in 1970, MCI **disputes** Defendant's vague use of the phrase "shore up Magazine

Management's assets" and, in particular, **disputes** any suggestion that Perfect Film or

Cadence took any actions that improperly recharacterized the nature of the Marvel assets it

purchased.  *See* Bard Decl., Ex. 10 at 2, 9 (June 28, 1968 Sale agreement, providing that all

then-existing copyrights be assigned to Perfect); Bard Decl., Ex. 11 at 3 (December 7, 1978

acknowledgment of assignment between Martin and Jean Goodman and Perfect's successor-

in-interest, Cadence, affirming, pursuant to the June 28, 1968 Sale, assignment of all

"copyrights and renewals and extensions of copyrights," including all publications listed on

Schedule B annexed thereto (including the Works); Lens Decl., Ex. 6 6:13-25 ("[Marvel

was] bought by a company called Perfect Film and Chemical which later became Cadence

Industries and that was later sold to New World and then it ended up with where it is

now."); Lens Opp. Decl., Ex. 84 283:4-12 (Thomas testifying that "[a]fter Perfect Film

purchased Magazine Management," "[i]t didn't seem like anything really changed.  We

knew we had different owners of the sort.  That was about it."); Lens Opp. Decl., Ex. 84

247:13-16 (Thomas testifying that he "had no real dealings with Perfect Film or Cadence"

because his "dealings were always with Martin Goodman, who occasionally remained as the

line publisher, and with Stan Lee"); Lens Opp. Decl., Ex. 84 273:11-15 ("Thomas testifying

that "[w]hether the official name was Cadence or Perfect Film or Magazine Management, to

me it was always Marvel Comics from the day I walked in the door until I left"); Lens

Decl., Ex. 14 ¶ 9 (Lee attesting that "[i]n the fall of 1968, Goodman sold the entire

publishing business to Perfect Film and Chemical Corporation, later known as Cadence

Industries Corporation" yet "[d]uring this time period, my responsibilities remained the

same, and I had the same agreement with Cadence/Marvel Comics that all of my creative

contributions were within the scope of my employment and commissioned by

Cadence/Marvel Comics . . . ").

    None of the evidence Defendant cites comes close to supporting any improper

recharacterization of Marvel assets by Perfect Film or Cadence.  Toberoff Exhibit 1 **does**

**not support** the notion that Perfect Film or Cadence did anything more than ensure that its

copyright interests were accounted for.  Toberoff Exhibit 3 also **does not support** any

particular actions by Perfect Film or Cadence, let along suggest that the actions were

improper or related in any way to copyrights.  Toberoff Exhibit 48 similarly **does not

support** this contention because the renewal was not filed by Perfect or Cadence (but rather

by a predecessor entity five years after Cadence divested its interests).  *See* Bard Decl., Ex.

14 at 9, 73 (November 20, 1986 purchase agreement between Cadence and New World

Pictures, Ltd. for the "'Marvel Entertainment Group' business").  And—in any event—the

renewal registration **does not support** any "recharacterization" because Lee has repeatedly

testified that he was an employee for hire of Marvel.  Lens Opp. Decl., Ex. 88 120:3-9 (Lee

testifying that he "did [Marvel characters] as a work for hire."); Lens Opp. Decl., Ex. 87

109:19-25 (Lee testifying that "[a]t Marvel I was an employee, a writer for hire.  No one

who worked for a comics company back then owned anything they created."); Lens Decl.,

Ex. 13 26:22-28:6 (Lee testifying that "it was typical in the industry for comic book

publishers to own the rights to the materials that were created for them for publication"

during the relevant time period); Lens Decl., Ex. 13 100:25-101:17 (Lee testifying that he

"always felt the company" owned the characters he created or co-created).

      Regardless, this contention is **immaterial** because it refers to events outside the

relevant time period and, in any event, has no bearing on the Court's application of the

work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby*

case, as upheld by Second Circuit, confirms.  *See Kirby*, 777 F. Supp. 2d 720, 748

(S.D.N.Y. 2011) (rejecting evidence from outside "the relevant time period" as "not

admissible evidence of anything"); *Kirby*, 726 F.3d at 139-40 (relevant principles of the

instance-and-expense test).

MCI also **objects** to Toberoff Exhibits 1 and 3. *See* MTE Evanier [Dkt. 77];

MCI's Evidentiary Objection Nos. [1] & [10].

23.      **Marvel did not ask any freelance creator to sign any contract until 1974.**
*See* Toberoff Decl. Ex. 2 at 71:17-74:5 (Lieber testifying that he sold freelance work to Marvel in the 1950s and 1960s and had no contract with Marvel); Ex. 11 ¶ 9 (Colan attesting that he had no contract with Marvel until 1975); Ex. 9 ¶ 8 (Steranko attesting that he did not have a contract with Marvel while he was submitting freelance material to the company from 1966 to 1973; Ex. 17 at 39:25-40:4, 51:20-52:4 (Thomas testifying that he had no written contract from 1965 to 1974); *id.* at 298:8-14 (Thomas testifying that freelancers did not have contracts with Marvel until Thomas's in 1974, which was the first); Ex. 24 at 79:2-8 (Levitz testifying that Marvel did not have contracts with any freelancer until the mid-1970s); Ex. 43 ¶ 7 (Marvel's contract with Colan dated March 22, 1975); Ex. 44 ¶ 7 (Marvel's contract with Roy Thomas dated September 1, 1974).

**RESPONSE:** **Disputed in part**, but **immaterial**. As Defendant himself acknowledges in

earlier facts, Marvel had written contracts with freelance artists in the 1940s and at times in

the 1950s and thus MCI **disputes** this contention. During the relevant time period, however,

MCI does not dispute that Marvel freelancers, including Steve Ditko, did not have written

employment agreements.

Additionally, Toberoff Exhibit 9 **does not support** this contention, because over a

decade ago, when Mr. Steranko was retained as an expert witness for Defendant's counsel,

he testified that "[w]hen [he] worked at Marvel, [he] was on a work for hire basis." Lens

Opp. Decl., Ex. 89 82:3-23. As Mr. Steranko explained, he understood this based on his

"experience at Marvel," as Marvel "provided him with [a] description of the character,"

gave him "treatment[s] [or] synops[e]s of the material that they were looking for,"

"supervis[ed]" him, and "stamped [his checks] work for hire." *Id.* And after Marvel

"editted [*sic*] some of [his] work" and "changed certain things that [he] didn't feel should be

changed," Steranko, like Ditko, who "faced the same frustrations," left Marvel. Lens Opp.

Decl., Ex. 95 at 4-5.

Regardless, this contention is **immaterial** because has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 777 F. Supp. 2d at 748 (rejecting evidence from outside "the relevant time period" as "not admissible evidence of anything"); *Kirby*, 726 F.3d at 141-142 (rejecting the Kirbys' argument that "the 'right to supervise' referred to in our case law requires a legal, presumably contractual, right" because there is "no hint of this requirement in our case law applying the instance and expense test"—"Marvel's active involvement in the creative process, coupled with its power to reject pages and request that they be redone" suffices).

MCI also **objects** to Toberoff Exhibits 2, 9, 11, 43, and 44. *See* MCI's Evidentiary Objection Nos. [2], [12], [14], [44], & [45].

24. **These contracts contained assignment language only and no contract during this time used the term "work for hire" or identified Magazine Managemnt/Cadence as the "author" of any of the works created by the freelancers who sold work to them, even though it was the norm for publishers at the time to do so.** *See* Toberoff Decl. Ex. 14 at 16-17 (Evanier Rebuttal Rep. explaining that it was the custom and practice of publishers seeking to be considered legal "authors" of "works-made-for-hire" to state so clearly and in writing during the Period); Ex. 8 ¶¶ 14-15 (Sinnott attesting that no Marvel contract used the term "work for hire" until 1978 or 1979, and that no one at Marvel used that term in the 1960s); Ex. 9 ¶ 8 (Steranko attesting that no one at Marvel used the term "work made for hire" from 1966 to 1973; Ex. 11 ¶ 13 (Colan attesting that his 1975 contract with Marvel used assignment, not work-for-hire, language); Ex. 17 at 60:3-10 (Thomas testifying that his 1974 contract continued the previous pre-contract working arrangement); Ex. 43 ¶ 7 (Marvel's contract with Colan dated March 22, 1975 using language of assignment, not work-for-hire); Ex. 44 ¶ 7 (Marvel's contract with Thomas dated September 1, 1974 using language of assignment, not work-for-hire); Ex. 53 ¶ 7 (Marvel's contract with Thomas dated August 27, 1976 still using language of assignment, not work-for-hire); Ex. 52 ¶ 7 (Marvel's October 7, 1977 contract with Stephen Gerber ("Gerber") using language of assignment, not work-for-hire); *compare* Ex. 47 ¶ 6 (unsigned Lancer Books contract with Don Rico dated December 15, 1966 with provision stating Lancer "shall be deemed the Author of the Work … in view of the fact that [Rico was Lancer's] employee for hire"); Ex. 54 at 2021MARVEL-0070259 (Marvel President Galton correspondence to Thomas dated February 24, 1978 stating "it was our intent that all copyrights be assigned to Marvel, I assume this is acceptable to you … I would appreciate your signing … to confirm that all right to claim renewal and extension of copyrights are assigned to Marvel").

**RESPONSE:**  **Disputed in part**, but **immaterial**.  MCI **disputes** Defendant's suggestion

that Ditko "sold" work "on spec" to Marvel, which is not only an issue of law but also

inaccurate.  To the contrary, freelance contributors, including Ditko, contributed to Marvel's

comic books pursuant to assignments from Lee, who directed the creation of the Works, and

they were compensated by Marvel on an agreed per-page basis for completed assignments.

*See supra* Response No. 3, *citing* Lens Decl., Ex. 2 152:1-154:7; Lens Decl., Ex. 12 56:12-

15, 57:25-58:9, 58:14-23; Lens Decl., Ex. 7 217:13-21; Lens Decl., Ex. 13 41:20-42:9; Lens

Decl., Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21; Lens Decl., Ex. 48 at 3; Lens Decl., Ex.

51 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2 27:19-28:7, 56:2-57:7, 148:22-151:25,

88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens Decl., Ex. 12 56:16-18, 58:10-13,

58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15 16:8-19; Lens Decl.,

Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13 14:5-8, 23:18-21; Lens Decl., Ex. 3

119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-10, 224:15-23, 241:25-242:14; Lens

Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl., Ex. 2 17:8-18:13, 24:17-23, 37:10-39:6; Lens

Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 44:4-17; Lens Decl., Ex. 13 16:3-19; Lens

Decl., Ex. 4 97:7-9, 93:23-94:5; Lens Decl., Ex. 2 80:24-81:12; 125:18-126:1; Lens Decl.,

Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18;

Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2

141:25-142:15; Lens Decl., Ex. 4 125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4;

Lens Decl., Ex. 13 30:11-14, 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3;

Lens Decl., Ex. 68A-G; Lens Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens

Decl., Ex. 6 40:14-20; Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-

153:10, 175:7, 226:7-11, 249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.

That said, MCI **does not dispute** that the Marvel contracts cited by Defendant contain assignment language, do not use the term "work for hire," and do not identify Marvel as "author" of any works.   MCI **disputes**, however, that it was "the norm" for publishers to include the term "work for hire" or identify the publisher as "author" of works in written contracts during the relevant time period, and Defendant cites no admissible evidence to the contrary.

Additionally, Toberoff Exhibit 9 **does not support** the contention, because over a decade ago, when Mr. Steranko was retained as an expert witness for Defendant's counsel, he testified that "[w]hen [he] worked at Marvel, [he] was on a work for hire basis."  Lens Opp. Decl., Ex. 89 82:3-23.  As Mr. Steranko explained, he understood this based on his "experience at Marvel," as Marvel "provided him with [a] description of the character," gave him "treatment[s] [or] synops[e]s of the material that they were looking for," "supervis[ed]" him, and "stamped [his checks] work for hire."  *Id*.  And after Marvel "editted [*sic*] some of [his] work" and "changed certain things that [he] didn't feel should be changed," Steranko, like Ditko, who "faced the same frustrations," left Marvel.  Lens Opp. Decl., Ex. 95 at 4-5.  Exhibits 8, 9, 11, 14, 17, 43, 44, 47, 52, 53 similarly **do not support** the contention, because none of the contracts at issue are between Marvel and Ditko and all are outside the relevant time period.  Ditko himself signed an agreement with Marvel in 1979, acknowledging that his prior work for Marvel was done on a work-made-for-hire basis.  Lens Decl., Ex. 23A at 2 (agreement between Marvel and Ditko whereby Ditko "acknowledges, agrees and confirms that any and all work, writing, art work material or services (the 'Work') which have been or are in the future created, prepared or performed by [him] for the Marvel Comics Group have been and will be specially ordered or

36

commissioned for use as a contribution to a collective work and that as such Work was and is expressly agreed to be considered a work made for hire.").

      Regardless, this contention is **immaterial** because it refers to events outside the relevant time period and, in any event, has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 777 F. Supp. 2d at 748 (rejecting evidence from outside "the relevant time period" as "not admissible evidence of anything"); *Kirby*, 726 F.3d at 141-142 (rejecting the Kirbys' argument that "the 'right to supervise' referred to in our case law requires a legal, presumably contractual, right" because there is "no hint of this requirement in our case law applying the instance and expense test"— "Marvel's active involvement in the creative process, coupled with its power to reject pages and request that they be redone" suffices).

      MCI also **objects** to Toberoff Exhibits 8, 9, 11, 14, 43, 44, 47, 52, 53, and 54. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [11], [12], [14], [17], [44], [45], [47], [49], [50], & [51].

25.    **The "work for hire" doctrine became the focus of attention when the 1976 Copyright Act established an explicit "work for hire" regime under which work by an independent contractor could be "made for hire," under certain conditions.** *See* Toberoff Decl. Ex. 15 at 25 (Expert Report of Paul Levitz ("Levitz Rep.") explaining that, once the 1976 Copyright Act was enacted, it was then that publishers began using the term "work made for hire"); Ex. 20 at 160:8-162:14 (Evanier testifying that Cadence attempted to fit pre-1978 works into the work-for-hire provision of the 1976 Copyright Act); Ex. 24 at 106:16-107:21 (Levitz testifying that people in the comic book industry began to talk about "work for hire" in the mid-1970s, as the Copyright Act of 1976 was coming into existence).

    **RESPONSE:  Disputed in part**, but **immaterial**.  MCI **disputes** this contention to the extent it states a legal conclusion and purports to generally characterize the manner and reasons for which the work for hire doctrine "became the focus of attention," neither of which constitute a statement of undisputed fact.  MCI further **disputes** that the concept that

works commissioned by a publisher and created at the commissioning party's instance and expense was not the "focus of attention" prior to adoption of the 1976 Copyright Act. *See, e.g., Brattleboro Pub. Co. v. Winmill Pub. Corp.*, 369 F.2d 565, 567 (2d Cir. 1966); *Lin–Brook Builders Hardware v. Gertler*, 352 F.2d 298, 300 (9th Cir.1965); Lens Opp. Decl., Ex. 91 at 4-5 (Goodman attesting under oath in 1966 dispute over Captain America that he believed the character was "created for and on their behalf of [Marvel's] predecessors" because it was "created at the suggestion and upon request of the Goodmans," "to their specifications and requirements," "under and subject to their general supervision and direction" and with the assistance of "writing, layout, penciling and, shading, editing, lettering, inking and coloring . . . paid [for] by the Goodmans").

Even if the phrase "work for hire" was not common parlance prior to the 1976 Copyright Act, the instance and expense test turns on the *relationship* between the parties—not the name they ascribed to it. *See Kirby*, 777 F. Supp. 2d at 741 ("[I]n deciding whether the 'instance' prong is satisfied, courts focus on the 'actual relationship between the parties[.]") (quoting *Aldon Accessories Ltd. v. Spiegel, Inc.*, 738 F.2d 548, 552–53 (2d Cir. 1984)). Marvel freelancers, including Steve Ditko, contributed to Marvel's comic books pursuant to assignments from Lee, who directed the creation of the Works, and they were compensated by Marvel on an agreed per-page basis for completed assignments. *See supra* Response No. 3, *citing* Lens Decl., Ex. 2 152:1-154:7; Lens Decl., Ex. 12 56:12-15, 57:25-58:9, 58:14-23; Lens Decl., Ex. 7 217:13-21; Lens Decl., Ex. 13 41:20-42:9; Lens Decl., Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21; Lens Decl., Ex. 48 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2 27:19-28:7, 56:2-57:7, 148:22-151:25, 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens Decl., Ex. 12 56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at

6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13 14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11,

138:18-24, 139:17-140:2, 140:8-11, 224:5-10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9

14:5-8, 110:21-24; Lens Decl., Ex. 2 17:8-18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12

67:16-68:6; Lens Decl., Ex. 13 44:4-17; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-

9, 93:23-94:5; Lens Decl., Ex. 2 80:24-81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-

220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18; Thomas

Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-

142:15; Lens Decl., Ex. 4 125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens

Decl., Ex. 13 30:11-14, 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens

Decl., Ex. 68A-G; Lens Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens Decl.,

Ex. 6 40:14-20; Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10,

175:7, 226:7-11, 249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.

     Moreover, Jim Steranko—one of Defendant's witnesses—testified over a decade

ago when he was retained as an expert by Defendant's counsel that "[w]hen [he] worked at

Marvel, [he] was on a work for hire basis."  Lens Opp. Decl., Ex. 89 82:3-23.  As Mr.

Steranko explained, he understood this based on his "experience at Marvel," as Marvel

"provided him with [a] description of the character," gave him "treatment[s] [or] synops[e]s

of the material that they were looking for," "supervis[ed]" him, and "stamped [his checks]

work for hire."  *Id.*  And after Marvel "editted [*sic*] some of [his] work" and "changed

certain things that [he] didn't feel should be changed," Steranko, like Ditko, who "faced the

same frustrations," left Marvel.  Lens Opp. Decl., Ex. 95 at 4-5.

     Regardless, this contention is **immaterial** because when the doctrine became "the

focus of attention" has no bearing on the Court's application of the work-made-for-hire test,

as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by

Second Circuit, confirms.  *See Kirby*, 726 F.3d at 139-40 (relevant principles of the

instance-and-expense test).

MCI also **objects** to Toberoff Exhibit 20.  *See* MTE Evanier [Dkt. 77]; MCI's

Evidentiary Objection No. [19].

26.    **Commencing in the late 1970s, Marvel/Cadence attempted to re-label the freelance material Marvel's predecessors had purchased and published decades earlier as "work for hire," even though such purchased material had theretofore not been treated or viewed as such by Marvel or the freelancers.**  *See* Toberoff Decl. Ex. 1 at 17 (Evanier Rep. explaining Cadence's practices of trying to fit prior freelance work purchased by Marvel into the "work-for-hire" provisions of the Copyright Act of 1976); Ex. 5 at 371:3-25 (Lee testifying that Marvel "would only buy what [it] needed"); Ex. 15 at 25 (Levitz Rep. explaining that, once the 1976 Copyright Act was enacted, it was only then that publishers began using the term "work made for hire"); Ex. 13 ¶ 15 (Adams attesting that Marvel started forcing freelancers to sign retroactive "work for hire" releases and other contracts in the late 1970s); Ex. 20 at 160:8-162:14 (Evanier testifying that Cadence tried to fit pre-1978 works into the work-for-hire provision of the 1976 Copyright Act); Ex. 39 (purported retroactive work-for-hire contract dated January 26, 1979 allegedly signed by Ditko); Ex. 48 at (Certificate of Registration of a Claim for Copyright dated August 31, 1964 for *Amazing Spider-Man Annual* Vol. 1, No. 1 filed by Magazine Management and identifying Lee as the "Author" and Non-Pareil as the "Copyright Claimant." Compared to the Certificate of Renewal Registration for *Amazing Spider-Man Annual* Vol. 1, No. 1 filed by Cadence's purported successor, Marvel Entertainment Group, dated December 15, 1992 and now claiming Lee as an "Employee for Hire of Non-Pareil"); Ex. 64 at 245 n.80 (Nimmer explaining in 1963 "that 17 U.S.C. Sec. 26 expressly renders an employer for hire an 'author' but makes no comparable provision with respect to commissioned works").

**RESPONSE:  Disputed**.  MCI **disputes** Defendant's characterization of Marvel's conduct

as "attempt[ing] to re-label" prior Marvel freelance work as work for hire and **disputes**

Defendant's suggestion that Marvel "purchased" work "on spec," which is not only an issue

of law but also inaccurate.  To the contrary, freelance contributors, including Ditko,

contributed to Marvel's comic books pursuant to assignments from Lee, who directed the

creation of the Works, and they were compensated by Marvel on an agreed per-page basis

for completed assignments.  *See supra* Response No. 3, *citing* Lens Decl., Ex. 2 152:1-

154:7; Lens Decl., Ex. 12 56:12-15, 57:25-58:9, 58:14-23; Lens Decl., Ex. 7 217:13-21;

Lens Decl., Ex. 13 41:20-42:9; Lens Decl., Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21;

Lens Decl., Ex. 48 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2 27:19-28:7, 56:2-57:7, 148:22-151:25, 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens Decl., Ex. 12 56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13 14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl., Ex. 2 17:8-18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 44:4-17; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-9, 93:23-94:5; Lens Decl., Ex. 2 80:24-81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15; Lens Decl., Ex. 4 125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens Decl., Ex. 13 30:11-14, 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 68A-G; Lens Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens Decl., Ex. 6 40:14-20; Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7, 226:7-11, 249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.

   MCI also **disputes** that, prior to the 1970s, Marvel and Marvel freelancers did not "treat" or "view" the Works as works for hire.  The evidence establishes that Marvel viewed the Works as works made for hire and itself as the author, and that freelancers, including Steve Ditko, understood their work for Marvel during the relevant time period was done on a work for hire basis.  *See supra* Response No. 20, *citing* Lens Decl., Ex. 24A-E; Lens Decl., Ex. 2 40:24-41:8, 48:11-49:4, 60:19-61:6; Lens Decl., Ex. 13 at 26:22-28:6,100:25-101:17; Lens Decl., Ex. 20 at 2; Lens Decl., Ex. 19 at 2; Lens Decl., Ex. 23A-E; Lens Decl., Ex. 7 355:18-23; Lens Opp. Decl., Ex. 88 120:3-9; Lens Opp. Decl., Ex. 87 109:19-25; Lens

Decl., Ex. 23A at 2; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 52 at 3; Lens Decl., Ex. 59 at 3;

Lens Decl., Ex. 50 at 3; Lens Decl., Ex. 56 at 2, Lens Decl., Ex. 61 at 3; Lens Decl., Ex. 49

at 2; Lens Decl., Ex. 60 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex. 61 at 2; Lens Decl.,

Ex. 44 at 4.

Additionally, Toberoff Exhibit 5 **does not support** this contention, as the cited

material refers to the late 1940s, not the relevant time period.  Toberoff Exhibit 48 **does not**

**support** any "re-label[ing]" because Lee repeatedly testified that he was an employee for

hire of Marvel.  Lens Opp. Decl., Ex. 88 120:3-9 (Lee testifying that he "did [Marvel

characters] as a work for hire."); Lens Opp. Decl., Ex. 87 109:19-25 (Lee testifying that

"[a]t Marvel I was an employee, a writer for hire.  No one who worked for a comics

company back then owned anything they created.") Lens Decl., Ex. 13 26:22-28:6 (Lee

testifying that "it was typical in the industry for comic book publishers to own the rights to

the materials that were created for them for publication" during the relevant time period);

Lens Decl., Ex. 13 100:25-101:17 (Lee testifying that he "always felt the company" owned

the characters he created or co-created).  Toberoff Exhibit 64 **cannot** provide factual

support, as the cited material is a treatise purportedly summarizing the law, not a fact.

MCI also **objects** to Toberoff Exhibits 1, 13, 20 and 64.  *See* MTE Evanier [Dkt.

77]; MCI's Evidentiary Objection Nos. [1], [16], [19], & [58].

27.    **In the 1970s, Marvel began insisting that freelancers sign contracts or acknowledgements that retroactively re-characterized as "work for hire," decades after creation, all of the freelance material Marvel's predecessors had purchased.**  *See* Toberoff Ex. 11 ¶ 14 (Colan attesting that in 1978, he was forced to sign a contract stating that everything he had ever created and submitted to Marvel was done as "work made for hire"); Ex. 13 ¶ 15 (Adams attesting that Marvel started forcing freelancers to sign retroactive "work for hire" releases and other contracts in the late 1970s); Ex. 15 at 25 (Levitz Rep. explaining that, starting in 1977 or 1978, Marvel began to have freelancers sign "work made for hire" releases stating that all prior work had been submitted on a "work made for hire" basis); Ex. 20 at 160:8-162:14 (Evanier testifying that Cadence tried to fit pre-1978 works into the work-for-hire provision of the 1976 Copyright Act); Ex. 39 (retroactive work-for-hire contract dated January 26, 1979 allegedly signed

42

by Ditko); Ex. 64 at 245 n.80 (Nimmer explaining in 1963 "that 17 U.S.C. Sec. 26 expressly renders an employer for hire an 'author' but makes no comparable provision with respect to commissioned works").

    **RESPONSE:  Disputed**, but **immaterial**.  MCI **disputes** Defendant's suggestion that Marvel "purchased" work "on spec," which is not only an issue of law but also inaccurate. To the contrary, freelance contributors, including Ditko, contributed to Marvel's comic books pursuant to assignments from Lee, who directed the creation of the Works, and they were compensated by Marvel on an agreed per-page basis for completed assignments. *See supra* Response No. 3, *citing* Lens Decl., Ex. 2 152:1-154:7; Lens Decl., Ex. 12 56:12-15, 57:25-58:9, 58:14-23; Lens Decl., Ex. 7 217:13-21; Lens Decl., Ex. 13 41:20-42:9; Lens Decl., Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21; Lens Decl., Ex. 48 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2 27:19-28:7, 56:2-57:7, 148:22-151:25, 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens Decl., Ex. 12 56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13 14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl., Ex. 2 17:8-18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 44:4-17; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-9, 93:23-94:5; Lens Decl., Ex. 2 80:24-81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15; Lens Decl., Ex. 4 125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens Decl., Ex. 13 30:11-14, 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 68A-G; Lens Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens

Decl., Ex. 6 40:14-20; Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-

153:10, 175:7, 226:7-11, 249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.

   While MCI does not dispute that many freelancers, including Steve Ditko, signed

contracts acknowledging that the work they had performed for Marvel in prior years,

including Ditko's contributions to the Works, was done on a work-made-for-hire basis, MCI

**disputes** Defendant's assertion that Marvel "insist[ed]" that freelancers sign any agreements

concerning the nature of their work as well as Defendant's assertion that the agreements

"retroactively re-characterize[]" work as "work for hire."  Instead, the agreements merely

affirmed, in the precise nomenclature of the 1976 Copyright Act, what was already

understood.  Lens Decl., Ex. 7 355:18-23 (Thomas testifying that the popularization of "the

term 'work-for-hire'" in the mid-1970s only formalized "the same general situation that had

already existed"); Lens Opp. Decl., Ex. 88 120:3-9 (Lee testifying that he "did [Marvel

characters] as a work for hire."); Lens Opp. Decl., Ex. 87 109:19-25 (Lee testifying that

"[a]t Marvel I was an employee, a writer for hire.  No one who worked for a comics

company back then owned anything they created."); Lens Decl., Ex. 20 at 2 (Marvel artist

Gene Colan writing that "[p]ages were stamped on the back 'work for hire' . . . In the

narrow field of comic art, one either worked 'for hire' or didn't work!"); Lens Decl., Ex. 19

at 2 (agreement between Marvel and Colan that his contributions to Marvel's comic books

"were created as works made for hire"); Lens Decl., Ex. 23A-E (documentation reflecting

hundreds of freelancers' "express[] agree[ment]" that their work would "be considered a

work made for hire.").  And Toberoff Exhibit 64 **cannot provide factual support**, as the

cited material is a treatise purportedly summarizing the law, not a fact.

   Regardless, this contention is **immaterial** because a written agreement

characterizing the work as "work for hire" has no bearing on the Court's application of the

work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 777 F. Supp. 2d at 748 (rejecting evidence from outside "the relevant time period" as "not admissible evidence of anything"); *Kirby*, 726 F.3d at 141-142 (rejecting the Kirbys' argument that "the 'right to supervise' referred to in our case law requires a legal, presumably contractual, right" because there is "no hint of this requirement in our case law applying the instance and expense test"— "Marvel's active involvement in the creative process, coupled with its power to reject pages and request that they be redone" suffices).

MCI also **objects** to Toberoff Exhibits 11, 13, 20, and 64. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [14], [16], [19], & [58].

28.    **In the late 1970s and 1980s, after Marvel's competitor, DC Comics, began returning to freelancers their physical art (as opposed to the copyrights therein) so the freelancers could improve their uncertain and unstable financial situations by selling autographed art to fans, Marvel was under pressure to do the same.** *See* Toberoff Decl. Ex. 1 at 23 (Evanier Rep. describing DC Comics and other publishers' practice of returning artwork to the freelancers who created it); Ex. 6 at 82:2-12 (Thomas testifying that Marvel returned artwork to give artists extra income and to enhance goodwill); Ex. 9 ¶¶ 15-16 (Steranko attesting that Marvel began to return artwork to freelancers to avoid paying sales taxes on its purchase of such material and that freelancers welcomed the extra source of income); Ex. 10 ¶ 15 (Ayers attesting that he signed artwork releases because he needed the extra income).

**RESPONSE:** **Disputed**, but **immaterial**. While MCI does not dispute that DC Comics returning physical artwork was a factor that led Marvel to do the same, MCI **disputes** Defendant's suggestion that Marvel freelancers had an "uncertain and unstable financial situation," which is unsupported by the cited evidence. *See* Lens Decl., Ex. 10 376:16-22 (Lee testifying that "[a]ny artists that drew anything that I had asked him or her to draw at my behest, I paid them for it. If it wasn't good, we wouldn't use it. But I asked them to draw it, so I did pay them."); Lens Decl., Ex. 7 225:17-226:20 (Thomas testifying that he was "typically paid before the issue hit the stands" and he and other Marvel freelancers were

paid "the same page rate regardless of whether the issue they worked on ultimately sold well

or not" as Marvel had a "straight page rate system"); Lens Decl., Ex. 13 42:21-43:2 (Lee

testifying that Marvel freelance artists "g[o]t paid whether or not a particular book or comic

was successful" as "[t]hey were paid when they delivered the artwork"); Lens Decl., Ex. 6

34:22-35:7 (Lee testifying that "[i]t wasn't [Marvel's] policy" and he "can't think of any

case" where any compensation was "dependent on the success of the sales of the comic

book"); Lens Decl., Ex. 2 140:21-141:3 (Thomas confirming that he was paid his same "per

page" rate "whether the comic was a hit or a flop" and that "if a comic that [he] worked on

lost money from Marvel, Marvel didn't take that out of [his] paychecks").

Regardless, this contention is **immaterial** because it refers to events outside the

relevant time period and, in any event, has no bearing on the Court's application of the

work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby*

case, as upheld by Second Circuit, confirms. *See Kirby*, 777 F. Supp. 2d at 748 (rejecting

evidence from outside "the relevant time period" as "not admissible evidence of anything");

*Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).

MCI also **objects** to Toberoff Exhibits 1, 9, and 10.  *See* MTE Evanier [Dkt. 77];

MCI's Evidentiary Objection Nos. [1], [12], & [13].

29.    **Marvel withheld the art and conditioned its return on the freelancers signing
purported retroactive releases and acknowledgements that the freelance art they had created
decades earlier was all "work made for hire."** *See* Toberoff Decl. Ex. 1 at 24 (Evanier Rep.
describing Marvel's practice of returning artwork to the freelancers who created it on condition that
freelancers sign "work-for-hire" releases); Ex. 9 ¶ 16 (Steranko attesting that Marvel returned
artwork, but made freelancers sign releases recharacterizing their work as "work made for hire");
Ex. 13 ¶ 15 (Adams attesting that Marvel started forcing freelancers to sign retroactive "work for
hire" releases and other contracts in the late 1970s); Ex. 20 at 160:8-162:14 (Evanier testifying that
Cadence tried to fit pre-1978 works into the work-for-hire provision of the 1976 Copyright Act);
Ex. 37 at 2021MARVEL-0054634-005636 (sample 1979-1980 artwork releases retroactively
claiming the returned artwork was done by Marv Wolfman as an "employee-for-hire").

**RESPONSE:  Disputed in part**, and **immaterial**.  While MCI does not dispute that many

freelancers, including Steve Ditko, signed contracts acknowledging that the work they had

performed for Marvel in prior years, including Ditko's contributions to the Works, was done

on a work-made-for-hire basis, MCI **disputes** Defendant's assertion that Marvel

"conditioned its return" of artwork on freelancers signing any agreements concerning the

nature of their work, as well as Defendant's suggestion that the agreements as

"retroactive[ly]" re-characterized Marvel freelancers' work as "work made for hire."

Instead, the agreements merely affirmed, in the precise nomenclature of the 1976 Copyright

Act, what was already understood.  Lens Decl., Ex. 7 355:18-23 (Thomas testifying that the

popularization of "the term 'work-for-hire'" in the mid-1970s only formalized "the same

general situation that had already existed"); Lens Opp. Decl., Ex. 88 120:3-9 (Lee testifying

that he "did [Marvel characters] as a work for hire."); Lens Opp. Decl., Ex. 87 109:19-25

(Lee testifying that "[a]t Marvel I was an employee, a writer for hire.  No one who worked

for a comics company back then owned anything they created."); Lens Decl., Ex. 20 at 2

(Marvel artist Gene Colan writing that "[p]ages were stamped on the back 'work for hire' . .

. In the narrow field of comic art, one either worked 'for hire' or didn't work!"); Lens Decl.,

Ex. 19 at 2 (agreement between Marvel and Colan that his contributions to Marvel's comic

books "were created as works made for hire"); Lens Decl., Ex. 23A-E (documentation

reflecting hundreds of freelancers' "express[] agree[ment]" that their work would "be

considered a work made for hire.").

     Additionally, Toberoff Exhibit 9 **does not support** this contention, because over a

decade ago, when Mr. Steranko was retained as an expert witness for Defendant's counsel,

he testified that "[w]hen [he] worked at Marvel, [he] was on a work for hire basis."  Lens

Opp. Decl., Ex. 89 82:3-23.  As Mr. Steranko explained, he understood this based on his

"experience at Marvel," as Marvel "provided him with [a] description of the character,"
gave him "treatment[s] [or] synops[e]s of the material that they were looking for,"
"supervis[ed]" him, and "stamped [his checks] work for hire." *Id*. And after Marvel
"editted [*sic*] some of [his] work" and "changed certain things that [he] didn't feel should be
changed," Steranko, like Ditko, who "faced the same frustrations," left Marvel. Lens Opp.
Decl., Ex. 95 at 4-5.

      Regardless, this contention is **immaterial** because it refers to events outside the
relevant time period and, in any event, a written agreement characterizing the work as
"work for hire" has no bearing on the Court's application of the work-made-for-hire test, as
this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second
Circuit, confirms. *See Kirby*, 777 F. Supp. 2d at 748 (rejecting evidence from outside "the
relevant time period" as "not admissible evidence of anything"); *Kirby*, 726 F.3d at 141-142
(rejecting the Kirbys' argument that "the 'right to supervise' referred to in our case law
requires a legal, presumably contractual, right" because there is "no hint of this requirement
in our case law applying the instance and expense test"—"Marvel's active involvement in
the creative process, coupled with its power to reject pages and request that they be redone"
suffices).

      MCI also **objects** to the evidence cited in support of this contention. *See* MTE
Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [12], [16], [19], & [42].

30.    **In the early 1980s, Marvel ran a competition for aspiring artists and writers,
open to the public.** *See* Toberoff Decl. Ex. 1 at 17 (Evanier Rep. describing Marvel's practice of
running competitions to discover new, aspiring artist and writers); Ex. 34 at 1 (Randy Schueller
("Schueller") interview explaining that Marvel ran a competition for aspiring writers and artists in
the early 1980s).

      <u>**RESPONSE:**</u> **Undisputed**, but **immaterial** because this paragraph refers to events outside
the relevant time period and, in any event, has no bearing on the Court's application of the

work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 777 F. Supp. 2d at 748 (rejecting evidence from outside "the relevant time period" as "not admissible evidence of anything"); *Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).

MCI, however, **objects** to the evidence cited in support of this contention. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1] & [40].

31.    **One entrant, Randy Schueller, an amateur and previously unknown writer/artist, submitted a story wherein Spider-Man had a stealthy black costume instead of his usual red, black, and blue.** *See* Toberoff Decl. Ex. 1 at 17 (Evanier Rep. describing Schueller's unique Spider-Man submission and his amateur status); Ex. 31 at 2 (Walter Durajlija ("Durajlija") writing that young fan Schueller won an ideas contest Marvel was having in 1982 with his idea for a black Spider-Man costume); Ex. 34 at 2 (Schueller interview explaining that he came up with, and submitted to Marvel, a story featuring a black-costume Spider-Man).

**RESPONSE:** **Undisputed**, but **immaterial** because this paragraph refers to events outside the relevant time period and, in any event, has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 777 F. Supp. 2d at 748 (rejecting evidence from outside "the relevant time period" as "not admissible evidence of anything"); *Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).

MCI, however, **objects** to the evidence cited in support of this contention. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [37], & [40].

32.    **A few months after Schueller's submission, then Marvel editor, Jim Shooter ("Shooter"), wrote to Schueller on August 3, 1982, offering to buy the story for $220 and told him to sign a "Work-made-for-hire Agreement."** *See* Toberoff Decl. Ex. 17 at 59:2-10 (Thomas testifying that Jim Shooter was editor-in-chief at Marvel in the 1980s); Ex. 31 at 2 (Durajlija writing that Marvel editor Shooter liked the costume idea and bought it from Schueller for $220); Ex. 32 (Shooter letter dated August 3, 1982 offering to buy Schueller's black-costume *Spider-Man* story submission for $220 and telling Schueller to sign the attached "Work-made-for-hire Agreement"); Ex. 34 at 2 (Schueller interview explaining that, a few months after he submitted his black-costume *Spider-Man* story, Shooter wrote to him offering to buy it for $220); Ex. 38 (retroactive work-for-hire agreement signed by Schueller dated August 9, 1982).

**RESPONSE:  Disputed**, but **immaterial**.  MCI **disputes** this contention insofar as Defendant suggests that the work-made-for-hire agreement was signed after the work was completed.  Indeed, in Toberoff Exhibit 32, which Defendant omits from this contention, Jim Shooter states that he "want[ed] changes made" and that he would "fill [Schueller] in on [the changes] after [he] return[ed] the work-made-for-hire form."

Regardless, this contention is **immaterial** because it refers to events outside the relevant time period and, in any event, has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 777 F. Supp. 2d at 748 (rejecting evidence from outside "the relevant time period" as "not admissible evidence of anything"); *Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).

MCI also **objects** to Toberoff Exhibits 31, 32, 34, and 38.  *See* MCI's Evidentiary Objection Nos. [37], [38], [40], & [43].

33.    **Schueller signed the agreement on August 9, 1982, which is the same form agreement Marvel had other freelancers sign in and around 1978.**  *See* Toberoff Decl. Ex. 1 at 17 (Evanier Rep. identifying Schueller's August 9, 1982 contract as being the same as those Marvel forced freelancers to sign in the late 1970s); Ex. 38 (retroactive work-for-hire agreement signed by Schueller dated August 9, 1982); Ex. 39 (retroactive work-for-hire contract dated January 26, 1979 allegedly signed by Ditko).

**RESPONSE:  Undisputed**, but **immaterial** because this paragraph refers to events outside the relevant time period and, in any event, has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 777 F. Supp. 2d at 748 (rejecting evidence from outside "the relevant time period" as "not admissible evidence of anything"); *Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).

MCI, however, **objects** to Toberoff Exhibits 1 and 38.  *See* MTE Evanier [Dkt.

77]; MCI's Evidentiary Objection Nos. [1] & [43].

34.     **Schueller's "agreement" retroactively provided that "all work … which have been or are in the future created … [were] to be considered a work made for hire."**  *See* Toberoff Decl. Ex. 38 (purported retroactive work-for-hire agreement signed by Schueller dated August 9, 1982).

> **RESPONSE:  Disputed**, but **immaterial**.  While MCI does not dispute the quoted terms of
>
> the agreement, MCI **disputes** Defendant's characterization of them as "retroactive."
>
> Indeed, in Toberoff Exhibit 32, which Defendant omits to cite in this contention, Jim
>
> Shooter states that he "want[ed] changes made" and that he would "fill [Schueller] in on
>
> [the changes] after [he] return[ed] the work-made-for-hire form."
>
>      Regardless, this contention is **immaterial** because it refers to events outside the
>
> relevant time period and, in any event, has no bearing on the Court's application of the
>
> work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby*
>
> case, as upheld by Second Circuit, confirms.  *See Kirby*, 777 F. Supp. 2d at 748 (rejecting
>
> evidence from outside "the relevant time period" as "not admissible evidence of anything");
>
> *Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).
>
>      MCI also **objects** to the evidence cited in support of this contention.  *See* MCI's
>
> Evidentiary Objection No. [43].

35.     **Ditko was a prolific comic book creator and illustrator who revolutionized the artform, and created or co-created, in the Period, some of Marvel's most enduring and profitable superheroes including, without limitation, Spider-Man and Dr. Strange (the "Works").**  *See* Toberoff Decl. Ex. 17 at 17:8-23 (Thomas testifying that Ditko and others revolutionized comics with their characters and style); Ex. 25 at DITKO-0308 (Ditko explaining that Dr. Strange was his creation and at one point, he was doing all the stories, writing, and art for it); Ex. 30 at 2021MARVEL-0050281 (Lee writing that Dr. Strange "'twas Steve[] [Ditko's] idea," in a letter dated January 9, 1963; Ex. 28 (Lee writing that Ditko was co-creator of Spider-Man and that Ditko did most of the story plotting of *Spider-Man*).

**RESPONSE:  Disputed**, but **immaterial**.  While MCI does not dispute that Ditko, like

Kirby, was a prolific comic book illustrator who contributed to a number of Marvel's key

Super Heroes, MCI **disputes** that Ditko "created" any Marvel Super Heroes to the extent

Defendant is suggesting that Ditko's contributions were not done on a work-made-for-hire

basis.  Additionally, Toberoff Exhibits 17, and 30 **do not support** the contention that Ditko

"created" any Marvel characters.

Regardless, this contention is **immaterial** because it has no bearing on the Court's

application of the work-made-for-hire test, as this Court's grant of summary judgment for

Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F.3d at

139-40 (relevant principles of the instance-and-expense test).  Indeed, as *Kirby* held,

"[q]uestions of who created the characters are mostly beside the point," but what matters is

the hiring parties' "inducement, right to supervise, exercise of that right, and creative

contribution with respect to" the works.  *Kirby*, 726 F.3d at 142.

MCI also **objects** to Toberoff Exhibit 25.  *See* MCI's Evidentiary Objection No.

[34].

36.    **Unlike most freelancers in the Period who worked from home, Ditko worked
out of a separate art studio he rented at his own expense.**  *See* Toberoff Decl. Ex. 1 at 13
(Evanier Rep. explaining the custom and practice of freelancers creating their material from home
and noting that Ditko was unique in renting and paying for a separate studio); Ex. 2 at 76:4-24
(Lieber testifying that he created his freelance work from home and used his own supplies); Ex. 3 at
16:22-24, 194:14-195:3, 209:16-210:7 (Romita testifying that he purchased his own materials and
worked from home); Ex. 4 at 33:25-34:2 (Lee testifying that freelancers mostly worked from
home); Ex. 6 at 30:21-24 (Thomas testifying that he did his freelance writing from home); Ex. 8 ¶ 9
(Sinnott attesting that he worked from home and paid for his own materials); Ex. 9 ¶ 10 (Steranko
attesting that he worked from home and paid for his own materials, for which Marvel never
reimbursed him); Ex. 10 ¶ 10 (Ayers attesting that he worked from home and paid for his own
materials); Ex. 11 ¶ 8 (Colan attesting that he created his freelance art from home and paid for his
own materials); Ex. 13 ¶ 7 (Adams attesting that he worked from home and paid for his own
materials); Ex. 16 at 117:15-16 (Nanci Solo ("Solo") testifying that Colan worked from home); Ex.
17 at 24:5-25:4 (Thomas testifying that artists worked from home as freelancers and rarely, if ever,
came into the office); Ex. 22 at 286:17-287:19 (Lieber testifying that he worked from home and

52

paid for his own typewriter); Ex. 24 at 123:18-21 (Levitz testifying that Ditko created work from his own studio).

>    **RESPONSE: Undisputed**, but **immaterial**.  MCI notes that Ditko could afford his own
>
>    studio undermines Defendant's portrayal of him in later contentions as a starving artist.
>
>    And Toberoff Exhibit 13 **does not support** this paragraph, as it refers to a period of time
>
>    beginning in late 1960s, not the relevant time period.
>
>        Regardless, this paragraph is **immaterial** because it has no bearing on the Court's
>
>    application of the work-made-for-hire test, as this Court's grant of summary judgment for
>
>    Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F.3d at
>
>    142-143 (holding that even though Marvel "did not pay for Kirby's supplies or provide him
>
>    with office space . . . Marvel's payment of a flat rate and its contribution of both creative
>
>    and production value, in light of the parties' relationship as a whole, is enough to satisfy the
>
>    expense requirement").
>
>        MCI, however, **objects** to Toberoff Exhibits 1, 8, 9, 10, 11, 13, and 16.  *See* MTE
>
>    Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [11], [12], [13], [14], [16], & [18].

37.     **Ditko also paid for all his own materials and instruments, including paper, pens, pencils, erasers, brushes and ink.**  *See* Toberoff Decl. Ex. 1 at 13 (Evanier Rep. explaining that it was the custom and practice in the comic book industry, and at Marvel, in the 1960s for freelancers to pay for their own materials including paper, pencils, ink, pens, brushes); Ex. 2 at 76:4-24 (Lieber testifying that he created his freelance work from home and used his own supplies); Ex. 3 at 16:22-24, 194:14-195:3, 209:16-210:7 (Romita testifying that he purchased his own materials and worked from home); Ex. 8 ¶ 9 (Sinnott attesting that he worked from home and paid for his own materials); Ex. 9 ¶ 10 (Steranko attesting that he worked from home and paid for his own materials, for which Marvel never reimbursed him); Ex. 10 ¶ 10 (Ayers attesting that he worked from home and paid for his own materials); Ex. 11 ¶ 8 (Colan attesting that he created his freelance art from home and paid for his own materials); Ex. 13 ¶ 7 (Adams attesting that he worked from home and paid for his own materials); Ex. 17 at 294:6-295:3 (Thomas testifying that freelancers paid for their own materials, paper, typewriter, and work from home); Ex. 21 at 97:3-23 (Steranko testifying that he paid for his own materials); Ex. 22 at 286:17-287:19 (Lieber testifying that he worked from home and paid for his own typewriter).

**RESPONSE:  Undisputed**, but **immaterial**.  However, Toberoff Exhibit 13 **does not**

**support** the stated fact in this paragraph, as it refers to a period of time beginning in late

1960s, not the relevant time period.

Regardless, this paragraph is **immaterial** because it has no bearing on the Court's

application of the work-made-for-hire test, as this Court's grant of summary judgment for

Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F. 3d at

142-143 (holding that even though Marvel "did not pay for Kirby's supplies or provide him

with office space . . . Marvel's payment of a flat rate and its contribution of both creative

and production value, in light of the parties' relationship as a whole, is enough to satisfy the

expense requirement").

MCI, however, **objects** to Toberoff Exhibits 1, 8, 9, 10, 11, 13, and 21.  *See* MTE

Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [11], [12], [13], [14], [16], & [23].

38.    **Ditko created his freelance artwork solely as an independent contractor on his own time, and at his own volition with the intention and hope of selling his material to Magazine Management, Charlton Comics, or other publishers.**  *See* Toberoff Decl. Ex. 1 at 13 (Evanier Rep. explaining that it was the custom and practice in the comic book industry, and at Marvel, in the 1960s for freelancers to create their material as independent contractors and to set their own hours and choose their own working conditions); Ex. 12 ¶ 18 (Evanier attesting that Ditko was submitting freelance *Spider-Man* material to Marvel but was also selling work to Charlton Comics at the same time); Ex. 23 at 160:2-8 (Mark Ditko testifying that his uncle Ditko was selling work to both Marvel and Charlton Comics in the 1960s); Ex. 35 at DITKO-0199 (Ditko writing about his work at Charlton Comics in the 1960s); Ex. 57 at 2 (Ditko writing about creating material for Charlton Comics and DC Comics).

**RESPONSE:  Disputed**.  MCI **disputes** Defendant's suggestion that Ditko worked "at his

own volition with the intention and hope of selling" to Marvel "on spec," which is not only

an issue of law but also inaccurate.  To the contrary, freelance contributors, including Ditko,

contributed to Marvel's comic books pursuant to assignments from Lee, who directed the

creation of the Works, and they were compensated by Marvel on an agreed per-page basis

for completed assignments.  *See supra* Response No. 3, *citing* Lens Decl., Ex. 2 152:1-

154:7; Lens Decl., Ex. 12 56:12-15, 57:25-58:9, 58:14-23; Lens Decl., Ex. 7 217:13-21;

Lens Decl., Ex. 13 41:20-42:9; Lens Decl., Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21;

Lens Decl., Ex. 48 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2

27:19-28:7, 56:2-57:7, 148:22-151:25, 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9;

Lens Decl., Ex. 12 56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24;

Lens Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex.

13 14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-

10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl., Ex. 2 17:8-

18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 44:4-17;

Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-9, 93:23-94:5; Lens Decl., Ex. 2 80:24-

81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens

Decl., Ex. 4 124:19-125:4,124:3-18; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens

Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15; Lens Decl., Ex. 4 125:15-18; Lens

Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens Decl., Ex. 13 30:11-14, 58:13-21; Lens

Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 68A-G; Lens Decl., Ex. 2 137: 8-

16; Lens Decl., Ex. 10 396:1-10; Lens Decl., Ex. 6 40:14-20; Lens Decl., Ex. 2 276:7-23;

Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7, 226:7-11, 249:7-9, 258:12-17, 290:2-5,

290:18-22; Thomas Decl. ¶ 20.

Defendant's evidence also **does not support** this contention because no evidence

indicates that Ditko's work for Marvel (*e.g.*, Spider-Man, Doctor Strange, or any other

Works) was done with anyone but Marvel in mind—just the opposite, they were done based

on ongoing assignments for Marvel, in collaboration with Marvel's editor Lee, and always

subject to Marvel's ultimate authority.  *See* Thomas Decl. ¶¶ 16-17 ("I understood that

Steve Ditko was performing most, if not all, of this work for Marvel"); Lens Decl., Ex. 25

(reflecting Ditko's work for Marvel from the 1950s to 1990s); Lens Decl., Ex. 15 19:1-10

(Lee testifying that "there were a few artists that [he] worked with more than others,"

including Ditko); Lens Decl., Ex. 2 144:22-145:22 (Thomas testifying as to Lee's practice

of "keep[ing] [freelancers] busy" so that they "always had work at hand and didn't have

much downtime where they weren't making any money"); Lens Decl., Ex. 2 316:1-10

(Thomas testifying that Lee employed the Marvel Method to "keep [artists] busy by giving

them a plot . . . that way the artist didn't have the downtime and lose money"); Lens Decl.,

Ex. 72 at 4 (recalling Ditko toiling at his artist's desk in the early 1960s "tortured by []

deadlines"); Lens Decl., Ex. 73 at 3 (Ditko noting that Kirby was "buried under work" and

needed to work fast "to keep up with the assignments Lee was throwing at him"); Lens

Decl., Ex. 48 at 2 (Ditko writing that "Stan provided the plot ideas. There would be a

discussion to clear up anything, consider plot options and so forth. I would then do the

panel/page breakdowns, pencil the visual story continuity, and, on a separate paper, provide

a very rough panel dialogue, merely as a guide for Stan. We would go over the penciled

story/art pages and I would explain any deviations, changes, and additions, noting anything

to be corrected before or during the inking."); Lens Decl., Ex. 4 124:3-18 (Lee testifying

about his collaboration with Ditko on *Amazing Fantasy*); Lens Decl., Ex. 2 17:8-18:13

(Thomas testifying that "subject to the publisher, [Lee] was in charge of everything. He

oversaw the writing, he oversaw the artists and the art that came in. You know, everything

went through him with the help of the production manager in particular."); Lens Decl., Ex. 2

37:10-39:6 (Thomas testifying that when he became editor-in-chief, he was "in charge of,

you know, all the artists, the writers, the colorists, the letterers and so forth"); Lens Decl.,

Ex. 12 67:16-68:6 (Thomas testifying that Lee "decided which artist would do a cover for a

particular issue[,] . . . they were reviewed by Stan, . . . then they were all reviewed

eventually by Martin Goodman as publisher"); Lens Decl., Ex. 13 16:3-19 (Lee testifying

that he would "give instructions to the artists as to how [he] wanted the story to go" and

"oversaw . . . creative editorial aspects of the comic books that were created, . . . because

[he] had to answer to the publisher, Martin Goodman, and he had to be happy with what I

was doing"); Lens Decl., Ex. 2 80:24-81:12 (Thomas testifying that "[s]ubject to the

publisher, [Lee had] complete authority" over artwork in Marvel comics); Lens Decl., Ex. 2

125:18-126:1 (Thomas testifying that Lee "was always the ultimate authority unless Martin

Goodman stepped in, and that was mostly on covers"); Lens Decl., Ex. 7 219:11-220:11

(Thomas testifying that "the ultimate say, as far as I know, was the publisher, . . . Martin

Goodman"); Lens Decl., Ex. 13 97:8-11 (Lee testifying that he "couldn't do any book unless

Martin approved of it"); Lens Decl., Ex. 4 124:19-125:4 (Lee testifying that "[i]t was always

[Goodman's] decision" as to what to publish, and "he exercised the authority ultimately to

publish the last edition of 'Amazing Fantasy'"); Lens Decl., Ex. 4 124:3-18 (Lee testifying

that he "loved" the "Amazing Fantasy" books but "Mr. Goodman decided to cancel them

because they weren't selling"); Thomas Decl. ¶¶ 7-8 ("As part of [Marvel's] established

framework [for creating comics in the 1960s], Stan Lee supervised and directed Marvel's

comic book-creation process subject only to Martin Goodman"); *see also* Lens Decl., Ex. 55

at 4; Lens Decl., Ex. 59 at 3.

　　　　　MCI also **objects** to the evidence cited in support of this contention.  *See* MTE

Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [15], [32], [41], & [52].

39.　　　**None of Ditko's expenses in creating the Works were paid for or reimbursed,
whether by Magazine Management, or by the shell companies that copyrighted the Works.**
*See* Toberoff Decl. Ex. 1 at 13 (Evanier Rep. explaining that it was the custom and practice in the
comic book industry, and at Marvel, in the 1960s for freelancers to pay for their own materials
including paper, pencils, ink, pens, brushes); Ex. 2 at 76:4-24 (Lieber testifying that he created his
freelance work from home and used his own supplies); Ex. 3 at 16:22-24, 194:14-195:3, 209:16-
210:7 (Romita testifying that he purchased his own materials and worked from home); Ex. 8 ¶ 9

(Sinnott attesting that he worked from home and paid for his own material); Ex. 9 ¶ 10 (Steranko attesting that he worked from home and paid for his own materials, for which Marvel never reimbursed); Ex. 10 ¶ 10 (Ayers attesting that he worked from home and paid for his own materials); Ex. 11 ¶ 8 (Colan attesting that he created his freelance art from home and paid for his own materials); Ex. 13 ¶ 7 (Adams attesting that he worked from home and paid for his own materials); Ex. 17 at 320:10-322:14 (Thomas testifying that no one knew what Vista, Atlas, or Non-Pareil did and that Thomas did not receive any money from them, does not know anyone who did, does not know "of [them] having any existence" whatsoever); Ex. 21 at 97:3-23 (Steranko testifying that he worked out of his own studio and paid for his own materials); Ex. 22 at 286:17-287:19 (Lieber testifying that he worked from home and paid for his own typewriter); Ex. 50 at DETTWILER-0044-0058 (Don Heck's payment records identifying "Magazine Management" as the entity that paid him for his freelance pages in the Period).

> **RESPONSE: Disputed**, but **immaterial**. MCI **disputes** Defendant's characterization of
>
> such companies as "shell companies." As relevant here, Goodman's various comic book
>
> entities conducted business as "Marvel" or "Marvel Comics Group" and engaged with
>
> Magazine Management Company for administrative services, including payments to those
>
> providing services to Marvel. *See supra* Response No. 9, *citing* Bard Decl. ¶ 2; Bard Decl.,
>
> Ex. 5 at 2-3; Bard Decl., Ex. 7 at 5; Bard Decl., Ex. 10 at 2; Lens Decl., Ex. 18 72:25-73:11;
>
> Lens Opp. Decl., Ex. 90 5:11-19; Bard Decl., Ex. 8 at 5-6; Lens Decl., Ex. 75; Lens Decl.,
>
> Ex. 76; Lens Opp. Decl., Ex. 93 at 4-5; Lens Opp. Decl., Ex. 92 at 3-8; Bard Decl., Ex. 6 at
>
> 3; Bard Decl., Ex. 5 at 3; Lens Decl., Ex. 68A-G.
>
> Further, Marvel **disputes** that "[n]one of Ditko's expenses in creating the Works
>
> were paid for," as the per-page rate Marvel paid freelancers, particularly the generous one
>
> paid to Ditko, accounted for expenses incurred in contributing to the Works. *See supra*
>
> Response No. 2, *citing* Lens Opp. Decl., Ex. 83 72:25-73:7, 207:24-208:1; Lens Opp. Decl.,
>
> Ex. 94 at 3. And Toberoff Exhibit 13 **does not support** this contention, as it refers to a
>
> period of time beginning in late 1960s, not the relevant time period.
>
> Regardless, this contention is **immaterial** because it has no bearing on the Court's
>
> work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby*

case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F. 3d at 142-143 (holding that even though Marvel "did not pay for Kirby's supplies or provide him with office space . . . Marvel's payment of a flat rate and its contribution of both creative and production value, in light of the parties' relationship as a whole, is enough to satisfy the expense requirement").

MCI also **objects** to Toberoff Exhibits 1, 8, 9, 10, 11, 13, and 21.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [11], [12], [13], [14], [16], & [23].

40.      **Ditko kept a large chart in his studio, mapping out the future development of his characters so he could plant narrative seeds and introduce elements in current comic book issues whose importance would be revealed and come to fruition much later in issues many months down the line.**  *See* Toberoff Decl. Ex. 1 at 12 (Evanier Rep. describing Ditko's regular practice of maintaining a chart mapping out the future development of a character so he could introduce elements into current issues and then use those elements in issues many months down the line); Ex. 35 at DITKO-0193 (Ditko writing that he planted seeds of subplots in stories that would work their way through the issues until it was time for those sub-stories to play an active role later when the time was right); Ex. 58 at 3 (Ditko writing when he took over the *Spider-Man* stories he "knew in advance the [*Spider-Man*] story line like the best (worst) time for Aunt May to have a heart attack").

> **RESPONSE:  Disputed**, but **immaterial**.  Because Defendant fails to provide any time period in this contention, it is unclear as written.  While MCI does not dispute that Steve Ditko did some plotting for some Spider-Man and Doctor Strange stories, he only did so when Lee, using his editorial discretion, permitted, subject to Marvel's ultimate authority.  *See*  Toberoff Ex. 19 at 3-4 (although Lee "was willing to go along with a lot of what Steve wanted to do," "Stan had the authority" and used it "when he felt he had to use it" because an explanation that "the artist wanted to do it that way" "would not have been a sufficient excuse for Martin Goodman."); Lens Decl., Ex. 15 19:1-10 (Lee testifying that "there were a few artists that [he] worked with more than others," including Ditko); Lens Decl., Ex. 45 at 4 (Ditko explaining in 1965 that he was "*allowed* to drift" from his assigned scripts) (emphasis added); Lens Decl., Ex. 25 (reflecting Ditko's work for Marvel from the 1950s to 1990s); Lens Decl., Ex. 48 at 2 (Ditko explaining how *Amazing Adventures* "came about

because of the 5-page twist-ending stories we [Lee and Ditko] had done as back-ups in
*Strange Tales*" and others); Lens Decl., Ex. 2 307:25-308:3 (Thomas testifying that
*Amazing Fantasy* was comprised of little short stories by – written by Lee and drawn by
Ditko entirely); Lens Decl., Ex. 4 124:3-18 (Lee testifying about his collaboration with
Ditko on *Amazing Fantasy*); Lens Decl., Ex. 13 54:16-56:9 (Lee testifying that it "was part
of what [an artist's] assignment was" to "introduce . . . new characters in the stories"); Lens
Decl., Ex. 13 72:21- 73:23 (Lee testifying that "[t]he artist in every strip always creates new
characters to flesh out the strip and to make the characters living in the real world," although
such additions were subject to the approval of Lee and Goodman); Lens Decl., Ex. 13 79:3-
19 (Lee testifying that it would be the responsibility of "the Editor or the Publisher" to
"make the decision to take [a new, minor] character and make him or her a separate
character for a new comic"); Lens Decl., Ex. 12 55:4-15 (Thomas confirming that artists
would sometimes "come up with ideas for new characters," and that it was indeed "part of
the artist's assignment . . . to introduce new characters into a comic book series" if it "would
further the plot"); *see also* Lens Decl., Ex. 12 65:13-66:7.  MCI thus **disputes** that any
plotting by Ditko is an indicia that the works were not works made for hire.

Further, Toberoff Exhibits 35 and 58 **do not support** this contention because they
say nothing about Ditko having a chart in his studio to map out story ideas.  MCI also
**disputes** Defendant's characterization of Toberoff Exhibit 58.  While Defendant implies
Ditko "knew in advance" the Spider-Man story line because *Ditko* came up with it, Toberoff
Exhibit 58 supports that Lee provided Ditko with such storylines in advance, or that they
developed them together—consistent with Ditko's description of his working relationship
with Lee as a "collaboration".  *See* Lens Decl., Ex. 48 at 2 (Ditko writing that "Stan
provided the plot ideas.  There would be a discussion to clear up anything, consider plot

60

options and so forth.  I would then do the panel/page breakdowns, pencil the visual story

continuity, and, on a separate paper, provide a very rough panel dialogue, merely as a guide

for Stan.  We would go over the penciled story/art pages and I would explain any

deviations, changes, and additions, noting anything to be corrected before or during the

inking.”); Lens Decl., Ex. 4 124:3-18 (Lee testifying about his collaboration with Ditko on

*Amazing Fantasy*).

 Regardless, this contention is **immaterial** because it has no bearing on the Court’s

application of the work-made-for-hire test, as this Court’s grant of summary judgment for

Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F.3d at

139-40 (relevant principles of the instance-and-expense test).  To the extent Defendant is

referring to when Ditko began plotting Marvel stories, a period of time well after the major

characters were introduced, when Lee, using his editorial discretion, afforded Ditko greater

creative input, the fact—if true—that Ditko thought about the development of Marvel’s

characters would simply be one of the reasons that Marvel hired him in the first place.  *See*

*Kirby*, 726 F.3d at 142 (“[T]he hired party’s ingenuity and acumen are a substantial reason

for the hiring party to have enlisted him[, and] [i]t makes little sense to foreclose a finding

that work is made for hire because the hired artist indeed put his exceptional gifts to work

for the party that contracted for their benefit.”).  And, of course, Lee always retained

editorial discretion, and could reject any “narrative” put forth by Ditko.  *See* Toberoff Ex.

19 at 3-4 (although Lee “was willing to go along with a lot of what Steve wanted to do,”

“Stan had the authority” and used it “when he felt he had to use it” because an explanation

that “the artist wanted to do it that way” “would not have been a sufficient excuse for Martin

Goodman.”).

MCI also **objects** to the evidence cited in support of this contention. *See* MTE

Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [41], & [53].

41.     **When submitting his artwork to Lee, Ditko would often write extensive margin notes, including suggested captions and dialogue, so that when Lee, or later, Thomas, dialogued Ditko's story, they would know what story points Ditko intended in each panel and what the characters would likely say consistent with the story Ditko had plotted.** *See* Toberoff Decl. Ex. 14 at 7 (Evanier Rebuttal Rep. explaining Ditko's practice of submitting detailed notes with his freelance material to assist Lee in dialoguing the stories); Ex. 7 at 223:18-225:20 (Thomas testifying that Ditko refused to speak to Lee while working on *Spider-Man* and *Dr. Strange* so all plotting on the stories was done by Ditko, and further, that Ditko would provide margin notes to indicate what he intended to happen in the story to guide Lee when Lee dialogued the story); *id.* at 262:4-264:19 (Thomas testifying that when he began to dialogue *Dr. Strange* stories instead of Lee, Ditko would type his suggested captions and dialogue on a separate page, not in the margins, and then give them to Thomas to fill in the dialogue balloons); Ex. 17 at 84:18-90:9 (Thomas testifying that Ditko wrote extensive margin notes describing the plot and what was happening so that when Lee/Thomas dialogued the story, they could do so in a way that corresponded with what Ditko had intended); Ex. 18 (1965 example of Ditko's *Dr. Strange* margin notes for Thomas); Ex. 26 at 83 (Lee writing that Ditko came up with the *Dr. Strange* plots and illustrated the story and Lee only added the dialogue [in the balloons]); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script).

      **RESPONSE: Disputed**, but **immaterial**.  Because Defendant fails to provide any time

period in this contention, it is unclear as written.  MCI does not dispute that Ditko would

sometimes write "margin notes" that helped explain his penciled artwork, but MCI **disputes**

that the margin notes were "extensive" or that they generally included captions or dialogue.

*See* Lens Opp. Decl., Ex. 84 87:11-90:4 (Thomas testifying that Ditko would include just "a

couple of words" so Thomas "knew what was going on" since Ditko would draw "very,

very rough pencil" art at this stage); Toberoff Ex. 18 at 3-8 (sample Ditko notes such as

"Found Place to hide—must move fast" and "They're on the roof now"); Toberoff Ex. 19 at

4-5 (Thomas explaining that "Stan wanted the artists to tell what was going on," as early

artwork was "sketchy" with "very loose" pencils, but noting that "Stan would take what he

wanted from that, and felt no obligation to take any more").  Certainly, nothing about the

fact that Ditko would sometimes provide margin notes indicates that the Works were done

"on spec", as Defendant contends.  To the contrary, Lee and Thomas were free to, and often did, disregard such margin notes.  *See* Toberoff Ex. 19 at 4-5 (Thomas explaining that "Stan wanted the artists to tell what was going on," as early artwork was "sketchy" with "very loose" pencils, but noting that "Stan would take what he wanted from that, and felt no obligation to take any more").  Moreover, Toberoff Exhibit 26 **does not support** this contention, as it references only Ditko's work on *Spider-Man Annual #2*, a one-off special annual issue otherwise unconnected to the Spider-Man or Doctor Strange stories Ditko and Lee worked on.  Further, Toberoff Exhibit 17 **does not support** this contention because it states that Ditko's work was a "switch on the Marvel method" when Ditko began plotting Spider-Man later in his Marvel career, in contrast to his earlier working method with Lee.

To the extent Ditko was illustrating from Lee's plots, any such notes were derivative of Lee's own ideas.  To the extent Defendant is referring to when Ditko began plotting Marvel stories, a period of time well after the major characters were introduced, when Lee, using his editorial discretion, afforded Ditko greater creative input, subject to Marvel's ultimate authority, the fact—if true—that Ditko thought about the development of Marvel's characters would simply be one of the reasons that Marvel hired him in the first place.  *See Kirby*, 726 F.3d at 142 ("[T]he hired party's ingenuity and acumen are a substantial reason for the hiring party to have enlisted him[, and] [i]t makes little sense to foreclose a finding that work is made for hire because the hired artist indeed put his exceptional gifts to work for the party that contracted for their benefit.").

Regardless, this contention is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).

MCI also **objects** to Toberoff Exhibits 14 and 27. *See* MTE Evanier [Dkt. 77];

MCI's Evidentiary Objection Nos. [17] & [35].

42. **Ditko, in essence, acted as both a co-writer/plotter and the artist of the Works. Lee, or later sometimes, staff writer Thomas, would then dialogue the balloons and add some captions based on Ditko's illustrated story, notes, and suggestions.** *See* Toberoff Decl. Ex. 7 at 223:18-225:20, 277:11-13 (Thomas testifying that Ditko did all the plotting on *Spider-Man* and *Dr. Strange* stories while he and Lee were not speaking and that Ditko never received any plots from Thomas when Thomas was doing the dialoguing on *Dr. Strange*); *id.* at 262:4-264:19 (Thomas testifying that, when Thomas began to dialogue *Dr. Strange* stories instead of Lee, Ditko would type his suggested captions and dialogue on a separate page, not in the margins, and then give them to Thomas to fill in the dialogue balloons); Ex. 17 at 311:18-312:25 (Thomas testifying that Ditko, on his own, plotted and drew *Spider-Man* for more than one year before he left in 1966, did not work pursuant to the Marvel Method, and that Lee would not even know anything about the story until it was penciled and submitted by Ditko); *id.* at 84:18-90:9 (Thomas testifying that Ditko wrote extensive margin notes describing the plot and what was happening so that when Lee/Thomas dialogued the story, they could do so in a way that corresponded with what Ditko had intended); Ex. 18 (1965 example of Ditko's *Dr. Strange* margin notes for Thomas); Ex. 19 at 6-8 (Thomas interview explaining that Ditko and Lee were not speaking in 1965 and Ditko was plotting both *Spider-Man* and *Dr. Strange* and would only come to the office to drop work off with Brodsky); Ex. 26 at 83 (Lee writing that Ditko came up with the *Dr. Strange* plots and illustrated the story and Lee only added the dialogue); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script); Ex. 28 (Lee writing that Ditko was the co-creator of Spider-Man and that Ditko did most of the plotting of *Spider-Man* and just left Lee to do the dialogue and some captions).

> **RESPONSE:** **Disputed**, but **immaterial**. Because Defendant fails to provide any time
>
> period in this fact, it is unclear as written. MCI **disputes** that Ditko would act as the co-
>
> writer/plotter and the artist of the Works in general, particularly early in his working
>
> relationship with Marvel. To the contrary, Ditko did not begin plotting Marvel stories until
>
> well after the major characters were introduced and Lee, using his editorial discretion,
>
> afforded Ditko greater creative input, subject to Marvel's ultimate authority. *See supra*
>
> Response No. 40, *citing* Toberoff Ex. 19 at 3-4; Lens Decl., Ex. 15 19:1-10; Lens Decl., Ex.
>
> 45 at 4; Lens Decl., Ex. 25; Lens Decl., Ex. 48 at 2; Lens Decl., Ex. 2 307:25-308:3; Lens
>
> Decl., Ex. 4 124:3-18; Lens Decl., Ex. 13 54:16-56:9, 72:21- 73:23, 79:3-19; Lens Decl.,
>
> Ex. 12 55:4-15, 65:13-66:7. MCI further disputes Defendant's suggestion that because

Ditko would sometimes provide "notes[] and suggestions," the Works were done "on spec." To the contrary, Lee and Thomas were free to, and often did, disregard such margin notes. *See* Toberoff Ex. 19 at 4-5 (Thomas explaining that "Stan wanted the artists to tell what was going on," as early artwork was "sketchy" with "very loose" pencils, but noting that "Stan would take what he wanted from that, and felt no obligation to take any more"). Further, even if Ditko plotted some Works (and received credit for doing so), Ditko was not a "co-writer," as writing was Lee or Thomas's responsibility. *See* Lens Decl., Ex. 50 at 3 (Ditko admitting "I'm not a writer."); Lens Decl., Ex. 15 27:13-28:18 (Lee testifying about "the division of labor between the artist and a writer of a comic book"); Lens Decl., Ex. 31D at 24 –31H (*Strange Tales* comics, beginning with Doctor Strange's first appearance, bearing writing credits for Lee, Thomas, Don Rico, and Dennis O'Neil); Toberoff Ex. 28 at 2 (Lee explaining that when Ditko "eventually did most of the plotting" on Spider-Man Lee "of course, continued to provide the dialogue and captions").

To the extent Ditko was illustrating from Lee's plots, any such notes were derivative of Lee's own ideas. And to the extent Defendant is referring to when Ditko began plotting Marvel stories, a period of time well after the major characters were introduced, when Lee, using his editorial discretion, afforded Ditko greater creative input, subject to Marvel's ultimate authority, the fact—if true—that Ditko thought about the development of Marvel's characters would simply be one of the reasons that Marvel hired him in the first place. *See Kirby*, 726 F.3d at 142 ("[T]he hired party's ingenuity and acumen are a substantial reason for the hiring party to have enlisted him[, and] [i]t makes little sense to foreclose a finding that work is made for hire because the hired artist indeed put his exceptional gifts to work for the party that contracted for their benefit.").

65

Additionally, Toberoff Exhibit 17 **does not support** this contention, as it states that Ditko's work was a "switch on the Marvel method" when Ditko began plotting Spider-Man later in his Marvel career.  Toberoff Exhibit 19 also **does not support** this contention, as it concerns Ditko and Lee's strained working relationship in 1965—just before Ditko quit working for Marvel.  In any event, Defendant omits to note that Thomas explains in this exhibit that that even though Ditko may have suggested some margin notes, "Stan wanted them[] . . . to avoid misinterpretation" when *he* dialogued Ditko's "very loose" pencil art and only "would take what he wanted from that, and felt no obligation to take any more." Toberoff Exhibit 28 also **does not support** this contention, as it concerns the latter period of Ditko and Lee's working relationship on Spider-Man when Ditko "*eventually* did most of the plotting."

Regardless, this contention is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F.3d at (explaining that "[i]t [wa]s beyond dispute … that Kirby made many of the creative contributions, often thinking up and drawing characters on his own, influencing plotting, or pitching fresh ideas," but still finding that Kirby's work for Marvel was made for hire); *id.* at 139-40 (relevant principles of the instance-and-expense test).

MCI also **objects** to Toberoff Exhibit 27.  *See* MCI's Evidentiary Objection No. [35].

43.    **In the Period, Ditko was paid neither a fixed wage nor for his services, but was paid only for that work Magazine Management chose to purchase subsequent to its creation.** *See* Toberoff Decl. Ex. 1 at 15 (Evanier Rep. describing the comic book industry and Marvel's custom and practice of purchasing freelance work by the page, and not paying freelancers fixed wages or for their services or time); Ex. 14 at 3 (Evanier Rebuttal Rep. explaining the custom and practice of comic book publishers in the Period, including at Marvel, to pay for only those pages they chose to accept and purchase, and to not pay for a freelancer's time or services); Ex. 5 at

371:3-25 (Lee testifying that Marvel "would only buy what [it] needed"); Ex. 8 ¶ 11 (Sinnott attesting that Marvel only paid him for the pages it accepted); Ex. 9 ¶ 14 (Steranko attesting that he was only paid for the pages Marvel accepted); Ex. 10 ¶ 11 (Ayers attesting that he was paid per page for freelance material which Marvel accepted); Ex. 13 ¶¶ 9-11 (Adams attesting that Marvel only paid him for pages which it accepted); Ex. 17 at 292:24-293:15 (Thomas testifying that freelancers were only paid for the final, accepted page); Ex. 43 ¶ 3(a) (Marvel's contract with Colan dated March 22, 1975 providing that Colan would be paid only for those pages which Marvel accepted and requiring Colan to make changes to his work without any additional compensation); Ex. 44 ¶ 3(a) (Marvel's contract with Thomas dated September 1, 1974 providing that Thomas would be paid only for those pages which Marvel accepted and requiring Thomas to make changes to his work without any additional compensation); Ex. 53 ¶ 3(a) (Marvel's contract with Thomas dated August 27, 1976 with same provision); Ex. 52 ¶ 3(a) (Marvel's October 7, 1977 contract with Gerber providing Gerber would be paid only for those pages Marvel accepted and that Gerber "will make all changes and rework all Material … without charge").

**RESPONSE:  Disputed**, but **immaterial**.  MCI **disputes** Defendant's suggestion that

Marvel "purchase[d]" work "on spec," which is not only an issue of law but also inaccurate.

To the contrary, freelance contributors, including Ditko, contributed to Marvel's comic

books pursuant to assignments from Lee, who directed the creation of the Works, and they

were compensated by Marvel on an agreed per-page basis for completed assignments.  *See*

*supra* Response No. 3, *citing* Lens Decl., Ex. 2 152:1-154:7; Lens Decl., Ex. 12 56:12-15,

57:25-58:9, 58:14-23; Lens Decl., Ex. 7 217:13-21; Lens Decl., Ex. 13 41:20-42:9; Lens

Decl., Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21; Lens Decl., Ex. 48 at 3; Lens Decl., Ex.

51 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2 27:19-28:7, 56:2-57:7, 148:22-151:25,

88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens Decl., Ex. 12 56:16-18, 58:10-13,

58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15 16:8-19; Lens Decl.,

Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13 14:5-8, 23:18-21; Lens Decl., Ex. 3

119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-10, 224:15-23, 241:25-242:14; Lens

Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl., Ex. 2 17:8-18:13, 24:17-23, 37:10-39:6; Lens

Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 44:4-17; Lens Decl., Ex. 13 16:3-19; Lens

Decl., Ex. 4 97:7-9, 93:23-94:5; Lens Decl., Ex. 2 80:24-81:12; 125:18-126:1; Lens Decl.,

Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18;

Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2

141:25-142:15; Lens Decl., Ex. 4 125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4;

Lens Decl., Ex. 13 30:11-14, 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3;

Lens Decl., Ex. 68A-G; Lens Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens

Decl., Ex. 6 40:14-20; Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-

153:10, 175:7, 226:7-11, 249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.

      Further, while MCI does not dispute that Steve Ditko was not paid a fixed salary or

hourly wage, MCI **disputes** that Ditko was not paid for his services; to the contrary, Ditko

was paid his agreed per-page rate for his completed assignments during the relevant time

period.  *See* Lens Decl., Ex. 57 at 3 (Ditko writing "What I did with Spider-man, I was paid

for. Marvel's property."); Lens Decl., Ex. 13 18:6-16 (Lee testifying that "[e]ven if we

didn't publish – if an artist drew a 10-page story, and the artist rate was $20 a page, I would

put in a voucher for $200 for that artist. Now, if – and this happened rarely – but if we

decided not to use that story, the artist would still keep the money because he had done the

work. It wasn't his fault. . . . Everybody was paid per page."); Lens Decl., Ex. 10 376:16-22

(Lee testifying that "[a]ny artists that drew anything that I had asked him or her to draw at

my behest, I paid them for it. If it wasn't good, we wouldn't use it. But I asked them to draw

it, so I did pay them."); Lens Decl., Ex. 9 30:10-12 (Lieber testifying that he "g[o]t paid for

all the work [he] did for Marvel"); Lens Decl., Ex. 68A-G (reflecting number of pages and

payment amount for work on various Marvel series); *compare* Lens Decl., Ex. 35 at 9

(Thomas noting that Gil Kane was assigned to and did pencil and ink the cover of Avengers

#37), *with* Lens Decl., Ex. 68D at 10 (reflecting payment to Don Heck for "Avengers #37

P&I cover"); Lens Decl., Ex. 35 at 12 ("The Avengers #37 unused cover art by Don Heck");

*see also* Lens Decl., Ex. 2 158:17-20 (Thomas testifying that he recalled "a few instances" where "Marvel paid an artist their per-page rate for their artwork but decided not to publish it"); Lens Decl., Ex. 2 297:14-20 (Thomas testifying that Marvel would pay out its per-page rates "if a new page came in that they accepted"); Lens Decl., Ex. 12 68:24-69:6 (Thomas testifying that "if an artist's work required that changes be made, [] the artist have been paid for the original work that they submitted"); Lens Decl., Ex. 12 74:19-25 (Thomas testifying that he was still paid for "any materials that [he] submitted in [his] freelance capacity that were modified by Stan"). Indeed, Defendant cites no evidence (because there is none) that Ditko was not paid for completed assignments for Marvel—even if Marvel "rejected" such artwork for publication. Additionally, Toberoff Exhibits 5, 13, 43, 44, 52, and 53 **do not support** this contention, as the cited materials refers to times periods outside the relevant time period.

Regardless, this contention is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).

MCI also **objects** to Toberoff Exhibits 1, 8, 9, 10, 13, 14, 43, 44, 52, and 53. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [11], [12], [13], [16], [17], [44], [45], [49], & [50].

44.    **If work was rejected, Ditko was not compensated, and personally took the loss.**
*See* Toberoff Decl. Ex. 1 at 15 (Evanier Rep. describing the comic book industry and Marvel's custom and practice of not paying freelancers for material they rejected); Ex. 14 at 3, 7 (Evanier Rebuttal Rep. explaining the custom and practice in the comic book industry in the Period, including at Marvel, to not pay for any freelance material rejected by the publishers); Ex. 2 at 100:3-101:9 (Lieber testifying about a time he witnessed Kirby's work being rejected and Kirby tearing up and throwing away the rejected pages); Ex. 10 ¶ 11 (Ayers attesting that was not paid for rejected material or for having to redo material); Ex. 11 ¶ 9 (Colan attesting that Marvel only paid for the pages it accepted); Ex. 13 ¶¶ 8, 10-11 (Adams attesting that he bore the risk of creation

because there was no guarantee his work would be purchased by Marvel); Ex. 15 at 22-23 (Levitz Rep. explaining that it was the custom and practice for comic book publishers to have the right to reject work submitted by freelancers and to pay only for the pages which were accepted); Ex. 16 at 117:6-121:4 (Solo testifying that Colan was not paid for rejected work and that her father was so upset by this periodic waste of his efforts that he would commonly use the rejected, unpaid-for pages of artwork to pick up their family dog's feces); Ex. 17 at 295:8-296:8, 297:1-20 (Thomas testifying that Marvel could accept or reject submitted freelance material in its sole discretion); Ex. 20 at 73:14-74:24 (Evanier testifying that Marvel had asked Evanier to submit some work in the 1970s prior to 1978, for a new magazine, but that after he did the work, Marvel declined to buy it or pay for it since it decided not to publish the magazine after all); Ex. 21 at 29:9-30:17 (Steranko testifying that Lee sometimes rejected the work Steranko submitted on spec); Ex. 22 at 155:17-156:4, 259:5-16, 267:5-269:21 (Lieber testifying that he was only paid for work that was accepted by Marvel and recalls at least one instance where he submitted a plot which Marvel rejected and did not pay for); Ex. 24 at 14:12-19, 104:16-105:11 (Levitz testifying that Marvel had the right to reject material and not pay for it); Ex. 43 ¶ 3(a) (Marvel's contract with Colan dated March 22, 1975 providing that Colan would be paid only for those pages which Marvel accepted and requiring Colan to make changes to his work without any additional compensation); Ex. 44 ¶ 3(a) (Marvel's contract with Thomas dated September 1, 1974 providing that Thomas would be paid only for those pages which Marvel accepted and requiring Thomas to make changes to his work without any additional compensation); Ex. 53 ¶ 3(a) (Marvel's contract with Thomas dated August 27, 1976 with same provision); Ex. 52 ¶ 3(a) (Marvel's October 7, 1977 contract with Gerber providing Gerber would be paid only for those pages Marvel accepted and that Gerber "will make all changes and rework all Material … without charge").

**RESPONSE:** **Disputed**, but **immaterial**.  It is unclear what Defendant means by "rejected."  To the extent Defendant is referring to work that Marvel assigned Ditko but due to it being in an unmarketable condition (*i.e.*, failing to conform to the assignment), Marvel refused to accept and pay for, Defendant has no evidence of that happening to any of Ditko's work for Marvel.  Further, as was Marvel's policy, Ditko was paid his agreed per-page rate for his completed assignments during the relevant time period, even if Marvel decided not to publish such pages.  *See supra* Response No. 43, *citing* Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 13 18:6-16; Lens Decl., Ex. 10 376:16-22; Lens Decl., Ex. 9 30:10-12; Lens Decl., Ex. 68A-G; Lens Decl., Ex. 35 at 9, 12; Lens Decl., Ex. 68D at 10; Lens Decl., Ex. 2 158:17-20, 297:14-20; Lens Decl., Ex. 12 68:24-69:6, 74:19-25.

Additionally, Exhibit 2 **does not support** this contention as the cited material about an single instance in which Jack Kirby purportedly was upset, tore up pages, and

threw them in the trash says nothing about Marvel not paying for pages that were

"rejected.".  Toberoff Exhibit 17 **does not support** this contention as while Thomas

testifies that Marvel was free to accept or reject work, Defendant omits Thomas's testimony

that "Marvel paid an artist their per-page rate for their artwork [even if they] decided not to

publish it." *See* Lens Decl., Ex. 2 158:17-20.  Toberoff Exhibit 22 **does not support** this

contention as it post-dates the relevant time period and is unrelated to Lieber's work under

Lee or on Marvel's Super Hero comics.  Toberoff Exhibits 13, 43, 44, 52, and 53 **do not

support** this contention, as they post-date the relevant time period.  Toberoff Exhibit 24

**does not support** this contention as Levitz testified that any risk of "hav[ing] an assignment

completely rejected and not [] paid . . . was only true at the very, very beginning of people's

working relationship with any specific company," and Ditko had worked for Marvel for

several years prior to the creation of the Works.  *See* Toberoff Ex. 24 105:2-11.  Toberoff

Exhibit 21 also **does not establish** this contention, because over a decade ago, when Mr.

Steranko was retained as an expert witness for Defendant's counsel, he testified that

"[w]hen [he] worked at Marvel, [he] was on a work for hire basis."  Lens Opp. Decl., Ex. 89

82:3-23.  As Mr. Steranko explained, he understood this based on his "experience at

Marvel," as Marvel "provided him with [a] description of the character," gave him

"treatment[s] [or] synops[e]s of the material that they were looking for," "supervis[ed]"

him, and "stamped [his checks] work for hire."  *Id*.  And after Marvel "editted [*sic*] some of

[his] work" and "changed certain things that [he] didn't feel should be changed," Steranko,

like Ditko, who "faced the same frustrations," left Marvel.  Lens Opp. Decl., Ex. 95 at 4-5.

Regardless, this contention is **immaterial** because it has no bearing on the Court's

application of the work-made-for-hire test, as this Court's grant of summary judgment for

Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F.3d at

139-40 (relevant principles of the instance-and-expense test).  Indeed, the *Kirby* court

already held that the risk that certain pages would not be paid did not defeat a finding that

the works were made at Marvel's expense where, as here, the hiring party has a close and

continuous relationship with the artist during the relevant time period.  *See Kirby*, 726 F.3d

at 143 ("[T]he record suggests that both parties took on risks with respect to the works'

success—Kirby that he might occasionally not be paid for the labor and materials for certain

pages, and Marvel that the pages it did pay for might not result in a successful comic book.

But we think that Marvel's payment of a flat rate and its contribution of both creative and

production value, in light of the parties' relationship as a whole, is enough to satisfy the

expense requirement.").

    MCI also **objects** to Toberoff Exhibits 1, 2, 10, 11, 13, 14, 16, 20, 21, 22, 43, 44,

52, and 53.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [3], [13],

[14], [16], [17], [18], [19], [20], [24], [25], [44], [45], [49], & [50].

**45.    If Ditko was asked to redraw a page, he was not compensated for the extra
time, materials, or labor necessary to make such changes, but was paid only for the final,
completed page Magazine Management decided to buy.**  *See* Toberoff Decl. Ex. 1 at 15 (Evanier
Rep. describing the comic book industry and Marvel's custom and practice of not paying
freelancers to revise or redraw a page, as freelancers were only paid for the final pages the
publisher decided to accept and purchase); Ex. 14 at 7 (Evanier Rebuttal Rep. explaining the
custom and practice in the comic book industry, including at Marvel, for publishers to not pay for
rejected material, or to pay a freelancer to make revisions to his material); Ex. 2 at 102:15-105:17
(Lieber testifying he was not paid for redoing work and that he was only paid for the final pages
Marvel accepted); Ex. 8 ¶ 13 (Sinnott attesting that Marvel only paid for the final pages that were
sold to Marvel, not for any changes or rejected work); Ex. 9 ¶ 14 (Steranko attesting he was not
compensated for having to redo any work); Ex. 10 ¶ 11 (Ayers attesting that he was not paid for
rejected material or for having to redo material); Ex. 11 ¶¶ 9, 11 (Colan attesting that Marvel did
not pay him for redoing work); Ex. 13 ¶¶ 10-11 (Adams attesting that he was only paid for pages
Marvel accepted); Ex. 17 at 142:21-143:15, 296:10-25 (Thomas testifying that freelancers were not
paid for having to redo or revise pages and that they would only be paid for the final, accepted
page); Ex. 43 ¶ 3(a) (Marvel's contract with Colan dated March 22, 1975 providing that Colan
would be paid only for those pages which Marvel accepted and requiring Colan to make changes to
his work without any additional compensation); Ex. 44 ¶ 3(a) (Marvel's contract with Thomas
dated September 1, 1974 providing that Thomas would be paid only for those pages which Marvel
accepted and requiring Thomas to make changes to his work without any additional compensation);

Ex. 53 ¶ 3(a) (Marvel's contract with Thomas dated August 27, 1976 with same provision); Ex. 52 ¶ 3(a) (Marvel's October 7, 1977 contract with Gerber providing Gerber would be paid only for those pages Marvel accepted and that Gerber "will make all changes and rework all Material … without charge").

> **RESPONSE:** **Disputed in part**, but **immaterial**.  While MCI does not dispute that the per-page-rate included the right to request revisions, MCI **disputes** Defendant's suggestion that Marvel was "buy[ing]" work "on spec," which is not only an issue of law but also inaccurate.  To the contrary, freelance contributors, including Ditko, contributed to Marvel's comic books pursuant to assignments from Lee, who directed the creation of the Works, and they were compensated by Marvel on an agreed per-page basis for completed assignments. *See supra* Response No. 3, *citing* Lens Decl., Ex. 2 152:1-154:7; Lens Decl., Ex. 12 56:12-15, 57:25-58:9, 58:14-23; Lens Decl., Ex. 7 217:13-21; Lens Decl., Ex. 13 41:20-42:9; Lens Decl., Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21; Lens Decl., Ex. 48 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2 27:19-28:7, 56:2-57:7, 148:22-151:25, 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens Decl., Ex. 12 56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13 14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl., Ex. 2 17:8-18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 44:4-17; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-9, 93:23-94:5; Lens Decl., Ex. 2 80:24-81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15; Lens Decl., Ex. 4 125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens Decl., Ex. 13 30:11-14, 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3;

Lens Decl., Ex. 68A-G; Lens Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens

Decl., Ex. 6 40:14-20; Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-

153:10, 175:7, 226:7-11, 249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.

Additionally, Toberoff Exhibits 13, 43, 44, 52, and 53 **do not support** this

contention, as they post-date the relevant time period.  Toberoff Exhibit 21 similarly **does**

**not support** this contention, because over a decade ago, when Mr. Steranko was retained as

an expert witness for Defendant's counsel, he testified that "[w]hen [he] worked at Marvel,

[he] was on a work for hire basis."  Lens Opp. Decl., Ex. 89 82:3-23.  As Mr. Steranko

explained, he understood this based on his "experience at Marvel," as Marvel "provided him

with [a] description of the character," gave him "treatment[s] [or] synops[e]s of the material

that they were looking for," "supervis[ed]" him, and "stamped [his checks] work for hire."

*Id*.  And after Marvel "editted [*sic*] some of [his] work" and "changed certain things that

[he] didn't feel should be changed," Steranko, like Ditko, who "faced the same frustrations,"

left Marvel.  Lens Opp. Decl., Ex. 95 at 4-5.

Regardless, this contention is **immaterial** because it has no bearing on the Court's

application of the work-made-for-hire test, as this Court's grant of summary judgment for

Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F.3d at

139-40 (relevant principles of the instance-and-expense test).  Indeed, the *Kirby* court

already held that the risk that certain pages would not be paid did not defeat a finding that

the works were made at Marvel's expense where, as here, the hiring party has a close and

continuous relationship with the artist during the relevant time period.  *See Kirby*, 726 F.3d

at 143  ("[T]he record suggests that both parties took on risks with respect to the works'

success—Kirby that he might occasionally not be paid for the labor and materials for certain

pages, and Marvel that the pages it did pay for might not result in a successful comic book.

But we think that Marvel's payment of a flat rate and its contribution of both creative and production value, in light of the parties' relationship as a whole, is enough to satisfy the expense requirement.").

MCI also **objects** to Toberoff Exhibits 1, 8, 9, 10, 11, 13, 14, 43, 44, 52, and 53. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [11], [12], [13], [14], [16], [17], [44], [45], [49], & [50].

46.     **Ditko often refused to make changes to his work outright, and in that event, any changes Lee wanted were either ignored, or had to be made by a production assistant after Ditko had sold his work to the company.**  *See* Toberoff Decl. Ex. 14 at 7 (Evanier Rebuttal Rep. explaining Ditko's practice of refusing to make changes and in such case, Marvel's custom of having staff make such changes after the work had been submitted to and purchased by Marvel); Ex. 3 at 75:18-20, 243:13-244:23, 246:5-9 (Romita testifying that he, or someone else Lee could find in the Marvel office, would be asked to make changes to other artists' work after it had been submitted and would not be paid any extra for making these changes and noting specifically that when Lee did not like something on a Ditko cover, he asked Kirby to change it); Ex. 19 at 6, "Legends at Loggerheads!" (Thomas explaining example of when Lee incorrectly dialogued a *Spider-Man* story in a way Ditko had not intended, Ditko refused to accede to Lee's chosen direction); Ex. 21 at 41:7-18 (Steranko testifying that Marvel had production assistants to make changes to work after it had been submitted by artists); Ex. 35 at DITKO-0193 (Ditko writing that he ignored comments from Lee and Brodsky and only made changes to stories when he agreed with them).

**RESPONSE:**  **Disputed**.  MCI **disputes** Defendant's suggestion that Ditko "sold" work "on spec," which is not only an issue of law but also inaccurate.  To the contrary, freelance contributors, including Ditko, contributed to Marvel's comic books pursuant to assignments from Lee, who directed the creation of the Works, and they were compensated by Marvel on an agreed per-page basis for completed assignments.  *See supra* Response No. 3, *citing* Lens Decl., Ex. 2 152:1-154:7; Lens Decl., Ex. 12 56:12-15, 57:25-58:9, 58:14-23; Lens Decl., Ex. 7 217:13-21; Lens Decl., Ex. 13 41:20-42:9; Lens Decl., Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21; Lens Decl., Ex. 48 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2 27:19-28:7, 56:2-57:7, 148:22-151:25, 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens Decl., Ex. 12 56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6

41:14-24; Lens Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens

Decl., Ex. 13 14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2,

140:8-11, 224:5-10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24; Lens

Decl., Ex. 2 17:8-18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12 67:16-68:6; Lens Decl.,

Ex. 13 44:4-17; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-9, 93:23-94:5; Lens

Decl., Ex. 2 80:24-81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex.

13 97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex.

55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15; Lens Decl., Ex. 4 125:15-

18; Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens Decl., Ex. 13 30:11-14, 58:13-21;

Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 68A-G; Lens Decl., Ex. 2

137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens Decl., Ex. 6 40:14-20; Lens Decl., Ex. 2

276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7, 226:7-11, 249:7-9, 258:12-17,

290:2-5, 290:18-22; Thomas Decl. ¶ 20.

    MCI also **disputes** that Ditko "often refused to make changes to his work

outright."  To the contrary, for the majority of the time Ditko worked for Marvel, Ditko

described his working relationship with Lee as a "collaboration" that involved meetings to

discuss assignments, "plotting conferences" to discuss the stories he was drawing, and

further meetings to go over draft artwork, with Ditko "noting anything to be corrected."  *See*

*supra* Response No. 40, *citing* Lens Decl., Ex. 48 at 2; Lens Decl., Ex. 4 124:3-18.

    Additionally, Toberoff Exhibits 3 and 21 **do not support** this contention, as they

simply establish that Marvel had production assistants capable of making changes.  Toberoff

Exhibit 3 **does not support** this contention because Mr. Romita's testimony that he

purportedly was not paid for making corrections to work submitted by other Marvel

freelancers has no bearing on this contention.  Toberoff Exhibit 19 also **does not support**

this contention, because it concerns Ditko and Lee's strained working relationship in

1965—just before Ditko quit working for Marvel.  Moreover, as Toberoff Exhibit 19 makes

clear, although Lee "was willing to go along with a lot of what Steve wanted to do," "Stan

had the authority" and used it "when he felt he had to use it" because an explanation that

"the artist wanted to do it that way" "would not have been a sufficient excuse for Martin

Goodman."  *See* Toberoff Ex. 19 at 3-4.

      MCI also **objects** to Toberoff Exhibits 3, 14 and 35.  *See* MTE Evanier [Dkt. 77];

MCI's Evidentiary Objection Nos. [8], [17], & [41].

47.     **Magazine Management did not withhold any taxes, nor provide Ditko with any employment benefits.**  *See* Toberoff Decl. Ex. 1 at 12 (Evanier Rep. describing the comic book industry and Marvel's custom and practice of publishers not withholding payroll taxes, nor providing health insurance or employment benefits to freelancers in the Period); Ex. 2 at 79:5-80:9 (Lieber testifying that Marvel did not withhold any taxes or pay for any health benefits for freelancers); Ex. 9 ¶ 10 (Steranko attesting that Marvel did not withhold any taxes or provide any employment benefits to him from 1966 to 1973; Ex. 13 ¶ 10 (Adams attesting that Marvel did not withhold any taxes or provide him with any employment benefits).

**RESPONSE:**  Undisputed, but **immaterial** because this paragraph does not mean that

Ditko did not work for Marvel on a work-made-for-hire basis, as confirmed by the *Kirby*

court.  *See Kirby*, 777 F. Supp. 2d at 741-43 (finding that "the expense factor favors

Marvel's work-for-hire claim" even though "Kirby provided his own tools, worked his own

hours, paid his own taxes and benefits, and used his own art supplies"); *see also Kirby*, 726

F.3d at 143  ("Marvel's payment of a flat rate and its contribution of both creative and

production value, in light of the parties' relationship as a whole, is enough to satisfy the

expense requirement."); *Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-

expense test).  And Toberoff Exhibit 13 **does not support** this paragraph, as it refers to a

period of time beginning in late 1960s, not the relevant time period.

MCI, however, **objects** to Toberoff Exhibits 1, 9, and 13.  *See* MTE Evanier [Dkt.

77]; MCI's Evidentiary Objection Nos. [1], [12], & [16].

48.    **Ditko, as an independent artist, was free to sell, and did sell, work to other publishers, like Charlton Comics, while also selling his work to Magazine Management.**  *See* Toberoff Decl. Ex. 1 at 10 (Evanier Rep. describing the common practice of freelancers selling material to more than one publisher, including Marvel, DC Comics, and Charlton Comics); Ex. 3 at 207:12-22 (Romita testifying that freelancers were free to sell work to other publishers); Ex. 9 ¶ 11 (Steranko attesting that Marvel had no contract with Steranko and so he was free to sell work to other publishers); Ex. 13 ¶¶ 5-6 (Adams attesting that he sold work to both Marvel and DC Comics during the 1960s and 1970s); Ex. 17 at 298:8-14, 301:14-303:7 (Thomas testifying that Marvel did not have contracts with freelancers prohibiting them from selling work to other publishers); Ex. 23 at 160:2-8 (Mark Ditko testifying that Ditko was selling work to both Marvel and Charlton Comics in the 1960s); Ex. 35 at DITKO-0199 (Ditko writing about his work at Charlton Comics in the 1960s); Ex. 57 at 2 (Ditko writing about creating material for Charlton Comics and DC Comics).

**RESPONSE:  Disputed**, but **immaterial**.  While MCI does not dispute that Ditko was free

to work for other publishers while working for Marvel (provided it did not draw upon

Marvel's pre-existing intellectual property), MCI **disputes** Defendant's suggestion that

Ditko was "selling" work to Marvel "on spec," which is not only an issue of law but also

inaccurate.  To the contrary, freelance contributors, including Ditko, contributed to Marvel's

comic books pursuant to assignments from Lee, who directed the creation of the Works, and

they were compensated by Marvel on an agreed per-page basis for completed assignments.

*See supra* Response No. 3, *citing* Lens Decl., Ex. 2 152:1-154:7; Lens Decl., Ex. 12 56:12-

15, 57:25-58:9, 58:14-23; Lens Decl., Ex. 7 217:13-21; Lens Decl., Ex. 13 41:20-42:9; Lens

Decl., Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21; Lens Decl., Ex. 48 at 3; Lens Decl.,

Ex. 51 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2 27:19-28:7, 56:2-57:7, 148:22-151:25,

88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens Decl., Ex. 12 56:16-18, 58:10-13,

58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15 16:8-19; Lens Decl.,

Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13 14:5-8, 23:18-21; Lens Decl., Ex. 3

119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-10, 224:15-23, 241:25-242:14; Lens

Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl., Ex. 2 17:8-18:13, 24:17-23, 37:10-39:6; Lens

Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 44:4-17; Lens Decl., Ex. 13 16:3-19; Lens

Decl., Ex. 4 97:7-9, 93:23-94:5; Lens Decl., Ex. 2 80:24-81:12; 125:18-126:1; Lens Decl.,

Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18;

Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2

141:25-142:15; Lens Decl., Ex. 4 125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4;

Lens Decl., Ex. 13 30:11-14, 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3;

Lens Decl., Ex. 68A-G; Lens Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens

Decl., Ex. 6 40:14-20; Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-

153:10, 175:7, 226:7-11, 249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.

 Further, Toberoff Exhibit 13 **does not support** this contention, as it refers to a

period of time beginning in late 1960s, not the relevant time period.  Moreover, none of the

cited evidence indicates that Ditko actually sold work to other publishers during the relevant

time period.

 Regardless, this contention is **immaterial** because it does not change that Ditko

had a close and continuous working relationship with Marvel, precisely as Kirby did.  *See*

*Kirby*, 726 F.3d at 126 (explaining that "Kirby and Marvel were closely affiliated during the

relevant time period . . . Although  . . . [Kirby] could and did produce and sell work to other

publishers . . . the vast majority of his published works in that time frame was published by

Marvel"); *id.* at 141 ("Kirby's works during this period were hardly self-directed projects in

which he hoped Marvel, as one of several potential publishers, might have an interest;

rather, he created the relevant works pursuant to Marvel's assignment or with Marvel

specifically in mind.  Kirby's ongoing partnership with Marvel . . . is therefore what induced

Kirby's creation of the works."); *see also id.* at 139-40 (relevant principles of the instance-and-expense test).

MCI also **objects** to Toberoff Exhibits 1, 9, 13, 23, 35, and 57.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [12], [16], [32], [41], & [52].

49.    **On the occasions when Ditko and Lee would exchange story ideas, Ditko was free to incorporate ideas from the exchange or reject them altogether.**  *See* Toberoff Decl. Ex. 14 at 11, 13 (Evanier Rebuttal Rep. explaining the custom and practice of comic book publishers to reserve the right to purchase or not purchase freelancers' submitted material, and that freelancers were free to decline to make changes to their work); Ex. 35 at DITKO-0192, DITKO-0207-0210, DITKO-0215-0218 (Ditko writing that he rejected several of Lee's *Spider-Man* story ideas and characters such as, for instance, Lee's idea for a Spider-Woman character, or Lee's idea of making Aunt May more glamorous); Ex. 58 at 4 (Ditko writing that he "refused to do a drunken Iron Man splash page—someone else had to draw [and] ink it").

RESPONSE:  **Disputed**.  Because Defendant fails to provide any time period in this fact, it is unclear as written.  While MCI does not dispute that Lee, within his editorial discretion, sometimes allowed Ditko more creative freedom (eventually allowing him to plot stories), MCI disputes the suggestion that Ditko worked for Marvel on "spec," as Defendant suggests.  To the contrary, Defendant has no evidence that Ditko's freedoms were not a by-product of Lee's editorial discretion.  *See* Toberoff Ex. 19 at 3-4 (although Lee "was willing to go along with a lot of what Steve wanted to do," "Stan had the authority" and used it "when he felt he had to use it" because an explanation that "the artist wanted to do it that way" "would not have been a sufficient excuse for Martin Goodman.").  Moreover, for the majority of the time Ditko worked for Marvel, Ditko described his working relationship with Lee as a "collaboration" that involved meetings to discuss assignments, "plotting conferences" to discuss the stories he was drawing, and further meetings to go over draft artwork, with Ditko "noting anything to be corrected."  *See supra* Response No. 40 *citing* Lens Decl., Ex. 48 at 2; Lens Decl., Ex. 4 124:3-18.

MCI further **disputes** this contention because Ditko often lamented that he disagreed with Lee's creative decisions but was bound by them.  Lens Decl., Ex. 59 at 2 (Ditko complaining that "Stan's dialogue was too much his personal writing style with heroes/villains. He had his formula to handle all the hero/villains material."); Lens Decl., Ex. 58 at 3 (Ditko writing that "I believe Stan loved writing those corny captions, etc. It added to reading appeal, but undercut a more serious growth of a teenagers [sic] in a heroic role"); Lens Decl., Ex. 52 at 4 (Ditko writing that "Stan's 'humor' dialogue undercut Peter Parker, S[pider]-M[an] as a teen-ager growing up to become a professional hero like Captain America"); Lens Decl., Ex. 54 at 4 (Ditko commenting that "Stan's writing style was completely wrong for SM [Spider-Man]" and that he "treated teen-age P. Parker as a seasoned veteran with his nonsensical comic dialogue exchanges between a 'Hero' and 'villains'"); Lens Decl., Ex. 60 at 3 (Ditko remarking that "[e]ven some poor plots by Stan, others, incompetent inkers didn't sink my basic ideas for Doctor Strange"); Lens Decl., Ex. 57 at 4 (Ditko noting that it was "a mystery to [him] why no Doctor Strange covers"); Lens Decl., Ex. 53 at 3 (Ditko writing that it was "hard to understand, explain Stan's motives with his likes, dislikes . . . . In a cover, I had S[pider]-M[an] leaping toward the Molten Man. S[pider]-M[an] was changed to leaping across the Molton Man and off the cover. What pleases an editor? They all have their likes and dislikes."); Lens Decl., Ex. 54 at 4 (Ditko describing Marvel as having "picky editors" who adopted the creed that "[t]he editor is always right"); Lens Decl., Ex. 45 at 3 (Ditko explaining that, if he had the choice, he would do both drawing and inking, rather than having "other people . . . ink [his] pencils"); Lens Decl., Ex. 2 at 57:13-58:11 (Thomas testifying that every single artist at Marvel was "subject to the editorial discretion of the editor-in-chief" and that, during Lee's tenure, all freelancers worked "subject to Stan Lee's supervision and discretion"); Lens Decl., Ex. 13

16:8-19 (Lee confirming that he would "give instructions to the artists as to how [he]

wanted the story to go" and that it was his "responsibility" to oversee "the creative editorial

aspects of the comic books that were created"); *see also* Lens Decl., Ex. 61 at 4.

Additionally, Toberoff Exhibit 58 **does not support** this contention, as it has

nothing to do with Ditko's working relationship with Lee, but instead concerns Ditko's

working relationship with a different Marvel editor post-dating the relevant time period by

many years.

Regardless, this contention is **immaterial** because that Ditko "enjoyed more

creative discretion than most [Marvel] artists," just as Jack "Kirby undoubtedly" did, that

does not change that "Marvel also played at least some creative role with respect to the

works," that Ditko "worked within the scope of Marvel's assignments and titles," and that

"Marvel had the power to reject [Ditko's] pages and require him to redo them, or to alter

them, a power it exercised from time to time." *Kirby*, 726 F.3d at 141; *see also id*. at 139-

40 (relevant principles of the instance-and-expense test).

MCI also **objects** to the evidence cited in support of this contention. *See* MTE

Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [17], [41], & [53].

50. **If Ditko did not wish to work on a project offered to him by "Marvel," he was free to decline it without consequence.** *See* Toberoff Decl. Ex. 14 at 11, 13 (Evanier Rebuttal Rep. explaining the custom and practice of comic book publishers to reserve the right to purchase or not purchase freelancers' submitted material and for freelancers to be free to sell work to comic book publishers if they so chose); Ex. 3 at 219:12-24 (Romita testifying that he turned down Lee's offer to submit material to Marvel and preferred to sell freelance work to DC Comics); Ex. 21 at 29:9-30:17 (Steranko testifying that he was not given "assignments," but rather, he had the option to work on some books or to not if he chose not to); Ex. 24 at 89:2-11 (Levitz testifying that freelancers were free to decline "assignments"); Ex. 58 at 4 (Ditko writing that, after he stopped selling his material to Marvel in 1966, he later started working with Marvel again, but refused to do any *Spider-Man* or *Dr. Strange* stories and recounting that when other writers tried to sneak in *Spider-Man* panels for Ditko to work on, he "left [them] blank for someone else to fill in"); *id*. (Ditko writing that he "refused to do a drunken Iron Man splash page—someone else had to draw [and] ink it").

82

**RESPONSE:**  **Disputed in part**, but **immaterial**.  While MCI does not dispute that Ditko could turn down assignments, MCI **disputes** that any decision by Ditko to decline assignments was "without consequence."  If Ditko turned down an assignment, he (1) would give up the compensation associated with such work; and, more importantly, (2) could jeopardize future Marvel assignments.  Lens Decl., Ex. 12 56:16-18 (Thomas confirming that it was Lee who "decided which writer and artist would work on a particular comic book or issue"); Lens Decl., Ex. 2 148:22-151:25 (Thomas testifying why freelancers might be removed from certain comic books, including for "lateness, undependability," or the editor's decision that "they just weren't doing the right job, or even if  they were okay . . . [that] a little bit of musical chairs might get us a better arrangement of people"); Lens Decl., Ex. 12 58:24-59:5 (Thomas testifying that in the 1950s and 1960s Lee could, and did, make the decision to have freelancers "taken off a comic book issue for an ongoing series").  *See also supra* Response No. 3, *citing* Lens Decl., Ex. 2 141:25-142:15; Lens Decl., Ex. 4 125:15-18; Lens Decl., Ex. 2 292:18-293:4; Lens Decl., Ex. 2 332:23-333:4; Lens Decl., Ex. 13 30:11-14; Lens Decl., Ex. 13 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 68A-G; Lens Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens Decl., Ex. 6 40:14-20; Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7, 226:7-11, 249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.

Additionally, Toberoff Exhibit 3 **does not support** this contention, as Romita merely testified that he would not accept assignments from Marvel during 1958 to 1965 period—when he was steadily working at DC Comics and performing no work for Marvel. Toberoff Exhibit 24 **does not support** this contention as Levitz testified that "freelancers very rarely [declined assignments] because that's how they made a living, and assignments were the necessary life blood."  *See* Toberoff Ex. 24 at 89:9-11.  Toberoff Exhibit 21 also

**does not support** this contention, because over a decade ago, when Mr. Steranko was retained as an expert witness for Defendant's counsel, he testified that "[w]hen [he] worked at Marvel, [he] was on a work for hire basis." Lens Opp. Decl., Ex. 89 82:3-23. As Mr. Steranko explained, he understood this based on his "experience at Marvel," as Marvel "provided him with [a] description of the character," gave him "treatment[s] [or] synops[e]s of the material that they were looking for," "supervis[ed]" him, and "stamped [his checks] work for hire." *Id.* And after Marvel "editted [*sic*] some of [his] work" and "changed certain things that [he] didn't feel should be changed," Steranko, like Ditko, who "faced the same frustrations," left Marvel. Lens Opp. Decl., Ex. 95 at 4-5. Toberoff Exhibit 58 **does not support** this contention either, because Ditko admits that he worked on assignment, and merely identifies a narrow subset of work he refused to do, which was unrelated to the Works, outside the relevant time period, and for a different Marvel editor.

Regardless, this contention is **immaterial** because that Ditko had the right to decline assignments from Marvel does not speak to whether the assignments that Ditko accepted from Marvel during their close and continuous relationship in the relevant time period were done on a work-made-for-hire basis. *See Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test). Indeed, as with Kirby, "most of [Ditko's] work during this period was published by Marvel and for established Marvel titles." *Id.* at 141. When "[u]nderstood as products of this overarching relationship, [Ditko's] works during this period were hardly self-directed projects in which he hoped Marvel, as one of several potential publishers, might have an interest; rather, he created the relevant works pursuant to Marvel's assignment or with Marvel specifically in mind. [Ditko's] ongoing partnership with Marvel … is therefore what induced [his] creation of the works." *Id.* at 141.

84

MCI also **objects** to Toberoff Exhibits 3, 14, 21, and 58. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [7], [17], [20], & [53].

51.     **Ditko, an extremely independent-minded artist, supervised himself, edited his own work, and created the Works after little or no discussion with Lee.** *See* Toberoff Decl. Ex. 1 at 13 (Evanier Rep. describing the common practice of independent freelancers supervising themselves and editing their own work prior to submission); Ex. 7 at 223:18-225:20, 277:11-13 (Thomas testifying that Ditko did all the plotting on *Spider-Man* and *Dr. Strange* stories while he and Lee were not speaking and that Ditko never received any plots from Thomas when Thomas was doing the dialoguing on *Dr. Strange*); Ex. 17 at 311:18-312:25 (Thomas testifying that Ditko plotted and drew *Spider-Man* stories completely on his own for more than one year before he left in 1966); Ex. 25 at DITKO-0308 (Ditko explaining that Dr. Strange was his creation and at one point, he was doing all the stories, writing, and art for it); Ex. 26 at 83 (Lee writing that Ditko came up with the *Dr. Strange* plots and illustrated the story and Lee only added the dialogue [in the balloons]); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script).

     **RESPONSE:  Disputed**.  For the majority of the time Ditko worked for Marvel, Ditko described his working relationship with Lee as a "collaboration" that involved meetings to discuss assignments, "plotting conferences" to discuss the stories he was drawing, and further meetings to go over draft artwork, with Ditko "noting anything to be corrected." *See supra* Response No. 40 *citing* Lens Decl., Ex. 48 at 2; Lens Decl., Ex. 4 124:3-18.  Further, while MCI does not dispute that later in Ditko's career at Marvel he was sometimes afforded certain creative freedoms, MCI **disputes** that this is any indication that Ditko did not work for Marvel on a work-made-for-hire basis.  To the contrary, Lee exercised his editorial discretion to sometimes afford Ditko greater creative input, subject to Marvel's ultimate authority.  *See supra* Response No. 40, *citing* Toberoff Ex. 19 at 3-4; Lens Decl., Ex. 15 19:1-10; Lens Decl., Ex. 45 at 4; Lens Decl., Ex. 25; Lens Decl., Ex. 48 at 2; Lens Decl., Ex. 2 307:25-308:3; Lens Decl., Ex. 4 124:3-18; Lens Decl., Ex. 13 54:16-56:9, 72:21- 73:23, 79:3-19; Lens Decl., Ex. 12 55:4-15, 65:13-66:7.  But even then, Lee assigned Ditko to the stories and could remove him at any time, could request or make changes to his

work, or otherwise elect not to publish it. *See supra* Response No. 3, *citing* Lens Decl., Ex. 2 152:1-154:7; Lens Decl., Ex. 12 56:12-15, 57:25-58:9, 58:14-23; Lens Decl., Ex. 7 217:13-21; Lens Decl., Ex. 13 41:20-42:9; Lens Decl., Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21; Lens Decl., Ex. 48 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2 27:19-28:7, 56:2-57:7, 148:22-151:25, 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens Decl., Ex. 12 56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13 14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24. *See also* Lens Decl., Ex. 48 at 2 (Ditko explaining that he and Lee "would go over the penciled story/art pages" together and discuss changes, additions, or corrections to them"); Lens Decl., Ex. 53 at 3 (Ditko writing about a Spider-Man cover in which he "had S[pider]-M[an] leaping toward the Molten Man" but "S[pider]-M[an] was changed to leaping across the Molton Man and off the cover"); Lens Decl., Ex. 54 at 4 (Ditko complaining about Marvel's "picky editors" and their "corrections"); Lens Decl., Ex. 29 (original art for *Amazing Fantasy* #15 showing editorial comments in the margins from Lee to Ditko on Spider-Man panels); Lens Decl., Ex. 2 44:22-45:5 (Thomas testifying that he "observe[d]" Marvel editors "actually making changes to work that had been done by freelance writers and artists," in terms of "both . . . lettering and artwork"); Lens Decl., Ex. 2 127:17-20 (Thomas confirming that "Stan Lee ha[d] the ability to just have changes made to artwork without the artist's involvement"); Lens Decl., Ex. 2 133:11-13 (similar); Lens Decl., Ex. 2 24:17-23 (Thomas testifying how Marvel production manager Sol Brodsky "would call a freelancer in, a letterer or an artist to come in . . . simply because they had something that had to be corrected or changed and they needed more work than just the one production person could

do"); Lens Decl., Ex. 2 41:16-20 (Thomas confirming that he understood Marvel could "request that [he], for example, do rewrites or revisions to work that you had done"); Lens Decl., Ex. 13 16:20-17:4 (Lee confirming that it "was [his] job" to "not only make assignments but also to edit and change things that other writers or artists did," and that, "[i]f, for example, I saw some art work, and I felt there wasn't enough action on a page, or it was confusing, the reader might not know what it was, or in a script if I felt there was too much dialogue or too little dialogue, . . . it was up to me to make the stories as good as I could make them"); Lens Decl., Ex. 3 128:23-129:2 (Lieber testifying that "of course" Lee "had the right [to] make the changes to [Lieber's] scripts"); Lens Decl., Ex. 3 133:14-134:5) (Lieber testifying that, when Lee went over his work, he would explain to Lieber, "'Oh, you could have said this. You could have done that,' and he'd make some little corrections" but "as time went on, he had fewer to make"); Lens Decl., Ex. 54 at 4 (Ditko remarking that he "got more out of working for" Charlton Comics than for Marvel because of its "picky editors, 'corrections' etc."); Lens Decl., Ex. 48 at 5 (Ditko discussing Marvel's rejection of his Spider-Man cover and reassignment of the task to Kirby); Lens Decl., Ex. 47 at 2 (same); Lens Decl., Ex. 30 at 2 ("*Amazing Fantasy* #15 unused cover art by Steve Ditko"); Lens Decl., Ex. 13 22:11-23:19 (Lee confirming that he "always maintain[ed] the ability to edit and make changes or reject what the other writers or artists had created"); Lens Decl., Ex. 2 286:15-23 (Thomas testifying that Goodman's "main concern was the covers" and that he was known to scrutinize them); Lens Decl., Ex. 12 67:16-68:6 (Thomas testifying that Lee would review the covers before publication, and then "they were all reviewed eventually by Martin Goodman as publisher"); *see also* Lens Decl., Ex. 2 161:8-20; Lens Decl., Ex. 13 44:4-17; Lens Decl., Ex. 41 at 4; Lens Decl., Ex. 49 at 3; Lens Decl., Ex. 52 at 4; Lens Decl., Ex. 2 42:24-44:18, 333:18-334:5; Lens Decl., Ex. 12 113:18-114:11; Lens

Decl., Ex. 3 137:11-20, 138:2-5; Lens Decl., Ex. 13 18:17-19:17, 22:11-14, 33:25-34:7;

Thomas Decl. ¶¶ 20-21.  Additionally, Toberoff Exhibit 26 **does not support** this

contention, as it references only Ditko's work on *Spider-Man Annual #2*, a one-off special

annual issue otherwise unconnected to the Spider-Man or Doctor Strange stories Ditko and

Lee worked on.

MCI also **objects** to Toberoff Exhibits 1, 25, and 27.  *See* MTE Evanier [Dkt. 77];

MCI's Evidentiary Objection Nos. [1], [34], & [35].

52.    **In 1964, Ditko and Lee had a falling out over the future direction of the *Spider-Man* stories and they refused to speak anymore.**  *See* Toberoff Decl. Ex. 7 at 223:18-224:13
(Thomas testifying that Ditko did all the plotting on *Spider-Man* and *Dr. Strange* stories while he
and Lee were not speaking); Ex. 17 at 311:2-17 (Thomas testifying that, by the time he started at
Marvel in mid-1965, Ditko and Lee were not speaking anymore because they had been fighting
over the direction of the *Spider-Man* series); Ex. 24 at 124:5-24 (Levitz testifying that Ditko and
Lee stopped speaking in the last year of Ditko's time with Marvel because Ditko was not getting
proper credit for his contributions to the stories); Ex. 35 at DITKO-0193 (Ditko writing that he and
Lee stopped speaking around 1964); Ex. 58 at 3 (Ditko writing that he took over all plotting of the
*Spider-Man* stories).

**RESPONSE:  Disputed**.  While MCI does not dispute that Ditko and Lee had a falling out

and stopped speaking, MCI **disputes** Defendant's suggestion that means Ditko's work

stopped being done on a work-made-for-hire basis for Marvel as a result.  Indeed, after Lee

and Ditko's falling out, Ditko received his assignments from Marvel's production manager,

Sol Brodsky, who gave them on Stan's behalf.  *See* Toberoff Ex. 19 at 3 (Thomas discussing

Ditko's working relationship with Lee when they "weren't speaking to each other,"

explaining how Marvel production manager Sol Brodsky served as Lee's intermediary on

assignments); Lens Opp. Decl., Ex. 84 30:17-31:1 (Thomas testifying that "a lot of it went

through the production manager, Sol Brodsky" who "was speaking for [Lee]"); Lens Opp.

Decl., Ex. 84 335:2-5 (Thomas testifying that Lee would "give directions through Sol

Brodsky"); *see also* Toberoff Ex. 19 at 3-4 (although Lee "was willing to go along with a lot

of what Steve wanted to do," "Stan had the authority" and used it "when he felt he had to use it" because an explanation that "the artist wanted to do it that way" "would not have been a sufficient excuse for Martin Goodman."). Likewise, Stan still reviewed Ditko's work and had ultimate authority over it, regardless of whether he communicated directly with Ditko. *See supra* Response No. 38, *citing* Lens Decl., Ex. 2 17:8-18:13, 37:10-39:6, 80:24-81:12, 125:18-126:1; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:3-125:4; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3. In addition, Defendant cites no evidence that the falling out occurred in 1964 or that it was about the "future of the *Spider-Man* stories." Toberoff Exhibit 35 **does not support** this contention, as Ditko merely states in the cited material that he and Lee stopped talking "at some point before issue #25" of *The Amazing Spider-Man*, which was published with a cover date of June 1965. Toberoff Exhibit 17 **does not support** this contention, as the cited material does not state or imply that "Ditko and Lee were not speaking anymore because they had been fighting over the direction of the Spider-Man series." Toberoff Exhibit 24 **does not support** this contention, as the cited material does not state or imply that Ditko and Lee stopped speaking "because Ditko was not getting proper credit for his contributions to the stories," but instead states that it was due to "discomfort between the two on their working process and the allocation of credit work."

MCI also **objects** to Toberoff Exhibits 35 and 58. *See* MCI's Evidentiary Objection Nos. [41] & [53].

53.    **From that point until Ditko left Marvel in 1966, Ditko was in complete creative control over how he plotted and drew his stories, leaving Lee (and Magazine Management) with little or no control over the stories, aside from Lee's dialoguing the balloons.** *See* Toberoff Decl. Ex. 7 at 223:18-224:13 (Thomas testifying that Ditko did all the plotting on *Spider-Man* and *Dr. Strange* stories while he and Lee were $not speaking); Ex. 17 at 29:19-30:8, 83:13-18

(Thomas testifying that by the time Thomas began at Marvel in mid-1965, Ditko was plotting and penciling *Dr. Strange* stories, which Thomas would dialogue); *id.* at 92:9-20 (Thomas testifying that Ditko stopped working with Marvel around Christmas 1965); Ex. 25 at DITKO-0308 (Ditko explaining that Dr. Strange was his creation and soon he was doing all the stories, writing, and art for it); Ex. 26 at 83 (Lee writing that Ditko came up with the *Dr. Strange* plots and illustrated the story and Lee only added the dialogue to the balloons); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script); Ex. 35 at DITKO-0189 (Ditko writing that he left Marvel in 1966); *id.* at DITKO-0193 (Ditko writing that he and Lee stopped speaking around 1964 and thus from then on, Ditko had complete creative control of the *Spider-Man* and *Dr. Strange* stories, which he was plotting and penciling until he left in 1966).

> **RESPONSE:  Disputed**.  While MCI does not dispute that Ditko and Lee had a falling out,
>
> MCI **disputes** that Ditko was "in complete creative control" over his work for Marvel.  To
>
> the contrary, even when Ditko and Lee were not on speaking terms, Lee, within his editorial
>
> discretion, assigned Ditko to the stories (through Marvel production manager Sol Brodsky)
>
> and could remove him at any time, could request or make changes to his work, or otherwise
>
> elect not to publish it.  *See supra* Response Nos. 52 and 38*, citing* Toberoff Ex. 19 at 3-4;
>
> Lens Opp. Decl., Ex. 84 30:17-31:1, 335:2-5; Lens Decl., Ex. 2 17:8-18:13, 37:10-39:6,
>
> 80:24-81:12, 125:18-126:1; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 16:3-19;
>
> Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:3-
>
> 125:4; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3.  Moreover,
>
> Defendant disputes that Ditko left Marvel in 1966, as opposed to sometime before
>
> December 1965.  *See* Lens Opp. Decl., Ex. 84 311:13 (Thomas testifying that "Steve walked
>
> in and quit near the end of the year [1965]"); Toberoff Ex. 17 92:9-20 (Thomas testifying
>
> that Ditko stopped working with Marvel around Christmas 1965); Lens Decl., Ex. 39 at 5
>
> (Thomas recounting that the day Ditko quit Marvel, noting that Marvel production manager
>
> Sol Brodsky "had a memo on his desk for a $5 a page raise for Steve, which was fairly
>
> substantial for 1965").  None of Defendant's evidence establishes when Ditko left—let
>
> alone that he left in 1966.  Additionally, Toberoff Exhibit 26 **does not support** this

contention, as it references only Ditko's work on *Spider-Man Annual #2*, a one-off special

annual issue otherwise unconnected to the Spider-Man or Doctor Strange stories Ditko and

Lee worked on.  And Toberoff Exhibit 17 **does not support** this contention as Thomas

never states or suggests that Ditko "was in complete creative control."  *See* Lens Decl., Ex.

2 80:24-81:12 (Thomas testifying that "[s]ubject to the publisher, [Lee had] complete

authority" over artwork in Marvel comics); Lens Decl., Ex. 2 125:18-126:1 (Thomas

testifying that Lee "was always the ultimate authority unless Martin Goodman stepped in,

and that was mostly on covers"); Toberoff Ex. 19 at 3-4 (although Lee "was willing to go

along with a lot of what Steve wanted to do," "Stan had the authority" and used it "when he

felt he had to use it" because an explanation that "the artist wanted to do it that way" "would

not have been a sufficient excuse for Martin Goodman.").

   MCI also **objects** to Toberoff Exhibits 25, 27, and 35.  *See* MCI's Evidentiary

Objection Nos. [34], [35], & [41].

54. **Ditko had no employment or other contract during the Period with Magazine Management or any other alleged Marvel predecessor.**  *See* Toberoff Decl. Ex. 17 at 298:8-14 (Thomas testifying that freelancers did not have contracts with Marvel until Thomas's in 1974, which was the first); Ex. 36 at 7 (Marvel admitting it had no written contract with Ditko in the 1960s); Ex. 64 at 245 n.80 (Nimmer explaining in 1963 "that 17 U.S.C. Sec. 26 expressly renders an employer for hire an 'author' but makes no comparable provision with respect to commissioned works").

**RESPONSE:  Disputed**, but **immaterial**.  While MCI does not dispute that Ditko had no

written employment agreement or other written contract with Marvel during the relevant

time period, MCI **disputes** that he had no contract whatsoever with Marvel.  Ditko, like

other Marvel freelance artists, contributed to Marvel's comic books pursuant to assignments

from Lee, who directed the creation of the Works, and he was compensated by Marvel on an

agreed per-page basis for his completed assignments.  *See supra* Response No. 3, *citing*

Lens Decl., Ex. 2 152:1-154:7; Lens Decl., Ex. 12 56:12-15, 57:25-58:9, 58:14-23; Lens

Decl., Ex. 7 217:13-21; Lens Decl., Ex. 13 41:20-42:9; Lens Decl., Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21; Lens Decl., Ex. 48 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2 27:19-28:7, 56:2-57:7, 148:22-151:25, 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens Decl., Ex. 12 56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13 14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl., Ex. 2 17:8-18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 44:4-17; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-9, 93:23-94:5; Lens Decl., Ex. 2 80:24-81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15; Lens Decl., Ex. 4 125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens Decl., Ex. 13 30:11-14, 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 68A-G; Lens Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens Decl., Ex. 6 40:14-20; Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7, 226:7-11, 249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.

Further, Toberoff Exhibit 64 **cannot provide factual support**, as the cited material is a treatise purportedly summarizing the law, not a fact. Moreover, Marvel's course of dealing with freelance artists involved oral or implied-in-fact contracts. *Cf. Kirby*, 777 F. Supp. 2d at 741 ("[T]he fact that there was no written contract does not, as a matter of law, mean there was no contractual relationship. 'We agree that, if you draw a picture, I will pay you' creates a contract, whether the agreement is reduced to writing or not.").

Regardless, this contention is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 726 F.3d at 141-142 (rejecting the Kirbys' argument that "the 'right to supervise' referred to in our case law requires a legal, presumably contractual, right" because there is "no hint of this requirement in our case law applying the instance and expense test"—"Marvel's active involvement in the creative process, coupled with its power to reject pages and request that they be redone" suffices).

MCI also **objects** to Toberoff Exhibit 64. *See* MCI's Evidentiary Objection No. [58].

55.    **Ditko had no contact or relationship with any one of the shell companies (i.e., Vista, Atlas, Non-Pareil) which purported to copyright the magazines in which the Works appeared.** *See* Toberoff Decl. Ex. 14 at 4-5 (Evanier Rebuttal Rep. providing historical context and explaining that the shell companies had no employees, offices, or business activities, and had no contact with any freelancer); Ex. 17 at 320:10-322:14 (Thomas testifying that no one knew what Vista, Atlas, or Non-Pareil did and that he did not receive any money from them, does not know anyone who did, does not know if they had any employees or any offices, or "of [them] having any existence" whatsoever); Ex. 22 at 252:23-254:24, 303:15-19 (Lieber testifying that he never heard of Vista or other shell companies, did not know if they had any employees and that he was paid by, and believed he was working with, Magazine Management); Ex. 50 at DETTWILER-0044-0058 (Don Heck's payment records identifying "Magazine Management" as the only entity that paid him for his freelance material in the Period).

**<u>RESPONSE</u>:  Disputed**, but **immaterial**.  MCI **disputes** Defendant's characterization of such companies as "shell companies."  As relevant here, Goodman's various comic book entities conducted business as "Marvel" or "Marvel Comics Group" and engaged with Magazine Management Company for administrative services, including payments to those providing services to Marvel.  *See supra* Response No. 9, *citing* Bard Decl. ¶ 2; Bard Decl., Ex. 5 at 2-3; Bard Decl., Ex. 7 at 5; Bard Decl., Ex. 10 at 2; Lens Decl., Ex. 18 72:25-73:11; Lens Opp. Decl., Ex. 90 5:11-19; Bard Decl., Ex. 8 at 5-6; Lens Decl., Ex. 75; Lens Decl.,

Ex. 76; Lens Opp. Decl., Ex. 93 at 4-5; Lens Opp. Decl., Ex. 92 at 3-8; Bard Decl., Ex. 6 at 3; Bard Decl., Ex. 5 at 3; Lens Decl., Ex. 68A-G.

Moreover, while MCI does not dispute that Ditko had no "contact" with Vista, Atlas, or Non-Pareil—which are business entities (and not people)—during the relevant time period, MCI **disputes** that he had no "relationship" with them.  Ditko, like other Marvel freelance artists, contributed to Marvel's comic books pursuant to assignments from Lee, who directed the creation of the Works, and he was compensated by Marvel on an agreed per-page basis for completed assignments.  *See supra* Response No. 3, *citing* Lens Decl., Ex. 2 152:1-154:7; Lens Decl., Ex. 12 56:12-15, 57:25-58:9, 58:14-23; Lens Decl., Ex. 7 217:13-21; Lens Decl., Ex. 13 41:20-42:9; Lens Decl., Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21; Lens Decl., Ex. 48 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2 27:19-28:7, 56:2-57:7, 148:22-151:25, 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens Decl., Ex. 12 56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13 14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl., Ex. 2 17:8-18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 44:4-17; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-9, 93:23-94:5; Lens Decl., Ex. 2 80:24-81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15; Lens Decl., Ex. 4 125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens Decl., Ex. 13 30:11-14, 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 68A-G; Lens Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens Decl., Ex. 6 40:14-20; Lens Decl., Ex. 2

276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7, 226:7-11, 249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20. Lee's editorial work, in turn, was performed for and on behalf of Marvel's publisher Goodman. As such, Ditko, through Lee and Goodman, provided services to Vista, Atlas, or Non-Pareil.

In addition, Vista, Atlas, and Non-Pareil are listed on the inside cover of all comic books as the publishing entities—something that would have been obvious to Ditko. *See, e.g.*, Lens Decl., Ex. 31A at 3 ("AMAZING FANTASY is published by ATLAS MAGAZINES, INC."); Lens Decl., Ex. 31A at 5 ("AMAZING SPIDER-MAN is published by NON-PAREIL PUBLISHING CORP"); Lens Decl., Ex. 31D at 25 ("STRANGE TALES is published by VISTA PUBLICATIONS INC.").

Regardless, this contention is **immaterial** because it will not "affect the outcome of the suit under the governing law." *Kinsella*, 320 F.3d 309 at 311. Indeed, this was equally true with respect to the various works at issue in *Kirby*, when this Court granted summary judgment for Marvel, as upheld by Second Circuit. *See Kirby*, 726 F.3d at 126, 141 (discussing Kirby's "close and continuous" working relationship "with Marvel" despite noting that "Atlas Comics, as part of Marvel Comics Group"—one such Goodman publishing entity—published most of the relevant works).

MCI also **objects** to Toberoff Exhibits 14 and 22. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [17], [26], & [31].

56.    **Ditko received no direction or communication from any of the shell companies (i.e., Vista, Atlas, Non-Pareil) or any employee of theirs, as these entities had none, nor was Ditko ever paid by any of them.** *See* Toberoff Decl. Ex. 14 at 4-5 (Evanier Rebuttal Rep. providing historical context and explaining that the shell companies had no employees, offices, or business activities, and had no contact with any freelancer); Ex. 17 at 138:3-139:2 (Thomas testifying that Magazine Management was the only payor of staff/freelancer checks); *id.* at 320:10-322:14 (Thomas testifying that no one knew what Vista, Atlas, or Non-Pareil did and that Thomas did not receive any money from them, does not know anyone who did, does not know if they had any employees or any offices, or "of [them] having any existence" whatsoever); Ex. 22 at 252:23-

254:24, 303:15-19 (Lieber testifying that he never heard of Vista or other shell companies, did not know if they had any employees and that he was paid by, and believed he was working with, Magazine Management); Ex. 50 at DETTWILER-0044-0058 (Don Heck's payment records identifying "Magazine Management" as the only entity that paid him for his freelance material in the Period).

**RESPONSE:** **Disputed**, but **immaterial**.  MCI **disputes** Defendant's characterization of

such companies as "shell companies."  As relevant here, Goodman's various comic book

entities conducted business as "Marvel" or "Marvel Comics Group" and engaged with

Magazine Management Company for administrative services, including payments to those

providing services to Marvel.  *See supra* Response No. 9, *citing* Bard Decl. ¶ 2; Bard Decl.,

Ex. 5 at 2-3; Bard Decl., Ex. 7 at 5; Bard Decl., Ex. 10 at 2; Lens Decl., Ex. 18 72:25-73:11;

Lens Opp. Decl., Ex. 90 5:11-19; Bard Decl., Ex. 8 at 5-6; Lens Decl., Ex. 75; Lens Decl.,

Ex. 76; Lens Opp. Decl., Ex. 93 at 4-5; Lens Opp. Decl., Ex. 92 at 3-8; Bard Decl., Ex. 6 at

3; Bard Decl., Ex. 5 at 3; Lens Decl., Ex. 68A-G.  Ditko, like other Marvel freelance artists,

contributed to Marvel's comic books pursuant to assignments from Lee, who directed the

creation of the Works, and he was compensated by Marvel on an agreed per-page basis for

completed assignments.  *See supra* Response No. 3, *citing* Lens Decl., Ex. 2 152:1-154:7;

Lens Decl., Ex. 12 56:12-15, 57:25-58:9, 58:14-23; Lens Decl., Ex. 7 217:13-21; Lens

Decl., Ex. 13 41:20-42:9; Lens Decl., Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21; Lens

Decl., Ex. 48 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2 27:19-

28:7, 56:2-57:7, 148:22-151:25, 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens

Decl., Ex. 12 56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens

Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13

14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-10,

224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl., Ex. 2 17:8-

18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 44:4-17;

Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-9, 93:23-94:5; Lens Decl., Ex. 2 80:24-81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15; Lens Decl., Ex. 4 125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens Decl., Ex. 13 30:11-14, 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 68A-G; Lens Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens Decl., Ex. 6 40:14-20; Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7, 226:7-11, 249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.  Lee's editorial work, in turn, was performed for and on behalf of Marvel's publisher Goodman.  As such, Ditko, through Lee and Goodman, provided services to Vista, Atlas, or Non-Pareil.

    In addition, Vista, Atlas, and Non-Pareil are listed on the inside cover of all comics books as the publishing entities—something that would have been obvious to Ditko.  *See, e.g.*, Lens Decl., Ex. 31A at 3 ("AMAZING FANTASY is published by ATLAS MAGAZINES, INC."); Lens Decl., Ex. 31A at 5 ("AMAZING SPIDER-MAN is published by NON-PAREIL PUBLISHING CORP"); Lens Decl., Ex. 31D at 25 ("STRANGE TALES is published by VISTA PUBLICATIONS INC.").

    Regardless, this contention is **immaterial** because it will not "affect the outcome of the suit under the governing law." *Kinsella*, 320 F.3d 309 at 311.  Indeed, this was equally true with respect to the various works at issue in *Kirby*, when this Court granted summary judgment for Marvel, as upheld by Second Circuit. *See Kirby*, 726 F.3d at 126, 141 (discussing Kirby's "close and continuous" working relationship "with Marvel" despite noting that "Atlas Comics, as part of Marvel Comics Group"—one such Goodman publishing entity—published most of the relevant works).

MCI also **objects** to Toberoff Exhibits 14 and 22.  *See* MTE Evanier [Dkt. 77];

MCI's Evidentiary Objection Nos. [17], [26], & [31].

57.    **When Lee composed the final captions and dialogue he too did so as a freelancer, not as Marvel's editor, as writing was not part of his editorial function.**  *See* Toberoff Decl. Ex. 1 at 13 (Evanier Rep. describing Lee's common practice of composing dialogue as a freelancer, not as Marvel's editor and doing his freelancing from home two of the five workdays per week, for which he was paid on a per-page basis as a freelancer); Ex. 3 at 41:19-42:2 (Romita testifying that Lee would stay home several days per week to write); Ex. 4 at 17:17-25 (Lee testifying that he was paid as a freelancer for his writing and was on salary for his work as an editor); Ex. 17 at 27:2-18, 30:9-13, 31:22-32:7, 276:2-14 (Thomas testifying that he was a staff writer/assistant editor in the 1960s and got a salary for that work, but separately freelanced when writing stories and was paid at a per-page rate on a separate check like other freelancers); Ex. 22 at 255:10-256:6 (Lieber testifying that Lee wrote stories and scripts as a writer, not as an editor, because writing is "not what an Editor does"); Ex. 55 at 62:18-63:18 (Lee testifying that he got paid a salary as editor and separately for his writing); Ex. 56 at 91:20-92:6 (Lee testifying that he got paid a salary as editor and separately as a freelancer pre page for his writing); *id*. at 94:6-95:18 (Lee testifying that there was very little editing of his own freelance written material).

> **RESPONSE:**  **Undisputed**, but **immaterial** because this has no bearing on the Court's
>
> application of the work-made-for-hire test, as this Court's grant of summary judgment for
>
> Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F.3d at
>
> 125 (detailing Lee's deposition testimony regarding his roles at Marvel and affirming
>
> district court's finding that Kirby's works were made for hire); *id*. at 139-40 (relevant
>
> principles of the instance-and-expense test).
>
> MCI, however, **objects** to Toberoff Exhibits 1 and 22.  *See* MTE Evanier [Dkt.
>
> 77]; MCI's Evidentiary Objection Nos. [1] & [27].

58.    **Lee did his writing at home and his editor's salary did not cover his writing, for which was paid by the page on a freelance basis.**  *See* Toberoff Decl. Ex. 1 at 13 (Evanier Rep. describing Lee's common practice of composing dialogue as a freelancer, not as Marvel's editor and doing his freelancing from home two of the five workdays per week, for which he was paid on a per-page basis as a freelancer); Ex. 4 at 17:17-25 (Lee testifying that he was paid as a freelancer for his writing and was on salary for his work as an editor); Ex. 6 at 30:21-31:9 (Thomas testifying that Lee did his freelance writing from home); Ex. 17 at 289:7-291:5 (Thomas testifying that he and Lee each did their writing in a freelance capacity from home in the 1960s and would come to the office only to do their editorial work); Ex. 22 at 256:7-257:12 (Lieber testifying that Lee wrote scripts from home); Ex. 55 at 62:18-63:18 (Lee testifying that he got paid a salary as editor and

separately for his writing); Ex. 56 at 91:20-92:6 (Lee testifying that he got paid a salary as editor and separately as a freelancer pre page for his writing).

    **RESPONSE: Undisputed**, but **immaterial** because this has no bearing on the Court's

application of the work-made-for-hire test, as this Court's grant of summary judgment for

Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 726 F.3d at

125 (detailing Lee's deposition testimony regarding his roles at Marvel and affirming

district court's finding that Kirby's works were made for hire); *id.* at 139-40 (relevant

principles of the instance-and-expense test).

    MCI, however, **objects** to Toberoff Exhibit 1. *See* MTE Evanier [Dkt. 77]; MCI's

Evidentiary Objection No. [1].

59.    **During the Period, it was Marvel's policy that those employed in editorial or production roles, who also created material as artists or writers, did the latter on a freelance basis, on their own time, usually at home, and were paid only for those pages Marvel chose to buy.** *See* Toberoff Decl. Ex. 1 at 13 (Evanier Rep. describing Lee's common practice of composing dialogue as a freelancer, not as Marvel's editor and doing his freelance writing from home two of the five workdays per week, and was paid on a per-page basis as a freelancer); Ex. 17 at 289:7-291:5 (Thomas testifying that he and Lee each did their freelance writing from home in the 1960s and would come to the office only to do their editorial work); *id.* at 27:2-18, 30:9-13, 31:22-32:7, 276:2-14 (Thomas testifying that he was a staff writer/assistant editor in the 1960s and got a salary for that work, but separately freelanced when writing stories and was paid at a per-page rate with a separate check like other freelancers); Ex. 44 ¶ 3(a) (Marvel's contract with Thomas dated September 1, 1974 providing that Thomas would be paid only for those pages which Marvel accepted and requiring Thomas to make changes to his work without any additional compensation).

    **RESPONSE: Disputed in part**, but **immaterial**. MCI **disputes** Defendant's suggestion

that Marvel was "buy[ing]" work "on spec," which is not only an issue of law but also

inaccurate. To the contrary, freelance contributors, even those in editorial or production

roles, contributed to Marvel's comic books pursuant to assignments from Lee, who directed

the creation of the Works, and they were compensated by Marvel on an agreed per-page

basis for completed assignments. *See supra* Response No. 3, *citing* Lens Decl., Ex. 2 152:1-

154:7; Lens Decl., Ex. 12 56:12-15, 57:25-58:9, 58:14-23; Lens Decl., Ex. 7 217:13-21;

Lens Decl., Ex. 13 41:20-42:9; Lens Decl., Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21;

Lens Decl., Ex. 48 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2

27:19-28:7, 56:2-57:7, 148:22-151:25, 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9;

Lens Decl., Ex. 12 56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24;

Lens Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex.

13 14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-

10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl., Ex. 2 17:8-

18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 44:4-17;

Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-9, 93:23-94:5; Lens Decl., Ex. 2 80:24-

81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens

Decl., Ex. 4 124:19-125:4,124:3-18; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens

Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15; Lens Decl., Ex. 4 125:15-18; Lens

Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens Decl., Ex. 13 30:11-14, 58:13-21; Lens

Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 68A-G; Lens Decl., Ex. 2 137: 8-

16; Lens Decl., Ex. 10 396:1-10; Lens Decl., Ex. 6 40:14-20; Lens Decl., Ex. 2 276:7-23;

Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7, 226:7-11, 249:7-9, 258:12-17, 290:2-5,

290:18-22; Thomas Decl. ¶ 20.

      Further, while MCI does not dispute that freelancers, including those in editorial or

production roles, worked for Marvel on a freelance basis, Toberoff Exhibit 44 **does not**

**support** this contention, as the cited material post-dates the relevant time period.

      Regardless, this contention is **immaterial** because it has no bearing on the Court's

application of the work-made-for-hire test, as this Court's grant of summary judgment for

Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F.3d at

125 (detailing Lee's testimony regarding his roles at Marvel and affirming district court's

finding that Kirby's works were made for hire).; *id*. at 139-40 (relevant principles of the

instance-and-expense test).

MCI also **objects** to Toberoff Exhibits 1 and 44.  *See* MTE Evanier [Dkt. 77];

MCI's Evidentiary Objection Nos. [1] & [45].

60.     **Lee went in to Magazine Management's office to serve as editor only two or three of the five workdays each week, so he could freelance write at his home.**  *See* Toberoff Decl. Ex. 1 at 13 (Evanier Rep. describing Lee's common practice of composing dialogue as a freelancer, not as Marvel's editor and doing his freelancing from home 2 of the 5 workdays per week, and was paid on a per-page basis as a freelancer); Ex. 3 at 41:19-42:2 (Romita testifying that Lee would stay home several days per week to write); Ex. 17 at 289:7-291:5 (Thomas testifying that he and Lee each freelance wrote from home in the 1960s and would come to the office to do their editorial work); Ex. 22 at 256:7-257:12 (Lieber testifying that Lee would do his writing from home).

**RESPONSE:  Undisputed**, but **immaterial** because this has no bearing on the Court's

application of the work-made-for-hire test, as this Court's grant of summary judgment for

Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F.3d at

125 (detailing Lee's testimony regarding his roles at Marvel and affirming district court's

finding that Kirby's works were made for hire).; *id*. at 139-40 (relevant principles of the

instance-and-expense test).

MCI, however, **objects** to Toberoff Exhibit 1.  *See* MTE Evanier [Dkt. 77]; MCI's

Evidentiary Objection No. [1].

61.     **Magazine Management was the only entity that bought work from freelance writers/artists or employed editors like Lee in the Period.**  *See* Toberoff Decl. Ex. 17 at 272:23-275:2 (Thomas testifying that he was paid and employed by Magazine Management/Marvel Comics, and then Perfect Film/Cadence); *id*. at 320:10-322:14 (Thomas testifying that no one knew what Vista, Atlas, or Non-Pareil did and that Thomas did not receive any money from them, does not know anyone who did, does not know if they had any employees or any offices, or "of [them] having any existence" whatsoever); Ex. 22 at 252:23-254:24, 303:15-19 (Lieber testifying that he never heard of Vista or other shell companies, did not know if they had any employees and that he was paid by, and believed he was working with, Magazine Management); Ex. 50 at DETTWILER-0044-0058 (Don Heck's payment records identifying "Magazine Management" as the only entity that paid him for his freelance material in the Period).

**RESPONSE:  Disputed**, but **immaterial**.  Ditko, like other Marvel freelance artists, contributed to Marvel's comic books pursuant to assignments from Lee, who directed the creation of the Works, and they were compensated by Marvel on an agreed per-page basis for completed assignments.  *See supra* Response No. 3, *citing* Lens Decl., Ex. 2 152:1-154:7; Lens Decl., Ex. 12 56:12-15, 57:25-58:9, 58:14-23; Lens Decl., Ex. 7 217:13-21; Lens Decl., Ex. 13 41:20-42:9; Lens Decl., Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21; Lens Decl., Ex. 48 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2 27:19-28:7, 56:2-57:7, 148:22-151:25, 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens Decl., Ex. 12 56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13 14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl., Ex. 2 17:8-18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 44:4-17; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-9, 93:23-94:5; Lens Decl., Ex. 2 80:24-81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15; Lens Decl., Ex. 4 125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens Decl., Ex. 13 30:11-14, 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 68A-G; Lens Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens Decl., Ex. 6 40:14-20; Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7, 226:7-11, 249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.

Moreover, Lee's editorial work was performed for and on behalf of Marvel's publisher Goodman, whose various comic book entities conducted business as "Marvel" or

"Marvel Comics Group" and engaged with Magazine Management Company for administrative services, including payments to those providing services to Marvel. *See supra* Response No. 9, *citing* Bard Decl. ¶ 2; Bard Decl., Ex. 5 at 2-3; Bard Decl., Ex. 7 at 5; Bard Decl., Ex. 10 at 2; Lens Decl., Ex. 18 72:25-73:11; Lens Opp. Decl., Ex. 90 5:11-19; Bard Decl., Ex. 8 at 5-6; Lens Decl., Ex. 75; Lens Decl., Ex. 76; Lens Opp. Decl., Ex. 93 at 4-5; Lens Opp. Decl., Ex. 92 at 3-8; Bard Decl., Ex. 6 at 3; Bard Decl., Ex. 5 at 3; Lens Decl., Ex. 68A-G. Lee provided services to these various entities, even though his actual paycheck likely was drawn on a Magazine Management account.

Regardless, this contention is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 726 F.3d at 126, 141 (discussing Kirby's "close and continuous" working relationship "with Marvel" despite noting that "Atlas Comics, as part of Marvel Comics Group"—one such Goodman publishing entity—published most of the relevant works); *id*. at 139-40 (relevant principles of the instance-and-expense test).

MCI also **objects** to Toberoff Exhibit 22. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [26] & [31].

62.     **The shell companies (e.g., Vista, Atlas, Non-Pareil) had no legal or corporate affiliation to one another or Magazine Management.** *See* Toberoff Decl. Ex. 46 at 1-3 (list of Goodman's shell companies dated October 4, 1967 showing no legal or corporate relationship to one another or Magazine Management); Ex. 17 at 320:10-322:14 (Thomas testifying that no one knew what Vista, Atlas, or Non-Pareil did and that Thomas did not receive any money from them, does not know anyone who did, does not know if they had any employees or any offices, or "of [them] having any existence" whatsoever); Ex. 22 at 252:23-254:24, 303:15-19 (Lieber testifying that he never heard of Vista or other shell companies, did not know if they had any employees and that he was paid by, and believed he was working with, Magazine Management).

**RESPONSE: Disputed**, but **immaterial**. MCI **disputes** Defendant's characterization of

such companies as "shell companies." As relevant here, Goodman's various comic book

103

entities conducted business as "Marvel" or "Marvel Comics Group" and engaged with

Magazine Management Company for administrative services, including payments to those

providing services to Marvel.  *See supra* Response No. 9, *citing* Bard Decl. ¶ 2; Bard Decl.,

Ex. 5 at 2-3; Bard Decl., Ex. 7 at 5; Bard Decl., Ex. 10 at 2; Lens Decl., Ex. 18 72:25-73:11;

Lens Opp. Decl., Ex. 90 5:11-19; Bard Decl., Ex. 8 at 5-6; Lens Decl., Ex. 75; Lens Decl.,

Ex. 76; Lens Opp. Decl., Ex. 93 at 4-5; Lens Opp. Decl., Ex. 92 at 3-8; Bard Decl., Ex. 6 at

3; Bard Decl., Ex. 5 at 3; Lens Decl., Ex. 68A-G.  Further,  Toberoff Exhibit 46 **does not**

**support** this contention, as it shows that all entities were wholly owned directly or

indirectly by "MG" (Martin Goodman) or "MG & JG" (Martin Goodman and Jean

Goodman), and that all entities were "Martin Goodman's Corporations," serviced together

by Magazine Management Company, the "Servicing Partnership."

> Regardless, this contention is **immaterial** because it has no bearing on the Court's
>
> application of the work-made-for-hire test, as this Court's grant of summary judgment for
>
> Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F.3d at
>
> 126, 141 (discussing Kirby's "close and continuous" working relationship "with Marvel"
>
> despite noting that "Atlas Comics, as part of Marvel Comics Group"—one such Goodman
>
> publishing entity—published most of the relevant works); *id*. at 139-40 (relevant principles
>
> of the instance-and-expense test).

> MCI also **objects** to Toberoff Exhibit 22.  *See* MTE Evanier [Dkt. 77]; MCI's

Evidentiary Objection Nos. [26] & [31].

63.     **These shell companies—which Marvel later claimed in the copyright renewal**
**registrations of its comic books (including the Works) were the "authors" of freelancers'**
**creative material as "works made for hire"—made no payments to, and had no interaction**
**whatsoever with the freelance writers/artists, including Ditko, who created the original**
**material in question.**  *See* Toberoff Decl. Ex. 14 at 4-5 (Evanier Rebuttal Rep. providing historical
context and explaining that the shell companies had no employees, actual offices, or business
activities, and had no contact with any freelancer); Ex. 6 at 200:2-24 (Thomas testifying that he was

hired by Magazine Management in 1965); Ex. 17 at 272:23-275:2 (Thomas testifying that he was paid and employed by Magazine Management/Marvel Comics, and then Perfect Film/Cadence); *id.* at 320:10-322:14 (Thomas testifying that no one knew what Vista, Atlas, or Non-Pareil did and that Thomas did not receive any money from them, does not know anyone who did, does not know if they had any employees or any offices, or "of [them] having any existence" whatsoever); Ex. 22 at 252:23-254:24, 303:15-19 (Lieber testifying that he never heard of Vista or other shell companies, did not know if they had any employees and that he was paid by, and believed he was working with, Magazine Management); Ex. 40 at 2021MARVEL-0005845 (Certificate of Renewal Registration of *Amazing Fantasy* Vol. 1, No. 15, the issue in which Spider-Man originally appeared, dated November 20, 1990, claiming "Atlas Magazines, Inc." as the original author and copyright claimant); Ex. 41 at 2021MARVEL-0005849 (Certificate of Renewal Registration of *Amazing Spider-Man* Vol. 1, No. 1 dated November 20, 1990, claiming "Non-Pareil Publishing Corporation" as the original author and copyright claimant); Ex. 42 (Certificate of Renewal Registration of *Strange Tales* Vol. 1, No. 110, the issue in which Dr. Strange first appeared, dated December 27, 1991, claiming "Vista Publications, Inc." as the original author and copyright claimant); Ex. 50 at DETTWILER-0044-0058 (Don Heck's payment records identifying "Magazine Management" as the only entity that paid him for his freelance material in the Period).

> **RESPONSE:  Disputed in part**, but **immaterial**.  While MCI does not dispute that
>
> Marvel's renewal registrations accurately reflect the work-made-for-hire nature of the
>
> Works, MCI **disputes** Defendant's characterization of such companies as "shell
>
> companies."  Lee's editorial work was performed for and on behalf of Marvel's publisher
>
> Goodman, whose various comic book entities conducted business as "Marvel" or "Marvel
>
> Comics Group" and engaged with Magazine Management Company for administrative
>
> services, including payments to those providing services to Marvel.  *See supra* Response
>
> No. 9, *citing* Bard Decl. ¶ 2; Bard Decl., Ex. 5 at 2-3; Bard Decl., Ex. 7 at 5; Bard Decl., Ex.
>
> 10 at 2; Lens Decl., Ex. 18 72:25-73:11; Lens Opp. Decl., Ex. 90 5:11-19; Bard Decl., Ex. 8
>
> at 5-6; Lens Decl., Ex. 75; Lens Decl., Ex. 76; Lens Opp. Decl., Ex. 93 at 4-5; Lens Opp.
>
> Decl., Ex. 92 at 3-8; Bard Decl., Ex. 6 at 3; Bard Decl., Ex. 5 at 3; Lens Decl., Ex. 68A-G.
>
> Ditko, like other Marvel freelance artists, contributed to Marvel's comic books pursuant to
>
> assignments from Lee, who directed the creation of the Works, and he was compensated by
>
> Marvel on an agreed per-page basis for completed assignments.  *See supra* Response No. 3,
>
> *citing* Lens Decl., Ex. 2 152:1-154:7; Lens Decl., Ex. 12 56:12-15, 57:25-58:9, 58:14-23;

Lens Decl., Ex. 7 217:13-21; Lens Decl., Ex. 13 41:20-42:9; Lens Decl., Ex. 10 383:18-21;

Lens Decl., Ex. 6 38:8-21; Lens Decl., Ex. 48 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex.

54 at 4; Lens Decl., Ex. 2 27:19-28:7, 56:2-57:7, 148:22-151:25, 88:17-89:13, 131:8-19,

145:23-148:20, 164:3-9; Lens Decl., Ex. 12 56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens

Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex.

53 at 2; Lens Decl., Ex. 13 14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24,

139:17-140:2, 140:8-11, 224:5-10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8,

110:21-24; Lens Decl., Ex. 2 17:8-18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12 67:16-

68:6; Lens Decl., Ex. 13 44:4-17; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-9,

93:23-94:5; Lens Decl., Ex. 2 80:24-81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-220:11;

Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18; Thomas Decl. ¶¶ 7-8;

Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15; Lens

Decl., Ex. 4 125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens Decl., Ex. 13

30:11-14, 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 68A-

G; Lens Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens Decl., Ex. 6 40:14-20;

Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7, 226:7-11,

249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.  As such, Ditko, through Lee

and Goodman, provided services to Vista, Atlas, or Non-Pareil.

Regardless, this contention is **immaterial** because it has no bearing on the Court's

application of the work-made-for-hire test, as this Court's grant of summary judgment for

Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F.3d at

126, 141 (discussing Kirby's "close and continuous" working relationship "with Marvel"

despite noting that "Atlas Comics, as part of Marvel Comics Group"—one such Goodman

publishing entity—published most of the relevant works); *id*. at 139-40 (relevant principles of the instance-and-expense test).

MCI also **objects** to Toberoff Exhibits 14 and 22. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [17], [26], & [31].

64.    **Lee was only ever paid by Magazine Management for his editorial services and for his freelance writing.** *See* Toberoff Decl. Ex. 17 at 138:3-139:2 (Thomas testifying that Magazine Management was the only payor of staff salaries and freelancer checks); *id*. at 320:10-322:14 (Thomas testifying that no one knew what Vista, Atlas, or Non-Pareil did and that Thomas did not receive any money from them, does not know anyone who did, does not know if they had any employees or any offices, or "of [them] having any existence" whatsoever); Ex. 22 at 252:23-254:24, 303:15-19 (Lieber testifying that he never heard of Vista or other shell companies, did not know if they had any employees and that he was paid by, and believed he was working with, Magazine Management); Ex. 50 at DETTWILER-0044-0058 (Don Heck's payment records identifying "Magazine Management" as the only entity that paid him for his freelance material in the Period).

> **RESPONSE:** **Undisputed** that from 1962 to 1965 Lee was likely paid with checks drawn on Magazine Management accounts, though no checks from relevant time period exist, but **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 726 F.3d at 126, 141 (discussing Kirby's "close and continuous" working relationship "with Marvel" despite noting that "Atlas Comics, as part of Marvel Comics Group"—one such Goodman publishing entity—published most of the relevant works*)*; *id.* at 139-40 (relevant principles of the instance-and-expense test); *Kirby*, 777 F. Supp. 2d at 747 (discussing Magazine Management Company checks but ultimately finding they were immaterial).
>
> MCI, however, **objects** to Toberoff Exhibit 22. *See* MCI's Evidentiary Objection Nos. [26] & [31].

65.    **Ditko was not employed by, did not work for, nor have any contact with any of the shell companies.** *See* Toberoff Decl. Ex. 17 at 272:23-275:2 (Thomas testifying that he was paid and employed by Magazine Management/Marvel Comics, and then Perfect Film/Cadence); *id*.

at 320:10-322:14 (Thomas testifying that no one knew what Vista, Atlas, or Non-Pareil did and that Thomas did not receive any money from them, does not know anyone who did, does not know if they had any employees or any offices, or "of [them] having any existence" whatsoever); Ex. 22 at 252:23-254:24, 303:15-19 (Lieber testifying that he never heard of Vista or other shell companies, did not know if they had any employees and that he was paid by, and believed he was working with, Magazine Management).

**RESPONSE:** **Disputed**, but **immaterial**.  While MCI does not dispute that Ditko had no written employment agreement with any of Goodman's publishing entities, MCI **disputes** that Ditko had "did not work for[] nor ha[d] any contact" with them.  Lee's editorial work was performed for and on behalf of Marvel's publisher Goodman, whose various comic book entities conducted business as "Marvel" or "Marvel Comics Group" and engaged with Magazine Management Company for administrative services, including payments to those providing services to Marvel.  *See supra* Response No. 9, *citing* Bard Decl. ¶ 2; Bard Decl., Ex. 5 at 2-3; Bard Decl., Ex. 7 at 5; Bard Decl., Ex. 10 at 2; Lens Decl., Ex. 18 72:25-73:11; Lens Opp. Decl., Ex. 90 5:11-19; Bard Decl., Ex. 8 at 5-6; Lens Decl., Ex. 75; Lens Decl., Ex. 76; Lens Opp. Decl., Ex. 93 at 4-5; Lens Opp. Decl., Ex. 92 at 3-8; Bard Decl., Ex. 6 at 3; Bard Decl., Ex. 5 at 3; Lens Decl., Ex. 68A-G.   Ditko, like other Marvel freelance artists, contributed to Marvel's comic books pursuant to assignments from Lee, who directed the creation of the Works, and he was compensated by Marvel on an agreed per-page basis for completed assignments.  *See supra* Response No. 3, *citing* Lens Decl., Ex. 2 152:1-154:7; Lens Decl., Ex. 12 56:12-15, 57:25-58:9, 58:14-23; Lens Decl., Ex. 7 217:13-21; Lens Decl., Ex. 13 41:20-42:9; Lens Decl., Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21; Lens Decl., Ex. 48 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2 27:19-28:7, 56:2-57:7, 148:22-151:25, 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens Decl., Ex. 12 56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13

14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl., Ex. 2 17:8-18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 44:4-17; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-9, 93:23-94:5; Lens Decl., Ex. 2 80:24-81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15; Lens Decl., Ex. 4 125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens Decl., Ex. 13 30:11-14, 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 68A-G; Lens Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens Decl., Ex. 6 40:14-20; Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7, 226:7-11, 249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.   As such, Ditko, through Lee and Goodman, provided services to Vista, Atlas, or Non-Pareil.

Regardless, this contention is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F.3d at 126, 141 (discussing Kirby's "close and continuous" working relationship "with Marvel" despite noting that "Atlas Comics, as part of Marvel Comics Group"—one such Goodman publishing entity—published most of the relevant works); *id*. at 139-40 (relevant principles of the instance-and-expense test).

MCI also **objects** to Toberoff Exhibit 22.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [26] & [31].

66.    **Freelancers in the Period were paid with a Magazine Management check for those freelance pages it chose to purchase in its sole discretion.**  *See* Toberoff Decl. Ex. 2 at 100:3-101:9 (Lieber testifying that he was paid for his freelance material by checks stamped with a

legend that used assignment-type language); Ex. 5 at 371:3-25 (Lee testifying that Marvel "would only buy what [it] needed"); Ex. 17 at 295:8-296:8, 297:1-20 (Thomas testifying that Marvel could accept or reject submitted material in its sole discretion); Ex. 22 at 303:15-19 (Lieber testifying he thought the name on the checks was Marvel or Magazine Management); Ex. 43 ¶ 3(a) (Marvel's contract with Colan dated March 22, 1975 providing that Colan would be paid only for those pages which Marvel accepted and requiring Colan to make changes to his work without any additional compensation); Ex. 44 ¶ 3(a) (Marvel's contract with Thomas dated September 1, 1974 providing that Thomas would be paid only for those pages which Marvel accepted and requiring Thomas to make changes to his work without any additional compensation); Ex. 53 ¶ 3(a) (Marvel's contract with Thomas dated August 27, 1976 with same provision); Ex. 52 ¶ 3(a) (Marvel's October 7, 1977 contract with Gerber providing Gerber would be paid only for those pages Marvel accepted and that Gerber "will make all changes and rework all Material … without charge"); Ex. 45 at KIRBY-4142-4154, KIRBY-4158-4164 (Marvel freelance checks made payable to Ayers dated from February 1, 1974 to July 4, 1975); Ex. 50 at DETTWILER-0044-0058 (Don Heck's payment records identifying "Magazine Management" as the only entity that paid him for his freelance material in the Period); Ex. 51 (Marvel freelance checks made payable to Gerber dated June 1, 1973, expressly acknowledging Gerber's "assignment to [Marvel] of any copyright, trademark and any other rights in or related to the material, including [his] assignment of any rights to renewal copyright").

> **RESPONSE:  Disputed in part**, but **immaterial**.  While MCI does not dispute that
>
> Magazine Management was the entity that Marvel paid freelancers, including Ditko, via
>
> check for their freelance work for Marvel, MCI **disputes** that their work was "purchase[d]"
>
> by Marvel "on spec."  Lee's editorial work was performed for and on behalf of Marvel's
>
> publisher Goodman, whose various comic book entities conducted business as "Marvel" or
>
> "Marvel Comics Group" and engaged with Magazine Management Company for
>
> administrative services, including payments to those providing services to Marvel.  *See*
>
> *supra* Response No. 9, *citing* Bard Decl. ¶ 2; Bard Decl., Ex. 5 at 2-3; Bard Decl., Ex. 7 at
>
> 5; Bard Decl., Ex. 10 at 2; Lens Decl., Ex. 18 72:25-73:11; Lens Opp. Decl., Ex. 90 5:11-
>
> 19; Bard Decl., Ex. 8 at 5-6; Lens Decl., Ex. 75; Lens Decl., Ex. 76; Lens Opp. Decl., Ex.
>
> 93 at 4-5; Lens Opp. Decl., Ex. 92 at 3-8; Bard Decl., Ex. 6 at 3; Bard Decl., Ex. 5 at 3;
>
> Lens Decl., Ex. 68A-G.  Ditko, like other Marvel freelance artists, contributed to Marvel's
>
> comic books pursuant to assignments from Lee, who directed the creation of the Works, and
>
> he was compensated by Marvel on an agreed per-page basis for completed assignments.  *See*

*supra* Response No. 3, *citing* Lens Decl., Ex. 2 152:1-154:7; Lens Decl., Ex. 12 56:12-15, 57:25-58:9, 58:14-23; Lens Decl., Ex. 7 217:13-21; Lens Decl., Ex. 13 41:20-42:9; Lens Decl., Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21; Lens Decl., Ex. 48 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2 27:19-28:7, 56:2-57:7, 148:22-151:25, 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens Decl., Ex. 12 56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13 14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl., Ex. 2 17:8-18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 44:4-17; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-9, 93:23-94:5; Lens Decl., Ex. 2 80:24-81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15; Lens Decl., Ex. 4 125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens Decl., Ex. 13 30:11-14, 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 68A-G; Lens Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens Decl., Ex. 6 40:14-20; Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7, 226:7-11, 249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.

Additionally, Toberoff Exhibits 5, 43, 44, 52, and 53 **do not support** this contention, as the cited material either pre- or post-dates the relevant time period.  Toberoff Exhibits 45 and 51 likewise **do not support** this contention, as they post-date the relevant time period and do not list Magazine Management Company as the payor.

Regardless, this contention is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for

111

Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 726 F.3d at 126, 141 (discussing Kirby's "close and continuous" working relationship "with Marvel" despite noting that "Atlas Comics, as part of Marvel Comics Group"—one such Goodman publishing entity—published most of the relevant works)*; id.* at 139-40 (relevant principles of the instance-and-expense test); *Kirby*, 777 F. Supp. 2d at 747 (discussing Magazine Management Company checks but ultimately finding they were immaterial).

MCI also **objects** to Toberoff Exhibits 2, 22, 43, 44, 45, 51, 52, and 53. *See* MCI's Evidentiary Objection Nos. [3], [31], [44], [45], [46], [48], [49], & [50].

67.    **Magazine Management stamped legends on the back of its checks, forcing freelancers to sign under the legend to cash them.** *See* Toberoff Decl. Ex. 1 at 16 (Evanier Rep. describing the comic book industry and Marvel's custom and practice of stamping legends on the backs of checks to freelancers in the Period, thereby forcing freelancers to sign the legend to cash the check); Ex. 2 at 100:3-101:9 (Lieber testifying that he was paid for his freelance material by checks stamped with a legend that used assignment-type language); Ex. 8 ¶ 13 (Sinnott attesting that Marvel paid him with checks that had an assignment legend on the back); Ex. 21 at 63:10-64:17, 91:11-93:19 (Steranko testifying that would cross out the legend on the backs of the Marvel checks because he thought it was bad business to add an after-the-fact condition to payment on work that had been submitted a week or two prior); Ex. 45 at KIRBY-4142-4154, KIRBY-4158-4164 (Marvel freelance checks made payable to Ayers dated from February 1, 1974 to July 4, 1975, with assignment legends stamped on the backs of the checks); Ex. 51 (Marvel freelance checks made payable to Gerber dated June 1, 1973, expressly acknowledging Gerber's "assignment to [Marvel] of any copyright, trademark and any other rights in or related to the material, including [his] assignment of any rights to renewal copyright").

**RESPONSE:  Disputed**, but **immaterial**.  Because Defendant fails to provide any time period in this fact, it is unclear as written.  To the extent MCI is referring to Magazine Management checks during the relevant time period, MCI does not dispute that there were stamped legends on the backs of the checks, but **disputes** Defendant's suggestion that Marvel "forced" freelancers to sign under the legends.  Freelancers had the freedom to sign or not sign their checks—and indeed sometimes freelancers struck out the language before cashing their checks.  *See* Toberoff Ex. 21 at 64:8-21 (Steranko testifying that he would cross out the legend on the backs of the Marvel checks but was still paid regardless); Lens

Opp. Decl., Ex. 89 82:17-21 (Steranko testifying that there was "[a] little stamp on the opposite side I think said work for hire, which I often just crossed off just to see what would happen with it, and the check was cashed and I got paid anyway").  Additionally, Toberoff Exhibits 45 and 51 **do not support** this contention, as the cited checks post-date the relevant time period and do not list Magazine Management Company as the payor.

Regardless, this contention is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F.3d at 126, 141 (discussing Kirby's "close and continuous" working relationship "with Marvel" despite noting that "Atlas Comics, as part of Marvel Comics Group"—one such Goodman publishing entity—published most of the relevant works)*; id.* at 139-40 (relevant principles of the instance-and-expense test); *Kirby*, 777 F. Supp. 2d at 747 (discussing Magazine Management Company checks but ultimately finding they were immaterial).

MCI also **objects** to the evidence cited in support of this contention.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [3], [11], [21], [22], [46], & [48].

68.    **Magazine Management's check legends acknowledged the freelancer's contemporaneous "assignment to it of any copyright, trademark and any other rights in or related to the material, including [his] assignment of any rights to renewal copyright."**  *See* Toberoff Decl. Ex. 2 at 100:3-101:9 (Lieber testifying that he was paid for his freelance material by checks stamped with a legend that used assignment-type language); Ex. 8 ¶ 13 (Sinnott attesting that Marvel paid him with checks that had an assignment legend on the back); Ex. 9 ¶ 13 (Steranko attesting that legends on the backs of Marvel's checks to him used assignment, not work-for-hire, language); Ex. 10 ¶ 14 (Ayers attesting that Marvel's check legends used assignment language); Ex. 11 ¶ 12 (Colan attesting that the legends on the backs of Marvel's checks used assignment, not work-for-hire, language); Ex. 13 ¶ 14 (Adams attesting that Marvel's check legends used assignment language only); Ex. 21 at 61:23-62:3, 91:11-93:19 (Steranko testifying that in the 1960s, Marvel's check legends did not say "work for hire," but indicated that Steranko "gave them the rights to the work, sold them the rights to the work"); Ex. 22 at 269:24-271:20 (Lieber testifying that the check legends used assignment, not work-for-hire language); Ex. 45 at KIRBY-4142-4154, KIRBY-4158-4164 (Marvel freelance checks made payable to Ayers dated from February 1, 1974 to July 4, 1975, expressly acknowledging Ayers' "assignment to [Marvel] of any copyright, trademark and any other rights in or related to the material, including [his] assignment of any rights

to renewal copyright"); Ex. 51 (Marvel freelance checks made payable to Gerber dated June 1, 1973, expressly acknowledging Gerber's "assignment to [Marvel] of any copyright, trademark and any other rights in or related to the material, including [his] assignment of any rights to renewal copyright").

    **RESPONSE:  Disputed**, but **immaterial**.  Because Defendant fails to provide any time period in this fact, it is unclear as written.  To the extent MCI is referring to Magazine Management checks during the relevant time period, MCI does not dispute that there were stamped legends on the backs of the checks, but **disputes** that the legends contained the language quoted by Defendant.  No checks from the relevant time period were produced and no witness was able to identify the language contained in the legends.

    In addition, Toberoff Exhibits 45 and 51 **do not support** this contention, as the cited checks post-date the relevant time period and do not list Magazine Management Company as the payor.  Toberoff Exhibit 13 also **does not support** this contention, as the cited material refers to a period of time beginning in the late 1960s, not the relevant time period.  Toberoff Exhibits 2 and 22 **do not support** this contention, because Mr. Lieber only testified regarding his "understanding" of the effect of the purported language. Toberoff Exhibit 9 **does not support** this contention, as the cited material merely states that the freelancer was paid a per-page rate.  Toberoff Exhibits 9 and 21 further **do not support** this contention, because over a decade ago, when Mr. Steranko was retained as an expert witness for Defendant's counsel, he testified that the paychecks he received from Marvel were "stamped work for hire[,] [a] little stamp on the opposite side I think said work for hire."  Lens Opp. Decl., Ex. 89 82:3-23.  As Mr. Steranko explained, "[w]hen [he] worked at Marvel, [he] was on a work for hire basis," which he understood based on his "experience at Marvel," as Marvel "provided him with [a] description of the character," gave him "treatment[s] [or] synops[e]s of the material that they were looking for," "supervis[ed]"

him, and "stamped [his checks] work for hire." *Id*. And after Marvel "edited [*sic*] some of [his] work" and "changed certain things that [he] didn't feel should be changed," Steranko, like Ditko, who "faced the same frustrations," left Marvel. Lens Opp. Decl., Ex. 95 at 4-5.

Regardless, this contention is **immaterial** because the existence or non-existence of check legends has no bearing on the Court's application of the work-made-for-hire test, as the Second Circuit already held with respect to this same evidence. *Kirby*, 726 F.3d at 143 ("[W]e decline to infer from Marvel's suspenders that it had agreed to give Kirby its belt."); *see also id*. at 139-40 (the relevant principles of the instance-and-expense test).

MCI objects to all evidence cited in support of this fact under the best evidence rule, given that Defendant is attempting to establish the terms of a writing without having produced the writing or a copy thereof (and without establishing a reasonably diligent search). *See* MCI's Evidentiary Objection Nos. [3], [11], [12], [13], [14], [16], [21], [29], [46], & [48].

69.    **As late as 1975, the legends on "Marvel's" checks contained such "assignment" language and no "work for hire" language whatsoever.** *See* Toberoff Decl. Ex. 2 at 100:3-101:9 (Lieber testifying that he was paid for his freelance material by check stamped with a legend that used assignment-type language); Ex. 9 ¶ 13 (Steranko attesting that legends on the backs of Marvel's checks to him until at least 1973 used assignment, not work-for-hire, language); Ex. 21 at 61:23-62:3, 91:11-93:19 (Steranko testifying that in the 1960s, Marvel's check legends did not say "work for hire"); Ex. 45 at KIRBY-4142-4154, KIRBY-4158-4164 (Marvel freelance checks made payable to Ayers dated from February 1, 1974 to July 4, 1975, acknowledging Ayers' "assignment to [Marvel] of any copyright, trademark and any other rights in or related to the material, including [his] assignment of any rights to renewal copyright"); Ex. 51 (Marvel freelance checks made payable to Gerber dated June 1, 1973, expressly acknowledging Gerber's "assignment to [Marvel] of any copyright, trademark and any other rights in or related to the material, including [his] assignment of any rights to renewal copyright").

**RESPONSE:  Disputed**, but **immaterial**.  MCI **disputes** this contention as stating a legal conclusion and not a statement of undisputed fact.  While MCI does not dispute that there were stamped legends on the backs of Marvel checks as late as 1975, MCI **disputes** that the legends contained only "assignment" language, as no checks from the relevant time period

were produced, no witness was able to identify the precise language contained in the legends, and the two post-relevant time period checks proffered by Defendant do not establish the nature of any legends during the relevant time period.

Additionally, Toberoff Exhibit 9 **does not support** this contention, as the cited material merely states that the freelancer was paid a per-page rate. Toberoff Exhibit 2 **does not support** this contention, because Mr. Lieber only testified regarding his "understanding" of the effect of the purported language.

Further, Toberoff Exhibits 9 and 21 **do not establish** this contention, because over a decade ago, when Mr. Steranko was retained as an expert witness for Defendant's counsel, he testified that the paychecks he received from Marvel were "stamped work for hire[,] [a] little stamp on the opposite side I think said work for hire." Lens Opp. Decl., Ex. 89 82:3-23. As Mr. Steranko explained, "[w]hen [he] worked at Marvel, [he] was on a work for hire basis," which he understood based on his "experience at Marvel," as Marvel "provided him with [a] description of the character," gave him "treatment[s] [or] synops[e]s of the material that they were looking for," "supervis[ed]" him, and "stamped [his checks] work for hire." *Id*. And after Marvel "editted [*sic*] some of [his] work" and "changed certain things that [he] didn't feel should be changed," Steranko, like Ditko, who "faced the same frustrations," left Marvel. Lens Opp. Decl., Ex. 95 at 4-5.

Regardless, this contention is **immaterial** because the existence or non-existence of check legends has no bearing on the Court's application of the work-made-for-hire test, as the Second Circuit already held with respect to this same evidence. *See Kirby*, 777 F. Supp. 2d at 748 (rejecting evidence from outside "the relevant time period" as "not admissible evidence of anything"); *Kirby*, 726 F.3d at 143 ("[W]e decline to infer from

Marvel's suspenders that it had agreed to give Kirby its belt."); *see also id.* at 139-40

(relevant principles of the instance-and-expense test).

       MCI objects to all evidence cited in support of this fact under the best evidence

rule, given that Defendant is attempting to establish the terms of a writing without having

produced the writing or a copy thereof (and without establishing a reasonably diligent

search). *See* MCI's Evidentiary Objection Nos. [3], [12], [21], [46], & [48].

70.    **In 1966, Ditko, frustrated with Lee/Magazine Management's failure to credit and pay him for his enormous role in the *Spider-Man* and *Dr. Strange* stories, refused to sell any more material to the company.** *See* Toberoff Decl. Ex. 3 at 44:22-46:12 (Romita testifying that Ditko quit *Spider-Man* because he had personal and professional conflicts with Lee); Ex. 20 at 57:13-59:3 (Evanier testifying that Ditko told him he had been promised additional compensation if his characters were used in other media); Ex. 24 at 124:5-24 (Levitz testifying that Ditko and Lee stopped speaking in the last year of Ditko's time with Marvel because Ditko was not getting proper credit for his contributions).

       **<u>RESPONSE</u>: Disputed**, but **immaterial**. MCI **disputes** Defendant's suggestion that Ditko

was "sell[ing]" work "on spec," which is not only an issue of law but also inaccurate. To

the contrary, freelance contributors, including Ditko, contributed to Marvel's comic books

pursuant to assignments from Lee, who directed the creation of the Works, and they were

compensated by Marvel on an agreed per-page basis for completed assignments. *See supra*

Response No. 3, *citing* Lens Decl., Ex. 2 152:1-154:7; Lens Decl., Ex. 12 56:12-15, 57:25-

58:9, 58:14-23; Lens Decl., Ex. 7 217:13-21; Lens Decl., Ex. 13 41:20-42:9; Lens Decl.,

Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21; Lens Decl., Ex. 48 at 3; Lens Decl., Ex. 51 at 3;

Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2 27:19-28:7, 56:2-57:7, 148:22-151:25, 88:17-

89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens Decl., Ex. 12 56:16-18, 58:10-13, 58:24-

59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at

6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13 14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11,

138:18-24, 139:17-140:2, 140:8-11, 224:5-10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9

14:5-8, 110:21-24; Lens Decl., Ex. 2 17:8-18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12

67:16-68:6; Lens Decl., Ex. 13 44:4-17; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-

9, 93:23-94:5; Lens Decl., Ex. 2 80:24-81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-

220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18; Thomas

Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-

142:15; Lens Decl., Ex. 4 125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens

Decl., Ex. 13 30:11-14, 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens

Decl., Ex. 68A-G; Lens Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens Decl.,

Ex. 6 40:14-20; Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10,

175:7, 226:7-11, 249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.

Further, while MCI does not dispute that Ditko no longer worked at Marvel in

1966, and while **immaterial**, MCI **disputes** that he quit doing work for Marvel in 1966, as

Defendant cites no evidence to definitively support that date, and the evidence instead

suggests Ditko quit in late 1965.  *See supra* Response No. 53, *citing* Lens Opp. Decl., Ex.

84 311:13; Toberoff Ex. 17 92:9-20; Lens Decl., Ex. 39 at 5.

MCI also **disputes** that Ditko left because of Marvel's "failure to credit and pay

him for his enormous role" on Spider-Man and Doctor Strange comics.  Defendant's

evidence **does not support** this contention.  Specifically, Toberoff Exhibits 3, 20, and 24 **do**

**not support** this contention, as each proffers a *different* reason for why Ditko left:  Toberoff

Exhibit 3 suggests that Ditko left due to personal and political differences between Lee and

Ditko, Toberoff Exhibit 24 suggests that Ditko left due to "discomfort between the two on

their working process and the allocation of credit work," and Toberoff Exhibit 20 suggests

that Ditko left due an alleged broken promise by Goodman to pay additional money for

derivative uses of the characters at issue.

MCI also **objects** to Toberoff Exhibits 3 and 20.  *See* MTE Evanier [Dkt. 77];

MCI's Evidentiary Objection Nos. [5] & [19].

71.     **In 1963, Ditko created, plotted, and drew the first story of his celebrated character, the supernatural magician, Dr. Strange, published in *Strange Tales* No. 110.**  *See* Toberoff Decl. Ex. 1 at 21 (Evanier Rep. providing historical context of the first publication of Ditko's Dr. Strange character in *Strange Tales* No. 110); Ex. 25 at DITKO-0308 (Ditko explaining that Dr. Strange was his creation and at one point, he was doing all the stories, writing, and art for it); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script); Ex. 30 at 2021MARVEL-0050281 (Lee writing that Dr. Strange "'twas [Ditko's] idea," in a contemporaneous letter dated January 9, 1963; Ex. 49 at 1 (first published appearance of Dr. Strange in *Strange Tales* No. 110).

> **RESPONSE:  Disputed in part**, but **immaterial**.  While MCI does not dispute that the
>
> initial "idea" for the character that became Doctor Strange may have been Ditko's, MCI
>
> **disputes** that Ditko "created … the first [Doctor Strange] story" or that Ditko created the
>
> work "on spec."  Defendant has no admissible evidence to support this contention.  Rather,
>
> the evidence establishes that Doctor Strange grew out of Ditko's longstanding relationship
>
> with Marvel.
>
> The first Doctor Strange story came about as a five-page "back-up" in *Strange*
>
> *Tales*, a Marvel comic book that Ditko was assigned by Lee to contribute to, and which he
>
> had been assigned by Lee to contribute to dating back to 1956.  Lens Decl., Ex. 60 at 3
>
> (Ditko remarking that "Dr. Strange started out as a 5 page backup"); Lens Decl., Ex. 57 at 4
>
> (Ditko noting that it was "a mystery to [him] why no Doctor Strange covers"); Lens Decl.,
>
> Ex. 27 at 3 (Lee teasing Doctor Strange as "just a 5-page filler"); Lens Decl., Ex. 33 at 3 ("It
>
> is a great pleasure and privilege for the editors of STRANGE TALES to present, quietly and
>
> without fanfare, the first of a new series, based upon a DIFFERENT kind of super-hero - - -
>
> DR. STRANGE MASTER OF BLACK MAGIC! Story: Stan Lee[;] Art: Steve Ditko[;]
>
> Lettering: Terry Szenics"); Lens Decl., Ex. 14 at 8, 11 (Lee attesting that he "(together with

numerous artists) created or co-created hundreds of characters and introduced them into the story lines to be published by [Marvel] . . . . [including] . . . Doctor Strange"); Thomas Decl. ¶ 12 ("Ditko was a regular contributor to the [*Strange Tal*es] series in 1959 beginning with issue 67 (cover-dated February 1959)."); *see also* Thomas Decl. ¶ 13; Lens Decl., Ex. 10 335:10-336:1; Lens Decl., Ex. 71 at 20:17-23:23; Lens Decl., Ex. 25 at 25-28; Lens Decl., Ex. 63 at 18-19.  Ditko consistently did the five-page "back-up" stories in *Strange Tales*, including for years leading up to Doctor Strange's first appearance in 1963.  Lens Decl., Ex. 80 (Lee and Ditko's five-page stories in *Strange Tales* Vol. 1, Nos. 102-109); Lens Decl., Ex. 48 at 2 (Ditko reflecting on his work for Marvel back-up features in *Strange Tales* and noting that "[t]he back-up features (5-pagers) were drawn by Don Heck, Paul Reinman and me"); Thomas Decl. ¶ 12 ("Ditko was a regular contributor to the [*Strange Tal*es] series in 1959 beginning with issue 67 (cover-dated February 1959)."); Thomas Decl. ¶ 13 (explaining "*Strange Tales* comics featured five-page 'back-up' features written by Stan Lee and drawn by Steve Ditko").

Lee named the character Doctor Strange—"Strange" because the story was published in Marvel's Strange Tales series; "Doctor" to avoid confusion with "Mr. Fantastic," another Marvel superhero.  Lens Decl., Ex. 27 at 3 (Lee writing that he "[o]riginally decided to call him MR. STRANGE, but thought the MR. bit too similar to MR. FANTASTIC—now however, I just remember we had a villain called DR. STRANGE just [ ] recently in one of our mags—hope it won't be too confusing!"); Lens Decl., Ex. 41 at 5 (Lee recounting that "I gave him the name Doctor Strange—I think Stephen Strange; something like that. And Steve was the fellow who drew it.").

Lee also wrote the dialogue for the first Doctor Strange story—and he or another Marvel writer wrote the dialogue for all subsequent Doctor Strange stories.  Lens Decl., Ex.

33 at 3 ("DR. STRANGE MASTER OF BLACK MAGIC! Story: Stan Lee[;]"); Ex. 2

83:13-18 (Thomas testifying that he "dialogue[d] two Doctor Strange stories"); Lens Decl.,

Ex. 31D at 24 –31H (*Strange Tales* comics, beginning with Doctor Strange's first

appearance, bearing writing credits for Lee, Thomas, Don Rico, and Dennis O'Neil).

  While Doctor Strange did not have a backstory when originally published, Marvel

gave Doctor Strange a fleshed out personality and origin story in *Strange Tales* Vol. 1, No.

115 drawing upon Lee's earlier work with Ditko on the "Dr. Droom" character in *Amazing

Adventures* Vol. 1, No. 1.  Lens Decl., Ex. 34 at 3 (story belatedly laying out "The ORIGIN

of Doctor Strange" in response to "a flood of letters" from fans); Lens Decl., Ex. 37 at 5

(Thomas explaining that, "when Lee and Ditko gave Doctor Strange an origin in *Strange

Tales* No. 115, it bore a distinct similarity to that of Lee and Kirby's Dr. Droom in *Amazing

Adventures* No. 1, two years earlier"); Lens Decl., Ex. 37 at 8 (Thomas remarking that,

"[s]ince the 1920s American movies, radio, comics, and the pulps had seated the Orient as

the center of mysticism, and Marvel was no exception, with its first two sorcerers Strange

and D[r]oom"); Lens Decl., Ex. 2 304:24-305:6 (Thomas discussing the large number of

"comic book magicians" that "were all imitating the comic strip character Mandrake," and

noting that "[a]lmost every company had a couple of magicians, many of them with

mustaches and capes"); Thomas Decl. ¶ 13 (first appearance of Dr. Strange "was published

without a backstory"); *see also* Thomas Decl. ¶ 15.

  Both Dr. Droom and Doctor Strange are doctors who undergo a series of tests in

Tibet and develop mystical abilities to combat magical forces. Lens Decl., Ex. 26 at 3-7;

Lens Decl., Ex. 40 at 5-8; Lens Decl., Ex. 25 at 3; Lens Decl., Ex. 36 at 2; Lens Decl., Ex.

41 at 5 (Lee recounting how before Doctor Strange, Marvel had "a character some years

ago—I think we called him Dr. Droom, or something—who had been a magician"); Thomas

121

Decl. ¶ 15 (explaining "when Lee and Ditko gave Dr. Strange an origin in *Strange Tales*

No. 115, it bore a distinct similarity to that of Lee and Kirby's Dr. Droom in *Amazing*

*Adventures* No. 1, two years earlier" in that "[b]oth characters were magicians sharing the

same backstory: doctors that travel to Tibet, undergo a series of tests, and develop mystical

abilities to combat magical forces").

Regardless, this contention is **immaterial** because it has no bearing on the Court's

application of the work-made-for-hire test, as this Court's grant of summary judgment for

Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F.3d at

139-40 (relevant principles of the instance-and-expense test).  Indeed, as *Kirby* held,

"[q]uestions of who created the characters are mostly beside the point," but what matters is

the hiring parties' "inducement, right to supervise, exercise of that right, and creative

contribution with respect to" the works.  *Id*. at 142.

MCI also **objects** to Toberoff Exhibits 1, 25, and 27.  *See* MTE Evanier [Dkt. 77];

MCI's Evidentiary Objection Nos. [1], [34], & [35].

72.    **Ditko independently originated the character in 1946 more than a decade before he met Lee and began selling his work to Magazine Management.**  *See* Toberoff Decl. Ex. 25 at DITKO-0308 (Ditko explaining that Dr. Strange was his creation and at one point, he was doing all the stories, writing, and art for it); Ex. 33 (Ditko's letter post-marked August 6, 1946 to his brother Patrick Ditko enclosing an initial sketch of Dr. Strange); Ex. 59 at 61:15-65:14 (Patrick Ditko, being shown composite Ex. 33 and testifying that his brother, Steve Ditko, sent him this letter in 1946, while Ditko was in military service abroad, enclosing Ditko's early sketch of Dr. Strange (Ex. 33) and that he had found Ex. 33 at his home amongst letters he had kept from his brother); Ex. 23 at 166:5-168:8 (Mark Ditko testifying that his father lived in Johnstown, PA at the address written on the letter envelope of composite Ex. 33, and that in 1946 (postmarked on the letter envelope), his uncle Ditko was in the military, stationed abroad in Germany).

**RESPONSE:  Disputed**, but **immaterial**.  Defendant has no admissible evidence

establishing that Ditko "originated the [Doctor Strange] character in 1946."  MCI further

**disputes** Defendant's suggestion that Ditko was "selling" his work to Marvel, which is not

only an issue of law but also inaccurate.  To the contrary, freelance contributors, including

Ditko, contributed to Marvel's comic books, including *Strange Tales*, pursuant to assignments from Lee, who directed the creation of the Works, and they were compensated by Marvel on an agreed per-page basis for completed assignments. *See supra* Response No. 3, *citing* Lens Decl., Ex. 2 152:1-154:7; Lens Decl., Ex. 12 56:12-15, 57:25-58:9, 58:14-23; Lens Decl., Ex. 7 217:13-21; Lens Decl., Ex. 13 41:20-42:9; Lens Decl., Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21; Lens Decl., Ex. 48 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2 27:19-28:7, 56:2-57:7, 148:22-151:25, 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens Decl., Ex. 12 56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13 14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl., Ex. 2 17:8-18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 44:4-17; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-9, 93:23-94:5; Lens Decl., Ex. 2 80:24-81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15; Lens Decl., Ex. 4 125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens Decl., Ex. 13 30:11-14, 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 68A-G; Lens Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens Decl., Ex. 6 40:14-20; Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7, 226:7-11, 249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.

Further, in particular here, this contention ignores the circumstances in which the actual Doctor Strange character first appears in Marvel's *Strange Tales*. *See supra* Response No. 71 *citing* Lens Decl., Ex. 60 at 3; Lens Decl., Ex. 57 at 4; Lens Decl., Ex. 27

at 3; Lens Decl., Ex. 33 at 3; Lens Decl., Ex. 14 at 8, 11; Thomas Decl. ¶¶ 12-13; Lens

Decl., Ex. 10 335:10-336:1; Lens Decl., Ex. 71 at 20:17-23:23; Lens Decl., Ex. 2 304:24-

305:6; Lens Decl., Ex. 25 at 25-28; Lens Decl., Ex. 63 at 18-19; Lens Decl., Ex. 80; Lens

Decl., Ex. 48 at 2; Lens Decl., Ex. 27 at 3; Lens Decl., Ex. 41 at 5; Lens Decl., Ex. 33 at 3;

Lens Decl., 83:13-18; Lens Decl., Ex. 31D at 24 –31H; Lens Decl., Ex. 34 at 3; Lens Decl.,

Ex. 37 at 5, 8; Thomas Decl. ¶ 15; Lens Decl., Ex. 26 at 3-7; Lens Decl., Ex. 40 at 5-8; Lens

Decl., Ex. 25 at 3; Lens Decl., Ex. 36 at 2.

Defendant's proffered evidence additionally does not support this contention.

Toberoff Exhibit 33 **does not suppor**t this contention, as there is no evidence that the sketch

of a man from the chest up contained therein is the Marvel character Doctor Strange.  The

only connection between the sketch and Doctor Strange is Defendant's belief that it depicts

the same character.  *See* Toberoff Ex. 59 62:7-12.  But Defendant admits that Ditko never

told him the sketch was supposed to be the Doctor Strange character; Defendant simply

"assumed it."  *Id.* 62:3-10.  As Roy Thomas observed, the sketch "looks like any number of

comic book magicians over the years imitating Mandrake going back to the '40s," adding

that "any character [Ditko] drew in a cloak and mustache would have a resemblance to

Doctor Strange and also to Mandrake the Magician and 100 other comic book magicians

that existed between 1940 and 1960."  Lens Opp. Decl., Ex. 84 303:14-304:19; *see also id.*

at 305:5-6 ("Almost every [comic book] company had a couple of magicians, many of them

with mustaches and capes.").

Regardless, this contention is **immaterial** because it has no bearing on the Court's

application of the work-made-for-hire test, as this Court's grant of summary judgment for

Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F.3d at

139-40 (relevant principles of the instance-and-expense test).  Indeed, as *Kirby* held,

"[q]uestions of who created the characters are mostly beside the point," but what matters is the hiring parties' "inducement, right to supervise, exercise of that right, and creative contribution with respect to" the works. *Kirby*, 726 F.3d at 142.

MCI also **objects** to the evidence cited in support of this contention. *See* MCI's Evidentiary Objection Nos. [33], [34], [39], & [54].

73.     **Lee acknowledged that Ditko was the originator of the character, which flowed from concepts Ditko had been playing with for years.** *See* Toberoff Decl. Ex. 1 at 121 (Evanier Rep. providing historical context of Lee's admission that Ditko originated the idea and story for the Dr. Strange character); Ex. 25 at DITKO-0308 (Ditko explaining that Dr. Strange was his creation and at one point, he was doing all the stories, writing, and art for it); Ex. 30 at 2021MARVEL-0050281 (Lee writing that Dr. Strange "'twas [Ditko's] idea," in a contemporaneous letter dated January 9, 1963).

**RESPONSE:  Disputed**, but **immaterial**.  While MCI does not dispute that Lee wrote that Doctor Strange "'twas Steve's idea," MCI **disputes** that Doctor Strange "flowed from concepts Ditko had been playing with for years," which is unsupported by any evidence.

Further, in particular here, this contention ignores the circumstances in which the actual Doctor Strange character first appears in Marvel's *Strange Tales*.  *See supra* Response No. 71 *citing* Lens Decl., Ex. 60 at 3; Lens Decl., Ex. 57 at 4; Lens Decl., Ex. 27 at 3; Lens Decl., Ex. 33 at 3; Lens Decl., Ex. 14 at 8, 11; Thomas Decl. ¶¶ 12-13; Lens Decl., Ex. 10 335:10-336:1; Lens Decl., Ex. 71 at 20:17-23:23; Lens Decl., Ex. 2 304:24-305:6; Lens Decl., Ex. 25 at 25-28; Lens Decl., Ex. 63 at 18-19; Lens Decl., Ex. 80; Lens Decl., Ex. 48 at 2; Lens Decl., Ex. 27 at 3; Lens Decl., Ex. 41 at 5; Lens Decl., Ex. 33 at 3; Lens Decl., 83:13-18; Lens Decl., Ex. 31D at 24 –31H; Lens Decl., Ex. 34 at 3; Lens Decl., Ex. 37 at 5, 8; Thomas Decl. ¶ 15; Lens Decl., Ex. 26 at 3-7; Lens Decl., Ex. 40 at 5-8; Lens Decl., Ex. 25 at 3; Lens Decl., Ex. 36 at 2.

Regardless, this contention is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for

Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F.3d at

139-40 (relevant principles of the instance-and-expense test).  Indeed, as *Kirby* held,

"[q]uestions of who created the characters are mostly beside the point," but what matters is

the hiring parties' "inducement, right to supervise, exercise of that right, and creative

contribution with respect to" the works.  *Kirby*, 726 F.3d at 142.

MCI also **objects** to Toberoff Exhibits 1 and 25.  *See* MTE Evanier [Dkt. 77];

MCI's Evidentiary Objection Nos. [1] & [34].

74.    **Ditko's early Dr. Strange sketches depict what would later become the character he created and sold to Magazine Management.**  *See* Toberoff Decl. Ex. 33 (Ditko's letter post-marked August 6, 1946 to his brother Patrick Ditko enclosing an early sketch of Dr. Strange); Ex. 49 at 1 (first published appearance of Dr. Strange in *Strange Tales* No. 110); Ex. 59 at 61:15-65:14 (Patrick Ditko, being shown composite Ex. 33 and testifying that his brother, Steve Ditko, sent him this letter in 1946, while Ditko was in military service abroad, enclosing Ditko's early sketch of Dr. Strange (Ex. 33) and that he had found Ex. 33 at his home amongst letters he had kept from his brother); Ex. 23 at 166:5-168:8 (Mark Ditko testifying that his father lived at the address written on the letter envelope of composite Ex. 33, and that, in 1946 (postmarked on the letter envelope), his uncle Ditko was in the military, stationed abroad in Germany).

**RESPONSE:  Disputed**, but **immaterial**.  Defendant has no admissible evidence

establishing that the sketch in Toberoff Exhibit 33 depicts the Marvel character Doctor

Strange, that Ditko "created" Doctor Strange, or "sold" it to Marvel.  MCI further **disputes**

Defendant's suggestion that Ditko "sold" his work to Marvel, which is not only an issue of

law but also inaccurate.  To the contrary, freelance contributors, including Ditko,

contributed to Marvel's comic books, including *Strange Tales*, pursuant to assignments

from Lee, who directed the creation of the Works, and they were compensated by Marvel on

an agreed per-page basis for completed assignments.  *See supra* Response No. 3, *citing* Lens

Decl., Ex. 2 152:1-154:7; Lens Decl., Ex. 12 56:12-15, 57:25-58:9, 58:14-23; Lens Decl.,

Ex. 7 217:13-21; Lens Decl., Ex. 13 41:20-42:9; Lens Decl., Ex. 10 383:18-21; Lens Decl.,

Ex. 6 38:8-21; Lens Decl., Ex. 48 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex. 54 at 4; Lens

Decl., Ex. 2 27:19-28:7, 56:2-57:7, 148:22-151:25, 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens Decl., Ex. 12 56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13 14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl., Ex. 2 17:8-18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 44:4-17; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-9, 93:23-94:5; Lens Decl., Ex. 2 80:24-81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15; Lens Decl., Ex. 4 125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens Decl., Ex. 13 30:11-14, 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 68A-G; Lens Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens Decl., Ex. 6 40:14-20; Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7, 226:7-11, 249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.

Further, in particular here, this contention ignores the circumstances in which the actual Doctor Strange character first appears in Marvel's *Strange Tales*. *See supra* Response No. 71 *citing* Lens Decl., Ex. 60 at 3; Lens Decl., Ex. 57 at 4; Lens Decl., Ex. 27 at 3; Lens Decl., Ex. 33 at 3; Lens Decl., Ex. 14 at 8, 11; Thomas Decl. ¶¶ 12-13; Lens Decl., Ex. 10 335:10-336:1; Lens Decl., Ex. 71 at 20:17-23:23; Lens Decl., Ex. 2 304:24-305:6; Lens Decl., Ex. 25 at 25-28; Lens Decl., Ex. 63 at 18-19; Lens Decl., Ex. 80; Lens Decl., Ex. 48 at 2; Lens Decl., Ex. 27 at 3; Lens Decl., Ex. 41 at 5; Lens Decl., Ex. 33 at 3; Lens Decl., 83:13-18; Lens Decl., Ex. 31D at 24 –31H; Lens Decl., Ex. 34 at 3; Lens Decl.,

Ex. 37 at 5, 8; Thomas Decl. ¶ 15; Lens Decl., Ex. 26 at 3-7; Lens Decl., Ex. 40 at 5-8; Lens

Decl., Ex. 25 at 3; Lens Decl., Ex. 36 at 2.

Regardless, this contention is **immaterial** because it has no bearing on the Court's

application of the work-made-for-hire test, as this Court's grant of summary judgment for

Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F.3d at

139-40 (relevant principles of the instance-and-expense test).  Indeed, as *Kirby* held,

"[q]uestions of who created the characters are mostly beside the point," but what matters is

the hiring parties' "inducement, right to supervise, exercise of that right, and creative

contribution with respect to" the works.  *Kirby*, 726 F.3d at 142.

MCI also **objects** to Toberoff Exhibits 23, 33, and 59.  *See* MCI's Evidentiary

Objection Nos. [33], [39], & [54].

75.     **Ditko plotted and drew completely "on spec" a five-page story introducing Dr. Strange, which he presented to Lee, which Magazine Management bought, and which was purportedly "published" by Vista.**  *See* Toberoff Decl. Ex. 1 at 21 (Evanier Rep. providing historical context of the first publication of Ditko's Dr. Strange character which began as a five-page story Ditko wrote and drew on spec introducing the character which he presented to Lee); Ex. 25 at DITKO-0308 (Ditko explaining that Dr. Strange was his creation and at one point, he was doing all the stories, writing, and art for it); *id*. at DITKO-0307 (Ditko explaining that Dr. Strange was a unique character who was a contradiction to Marvel's other superheroes and that the story started out as a five-page filler story); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script); Ex. 30 at 2021MARVEL-0050281 (Lee writing that Dr. Strange "'twas [Ditko's] idea," in a contemporaneous letter dated January 9, 1963 and noting the story was a "5-page filler"); Ex. 42 (Certificate of Renewal Registration of *Strange Tales* Vol. 1, No. 110, the issue in which Dr. Strange first appeared, dated December 27, 1991, claiming "Vista Publications, Inc." as the original author and copyright claimant); Ex. 50 at DETTWILER-0044-0058 (Don Heck's payment records identifying "Magazine Management" as the only entity that paid him for his freelance material in the Period); Ex. 57 at 2 (Ditko writing that Dr. Strange started out as a "5-page filler," which was a great opportunity to try out all kinds of ideas like Dr. Strange, which "never fit in to Marvel's world of heroes"); Ex. 33 (Ditko's letter post-marked August 6, 1946 to his brother Patrick Ditko enclosing an early sketch of Dr. Strange); Ex. 59 at 61:15-65:14 (Patrick Ditko, being shown composite Ex. 33 and testifying that his brother, Steve Ditko, sent him this letter in 1946, while Ditko was in military service abroad, enclosing Ditko's early sketch of Dr. Strange (Ex. 33) and that he had found Ex. 33 at his home amongst letters he had kept from his brother); Ex. 23 at 166:5-168:8 (Mark Ditko testifying that his father lived at the address written on

the letter envelope of composite Ex. 33, and that, in 1946 (postmarked on the letter envelope), his uncle Ditko was in the military, stationed abroad in Germany).

> **RESPONSE:  Disputed**.  MCI **disputes** that Ditko plotted and drew the first Doctor
>
> Strange story "on spec."  MCI further **disputes** Defendant's contention that Marvel
>
> "bought" Ditko's work, which is not only an issue of law but also inaccurate.  To the
>
> contrary, freelance contributors, including Ditko, contributed to Marvel's comic books,
>
> including *Strange Tales*, pursuant to assignments from Lee, who directed the creation of the
>
> Works, and they were compensated by Marvel on an agreed per-page basis for completed
>
> assignments.  *See supra* Response No. 3, *citing* Lens Decl., Ex. 2 152:1-154:7; Lens Decl.,
>
> Ex. 12 56:12-15, 57:25-58:9, 58:14-23; Lens Decl., Ex. 7 217:13-21; Lens Decl., Ex. 13
>
> 41:20-42:9; Lens Decl., Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21; Lens Decl., Ex. 48 at
>
> 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2 27:19-28:7, 56:2-57:7,
>
> 148:22-151:25, 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens Decl., Ex. 12 56:16-
>
> 18, 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15 16:8-19;
>
> Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13 14:5-8, 23:18-21; Lens
>
> Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-10, 224:15-23, 241:25-
>
> 242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl., Ex. 2 17:8-18:13, 24:17-23, 37:10-
>
> 39:6; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 44:4-17; Lens Decl., Ex. 13 16:3-
>
> 19; Lens Decl., Ex. 4 97:7-9, 93:23-94:5; Lens Decl., Ex. 2 80:24-81:12; 125:18-126:1;
>
> Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:19-
>
> 125:4,124:3-18; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Lens
>
> Decl., Ex. 2 141:25-142:15; Lens Decl., Ex. 4 125:15-18; Lens Decl., Ex. 2 292:18-293:4,
>
> 332:23-333:4; Lens Decl., Ex. 13 30:11-14, 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl.,
>
> Ex. 57 at 3; Lens Decl., Ex. 68A-G; Lens Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-

10; Lens Decl., Ex. 6 40:14-20; Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7, 226:7-11, 249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.

   Further, in particular here, this contention ignores the circumstances in which the actual Doctor Strange character first appears in Marvel's *Strange Tales*. *See supra* Response No. 71 *citing* Lens Decl., Ex. 60 at 3; Lens Decl., Ex. 57 at 4; Lens Decl., Ex. 27 at 3; Lens Decl., Ex. 33 at 3; Lens Decl., Ex. 14 at 8, 11; Thomas Decl. ¶¶ 12-13; Lens Decl., Ex. 10 335:10-336:1; Lens Decl., Ex. 71 at 20:17-23:23; Lens Decl., Ex. 2 304:24-305:6; Lens Decl., Ex. 25 at 25-28; Lens Decl., Ex. 63 at 18-19; Lens Decl., Ex. 80; Lens Decl., Ex. 48 at 2; Lens Decl., Ex. 27 at 3; Lens Decl., Ex. 41 at 5; Lens Decl., Ex. 33 at 3; Lens Decl., 83:13-18; Lens Decl., Ex. 31D at 24 –31H; Lens Decl., Ex. 34 at 3; Lens Decl., Ex. 37 at 5, 8; Thomas Decl. ¶ 15; Lens Decl., Ex. 26 at 3-7; Lens Decl., Ex. 40 at 5-8; Lens Decl., Ex. 25 at 3; Lens Decl., Ex. 36 at 2.

   Further, MCI **disputes** Defendant's contention that the first Doctor Strange story was "purportedly 'published' by Vista"—there is no dispute that the story was published by Vista Publications, and Defendant cites no evidence to support this contention. *See* Lens Decl., Ex. 31D at 25 ("STRANGE TALES is published by VISTA PUBLICATIONS INC. OFFICE OF PUBLICATION: 655 MADISON AVENUE, NEW YORK, N.Y. SECOND CLASS POSTAGE PAID AT NEW YORK, N.Y. and at MERIDEN, CONN. Published monthly. Copyright 1963 by VISTA PUBLICATIONS, INC. 655 Madison Avenue, New York, N.Y. Vol. 1, No. 110, July 1963 issue").

   MCI also **objects** to Toberoff Exhibits 1, 23, 25, 27, 33, 57, and 59. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [33], [34], [35], [39], [52], & [54].

76.    **The world of Dr. Strange was strikingly different from other "Marvel" series of the time but Lee liked it and bought it and many more tales of Ditko's Dr. Strange followed.** *See* Toberoff Decl. Ex. 1 at 21 (Evanier Rep. providing historical context of Dr. Strange as a character very different than any other character Marvel was publishing at the time); Ex. 25 at DITKO-0307 (Ditko explaining that Dr. Strange was a unique character who was a contradiction to Marvel's other superheroes); Ex. 30 at 2021MARVEL-0050281 (Lee writing that Dr. Strange "'twas Steve[] [Ditko's] idea," in a letter dated January 9, 1963; Ex. 57 at 2 (Ditko writing that Dr. Strange started out as a "5-page filler," which was a great opportunity to try out all kinds of ideas like Dr. Strange, which "never fit in to Marvel's world of heroes").

> **RESPONSE:  Disputed**, but **immaterial**.  While MCI does not dispute that Lee liked
>
> Ditko's work on Doctor Strange, resulting in more assignments for Ditko from Lee to
>
> develop the character in *Strange Tales*, MCI **disputes** Defendant's suggestion that Marvel
>
> "bought" work "on spec," which is not only an issue of law but also inaccurate.  To the
>
> contrary, Ditko contributed to Marvel's comic books, including *Strange Tales*, pursuant to
>
> assignments from Lee, who directed the creation of the Works, he was compensated by
>
> Marvel on an agreed per-page basis for completed assignments.  *See supra* Response No. 3,
>
> *citing* Lens Decl., Ex. 2 152:1-154:7; Lens Decl., Ex. 12 56:12-15, 57:25-58:9, 58:14-23;
>
> Lens Decl., Ex. 7 217:13-21; Lens Decl., Ex. 13 41:20-42:9; Lens Decl., Ex. 10 383:18-21;
>
> Lens Decl., Ex. 6 38:8-21; Lens Decl., Ex. 48 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex.
>
> 54 at 4; Lens Decl., Ex. 2 27:19-28:7, 56:2-57:7, 148:22-151:25, 88:17-89:13, 131:8-19,
>
> 145:23-148:20, 164:3-9; Lens Decl., Ex. 12 56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens
>
> Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex.
>
> 53 at 2; Lens Decl., Ex. 13 14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24,
>
> 139:17-140:2, 140:8-11, 224:5-10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8,
>
> 110:21-24; Lens Decl., Ex. 2 17:8-18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12 67:16-
>
> 68:6; Lens Decl., Ex. 13 44:4-17; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-9,
>
> 93:23-94:5; Lens Decl., Ex. 2 80:24-81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-220:11;
>
> Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18; Thomas Decl. ¶¶ 7-8;

Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15; Lens

Decl., Ex. 4 125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens Decl., Ex. 13

30:11-14, 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 68A-

G; Lens Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens Decl., Ex. 6 40:14-20;

Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7, 226:7-11,

249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.

  Further, in particular here, this contention ignores the circumstances in which the

actual Doctor Strange character first appears in Marvel's *Strange Tales*.  *See supra*

Response No. 71 *citing* Lens Decl., Ex. 60 at 3; Lens Decl., Ex. 57 at 4; Lens Decl., Ex. 27

at 3; Lens Decl., Ex. 33 at 3; Lens Decl., Ex. 14 at 8, 11; Thomas Decl. ¶¶ 12-13; Lens

Decl., Ex. 10 335:10-336:1; Lens Decl., Ex. 71 at 20:17-23:23; Lens Decl., Ex. 2 304:24-

305:6; Lens Decl., Ex. 25 at 25-28; Lens Decl., Ex. 63 at 18-19; Lens Decl., Ex. 80; Lens

Decl., Ex. 48 at 2; Lens Decl., Ex. 27 at 3; Lens Decl., Ex. 41 at 5; Lens Decl., Ex. 33 at 3;

Lens Decl., 83:13-18; Lens Decl., Ex. 31D at 24 –31H; Lens Decl., Ex. 34 at 3; Lens Decl.,

Ex. 37 at 5, 8; Thomas Decl. ¶ 15; Lens Decl., Ex. 26 at 3-7; Lens Decl., Ex. 40 at 5-8; Lens

Decl., Ex. 25 at 3; Lens Decl., Ex. 36 at 2.

  Additionally, Defendant has **no admissible evidence** to support the contention that

Doctor Strange was "strikingly different" than other Marvel comics at the time.  Indeed,

Defendant ignores that magicians, like Doctor Strange, were common to comics at the time.

*See* Lens Decl., Ex. 2 304:24-305:6 (Thomas discussing the large number of "comic book

magicians" that "were all imitating the comic strip character Mandrake," and noting that

"[a]lmost every company had a couple of magicians, many of them with mustaches and

capes"); Lens Decl., Ex. 37 at 8 (Thomas remarking that, "[s]ince the 1920s American

movies, radio, comics, and the pulps had seated the Orient as the center of mysticism, and Marvel was no exception, with its first two sorcerers Strange and D[r]oom").

Regardless, this contention is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test). Indeed, as *Kirby* held, "[q]uestions of who created the characters are mostly beside the point," but what matters is the hiring parties' "inducement, right to supervise, exercise of that right, and creative contribution with respect to" the works. *Kirby*, 726 F.3d at 142.

MCI also **objects** to Toberoff Exhibits 1, 25, and 57. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [34] & [52].

77.    **Ditko was selling work to other publishers, including Charlton Comics, at the same time as selling to Marvel.** *See* Toberoff Decl. Ex. 1 at 21 (Evanier Rep. describing Ditko's common practice of selling freelance work to various publishers during the Period); Ex. 12 ¶ 18 (Evanier attesting that Ditko was submitting freelance *Spider-Man* material to Marvel but was also selling work to Charlton Comics at the same time); Ex. 23 at 160:2-8 (Mark Ditko testifying that Ditko was selling work to both Marvel and Charlton Comics in the 1960s); Ex. 35 at DITKO-0199 (Ditko writing about his work at Charlton Comics in the 1960s); Ex. 57 at 2 (Ditko writing about creating material for Charlton Comics and DC Comics).

**RESPONSE:  Disputed**, but **immaterial**.  MCI **disputes** Defendant's suggestion that Ditko was "selling" work "on spec" to Marvel, which is not only an issue of law but also inaccurate.  To the contrary, Ditko contributed to Marvel's comic books pursuant to assignments from Lee, who directed the creation of the Works, and he was compensated by Marvel on an agreed per-page basis for completed assignments.  *See supra* Response No. 3, *citing* Lens Decl., Ex. 2 152:1-154:7; Lens Decl., Ex. 12 56:12-15, 57:25-58:9, 58:14-23; Lens Decl., Ex. 7 217:13-21; Lens Decl., Ex. 13 41:20-42:9; Lens Decl., Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21; Lens Decl., Ex. 48 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex.

54 at 4; Lens Decl., Ex. 2 27:19-28:7, 56:2-57:7, 148:22-151:25, 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens Decl., Ex. 12 56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13 14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl., Ex. 2 17:8-18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 44:4-17; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-9, 93:23-94:5; Lens Decl., Ex. 2 80:24-81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15; Lens Decl., Ex. 4 125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens Decl., Ex. 13 30:11-14, 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 68A-G; Lens Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens Decl., Ex. 6 40:14-20; Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7, 226:7-11, 249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.

Further, this contention ignores that during the relevant time period Ditko worked nearly exclusively for Marvel. *See supra* Response No. 38, *citing* Thomas Decl. ¶¶ 16-17; Lens Decl., Ex. 25; Lens Decl., Ex. 15 19:1-10; Lens Decl., Ex. 2 144:22-145:22; Lens Decl., Ex. 2 316:1-10; Lens Decl., Ex. 72 at 4; Lens Decl., Ex. 73 at 3.

That said, MCI does not dispute that Ditko was able to work for other publishers while working for Marvel (provided it did not draw upon Marvel's pre-existing intellectual property). Indeed, at times, Ditko chose to work for Wally Wood's "Witzend" magazine, as Witzend was different from Marvel in that Ditko would be considered the copyright author of his work. *See supra* Response No. 5, *citing* Lens Decl., Ex. 23A at 2; Lens Decl., Ex. 57

at 3; Lens Decl., Ex. 52 at 3; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 50 at 3; Lens Decl. Ex.

56 at 2; Lens Decl., Ex. 61 at 3; Lens Decl., Ex. 49 at 2; Lens Decl., Ex. 60 at 3; Lens Decl.,

Ex. 51 at 3; Lens Decl., Ex. 61 at 2; Lens Decl., Ex. 44 at 4.

      Regardless, this contention is **immaterial** because it does not change that Ditko

had a close and continuous working relationship with Marvel, precisely as Kirby did. *See*

*Kirby*, 726 F.3d at 126 (explaining that "Kirby and Marvel were closely affiliated during the

relevant time period . . . Although . . . [Kirby] could and did produce and sell work to other

publishers . . . the vast majority of his published works in that time frame was published by

Marvel"); *id.* at 141 ("Kirby's works during this period were hardly self-directed projects in

which he hoped Marvel, as one of several potential publishers, might have an interest;

rather, he created the relevant works pursuant to Marvel's assignment or with Marvel

specifically in mind. Kirby's ongoing partnership with Marvel . . . is therefore what induced

Kirby's creation of the works."); *see also id.* at 139-40 (relevant principles of the instance-

and-expense test).

      MCI also **objects** to the evidence cited in support of this contention. *See* MTE

Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [15], [32], [41] & [52].

78. **Ditko thereafter created a host of supporting characters and an entire
mythology of Dr. Strange before he stopped selling his works to Magazine Management in
1966.** *See* Toberoff Decl. Ex. 1 at 21 (Evanier Rep. providing historical context of Dr. Strange and
Ditko's role in creating numerous supporting characters before he stopped selling work to Marvel
in 1966); Ex. 25 at DITKO-0308 (Ditko explaining that Dr. Strange was his creation and at one
point, he was doing all the stories, writing, and art for it); Ex. 26 at 83 (Lee writing concerning Dr.
Strange, "Steve Ditko is one of the best plot men in the biz. When it comes to dreaming up story
ideas, putting them together intricately, panel by panel, and utilizing the best of cinematic
techniques, the guy's a whiz. Thus, the spectacular saga that is about to knock you out was
basically concocted by our own Mr. D[itko]"); *id.* (Lee writing concerning *Dr. Strange*, "After
[Ditko] did the hard part—after he dreamed up the story and illustrated it in his own unique style—I
then got to the fun part … the dialog balloons and captions").

**RESPONSE:  Disputed**, but **immaterial**.  While MCI does not dispute that Ditko helped create the mythology and supporting characters for Doctor Strange, as it was his job to do, MCI **disputes** Defendant's suggestion that Ditko alone created the mythology and supporting characters and that Ditko was "selling" the Works to Marvel "on spec."  To the contrary, Ditko contributed to Marvel's comic books, including *Strange Tales*, pursuant to assignments from Lee, who directed the creation of the Works, and he was compensated by Marvel on an agreed per-page basis for completed assignments.  *See supra* Response No. 3, *citing* Lens Decl., Ex. 2 152:1-154:7; Lens Decl., Ex. 12 56:12-15, 57:25-58:9, 58:14-23; Lens Decl., Ex. 7 217:13-21; Lens Decl., Ex. 13 41:20-42:9; Lens Decl., Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21; Lens Decl., Ex. 48 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2 27:19-28:7, 56:2-57:7, 148:22-151:25, 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens Decl., Ex. 12 56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13 14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl., Ex. 2 17:8-18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 44:4-17; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-9, 93:23-94:5; Lens Decl., Ex. 2 80:24-81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15; Lens Decl., Ex. 4 125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens Decl., Ex. 13 30:11-14, 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 68A-G; Lens Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens Decl., Ex. 6 40:14-20;

Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7, 226:7-11, 249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.

Further, in particular here, this contention ignores the circumstances in which the actual Doctor Strange character first appears in Marvel's *Strange Tales*. *See supra* Response No. 71 *citing* Lens Decl., Ex. 60 at 3; Lens Decl., Ex. 57 at 4; Lens Decl., Ex. 27 at 3; Lens Decl., Ex. 33 at 3; Lens Decl., Ex. 14 at 8, 11; Thomas Decl. ¶¶ 12-13; Lens Decl., Ex. 10 335:10-336:1; Lens Decl., Ex. 71 at 20:17-23:23; Lens Decl., Ex. 2 304:24-305:6; Lens Decl., Ex. 25 at 25-28; Lens Decl., Ex. 63 at 18-19; Lens Decl., Ex. 80; Lens Decl., Ex. 48 at 2; Lens Decl., Ex. 27 at 3; Lens Decl., Ex. 41 at 5; Lens Decl., Ex. 33 at 3; Lens Decl., 83:13-18; Lens Decl., Ex. 31D at 24 –31H; Lens Decl., Ex. 34 at 3; Lens Decl., Ex. 37 at 5, 8; Thomas Decl. ¶ 15; Lens Decl., Ex. 26 at 3-7; Lens Decl., Ex. 40 at 5-8; Lens Decl., Ex. 25 at 3; Lens Decl., Ex. 36 at 2.

Further, this contention ignores that it was part of an artist's assignment to populate stories with supporting characters, subject to Marvel's ultimate authority. *See supra* Response No. 40, *citing* Lens Decl., Ex. 13 54:16-56:9, 72:21- 73:23, 79:3-19; Lens Decl., Ex. 12 55:4-15, 65:13-66:7.

Additionally, Toberoff Exhibit 26 **does not support** this contention, as it specifically references only Ditko's work on *Spider-Man Annual #2*, a one-off special annual issue otherwise unconnected to the Spider-Man or Doctor Strange stories Ditko and Lee worked on.

Further, while the date itself is **immaterial** because it will not "affect the outcome of the suit under the governing law," *Kinsella*, 320 F.3d 309 at 311, MCI **disputes** that Ditko left Marvel in 1966 rather than late 1965, and Defendant's evidence is ambiguous, at

best, regarding the relevant date.  *See supra* Response No. 53, *citing* Lens Opp. Decl., Ex.

84 311:13; Toberoff Ex. 17 92:9-20; Lens Decl., Ex. 39 at 5.

Regardless, this contention is **immaterial** because it has no bearing on the Court's

application of the work-made-for-hire test, as this Court's grant of summary judgment for

Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F.3d at

139-40 (relevant principles of the instance-and-expense test).  Indeed, as *Kirby* held,

"[q]uestions of who created the characters are mostly beside the point," but what matters is

the hiring parties' "inducement, right to supervise, exercise of that right, and creative

contribution with respect to" the works.  *Kirby*, 726 F.3d at 142.

MCI also **objects** to Toberoff Exhibits 1 and 25.  *See* MTE Evanier [Dkt. 77];

MCI's Evidentiary Objection Nos. [1] & [34].

79.    **In 1962, as Magazine Management cast about for new superhero ideas, Jack Kirby and Lee worked on a character named "Spider-Man," which Kirby said was based on an idea that he had developed with Joe Simon in the mid-1950s.**  *See* Toberoff Decl. Ex. 1 at 20 (Evanier Rep. providing historical context of Spider-Man's creation and describing Kirby and Lee's initial work on a character named "Spider-Man" that was based on an idea developed by Joe Simon in the mid-1950s); Ex. 3 at 112:7-113:7 (Romita testifying that Kirby did some initial Spider-Man drawings but Lee did not like them and went with Ditko's version of the character); Ex. 4 at 37:3-19 (Lee testifying that he did not like Kirby's version of Spider-Man, he liked Ditko's); Ex. 29 at 33-34 (Ditko writing that the Spider-Man character that Lee and Kirby had originally worked up was a version of "The Fly" character created by Joe Simon).

**RESPONSE:  Disputed**, but **immaterial** in part.  While MCI does not dispute that Lee

initially assigned Kirby to do artwork for Spider-Man in 1962, MCI **disputes** that the

character was based on a 1950s idea by Kirby and Joe Simon.  *See* Lens Decl., Ex. 48 at 5

(Ditko writing that "[t]he first complete Spider-Man adventure, containing the legend and

story, was published in Amazing Fantasy #15, from Stan's synopsis"); Lens Decl., Ex. 46 at

3 (Ditko recounting that Lee "create[ed] the Spider-Man name" and provided him with a "1

or 2 page synopsis" for the first story); Lens Decl., Ex. 13 74:6-75:5 (Lee testifying about

"dreaming up" the idea for Spider-Man and his superpower); Lens Decl., Ex. 10 335:10-

336:11 (Lee testifying that he "came up with Spider-Man," among other "main characters"

that featured in Marvel's comics, and that he would tell artists "how [he] wanted them

done"); Lens Decl., Ex. 71 at 3:25-6:09 (Lee explaining how Marvel's basic "formula" was

to "mix fantasy with realism," creating characters that "are a little different . . . sort of like

continuing soap operas"); Lens Decl., Ex. 71 at 3:25-6:09 (Lee explaining how Spider-Man,

like other Marvel characters, "juxtapos[ed] . . . bigger-than-life problem[s]" with "the very

simple home life and family life"); Lens Decl., Ex. 28; *see also* Lens Decl., Ex. 14 at 8, 15.

Regardless, this contention is **immaterial** because it has no bearing on the Court's

application of the work-made-for-hire test, as this Court's grant of summary judgment for

Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F.3d at

139-40 (relevant principles of the instance-and-expense test).  Indeed, the *Kirby* court held

that Kirby's contributions to Spider-Man were done on a work-made-for-hire basis, like all

his other work for Marvel.  *See Kirby*, 726 F.3d at 143 ("[T]he district court made no error,

in our view, in determining as a matter of law that the works [(including Kirby's alleged

contributions to Spider-Man)] were made at Marvel's instance and expense").

MCI also **objects** to Toberoff Exhibits 1, 3, and 29.  *See* MTE Evanier [Dkt. 77];

MCI's Evidentiary Objection No. [1], [6], & [36].

80.    **At some point, it was decided to toss their early development of a character by
that name and start over in a brand-new direction.**  *See* Toberoff Decl. Ex. 1 at 20 (Evanier
Rep. providing historical context of Spider-Man's creation and describing the decision to go in a
direction with the character different from Kirby and Lee's initial character based on the one
developed by Joe Simon in the mid-1950s); Ex. 3 at 112:7-113:7 (Romita testifying that Kirby did
some initial Spider-Man drawings but Lee did not like them and went with Ditko's version of the
character); Ex. 4 at 37:3-19 (Lee testifying that he did not like Kirby's version of Spider-Man, he
liked Ditko's); Ex. 29 at 34-35 (Ditko writing that the initial Kirby Spider-Man idea was tossed and
Ditko created a brand new Spider-Man).

**RESPONSE:  Disputed**, but **immaterial**.  While MCI does not dispute that Lee exercised his editorial discretion to reassign the Spider-Man assignment from Kirby to Ditko, MCI **disputes** that the character went in a "brand-new direction."  *See* Lens Decl., Ex. 13 37:3-38:3 (Lee testifying that he initially "wanted Jack [Kirby] to do" the Spider-Man comic and "gave it to him" with the admonition that he "d[id]n't want this guy to be too heroic-looking"—but Kirby's penciled drawings "looked still a bit too heroic" for Lee "even though [Kirby] tried to nerd him up," so he "gave it to Steve Ditko" instead whose "style was really more really what Spider-Man should have been"); Lens Decl., Ex. 13 334:14-18 (Lee testifying that "it was me who said, 'I want to do a strip called Spider-Man,' and I hired Jack, and I didn't like it, and then I hired Ditko."); Lens Decl., Ex. 48 at 5 (Ditko writing that he "penciled and inked the first [Spider-Man] cover after [he] inked first story" but that "Stan rejected [his] cover" and "had Jack pencil a second, replacement cover" that "became the first published cover"); Lens Decl., Ex. 47 at 2 (Ditko admitting that "it became *publicly known and shown* that I had *previously* penciled and inked a *first* S[pider]-m[an] cover that Stan rejected"); Lens Decl., Ex. 30 at 2 ("*Amazing Fantasy* #15 unused cover art by Steve Ditko"); *see also* Lens Decl., Ex. 10 376:3-15; Lens Decl., Ex. 48 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 28; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 61 at 4; Lens Decl., Ex. 49 at 3; Thomas Decl. ¶ 21.

Regardless, this contention is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).  Indeed, the *Kirby* court held that Kirby's contributions to Spider-Man were done on a work-made-for-hire basis, like all his other work for Marvel.  *See Kirby*, 726 F.3d at 143 ("[T]he district court made no error,

in our view, in determining as a matter of law that the works [(including Kirby's alleged contributions to Spider-Man)] were made at Marvel's instance and expense").

MCI also **objects** to Toberoff Exhibits 1 and 3.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1] & [6].

81.    **Kirby insisted he was never paid for the pages he had drawn of that first version that was rejected by "Marvel."**  *See* Toberoff Decl. Ex. 1 at 20 (Evanier Rep. providing historical context of Spider-Man's creation and noting Kirby's insistence that he was not paid for his initial work on Spider-Man).

**RESPONSE:  Disputed**, but **immaterial**.  Defendant has no admissible evidence establishing this contention.  Consistent with Marvel's established practices, Kirby would have been paid his agreed per-page rate for his completed assignments for Marvel, even if the pages were not used for publication.  *See supra* Response No. 43, *citing* Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 13 18:6-16; Lens Decl., Ex. 10 376:16-22; Lens Decl., Ex. 9 30:10-12; Lens Decl., Ex. 68A-G; Lens Decl., Ex. 35 at 9, 12; Lens Decl., Ex. 68D at 10; Lens Decl., Ex. 2 158:17-20, 297:14-20; Lens Decl., Ex. 12 68:24-69:6, 74:19-25.

Regardless, this contention is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).  Indeed, the *Kirby* court held that Kirby's contributions to Spider-Man were done on a work-made-for-hire basis, like all his other work for Marvel.  *See Kirby*, 726 F.3d at 143 ("[T]he district court made no error, in our view, in determining as a matter of law that the works [(including Kirby's alleged contributions to Spider-Man)] were made at Marvel's instance and expense").

MCI also **objects** to the evidence cited in support of this contention.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection No. [1].

82.    **Ditko then devised a new costume, and a new direction was charted for a very different Spider-Man character.**  *See* Toberoff Decl. Ex. 1 at 20 (Evanier Rep. providing historical context of Spider-Man's creation and describing Ditko's creation of a very different costume and direction for the character); Ex. 3 at 112:7-113:7 (Romita testifying that Kirby did some initial Spider-Man drawings but Lee did not like them and went with Ditko's version of the Spider-Man character); Ex. 4 at 37:3-19 (Lee testifying that he did not like Kirby's version of Spider-Man, he liked Ditko's); Ex. 28 (Lee writing that Ditko was the co-creator of Spider-Man); Ex. 29 at 34-35 (Ditko writing that the initial Kirby Spider-Man idea was tossed and Ditko created a brand new Spider-Man).

**RESPONSE:**  **Disputed**, but **immaterial**.  While MCI does not dispute that Lee asked

Kirby to draw a Spider-Man that differed in some respects from that which Kirby had

drawn, MCI **disputes** the characterization of them as being "very different" and that a "new

direction was charted for a very different Spider-Man character."  *See supra* Response No.

80, *citing* Lens Decl., Ex. 13 37:3-38:3, 334:14-18; Lens Decl., Ex. 48 at 3, 5; Lens Decl.,

Ex. 47 at 2; Lens Decl., Ex. 30 at 2; Lens Decl., Ex. 10 376:3-15; Lens Decl., Ex. 54 at 4;

Lens Decl., Ex. 28; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 61 at 4; Lens Decl., Ex. 49 at 3;

Thomas Decl. ¶ 21.

Regardless, this contention is **immaterial** because it has no bearing on the Court's

application of the work-made-for-hire test, as this Court's grant of summary judgment for

Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F.3d at

139-40 (relevant principles of the instance-and-expense test).  Indeed, as *Kirby* held,

"[q]uestions of who created the characters are mostly beside the point," because "the hired

party's ingenuity and acumen are a substantial reason for the hiring party to have enlisted

him."  *Kirby*, 726 F.3d at 142.  What matters is the hiring parties' "inducement, right to

supervise, exercise of that right, and creative contribution with respect to" the works.  *Id*.

Moreover, the *Kirby* court held that Kirby's contributions to Spider-Man were done on a

work-made-for-hire basis, like all his other work for Marvel.  *See Kirby*, 726 F.3d at 143

("[T]he district court made no error, in our view, in determining as a matter of law that the

works [(including Kirby's alleged contributions to Spider-Man)] were made at Marvel's

instance and expense").

MCI also **objects** to Toberoff Exhibits 1, 3, and 29.  *See* MTE Evanier [Dkt. 77];

MCI's Evidentiary Objection Nos. [1], [3], & [36].

83.    **Ditko's conception of the character and Kirby's of Spider-Man were very
different.**  *See* Toberoff Decl. Ex. 3 at 112:7-113:7 (Romita testifying that Kirby did some initial
Spider-Man drawings but Lee did not like them and went with Ditko's version of the character); Ex.
4 at 37:3-19 (Lee testifying that he did not like Kirby's version of Spider-Man, he liked Ditko's);
Ex. 29 at 34 (Ditko comparison depiction of Kirby's and Ditko's versions of the Spider-Man
character).

**RESPONSE:  Disputed**, but **immaterial**.  While MCI does not dispute that Ditko and

Kirby each drew the Spider-Man character differently in certain aspects, MCI **disputes**

Defendants' characterization of them as being "very different."  *See supra* Response No. 80,

*citing* Lens Decl., Ex. 13 37:3-38:3, 334:14-18; Lens Decl., Ex. 48 at 3, 5; Lens Decl., Ex.

47 at 2; Lens Decl., Ex. 30 at 2; Lens Decl., Ex. 10 376:3-15; Lens Decl., Ex. 54 at 4; Lens

Decl., Ex. 28; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 61 at 4; Lens Decl., Ex. 49 at 3;

Thomas Decl. ¶ 21.

Regardless, this contention is **immaterial** because it has no bearing on the Court's

application of the work-made-for-hire test, as this Court's grant of summary judgment for

Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F.3d at

139-40 (relevant principles of the instance-and-expense test).  Indeed, as *Kirby* held,

"[q]uestions of who created the characters are mostly beside the point," because "the hired

party's ingenuity and acumen are a substantial reason for the hiring party to have enlisted

him."  *Kirby*, 726 F.3d at 142.  What matters is the hiring parties' "inducement, right to

supervise, exercise of that right, and creative contribution with respect to" the works.  *Id*.

Moreover, the *Kirby* court held that Kirby's contributions to Spider-Man were done on a

work-made-for-hire basis, like all his other work for Marvel. *See Kirby*, 726 F.3d at 143

("[T]he district court made no error, in our view, in determining as a matter of law that the

works [(including Kirby's alleged contributions to Spider-Man)] were made at Marvel's

instance and expense").

      MCI also **objects** to Toberoff Exhibits 3 and 29. *See* MCI's Evidentiary Objection

Nos. [6] & [36].

84.     **Ditko wrote on several occasions that the character and stories were all worked out without Lee ever writing an actual script.** *See* Toberoff Decl. Ex. 1 at 20 (Evanier Rep. providing historical context of Spider-Man's creation and describing Ditko's insistence that the character was worked out with Lee ever writing a script); Ex. 28 (Lee writing that Ditko was co-creator of Spider-Man and that Ditko did most of the story plotting of *Spider-Man* and just left Lee to do the dialogue and captions).

    **RESPONSE:** **Disputed**, but **immaterial**. While MCI does not dispute that Lee did not

provide Ditko with full written scripts of Spider-Man stories from which to draw, MCI

**disputes** this contention to the extent that Defendant is suggesting that Ditko did not work

on Spider-Man pursuant to assignments from Lee. To the contrary, Ditko contributed to

Marvel's comic books, including *Amazing Fantasy* and *Amazing Spider-Man*, pursuant to

assignments from Lee, who directed the creation of the Works, and he was compensated by

Marvel on an agreed per-page basis for completed assignments. *See supra* Response No. 3,

*citing* Lens Decl., Ex. 2 152:1-154:7; Lens Decl., Ex. 12 56:12-15, 57:25-58:9, 58:14-23;

Lens Decl., Ex. 7 217:13-21; Lens Decl., Ex. 13 41:20-42:9; Lens Decl., Ex. 10 383:18-21;

Lens Decl., Ex. 6 38:8-21; Lens Decl., Ex. 48 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex.

54 at 4; Lens Decl., Ex. 2 27:19-28:7, 56:2-57:7, 148:22-151:25, 88:17-89:13, 131:8-19,

145:23-148:20, 164:3-9; Lens Decl., Ex. 12 56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens

Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex.

53 at 2; Lens Decl., Ex. 13 14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24,

139:17-140:2, 140:8-11, 224:5-10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8,

110:21-24; Lens Decl., Ex. 2 17:8-18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12 67:16-

68:6; Lens Decl., Ex. 13 44:4-17; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-9,

93:23-94:5; Lens Decl., Ex. 2 80:24-81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-220:11;

Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18; Thomas Decl. ¶¶ 7-8;

Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15; Lens

Decl., Ex. 4 125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens Decl., Ex. 13

30:11-14, 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 68A-

G; Lens Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens Decl., Ex. 6 40:14-20;

Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7, 226:7-11,

249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.

   Further, in particular here, this contention ignores the circumstances in which

Spider-Man first appears in *Amazing Fantasy* No. 15. *See supra* Response No. 80, *citing*

Lens Decl., Ex. 13 37:3-38:3, 334:14-18; Lens Decl., Ex. 48 at 3, 5; Lens Decl., Ex. 47 at 2;

Lens Decl., Ex. 30 at 2; Lens Decl., Ex. 10 376:3-15; Lens Decl., Ex. 54 at 4; Lens Decl.,

Ex. 28; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 61 at 4; Lens Decl., Ex. 49 at 3; Thomas

Decl. ¶ 21.   Additionally, Toberoff Exhibit 28 **does not support** this contention, as it refers

to Lee crediting Ditko for "*eventually* d[oing] most of the plotting . . . as the strip continued

to increase in popularity," when Lee, using his editorial discretion, afforded Ditko greater

creative input on the Spider-Man comics, subject to Marvel's ultimate authority.

   Regardless, this contention is **immaterial** because it has no bearing on the Court's

application of the work-made-for-hire test, as this Court's grant of summary judgment for

Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 726 F.3d at

126 (quoting Lee's testimony that "Lee would provide the artist with a 'brief outline' or

'synopsis' of an issue; sometimes he would 'just talk ... with the artist' about ideas … and [t]he artist would then 'draw it any way they wanted to'" and nevertheless affirming grant of summary judgment in Marvel's favor).  Moreover, the *Kirby* court held that Kirby's contributions to Spider-Man were done on a work-made-for-hire basis, like all his other work for Marvel.  *See Kirby*, 726 F.3d at 143 ("[T]he district court made no error, in our view, in determining as a matter of law that the works [(including Kirby's alleged contributions to Spider-Man)] were made at Marvel's instance and expense").

MCI also **objects** to Toberoff Exhibit 1.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection No. [1].

85.     **That first *Spider-Man* story introduced not only Peter Parker (aka Spider-Man) but also his Aunt May and a rival at school, Flash Thompson—the first two members of what would eventually grow into a large supporting cast of friends and foes.**  *See* Toberoff Decl. Ex. 1 at 20 (Evanier Rep. providing historical context of Spider-Man's creation and identifying the characters introduced in the first several dozen issues of the *Spider-Man* story done by Ditko); Ex. 60 (*Amazing Fantasy* No. 15 introducing Spider-Man, Aunt May, and Flash Thompson).

**RESPONSE:  Undisputed**, but **immaterial**.  Further, this paragraph ignores that it was part of an artist's assignment from Marvel to populate stories with supporting characters, subject to Marvel's ultimate authority.  *See supra* Response No. 40, *citing* Lens Decl., Ex. 13 54:16-56:9, 72:21- 73:23, 79:3-19; Lens Decl., Ex. 12 55:4-15, 65:13-66:7.

Regardless, this paragraph is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).  Moreover, the *Kirby* court held that Kirby's contributions to Spider-Man were done on a work-made-for-hire basis, like all his other work for Marvel.  *See Kirby*, 726 F.3d at 143 ("[T]he district court made no

error, in our view, in determining as a matter of law that the works [(including Kirby's alleged contributions to Spider-Man)] were made at Marvel's instance and expense").

MCI, however, **objects** to Toberoff Exhibit 1.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection No. [1].

86.    **Lee admitted that Goodman did not think the new character would sell and thus forbade Lee to continue with it.**  *See* Toberoff Decl. Ex. 1 at 20 (Evanier Rep. providing historical context of Spider-Man's creation and explaining Goodman's dislike of the character); Ex. 4 at 75:24-78:2, 130:21-134:6 (Lee testifying that Goodman hated the idea of Spider-Man, but Lee published the story anyway); Ex. 17 at 307:12-310:9 (Thomas testifying that Goodman hated the idea of *Spider-Man*, but Lee published it anyway); Ex. 56 at 89:8-90:11 (Lee testifying that Goodman hated the idea of the Spider-Man character but Lee published the story anyway, without Goodman's permission).

**RESPONSE:  Disputed**, but **immaterial**.  While MCI does not dispute that Goodman did not think that Spider-Man would sell well, MCI **disputes** that Goodman forbade Lee to continue with it.  Toberoff Exhibits 4, 17, and 56 **do not support** this contention, as Lee's testimony in each exhibit makes clear that even though Goodman was not a fan of the Spider-Man idea at first, because the *Amazing Fantasy* title was set to end anyway, Goodman "didn't care what went into the last issue."

Regardless, this contention is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).  Indeed, while Goodman, as publisher, had the ultimate authority as to what Marvel would publish, Lee was otherwise in charge of making creative decisions for Marvel.  *See supra* Response No. 38, *citing* Lens Decl., Ex. 2 17:8-18:13, 37:10-39:6, 80:24-81:12, 125:18-126:1; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:3-125:4; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens

Decl., Ex. 59 at 3.  And even assuming that Lee ignored Goodman's instruction not to

publish Spider-Man, Lee still induced and supervised the creation of *Amazing Fantasy* No.

15, and there is no dispute Ditko was paid his per-page rate for his pages, meaning it was

created at Marvel's instance and expense.  *See Kirby*, 726 F.3d at 142 (explaining that, for

purposes of work-made-for-hire test, what matters is the hiring parties' "inducement, right

to supervise, exercise of that right, and creative contribution with respect to" the works).

Moreover, the *Kirby* court held that Kirby's contributions to Spider-Man were done on a

work-made-for-hire basis, like all his other work for Marvel.  *See Kirby*, 726 F.3d at 143

("[T]he district court made no error, in our view, in determining as a matter of law that the

works [(including Kirby's alleged contributions to Spider-Man)] were made at Marvel's

instance and expense").

   MCI also **objects** to Toberoff Exhibit 1.  *See* MTE Evanier [Dkt. 77]; MCI's

Evidentiary Objection No. [1].

87. **Lee, enthusiastic about Ditko's Spider-Man, flouted Goodman's authority and published the story in *Amazing Fantasy* No. 15, anyway.**  *See* Toberoff Decl. Ex. 4 at 75:24-78:2, 130:21-134:6 (Lee testifying that Goodman hated the idea of Spider-Man, but Lee published the story anyway); Ex. 17 at 307:12-310:9 (Thomas testifying that Goodman hated the idea of *Spider-Man*, but Lee published it anyway); Ex. 56 at 89:8-90:11 (Lee testifying that Goodman hated the idea of the Spider-Man character but Lee published the story anyway, without Goodman's permission).

  <u>**RESPONSE:**</u>  **Disputed**, but **immaterial**.  MCI **disputes** that Lee "flouted Goodman's

authority" when he published the first Spider-Man story.  Additionally, Toberoff Exhibits 4,

17, and 56 **do not support** this contention, as Lee's testimony in each exhibit makes clear

that even though Goodman was not a fan of the Spider-Man idea at first, because the

*Amazing Fantasy* title was set to end anyway, Goodman "didn't care what went into the last

issue."

Regardless, this contention is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).  Indeed, while Goodman, as publisher, had the ultimate authority as to what Marvel would publish, Lee was otherwise in charge of making creative decisions for Marvel.  *See supra* Response No. 38, *citing* Lens Decl., Ex. 2 17:8-18:13, 37:10-39:6, 80:24-81:12, 125:18-126:1; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:3-125:4; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3.  And even assuming that Lee ignored Goodman's instruction not to publish Spider-Man, Lee still induced and supervised the creation of *Amazing Fantasy* No. 15, and there is no dispute Ditko was paid his per-page rate for his pages, meaning it was created at Marvel's instance and expense.  *See Kirby*, 726 F.3d at 142 (explaining that, for purposes of work-made-for-hire test, what matters is the hiring parties' "inducement, right to supervise, exercise of that right, and creative contribution with respect to" the works).

88.    **Months later, after its success became known, Spider-Man got its own title and an *Amazing Spider-Man* comic was launched.**  *See* Toberoff Decl. Ex. 1 at 21 (Evanier Rep. providing historical context of Spider-Man's creation and explaining that after initial sales figures came in for the first *Spider-Man* story showing it was a success, Spider-Man got its own series); Ex. 56 at 89:8-90:11 (Lee testifying that *Spider-Man* got its own series after the first story was a success).

**RESPONSE:  Undisputed**.

MCI, however, **objects** to Toberoff Exhibit 1.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection No. [1].

89.    **In short order, the cast swelled with supporting characters in the life of Peter Parker like J. Jonah Jameson and Mary Jane Watson, and Spider-Man foes like Dr. Octopus, The Sandman, The Green Goblin, Kraven the Hunter, The Vulture, The Scorpion and many, many more.**  *See* Toberoff Decl. Ex. 1 at 21 (Evanier Rep. providing historical context of Spider-

Man's creation and identifying the characters introduced in the first several dozen issues of the *Spider-Man* story done by Ditko).

> **RESPONSE:  Undisputed**, but **immaterial**.  Further, this paragraph ignores that it was part of an artist's assignment to populate stories with supporting characters, subject to Marvel's ultimate authority.  *See supra* Response No. 40, *citing* Lens Decl., Ex. 13 54:16-56:9, 72:21-73:23, 79:3-19; Lens Decl., Ex. 12 55:4-15, 65:13-66:7.
>
> Regardless, this paragraph is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).
>
> MCI, however, **objects** to Toberoff Exhibit 1.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection No. [1].

90.    **All these and many others were co-created by Ditko, and firmly established well before Ditko left the comic, and stopped selling work to "Marvel" in 1966.**  *See* Toberoff Decl. Ex. 1 at 21 (Evanier Rep. providing historical context of Spider-Man's creation and identifying the characters introduced in the first several dozen issues of the *Spider-Man* story done by Ditko); Ex. 7 at 223:18-225:20, 277:11-13 (Thomas testifying that Ditko did all the plotting on *Spider-Man* stories while Ditko and Lee were not speaking);  Ex. 17 at 311:18-312:25 (Thomas testifying that Ditko, on his own, plotted and drew *Spider-Man* for more than one year before he left in 1966, did not work pursuant to the "Marvel Method," and that Lee would not even know anything about the story until it was penciled and submitted by Ditko); Ex. 28 (Lee writing that Ditko was co-creator of Spider-Man and that Ditko did most of the plotting of *Spider-Man* and just left Lee to do the dialogue and captions).

> **RESPONSE:  Disputed**, but **immaterial**.  MCI **disputes** this contention to the extent that Defendant is suggesting that Ditko did not work on Spider-Man pursuant to assignments from Lee.  To the contrary, Ditko contributed to Marvel's comic books pursuant to assignments from Lee, who directed the creation of the Works, and he was compensated by Marvel on an agreed per-page basis for completed assignments.  *See supra* Response No. 3, *citing* Lens Decl., Ex. 2 152:1-154:7; Lens Decl., Ex. 12 56:12-15, 57:25-58:9, 58:14-23;

Lens Decl., Ex. 7 217:13-21; Lens Decl., Ex. 13 41:20-42:9; Lens Decl., Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21; Lens Decl., Ex. 48 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2 27:19-28:7, 56:2-57:7, 148:22-151:25, 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens Decl., Ex. 12 56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13 14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl., Ex. 2 17:8-18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 44:4-17; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-9, 93:23-94:5; Lens Decl., Ex. 2 80:24-81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15; Lens Decl., Ex. 4 125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens Decl., Ex. 13 30:11-14, 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 68A-G; Lens Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens Decl., Ex. 6 40:14-20; Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7, 226:7-11, 249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.

Further, in particular here, this contention ignores the circumstances in which Spider-Man first appears in *Amazing Fantasy* No. 15. *See supra* Response No. 80, *citing* Lens Decl., Ex. 13 37:3-38:3, 334:14-18; Lens Decl., Ex. 48 at 3, 5; Lens Decl., Ex. 47 at 2; Lens Decl., Ex. 30 at 2; Lens Decl., Ex. 10 376:3-15; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 28; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 61 at 4; Lens Decl., Ex. 49 at 3; Thomas Decl. ¶ 21.  Additionally, Toberoff Exhibits 17 and 28 **do not support** this contention. Exhibit 28 refers to Lee crediting Ditko for "*eventually* d[oing] most of the plotting . . . as

the strip continued to increase in popularity," when Lee, using his editorial discretion, afforded Ditko greater creative input on the Spider-Man comics, subject to Marvel's ultimate authority.  Toberoff Exhibit 17 similarly states that Ditko's work was a "switch on the Marvel method" when Ditko began plotting Spider-Man later in his Marvel career.

Further, while the date itself is **immaterial** because it will not "affect the outcome of the suit under the governing law," *Kinsella*, 320 F.3d 309 at 311, MCI **disputes** that Ditko left Marvel in 1966 rather than late 1965, and Defendant's evidence is, at best, ambiguous as to date.  Regardless, this contention is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).  Indeed, as *Kirby* held, "[q]uestions of who created the characters are mostly beside the point," because "the hired party's ingenuity and acumen are a substantial reason for the hiring party to have enlisted him." *Kirby*, 726 F.3d at 142.  What matters is the hiring parties' "inducement, right to supervise, exercise of that right, and creative contribution with respect to" the works. *Id*.

MCI also **objects** to Toberoff Exhibit 1.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection No. [1].

91.    **Counterclaimant's Notices of Terminations concerning the Works were duly served on Marvel and its affiliates and recorded with the U.S. Copyright Office.**  *See* Toberoff Decl. Ex. 66 (Certificates and proof of recordation of Counterclaimant's Notices of Terminations).

**RESPONSE:  Undisputed**, except that MCI **disputes** the validity of such notices.

Dated:  June 30, 2023                    **O'MELVENY & MYERS LLP**


By:    */s/ Daniel M. Petrocelli*
          Daniel M. Petrocelli

Daniel M. Petrocelli*
dpetrocelli@omm.com
Molly M. Lens
mlens@omm.com
Matthew Kaiser*
mkaiser@omm.com
1999 Avenue of the Stars, 8th Floor
Los Angeles, California 90067
Telephone:  (310) 553-6700
Facsimile:  (310) 246-6779

Allen Burton
aburton@omm.com
Danielle Feuer
dfeuer@omm.com
Times Square Tower
7 Times Square
New York, NY 10036
Telephone:  (212) 326-2000
Facsimile:  (212) 326-2061

* Admitted *pro hac vice*

*Attorneys for Marvel Characters, Inc.*