# EXHIBIT 98

TOBEROFF & ASSOCIATES, P.C.
2049 Century Park East, Suite 3630
Los Angeles, CA 90067
Tel:    310-246-3333
Fax:    310-246-3101
MToberoff@ipwla.com

Attorneys for Defendants Lisa R. Kirby, Barbara J.
Kirby, Neal L. Kirby and Susan M. Kirby

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------

MARVEL WORLDWIDE, INC.,
MARVEL CHARACTERS, INC. and
MVL RIGHTS, LLC,

                                    Plaintiffs,

          -against-

LISA R. KIRBY, BARBARA J. KIRBY,
NEAL L. KIRBY and SUSAN M. KIRBY,

                                    Defendants.

----------------------------------------------------------

LISA R. KIRBY, BARBARA J. KIRBY,
NEAL L. KIRBY and SUSAN M. KIRBY,

                                    Counterclaimants,

          -against-

MARVEL ENTERTAINMENT, INC.,
MARVEL WORLDWIDE, INC.,
MARVEL CHARACTERS, INC., MVL
RIGHTS, LLC, THE WALT DISNEY
COMPANY and DOES 1 through 10,

                                    Counterclaim-Defendants.

----------------------------------------------------------

Civil Action No.  10-141 (CM) (KF)

**[REDACTED] CONFIDENTIAL
MEMORANDUM OF LAW IN
SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY
JUDGMENT**

**ORIGINAL FILED UNDER SEAL**

[Hon. Colleen McMahon]
[ECF Case]

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................... 1

FACTUAL BACKGROUND ....................................................................... 2

LEGAL STANDARD ................................................................................. 3

ARGUMENT ............................................................................................. 4

I.      MARVEL CANNOT PROVE "INSTANCE AND EXPENSE" AND, AT
BEST, RAISES GENUINE ISSUES OF MATERIAL FACT
PRECLUDING ITS MOTION ............................................................. 4

      A.      Marvel's Star Witness, Stan Lee, Lacks Credibility ................... 4

      B.      Marvel Has Not Met Its Burden of Proving That Kirby's Material
Was "Work Made For Hire" .................................................... 8

            1.      The "Work For Hire" Doctrine Under the 1909 Act ................... 8

            2.      Marvel Cannot Establish the "Expense" Prong ........................... 9

            3.      Marvel Cannot Establish the "Instance" Prong ........................... 13

                  a.      "Instance" Requires a Legal Right to Control a
Work's Creation ............................................................. 13

                  b.      Marvel Cannot Meet Its Burden on "Instance" .............. 14

                  c.      Marvel's Lack of a Legal Obligation to Buy Kirby's
Material, Weighs Against "Instance" (As Well As
"Expense") .................................................................... 15

            4.      The Parties Clearly Did Not Intend "Work for Hire" ................. 16

                  a.      The Fact-Intensive Question of the Parties' Mutual
Intent is Normally for the Trier of Fact .......................... 16

                  b.      The Record Evidence Establishes That the Parties
Understood That Kirby "Assigned" His Freelance
Work to Marvel .............................................................. 16

                  c.      The Court Must Not Retroactively Impute an Intent
the Parties Did Not Have, and Could Not Have Had ...... 20

d.     Kirby's Purported Acknowledgments of "Work for Hire" Years Later are Unpersuasive and Cannot Circumvent the Termination..........................................21

e.     In the Termination Context, the "Instance and Expense" Test Must Be Applied Cautiously At Best......22

CONCLUSION.............................................................................25

## TABLE OF AUTHORITIES

### Federal Cases

*Amoco Prod. Co. v. Ute Indian Tribe*,
526 U.S. 865 (1999)..................................................................................................23

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986).....................................................................................................5

*Brattleboro Publishing Co., v. Winmill Publishing Corp.*,
369 F.2d 565 (2d Cir. 1966) ................................................................................. 9-10

*Brattleboro Publishing Co., v. Winmill Publishing Corp.*,
250 F. Supp. 215 (D. Vt. 1966) .............................................................................10

*Burroughs v. Metro-Goldwyn-Mayer, Inc.*,
683 F.2d 610 (2d Cir. 1982) ..................................................................................25

*Carter v. United States*,
530 U.S. 255 (2000).................................................................................................23

*Clackamas Gastroenterology Assocs., P.C. v. Wells*,
538 U.S. 440 (2003).................................................................................................23

*Community for Creative Non-Violence v. Reid*,
490 U.S. 730 (1989)..........................................................................................*passim*

*Consarc v. Marine Mid. Bank*,
996 F.2d 568 (2d Cir. 1993) ....................................................................................5

*Donahue v. Windsor Locks Bd. of Fire Comm'rs*,
834 F.2d 54 (2d Cir. 1987) ......................................................................................5

*Epoch Producing Corp. v. Killiam Shows, Inc.*,
522 F.2d 737 (2nd Cir. 1975) ...........................................................................13, 15

*Estate of Hogarth v. Edgar Rice Burroughs, Inc.*,
342 F.3d 149 (2d Cir. 2003) ..............................................................................*passim*

*Estate of Hogarth v. Edgar Rice Burroughs, Inc.*,
2002 U.S. Dist. LEXIS 4219 (S.D.N.Y. Mar. 15, 2002)...............................*passim*

*Fifty-Six Hope Rd. Music Ltd. v. UMG Recordings, Inc.*,
2010 U.S. Dist. LEXIS 94500 (S.D.N.Y. Sept. 10, 2010)...........................14, 19

*Langman Fabrics v. Graff Californiawear, Inc.*,
160 F.3d 106 (2d Cir. 1998) ................................................................................16

*Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Center of
Contemporary Dance, Inc.*,
380 F.3d 624 (2d Cir. 2004) ..........................................................................13, 24

*Marvel Characters, Inc. v. Simon*,
310 F.3d 280 (2d Cir. 2002) .........................................................................*passim*

*Molzof v. United States*,
502 U.S. 301, 307 (1992) ....................................................................................23

*Morissette v. United States*,
342 U.S. 246 (1952) .............................................................................................23

*Nationwide Mut. Ins. Co. v. Darden*,
503 U.S. 318 (1992) .............................................................................................23

*NLRB v. United Ins. Co. of America*,
390 U.S. 254 (1968) .............................................................................................23

*N.Y. Times v. Tasini*,
533 U.S. 483 (2001) .............................................................................................25

*Penguin Group (USA) Inc. v. Steinbeck*,
537 F.3d 193 (2d Cir. 2008) ..........................................................................24-25

*Picture Music, Inc. v. Bourne, Inc.*,
457 F.2d 213 (2d Cir. 1972) ..................................................................................9

*Playboy Enterprises, Inc. v. Dumas*,
53 F.3d 549 (2d Cir. 1995) .........................................................................*passim*

*Playboy Enterprises, Inc. v. Dumas*,
960 F. Supp. 710 (S.D.N.Y. 1997) ..............................................................*passim*

*Siegel v. Warner Bros. Entm't Inc.*,
658 F. Supp. 2d 1036 (C.D. Cal 2009) ............................................................11, 16

*Standard Oil Co. v. United States*,
221 U.S. 1 (1911)..................................................................................................22

*Stone v. Williams*,
970 F.2d 1043 (2d Cir. 1992) ..............................................................................25

*Twentieth Century Fox Film Corp v. Entertainment Distrib.,*
429 F.3d 869 (9th Cir. 2005) ...................................................................*passim*

*Woods v. Bourne Co.,*
60 F.3d 978 (2d Cir. 1995) ..............................................................................9

*Yardley v. Houghton Mifflin Co.,*
108 F.2d 28 (2d Cir. 1939) .............................................................................9

## **Federal Statutes, Rules and Regulations**

17 U.S.C. § 26 (1909) .............................................................................8, 22

17 U.S.C. § 304 ...............................................................................*passim*

F.R.C.P. 56 .........................................................................................5

## **Other Authorities**

M. Nimmer & D. Nimmer, *Nimmer on Copyright*
1 *Nimmer* § 5.03[B][1][a][ii] .......................................................................23

1 *Nimmer* § 5.03[B][2][e] ...........................................................................20

3 *Nimmer* § 9.03[D] .................................................................................24

3 *Nimmer* § 11.02[A][2] ............................................................................16

3 *Nimmer* § 12.10[A] ...............................................................................16

W. Patry, *Patry on Copyright*
2 *Patry* § 5:44 ......................................................................................23

2 *Patry* § 5:54 ......................................................................................14

Barbara A. Ringer, Copyright Law Revision Study No. 31 "Renewal of
Copyright," prepared for the Senate Subcommittee on Patents, Trademarks
and Copyrights of the Committee on the Judiciary (June 1960) .........................8

B. Varmer, Copyright Law Revision Study No. 13, "Works Made for Hire
and on Commission," prepared for the Subcommittee on Patents,
Trademarks and Copyrights of the Senate Committee on the Judiciary
(Comm. Print 1960) ................................................................................21

**INTRODUCTION**

Defendants/counterclaimants (the "Kirbys"), the children of legendary comic book artist Jack Kirby ("Kirby"), hereby oppose plaintiffs/counterclaim-defendants' (with predecessors, "Marvel") motion for summary judgment ("Mot."). The Kirbys properly availed themselves of their termination right under 17 U.S.C. § 304(c) to recapture their father's copyrights from 1958-1963 (the "Period") by serving statutory notices of termination ("Termination") on Marvel.

Marvel predictably claims that all the Kirby material it published was "work for hire" – the lone exception to the inalienable termination right. However, Marvel cannot meet its burden of proving by credible evidence, viewed in the light most favorable to the Kirbys, that it satisfies the "instance" and "expense" prongs of the "work for hire" test under the 1909 Copyright Act.

In essence, a work is created at the "expense" of a putative employer if it is "on the hook" prior to the work's creation to pay for it. Marvel clearly was not. Marvel in the 1950's to mid-1960's was a small, tight-fisted operation. In 1957, it fired its staff writers and artists, buying material from freelancers to limit its financial risk. The freelancers, who worked out of their houses and paid for their supplies, shouldered the financial risk of creation, not Marvel. Try as it may to re-label freelance material "work for hire," Marvel paid for only that work it accepted and purchased. The record evidence reveals that Marvel did not pay freelancers for rejected work, or to revise it as a condition to its acceptance. As Marvel had no legal obligation to buy Kirby's artwork it cannot satisfy the "expense" prong, precluding its "work for hire" defense.

Similarly, a work is created at a putative employer's "instance" if it has the legal right to control the work's creation. Marvel had no such right. It had no contract with Kirby or the other freelancers, who, in turn, had no obligation to provide material to Marvel. Marvel's claim that it had the right to "edit" freelance material is a red herring. Marvel had no legal right to edit work

1

until it accepted, bought and paid for it. Once purchased, Marvel could edit, publish the work, or not, like any publisher. The fact Marvel could use its buying power to require freelancers to modify their work so that Marvel would purchase it does not equate to a legal right. That a freelancer's refusal to revise his work could result in a lost sale only demonstrates that such material was not owned by Marvel at inception as "work for hire."

Marvel relies heavily on the testimony of its "Chairman Emeritus" Stan Lee ("Lee"), who has deep financial ties to both Marvel and Disney. His prepared testimony contradicts his prior authenticated statements and the bulk of the record evidence. By claiming *sole* credit for the creation of the characters at issue, Lee/Marvel not only seek to deny the Kirbys their rights under the Copyright Act, but to marginalize their father's enormous contributions. Such overreaching only underscores the many genuine issues of material fact requiring denial of Marvel's motion.

## **FACTUAL BACKGROUND**

The relevant background facts are set out in greater detail in the Kirbys' cross-motion for summary judgment, incorporated herein by reference. Docket No. 76 at 3-8. From its beginnings to the 1960s, the comic book business was "a fly-by-night industry." *See* 56.1 Statement of Disputed Facts ("56.1 Stmnt") ¶ 134. Notably, little to no attention was paid to copyright ownership by the publishers or artists. *Id.* In the 1930s-40s, some writers and artists worked as employees, under "sweat shop" conditions. *Id.* ¶ 135. Others worked as freelancers out of their homes, setting their own hours, and paying for their own supplies. *Id.* Freelancers were not paid for rejected work or for revising it as a condition to its acceptance. *Id.*

In 1939, Martin Goodman founded Marvel's predecessor, Timely Comics. 56.1 Stmnt ¶ 136. In the mid-1940s, Timely had a "bullpen" of salaried artists and writers. *Id.* However, in 1949, Goodman discovered surplus artwork, and fired its employees until the art was used up.

*Id.* By 1957, the comic book industry was at an all time low due to Frederic Wertham's crusade against comic books. *Id.* ¶¶ 137-38. In 1957, Timely, near bankruptcy, again fired all its employees except Goodman's relative Lee and his assistant. *Id.* ¶ 139. In 1958, Timely slowly resumed buying freelance material on a per-page basis. *Id.* ¶ 140. Timely purposefully had no written freelancer contracts, and no obligation to buy their material. *Id.* ¶¶ 141, 154.

In the 1930's Jack Kirby formed a famous partnership with Joe Simon that sold work to different publishers, including Timely, until it disbanded in 1955. 56.1 Stmnt ¶ 143. From the 1958-1963 Period until 1970, Kirby produced and sold artwork to Marvel solely on a freelance basis, and was never employed by Marvel. *Id.* ¶¶ 145-47. In this fashion, Kirby created or co-created many of Marvel's signature characters, including *The Fantastic Four, The Incredible Hulk, Thor, The Silver Surfer, Iron Man, X-Men, Avengers, Ant-Man, and Nick Fury.* 56.1 Stmnt ¶¶ 3, 8, 79-83, 85, 87-88, 90-91, 94-95, 97, 99, 101, 103, 105, 107, 108. Kirby would conceive, draw and plot the stories in his artwork, with story notes and dialogue in the margins. *Id.* ¶ 148.

Notably, Marvel did not have any written agreement with Kirby (or any other freelancer) during this Period. 56.1 Stmnt ¶¶ 141, 144-47. The first agreement with Kirby produced by Marvel was executed on June 5, 1972, and is aptly titled an "Assignment." *Id.* ¶¶ 146-47. In the Period and beyond, Kirby, like other freelancers, was not paid a fixed salary by Marvel; Marvel was not legally obligated to purchase his artwork; and Kirby was not obligated to supply artwork to Marvel. *Id.* ¶¶ 144-47, 149-51, 154-55, 160. Kirby was paid on a per-page basis for those pages ultimately accepted and purchased by Marvel, and was not paid for rejected work or work Marvel asked him to redraw. *Id.* ¶¶ 145, 152-53. Kirby was free to and, in fact, did sell his freelance work to other publishers during the Period. *Id.* ¶ 155. Kirby also freely sold to other companies works with concepts and characters that Marvel had rejected. *Id.* ¶ 154-55. Like

3

other freelancers, Kirby bore all the expenses of creating his material, which Marvel did not reimburse. *Id.* ¶ 149. Nor did Marvel provide to Kirby with any employee benefits. *Id.* ¶ 151.

In 1968 Marvel was acquired by Perfect Film, which later became Cadence Industries. 56.1 Stmnt ¶ 161. Due to Marvel's loose practices, and the increasing value of comic book characters, Cadence sought to shore up Marvel's assets. *Id.* "Work for hire" became a focus of insecurity, when the 1976 Copyright Act, effective on January 1, 1978, articulated a detailed "work for hire" regime. 17 U.S.C. § 101. Cadence/Marvel embarked on a campaign to revise history by forcing the artists and writers who had supplied it with material to sign statements re-characterizing all their prior work as "for hire," decades after its creation. In May 1978, after Kirby left Marvel, it required its artists and writers, if they hoped to continue working, to sign self-serving agreements "that any and all work … which have been or are in the future created" is "to be considered a work made for hire." 56.1 Stmnt ¶ 162. Then, when many of the older freelancers, including Kirby, sought the return of their original artwork to supplement their meager incomes, Marvel used this as leverage to force them to sign "artwork releases" with retroactive "work for hire" clauses as a condition to returning their artwork. *Id.* ¶ 163. *See* Declarations of Dick Ayers ("Ayers Dec.") ¶ 15 ("Marvel sent me a one page artwork release form to sign, and informed me that unless I signed and returned the form 'as is,' they would not return my original artwork. I signed the release, because I was in no position to bargain..."); Jim Steranko ("Steranko Dec.") ¶ 16; and Neal Adams ("Adams Dec.") ¶ 15.

On September 16, 2009, Kirby's children served Marvel with their Termination. Tob. Dec. ¶ 4; Ex. A. On January 8, 2010, Marvel sued the Kirbys under their "work for hire" theory.

## **LEGAL STANDARD**

A motion for summary judgment may only be granted if the evidence "show[s] that there

is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." F.R.C.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-50 (1986). The "fundamental maxim" is that the "court cannot try issues of fact," and can only determine if there are issues to be tried. *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir. 1987). A fact is "material" if it affects the outcome under the governing law. *Consarc v. Marine Mid. Bank*, 996 F.2d 568, 572 (2d Cir. 1993). The moving party bears the burden of identifying credible evidence that demonstrates the absence of a genuine issue of material fact for trial. *Liberty*, 477 U.S at 256. On summary judgment, the court must resolve all ambiguities and draw all reasonable inferences *against* the moving party. *Consarc,* 996 F.2d at 572.[1]

## ARGUMENT

## I.  MARVEL CANNOT PROVE "INSTANCE AND EXPENSE" AND, AT MOST, RAISES GENUINE ISSUES OF MATERIAL FACT PRECLUDING ITS MOTION

### A.  Marvel's Star Witness, Stan Lee, Lacks Credibility

Marvel's supposedly "undisputed" facts rest largely on the testimony of Stan Lee and his claims that he solely created the famous characters at issue herein. *See, e.g.,* Docket No. 61 (Marvel's Rule 56.1 Statement), ¶¶ 14-16, 18-35, 37-59, 61-65, 79-83, 85, 87-88, 90-91, 93-95, 97, 99, 101, 103, 105, 107. Lee's rehearsed testimony, repeating hearsay in Lee's self-aggrandizing books, is frequently the *sole* evidence of Marvel's purported "facts." *Id.* ¶¶ 14, 18, 20, 42, 43, 57, 65, 79, 81, 82-83, 85, 87, 91, 93, 97, 99, 107.

---

[1] The Kirbys' motion for summary judgment, asserting that Marvel cannot satisfy the "expense" prong of "instance and expense" test, does not mean there are no genuine issues of material fact as to Marvel's motion. If the Court found issues of fact as to "expense," both motions are barred. Marvel's motion fails by implicating issues of fact as to the "instance" prong of the test as well.

Lee's credibility is further undermined by his now taking *sole* credit for the creation of the iconic characters at issue. Declaration of Marc Toberoff ("Tob. Dec.") Ex. J at 333:25-336:11; 378:8-379:3. This is inconsistent with both the record and Lee's prior authenticated statements. *Compare* Docket No. 61 ¶¶ 81, 85, 97, 99, 107 with Singer Dec. Ex. 53 at 36-37; Tob. Dec. Ex. VV at 6 ("I co-created The Fantastic Four and the Hulk with Kirby."); Ex. NN at K1759 ("[Kirby] was a virtually inexhaustible wellspring of fantastic new ideas, concepts and designs."); Ex. U at 87; 340:8-341:8, 348:17-349:11. *See also* Tob. Dec., Ex. J at 284:10-287:24 (Lee admitting his famously "poor memory"). Marvel claims Lee "routinely ignore[d]" Kirby's suggestions citing Lee's testimony (Mot. at 6), but Lee has stated otherwise:

> Some artists, such as Jack Kirby, need no plot at all. I mean I'll just say to Jack, "Let's let the next villain be Dr. Doom" … or I may not even say that. He may tell me. And then he goes home and does it. He's so good at plots, I'm sure he's a thousand times better than I. He just about makes up the plots for these stories. All I do is a little editing. … I may tell him that he's gone too far in one direction or another. Of course, occasionally I'll give him a plot, but we're practically both the writers on the things.

*Id.* Ex. J at 342:4-343:1. Unlike Kirby (*Captain America* in 1941, *The New Gods* in 1971), Lee did not create a single well-known character before Kirby arrived in 1958 or after he left in 1970:

> "Q: Do you recall creating any new characters for Marvel after 1970?
> A (Lee): There was a time in the –maybe in the 90s when I started to create a new line of comics for Marvel…We never published them…I was working with new people and it just-they didn't turn out right. But aside from that, no." Tob. Dec. Ex. J at 23:4-13.

Lee's bias and motive to help Marvel at all costs is exemplified by his contradictory testimony on many other key points. For instance, Lee testified on direct examination that Marvel's checks always had "work for hire" language on the back (Tob. Dec. Ex. I at 28:20-29:11); and in June 11, 2007 Lee signed under oath an affidavit for Marvel that "I received checks from Timely and its successors that bore a legend acknowledging that the payment was for 'works for hire'" for works published in the 1950's and 1960's, and that he "can recall no

checks that [he] received that did not bear this legend." Singer Dec. Ex. 34 at ¶ 13; Ex. 8 at ¶ 2. This contradicts all the record evidence. *See* Tob. Dec. Exs. AA, LL at Ex. C; Declarations of Joe Sinnott ("Sinnott Dec.") ¶¶ 13-14 and Gene Colan ("Colan Dec.") ¶ 12; Ayers Dec. ¶ 14; Steranko Dec. ¶ 12; and Adams Dec. ¶ 14-15. On cross, Lee was forced to admit that, as late as 1974, Marvel's checks contained "assignment" language instead of "work for hire" language and that he did not know when the "work for hire" legend first appeared. Tob. Dec. Ex. J at 276:12-278:1; 280:21-281:12; Ex. C at 141:9-142:21.

Lee's treatment of his brother, Lieber, regarding his testimony is also telling. Lieber has worked on Lee's syndicated *Spider-Man* strip for 23 years. Tob. Dec. Ex. E at 7:18-23.

To recruit witnesses after the Termination, Marvel invited Lieber to a "reunion of old-timers," but Lieber declined. Tob. Dec. Ex. E at 51:20-52:23. Thereafter, Stan Lee leaned on his own brother. *Id.* Ex. E at 58:19-59:19 (Lieber: "He didn't tell I shouldn't, but he sort of said, 'Well I hope you don't lose the [*Spider-Man*] strip because of it or something.'").

**B.     Marvel Has Not Met Its Burden of Proving That Kirby's Material Was "Work Made For Hire"**

**1.     The "Work For Hire" Doctrine Under the 1909 Act**

As the Kirby works at issue were created prior to 1978, the Copyright Act of 1909 (the "1909 Act") governs. *See Estate of Hogarth v. Edgar Rice Burroughs, Inc.* ("*Hogarth*"), 342 F.3d 149 (2d Cir. 2003). The 1909 Act simply stated, without further explication, that "the word 'author' shall include an employer in the case of works made for hire," 17 U.S.C. § 26, repealed by Pub. L. 94-553 (1976), and was intended to have a narrow application. *See* Barbara A. Ringer, Copyright Law Revision Study No. 31 at 138-39 (1960). Thus, "until the mid-1960's, federal courts applied the work-for-hire doctrine only to cases in which a traditional

employer/employee relationship existed…." *Hogarth*, 342 F.3d at 161, n.15.[2]

The extension of the "instance and expense" test in the mid-1960's to independent contractors was marred by confusion and contradictions. In *Brattleboro Publishing Co., v. Winmill Publishing Corp.* ("*Brattleboro*"), 369 F.2d 565, 567-68 (2d Cir. 1966), the Second Circuit used an "instance and expense" test to find an implied *assignment* of an independent author's copyright to a publisher, stating that "there is a presumption … that the copyright shall be in the person at whose instance and expense the work is done." *Picture Music, Inc. v. Bourne, Inc.*, 457 F.2d 213 (2d Cir. 1972) used this "instance and expense" test to extend the "work for hire" doctrine to independent contractors, based on erroneous interpretations of *Brattleboro*, *Yardley* and other implied *assignment* cases. *See Hogarth*, 342 F.3d at 160, n.14. In turn, *Playboy Enterprises, Inc. v. Dumas* ("*Playboy*"), 53 F.3d 549, 563 (2d Cir. 1995), relied on *Picture Music* to find an independent contractor's work was "work for hire."

In any event, Marvel bears the burden of proving by credible evidence that the terminated works were created at its "instance and expense" of its predecessors because "work for hire" is a statutory exception to the termination statute. *See* 17 U.S.C. § 304(c); *Woods v. Bourne Co.*, 60 F.3d 978, 993 (2d Cir. 1995) (burden of proving exception to § 304(c) falls on the assignee).

## 2. Marvel Cannot Establish the "Expense" Prong

Marvel cannot satisfy the "expense" prong of its "work for hire" defense. Marvel contends that the mere payment to Kirby of a "fixed per-page rate," once it accepted his pages, satisfies the "expense" prong. Mot. at 17. However, this ignores the critical function of this prong to distinguish "work for hire" from the mere purchase of finished material. As set forth in

---

[2] Commissioned works were owned through *assignment*. *See, e.g., Yardley v. Houghton Mifflin Co.*, 108 F.2d 28, 30 (2d Cir. 1939) ("When an artist accepts a commission to paint a picture for another for pay, he sells not only the picture but also the right to reproduce copies ….").

the Kirbys' motion for summary judgment, the relevant focus of the "expense" prong is not whether a publisher ended up paying a "sum certain," but whether it was "certainly" or legally obligated to pay prior to the creation of the work. *See* Docket No. 76 at 16-22; *Brattleboro,* 369 F.2d at 568 (finding "instance and expense" because hiring party obliged to bear expense regardless of whether work was accepted, *see Brattleboro*, 250 F. Supp. 215, 218 (D. Vt. 1966)). Thus, where the putative employer is obligated to pay the author a "'turn-down'" fee for "unused work," this weighs in favor of "work for hire." *Playboy,* 960 F. Supp. 710, 715 (S.D.N.Y. 1997). *See Twentieth Century Fox Film Corp v. Entertainment Distrib.* ("*Twentieth Century*"), 429 F.3d 869, 881 (9th Cir. 2005) (publisher paid author advances); *Hogarth*, 2002 U.S. Dist. LEXIS 4219, at *57 (S.D.N.Y. Mar. 15, 2002) (publisher paid author a "nonrefundable advance").

Marvel can offer no evidence that it was legally obligated to buy artwork submitted by Kirby or any other freelancer during the operative Period. The evidence shows exactly the opposite – that payment was *contingent* on Marvel's acceptance of completed artwork: Marvel converted to a freelance model in 1957 to limit its financial obligations to artists (56.1 Stmnt ¶¶ 137-39); Kirby worked as a freelancer during the Period and beyond, without a contract from Marvel or financial security, and bore all the expenses of creating his material without reimbursement and was paid on a "per page" basis only for those pages that Marvel had accepted (*id.* ¶¶ 145-55); Kirby was not paid for rejected pages or for revisions he performed at Marvel's request as a condition to its acceptance (*id.*); Lieber testified that Marvel was "not obligated" to purchase such freelance material (*id.* ¶¶ 141, 154) and that Marvel did not pay for redone work (*id.*); Kirby tore up pages for *The Incredible Hulk* that Marvel rejected and did not pay for, which ended up in Lieber's possession (*id.* ¶ 152); Marvel's witness, John Romita ("Romita") testified that Marvel did not pay for rejected work (*id.*); Neal Kirby and Susan Kirby, both teenagers in

the Period, testified that their father was not paid for rejected work or for redrawing work (*id.*);

Evanier testified that Kirby "had pages … where [Marvel] had rejected certain pages and sent

them back to him, and they had not paid him." *Id.* As Kirby expert John Morrow stated "[a]ll

the historical data shows rejected and redrawn work or rejected work wasn't paid for." *Id.*

Even as late as 1974-1977, when Marvel gave its top freelancers written contracts, it

explicitly stated that it would *not* pay for redrawing work.

> "…Employee will make all changes and rework all Material as reasonably required by
> the Publisher of Marvel without charge (that is reworks and changes shall not constitute
> pages for the purposes of computing compensation hereunder)."

Tob. Ex. LL at Ex. E ¶ 3                                                    . In further support of the

fact that Marvel did not pay for rejected work, Marvel sought out the Kirbys in 2008 to license

unpublished Kirby artwork, including rejected work for *Thor, X-Men* and *The Fantastic Four*.

Tob Dec. Ex. Q at 1509-1512, Ex. R at 1492. If Kirby's work had been "for hire," Marvel would

have owned it "automatically upon the employee's creation of the work." *Hogarth*, 342 F.3d at

162; *see Siegel v. Warner Bros. Entm't Inc.*, 658 F. Supp. 2d 1036, 1056 (C.D. Cal 2009) (a

work is "for hire" if it "belonged at the outset to the party that commissioned the work.").

Marvel's sole purported evidence is testimony by Lee, on rehabilitation by Marvel's

counsel, that Kirby supposedly got paid for some rejected *Spiderman* pages. Tob. Dec. Ex. J at

376:13-15 (Q.: "Did Kirby get paid for those pages?" A: "Sure."). The problem, however, is Lee

had just testified that he had absolutely nothing to do with Marvel's accounting and payroll. *Id.*

*Ex.* J at 275:17-276:1 ("I was never in charge of payroll …. [T]hat was the payroll and

bookkeeping department. And I have no idea what went on there.").[3]

Marvel's other purported citations as to "rejected pages" do not address the point. *See*

---

[3] Notably, Lee changed his story after Marvel's counsel requested a break after Lee's cross-examination, and rehearsed Lee for such rehabilitation questioning. Tob. Dec. ¶ 70.

Singer Dec. Ex. 1 at 18:6-16 (Lee testifies that Marvel did not ask for its money back when it purchased material but ultimately decided not to publish it); 30:11-31:5 (Lee skirts the issue and discusses payment "whether or not the actual drawing were ultimately published"); Ex. 3 at 28: 5-15 (Thomas does not discuss rejected pages); 68:24-69:6 (Thomas discusses revisions); Ex. 2 at 16:13-21 (Romita just discusses his page rate); 32:2-5 (Romita generally affirms that he got paid for his work, but does not discuss issue of rejected pages).

Lee's testimony is also contradicted by the testimony of Marvel veterans that Marvel did not pay for rejected material or redraws.  *See* Ayers Dec. ¶¶ 10-12 ("I was not paid for rejected material, nor was I paid for … redoing any artwork at Marvel's request as a condition to their purchase"); Colan Dec. ¶¶ 8-10 ("Marvel…did not pay for rejected material or material it wanted you to revise."); Steranko Dec. ¶¶ 13-14; Sinnott Dec. ¶¶ 10-11, and Adams Dec. ¶¶ 8-11.

All of the credible evidence suggests that Marvel conditioned payment on its acceptance of completed works.  56.1 Stmt ¶¶ 134, 137-42, 145-47, 149-59.  When a company like Marvel pays only for that freelance material it deems acceptable, that is a *purchase* of essentially speculative work, not "work for hire."  That freelancers like Kirby redrew their work, without extra compensation, as a condition of Marvel's acceptance, underscores this point.

As Marvel admits, the crux of the "expense" prong is who "b[ears] the entire financial risk associated with the creation of the Works."  Mot. at 17.  It is undisputed that Kirby bore all expenses of creating his art, and thus the "financial risk" of creation.  *See* Adams Dec. ¶ 7 ("I completely accepted the financial risk of creating the artwork"); Steranko ¶ 14 ("[W]e … shouldered the financial risk of creating our own material."); Ayers Dec. ¶¶ 10-12.  That is not "work for hire."  *See* 56.1 Stmnt ¶¶ 145-47, 149-59; *Twentieth Century,* 429 F. 3d at 881 ("expense" test met if that party takes on "all the financial risk" of the work's creation) (cited by

Marvel); *Hogarth*, 2002 U.S. Dist. LEXIS 4219, at *57 (publisher took "full assumption of the risk of loss" where it paid a "nonrefundable advance) (cited by Marvel); 1 M. Nimmer & D. Nimmer, *Nimmer on Copyright* ("*Nimmer*") § 5.03[B][2][d] at 5-56.9 n.171c ("Plainly, it is the expense of creation, rather than publication, that is relevant" to the expense test.).

### 3. Marvel Cannot Establish the "Instance" Prong

#### a. "Instance" Requires a Legal Right to Control a Work's Creation

In applying the "instance" prong of the test, courts focus on the specific facts – *e.g.*, a work created by a traditional employee "as a special job assignment" is "not a work for hire." *Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Center of Contemporary Dance, Inc.*, 380 F.3d 624, 635 (2d Cir. 2004). The "instance" requirement is largely determined by the degree to which the hiring party "'had the right … 'to direct and supervise'" the artist's work as this is a "hallmark of 'an employment for hire.'" *Playboy*, 53 F.3d at 554 (citations omitted); *see Martha Graham*, 380 F.3d at 635 ("The *right* to direct and supervise the manner in which work is created need never be exercised.") (emph. in original); *Twentieth Century*, 429 F. 3d at 879 (determinative factor is "the right to control or supervise the artist's work").

As a matter of law and logic, the "right" to control a work's creation must refer to a contractual or legal right. *Martha Graham*, 380 F.3d at 635. Such "control" cannot be construed as the practical power or not a superior bargaining position exercised by a buyer as a condition of acceptance; nor the kind of editorial supervision exercised by a publisher with respect to both non-works-for-hire and works for hire alike. *Epoch Producing Corp. v. Killiam Shows, Inc.*, 522 F.2d 737, 745 (2nd Cir. 1975) ("The existence of evidence that is as consistent with a [for hire] relationship as it is with numerous other hypotheses cannot be bootstrapped" to support a "work for hire" conclusion.); *Twentieth Century*, 429 F.3d at 880 (distinguishing right of control under

13

instance prong from a publisher's "typical process" of "discussing possible improvements with the author"). The right of control also cannot refer to the ultimate control every publisher has over whether to accept and publish a work; it refers to the much more specific "right" to control the creative process. *See* 2 W. Patry, *Patry on Copyright* ("*Patry*") § 5:54 ("Any hiring party ultimately has the ability to 'control' the work in the sense of accepting or rejecting it.").

        b.      <u>Marvel Cannot Meet Its Burden on "Instance"</u>

Marvel has no evidence that it had the legal right to control Kirby's creation of the works at issue – the "hallmark" of work for hire. *Playboy*, 53 F.3d at 554. Kirby indisputably had no contract with Marvel during the Period (56.1 Stmnt ¶¶ 146-47), and thus Marvel lacked the legal right to control Kirby's work during the Period. *Compare Fifty-Six Hope Rd. Music Ltd. v. UMG Recordings, Inc.*, 2010 U.S. Dist. LEXIS 94500, at *29 (S.D.N.Y. Sept. 10, 2010) ("[Employer] had the contractual right to accept, reject, modify and otherwise control the creation of the [works]."). The first agreement with Kirby that Marvel produced is a 1972 "Assignment." Tob. Dec. Ex. M. The second is a 1975 employment contract. Singer Dec. Ex. 46.

As to "instance," Marvel argues that it had "authority to supervise and control" the "ultimate publication," including the artist's "contributions." Mot. at 18. This misconstrues "instance." The relevant point is that Marvel had no legal right to direct or control Kirby's creation of material. All it had was purchasing power. That Kirby provided what Marvel liked to publish is prudent business, not "work for hire." Their open-ended relationship was dictated by the market, not "work for hire" employment. For example, Kirby developed a new version of *Captain America* that Marvel rejected. Ev. Dec. ¶ 19, Ex. B at 355-56. Kirby later used this artwork to create *Captain Glory*, published by Topps, and Marvel never objected, even though under their theory they would have owned this as "work for hire" at the time of its creation. *Id.*

14

Marvel maintains it had a "right" of control because it could edit the works, reassign artists or cancel comic books. Mot. at 13. However, Marvel had no "right" to edit or modify Kirby's material unless and until Marvel bought it, and Kirby likewise had no obligation to revise his material. Marvel's suggestions or Kirby's compliance, if any, were a function of Marvel's buying power. As Kirby and other freelancers were not paid for "redraws" (56.1 Stmnt, ¶¶ 145, 152-53), they obviously complied so that Marvel would purchase their material. Marvel ignores the key fact that Kirby was free to reject Marvel's requests or submit material that Marvel did not request. The fact that this might result in a lost sale shows that such works were not owned by Marvel as "works for hire" at inception. Marvel's power as a publisher to reject and not pay for Kirby's material does not render it "work for hire." *Epoch Producing Corp.*, 522 F.2d at 745. Once Marvel purchased Kirby's work, it was free to edit, publish or not publish what it *owned*, and Marvel, like any publisher, had the "last word" on what it published.

c.    Marvel's Lack of a Legal Obligation to Buy Kirby's Material, Weighs Against "Instance" (As Well As "Expense")

Marvel had no legal obligation to buy and pay for Kirby's material, and Kirby had no legal obligation to provide material to Marvel, to modify his work or even to finish work he started. *See* 56.1 Stmnt ¶ 154; Tob. Dec. Ex. E at 73:11-74:5; Ayers Dec. ¶¶ 10-12 ("I was not obligated to Marvel to create or work on any material."); Adams Dec. ¶¶ 8-10 ("Marvel ... was not obligated to buy my artwork or stories .... In the same vein, as a freelancer, I was not obligated to Marvel."); Colan Dec. ¶¶ 8-14; Steranko Dec. ¶¶ 8-11; and Sinnott Dec. ¶¶ 10-11. This weighs heavily against "instance." *Playboy*, 53 F.3d at 563 (where hiring party "had no commitment to purchase any of [the author's] work," that supports a finding that such works were not "for-hire"); 960 F. Supp. at 718 (stating that "[t]he logical conclusion ... is that Playboy paid Nagel for works it did not use because he created them at its instance" and that "if Playboy

15

had never published the work at all there would have been no reason to pay anything for it absent a work for hire relationship ....”). There is a natural link between such an obligation to pay and the “right to supervise” under the “instance” test. Every publisher can “accept, reject or modify” a work, regardless of whether it is “work for hire.” If such right is not linked to a legal obligation to pay, any sale to a publisher would instantly make a work “for hire.” Thus, Marvel’s lack of legal obligation to pay Kirby weighs against both “instance” and “expense.”

### 4. The Parties Clearly Did Not Intend “Work for Hire”

#### a. The Fact-Intensive Question of the Parties’ Mutual Intent is Normally for the Trier of Fact

It is well accepted that whether a work is “made for hire” under the 1909 Act turns on the mutual “intent of the parties.” *Playboy,* 53 F.3d at 556-57. The analysis requires an evaluation of “the actual relationship between the parties, rather than the language of their agreements, in determining authorship of the work.” *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 291 (2d Cir. 2002) (citing *Donaldson*). *See* 3 *Nimmer* § 11.02[A][2] at 11-13 (“[I]t is the relationship that in fact exists between the parties ... that is determinative.”). Such “questions ... as to the parties’ intent ... are generally for the trier of fact.” 3 *Nimmer* § 12.10[A]; *Langman Fabrics v. Graff Californiawear, Inc.*, 160 F.3d 106, 111, 113 (2d Cir. 1998) (“Questions of historical fact relevant to applying each [work for hire] factor are for the finder of fact....”). As held in *Marvel,* “it will be for the [trier of fact] to determine whether Simon was the author of the Works and, therefore, whether he can exercise § 304(c)’s termination right.” 310 F.3d at 292.

#### b. The Record Evidence Establishes That the Parties Understood That Kirby “Assigned” His Freelance Work to Marvel

As Marvel argues, a work is “made for hire” if it “‘belonged at the outset to the party that commissioned the work.’” Mot. at 10-11 (quoting *Siegel*, 658 F. Supp. 2d at 1056). All the

16

evidence points to the fact that this was not Kirby's or Marvel's understanding in the Period, and that Marvel purchased and Kirby assigned that freelance material once Marvel accepted it – the antithesis of "work for hire."  Marvel engaged in a practice of placing a legal acknowledgement or legend on the back of its checks, forcing freelancers to sign under the legend in order to cash their checks.  Marvel claims it has no copies of *any* freelancer checks prior to 1974 and no checks to Jack Kirby prior to 1986.  Tob. Dec. Ex. L at ¶¶ 2, 4; Ex. AA.  However, the Kirbys uncovered a June 1, 1973 Marvel check to freelancer Stephen Gerber (*Howard the Duck*) that Marvel submitted in a lawsuit against Gerber.  Tob. Dec. Ex. LL at Ex. C.  Marvel described the check as "typical of checks endorsed by Gerber," and it contained this "legend":

> By endorsement of this check, I, the payee, acknowledge full ***payment*** for my employment by Magazine Management Company, Inc. and ***for my assignment to it of any copyright***, trademark and any other rights in or related to the material, and including my ***assignment of any rights to renewal copyright***.

*Id.* Ex. LL at Ex. C (emphasis added); Ex. AA at 14603; Ex. L at ¶ 15.  This "assignment" legend also appeared on the earliest freelance check produced by Marvel – a 1974 check to the freelance artist Dick Ayers (*Sgt. Fury*).  Tob. Dec. Ex. AA.  Neither legend mentions "work made for hire;" rather, both use explicit language of purchase and assignment.  *Id.* Ex. BB.  Numerous freelancers who sold work to Marvel both during and shortly after the Period testified that their checks from Marvel contained such language of purchase and assignment, and did not mention "work for hire."  *See* Ayers Dec. ¶¶ 13-14 ("[language] stated that by signing the check I was transferring to the comic book publisher all of my rights in the material it had purchased"); Colan Dec. ¶¶ 12, 14 ("[I]t was not until the late 1970's that the words 'work for hire' and 'work made for hire' were" added to the checks.); Steranko Dec. ¶¶ 12-13 (there "was a stamped legend which stated that by endorsing the check, I was assigning to the publisher all rights in the work, including the copyright;" "[n]owhere did the phrase 'work for hire' or 'work made for hire'

appear"); Sinnott Dec. ¶¶ 13-14 and Adams Dec. ¶¶ 13-14.[4]  The earliest produced Marvel check

with a legend mentioning "work for hire" is from 1986 and applies to traditional employment:

> By acceptance and endorsement of this check, payee acknowledges, a) full payment for payee's employment by Marvel Entertainment Group, Inc., b) that all payee's work has been within the scope of that employment, and c) that all payee's works are and shall be considered as works made for hire, the property of Marvel Comics Group, Inc.

Tob. Dec. Ex. BB.  All this evidence raises a strong inference that Marvel viewed its ownership

as predicated on purchase and assignment, not "work for hire."[5]  Marvel's key competitor, DC,

has admitted that "[w]e, the publishing houses, are paying only the right to reproduce the work,"

and that "[t]he ownership of the page … belongs unequivocally to the artist...." *Id.* Ex. QQ.

Marvel's language of purchase and assignment can even be found in agreements Marvel

entered into with freelancers in the mid to late 1970's.  The term "work for hire" appears

nowhere in these Marvel agreements.  Kirby's first written employment agreement with Marvel,

dated March 24, 1975, is telling.  Singer Dec. Ex. 46 at ¶ 11.  Therein, Kirby "grants to Marvel

the sole and exclusive right to all Material delivered to Marvel hereunder, including but not

limited to, (a) the exclusive right to secure copyrights in the Material." *Id.* Ex. 46 at ¶ 7.

Marvel's October 7, 1977 agreement with Gerber,

all use the same language of assignment.  Tob.

Dec. Ex. LL at Ex. E at ¶ 7; Ex. LL at Ex. D at ¶ 8;

. Marvel's own attorneys admitted in Gerber's lawsuit that his "agreement …

---

[4]  Western Printing, Marvel's competitor, also owned freelance artwork based on "assignment," as evidenced by Western's form freelance voucher signed by Don Heck in 1965. Tob. Dec. Ex. T ("I hereby release, transfer and assign to Western…").  Like Kirby, Heck (*Iron Man*) worked as a freelance artist with Marvel and others, from 1958-1960's. *Id. Ex.* U at 78, 99, 108.

[5]  Notably, in Lee's November 1, 1998 agreement with Marvel, Lee agreed to "assign, convey and grant … all right, title and interest," and "any copyrights" in his alleged material.  Singer Dec. Ex. 25 at ¶ 5(a).  It nowhere mentions "work for hire," and the reason is that if Marvel fails to pay the monies due in the agreement, Lee can revoke the assignment. *Id.* Ex. 25 at ¶ 5(f).

**granted** to Marvel the sole and exclusive right to all of the material delivered by Gerber to Marvel, including the exclusive right to secure copyrights in the material." Tob. Dec. Ex. LL at Ex. E at ¶ 5; Ex. LL at Ex. D at ¶ 8.

The agreement further provides that Kirby shall "deliver such further documents ... as Marvel may request for the purpose of confirming the rights herein granted to Marvel." Singer Dec. Ex. 46 at ¶ 11 .

Thus, as late as 1977, nearly 15 years after the operative Period, Marvel still couched its relationship with freelancers in terms of the purchase and assignment of copyright, not "work for hire," in both its agreements and its freelancer checks. This raises a nearly irrebutable inference that the parties did not intend a "work for hire" relationship in the more haphazard Period.[6]

The foregoing is also consistent with the understanding of numerous freelancers who had worked with Marvel during or shortly after the Period that Marvel owned their work, not as "work for hire," but because it simply had **purchased** it. *See* Ayers Dec. ¶¶ 11-14 ("In fact, I do not believe I ever even heard the term "work for hire" mentioned in the comic book business until the very late 1970's or early 1980's."); Colan Dec. ¶ 9, 12 ("I understood that Marvel would own the artwork...once they accepted it because I was selling it to Marvel."); Steranko Dec. ¶¶ 8-14; Sinnott Dec. ¶¶ 10-11; Adams Dec. ¶¶ 7-15.[7]  Marvel's own witnesses Stan Lee (Tob. Dec.

---

[6] The cases cited by Marvel to weakly argue that "grant" language is not dispositive all involved employers that were financially obligated to pay for commissioned work. *See Fifty-Six Hope Rd. Music Ltd. v. UMG Recordings*, Inc., 2010 U.S. Dist. LEXIS 94500, at *30-32 (advances against royalties); *Twentieth Century*, 429 F.3d at 881 (same); *Hogarth*, 2002 U.S. Dist. LEXIS 4219, at *57 (same); *Playboy*, 960 F. Supp. at 715 (S.D.N.Y. 1997) (turn-down fee).

[7] That Marvel did not own these works from inception as "work for hire" is also shown by Marvel's concern over its failure to pay sales tax when it purchased the artwork. Ev. Dec. Ex. A at 18; Mor. Dec. Ex. 13-14; Tob. Dec. Ex. PP at 93. As early as the 1950s, comic book companies in California paid sales tax when they purchased artwork. Ev. Dec. Ex. A at 18. In

Ex. J at 396:1-14), Roy Thomas (*Id. Ex.* K at 232:5-10) and by Lee's brother, Larry Lieber (*Id. Ex.* E at 100:21-101:9) admitted this as well. Also inconsistent with Marvel's revisionist "work for hire" theory, is that Kirby used rejected artwork, elsewhere. Mor. Dec. Ex. A at 9-10.[8] From every respect, Marvel's conduct contradicts its revisionist "work for hire" claim, and, at most, raises triable issues of material fact as to the parties' intent.

        c.      The Court Must Not Retroactively Impute an Intent the Parties Did Not Have, and Could Not Have Had

As noted above, whether material is a "work for hire" under the 1909 Act "always turn[s] on the intention of the parties." 1 *Nimmer* § 5.03[B][2][e] at 5-56.1. Yet, until 1965-66, "the courts had applied the work for hire doctrine under the 1909 Act exclusively to traditional employees." *Community for Creative Non-Violence v. Reid* ("*CCNV*"), 490 U.S. 730, 744 (1989); *Hogarth*, 342 F.3d at 161 n.15. As the "work for hire" doctrine only applied to traditional hierarchical employees during the relevant 1958-1963 Period, and Kirby was clearly an independent contractor, the parties could not intended a "work for hire" relationship.

The contemporaneous first 1963 edition of the *Nimmer* treatise confirms this, stating "if in the creation of such material the employee is to work as an independent contractor … then the employer must claim such ownership by virtue of an assignment and not merely by virtue of his status as an employer." M. Nimmer, *Nimmer on Copyright* § 62.4 at 242 (1963) (Toberoff Dec. Ex. JJJ). "Sec[tion] 26 expressly renders an employer for hire an 'author' but makes no

---

the early 1980s, artists inquired about this practice with the New York tax authorities. *Id.*; Tob. Dec. Ex. KKK. Marvel feared substantial liability for years of back taxes on purchased freelance artwork. Tob. Dec. Ex. K at 267:14-19; Colan Dec. at ¶ 15; Steranko Dec. at ¶¶ 15-16.

[8] For example, Kirby developed *The New Gods* while submitting artwork for Marvel's *Thor*; Kirby offered these characters to Marvel, who did not purchase them and never objected when it became Kirby's flagship comic at Marvel's rival DC Comics. Ev. Dec. ¶ 17, 20, Exs. C, D. Similarly, Kirby's re-imagined version of *Thor* was rejected by Marvel without pay, and Kirby openly sold copies of it without objection from Marvel. Ev. Dec., ¶ 17; Ex. C at 956.

comparable provision with respect to commissioned works." *Id.* § 63 at 245 n.80. *Nimmer* in 1963 drew a sharp distinction "where the creator is an independent contractor rather than an employee" and "contrasted [this] with an employment for hire." *Id.* § 63 at 244-45.

The legislative history from 1960 of the 1976 Act also made it clear that the definition "work for hire" under the 1909 Act was intended to apply only to traditional "employees":

> The statutory concept of employment for hire is based on the specific contractual relationship between employer and employee. …. [A]ll the cases have involved salaried employees who received either a fixed salary or a minimum salary plus commission…. *Hence, it may be concluded that section 26 [of the 1909 Act] refers only to works made by salaried employees in the regular course of their employment.*

B. Varmer, Copyright Law Revision Study No. 13 (1960) (emphasis added).

This understanding of "employer" and "employee" to mean traditional forms of employment and hiring is consistent with the contemporary legal definition not only when the 1909 Act was passed, but during the 1958-1963 Period as well.[9]

In short, even if Marvel or Kirby had retained sophisticated counsel in the operative Period, even Melville B. Nimmer, himself, they would have been advised that Kirby's work was <u>not</u> "for hire." As the "work for hire" doctrine at the time applied only to employees, the parties, as matter of law, could not have intended that Kirby's freelance work was "made for hire."

        d.    <u>Kirby's Purported Acknowledgments of "Work for Hire" Years Later are Unpersuasive and Cannot Circumvent the Termination</u>

Marvel weakly relies on two self-serving documents drafted by Marvel long after the Period and signed by Kirby under economic pressure – (i) a 1972 "Assignment" entered into in

---

[9] *See, e.g.,* Black's Law Dictionary, 2d Ed. (1910) at 421 (defining "employer" as "one who employs the services of others; …who pays their wages or salaries" and "employee" "mean[s] some permanent employment or position"); Black's Law Dictionary, 4th Ed. (1951) at 617-18 (defining "employer" in the same manner, and as "*the correlative of employee,*" and "employee" as "[o]ne who works for an employer; a person working for salary or wages;… *'employee' must be distinguished from 'independent contractor,'*…..") (emphasis added).

21

connection with a prior lawsuit by Kirby's former partner Joe Simon ("Simon") over *Captain America*; (ii) a mandatory "artwork release" for the return of Kirby's original artwork – that re-characterized all Kirby material published by Marvel as "work for hire." Mot. at 22.

Incredibly, Marvel intentionally omits from its Motion the Second Circuit's leading termination case, *Marvel v. Simon*, 310 F.3d 280 (2002). In *Simon*, Marvel sought to invalidate a statutory termination notice by Simon regarding *Captain America*, arguing, as here, that it was "work for hire." The district court granted summary judgment based, in part, on a settlement agreement from the same prior lawsuit containing a *post-hoc* "work for hire" acknowledgement very similar to that in Kirby's 1972 Assignment,[10] and the 1987 artwork release that Marvel relies on here. The Second Circuit unequivocally held that Marvel cannot avoid section 304's inalienable termination right by re-characterizing a work as "for hire" years after its creation; and that such is void under 17 U.S.C. § 304(c)(5) as an "agreement to the contrary." 310 F.3d at 292 ("Termination of [a] grant may be effected notwithstanding any agreement to the contrary....").

> e.  In the Termination Context, the "Instance and Expense" Test Must Be Applied Cautiously At Best

Section 24 of the 1909 Copyright Act simply states that "[t]he word author shall include an employer in the case of works made for hire," but does not further define "employer." 17 U.S.C. § 26 (repealed). It is a well-accepted canon of statutory construction that "where words are employed in a statute which had at the time a well-known meaning at common law or in the law of this country they are presumed to have been used in that sense unless the context compels to the contrary." *Standard Oil Co. v. United States*, 221 U.S. 1, 59 (1911). This canon remains a

---

[10] In fact, Kirby's 1972 Assignment reveals that it was originally an agreement between Simon and Marvel regarding *Captain America*. Tob. Dec. Ex. M. Simon's name was "whited out" and "Kirby" was written in its place, and Marvel failed to alter the preamble which reads: "For and in consideration of the covenants and agreements herein contained and the sum of One Dollar ($1), the receipt of which *Simon* hereby acknowledges...." *Id.* Ex. M at K1531 (emphasis added).

"cardinal rule of statutory construction." *Molzof v. United States*, 502 U.S. 301, 307 (1992).[11]

    The "instance and expense" test, as extended to independent contractors, contradicts the common law definition of "employer" in the 1909 Act. The common-law meaning of "employer" as a "conventional master-servant relationship" clearly distinguishes independent contractor relationships such as that between Kirby and Marvel. *See Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 445 n.5 (2003) (common-law agency doctrine is used "for determining whether a hired party is an employee," and "draw[s] a line between independent contractors and employees"); *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992) (distinguishing independent contractors from employees under ERISA); *NLRB v. United Ins. Co. of America*, 390 U.S. 254, 256 (1968) (same, under NLRA).

    In the copyright context, the Supreme Court also drew a clear distinction between an "employee" and "independent contractor," and expressly stated that "when Congress has used the term 'employee' without defining it, we have concluded that Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine." *CCNV*, 490 U.S. at 739-40. In other contexts, the Supreme Court similarly rejected result-oriented decisions where "the content of the term 'employee' in the context of a particular federal statute is to be construed in the light of the mischief to be corrected and the end to be attained," as this does not justify "unmooring the term from the common law." *Nationwide Mut. Ins. Co.*, 503 U.S. at 324. The Supreme Court reaffirmed the strong presumption that "Congress means an agency law definition for 'employee' unless it clearly indicates otherwise." *Id.* at 325.

    Notably, after the Second Circuit held that the "instance and expense" test determined "who qualified as an employee under the 1976 Act," *see* 1 Nimmer § 5.03[B][1][a][ii], the

---

[11] *See, e.g., Carter v. United States*, 530 U.S. 255, 266 (2000); *Amoco Prod. Co. v. Ute Indian Tribe*, 526 U.S. 865, 873-74 (1999); *Morissette v. United States*, 342 U.S. 246, 263 (1952).

Supreme Court unanimously rejected that approach. *CCNV*, 490 U.S. at 749-50. Instead, it relied on the common law of agency to define "employee," not the "instance and expense" test, as the "paramount goal" is to "enhance predictability and certainty of copyright ownership." *Id.*[12]

*Hogarth*, 342 F.3d at 162-63, declined to read *CCNV* as effectively overruling the instance and expense test under the 1909 Act, stating that *CCNV*'s definition of "employee" was "dictum." However, it never reconciled its application of the "instance and expense" test with the 1909 Act's limitation of "work for hire" to an "employer," or its common law definition.

Moreover, the Second Circuit has never applied the "instance and expense" test to determine "work for hire" under the 1976 Act's termination provisions. None of the Second Circuit's post-*CCNV* "instance and expense" cases relate to termination rights. *See, e.g., Playboy*, 53 F.3d 549 (ownership under the 1909 Act); *Hogarth*, 342 F.3d 149 (renewal rights under the 1909 Act); *Martha Graham*, 380 F.3d 624 (same). The issue was ownership. The lines between ownership by implied assignment or as "work for hire" were blurred and of less importance. *See Hogarth*, 342 F.3d at 160, 160 n.14.[13] None of Marvel's cases concern the 1976 Act's termination provisions, where the distinction, as here, makes all the difference.

Similarly, none of the Second Circuit cases regarding the 1976 Act's termination rights involved the "work for hire" exception, except the post-*CCNV* case, *Marvel*.[14] Notably, in

---

[12] *CCNV* noted that relevant factors from "the general law of agency" include "the skill required; the source of instrumentalities and tools; the location of the work … the extent of the hired party's discretion over when and how long to work; the method of payment; … the provision of employee benefits and the tax treatment of the hired party." *Id.* at 751-52.

[13] For this reason, the application of the "instance and expense" test to freelancers has been criticized by the leading copyright authorities. *See* 2 Patry § 5:44 (criticizing the vague post-1965 expansion of "work for hire" to freelancers and praising *Martha Graham*, 380 F.3d at 624, for "[e]liminat[ing] the worst features of [the] presumptive 'instance and expense' approach."); 3 Nimmer § 9.03[D], at 9-28.2 to 9-28.3 (decisions applying "work for hire" doctrine to independent contractors are "wrong both on principle and under the rule of the early cases").

[14] *See Penguin Group (USA) Inc. v. Steinbeck*, 537 F.3d 193, 200-04 (2d Cir. 2008) (whether a

*Marvel*, the Second Circuit cited *CCNV*, and stated that "this Court has looked to agency law to determine whether a work is created 'for hire' under the 1909 Act." 310 F.3d at 291.

It is indisputable that the clear legislative intent behind the termination provisions was "to protect authors from [their] unequal bargaining positions." *Marvel*, 310 F.3d at 290 (citing H.R. Rep. at 124). The Supreme Court recently emphasized the "inalienable authorial right to revoke a copyright transfer" and confirmed that the objective of the termination provisions is to readjust the "author/publisher balance" by "enhanc[ing] the author's position vis-à-vis the patron." *N.Y. Times v. Tasini*, 533 U.S. 483, 496, n.1 (2001).

In light of the lack of binding authority for application of the "instance and expense" test in the termination context, the Second Circuit's contrary indications in *Marvel,* the Supreme Court's repeated interpretation of the terms "employer"/"employee" under the common law of agency, and the concerted legislative objectives behind the termination right, this Court can determine under *CCNV* and the "general law of agency" that Marvel was not Kirby's "employer" in the Period for purposed of Section 26 of the 1909 Act. If the Court feels constrained to apply the controversial "instance and expense" test, it should be applied with care so as not to gut the equitable legislative purpose of the termination provisions. As Marvel cannot even meet its burden of proving "instance and expense," under any meaningful application of that test, and implicates numerous material issues of fact in attempting to do so, its motion must be denied.

## CONCLUSION

For the foregoing reasons, the Kirbys respectfully request that Marvel's motion for summary judgment be denied.

---

post-1978 grant was barred by § 304(c)(5)); *Stone v. Williams*, 970 F.2d 1043, 1066 (2d Cir. 1992) (who owns the termination right); *Burroughs v. Metro-Goldwyn-Mayer, Inc.*, 683 F.2d 610, 620-628 (2d Cir. 1982) (whether termination covered certain works).

Dated: March 25, 2011               Respectfully submitted,

TOBEROFF & ASSOCIATES, P.C.

/s/ Marc Toberoff
_____
Marc Toberoff (MT 4862)

Attorneys for defendants
Lisa R. Kirby, Barbara J. Kirby, Neal L.
Kirby and Susan M. Kirby

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was served electronically by e-mail and by first class mail on those parties not registered for ECF pursuant to the rules of this court.

Dated: March 25, 2011    TOBEROFF & ASSOCIATES, P.C.

           /s/ Marc Toberoff

           Marc Toberoff (MT 4862)

           Attorneys for defendants
           Lisa R. Kirby, Barbara J. Kirby, Neal L.
           Kirby and Susan M. Kirby