# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARVEL CHARACTERS, INC.,<br><br>                    Plaintiff,<br>          v.<br><br>PATRICK S. DITKO, in his capacity as<br>Administrator of the Estate of Stephen J.<br>Ditko,<br><br>                    Defendant. | Case No.: 1:21-cv-07957-LAK<br><br><br>Hon. Lewis A. Kaplan<br><br>**DEFENDANT AND COUNTERCLAIMANT**<br>**PATRICK S. DITKO'S MEMORANDUM OF**<br>**LAW IN REPLY AND FURTHER SUPPORT**<br>**OF HIS MOTION FOR SUMMARY**<br>**JUDGEMENT** |
| PATRICK S. DITKO, in his capacity as<br>Administrator of the Estate of Stephen J.<br>Ditko,<br><br>                    Counterclaimant,<br>          v.<br><br>MARVEL CHARACTERS, INC. and DOES<br>1-10, inclusive,<br><br>                    Counterclaim-Defendants. | Oral Argument Requested |

## <u>TABLE OF CONTENTS</u>

**Page**

A.    Marvel Cannot Show that Ditko Created His Work at the "Instance"
      or "Expense" of the Shell Companies Which It Registered as the "Authors." ................... 1

B.    Marvel's Opposition to the Estate's "Expense" Arguments Are Unpersuasive ................. 7

C.    MMC and Ditko Clearly Intended to Make a Purchase and Assignment ......................... 10

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*,
  757 F.2d 523 (2d Cir.1985) ........................................................................................ 6

*Blue Cross and Blue Shield v. Philip Morris*,
  141 F. Supp. 2d 320 (E.D.N.Y. 2001) ....................................................................... 3

*Cedric Kushner Promotions, Ltd. v. King*,
  533 U.S. 158, 121 S. Ct. 2087 (2001) ....................................................................... 5

*Clarex Ltd. v. Natixis Sec. Am. LLC*,
  2012 WL 4849146 (S.D.N.Y. Oct. 12, 2012) ........................................................... 5

*Cleveland v. Caplaw Enters.*,
  448 F.3d 518 (2d Cir. 2006) ...................................................................................... 2

*Dole Food Co. v. Patrickson*,
  538 U.S. 468, 474, 123 S.Ct. 1655 (2003) ................................................................ 5

*Dolman v. Agee*,
  157 F.3d 708 (9th Cir. 1998) .................................................................................... 10

*Eckes v. Card Prices Update*,
  7 36 F.2d 859 (2d Cir. 1984) ..................................................................................... 7

*Epoch Produc'g Corp. v. Killiam Shows, Inc.*,
  522 F.2d 737 (2nd Cir. 1975) .................................................................................... 1

*Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.*,
  342 F.3d 149 (2d Cir. 2003) ...................................................................................... 8

*Fourth Estate Pub. Benefit Corp. v. Wall-Street.com*,
  586 U.S. ___, 139 S. Ct. 881, 203 L.Ed.2d 147 (2019) ......................................... 5-6

*Fred Fisher Music Co. v. M. Witmark & Sons*,
  318 U.S. 643, 63 S.Ct. 773 (1943) ........................................................................... 8

*Gayle v. MMC Company*,
  153 F. Supp. 861 (D. Md. 1957) ............................................................................ 2-3

*Hutson v. Notorious B.I.G*,
  2015 WL 9450623 (S.D.N.Y. Dec. 22, 2015) .......................................................... 5

*Kaseberg v. Conaco, LLC*,
  360 F. Supp. 3d 1026 (S.D. Cal. 2018) ..................................................................... 7

*Martha Graham School v. Martha Graham Center*,
  380 F.3d 624 (2d Cir. 2004) .................................................................................. 5, 8

*Marvel Characters, Inc. v. Kirby*,
  726 F.3d 119 (2d Cir. 2013) ...................................................................................passim

*Magnuson v. Video Yesteryear*,
  85 F.3d 1424 (9th Cir. 1996) .............................................................................................. 8

*Morgan, Inc. v. White Rock Distilleries, Inc.*,
  230 F. Supp. 2d 104 (D. Me. 2002) ..................................................................................... 7

*Niss v. Columbia Pictures Indus., Inc.*,
  2000 WL 1862814 (S.D.N.Y. Dec. 20, 2000) ................................................................. 4-6

*Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*,
  322 F.3d 147 (2d Cir. 2003) ................................................................................................ 6

*Picture Music, Inc. v. Bourne, Inc.*,
  457 F.2d 1213 (2d Cir. 1972) .............................................................................................. 5

*Playboy Enterprises, Inc. v. Dumas*,
  53 F.3d 549 (2d Cir.1995) ................................................................................................. 10

*Siegel v. Warner Bros. Ent'mt Inc.*,
  658 F. Supp. 2d 1036 (C.D. Cal. 2009) ............................................................................... 8

*Soo Line R.R. Co. v. St. Louis Southwestern Ry. Co.*,
  125 F.3d 481 (7th Cir. 1997) .............................................................................................. 6

*Technicon Med. Info. v. Green Bay Packaging*,
  687 F.2d 1032 (7th Cir. 1982) ............................................................................................ 6

*Urbont v. Sony Music Entm't*,
  831 F.3d 80 (2d Cir. 2016) ............................................................................................. 8-9

*Waite v. UMG Recordings, Inc.*,
  450 F. Supp. 3d 430 (S.D.N.Y. 2020) ................................................................................. 5

## FEDERAL STATUTES, RULES AND REGULATIONS

17 U.S.C. § 2 (repealed) ............................................................................................................ 6

17 U.S.C. § 12 (repealed) .......................................................................................................... 6

17 U.S.C. § 13 (repealed) .......................................................................................................... 6

17 U.S.C. § 24 (repealed) .......................................................................................................... 6

17 U.S.C. § 304 .......................................................................................................................... 8

17 U.S.C. § 409 .......................................................................................................................... 6

17 U.S.C. § 411 .......................................................................................................................... 6

iv

**OTHER AUTHORITIES**

Melville B. Nimmer & David Nimmer, 1 *Nimmer on Copyright* (Aug. 2021 rev. ed)

§ 2.02 ..................................................................................................................... 8

§ 5.01 ..................................................................................................................... 8

§ 5.03 ..................................................................................................................9-10

§ 7.02 ..................................................................................................................... 7

§ 11.02 ................................................................................................................... 8

*Restatement (Second) of Agency* § 1 cmt. b (1958) ................................................... 2

U.S. Copyright Office, *Compendium of U.S. Copyright Office Practices* § 602.1 (3d ed. 2017) ................. 2

**A. Marvel Cannot Show that Ditko Created His Work at the "Instance" or "Expense" of the Shell Companies Which It Registered as the "Authors."**

Marvel's opposition ("Opp.") regarding the shell company issue is at once vague and self-contradictory. It avoids any mention of its registration of the relevant copyrights as "work for hire" of the shell companies and of the shells as the statutory "authors," or its reliance on those copyright registrations here. Dkt. 1 ¶¶ 4, 14. As the Estate argued in its motion (Dkt. 76 at 24-27) and opposition (Dkt. 88 at 10-17), Ditko could not have created his works at the "instance and expense" of these shell companies which had no employees nor any interaction with him. This is the only place Marvel does not rely on *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 138-140 (2d Cir. 2013) because this issue was not before or adjudicated by the *Kirby* panel.

The Second Circuit's decision in *Epoch Producing Corp. v. Killiam Shows*, 522 F.2d 737 (2d Cir. 1975), is illustrative. *Epoch* concerned whether the film THE BIRTH OF A NATION was a "work made for hire" under the 1909 Act. *Id*. at 743–44. The appellant did not exist when the film was created and acquired the film's copyright from DWG Corp., in whose name it was registered. *Id.* at 740-41, 745. But DWG "was essentially an inactive shell corporation," and "*[u]nder these circumstances it could not have been an employer for whom the film was made for hire.*" *Id* at 745 (emphasis added). The same result is appropriate here, for the same reason.

In rebuttal, Marvel offers up a grab-bag: tall tales about the record evidence, elementary errors in corporate law, and a half-hearted "Hail Mary" at odds with everything they have told courts and the U.S. Register of Copyrights about the relevant copyrights.

Marvel says this matter depends not on the entity that "'hired' Ditko," but rather with "the party that commissioned the work." Opp. 36. But in the "instance and expense" cases the two mean the same. Marvel is unclear who the "commissioning party" is, first suggesting it is Magazine Management Co. ("MMC"). But then Marvel says it does not matter if "other entities

1

*completely independent of the commissioning party* provide direction and supervision", *id.*,

suggesting the opposite. More confusingly, Marvel compares an unnamed "ultimate employer"

to entities that "mere[ly"] register[] the copyrights." Opp. 37. Eventually, Marvel settles down

into the theory that the shell companies were the commissioning parties, who "delegate[d]

certain tasks to vendors" like MMC which acted "as a servicing partnership contracted by the

other entities", the "true payors", at whose "instance and expense" the work was done. Opp. 38.

 In other words, Marvel says the shell companies directed and paid for Ditko's work

through an *agent* (MMC). As an abstract matter, this could conceivably make sense, but the

problem for Marvel is that it has *absolutely no evidence that the shell companies did that*. To

show that the shells retained MMC (or anyone else) as their agent, Marvel would have to adduce

evidence "of three elements":  a "manifestation by the principal that the agent shall act for him,"

the agent's "acceptance of the undertaking"—"*and,*" evidence of the parties' "understanding …

that the principal is to be in control of the undertaking." *Cleveland v. Caplaw Enters.*, 448 F.3d

518, 522 (2d Cir. 2006) (emphasis in original) (citing Restatement (Second) of Agency § 1 cmt.

b. (1958)). The evidence to which Marvel points to, however, establishes *none* of these things.

 Marvel cites just three record documents. Opp. 38 (citing Dkt. 70 ("Bard Decl."), Exs. 5-

7).[1] Ex. 5 is MMC's "1951 *Dun & Bradstreet* report"; Ex. 6 is *Gayle v. Magazine Management*

*Co.*, 153 F. Supp. 861, 864 (D. Ala. 1957); Ex. 7 is an FTC complaint/consent order. None are an

MMC agreement with any shell company nor reference any such agreement. None were created

by MMC, the shells, or a Marvel entity. Two predate the relevant period by years. Marvel never

explains how these documents prove an agency relationship. And as we will see, they do not.

 Consider first the *Dun & Broadstreet* report from 1951, three-pages which evaluate

---

[1] Elsewhere Marvel generally cites its SUF ¶1, but the question is obviously what the underlying documents say, and the three documents that Marvel identifies as relevant to this question are these. Opp. 38.

MMC's creditworthiness. Bard Decl., Ex. 5. It is unclear who wrote it, or why, and the author repeatedly notes how little information was provided. *Id.* at 1 (company's "financial details" were "not made available"); 2 (attempts to contact company rep. "proved unsuccessful due to his continued absence from the premises" and "interview" requests went "unanswered"). Moreover, the document does not mention the shell companies at issue here at all. It lists twelve *other* companies in which it says that Goodman was "active." Of the companies it does mention, it says that "*there are no inter-company relations such as loans, advances of guarantees reported.*" (*Id.* at 3; emphasis added). Marvel never explains what this document is supposed to prove.

Marvel's second piece of "evidence" is a print-out of *Gayle*, 153 F. Supp. 861. *Id.*, Ex. 6. It is a stretch to even call this evidence. The opinion concerns a completely different issue (*in personam* jurisdiction for a libel suit) and does not purport to make adjudicated "findings" about the relationship between the shell companies and MMC. Even if one dignified the uncontested background facts in *Gayle* as "judicial findings," such "are inadmissible hearsay" when proffered as evidence in another case. *Blue Cross and Blue Shield v. Philip Morris*, 141 F. Supp. 2d 320, 323 (E.D.N.Y. 2001). As background, *Gayle* states that MMC "renders administrative services to and exercises the over-all control of the other defendants." But this does not prove what Marvel argues, and, if true, supports *MMC* as principal*,* and the shells as *its* agents. *But see* Toberoff Reply Decl., Ex. 67 ("Q: These companies are owned and controlled by you …doing business as Magazine Management Company? A [Goodman]: "No, each corporation stands on its own.") Moreover, creative direction of Ditko would not naturally be called an "*administrative* service."

Finally, consider Marvel's last document, the 1962 FTC complaint. Bard Decl. Ex. 7. Two of the shell companies, Atlas and Vista, are respondents, as are MMC and Goodman personally. But the complaint says absolutely nothing about the *relationship* between the shells

and MMC. In fact, it says that the "Marvel Comics Group" was an unincorporated association comprised of seven entities, but Atlas was not one of them, and curiously, *neither was Magazine Management*. *Id.* at 5. Whatever that may mean, the complaint does not say that MMC acted as the "agent" of any of the other respondents; rather, it says MMC was *one* vehicle by which Goodman "controls and operates approximately forty-eight [unnamed] corporations."

Although, not cited for its agency argument, Marvel has relied elsewhere on a 1967 letter returning an unelaborated "list of Martin Goodman's Corporations," with no details other than their ownership, fiscal year net worth and net profits.[2]  Bard Decl., Ex. 2. One entry appears for "Magazine Management Co. (Servicing Partnership)," but neither the 1967 list, nor any other contemporaneous document describes, at all, what "servicing partnership" means, when that began, with whom, what its terms were, or anything else. *Id.* It is literally just an entry on a list.

Marvel's contention (Opp. 37) that the Estate's "very argument" was rejected in *Niss v. Columbia Pictures Indus., Inc.*, 2000 WL 1862814 (S.D.N.Y. Dec. 20, 2000) is therefore mistaken. Niss had an employment contract with MGM and Columbia to write/produce a film, under which it was "work for hire." *Id*. at *2, 3, 9. The copyright to the film was registered by another entity, "notwithstanding the clear language of the [contract]" "evidencing that the corporation breached the agreement, not that it is the owner of the copyright." *Id*. at *5-6, 11. The studio's authorship was proven by a written agreement; the shell cos. do not have one.

As the evidence does not support Marvel's agency argument, its opposition devolves into increasingly zany fallback arguments. It says that because the copyright registrants were owned

---

[2] Most of Goodman's entities appear to be shell companies used to divert income and assets. *Id*. His 1967 list shows a net worth of $84,700 and profits of $138,252 for MMC (with actual operations) while the shells Non-Pareil and Vista (no employees and no actual business) each show the *same* net worth and profits of $120,000 and $82,750. *Id.* Goodman obviously used these entities to shift money and assets around for tax and liability purposes. *See* Toberoff Reply Decl., Ex. 67 at 73-74 (Goodman testifying comic-book copyrights are booked at "one dollar or nothing").

by Goodman, Ditko "at minimum" worked at "Goodman's instance and expense." Op. 35.

Marvel seems to suggest that, when artists do work for a corporation, its *owners and officers* are

the statutory "authors." This cannot be taken seriously. "Corporate form matters. Here, there

were distinct legal entities, whose separate nature cannot simply be ignored when inconvenient."

*Clarex Ltd. v. Natixis Sec. Am. LLC*, 2012 WL 4849146, at *6 (S.D.N.Y. Oct. 12, 2012). Indeed,

"incorporation's basic purpose is to create a distinct legal entity, with legal rights, obligations,

powers, and privileges different from those of the natural individuals who created it, who own it,

or whom it employs." *Cedric Kushner Pr'ns, Ltd. v. King*, 533 U.S. 158, 163, 121 S. Ct. 2087,

2091 (2001). *See* Toberoff Reply Decl., Ex. 67. "A basic tenet of American corporate law is that

the corporation and its shareholders are distinct entities." *Dole Food Co. v. Patrickson,* 538 U.S.

468, 474, 123 S.Ct. 1655 (2003). *See Hutson v. Notorious B.I.G.,* 2015 WL 9450623, at *5-6

(S.D.N.Y. Dec. 22, 2015) (owner of company which registered copyright has no interest therein).

For its "veil-piercing" copyright theory Marvel points to a statement in *Picture Music,*

*Inc. v. Bourne, Inc.*, that "[t]he purpose of the statute [17 U.S.C. § 24] is not to be frustrated by

conceptualistic formulations of the employment relationship." 457 F.2d 1213, 1216 (2d Cir.

1972). But this simply buttressed *Bourne's* next statement that the statute applied equally to

employment of "an independent contractor." *Id*. *Bourne* nowhere suggests that the *corporate*

*form* is a "conceptualistic formulation." No copyright case supports this notion. Rather, the rule

is the same: "people cannot use a corporate structure for some purposes" and "disavow it for

others." *Waite v. UMG Recordings, Inc*., 450 F. Supp. 3d 430, 441-42 (S.D.N.Y. 2020)

(copyright termination case). *See also Martha Graham School v. Martha Graham Center*, 380

F.3d 624, 640-41 (2d Cir. 2004) (refusing to disregard Graham's own charitable Foundation as

her "employer" in finding her choreography to be "work for hire"); *Niss,* 2000 WL 1862814 at

*12 (copyright registrant was not Niss's *alter ego* as "the evidence shows that corporate

formalities were adhered to [] and that both parties benefitted from the corporate structure.")

Finally, in a footnote, Marvel suggests that even if it expressly registered the shell

companies as statutory "authors" of the alleged "works for hire," perhaps Ditko created his

works at the "instance and expense" of someone else. Opp. 35. But Marvel's own Complaint

relies on its copyright registrations and alleges that it "complied in all relevant respects with all

laws governing copyright" (Dkt. 1 ¶ 14), chief among which is the requirement that a registrant

truthfully state the facts, including whether the work is "for hire," and, if so, for whom. 17

U.S.C. § 409(4). Marvel's complaint allegations serve as "judicial admissions" by which a party

is "bound throughout the course of the proceeding." *Official Comm. of the Unsecured Creditors

of Color Tile, Inc. v. Coopers & Lybrand*, 322 F.3d 147, 167 (2d Cir. 2003) (quoting *Bellefonte

Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 528 (2d Cir. 1985)). In fact, a plaintiff can "plead

[it]self out of court by alleging facts which show that [it] has no claim" because "judicial

efficiency demands that a party not be allowed to controvert what it has already unequivocally

told a court." *Soo Line R.R. Co. v. St. Louis SW'n Ry. Co.*, 125 F.3d 481, 483 (7th Cir. 1997).

Marvel's case rises or falls on its shell companies for another reason: a party who has

acquired a statutory benefit by making certain representations is estopped from later making

inconsistent assertions in litigation. *Technicon Med. Info. V. Green Bay Packaging*, 687 F.2d

1032, 1035 (7th Cir. 1982). *See also Citicasters Licenses, Inc. v. Cumulus Media, Inc.*, 189 F.

Supp. 2d 1372, 1378 (S.D. Ga. 2002) (stating elements). Marvel secured copyright registrations

by representing the shell companies as the works' "author[s]" and received a valuable benefit:

Under both the 1909 Act and 1976 Act valid copyright registration is an absolute prerequisite to

any infringement action. 17 U.S.C. § 13 (repealed); § 411(a); *Fourth Estate Pub. Benefit Corp. v.*

*Wall-Street.com*, 586 U.S. __, 139 S. Ct. 881, 886 203 L.Ed.2d 147 (2019). Having acquired and renewed the copyrights expressly as "works for hire" of the shell companies, Marvel cannot now claim that some other entity was really the "author" all along; it must defend what it represented to the Register of Copyright in exchange for the benefits of registration it has enjoyed for years.

Marvel cannot disavow its representations for yet another reason. An applicant owes a duty of candor when communicating with the U.S. Copyright Office. *Kaseberg v. Conaco, LLC*, 360 F. Supp. 3d 1026, 1034 (S.D. Cal. 2018) (citing U.S. Copyright Office, Compendium of U.S. Copyright Office Practices § 602.1 (3d ed. 2017)). "If the claimant willfully misstates or fails to state a fact that, if known, might have caused the Copyright Office to reject the application, then the registration may be ruled invalid."  Nimmer § 7.02 [B][1] (citing *Eckes v. Card Prices Update*, 736 F.2d 859 (2d Cir. 1984)). Any "evasions" or "artful omissions" in registering a "work for hire" would invalidate that registration. *Morgan, Inc. v. White Rock Distilleries, Inc.*, 230 F. Supp. 2d 104, 108 (D. Me. 2002).[3] To conclude that Marvel's registrations misrepresented known shell companies as the statutory "authors," as it halfheartedly proposes, would threaten to put those works *in the public domain*—a result that neither Marvel nor the Estate endorses. The only alternative, therefore, is to hold Marvel to what it has said all along and require it to adduce evidence that Ditko's works were made at the "instance and expense" of the shell companies, as registered. As Marvel has not done that, summary judgment should be granted for the Estate.

**B.  Marvel's Opposition to the Estate's "Expense" Arguments Are Unpersuasive**

As to the "expense" prong, Marvel never addresses the "elephant in the room": If "authorship" is fixed at creation, but payment was *contingent* on "Marvel's" discretionary post-

---

[3] *See Russ Berrie & Co. v. Jerry Elsner Co.,* 482 F. Supp. 980, 988 (S.D.N.Y. 1980) (declining copyright based on "knowing failure to advise the copyright office of [relevant] facts" in registration); *Ross Products, Inc. v. New York Merch. Co.,* 233 F. Supp. 260 (S.D.N.Y. 1965) (omission of prior publication, if purposeful, invalidated copyright).

creation decision to accept and buy Ditko's material (or not), how could "Marvel" be the statutory "author" *at creation*? Marvel relies on *Kirby*, which did not address this legal problem; the Estate is entitled to its own day in court. Marvel tries to sew confusion as to the settled principle that "with a true work for hire, copyright ownership [and authorship]… [is] with the employer automatically upon the employee's creation of the work." *Est. of Burne Hogarth v. Edgar Rice Burroughs*, 342 F.3d 149, 162 (2d Cir. 2003). It argues authorship does not vest at creation because there is no federal copyright until publication (Opp. 21 n.13). This is sophistry.[4] "Under the 1909 Act . . . state common law copyright provided protection until first publication, and thereafter the work was entitled to . . . statutory copyright … at publication, or appropriate registration" *Martha Graham*, 380 F.3d at 632-33 (citing 17 U.S.C. §§ 2, 10, 12, 24 (repealed).[5]

Marvel's *contingent* payment of a sum certain does not advance the analysis because that applies equally to a post-creation purchase and differs from *the majority* of "instance and expense" cases where obligatory sums are paid in the context of *legally binding* employment.

Marvel does not dispute that this case as plead focuses on Ditko's work and that "'the 'expense' component refers to the resources the hiring party invests in the creation of the work'" *Urbont v. Sony Music Entm't*, 831 F.3d 80 (2d Cir. 2016) (quoting *Kirby*, 726 F.3d at 139). *See* Dkt. 92 at 8 (Marvel: "The expense prong" includes "who bore the financial risk of creation.");

---

[4] By extension, Marvel's argument would also mean that "work for hire" under the 1909 Act could not apply to Ditko's creation of an unpublished work because at creation there is only a common-law copyright.

[5] *See also* M. Nimmer & D. Nimmer, 1 *Nimmer on Copyright* ("Nimmer"), §§ 2.02 [A], 7.12 [A][2][a],[b], 5.01[B] at 5-7 (Unpublished works protected by common law copyright which may be assigned and when published or registered secure statutory copyright); § 11.02 [A][1] (if "grant of common law copyright … assign[s] renewal copyright it will be subject to [] termination"); *Siegel v. Warner Bros. Ent'mt Inc.*, 658 F. Supp. 2d 1036 at 1084-91(C.D. Cal. 2009) (confirming § 304(c) termination of transfer of common law copyright (statutory upon publication) to Superman strips). Marvel's check legends assign "copyright" and "renewal copyright" to freelancer's unpublished works. SMF ¶ 68. *See Fred Fisher Music Co. v. M. Witmark & Sons* , 318 U.S. 643, 657, 63 S.Ct. 773 (1943) (holding such grants enforceable); *Magnuson v. Video Yesteryear*, 85 F.3d 1424, 1428 (9th Cir.1996) ("Common law copyrights could be transferred either orally, or by implication from the conduct of the parties.").

Nimmer § 5.03[B][2][d] at n.171 ("Plainly, it is the expense of creation, rather than publication, that is relevant."). Marvel also does not dispute that (i) it did not advance Ditko any money; (ii) Ditko rented his own studio, paid his own overhead, bought the materials and instrumentalities used to create his artwork; and (iii) Marvel did not reimburse these expenses. *See* Dkt. 93 (Marvel 56.1 Resp.) ¶¶ 36-37 ("Undisputed."); *Urbont*, 831 F.3d at 90 (artist's provision of "his own tools and resources in[] a recording studio he rented" indicates he bore expense of creation).

Instead, Marvel just points to *Kirby*, which acknowledged that "whether the Works were created at Marvel's expense presents a more difficult question." 726 F.3d at 142. *Kirby* also concerned a *different* author, relationship and works. Importantly, in *Kirby*, the "Works" at issue were the *completed* comic book *publications*.[6] This naturally affected the scope of *Kirby's* "expense" analysis and narrowly tipped it in Marvel's favor. 726 F.3d at 143. Accordingly, *Kirby* included the "production work that Marvel supplied" and its "expenditures over and above the flat rate it paid Kirby for his drawings" and that Kirby's drawings were not the "finished [published] product." *Id*. Here, by contrast, the works at issue are solely *Ditko's contributions*[7] resulting in a different outcome, as Ditko bore the expenses of creating *his* material. Moreover, "if funding publication could convert a manuscript into a work for hire, then the category would soon subsume all published material." Nimmer § 5.03[B][2][d] at n.171. Contrary to Marvel's assertion, *Kirby* based its decision *on such costs*, *not* on who bore the risk of the comics' success,

---

[6] *Id*. at 125 (this litigation concerns … 262 works published by Marvel); *see also Kirby*, 777 F. Supp. 2d 720, 724 (S.D.N.Y. 2011) (defining the "Kirby Works" as 262 Marvel comic-book publications).

[7] *See* Dkt. 1 (Complaint) ¶¶ 1 (focusing on "the contributions Steve Ditko made", 19-13,23-24, 28-37 (same); Dkt. 24 (Counterclaims) ¶¶ 2, 24, 28-37 (focusing on "Ditko's creative material (the 'Ditko Material')", 55-58 (seeking declaration that Ditko Material was not "work for hire"). As noted, the published comics were classic joint works (art by Ditko, text by Lee). Upon statutory termination the Estate recovers Ditko's undivided co-author share in those joint works, but that does not alter the focus. Nor does the status of Lee's contribution. *See e.g., Siegel v. Time Warner Inc.*, 496 F. Supp. 2d 1111, 1144 (C.D. Cal. 2007) (As to [Siegel/Shuster's] joint work, [DC] would own half of the copyright [] as the author of Shuster's alleged work for hire or … given his [] failure to … terminat[e]".).

as it found "that both parties took on risks with respect to the works' success". 726 F.3d at 143.

### C. MMC and Ditko Clearly Intended to Make a Purchase and Assignment

Marvel cannot dispute that "work for hire" under the 1909 Act "always turn[s] on the intention of the parties." *Playboy Enterprises, Inc. v. Dumas*, 53 F.3d 549, 556-57 (2d Cir.1995). *See* Nimmer § 5.03[B][2] [c] (same). The "instance and expense" test itself tries to derive the "mutual intent of the parties." *Id*. *See also Dolman v. Agee*, 157 F.3d 708, 712 (9th Cir. 1998) (test tries to determine the "intent of the parties, and does not operate as a matter of law"). Given this settled standard, the Estate asked how Ditko and Marvel could possibly have intended his creations to be "works for hire" if, in the relevant 1962-65 period, the doctrine did *not* apply to freelancers, as Marvel admits. Once again, Marvel just shrugs it shoulders.[8] It makes no attempt to reconcile this with anything resembling modern legal analysis and points to *Kirby*, which also does not address this. Nor is it addressed in the many cases which concern post-1965 works.

However, the Estate's analysis of the parties' *actual* intent, as mandated by the caselaw, encompasses much more than this "Catch-22." The Estate has adduced unrebutted evidence of the parties' contrary intent to simply sell/purchase and assign the Ditko works Marvel opted to buy.[9] Marvel never explains why this Court should indulge counterintuitive legal fictions, that lead to multiple absurdities, when the evidence points to a far more natural conclusion.

---

[8] Marvel applies a double standard, saying the Estate must show a "contrary agreement" that Ditko's work was not "for hire," but why would even sophisticated parties have such agreement at a time when the doctrine did not apply?

[9] *See e.g.*, SMF ¶ 66 (Lee testifying "[Marvel] would only buy what [it] needed"), ¶¶ 20, 66-69 (Marvel check legends in mid-1970s with express "assignment … [of] renewal copyright" language and still no mention of "work for hire"; declarations of *five* Marvel freelancers from relevant Period recalling such "assignment" legends, and attesting to their intent at the time to sell and assign all rights in their material once Marvel accepted and purchased it, and that "work for hire" was *never* mentioned in the 1960s); ¶¶ 23-24 (when Marvel finally had freelancers sign contracts in mid-to-late 1970s, it *still* used *assignment language with no mention of "work for hire"* whatsoever.)

Date: July 28, 2023

Respectfully submitted,

By:        */s/ Marc Toberoff*

          Marc Toberoff
TOBEROFF & ASSOCIATES, P.C.
*mtoberoff@toberoffandassociates.com*
23823 Malibu Road, Suite 50-363
Malibu, CA 90265

*Attorneys for Patrick S. Ditko*