## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARVEL CHARACTERS, INC., | Case No.: 1:21-cv-7957-LAK |
| Plaintiff, | Hon. Lewis A. Kaplan |
| v. | **REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY PLAINTIFF AND COUNTERCLAIM-DEFENDANT MARVEL CHARACTERS, INC.** |
| PATRICK S. DITKO, in his capacity as Administrator of the Estate of Stephen J. Ditko, | |
| Defendant. | |
| PATRICK S. DITKO, in his capacity as Administrator of the Estate of Stephen J. Ditko, | Oral Argument Requested |
| Counterclaimant, | |
| v. | |
| MARVEL CHARACTERS, INC. and DOES 1-10, inclusive, | |
| Counterclaim-Defendants. | |

## PRELIMINARY STATEMENT

Defendant's repeated misstatements of law and fact cannot erase the Second Circuit's dispositive decision in *Kirby* or create a genuine issue for trial.  MCI has proffered extensive evidence showing that Marvel induced the creation of, had editorial control over, and paid Ditko a fixed per-page rate for the Works, and Defendant has failed to rebut that evidence.  There is no legal daylight between Jack Kirby's and Steve Ditko's contributions to Marvel's comics:  They were all works made for hire.  MCI's summary judgment motion should be granted.

## ARGUMENT

### A.  *Kirby* Demands Summary Judgment For MCI In This Case.

Defendant's brief gets one thing right:  MCI does view this litigation as "a *Kirby* sequel." (Opp. at 17.)  That's because it concerns the same core facts, the same overarching time period, and the same governing law.[1]  Defendant retorts that whether the instance and expense test is satisfied depends on "the record in *each case*."  (Opp. at 17.)  True enough.  But large swaths of the record overlap, and the minor deviations that exist do not alter the conclusion that Ditko, like his contemporary Jack Kirby, worked at Marvel's instance and expense.

Defendant tries to brush aside MCI's reliance on *Kirby* as "some sort of 'collateral estoppel,'" Opp. at 20, but it is a straightforward application of precedent.  Defendant is not estopped from rearguing issues litigated by the Kirby Heirs, but the viability of those arguments is constrained by the precedent *Kirby* set—precedent that, here, commands judgment against him.

---

[1] Defendant contends that this case presents "different . . . legal questions," because *Kirby* purportedly considered the status of completed, published comic books, whereas this case addresses only "Ditko's creative material."  (Opp. at 19.)  Not so:  The Second Circuit expressly described the question before it as ascertaining "the rights to drawings Kirby allegedly created between 1958 and 1963."  *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 124 (2d Cir. 2013).  Indeed, neither Kirby nor Ditko could lay claim to an entire comic book containing stories to which he did not contribute (a paradigmatic collective work) even if he had not worked for hire.

**B. The Undisputed Facts Show That MCI Prevails On Each Prong Of The Instance And Expense Test.**[2]

*1. Ditko's Contributions to the Works Were Made at Marvel's Instance.*

Defendant's arguments on the instance prong are off track from the start.  Defendant

spends several pages attacking MCI for "consciously avoid[ing]" that "'[t]he *right* to direct and

supervise' a worker's creative process must mean a *legal* right."  (Opp. at 24-26.)  Yes, MCI

does "avoid" that hypothesized rule—but only because it misstates the law.  That precise

argument was raised by the Kirby Heirs and squarely rejected by the Second Circuit:

> Their argument is that the "right to supervise" referred to in our case law requires a legal, presumably contractual, right.  We find no hint of this requirement in our case law applying the instance and expense test.  Nor do the Kirbys provide a principled reason why Marvel's active involvement in the creative process, coupled with its power to reject pages and request that they be redone, should not suffice.

*Kirby*, 726 F.3d at 141-42 (citation omitted).  (*See* Ex. 98, Kirby Heirs' Opp'n Mem. at 13-15.)

Defendant's next arguments pay no greater heed to Second Circuit precedent.  For one,

he emphasizes that Ditko sold work to other publishers during the relevant time period,[3] and

advocates this as a way to distinguish *Kirby*.  (Opp. at 17, 27.)  But the same was true of Kirby—

the Second Circuit recognized that, like many artists, Kirby sold work to other publishers

contemporaneous with his work for Marvel.  726 F.3d at 141.  He also challenges MCI's reliance

on the fact "that Ditko 'worked in concert with Marvel's universe of characters and narratives,'"

---

[2] Defendant's characterizations of the facts depart from the actual evidence, as laid out more fully in MCI's responsive Rule 56.1 Statement.  *E.g.*, *compare* Opp. at 18 (asserting Ditko "almost always" inked his own drawings), *with* Lens Decl., Ex. 54 at 4; Ex. 55 at 3; Ex. 59 at 3; Ex. 60 at 3 (Ditko complaining that Marvel would not let him ink many of the Doctor Strange stories); *compare* Opp. at 18 (claiming "Ditko edited his own stories"), *with* Lens Decl., Ex. 2 80:24-81:12, 125:18-126:1; Ex. Ex. 53 at 3; 54 at 4 (reflecting that Marvel had the "ultimate authority" over any work, consistent with Ditko's lamentations that "[t]he editor is always right"); *see also* Opp. at 30, 33-35 (asserting Ditko had been "playing with" Doctor Strange and supporting Spider-Man characters "for years," even though the cited evidence contains no support for these propositions).

[3] Nonetheless the bulk of Ditko's work during the relevant period was for Marvel.  SUF ¶ 45.

arguing that is irrelevant because Ditko worked on many of those previous stories too.  (Opp. at 26.)  But he neglects to mention that, again, the same was true of Kirby, who "produce[d] drawings designed to fit within specific Marvel universes that his previously purchased pages had helped to define."[4]  726 F.3d at 142.  He also dubs Marvel's assignments mere "proposals," because "Ditko had no obligation to provide any work to Marvel, to revise his material, or to even finish the work he started."  (Opp. at 25.)  Again, he ignores that the Kirby Heirs raised the same failing argument.  (Ex. 98 at 15 ("Kirby had no legal obligation to provide material to Marvel, to modify his work or even to finish work he started."); *id.* ("Kirby was free to reject Marvel's requests").)  Defendant further contends that "every one of Marvel's factual assertions regarding 'instance' are just as or more readily a function of its purchasing power and standard role as a publisher," and so "do not support a judicial declaration that Ditko's Works were 'made for hire.'"  (Opp. at 30.)  Yet he fails to mention that the Second Circuit found these same factors material to, and dispositive of, the work-made-for-hire inquiry in *Kirby*.[5]  726 F.3d at 141-43.

Defendant's character-specific arguments are even less convincing.  Based on nothing more than speculation, he claims that Ditko developed Doctor Strange, as well as several supporting characters in the *Spider-Man* series, before he started working on those projects for Marvel.  (Opp. at 30-35.)  This theory is unmoored from the evidence and the law alike.  First,

---

[4] Defendant's argument also misses the point:  Like Kirby, Ditko drew "with Marvel specifically in mind," not merely with the "hope[] Marvel, as one of several potential publishers, might have an interest."  726 F.3d at 141.  Ditko could not sell a Spider-Man story to Charlton Comics—even if he was the one who drew the previous Marvel issues.

[5] Defendant also questions whether Stan Lee's "creative contributions" can be attributed to Marvel, because he was compensated separately for his writing and his role as editor-in-chief.  But even if Defendant were correct that Lee's writing (which, in any event, was done for hire) should be discounted, Lee's creative contributions spanned well beyond scripting stories.  What is most relevant is that Lee came up with the creative direction for Marvel's comics, conceived of character and story ideas, assigned work to the artists to bring his vision to life, and later revised them.  Being editor-in-chief was not limited to literally editing others' work.

Defendant's bare postulation that two drawings or story "elements" are related to each other does not constitute evidence.  For example, Defendant presents side-by-side an image of Spider-Man's elderly aunt, Aunt May, and an elderly female character who appeared in a Charlton Comics story from several years earlier.  (Opp. at 34.)  Although Defendant conclusorily proclaims one to be "the precursor" of the other, their only apparent similarities are advanced age, wrinkles, and gray hair pulled back.  (Opp. at 34.)  In short, both are elderly women.  That is a far cry from a developed character.  The same is true for the "curled hairstyle" and "corporate villainy" shared by two comic book characters drawn by Ditko a decade apart, the common comic-book trope of a "faceless" masked villain, or the electric superpowers shared by two characters Ditko drew and dozens more that he did not.  (Opp. at 34-35.)  At most, these surface-level parallels show that Ditko had his own artistic style and an affinity for certain types of characters and traits.  That has no bearing on whether he worked for hire.  Ditko's distinctive style is exactly why he was hired to draw stories for Marvel in the first place.  (*E.g.*, SUF ¶ 41.)

Defendant tries the same ploy with Doctor Strange, juxtaposing images of a 1946 facial sketch drawn by Ditko and a 1963 cropped image of Doctor Strange, and then stating as fact that the sketch "clearly depict[s] what became the character he sold to" Marvel.  (Opp. at 30-31.)  But Defendant admits that Ditko never told him the sketch was meant to be the Doctor Strange character; Defendant simply "assumed it."  (Ex. 81, Patrick Ditko Dep. Tr. at 62:3-10.)  Moreover, the generic similarities between the two images—their oblong faces, mustaches, streaked hair, and capes—"look[] like any number of comic book magicians over the years imitating Mandrake going back into the '40s."  (Ex. 84, Thomas Dep. Tr. at 303:14-304:19.)  Defendant proceeds to cite any instance of arguable similarity between Doctor Strange stories and those Ditko worked on for Charlton Comics, ascribing peculiar significance to "elements" as

generic as "us[ing] his hands to cast . . . spells."  (Opp. at 31-32.)  Of course, no artist, character,

or comic book has a monopoly on such ideas—much less ones this ordinary.

Defendant's hodgepodge of purported similarities reflects his misunderstanding of the

applicable test.  As discussed more fully in MCI's opposition to Defendant's motion, Dkt. 92 at

26-28, prior development of the "nascent idea for a character and story" (and certainly the idea

for a mere story *element*) does not undercut a work-made-for-hire finding.  *In re Marvel Ent.*

*Grp., Inc*., 254 B.R. 817, 830-32 (D. Del. 2000).  The hiring party is still considered the

"motivating factor" for the finished work, so long as the character or story was not "completely

developed" and "publication-ready" before the engagement began.  *Id.*  There is no evidence of

that here.

Defendant also tries to wave away Ditko's history of assignments drawing filler stories

for *Strange Tales*.  (Opp. at 32.)  Of course, that history is inconsistent with Defendant's

theory—supported by no evidence—that Ditko suddenly departed from that practice and created

the first Doctor Strange story "on spec."  Having certain creative freedom as to the content of an

assigned story is entirely consistent with working on assignment; that Ditko came up with ideas

for that assigned filler story does not mean he worked "on spec."  *Kirby*, 726 F.3d at 126-27

(Kirby worked at Marvel's instance even though he would "often think[] up and draw[]

characters on his own" and "pitch[] fresh ideas" for stories and characters); *see id.* at 141-42.[6]

2.  *Ditko's Contributions to the Works Were Made at Marvel's Expense.*

Defendant's arguments on the expense prong, too, distill to his disagreement with Second

Circuit precedent in general, and *Kirby* in particular.  But that comes as no surprise:  Marvel

---

[6] Defendant also points to Ditko's intermittent intransigence as a means of refuting the instance
prong.  That Ditko may have been difficult to work with proves nothing.  Notably, even though Ditko
openly disagreed with Marvel's editorial decisions, he never tried to effect a termination of any of the
Works in his lifetime or otherwise complained about Marvel's legal claim to them.

maintained consistent payment practices in the 1960s—the relevant time period in each case—so the "expense" facts pertaining to Ditko do not differ in any material way from those about Kirby. Defendant cannot make headway by quibbling with controlling authority.

His core argument is that "expense" concerns "who bore *the financial risk* associated with Ditko's creation of his material at issue, <u>*not*</u> Marvel's subsequent production and publication of the Stories or the risk that a particular Comic Book might not sell well." (Opp. at 36.) That is wrong. In *Kirby*, the Second Circuit focused equally on the "risks" assumed by "both parties . . . with respect to the works' success," including Marvel's risk "that the pages it did pay for might not result in a successful comic book." 726 F.3d at 143; *see also id.* at 140 (explaining that the expense prong aims to "reward[] with ownership the party that bears the risk with respect to the work's success"). And there, like here, Marvel bore the brunt of that risk.

Defendant's arguments fit right into the *Kirby* fact pattern. He argues the expense prong cannot be satisfied because (i) Ditko was not paid an advance for his work; (ii) Ditko provided his own workspace and supplies without reimbursement; and (iii) Marvel had "no legal obligation" to accept Ditko's work and, as such, to pay for it.[7] (Opp. at 37.) The Kirby Heirs advanced these very same arguments, to no avail.[8] *Kirby*, 726 F.3d at 142-43 (noting that

---

[7] Because Defendant cannot point to a single instance in which Marvel rejected Ditko's work without pay, he argues it is "irrelevant as a matter of law" whether Marvel rejected pages without payment "often or seldom." (Opp. at 37.) That too is wrong. In *Kirby*, the Second Circuit explained that, even if Marvel could reject Kirby's work, Kirby's "expectation" that Marvel would pay for his pages "proved warranted" "in the run of assignments." 726 F.3d at 142-43.

[8] Defendant elaborates on this final point with a standalone section claiming that "Marvel's conscious avoidance of the simple legal commitment to pay Ditko for confirming services is fatal to the 'expense' prong." (Opp. at 37-39 (initial capitals removed).) That rule statement clashes with *Kirby*, which found for Marvel on the expense prong notwithstanding the same lack of "legal commitment." In fact, the Kirby Heirs raised this exact argument. (Ex. 98 at 10 ("Marvel can offer no evidence that it was legally obligated to buy artwork submitted by Kirby or any other freelancer during the operative Period. The evidence shows exactly the opposite – that payment was *contingent* on Marvel's acceptance of completed artwork . . . .").)

Marvel "did not pay for Kirby's supplies or provide him with office space," "was free to reject Kirby's pages and pay him nothing for them," and paid Kirby on a "purely contingent" basis). (*See also* Ex. 98 at 9-13, 15-16.)  Once again, "Marvel's payment of a flat rate and its contribution of both creative and production value, in light of the parties' relationship as a whole, is enough to satisfy the expense requirement."  *Kirby*, 726 F.3d at 143.

### 3. There Is No Evidence of a Contrary Agreement Between Ditko and Marvel.

Because Ditko worked at Marvel's instance and expense, Defendant cannot overcome the work-made-for-hire presumption unless he demonstrates that the parties entered in "an agreement to the contrary contemporaneous with the creation of the work[s]."  *Id.*  Defendant, who bears the burden on this prong, fails to adduce *any* relevant, admissible evidence on it.  But even if he had, his argument largely regurgitates the failed one presented by the Kirby Heirs—even deploying the same evidence in support—that was ridden with "elliptical inferences" about intent and, in any event, entirely consistent with working for hire.[9]  *Id.* (Ex. 98 at 16-21; *see also* Dkt. 92 at 22-23.)

### C.  Attacks On Witness Credibility Cannot Create An Issue Of Fact.

Defendant alternatively argues that his doubts about the credibility of MCI's witnesses create an issue of fact and thus "doom[] [its] summary judgment motion."  (Opp. at 20.)  This argument misunderstands the summary judgment standard.

Defendant starts off with an accurate recitation of the law:  It is "well-settled" that "credibility determinations" are "jury functions" and "thus improper on summary judgment."

---

[9] Defendant alternatively argues that Marvel and Ditko could not have intended a work-for-hire relationship because courts had not yet clarified that the instance and expense test applied equally to independent contractors.  Not only does this argument parrot the one rejected in *Kirby*, *see* Ex. 98 at 20-21, but it also proves too much:  Defendant's reading would displace the settled rule of law that the instance and expense test applies to independent contractors under the 1909 Act, as no employer of an independent contractor would be able to establish the purportedly required "intent" for works created during the first 57 years of the Act's history.

(Opp. at 20). But he then draws entirely the wrong lesson from this authority, *i.e.*, that the moment a party questions the credibility of a witness, the court must throw its hands in the air and leave the case to a jury (or here, a bench trial). Quite the opposite. It means that, on summary judgment, a court cannot use credibility determinations to discount a witness's otherwise-uncontroverted testimony. Thus, where "the [movant] has made a properly supported motion, the [non-movant] may not respond simply with general attacks upon the [witness's] credibility, but rather must identify affirmative evidence from which a jury could find" for the non-movant. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998). It is Defendant, not MCI, who asks this Court to cast impermissible judgments on witness credibility.

Defendant is correct that the testimony of Stan Lee and Roy Thomas must be viewed in the light most favorable to him, as the non-movant, and that any ambiguities in their testimony must be resolved in his favor. But Defendant contorts the case law by arguing that "'ambiguity' about a witness' credibility"—whatever that means—must be bent in his favor too. (Opp. at 20-21.) Unsurprisingly, Defendant's cited authority for this proposition, *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006), says nothing of the sort and instead only confirms that a court "may not make credibility determinations" on summary judgment. In short, Defendant "cannot defeat summary judgment . . . merely by impugning [witnesses'] honesty." *McCullough v. Wyandanch Union Free Sch. Dist.*, 187 F.3d 272, 280 (2d Cir. 1999); *Island Software & Comput. Serv. v. Microsoft Corp.*, 413 F.3d 257, 261 (2d Cir. 2005) ("Broad, conclusory attacks on the credibility of a witness will not, by themselves, present questions of material fact.").

To cast doubt on Lee's credibility, Defendant attacks Lee's memory, his financial ties to Marvel, and his purported tendency to "self-aggrandiz[e]." (Opp. at 21-23.) He questions Thomas's neutrality, because Thomas testified for Marvel in several other actions and derived

income from Marvel.[10]  (Opp. at 23-24.)  And he cursorily attacks Lieber's testimony based on his advanced age.  (Opp. at 24.)  These "credibility" challenges fail to refute the substance of the witnesses' testimony, instead postulating their motives or bias—but that is exactly the sort of general attack on credibility that does not pass muster on summary judgment.[11]

The principal case on which Defendant relies, *Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 206 F.3d 1322 (9th Cir. 2000), defeats his own argument. There, on summary judgment, "[t]he district court characterized [a key witness's] declaration testimony as 'insufficient' and 'uncertain,' and commented on the possible inaccuracy of [her] memory"—and therefore rejected it.  *Id.* at 1330.  The Ninth Circuit reversed, holding that the district court erred because it "discounted the declarations by making a determination of credibility."  *Id.*  Yet that is *precisely* what Defendant asks this Court to do here.

This argument was also raised and rejected in *Kirby*.  Faced with the Kirby Heirs' parallel credibility challenge—indeed, concerning much of the same testimony—the court held that "general attacks on Lee's honesty or credibility, without more, are insufficient to raise a genuine issue of fact—especially since many matters about which Lee testified are corroborated by testimony from other freelance artists and writers."  *Marvel Worldwide, Inc. v. Kirby*, 777 F. Supp. 2d 720, 736 (S.D.N.Y. 2011) (internal citation omitted).[12]

---

[10] Defendant further challenges Thomas's status as a percipient witness, but Defendant concedes that Thomas and Ditko overlapped at Marvel.  (Opp. at 5, 23.)  And Defendant too relies on Thomas.

[11] Defendant also complains in passing that Lee's and Thomas's testimony contains hearsay.  But he neither elaborates nor submitted evidentiary objections.  Courts in this District have had "little difficulty rejecting" such "undifferentiated, blanket objections."  *See S.E.C. v. Cole*, 2015 WL 5737275, at *4 (S.D.N.Y. Sept. 19, 2015).  On substance, too, this objection fails because both witnesses' testimony is tethered to their personal experiences and observations at Marvel.

[12] Before the Second Circuit, the Kirby Heirs also unsuccessfully argued that "Marvel's [s]tar [w]itness, Stan Lee, [l]acks [c]redibility."  (Ex. 98 at 5.)

**D.  Marvel's Corporate Structure Does Not Affect The Instance And Expense Test.**

Defendant alternatively argues that Marvel cannot prevail because it registered the Works in the names of what he deems "[s]hell [c]ompanies." (Opp. at 10.)  He begins with the flawed premise that Marvel cannot "escape termination" unless it shows the Works were made for hire "by the *Shell Companies*" in particular. (Opp. at 11.)  But all works for hire are per se non-terminable.  17 U.S.C. § 304(c) (limiting the statutory termination right to copyrights "other than a copyright in a work made for hire").  What is relevant is that Ditko worked for hire, not for whom.  So even if Marvel had listed the wrong one of its affiliated entities on a copyright registration—though, to be clear, it stands by the registrations[13]—that would not make Ditko any less of a work-for-hire contributor or mean that he can somehow claim the rights to works he did not technically author.[14]  As a work-for-hire contributor, neither Ditko nor his estate has or ever had a termination right.  That is all this case is about.

Defendant also gets the facts wrong.  The entities comprising Marvel worked in concert with each other, all under the umbrella of Marvel Comics Group, serviced by Magazine Management Company.  (SUF ¶ 1.)  Defendant expresses his personal dissatisfaction with MCI's evidence, but he does not and cannot furnish any contrary evidence.  There is no genuine dispute.

## <u>CONCLUSION</u>

For the foregoing reasons, MCI's Motion for Summary Judgment should be granted.

---

[13] Defendant complains that the Works' initial registrations did not state they were made for hire. (Opp. at 10.)  This is misleading.  At the time, Form B registrations (the form applicable to the Works here) did not include a field for the author or statement of claim.  It was not until the Works were eligible for copyright renewal that Form B was updated to include these fields, thus allowing a renewal registrant to indicate that the work was a work for hire.

[14] A more detailed discussion can be found in MCI's cross-motion briefing, including Defendant's misplaced reliance on this Court's decision in *Waite*, though Defendant ignores many of MCI's arguments altogether.  Dkt. 92 at 30-35.

Dated:  July 28, 2023

**O'MELVENY & MYERS LLP**


By: _____*/s/ Daniel M. Petrocelli*_____
           Daniel M. Petrocelli

Daniel M. Petrocelli*
dpetrocelli@omm.com
Molly M. Lens
mlens@omm.com
Matthew Kaiser*
mkaiser@omm.com
1999 Avenue of the Stars, 8th Floor
Los Angeles, California 90067
Telephone:  (310) 553-6700
Facsimile:  (310) 246-6779

Allen Burton
aburton@omm.com
Danielle Feuer
dfeuer@omm.com
Times Square Tower
7 Times Square
New York, NY 10036
Telephone:  (212) 326-2000
Facsimile:  (212) 326-2061

* Admitted *pro hac vice*

*Attorneys for Marvel Characters, Inc.*