# EXHIBIT 103

Contains Confidential Portions

<pre>
                                                                  Page 1
 1

 2             UNITED STATES DISTRICT COURT

 3             SOUTHERN DISTRICT OF NEW YORK

 4   MARVEL WORLDWIDE, INC.,        )
     MARVEL CHARACTERS, INC.,       )
 5   and MVL RIGHTS, LLC,           )
                                    )
 6              Plaintiffs,         )
                                    )   Case No.
 7              vs.                 )   10-141-CMKF
                                    )
 8   LISA R. KIRBY, BARBARA J.      )
     KIRBY, NEAL L. KIRBY, and      )
 9   SUSAN N. KIRBY,                )
                                    )
10              Defendants.         )
     -------------------------------)
11

12            PARTIALLY CONFIDENTIAL
13         PURSUANT TO PROTECTIVE ORDER
14            (Pages 66 through 70)
15   VIDEOTAPED DEPOSITION OF LAWRENCE LIEBER
16              New York, New York
17              January 7, 2011
18
19
20
21
22
23   Reported by:
24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR
25   JOB NO. 35338
</pre>

Contains Confidential Portions

## Page 2

January 7, 2011

Partially confidential videotaped deposition of LAWRENCE LIEBER, held at Weil Gotshal & Manges, 767 Fifth Avenue, New York, New York, before Kathy S. Klepfer, a Registered Professional Reporter, Registered Merit Reporter, Certified Realtime Reporter, Certified Livenote Reporter, and Notary Public of the State of New York.

## Page 3

APPEARANCES:

WEIL, GOTSHAL & MANGES
Attorneys for Plaintiffs
    767 Fifth Avenue
    New York, New York  10153
BY:  RANDI W. SINGER, ESQ.
     SABRINA A. PERELMAN, ESQ.

TOBEROFF & ASSOCIATES
Attorneys for the Defendants
    2049 Century Park East, Suite 2720
    Los Angeles, California  90067
BY:  MARC TOBEROFF, ESQ.


ALSO PRESENT:
    ELI BARD, Marvel Entertainment
    MATTHEW SMITH, Legal Video Specialist

## Page 4

IT IS HEREBY STIPULATED AND AGREED, by and between the attorneys for the respective parties herein, that the filing and sealing be and the same are hereby waived.
    IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.
    IT IS FURTHER STIPULATED AND AGREED that the within deposition may be sworn to and signed before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court.

## Page 5

        L. Lieber
        THE VIDEOGRAPHER:  This begins tape labeled number 1 of the videotaped deposition of Lawrence Lieber in the matter of Marvel Worldwide, Incorporated, et al. v. Lisa R. Kirby, et al., in the United States District Court, Southern District of New York, Case Number 10-141-CMKF.
        This deposition is being held at 767 Fifth Avenue in New York, New York, on January 7, 2011 at approximately 11:09 A.M. My name is Matthew Smith for TSG Reporting, Incorporated, and I am the legal video specialist.  The court reporter is Kathy Klepfer, in association with TSG Reporting.
        Will counsel please introduce yourself for the record?
        MS. SINGER:  Randi Singer of Weil Gotshal for plaintiffs Marvel Worldwide. With me is my colleagues Sabrina Perelman, also of Weil Gotshal.
        MR. BARD:  Eli Bard, Deputy General Counsel, Marvel Entertainment.
        MR. TOBEROFF:  Marc Toberoff, Toberoff & Associates, for the Kirby family.

2021MARVEL-0042360

### Page 6

```
1              L. Lieber
2        THE VIDEOGRAPHER: And will the court
3     reporter please swear in the witness?
4              * * *
5     LAWRENCE LIEBER, called as a
6       witness, having been duly sworn by a Notary
7       Public, was examined and testified as
8       follows:
9     EXAMINATION BY
10    MS. SINGER:
11       Q.   Good morning, Mr. Lieber.
12       A.   Good morning.
13       Q.   Have you ever been deposed before?
14       A.   No.
15       Q.   Okay. Just a couple of ground rules.
16    You have to give, when I ask you a question, you
17    have to give a verbal answer so that she can
18    write it down because she can't get nods of your
19    head or anything like that. So you have to say
20    "yes" or "no" or words.
21       A.   Uh-huh.
22       Q.   If you don't understand any of my
23    questions, please feel free to ask me to
24    rephrase or ask for clarification. Okay?
25       A.   (Witness nods.)
```

### Page 7

```
1              L. Lieber
2        Q.   If you need a break at any time, just
3     let us know. Okay?
4        A.   (Witness nods.) Yes.
5        Q.   Mr. Lieber, could you just very
6     briefly tell us your personal background, your
7     age, your education, where you were born?
8        A.   Well, I'm 79 years old. I was born in
9     New York City, grew up in the Bronx in
10    Washington Heights. And I was in the service
11    about the age of, I think, 19 for four years in
12    the air force. Came out. I don't know, I lived
13    in Long Island with relatives, and then I lived
14    in, down in Tudor City when I started working
15    for Marvel, actually. That was in 1958.
16       Q.   Okay.
17       A.   ==And I worked for them from I guess, I==
18    ==don't know how many years. For the past 23==
19    ==years I know I've been working just on a==
20    ==newspaper strip for my brother, Stan Lee, and so==
21    ==I haven't been actually working for Marvel.==
22       Q.   Okay.
23       A.   He pays me.
24       Q.   Okay.
25       A.   And it's been I think 23 years, I
```

### Page 8

```
1              L. Lieber
2     said. And I don't do any other work. I'm a --
3     I've been a freelancer most of my life, but it
4     seems that I've only had one company to work for
5     or one person. I haven't been working for
6     different companies. And that's ...
7        Q.   Okay. Do you recall --
8        A.   And I've lived at the same address
9     since 1963, the same apartment.
10       Q.   Do you recall approximately when the
11    last time you did work for Marvel was?
12       A.   That's hard. Well, I'd have to go --
13    I would say, I would say if you go back 23 years
14    and take a couple years before that, I guess. I
15    didn't do much for them for quite a period of
16    time.
17             When my brother went out, he was -- he
18    was the head of Marvel in the city here and then
19    he went out to California. When he went out to
20    California, Marvel got a new editor, Jim
21    Shooter. I did some work for Jim Shooter, some
22    inventory stories, a couple. I didn't do much
23    work. I really wasn't working much. And I may
24    have done some covers at the beginning and then
25    a few inventory stories, and then I -- I don't
```

### Page 9

```
1              L. Lieber
2     remember.
3           I -- I know I was doing, sometime
4     back, I did The Hulk newspaper strip. That
5     started out with my brother writing it and me
6     drawing it, penciling it, and it didn't do well
7     and he finally said I could write it, and I
8     wrote that for a while. But it didn't last too
9     long and but I don't remember when these things
10    were.
11       Q.   Okay. We're going to focus today on
12    the period from 1958 to 1965, so that's fine.
13       A.   Uh-huh.
14       Q.   I think you mentioned that you started
15    working at Marvel in about 1958?
16       A.   I could tell you, yeah, it was -- it
17    was -- well, I remember the date. This I happen
18    to remember. June, the end of June.
19       Q.   Okay.
20       A.   About then, yeah. '58.
21       Q.   And how did you come to work for
22    Marvel?
23       A.   Stan offered me -- I had to earn a
24    living. I had been living with relatives and I
25    was going to the Art Students League studying
```

Page 58

1            L. Lieber
2    Q.   Other than Marvel's attorneys, did --
3 who else did you speak with regarding this
4 lawsuit?
5    A.   Well, I spoke with my brother, Stan
6 Lee.
7    Q.   And when was the first time you spoke
8 with your brother?
9    A.   I don't recall, but I -- I spoke with
10 him after I was -- I know after I was first
11 approached and asked to come down and talk about
12 the past.
13    Q.   This was after you were approached and
14 you testified --
15    A.   After the phone call.
16    Q.   And you testified that you declined;
17 is that correct?
18    A.   Yes. Yes.
19    Q.   And then you got a call from your
20 brother?
21    A.   No, I talked -- I speak with him every
22 week to -- to go over my work. I have to send
23 my work to him, so while I was speaking to him,
24 I mentioned it.
25    Q.   And what did you say to him?

Page 59

1            L. Lieber
2    A.   I told him what had happened and, you
3 know, the call, and I told him I declined.
4    Q.   And what did he say to you?
5    A.   He didn't tell me I shouldn't, but he
6 sort of said, "Well, I hope you don't lose the
7 strip because of it or something."
8    Q.   And he was referring, when he said, "I
9 hope you don't lose the strip because of this,"
10 he was referring to your work on the Spider-Man
11 strip?
12    A.   Yes.
13    Q.   Is that, is your work on the
14 Spider-Man strip your sole means of livelihood?
15    A.   Yes.
16    Q.   And has it been your sole means of
17 livelihood for the past I think you testified 23
18 years?
19    A.   Yes.
20    Q.   Did you speak to your -- I think you
21 mentioned did you speak to your brother Stan
22 about your testifying in this case again after
23 that?
24    A.   Yes. I told him --
25    Q.   When was that?

Page 60

1            L. Lieber
2    A.   Let's see, I told him that I had
3 finally -- the second time I got the phone call,
4 ==I spoke to him, and this time I told him I==
5 ==decided to go down and talk to the lawyers for==
6 ==Marvel or Disney. And I told him I was nervous==
7 ==about it, and he said not to be, just tell the==
8 ==truth, don't worry about anything. He was==
9 ==reassuring, or tried to be.==
10    Q.   Now, at your first meeting with
11 Marvel's attorneys, to the best of your
12 recollection -- and I don't need exact quotes --
13 what did Marvel's attorneys tell you?
14    A.   I don't recall them telling me except
15 asking me questions not as specific as today,
16 but similar, in general, how I worked and what
17 it was like and so on. I don't remember the
18 exact questions or -- or -- other than what they
19 asked was similar to what I've been asked in the
20 interviews, and my answers were similar to what
21 I've given in interviews and what I gave today.
22 I feel like they're all the same.
23    Q.   And did Marvel's attorneys in any
24 respect characterize claims made by the Kirby
25 family in any respects?

Page 61

1            L. Lieber
2         MS. SINGER: I object to that on
3    grounds of privilege.
4         MR. TOBEROFF: You can answer.
5    A.   When I first came into the room, the
6 gentleman lawyer who is not present today, who
7 was present then, I think he spoke about it as a
8 claim that, I don't know, I got the impression
9 that it was sort of unjustified what Kirby was
10 claiming and that, I don't know, that he was --
11 can I put it that Kirby was treated fairly,
12 there was nothing done wrong or that they know,
13 but they were pressing it. This was the
14 impression I got.
15    Q.   Characterizing the claims in the Kirby
16 lawsuit as being unjustified?
17         MS. SINGER: Objection.
18    A.   I think so. That was the --
19 I'm sorry.
20         MS. SINGER: I objected to the
21    question.
22    A.   That was the impression I had.
23    Q.   Anything else you can recall in that
24 respect?
25    A.   In that respect, no. No. Nothing

2021MARVEL-0042374

Page 62

1        L. Lieber
2   else.
3      Q.  Now, at the meeting this morning
4   before the deposition, what do you recall was
5   said to you?
6      A.  My mind...
7          Just to answer the questions, as I
8   think you said, you know, be specific, and
9   something about there may be objections. And
10  that made me nervous about objections.  I
11  thought I'm in a conflict.  But then I got I
12  think reassured that it had nothing to do with
13  me that much and I could still answer or not
14  answer, and I said I wanted to answer everybody
15  who's asking me the question.  And other than
16  that, I don't recall much more.
17     Q.  Now, the first meeting you had at
18  these law offices with Marvel's attorneys, how
19  long did that meeting last, approximately?
20     A.  I think it was a couple hours.  I'm
21  not...
22     Q.  And at that first meeting with
23  Marvel's attorneys, did you bring any documents
24  to the meeting?
25     A.  No.

Page 63

1        L. Lieber
2      Q.  Were you shown any documents at that
3   meeting?
4      A.  No.  I don't believe so.
5      Q.  And at the second meeting this
6   morning, were you shown any documents?
7      A.  No, I don't -- I don't believe so.
8   Not until here, no.
9      Q.  Not until the deposition?
10     A.  Yes.
11     Q.  Did you speak with, other than
12  Marvel's attorneys and -- and your brother Stan
13  Lee, did you speak with anyone else regarding
14  this lawsuit?
15     A.  Well, the woman in my life who I live
16  with, we talk about it.
17     Q.  I understand.  Other than her?
18     A.  I did.  I have a friend who is a
19  lawyer, and we've been friends for years, and I
20  told him about the situation when I was asked to
21  come down.  And he asked me if I want to have a
22  lawyer go with me.  He said you have a right or
23  something.  And I said, no, I don't want
24  anybody.  My only intention is to go down and
25  tell the truth as I know it.

Page 64

1        L. Lieber
2       I don't -- if I'm nervous about it,
3   that's just me, but I'm not -- I'm not going
4   down as a defendant or being accused of
5   anything.
6      Q.  And you didn't -- did you speak with
7   anyone from the Walt Disney Company about this
8   case?
9      A.  No.  No.  No.
10     Q.  Did you review any deposition
11  transcripts of other witnesses in this case?
12     A.  No.
13     Q.  Did your brother Stan talk to you
14  about his deposition?
15     A.  Yes.  Well, he didn't talk about it.
16  I happened to call him the day he came back from
17  giving a deposition, and he said it took him
18  seven hours and he was exhausted.  And that was
19  all he said about it.  So, that's what...
20     Q.  Are you presently an employee with
21  regard to the Spider-Man strips that you
22  illustrate, or do you work freelance?
23     A.  I'm freelance.  I'm freelance.
24     Q.  And you work for your brother Stan
25  Lee, correct?

Page 65

1        L. Lieber
2      A.  Yes.
3      Q.  And you draw the art for the
4   syndicated newspaper strip The Amazing
5   Spider-Man?
6      A.  Yes, I draw what we call the dailies,
7   Monday through Saturday.  There's a Sunday page
8   that's in color and somebody else draws that.
9      Q.  Who draws that?
10     A.  Saviuk his name is.  All of a sudden,
11  I can't think of his first name.
12     Q.  That's okay.
13     A.  And he draws that.
14     Q.  Do you have a contract?
15     A.  I'm sorry.  Alex was his name.  Alex
16  Saviuk.
17         Do I have a contract?  No.
18         (Pages 66 through 70 have been marked
19  confidential pursuant to the protective order
20  and will continue on the next page.)

Contains Confidential Portions

```
                                Page 106
 1              L. Lieber
 2    That's the beginning of an article entitled
 3    "Kirby's Gamma Rays: Alpha to Omega!" Do you
 4    see that?
 5        A.   I'm sorry, yes. I have the page, yes,
 6    "Kirby's Gamma Rays: Alpha to Omega!" Yes.
 7        Q.   Now, when you turn to page 72
 8    through -- they're not all numbered, but 72
 9    through 74.
10        A.   Uh-huh.
11        Q.   Are those copies of --
12        A.   Yes.
13        Q.   -- these Hulk drawings that were
14    ripped in half?
15        A.   Yes. Yes. Yes.
16        Q.   And the line appearing in these
17    drawings is the place where, again, where they
18    were ripped in half?
19        A.   Yes.
20        Q.   And did you supply these to the Kirby
21    Collector for the purposes of this article?
22        A.   I don't believe so. I don't -- I
23    didn't recall who or where I supplied them, and
24    when I read them in the Kirby article, I was
25    surprised and I thought, well, what is that
```

```
                                Page 107
 1              L. Lieber
 2    doing there? Don't I have them? And I -- I
 3    went and looked through and I found I have them.
 4    So I said, well, they're here, the originals, I
 5    must have. But when or where I don't know.
 6             I don't, again, my memory isn't good
 7    and I'm not always careful, so somebody I can
 8    assume must have asked me can I borrow them or
 9    take a picture of them or can I have them.
10    Because these are stats of them here. And I
11    must -- or Xeroxes. And either I gave them the
12    copies or they took them and made copies and
13    gave me back the originals. And who that
14    person -- they were I don't know. It may have
15    been the Kirby Collector or somebody before who
16    gave them to the Kirby Collector. I don't know.
17        Q.   Okay. And were you interviewed in
18    connection with this article about these
19    drawings?
20        A.   No. No. It was just written here.
21             (Lieber Exhibit 7, a document bearing
22    Bates Nos. MARVEL0016570, marked for
23    identification, as of this date.)
24             MR. TOBEROFF: I would like to mark as
25    Lieber Exhibit 7 an agreement dated June 14,
```

```
                                Page 108
 1              L. Lieber
 2    1978 between Larry Lieber and the Marvel
 3    Comics Group, a Division of Cadence
 4    Industries Corporation.
 5        Q.   Mr. Lieber, do you have any
 6    recollection regarding the agreement that's been
 7    marked Lieber Exhibit 7?
 8        A.   No. No.
 9        Q.   Is that your signature at the bottom
10    of the page?
11        A.   It looks like it, yes. Yes.
12             (Lieber Exhibit 8, excerpts from Comic
13    Book Marketplace No. 72, October 1999,
14    marked for identification, as of this date.)
15             (Lieber Exhibit 9, excerpts from Comic
16    Book Marketplace No. 73, November 1999,
17    marked for identification, as of this date.)
18             MR. TOBEROFF: I would like to mark as
19    Lieber Exhibit 8 excerpts from Comic Book
20    Marketplace No. 72, October 1999; and mark,
21    please, as Lieber Exhibit 9 excerpts from
22    Comic Book Marketplace No. 73, November
23    1999. Exhibit 8 and 9 comprise parts 1 and
24    2 of an interview with Larry Lieber.
25        Q.   Turning to the third page in -- fourth
```

```
                                Page 109
 1              L. Lieber
 2    page in of Exhibit 8, is that, is that you on
 3    the cover there?
 4        A.   Yes. Yes, I guess, yes.
 5        Q.   It says, "Marvel's Mystery Man...
 6    Larry Lieber"?
 7        A.   Yes, that must be me.
 8        Q.   Did you give this interview?
 9        A.   I don't remember giving it, but I must
10    have.
11        Q.   Do you have any reason to believe you
12    didn't give this interview?
13        A.   No. No. Sure. It sounds like me,
14    all the details. Yeah, that's me. Must have.
15             Hum. '99.
16             MR. TOBEROFF: I have no further
17    questions for the time being, depending on
18    what questions you ask.
19             MS. SINGER: I have just a couple
20    of -- a couple of quick follow-up questions.
21    FURTHER EXAMINATION BY
22    MS. SINGER:
23        Q.   Mr. Lieber, did anyone at Marvel ever
24    tell you that if you didn't speak with their
25    lawyers, you would lose the strip?
```

Page 110

1       L. Lieber
2       A.  No.
3       Q.  Did anyone at Marvel ever promise you
4   more work or more money or anything if you gave
5   a deposition or testified?
6       A.  No.
7       Q.  You spoke with Mr. Toberoff about a
8   zombie story, a plot that you gave them, and
9   there was an editor who made you redo it a
10  couple of times.  Who was that editor?
11      A.  Marv Wolfman.
12      Q.  Do you know approximately when that
13  was?
14      A.  It was -- I did the -- I'm trying -- I
15  figure in the '70s, probably, in the '70s.  It
16  was after I finished The Rawhide Kid, which I --
17  I don't know when it was, and sometime after
18  that.
19      Q.  Okay.  Other than that, that zombie
20  story with Mr. Wolfman, did you ever -- strike
21  that.  For the period 1958 to 1965, did you ever
22  submit any work to Marvel that hadn't been
23  assigned to you?
24      A.  No.  No.
25      MS. SINGER:  I have no further

Page 111

1       L. Lieber
2   questions.
3       I just want to make sure before we're
4   done that we stipulate on the record that
5   Mr. Lieber has appeared today in response to
6   plaintiffs' subpoena and defendants'
7   subpoena and that he's testified fully and
8   that he is done, he has satisfied both
9   subpoenas and he's done.
10      MR. TOBEROFF:  Well, I'll --
11      MS. SINGER:  Subject to whatever
12  follow-up you have.
13      MR. TOBEROFF:  The "testified fully"
14  part I don't know about, but that he's
15  satisfied the subpoenas and we can conclude
16  his deposition pursuant to those subpoenas,
17  I agree.
18      MS. SINGER:  Fair enough.  Okay.  He
19  doesn't have to come back for a deposition
20  is my point.
21      MR. TOBEROFF:  Not -- not in
22  connection with this action so far.
23      MS. SINGER:  Do you have any
24  follow-up?
25      MR. TOBEROFF:  We're done.  I'm done.

Page 112

1       L. Lieber
2       MS. SINGER:  Okay.
3       THE VIDEOGRAPHER:  This concludes tape
4   number 3 of 3 of the videotaped deposition
5   of Lawrence Lieber.  The time is 2:24 P.M.
6   We are now off the record.
7                   oOo

_____
LAWRENCE LIEBER

Subscribed and sworn to
before me this     day
of       2011.

_____

Page 113

1       L. Lieber
2               CERTIFICATE
3   STATE OF NEW YORK )
                      : ss
4   COUNTY OF NEW YORK)
5       I, Kathy S. Klepfer, a Registered
6   Merit Reporter and Notary Public within and
7   for the State of New York, do hereby
8   certify:
9       That LAWRENCE LIEBER, the witness
10  whose deposition is herein before set forth,
11  was duly sworn by me and that such
12  deposition is a true record of the testimony
13  given by such witness.
14      I further certify that I am not
15  related to any of the parties to this action
16  by blood or marriage and that I am in no way
17  interested in the outcome of this matter.
18      I further certify that neither the
19  deponent nor a party requested a review of
20  the transcript pursuant to Federal Rule of
21  Civil Procedure 30(e) before the deposition
22  was completed.
23      In witness whereof, I have hereunto
24  set my hand this 20th day of January, 2011.
25      -------------------------------

Page 114

```
1         L. Lieber
2         INDEX
3    TESTIMONY OF L. LIEBER:              PAGE
4    Examination by Ms. Singer            6, 109
5    Examination by Mr. Toberoff          50
6    LIEBER EXHIBITS:                     PAGE
7    Exhibit 1, a document bearing Bates Nos.   40
8    MARVEL0017320 through 332
9    Exhibit 2, a document bearing Bates Nos.   44
10   MARVEL0017333 through 362
11   Exhibit 3, Excerpts from Son of Origins    83
12   of Marvel Comics, by Stan Lee
13   Exhibit 4, an excerpt from a magazine      98
14   entitled Five Fabulous Decades of the World's
15   Greatest Comics by Les Daniels
16   Exhibit 5, reduced copies of six large pages   102
17   of drawings by Jack Kirby that were in the
18   possession of Lawrence Lieber and furnished in
19   response to subpoena
20   Exhibit 6, an excerpt from Jack Kirby Collector   105
21   Forty-One
22   Exhibit 7, a document bearing Bates Nos.   107
23   MARVEL0016570
24   Exhibit 8, excerpts from Comic Book Marketplace   108
25   No. 72, October 1999
```

Page 115

```
1         L. Lieber
2         INDEX (Cont'd.)
3    LIEBER EXHIBITS:                     PAGE
4    Exhibit 9, excerpts from Comic Book Marketplace   108
5    No. 73, November 1999
```

Page 116

```
1         L. Lieber
2    NAME OF CASE:  Marvel v. Kirby, et al.
3    DATE OF DEPOSITION:  January 7, 2011
4    NAME OF WITNESS:  Lawrence Lieber
5    Reason Codes:
6       1. To clarify the record.
        2. To conform to the facts.
7       3. To correct transcription errors.
8    Page _____ Line _____ Reason _____
     From _____ to _____
9
     Page _____ Line _____ Reason _____
10   From _____ to _____
11   Page _____ Line _____ Reason _____
     From _____ to _____
12
     Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
     From _____ to _____
15
     Page _____ Line _____ Reason _____
16   From _____ to _____
17   Page _____ Line _____ Reason _____
     From _____ to _____
18
     Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
     From _____ to _____
21
     Page _____ Line _____ Reason _____
22   From _____ to _____
23   Page _____ Line _____ Reason _____
     From _____ to _____
24
25
```