# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARVEL CHARACTERS, INC., | **Case No.: 1:21-cv-07957-LAK** |
| Plaintiff, | Hon. Lewis A. Kaplan |
| v. | **MARVEL CHARACTERS, INC.'S REPLY LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** |
| PATRICK S. DITKO, in his capacity as Administrator of the Estate of Stephen J. Ditko, | |
| Defendant. | |
| PATRICK S. DITKO, in his capacity as Administrator of the Estate of Stephen J. Ditko, | |
| Counterclaimant, | |
| v. | |
| MARVEL CHARACTERS, INC. and DOES 1-10, inclusive, | |
| Counterclaim-Defendants. | |

Pursuant to Local Civil Rule 56.1 of the Local Rules of the United States District Court for the Southern District of New York ("Local Rules"), Plaintiff Marvel Characters, Inc. ("MCI"), by and through its undersigned counsel, respectfully submits the following reply statement of material facts as to which there is no genuine issue to be tried in support of its motion for summary judgment.

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| **THE PARTIES** | | |
| 1.      The companies now known as "Marvel" were preceded by numerous predecessors-in-interest doing business as the Marvel Comics Group, including: Martin and Jean Goodman, their Magazine Management Company partnership, and their wholly-owned entities Atlas Magazines, Inc., Canam Publisher Sales Corp., Non-Pareil Publishing Corp., Vista Publications, Inc., and Magazine Management Company, Inc. (New York); Perfect Film & Chemical Corp. ("Perfect") (later renamed as Cadence Industries Corp. ("Cadence")); Magazine Management Company, Inc. (Delaware); and Marvel Entertainment Group, Inc. (collectively, "Marvel"). *See* May 19, 2023 Declaration of Eli Bard (Dkt. 70, "Bard Decl.") ¶ 2; Bard Decl., Ex. 1 (reflecting incorporation and later dissolution of Marvel entities in existence during the early 1960s and their common ownership by Martin Goodman); Bard Decl., Ex. 2 (showing Martin and Jean Goodman's ownership of Marvel); Bard Decl., Ex. 4 (same); Bard Decl., Ex. 3 (listing various "active corporations and magazines"); Bard Decl., Ex. 5 at 2-3 (reporting on Magazine Management Company, a "[p]artnership formed 1942" | **Counterclaimant admits that the companies it lists are Marvel's alleged predecessors but denies the above statement to the extent it implies that in the relevant Period there was any corporate relationship or other legal relationship between Goodmans' independent shell companies, Atlas Magazines, Inc., Canam Publisher Sales Corp., Non-Pareil Publishing Corp., Vista Publications, Inc. (each dissolved in 1968) and the Goodmans' partnership Magazine Management Company ("Magazine Management"), other than common ownership. Counterclaimant further disputes this statement to the extent it implies that "Marvel Comics Group" had any corporate or legal status or significance in the Period because it was not a legal entity in the Period and was merely a name Magazine Management sometimes placed on the cover of some of the comic books it published. In 1973, well after the Period, Perfect Film and Chemical (which in 1968 had purchased all of the publishing assets of Magazine Management and Goodman's numerous shell companies) renamed itself Cadence Industries and renamed** | This fact remains undisputed.

Defendant admits that the list is comprised of Marvel's predecessors, but contests that there was any "corporate relationship or other legal relationship . . . other than common ownership" between Goodman's entities, which is incorrect and turns on improper legal argument.  As the evidence cited in support of this fact demonstrates, Goodman's various comic book entities conducted business as "Marvel" or "Marvel Comics Group" and engaged with Magazine Management Company for administrative services, including payments to those providing services to Marvel.  *See* MCI's Evidence in Support of Undisputed Facts 1 and 49.

Further, Defendant's contention that "Marvel Comics Group" had no "corporate or legal status or significance" and "was merely a name," is likewise incorrect and turns on improper legal argument.  As the evidence cited in support of this fact establishes, these entities long did business as Marvel.  *See, e.g.*, Bard Decl., Ex. 8 at 5-6 ("Beginning in 1940, the predecessors of the plaintiffs, a group of commonly owned and |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| that acts as "the managing organization for the various publishing corporations in which Martin Goodman is a principal or a stockholder"); Bard Decl., Ex. 6 at 3 ("Magazine Management Company . . . renders administrative services to and exercises the over-all control over" other Goodman-owned publishing corporations); Bard Decl., Ex. 7 at 5 ("Martin Goodman . . . formulates, directs and controls the acts and practices of each corporate respondent either directly or through the partnership, Magazine Management Company . . . ."); Bard Decl., Ex. 8 at 5-6 (A "group of commonly owned and controlled corporations collectively known as the Marvel Comics Group" published comic books "frequently includ[ing] material concerning characters featured in other publications of the Group"); Bard Decl., Ex. 10 at 2, 9 (June 28, 1968 agreement for sale of the Goodmans' Marvel Comics business to Perfect, providing that all then-existing copyrights be assigned to Perfect (the "June 28, 1968 Sale")); Bard Decl., Ex. 11 at 3 (December 7, 1978 acknowledgment of assignment between Martin and Jean Goodman and Perfect's successor-in-interest, Cadence, affirming, pursuant to the June 28, 1968 Sale, assignment of all "copyrights and | **Magazine Management's publishing business the Marvel Comics Group.** *See* Lens Decl., Ex. 18 72:25-73:11 (Goodman discussing his publishing entities, explaining that "each corporation st[ood] on its own"); Declaration of Marc Toberoff ("Toberoff Decl."), Ex. 46 (1966-67 list Goodman's myriad entities with no mention of "Marvel Comics Group"); Bard Decl., Ex. 10 (June 28, 1968 sales agreement of Magazine Management and the shell companies' assets to Perfect); Bard Decl., Ex. 1 (reflecting dissolution of the shell companies Atlas Magazines, Inc., Canam Publisher Sales Corp., Non-Pareil Publishing Corp., Vista Publications, Inc.); Toberoff Decl., Ex. 43 (March 22, 1975 Agreement between Marvel Comics Group and Gene Colan); Bard Decl., Ex. 13 at 2-3 (December 29, 1986 Cadence agreement "relating to [Cadence's] Marvel Comics Group business."). | controlled corporations collectively known as the Marvel Comics Group" published comic books); *see also* June 30, 2023 Molly M. Lens Declaration (Dkt. 94, "Lens Opp. Decl."), Ex. 93 at 4-5 (1966 advertising rate card for Marvel Comics Group soliciting advertisements across its magazines, reflecting that Marvel Comics Group "consists principally of the following magazines . . . [including] *Amazing Spider-Man* and *Strange Tales*"); Lens Opp. Decl., Ex. 92 at 3-8 (1947 advertising rate card for Marvel Comics Group).  And Ditko himself surely understood this, writing in 1965 that he "did 1st work for Stan Lee and Marvel" in 1955 and in 1958 "Stan Lee asked [him] to do some work, [and he] returned to Marvel."  *See* Lens Decl., Ex. 45 at 3.<br><br>MCI also **objects** to Toberoff Exhibit 43. *See* MCI's Evidentiary Objection No. [44]. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| renewals and extensions of copyrights," including all publications listed on Schedule B annexed thereto (including those listed in the termination notices (the "Works"))); Bard Decl., Ex. 9 at 2 ("Cadence Industries Corporation admits that its Marvel Comics Group division is engaged in the business of magazine publishing . . . ."); Bard Decl., Ex. 12 at 2-3 (January 1, 1972 assignment from Cadence's wholly owned subsidiary, Magazine Management Co., Inc. (Delaware) to Cadence of all copyrights relating to "its Marvel Comics Group Division or the comics business"); Bard Decl., Ex. 13 at 2-3 (December 29, 1986 assignment from Cadence to MEG of all "copyrights relating to [Cadence's] Marvel Comics Group business," including all publications listed on Schedule A annexed thereto (including the Works)); Bard Decl., Ex. 14 (November 20, 1986 purchase agreement between Cadence Industries Corporation and New World Pictures, Ltd.); Bard Decl., Ex. 15 (November 4, 1988 acquisition agreement between New World Entertainment, Ltd. and Andrews Group Incorporated relating to MEG); Bard Decl., Ex. 16 (September 1, 1995 assignment from MEG to MCI of all copyrights "in its comics books and comic | | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| book-related works," including all publications listed on Schedule A annexed thereto (including the Works)); May 19, 2023 Molly M. Lens Declaration (Dkt. 71, "Lens Decl."), Ex. 75 (Goodman certifying as president of various publishing corporations that he, Jean Goodman, and said corporations conducted business as "Marvel"); Lens Decl., Ex. 76 (Goodman certifying as president of various publishing corporations that he, Jean Goodman, and said corporations conducted business as "Marvel Comics Group"); Lens Decl., Ex. 18 72:25-73:11 (Goodman discussing his publishing entities, explaining that "each corporation st[ood] on its own" but he "own[ed] them either completely or [his] wife may [have] own[ed] some stock in some of them"); Lens Decl., Ex. 13 11:24-12:3 ("It had many different names over the years, and it finally became Marvel."); Lens Decl., Ex. 6 9:6-10:1 ("As far as I know, Marvel Comics Group did the comic books and Magazine Management was the overall company that did all the other magazines. They had all different kinds of magazines."); Lens Decl., Ex. 6 6:13-25 ("[Marvel was] bought by a company called Perfect Film and Chemical which later became Cadence Industries and that was later sold to New | | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| World and then it ended up with where it is now."); *see also* Lens Decl., Ex. 8 16:11-20; Lens Decl., Ex. 8 17:16-25; Lens Decl., Ex. 4 83:10-13; Lens Decl., Ex. 8 15:2-8; Lens Decl., Ex. 17 3:18-4:9. | | |
| 2.      Steven J. Ditko ("Ditko") was an artist who worked for Marvel from approximately 1955 to 1965, including a period from 1963 to 1965 where Ditko worked nearly exclusively at Marvel, before working again for Marvel from 1979 into the 1990s. Lens Decl., Ex. 45 at 3; Lens Decl., Ex. 44 at 3; Lens Decl., Ex. 25; Lens Decl., Ex. 15 19:1-10; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 2 92:11-20; Declaration of Roy Thomas ("Thomas Decl.") ¶ 19. | **Counterclaimant disputes Marvel's use of the phrase "worked *for* Marvel" (emphasis added) to the extent it implies Steve Ditko ("Ditko") was employed or hired by any "Marvel" entity. Ditko was an independent artist, who had no employment contract with, nor was he employed by, any "Marvel" entity, nor did Ditko and "Marvel" share the bilateral rights and obligations that hiring entails during the relevant 1962-1965 period (the "Period").** Marvel has not produced any contemporaneous agreement with Ditko from the Period for his creative services, nor any other evidence reflecting any bilateral rights and obligations between Ditko and Magazine Management (nor any other alleged Marvel predecessor) in the Period, nor has Marvel alleged that any such agreement or bilateral legal rights and obligations existed between such parties in the Period. *See* Toberoff Decl. Ex. 1 at 10, 13 (Supplemented Expert Report of Mark Evanier ("Evanier Rep.") providing historical context giving rise to Marvel's use of freelance creators | **This fact remains undisputed.**

Defendant does not address the substance of this fact, much less dispute it.  Instead, Defendant suggests that Ditko did not work for Marvel because Ditko lacked a written employment agreement, which is incorrect, turns on improper legal argument, and—in any event—is immaterial, as the Second Circuit's decision in *Kirby* confirms.  *See Kirby*, 726 F.3d at 141-42 (rejecting the Kirbys' argument that "the 'right to supervise' referred to in our case law requires a legal, presumably contractual, right" because there is "no hint of this requirement in our case law applying the instance and expense test"—"Marvel's active involvement in the creative process, coupled with its power to reject pages and request that they be redone" suffices); *Kirby*, 777 F. Supp. 2d at 741-42 (rejecting the Kirbys' "entirely unpersuasive" argument that the lack of a written contract with Marvel meant it "lacked the legal right to control Kirby's work"). |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | and explaining that, when Magazine Management ran out of surplus artwork to publish, it began to purchase artwork and scripts from freelancers at a low page rate and that freelancers did not have written contracts with Magazine Management during the 1950s or 1960s and describing the common practice of freelancers selling material to more than one publisher, including Marvel, DC Comics, and Charlton Comics); Ex. 14 at 10-11 (Rebuttal Expert Report of Mark Evanier ("Evanier Rebuttal Rep.") explaining that it was not the custom and practice of Marvel or other publishers in the comic book industry to have written contracts with freelance creators during the Period); Ex. 2 at 71:17-74:5 (Larry Lieber ("Lieber") testifying that he sold freelance work to Marvel in the 1950s and 1960s, had no contract with Marvel, and that Marvel was not obligated to buy his submitted freelance material); Ex. 3 at 159:24-160:4, 194:11-195:3, 207:12-22, 211:7-212:3 (John V. Romita ("Romita") testifying that he did not have a contract with Marvel as a freelancer and that freelancers were free to sell work to other publishers); Ex. 5 at 371:3-25 (Stan Lee ("Lee") testifying that Marvel "would only buy what [it] needed"); Ex. 6 at 36:17-21, 202:2-20 (Roy Thomas | Defendant's argument that Ditko did not work for "Marvel" because he was paid and the Works were published by various Goodman comic book publishing entities is likewise incorrect and it too turns on improper legal argument.  As the evidence demonstrates, Goodman's various comic book entities conducted business as "Marvel" or "Marvel Comics Group" and engaged with Magazine Management Company for administrative services, including payments to those providing services to Marvel.  *See* MCI's Evidence in Support of Undisputed Facts 1 and 49. <br><br> Finally, Defendant's evidence **does not controvert** the fact that Ditko worked for Marvel from 1955 to 1965, including a period from 1963 to 1965 where Ditko worked nearly exclusively for Marvel. And, critically, none of Defendant's contentions change the fact that Ditko had a close and continuous working relationship with Marvel, precisely as Jack Kirby did.  *See Kirby*, 726 F.3d at 126 (explaining that "Kirby and Marvel were closely affiliated during the relevant time period . . . Although . . . [Kirby] could and did produce and sell work to other publishers"); *id*. at 141 ("Kirby's works during this period were hardly self- |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | ("Thomas") testifying that he had no contract with Marvel until 1974); Ex. 8 ¶ 10 (Joe Sinnott ("Sinnott") attesting that he had no contract with Marvel and Marvel was very small and disorganized in the 1950s and 1960s); Ex. 8 ¶ 11 (Sinnott attesting that Marvel had no obligation to buy pages of his work and that Marvel paid only for the pages it wanted); Ex. 9 ¶ 8 (James Steranko ("Steranko") Steranko attesting that Marvel had no contract with Steranko and so he was free to sell work to other publishers); Ex. 10 ¶ 12 (Richard Ayers ("Ayers") attesting that he had no contract with Marvel from 1959 to 1975); Ex. 11 ¶ 9 (Gene Colan ("Colan") attesting that he had no contract with Marvel until 1975); Ex. 13 ¶ 5-7 (Neal Adams ("Adams") attesting that he had no contract with Marvel in the 1960s or 1970s and that he sold work to both Marvel and DC Comics during the 1960s and 1970s); Ex. 17 at 39:25-40:4, 51:20-52:4, 298:8-14, 301:14-303:7 (Thomas testifying that he had no written contract from 1965 to 1974 and that Marvel did not have contracts with freelancers prohibiting them from selling work to other publishers); Ex. 22 at 287:22-288:12 (Lieber testifying that he had no contract with Marvel in the 1950s or 1960s); Ex. 24 at 79:2-8 (Paul Levitz | directed projects in which he hoped Marvel, as one of several potential publishers, might have an interest; rather, he created the relevant works pursuant to Marvel's assignment or with Marvel specifically in mind. Kirby's ongoing partnership with Marvel . . . is therefore what induced Kirby's creation of the works.").<br><br>Toberoff Exhibit 9 further **does not support** this contention, because over a decade ago, when Mr. Steranko was retained as an expert witness for Defendant's counsel, he testified that the paychecks he received from Marvel were "stamped work for hire[,] [a] little stamp on the opposite side I think said work for hire."  Lens Opp. Decl., Ex. 89 82:3-23. As Mr. Steranko explained, "[w]hen [he] worked at Marvel, [he] was on a work for hire basis," which he understood based on his "experience at Marvel," as Marvel "provided him with [a] description of the character," gave him "treatment[s] [or] synops[e]s of the material that they were looking for," "supervis[ed]" him, and "stamped [his checks] work for hire." *Id*. And after Marvel "edited [*sic*] some of [his] work" and "changed certain things that [he] didn't feel should be changed," Steranko, like Ditko, who "faced the same |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | ("Levitz") testifying that Marvel did not have contracts with any freelancer until the mid-1970s); Ex. 23 at 160:2-8 (Mark Ditko testifying that Ditko was selling work to both Marvel and Charlton Comics in the 1960s); Ex. 35 at DITKO-0199 (Ditko writing about his work at Charlton Comics in the 1960s); Ex. 57 at 2 (Ditko writing about creating material for Charlton Comics and DC Comics). **Counterclaimant further disputes the use of the term "Marvel," as Ditko was only ever paid by Magazine Management Company ("Magazine Management"), and not by any of the shell companies (e.g., Vista Publications, Inc. ("Vista"), Atlas Magazines, Inc. ("Atlas"), Non-Pareil Publishing Corp. ("Non-Pareil"))— which Marvel claims were its predecessors-in-interest and the legal "authors" of Ditko's creative material as the shell companies' "works made for hire"—Ditko also had no contract with any of them and, as the shell companies had no employees, he had no contact with any employee of the shell companies.** *See* Dkt. 1 (Marvel's Complaint), ¶ 4 (alleging Marvel owns "the copyrights in the famous Marvel characters and comics on which Ditko worked" "as evidenced by the relevant | frustrations," left Marvel. Lens Opp. Decl., Ex. 95 at 4-5. MCI also **objects** to Toberoff Exhibits 1, 2, 3, 8, 9, 10, 11, 12, 13, 14, 20, 22, 23, 35, 57, 61, 65, 67, 75, 77, and 79. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [2], [9], [11], [12], [13], [14], [15], [16], [17], [19], [25], [26], [31], [32], [41], [52], [55], [57], [58], [59], [60], & [61]. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
|  | copyright registration notices themselves"), ¶ 14 (again relying on Marvel's relevant copyright registrations and documenting them as Exhibit 1 to its Complaint); Ex. 1 (reflecting alleged recordation of copyright registrations with the United States Copyright Office); Dkt. 71 (Declaration of Molly Lens) ¶ 25 (attaching as composite Exhibit 24 the copyright registrations and renewal registrations relevant to Ditko's works (Dkt. 71-20 to 71-32) wherein Marvel's renewal registrations represent to the United States Copyright Office that the respective shell companies were the legal "authors" of the works as "works made for hire." *See also* Toberoff Decl., Ex. 14 at 4-5 (Evanier Rebuttal Rep. providing historical context and explaining that Martin Goodman ("Goodman") registered the copyright to comic books under the names of various different shell corporations that were unrelated to each other and had no employees, offices, or business activities, and had no contact with any freelancer); Ex. 6 at 200:2-24 (Thomas testifying that he was hired by Magazine Management in 1965); Ex. 17 at 317:18-318:18 (Thomas testifying that Goodman ran "Marvel" as a bunch of small companies rather than just as a unified Magazine Management for some |  |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | unknown business or legal reasons); *id*. at 244:15-23, 278:20-279:20 (Thomas testifying that the door to "Marvel's" office in 1965 only said "Magazine Management" and that "Marvel's" employees worked in Magazine Management's offices); *id*. at 318:4-322:14 (Thomas testifying that Vista, Atlas, Non-Pareil, and others were just used as names on the comic book cover copyright indicia, but other than the indicia, no one knew what those entities did); *id*. at 320:10-322:14 (Thomas testifying that no one knew what Vista, Atlas, or Non-Pareil did and that Thomas did not receive any money from them, does not know anyone who did, does not know if they had any employees or any offices, or "of [them] having any existence" whatsoever); Ex. 20 at 196:1-12 (Evanier testifying that Sol Brodsky ("Brodsky") described Goodman's shell companies as "shell companies"); Ex. 24 at 49:21-50:22, 51:19-52:2 (Levitz testifying that Vista was one of Goodman's shell companies and that the shell companies had no actual offices and that only Magazine Management had offices); Ex. 46 at 1-3 (list of Goodman's shell companies dated October 4, 1967 showing no legal or corporate relationship to one another or to Magazine | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | Management); Ex. 22 at 252:23-254:24, 303:15-19 (Lieber testifying that he never heard of Vista or other shell companies, did not know if they had any employees and that he was paid by, and believed he was working with, Magazine Management); Ex. 50 at DETTWILER-0044-0058 (Don Heck's payment records identifying "Magazine Management" as the only entity that paid him for his freelance material from 1962 to 1966 (the "Period")); Ex. 22 at 252:23-254:24, 303:15-19 (Lieber testifying that he never heard of Vista or the other shell companies, did not know if they had any employees and that he was paid by, and believed he was working with, Magazine Management). **Ditko in the Period sold his freelance material to Magazine Management and thereby significantly contributed to its comic books, but Ditko was also selling and contributing his freelance material to other publishers, including Charlton Comics, at the same time, as was his right.** *See* Toberoff Decl. Ex. 1 at 21 (Evanier Rep. describing Ditko's common practice of selling freelance work to various publishers during the Period); Ex. 12 ¶ 18 (Evanier attesting that Ditko was submitting freelance *Spider-Man* material to Marvel but was also selling work to | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | Charlton Comics at the same time); Ex. 23 at 160:2-8 (Mark Ditko testifying that Ditko was selling work to both Marvel and Charlton Comics in the 1960s); Ex. 35 at DITKO-0199 (Ditko writing about his work at Charlton Comics in the 1960s); Ex. 57 at 2 (Ditko writing about creating material for Charlton Comics and DC Comics); Ex. 61 (Ditko contributes to Charlton Comics' *Space Adventures* No. 27 (1959)); Ex. 65 (Ditko contributes to Charlton Comics' *Out of this World* No. 7 (1958)); Ex. 67 (Ditko contributes to Charlton Comics' *Strange Suspense* No. 32 (1957)); Ex. 75 (Ditko contributes to Charlton Comics' *Strange Suspense Stories* No. 33, *Director of the Board* (1957)); Ex. 77 (Ditko contributes to Charlton Comics' *Strange Suspense Stories* No. 48 (1960)); Ex. 79, "All Those Eyes" at 1-3 (Ditko contributes to Charlton Comics' *Out of this World* No. 6 (1957); | |
| 3.     Between 1962 and 1965 (the "Time Period"),[1] Ditko contributed to the creation of many comic book stories and characters appearing in Marvel comic books published during the Time Period, including the Works. Lens Decl., Ex. 63. | **Counterclaimant disputes the use of the phrase "*Marvel* comic books" (emphasis added) as Ditko was only ever paid by Magazine Management and the comic book stories to which Ditko contributed were published by** | **This fact remains undisputed.** Defendant does not address the substance of this fact, much less dispute it.  Instead, Defendant contends that Ditko did not contribute to "Marvel comic books" |

---

[1] Unless otherwise stated, all factual statements herein relate to the Time Period only. Note that due to a lag between when contributions were made and when a comic book was ultimately published, some Works were published in 1966 even though Ditko stopped working for Marvel in late 1965. *See* Thomas Decl. ¶ 18.

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | **various corporately unrelated shell companies (e.g., Vista, Atlas, Non-Pareil), and were not published nor paid for by "Marvel" and the copyrights to the comic books were registered in the United States Copyright Office in the name of such independent shell companies and thereafter renewed in the United States Copyright Office as "works made for hire" of the respective shell companies.** *See* Dkt. 71 (Declaration of Molly Lens) ¶ 25 (attaching as composite Exhibit 24 the copyright registrations and renewal registrations relevant to Ditko's works (Dkt. 71-20 to 71-32) wherein Marvel's renewal registrations represent to the United States Copyright Office that the respective shell companies were the legal "authors" of the works as "works made for hire."; Toberoff Decl., Ex. 14 at 4-5 (Evanier Rebuttal Rep. providing historical context and explaining that Goodman registered the copyright to comic books under the names of various shell corporations that were unrelated to each other and that the shell companies had no employees, offices, or business activities, and had no contact with any freelancer); Ex. 17 at 317:18-318:18 (Thomas testifying that Goodman ran "Marvel" as a bunch of small companies | because he was paid by and the works were published by entities with names other than "Marvel," which is incorrect and turns on improper legal argument.  As the evidence demonstrates, Goodman's various comic book entities conducted business as "Marvel" or "Marvel Comics Group" and engaged with Magazine Management Company for administrative services, including payments to those providing services to Marvel.  *See* MCI's Evidence in Support of Undisputed Facts 1 and 49.  The evidence further demonstrates that freelance contributors, including Ditko, contributed to Marvel's comic books pursuant to assignments from Lee, who directed the creation of the Works, and they were compensated by Marvel on an agreed per-page basis for completed assignments.  *See* MCI's Evidence in Support of Undisputed Facts 22, 23, and 49.  Lee, in turn, answered to Goodman, who not only owned the various entities that conducted business as "Marvel" or "Marvel Comics Group," but served as Marvel's publisher during the Time Period. *See* MCI's Evidence in Support of Undisputed Facts 1 and 9.<br><br>Further, Defendant's contention that Ditko did not "*merely* contribute[]" to the creation of many Marvel characters, but |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | rather than just as a unified Magazine Management for some unknown business or legal reasons); *id.* at 244:15-23, 278:20-279:20 (Thomas testifying that the door to "Marvel's" office in 1965 only said "Magazine Management" and "Marvel's" employees worked in Magazine Management's offices); *id.* at 318:4-322:14 (Thomas testifying that Vista, Atlas, Non-Pareil, and others were just used as names on the comic book cover copyright indicia, but other than the indicia, no one knew what those entities did); *id.* at 320:10-322:14 (Thomas testifying that no one knew what Vista, Atlas, or Non-Pareil did and that Thomas did not receive any money from them, does not know anyone who did, does not know if they had any employees or any offices, or "of [them] having any existence" whatsoever); *id.* at 138:3-139:2 (Thomas testifying that Magazine Management was the only payor of staff/freelancer checks); Ex. 20 at 196:1-12 (Evanier testifying that Brodsky described Goodman's shell companies as "shell companies"); Ex. 24 at 49:21-50:22, 51:19-52:2 (Levitz testifying that Vista was one of Goodman's shell companies and that Goodman's shell companies had no actual offices and that only Magazine Management had offices); | "originated" them "on spec" is incorrect and improper legal argument.  As the evidence shows, for the majority of the time Ditko worked for Marvel, Ditko worked under the Marvel Method and described his working relationship with Lee as a "collaboration" that involved meetings to discuss assignments, "plotting conferences" to discuss the stories he was drawing, and further meetings to go over draft artwork, with Ditko "noting anything to be corrected."  *See* MCI's Evidence in Support of Undisputed Facts 39 and 47.  According to Ditko "Stan provided the plot ideas."  Lens Decl., Ex. 48 at 2.  Indeed, Ditko's explanation of how he worked with Lee mirrors the Second Circuit's description of how Jack Kirby worked with Lee during approximately the same time period.  *Compare* Lens Decl., Ex. 48 at 2 ("Stan provided the plot ideas.  There would be a discussion to clear up anything, consider plot options and so forth . . . We would go over the penciled story/art pages and I would explain any deviations, changes, and additions, noting anything to be corrected before or during the inking."), *with Kirby*, 726 F.3d at 126 ("The first step was for Lee to meet with an artist at a 'plotting conference' … Lee would provide the artist with a 'brief outline' or 'synopsis' of |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
|  | Ex. 46 at 1-3 (list of Goodman's shell companies dated October 4, 1967 showing no legal or corporate relationship to one another or Magazine Management); Ex. 22 at 252:23-254:24, 303:15-19 (Lieber testifying that he never heard of Vista or other shell companies, did not know if they had any employees and that he was paid by, and believed he was working with, Magazine Management); Ex. 50 at DETTWILER-0044-0058 (Don Heck's payment records identifying "Magazine Management" as the only entity that paid him for his freelance material from 1962 to 1966); Ex. 22 at 252:23-254:24, 303:15-19 (Lieber testifying that he never heard of Vista or other shell companies, did not know if they had any employees and that he was paid by, and believed he was working with, Magazine Management and that he thought the name on the checks was Marvel or Magazine Management); Ex. 6 at 200:2-24 (Thomas testifying that he was hired by Magazine Management in 1965); Ex. 40 at 2021MARVEL-0005845 (Certificate of Renewal Registration of *Amazing Fantasy* Vol. 1, No. 15, the issue in which Spider-Man originally appeared, dated November 20, 1990, claiming "Atlas Magazines, Inc." as the original author and copyright claimant); Ex. 41 at 2021MARVEL- | an issue; sometimes he would 'just talk ... with the artist' about ideas …. [and t]he artist would then 'draw it any way they wanted to.'"). And here, as in *Kirby*, the fact that Ditko "had a freer hand within this framework than did comparable artists" is immaterial to whether Ditko worked at Marvel's instance and expense. *Id*.<br><br>Further, while Lee eventually exercised his editorial discretion to afford Ditko greater creative input, subject to Marvel's ultimate authority, this did not occur until sometime in 1965, late in Ditko's Marvel career, a period of time well after the major characters were introduced. *See* MCI's Evidence in Support of Undisputed Facts 25 and 47. But even then, Lee still assigned Ditko to the stories and could remove him at any time, could request or make changes to his work, or otherwise elect not to publish it. *See* MCI's Evidence in Support of Undisputed Facts 23, 27, 28, and 48. Indeed, Toberoff Exhibit 82 makes clear that after their falling out, Lee assigned Ditko "to start making up his own stories." Ditko continued to received his assignments from Marvel's production manager, Sol Brodsky, who gave them on Lee's behalf. *See* Toberoff Ex. 19 at 3 (Thomas |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | 0005849 (Certificate of Renewal Registration of *Amazing Spider-Man* Vol. 1, No. 1 dated November 20, 1990, claiming "Non-Pareil Publishing Corporation" as the original author and copyright claimant); Ex. 42 (Certificate of Renewal Registration of *Strange Tales* Vol. 1, No. 110, the issue in which Dr. Strange first appeared, dated December 27, 1991, claiming "Vista Publications, Inc." as the original author and copyright claimant).<br><br>**Counterclaimant further disputes that Ditko merely "*contributed* to the creation of many ... characters" (emphasis added), as, for example, and without limitation, Ditko solely originated the Dr. Strange character as early as 1946 and created the first five-page Dr. Strange story "on spec" which he then sold to Magazine Management and it was published in *Strange Tales* No. 110 (1963). In addition to co-creating Spider-Man, Ditko created a host of key supporting characters like the Chameleon, Electro, Aunt May, and Norman Osborn (the alter ego of the Green Goblin). Moreover, Ditko took over sole plotting and penciling both *Spider-Man* and *Dr. Strange* stories when Lee stopped speaking with Ditko later in the Period, and therefore solely** | discussing Ditko's working relationship with Lee when they "weren't speaking to each other," explaining how Marvel production manager Sol Brodsky served as Lee's intermediary on assignments); Lens Opp. Decl., Ex. 84 30:17-31:1 (Thomas testifying that "a lot of it went through the production manager, Sol Brodsky" who "was speaking for [Lee]"); Lens Opp. Decl., Ex. 84 335:2-5 (Thomas testifying that Lee would "give directions through Sol Brodsky").  Likewise, Lee still reviewed Ditko's work and had ultimate authority over it, regardless of whether he communicated directly with Ditko.  Toberoff Ex. 19 at 3-4 (although Lee "was willing to go along with a lot of what Steve wanted to do," "Stan had the authority" and used it "when he felt he had to use it" because an explanation that "the artist wanted to do it that way" "would not have been a sufficient excuse for Martin Goodman."); *see also* Evidence in Support of Undisputed Fact 22.<br><br>Additionally, Defendant's evidence **does not support** his contention that Ditko created any of the characters in the Works "on spec."  Indeed, Defendant's evidence consists of prior (unproduced) comic books and a naked sketch allegedly drawn by Ditko that Defendant simply speculates |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | **originated and created—and did not merely "contribute[] to"—the new characters and new elements appearing in the stories he created during that time.** *See* Toberoff Decl. Ex. 1 at 21 (Evanier Rep. providing historical context of the first publication of Ditko's Dr. Strange character in *Strange Tales* No. 110 (1963) and Lee's admission that Ditko originated the idea and story for the Dr. Strange character); Ex. 25 (Ditko: "Dr. Strange has always been a contradiction to Marvel heroes ... He is my creation, and at one point I took over all stories, writing, [and] art."); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script); Ex. 30 at 2021MARVEL-0050281 (Lee writing that Dr. Strange "'twas [Ditko's] idea, and I figgered [sic] we'd give it a chance'" in a contemporaneous letter dated January 9, 1963); Ex. 49 at 1 (first published appearance of Dr. Strange in *Strange Tales* No. 110); Ex. 33 (Ditko's letter post-marked August 6, 1946 to his brother Patrick Ditko enclosing an initial sketch of Dr. Strange); Ex. 59 at 61:15-65:14 (Patrick Ditko, being shown composite Ex. 33 and testifying that his brother, | include "precursors" to characters Ditko would later contribute to Marvel comic books. Such "evidence" cannot controvert this fact. And all of the other evidence Defendant cites relates to the period in 1965, at the very end of the Time Period, when Lee, using his editorial discretion, afforded Ditko greater creative input on the Spider-Man comics, including assigning him to plot the stories, subject to Marvel's ultimate authority. *See* MCI's Evidence in Support of Undisputed Facts 25 and 47.<br><br>MCI also **objects** to Toberoff Exhibits 1, 14, 20, 22, 23, 25, 27, 33, 35, 59, 61, 65, 67, 75, 77, and 79. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [17], [19], [26], [31], [33], [34], [35], [39], [41], [54], [55], [57], [58], [59], [60], & [61]. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | Steve Ditko, sent him this letter in 1946, while Ditko was in military service abroad, enclosing Ditko's early sketch of Dr. Strange (Ex. 33) and that he had found Ex. 33 at his home amongst letters he had kept from his brother); Ex. 23 at 166:5-168:8 (Mark Ditko testifying that his father lived in Johnstown, PA at the address written on the letter envelope of composite Ex. 33, and that in 1946 (postmarked on the letter envelope), his uncle Ditko was in the military, stationed abroad in Germany); Ex. 71 at 159 (*Amazing Spider-Man* No. 25: "Sturdy Stevey Ditko dreamed up the plot of this tantalizing tale, and it's full of unexpected surprises!"); Ex. 72 at 225 (*Strange Tales* No. 135: "Plotted and Illustrated by Fandom's Favorite Fiend: Steve Ditko"); Ex. 7 at 223:18-224:13 (Thomas testifying that Ditko did all the plotting on *Spider-Man* and *Dr. Strange* stories while Ditko and Lee were no longer speaking to each other in the Period); Ex. 17 at 29:19-30:8, 83:13-18 (Thomas testifying that by the time Thomas began at Marvel in mid-1965, Ditko was plotting and penciling *Dr. Strange* stories, which Thomas would dialogue); *id.* at 92:9-20 (Thomas testifying that Ditko stopped working with Marvel around Christmas 1965); Ex. 26 at 83 (Lee writing that Ditko came up with | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | the *Dr. Strange* plots and illustrated the story and Lee only added the dialogue to the balloons); Ex. 35 at DITKO-0193 (Ditko writing that he and Lee stopped speaking around 1964 and thus from then on, Ditko had complete creative control of the *Spider-Man* and *Dr. Strange* stories, which he was plotting and penciling until he left in 1966); Ex. 62 at 4-5 (Dr. Strange used his hands to cast teleportation and other spells in *Strange Tales* No. 139 (1965)); Ex. 63 at 2 (same in *Strange Tales* No. 126 (1964)); Ex. 70 at 8-9 (same in *Strange Tales* No. 129 (1965)); *compare* Ex. 61 at 3 (Ditko's character used his hands to cast spells in 1959 in Charlton Comics' *Space Adventures* No. 27); *see also* Ex. 66 at 10 (in *Strange Tales* No. 137 (1965), Dr. Strange used a device—the Eye of Agamotto—to transport through space and time); *compare* Ex. 65 at 4-5 (In Charlton Comics' *Out of this World* No. 7 (1958), Ditko's character used similar artifact to transport characters in a swirl of visual effects through space and time); *see also* Ex. 68 at 4-5 (in *Strange Tales* No. 122 (1964), Dr. Strange traversed through different dimensions and journeyed through alternate planes of existence); Ex. 69 at 1 (same in *Strange Tales* No. 134 (1965)); *compare* Ex. 67 at Cover, 4-5 | |

Case 1:21-cv-07957-LAK   Document 104   Filed 07/28/23   Page 21 of 383


| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | (Ditko used same effect in Charlton Comics' *Strange Suspense* No. 32 (1957)); *see also* Ex. 73 at 6 (Norman Osborn's first appearance in the *Spider-Man* series in 1965); Ex. 74 at 10 (Norman Osborn's identity revealed to readers in *Amazing Spider-Man* No. 37 (1966)); *compare* Ex. 75 at 1-2 (Norman Osborn's precursor—including corporate villainy and distinct curled hairstyle—in 1957 in Ditko's story published in Charlton Comics' *Strange Suspense Stories* No. 33, *Director of the Board*); *see also* Ex. 60 at 2, 8 (*Amazing Fantasy* No. 15 (1962), the issue in which Spider-Man and Ditko's Aunt May character first appeared) *compare* Ex. 79, "All Those Eyes" at 1-3 (Aunt May's forerunner character appeared in Ditko's story in Charlton Comics' *Out of this World* No. 6 (1957)); *see also* Ex. 76 at 1, 4 (Ditko's Electro character in *Amazing Spider-Man* No. 9 (1964)); *compare* Ex. 77 at 1, 4-5 (Ditko's electrically powered man, the predecessor of Electro, first appeared in Ditko's story published in Charlton Comics' *Strange Suspense Stories* No. 48 (1960)); *see also* Ex. 78 at 1, 5-6, 8-9 (Ditko introduces the Chameleon—a character who used various masks to carry out his villainy—in *Amazing Spider-Man* No. 1 (1963)); *compare* Ex. 79, "All | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | Those Eyes" at 2-3 (Chameleon precursor—a spy character who used various masks in his espionage with a similar back story as the Chameleon—appeared in Ditko's "All Those Eyes" story he sold to Charlton Comics in 1957); Ex. 82 (Lee explaining in January 9, 1966 published interview: "**I don't plot Spider-Man any more. Steve Ditko, the artist, has been doing the stories.** I guess I'll leave him alone until sales start to slip. Since Spidey got so popular, Ditko thinks he's the genius of the world. We were arguing so much over plot lines I told him to start making up his own stories. **He won't let anybody else ink his drawings either. He just drops off the finished pages with notes at the margins and I fill in the dialogue. I never know what he'll come up with next**, but it's interesting to work that way.") (emphasis added); Ex. 83 at 7 (same). | |
| 4.      Following his June 29, 2018 death, Ditko's brother Defendant Patrick S. Ditko was appointed administrator of his estate.[2] Lens Decl., Ex. 67 at 2; Lens Decl., Ex. 66; Lens Decl., Ex. 62 ¶ 6. | **Admitted.** | **Defendant admits this fact is undisputed.** |

---

[2] Unless otherwise noted, all references to "Ditko" herein shall refer to Steve Ditko and Defendant Patrick S. Ditko shall be referred to as "Defendant."

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| **THE TERMINATION NOTICES** | | |
| 5.  Marvel filed copyright registrations for each of the Works with the U.S. Copyright Office in the name of the Marvel entity that published the work. Lens Decl., Ex. 24A-E. | **Admitted that copyright registrations were filed with the U.S. Copyright Office for the published comic books containing Ditko's works, but disputing that "Marvel" filed these copyright registrations in the Period and noting that the copyrights registrations were filed in the name of independent shell corporations.** *See* Toberoff Decl. Ex. 40 at 2021MARVEL-0005848; Ex 41 at 2021MARVEL-0005852; Ex. 42 at 2021MARVEL-0006420; Dkt. 71 (Declaration of Molly Lens) ¶ 25 (attaching as composite Exhibit 24 the copyright registrations and renewal registrations relevant to Ditko's works (Dkt. 71-20 to 71-32). | **This fact remains undisputed.**<br><br>Defendant admits that, as the evidence shows, the copyright registrations for the Works were filed in the name of the Marvel entity that published each respective Work, but disputes that "Marvel" filed the copyright registrations. As already explained, that is incorrect and turns on improper legal argument about the association between Goodman's publishing entities. *See* MCI's Evidence in Support of Undisputed Facts 1 and 49. Defendant cites no evidence disputing that the Works were copyrighted in the name of a Goodman publishing entity, and the copyright registrations for the Works confirm Magazine Management Company's connection, as they list Magazine Management Company and its address, as the location for the Copyright Office to "[s]end certificate to." *See, e.g.,* Lens Decl., Ex. 24 at 7. |
| 6.  Marvel subsequently filed renewal copyright registrations for each of | **Admitted that copyright renewal registrations were filed with the U.S.** | **This fact remains undisputed.** |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| the Works, with each such renewal listing a Marvel entity as the renewal claimant and proprietor of the copyright in the subject work as a work made for hire. Lens Decl., Ex. 24A-E. | **Copyright Office listed Marvel Entertainment Group, Inc. as the renewal claimant regarding the published comic books containing Ditko's works, but disputing with respect to Ditko's works Marvel's retroactive mischaracterization in the renewal registrations that the comic books were "work made for hire" for various shell companies and listing such shell companies as the legal "authors" thereof.** *See* Dkt. 71 (Declaration of Molly Lens) ¶ 25 (attaching as composite Exhibit 24 the copyright registrations and renewal registrations relevant to Ditko's works (Dkt. 71-20 to 71-32) wherein Marvel's renewal registrations represent to the United States Copyright Office that the respective shell companies were the legal "authors" of the works as "works made for hire."; Toberoff Decl., Ex. 14 at 4-5 (Evanier Rebuttal Rep. providing historical context and explaining that Goodman registered the copyright to comic books under the names of various shell corporations that were unrelated to each other and that the shell companies had no employees, offices, or business activities, and had no contact with any freelancer); Ex. 17 at 317:18-318:18 (Thomas testifying that Goodman ran "Marvel" as a bunch of small companies | Defendant admits that Marvel filed renewal copyright registrations with the U.S. Copyright Office, and cites nothing disputing that such copyright renewals *list* a Marvel entity as the renewal claimant and copyright proprietor. Instead, Defendant non-responsively and incorrectly argues that the renewals contain "retroactive mischaracterization[s]" insofar as they list Marvel publishing entities as authors. This is misleading. At the time Marvel filed the initial registrations, Form B (the form applicable to the Works here) did not include a field for the author or statement of claim. It was not until the Works were eligible for copyright renewal that Form B was updated to include these fields, thus allowing a renewal registrant to indicate that the work was a work for hire. In any event, since this fact only concerns the existence of the renewals and what is listed therein, none of Defendant's arguments is responsive, and this fact is deemed admitted in its entirety. *See* Local Rule 56.1(b)-(d); *see also Parks Real Estate, Purchasing Group v. St. Paul Fire and Marine Ins. Co.*, 472 F.3d 33, 41 (2d Cir. 2006); *Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003). |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | rather than just as a unified Magazine Management for some unknown business or legal reasons); *id.* at 244:15-23, 278:20-279:20 (Thomas testifying that the door to "Marvel's" office in 1965 only said "Magazine Management" and "Marvel's" employees worked in Magazine Management's offices); *id.* at 318:4-322:14 (Thomas testifying that Vista, Atlas, Non-Pareil, and others were just used as names on the comic book cover copyright indicia, but other than the indicia, no one knew what those entities did); *id.* at 320:10-322:14 (Thomas testifying that no one knew what Vista, Atlas, or Non-Pareil did and that Thomas did not receive any money from them, does not know anyone who did, does not know if they had any employees or any offices, or "of [them] having any existence" whatsoever); *id.* at 138:3-139:2 (Thomas testifying that Magazine Management was the only payor of staff/freelancer checks); Ex. 20 at 196:1-12 (Evanier testifying that Brodsky described Goodman's shell companies as "shell companies"); Ex. 24 at 49:21-50:22, 51:19-52:2 (Levitz testifying that Vista was one of Goodman's shell companies and that Goodman's shell companies had no actual offices and that only Magazine Management had offices); | In any event, as explained above, the evidence demonstrates that Ditko, like other Marvel freelance contributors, had an ongoing relationship with Marvel pursuant to which Ditko contributed to Marvel comics books on assignment, subject to Lee's and (and ultimately Goodman's direction, supervision, and authority, and was compensated by Marvel on an agreed per-page basis for completed assignments.  *See* MCI's Evidence in Support of Undisputed Facts 22, 23, and 49.  And the evidence further demonstrates that Marvel freelancers, including Steve Ditko, understood their work for Marvel during the relevant time period was done on a work for hire basis. *See* MCI's Evidence in Support of Undisputed Facts 5, 6, 53, 54, and 55.

MCI also **objects** to Toberoff Exhibits 14, 20, and 22.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [17], [19], [26], & [31]. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | Ex. 46 at 1-3 (list of Goodman's shell companies dated October 4, 1967 showing no legal or corporate relationship to one another or Magazine Management); Ex. 22 at 252:23-254:24, 303:15-19 (Lieber testifying that he never heard of Vista or other shell companies, did not know if they had any employees and that he was paid by, and believed he was working with, Magazine Management); Ex. 50 at DETTWILER-0044-0058 (Don Heck's payment records identifying "Magazine Management" as the only entity that paid him for his freelance material from 1962 to 1966); Ex. 22 at 252:23-254:24, 303:15-19 (Lieber testifying that he never heard of Vista or other shell companies, did not know if they had any employees and that he was paid by, and believed he was working with, Magazine Management and that he thought the name on the checks was Marvel or Magazine Management); Ex. 6 at 200:2-24 (Thomas testifying that he was hired by Magazine Management in 1965); Ex. 40 at 2021MARVEL-0005845 (Certificate of Renewal Registration of *Amazing Fantasy* Vol. 1, No. 15, the issue in which Spider-Man originally appeared, dated November 20, 1990, claiming "Atlas Magazines, Inc." as the original author and copyright claimant); Ex. 41 at 2021MARVEL- | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | 0005849 (Certificate of Renewal Registration of *Amazing Spider-Man* Vol. 1, No. 1 dated November 20, 1990, claiming "Non-Pareil Publishing Corporation" as the original author and copyright claimant); Ex. 42 (Certificate of Renewal Registration of *Strange Tales* Vol. 1, No. 110, the issue in which Dr. Strange first appeared, dated December 27, 1991, claiming "Vista Publications, Inc." as the original author and copyright claimant). | |
| 7.    MCI acquired copyright title for the Works from Marvel through a series of copyright assignments. Bard Decl., Ex. 10; Bard Decl., Ex. 11; Bard Decl., Ex. 12; Bard Decl., Ex. 13; Bard Decl., Ex. 16. | **Counterclaimant admits that Marvel has presented a series of copyright assignments with the last one being to MCI but denies that each clearly specifies that the copyrights to the Works are being assigned.** Bard Decl., Ex. 10; Ex. 11; Ex. 12; Ex. 13; Ex. 16. | This fact remains undisputed.<br><br>Defendant admits that MCI provided a series of copyright assignments, but "denies that each [assignment] clearly specifies that the copyrights to the Works are being assigned." Because Defendant does not set forth any specific facts or evidence to dispute this fact as required by Local Rule 56.1(c) and (d), this fact is deemed admitted in its entirety. *See* Local Rule 56.1(b)-(d); *see also Parks Real Estate*, 472 F.3d at 41; *Giannullo*, 322 F.3d at 140.<br><br>In any event, as the evidence demonstrates, these copyright assignments included the assignment of "***any*** copyrights and renewals and extensions of copyrights" of Marvel publications, |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | | including copyrights in any *Amazing Fantasy*, *Amazing Spider-Man*, and *Strange Tales* titles.  *See* Bard Decl., Ex. 10 at 15; Ex. 11 at 2, 8, 22, 23; Ex. 12 at 2-3; Ex. 13 at 2-3, 5, 8,15, 19, 41; Ex. 16 at 6-7, 10, 22, 55. |
| 8.      Between June 1 and July 16, 2021, Defendant served four notices on MCI, The Walt Disney Company, and other entities purporting to terminate alleged assignments of the copyrights in the Works (the "Termination Notices"). Lens Decl., Ex. 63; Lens Decl., Ex. 62 ¶ 15. | **Counterclaimant disputes Marvel's use of "*purporting* to terminate" and "*alleged* assignments" (emphasis added), but otherwise, admitted.** | **Defendant admits this fact is undisputed, and only disputes the legal effect of the termination notices he served.**<br><br>Because Defendant does not set forth any specific facts or evidence to dispute this fact as required by Local Rule 56.1(c) and (d), this fact is deemed admitted in its entirety.  *See* Local Rule 56.1(b)-(d); *see also Parks Real Estate*, 472 F.3d at 41; *Giannullo*, 322 F.3d at 140. |
| **MARVEL'S PUBLISHERS AND EDITORIAL STAFF DROVE ITS COMIC-CREATION PROCESS FROM IDEATION TO DISTRIBUTION**<br>*Marvel's Publishers and Editors* | | |
| 9.      Martin Goodman was Marvel's publisher from 1939 until 1972. Bard Decl., Ex. 7 at 5; Lens Decl., Ex. 2 18:10-13; Lens Decl., Ex. 2 81:10-12; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 12 60:22-61:4; Lens Decl., Ex. 13 11:18-23; Lens Decl., Ex. 13 16:14-19; | **Counterclaimant disputes that Goodman was "Marvel's" publisher from 1939 until 1972 but admits that Goodman was the publisher of Timely Comics, and then, during the Period, of Magazine Management. There is no evidence that Goodman served as the publisher for any of the shell** | **This fact remains undisputed.**<br><br>Defendant admits that Goodman was the publisher of Timely Comics, Marvel's predecessor, and of Magazine Management Company, but argues there is "no evidence" Goodman was the publisher of Vista, Atlas, or Non-Pareil. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| Lens Decl., Ex. 15 12:19-21; Lens Decl., Ex. 4 99:6-10; Lens Decl., Ex. 2 32:8-12. | **companies, including Vista, Atlas, and Non-Pareil, which existed only on paper and had no actual publishing or other business operations.** *See* Toberoff Decl., Ex. 1 at 8 (Evanier Rep. providing historical context and describing Goodman's founding of Timely); Ex. 4 at 11:24-12:3 (Lee testifying that Timely changed names many times); Ex. 56 at 82:23-83:13 (Lee testifying he started working at Timely, which was somehow related to Magazine Management); Ex. 11 ¶ 4 (Colan attesting that he was originally hired in 1946 as a staff artist for Timely, which became Atlas); Ex. 17 at 34:21-35:25 (Thomas testifying that Goodman kept changing names of his companies and the public was confused as to what the name of "Marvel" actually was. The company started as "Timely," but that "Atlas," which was Goodman's distributing company, had its name on the magazines, which made the public think the company's name was "Atlas." Finally, "Marvel" began being sporadically used sometime between 1961 to 1963.); Ex. 14 at 4 (Evanier Rebuttal Rep. providing historical context and explaining that Goodman registered the copyright to comic books under the names of various shell corporations that were unrelated to each other); Ex. 17 at 317:18-318:18 | That is incorrect.  The undisputed evidence demonstrates that Goodman was not only the owner, but also the publisher of Vista, Atlas, and Non-Pareil.  *See* MCI's Evidence in Support of Undisputed Fact 1; *see also, e.g.*, Lens Decl., Ex. 31A at 18 ("AMAZING SPIDER-MAN is published by NON-PAREIL PUBLISHING CORP . . . Martin Goodman, Publisher"); Lens Decl., Ex. 31E at 9 ("STRANGE TALES is published by VISTA PUBLICATIONS INC . . . Martin Goodman, Publisher"); July 28, 2023 Molly M. Lens Declaration ("Lens Reply Decl."), Ex. 113 at 3 ("JOURNEY INTO MYSTERY is published by ATLAS MAGAZINES, INC . . . Martin Goodman, Publisher."). <br><br> MCI also **objects** to Toberoff Exhibits 1, 11, 14, and 20.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [14], [17], & [19]. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | (Thomas testifying that Goodman ran "Marvel" as a bunch of small companies rather than just as a unified Magazine Management for some unknown business or legal reasons); Ex. 20 at 196:1-12 (Evanier testifying that Brodsky described Goodman's shell companies as "shell companies"); Ex. 24 at 49:21-50:22 (Levitz testifying that Vista was one of Goodman's shell companies); Ex. 46 at 1-3 (list of Goodman's shell companies dated October 4, 1967 showing no legal or corporate relationship to one another or to Magazine Management). | |
| 10.     Stan Lee was Marvel's editor (a/k/a editor-in-chief) from approximately 1942 until 1972—when he was promoted to president and publisher of Marvel. Lee also wrote stories for Marvel on a freelance basis, including during the Time Period. Lens Decl., Ex. 13 14:2-17; Lens Decl., Ex. 6 7:18-8:10; Lens Decl., Ex. 6 12:1-4; Lens Decl., Ex. 15 11:21-13:10; Lens Decl., Ex. 2 32:8-12; Lens Decl., Ex. 6 40:14-20; Lens Decl., Ex. 15 17:2-8; Lens Decl., Ex. 5 63:1-18; Lens Decl., Ex. 2 290:17-291:5; *see also* Lens Decl., Ex. 22 at 3; Lens Decl., Ex. 74 at 3. | **Counterclaimant disputes that Lee was editor of "Marvel" from 1942 to 1972, as Lee originally worked for Timely and then, in the Period, was employed as an editor by Magazine Management.** *See* Toberoff Decl. Ex. 1 at 9 (Evanier Rep. describing Lee's role as an office boy at Timely); Ex. 4 at 10:23-11:17 (Lee testifying that he got hired at Timely in 1939 or 1940); Ex. 56 at 82:13-22 (Lee testifying he started at Timely around 1940 when he was 17 years old). **Counterclaimant disputes that Lee wrote stories for "Marvel." In the Period, Lee principally wrote the dialogue and captions for comic book stories in a freelance capacity and was paid by the page for such freelance** | **This fact remains undisputed.**

Defendant admits that Lee was employed as an editor for "Timely" and "Magazine Management," but disputes that he was editor of "Marvel," which is incorrect and turns on improper legal argument.  As the evidence demonstrates, Lee's work—both in his capacity as editor and freelancer writer—was performed for and on behalf of Marvel's publisher Goodman, whose various comic book entities conducted business as "Marvel" or "Marvel Comics Group" and engaged with Magazine Management Company for administrative services, including payments to those providing services to Marvel.  *See* MCI's Evidence in Support of Undisputed Facts |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
|  | **material by Magazine Management in the Period.** *See* Toberoff Decl. Ex. 1 at 13 (Evanier Rep. describing Lee's common practice of composing dialogue as a freelancer, not as Marvel's editor and doing his freelancing from home two of the five workdays per week, for which he was paid on a per-page basis as a freelancer); Ex. 4 at 17:17-25 (Lee testifying that he was paid as a freelancer for his writing and was on salary for his work as an editor); Ex. 55 at 62:18-63:18 (Lee testifying that he got paid a salary as editor and was paid separately for his writing); Ex. 56 at 91:20-92:6 (Lee testifying that he got paid a salary as editor and separately as a freelancer pre page for his writing); Ex. 17 at 138:3-139:2 (Thomas testifying that Magazine Management was the only payor of staff salaries and freelancer checks); Ex. 22 at 252:23-254:24, 303:15-19 (Lieber testifying that he never heard of Vista or other shell companies, did not know if they had any employees and that he was paid by, and believed he was working with, Magazine Management); Ex. 50 at DETTWILER-0044-0058 (Don Heck's payment records identifying "Magazine Management" as the only entity that paid him for his freelance material in the Period). | 1 and 49.  Lee provided these services to Marvel (or, at a minimum, to Goodman, who controlled and was publisher of the entities that published the Works), even though his actual paycheck likely was drawn on a Magazine Management account.  *See* Lens Decl., Ex. 68A-G (freelance writer Don Heck's payment ledger reflecting extensive entries on per-page basis for his work for "Mag. Management," "Maga. Management," "Magazine Management," and "Marvel" from 1954 to 1972 and intermittently until 1994, when all entries end); *see also* MCI's Evidence in Support of Undisputed Facts 1, 9, and 10.<br><br>MCI also **objects** to Toberoff Exhibits 1 and 22.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [26], & [31]. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| 11.     Roy Thomas joined Marvel in 1965 as a staff writer, quickly transitioned to working as an editorial assistant to Stan Lee, was promoted to assistant editor in approximately 1967, and was promoted to editor-in-chief from 1972 to 1974. Thomas also wrote stories for Marvel on a freelance basis, including during the Time Period. Lens Decl., Ex. 2 271:11-272:19; Lens Decl., Ex. 16 99:6-11; Lens Decl., Ex. 2 26:11-27:22; Lens Decl., Ex. 2 61:7-15; Lens Decl., Ex. 2 64:17-25; Lens Decl., Ex. 21. | **Admitted, except that Roy Thomas was employed by Magazine Management in 1965 at the tail end of the relevant Period and, though on a staff salary, wrote and sold stories to Magazine Management by the page on a purely freelance basis.** *See* Toberoff Decl**.** Ex. 6 at 200:2-24 (Thomas testifying that he was hired by Magazine Management in 1965); Ex. 17 at 138:3-139:2 (Thomas testifying that Magazine Management was the only payor of staff salaries and freelance checks); *id*. at 244:15-23, 278:20-279:20 (Thomas testifying that the door to "Marvel's" office in 1965 only said "Magazine Management"); Ex. 44 ¶ 3(a) (Marvel's contract with Thomas dated September 1, 1974 providing that any writing Thomas did would be on a purely freelance basis for which he would be paid for only for those pages which Marvel accepted in its sole discretion and requiring Thomas to make changes to his freelance work for no additional compensation); Ex. 53 ¶ 3(a) (Marvel's contract with Thomas dated August 27, 1976 with same provision). | **This fact remains undisputed.**<br><br>Defendant admits that Thomas was employed as a staff writer, editorial assistant, assistant editor, and editor, but disputes that he was employed by "Marvel," which is incorrect and turns on improper legal argument.  Just as it does with Stan Lee, the evidence demonstrates that Thomas's work—both in his capacity as editor and freelance writer—was performed for and on behalf of Marvel's publisher Goodman, whose various comic book entities conducted business as "Marvel" or "Marvel Comics Group" and engaged with Magazine Management Company for administrative services, including payments to those providing services to Marvel.  *See* MCI's Evidence in Support of Undisputed Facts 1 and 49.  Thomas provided these services to Marvel (or, at a minimum, to Goodman, who controlled and was publisher of the entities that published the Works), even though his actual paycheck likely was drawn on a Magazine Management account. *See* Lens Decl., Ex. 68A-G (freelance writer Don Heck's payment ledger reflecting extensive entries on per-page basis for his work for "Mag. Management," "Maga. Management," "Magazine Management," and "Marvel" |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | | from 1954 to 1972 and intermittently until 1994, when all entries end); *see also* MCI's Evidence in Support of Undisputed Facts 1, 9, and 11.<br><br>MCI also **objects** to Toberoff Exhibits 44 and 53.  *See* MCI's Evidentiary Objection Nos. [45] & [50]. |
| *The Marvel Method for Creating Comics* | | |
| 12.     During Stan Lee's tenure as editor, Marvel developed what became known as the Marvel Method for creating comic book stories. Lens Decl., Ex. 13 20:11-21:25; Lens Decl., Ex. 11 218:14-219:16; Lens Decl., Ex. 9 at 47:20-48:8. | **Counterclaimant admits that Lee often utilized what he called the "Marvel Method," wherein the artist would create and plot the comic book stories, to which Lee would later add dialogue, but denies that Ditko created his material pursuant to the "Marvel's" or Lee's "method," as Ditko was extremely independent and often took control of his stories that he sold to Marvel.** *See* Toberoff Decl. Ex. 7 at 223:18-225:20, 277:11-13 (Thomas testifying that Ditko did all the plotting on *Spider-Man* and *Dr. Strange* stories while he and Lee were not speaking and that Ditko never received any plots from Thomas when Thomas was doing the dialoguing on *Dr. Strange*); *id*. at 262:4-264:19 (Thomas testifying that, when Thomas began to dialogue *Dr. Strange* stories instead of Lee, Ditko would type his suggested captions and dialogue on a | **This fact remains undisputed.**<br><br>As an initial matter, this fact concerns the Marvel Method generally, and hence Defendant's admission that Lee "often utilized" the Marvel Method renders this fact undisputed.<br><br>Regardless, Defendant's contention that Ditko was "extremely independent and often took control of his stories" is non-responsive and incorrect for the reasons stated in MCI's Reply in Support of Undisputed Fact 3.<br><br>MCI also **objects** to Toberoff Exhibit 27. *See* MCI's Evidentiary Objection No. [35]. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | separate page, not in the margins, and then give them to Thomas to fill in the dialogue balloons); Ex. 17 at 311:18-312:25 (Thomas testifying that Ditko, on his own, plotted and drew *Spider-Man* for more than one year before he left in 1966, did not work pursuant to the Marvel Method, and that Lee would not even know anything about the story until it was penciled and submitted by Ditko); *id*. at 84:18-90:9 (Thomas testifying that Ditko wrote extensive margin notes describing the plot and what was happening so that when Lee/Thomas dialogued the story, they could do so in a way that corresponded with what Ditko had intended); Ex. 71 at 159 (*Amazing Spider-Man* No. 25: "Sturdy Stevey Ditko dreamed up the plot of this tantalizing tale, and it's full of unexpected surprises!"); Ex. 72 at 225 (*Strange Tales* No. 135: "Plotted and Illustrated by Fandom's Favorite Fiend: Steve Ditko"); Ex. 18 (1965 example of Ditko's *Dr. Strange* margin notes for Thomas); Ex. 19 at 6-8 (Thomas interview explaining that Ditko and Lee were not speaking in 1965 and Ditko was plotting both *Spider-Man* and *Dr. Strange* and would only come to the office to drop work off with Brodsky); Ex. 26 at 83 (Lee writing that Ditko came up with the *Dr. Strange* plots and | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | illustrated the story and Lee only added the dialogue); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script); Ex. 28 (Lee writing that Ditko was the co-creator of Spider-Man and that Ditko did most of the plotting of *Spider-Man* and just left Lee to do the dialogue and some captions). | |
| 13.    Under the Marvel Method, Stan Lee generally originated characters and plot ideas for Marvel comics. Lens Decl., Ex. 48 at 2 (Ditko admitting that "Stan provided the plot ideas"); Lens Decl., Ex. 2 48:2-22 (Thomas affirming prior statements that "Stan was really the guy who generated the ideas" and that he did not "push[] us to come up with new characters in the early days, except for villains"); Lens Decl., Ex. 3 97:8-98:25 (Marvel writer Larry Lieber (and defendant in consolidated action) testifying that "Stan would give me a one-page plot outline for a story, I would write the script, [and] return it Stan"); Lens Decl., Ex. 9 13:22-14:4 (Lieber confirming that Stan Lee "came up with the ideas for the characters that would be in the story"); Lens Decl., Ex. 9 12:19-13:5 (Lieber testifying that "my brother | **Counterclaimant admits that Lee often utilized what he called the "Marvel Method," wherein the artist would create and plot the comic book stories, to which Lee would later add dialogue, but disputes that Lee "generally originated the characters and plot ideas" and denies that Ditko created his material pursuant to the "Marvel's" or Lee's "method," as Ditko was extremely independent and often took control of his stories that he sold to Marvel.** *See* Toberoff Decl. Ex. 7 at 223:18-225:20, 277:11-13 (Thomas testifying that Ditko did all the plotting on *Spider-Man* and *Dr. Strange* stories while he and Lee were not speaking and that Ditko never received any plots from Thomas when Thomas was doing the dialoguing on *Dr. Strange*); *id.* at 262:4-264:19 (Thomas testifying that, when | **This fact remains undisputed.**<br><br>As an initial matter, this fact concerns the Marvel Method generally, and hence Defendant's admission that Lee "often utilized" the Marvel Method renders this fact undisputed.<br><br>Regardless, Defendant's suggestion that Lee did not generally originate characters and plot ideas for the Works because Ditko "often took control of his stories" is non-responsive, incorrect, and unsupported by Defendant's evidence for the reasons set forth above in MCI's Reply in Support of Undisputed Fact 3.<br><br>MCI, however, **objects** to Toberoff Exhibits 27, 35, and 58. *See* MCI's Evidentiary Objection Nos. [35], [41], and [53]. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| [Stan Lee] made up the plot and gave me a synopsis" and that "all" story ideas "came from Stan Lee"); Lens Decl., Ex. 13 35:5-10 (Lee confirming that his "role" was "to come up with the idea" for new comic books or stories); Lens Decl., Ex. 13 35:23-36:6 (Lee testifying that "[i]n the 60s, the ideas for the new characters originated with [him] because that was [his] responsibility."); Lens Decl., Ex. 71 at 3:25-6:09 (Lee explaining how Marvel's basic "formula" was to "mix fantasy with realism" with characters that "are a little different, . . . sort of like continuing soap operas"); Lens Decl., Ex. 71 at 3:25-6:09 (Lee explaining how Marvel "juxtapos[ed] . . . bigger-than-life problem[s]" with "the very simple home life and family life"); Lens Decl., Ex. 71 at 20:17-23:23 (Lee explaining how Marvel "juxtapos[ed] [] the supernatural with the very mundane, every day type of existence"); *see also* Lens Decl., Ex. 10 335:10-336:11; Lens Decl., Ex. 38 at 5; Lens Decl., Ex. 43 at 2. | Thomas began to dialogue *Dr. Strange* stories instead of Lee, Ditko would type his suggested captions and dialogue on a separate page, not in the margins, and then give them to Thomas to fill in the dialogue balloons); Ex. 17 at 311:18-312:25 (Thomas testifying that Ditko, on his own, plotted and drew *Spider-Man* for more than one year before he left in 1966, did not work pursuant to the Marvel Method, and that Lee would not even know anything about the story until it was penciled and submitted by Ditko); *id*. at 84:18-90:9 (Thomas testifying that Ditko wrote extensive margin notes describing the plot and what was happening so that when Lee/Thomas dialogued the story, they could do so in a way that corresponded with what Ditko had intended); Ex. 18 (1965 example of Ditko's *Dr. Strange* margin notes for Thomas); Ex. 19 at 6-8 (Thomas interview explaining that Ditko and Lee were not speaking in 1965 and Ditko was plotting both *Spider-Man* and *Dr. Strange* and would only come to the office to drop work off with Brodsky); Ex. 26 at 83 (Lee writing that Ditko came up with the *Dr. Strange* plots and illustrated the story and Lee only added the dialogue); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and that he plotted and | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script); Ex. 28 (Lee writing that Ditko was the co-creator of Spider-Man and that Ditko did most of the plotting of *Spider-Man* and just left Lee to do the dialogue and some captions); Ex. 71 at 159 (*Amazing Spider-Man* No. 25: "Sturdy Stevey Ditko dreamed up the plot of this tantalizing tale, and it's full of unexpected surprises!"); Ex. 72 at 225 (*Strange Tales* No. 135: "Plotted and Illustrated by Fandom's Favorite Fiend: Steve Ditko"); Ex. 35 at DITKO-0192, DITKO-0207-0210, DITKO-0215-0218 (Ditko writing that he rejected several of Lee's *Spider-Man* story ideas and characters such as, for instance, Lee's idea for a Spider-Woman character, or Lee's idea of making Aunt May more glamorous); Ex. 58 at 4 (Ditko writing that he "refused to do a drunken Iron Man splash page—someone else had to draw [and] ink it"). | |
| 14.     After Lee conceived of a story idea, Lee then assigned a pencil artist ("penciller") to the comic and generally provided a "plot" or "synopsis" outlining the key elements of the story he wanted the penciller to draw. Lens Decl., Ex. 48 at 2 (Ditko admitting that "Stan provided the plot ideas"); Lens Decl., Ex. 46 at 3 | **Counterclaimant admits that Lee often utilized what he called the "Marvel Method," wherein the artist would create and plot the comic book stories, to which Lee would later add dialogue, but denies that Ditko created his material pursuant to the "Marvel's" or Lee's "method," as Ditko was** | **This fact remains undisputed.**<br><br>As an initial matter, this fact concerns the Marvel Method generally, and hence Defendant's admission that Lee "often utilized" the Marvel Method renders this fact undisputed. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| (Ditko explaining that Stan Lee "create[ed]" the "Spider-Man" name and wrote the original "synopsis for the artist [(*i.e.*, Ditko)]"); Lens Decl., Ex. 13 20:11-21:25 (Lee testifying about the Marvel Method and, using Ditko as an example, explaining that he might say: "Look, Steve, I don't have time to write your script for you, but this is the idea for the story. I'd like this fill in, and I'd like this to happen, and in the end the hero ends by doing this. You go ahead and draw it any way you want to, as long as you keep to that main theme. . . . And when you finish drawing this one, I will put in all the dialogue and the captions."); Lens Decl., Ex. 11 218:14-219:16 (Thomas testifying that, under the Marvel Method, Stan Lee "would come up with the idea for the plots . . . [a]nd he simply would give those plots to the artists, who would then draw the story, break them down into pictures, expanding them, whatever needed to be done to break them down into pictures"); *see also* Lens Decl., Ex. 2 28:8-21; Lens Decl., Ex. 9 at 47:20-48:8; Lens Decl., Ex. 69; Lens Decl., Ex. 70. | **extremely independent and often took control of his stories, rejecting any of Lee's "ideas" he did not like.** *See* Toberoff Decl. Ex. 7 at 223:18-225:20, 277:11-13 (Thomas testifying that Ditko did all the plotting on *Spider-Man* and *Dr. Strange* stories while he and Lee were not speaking and that Ditko never received any plots from Thomas when Thomas was doing the dialoguing on *Dr. Strange*); *id.* at 262:4-264:19 (Thomas testifying that, when Thomas began to dialogue *Dr. Strange* stories instead of Lee, Ditko would type his suggested captions and dialogue on a separate page, not in the margins, and then give them to Thomas to fill in the dialogue balloons); Ex. 17 at 311:18-312:25 (Thomas testifying that Ditko, on his own, plotted and drew *Spider-Man* for more than one year before he left in 1966, did not work pursuant to the Marvel Method, and that Lee would not even know anything about the story until it was penciled and submitted by Ditko); *id.* at 84:18-90:9 (Thomas testifying that Ditko wrote extensive margin notes describing the plot and what was happening so that when Lee/Thomas dialogued the story, they could do so in a way that corresponded with what Ditko had intended); Ex. 18 (1965 example of Ditko's *Dr. Strange* margin notes for | Regardless, Defendant's suggestion that Lee did not assign Marvel artists to pencil and/or ink Marvel comics and that Ditko did not work pursuant to the Marvel Method because he was "extremely independent" and "often took control of his stories" is non-responsive, incorrect, and unsupported by Defendant's evidence for the reasons set forth above in MCI's Reply in Support of Undisputed Fact 3.<br><br>Further, Defendant's suggestion that Lee did not assign Ditko to work on Marvel comic books because Ditko lacked a written employment agreement is incorrect, turns on an improper legal argument, and—in any event—is immaterial, as the Second Circuit's decision in *Kirby* confirms. *See* MCI's Reply in Support of Undisputed Fact 2.<br><br>MCI also **objects** to Toberoff Exhibits 1, 2, 3, 8, 9, 10, 11, 13, 14, 22, 23, 27, 35, 57, and 58. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos.[1], [2], [9], [11], [12], [13], [14], [16], [17], [25], [32], [35], [41], [52], & [53]. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | Thomas); Ex. 19 at 6-8 (Thomas interview explaining that Ditko and Lee were not speaking in 1965 and Ditko was plotting both *Spider-Man* and *Dr. Strange* and would only come to the office to drop work off with Brodsky); Ex. 26 at 83 (Lee writing that Ditko came up with the *Dr. Strange* plots and illustrated the story and Lee only added the dialogue); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script); Ex. 28 (Lee writing that Ditko was the co-creator of Spider-Man and that Ditko did most of the plotting of *Spider-Man* and just left Lee to do the dialogue and some captions); Ex. 71 at 159 (*Amazing Spider-Man* No. 25: "Sturdy Stevey Ditko dreamed up the plot of this tantalizing tale, and it's full of unexpected surprises!"); Ex. 72 at 225 (*Strange Tales* No. 135: "Plotted and Illustrated by Fandom's Favorite Fiend: Steve Ditko"); Ex. 35 at DITKO-0192, DITKO-0207-0210, DITKO-0215-0218 (Ditko writing that he rejected several of Lee's *Spider-Man* story ideas and characters such as, for instance, Lee's idea for a Spider-Woman character, or Lee's idea of making Aunt May more glamorous); Ex. | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | 58 at 4 (Ditko writing that he "refused to do a drunken Iron Man splash page—someone else had to draw [and] ink it");. Ex. 1 at 12 (Evanier Rep. describing Ditko's regular practice of maintaining a chart mapping out the future development of a character so he could introduce elements into current issues and then use those elements in issues many months down the line); Ex. 35 at DITKO-0193 (Ditko writing that he planted seeds of subplots in stories that would work their way through the issues until it was time for those sub-stories to play an active role later when the time was right); Ex. 58 at 3 (Ditko writing when he took over the *Spider-Man* stories he "knew in advance the [*Spider-Man*] story line like the best (worst) time for Aunt May to have a heart attack"); Ex. 82 (Lee explaining in January 9, 1966 published interview: "**I don't plot Spider-Man any more. Steve Ditko, the artist, has been doing the stories.** I guess I'll leave him alone until sales start to slip. Since Spidey got so popular, Ditko thinks he's the genius of the world. We were arguing so much over plot lines I told him to start making up his own stories. **He won't let anybody else ink his drawings either. He just drops off the finished pages with notes at the margins and I fill in the dialogue. I** | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | **never know what he'll come up with next**, but it's interesting to work that way.") (emphasis added); Ex. 83 at 7 (same). **Counterclaimant also denies that Lee "assigned" Ditko tasks to the extent this connotes that Ditko was under any legal obligation to perform work or to do what Lee or Magazine Management proposed. Ditko was not employed or hired by Magazine Management (or by any other alleged Marvel predecessor), Ditko was not under contract with any such entities and there were no bilateral legal obligations between Ditko and any such entities; thus Lee could not "assign" Ditko to perform anything in any legal or employment sense.** Marvel has not produced any contemporaneous agreement with Ditko from the Period for his creative services, nor any other evidence reflecting any bilateral rights and obligations between Ditko and Magazine Management (nor any other alleged Marvel predecessor) in the Period, nor has Marvel alleged that any such agreement or bilateral legal rights and obligations existed between such parties in the Period. *See* Toberoff Decl. Ex. 1 at 10, 13 (Supplemented Expert Report of Mark Evanier ("Evanier Rep.") providing historical context giving rise to Marvel's | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | use of freelance creators and explaining that, when Magazine Management ran out of surplus artwork to publish, it began to purchase artwork and scripts from freelancers at a low page rate and that freelancers did not have written contracts with Magazine Management during the 1950s or 1960s and describing the common practice of freelancers selling material to more than one publisher, including Marvel, DC Comics, and Charlton Comics); Ex. 14 at 10-11 (Rebuttal Expert Report of Mark Evanier ("Evanier Rebuttal Rep.") explaining that it was not the custom and practice of Marvel or other publishers in the comic book industry to have written contracts with freelance creators during the Period); Ex. 2 at 71:17-74:5 (Larry Lieber ("Lieber") testifying that he sold freelance work to Marvel in the 1950s and 1960s, had no contract with Marvel, and that Marvel was not obligated to buy his submitted freelance material); Ex. 3 at 159:24-160:4, 194:11-195:3, 207:12-22, 211:7-212:3 (John V. Romita ("Romita") testifying that he did not have a contract with Marvel as a freelancer and that freelancers were free to sell work to other publishers); Ex. 5 at 371:3-25 (Stan Lee ("Lee") testifying that Marvel "would only buy what [it] needed"); Ex. 6 at | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | 36:17-21, 202:2-20 (Roy Thomas ("Thomas") testifying that he had no contract with Marvel until 1974); Ex. 8 ¶ 10 (Joe Sinnott ("Sinnott") attesting that he had no contract with Marvel and Marvel was very small and disorganized in the 1950s and 1960s); Ex. 8 ¶ 11 (Sinnott attesting that Marvel had no obligation to buy pages of his work and that Marvel paid only for the pages it wanted); Ex. 9 ¶ 8 (James Steranko ("Steranko") Steranko attesting that Marvel had no contract with Steranko and so he was free to sell work to other publishers); Ex. 10 ¶ 12 (Richard Ayers ("Ayers") attesting that he had no contract with Marvel from 1959 to 1975); Ex. 11 ¶ 9 (Gene Colan ("Colan") attesting that he had no contract with Marvel until 1975); Ex. 13 ¶ 5-7 (Neal Adams ("Adams") attesting that he had no contract with Marvel in the 1960s or 1970s and that he sold work to both Marvel and DC Comics during the 1960s and 1970s); Ex. 17 at 39:25-40:4, 51:20-52:4, 298:8-14, 301:14-303:7 (Thomas testifying that he had no written contract from 1965 to 1974 and that Marvel did not have contracts with freelancers prohibiting them from selling work to other publishers); Ex. 22 at 287:22-288:12 (Lieber testifying that he had no contract with Marvel in the 1950s | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
|  | or 1960s); Ex. 24 at 79:2-8 (Paul Levitz ("Levitz") testifying that Marvel did not have contracts with any freelancer until the mid-1970s); Ex. 23 at 160:2-8 (Mark Ditko testifying that Ditko was selling work to both Marvel and Charlton Comics in the 1960s); Ex. 35 at DITKO-0199 (Ditko writing about his work at Charlton Comics in the 1960s); Ex. 57 at 2 (Ditko writing about creating material for Charlton Comics and DC Comics). |  |
| 15.    Once the penciller turned in his work, Lee would review the artwork and consider any changes, additions, or corrections. Lens Decl., Ex. 48 at 2 (Ditko describing the process of Stan Lee reviewing his work); Lens Decl., Ex. 13 20:11-21:25 (Lee testifying about the Marvel Method); Lens Decl., Ex. 11 218:14-219:16 (Thomas explaining the Marvel Method). | **Counterclaimant admits that Lee would often review artwork submitted by freelancers prior to Magazine Management deciding whether to purchasing it by the page, and at times would request changes to pages as a condition to purchasing such pages. Counterclaimant denies that Ditko would make such changes, as Ditko often refused to alter his work, and in that event, any changes Lee wanted were either ignored, or had to be made by a production assistant after Ditko had sold his work to the company.** *See* Toberoff Decl. Ex. 14 at 7 (Evanier Rebuttal Rep. explaining Ditko's practice of refusing to make changes and in such case, Marvel's custom of having staff make such changes after the work had been submitted to and purchased by Marvel); Ex. 3 at 75:18-20, 243:13- | **This fact remains undisputed.**<br><br>As an initial matter, this fact concerns the Marvel Method generally, and hence Defendant's admission that Lee "often utilized" the Marvel Method renders this fact undisputed.<br><br>Regardless, Defendant's suggestion that Ditko would ignore Lee's changes or any such changes had to be made by a production assistant is incorrect and unsupported by any admissible evidence. And, as explained above in MCI's Reply in Support of Undisputed Fact 3, Ditko's explanation of how he worked with Lee mirrors the Second Circuit's description of how Jack Kirby worked with Lee during approximately the same time period. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | 244:23, 246:5-9 (Romita testifying that he, or someone else Lee could find in the Marvel office, would be asked to make changes to other artists' work after it had been submitted and would not be paid any extra for making these changes and noting specifically that when Lee did not like something on a Ditko cover, he asked Kirby to change it); Ex. 19 at 6, "Legends at Loggerheads!" (Thomas explaining example of when Lee incorrectly dialogued a *Spider-Man* story in a way Ditko had not intended, Ditko refused to accede to Lee's chosen direction); Ex. 35 at DITKO-0193 (Ditko writing that he ignored comments from Lee and Brodsky and only made changes to stories when he agreed with them); Ex. 21 at 41:7-18 (Steranko testifying that Marvel had production assistants to make changes to work after it had been submitted by artists). **Counterclaimant further denies that Magazine Management would pay for any such changes requested (as a condition to purchasing the freelance pages in question), as it only paid for the final page it decided to purchase from a freelancer in its sole discretion.** *See* Toberoff Decl. Ex. 1 at 15 (Evanier Rep. describing the comic book industry and Marvel's custom and practice of not | Further, Defendant cites no admissible evidence establishing that Ditko regularly refused to make Lee's revisions (which would run contrary to Ditko's self-described practice of "noting anything to be corrected" following his meetings with Lee). And Toberoff Exhibit 19, the only admissible evidence that Defendant cites, **does not controvert** this fact. It shows only that in 1965, when all major characters had been well established, and just months before Ditko left Marvel, Ditko did not make a change Lee requested, so Lee responded by having another artist redraw the panel as Lee requested. *See* Toberoff Ex. 19 at 3. That shows supervision and control—not a lack thereof. Indeed, as Toberoff Exhibit 19 makes clear, although Lee "was willing to go along with a lot of what Steve wanted to do," "Stan had the authority" and used it "when he felt he had to use it" because an explanation that "the artist wanted to do it that way" "would not have been a sufficient excuse for Martin Goodman." *See* Toberoff Ex. 19 at 3-4. Additionally, Toberoff Exhibits 3 and 21 **do not support** this contention, as they simply establish that Marvel had production assistants capable of making changes. Toberoff Exhibits 9 and 21 further **do not support** this contention, as explained in |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | paying freelancers to revise or redraw a page, as freelancers were only paid for the final pages the publisher decided to accept and purchase); Ex. 14 at 7 (Evanier Rebuttal Rep. explaining the custom and practice in the comic book industry, including at Marvel, for publishers to not pay for rejected material, or to pay a freelancer to make revisions to his material); Ex. 2 at 102:15-105:17 (Lieber testifying he was not paid for redoing work and that he was only paid for the final pages Marvel accepted); Ex. 8 ¶ 13 (Sinnott attesting that Marvel only paid for the final pages that were sold to Marvel, not for any changes or rejected work); Ex. 9 ¶ 14 (Steranko attesting he was not compensated for having to redo any work); Ex. 10 ¶ 11 (Ayers attesting that he was not paid for rejected material or for having to redo material); Ex. 11 ¶¶ 9, 11 (Colan attesting that Marvel did not pay him for redoing work); Ex. 13 ¶¶ 10-11 (Adams attesting that he was only paid for pages Marvel accepted); Ex. 17 at 142:21-143:15, 296:10-25 (Thomas testifying that freelancers were not paid for having to redo or revise pages and that they would only be paid for the final, accepted page); Ex. 43 ¶ 3(a) (Marvel's contract with Colan dated March 22, 1975 providing that Colan would be paid only | MCI's Reply in Support of Undisputed Fact 2.<br><br>Finally, Defendant's contention that Marvel would not pay for changes it requested—apart from implying (correctly) that Ditko did, in fact, make changes requested by Marvel—is also non-responsive and incorrect.  The per-page rate that Marvel paid freelancers, particularly the generous one paid to Ditko, accounted for the right to request revisions.  *See* MCI's Evidence in Support of Undisputed Facts 49-50.<br><br>MCI also **objects** to Toberoff Exhibits 1, 2, 3, 8, 9, 10, 11, 13, 14, 35, 43, 44, 47, 52, and 53.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [4], [8], [11], [12], [13], [14], [16], [17], [41], [44], [45], [47], [49], & [50]. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | for those pages which Marvel accepted and requiring Colan to make changes to his work without any additional compensation); Ex. 44 ¶ 3(a) (Marvel's contract with Thomas dated September 1, 1974 providing that Thomas would be paid only for those pages which Marvel accepted and requiring Thomas to make changes to his work without any additional compensation); Ex. 53 ¶ 3(a) (Marvel's contract with Thomas dated August 27, 1976 with same provision); Ex. 52 ¶ 3(a) (Marvel's October 7, 1977 contract with Gerber providing Gerber would be paid only for those pages Marvel accepted and that Gerber "will make all changes and rework all Material ...without charge"); *compare* Ex. 47 ¶ 6 (unsigned Lancer Books contract with Don Rico dated December 15, 1966 with provision stating Lancer "shall be deemed the Author of the Work ... in view of the fact that [Rico was Lancer's] employee for hire"). | |
| 16.    Lee and the other Marvel editors would then direct the pages through the office, beginning with the addition of the writer's dialogue and captions (typically written by Lee or Thomas). Lens Decl., Ex. 7 201:24-203:16 (Thomas testifying about the process of "trafficking [pages] through the | **Counterclaimant admits that Lee or Thomas (after he commenced working at Magazine Management in 1965) would dialogue the balloons after Magazine Management had purchased Ditko's pages, but denies that Lee (or later, Thomas) were the sole originators/writers of the dialogue, as** | **This fact remains undisputed.**<br><br>Defendant's contention that Lee and later Thomas were not "the sole originators/writers of the dialogue" is non-responsive and incorrect. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| office" at Marvel); Lens Decl., Ex. 2 135:8-14, 125:9-17 (similar); Lens Decl., Ex. 11 218:14-219:16 (Thomas testifying that, after artists turned in their penciled pages, Lee "would dialogue it, which means [adding] the dialogue and captions"); Lens Decl., Ex. 13 20:11-21:25 (Lee testifying to the same). | **Ditko would often write extensive margin notes, including suggested dialogue and captions, so that when Lee (or later, Thomas), dialogued Ditko's story, they would know what story points Ditko intended in each panel and what the characters would likely say consistent with the story Ditko had plotted.** *See* Toberoff Decl. Ex. 14 at 7 (Evanier Rebuttal Rep. explaining Ditko's practice of submitting detailed notes with his freelance material to assist Lee in dialoguing the stories); Ex. 7 at 223:18-225:20 (Thomas testifying that Ditko refused to speak to Lee while working on *Spider-Man* and *Dr. Strange* so all plotting on the stories was done by Ditko, and further, that Ditko would provide margin notes to indicate what he intended to happen in the story to guide Lee when Lee dialogued the story); *id*. at 262:4-264:19 (Thomas testifying that when he began to dialogue *Dr. Strange* stories instead of Lee, Ditko would type his suggested captions and dialogue on a separate page, not in the margins, and then give them to Thomas to fill in the dialogue balloons); Ex. 17 at 84:18-90:9 (Thomas testifying that Ditko wrote extensive margin notes describing the plot and what was happening so that when Lee/Thomas dialogued the story, they | The evidence demonstrates that while Ditko would sometimes write "margin notes" intended to help explain his penciled artwork, these notes were quite simplistic, consisting of only a few words like "Found Place to hide—must move fast" or "They're on the roof now," which fall considerably short of constituting dialogue or captions. *See* Toberoff Ex. 18 at 3-8 (sample Ditko notes); Lens Opp. Decl., Ex. 84 87:11-90:4 (Thomas testifying that Ditko would include just "a couple of words" so Thomas "knew what was going on" since Ditko would draw "very, very rough pencil" art at this stage). And Lee and Thomas were free to, and often did, disregard such margin notes. *See* Toberoff Ex. 19 at 4-5 (Thomas explaining that "Stan wanted the artists to tell what was going on," as early artwork was "sketchy" with "very loose" pencils, but noting that "Stan would take what he wanted from that, and felt no obligation to take any more").<br><br>MCI also **objects** to Toberoff Exhibits 14 and 27. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [17] & [35]. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | could do so in a way that corresponded with what Ditko had intended); Ex. 18 (1965 example of Ditko's *Dr. Strange* margin notes for Thomas); Ex. 26 at 83 (Lee writing that Ditko came up with the *Dr. Strange* plots and illustrated the story and Lee only added the dialogue [in the balloons]); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script); Ex. 71 at 159 (*Amazing Spider-Man* No. 25: "Sturdy Stevey Ditko dreamed up the plot of this tantalizing tale, and it's full of unexpected surprises!"); Ex. 72 at 225 (*Strange Tales* No. 135: "Plotted and Illustrated by Fandom's Favorite Fiend: Steve Ditko"). | |
| 17.    Marvel would send the pages to an inker, who would go over the penciled drawings in ink, and to a letterer, who would add the dialogue balloons and captions in ink. Lens Decl., Ex. 2 129:10-132:8; Lens Decl., Ex. 13 31:23-33:12. | **Admitted but Counterclaimant denies that this is relevant to the issue of whether Ditko created his material as "work made for hire" because these things transpired well after Ditko had created and submitted his material and after Ditko's work was accepted for publication and purchased by Magazine Management. Magazine Management's subsequent physical production, assemblage and publication of the resulting comic books is not what this case is about nor is it relevant to** | **Defendant admits this fact is undisputed, and only "disputes" the legal effect of the fact, which is improper.**<br><br>Because Defendant does not set forth any specific facts or evidence to dispute this fact as required by Local Rule 56.1(c) and (d), this fact is deemed admitted in its entirety.  *See* Local Rule 56.1(b)-(d); *see also Parks Real Estate*, 472 F.3d at 41; *Giannullo*, 322 F.3d at 140. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | the "work for hire" issue here which focuses on *Ditko's* creation of *his material* only. | |
| 18. After the lettering was finished, Marvel would proofread the pages and then provide them to a colorist to add color to the pages. Lens Decl., Ex. 2 132:9-133:10; Lens Decl., Ex. 2 134:9-135:7; Lens Decl., Ex. 13 31:23-33:12. | Admitted but Counterclaimant denies that this is relevant to the issue of whether Ditko created his material as "work made for hire" because these things transpired well after Ditko had created and submitted his material and after Ditko's work was accepted for publication and purchased by Magazine Management. Magazine Management's subsequent physical production, assemblage and publication of the resulting comic books is not what this case is about nor is it relevant to the "work for hire" issue here which focuses on *Ditko's* creation of *his material* only. | Defendant admits this fact is undisputed, and only "disputes" the legal effect of the fact, which is improper.<br><br>Because Defendant does not set forth any specific facts or evidence to dispute this fact as required by Local Rule 56.1(c) and (d), this fact is deemed admitted in its entirety. *See* Local Rule 56.1(b)-(d); *see also Parks Real Estate*, 472 F.3d at 41; *Giannullo*, 322 F.3d at 140. |
| 19. Once the pages were colored, Marvel would send them to the printer to be printed for publication. Lens Decl., Ex. 13 31:23-33:12; Lens Decl., Ex. 10 384:22-385:11; Lens Decl., Ex. 13 42:10-20. | Admitted, but Counterclaimant denies that this is relevant to the issue of whether Ditko created his material as "work made for hire" because these things transpired well after Ditko had created and submitted his material and after Ditko's work was accepted for publication and purchased by Magazine Management. Magazine Management's subsequent physical production, assemblage and publication of the resulting comic books is not what | Defendant admits this fact is undisputed, and only "disputes" the legal effect of the fact, which is improper.<br><br>Because Defendant does not set forth any specific facts or evidence to dispute this fact as required by Local Rule 56.1(c) and (d), this fact is deemed admitted in its entirety. *See* Local Rule 56.1(b)-(d); *see also Parks Real Estate*, 472 F.3d at 41; *Giannullo*, 322 F.3d at 140. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | this case is about nor is it relevant to the "work for hire" issue here which focuses on *Ditko's* creation of *his material* only. | |
| 20.    Marvel freelancers typically had no contact with other freelancers working on the same comic book, as it was Lee and other Marvel staff that coordinated this process, not the freelancers. Lens Decl., Ex. 57 at 3-4 (Ditko writing that "[o]nce I turned in the inked pages, I never knew who edited them or what, how anything was changed, added—sound effects, etc. Who, why changes, different cover, etc. Once I did the job, turned it in, got paid, my involvement ended. It was all ancient history."); Lens Decl., Ex. 3 141:8-13 (Lieber testifying that he could not recall "ever hav[ing] contact" with other contributors to a work after submitting his script); Lens Decl., Ex. 3 299:13-23 (Lieber explaining that he did not get to select the artists, letterers, or colorists for his scripts); Lens Decl., Ex. 3 300:4-18 (Lieber confirming that, after he turned in his work, he did not have "further communication or contact with anybody except, perhaps, with Stan" and that "[t]he next time [he] . . . knew anything about it is when it came out, you know, in the comic book form"); Lens Decl., Ex. 9 17:13-19 (Lieber testifying | **Counterclaimant disputes specifically, that Ditko "typically had no contact with other freelancers working on the same comic book," as Ditko would typically plot and draw the *Spider-Man* and *Dr. Strange* stories, and in addition, Ditko would provide detailed story notes as to what was happening on each page and suggest dialogue and captions, either in the margins or often written out separately, and then deliver those artwork pages and story notes to Lee (or later, Thomas) who, as *freelancers*, would dialogue and caption the stories Ditko had given them. In many instances, Ditko would then get the stories back from Lee (or later, Thomas), and ink his stories as well, correcting any of Lee's dialoguing mistakes that did not align with Ditko's story.** *See* Toberoff Decl. Ex. 14 at 7 (Evanier Rebuttal Rep. explaining Ditko's practice of submitting detailed notes with his freelance material to assist Lee in dialoguing the stories); Ex. 7 at 223:18-225:20 (Thomas testifying that Ditko refused to speak to Lee while working on *Spider-Man* and *Dr. Strange* so all | **This fact remains undisputed**. Defendant's contention that Ditko had contact with other freelancers working on the same comic book because he would "provide detailed story notes" in margins or on a separate paper is non-responsive and, in any event, incorrect.  As explained above in MCI's Reply in Support of Undisputed Fact 16, the evidence shows that while Ditko would sometimes write "margin notes" intended to help explain his penciled artwork, these notes were quite simplistic, and Lee and Thomas were free to, and often did, disregard such margin notes. Further, Defendant's suggestion that Ditko would "correct[] any of Lee's dialoguing mistakes that did not align with Ditko's story" when inking his work is unsupported by any evidence.  To the contrary, the evidence shows that Ditko frequently lamented about Lee's "corny dialogue" in Spider-Man comics that "undercut [] more serious [character] growth" or Lee's "haunted house" Doctor Strange plots.  *See* Lens Decl., Ex. 58 at 3; |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| that he did not "have any contact with the story after [he] turned it in" and never "ha[d] discussions with the artists about the stories"). | plotting on the stories was done by Ditko, and further, that Ditko would provide margin notes to indicate what he intended to happen in the story to guide Lee when Lee dialogued the story); *id*. at 262:4-264:19 (Thomas testifying that when he began to dialogue *Dr. Strange* stories instead of Lee, Ditko would type his suggested captions and dialogue on a separate page, not in the margins, and then give them to Thomas to fill in the dialogue balloons); Ex. 17 at 84:18-90:9 (Thomas testifying that Ditko wrote extensive margin notes describing the plot and what was happening so that when Lee/Thomas dialogued the story, they could do so in a way that corresponded with what Ditko had intended); Ex. 18 (1965 example of Ditko's *Dr. Strange* margin notes for Thomas); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script); Ex. 7 at 262:4-264:19 (Thomas testifying that, when Thomas began to dialogue *Dr. Strange* stories instead of Lee, Ditko would type his suggested captions and dialogue on a separate page, not in the margins, and then give them to Thomas to fill in the dialogue balloons); Ex. 19 at 6, | Lens Decl., Ex. 52 at 4; Lens Decl., Ex. 59 at 2 (Ditko complaining that "Stan's dialogue was too much his personal writing style with heroes/villains."); Lens Decl., Ex. 54 at 4 (Ditko commenting that "Stan's writing style was completely wrong for SM [Spider-Man]"); *see also* Lens Decl., Ex. 60 at 3; Lens Decl., Ex. 45 at 3.  Ditko recognized, however, that in the comic business the "[t]he editor is always right."  *See* MCI's Evidence in Support of Undisputed Fact 29.<br><br>MCI also **objects** to Toberoff Exhibits 17, 35, and 62.  *See* MCI's Evidentiary Objection Nos. [17], [35[, & [62]. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
|  | "Legends at Loggerheads!" (Thomas explaining example of when Lee incorrectly dialogued a *Spider-Man* story in a way Ditko had not intended, Ditko refused to accede to Lee's chosen direction, and corrected Lee's mistake when Ditko received the work to ink it); Ex. 71 at 159 (*Amazing Spider-Man* No. 25: "Sturdy Stevey Ditko dreamed up the plot of this tantalizing tale, and it's full of unexpected surprises!"); Ex. 72 at 225 (*Strange Tales* No. 135: "Plotted and Illustrated by Fandom's Favorite Fiend: Steve Ditko"); Ex. 80 (Marvel paying Ditko for reprints of numerous comic book stories noting that the payments were for pencil (i.e., drawing the story panel by panel), plot (i.e., the story plot) and ink (i.e., inking the "pencilled" panels); 81 (same). |  |
| 21.    To keep comic book production on schedule, Marvel imposed deadlines on its freelance writers and artists. Lens Decl., Ex. 13 42:10-20 (Lee testifying that "[e]very strip had a deadline, because these books had to go out every month. And it was very important that the deadline be met. Because if a book was late, we had already paid the printer for that press time. And if the book wasn't delivered in time, we still had to pay the printer. So it was a total loss to us. So the | **Admitted that Magazine Management set deadlines in connection with the production of its comic books but denied that it could impose deadlines on Ditko in any legal or employment sense because the company intentionally did not employ or place Ditko under contract. The parties thus had no bilateral obligations to one another and, as such, neither Magazine Management nor its editors could "impose deadlines" on Ditko.** Marvel has not produced any | **Defendant admits this fact is undisputed, and only "disputes" the legal effect of the fact, which is improper.**<br><br>Defendant admits that Marvel set deadlines yet somehow suggests that Marvel could not "impose deadlines on Ditko in any legal or employment sense" because Ditko lacked a written employment agreement, which is incorrect, turns on improper legal |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| deadlines were very important. And the artists always knew this has to be delivered by thus-and-such a date."); Lens Decl., Ex. 10 384:22-385:11 (Lee testifying that it was part of his job as editor-in-chief to set deadlines for the artists); Lens Decl., Ex. 72 at 4 (recalling Ditko toiling at his artist's desk in the early 1960s "tortured by [] deadlines"); Lens Decl., Ex. 73 at 3 (Ditko noting that Kirby was "buried under work" and needed to work fast "to keep up with the assignments Lee was throwing at him"); *see also* Lens Decl., Ex. 4 94:6-21; Lens Decl., Ex. 2 154:9-155:25; Lens Decl., Ex. 2 333:8-16; Lens Decl., Ex. 12 59:22-60:21; Lens Decl., Ex. 7 218:2-16; Lens Decl., Ex. 3 266:11-12; Lens Decl., Ex. 3 125:5-13; Lens Decl., Ex. 9 14:9-25. | contemporaneous agreement with Ditko from the Period for his creative services, nor any other evidence reflecting any bilateral rights and obligations between Ditko and Magazine Management (nor any other alleged Marvel predecessor) in the Period, nor has Marvel alleged that any such agreement or bilateral legal rights and obligations existed between such parties in the Period. *See* Toberoff Decl. Ex. 1 at 10, 13 (Supplemented Expert Report of Mark Evanier ("Evanier Rep.") providing historical context giving rise to Marvel's use of freelance creators and explaining that, when Magazine Management ran out of surplus artwork to publish, it began to purchase artwork and scripts from freelancers at a low page rate and that freelancers did not have written contracts with Magazine Management during the 1950s or 1960s and describing the common practice of freelancers selling material to more than one publisher, including Marvel, DC Comics, and Charlton Comics); Ex. 14 at 10-11 (Rebuttal Expert Report of Mark Evanier ("Evanier Rebuttal Rep.") explaining that it was not the custom and practice of Marvel or other publishers in the comic book industry to have written contracts with freelance creators during the Period); Ex. 2 at 71:17-74:5 (Larry Lieber | argument, and—in any event—is immaterial as the Second Circuit's decision in *Kirby* confirms. *See* MCI's Reply in Support of Undisputed Fact 2. MCI also **objects** to Toberoff Exhibits 1, 2, 3, 8, 9, 10, 11, 13, 14, and 22. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [2], [9], [11], [12], [13], [14], [16], [17], & [25]. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | ("Lieber") testifying that he sold freelance work to Marvel in the 1950s and 1960s, had no contract with Marvel, and that Marvel was not obligated to buy his submitted freelance material); Ex. 3 at 159:24-160:4, 194:11-195:3, 207:12-22, 211:7-212:3 (John V. Romita ("Romita") testifying that he did not have a contract with Marvel as a freelancer and that freelancers were free to sell work to other publishers); Ex. 5 at 371:3-25 (Stan Lee ("Lee") testifying that Marvel "would only buy what [it] needed"); Ex. 6 at 36:17-21, 202:2-20 (Roy Thomas ("Thomas") testifying that he had no contract with Marvel until 1974); Ex. 8 ¶ 10 (Joe Sinnott ("Sinnott") attesting that he had no contract with Marvel and Marvel was very small and disorganized in the 1950s and 1960s); Ex. 8 ¶ 11 (Sinnott attesting that Marvel had no obligation to buy pages of his work and that Marvel paid only for the pages it wanted); Ex. 9 ¶ 8 (James Steranko ("Steranko") Steranko attesting that Marvel had no contract with Steranko and so he was free to sell work to other publishers); Ex. 10 ¶ 12 (Richard Ayers ("Ayers") attesting that he had no contract with Marvel from 1959 to 1975); Ex. 11 ¶ 9 (Gene Colan ("Colan") attesting that he had no contract with Marvel until 1975); | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | Ex. 13 ¶ 5-7 (Neal Adams ("Adams") attesting that he had no contract with Marvel in the 1960s or 1970s and that he sold work to both Marvel and DC Comics during the 1960s and 1970s); Ex. 17 at 39:25-40:4, 51:20-52:4, 298:8-14, 301:14-303:7 (Thomas testifying that he had no written contract from 1965 to 1974 and that Marvel did not have contracts with freelancers prohibiting them from selling work to other publishers); Ex. 22 at 287:22-288:12 (Lieber testifying that he had no contract with Marvel in the 1950s or 1960s); Ex. 24 at 79:2-8 (Paul Levitz ("Levitz") testifying that Marvel did not have contracts with any freelancer until the mid-1970s). | |
| 22.    Marvel's editors, including Stan Lee and Roy Thomas, supervised the creation of Marvel's comics subject only to Martin Goodman, who had ultimate authority to supervise and direct the creation of all Marvel comic books. Lens Decl., Ex. 2 17:8-18:13 (Thomas testifying that "subject to the publisher, [Lee] was in charge of everything. He oversaw the writing, he oversaw the artists and the art that came in. You know, everything went through him with the help of the production manager in particular."); Lens Decl., Ex. 2 24:17-23 (Thomas testifying how Marvel | **Counterclaimant disputes that "Marvel," Lee, or Thomas directed or supervised Ditko's creative process regarding his works. Ditko created his material from his own studio, on his own time, pursuant to character and story charts that he created on his own volition, and often refused to make any changes to his work.** *See* Toberoff Decl. Ex. 1 at 12-13 (Evanier Rep. explaining the custom and practice of freelancers creating their material from home and noting that Ditko was unique in renting and paying for a separate studio and that it was Ditko's regular practice to maintain a | **This fact remains undisputed**.

Defendant's suggestion that Lee and Thomas did not supervise the creation of Marvel comics because Ditko worked from home, used "story charts," or refused to make changes is non-responsive and incorrect for the reasons stated in MCI's Reply in Support of Undisputed Fact 3.

Further, Defendant's suggestion that Ditko's work for Marvel was not done on a work-for-hire basis because Ditko and Lee had a falling out and stopped speaking in 1965, at the very end of the |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| production manager Sol Brodsky "would call a freelancer in . . . to keep an eye on him to make sure he finished the job on deadline or . . . had something that had to be corrected or changed"); Lens Decl., Ex. 2 37:10-39:6 (Thomas testifying that when he became editor-in-chief, he was "in charge of, you know, all the artists, the writers, the colorists, the letterers and so forth"); Lens Decl., Ex. 13 16:8-19 (Lee confirming that he would "give instructions to the artists as to how [he] wanted the story to go" and that it was his "responsibility" to oversee "the creative editorial aspects of the comic books that were created"); Lens Decl., Ex. 12 67:16-68:6 (Thomas testifying that Lee "decided which artist would do a cover for a particular issue[,] . . . they were reviewed by Stan, . . . then they were all reviewed eventually by Martin Goodman as publisher"); Lens Decl., Ex. 13 44:4-17 (Lee testifying that because "we considered the covers the most important part of the book," he "spent a lot of time on" their look and layout); Lens Decl., Ex. 13 16:3-19 (Lee testifying that he would "give instructions to the artists as to how [he] wanted the story to go" and "oversaw . . . creative editorial aspects of the comic books that were created, . . . because [he] had to answer to the publisher, Martin | chart mapping out the future development of stories and characters so as to introduce elements into current stories and then use those elements in stories many months down the line); Ex. 24 at 123:18-21 (Levitz testifying that Ditko created work from his own studio); Ex. 35 at DITKO-0193 (Ditko writing that he planted seeds of subplots in stories that would work their way through the issues until it was time for those sub-stories to play an active role later when the time was right); Ex. 58 at 3 (Ditko writing when he took over the *Spider-Man* stories he "knew in advance the [*Spider-Man*] story line like the best (worst) time for Aunt May to have a heart attack"); Ex. 14 at 7 (Evanier Rebuttal Rep. explaining Ditko's practice of refusing to make changes and in such case, Marvel's custom of having staff make such changes after the work had been submitted to and purchased by Marvel); Ex. 3 at 75:18-20, 243:13-244:23, 246:5-9 (Romita testifying that he, or someone else Lee could find in the Marvel office, would be asked to make changes to other artists' work after it had been submitted and would not be paid any extra for making these changes and noting specifically that when Lee did not like something on a Ditko cover, he asked Kirby to change it); Ex. 19 at 6, "Legends | relevant time period, is incorrect for the reasons stated in MCI's Reply in Support of Undisputed Fact 3.<br><br>Moreover, Defendant's contention that Ditko "created . . . the first *Dr. Strange* story completely 'on spec' based on a character he was toying with since 1946" is non-responsive and incorrect.  The evidence demonstrates that Doctor Strange grew out of Ditko's longstanding relationship with Marvel and was not created by Ditko "on spec."  The first Doctor Strange story came about as a five-page "back-up" in *Strange Tales*, a Marvel comic book that Ditko was assigned by Lee to contribute to, and which he had been assigned by Lee to contribute to dating back to 1956.  *See* MCI's Evidence in Support of Undisputed Facts 31 and 33.  Ditko consistently did the five-page "back-up" stories in *Strange Tales*, including for years leading up to Doctor Strange's first appearance in 1963.  *See* MCI's Evidence in Support of Undisputed Fact 32.  Lee named the character Doctor Strange—"Strange" because the story was published in Marvel's *Strange Tales* series; "Doctor" to avoid confusion with "Mr. Fantastic," another Marvel superhero.  *See* MCI's Evidence in Support of Undisputed Fact |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| Goodman, and he had to be happy with what I was doing"); Lens Decl., Ex. 4 97:7-9 (Lee testifying that comic book production "was [his] responsibility, the whole thing"); Lens Decl., Ex. 4 93:23-94:5 (Lee testifying that he supervised Marvel's writers and artists); Lens Decl., Ex. 2 80:24-81:12 (Thomas testifying that "[s]ubject to the publisher, [Lee had] complete authority" over artwork in Marvel comics); Lens Decl., Ex. 2 125:18-126:1 (Thomas testifying that Lee "was always the ultimate authority unless Martin Goodman stepped in, and that was mostly on covers"); Lens Decl., Ex. 7 219:11-220:11 (Thomas testifying that "the ultimate say, as far as I know, was the publisher, . . . Martin Goodman"); Lens Decl., Ex. 13 97:8-11 (Lee testifying that he "couldn't do any book unless Martin approved of it"); Lens Decl., Ex. 4 124:19-125:4 (Lee testifying that "[i]t was always [Goodman's] decision" as to what to publish, and "he exercised the authority ultimately to publish the last edition of 'Amazing Fantasy'"); Lens Decl., Ex. 4 124:3-18 (Lee testifying that he "loved" the "Amazing Fantasy" books but "Mr. Goodman decided to cancel them because they weren't selling"); Thomas Decl. ¶¶ 7-8 ("As part of [Marvel's] established framework [for creating comics in the | at Loggerheads!" (Thomas explaining example of when Lee incorrectly dialogued a *Spider-Man* story in a way Ditko had not intended, Ditko refused to accede to Lee's chosen direction); Ex. 21 at 41:7-18 (Steranko testifying that Marvel had production assistants to make changes to work after it had been submitted by artists); Ex. 35 at DITKO-0193 (Ditko writing that he ignored comments from Lee and Brodsky and only made changes to stories when he agreed with them); Ex. 82 (Lee explaining in January 9, 1966 published interview: "**I don't plot Spider-Man any more. Steve Ditko, the artist, has been doing the stories.** I guess I'll leave him alone until sales start to slip. Since Spidey got so popular, Ditko thinks he's the genius of the world. We were arguing so much over plot lines I told him to start making up his own stories. **He won't let anybody else ink his drawings either. He just drops off the finished pages with notes at the margins and I fill in the dialogue. I never know what he'll come up with next**, but it's interesting to work that way.") (emphasis added); Ex. 83 at 7 (same); Ex. 4 at 33:25-34:2 (Lee testifying that freelancers mostly worked from home); Ex. 17 at 24:5-25:4 (Thomas testifying that artists worked from home | 34.  Lee also wrote the dialogue for the first Doctor Strange story—and he or another Marvel writer wrote the dialogue for all subsequent Doctor Strange stories. *See* MCI's Evidence in Support of Undisputed Fact 33.  While Doctor Strange did not have a backstory when originally published, Marvel gave Doctor Strange a fleshed out personality and origin story in *Strange Tales* Vol. 1, No. 115 drawing upon Lee's earlier work with Ditko on the "Dr. Droom" character in *Amazing Adventures* Vol. 1, No. 1.  *See* MCI's Evidence in Support of Undisputed Fact 35.  Both Dr. Droom and Doctor Strange are doctors who undergo a series of tests in Tibet and develop mystical abilities to combat magical forces.  *See* MCI's Evidence in Support of Undisputed Fact 36.  Together, the evidence demonstrates that Doctor Strange—like other works by Ditko, Kirby, and other freelancers during the relevant time period—was not created and sold "on spec."<br><br>Finally, in any event, Defendant's contentions regarding "creation" are immaterial, as the Second Circuit's decision in *Kirby* confirms.  *See Kirby*, 726 F.3d at 142 ("Questions of who created the characters are mostly beside |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| 1960s], Stan Lee supervised and directed Marvel's comic book-creation process subject only to Martin Goodman"); *see also* Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3. | as freelancers and rarely, if ever, came into the office); Ex. 2 at 76:4-24 (Lieber testifying that he created his freelance work from home and used his own supplies); Ex. 3 at 16:22-24, 194:14-195:3, 209:16-210:7 (Romita testifying that he purchased his own materials and worked from home); Ex. 6 at 30:21-24 (Thomas testifying that he did his freelance writing from home); Ex. 8 ¶ 9 (Sinnott attesting that he worked from home with his own materials); Ex. 9 ¶ 10 (Steranko attesting that he worked from home and supplied his own materials, for which Marvel never reimbursed him); Ex. 10 ¶ 10 (Ayers attesting that he worked from home and paid for his own materials); Ex. 11 ¶ 8 (Colan attesting that he created his freelance art from home and paid for his own materials); Ex. 13 ¶ 7 (Adams attesting that he worked from home and paid for his own materials); Ex. 16 at 117:15-16 (Nanci Solo ("Solo") testifying that Colan worked from home); Ex. 22 at 286:17-287:19 (Lieber testifying that he worked from home and paid for his own typewriter); **Counterclaimant further disputes that Ditko created his works under "Marvel" /Lee/ Thomas's direction or supervision, as Ditko created many of his works in question when Lee and he** | the point," but what matters is the hiring parties' "inducement, right to supervise, exercise of that right, and creative contribution with respect to" the works.").<br><br>MCI also **objects** to Toberoff Exhibits 1, 3, 8, 9, 10, 11, 13, 14, 16, 23, 25, 27, 33, 35, 57, 58, and 59.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [8], [11], [12], [13], [14], [16], [17], [18], [33], [34], [35], [39], [41], [52], [53] & [54]. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | **were no longer communicating, and thus, Lee would not know anything about the *Spider-Man* or *Dr. Strange* stories Ditko was creating until Ditko dropped off his finished pages.** *See* Toberoff Decl. Ex. 7 at 223:18-225:20, 277:11-13 (Thomas testifying that Ditko did all the plotting on *Spider-Man* and *Dr. Strange* stories while he and Lee were not speaking and that Ditko never received any plots from Thomas when Thomas was doing the dialoguing on *Dr. Strange*); Ex. 17 at 311:2-17 (Thomas testifying that, by the time he started at Marvel in mid-1965, Ditko and Lee were not speaking anymore because they had been fighting over the direction of the *Spider-Man* series); *id.* at 29:19-30:8, 83:13-18 (Thomas testifying that by the time Thomas began at Marvel in mid-1965, Ditko was plotting and penciling *Dr. Strange* stories, which Thomas would dialogue); *id.* at 311:18-312:25 (Thomas testifying that Ditko plotted and drew *Spider-Man* stories completely on his own for more than one year before he left in 1966). Ex. 24 at 124:5-24 (Levitz testifying that Ditko and Lee stopped speaking in the last year of Ditko's time with Marvel because Ditko was not getting proper credit for his contributions to the stories); Ex. 35 at DITKO-0193 (Ditko writing that he and | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
|  | Lee stopped speaking around 1964 and thus from then on, Ditko had complete creative control of the *Spider-Man* and *Dr. Strange* stories, which he was plotting and penciling until he left in 1966); Ex. 58 at 3 (Ditko writing that he took over all plotting of the *Spider-Man* stories); Ex. 71 at 159 (*Amazing Spider-Man* No. 25: "Sturdy Stevey Ditko dreamed up the plot of this tantalizing tale, and it's full of unexpected surprises!"); Ex. 72 at 225 (*Strange Tales* No. 135: "Plotted and Illustrated by Fandom's Favorite Fiend: Steve Ditko"); Ex. 25 (Ditko: "Dr. Strange has always been a contradiction to Marvel heroes ... He is my creation, and at one point I took over all stories, writing, [and] art."); Ex. 26 at 83 (Lee writing that Ditko came up with the *Dr. Strange* plots and illustrated the story and Lee only added the dialogue to the balloons); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script); Ex. 1 at 13 (Evanier Rep. describing the common practice of independent freelancers supervising themselves and editing their own work prior to submission); Ex. 82 (Lee explaining in January 9, 1966 published interview: "**I don't plot** |  |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | **Spider-Man any more. Steve Ditko, the artist, has been doing the stories.** I guess I'll leave him alone until sales start to slip. Since Spidey got so popular, Ditko thinks he's the genius of the world. We were arguing so much over plot lines I told him to start making up his own stories. **He won't let anybody else ink his drawings either. He just drops off the finished pages with notes at the margins and I fill in the dialogue. I never know what he'll come up with next**, but it's interesting to work that way.") (emphasis added); Ex. 83 at 7 (same). **Counterclaimant further disputes that Ditko created Dr. Strange pursuant to "Marvel" /Lee/ Thomas's direction or supervision, as Ditko wrote and drew the first *Dr. Strange* story completely "on spec" based on a character he was toying with since 1946.** *See* Toberoff Decl. Ex. 1 at 21 (Evanier Rep. providing historical context of the first publication of Ditko's Dr. Strange character which began as a five-page story Ditko wrote and drew on spec introducing the character which he presented to Lee); Ex. 25 (Ditko: "Dr. Strange has always been a contradiction to Marvel heroes ... He is my creation, and at one point I took over all stories, writing, [and] art."); Ex. 27 (Ditko writing that he created the first *Dr.* | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | *Strange* story and that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script); Ex. 30 at 2021MARVEL-0050281 (Lee writing that Dr. Strange "'twas [Ditko's] idea, and I figgered we'd give it a chance" in a contemporaneous letter dated January 9, 1963 and noting the story was a "5-page filler"); Ex. 57 at 2 (Ditko writing that Dr. Strange was a great opportunity for him to try out all kinds of ideas, which "never fit in to Marvel's world of heroes"); Ex. 33 (Ditko's letter post-marked August 6, 1946 to his brother Patrick Ditko enclosing an early sketch of Dr. Strange); Ex. 59 at 61:15-65:14 (Patrick Ditko, being shown composite Ex. 33 and testifying that his brother, Steve Ditko, sent him this letter in 1946, while Ditko was in military service abroad, enclosing Ditko's early sketch of Dr. Strange (Ex. 33) and that he had found Ex. 33 at his home amongst letters he had kept from his brother); Ex. 23 at 166:5-168:8 (Mark Ditko testifying that his father lived at the address written on the letter envelope of composite Ex. 33, and that, in 1946 (postmarked on the letter envelope), his uncle Ditko was in the military, stationed abroad in Germany). | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| **DITKO—LIKE OTHER MARVEL FREELANCERS—WORKED AT MARVEL'S INSTANCE DURING THE TIME PERIOD** *Ditko Worked Under Marvel's Direction and Supervision* | | |
| 23. Marvel assigned Ditko, like other freelancers, to contribute to specific Marvel comic books and could reassign him to different comics when it deemed it necessary or appropriate to do so. Lens Decl., Ex. 48 at 3 (Ditko admitting that he "was given the job of drawing Spider-Man" but could not speak to "[w]hy, exactly"); Lens Decl., Ex. 51 at 3 (Ditko explaining that, "[a]s a freelancer, [his] focus had to be on what is next, what has to be done," as "[t]he last job is history"); Lens Decl., Ex. 54 at 4 (Ditko acknowledging that, "[s]ince [he] was a freelancer, Stan Lee could have taken [him] off S[pider]-M[an] anytime he wanted— he did it for a S[pider]-M[an] story pencilled by Jack Kirby"); Lens Decl., Ex. 2 27:19-28:7 (Thomas testifying that his "responsibilities as a freelance writer" were "[j]ust to write whatever Stan told [him] to write"); Lens Decl., Ex. 2 56:2-57:7 (Thomas testifying that Marvel artists did not "have the ability to select which comics they were going to work on" or "the ability to select which artists, letterers, or colorists they were going to be working with" during the Time Period); Lens Decl., Ex. 12 | **Counterclaimant disputes that Ditko was "assigned" to contribute to comic books, as Marvel had no contract or other legal authority to "assign" Ditko to do anything. Ditko was an independent artist and was free to accept any proposal by Lee that Ditko contribute to a particular story or to reject such proposal without consequence.** Marvel has not produced any contemporaneous agreement with Ditko from the Period for his creative services, nor any other evidence reflecting any bilateral rights and obligations between Ditko and Magazine Management (nor any other alleged Marvel predecessor) in the Period, nor has Marvel alleged that any such agreement or bilateral legal rights and obligations existed between such parties in the Period. *See* Toberoff Decl. Ex. 17 at 298:8-14 (Thomas testifying that freelancers did not have contracts with Marvel until Thomas's in 1974, which was the first); Ex. 36 at 7 (Marvel admitting it had no written contract with Ditko in the 1960s); Ex. 1 at 10 (Evanier Rep. describing the common practice of freelancers selling material to more than one publisher, | This fact remains undisputed. Defendant does not address this fact, much less dispute it. Defendant's suggestion that Lee did not assign Ditko to work on Marvel comic books because Ditko was not contractually bound to accept every assignment that Lee provided is incorrect, turns on an improper legal argument, and—in any event—is immaterial, as the Second Circuit's decision in *Kirby* confirms. *See* MCI's Reply in Support of Undisputed Fact 2. This argument also ignores that Ditko did, in fact, consistently accept assignments from Lee. Indeed, the vast majority of Ditko's work during the 1962-1965 relevant time period was published by Marvel as detailed in MCI's Reply in Support of Undisputed Fact 2. MCI also **objects** to Toberoff Exhibits 1, 3, 9, 13, 21, 23, 25, 35, 57, and 58. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [7], [12], [16], [20], [32], [34], [41], [52], & [53]. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| 56:16-18 (Thomas confirming that it was Stan Lee who "decided which writer and artist would work on a particular comic book or issue"); Lens Decl., Ex. 2 148:22-151:25 (Thomas testifying about why freelancers might be removed from certain comic books, including for "lateness, undependability," or the editor's decision that "they just weren't doing the right job, or even if they were okay . . . [that] a little bit of musical chairs might get us a better arrangement of people"); *see also* Lens Decl., Ex. 2 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens Decl., Ex. 12 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13 14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24. | including Marvel, DC Comics, and Charlton Comics); Ex. 3 at 207:12-22 (Romita testifying that freelancers were free to sell work to other publishers); Ex. 9 ¶ 11 (Steranko attesting that Marvel had no contract with Steranko and so he was free to sell work to other publishers); Ex. 13 ¶¶ 5-6 (Adams attesting that he sold work to both Marvel and DC Comics during the 1960s and 1970s); Ex. 23 at 160:2-8 (Mark Ditko testifying that Ditko was selling work to both Marvel and Charlton Comics in the 1960s); Ex. 35 at DITKO-0199 (Ditko writing about his work at Charlton Comics in the 1960s); Ex. 57 at 2 (Ditko writing about creating material for Charlton Comics and DC Comics); Ex. 35 at DITKO-0192, DITKO-0207-0210, DITKO-0215-0218 (Ditko writing that he rejected several of Lee's *Spider-Man* story ideas and characters such as, for instance, Lee's idea for a Spider-Woman character, or Lee's idea of making Aunt May more glamorous); Ex. 3 at 219:12-24 (Romita testifying that he turned down Lee's offer to submit material to Marvel and preferred to sell freelance work to DC Comics); Ex. 21 at 29:9-30:17 (Steranko testifying that he was not given "assignments," but rather, he had the option to work on some books or to not if he chose not to); Ex. 24 | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | at 89:2-11 (Levitz testifying that freelancers were free to decline "assignments"); Ex. 58 at 4 (Ditko writing that, after he stopped selling his material to Marvel in 1966, he later started working with Marvel again, but refused to do any *Spider-Man* or *Dr. Strange* stories and recounting that when other writers tried to sneak in *Spider-Man* panels for Ditko to work on, he "left [them] blank for someone else to fill in"); *id.* (Ditko writing that he "refused to do a drunken Iron Man splash page—someone else had to draw [and] ink it"). **In addition, Ditko often took control over the characters he created and indeed, plotted and drew each *Spider-Man* and *Dr. Strange* story from its inception, until he stopped submitting and selling his stories to Marvel in early 1966.** *See* Toberoff Decl. Ex. 1 at 21 (Evanier Rep. providing historical context of Spider-Man and Dr. Strange and Ditko's role in creating numerous supporting characters before he stopped selling work to Marvel in 1966); Ex. 25 (Ditko: "Dr. Strange has always been a contradiction to Marvel heroes ... He is my creation, and at one point I took over all stories, writing, [and] art."); Ex. 26 at 83 (Lee writing concerning Dr. Strange: "Steve Ditko is one of the best plot men in | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | the biz. When it comes to dreaming up story ideas, putting them together intricately, panel by panel, and utilizing the best of cinematic techniques, the guy's a whiz. Thus, the spectacular saga that is about to knock you out was basically concocted by our own Mr. D[itko]"); *id.* (Lee writing concerning *Dr. Strange*, "After [Ditko] did the hard part—after he dreamed up the story and illustrated it in his own unique style—I then got to the fun part. I wrote the squiggly little words: the dialog balloons and captions"). Ex. 7 at 223:18-225:20, 277:11-13 (Thomas testifying that Ditko did all the plotting on *Spider-Man* stories while Ditko and Lee were not speaking); Ex. 17 at 311:18-312:25 (Thomas testifying that Ditko, on his own, plotted and drew *Spider-Man* for more than one year before he left in 1966, did not work pursuant to the "Marvel Method," and that Lee would not even know anything about the story until it was penciled and submitted by Ditko); Ex. 28 (Lee writing that Ditko was co-creator of Spider-Man and that Ditko did most of the plotting of *Spider-Man* and just left Lee to do the dialogue and captions); Ex. 71 at 159 (*Amazing Spider-Man* No. 25: "Sturdy Stevey Ditko dreamed up the plot of this tantalizing tale, and it's full of unexpected surprises!"); Ex. 72 at 225 | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | (*Strange Tales* No. 135: "Plotted and Illustrated by Fandom's Favorite Fiend: Steve Ditko"); Ex. 82 (Lee explaining in January 9, 1966 published interview: "**I don't plot Spider-Man any more. Steve Ditko, the artist, has been doing the stories.** I guess I'll leave him alone until sales start to slip. Since Spidey got so popular, Ditko thinks he's the genius of the world. We were arguing so much over plot lines I told him to start making up his own stories. **He won't let anybody else ink his drawings either. He just drops off the finished pages with notes at the margins and I fill in the dialogue. I never know what he'll come up with next,** but it's interesting to work that way.") (emphasis added); Ex. 83 at 7 (same). | |
| 24.     Marvel generally provided Ditko, like other freelancers, with a plot or synopsis, which could be written or oral, that outlined the key elements of the story it wanted penciled. Lens Decl., Ex. 48 at 2 (Ditko admitting that "Stan provided the plot ideas"); Lens Decl., Ex. 46 at 3 (Ditko explaining that Stan Lee "create[ed]" the "Spider-Man" name and then wrote the original "synopsis for the artist [(i.e., Ditko)]"); Lens Decl., Ex. 2 28:8-21 (Thomas describing the plotting | **Counterclaimant disputes that "Marvel" provided Ditko with plots or synopses, given that Lee did his writing and made his story contributions not as an editor but as an independent freelancer for which he was paid by the page by Magazine Management, and that the shell companies which registered the relevant copyrights had no business operations or employees, no contact with Ditko, did not acquire Lee's freelance writing contributions** | **This fact remains undisputed**.

Defendant contends that even if Lee provided Ditko with plots or synopses, Lee was not providing those plots or synopses on behalf of Marvel.  As explained in MCI's Reply in Support of Undisputed Facts 3 and 35, that contention is factually and legally incorrect. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| process); Lens Decl., Ex. 13 20:11-21:25 (Lee testifying about the same); Lens Decl., Ex. 9 at 47:20-48:8 (Lieber testifying that Stan Lee "would discuss a story or a plot with the artist and the artist . . . would lay it out and draw it with enough knowledge about what the story is and leave room for dialogue to come later"); Lens Decl., Ex. 69; Lens Decl., Ex. 70; Lens Decl., Ex. 71 at 3:25-6:09 (Lee explaining how Marvel comics were "sort of like continuing soap operas"); *see also* Lens Decl., Ex. 11 218:14-219:16; Lens Decl., Ex. 3 113:21-114:17, 118:24-119:4, 123:11-124:8, 124:16-125:4, 222:16-23; Lens Decl., Ex. 9 12:19-13:5. | **and therefore could not, and did not, supply Ditko with anything.** *See* Toberoff Decl. Ex. 1 at 13 (Evanier Rep. describing Lee's common practice of composing dialogue as a freelancer, not as Marvel's editor and doing his freelancing from home two of the five workdays per week, for which he was paid on a per-page basis as a freelancer); Ex. 3 at 41:19-42:2 (Romita testifying that Lee would stay home several days per week to write); Ex. 4 at 17:17-25 (Lee testifying that he was paid as a freelancer for his writing and was on salary for his work as an editor); Ex. 17 at 27:2-18, 30:9-13, 31:22-32:7, 276:2-14 (Thomas testifying that he was a staff writer/assistant editor in the 1960s and got a salary for that work, but separately freelanced when writing stories and was paid at a per-page rate on a separate check like other freelancers); Ex. 22 at 255:10-256:6 (Lieber testifying that Lee wrote stories and scripts as a writer, not as an editor, because writing is "not what an Editor does"); Ex. 55 at 62:18-63:18 (Lee testifying that he got paid a salary as editor and separately for his writing); Ex. 56 at 91:20-92:6 (Lee testifying that he got paid a salary as editor and separately as a freelancer pre page for his writing); Ex. 14 at 4-5 (Evanier Rebuttal Rep. providing | Further, while Defendant suggests that Lee did not provide Ditko with a plot or synopsis, the evidence demonstrates precisely the opposite, as explained in MCI's Reply in Support of Undisputed Fact 3.<br><br>MCI also **objects** to Toberoff Exhibits 1, 14, 22, 23, 25, 27, 33, 35, 57, 58, 59, 61, 65, 67, 75, 77, and 79. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [17], [26], [27], [31], [33], [34], [35], [39], [41], [52], [53], [54], [55], [57], [58], [59], [60], & [61]. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | historical context and explaining that the shell companies had no employees, actual offices, or business activities, and had no contact with any freelancer); Ex. 6 at 200:2-24 (Thomas testifying that he was hired by Magazine Management in 1965); Ex. 17 at 272:23-275:2 (Thomas testifying that he was paid and employed by Magazine Management/Marvel Comics, and then Perfect Film/Cadence); *id.* at 320:10-322:14 (Thomas testifying that no one knew what Vista, Atlas, or Non-Pareil did and that Thomas did not receive any money from them, does not know anyone who did, does not know if they had any employees or any offices, or "of [them] having any existence" whatsoever); Ex. 22 at 252:23-254:24, 303:15-19 (Lieber testifying that he never heard of Vista or other shell companies, did not know if they had any employees and that he was paid by, and believed he was working with, Magazine Management); Ex. 50 at DETTWILER-0044-0058 (Don Heck's payment records identifying "Magazine Management" as the only entity that paid him for his freelance material in the Period). **Counterclaimant further disputes that Lee "generally" provided a plot or synopsis to Lee as Ditko was well-known to be extremely independent** | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | **when it came to the creation of his stories and characters because of this Lee stopped communicating with Lee in the Period.** *See* Toberoff Decl. Ex. 1 at 13 (Evanier Rep. describing the common practice of independent freelancers supervising themselves and editing their own work prior to submission); *id.* at 12 (Evanier Rep. describing Ditko's regular practice of maintaining a chart mapping out the future development of a character so he could introduce elements into current issues and then use those elements in issues many months down the line); Ex. 35 at DITKO-0193 (Ditko writing that he planted seeds of subplots in stories that would work their way through the issues until it was time for those sub-stories to play an active role later when the time was right); Ex. 58 at 3 (Ditko writing when he took over the *Spider-Man* stories he "knew in advance the [*Spider-Man*] story line like the best (worst) time for Aunt May to have a heart attack"); Ex. 7 at 223:18-225:20, 277:11-13 (Thomas testifying that Ditko did all the plotting on *Spider-Man* and *Dr. Strange* stories while he and Lee were not speaking and that Ditko never received any plots from Thomas when Thomas was doing the dialoguing on *Dr. Strange*); Ex. 17 at 311:18-312:25 (Thomas testifying that | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | Ditko plotted and drew *Spider-Man* stories completely on his own for more than one year before he left in 1966); Ex. 25 (Ditko: "Dr. Strange has always been a contradiction to Marvel heroes ... He is my creation, and at one point I took over all stories, writing, [and] art."); Ex. 26 at 83 (Lee writing that Ditko came up with the *Dr. Strange* plots and illustrated the story and Lee only added the dialogue [in the balloons]); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script); Ex. 58 at 4 (Ditko writing that, after he stopped selling his material to Marvel in 1966, he later started working with Marvel again, but refused to do any *Spider-Man* or *Dr. Strange* stories and recounting that when other writers tried to sneak in *Spider-Man* panels for Ditko to work on, he "left [them] blank for someone else to fill in"); *id*. (Ditko writing that he "refused to do a drunken Iron Man splash page—someone else had to draw [and] ink it"); Ex. 35 at DITKO-0192, DITKO-0207-0210, DITKO-0215-0218 (Ditko writing that he rejected several of Lee's *Spider-Man* story ideas and characters such as, for instance, Lee's idea for a Spider-Woman character, or | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | Lee's idea of making Aunt May more glamorous); Ex. 71 at 159 (*Amazing Spider-Man* No. 25: "Sturdy Stevey Ditko dreamed up the plot of this tantalizing tale, and it's full of unexpected surprises!"); Ex. 72 at 225 (*Strange Tales* No. 135: "Plotted and Illustrated by Fandom's Favorite Fiend: Steve Ditko"); Ex. 82 (Lee explaining in January 9, 1966 published interview: "**I don't plot Spider-Man any more. Steve Ditko, the artist, has been doing the stories.** I guess I'll leave him alone until sales start to slip. Since Spidey got so popular, Ditko thinks he's the genius of the world. We were arguing so much over plot lines I told him to start making up his own stories. **He won't let anybody else ink his drawings either. He just drops off the finished pages with notes at the margins and I fill in the dialogue. I never know what he'll come up with next**, but it's interesting to work that way.") (emphasis added); Ex. 83 at 7 (same). **Counterclaimant further disputes that Ditko was provided any plot or synopsis for the first *Dr. Strange* story, as Ditko created that story on his own, utilizing a character he had been playing with since 1946 well before he met Marvel or Lee. Ditko also often repurposed characters and character elements** | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | **(which drove his story plots) that Ditko had created years prior and included them into stories he sold to Magazine Management, evidencing that Lee/Marvel were not "generally" providing Ditko with story plots.** *See* Toberoff Decl. Ex. 1 at 21 (Evanier Rep. providing historical context of the first publication of Ditko's Dr. Strange character which began as a five-page story Ditko wrote and drew on spec introducing the character which he presented to Lee); Ex. 25 (Ditko: "Dr. Strange has always been a contradiction to Marvel heroes ... He is my creation, and at one point I took over all stories, writing, [and] art."); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script); Ex. 30 at 2021MARVEL-0050281 (Lee writing that Dr. Strange "'twas [Ditko's] idea, and I figgered we'd give it a chance" in a contemporaneous letter dated January 9, 1963); Ex. 33 (Ditko's letter post-marked August 6, 1946 to his brother Patrick Ditko enclosing an initial sketch of Dr. Strange); Ex. 59 at 61:15-65:14 (Patrick Ditko, being shown composite Ex. 33 and testifying that his brother, Steve Ditko, sent him this letter in 1946, while Ditko | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | was in military service abroad, enclosing Ditko's early sketch of Dr. Strange (Ex. 33) and that he had found Ex. 33 at his home amongst letters he had kept from his brother); Ex. 23 at 166:5-168:8 (Mark Ditko testifying that his father lived in Johnstown, PA at the address written on the letter envelope of composite Ex. 33, and that in 1946 (postmarked on the letter envelope), his uncle Ditko was in the military, stationed abroad in Germany); Ex. 57 at 2 (Ditko writing that Dr. Strange started out as a "5-page filler," which was a great opportunity to try out all kinds of ideas like Dr. Strange, which "never fit in to Marvel's world of heroes"); Ex. 62 at 4-5 (Dr. Strange used his hands to cast teleportation and other spells in *Strange Tales* No. 139 (1965)); Ex. 63 at 2 (same in *Strange Tales* No. 126 (1964)); Ex. 70 at 8-9 (same in *Strange Tales* No. 129 (1965)); *compare* Ex. 61 at 3 (Ditko's character used his hands to cast spells in 1959 in Charlton Comics' *Space Adventures* No. 27); *see also* Ex. 66 at 10 (in *Strange Tales* No. 137 (1965), Dr. Strange used a device—the Eye of Agamotto—to transport through space and time); *compare* Ex. 65 at 4-5 (In Charlton Comics' *Out of this World* No. 7 (1958), Ditko's character used similar artifact to transport characters in a swirl of | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | visual effects through space and time); *see also* Ex. 68 at 4-5 (in *Strange Tales* No. 122 (1964), Dr. Strange traversed through different dimensions and journeyed through alternate planes of existence); Ex. 69 at 1 (same in *Strange Tales* No. 134 (1965)); *compare* Ex. 67 at Cover, 4-5 (Ditko used same effect in Charlton Comics' *Strange Suspense* No. 32 (1957)); *see also* Ex. 73 at 6 (Norman Osborn's first appearance in the *Spider-Man* series in 1965); Ex. 74 at 10 (Norman Osborn's identity revealed to readers in *Amazing Spider-Man* No. 37 (1966)); *compare* Ex. 75 at 1-2 (Norman Osborn's precursor—including corporate villainy and distinct curled hairstyle—in 1957 in Charlton Comics' *Strange Suspense Stories* No. 33, *Director of the Board*); *see also* Ex. 60 at 2, 8 (*Amazing Fantasy* No. 15 (1962), the issue in which Spider-Man and Ditko's Aunt May character first appeared) *compare* Ex. 79, "All Those Eyes" at 1-3 (Aunt May's forerunner character appeared in Ditko's story in Charlton Comics' *Out of this World* No. 6 (1957)); *see also* Ex. 76 at 1, 4 (Ditko's Electro character in *Amazing Spider-Man* No. 9 (1964)); *compare* Ex. 77 at 1, 4-5 (Ditko's electrically powered man, the predecessor of Electro, first appeared in Charlton Comics' *Strange* | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | *Suspense Stories* No. 48 (1960)); *see also* Ex. 78 at 1, 5-6, 8-9 (Ditko introduces the Chameleon—a character who used various masks to carry out his villainy—in *Amazing Spider-Man* No. 1 (1963)); *compare* Ex. 79, "All Those Eyes" at 2-3 (Chameleon precursor—a spy character who used various masks in his espionage with a similar back story as the Chameleon—appeared in Ditko's "All Those Eyes" story he sold to Charlton Comics in 1957). | |
| 25.     Marvel tasked Ditko, like other freelancers, with proposing new characters as part of his assignment, subject to the ultimate discretion of Marvel. Lens Decl., Ex. 13 54:16-56:9 (Lee testifying that it "was part of what [an artist's] assignment was" to "introduce . . . new characters in the stories"); Lens Decl., Ex. 13 72:21- 73:23 (Lee testifying that "[t]he artist in every strip always creates new characters to flesh out the strip and to make the characters living in the real world," although such additions were subject to the approval of Lee and publisher Martin Goodman); Lens Decl., Ex. 13 79:3-19 (Lee testifying that it would be the responsibility of "the Editor or the Publisher" to "make the decision to take [a new, minor] character and make him or | **Counterclaimant disputes that "Marvel tasked Ditko" with proposing new characters as part of his "assignment[s]," as Ditko and Magazine Management had no legal obligations to one another such that "Marvel" could "task" or "assign" Ditko to do anything. Ditko thus plotted and drew his stories the way he wished, and freely rejecting any of Lee's ideas Ditko did not like or agree with.** *See* Toberoff Decl. Ex. 14 at 11, 13 (Evanier Rebuttal Rep. explaining the custom and practice that comic book freelancers were free to decline work or to make changes to their work); Ex. 35 at DITKO-0192, DITKO-0207-0210, DITKO-0215-0218 (Ditko writing that he rejected several of Lee's *Spider-Man* story ideas and characters such as, for instance, Lee's idea | **This fact remains undisputed.** Defendant's suggestion that Marvel did not task Ditko with proposing new characters in Marvel comic stories because Ditko had no written employment agreement with Marvel is incorrect, turns on improper legal argument, and—in any event—is immaterial, as the Second Circuit's decision in *Kirby* confirms.  *See* MCI's Reply in Support of Undisputed Fact 2. Further, the evidence demonstrates that Ditko was not "free[]" to "plot[] and dr[a]w" Marvel comics "the way he wished," because Marvel exercised supervision and control over his contributions, as explained in MCI's Reply in Support of Undisputed Fact 3. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| her a separate character for a new comic"); Lens Decl., Ex. 12 55:4-15 (Thomas confirming that artists would sometimes "come up with ideas for new characters," and that it was indeed "part of the artist's assignment . . . to introduce new characters into a comic book series" if it "would further the plot"); *see also* Lens Decl., Ex. 12 65:13-66:7. | for a Spider-Woman character, or Lee's idea of making Aunt May more glamorous); Ex. 58 at 4 (Ditko writing that he "refused to do a drunken Iron Man splash page—someone else had to draw [and] ink it"); Ex. 21 at 29:9-30:17 (Steranko testifying that he was not given "assignments," but rather, he had the option to work on some books or to not as he chose to); Ex. 24 at 89:2-11 (Levitz testifying that freelancers were free to decline "assignments"); Ex. 58 at 4 (Ditko writing that, after he stopped selling his material to Marvel in 1966, he much later started working with Marvel again, but refused to do any more *Spider-Man* or *Dr. Strange* stories and recounting that when other writers tried to sneak in *Spider-Man* panels for Ditko to work on, he "left [them] blank for someone else to fill in"); Ex. 82 (Lee explaining in January 9, 1966 published interview: "**I don't plot Spider-Man any more. Steve Ditko, the artist, has been doing the stories.** I guess I'll leave him alone until sales start to slip. Since Spidey got so popular, Ditko thinks he's the genius of the world. We were arguing so much over plot lines I told him to start making up his own stories. **He won't let anybody else ink his drawings either. He just drops off the finished pages with notes at the margins and I** | MCI also **objects** to Toberoff Exhibits 1, 14, 21, 23, 25, 27, 33, 35, 57, 58, and 59. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [17], [20], [33], [34], [35], [39], [41], [52], [53], & [54]. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | **fill in the dialogue. I never know what he'll come up with next**, but it's interesting to work that way.") (emphasis added); Ex. 83 at 7 (same). **Counterclaimant further disputes that Ditko was "tasked" with creating the Dr. Strange character, as Ditko created that story on his own, utilizing a character he had been playing with since 1946 well before he met Marvel or Lee.** *See* Toberoff Decl. Ex. 25 (Ditko: "Dr. Strange has always been a contradiction to Marvel heroes ... He is my creation, and at one point I took over all stories, writing, [and] art."); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script); Ex. 30 at 2021MARVEL-0050281 (Lee writing that Dr. Strange "'twas [Ditko's] idea, and I figgered we'd give it a chance," in a contemporaneous letter dated January 9, 1963); Ex. 1 at 21 (Evanier Rep. providing historical context of the first publication of Ditko's Dr. Strange character which began as a five-page story Ditko wrote and drew on his own introducing the character which he presented to Lee); Ex. 49 at 1 (first published appearance of Dr. Strange in | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | *Strange Tales* No. 110); Ex. 33 (Ditko's letter post-marked August 6, 1946 to his brother Patrick Ditko enclosing an initial sketch of Dr. Strange); Ex. 59 at 61:15-65:14 (Patrick Ditko, being shown composite Ex. 33 and testifying that his brother, Steve Ditko, sent him this letter in 1946, while Ditko was in military service abroad, enclosing Ditko's early sketch of Dr. Strange (Ex. 33) and that he had found Ex. 33 at his home amongst letters he had kept from his brother); Ex. 23 at 166:5-168:8 (Mark Ditko testifying that his father lived in Johnstown, PA at the address written on the letter envelope of composite Ex. 33, and that in 1946 (postmarked on the letter envelope), his uncle Ditko was in the military, stationed abroad in Germany); Ex. 57 at 2 (Ditko writing that Dr. Strange started out as his 5-page story and that Dr. Strange was a great opportunity to try out all kinds of ideas which "never fit in to Marvel's world of heroes"). | |
| 26.    After Ditko submitted his assignment, a Marvel editor would review the penciled pages and, as appropriate, discuss changes, additions, or corrections— like Marvel did with other freelancers. Lens Decl., Ex. 48 at 2 (Ditko explaining that he and Stan Lee "would go over the penciled story/art pages" | **While Counterclaimant admits someone at Magazine Management would generally review Ditko's submitted material prior to its publication and may from time to time desire changes or corrections to such material, as that is a normal part of the publishing process, Counterclaimant** | **This fact remains undisputed.**<br><br>Defendant admits that Lee reviewed Ditko's submitted artwork and would at times request changes, but disputes that Ditko was "required" to make changes and contends that he often refused to do so.  Defendant's suggestion that Ditko |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| together and discuss changes, additions, or corrections to them); Lens Decl., Ex. 29 (original art for *Amazing Fantasy* #15 showing editorial comments in the margins from Lee to Ditko on Spider-Man panels); Lens Decl., Ex. 2 126:2-127:12 (Thomas testifying that Lee would review the artwork pages submitted by assigned artists and that, as editor, "it was his job to supervise"—"[i]f something went wrong, the publisher wasn't going to blame . . . the artist, he was going to go to Stan Lee"); Lens Decl., Ex. 12 67:16-68:6 (Thomas testifying that Lee, and then Goodman, would review all covers before they were finalized); Lens Decl., Ex. 3 170:18-21 (Lieber testifying that Lee "had to approve the plot and the artwork and the other things and – before it went to the engraver"); Lens Decl., Ex. 6 39:2-24 (Lee testifying about the supervisorial role of Marvel's art director and editor, including that it was the art director's role to "look[] over the artwork and sa[y], 'Gee, I think that ought to be a closeup instead of a long shot or it is a little hard to understand what he is doing, can you clarify that panel,'" and generally "discuss the artwork with the artist"); *see also* Lens Decl., Ex. 13 20:11-21:25; Lens Decl., Ex. 11 218:14-219:16; Lens Decl., Ex. 9 16:20-17:4. | **disputes that Ditko was required to make any requested changes and Ditko often refused to make changes to his work. Once Magazine Management purchased and Ditko assigned ownership of his material to Magazine Management, it could make any revisions or corrections it wanted and had production staff on hand to do so.** *See* Toberoff Decl. Ex. 35 at DITKO-0193 (Ditko writing that he ignored comments from Lee and Brodsky and only made changes to stories when he agreed with them); Ex. 14 at 7 (Evanier Rebuttal Rep. explaining Ditko's practice of refusing to make changes and in such case, Marvel's customary practice of having staff make such changes after the work had been submitted to and purchased by Marvel); Ex. 3 at 75:18-20, 243:13-244:23, 246:5-9 (Romita testifying that he, or someone else Lee could find in the Marvel office, would be asked to make changes to other artists' work after it had been submitted and would not be paid any extra for making these changes and noting specifically that when Lee did not like something on a Ditko cover, he asked Kirby to change it); Ex. 19 at 6, "Legends at Loggerheads!" (Thomas explaining example of when Lee incorrectly dialogued a *Spider-Man* story | was not "required" to make changes appears to be based on the incorrect legal argument that because Ditko had no written employment agreement with Marvel, Marvel could not request changes or otherwise control his work. *See* MCI's Reply in Support of Undisputed Fact 2.

Regardless, Ditko did make changes requested by Marvel, "noting" them after going over his work with Stan Lee, as discussed in more detail in MCI's Reply in Support of Undisputed Fact 3. And while Defendant suggests that Ditko "often" refused to make requested changes, the evidence **does not support** that contention, as explained in MCI's Reply in Support of Undisputed Fact 15.

MCI also **objects** to Toberoff Exhibits 3, 14, and 35. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [8], [17], and [41]. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
|  | in a way Ditko had not intended, Ditko refused to accede to Lee's chosen direction); Ex. 21 at 41:7-18 (Steranko testifying that Marvel had production assistants to make changes to work after it had been submitted by and purchased from artists). |  |
| 27.    Marvel could decide to not publish material that it had assigned to Ditko or other freelancers, but, to the extent it did, typically did so only in connection with comic book covers (a top priority for Marvel's publisher Martin Goodman), not interior pages. Lens Decl., Ex. 54 at 4 (Ditko remarking that he "got more out of working for" Charlton Comics than for Marvel because of its "picky editors, 'corrections' etc."); Lens Decl., Ex. 48 at 5 (Ditko discussing Marvel's rejection of his Spider-Man cover and reassignment of the task to Jack Kirby); Lens Decl., Ex. 47 at 2 (same); Lens Decl., Ex. 30 at 2 ("*Amazing Fantasy* #15 unused cover art by Steve Ditko"); Lens Decl., Ex. 13 22:11-23:19 (Lee confirming that he "always maintain[ed] the ability to edit and make changes or reject what the other writers or artists had created"); Lens Decl., Ex. 2 286:15-23 (Thomas testifying that Goodman's "main concern was the | **Counterclaimant admits that Magazine Management, like all other publishers, could choose what it published, but once again denies that Marvel could "assign" Ditko to do anything in any legal employment sense as Marvel had no contract with Ditko or other legal authority over him. Ditko was an independent artist and was free to accept or reject any proposal by Magazine Management or Lee without consequence.** Marvel has not produced any contemporaneous agreement with Ditko from the Period for his creative services, nor any other evidence reflecting any bilateral rights and obligations between Ditko and Magazine Management (nor any other alleged Marvel predecessor) in the Period, nor has Marvel alleged that any such agreement or bilateral legal rights and obligations existed between such parties in the Period. *See* Toberoff Decl. Ex. 17 at 298:8-14 (Thomas testifying that freelancers did not | **This fact remains undisputed.**  Defendant admits that Marvel could choose what it published, but denies that Marvel could "assign" Ditko to do anything because Ditko had no written employment contract with Marvel. That is incorrect, turns on improper legal argument, and—in any event—is immaterial, the Second Circuit's decision in *Kirby* confirms. *See* MCI's Reply in Support of Undisputed Fact 2.  This argument also ignores that Ditko did, in fact, consistently accept assignments from Lee. Indeed, the vast majority of Ditko's work during the 1962-1965 relevant time period was published by Marvel, as detailed in MCI's Reply in Support of Undisputed Fact 2.  MCI also **objects** to Toberoff Exhibits 1, 3, 9, 13, 21, 23, 35, 57 and 58. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| covers" and that he was known to scrutinize them); Lens Decl., Ex. 12 67:16-68:6 (Thomas testifying that Stan Lee would review the covers before publication, and then "they were all reviewed eventually by Martin Goodman as publisher"); *see also* Lens Decl., Ex. 2 161:8-20; Lens Decl., Ex. 13 44:4-17; Lens Decl., Ex. 41 at 4; Lens Decl., Ex. 49 at 3; Thomas Decl. ¶¶ 20-21. | have contracts with Marvel until Thomas's in 1974, which was the first); Ex. 36 at 7 (Marvel admitting it had no written contract with Ditko in the 1960s); Ex. 1 at 10 (Evanier Rep. describing the common practice of freelancers selling material to more than one publisher, including Marvel, DC Comics, and Charlton Comics); Ex. 3 at 207:12-22 (Romita testifying that freelancers were free to sell work to other publishers); Ex. 9 ¶ 11 (Steranko attesting that Marvel had no contract with Steranko and so he was free to sell work to other publishers); Ex. 13 ¶¶ 5-6 (Adams attesting that he sold work to both Marvel and DC Comics during the 1960s and 1970s); Ex. 23 at 160:2-8 (Mark Ditko testifying that Ditko was selling work to both Marvel and Charlton Comics in the 1960s); Ex. 35 at DITKO-0199 (Ditko writing about his work at Charlton Comics in the 1960s); Ex. 57 at 2 (Ditko writing about creating material for Charlton Comics and DC Comics); Ex. 35 at DITKO-0192, DITKO-0207-0210, DITKO-0215-0218 (Ditko writing that he rejected several of Lee's *Spider-Man* story ideas and characters such as, for instance, Lee's idea for a Spider-Woman character, or Lee's idea of making Aunt May more glamorous); Ex. 3 at 219:12-24 (Romita | Objection Nos. [1], [7], [12], [16], [20], [32], [41], [52], & [53]. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | testifying that he turned down Lee's offer to submit material to Marvel and preferred to sell freelance work to DC Comics); Ex. 21 at 29:9-30:17 (Steranko testifying that he was not given "assignments," but rather, he had the option to work on some books or to not if he chose not to); Ex. 24 at 89:2-11 (Levitz testifying that freelancers were free to decline "assignments"); Ex. 58 at 4 (Ditko writing that, after he stopped selling his material to Marvel in 1966, he later started working with Marvel again, but refused to do any *Spider-Man* or *Dr. Strange* stories and recounting that when other writers tried to sneak in *Spider-Man* panels for Ditko to work on, he "left [them] blank for someone else to fill in"); *id.* (Ditko writing that he "refused to do a drunken Iron Man splash page—someone else had to draw [and] ink it"). | |
| 28.     Marvel could require Ditko, like other freelancers, to make changes to his work (or could make the changes directly), and sometimes did so. Lens Decl., Ex. 48 at 2 (Ditko explaining that he and Stan Lee "would go over the penciled story/art pages" together and "discuss changes, additions, or corrections to them"); Lens Decl., Ex. 53 at 3 (Ditko writing about a Spider-Man cover in which he "had S[pider]-M[an] leaping | **Counterclaimant disputes that "Marvel" could "require" Ditko to make any requested changes to his material, as he had no contract with any Marvel entity during the Period and was free to accept or decline "Marvel's" suggestions. Magazine Management had production staff on hand and was free to make changes to Ditko's material only *after* Ditko had created, sold and assigned it to** | **This fact remains undisputed**. Defendant admits that Lee reviewed Ditko's submitted artwork and would at times request changes, but disputes that Ditko was "required" to make changes and contends that he often refused to do so. Defendant's suggestion that Ditko was not "required" to make changes appears to be based on the incorrect legal argument that because Ditko had no |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| toward the Molten Man" but "S[pider]-M[an] was changed to leaping <u>across</u> the Molton Man and <u>off</u> the cover"); Lens Decl., Ex. 54 at 4 (Ditko complaining about Marvel's "picky editors" and their "corrections"); Lens Decl., Ex. 29 (original art for *Amazing Fantasy* #15 showing editorial comments in the margins from Lee to Ditko on Spider-Man panels); Lens Decl., Ex. 2 44:22-45:5 (Thomas testifying that he "observe[d]" Marvel editors "actually making changes to work that had been done by freelance writers and artists," in terms of "both . . . lettering and artwork"); Lens Decl., Ex. 2 127:17-20 (Thomas confirming that "Stan Lee ha[d] the ability to just have changes made to artwork without the artist's involvement"); Lens Decl., Ex. 2 133:11-13 (similar); Lens Decl., Ex. 2 24:17-23 (Thomas testifying how Marvel production manager Sol Brodsky "would call a freelancer in, a letterer or an artist to come in . . . simply because they had something that had to be corrected or changed and they needed more work than just the one production person could do"); Lens Decl., Ex. 2 41:16-20 (Thomas confirming that he understood Marvel could "request that [he], for example, do rewrites or revisions to work that you had done"); Lens Decl., Ex. 13 16:20-17:4 | **Magazine Management.** *See* Counterclaimant's Response to Marvel Statement No. 27, *supra*, incorporated herein by reference. *See also* Toberoff Decl. Ex. 14 at 7 (Evanier Rebuttal Rep. explaining Ditko's practice of refusing to make changes and in such case, Marvel's custom of having staff make such changes after the work had been submitted to and purchased by Marvel); *id*. at 11, 13 (Evanier Rebuttal Rep. explaining the custom and practice of comic book publishers to reserve the right to purchase or not purchase freelancers' submitted material, and that freelancers were free to decline to make changes to their work); Ex. 3 at 75:18-20, 243:13-244:23, 246:5-9 (Romita testifying that he, or someone else Lee could find in the Marvel office, would be asked to make changes to other artists' work after it had been submitted and would not be paid any extra for making these changes and noting specifically that when Lee did not like something on a Ditko cover, he asked Kirby to change it); Ex. 19 at 6, "Legends at Loggerheads!" (Thomas explaining example of when Lee incorrectly dialogued a *Spider-Man* story in a way Ditko had not intended, Ditko refused to accede to Lee's chosen direction); Ex. 21 at 41:7-18 (Steranko testifying that | written employment agreement with Marvel, Marvel could not request changes or otherwise control his work. *See* MCI's Reply in Support of Undisputed Fact 2.<br><br>Regardless, Ditko did make changes requested by Marvel, "noting" them after going over his work with Stan Lee, as discussed in more detail in MCI's Reply in Support of Undisputed Fact 3. And while Defendant suggests that Ditko "often" refused to make requested changes, the evidence **does not support** that contention, as explained in MCI's Reply in Support of Undisputed Fact 15.<br><br>MCI also **objects** to Toberoff Exhibits 3, 14, 35, and 58. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [8], [17], [41] & [53]. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| (Lee confirming that it "was [his] job" to "not only make assignments but also to edit and change things that other writers or artists did," and that, "[i]f, for example, I saw some art work, and I felt there wasn't enough action on a page, or it was confusing, the reader might not know what it was, or in a script if I felt there was too much dialogue or too little dialogue, . . . it was up to me to make the stories as good as I could make them"); Lens Decl., Ex. 3 128:23-129:2 (Lieber testifying that "of course" Stan Lee "had the right [to] make the changes to [Lieber's] scripts"); Lens Decl., Ex. 3 133:14-134:5) (Lieber testifying that, when Lee went over his work, he would explain to Lieber, "'Oh, you could have said this. You could have done that,' and he'd make some little corrections" but "as time went on, he had fewer to make"); *see also* Lens Decl., Ex. 52 at 4; Lens Decl., Ex. 2 42:24-44:18, 333:18-334:5; Lens Decl., Ex. 12 113:18-114:11; Lens Decl., Ex. 3 137:11-20, 138:2-5; Lens Decl., Ex. 13 18:17-19:17, 22:11-14, 33:25-34:7; Thomas Decl. ¶ 20. | Marvel had production assistants to make changes to work after it had been submitted by artists); Ex. 35 at DITKO-0193 (Ditko writing that he ignored comments from Lee and Brodsky and only made changes to stories when he agreed with them); *id.* at DITKO-0192, DITKO-0207-0210, DITKO-0215-0218 (Ditko writing that he rejected several of Lee's *Spider-Man* story ideas and characters such as, for instance, Lee's idea for a Spider-Woman character, or Lee's idea of making Aunt May more glamorous); Ex. 17 at 298:8-14 (Thomas testifying that freelancers did not have contracts with Marvel until Thomas's in 1974, which was the first); Ex. 36 at 7 (Marvel admitting it had no written contract with Ditko in the 1960s); Ex. 58 at 4 (Ditko writing that he "refused to do a drunken Iron Man splash page—someone else had to draw [and] ink it"). | |
| 29.  Ditko, like other freelancers, did not always agree with Stan Lee's choices, but Lee, as editor, had editorial control. Lens Decl., Ex. 59 at 2 (Ditko complaining that "Stan's dialogue was too | **Counterclaimant notes that all publishers control what they chose to publish and have editors to oversee what they publish. Counterclaimant disputes that Lee's literary and writing** | **This fact remains undisputed.**  Defendant admits that Marvel's publisher could choose what it published and that Lee (as Marvel's editor) oversaw what |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| much his personal writing style with heroes/villains. He had his formula to handle all the hero/villains material."); Lens Decl., Ex. 58 at 3 (Ditko writing that "I believe Stan loved writing those corny captions, etc. It added to reading appeal, but undercut a more serious growth of a teenagers [sic] in a heroic role"); Lens Decl., Ex. 52 at 4 (Ditko writing that "Stan's 'humor' dialogue undercut Peter Parker, S[pider]-M[an] as a teen-ager growing up to become a professional hero like Captain America"); Lens Decl., Ex. 54 at 4 (Ditko commenting that "Stan's writing style was completely wrong for SM [Spider-Man]" and that he "treated teen-age P. Parker as a seasoned veteran with his nonsensical comic dialogue exchanges between a 'Hero' and 'villains'"); Lens Decl., Ex. 60 at 3 (Ditko remarking that "[e]ven some poor plots by Stan, others, incompetent inkers didn't sink my basic ideas for Doctor Strange"); Lens Decl., Ex. 57 at 4 (Ditko noting that it was "a mystery to [him] why no Doctor Strange covers"); Lens Decl., Ex. 53 at 3 (Ditko writing that it was "hard to understand, explain Stan's motives with his likes, dislikes . . . . In a cover, I had S[pider]-M[an] leaping toward the Molten Man. S[pider]-M[an] was changed to leaping <u>across</u> the Molton Man and <u>off</u> the | **contributions to the Works, if any, were done as Magazine Management's "editor," as creating stories and writing dialogue are not editorial functions, but the functions of a writer, which Lee did strictly as a freelancer, outside of Magazine Management's offices and outside his editorial duties. Counterclaimant further notes that Lee dialogued the balloons and added captions to Ditko's stories only *after* Ditko had already created, sold and assigned his works to Magazine Management.** *See* Toberoff Decl. Ex. 1 at 13 (Evanier Rep. describing Lee's common practice of composing dialogue as a freelancer, not as Marvel's editor and doing his freelancing from home two of the five workdays per week, for which he was paid on a per-page basis as a freelancer); Ex. 3 at 41:19-42:2 (Romita testifying that Lee would stay home several days per week to write); Ex. 4 at 17:17-25 (Lee testifying that he was paid as a freelancer for his writing and was on salary for his work as an editor); Ex. 17 at 27:2-18, 30:9-13, 31:22-32:7, 276:2-14 (Thomas testifying that he was a staff writer/assistant editor in the 1960s and got a salary for that work, but separately freelanced when writing stories and was paid at a per-page rate on a separate check | was published, but argues non-responsively that Lee's "writing" contributions were made in a freelance capacity as opposed to in an editorial capacity.<br><br>Further, Defendant's contention that Lee could not control Ditko's work on Marvel assignments is incorrect, as explained in MCI's Reply in Support of Undisputed Fact 3.<br><br>MCI also **objects** to Toberoff Exhibits 1, 22, 25, 27, 35, and 58. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [27], [34], [35], [41], & [53]. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| cover. What pleases an editor? They all have their likes and dislikes."); Lens Decl., Ex. 54 at 4 (Ditko describing Marvel as having "picky editors" who adopted the creed that "[t]he editor is always right"); Lens Decl., Ex. 45 at 3 (Ditko explaining that, if he had the choice, he would do both drawing and inking, rather than having "other people . . . ink [his] pencils"); Lens Decl., Ex. 2 at 57:13-58:11 (Thomas testifying that every single artist at Marvel was "subject to the editorial discretion of the editor-in-chief" and that, during Lee's tenure, all freelancers worked "subject to Stan Lee's supervision and discretion"); Lens Decl., Ex. 13 16:8-19 (Lee confirming that he would "give instructions to the artists as to how [he] wanted the story to go" and that it was his "responsibility" to oversee "the creative editorial aspects of the comic books that were created"); *see also* Lens Decl., Ex. 61 at 4. | like other freelancers); *id*. at 289:7-291:5 (Thomas testifying that he and Lee each did their writing in a freelance capacity from home in the 1960s and would come to the office only to do their editorial work); Ex. 22 at 255:10-256:6 (Lieber testifying that Lee wrote stories and scripts as a writer, not as an editor, because writing is "not what an Editor does"); *id*. at 256:7-257:12 (Lieber testifying that Lee wrote scripts from home); Ex. 55 at 62:18-63:18 (Lee testifying that he got paid a salary as editor and separately for his writing); Ex. 56 at 91:20-92:6 (Lee testifying that he got paid a salary as editor and separately as a freelancer pre page for his writing); *id*. at 94:6-95:18 (Lee testifying that there was very little editing of his own freelance written material). **Counterclaimant further disputes that Lee could control Ditko's creation of his material, as Ditko was extremely independent-minded, and told the stories his way based on a chart he created mapping out the macro-level plot and elements of his stories, and often declined to make changes to his material and to incorporate Lee's ideas, if any.** *See* Toberoff Decl. Ex. 35 at DITKO-0193 (Ditko writing that he planted seeds of subplots in stories that | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | would work their way through the issues until it was time for those sub-stories to play an active role later when the time was right); Ex. 58 at 3 (Ditko writing when he took over the *Spider-Man* stories he "knew in advance the [*Spider-Man*] story line like the best (worst) time for Aunt May to have a heart attack"); Ex. 1 at 13 (Evanier Rep. describing the common practice of independent freelancers supervising themselves and editing their own work prior to submission); *id*. at 12 (Evanier Rep. describing Ditko's regular practice of maintaining a chart mapping out the future development of stories and characters so he could introduce elements into current issues and then use those elements in issues many months down the line); Ex. 7 at 223:18-225:20, 277:11-13 (Thomas testifying that Ditko did all the plotting on *Spider-Man* and *Dr. Strange* stories while he and Lee were not speaking and that Ditko never received any plots from Thomas when Thomas was doing the dialoguing on *Dr. Strange*); Ex. 17 at 311:18-312:25 (Thomas testifying that Ditko plotted and drew *Spider-Man* stories completely on his own for more than one year before he left in 1966); Ex. 25 (Ditko: "Dr. Strange has always been a contradiction to Marvel heroes ... He is | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | my creation, and at one point I took over all stories, writing, [and] art."); Ex. 26 at 83 (Lee writing that Ditko came up with the *Dr. Strange* plots and illustrated the story and Lee only added the dialogue [in the balloons]); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script); Ex. 58 at 4 (Ditko writing that, after he stopped selling his material to Marvel in 1966, he later started working with Marvel again, but refused to do any *Spider-Man* or *Dr. Strange* stories and recounting that when other writers tried to sneak in *Spider-Man* panels for Ditko to work on, he "left [them] blank for someone else to fill in"); *id*. (Ditko writing that he "refused to do a drunken Iron Man splash page—someone else had to draw [and] ink it"); Ex. 35 at DITKO-0192, DITKO-0207-0210, DITKO-0215-0218 (Ditko writing that he rejected several of Lee's *Spider-Man* story ideas and characters such as, for instance, Lee's idea for a Spider-Woman character, or Lee's idea of making Aunt May more glamorous); Ex. 71 at 159 (*Amazing Spider-Man* No. 25: "Sturdy Stevey Ditko dreamed up the plot of this tantalizing tale, and it's full of unexpected | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | surprises!"); Ex. 72 at 225 (*Strange Tales* No. 135: "Plotted and Illustrated by Fandom's Favorite Fiend: Steve Ditko"); Ex. 82 (Lee explaining in January 9, 1966 published interview: "**I don't plot Spider-Man any more. Steve Ditko, the artist, has been doing the stories.** I guess I'll leave him alone until sales start to slip. Since Spidey got so popular, Ditko thinks he's the genius of the world. We were arguing so much over plot lines I told him to start making up his own stories. **He won't let anybody else ink his drawings either. He just drops off the finished pages with notes at the margins and I fill in the dialogue. I never know what he'll come up with next**, but it's interesting to work that way.") (emphasis added); Ex. 83 at 7 (same). | |
| 30.    Marvel had final authority on the artwork, plot, and dialogue. Lens Decl., Ex. 2 18:3-13 (Thomas testifying that all decisions were "subject to the publisher" who "was in charge of everything"—"he oversaw the writing, he oversaw the artists and the art that came in," and "everything went through him"); Lens Decl., Ex. 2 80:12-21 (Thomas testifying that Lee "had complete authority over" dialogue, "so – to edit it, have it rewritten or whatever"); Lens | **Counterclaimant admits that Marvel had authority over what it chose to purchase and what it would publish, like any publisher, but disputes that it had any legal authority over what Ditko chose to work on or his creative process. Ditko was an extremely independent-minded freelance artist with whom Marvel conspicuously avoided any contractual relationship in the Period.** Marvel has not produced any contemporaneous agreement with Ditko | **Defendant admits this fact is undisputed, and only "disputes" extraneous facts, which is improper.**<br><br>Defendant admits that Marvel had final authority over any artwork, plot, or dialogue, but disputes that Marvel had "any legal authority over what Ditko chose to work on or his creative process" because he lacked a written employment agreement.  That is incorrect, turns on improper legal argument, and—in any |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| Decl., Ex. 2 80:24-81:12 (Thomas testifying that Stan Lee had "complete authority" over artwork—that is, "[s]ubject to the publisher"); Lens Decl., Ex. 2 125:18-126:1 (Thomas testifying that Lee "was always the ultimate authority unless Martin Goodman stepped in, and that was mostly on covers"); *see also* Lens Decl., Ex. 12 66:13-67:2, 117:11-22; Lens Decl., Ex. 16 37:13-39:7, 42:6-18; Lens Decl., Ex. 13 16:8-13, 51:17-52:5; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Thomas Decl. ¶¶ 7-8. | from the Period for his creative services, nor any other evidence reflecting any bilateral rights and obligations between Ditko and Magazine Management (nor any other alleged Marvel predecessor) in the Period, nor has Marvel alleged that any such agreement or bilateral legal rights and obligations existed between such parties in the Period. *See* Toberoff Decl. Ex. 36 at 7 (Marvel admitting it had no written contract with Ditko in the 1960s); Ex. 5 at 371:3-25 (Stan Lee testifying that Marvel "would only buy what [it] needed"); Ex. 1 at 10, 13 (Supplemented Expert Report of Mark Evanier ("Evanier Rep.") providing historical context giving rise to Marvel's use of freelance creators and explaining that, when Magazine Management ran out of surplus artwork to publish, it began to purchase artwork and scripts from freelancers at a low page rate and that freelancers did not have written contracts with Magazine Management during the 1950s or 1960s and describing the common practice of freelancers selling material to more than one publisher, including Marvel, DC Comics, and Charlton Comics); Ex. 14 at 10-11 (Rebuttal Expert Report of Mark Evanier ("Evanier Rebuttal Rep.") explaining that it was not the custom and practice of | event—is immaterial, as the Second Circuit's decision in *Kirby* confirms.  *See* MCI's Reply in Support of Undisputed Fact 2.<br><br>MCI also **objects** to Toberoff Exhibits 1, 2, 3, 8, 9, 10, 11, 13, 14, 21, 22, 23, 25, 27, 35, 57, and 58.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [2], [7], [9], [11], [12], [13], [14], [16], [17], [20], [25], [32], [34], [35], [41], [52], & [53]. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | Marvel or other publishers in the comic book industry to have written contracts with freelance creators during the Period); Ex. 2 at 71:17-74:5 (Larry Lieber ("Lieber") testifying that he sold freelance work to Marvel in the 1950s and 1960s, had no contract with Marvel, and that Marvel was not obligated to buy his submitted freelance material); Ex. 3 at 159:24-160:4, 194:11-195:3, 207:12-22, 211:7-212:3 (John V. Romita ("Romita") testifying that he did not have a contract with Marvel as a freelancer and that freelancers were free to sell work to other publishers); Ex. 17 at 39:25-40:4, 51:20-52:4, 298:8-14, 301:14-303:7 (Thomas testifying that he had no written contract from 1965 to 1974 and that Marvel did not have contracts with freelancers prohibiting them from selling work to other publishers); Ex. 6 at 36:17-21, 202:2-20 (Thomas testifying that he had no contract with Marvel until 1974); Ex. 8 ¶ 10 (Sinnott attesting that he had no contract with Marvel and Marvel was very small and disorganized in the 1950s and 1960s); Ex. 8 ¶ 11 (Sinnott attesting that Marvel had no obligation to buy pages of his work and that Marvel paid only for the pages it wanted); Ex. 9 ¶ 8 (Steranko attesting that Marvel had no contract with Steranko and so he was free to sell work | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | to other publishers); Ex. 10 ¶ 12 (Ayers attesting that he had no contract with Marvel from 1959 to 1975); Ex. 11 ¶ 9 (Colan attesting that he had no contract with Marvel until 1975); Ex. 13 ¶ 5-7 (Adams attesting that he had no contract with Marvel in the 1960s or 1970s and that he sold work to both Marvel and DC Comics during the 1960s and 1970s); Ex. 22 at 287:22-288:12 (Lieber testifying that he had no contract with Marvel in the 1950s or 1960s); Ex. 24 at 79:2-8 (Levitz testifying that Marvel did not have contracts with any freelancer until the mid-1970s); Ex. 23 at 160:2-8 (Mark Ditko testifying that Ditko was selling work to both Marvel and Charlton Comics in the 1960s); Ex. 35 at DITKO-0199 (Ditko writing about his work at Charlton Comics in the 1960s); Ex. 57 at 2 (Ditko writing about creating material for Charlton Comics and DC Comics); Ex. 1 at 10 (Evanier Rep. describing the common practice of freelancers selling material to more than one publisher, including Marvel, DC Comics, and Charlton Comics); *id.* at 13 (Evanier Rep. describing the common practice of independent freelancers supervising themselves and editing their own work prior to submission); Ex. 35 at DITKO-0192, DITKO-0207-0210, DITKO-0215- | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | 0218 (Ditko writing that he rejected several of Lee's *Spider-Man* story ideas and characters such as, for instance, Lee's idea for a Spider-Woman character, or Lee's idea of making Aunt May more glamorous); Ex. 58 at 4 (Ditko writing that he "refused to do a drunken Iron Man splash page—someone else had to draw [and] ink it"); Ex. 3 at 219:12-24 (Romita testifying that he turned down Lee's offer to submit material to Marvel and preferred to sell freelance work to DC Comics); Ex. 21 at 29:9-30:17 (Steranko testifying that he was not given "assignments," but rather, he had the option to work on some books or to not if he chose not to); Ex. 24 at 89:2-11 (Levitz testifying that freelancers were free to decline "assignments"); Ex. 7 at 223:18-225:20, 277:11-13 (Thomas testifying that Ditko did all the plotting on *Spider-Man* and *Dr. Strange* stories while he and Lee were not speaking and that Ditko never received any plots from Thomas when Thomas was doing the dialoguing on *Dr. Strange*); Ex. 17 at 311:18-312:25 (Thomas testifying that Ditko plotted and drew *Spider-Man* stories completely on his own for more than one year before he left in 1966); Ex. 25 (Ditko: "Dr. Strange has always been a contradiction to Marvel heroes ... He is my creation, and at one point I took over | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | all stories, writing, [and] art."); Ex. 26 at 83 (Lee writing that Ditko came up with the *Dr. Strange* plots and illustrated the story and Lee only added the dialogue [in the balloons]); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script); Ex. 82 (Lee explaining in January 9, 1966 published interview: "**I don't plot Spider-Man any more. Steve Ditko, the artist, has been doing the stories.** I guess I'll leave him alone until sales start to slip. Since Spidey got so popular, Ditko thinks he's the genius of the world. We were arguing so much over plot lines I told him to start making up his own stories. **He won't let anybody else ink his drawings either. He just drops off the finished pages with notes at the margins and I fill in the dialogue. I never know what he'll come up with next**, but it's interesting to work that way.") (emphasis added); Ex. 83 at 7 (same). | |
| *Doctor Strange* | | |
| 31.     Beginning in 1956, Marvel regularly assigned Ditko to contribute to the Marvel series entitled *Strange Tales*; he ultimately contributed to all 79 issues | **Counterclaimant disputes that Ditko was "assigned" to create his works, as he had no contract with any "Marvel" entity and was free to decline any** | **This fact remains undisputed**. Defendant's suggestion that Marvel did not regularly assign Ditko to work on |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| from February 1959 (*Strange Tales* Vol. 1, No. 67) to July 1966 (*Strange Tales* Vol. 1, No. 146), with Lee as the credited editor and writer. Lens Decl., Ex. 25 at 25-28; Lens Decl., Ex. 63 at 18-19; Thomas Decl. ¶ 12 ("Ditko was a regular contributor to the [*Strange Tal*es] series in 1959 beginning with issue 67 (cover-dated February 1959)."). | **"assignment" without consequence.** *See* Response to Marvel's Statement 30, supra, incorporated herein by reference. *See also* Toberoff Decl. Ex. 3 at 219:12-24 (Romita testifying that he turned down Lee's offer to submit material to Marvel and preferred to sell freelance work to DC Comics); Ex. 21 at 29:9-30:17 (Steranko testifying that he was not given "assignments," but rather, he had the option to work on some books or to not if he chose not to); Ex. 24 at 89:2-11 (Levitz testifying that freelancers were free to decline "assignments"); Ex. 58 at 4 (Ditko writing that, after he stopped selling his material to Marvel in 1966, he later started working with Marvel again, but refused to do any *Spider-Man* or *Dr. Strange* stories and recounting that when other writers tried to sneak in *Spider-Man* panels for Ditko to work on, he "left [them] blank for someone else to fill in"); *id*. (Ditko writing that he "refused to do a drunken Iron Man splash page—someone else had to draw [and] ink it"); Ex. 17 at 298:8-14 (Thomas testifying that freelancers did not have contracts with Marvel until Thomas's in 1974, which was the first); Ex. 36 at 7 (Marvel admitting it had no written contract with Ditko in the 1960s). | Marvel comic books because Ditko lacked a written employment agreement with Marvel is incorrect, turns on improper legal argument, and—in any event—is immaterial, as the Second Circuit's decision in *Kirby* confirms.  *See* MCI's Reply in Support of Undisputed Fact 2.<br><br>This argument also ignores that Ditko did, in fact, consistently accept assignments from Lee.  Indeed, the vast majority of Ditko's work during the 1962-1965 relevant time period was published by Marvel, as detailed in MCI's Reply in Support of Undisputed Fact 2.<br><br>MCI also **objects** to Toberoff Exhibits 3, 21, and 58.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [7], [20], & [53]. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| 32.    Ditko's contributions to the *Strange Tales* series—particularly in 1962 and 1963—generally consisted of penciling and inking discrete five-page comics that appeared at the end of the comic book—commonly referred to as "back-ups." Lens Decl., Ex. 80 (Lee and Ditko's five-page stories in *Strange Tales* Vol. 1, Nos. 102-109); Lens Decl., Ex. 48 at 2 (Ditko reflecting on his work for Marvel back-up features in *Strange Tales* and noting that "[t]he back-up features (5-pagers) were drawn by Don Heck, Paul Reinman and me"); Thomas Decl. ¶ 12 ("Ditko was a regular contributor to the [*Strange Tales*] series in 1959 beginning with issue 67 (cover-dated February 1959)."); Thomas Decl. ¶ 13 (explaining "*Strange Tales* comics featured five-page 'back-up' features written by Stan Lee and drawn by Steve Ditko"). | **Counterclaimant admits only that Ditko created, plotted, penciled, and inked five-page stories in the *Strange Tales* series in the Period, but denies Marvel's intended inference that Ditko's origination and creation of Dr. Strange which Ditko had been conceived long before he ever met Lee or Magazine Management was somehow at "Marvel's" suggestion or direction.** *See* Toberoff Decl. Ex. 1 at 21 (Evanier Rep. providing historical context of the first publication of Ditko's Dr. Strange character which began as a five-page story Ditko wrote and drew on spec introducing the character which he presented to Lee); Ex. 25 (Ditko: "Dr. Strange has always been a contradiction to Marvel heroes ... He is my creation, and at one point I took over all stories, writing, [and] art."); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script); Ex. 30 at 2021MARVEL-0050281 (Lee writing that Dr. Strange "'twas [Ditko's] idea, and I figgered we'd give it a chance," in a contemporaneous letter dated January 9, 1963); Ex. 49 at 1 (first published appearance of Dr. Strange in *Strange Tales* No. 110); Ex. 33 (Ditko's | **Defendant admits this fact is undisputed, and only disputes "Marvel's intended inference," which is improper.** Defendant admits that Ditko contributed to five-page "back up" stories in Marvel's *Strange Tales* throughout the relevant time period, but "denies" any inference that such fact means Doctor Strange was created at Marvel's "suggestion or direction."  That improper response turns on an incorrect legal argument, as confirmed by the Second Circuit's decision in *Kirby*.  *See Kirby*, 726 F.3d at 141 ("Kirby's works during this period were hardly self-directed projects in which he hoped Marvel, as one of several potential publishers, might have an interest; rather, he created the relevant works pursuant to Marvel's assignment or with Marvel specifically in mind. Kirby's ongoing partnership with Marvel . . . is therefore what induced Kirby's creation of the works."). Further, Defendant's contention that Doctor Strange "had been conceived [by Ditko] long before he ever met Lee" is unsupported by any evidence.  Toberoff Exhibit 33 **does not support** this contention, as there is no evidence that the |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | letter post-marked August 6, 1946 to his brother Patrick Ditko enclosing an initial sketch of Dr. Strange); Ex. 59 at 61:15-65:14 (Patrick Ditko, being shown composite Ex. 33 and testifying that his brother, Steve Ditko, sent him this letter in 1946, while Ditko was in military service abroad, enclosing Ditko's early sketch of Dr. Strange (Ex. 33) and that he had found Ex. 33 at his home amongst letters he had kept from his brother); Ex. 23 at 166:5-168:8 (Mark Ditko testifying that his father lived in Johnstown, PA at the address written on the letter envelope of composite Ex. 33, and that in 1946 (postmarked on the letter envelope), his uncle Ditko was in the military, stationed abroad in Germany); Ex. 57 at 2 (Ditko writing that Dr. Strange started out as a "5-page filler," which was a great opportunity to try out all kinds of ideas like Dr. Strange, which "never fit in to Marvel's world of heroes"). | sketch of a man from the chest up contained therein is the Marvel character Doctor Strange. The only connection between the sketch and Doctor Strange is Defendant's belief that it depicts the same character. *See* Toberoff Ex. 59 62:7-12. But Defendant admits that Ditko never told him the sketch was supposed to be the Doctor Strange character; Defendant simply "assumed it." *Id.* 62:3-10. As Roy Thomas observed, the sketch "looks like any number of comic book magicians over the years imitating Mandrake going back to the '40s," adding that "any character [Ditko] drew in a cloak and mustache would have a resemblance to Doctor Strange and also to Mandrake the Magician and 100 other comic book magicians that existed between 1940 and 1960." Lens Opp. Decl., Ex. 84 303:14-304:19; *see also id.* at 305:5-6 ("Almost every [comic book] company had a couple of magicians, many of them with mustaches and capes."). |
| | | Regardless, when Ditko allegedly conceived of Doctor Strange is immaterial because it has no bearing on the Court's application of the work-made-for-hire test, as the Second Circuit's decision in *Kirby* confirms. *See* MCI's Reply in Support of Undisputed Fact 22. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | | MCI also **objects** to Toberoff Exhibits 1, 23, 25, 27, 33, and 57.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [33], [34], [35], [39], & [52]. |
| 33.     As part of his ongoing work on the *Strange Tales* series and for Marvel Comics more generally, and with Lee as the credited editor and writer, Ditko penciled and inked a five-page back-up for *Strange Tales* Vol. 1, No. 110, the issue in which Doctor Strange first appears. Lens Decl., Ex. 60 at 3 (Ditko remarking that "Dr. Strange started out as a 5 page backup"); Lens Decl., Ex. 57 at 4 (Ditko noting that it was "a mystery to [him] why no Doctor Strange covers"); Lens Decl., Ex. 27 at 3 (Lee teasing Doctor Strange as "just a 5-page filler"); Lens Decl., Ex. 33 at 3 ("It is a great pleasure and privilege for the editors of STRANGE TALES to present, quietly and without fanfare, the first of a new series, based upon a DIFFERENT kind of super-hero - - - DR. STRANGE MASTER OF BLACK MAGIC! Story: Stan Lee[;] Art: Steve Ditko[;] Lettering: Terry Szenics"); Lens Decl., Ex. 14 at 8, 11 (Lee attesting that he "(together with numerous artists) created or co-created hundreds of characters and introduced | **Counterclaimant disputes that Ditko merely "penciled and inked" the first Dr. Strange story, as the evidence shows that Ditko on his initiative wrote, plotted, penciled, and inked the first story featuring the Dr. Strange character he had been playing with since at least 1946. Further, Lee admitted that the *Dr. Strange* story was solely Ditko's original conception. Counterclaimant further denies that Ditko "work[ed] ... for Marvel." (***See*** Counterclaimant's Response to Marvel Statement No. 30, *supra*, incorporated herein by reference). *See also* Toberoff Decl. Ex. 1 at 21 (Evanier Rep. providing historical context of the first publication of Ditko's Dr. Strange character which began as a five-page story Ditko wrote and drew on spec introducing the character which he presented to Lee); Ex. 25 (Ditko: "Dr. Strange has always been a contradiction to Marvel heroes ... He is my creation, and at one point I took over all stories, writing, [and] art."); Ex. 27 (Ditko writing that he created the first *Dr.* | **Defendant admits this fact is undisputed, and only "disputes" extraneous facts, which is improper.**

Defendant disputes that Ditko "merely penciled and inked" the first Dr. Strange story, but does not contend and cites no evidence disputing this fact, which is therefore undisputed.  *See* Local Rule 56.1(b)-(d); *see also Parks Real Estate*, 472 F.3d at 4; *Giannullo*, 322 F.3d at 140.

Further, although Defendant non-responsively contends that Lee "admitted" that Doctor Strange was "solely Ditko's original conception," the evidence he cites **does not support** that contention.  Indeed, Lee states that Doctor Strange was "Steve's idea," but does not suggest that the final character, as published, was "solely Ditko's original conception."  *See* Toberoff Exhibit 30.

Regardless, Defendant's contention about who "created" Doctor Strange is immaterial, as the Second Circuit's |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| them into the story lines to be published by [Marvel] . . . . [including] . . . Doctor Strange"); *see also* Thomas Decl. ¶ 13; Lens Decl., Ex. 10 335:10-336:1; Lens Decl., Ex. 71 at 20:17-23:23; Lens Decl., Ex. 2 304:24-305:6. | *Strange* story and that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script); Ex. 30 at 2021MARVEL-0050281 (Lee writing that Dr. Strange "'twas [Ditko's] idea, and I figgered we'd give it a chance," in a contemporaneous letter dated January 9, 1963); Ex. 49 at 1 (first published appearance of Dr. Strange in *Strange Tales* No. 110); Ex. 33 (Ditko's letter post-marked August 6, 1946 to his brother Patrick Ditko enclosing an initial sketch of Dr. Strange); Ex. 59 at 61:15-65:14 (Patrick Ditko, being shown composite Ex. 33 and testifying that his brother, Steve Ditko, sent him this letter in 1946, while Ditko was in military service abroad, enclosing Ditko's early sketch of Dr. Strange (Ex. 33) and that he had found Ex. 33 at his home amongst letters he had kept from his brother); Ex. 23 at 166:5-168:8 (Mark Ditko testifying that his father lived in Johnstown, PA at the address written on the letter envelope of composite Ex. 33, and that in 1946 (postmarked on the letter envelope), his uncle Ditko was in the military, stationed abroad in Germany); Ex. 57 at 2 (Ditko writing that Dr. Strange started out as a "5-page filler," which was a great opportunity to try out all kinds of ideas | decision in *Kirby* confirms.  *See* MCI's Reply in Support of Undisputed Fact 22. And even still, Toberoff Exhibit 30 **does not support** the contention that Ditko "created" any Marvel characters.<br><br>MCI, however, **objects** to Toberoff Exhibits 1, 23, 25, 27, 33, 57, and 59.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [33], [34], [35], [39], [52], & [54]. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | like Dr. Strange, which "never fit in to Marvel's world of heroes"). | |
| 34.    Lee named the character Doctor Strange—"Strange" because the story was published in Marvel's *Strange Tales* series; "Doctor" to avoid confusion with "Mr. Fantastic," another Marvel superhero. Lens Decl., Ex. 27 at 3 (Lee writing that he "[o]riginally decided to call him MR. STRANGE, but thought the MR. bit too similar to MR. FANTASTIC—now however, I just remember we had a <u>villain</u> called DR. STRANGE just [ ] recently in one of our mags—hope it won't be too confusing!"); Lens Decl., Ex. 41 at 5 (Lee recounting that "I gave him the name Doctor Strange—I think Stephen Strange; something like that. And Steve was the fellow who drew it."). | **Admitted that Lee chose the name Doctor Strange because the original story Ditko created on spec, which Lee liked and Magazine Management purchased, would be published in its *Strange Tales* magazine.** *See* also Toberoff Decl. Ex. 1 at 21 (Evanier Rep. providing historical context of the first publication of Ditko's Dr. Strange character which began as a five-page story Ditko wrote and drew on spec introducing the character which he presented to Lee); Ex. 25 (Ditko: "Dr. Strange has always been a contradiction to Marvel heroes ... He is my creation, and at one point I took over all stories, writing, [and] art."); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script); Ex. 30 at 2021MARVEL-0050281 (Lee writing that Dr. Strange "'twas [Ditko's] idea, and I figgered we'd give it a chance," in a contemporaneous letter dated January 9, 1963); Ex. 49 at 1 (first published appearance of Dr. Strange in *Strange Tales* No. 110); Ex. 33 (Ditko's letter post-marked August 6, 1946 to his brother | **Defendant admits this fact is undisputed, but interposes additional extraneous facts, which is improper.**<br><br>Defendant admits that Lee chose the name "Doctor Strange," but interposes an incorrect contention that the first Doctor Strange story was purchased "on spec." As discussed in MCI's Reply in Support of Undisputed Facts 22 and 32, that is incorrect and unsupported by any evidence, because Ditko's work on *Strange Tales* No. 110, in which Doctor Strange first appears, was done pursuant to assignment, subject to Marvel's supervision and control, and done with Marvel specifically in mind.<br><br>MCI also **objects** to Toberoff Exhibits 1, 23, 25, 27, 33, 57, and 59.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [33], [34], [35], [39], [52] & [54]. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | Patrick Ditko enclosing an initial sketch of Dr. Strange); Ex. 59 at 61:15-65:14 (Patrick Ditko, being shown composite Ex. 33 and testifying that his brother, Steve Ditko, sent him this letter in 1946, while Ditko was in military service abroad, enclosing Ditko's early sketch of Dr. Strange (Ex. 33) and that he had found Ex. 33 at his home amongst letters he had kept from his brother); Ex. 23 at 166:5-168:8 (Mark Ditko testifying that his father lived in Johnstown, PA at the address written on the letter envelope of composite Ex. 33, and that in 1946 (postmarked on the letter envelope), his uncle Ditko was in the military, stationed abroad in Germany); Ex. 57 at 2 (Ditko writing that Dr. Strange started out as his five page story and was a great opportunity to try out all kinds of ideas which "never fit in to Marvel's world of heroes"). | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| 35.    While Doctor Strange did not have a backstory when originally published, Marvel gave Doctor Strange a fleshed out personality and origin story, a doctor who undergoes a series of tests in Tibet and develops mystical abilities to combat magical forces in *Strange Tales* Vol. 1, No. 115. Lens Decl., Ex. 34 at 3 (story belatedly laying out "The ORIGIN of Doctor Strange" in response to "a flood of letters" from fans); Lens Decl., Ex. 37 at 5 (Thomas explaining that, "when Lee and Ditko gave Doctor Strange an origin in *Strange Tales* No. 115, it bore a distinct similarity to that of Lee and Kirby's Dr. Droom in *Amazing Adventures* No. 1, two years earlier"); Lens Decl., Ex. 37 at 8 (Thomas remarking that, "[s]ince the 1920s American movies, radio, comics, and the pulps had seated the Orient as the center of mysticism, and Marvel was no exception, with its first two sorcerers Strange and D[r]oom"); Lens Decl., Ex. 2 304:24-305:6 (Thomas discussing the large number of "comic book magicians" that "were all imitating the comic strip character Mandrake," and noting that "[a]lmost every company had a couple of magicians, many of them with mustaches and capes"); Thomas Decl. ¶ 13 (first appearance of Dr. Strange "was published | **Counterclaimant disputes that Dr. Strange "did not have a backstory when originally published,"** because, while the character's backstory was not published in *Strange Tales* No. 110, Ditko often charted out his stories well in advance in order to organize the larger narrative and plot points he would include in his stories later down the line, and so, not all of a character's story was told in its first appearance. *See* Toberoff Decl. Ex. 1 at 12 (Evanier Rep. describing Ditko's regular practice of maintaining a chart mapping out the future development of a character so he could introduce elements into current issues and then use those elements in issues many months down the line); Ex. 35 at DITKO-0193 (Ditko writing that he planted seeds of subplots in stories that would work their way through the issues until it was time for those sub-stories to play an active role later when the time was right); Ex. 58 at 3 (Ditko writing when he took over the *Spider-Man* stories he "knew in advance the [*Spider-Man*] story line like the best (worst) time for Aunt May to have a heart attack"). **Counterclaimant further denies that "Marvel gave Doctor Strange a fleshed out [*sic*] personality and origin story, a doctor who undergoes a series of tests | **This fact remains undisputed.** Defendant cites no admissible evidence establishing that Ditko "charted out" any of his Doctor Strange work, let alone prior to 1965, when Lee assigned him to plot Spider-Man and Doctor Strange stories. Defendant simply invites rank speculation, which is improper. Further, Defendant's contention that Lee's freelance contributions were not contributions by Marvel is an incorrect legal argument.  Unlike Defendant's improper assertion that Ditko did not work for Marvel, Lee never questioned that he worked for Marvel and that his freelance contributions were done on a work-made-for-hire basis.  *See* Lens Decl., Ex. 13 100:25-101:17 (Lee testifying that he "always felt the company" owned the characters he created or co-created); Lens Decl., Ex. 13 26:22-28:6 (Lee testifying that it was typical in the industry for comic book publishers to own the rights to the materials that were created for them for publication" during the relevant time period); Lens Opp. Decl., Ex. 88 120:3-9 (Lee testifying that he "did [Marvel characters] as a work for hire."); Lens Opp. Decl., Ex. 87 109:19-25 (Lee |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| without a backstory"); *see also* Thomas Decl. ¶ 15. | **in Tibet and develops mystical abilities to combat magical forces in *Strange Tales* Vol. 1, No. 115." "Marvel" did not give Dr. Strange anything. This story was co-authored by Ditko and Lee, in his capacity as a freelancer and purchased by Magazine Management by the page like the other stories it published. In addition, the doctor in *Strange Tales* Vol. 1, No. 115 does not undergo a series of tests nor develops mystical abilities to combat magical forces, he resigns himself to become a student of the mystical arts.** *See* Lens Decl., Ex. 34 (*Strange Tales* Vol. 1, No. 115); Counterclaimant's Response to Marvel Statement No. 30, *supra*, incorporated herein by reference; Toberoff Decl. Ex. 1 at 13 (Evanier Rep. describing Lee's common practice of composing dialogue as a freelancer, not as Marvel's editor and doing his freelance writing from home two of the five workdays per week, for which he was paid on a per-page basis as a freelancer); Ex. 3 at 41:19-42:2 (Romita testifying that Lee would stay home several days per week to write); Ex. 4 at 17:17-25 (Lee testifying that he was paid as a freelancer for his writing and was on salary for his work as an editor); Ex. 17 at 27:2-18, 30:9-13, 31:22-32:7, 276:2-14 (Thomas | testifying that "[a]t Marvel I was an employee, a writer for hire. No one who worked for a comics company back then owned anything they created."). Finally, Defendant's contention that Doctor Strange "does not undergo a series of tests nor develops mystical abilities to combat magical forces" is incorrect.  As the evidence shows, Doctor Strange appears before the Ancient One, who explains that before he is healed with "the power of [his] magic," Doctor Strange "must prove [he] is worthy!"  Doctor Strange is forced to endure difficult visions of his past before being "be[ing] tested, and . . . pass[ing] [his] baptism of fire."  *See* Lens Decl., Ex. 34 at 2-10. MCI also **objects** to Toberoff Exhibits 1, 22, 35, and 58.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [27], [41] & [53]. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | testifying that he was a staff writer/assistant editor in the 1960s and got a salary for that work, but separately freelanced when writing stories and was paid at a per-page rate on a separate check like other freelancers); *id*. at 289:7-291:5 (Thomas testifying that he and Lee each did their writing in a freelance capacity from home in the 1960s and would come to the office only to do their editorial work); Ex. 22 at 255:10-256:6 (Lieber testifying that Lee wrote stories and scripts as a writer, not as an editor, because writing is "not what an Editor does"); *id*. at 256:7-257:12 (Lieber testifying that Lee wrote scripts from home); Ex. 55 at 62:18-63:18 (Lee testifying that he got paid a salary as editor and separately for his writing); Ex. 56 at 91:20-92:6 (Lee testifying that he got paid a salary as editor and separately as a freelancer pre page for his writing); *id*. at 94:6-95:18 (Lee testifying that there was very little editing of his own freelance written material). | |
| 36.    The first issue of *Amazing Adventures*, published in June 1961, featured a five-page story entitled "I Am The Fantastic Dr. Droom," inked by Ditko. Dr. Droom was a doctor who, just like Doctor Strange, undergoes a series of tests in Tibet and develops mystical | **Counterclaimant admits that many artists and musicians of the 1960s were captivated by the mystique of the East, including India and Tibet (e.g., The Beatles, Rolling Stones, Allen Ginsburg) but disputes any implication that Dr. Strange found its roots in Dr.** | **This fact remains undisputed.** Defendant does not respond to this fact, let alone cite evidence disputing it. Instead, he says nothing about the striking similarity of Doctor Strange's backstory and the backstory of Dr. Droom, and |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| abilities to combat magical forces. Lens Decl., Ex. 26 at 3-7; Lens Decl., Ex. 40 at 5-8; Lens Decl., Ex. 25 at 3; Lens Decl., Ex. 36 at 2; Lens Decl., Ex. 41 at 5 (Lee recounting how before Doctor Strange, Marvel had "a character some years ago—I think we called him Dr. Droom, or something—who had been a magician"); Thomas Decl. ¶ 15 (explaining "when Lee and Ditko gave Dr. Strange an origin in *Strange Tales* No. 115, it bore a distinct similarity to that of Lee and Kirby's Dr. Droom in *Amazing Adventures* No. 1, two years earlier" in that "[b]oth characters were magicians sharing the same backstory: doctors that travel to Tibet, undergo a series of tests, and develop mystical abilities to combat magical forces"). | **Droom (1961). The evidence shows that Ditko's Dr. Strange was based on a character he had conceived as early as 1946. Moreover, Ditko's Dr. Strange character, as he appeared in *Strange Tales* No. 110 and later issues, was a meticulously crafted synthesis of various characters and narrative elements Ditko had been tinkering with in stories he sold to Charlton Comics in the 1950s.** *See* Toberoff Dec. Ex. 62 at 4-5 (Dr. Strange used his hands to cast teleportation and other spells in *Strange Tales* No. 139 (1965)); Ex. 63 at 2 (same in *Strange Tales* No. 126 (1964)); Ex. 70 at 8-9 (same in *Strange Tales* No. 129 (1965)); *compare* Ex. 61 at 3 (Ditko's character used his hands to cast spells in 1959 in Charlton Comics' *Space Adventures* No. 27); *see also* Ex. 66 at 10 (in *Strange Tales* No. 137 (1965), Dr. Strange used a device—the Eye of Agamotto—to transport through space and time); *compare* Ex. 65 at 4-5 (In Charlton Comics' *Out of this World* No. 7 (1958), Ditko's character used similar artifact to transport characters in a swirl of visual effects through space and time); *see also* Ex. 68 at 4-5 (in *Strange Tales* No. 122 (1964), Dr. Strange traversed through different dimensions and journeyed through alternate planes of existence); Ex. | contends that Doctor Strange was "conceived" of by Ditko in 1946.  As discussed in MCI's Reply in Support of Undisputed Fact 32, Defendant cites no evidence that supports that contention.<br><br>MCI also **objects** to Toberoff Exhibits 23, 33, 34, 59, 61, 65, and 67.  *See* MCI's Evidentiary Objection Nos. [33], [39], [40], [54], [55], [57], & [58]. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | 69 at 1 (same in *Strange Tales* No. 134 (1965)); *compare* Ex. 67 at Cover, 4-5 (Ditko used same effect in Charlton Comics' *Strange Suspense* No. 32 (1957)); Ex. 33 (Ditko's letter post-marked August 6, 1946 to his brother Patrick Ditko enclosing an early sketch of Dr. Strange); Ex. 59 at 61:15-65:14 (Patrick Ditko, being shown composite Ex. 33 and testifying that his brother, Steve Ditko, sent him this letter in 1946, while Ditko was in military service abroad, enclosing Ditko's early sketch of Dr. Strange (Ex. 33) and that he had found Ex. 33 at his home amongst letters he had kept from his brother); Ex. 23 at 166:5-168:8 (Mark Ditko testifying that his father lived at the address written on the letter envelope of composite Ex. 33, and that, in 1946 (postmarked on the letter envelope), his uncle Ditko was in the military, stationed abroad in Germany). **Counterclaimant further denies that Dr. Droom is similar to Dr. Strange. Whereas Dr. Droom gets mystical powers at the touch of a mystic's hand, Dr. Strange becomes a serious student of mystical powers in his origin story. Marvel's claim is easily refuted by the comic books themselves. Other than being doctors the two characters are completely different (e.g., Dr. Doom** | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | turns from Caucasian to Oriental). *Compare* Lens Decl., Ex. 26 (Dr. Droom) *to* Lens Decl., Ex. 34 (Ditko's Dr. Strange in *Strange Tales* Vol. 1, No. 115). | |
| 37.     After Doctor Strange was fleshed out and given a backstory in *Strange Tales* Vol. 1, No. 115, Marvel decided to feature the character as a regular in *Strange Tales* and more broadly across other Marvel publications, with Doctor Strange appearing alongside already-established Marvel Super Heroes and villains such as Thor and Loki. Lens Decl., Ex. 32 (Thor and Loki guest-starring in *Strange Tales* Vol. 1, No. 123 with Doctor Strange); Lens Decl., Ex. 71 at 20:17-23:23 (Lee explaining how Doctor Strange was given "dramatic" expressions and characteristics like his cape and mustache but set in Greenwich Village with real-world problems, like fears of being mugged walking down the street, "juxtapos[ing] [] the supernatural with the very mundane, every day type of existence" that Marvel characters were famous for"); Lens Decl., Ex. 71 at 3:25-6:09 (Lee explaining how Marvel's basic "formula" was to "mix fantasy with realism" with characters that "are a little different . . . sort of like continuing soap operas"); Lens Decl., Ex. 59 at 3 (Ditko writing that Lee had "some formula | **While Counterclaimant does not believe this is relevant to the issues in this case, Counterclaimants admits that Lee liked the Dr. Strange character and that Magazine Management continued to purchase and feature Ditko's *Dr. Strange* stories in its publications. Counterclaimants denies Marvel attempt to inferentially co-opt Ditko's Dr. Strange character with its citation to irrelevancies.** *See* Toberoff Decl. Ex. 1 at 21 (Evanier Rep. providing historical context of Dr. Strange as a character very different than any other character Marvel was publishing at the time); Ex. 25 at DITKO-0307 (Ditko explaining that Dr. Strange was a unique character who was a contradiction to Marvel's other superheroes); Ex. 30 at 2021MARVEL-0050281 (Lee writing that Dr. Strange "'twas Steve[] [Ditko's] idea," in a letter dated January 9, 1963); Ex. 57 at 2 (Ditko writing that Dr. Strange started out as a 5-page story of his and was a great opportunity to try out all kinds of ideas which "never fit in to Marvel's world of heroes"); Ex. 62 at 4-5 (Dr. Strange used his hands to cast teleportation and other | **Defendant admits this fact is undisputed, and only "disputes" purported "inferen[ces]" from the fact, which is improper.** Defendant does not address this fact, much less dispute it.  Instead, Defendant offers confusing and non-responsive argument about "Marvel['s] attempt to inferentially co-opt Ditko's Dr. Strange character with its citation to irrelevancies," which is improper. Because Defendant does not set forth any specific facts or evidence to dispute this fact as required by Local Rule 56.1(c) and (d), this fact is deemed admitted in its entirety.  *See* Local Rule 56.1(b)-(d); *see also Parks Real Estate*, 472 F.3d at 41; *Giannullo*, 322 F.3d at 140. MCI also **objects** to Toberoff Exhibits 1, 23, 25, 33, 57, 59, 61, 65, and 67.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [33], [34], [39], [52], [54], [55], [57] & [58]. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| approach for everything . . . [as] seen with Dr. Strange's early Stan plots, stories"). | spells in *Strange Tales* No. 139 (1965)); Ex. 63 at 2 (same in *Strange Tales* No. 126 (1964)); Ex. 70 at 8-9 (same in *Strange Tales* No. 129 (1965)); *compare* Ex. 61 at 3 (Ditko's character used his hands to cast spells in 1959 in Charlton Comics' *Space Adventures* No. 27); *see also* Ex. 66 at 10 (in *Strange Tales* No. 137 (1965), Dr. Strange used a device—the Eye of Agamotto—to transport through space and time); *compare* Ex. 65 at 4-5 (In Charlton Comics' *Out of this World* No. 7 (1958), Ditko's character used similar artifact to transport characters in a swirl of visual effects through space and time); *see also* Ex. 68 at 4-5 (in *Strange Tales* No. 122 (1964), Dr. Strange traversed through different dimensions and journeyed through alternate planes of existence); Ex. 69 at 1 (same in *Strange Tales* No. 134 (1965)); *compare* Ex. 67 at Cover, 4-5 (Ditko used same effect in Charlton Comics' *Strange Suspense* No. 32 (1957)); Ex. 33 (Ditko's letter post-marked August 6, 1946 to his brother Patrick Ditko enclosing an early sketch of Dr. Strange); Ex. 59 at 61:15-65:14 (Patrick Ditko, being shown composite Ex. 33 and testifying that his brother, Steve Ditko, sent him this letter in 1946, while Ditko was in military service abroad, enclosing Ditko's early sketch of | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | Dr. Strange (Ex. 33) and that he had found Ex. 33 at his home amongst letters he had kept from his brother); Ex. 23 at 166:5-168:8 (Mark Ditko testifying that his father lived at the address written on the letter envelope of composite Ex. 33, and that, in 1946 (postmarked on the letter envelope), his uncle Ditko was in the military, stationed abroad in Germany). | |
| 38.    Marvel never assigned Ditko to do a Doctor Strange cover and frequently had other artists ink Doctor Strange comics. Lens Decl., Ex. 53 at 3 (Ditko recounting that he "was never asked to do a Dr. Strange cover"); Lens Decl., Ex. 57 at 4 (Ditko noting that it was "a mystery to [him] why no Doctor Strange covers"); Lens Decl., Ex. 60 at 3 (Ditko criticizing the "incompetent inkers" who inked his penciled drawings for Doctor Strange); Lens Decl., Ex. 59 at 3 (Ditko lamenting that there was a "los[s] of a consistent look" for Dr. Strange because of Lee "having someone else ink" him); Lens Decl., Ex. 2 131:1-132:8 (Thomas testifying that at Marvel the inker "usually was not the same pencil," and citing Ditko's work as an example of the penciller and inker "not [being] the same person"); Lens Decl., Ex. 45 at 3 (Ditko explaining that, if he had the choice "to | **Counterclaimant only admits that Ditko did not draw Dr. Strange covers but disputes that Magazine Management "frequently had other artists ink Doctor Strange comics." Ditko usually insisted on inking and inked his own stories, as Marvel's reprint payments to Ditko show that Ditko plotted, penciled, and inked many *Dr. Strange* stories.** *See* Toberoff Decl. Ex. 19 at 6, "Legends at Loggerheads!" (Thomas explaining example of when Lee incorrectly dialogued a *Spider-Man* story in a way Ditko had not intended, Ditko refused to accede to Lee's chosen direction when he got the story back to ink it); Ex. 80 (Marvel paying Ditko for reprints of numerous issues he penciled and inked); Ex. 81 (same). | **This fact remains undisputed.**<br><br>Defendant admits that Marvel did not assign Ditko to provide cover art for *Strange Tales* comics featuring Doctor Strange, but contends  that Ditko "usually insisted on inking and inked" his work for Marvel.  That is incorrect and unsupported by any evidence.  To the contrary, the evidence shows that Ditko frequently lamented that Marvel would have others ink his work.  *See* MCI's Evidence in Support of Undisputed Fact 29; *see also* Lens Decl., Ex. 55 at 3 ("Stan had <u>others</u> ink some of my Dr. Strange stories."); Ex. 54 at 4 ("I don't know why he had other artists ink [Dr. Strange].  It may be he had inkers he wanted to keep and had to give them some work.").<br><br>Toberoff Exhibits 80 and 81 **do not support** Defendant's contention that |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| draw and ink or . . . [for] other people to ink [his] pencils, he would "[r]ather do it all [him]self"); *see also* Lens Decl., Ex. 44 at 3; Decl., Ex. 55 at 4. | | Ditko usually inked his work for Marvel. Exhibit 80 merely lists payments to Ditko, without any reference to which particular comic book or books the payments correspond to, and thus says nothing about the *number* of Marvel comics that Ditko inked.  And Toberoff Exhibit 81 actually forecloses Defendant's contention.  While it lists some payments to Ditko for inking some Marvel comics, it shows no inking payments for many of the Doctor Strange comics that are among the Works. <br><br> MCI also **objects** to Toberoff Exhibits 80 and 81.  *See* MCI's Evidentiary Objection Nos. [62] & [63]. |
| **Spider-Man** | | |
| 39.     Marvel regularly assigned Ditko to contribute to the Marvel comic book series *Amazing Fantasy*[3] from issue No. 1 through No. 15. Lens Decl., Ex. 4 124:3-18 (Lee describing *Amazing Fantasy* as "a book I worked on with an artist called Steve Ditko"); *see also* Lens Decl., Ex. 48 at 2; Lens Decl., Ex. 25 at 2-3. | **Counterclaimant disputes that Ditko was "assigned" to create his Works, as he had no contract with any "Marvel" entity and was free to decline any "assignment" without consequence.** Marvel has not produced any contemporaneous agreement with Ditko from the Period for his creative services, nor any other evidence reflecting any bilateral rights and obligations between Ditko and Magazine Management (nor any other alleged Marvel predecessor) in | **This fact remains undisputed**. <br><br> Defendant's suggestion that Lee did not assign Ditko to work on Marvel comic books because Ditko lacked a written employment agreement is incorrect, turns on improper legal argument, and—in any event—is immaterial, as the Second Circuit's decision in *Kirby* confirms.  *See* MCI's Reply in Support of Undisputed Fact 2. |

---

[3] The series began as *Amazing Adventures* but was renamed twice, first as *Amazing Adult Fantasy* then again as *Amazing Fantasy*.

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | the Period, nor has Marvel alleged that any such agreement or bilateral legal rights and obligations existed between such parties in the Period. *See* Toberoff Decl. Ex. 36 at 7 (Marvel admitting it had no written contract with Ditko in the 1960s); Ex. 17 at 298:8-14 (Thomas testifying that freelancers did not have contracts with Marvel until Thomas's in 1974, which was the first); Ex. 1 at 10 (Evanier Rep. describing the common practice of freelancers selling material to more than one publisher, including Marvel, DC Comics, and Charlton Comics); Ex. 3 at 207:12-22 (Romita testifying that freelancers were free to sell work to other publishers); Ex. 9 ¶ 11 (Steranko attesting that Marvel had no contract with Steranko and so he was free to sell work to other publishers); Ex. 13 ¶¶ 5-6 (Adams attesting that he sold work to both Marvel and DC Comics during the 1960s and 1970s); Ex. 23 at 160:2-8 (Mark Ditko testifying that Ditko was selling work to both Marvel and Charlton Comics in the 1960s); Ex. 35 at DITKO-0199 (Ditko writing about his work at Charlton Comics in the 1960s); Ex. 57 at 2 (Ditko writing about creating material for Charlton Comics and DC Comics); Ex. 35 at DITKO-0192, DITKO-0207-0210, DITKO-0215-0218 (Ditko writing that he | This argument also ignores that Ditko did, in fact, consistently accept assignments from Lee.  Indeed, the vast majority of Ditko's work during the 1962-1965 relevant time period was published by Marvel as detailed in MCI's Reply in Support of Undisputed Fact 2.<br><br>MCI also **objects** to Toberoff Exhibits 1, 3, 9, 13, 21, 23, 35, 57, and 58.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [7], [12], [16], [20], [32], [41], [52] & [53]. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | rejected several of Lee's *Spider-Man* story ideas and characters such as, for instance, Lee's idea for a Spider-Woman character, or Lee's idea of making Aunt May more glamorous); Ex. 3 at 219:12-24 (Romita testifying that he turned down Lee's offer to submit material to Marvel and preferred to sell freelance work to DC Comics); Ex. 21 at 29:9-30:17 (Steranko testifying that he was not given "assignments," but rather, he had the option to work on some books or to not if he chose not to); Ex. 24 at 89:2-11 (Levitz testifying that freelancers were free to decline "assignments"); Ex. 58 at 4 (Ditko writing that, after he stopped selling his material to Marvel in 1966, he later started working with Marvel again, but refused to do any *Spider-Man* or *Dr. Strange* stories and recounting that when other writers tried to sneak in *Spider-Man* panels for Ditko to work on, he "left [them] blank for someone else to fill in"); *id.* (Ditko writing that he "refused to do a drunken Iron Man splash page—someone else had to draw [and] ink it"). | |
| 40.    Lee conceived of the idea for a new character named Spider-Man and devised the plot for Spider-Man's first appearance in *Amazing Fantasy* Vol. 1, No. 15. Lens Decl., Ex. 48 at 5 (Ditko writing that "[t]he first complete Spider- | **Counterclaimant disputes that "Lee conceived of the idea for a new character named Spider-Man" as Lee's initial "idea" for Spider-Man was based on a character Jack Kirby and Joe Simon had created in the mid-1950s** | **This fact remains undisputed.**<br><br>Defendant's contentions about how Spider-Man "was based on a character Jack Kirby and Joe Simon had created in the 1950s" and how there are purported |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| Man adventure, containing the legend and story, was published in *Amazing Fantasy* #15, from Stan's synopsis"); Lens Decl., Ex. 46 at 3 (Ditko recounting that Stan Lee "create[ed] the Spider-Man name" and provided him with a "1 or 2 page synopsis" for the first story); Lens Decl., Ex. 13 74:6-75:5 (Lee testifying about "dreaming up" the idea for Spider-Man and his superpower); Lens Decl., Ex. 10 335:10-336:11 (Lee testifying that he "came up with Spider-Man," among other "main characters" that featured in Marvel's comics, and that he would tell artists "how [he] wanted them done"); Lens Decl., Ex. 71 at 3:25-6:09 (Lee explaining how Marvel's basic "formula" was to "mix fantasy with realism," creating characters that "are a little different . . . sort of like continuing soap operas"); Lens Decl., Ex. 71 at 3:25-6:09 (Lee explaining how Spider-Man, like other Marvel characters, "juxtapos[ed] . . . bigger-than-life problem[s]" with "the very simple home life and family life"); Lens Decl., Ex. 28; *see also* Lens Decl., Ex. 14 at 8, 15. | **and the stark differences between Kirby's rendition of Spider-Man and Ditko's Spider-Man character underscores how little was actually supplied by Lee.** *See* Toberoff Decl. Ex. 1 at 20 (Evanier Rep. providing historical context of Spider-Man's creation and describing Kirby and Lee's initial work on a character named "Spider-Man" that was based on an idea developed by Joe Simon in the mid-1950s); Ex. 29 at 33-34 (Ditko writing that the Spider-Man character that Lee and Kirby had originally worked up was a version of "The Fly" character created by Joe Simon); Ex. 3 at 112:7-113:7 (Romita testifying that Kirby did some initial Spider-Man drawings but Lee did not like them and went with Ditko's version of the Spider-Man character); Ex. 4 at 37:3-19 (Lee testifying that he did not like Kirby's version of Spider-Man, he liked Ditko's); Ex. 29 at 34-35 (Ditko writing that the initial Kirby Spider-Man idea was tossed whereupon Ditko created a brand-new Spider-Man); Ex. 29 at 34 (Ditko comparison depiction of Kirby's and Ditko's versions of the Spider-Man character); Ex. 28 (Lee writing that Ditko was the co-creator of Spider-Man); Ex. 3 at 112:7-113:7 (Romita testifying that Kirby did some initial Spider-Man drawings but Lee did not like them and | "stark differences" between the characters drawn by Kirby and Ditko are incorrect and legally unavailing. *See* MCI's Reply in Support of Undisputed Fact 22.<br><br>Indeed, the *Kirby* court held that Kirby's contributions to Spider-Man were done on a work-made-for-hire basis, like all his other work for Marvel. *See Kirby*, 726 F.3d at 143 ("[T]he district court made no error, in our view, in determining as a matter of law that the works [(including Kirby's alleged contributions to Spider-Man)] were made at Marvel's instance and expense").<br><br>Further, Defendant's contention about "how little was actually supplied by Lee" to the Spider-Man character is incorrect. As the Ditko himself admitted, Lee provided Ditko with a "1 or 2 page synopsis" and "create[ed] the Spider-Man name." And Defendant further ignores the circumstances in which Spider-Man first appears in *Amazing Fantasy* No. 15. *See* MCI's Evidence in Support of Undisputed Facts 40 and 41.<br><br>Additionally, Toberoff Exhibit 28 **does not support** Defendant's response. Exhibit 28 refers to Lee crediting Ditko for "eventually d[oing] most of the |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | went with Ditko's version of the Spider-Man character); Ex. 7 at 223:18-225:20, 277:11-13 (Thomas testifying that Ditko did all the plotting on *Spider-Man* stories while Ditko and Lee were not speaking); Ex. 28 (Lee writing that Ditko was co-creator of Spider-Man and that Ditko did most of the plotting of *Spider-Man* and just left Lee to do the dialogue and captions). Ex. 7 at 223:18-225:20, 277:11-13 (Thomas testifying that Ditko did all the plotting on *Spider-Man* stories while Ditko and Lee were not speaking); Ex. 28 (Lee writing that Ditko was co-creator of Spider-Man and that Ditko did most of the plotting of *Spider-Man* and just left Lee to do the dialogue and captions). | plotting [when] the strip continued to increase in popularity," when Lee, using his editorial discretion, afforded Ditko greater creative input on the Spider-Man comics, subject to Marvel's ultimate authority.  Toberoff Exhibit 17 similarly states that Ditko's work was a "switch on the Marvel method" when Ditko began plotting Spider-Man later in his Marvel career.<br><br>MCI also **objects** to Toberoff Exhibits 1, 3, and 29.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [6], & [36]. |
| 41.     Stan Lee initially assigned Jack Kirby to pencil the artwork for Spider-Man's first appearance in *Amazing Fantasy* Vol. 1, No. 15, but because Lee was dissatisfied with Kirby's Spider-Man drawings, Lee took Kirby off the project and assigned Ditko to pencil the interior artwork and cover for *Amazing Fantasy* Vol. 1, No. 15. Lens Decl., Ex. 13 37:3-38:3 (Lee testifying that he initially "wanted Jack [Kirby] to do" the Spider-Man comic and "gave it to him" with the admonition that he "d[id]n't want this guy to be too heroic-looking"—but Kirby's penciled drawings "looked still a bit too | **Counterclaimant disputes that Ditko was "assigned" to work on Spider-Man, as he had no contract with nor was employed by any "Marvel" entity and was free to decline any proposal by Lee without consequence.** Marvel has not produced any contemporaneous agreement with Ditko from the Period for his creative services, nor any other evidence reflecting any bilateral rights and obligations between Ditko and Magazine Management (nor any other alleged Marvel predecessor) in the Period, nor has Marvel alleged that any such agreement or bilateral legal rights and obligations | **This fact remains undisputed**.<br><br>Defendant does not address this fact, much less dispute it.  Defendant's suggestion that Lee did not assign Ditko to work on Marvel comic books because Ditko was not contractually bound to accept every assignment that Lee provided is incorrect and turns on an improper legal argument, as the Second Circuit's decision in *Kirby* confirms.  *See* MCI's Reply in Support of Undisputed Fact 2.<br><br>This argument also ignores that Ditko did, in fact, consistently accept assignments |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| heroic" for Lee "even though [Kirby] tried to nerd him up," so he "gave it to Steve Ditko" instead whose "style was really more really what Spider-Man should have been"); Lens Decl., Ex. 13 334:14-18 (Lee testifying that "it was me who said, 'I want to do a strip called Spider-Man,' and I hired Jack, and I didn't like it, and then I hired Ditko."); *see also* Lens Decl., Ex. 10 376:3-15; Lens Decl., Ex. 48 at 3; Lens Decl., Ex. 54 at 4. | existed between such parties in the Period. *See* Toberoff Decl. Ex. 36 at 7 (Marvel admitting it had no written contract with Ditko in the 1960s); Ex. 17 at 298:8-14 (Thomas testifying that freelancers did not have contracts with Marvel until Thomas's in 1974, which was the first); Ex. 3 at 219:12-24 (Romita testifying that he turned down Lee's offer to submit material to Marvel and preferred to sell freelance work to DC Comics); Ex. 21 at 29:9-30:17 (Steranko testifying that he was not given "assignments," but rather, he had the option to work on some books or to not if he chose not to); Ex. 24 at 89:2-11 (Levitz testifying that freelancers were free to decline "assignments"); Ex. 58 at 4 (Ditko writing that, after he stopped selling his material to Marvel in 1966, he later started working with Marvel again, but refused to do any *Spider-Man* or *Dr. Strange* stories and recounting that when other writers tried to sneak in *Spider-Man* panels for Ditko to work on, he "left [them] blank for someone else to fill in"); *id.* (Ditko writing that he "refused to do a drunken Iron Man splash page—someone else had to draw [and] ink it"). **Counterclaimant further disputes that Ditko merely "pencil[ed]" the interior pages, as Lee has acknowledged that** | from Lee.  Indeed, the vast majority of Ditko's work during the 1962-1965 relevant time period was published by Marvel as detailed in MCI's Reply in Support of Undisputed Fact 2.<br><br>Defendant's contention regarding Ditko's "co-creat[ion]" of characters is also non-responsive and immaterial, as the Second Circuit's decision in *Kirby* confirms.  *See* MCI's Reply in Support of Undisputed Fact 22.<br><br>MCI also **objects** to Toberoff Exhibits 1, 3, 21, 29, and 58.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [6], [7], [20], [36] & [53]. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | **Ditko was a "co-creator" of the Spider-Man character and Ditko completely originated the look, aesthetic, and gimmicks of the Spider-Man character and the *Spider-Man* stories.** *See* Toberoff Decl. Ex. 1 at 20 (Evanier Rep. providing historical context of Spider-Man's creation and describing Ditko's creation of a very different costume and direction for the character); Ex. 3 at 112:7-113:7 (Romita testifying that Kirby did some initial Spider-Man drawings but Lee did not like them and went with Ditko's version of the Spider-Man character); Ex. 4 at 37:3-19 (Lee testifying that he did not like Kirby's version of Spider-Man, he liked Ditko's); Ex. 28 (Lee writing that Ditko was the co-creator of Spider-Man); Ex. 29 at 34-35 (Ditko writing that the initial Kirby Spider-Man idea was tossed and Ditko created a brand new Spider-Man); Ex. 29 at 34 (Ditko comparison depiction of Kirby's and Ditko's versions of the Spider-Man character); Ex. 7 at 223:18-225:20, 277:11-13 (Thomas testifying that Ditko did all the plotting on *Spider-Man* stories while Ditko and Lee were not speaking); Ex. 28 (Lee writing that Ditko was co-creator of Spider-Man and that Ditko did most of the plotting of *Spider-Man* and | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | just left Lee to do the dialogue and captions). | |
| 42.    Stan Lee rejected (*i.e.*, did not publish) Ditko's cover, and, instead, re-assigned the cover artwork to Kirby such that the published cover was drawn by Kirby with the interior artwork drawn by Ditko. Lens Decl., Ex. 48 at 5 (Ditko writing that he "penciled and inked the first [Spider-Man] cover after [he] inked first story" but that "Stan rejected [his] cover" and "had Jack pencil a second, replacement cover" that "became the first published cover"); Lens Decl., Ex. 47 at 2 (Ditko admitting that "it became *publicly known and shown* that I had *previously* penciled and inked a *first* S[pider]-m[an] cover that Stan rejected"); Lens Decl., Ex. 30 at 2 ("*Amazing Fantasy* #15 unused cover art by Steve Ditko"); *see also* Lens Decl., Ex. 28; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 61 at 4; Lens Decl., Ex. 49 at 3; Thomas Decl. ¶ 21. | **Counterclaimant admits that Lee rejected, and Magazine Management declined to purchase, Ditko's initial Spider-Man cover.** | **Defendant admits this fact is undisputed.** |
| 43.    After Spider-Man's first appearance in *Amazing Fantasy* Vol. 1, No. 15, Marvel decided to give the character his own series—*The Amazing Spider-Man*—and feature him alongside already-established Marvel Super Heroes and villains, such as the Fantastic Four, the Human Torch, and the Incredible Hulk. Lens Decl., Exs. 31A at 4-5, 20-21 | **Counterclaimant admits that Spider-Man got his own series, but disputes that he was merely featured alongside "already-established Marvel Super Heroes and villains," as Spider-Man famously had his own comic book *The Amazing Spider-Man* published throughout the Sixties and decades thereafter (1963-1998). The evidence** | **This fact remains undisputed.**<br><br>Defendant admits that Marvel gave Spider-Man his own series, and cites nothing to dispute that Spider-Man was featured alongside already-established Marvel Super Heroes and villains.  Thus, this fact remains undisputed.  Because Defendant does not set forth any specific |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| & 31B at 2-4 (The Fantastic Four, the Human Torch, and the Incredible Hulk guest-starring alongside Spider-Man in *The Amazing Spider-Man* Vol. 1, Nos. 1, 8, and 14); *see also* Lens Decl., Ex. 71 at 3:25-6:09 (Lee explaining how Marvel's basic "formula" was to "mix fantasy with realism," creating characters that "are a little different . . . sort of like continuing soap operas"). | shows that in the Period Ditko was **largely in charge of plotting (i.e., writing) the stories, and that Ditko often introduced into his *Spider-Man* stories he created character elements Ditko had created years earlier in stories he sold to Charlton Comics.** *See* Toberoff Decl. Ex. 82 (Lee explaining in January 9, 1966 published interview: "**I don't plot Spider-Man any more. Steve Ditko, the artist, has been doing the stories.** I guess I'll leave him alone until sales start to slip. Since Spidey got so popular, Ditko thinks he's the genius of the world. We were arguing so much over plot lines I told him to start making up his own stories. **He won't let anybody else ink his drawings either. He just drops off the finished pages with notes at the margins and I fill in the dialogue. I never know what he'll come up with next**, but it's interesting to work that way.") (emphasis added); Ex. 83 at 7 (same); Ex. 28 (Lee writing that Ditko was co-creator of Spider-Man and that Ditko did most of the plotting of *Spider-Man* and just left Lee to do the dialogue and captions); Ex. 7 at 223:18-225:20, 277:11-13 (Thomas testifying that Ditko did all the plotting on *Spider-Man* stories while Ditko and Lee were not speaking); Ex. 73 at 6 (Norman Osborn's first | facts or evidence to dispute this fact as required by Local Rule 56.1(c) and (d), this fact is deemed admitted in its entirety. *See* Local Rule 56.1(b)-(d); *see also Parks Real Estate*, 472 F.3d at 41; *Giannullo*, 322 F.3d at 140.<br><br>Defendant's non-responsive argument concerning Ditko's allegedly being "largely in charge of plotting" is incorrect as explained in MCI's Reply in Support of Undisputed Fact 3.<br><br>Further, Defendant's contention that Ditko "often introduced into his *Spider-Man* stories he created character elements Ditko had created years earlier" is likewise non-responsive and incorrect. Defendant cites no evidence to support this contention and, instead, ignores the circumstances in which these supporting characters first appeared in Marvel's *Amazing Fantasy* No. 15 (1962) or *Amazing Spider-Man* (1963-1965). All of the supporting characters Defendant identifies, *e.g.*, Aunt May, Norman Osborn, Electro, and the Chameleon, were published in Marvel comic books plotted and edited by Stan Lee. Indeed, each of the supporting characters Defendant identifies was first introduced *before* Lee and Ditko's working relationship evolved |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | appearance in the *Spider-Man* series in 1965); Ex. 74 at 10 (Norman Osborn's identity revealed to readers in *Amazing Spider-Man* No. 37 (1966)); *compare* Ex. 75 at 1-2 (Norman Osborn's precursor—including corporate villainy and distinct curled hairstyle—in 1957 in Charlton Comics' *Strange Suspense Stories* No. 33, *Director of the Board*); *see also* Ex. 60 at 2, 8 (*Amazing Fantasy* No. 15 (1962), the issue in which Spider-Man and Ditko's Aunt May character first appeared) *compare* Ex. 79, "All Those Eyes" at 1-3 (Aunt May's forerunner character appeared in Ditko's story in Charlton Comics' *Out of this World* No. 6 (1957)); *see also* Ex. 76 at 1, 4 (Ditko's Electro character in *Amazing Spider-Man* No. 9 (1964)); *compare* Ex. 77 at 1, 4-5 (Ditko's electrically powered man, the predecessor of Electro, first appeared in Charlton Comics' *Strange Suspense Stories* No. 48 (1960)); *see also* Ex. 78 at 1, 5-6, 8-9 (Ditko introduces the Chameleon—a character who used various masks to carry out his villainy—in *Amazing Spider-Man* No. 1 (1963)); *compare* Ex. 79, "All Those Eyes" at 2-3 (Chameleon precursor—a spy character who used various masks in his espionage with a similar back story as the Chameleon— | in 1965.  And, as with all freelancer's work for Marvel, Ditko's contributions to those supporting characters were made pursuant to assignments from Lee, who directed the creation of the Works, and he was compensated by Marvel on an agreed per-page basis for completed assignments. *See* MCI's Reply In Support of Undisputed Facts 22, 23, and 49.  MCI also **objects** to Toberoff Exhibits 75, 77, and 79.  *See* MCI's Evidentiary Objection Nos. [59], [60], & [61]. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | appeared in Ditko's "All Those Eyes" story he sold to Charlton Comics in 1957). | |
| 44.    With Stan Lee as the editor and writer, Ditko penciled every issue of *The Amazing Spider-Man* during the Time Period. Lens Decl., Ex. 25 at 3-7; Lens Decl., Exs. 31A at 4-31, 31B at 2-36, & 31C at 2-17 (comic books bearing credits reflecting Ditko as the artist and Lee as the writer and editor for all issues of *The Amazing Spider-Man*). | **Counterclaimant admits that Ditko drew every issue of *The Amazing Spider-Man* during the Period, but disputes that Lee was actually the "writer" on every issue of *The Amazing Spider-Man* in the Period. For instance, Ditko and Lee were not speaking for much of the Period relevant to Spider-Man (between first publication of *The Amazing Spiderman* (March 1963) and the end of 1965 when Ditko stopped selling to Magazine Management). During this critical Period Ditko was completely in charge of writing and drawing (penciling) the *Spider-Man* stories (and the *Dr. Strange* stories), with Lee left merely to dialogue the balloons and finalize captions based on Ditko's notes and directions.** *See* Toberoff Decl. Ex. 82 (Lee explaining in January 9, 1966 published interview: **"I don't plot Spider-Man any more. Steve Ditko, the artist, has been doing the stories.** I guess I'll leave him alone until sales start to slip. Since Spidey got so popular, Ditko thinks he's the genius of the world. We were arguing so much over plot lines I told him to start making up his own stories. **He won't let anybody else ink his drawings either. He just drops** | **This fact remains undisputed**.

Defendant admits that Ditko drew every issue of *Spider-Man* during the relevant time period, but "disputes" that Lee was the writer of every issue of *The Amazing Spider-Man* during the Time Period. However, he cites no evidence supporting this contention and instead cites evidence indicating that at some point in 1965, near the end of the Time Period, Lee assigned Ditko to *plot* Spider-Man stories due to the state of Ditko and Lee's personal relationship.  *See* Toberoff Ex. 82 (Lee explaining in 1966 interview that "Since Spidey got so popular, Ditko thinks he's the genius of the world. We were arguing so much over plot lines I told him to start making up his own stories."); Toberoff Ex. 26 (Lee discussing Ditko's work on the *Amazing Spider-Man Annual* #2, a one-off special annual issue cover-dated October 1965, where "[t]o make it even more special," Lee "let Daring Ditko himself dream up the plot" as "Ditko was illustrating both Dr. Strange and Spidey" at the time."). Lee continued to act as writer, and continued to maintain editorial control over the Works, as explained in more detail in MCI's Evidence in Support |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | **off the finished pages with notes at the margins and I fill in the dialogue. I never know what he'll come up with next,** but it's interesting to work that way.") (emphasis added); Ex. 83 at 7 (same); Ex. 14 at 7 (Evanier Rebuttal Rep. explaining Ditko's practice of submitting detailed notes with his freelance material to assist Lee in dialoguing the stories); Ex. 7 at 223:18-225:20 (Thomas testifying that Ditko refused to speak to Lee while working on *Spider-Man* and *Dr. Strange* so all plotting on the stories was done by Ditko, and further, that Ditko would provide margin notes to indicate what he intended to happen in the story to guide Lee when Lee dialogued the story); *id.* at 262:4-264:19 (Thomas testifying that when he began to dialogue *Dr. Strange* stories instead of Lee, Ditko would type his suggested captions and dialogue on a separate page, not in the margins, and then give them to Thomas to fill in the dialogue balloons); Ex. 17 at 84:18-90:9 (Thomas testifying that Ditko wrote extensive margin notes describing the plot and what was happening so that when Lee/Thomas dialogued the story, they could do so in a way that corresponded with what Ditko had intended); *id.* at 311:18-312:25 (Thomas testifying that Ditko, on his own, plotted and drew | of Undisputed Fact 22.  *See also* Toberoff Ex. 28 at 2 (Lee explaining that when Ditko "eventually did most of the plotting" on Spider-Man Lee "of course, continued to provide the dialogue and captions").<br><br>MCI also **objects** to Toberoff Exhibits 14, 27, 35, 58, 75, 77, and 79.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [17], [35], [41], [53], [59], [60] & [61]. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | *Spider-Man* for more than one year before he left in 1966, did not work pursuant to the Marvel Method, and that Lee would not even know anything about the story until it was penciled and submitted by Ditko); Ex. 18 (1965 example of Ditko's *Dr. Strange* margin notes for Thomas); Ex. 26 at 83 (Lee writing that Ditko came up with the *Dr. Strange* plots and illustrated the story and Lee only added the dialogue [in the balloons]); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script); Ex. 19 at 6-8 (Thomas interview explaining that Ditko and Lee were not speaking in 1965 and Ditko was plotting both *Spider-Man* and *Dr. Strange* and would only come to the office to drop work off with Brodsky); Ex. 28 (Lee writing that Ditko was the co-creator of Spider-Man and that Ditko did most of the plotting of *Spider-Man* and just left Lee to do the dialogue and some captions); Ex. 24 at 124:5-24 (Levitz testifying that Ditko and Lee stopped speaking in the last year of Ditko's time with Marvel because Ditko was not getting proper credit for his contributions to the stories); Ex. 35 at DITKO-0193 (Ditko writing that he and Lee stopped | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | speaking around 1964); Ex. 58 at 3 (Ditko writing that he took over all plotting of the *Spider-Man* stories).<br><br>**Counterclaimant further disputes that Ditko merely "penciled" the *Spider-Man* stories, when in fact, Ditko often created and always plotted the stories which is a literary function. The evidence reflected that Ditko also created numerous supporting characters and repurposed character types in the *Spider-Man* stories that he had created years prior in stories Ditko sold to Charlton Comics like Aunt May, Electro, Norman Osborn, and the Chameleon.** *See* Toberoff Decl. Ex. 73 at 6 (Norman Osborn's first appearance in the *Spider-Man* series in 1965); Ex. 74 at 10 (Norman Osborn's identity revealed to readers in *Amazing Spider-Man* No. 37 (1966)); *compare* Ex. 75 at 1-2 (Norman Osborn's precursor—including corporate villainy and distinct curled hairstyle—in 1957 in Charlton Comics' *Strange Suspense Stories* No. 33, *Director of the Board*); *see also* Ex. 60 at 2, 8 (*Amazing Fantasy* No. 15 (1962), the issue in which Spider-Man and Ditko's Aunt May character first appeared) *compare* Ex. 79, "All Those Eyes" at 1-3 (Aunt May's forerunner character appeared in Ditko's story in Charlton Comics' *Out of this* | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | *World* No. 6 (1957)); *see also* Ex. 76 at 1, 4 (Ditko's Electro character in *Amazing Spider-Man* No. 9 (1964)); *compare* Ex. 77 at 1, 4-5 (Ditko's electrically powered man, the predecessor of Electro, first appeared in Charlton Comics' *Strange Suspense Stories* No. 48 (1960)); *see also* Ex. 78 at 1, 5-6, 8-9 (Ditko introduces the Chameleon—a character who used various masks to carry out his villainy—in *Amazing Spider-Man* No. 1 (1963)); *compare* Ex. 79, "All Those Eyes" at 2-3 (Chameleon precursor—a spy character who used various masks in his espionage with a similar back story as the Chameleon—appeared in Ditko's "All Those Eyes" story he sold to Charlton Comics in 1957); Ex. 82 (Lee explaining in January 9, 1966 published interview: "**I don't plot Spider-Man any more. Steve Ditko, the artist, has been doing the stories.** I guess I'll leave him alone until sales start to slip. Since Spidey got so popular, Ditko thinks he's the genius of the world. We were arguing so much over plot lines I told him to start making up his own stories. **He won't let anybody else ink his drawings either. He just drops off the finished pages with notes at the margins and I fill in the dialogue. I never know what he'll come up with next**, but it's interesting to work that | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | way.") (emphasis added); Ex. 83 at 7 (same). **Lee, who was in charge of inserting credits on the comic book covers, publicly and contemporaneously credited Ditko with taking over plotting of the *Spider-Man* and *Dr. Strange* stories beginning at least with issues *Amazing Spider-Man # 25* and *Strange Tales # 135*, respectively.** *See* Toberoff Decl. Ex. 82 (Lee explaining in January 9, 1966 published interview: "**I don't plot Spider-Man any more. Steve Ditko, the artist, has been doing the stories.** I guess I'll leave him alone until sales start to slip. Since Spidey got so popular, Ditko thinks he's the genius of the world. We were arguing so much over plot lines I told him to start making up his own stories. **He won't let anybody else ink his drawings either. He just drops off the finished pages with notes at the margins and I fill in the dialogue. I never know what he'll come up with next**, but it's interesting to work that way.") (emphasis added); Ex. 83 at 7 (same); Ex. 71 at 159 (*Amazing Spider-Man* No. 25: "Sturdy Stevey Ditko dreamed up the plot of this tantalizing tale, and it's full of unexpected surprises!"); Ex. 72 at 225 (*Strange Tales* No. 135: "Plotted and Illustrated by Fandom's Favorite Fiend: Steve Ditko"). | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| *Ditko Worked Closely and Continuously for Marvel During the Time Period* | | |
| 45.     Marvel kept Ditko busy so that he—like other freelancers—performed much of his work for Marvel during the Time Period. Lens Decl., Ex. 25 (reflecting Ditko's work for Marvel from the 1950s to 1990s); Lens Decl., Ex. 15 19:1-10 (Lee testifying that "there were a few artists that [he] worked with more than others," including Ditko); Lens Decl., Ex. 2 144:22-145:22 (Thomas testifying as to Lee's practice of "keep[ing] [freelancers] busy" so that they "always had work at hand and didn't have much downtime where they weren't making any money"); Lens Decl., Ex. 2 316:1-10 (Thomas testifying that Lee employed the Marvel Method to "keep [artists] busy by giving them a plot . . . that way the artist didn't have the downtime and lose money"); *see also* Lens Decl., Ex. 72 at 4 (recalling Ditko toiling at his artist's desk in the early 1960s "tortured by [] deadlines"); Lens Decl., Ex. 73 at 3 (Ditko noting that Kirby was "buried under work" and needed to work fast "to keep up with the assignments Lee was throwing at him"); Thomas Decl. ¶¶ 16-17 ("I understood that Steve Ditko was performing most, if not all, of this work for Marvel"). | **Counterclaimant admits that Ditko regularly submitted freelance material to Magazine Management in the Period, but notes that Ditko was regularly submitting material to other publishers, including Charlton Comics as well.** *See* Toberoff Decl. Ex. 1 at 21 (Evanier Rep. describing Ditko's common practice of selling freelance work to various publishers during the Period); Ex. 12 ¶ 18 (Evanier attesting that Ditko was submitting freelance *Spider-Man* material to Marvel but was also selling work to Charlton Comics at the same time); Ex. 23 at 160:2-8 (Mark Ditko testifying that Ditko was selling work to both Marvel and Charlton Comics in the 1960s); Ex. 35 at DITKO-0199 (Ditko writing about his work at Charlton Comics in the 1960s); Ex. 57 at 2 (Ditko writing about creating material for Charlton Comics and DC Comics); Ex. 35 at DITKO-0199 (Ditko writing about his work at Charlton Comics in the 1960s); Ex. 57 at 2 (Ditko writing about creating material for Charlton Comics and DC Comics); Ex. 3 at 207:12-22 (Romita testifying that freelancers were free to sell work to other publishers); Ex. 9 ¶ 11 (Steranko attesting that Marvel had no contract with Steranko | **This fact remains undisputed**.<br><br>Defendant admits that Ditko regularly did work for Marvel, but suggests that Ditko was also "regularly submitting material to other publishers" in the Time Period. However, he cites no admissible evidence demonstrating that most of Ditko's comic work during the Time Period was not done for Marvel.  This fact is therefore undisputed.  *See* Local Rule 56.1(b)-(d); *see also Parks Real Estate*, 472 F.3d at 41; *Giannullo*, 322 F.3d at 140.<br><br>MCI also **objects** to Toberoff Exhibits 1, 9, 12, 13, 23, 35, and 57.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [12], [13], [15], [32], [41], & [52]. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | and so he was free to sell work to other publishers); Ex. 13 ¶¶ 5-6 (Adams attesting that he sold work to both Marvel and DC Comics during the 1960s and 1970s); Ex. 17 at 298:8-14, 301:14-303:7 (Thomas testifying that Marvel did not have contracts with freelancers prohibiting them from selling work to other publishers). | |
| 46.    Ditko performed his work for Marvel primarily under the "Marvel Method." Lens Decl., Ex. 48 at 2 (Ditko describing his working method with Stan Lee on *Amazing Adult Fantasy* in 1961); Lens Decl., Ex. 52 at 4 (Ditko writing that he "had an issue/monthly sheet"); Lens Decl., Ex. 46 at 3 (Ditko explaining that Stan Lee "create[ed]" the "Spider-Man" name and then wrote the original "synopsis for the artist [(i.e., Ditko)]"); Lens Decl., Ex. 2 312:1-5 ("Stan and Steve had worked in the usual way. They would get together, talk over the story. And then whatever Stan finally approved that Steve should do, Steve would go home and start drawing."); Lens Decl., Ex. 2 314:10-12 (Thomas testifying that Ditko's work with Lee was "a version of the Marvel method"); Lens Decl., Ex. 9 18:9-13 (Lieber testifying that "there was usually one story for Ditko in the books and Stan liked to write that himself, so he | **Counterclaimant disputes that Ditko submitted material under any purported Marvel "method" as Ditko was fiercely independent, rejected Lee's input, refused to make changes to his work. In fact, that is why Lee stopped communicating with Ditko for much of the Period, and when Ditko was in complete control over his stories. Moreover, Ditko originated the *Dr. Strange* character completely on spec, and others like Aunt May, Norman Osborn, Electro, and the Chameleon on his own years prior, and not pursuant to any trumpeted "Marvel Method."** *See* Toberoff Decl. Ex. 82 (Lee explaining in January 9, 1966 published interview: "**I don't plot Spider-Man any more. Steve Ditko, the artist, has been doing the stories.** I guess I'll leave him alone until sales start to slip. Since Spidey got so popular, Ditko thinks he's the genius of the world. We were arguing so much over | **This fact remains undisputed.** That Ditko may have been difficult to work with proves nothing. As explained in MCI's Reply in Support of Undisputed Fact 3, Ditko worked pursuant to the Marvel Method until sometime in 1965, at the end of the Time Period.  *Compare* Lens Decl., Ex. 48 at 2 ("Stan provided the plot ideas.  There would be a discussion to clear up anything, consider plot options and so forth . . . We would go over the penciled story/art pages and I would explain any deviations, changes, and additions, noting anything to be corrected before or during the inking."), *with Kirby*, 726 F.3d at 126 ("The first step was for Lee to meet with an artist at a 'plotting conference' ... Lee would provide the artist with a 'brief outline' or 'synopsis' of an issue; sometimes he would 'just talk ... with the |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| made it up and he worked with Ditko"); Lens Decl., Ex. 13 20:7-21:25 (Lee testifying about the Marvel Method, using Ditko as an example). | plot lines I told him to start making up his own stories. **He won't let anybody else ink his drawings either. He just drops off the finished pages with notes at the margins and I fill in the dialogue. I never know what he'll come up with next,** but it's interesting to work that way.") (emphasis added); Ex. 83 at 7 (same); Ex. 7 at 223:18-225:20, 277:11-13 (Thomas testifying that Ditko did all the plotting on *Spider-Man* and *Dr. Strange* stories while he and Lee were not speaking and that Ditko never received any plots from Thomas when Thomas was doing the dialoguing on *Dr. Strange*); *id.* at 262:4-264:19 (Thomas testifying that, when Thomas began to dialogue *Dr. Strange* stories instead of Lee, Ditko would type his suggested captions and dialogue on a separate page, not in the margins, and then give them to Thomas to fill in the dialogue balloons); Ex. 71 at 159 (*Amazing Spider-Man* No. 25: "Sturdy Stevey Ditko dreamed up the plot of this tantalizing tale, and it's full of unexpected surprises!"); Ex. 72 at 225 (*Strange Tales* No. 135: "Plotted and Illustrated by Fandom's Favorite Fiend: Steve Ditko"); Ex. 17 at 311:18-312:25 (Thomas testifying that Ditko, on his own, plotted and drew *Spider-Man* for more than one year before he left in 1966, did | artist' about ideas …. [and t]he artist would then 'draw it any way they wanted to.'"). And here, as in *Kirby*, the fact that Ditko "had a freer hand within this framework than did comparable artists" is immaterial to whether Ditko worked at Marvel's instance and expense. *Id.* <br><br> Further, contrary to Defendant's contention, Ditko did not "originate" Doctor Strange or any other character he contributed to the Works "on spec," as explained in MCI's Reply in Support of Undisputed Facts 22 and 32. And, in any event, Defendant's contentions regarding character "creation" are immaterial, as the Second Circuit's decision in *Kirby* confirms. *See* MCI's Reply in Support of Undisputed Fact 22. <br><br> MCI also **objects** to Toberoff Exhibits 3, 14, 23, 25, 27, 33, 35, 58, 59, 61, 65, 67, 75, 77, and 79. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [8], [17], [33], [34], [35], [39], [41], [53], [54], [55], [57], [58], [59], [60], & [61]. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | not work pursuant to the Marvel Method, and that Lee would not even know anything about the story until it was penciled and submitted by Ditko); *id.* at 84:18-90:9 (Thomas testifying that Ditko wrote extensive margin notes describing the plot and what was happening so that when Lee/Thomas dialogued the story, they could do so in a way that corresponded with what Ditko had intended); Ex. 19 at 6-8 (Thomas interview explaining that Ditko and Lee were not speaking in 1965 and Ditko was plotting both *Spider-Man* and *Dr. Strange* and would only come to the office to drop work off with Brodsky); Ex. 26 at 83 (Lee writing that Ditko came up with the *Dr. Strange* plots and illustrated the story and Lee only added the dialogue); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script); Ex. 28 (Lee writing that Ditko was the co-creator of Spider-Man and that Ditko did most of the plotting of *Spider-Man* and just left Lee to do the dialogue and some captions); Ex. 14 at 7 (Evanier Rebuttal Rep. explaining Ditko's practice of refusing to make changes and in such case, Marvel's custom of having staff | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | make such changes after the work had been submitted to and purchased by Marvel); *id.* at 11, 13 (Evanier Rebuttal Rep. explaining the custom and practice of comic book publishers to reserve the right to purchase or not purchase freelancers' submitted material, and that freelancers were free to decline to make changes to their work); Ex. 3 at 75:18-20, 243:13-244:23, 246:5-9 (Romita testifying that he, or someone else Lee could find in the Marvel office, would be asked to make changes to other artists' work after it had been submitted and would not be paid any extra for making these changes and noting specifically that when Lee did not like something on a Ditko cover, he asked Kirby to change it); Ex. 19 at 6, "Legends at Loggerheads!" (Thomas explaining example of when Lee incorrectly dialogued a *Spider-Man* story in a way Ditko had not intended, Ditko refused to accede to Lee's chosen direction); Ex. 21 at 41:7-18 (Steranko testifying that Marvel had production assistants to make changes to work after it had been submitted by artists); Ex. 35 at DITKO-0193 (Ditko writing that he ignored comments from Lee and Brodsky and only made changes to stories when he agreed with them); Ex. 35 at DITKO-0192, DITKO-0207-0210, DITKO-0215- | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | 0218 (Ditko writing that he rejected several of Lee's *Spider-Man* story ideas and characters such as, for instance, Lee's idea for a Spider-Woman character, or Lee's idea of making Aunt May more glamorous); Ex. 58 at 4 (Ditko writing that he "refused to do a drunken Iron Man splash page—someone else had to draw [and] ink it"); Ex. 25 (Ditko: "Dr. Strange has always been a contradiction to Marvel heroes ... He is my creation, and at one point I took over all stories, writing, [and] art."); Ex. 26 at 83 (Lee writing that Ditko came up with the *Dr. Strange* plots and illustrated the story and Lee only added the dialogue to the balloons); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script); Ex. 35 at DITKO-0189 (Ditko writing that he left Marvel in 1966); *id*. at DITKO-0193 (Ditko writing that he and Lee stopped speaking around 1964 and thus from then on, Ditko had complete creative control of the *Spider-Man* and *Dr. Strange* stories, which he was plotting and penciling until he left in 1966); Ex. 30 at 2021MARVEL-0050281 (Lee writing that Dr. Strange "'twas [Ditko's] idea," in a contemporaneous letter dated January 9, | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
|  | 1963 and noting the story was a "5-page filler"); Ex. 33 (Ditko's letter post-marked August 6, 1946 to his brother Patrick Ditko enclosing an early sketch of Dr. Strange); Ex. 59 at 61:15-65:14 (Patrick Ditko, being shown composite Ex. 33 and testifying that his brother, Steve Ditko, sent him this letter in 1946, while Ditko was in military service abroad, enclosing Ditko's early sketch of Dr. Strange (Ex. 33) and that he had found Ex. 33 at his home amongst letters he had kept from his brother); Ex. 23 at 166:5-168:8 (Mark Ditko testifying that his father lived at the address written on the letter envelope of composite Ex. 33, and that, in 1946 (postmarked on the letter envelope), his uncle Ditko was in the military, stationed abroad in Germany); Ex. 62 at 4-5 (Dr. Strange used his hands to cast teleportation and other spells in *Strange Tales* No. 139 (1965)); Ex. 63 at 2 (same in *Strange Tales* No. 126 (1964)); Ex. 70 at 8-9 (same in *Strange Tales* No. 129 (1965)); *compare* Ex. 61 at 3 (Ditko's character used his hands to cast spells in 1959 in Charlton Comics' *Space Adventures* No. 27); *see also* Ex. 66 at 10 (in *Strange Tales* No. 137 (1965), Dr. Strange used a device—the Eye of Agamotto—to transport through space and time); *compare* Ex. 65 at 4-5 (In |  |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | Charlton Comics' *Out of this World* No. 7 (1958), Ditko's character used similar artifact to transport characters in a swirl of visual effects through space and time); *see also* Ex. 68 at 4-5 (in *Strange Tales* No. 122 (1964), Dr. Strange traversed through different dimensions and journeyed through alternate planes of existence); Ex. 69 at 1 (same in *Strange Tales* No. 134 (1965)); *compare* Ex. 67 at Cover, 4-5 (Ditko used same effect in Charlton Comics' *Strange Suspense* No. 32 (1957)); *see also* Ex. 73 at 6 (Norman Osborn's first appearance in the *Spider-Man* series in 1965); Ex. 74 at 10 (Norman Osborn's identity revealed to readers in *Amazing Spider-Man* No. 37 (1966)); *compare* Ex. 75 at 1-2 (Norman Osborn's precursor—including corporate villainy and distinct curled hairstyle—in 1957 in Charlton Comics' *Strange Suspense Stories* No. 33, *Director of the Board*); *see also* Ex. 60 at 2, 8 (*Amazing Fantasy* No. 15 (1962), the issue in which Spider-Man and Ditko's Aunt May character first appeared) *compare* Ex. 79, "All Those Eyes" at 1-3 (Aunt May's forerunner character appeared in Ditko's story in Charlton Comics' *Out of this World* No. 6 (1957)); *see also* Ex. 76 at 1, 4 (Ditko's Electro character in *Amazing Spider-Man* No. 9 (1964)); *compare* Ex. | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | 77 at 1, 4-5 (Ditko's electrically powered man, the predecessor of Electro, first appeared in Charlton Comics' *Strange Suspense Stories* No. 48 (1960)); *see also* Ex. 78 at 1, 5-6, 8-9 (Ditko introduces the Chameleon—a character who used various masks to carry out his villainy—in *Amazing Spider-Man* No. 1 (1963)); *compare* Ex. 79, "All Those Eyes" at 2-3 (Chameleon precursor—a spy character who used various masks in his espionage with a similar back story as the Chameleon—appeared in Ditko's "All Those Eyes" story he sold to Charlton Comics in 1957). | |
| 47.    After gaining experience working with Marvel, Marvel afforded Ditko (like Jack Kirby) more artistic discretion, subject always to Marvel's (*i.e.*, Goodman's and Lee's) ultimate authority. Lens Decl., Ex. 15 19:1-10 (Lee testifying that "there were a few artists that [he] worked with more than others," including Ditko); Lens Decl., Ex. 45 at 4 (Ditko explaining in 1965 that he was "*allowed* to drift" from his assigned scripts) (emphasis added); Lens Decl., Ex. 25 (reflecting Ditko's work for Marvel from the 1950s to 1990s); Lens Decl., Ex. 48 at 2 (Ditko explaining how *Amazing Adventures* "came about because of the 5- | **Counterclaimant admits that Magazine Management had authority over what it would purchase and what it would publish, as does any publisher, but disputes that it had any "authority" over Ditko, as Ditko was an independent freelance artist with whom "Marvel" specifically avoided any contractual relationship.** Marvel has not produced any contemporaneous agreement with Ditko from the Period for his creative services, nor any other evidence reflecting any bilateral rights and obligations between Ditko and Magazine Management (nor any other alleged Marvel predecessor) in the Period, nor has | **This fact remains undisputed.** Defendant's suggestion that Marvel did not have ultimate authority over Ditko's contributions to Marvel comics because Ditko had no written employment agreement with Marvel incorrect, turns on improper legal argument, and—in any event—is immaterial, as the Second Circuit's decision in *Kirby* confirms.  *See* MCI's Reply in Support of Undisputed Fact 2. Further, the evidence demonstrates that Ditko worked pursuant to assignments fom Marvel, subject to Marvel's |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| page twist-ending stories we [Lee and Ditko] had done as back-ups in *Strange Tales*" and others); Lens Decl., Ex. 2 307:25-308:3 (Thomas testifying that *Amazing Fantasy* was comprised of little short stories by – written by Stan Lee and drawn by Steve Ditko entirely"); Lens Decl., Ex. 4 124:3-18 (Lee testifying about his collaboration with Ditko on *Amazing Fantasy*); *see also* Lens Decl., Ex. 45 at 4. | Marvel alleged that any such agreement or bilateral legal rights and obligations existed between such parties in the Period. *See* Toberoff Decl. Ex. 17 at 298:8-14 (Thomas testifying that freelancers did not have contracts with Marvel until Thomas's in 1974, which was the first); Ex. 36 at 7 (Marvel admitting it had no written contract with Ditko in the 1960s); Ex. 24 at 89:2-11 (Levitz testifying that freelancers were free to decline "assignments"); Ex. 1 at 10 (Evanier Rep. describing the common practice of freelancers selling material to more than one publisher, including Marvel, DC Comics, and Charlton Comics); Ex. 3 at 207:12-22 (Romita testifying that freelancers were free to sell work to other publishers); Ex. 9 ¶ 11 (Steranko attesting that Marvel had no contract with Steranko and so he was free to sell work to other publishers); Ex. 13 ¶¶ 5-6 (Adams attesting that he sold work to both Marvel and DC Comics during the 1960s and 1970s); Ex. 23 at 160:2-8 (Mark Ditko testifying that Ditko was selling work to both Marvel and Charlton Comics in the 1960s); Ex. 35 at DITKO-0199 (Ditko writing about his work at Charlton Comics in the 1960s); Ex. 57 at 2 (Ditko writing about creating material for Charlton Comics and DC Comics); Ex. 35 | supervision and control, and that Ditko's contributions to the Works were made with Marvel in mind, as explained in MCI's Reply in Support of Undisputed Fact 3.<br><br>MCI also **objects** to Toberoff Exhibits 1, 3, 9, 13, 21, 23, 25, 27, 35, 57, and 58. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [7], [12], [16], [20], [32], [34], [35], [41], [52], & [53]. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | at DITKO-0192, DITKO-0207-0210, DITKO-0215-0218 (Ditko writing that he rejected several of Lee's *Spider-Man* story ideas and characters such as, for instance, Lee's idea for a Spider-Woman character, or Lee's idea of making Aunt May more glamorous); Ex. 3 at 219:12-24 (Romita testifying that he turned down Lee's offer to submit material to Marvel and preferred to sell freelance work to DC Comics); Ex. 21 at 29:9-30:17 (Steranko testifying that he was not given "assignments," but rather, he had the option to work on some books or to not if he chose not to); Ex. 58 at 4 (Ditko writing that, after he stopped selling his material to Marvel in 1966, he later started working with Marvel again, but refused to do any *Spider-Man* or *Dr. Strange* stories and recounting that when other writers tried to sneak in *Spider-Man* panels for Ditko to work on, he "left [them] blank for someone else to fill in"); *id*. (Ditko writing that he "refused to do a drunken Iron Man splash page—someone else had to draw [and] ink it"); Ex. 82 (Lee explaining in January 9, 1966 published interview: "**I don't plot Spider-Man any more. Steve Ditko, the artist, has been doing the stories.** I guess I'll leave him alone until sales start to slip. Since Spidey got so popular, Ditko thinks he's the genius of the world. We were | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | arguing so much over plot lines I told him to start making up his own stories. **He won't let anybody else ink his drawings either. He just drops off the finished pages with notes at the margins and I fill in the dialogue. I never know what he'll come up with next**, but it's interesting to work that way.") (emphasis added); Ex. 83 at 7 (same); Ex. 1 at 10 (Evanier Rep. describing the common practice of freelancers selling material to more than one publisher, including Marvel, DC Comics, and Charlton Comics); Ex. 3 at 207:12-22 (Romita testifying that freelancers were free to sell work to other publishers); Ex. 9 ¶ 11 (Steranko attesting that Marvel had no contract with Steranko and so he was free to sell work to other publishers); Ex. 13 ¶¶ 5-6 (Adams attesting that he sold work to both Marvel and DC Comics during the 1960s and 1970s; Ex. 17 at 298:8-14, 301:14-303:7 (Thomas testifying that Marvel did not have contracts with freelancers prohibiting them from selling work to other publishers); Ex. 35 at DITKO-0192, DITKO-0207-0210, DITKO-0215-0218 (Ditko writing that he rejected several of Lee's *Spider-Man* story ideas and characters such as, for instance, Lee's idea for a Spider-Woman character, or Lee's idea of making Aunt May more | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | glamorous); Ex. 58 at 4 (Ditko writing that he "refused to do a drunken Iron Man splash page—someone else had to draw [and] ink it"); Ex. 17 at 311:18-312:25 (Thomas testifying that Ditko plotted and drew *Spider-Man* stories completely on his own for more than one year before he left in 1966); Ex. 25 (Ditko: "Dr. Strange has always been a contradiction to Marvel heroes ... He is my creation, and at one point I took over all stories, writing, [and] art."); Ex. 26 at 83 (Lee writing that Ditko came up with the *Dr. Strange* plots and illustrated the story and Lee only added the dialogue [in the balloons]); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script); Ex. 71 at 159 (*Amazing Spider-Man* No. 25: "Sturdy Stevey Ditko dreamed up the plot of this tantalizing tale, and it's full of unexpected surprises!"); Ex. 72 at 225 (*Strange Tales* No. 135: "Plotted and Illustrated by Fandom's Favorite Fiend: Steve Ditko"). | |
| **DITKO—LIKE OTHER MARVEL FREELANCERS— WORKED AT MARVEL'S EXPENSE** | | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| 48.     During the relevant period, Marvel did not purchase any work "on spec" from Ditko or any other freelancer. Lens Decl., Ex. 2 152:1-154:7 (Thomas testifying that he could not "think of any instances" in which "artists start[ed] working on pages for a comic before discussing the plot or synopsis with Stan or the writer," or, more specifically, in which Ditko "submitted artwork to Marvel for an existing comic book series that he hadn't been assigned to," or otherwise sold plots, synopses, scripts, dialogue, artwork, or characters "on spec" to Marvel); Lens Decl., Ex. 12 56:12-15 (Thomas testifying that artists did not "start working on pages before discussing the plot or synopsis with Stan or the writer"); Lens Decl., Ex. 12 57:25-58:9 (Thomas confirming that he was not "aware of any instance where a writer came in and actually started working on a new series before Stan said: Go ahead and write the series," nor was he "aware of any instances where an artist began work on a comic book issue before getting the assignment to do the issue from Stan"); Lens Decl., Ex. 12 58:14-23 (Thomas confirming that, during the relevant period, Marvel did not "ever buy any work created on spec by freelance artists"); Lens Decl., Ex. 7 217:13-21 | **Counterclaimant disputes that Marvel did not purchase any freelance material "on spec" as, for example, Ditko created the first Dr. Strange story "on spec" and more generally, Marvel reserved the right to reject and not pay for submitted freelance material (and not pay for redrawing) after Ditko had invested significant time and resources, and thus, by definition, Ditko created his freelance material with no contractual or financial guarantee— and thus, "on spec." Whether Ditko was paid for his pages more often than not is unknown but, in any event, irrelevant to the legal reality of the circumstances under which he created his material.** *See* Toberoff Decl. Ex. 1 at 21 (Evanier Rep. providing historical context of the first publication of Ditko's Dr. Strange character which began as a five-page story Ditko wrote and drew on spec introducing the character which he presented to Lee); Ex. 25 (Ditko: "Dr. Strange has always been a contradiction to Marvel heroes ... He is my creation, and at one point I took over all stories, writing, [and] art."); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script); | **This fact remains undisputed.**

Defendant's suggestion that Ditko created Doctor Strange "on spec" and "sold" him to Marvel is incorrect and improper legal argument.  As with all freelancer's work for Marvel, Ditko's contributions to Doctor Strange were made pursuant to assignments from Lee, who directed and supervised the creation of the Works, which Ditko contributed to with Marvel in mind, and Ditko was compensated by Marvel on an agreed per-page basis for completed assignments.  *See* MCI's Reply in Support of Facts 22, 32, and 49.

Further, Defendant's contention that Marvel could reject or request revisions to Ditko's work demonstrates that such work was done on a work-for-hire basis—*not* "on spec."  *Kirby*, 726 F.3d at 141 (holding Jack Kirby "did not work on 'spec' (speculation)" because "he worked within the scope of Marvel's assignments and titles" and Marvel "had the power to reject Kirby's pages and require him to redo them, or to alter them, a power it exercised from time to time").

Finally, Defendant's suggestion that Ditko worked on Marvel comic books "on spec" because Ditko lacked a written |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| (same); Lens Decl., Ex. 13 41:20-42:9 (Lee testifying that he could not recall "Marvel ever buy[ing] work that was created by one of the writers or freelancers on spec as opposed to having the material being part of an assignment that [Lee] would give him" during the Time Period); Lens Decl., Ex. 10 383:18-21 (Lee confirming that Jack Kirby did not "ever begin work on a book published by Marvel before [Lee] had assigned him that work"); Lens Decl., Ex. 6 38:8-21 (Lee confirming that he could not "recall any comic book that Marvel published prior to 1972 . . . that was created other than pursuant to a specific assignment by an editor to a writer and an artist"—at least, in Marvel's "regular comics"). | Ex. 30 at 2021MARVEL-0050281 (Lee writing that Dr. Strange "'twas [Ditko's] idea," in a contemporaneous letter dated January 9, 1963 and noting the story was a "5-page filler"); Ex. 57 at 2 (Ditko writing that Dr. Strange started out as a "5-page filler," which was a great opportunity to try out all kinds of ideas like Dr. Strange, which "never fit in to Marvel's world of heroes"); Ex. 33 (Ditko's letter post-marked August 6, 1946 to his brother Patrick Ditko enclosing an early sketch of Dr. Strange); Ex. 59 at 61:15-65:14 (Patrick Ditko, being shown composite Ex. 33 and testifying that his brother, Steve Ditko, sent him this letter in 1946, while Ditko was in military service abroad, enclosing Ditko's early sketch of Dr. Strange (Ex. 33) and that he had found Ex. 33 at his home amongst letters he had kept from his brother); Ex. 23 at 166:5-168:8 (Mark Ditko testifying that his father lived at the address written on the letter envelope of composite Ex. 33, and that, in 1946 (postmarked on the letter envelope), his uncle Ditko was in the military, stationed abroad in Germany); Ex. 17 at 295:8-296:8, 297:1-20 (Thomas testifying that Marvel could accept or reject submitted freelance material in its sole discretion); Ex. 15 at 22-23 (Levitz Rep. explaining that it was the custom and | employment agreement is incorrect, turns on improper legal argument, and—in any event—is immaterial, as the Second Circuit's decision in *Kirby* confirms.  *See* MCI's Reply in Support of Undisputed Fact 2.  MCI also **objects** to Toberoff Exhibits 1, 2, 10, 11, 13, 14, 16, 20, 21, 22, 23, 25, 27, 33, 43, 44, 52, 53, 57, and 59.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [3], [13], [14], [16], [17], [18], [19], [20], [24], [25], [33], [34], [35], [39], [44], [45], [49], [50], [52], & [54]. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | practice for comic book publishers to have the right to reject work submitted by freelancers and to pay only for the pages which were accepted); Ex. 1 at 15 (Evanier Rep. describing the comic book industry and Marvel's custom and practice of not paying freelancers for material they rejected); Ex. 14 at 3, 7 (Evanier Rebuttal Rep. explaining the custom and practice in the comic book industry in the Period, including at Marvel, to not pay for any freelance material rejected by the publishers); Ex. 10 ¶ 11 (Ayers attesting that was not paid for rejected material or for having to redo material); Ex. 11 ¶ 9 (Colan attesting that Marvel only paid for the pages it accepted); Ex. 13 ¶¶ 8, 10-11 (Adams attesting that he bore the risk of creation because there was no guarantee his work would be purchased by Marvel); Ex. 16 at 117:6-121:4 (Solo testifying that Colan was not paid for rejected work and that her father was so upset by this periodic waste of his efforts that he would commonly use the rejected, unpaid-for pages of artwork to pick up their family dog's feces); Ex. 20 at 73:14-74:24 (Evanier testifying that Marvel had asked Evanier to submit some work in the 1970s prior to 1978, for a new magazine, but that after he did the work, Marvel declined to buy it or pay for it since it | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | decided not to publish the magazine after all); Ex. 21 at 29:9-30:17 (Steranko testifying that Lee sometimes rejected the work Steranko submitted on spec); Ex. 2 at 100:3-101:9 (Lieber testifying about a time he witnessed Kirby's work being rejected and Kirby tearing up and throwing away the rejected pages); Ex. 22 at 155:17-156:4, 259:5-16, 267:5-269:21 (Lieber testifying that he was only paid for work that was accepted by Marvel and recalls at least one instance where he submitted a plot which Marvel rejected and did not pay for); Ex. 24 at 14:12-19, 104:16-105:11 (Levitz testifying that Marvel had the right to reject material and not pay for it); Ex. 43 ¶ 3(a) (Marvel's contract with Colan dated March 22, 1975 providing that Colan would be paid only for those pages which Marvel accepted and requiring Colan to make changes to his work without any additional compensation); Ex. 44 ¶ 3(a) (Marvel's contract with Thomas dated September 1, 1974 providing that Thomas would be paid only for those pages which Marvel accepted and requiring Thomas to make changes to his work without any additional compensation); Ex. 53 ¶ 3(a) (Marvel's contract with Thomas dated August 27, 1976 with same provision); Ex. 52 ¶ 3(a) (Marvel's October 7, 1977 | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | contract with Gerber providing Gerber would be paid only for those pages Marvel accepted and that Gerber "will make all changes and rework all Material ... without charge"). | |
| 49.    Marvel paid a flat, per-page rate to Ditko for his work on Marvel assignments, as it did with other freelancers. Lens Decl., Ex. 2 141:25-142:15 (Thomas testifying that freelance writers, artists, pencilers, inkers, letterers, and colorists all were paid by Marvel on a per-page rate); Lens Decl., Ex. 4 125:15-18 (Lee confirming that, to his recollection, Ditko was paid a per-page rate "for his contribution to . . . Spider-Man"); Lens Decl., Ex. 2 292:18-293:4 (Thomas explaining Marvel's per-page rate system, in that compensation "was based entirely on the page, whether it took ten minutes to write or an hour to write or five hours to write"); Lens Decl., Ex. 2 332:23-333:4 (Thomas testifying that Marvel had "always" used "a page rate kind of system for writers and for artists" during the Time Period); Lens Decl., Ex. 13 30:11-14 (Lee confirming that freelancers "were paid on a per page rate" during the Time Period); Lens Decl., Ex. 13 58:13-21 (same as to Jack Kirby); Lens Decl., Ex. 39 at 5 (Thomas | **Counterclaimant disputes Marvel's use of the term "assignments," and further notes that Marvel _purchased_ material from Ditko.** *See* Counterclaimant's Response to Marvel's Statement 47 incorporated herein by reference. *See also* Toberoff Decl. Ex. 5 at 371:3-25 (Lee testifying that Marvel "would only buy what [it] needed"); Ex. 1 at 15 (Evanier Rep. describing the comic book industry and Marvel's custom and practice of purchasing freelance work by the page, and not paying freelancers fixed wages or for their services or time); Ex. 14 at 3 (Evanier Rebuttal Rep. explaining the custom and practice of comic book publishers in the Period, including at Marvel, to pay for only those pages they chose to accept and purchase, and to not pay for a freelancer's time or services); Ex. 8 ¶ 11 (Sinnott attesting that Marvel only paid him for the pages it accepted); Ex. 9 ¶ 14 (Steranko attesting that he was only paid for the pages Marvel accepted); Ex. 10 ¶ 11 (Ayers attesting that he was paid per page for freelance material which | **This fact remains undisputed**.

Defendant does not dispute that Marvel paid Ditko a flat, per-page rate for artwork it accepted.  Indeed, there is **no evidence** that Marvel ever did not pay Ditko for a page.  Defendant instead **disputes** that Ditko did "assignments" for Marvel, which is incorrect and unsupported by any evidence.  As explained in MCI's Reply in Support of Undisputed Fact 3, Marvel assigned Ditko, like other freelancers, to contribute to specific Marvel comic books and could reassign him to different comics when it deemed it necessary or appropriate to do so.

Further, Defendant's semantic argument over whether Marvel "purchased" material as opposed to the contributor being "paid" for their is immaterial.  *See Kirby*, 726 F.3d at 142 (noting that "Marvel and Kirby had a standing engagement whereby Kirby would produce drawings designed to fit within specific Marvel universes that his |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| recounting that the day Ditko quit Marvel, noting that Marvel production manager Sol Brodsky "had a memo on his desk for a $5 a page raise for Steve, which was fairly substantial for 1965"); Lens Decl., Ex. 57 at 3 (Ditko writing "What I did with Spider-man, I was paid for. Marvel's property."); Lens Decl., Ex. 68A-G (freelance writer Don Heck's payment ledger reflecting extensive entries on per-page basis for his work for "Mag. Management," "Maga. Management," "Magazine Management," and "Marvel" from 1954 to 1972 and intermittently until 1994, when all entries end); Lens Decl., Ex. 2 137: 8-16 (Thomas testifying that he was "paid on a per-page basis for [his] freelance writing assignments from Marvel"); Lens Decl., Ex. 10 396:1-10 (Lee testifying that for his work as a writer, he "was paid on a freelance basis, like any freelancer writer . . . paid by the page"); Lens Decl., Ex. 6 40:14-20 (Lee testifying that as a writer he was paid"[p]er page on a freelancer basis like all the other writers."); *see also* Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7, 226:7-11, 249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20. | Marvel accepted); Ex. 13 ¶¶ 9-11 (Adams attesting that Marvel only paid him for pages which it accepted); Ex. 17 at 292:24-293:15 (Thomas testifying that freelancers were only paid for the final, accepted page); Ex. 43 ¶ 3(a) (Marvel's contract with Colan dated March 22, 1975 providing that Colan would be paid only for those pages which Marvel accepted and requiring Colan to make changes to his work without any additional compensation); Ex. 44 ¶ 3(a) (Marvel's contract with Thomas dated September 1, 1974 providing that Thomas would be paid only for those pages which Marvel accepted and requiring Thomas to make changes to his work without any additional compensation); Ex. 53 ¶ 3(a) (Marvel's contract with Thomas dated August 27, 1976 with same provision); Ex. 52 ¶ 3(a) (Marvel's October 7, 1977 contract with Gerber providing Gerber would be paid only for those pages Marvel accepted and that Gerber "will make all changes and rework all Material ... without charge"). | *previously purchased pages* had helped to define") (emphasis added).  What matters is that Marvel paid for or "purchased" pages from Ditko that he contributed to pursuant to an assignment from Marvel, subject to Marvel's supervision and control, and with Marvel specifically in mind.  *See id.* at 141 ("Kirby's works during this period were hardly self-directed projects in which he hoped Marvel, as one of several potential publishers, might have an interest; rather, he created the relevant works pursuant to Marvel's assignment or with Marvel specifically in mind. Kirby's ongoing partnership with Marvel, however unbalanced and under-remunerative to the artist, is therefore what induced Kirby's creation of the works.").<br><br>MCI also **objects** to Toberoff Exhibits 1, 8, 9, 10, 13, 14, 43, 44, 52, and 53.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [11], [12], [13], [16], [17], [44], [45], [49], & [50]. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| 50.    Marvel paid Ditko, like other freelancers, his per-page rate for his work even if Marvel required changes or did not ultimately publish the pages. Lens Decl., Ex. 2 142:21-143:15 (Thomas testifying that Marvel paid "a flat rate" and "didn't generally pay extra for revisions."); Lens Decl., Ex. 2 158:17-20 (Thomas testifying that he recalled "a few instances" where "Marvel paid an artist their per-page rate for their artwork but decided not to publish it"); Lens Decl., Ex. 2 297:14-20 (Thomas testifying that Marvel would pay out its per-page rates "if a new page came in that they accepted"); Lens Decl., Ex. 12 68:2469:6 (Thomas testifying that "if an artist's work required that changes be made, [] the artist have been paid for the original work that they submitted"); Lens Decl., Ex. 12 74:19-25 (Thomas testifying that he was still paid for "any materials that [he] submitted in [his] freelance capacity that were modified by Stan"); Lens Decl., Ex. 13 18:6-16 (Lee testifying that "[e]ven if we didn't publish – if an artist drew a 10-page story, and the artist rate was $20 a page, I would put in a voucher for $200 for that artist. Now, if – and this happened rarely – but if we decided not to use that story, the artist would still keep the money because he had done the work. | **Counterclaimant admits that Magazine Management would only pay for the final page of submitted freelance material it decided to purchase, and that it would not pay for any requested changes or do-overs and would not pay for pages it rejected. There may be instances where Magazine Management accepted and purchased freelance pages for publication but thereafter decided not to publish those pages, but the publisher was crystal clear that it would not pay for material it rejected or for material it wanted to be redone, all in its sole discretion.** *See* Toberoff Decl., Ex. 5 at 371:3-25 (Lee testifying that Marvel "would only buy what [it] needed"); Ex. 15 at 22-23 (Levitz Rep. explaining that it was the custom and practice for comic book publishers to have the right to reject work submitted by freelancers and to pay only for the pages which were accepted); Ex. 1 at 15 (Evanier Rep. describing the comic book industry and Marvel's custom and practice of purchasing freelance work by the page, and not paying freelancers fixed wages or for their services or time); Ex. 14 at 3 (Evanier Rebuttal Rep. explaining the custom and practice of comic book publishers in the Period, including at Marvel, to pay for only those pages they | **This fact remains undisputed.**  Defendant admits that Marvel would pay Ditko and other freelancers their per-page rate for all accepted work, even if Marvel elected not to publish it, but Defendant's arguments about revisions and rejections are non-responsive and incorrect.  While it is true that Marvel would not pay artists *twice* for a page that it requested revisions to, once the page met Marvel's specifications and was accepted the artist was paid his per-page rate.  Defendant also vaguely refers to alleged instances where Marvel "rejected" pages, but it is not clear what Defendant means. Defendant appears to be referring to a situation where Marvel assigned work to a freelancer but due to it being in an unmarketable condition (*i.e.*, failing to conform to the assignment), Marvel refused to accept and therefore refused to pay for it.  While such a scenario may have happened in rare instances at Marvel, there is **no evidence** of that happening to *any* of Ditko's work for Marvel.  And according to former editor-in-chief Roy Thomas, it would be extremely unlikely for Marvel to outright reject pages from a veteran artist like Ditko.  *See* Lens Reply Decl., Ex. 101 at 108:17-109:14 (Thomas testifying about fellow Marvel veteran |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| It wasn't his fault. . . . Everybody was paid per page."); Lens Decl., Ex. 10 376:16-22 (Lee testifying that "[a]ny artists that drew anything that I had asked him or her to draw at my behest, I paid them for it. If it wasn't good, we wouldn't use it. But I asked them to draw it, so I did pay them."); Lens Decl., Ex. 9 30:10-12 (Lieber testifying that he "g[o]t paid for all the work [he] did for Marvel"); Lens Decl., Ex. 68A-G (reflecting number of pages and payment amount for work on various Marvel series); *compare* Lens Decl., Ex. 35 at 9 (Thomas noting that Gil Kane was assigned to and did pencil and ink the cover of *Avengers* #37), *with* Lens Decl., Ex. 68D at 10 (reflecting payment to Don Heck for "Avengers #37 P&I cover"); Lens Decl., Ex. 35 at 12 ("*The Avengers* #37 unused cover art by Don Heck"). | chose to accept and purchase, and to not pay for a freelancer's time or services); Ex. 8 ¶ 11 (Sinnott attesting that Marvel only paid him for the pages it accepted); Ex. 9 ¶ 14 (Steranko attesting that he was only paid for the pages Marvel accepted); Ex. 10 ¶ 11 (Ayers attesting that he was paid per page for freelance material which Marvel accepted); Ex. 13 ¶¶ 9-11 (Adams attesting that Marvel only paid him for pages which it accepted); Ex. 17 at 292:24-293:15 (Thomas testifying that freelancers were only paid for the final, accepted page); Ex. 43 ¶ 3(a) (Marvel's contract with Colan dated March 22, 1975 providing that Colan would be paid only for those pages which Marvel accepted and requiring Colan to make changes to his work without any additional compensation); Ex. 44 ¶ 3(a) (Marvel's contract with Thomas dated September 1, 1974 providing that Thomas would be paid only for those pages which Marvel accepted and requiring Thomas to make changes to his work without any additional compensation); Ex. 53 ¶ 3(a) (Marvel's contract with Thomas dated August 27, 1976 with same provision); Ex. 52 ¶ 3(a) (Marvel's October 7, 1977 contract with Gerber providing Gerber would be paid only for those pages Marvel accepted and that Gerber "will | artist Gene Colan, explaining "[b]y the time [freelancers] got to the status that Gene was at, you know, you knew their work, and  . . . you basically knew what you were going to get from Gene, except for an occasional drawing or an occasional page . . . I have no memory of ever, you know, rejecting or trying to get Stan to reject, you know, a page of his.").<br><br>MCI also **objects** to Toberoff Exhibits 1, 2, 8, 9, 10, 13, 14, 20, 21, 22, 43, 44, 52, and 53.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [3], [4], [11], [12], [13], [16], [17], [19], [20], [24], [25], [44], [45], [49], & [50]. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | make all changes and rework all Material ... without charge"); Ex. 1 at 15 (Evanier Rep. describing the comic book industry and Marvel's custom and practice of not paying freelancers for material they rejected); Ex. 14 at 3, 7 (Evanier Rebuttal Rep. explaining the custom and practice in the comic book industry in the Period, including at Marvel, to not pay for any freelance material rejected by the publishers); Ex. 2 at 100:3-101:9 (Lieber testifying about a time he witnessed Kirby's work being rejected and Kirby tearing up and throwing away the rejected pages); Ex. 10 ¶ 11 (Ayers attesting that was not paid for rejected material or for having to redo material); Ex. 11 ¶ 9 (Colan attesting that Marvel only paid for the pages it accepted); Ex. 13 ¶¶ 8, 10-11 (Adams attesting that he bore the risk of creation because there was no guarantee his work would be purchased by Marvel); Ex. 16 at 117:6-121:4 (Solo testifying that Colan was not paid for rejected work and that her father was so upset by this periodic waste of his efforts that he would commonly use the rejected, unpaid-for pages of artwork to pick up their family dog's feces); Ex. 17 at 295:8-296:8, 297:1-20 (Thomas testifying that Marvel could accept or reject submitted freelance material in its sole discretion); Ex. 20 at | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | 73:14-74:24 (Evanier testifying that Marvel had asked Evanier to submit some work in the 1970s prior to 1978, for a new magazine, but that after he did the work, Marvel declined to buy it or pay for it since it decided not to publish the magazine after all); Ex. 21 at 29:9-30:17 (Steranko testifying that Lee sometimes rejected the work Steranko submitted on spec); Ex. 22 at 155:17-156:4, 259:5-16, 267:5-269:21 (Lieber testifying that he was only paid for work that was accepted by Marvel and recalls at least one instance where he submitted a plot which Marvel rejected and did not pay for); Ex. 24 at 14:12-19, 104:16-105:11 (Levitz testifying that Marvel had the right to reject material and not pay for it); Ex. 43 ¶ 3(a) (Marvel's contract with Colan dated March 22, 1975 providing that Colan would be paid only for those pages which Marvel accepted and requiring Colan to make changes to his work without any additional compensation); Ex. 44 ¶ 3(a) (Marvel's contract with Thomas dated September 1, 1974 providing that Thomas would be paid only for those pages which Marvel accepted and requiring Thomas to make changes to his work without any additional compensation); Ex. 53 ¶ 3(a) (Marvel's contract with Thomas dated August 27, 1976 with same provision); | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | Ex. 52 ¶ 3(a) (Marvel's October 7, 1977 contract with Gerber providing Gerber would be paid only for those pages Marvel accepted and that Gerber "will make all changes and rework all Material ... without charge"); Ex. 1 at 15 (Evanier Rep. describing the comic book industry and Marvel's custom and practice of not paying freelancers to revise or redraw a page, as freelancers were only paid for the final pages the publisher decided to accept and purchase); Ex. 14 at 7 (Evanier Rebuttal Rep. explaining the custom and practice in the comic book industry, including at Marvel, for publishers to not pay for rejected material, or to pay a freelancer to make revisions to his material); Ex. 2 at 102:15-105:17 (Lieber testifying he was not paid for redoing work and that he was only paid for the final pages Marvel accepted); Ex. 8 ¶ 13 (Sinnott attesting that Marvel only paid for the final pages that were sold to Marvel, not for any changes or rejected work); Ex. 9 ¶ 14 (Steranko attesting he was not compensated for having to redo any work); Ex. 10 ¶ 11 (Ayers attesting that he was not paid for rejected material or for having to redo material); Ex. 11 ¶¶ 9, 11 (Colan attesting that Marvel did not pay him for redoing work); Ex. 13 ¶¶ 10-11 (Adams attesting that he was only paid | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
|  | for pages Marvel accepted); Ex. 17 at 142:21-143:15, 296:10-25 (Thomas testifying that freelancers were not paid for having to redo or revise pages and that they would only be paid for the final, accepted page). |  |
| 51.    As with other freelancers, Marvel did not pay royalties or provide profit participation to Ditko. Lens Decl., Ex. 2 139:24-140:20 (Thomas testifying that he did not "receive royalties" or "profit participati[on]" for his Marvel work in the 1960s and 1970s); Lens Decl., Ex. 2 142:16-20 (Thomas testifying that he "was not aware" of any 1960s Marvel freelancers "receiving royalties or profit participation"); Lens Decl., Ex. 7 225:17-226:20 (Thomas testifying that he was "typically paid before the issue hit the stands" and he and other Marvel freelancers were paid "the same page rate regardless of whether the issue they worked on ultimately sold well or not" as Marvel had a "straight page rate system"); Lens Decl., Ex. 13 42:21-43:2 (Lee testifying that Marvel freelance artists "g[o]t paid whether or not a particular book or comic was successful" as "[t]hey were paid when they delivered the artwork"); Lens Decl., Ex. 13 45:4-9 (Lee testifying that he "d[id]'t remember any | **Counterclaimant admits that Marvel did not pay royalties or profit participation to Ditko, but disputes that Marvel did not owe Ditko payment for reprints or use of his creations in other media, which is part of the reason Ditko refused to sell any further work to Marvel at the end of the Period.** *See* Toberoff Decl. Ex. 3 at 44:22-46:12 (Romita testifying that Ditko quit *Spider-Man* because he had personal and professional conflicts with Lee); Ex. 20 at 57:13-59:3 (Evanier testifying that Ditko told him he had been promised by Marvel management additional compensation if his characters were used in other media); Ex. 24 at 124:5-24 (Levitz testifying that Ditko and Lee stopped speaking in the last year of Ditko's time with Marvel because Ditko was not getting proper credit for his contributions). | **Defendant admits this fact is undisputed, and only "disputes" extraneous facts, which is improper.** Defendant admits this fact, as framed by MCI, and it is therefore undisputed.  *See* Local Rule 56.1(b)-(d); *see also Parks Real Estate*, 472 F.3d at 41; *Giannullo*, 322 F.3d at 140. Regardless, Defendant's suggestion that Marvel somehow "owe[d] Ditko payment for reprints" and use of his contributions "in other media" is not only non-responsive but also unsupported by any admissible evidence.  Specifically, Toberoff Exhibits 3 and 24 **do not support** this contention, as each proffers a *different* reason for why Ditko left: Toberoff Exhibit 3 suggests that Ditko left due to personal and political differences between Lee and Ditko, and Toberoff Exhibit 24 suggests that Ditko left due to "discomfort between the two on their |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| royalties"); Lens Decl., Ex. 6 34:22-35:7 (Lee testifying that "[i]t wasn't [Marvel's] policy" and he "can't think of any case" where any compensation was "dependent on the success of the sales of the comic book"). | | working process and the allocation of credit work."<br><br>MCI also **objects** to Toberoff Exhibits 3 and 20.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [5] & [19]. |
| 52.     If a comic book did not sell well or lost money, Marvel (*i.e.*, Goodman) would ultimately bear the loss, not Ditko or other freelancers. Lens Decl., Ex. 2 140:21-141:3 (Thomas confirming that he was paid his same "per page" rate "whether the comic was a hit or a flop" and that "if a comic that [he] worked on lost money from Marvel, Marvel didn't take that out of [his] paychecks"); Lens Decl., Ex. 57 at 4 (Ditko acknowledging that "[p]ublishing comic book titles is a risky, competitive business and with monthly titles and with no guarantees"); Lens Decl., Ex. 13 43:3-44:2 (Lee explaining publisher Martin Goodman's perspective that he had "no guarantee" that Marvel's comic books would sell, faced months-long stretches in which he was "losing money where the books don't sell" but would not "cut [artists'] rate," and was the one "taking all the risk"); *see also* Lens Decl., Ex. 54 at 3; Lens Decl., Ex. 13 58:13-21; Lens Decl., Ex. 6 33:16-34:1; Lens Decl., Ex. 7 178:15-23, | **Counterclaimant disputes that if a book did not sell well, Ditko would not bear any loss, because, if a book were discontinued by Marvel, it would not purchase any more stories from Ditko for such discontinued book, and therefore, Ditko too bore the risk that a book might not sell well. Counterclaimant further disputes the relevance of this statement to the legal issues in this case as any publisher bears the risk that the works it published might not sell well.** *See* Counterclaimant's Response to Marvel's Statement 50, *supra*, incorporated herein by reference. *See also* Toberoff Decl. Ex. 20 at 73:14-74:24 (Evanier testifying that Marvel had asked Evanier to submit some work in the 1970s prior to 1978, for a new magazine, but that after he did the work, Marvel declined to buy it or pay for it since it decided not to publish the magazine after all). | **This fact remains undisputed**.<br><br>Defendant does not dispute that if a comic book did not sell well or lost money, Marvel, like "any publisher," would bear the risk of loss associated with the work's publication.  Defendant contends, however, that Ditko would also bear a loss in the sense that if Marvel discontinued a comic book, Ditko would no longer have the ability to make money contributing to it.  But Ditko was paid for his contributions regardless of how well they sold, and thus he had no risk of *out of pocket losses.*  Marvel, as publisher, on the other hand, had to shoulder the risk of all the overhead expenses associated with publishing and distributing its comic books with no guarantee they would sell.  *See Kirby*, 726 F.3d at 143 ("[T]he record suggests that both parties took on risks with respect to the works' success—Kirby that he might occasionally not be paid for the labor and materials for certain pages, and Marvel that the pages it did pay for |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| 224:24-225:15; Lens Decl., Ex. 4 129:24-130:4; Lens Decl., Ex. 3 155:12-23, 226:12-15; Lens Decl., Ex. 79 at 4. | | might not result in a successful comic book.  But we think that Marvel's payment of a flat rate and its contribution of both creative and production value, in light of the parties' relationship as a whole, is enough to satisfy the expense requirement.").  And, if anything, Defendant's contention that Ditko had an interest in Marvel's comic books doing well evidences that Ditko had a close and continuous relationship with Marvel and that their "ongoing partnership … is therefore what induced [Ditko's] creation of the works."  *Kirby*, 726 F.3d at 141.<br><br>Further, Defendant cites no admissible evidence to support this contention.  Toberoff Ex. 50 **does not support** Defendant's contention, as it relates to a wholly distinct situation, involving a speculative publication (not existing comics like those at issue here).<br><br>MCI also **objects** to the evidence cited in support of this contention.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection No. [19]. |
| **DITKO UNDERSTOOD THAT HE DID NOT HAVE ANY COPYRIGHT INTEREST IN HIS CONTRIBUTIONS TO MARVEL** | | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| 53.    Ditko, like other freelancers, confirmed his understanding that he worked for Marvel on a work-made-for-hire basis. Lens Decl., Ex. 23A at 2 (agreement between Marvel and Ditko whereby Ditko "acknowledges, agrees and confirms that any and all work, writing, art work material or services (the 'Work') which have been or are in the future created, prepared or performed by [him] for the Marvel Comics Group have been and will be specially ordered or commissioned for use as a contribution to a collective work and that as such Work was and is expressly agreed to be considered a work made for hire."); Lens Decl., Ex. 64 at 9 (Defendant acknowledging the above agreement); Lens Decl., Ex. 2 40:24-41:8 (Thomas testifying that "I understood when I came into the company that Marvel . . . would own the characters, the stories, the writing, whatever I was doing, and that was also made clear by the statement on the back of the check from the earliest days"); Lens Decl., Ex. 2 48:11-49:4 (Thomas testifying that he "didn't like creating many characters for Marvel, because [he] knew [he] wouldn't own them"); Lens Decl., Ex. 2 60:19-61:6 (Thomas agreeing that, "for the entire tenure that [he] worked with Marvel," he | Counterclaimant disputes that Ditko "confirmed his understanding that he worked for Marvel on a work-made-for-hire basis," as Marvel required him to sign a self-serving retroactive work-for-hire release, e.g., identical to the one signed by Randy Schueller, who created a black costumed Spider-Man completely "on spec." This retroactive "work for hire" whitewash was a common practice at Marvel in the years after the 1976 Copyright Act took effect and only serves to underscore its pervasive insecurity as to this issue and revisionist practices since that time. Such Marvel incantations have been specifically held to be unenforceable by the Second Circuit, particularly in the copyright termination context. *See Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 292 (2d Cir. 2002) ("[W]e hold that an agreement made subsequent to a work's creation which retroactively deems it a 'work for hire' constitutes an [unenforceable] 'agreement to the contrary' under § 304(c)(5) of the 1976 Act."). Much of Marvel's cited "evidence" also concerns "ownership," not authorship and is therefore consistent with ownership via the purchase and assignment of freelance material (Magazine | This fact remains undisputed.

Defendant's contention that "Marvel required [Ditko] to sign a self-serving retroactive work-for-hire release" is entirely unsupported by any evidence. Because Defendant cites no evidence disputing that Ditko, in fact, signed Exhibit 23A, this fact is undisputed.

Further, Defendant's characterization of the agreement as "retroactive … whitewash[ing]" is incorrect and again unsupported by any evidence.  The agreement merely affirmed, in the precise nomenclature of the 1976 Copyright Act, what was already understood, *i.e.* that his work for Marvel was done on a work for hire basis.

Further, Defendant's analogy to the work for hire status of another freelancer, Randy Schueller, is inaccurate.  As an initial matter, Defendant ignores that Marvel's editor Jim Shooter told Schueller he "want[ed] changes made" and that he would "fill [Schueller] in on [the changes] after [he] return[ed] the work-made-for-hire form."  *See* Toberoff Ex. 32.  In other words, Defendant's suggestion that Schueller's contributions were *not* made on a work-for-hire basis is unsupported by |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| understood "that Marvel would have all of the rights, including copyrights and anything that [he] worked on at Marvel"); Lens Decl., Ex. 13 at 26:22- 28:6 (Lee testifying that "it was typical in the industry for comic book publishers to own the rights to the materials that were created for them for publication" during the Time Period); Lens Decl., Ex. 13 at 100:25-101:17 (Lee testifying that he "always felt the company" owned the characters he created or co-created); Lens Decl., Ex. 20 at 2 (Marvel artist Gene Colan writing that "[p]ages were stamped on the back 'work for hire' . . . In the narrow field of comic art, one either worked 'for hire' or didn't work!"); Lens Decl., Ex. 19 at 2 (agreement between Marvel and Colan that his contributions to Marvel's comic books "were created as works made for hire"); Lens Decl., Ex. 23A-E (documentation reflecting hundreds of freelancers' "express[] agree[ment]" that their work would "be considered a work made for hire."); Lens Decl., Ex. 7 355:18-23 (Thomas testifying that the popularization of "the term 'work-for-hire'" in the mid-1970s only formalized "the same general situation that had already existed"). | **Management's simple business practice in the Period) and not "work for hire."** *See* Toberoff Decl. Ex. 1 at 17 (Evanier Rep. describing Marvel's practice of running competitions to discover new, aspiring artist and writers); Ex. 34 at 1 (Randy Schueller ("Schueller") interview explaining that Marvel ran a competition for aspiring writers and artists in the early 1980s); Ex. 1 at 17 (Evanier Rep. describing Schueller's unique Spider-Man submission and his amateur status); Ex. 31 at 2 (Walter Durajlija ("Durajlija") writing that young fan Schueller won an ideas contest Marvel was having in 1982 with his idea for a black Spider-Man costume); *id.* at 2 (Durajlija writing that Marvel editor Shooter liked the costume idea and bought it from Schueller for $220); Ex. 34 at 2 (Schueller interview explaining that he came up with, and submitted to Marvel, a story featuring a black-costume Spider-Man); *id.* at 2 (Schueller interview explaining that, a few months after he submitted his black-costume *Spider-Man* story, Shooter wrote to him offering to buy it for $220); Ex. 17 at 59:2-10 (Thomas testifying that Jim Shooter was editor-in-chief at Marvel in the 1980s); Ex. 32 (Shooter letter dated August 3, 1982 offering to buy Schueller's black-costume *Spider-Man* story submission for | the evidence.  (Nor did Schueller attempt to terminate any supposed grant of copyright to Marvel, and his window to do so has now closed, further suggesting that Schueller believed he worked for hire.)<br><br>In any event, that event significantly post-dates the relevant time period, and implicates different copyright laws, and is therefore immaterial. *See Kirby*, 777 F. Supp. 2d at 748 (rejecting evidence from outside "the relevant time period" as "not admissible evidence of anything").<br><br>MCI also **objects** to Toberoff Exhibits 1, 31, 32, 34, 37, and 38.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [37], [38], [40], [42], & [43]. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | $220 and telling Schueller to sign the attached "Work-made-for-hire Agreement"); Ex. 37 at 2021MARVEL-0054634-005636 (sample 1979-1980 artwork releases retroactively claiming the returned artwork was done by Marv Wolfman as an "employee-for-hire"); Ex. 38 (retroactive work-for-hire agreement signed by Schueller dated August 9, 1982); Ex. 1 at 17 (Evanier Rep. identifying Schueller's August 9, 1982 contract as being the same as those Marvel forced freelancers to sign in the late 1970s); Ex. 39 (retroactive work-for-hire contract dated January 26, 1979 allegedly signed by Ditko); Ex. 48 at (Certificate of Registration of a Claim for Copyright dated August 31, 1964 for *Amazing Spider-Man Annual* Vol. 1, No. 1 filed by Magazine Management and identifying Lee as the "Author" and Non-Pareil as the "Copyright Claimant." Compared to the Certificate of Renewal Registration for *Amazing Spider-Man Annual* Vol. 1, No. 1 by Cadence's purported successor, Marvel Entertainment Group, dated December 15, 1992 and now claiming Lee as an "Employee for Hire of Non-Pareil"). | |
| 54.    Ditko acknowledged that he did not own legal rights to characters he worked on for Marvel. Lens Decl., Ex. 57 | **Counterclaimant admits that it was understood that Marvel *owned* all rights to the Ditko works that Magazine** | **This fact remains undisputed.** |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| at 3 (letter from Ditko stating that he "never claimed creating Spider-Man" and that Marvel "own[s] the art pages, the published material"); Lens Decl., Ex. 52 at 3 (Ditko voicing dismay with the movie depiction of Doctor Strange but agreeing that "whoever has the rights can add and subtract from the original any way he chooses"); Lens Decl., Ex. 59 at 3 (Ditko critiquing Marvel's editorial choices, but acknowledging that, even if certain "ideas" were his, he "had no real right to them when published"); *see also* Lens Decl., Ex. 50 at 3. | **Management decided to purchase and pay for, but disputes that Ditko and/or Magazine Management in the Period viewed or intended Ditko's creations as "work made for hire" owned by Magazine Management (or Goodman's shell companies) at the moment of creation as the "author" of such works.** *See* Toberoff Decl. Ex. 8 ¶¶ 14-15 (Sinnott attesting that in the 1950s and 1960s, he did not consider his freelance work submitted to Marvel to be done as "work made for hire"); Ex. 9 ¶ 8 (Steranko attesting that no one at Marvel ever informed him that his work was being created as "work made for hire" from 1966 to 1973); Ex. 10 ¶ 13 (Ayers attesting that he thought Marvel owned his work because it bought the material he submitted, but that he never heard the term "work for hire" and did not think his work was created as "work made for hire"); Ex. 11 ¶ 12 (Colan attesting that he believed Marvel owned the work it purchased from him, but that he never heard the term "work for hire"); Ex. 13 ¶¶ 12-13 (Adams attesting that he did not consider the work he submitted to Marvel to be done as "work made for hire"); Ex. 21 at 97:3-23 (Steranko testifying that he believed that when he walked into Marvel to deliver his freelance material, he still | Defendant admits that it was understood that Marvel owned all rights to the Ditko works, but incorrectly and non-responsively argues about whether Marvel or Ditko "viewed or intended Ditko's creations as 'work made for hire' . . . at the moment of creation." The evidence establishes that Marvel viewed the Works as works made for hire and itself as the author, and freelancers, including Steve Ditko, understood their work for Marvel during the relevant time period was done on a work-for-hire basis. *See* MCI's Evidence in Support of Undisputed Fact 53.

Defendant cites no evidence suggesting that Ditko viewed himself as the copyright author of the Works or that he did not believe his work for Marvel was done on a work-for-hire basis. Toberoff Exhibits 8, 9, 11, and 17 **do not support** the contention, because none of the contracts at issue are between Marvel and Ditko and all outside the relevant time period. And Ditko himself signed an agreement with Marvel in 1979, acknowledging that his prior work for Marvel was done on a work-made-for-hire basis. Lens Decl., Ex. 23A at 2 (agreement between Marvel and Ditko whereby Ditko "acknowledges, agrees and confirms that any and all work, |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | owned the work and that his work belonged to him until he cashed the check Marvel wrote to him); Ex. 22 at 266:13-267:2 (Lieber testifying that he believed he owned his freelance material until Marvel bought it from him); Ex. 54 at 2021MARVEL-0070259 (Marvel President James Galton ("Galton") correspondence to Thomas dated February 24, 1978 stating "it was our intent that all copyrights be assigned to Marvel, I assume this is acceptable to you ... I would appreciate your signing ... to confirm that all right to claim renewal and extension of copyrights are assigned to Marvel"); Ex. 64 at 245 n.80 (Nimmer explaining *in 1963* "that 17 U.S.C. Sec. 26 expressly renders an employer for hire an 'author' but makes no comparable provision with respect to commissioned works"); Ex. 2 at 100:3-101:9 (Lieber testifying that he was paid for his freelance material by checks stamped with a legend that used assignment-type language); Ex. 5 at 371:325 (Lee testifying that Marvel "would only buy what [it] needed"); Ex. 17 at 295:8-296:8, 297:120 (Thomas testifying that Marvel could accept or reject submitted material in its sole discretion); Ex. 22 at 303:15-19 (Lieber testifying he thought the name on the checks was Marvel or Magazine | writing, art work material or services (the 'Work') which have been or are in the future created, prepared or performed by [him] for the Marvel Comics Group have been and will be specially ordered or commissioned for use as a contribution to a collective work and that as such Work was and is expressly agreed to be considered a work made for hire."). Toberoff Exhibits 9 and 21 further **do not support** this contention, as explained in MCI's Reply in Support of Undisputed Fact 2.  Further, Toberoff Exhibit 64 **cannot provide factual support**, as the cited material is a treatise purportedly summarizing the law, not a fact.<br><br>MCI also **objects** to Toberoff Exhibits 1, 2, 8, 9, 10, 11, 13, 21, 22, 45, 51, 54, and 64.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [3], [11], [12], [13], [14], [16], [21], [22], [23], [28], [31], [46], [48], [51] & [56]. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
|  | Management); Ex. 45 at 4142-4154, 4158-4164 (Marvel freelance checks made payable to Ayers dated from February 1, 1974 to July 4, 1975); Ex. 51 (Marvel freelance checks made payable to Gerber dated June 1, 1973, expressly acknowledging Gerber's "assignment to [Marvel] of any copyright, trademark and any other rights in or related to the material, including [his] assignment of any rights to renewal copyright"); Ex. 1 at 16 (Evanier Rep. describing the comic book industry and Marvel's custom and practice of stamping legends on the backs of checks to freelancers in the Period, thereby forcing freelancers to sign the legend to cash the check); Ex. 8 ¶ 13 (Sinnott attesting that Marvel paid him with checks that had an assignment legend on the back); Ex. 21 at 63:10-64:17, 91:11-93:19 (Steranko testifying that he would cross out the legend on the backs of the Marvel checks because he thought it was bad business to add an after-the-fact condition to payment on work that had been submitted a week or two prior); Ex. 45 at 4142-4154, 4158-4164 (Marvel freelance checks made payable to Ayers dated from February 1, 1974 to July 4, 1975, with assignment legends stamped on the backs of the checks); Ex. 51 (Marvel freelance checks made payable to |  |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | Gerber dated June 1, 1973, expressly acknowledging Gerber's "assignment to [Marvel] of any copyright, trademark and any other rights in or related to the material, including [his] assignment of any rights to renewal copyright"); Ex. 9 ¶ 13 (Steranko attesting that legends on the backs of Marvel's checks to him used assignment, not work-for-hire, language); Ex. 10 ¶ 14 (Ayers attesting that Marvel's check legends used assignment language); Ex. 11 ¶ 12 (Colan attesting that the legends on the backs of Marvel's checks used assignment, not work-for-hire, language); Ex. 13 ¶ 14 (Adams attesting that Marvel's check legends used assignment language only); Ex. 21 at 61:23-62:3, 91:11-93:19 (Steranko testifying that in the 1960s, Marvel's check legends did not say "work for hire," but indicated that Steranko "gave them the rights to the work, sold them the rights to the work"). | |
| 55.    Ditko acknowledged that he did not own copyrights in his work for Marvel, in contrast to his work with Wally Wood's "witzend" magazine. *Compare* Lens Decl., Ex. 56 at 2 (Ditko writing that "Wally Wood's Witzend [] gave writers, artists the opportunity to copyright their original ideas, created material when published"), Lens Decl., Ex. 61 at 3 | **Counterclaimant admits that it was understood that Marvel *owned* all rights to the Ditko works that Magazine Management decided to purchase and pay for, but disputes that Ditko and/or Magazine Management in the Period viewed or intended Ditko's creations as "work made for hire" owned by Magazine Management (or Goodman's** | **This fact remains undisputed.**<br><br>Defendant admits that it was understood that Marvel owned all rights to the Ditko works, but incorrectly and non-responsively argues about whether Marvel or Ditko "viewed or intended Ditko's creations as 'work made for hire' . . . at the moment of creation."  The evidence |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| (Ditko describing Wally Wood as "a stand-out in many ways" including that "[h]e published witzend—where one could copyright his own ideas, creations—I took advantage of it, my Mr. A, etc."), *and* Lens Decl., Ex. 61 at 2 (Ditko writing that "Mr. A is my copyrighted <u>PROPERTY</u>" and that "NO ONE, but me, has any right" to it), *with* Lens Decl., Ex. 44 at 4 (Ditko acknowledging that "Spider-Man & Doctor Strange are copyrighted by the Magazine Management company"); *see also* Lens Decl., Ex. 49 at 2 (Ditko writing that the "[m]ost important" thing about "Witzend" "was that one could copyright, own one's creative ideas, work"); Lens Decl., Ex. 60 at 3 (Ditko writing that "Wally Wood did an astounding thing for writers and artists, an opportunity to create and copyright what one creates, protecting and able to cash in on it at any future time"); Lens Decl., Ex. 51 at 3 (Ditko writing that "Wally Wood who created WITZEND wanted a publication for creators to copyright their ideas, creations"). | **shell companies) at the moment of creation as the "author" of such works.** *See* Toberoff Decl. Ex. 8 ¶¶ 14-15 (Sinnott attesting that in the 1950s and 1960s, he did not consider his freelance work submitted to Marvel to be done as "work made for hire"); Ex. 9 ¶ 8 (Steranko attesting that no one at Marvel ever informed him that his work was being created as "work made for hire" from 1966 to 1973); Ex. 10 ¶ 13 (Ayers attesting that he thought Marvel owned his work because it bought the material he submitted, but that he never heard the term "work for hire" and did not think his work was created as "work made for hire"); Ex. 11 ¶ 12 (Colan attesting that he believed Marvel owned the work it purchased from him, but that he never heard the term "work for hire"); Ex. 13 ¶¶ 12-13 (Adams attesting that he did not consider the work he submitted to Marvel to be done as "work made for hire"); Ex. 21 at 97:3-23 (Steranko testifying that he believed that when he walked into Marvel to deliver his freelance material, he still owned the work and that his work belonged to him until he cashed the check Marvel wrote to him); Ex. 22 at 266:13-267:2 (Lieber testifying that he believed he owned his freelance material until Marvel bought it from him); Ex. 54 at | establishes that Marvel viewed the Works as works made for hire and itself as the author, and freelancers, including Steve Ditko, understood their work for Marvel during the relevant time period was done on a work-for-hire basis. *See* MCI's Evidence in Support of Undisputed Fact 53.<br><br>Defendant cites no evidence suggesting that Ditko viewed himself as the copyright author of the Works or that he did not believe his work for Marvel was done on a work-for-hire basis. Toberoff Exhibits 8, 9, 11, and 17 **do not support** the contention, because none of the contracts at issue are between Marvel and Ditko and all are outside the relevant time period. And Ditko himself signed an agreement with Marvel in 1979, acknowledging that his prior work for Marvel was done on a work-made-for-hire basis. Lens Decl., Ex. 23A at 2 (agreement between Marvel and Ditko whereby Ditko "acknowledges, agrees and confirms that any and all work, writing, art work material or services (the 'Work') which have been or are in the future created, prepared or performed by [him] for the Marvel Comics Group have been and will be specially ordered or commissioned for use as a contribution to a collective work and that as such Work |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | 2021MARVEL-0070259 (Marvel President James Galton ("Galton") correspondence to Thomas dated February 24, 1978 stating "it was our intent that all copyrights be assigned to Marvel, I assume this is acceptable to you ... I would appreciate your signing ... to confirm that all right to claim renewal and extension of copyrights are assigned to Marvel"); Ex. 64 at 245 n.80 (Nimmer explaining *in 1963* "that 17 U.S.C. Sec. 26 expressly renders an employer for hire an 'author' but makes no comparable provision with respect to commissioned works"); Ex. 2 at 100:3-101:9 (Lieber testifying that he was paid for his freelance material by checks stamped with a legend that used assignment-type language); Ex. 5 at 371:325 (Lee testifying that Marvel "would only buy what [it] needed"); Ex. 17 at 295:8-296:8, 297:120 (Thomas testifying that Marvel could accept or reject submitted material in its sole discretion); Ex. 22 at 303:15-19 (Lieber testifying he thought the name on the checks was Marvel or Magazine Management); Ex. 45 at 4142-4154, 4158-4164 (Marvel freelance checks made payable to Ayers dated from February 1, 1974 to July 4, 1975); Ex. 51 (Marvel freelance checks made payable to Gerber dated June 1, 1973, expressly | was and is expressly agreed to be considered a work made for hire."). Toberoff Exhibits 9 and 21 further **do not support** this contention, as explained in MCI's Reply in Support of Undisputed Fact 2.  Further, Toberoff Exhibit 64 **cannot provide factual support**, as the cited material is a treatise purportedly summarizing the law, not a fact.<br><br>MCI also **objects** to Toberoff Exhibits 1, 2, 8, 9, 10, 11, 13, 21, 22, 45, 51, 54, and 64.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [3], [11], [12], [13], [14], [16], [21], [22], [23], [28], [31], [46], [48], [51], & [56]. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | acknowledging Gerber's "assignment to [Marvel] of any copyright, trademark and any other rights in or related to the material, including [his] assignment of any rights to renewal copyright"); Ex. 1 at 16 (Evanier Rep. describing the comic book industry and Marvel's custom and practice of stamping legends on the backs of checks to freelancers in the Period, thereby forcing freelancers to sign the legend to cash the check); Ex. 8 ¶ 13 (Sinnott attesting that Marvel paid him with checks that had an assignment legend on the back); Ex. 21 at 63:10-64:17, 91:11-93:19 (Steranko testifying that he would cross out the legend on the backs of the Marvel checks because he thought it was bad business to add an after-the-fact condition to payment on work that had been submitted a week or two prior); Ex. 45 at 4142-4154, 4158-4164 (Marvel freelance checks made payable to Ayers dated from February 1, 1974 to July 4, 1975, with assignment legends stamped on the backs of the checks); Ex. 51 (Marvel freelance checks made payable to Gerber dated June 1, 1973, expressly acknowledging Gerber's "assignment to [Marvel] of any copyright, trademark and any other rights in or related to the material, including [his] assignment of any rights to renewal copyright"); Ex. 9 ¶ | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | 13 (Steranko attesting that legends on the backs of Marvel's checks to him used assignment, not work-for-hire, language); Ex. 10 ¶ 14 (Ayers attesting that Marvel's check legends used assignment language); Ex. 11 ¶ 12 (Colan attesting that the legends on the backs of Marvel's checks used assignment, not work-for-hire, language); Ex. 13 ¶ 14 (Adams attesting that Marvel's check legends used assignment language only); Ex. 21 at 61:23-62:3, 91:11-93:19 (Steranko testifying that in the 1960s, Marvel's check legends did not say "work for hire," but indicated that Steranko "gave them the rights to the work, sold them the rights to the work"). | |
| **DEFENDANT CANNOT FURNISH ANY OF THE PURPORTED "GRANTS" HE SEEKS TO TERMINATE** | | |
| 56.    Defendant seeks to terminate purported grants and/or transfers of copyright allegedly stamped on the back of checks between Marvel, on the one hand, and Ditko, on the other. *See, e.g.*, Lens Decl., Ex. 63 at 4-5, 8-9, 15, 19-20. | **Counterclaimant admits that it seeks to terminate grants of copyright from Ditko to Magazine Management in the Period, whether those grants took place via an implied assignment at the point of sale of Ditko's pages to Magazine Management, or via the explicit "assignment[s]" of "copyright" including "the renewal copyright" memorialized in the endorsement legends Magazine Management placed on the back of its checks to freelancers** | This fact remains undisputed.

Defendant admits that he seeks to terminate purported grants and/or transfers of copyright allegedly stamped on the back of checks between Marvel, on the one hand, and Ditko, on the other. And while Defendant suggests that he might also be seeking to terminate grants that occurred "via an implied assignment,"  that is an invalid legal contention, given that "[u]nder section 28 |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | **for the purchase of their material.** *See* Toberoff Decl. Ex. 2 at 100:3101:9 (Lieber testifying that he was paid for his freelance material by checks stamped with a legend that used assignment-type language); Ex. 5 at 371:3-25 (Lee testifying that Marvel "would only buy what [it] needed"); Ex. 17 at 295:8-296:8, 297:1-20 (Thomas testifying that Marvel could accept or reject submitted material in its sole discretion); Ex. 22 at 303:15-19 (Lieber testifying he thought the name on the checks was Marvel or Magazine Management); Ex. 51 (Marvel freelance checks made payable to Gerber dated June 1, 1973, expressly acknowledging Gerber's "assignment to [Marvel] of any copyright, trademark and any other rights in or related to the material, including [his] assignment of any rights to renewal copyright" and no mention of "work made for hire" whatsoever); Ex. 45 at 4142-4154, 4158-4164 (Marvel freelance checks made payable to Ayers dated from February 1, 1974 to July 4, 1975 containing explicit "assignment" of "copyright" language and no mention of "work for hire" whatsoever); Ex. 1 at 16 (Evanier Rep. describing the comic book industry and Marvel's custom and practice of stamping such legends on the backs of checks to freelancers in the Period, | of the 1909 Copyright Act, which governs grants of copyrights executed before 1978, an assignment must be made by an 'instrument in writing signed by the proprietor of the copyright.'" *Guardian Music Corp. v. James W. Guercio Enterprises, Inc.*, 459 F. Supp. 2d 216, 222 (S.D.N.Y. 2006), *aff'd*, 271 F. App'x 119 (2d Cir. 2008); *accord Magnuson v. Video Yesteryear*, 85 F.3d 1424, 1428 (9th Cir. 1996) ("the Copyright Act of 1909 provided that assignment of a copyright had to be made in writing"). MCI also **objects** to Toberoff Exhibits 1, 2, 8, 9, 10, 11, 13, 21, 22, 45, and 51.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [3], [11], [12], [13], [14], [16], [21], [22], [31], [46] & [48]. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | thereby forcing freelancers to sign the legend to cash the check); Ex. 8 ¶ 13 (Sinnott attesting that Marvel paid him with checks that had an explicit assignment legend on the back); Ex. 21 at 63:10-64:17, 91:11-93:19 (Steranko testifying that he would cross out the legend on the backs of the Marvel checks because he thought it was bad business to add an after-the-fact condition to payment on work that had been submitted a week or two prior); Ex. 9 ¶ 13 (Steranko attesting that legends on the backs of Marvel's checks to him used assignment, not work-for-hire, language); Ex. 10 ¶ 14 (Ayers attesting that Marvel's check legends used assignment language); Ex. 11 ¶ 12 (Colan attesting that the legends on the backs of Marvel's checks used assignment, not work-for-hire, language); Ex. 13 ¶ 14 (Adams attesting that Marvel's check legends used assignment language only); Ex. 21 at 61:23-62:3, 91:11-93:19 (Steranko testifying that in the 1960s, Marvel's check legends did not say "work for hire," but indicated that Steranko "gave them the rights to the work, sold them the rights to the work"). *See also* Lens Decl., Ex. 63 (Counterclaimant's Notices of Termination each stating at 3 n.3: "This Notice of Termination also applies to each | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | and every grant or alleged grant by Stephen J. Ditko of rights under copyright in and to the Work that falls within the applicable termination time window (defined by 17 U.S.C. § 304(c) and the effective date of this Notice of Termination"); Ex. 64 at 10 (Counterclaimant referring, alternatively, to Ditko's "implied assignment ... due to Steve Diko's acceptance of payment from Marvel for his material and Marvel's subsequent known exploitation of his material."). | |
| 57.      Defendant does not have any checks from Marvel to Ditko during the Time Period and cannot attest to the language on the backs of the checks. Lens Decl., Ex. 1 28:12-23 (Defendant conceding that he had not "seen any checks from Marvel to Steve Ditko from the 1960s" or "seen the backs of any checks from Marvel to Steve Ditko from the 1960s"); Lens Decl., Ex. 64 at 9 (Defendant identifying the purported grants as check legends "contain[ing] express purchase and assignment language," but failing to identify any specific language). | **Counterclaimant admits that it does not possess checks from Magazine Management to Ditko in the Period because Ditko naturally deposited the checks he received from Magazine Management, but Counterclaimant notes that the record consists of numerous checks to other freelancers, all of which have explicit "assignment" of "copyright" language and no mention of "work for hire" in the legends Magazine Management put on the backs of its checks to such freelancers. Additionally, there is significant sworn testimony from freelancers from the Period concerning the explicit "assignment" of copyright language in the endorsement legends on the back of Magazine Management's** | **This fact remains undisputed.**<br><br>Defendant admits that he does not have checks from Marvel to Ditko during the relevant time period, but non-responsively refers to the existence of checks to other freelancers approximately a decade outside the Time Period.  As this Court has already found, "the checks were not issued to Kirby [or Ditko] and are not from the relevant time period . . . [O]ne cannot infer what might have been written on a check issued in 1958 [[or 1962-1965, for that matter)] from what was written on an analogous check fifteen years later. For that reason alone, the[se] 1973 and 1974 checks do not raise any genuine issue of fact that tends to contradict the work-for-hire presumption." *Kirby*, 777 F. Supp. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | **checks.** *See* Lens Decl., Ex. 63 (Counterclaimant's Notices of Termination each stating at 3 n.3: "This Notice of Termination also applies to each and every grant or alleged grant by Stephen J. Ditko of rights under copyright in and to the Work that falls within the applicable termination time window (defined by 17 U.S.C. § 304(c) and the effective date of this Notice of Termination"); Ex. 64 at 10 (Counterclaimant referring, alternatively, to Ditko's "implied assignment ... due to Steve Ditko's acceptance of payment from Marvel for his material and Marvel's subsequent known exploitation of his material."). *See also* Toberoff Decl. Ex. 2 at 100:3-101:9 (Lieber testifying that he was paid for his freelance material by checks stamped with a legend that used assignment-type language); Ex. 5 at 371:3-25 (Lee testifying that Marvel "would only buy what [it] needed"); Ex. 45 at KIRBY-4142-4154, KIRBY-4158-4164 (Marvel freelance checks made payable to Ayers dated from February 1, 1974 to July 4, 1975); Ex. 51 (Marvel freelance checks made payable to Gerber dated June 1, 1973, expressly acknowledging Gerber's "assignment to [Marvel] of any copyright, trademark and any other rights in or related to the | 2d at 748.  Thus, Toberoff Exhibits 45 and 51 **do not support** this contention. <br><br> Further, to the extent Defendant relies upon past testimony about what check legends may have said, that evidence is inadmissible under the best evidence rule, given that Defendant is attempting to establish the terms of a writing without having produced the writing or a copy thereof (and without establishing a reasonably diligent search).  And in any event, no admissible testimony supports Defendant's contention about "assignment" language on the back of checks.  Toberoff Exhibits 2 and 22 **do not support** this contention, because Mr. Lieber testified "I don't really know" when asked when legends first appeared on Marvel checks.  *See* Toberoff Decl., Ex. 2 at 100:13-20.  And Mr. Lieber only testified regarding his "understanding" of the effect of the purported language, which, in any event, is an (incorrect) legal conclusion. *See In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004) (explaining that such testimony "usurp[s] ... the role of the trial judge in instructing the jury as to the applicable law [and] the role of the jury in applying that law to the facts before it").  Toberoff Exhibits 9 and 21 further **do not support** this contention, as |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | material, including [his] assignment of any rights to renewal copyright"); Ex. 1 at 16 (Evanier Rep. describing the comic book industry and Marvel's custom and practice of stamping legends on the backs of checks to freelancers in the Period, thereby forcing freelancers to sign the legend to cash the check); Ex. 2 at 100:3-101:9 (Lieber testifying that he was paid for his freelance material by checks stamped with a legend that used assignment-type language); Ex. 8 ¶ 13 (Sinnott attesting that Marvel paid him with checks that had an assignment legend on the back); Ex. 21 at 63:10-64:17, 91:11-93:19 (Steranko testifying that he would cross out the legend on the backs of the Marvel checks because he thought it was bad business to add an after-the-fact condition to payment on work that had been submitted a week or two prior); Ex. 9 ¶ 13 (Steranko attesting that legends on the backs of Marvel's checks to him used assignment, not work-for-hire, language); Ex. 10 ¶ 14 (Ayers attesting that Marvel's check legends used assignment language); Ex. 11 ¶ 12 (Colan attesting that the legends on the backs of Marvel's checks used assignment, not work-for-hire, language); Ex. 13 ¶ 14 (Adams attesting that Marvel's check legends used assignment language only); Ex. 21 at | explained in MCI's Reply in Support of Undisputed Fact 2.<br><br>In any event, the existence or non-existence of check legends is immaterial to the Court's application of the work-made-for-hire test, as the Second Circuit already held with respect to this same evidence. *Kirby*, 726 F.3d at 143 ("[W]e decline to infer from Marvel's suspenders that it had agreed to give Kirby its belt.").<br><br>MCI also **objects** to Toberoff Exhibits 1, 2, 8, 9, 10, 11, 13, 21, 22, 45, and 48.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [3], [11], [12], [13], [14], [16], [21], [22], [29], [45], & [48]. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | 61:23-62:3, 91:11-93:19 (Steranko testifying that in the 1960s, Marvel's check legends did not say "work for hire," but indicated that Steranko "gave them the rights to the work, sold them the rights to the work"); Ex. 22 at 269:24-271:20 (Lieber testifying that the check legends used assignment, not work-for-hire language). | |
| 58.    Marvel does not have checks from Marvel to Ditko during the Time Period and cannot attest to what they said. Bard Decl. ¶ 3; Lens Decl., Ex. 65 at 4; Lens Decl., Ex. 2 139:3-23; Lens Decl., Ex. 12 71:25-72:19; Lens Decl., Ex. 3 153:2-154:21, 296:3-6, 297:7-13; Lens Decl., Ex. 9 31:17-32:5, 32:17-33:5. | **Admitted only that Marvel alleges that it does not have in its possession, custody or control checks from Magazine Management (or any other alleged "Marvel" entity) to Ditko during the relevant Period, or to any other freelancers during the Period however, reasonable inferences can be drawn from the Magazine Management checks to freelancers from the early to mid-1970's that Magazine Management's checks to Ditko in the Period for the purchase of his material bore the same assignment of copyright endorsement legends on the back. Additionally, there is significant sworn testimony from freelancers from the Period concerning the explicit "assignment" of copyright language in the endorsement legends on the back of Magazine Management's checks.** *See* Toberoff Decl. Ex. 2 at 100:3-101:9 | This fact remains undisputed.

Defendant admits that he does not have checks from Marvel to Ditko during the relevant time period, but non-responsively refers to the existence of checks to other freelancers approximately a decade outside the Time Period. That is non-responsive, turns on an incorrect legal argument, and is immaterial for the responses detailed above in MCI's Reply in Support of Undisputed Fact 57.

MCI also **objects** to Toberoff Exhibits 1, 2, 8, 9, 10, 11, 13, 21, 22, 45, and 48. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [3], [11], [12], [13], [14], [16], [21], [22], [29], [46] & [48]. |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | (Lieber testifying that he was paid for his freelance material by checks stamped with a legend that used assignment-type language); Ex. 5 at 371:3-25 (Lee testifying that Marvel "would only buy what [it] needed"); Ex. 45 at 4142-4154, 4158-4164 (Marvel freelance checks made payable to Ayers dated from February 1, 1974 to July 4, 1975); Ex. 51 (Marvel freelance checks made payable to Gerber dated June 1, 1973, expressly acknowledging Gerber's "assignment to [Marvel] of any copyright, trademark and any other rights in or related to the material, including [his] assignment of any rights to renewal copyright"); Ex. 1 at 16 (Evanier Rep. describing the comic book industry and Marvel's custom and practice of stamping legends on the backs of checks to freelancers in the Period, thereby forcing freelancers to sign the legend to cash the check); Ex. 2 at 100:3-101:9 (Lieber testifying that he was paid for his freelance material by checks stamped with a legend that used assignment-type language); Ex. 8 ¶ 13 (Sinnott attesting that Marvel paid him with checks that had an assignment legend on the back); Ex. 21 at 63:10-64:17, 91:11-93:19 (Steranko testifying that he would cross out the legend on the backs of the Marvel checks because he thought it | |

| MCI's Statement of Undisputed Fact | Defendant's Response | MCI's Reply |
|---|---|---|
| | was bad business to add an after-the-fact condition to payment on work that had been submitted a week or two prior); Ex. 9 ¶ 13 (Steranko attesting that legends on the backs of Marvel's checks to him used assignment, not work-for-hire, language); Ex. 10 ¶ 14 (Ayers attesting that Marvel's check legends used assignment language); Ex. 11 ¶ 12 (Colan attesting that the legends on the backs of Marvel's checks used assignment, not work-for-hire, language); Ex. 13 ¶ 14 (Adams attesting that Marvel's check legends used assignment language only); Ex. 21 at 61:23-62:3, 91:11-93:19 (Steranko testifying that in the 1960s, Marvel's check legends did not say "work for hire," but indicated that Steranko "gave them the rights to the work, sold them the rights to the work"); Ex. 22 at 269:24-271:20 (Lieber testifying that the check legends used assignment, not work-for-hire language). | |

## <u>MCI'S RESPONSE TO DEFENDANT'S "ADDITIONAL MATERIAL FACTS"</u>

Pursuant to Local Civil Rule 56.1(b), MCI further respectfully submits the following responses to Defendant's "Additional Material Facts" included with his response to MCI's motion for summary judgment.

MCI objects to the "facts" in Defendant's "Additional Material Facts" that are immaterial and/or irrelevant to the legal standards governing this case.  *See, e.g.*, *Marvel Worldwide, Inc. v. Kirby*, 777 F. Supp. 2d 720, 748 (S.D.N.Y. 2011) (rejecting evidence from outside "the relevant time period" as "not admissible evidence of anything"); *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 139-40 (2d. Cir. 2013) (relevant principles of the instance-and-expense test); *Kinsella v. Rumsfeld*, 320 F.3d 309, 311 (2d Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (facts are immaterial unless they "affect the outcome of the suit under the governing law").

MCI further objects to the "facts" in Defendant's "Additional Material Facts" that mischaracterize evidence, ignore relevant record evidence, or reflect unsupported legal assertions and/or conclusions.  By responding, MCI does not concede that any of Defendant's "facts" are: (1) facts, (2) supported by evidence that is admissible at trial, (3) proper facts under Rule 56, or (4) material or relevant to any issue in this action.

\*      \*      \*

1. **Except perhaps to a devotion to Westerns, Goodman had no particular interest in what he published, so long as it sold.** *See* Toberoff Decl. Ex. 85 at 21 ("While Martin Goodman loved Westerns, he seemed to have no feel at all for action heroes.... Martin Goodman was adept at putting out comic books but he lacked imagination when it came to what made those comics interesting to readers. Famously, he also resisted the idea of publishing Spider-Man when Stan Lee presented it to him."); id. at 26 ("For [Goodman], success meant jumping and pumping—jumping on a successful trend and pumping multiple similar titles (with the least possible investment) through the pipeline as fast as possible in order to rake in as much profit as possible.").

**RESPONSE:  Disputed**, but **immaterial**.  MCI **disputes** that Martin Goodman had no "particular interest" in what he published, so long as it sold.  Martin Goodman hired Stan Lee as Marvel's editor, and although it was Lee's job to select what Marvel would publish, Goodman was always the "ultimate authority."  Lens Decl., Ex. 13 97:8-11 (Lee testifying that he "couldn't do any book unless Martin approved of it"); Lens Decl., Ex. 4 124:19-125:4 (Lee testifying that "[i]t was always [Goodman's] decision" as to what to publish, and "he exercised the authority ultimately to publish the last edition of 'Amazing Fantasy'"); Lens Decl., Ex. 13 16:3-19 (Lee confirming that he would "give instructions to the artists as to how [he] wanted the story to go" and that it was his "responsibility" to oversee "the creative editorial aspects of the comic books that were created").  As Ditko himself recognized, Goodman was particularly interested in the appearance of his comic book covers, which indicates that he was concerned with the content of what he published.  *See* Lens Decl., Ex. 55 at 4 ("How much the publisher—Goodman—had to say about covers, etc?  He didn't like rats on the cover—etc."); Lens Decl., Ex. 12 67:16-68:6 (Thomas testifying that Lee "decided which artist would do a cover for a particular issue[,] . . . they were reviewed by Stan, . . . then they were all reviewed eventually by Martin Goodman as publisher"); Lens Reply Decl., Ex. 101 at 125:18-126:1 (Thomas testifying that Lee "was always the ultimate authority unless Martin Goodman stepped in, and that was mostly on covers").

Additionally, Toberoff Exhibit 85, the only evidence Defendant cites, **does not support** this contention, as the cited material merely suggests that Goodman did not "have a feel at all for action heroes," not that he was not "interested" in them, and that Goodman liked to capitalize on popular trends.

Regardless, this contention is **immaterial** because whether Goodman was

"interested" in the content that Ditko or any other Marvel artist contributed to has no

bearing on the Court's application of the work-made-for-hire test, as this Court's grant of

summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.

*See Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).

Indeed, while Goodman, as publisher, had the ultimate authority as to what Marvel would

publish, Lee was otherwise in charge of making creative decisions for Marvel.  *See infra*

Response No. 36, citing Lens Decl., Ex. 2 17:8-18:13, 37:10-39:6, 80:24-81:12, 125:18-

126:1; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 7

219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:3-125:4; Thomas Decl.

¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3.

MCI also **objects** to the evidence cited in support of this contention.  *See* MCI's

Evidentiary Objection No. [64].

2. **From the 1930s to 1960s, Goodman threw innumerable pulps, magazines, digests, comic books, and paperbacks at the wall to see what would sell. Whatever other publishers were selling at any particular time (men's magazines, sado-masochism, science fiction, sex advice, superhero comics, pulp fiction), he sourced and copied that content in multiple iterations and imitations.** *See* Toberoff Decl. Ex. 85 at 26 ("Within this nexus of cheap periodicals, multiple publishing fronts, and whirlwind title changes, the trends that defined Goodman's business principles began to emerge. The *modus operandi* that Goodman adopted to satisfy his thirst for a quick profit at any cost (except, of course, for the cost of investing in quality original material) got him censured by the federal government on at least four occasions."); *id*. at 26 ("For [Goodman], success meant jumping and pumping—jumping on a successful trend and pumping multiple similar titles (with the least possible investment) through the pipeline as fast as possible in order to rake in as much profit as possible."); *id*. at 45 ("Rather than try to innovate, [Goodman's] strategy was to imitate. Let someone else risk their money experimenting with different types and genres of magazines, trying to discover the next popular trend. Once a winner emerged, Goodman would jump in with a knockoff. Or two. Or twelve, if he could get away with it."); *id*. at 53 ("The most dubious trend that Goodman chased was that of the 'shudder pulp' genre ... [which] served up savage sadomasochist tales of satanic rituals with copious amounts of brutal rape and other violence towards women.").

**RESPONSE:  Disputed in part,** but **immaterial**. MCI does not dispute that Goodman's

publications varied in format and genre, but **disputes** Defendant's suggestion that

Goodman simply "sourced and copied [whatever] content [other publishers were selling]

in multiple iterations and imitations."  The evidence simply reflects that Goodman's

publishing portfolio varied over the thirty-year period that frames this contention.  *See,*

*e.g.*, Bard Decl., Ex. 1 at 11, 18, 22 (the purpose of Goodman's publishing corporations

was to "acquire, print, publish, conduct, circulate, sell, distribute, and otherwise deal in

and with any brochures, magazines, periodicals, journals, pamphlets, books, and other

publications of any and every description whatsoever"); Bard Decl., Ex. 5 at 2-3 (1951

Dun & Bradstreet report for Magazine Management Company discussing the formats and

genres of Goodman's publications); Bard Decl., Ex. 3 at 2-5 (1966 schedule of

Goodman's "Active Corporations and Magazines," listing his various comic books and

"slicks").

Further, Toberoff Exhibit 85, the only evidence Defendant cites, **does not**

**support** this contention, as none of the cited material demonstrates that Goodman

"sourced and copied" "[w]hatever other publishers were selling at any particular time"

over a thirty year period but at most suggests that Goodman had isolated legal issues

having been "censured by the federal government on at least four occasions."

Regardless, this contention is **immaterial** because it has no bearing on the Court's

application of the work-made-for-hire test, as this Court's grant of summary judgment for

Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F.3d at

139-40 (relevant principles of the instance-and-expense test).  Indeed, while Goodman, as

publisher, had the ultimate authority as to what Marvel would publish, Lee was otherwise

in charge of making creative decisions for Marvel.  *See infra* Response No. 36, *citing*

Lens Decl., Ex. 2 17:8-18:13, 37:10-39:6, 80:24-81:12, 125:18-126:1; Lens Decl., Ex. 12

67:16-68:6; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 7 219:11-220:11; Lens Decl.,

Ex. 13 97:8-11; Lens Decl., Ex. 4 124:3-125:4; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55

at 4; Lens Decl., Ex. 59 at 3.  Further, this contention is **immaterial** because it refers

entirely to events decades outside the relevant time period and, in any event, has no

bearing on the Court's application of the work-made-for-hire test, as this Court's grant of

summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.

*See Kirby*, 777 F. Supp. 2d at 748 (rejecting evidence from outside "the relevant time

period" as "not admissible evidence of anything"); *Kirby*, 726 F.3d at 139-40 (relevant

principles of the instance-and-expense test).

   MCI also **objects** to the evidence cited in support of this contention.  *See* MCI's

Evidentiary Objection No. [64].

3. **Goodman had little respect for intellectual property, and merely imitated and published works he had no rights to.** *See* Toberoff Decl. Ex. 85 at 26 ("Within this nexus of cheap periodicals, multiple publishing fronts, and whirlwind title changes, the trends that defined Goodman's business principles began to emerge. The *modus operandi* that Goodman adopted to satisfy his thirst for a quick profit at any cost (except, of course, for the cost of investing in quality original material) got him censured by the federal government on at least four occasions."); *id*. at 29 ("[I]n 1947, the FTC issued a "cease and desist" order, having found that Goodman's line of pulps and crime digest paperbacks, published between 1942 and 1945, "falsely represented that their books and other publications contained original, complete and unabridged novels, stories or articles" and that "changing the title of novels, stories and articles without properly disclosing that such changes have been made was another practice found to be deceptive"); Ex. 84 at 2 (On August 16, 1947 the Federal Trade Commission issued a cease-and-desist order to Martin and Jean Goodman regarding repeated misrepresentations in the sale of publications, including without limitation (i) falsely representing that their publications contained original, complete and unabridged novels, stories or articles when actually the publications contained condensed, abridged or altered. versions of previously published material; and (ii) deceptively changing the title of novels, stories and articles without properly disclosing this. An order to cease and desist was issued, with the concurrence of all the Commissioners, after the Goodmans filed an answer admitting all the material allegations of fact in the complaint and waived all intervening procedure and further hearing.); Ex. 85 at 21 ("When Goodman

decided to enter the comic book arena, which demanded action heroes, he decided to revive The Masked Rider ... By that time, though, ownership of the Masked Rider had changed hands and it was being published by someone else ... No problem. *Marvel Comics* #1 debuted with ... The Masked *Raider*) (emphasis original); *id*. at 28 ("It took two years, but on January 5, 1942, the FTC slammed ... Goodman ... for deceptively reprinting stories as new fiction, substituting new titles for the original titles ... [and] for stripping the original copyrights and claiming the work as their own."); *id*. at 36 ("Thus began Goodman's ... creation of an intricate web of shell publishers for [his] magazines (in Goodman's case, sometimes approaching 50 at one time). The purpose was to shield Goodman ... from legal liability—an ever-present threat due in large part to some questionable business practices.").

> **RESPONSE:  Disputed**, but **immaterial**.  MCI **disputes** that Goodman had little respect
>
> for intellectual property, as his publishing business registered copyrights in the comics
>
> and otherwise sought to respect intellectual property rights, including those of
>
> Goodman's competitors.  *See* Lens Decl., Ex. 24A-E (Marvel's contemporaneous
>
> copyright registrations in the Works); Lens Reply Decl., Ex. 109 at 2-3 (1942 mutual
>
> agreement between Fawcett Publications, Inc. and Goodman's Timely Comics, Inc. in
>
> which each consented to the registration of each other's use of "Marvel" in certain titles).
>
> Further, Toberoff Exhibits 84 and 85 **do not support** this contention, as the cited
>
> material does not demonstrate that Goodman "had little respect for intellectual property"
>
> but, at most, demonstrates that many years prior to the relevant time period, the FTC
>
> alleged and/or found that Goodman engaged in certain deceptive business practices.  The
>
> FTC decision itself, which Defendant fails to cite, expressly recognized that "the record
>
> indicated that respondents had discontinued the deceptive practices [described] therein."
>
> *See* Lens Reply Decl., Ex. 110 at 3.  And those allegedly deceptive practices say nothing
>
> about whether Goodman respected intellectual property—especially intellectual property
>
> created by and belonging to his Marvel Comics Group entities.
>
> Regardless, this contention is **immaterial** because it refers entirely to events
>
> decades outside the relevant time period and, in any event, has no bearing on the Court's

application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 777 F. Supp. 2d at 748 (rejecting evidence from outside "the relevant time period" as "not admissible evidence of anything"); *Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).

MCI also **objects** to Toberoff Exhibit 85. *See* MCI's Evidentiary Objection No. [64].

**4. From its beginnings in the Great Depression to the 1960s, the comic book business was a "fly-by-night" operation where publishers quickly came and went.** *See* Toberoff Decl. Ex. 1 at 7 (Evanier Rep. providing historical background and explaining volatile historical context of comic book business from the 1930s to the 1960s); Ex 3 at 204:6-23, 242:16-243:8 (Romita testifying that Goodman would open and close his comic book business at the drop of a hat and that Romita had no employment security); Ex. 13 ¶ 13 (Adams attesting that the comic book business was hand-to-mouth and the early years were a confusing time when one was not sure whether any particular comic book would still be around in a year).

**RESPONSE:** **Disputed in part**, but **immaterial**. Defendant does not identify which publishers he is referring to. To the extent Defendant is referring to Marvel, this contention is **disputed** because Marvel's business continues to the present day.

Regardless, this contention is **immaterial** because it refers in significant part to events decades outside the relevant time period and, in any event, has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 777 F. Supp. 2d at 748 (rejecting evidence from outside "the relevant time period" as "not admissible evidence of anything"); *Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).

MCI also **objects** to Toberoff Exhibits 1 and 13. *See* Memorandum Of Law In Support Of Plaintiff And Counterclaim-Defendant Marvel Characters, Inc.'s Motion To

Exclude The Expert Reports And Testimony of Mark Evanier ("MTE Evanier") [Dkt.

77]; MCI's Evidentiary Objection Nos. [1] & [16].

5. **Comic book publishers saw little value in their disposable product beyond monthly sales figures.** *See* Toberoff Decl. Ex. 1 at 7 (Evanier Rep. describing the custom and practice of comic book publishers attributing little value to comic books in the industry's early years); Ex 3 at 78:21-79:21, 254:2-25 (Romita testifying that no one at Marvel cared about the comic book characters until the 1950s and he never thought the art would be worth anything or that the comic book industry would last); Ex. 20 at 50:21-53:25, 154:13-155:14, 156:11-17 (Evanier testifying that Goodman saw little value in the work being done in the 1960s and was just following trends, that Lee told Evanier that comics would crumble and nothing would be remembered, and that Brodsky told Evanier that, in the 1960s, no one expected the comics books to ever be reprinted).

> **RESPONSE:  Disputed**, but **immaterial**.  Because Defendant fails to provide any time
>
> period or identify which "[c]omic book publishers" he is referring to in this contention, it
>
> is unclear as written.  To the extent Defendant is referring to Marvel, MCI **disputes** this
>
> contention as Marvel clearly saw value in its comics, as it registered copyrights in the
>
> comics, sought out advertising across its publishing portfolio, and otherwise capitalized
>
> on its comics through merchandising and licensing.  *See* Lens Decl., Ex. 24A-E
>
> (Marvel's contemporaneous copyright registrations in the Works); Lens Opp. Decl., Ex.
>
> 93 at 4-5 (1966 advertising rate card for Marvel Comics Group soliciting advertisements
>
> across its magazines, reflecting that Marvel Comics Group "consists principally of the
>
> following magazines . . . [including] Amazing Spider-Man and Strange Tales"); Lens
>
> Opp. Decl., Ex. 92 at 3-8 (1947 advertising rate card for Marvel Comics Group); Lens
>
> Opp. Decl., Ex. 96 at 2 (Martin Goodman authorizing his son, Charles Goodman, to act
>
> as an agent to "sign licensing and related contracts both for domestic accounts and
>
> foreign" on behalf of Magazine Management Company); Lens Opp. Decl., Ex. 97 at 2-4
>
> (schedules of assorted Marvel licensing contracts for radio programs, television
>
> productions, and merchandising during the relevant time period).  Additionally, Toberoff

Exhibit 3 **does not support** this contention, as the cited material refers to the 1950s, *i.e.,* before the relevant time period.

Regardless, this contention is **immaterial** because it refers at least in part to events outside the relevant time period and, in any event, has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 777 F. Supp. 2d at 748 (rejecting evidence from outside "the relevant time period" as "not admissible evidence of anything"); *Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).

MCI also **objects** to Toberoff Exhibits 1 and 20. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1] & [19].

6. **Little to no attention was paid to copyright issues by the publishers or artists.** *See* Toberoff Decl., Ex. 1 at 7 (Evanier Rep. describing the custom and practice of comic book publishers attributing little value to comic books in the industry's early years and the lack of attention paid to copyrights of the material); Ex 3 at 78:21-79:21, 254:2-25 (Romita testifying that no one at Marvel cared about the characters until the 1950s and he never thought the art would be worth anything or that the comic book industry would last).

**RESPONSE:** **Disputed**, but **immaterial**. Because Defendant fails to identify any time period or identify which "publishers or artists" he is referring to in this contention, it is unclear as written. To the extent Defendant is referring to Marvel, MCI **disputes** this contention because Marvel clearly paid attention to copyright issues as it registered copyrights in its comics and published appropriate copyright notices reflecting such registration. *See* Lens Decl., Ex. 23A at 2 (agreement between Marvel and Ditko whereby Ditko "acknowledges, agrees and confirms that any and all work, writing, art work material or services (the 'Work') which have been or are in the future created, prepared or performed by [him] for the Marvel Comics Group have been and will be

specially ordered or commissioned for use as a contribution to a collective work and that
as such Work was and is expressly agreed to be considered a work made for hire."); Lens
Decl., Ex. 57 at 3 (letter from Ditko stating that he "never claimed creating Spider-Man"
and that Marvel "own[s] the art pages, the published material"); Lens Decl., Ex. 52 at 3
(Ditko voicing dismay with the movie depiction of Doctor Strange but agreeing that
"whoever has the rights can add and subtract from the original any way he chooses");
Lens Decl., Ex. 59 at 3 (Ditko critiquing Marvel's editorial choices, but acknowledging
that, even if certain "ideas" were his, he "had no real right to them when published");
Lens Decl., Ex. 50 at 3 (letter from Ditko explaining that "[t]he who 'created' Spider-
man etc., issues, controversies were created by fan publication interviewers"); *compare*
Lens Decl., Ex. 56 at 2 (Ditko writing that "Wally Wood's Witzend [] gave writers,
artists the opportunity to copyright their original ideas, created material when
published"), Lens Decl., Ex. 61 at 3 (Ditko describing Wally Wood as "a stand-out in
many ways" including that "[h]e published witzend—where one could copyright his own
ideas, creations—I took advantage of it, my Mr. A, etc."), Lens Decl., Ex. 49 at 2 (Ditko
writing that the "[m]ost important" thing about "Witzend" "was that one could copyright,
own one's creative ideas, work"); Lens Decl., Ex. 60 at 3 (Ditko writing that "Wally
Wood did an astounding thing for writers and artists, an opportunity to create and
copyright what one creates, protecting and able to cash in on it at any future time"); Lens
Decl., Ex. 51 at 3 (Ditko writing that "Wally Wood who created WITZEND wanted a
publication for creators to copyright their ideas, creations"), and Lens Decl., Ex. 61 at 2
(Ditko writing that "Mr. A is my copyrighted PROPERTY" and that "NO ONE, but me,
has any right" to it), *with* Lens Decl., Ex. 44 at 4 (Ditko acknowledging that "Spider-Man

& Doctor Strange are copyrighted by the Magazine Management company").

Additionally, Toberoff Exhibit 3 **does not support** this contention, as the cited material

from 78:21-79:21 refers to the 1950s, *i.e.,* before the relevant time period.

   Regardless, this contention is **immaterial** because it refers at least in part to

events outside the relevant time period and, in any event, has no bearing on the Court's

application of the work-made-for-hire test, as this Court's grant of summary judgment for

Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 777 F. Supp.

2d at 748 (rejecting evidence from outside "the relevant time period" as "not admissible

evidence of anything"); *Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-

and-expense test).

   MCI also **objects** to Toberoff Exhibit 1. *See* MTE Evanier [Dkt. 77]; MCI's

Evidentiary Objection No. [1].

   7. **In addition, from the 1940s until June 1968, Goodman also operated his comic book business through dozens of unrelated shell companies.** *See* Toberoff Decl., Ex. 14 at 4 (Rebuttal Expert Report of Mark Evanier ("Evanier Rebuttal Rep.") providing historical context and explaining that Goodman registered the copyright to comic books under the names of various shell corporations that were unrelated to each other); Ex. 17 at 317:18-318:18 (Thomas testifying that Goodman ran "Marvel" as a bunch of small companies rather than just as a unified Magazine Management for some unknown business or legal reasons); Ex. 20 at 196:1-12 (Evanier testifying that Brodsky described Goodman's shell companies as "shell companies"); Ex. 24 at 49:21-50:22 (Paul Levitz ("Levitz") testifying that Vista Publications, Inc. ("Vista") was one of Goodman's shell companies); Ex. 46 at 1-3 (list of Goodman's shell companies dated October 4, 1967 showing no legal or corporate relationship to one another or Magazine Management).

   **RESPONSE:  Disputed**, but **immaterial**.  While MCI does not dispute that Goodman

operated his comic book business through various companies until he sold those assets in

June 1968, MCI **disputes** Defendant's characterization of such companies as "unrelated

shell companies."  As relevant here, Goodman's various comic book entities conducted

business as "Marvel" or "Marvel Comics Group" and engaged with Magazine

Management Company for administrative services, including payments to those providing services to Marvel.  *See* Bard Decl. ¶ 2; Bard Decl., Ex. 5 at 2-3 (reporting on Magazine Management Company, a "[p]artnership formed 1942" that acts as "the managing organization for the various publishing corporations in which Martin Goodman is a principal or a stockholder"); Bard Decl., Ex. 7 at 5 ("Through th[e] partnership, Magazine Management Company, respondent Martin Goodman controls and operates approximately forty-eight corporations engaged, among other things, in the business of publishing and distributing various publications.  Martin Goodman . . . formulates, directs and controls the acts and practices of each corporate respondent either directly or through the partnership, Magazine Management Company . . . ."); Bard Decl., Ex. 10 at 2 (June 28, 1968 agreement for sale of the Goodmans' Marvel Comics business (the "June 28, 1968 Sale"), reflecting the Marvel entities in existence during the early 1960s and their common ownership by Martin Goodman); Lens Decl., Ex. 18 72:25-73:11 (Goodman discussing his publishing entities, explaining that "each corporation st[ood] on its own" but he "own[ed] them either completely or [his] wife may [have] own[ed] some stock in some of them"); Lens Opp. Decl., Ex. 90 5:11-19 (Goodman testifying how a comic book would have been published by "one of [his] corporations" and would have been copyrighted "[u]nder the corporation that published it."); Bard Decl., Ex. 8 at 5-6 (A "group of commonly owned and controlled corporations collectively known as the Marvel Comics Group" published comic books "frequently includ[ing] material concerning characters featured in other publications of the Group."); Lens Decl., Ex. 75 (Goodman certifying as president of various publishing corporations that he, Jean Goodman, and said corporations conducted business as "Marvel"); Lens Decl., Ex. 76

(same); Lens Opp. Decl., Ex. 93 at 4-5 (1966 advertising rate card for Marvel Comics
Group soliciting advertisements across its magazines, reflecting that Marvel Comics
Group "consists principally of the following magazines . . . [including] Amazing Spider-
Man and Strange Tales"); Lens Opp. Decl., Ex. 92 at 3-8 (1947 advertising rate card for
Marvel Comics Group); Bard Decl., Ex. 6 at 3 ("The defendant Magazine Management
Company . . . partnership is composed of two New York citizens with offices in New
York City, and renders administrative services to and exercises the over-all control of the
other defendants.  The costs of these services are charged to the corporation, for which
and to the extent said services are rendered."); Bard Decl., Ex. 5 at 3 (explaining that
Magazine Management Company acts as the "managing organization for the various
publishing corporations" and its "[i]ncome is mainly derived from services rendered on a
contract basis"); Lens Decl., Ex. 68A-G (freelance writer Don Heck's payment ledger
reflecting extensive entries on per-page basis for his work for "Mag. Management,"
"Maga. Management," "Magazine Management," and "Marvel" from 1954 to 1972 and
intermittently until 1994, when all entries end).

Regardless, this contention is **immaterial** because it refers at least in part to
events outside the relevant time period and, in any event, has no bearing on the Court's
application of the work-made-for-hire test, as this Court's grant of summary judgment for
Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 777 F. Supp.
2d at 748 (rejecting evidence from outside "the relevant time period" as "not admissible
evidence of anything"); *Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-
and-expense test).

MCI also **objects** to Toberoff Exhibits 14 & 20.  *See* MTE Evanier [Dkt. 77];

MCI's Evidentiary Objection Nos. [17] & [19].

8. **These shell companies had no employees, no actual offices or business activities, and, aside from being the name listed on the comic book cover copyright indicia, had no connection whatsoever to the works they purportedly copyrighted and published.** *See* Toberoff Decl. Ex. 14 at 4-5 (Evanier Rebuttal Rep. providing historical context and explaining that the shell companies had no employees, offices, or business activities, and had no contact with any freelancer); Ex. 17 at 244:15-23, 278:20-279:20 (Thomas testifying that the door to "Marvel's" office in 1965 only said "Magazine Management" and "Marvel's" employees worked in Magazine Management's offices); *id*. at 318:4-322:14 (Thomas testifying that Vista, Atlas Magazines, Inc. ("Atlas"), Non-Pareil Publishing Corp. ("Non-Pareil"), and others were just used as names on the comic book cover copyright indicia, but other than the indicia, no one knew what those entities did); *id*. at 320:10-322:14 (Thomas testifying that no one knew what Vista, Atlas, or Non-Pareil did and that Thomas did not receive any money from them, does not know anyone who did, does not know if they had any employees or any offices, or "of [them] having any existence" whatsoever); Ex. 22 at 252:23-254:24, 303:15-19 (Lieber testifying that he never heard of Vista or other shell companies, did not know if they had any employees and that he was paid by, and believed he was working with, Magazine Management); Ex. 24 at 51:19-52:2 (Levitz testifying that Goodman's shell companies had no actual offices and that only Magazine Management had offices); Ex. 50 at DETTWILER-0044-0058 (Don Heck's payment records identifying "Magazine Management" as the only entity that paid him for his freelance material from 1962 to 1966 (the "Period")).

> **RESPONSE:  Disputed**, but **immaterial**.  MCI **disputes** Defendant's characterization of
>
> such companies as "shell companies" with "no connection whatsoever to the works" they
>
> published and copyrighted.  As relevant here, Goodman's various comic book entities
>
> conducted business as "Marvel" or "Marvel Comics Group" and engaged with Magazine
>
> Management Company for administrative services, including payments to those
>
> providing services to Marvel.  *See supra* Response No. 7, *citing* Bard Decl. ¶ 2; Bard
>
> Decl., Ex. 5 at 2-3; Bard Decl., Ex. 7 at 5; Bard Decl., Ex. 10 at 2; Lens Decl., Ex. 18
>
> 72:25-73:11; Lens Opp. Decl., Ex. 90 5:11-19; Bard Decl., Ex. 8 at 5-6; Lens Decl., Ex.
>
> 75; Lens Decl., Ex. 76; Lens Opp. Decl., Ex. 93 at 4-5; Lens Opp. Decl., Ex. 92 at 3-8;
>
> Bard Decl., Ex. 6 at 3; Bard Decl., Ex. 5 at 3; Lens Decl., Ex. 68A-G.

Regardless, this contention is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).

MCI also **objects** to Toberoff Exhibits 14 and 22.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [17], [26], & [31].

9. **"Marvel" from its inception through the 1960s, was unique in its informality and disorganization.** *See* Toberoff Decl. Ex. 24 at 112:20-113:4 (Levitz testifying that Marvel was disorganized and did not have document retention policies and could not even keep track of its published comic books, which was very different than the more-organized DC Comics); Ex. 8 ¶ 10 (Joe Sinnott ("Sinnott") attesting that Marvel was very small and disorganized in the 1950s and 1960s); Ex. 102 at 8-9 (Flo Steinberg ("Steinberg") explaining that, when she was hired at Marvel in March 1963, she and Lee were the only employees and noting that Marvel had the "teeniest little office" and that there "was just a small amount of comics to get out").

**RESPONSE:**  **Disputed**, but **immaterial**.  While MCI does not dispute that Marvel, as a creative comic book publisher, may have had an informal workplace in certain aspects, MCI **disputes** that its organization was "unique[ly]" informal and disorganized among all comic book publishers.  Indeed, none of the cited evidence establishes this contention.  To the contrary, Exhibits 24, 8, and 65 merely indicate that Marvel had a small office or less robust document retention policies than DC Comics, one of Marvel's competitors.

Regardless, this contention is **immaterial** because it refers at least in part to events outside the relevant time period and, in any event, has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 777 F. Supp. 2d at 748 (rejecting evidence from outside "the relevant time period" as "not admissible evidence of anything"); *Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).

188

MCI also **objects** to Toberoff Exhibit 8.  *See* MCI's Evidentiary Objection No. [11].

10. **Lee started at Timely as an office boy.** *See* Toberoff Decl. Ex. 1 at 9 (Evanier Rep. describing Lee's role as an office boy at Timely); Ex. 4 at 10:23-11:17 (Lee testifying that he got hired at Timely in 1939 or 1940); Ex. 56 at 82:13-22 (Lee testifying he started at Timely around 1940 when he was 17 years old).

> **RESPONSE:  Undisputed**, but **immaterial** because this paragraph refers to events
>
> outside the relevant time period and, in any event, has no bearing on the Court's
>
> application of the work-made-for-hire test, as this Court's grant of summary judgment for
>
> Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 777 F. Supp.
>
> 2d at 748 (rejecting evidence from outside "the relevant time period" as "not admissible
>
> evidence of anything"); *Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-
>
> and-expense test).
>
> MCI, however, **objects** to Toberoff Exhibit 1.  *See* MTE Evanier [Dkt. 77];
>
> MCI's Evidentiary Objection No. [1].

11. **Lee was the nephew of Goodman's business manager who married into the Goodman family, making Lee, Goodman's relative.** *See* Toberoff Decl. Ex. 1 at 9 (Evanier Rep. describing Lee's familial connection to Goodman); Ex. 5 at 296:10-14 (Lee testifying he was Goodman's wife's cousin).

> **RESPONSE:  Undisputed**, but **immaterial** because this paragraph has no bearing on the
>
> Court's application of the work-made-for-hire test, as this Court's grant of summary
>
> judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See*
>
> *Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).
>
> MCI, however, **objects** to Toberoff Exhibit 1.  *See* MTE Evanier [Dkt. 77];
>
> MCI's Evidentiary Objection No. [1].

12. **In 1941, Goodman promoted Lee, then 18, to the role of editor of his fledgling comic book business.** *See* Toberoff Decl. Ex. 1 at 9 (Evanier Rep. describing Lee's promotion

from office boy and apprentice writer to editor); Ex. 4 at 14:2-17 (Lee testifying that he got promoted to editor).

**RESPONSE:  Undisputed**.

MCI, however, **objects** to Toberoff Exhibit 1.  *See* MTE Evanier [Dkt. 77];

MCI's Evidentiary Objection No. [1].

13. **By the mid-1940s, Timely had staff artists on salary, but in 1949, Goodman discovered surplus artwork, and fired his entire staff.** *See* Toberoff Decl. Ex. 1 at 9 (Evanier Rep. providing historical context giving rise to Marvel's purchase of material from freelance creators and explaining caused him to fire his staff artists); Ex. 5 at 368:11-369:14, 371:3-25 (Lee testifying that Goodman discovered excess artwork and had Lee fire almost everyone and that artists went from having guarantees from Goodman for a certain amount of work, to working freelance where Marvel "would only buy what [it] needed"); Ex. 11 1 4 (Colan attesting that he was originally hired in 1946 as a staff artist for Timely, but was let go in the late 1940s, at which point he "sold artwork on a freelance basis to Timely").

**RESPONSE:  Disputed in part**, but **immaterial**.  MCI **disputes** that Goodman fired

"his entire staff." *See* Toberoff Ex. 5 369:3-8 (Lee testifying that "[m]ost of the salaried

creative people were let go, while I was ordered to use up all the inventory material.").

MCI also **disputes** Defendant's characterization that Marvel "purchase[d] material," "on

spec," which is not only an issue of law but also inaccurate.  To the contrary, freelance

contributors, including Ditko, contributed to Marvel's comic books pursuant to

assignments from Lee, who directed the creation of the Works, and they were

compensated by Marvel on an agreed per-page basis for completed assignments. *See*

Lens Decl., Ex. 2 152:1-154:7 (Thomas testifying that he could not "think of any

instances" in which "artists start[ed] working on pages for a comic before discussing the

plot or synopsis with Stan or the writer," or, more specifically, in which Ditko "submitted

artwork to Marvel for an existing comic book series that he hadn't been assigned to," or

otherwise sold plots, synopses, scripts, dialogue, artwork, or characters "on spec" to

Marvel); Lens Decl., Ex. 12 56:12-15 (Thomas testifying that artists did not "start

working on pages before discussing the plot or synopsis with Stan or the writer"); Lens Decl., Ex. 12 57:25-58:9 (Thomas confirming that he was not "aware of any instance where a writer came in and actually started working on a new series before Stan said: Go ahead and write the series," nor was he "aware of any instances where an artist began work on a comic book issue before getting the assignment to do the issue from Stan"); Lens Decl., Ex. 12 58:14-23 (Thomas confirming that, during the relevant period, Marvel did not "ever buy any work created on spec by freelance artists"); Lens Decl., Ex. 7 217:13-21 (same); Lens Decl., Ex. 13 41:20-42:9 (Lee testifying that he could not recall "Marvel ever buy[ing] work that was created by one of the writers or freelancers on spec as opposed to having the material being part of an assignment that [Lee] would give him" during the relevant time period); Lens Decl., Ex. 10 383:18-21 (Lee confirming that Kirby did not "ever begin work on a book published by Marvel before [Lee] had assigned him that work"); Lens Decl., Ex. 6 38:8-21 (Lee confirming that he could not "recall any comic book that Marvel published prior to 1972 . . . that was created other than pursuant to a specific assignment by an editor to a writer and an artist"—at least, in Marvel's "regular comics"); Lens Decl., Ex. 48 at 3 (Ditko admitting that he "was given the job of drawing Spider-Man" but could not speak to "[w]hy, exactly"); Lens Decl., Ex. 51 at 3 (Ditko explaining that, "[a]s a freelancer, [his] focus had to be on what is next, what has to be done," as "[t]he last job is history"); Lens Decl., Ex. 54 at 4 (Ditko acknowledging that, "[s]ince [he] was a freelancer, Stan Lee could have taken [him] off S[pider]-M[an] anytime he wanted—he did it for a S[pider]-M[an] story pencilled by Jack Kirby"); Lens Decl., Ex. 2 27:19-28:7 (Thomas testifying that his "responsibilities as a freelance writer" were "[j]ust to write whatever Stan told [him] to write"); Lens Decl., Ex. 2 56:2-57:7

(Thomas testifying that Marvel artists did not "have the ability to select which comics they were going to work on" or "the ability to select which artists, letterers, or colorists they were going to be working with" during the relevant time period); Lens Decl., Ex. 12 56:16-18 (Thomas confirming that it was Lee who "decided which writer and artist would work on a particular comic book or issue"); Lens Decl., Ex. 2 148:22-151:25 (Thomas testifying about why freelancers might be removed from certain comic books, including for "lateness, undependability," or the editor's decision that "they just weren't doing the right job, or even if they were okay . . . [that] a little bit of musical chairs might get us a better arrangement of people"); *see also* Lens Decl., Ex. 2 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens Decl., Ex. 12 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13 14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl., Ex. 2 17:8-18:13 (Thomas testifying that "subject to the publisher, [Lee] was in charge of everything. He oversaw the writing, he oversaw the artists and the art that came in. You know, everything went through him with the help of the production manager in particular."); Lens Decl., Ex. 2 24:17-23 (Thomas testifying how Marvel production manager Sol Brodsky "would call a freelancer in . . . to keep an eye on him to make sure he finished the job on deadline or . . . had something that had to be corrected or changed"); Lens Decl., Ex. 2 37:10-39:6 (Thomas testifying that when he became editor-in-chief, he was "in charge of, you know, all the artists, the writers, the colorists, the letterers and so forth"); Lens Decl., Ex. 12 67:16-68:6 (Thomas testifying that Lee "decided which artist would do a cover for a particular issue[,] . . . they were

reviewed by Stan, . . . then they were all reviewed eventually by Martin Goodman as publisher"); Lens Decl., Ex. 13 44:4-17 (Lee testifying that because "we considered the covers the most important part of the book," he "spent a lot of time on" their look and layout); Lens Decl., Ex. 13 16:3-19 (Lee testifying that he would "give instructions to the artists as to how [he] wanted the story to go" and "oversaw . . . creative editorial aspects of the comic books that were created, . . . because [he] had to answer to the publisher, Martin Goodman, and he had to be happy with what I was doing"); Lens Decl., Ex. 4 97:7-9 (Lee testifying that comic book production "was [his] responsibility, the whole thing"); Lens Decl., Ex. 4 93:23-94:5 (Lee testifying that he supervised Marvel's writers and artists); Lens Decl., Ex. 2 80:24-81:12 (Thomas testifying that "[s]ubject to the publisher, [Lee had] complete authority" over artwork in Marvel comics); Lens Decl., Ex. 2 125:18-126:1 (Thomas testifying that Lee "was always the ultimate authority unless Martin Goodman stepped in, and that was mostly on covers"); Lens Decl., Ex. 7 219:11-220:11 (Thomas testifying that "the ultimate say, as far as I know, was the publisher, . . . Martin Goodman"); Lens Decl., Ex. 13 97:8-11 (Lee testifying that he "couldn't do any book unless Martin approved of it"); Lens Decl., Ex. 4 124:19-125:4 (Lee testifying that "[i]t was always [Goodman's] decision" as to what to publish, and "he exercised the authority ultimately to publish the last edition of 'Amazing Fantasy'"); Lens Decl., Ex. 4 124:3-18 (Lee testifying that he "loved" the "Amazing Fantasy" books but "Mr. Goodman decided to cancel them because they weren't selling"); Thomas Decl. ¶¶ 7-8 ("As part of [Marvel's] established framework [for creating comics in the 1960s], Stan Lee supervised and directed Marvel's comic book-creation process subject only to Martin Goodman"); *see also* Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2

141:25-142:15 (Thomas testifying that freelance writers, artists, pencilers, inkers, letterers, and colorists all were paid by Marvel on a per-page rate); Lens Decl., Ex. 4 125:15-18 (Lee confirming that, to his recollection, Ditko was paid a per-page rate "for his contribution to . . . Spider-Man"); Lens Decl., Ex. 2 292:18-293:4 (Thomas explaining Marvel's per-page rate system, in that compensation "was based entirely on the page, whether it took ten minutes to write or an hour to write or five hours to write"); Lens Decl., Ex. 2 332:23-333:4 (Thomas testifying that he understood that Marvel had "always" used "a page rate kind of system for writers and for artists" during the relevant time period); Lens Decl., Ex. 13 30:11-14 (Lee confirming that freelancers "were paid on a per page rate" during the relevant time period); Lens Decl., Ex. 13 58:13-21 (same as to Kirby); Lens Decl., Ex. 39 at 5 (Thomas recounting that the day Ditko quit Marvel, noting that Marvel production manager Sol Brodsky "had a memo on his desk for a $5 a page raise for Steve, which was fairly substantial for 1965"); Lens Decl., Ex. 57 at 3 (Ditko writing "What I did with Spider-man, I was paid for. Marvel's property."); Lens Decl., Ex. 68A-G (freelance writer Don Heck's payment ledger reflecting extensive entries on per-page basis for his work for "Mag. Management," "Maga. Management," "Magazine Management," and "Marvel" from 1954 to 1972 and intermittently until 1994, when all entries end); Lens Decl., Ex. 2 137: 8-16 (Thomas testifying that he was "paid on a per-page basis for [his] freelance writing assignments from Marvel"); Lens Decl., Ex. 10 396:1-10 (Lee testifying that for his work as a writer, he "was paid on a freelance basis, like any freelancer writer . . . paid by the page"); Lens Decl., Ex. 6 40:14-20 (Lee testifying that as a writer he was paid"[p]er page on a freelancer basis like all the other

writers."); *see also* Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-

153:10, 175:7, 226:7-11, 249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.

Regardless, this paragraph is **immaterial** because it has no bearing on the Court's

application of the work-made-for-hire test, as this Court's grant of summary judgment for

Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 777 F. Supp.

2d at 748 (rejecting evidence from outside "the relevant time period" as "not admissible

evidence of anything"); *Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-

and-expense test).

MCI, however, **objects** to Toberoff Exhibits 1 and 11. *See* MTE Evanier [Dkt.

77]; MCI's Evidentiary Objection Nos. [1] & [14].

14. **In 1954-57, Senate hearings on the corrupting influence of comics nearly bankrupted Timely, now Magazine Management.** *See* Toberoff Decl. Ex 3 at 200:4-202:4 (Romita testifying that, around 1957, Timely/Atlas was having financial troubles because of Congressional hearings so the company cut artists and cut the number of comic book issues it was publishing); Ex. 24 at 138:16-140:7 (Levitz testifying that the comic book industry underwent great unrest in the 1950s).

**RESPONSE: Disputed**, but **immaterial**. Defendant cites no evidence that Senate

hearings occurred in the years 1954-57, nor that such hearings "nearly bankrupted

Timely." The evidence establishes, at most, that the comic industry underwent financial

troubles and "unrest."

Regardless, this contention is **immaterial** because it refers to events outside the

relevant time period and, in any event, has no bearing on the Court's application of the

work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the

*Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 777 F. Supp. 2d at 748

(rejecting evidence from outside "the relevant time period" as "not admissible evidence

of anything"); *Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense

test).

15. **In 1957, Magazine Management again fired essentially all its employees except Lee.** *See*
Toberoff Decl. Ex. 1 at 9 (Evanier Rep. providing historical context giving rise to Marvel's
relationship with freelancers and describing Goodman's decision to fire all writers and artists
except Lee); Ex 3 at 123:18-125:12 (Romita testifying that he was fired around 1957 and was not
paid for the work he was in the middle of completing); Ex. 5 at 372:19-373:13 (Lee testifying
that Goodman had Lee fire everyone a second time in response to the Senate comic book
controversy); Ex. 8 ¶ 10 (Sinnott attesting that Marvel fired its staff in 1957).

> **RESPONSE:  Undisputed**, but **immaterial** because this paragraph refers to events
>
> outside the relevant time period and, in any event, has no bearing on the Court's
>
> application of the work-made-for-hire test, as this Court's grant of summary judgment for
>
> Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 777 F. Supp.
>
> 2d at 748 (rejecting evidence from outside "the relevant time period" as "not admissible
>
> evidence of anything"); *Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-
>
> and-expense test).
>
> MCI, however, **objects** to Toberoff Exhibits 1 and 8.  *See* MTE Evanier [Dkt.
>
> 77]; MCI's Evidentiary Objection Nos. [1] & [11].

16. **Magazine Management went from publishing 45 comics per month to 8.** *See* Toberoff
Decl. Ex. 1 at 9 (Evanier Rep. providing historical context and describing Magazine
Management's severe reduction in the number of books it published during the 1950s); Ex 3 at
123:18-125:12, 200:4-202:4 (Romita testifying that, around 1957, Timely/Atlas was having
financial troubles so the company cut artists and cut the number of titles it published); Ex. 17 at
110:11-23 (Thomas testifying that Marvel was publishing only 8 comics per month in the
1960s); Ex. 102 at 8-9 (Flo Steinberg explaining that, when she was hired at Marvel in March
1963, she and Lee were the only employees and noting that Marvel had the "teeniest little office"
and that there "was just a small amount of comics to get out").

> **RESPONSE:  Disputed**, but **immaterial**.  Because Defendant fails to provide any time
>
> period in this contention, it is unclear when or for how long Defendant suggests
>
> Magazine Management went from publishing 45 to 8 comics per month.  While MCI

does not dispute that Marvel reduced its comics output in the late 1950s, MCI **disputes** that it specifically reduced its output from 45 to 8 comics.

Additionally, Toberoff Exhibit 17 **does not support** this contention because it states that when accounting *just* for Super Hero titles in 1965, "[t]here were around eight or so"—not that Marvel only published 8 comics in total or that this occurred at or near the time of the 1957 Congressional hearings, which Defendant seems to suggest. Toberoff Exhibit 3 **does not support** this contention because it says nothing about the specific number of titles Magazine Management was publishing (merely that it cut the total number of titles), and Toberoff Exhibit 65 **does not support** this contention because it says nothing at all about the number of titles Marvel published at any time.

Regardless, this contention is **immaterial** because it refers at least in part to events outside the relevant time period and, in any event, has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 777 F. Supp. 2d at 748 (rejecting evidence from outside "the relevant time period" as "not admissible evidence of anything"); *Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).

MCI also **objects** to Toberoff Exhibit 1.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection No. [1].

17. **In 1958, to keep its operations afloat, Magazine Management resumed buying freelance material at a per-page rate, but purposefully had no written contracts with freelancers, including Steve Ditko ("Ditko").** *See* Toberoff Decl. Ex. 1 at 10, 13 (Evanier Rep. providing historical context giving rise to Marvel's use of freelance creators and explaining that, when Magazine Management ran out of surplus artwork to publish, it began to purchase artwork and scripts from freelancers at a low page rate and that freelancers did not have written contracts with Magazine Management during the 1950s or 1960s); Ex. 14 at 10-11 (Evanier Rebuttal Rep. explaining that it was not the custom and practice of Marvel or other publishers in the comic

book industry to have written contracts with freelance creators during the Period); Ex. 2 at 71:17-
74:5 (Lieber testifying that he sold freelance work to Marvel in the 1950s and 1960s, had no
contract with Marvel, and that Marvel was not obligated to buy his submitted freelance material);
Ex. 3 at 159:24-160:4, 194:11-195:3, 211:7-212:3 (Romita testifying that he did not have a
contract with Marvel as a freelancer); Ex. 5 at 371:3-25 (Lee testifying that Marvel "would only
buy what [it] needed"); Ex. 6 at 36:17-21, 202:2-20 (Thomas testifying that he had no contract
with Marvel until 1974); Ex. 8 ¶ 10 (Sinnott attesting that he had no contract with Marvel and
Marvel was very small and disorganized in the 1950s and 1960s); Ex. 8 ¶ 11 (Sinnott attesting
that Marvel had no obligation to buy pages of his work and that Marvel paid only for the pages it
wanted); Ex. 9 ¶ 8 (James Steranko ("Steranko") attesting that he did not have a contract with
Marvel when he was submitting freelance material to it from 1966 to 1973); Ex. 10 ¶ 12 (Richard
Ayers ("Ayers") attesting that he had no contract with Marvel from 1959 to 1975); Ex. 11 ¶ 9
(Colan attesting that he had no contract with Marvel until 1975); Ex. 13 ¶ 7 (Adams attesting that
he had no contract with Marvel in the 1960s or 1970s); Ex. 17 at 39:25-40:4, 51:20-52:4
(Thomas testifying that he had no written contract from 1965 to 1974); Ex. 22 at 287:22-288:12
(Lieber testifying that he had no contract with Marvel in the 1950s or 1960s); Ex. 24 at 79:2-8
(Levitz testifying that Marvel did not have contracts with any freelancer until the mid-1970s).

> **RESPONSE:  Disputed**, but **immaterial**.  MCI **disputes** Defendant's suggestion that
>
> Marvel was "buying" work "on spec," which is not only an issue of law but also
>
> inaccurate.  To the contrary, freelance contributors, including Ditko, contributed to
>
> Marvel's comic books pursuant to assignments from Lee, who directed the creation of the
>
> Works, and they were compensated by Marvel on an agreed per-page basis for completed
>
> assignments for Marvel—even if, as of 1958, Marvel freelancers did not have written
>
> employment agreements with Marvel.  *See supra* Response No. 13, *citing* Lens Decl., Ex.
>
> 2 152:1-154:7; Lens Decl., Ex. 12 56:12-15, 57:25-58:9, 58:14-23; Lens Decl., Ex. 7
>
> 217:13-21; Lens Decl., Ex. 13 41:20-42:9; Lens Decl., Ex. 10 383:18-21; Lens Decl., Ex.
>
> 6 38:8-21; Lens Decl., Ex. 48 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex. 54 at 4; Lens
>
> Decl., Ex. 2 27:19-28:7, 56:2-57:7, 148:22-151:25, 88:17-89:13, 131:8-19, 145:23-
>
> 148:20, 164:3-9; Lens Decl., Ex. 12 56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens Decl.,
>
> Ex. 6 41:14-24; Lens Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at
>
> 2; Lens Decl., Ex. 13 14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-
>
> 140:2, 140:8-11, 224:5-10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-

24; Lens Decl., Ex. 2 17:8-18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 44:4-17; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-9, 93:23-94:5; Lens Decl., Ex. 2 80:24-81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15; Lens Decl., Ex. 4 125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens Decl., Ex. 13 30:11-14, 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 68A-G; Lens Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens Decl., Ex. 6 40:14-20; Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7, 226:7-11, 249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.

Regardless, this contention is **immaterial** because it refers at least in part to events outside the relevant time period and, in any event, has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 777 F. Supp. 2d at 741-42, 748 (rejecting the Kirbys' "entirely unpersuasive" argument that the lack of a written contract with Marvel meant it "lacked the legal right to control Kirby's work and rejecting evidence from outside "the relevant time period" as "not admissible evidence of anything"); *Kirby*, 726 F.3d at 141-142 (rejecting the Kirbys' argument that "the 'right to supervise' referred to in our case law requires a legal, presumably contractual, right" because there is "no hint of this requirement in our case law applying the instance and expense test"—"Marvel's active involvement in the creative process, coupled with its power to reject pages and request that they be redone" suffices).

MCI also **objects** to Toberoff Exhibits 1, 2, 3, 8, 9, 10, 11, 13, 14, and 22.  *See*

MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [2], [9], [11], [12], [13],

[14], [16], [17], [25], & [30].

18. **While it was understood that "Marvel"** *owned* **the work created by freelance writers/artists once it purchased and paid for such work, neither Magazine Management (nor Goodman's shell companies) nor the freelancers viewed or intended their creations as "work made for hire" or "Marvel" as the "author." and owner of such work at the moment of its creation.** *See* Toberoff Decl. Ex. 8 ¶¶ 14-15 (Sinnott attesting that in the 1950s and 1960s, he did not consider his freelance work submitted to Marvel to be done as "work made for hire"); Ex. 9 ¶ 8 (Steranko attesting that no one at Marvel ever informed him that his work was being created as "work made for hire" from 1966 to 1973); Ex. 10 ¶ 13 (Ayers attesting that he thought Marvel owned his work because it bought the material he submitted, but that he never heard the term "work for hire" and did not think his work was created as "work made for hire"); Ex. 11 ¶ 12 (Colan attesting that he believed Marvel owned the work it purchased from him, but that he never heard the term "work for hire"); Ex. 13 ¶¶ 12-13 (Adams attesting that he did not consider the work he submitted to Marvel to be done as "work made for hire"); Ex. 21 at 97:3-23 (Steranko testifying that he believed that when he walked into Marvel to deliver his freelance material, he still owned the work and that his work belonged to him until he cashed the check Marvel wrote to him); Ex. 22 at 266:13-267:2 (Lieber testifying that he believed he owned his freelance material until Marvel bought it from him); Ex. 54 at 2021MARVEL-0070259 (Marvel President James Galton ("Galton") correspondence to Thomas dated February 24, 1978 stating "it was our intent that all copyrights be assigned to Marvel, I assume this is acceptable to you ... I would appreciate your signing ... to confirm that all right to claim renewal and extension of copyrights are assigned to Marvel"); Ex. 64 at 245 n.80 (Nimmer explaining in 1963 "that 17 U.S.C. Sec. 26 expressly renders an employer for hire an 'author' but makes no comparable provision with respect to commissioned works").

**RESPONSE:**  **Disputed**, but **immaterial**.  MCI **disputes** Defendant's

characterization of such companies as "shell companies." As relevant here, Goodman's

various comic book entities conducted business as "Marvel" or "Marvel Comics Group"

and engaged with Magazine Management Company for administrative services, including

payments to those providing services to Marvel. *See supra* Response No. 7, *citing* Bard

Decl. ¶ 2; Bard Decl., Ex. 5 at 2-3; Bard Decl., Ex. 7 at 5; Bard Decl., Ex. 10 at 2; Lens

Decl., Ex. 18 72:25-73:11; Lens Opp. Decl., Ex. 90 5:11-19; Bard Decl., Ex. 8 at 5-6;

Lens Decl., Ex. 75; Lens Decl., Ex. 76; Lens Opp. Decl., Ex. 93 at 4-5; Lens Opp. Decl., Ex. 92 at 3-8; Bard Decl., Ex. 6 at 3; Bard Decl., Ex. 5 at 3; Lens Decl., Ex. 68A-G.

MCI also **disputes** Defendant's suggestion that Marvel "purchased" work "on spec," which is not only an issue of law but also inaccurate. To the contrary, freelance contributors, including Ditko, contributed to Marvel's comic books pursuant to assignments from Lee, who directed the creation of the Works, and they were compensated by Marvel on an agreed per-page basis for completed assignments. *See supra* Response No. 13, *citing* Lens Decl., Ex. 2 152:1-154:7; Lens Decl., Ex. 12 56:12-15, 57:25-58:9, 58:14-23; Lens Decl., Ex. 7 217:13-21; Lens Decl., Ex. 13 41:20-42:9; Lens Decl., Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21; Lens Decl., Ex. 48 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2 27:19-28:7, 56:2-57:7, 148:22-151:25, 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens Decl., Ex. 12 56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13 14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl., Ex. 2 17:8-18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 44:4-17; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-9, 93:23-94:5; Lens Decl., Ex. 2 80:24-81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15; Lens Decl., Ex. 4 125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens Decl., Ex. 13 30:11-14, 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 68A-G; Lens Decl., Ex.

2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens Decl., Ex. 6 40:14-20; Lens Decl., Ex. 2

276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7, 226:7-11, 249:7-9, 258:12-

17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.

      MCI further **disputes** that Marvel and Marvel freelancers did not view or intend

freelancer work as Marvel's "work made for hire" or that Marvel was the "author" and

owner of such work at the moment of its creation.  *See* Lens Decl., Ex. 24A-E (Marvel's

contemporaneous copyright registrations generally listing each respective Marvel

publishing entity as "Copyright Claimant" and renewal registrations generally listing

each such Marvel publishing entity as "Author"). The evidence establishes that Marvel

viewed the Works as works made for hire and itself as the author, and that freelancers,

including Steve Ditko, understood their work for Marvel during the relevant time period

was done on a work for hire basis. *See id*.; Lens Decl., Ex. 2 40:24-41:8 (Thomas

testifying that "I understood when I came into the company that Marvel . . . would own

the characters, the stories, the writing, whatever I was doing, and that was also made

clear by the statement on the back of the check from the earliest days"); Lens Decl., Ex. 2

48:11-49:4 (Thomas testifying that he "didn't like creating many characters for Marvel,

because [he] knew [he] wouldn't own them"); Lens Decl., Ex. 2 60:19-61:6 (Thomas

agreeing that, "for the entire tenure that [he] worked with Marvel," he understood "that

Marvel would have all of the rights, including copyrights and anything that [he] worked

on at Marvel"); Lens Decl., Ex. 13 at 26:22-28:6 (Lee testifying that "it was typical in the

industry for comic book publishers to own the rights to the materials that were created for

them for publication" during the relevant time period); Lens Decl., Ex. 13 at 100:25-

101:17 (Lee testifying that he "always felt the company" owned the characters he created

or co-created); Lens Decl., Ex. 20 at 2 (Marvel artist Gene Colan writing that "[p]ages were stamped on the back 'work for hire' . . . In the narrow field of comic art, one either worked 'for hire' or didn't work!"); Lens Decl., Ex. 19 at 2 (agreement between Marvel and Colan that his contributions to Marvel's comic books "were created as works made for hire"); Lens Decl., Ex. 23A-E (documentation reflecting hundreds of freelancers' "express[] agree[ment]" that their work would "be considered a work made for hire."); Lens Decl., Ex. 7 355:18-23 (Thomas testifying that the popularization of "the term 'work-for-hire'" in the mid-1970s only formalized "the same general situation that had already existed"); Lens Opp. Decl., Ex. 88 120:3-9 (Lee testifying that he "did [Marvel characters] as a work for hire."); Lens Opp. Decl., Ex. 87 109:19-25 (Lee testifying that "[a]t Marvel I was an employee, a writer for hire. No one who worked for a comics company back then owned anything they created."); *see also supra* Response No. 6, *citing* Lens Decl., Ex. 23A at 2; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 52 at 3; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 50 at 3; Lens Decl. Ex. 56 at 2; Lens Decl., Ex. 61 at 3; Lens Decl., Ex. 49 at 2; Lens Decl., Ex. 60 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex. 61 at 2; Lens Decl., Ex. 44 at 4.

Additionally, Toberoff Exhibits 9 and 21 **do not support** this contention, because over a decade ago, when Mr. Steranko was retained as an expert witness for Defendant's counsel, he testified that "[w]hen [he] worked at Marvel, [he] was on a work for hire basis." Lens Opp. Decl., Ex. 89 82:3-23. As Mr. Steranko explained, he understood this based on his "experience at Marvel," as Marvel "provided him with [a] description of the character," gave him "treatment[s] [or] synops[e]s of the material that they were looking for," "supervis[ed]" him, and "stamped [his checks] work for hire." *Id*. And after Marvel

"editted [sic] some of [his] work" and "changed certain things that [he] didn't feel should

be changed," Steranko, like Ditko, who "faced the same frustrations," left Marvel. Lens

Opp. Decl., Ex. 95 at 4-5. Toberoff Exhibit 64 **cannot provide factual support**, as the

cited material is a treatise purportedly summarizing the law, not a fact. Toberoff Exhibit

13 also **does not support** this contention, as the cited material refers to a period of time

beginning in late 1960s, not the relevant time period.

Regardless, this contention is **immaterial** because how Marvel or Marvel

freelancers "viewed" their relationship to the Works has no bearing on the Court's

application of the work-made-for-hire test, as this Court's grant of summary judgment for

Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 726 F.3d at

139-40 (relevant principles of the instance-and-expense test).

MCI also **objects** to the evidence cited in support of this contention. *See* MCI's

Evidentiary Objection Nos. [11], [12], [13], [14], [16], [23], [28], [51], & [58].

19. **In June 1968, Goodman sold Magazine Management and all his shell companies to publicly traded Perfect Film and Chemical Corporation ("Perfect Film") which was later renamed Cadence Industries ("Cadence").** *See* Toberoff Decl. Ex. 1 at 17 (Evanier Rep. providing historical context of Marvel's sale to Perfect Film in 1968, which was later renamed Cadence in 1973); Ex. 7 at 273:19-274:3 (Thomas testifying that Marvel was taken over by Perfect Film/Cadence); Ex. 17 at 246:1-12 (Thomas testifying that Perfect Film bought Marvel and later changed its name to "Cadence"); Ex. 24 at 37:5-18, 52:8-13 (Levitz testifying Marvel was a privately held company until it was sold to Perfect Film, which was a public company); Ex. 46 at 1-3 (list of Goodman's shell companies drafted in preparation of the sale to Perfect Film, dated October 4, 1967).

**RESPONSE:  Disputed**, but **immaterial**.  MCI **disputes** Defendant's characterization of

such companies as "shell companies."  As relevant here, Goodman's various comic book

entities conducted business as "Marvel" or "Marvel Comics Group" and engaged with

Magazine Management Company for administrative services, including payments to

those providing services to Marvel.  *See supra* Response No. 7, *citing* Bard Decl. ¶ 2;

Bard Decl., Ex. 5 at 2-3; Bard Decl., Ex. 7 at 5; Bard Decl., Ex. 10 at 2; Lens Decl., Ex. 18 72:25-73:11; Lens Opp. Decl., Ex. 90 5:11-19; Bard Decl., Ex. 8 at 5-6; Lens Decl., Ex. 75; Lens Decl., Ex. 76; Lens Opp. Decl., Ex. 93 at 4-5; Lens Opp. Decl., Ex. 92 at 3-8; Bard Decl., Ex. 6 at 3; Bard Decl., Ex. 5 at 3; Lens Decl., Ex. 68A-G.

MCI also **disputes** that Goodman sold Magazine Management and his commonly owned and controlled entities to Perfect Film.  Rather, Goodman sold only the *assets* relating to the Marvel Comics Group business (including the copyrights in and to the Works) to Perfect Film.  *See* Bard Decl., Ex. 10 at 3 (June 28, 1968 Sale agreement, reflecting the "transfer to Perfect" of "certain of the property and assets and business").

MCI further **disputes** Defendant's suggestion that Toberoff Exhibit 46 was "drafted in preparation of the sale to Perfect Film"—a characterization unsupported by any evidence.

Regardless, this contention is **immaterial** because it refers to events outside the relevant time period and, in any event, has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 777 F. Supp. 2d 720, 748 (S.D.N.Y. 2011) (rejecting evidence from outside "the relevant time period" as "not admissible evidence of anything"); *Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).

MCI also **objects** to Toberoff Exhibit 1.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection No. [1].

20. **When it took over, Cadence sought to shore up Magazine Management's assets.** *See* Toberoff Decl. Ex. 1 at 17 (Evanier Rep. describing historical context concerning Cadence's difficult task of trying to solidify Marvel's intellectual property assets after it purchased Marvel in the 1960s because of Marvel's haphazard business practices in the 1950s and 1960s); Ex. 3 at

226:8-227:3 (Romita testifying that, when Cadence purchased Marvel, it came in and tried to nail down all the freelancers and rights to the works); Ex. 48 at (Certificate of Registration of a Claim for Copyright dated August 31, 1964 for *Amazing Spider-Man Annual* Vol. 1, No. 1 filed by Magazine Management and identifying Lee as the "Author" and Non-Pareil as the "Copyright Claimant." Compared to the Certificate of Renewal Registration for *Amazing Spider-Man Annual* Vol. 1, No. 1 filed by Cadence's purported successor, Marvel Entertainment Group, dated December 15, 1992 and now claiming Lee as an "Employee for Hire of Non-Pareil").

> **RESPONSE:  Disputed**, but **immaterial**.  While MCI does not dispute that Perfect Film
>
> "took over" Marvel's comic book business, and that Perfect Film changed its name to
>
> Cadence in 1970, MCI **disputes** Defendant's vague use of the phrase "shore up Magazine
>
> Management's assets" and, in particular, **disputes** any suggestion that Perfect Film or
>
> Cadence took any actions that improperly recharacterized the nature of the Marvel assets
>
> it purchased.  *See* Bard Decl., Ex. 10 at 2, 9 (June 28, 1968 Sale agreement, providing
>
> that all then-existing copyrights be assigned to Perfect); Bard Decl., Ex. 11 at 3
>
> (December 7, 1978 acknowledgment of assignment between Martin and Jean Goodman
>
> and Perfect's successor-in-interest, Cadence, affirming, pursuant to the June 28, 1968
>
> Sale, assignment of all "copyrights and renewals and extensions of copyrights," including
>
> all publications listed on Schedule B annexed thereto (including the Works); Lens Decl.,
>
> Ex. 6 6:13-25 ("[Marvel was] bought by a company called Perfect Film and Chemical
>
> which later became Cadence Industries and that was later sold to New World and then it
>
> ended up with where it is now."); Lens Opp. Decl., Ex. 84 283:4-12 (Thomas testifying
>
> that "[a]fter Perfect Film purchased Magazine Management," "[i]t didn't seem like
>
> anything really changed.  We knew we had different owners of the sort.  That was about
>
> it."); Lens Opp. Decl., Ex. 84 247:13-16 (Thomas testifying that he "had no real dealings
>
> with Perfect Film or Cadence" because his "dealings were always with Martin Goodman,
>
> who occasionally remained as the line publisher, and with Stan Lee"); Lens Opp. Decl.,
>
> Ex. 84 273:11-15 ("Thomas testifying that "[w]hether the official name was Cadence or

Perfect Film or Magazine Management, to me it was always Marvel Comics from the day I walked in the door until I left"); Lens Decl., Ex. 14 ¶ 9 (Lee attesting that "[i]n the fall of 1968, Goodman sold the entire publishing business to Perfect Film and Chemical Corporation, later known as Cadence Industries Corporation" yet "[d]uring this time period, my responsibilities remained the same, and I had the same agreement with Cadence/Marvel Comics that all of my creative contributions were within the scope of my employment and commissioned by Cadence/Marvel Comics . . . ").

None of the evidence Defendant cites comes close to supporting any improper recharacterization of Marvel assets by Perfect Film or Cadence.  Toberoff Exhibit 1 **does not support** the notion that Perfect Film or Cadence did anything more than ensure that its copyright interests were accounted for.  Toberoff Exhibit 3 also **does not support** any particular actions by Perfect Film or Cadence, let along suggest that the actions were improper or related in any way to copyrights.  Toberoff Exhibit 48 similarly **does not support** this contention because the renewal was not filed by Perfect or Cadence (but rather by a predecessor entity five years after Cadence divested its interests).  *See* Bard Decl., Ex. 14 at 9, 73 (November 20, 1986 purchase agreement between Cadence and New World Pictures, Ltd. for the "'Marvel Entertainment Group' business").  And—in any event—the renewal registration **does not support** any "recharacterization" because Lee has repeatedly testified that he was an employee for hire of Marvel.  Lens Opp. Decl., Ex. 88 120:3-9 (Lee testifying that he "did [Marvel characters] as a work for hire."); Lens Opp. Decl., Ex. 87 109:19-25 (Lee testifying that "[a]t Marvel I was an employee, a writer for hire.  No one who worked for a comics company back then owned anything they created."); Lens Decl., Ex. 13 26:22-28:6 (Lee testifying that "it was

typical in the industry for comic book publishers to own the rights to the materials that

were created for them for publication" during the relevant time period); Lens Decl., Ex.

13 100:25-101:17 (Lee testifying that he "always felt the company" owned the characters

he created or co-created).

Regardless, this contention is **immaterial** because it refers to events outside the

relevant time period and, in any event, has no bearing on the Court's application of the

work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the

*Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 777 F. Supp. 2d 720, 748

(S.D.N.Y. 2011) (rejecting evidence from outside "the relevant time period" as "not

admissible evidence of anything"); *Kirby*, 726 F.3d at 139-40 (relevant principles of the

instance-and-expense test).

MCI also **objects** to Toberoff Exhibits 1 and 3.  *See* MTE Evanier [Dkt. 77];

MCI's Evidentiary Objection Nos. [1] & [10].

21. **Marvel did not ask any freelance creator to sign any contract until 1974.** *See* Toberoff
Decl. Ex. 2 at 71:17-74:5 (Lieber testifying that he sold freelance work to Marvel in the 1950s
and 1960s and had no contract with Marvel); Ex. 11 ¶ 9 (Colan attesting that he had no contract
with Marvel until 1975); Ex. 9 ¶ 8 (Steranko attesting that he did not have a contract with Marvel
while he was submitting freelance material to the company from 1966 to 1973); Ex. 17 at 39:25-
40:4, 51:20-52:4 (Thomas testifying that he had no written contract from 1965 to 1974); *id*. at
298:8-14 (Thomas testifying that freelancers did not have contracts with Marvel until Thomas's
in 1974, which was the first); Ex. 24 at 79:2-8 (Levitz testifying that Marvel did not have
contracts with any freelancer until the mid-1970s); Ex. 43 ¶ 7 (Marvel's contract with Colan
dated March 22, 1975); Ex. 44 ¶ 7 (Marvel's contract with Roy Thomas dated September 1,
1974).

**RESPONSE:  Disputed in part**, but **immaterial**.  As Defendant himself acknowledges

in earlier facts, Marvel had written contracts with freelance artists in the 1940s and at

times in the 1950s and thus MCI **disputes** this contention.  During the relevant time

period, however, MCI does not dispute that Marvel freelancers, including Steve Ditko,

did not have written employment agreements.

Additionally, Toberoff Exhibit 9 **does not support** this contention, because over a decade ago, when Mr. Steranko was retained as an expert witness for Defendant's counsel, he testified that "[w]hen [he] worked at Marvel, [he] was on a work for hire basis."  Lens Opp. Decl., Ex. 89 82:3-23.  As Mr. Steranko explained, he understood this based on his "experience at Marvel," as Marvel "provided him with [a] description of the character," gave him "treatment[s] [or] synops[e]s of the material that they were looking for," "supervis[ed]" him, and "stamped [his checks] work for hire."  *Id*.  And after Marvel "edited [*sic*] some of [his] work" and "changed certain things that [he] didn't feel should be changed," Steranko, like Ditko, who "faced the same frustrations," left Marvel. Lens Opp. Decl., Ex. 95 at 4-5.

Regardless, this contention is **immaterial** because has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 777 F. Supp. 2d at 748 (rejecting evidence from outside "the relevant time period" as "not admissible evidence of anything"); *Kirby*, 726 F.3d at 141-142 (rejecting the Kirbys' argument that "the 'right to supervise' referred to in our case law requires a legal, presumably contractual, right" because there is "no hint of this requirement in our case law applying the instance and expense test"—"Marvel's active involvement in the creative process, coupled with its power to reject pages and request that they be redone" suffices).

MCI also **objects** to Toberoff Exhibits 2, 9, 11, 43, and 44.  *See* MCI's Evidentiary Objection Nos. [2], [12], [14], [44], & [45].

**22. These contracts contained assignment language only and no contract during this time used the term "work for hire" or identified Magazine Management/Cadence as the "author" of any of the works created by the freelancers who sold work to them.** *See* Toberoff Decl. Ex. 14 at 16-17 (Evanier Rebuttal Rep. explaining that it was the custom and

practice of publishers seeking to be considered legal "authors" of "works-made-for-hire" to state clearly and in writing); Ex. 8 ¶¶ 14-15 (Sinnott attesting that no Marvel contract used the term "work for hire" until 1978 or 1979, and that no one at Marvel used that term in the 1960s); Ex. 9 ¶ 8 (Steranko attesting that no one at Marvel used the term "work made for hire" from 1966 to 1973); Ex. 11 ¶ 13 (Colan attesting that his 1975 contract with Marvel used assignment, not work-for-hire, language); Ex. 44 ¶ 7 (Marvel's contract with Thomas dated September 1, 1974 using language of assignment, not work-for-hire); Ex. 17 at 60:3-10 (Thomas testifying that his 1974 contract (which contained assignment language) continued the previous pre-contract working arrangement); Ex. 43 ¶ 7 (Marvel's contract with Colan dated March 22, 1975 using language of assignment, not work-for-hire); Ex.. 53 ¶ 7 (Marvel's contract with Thomas dated August 27, 1976 still using language of assignment, not work-for-hire); Ex. 52 ¶ 7 (Marvel's October 7, 1977 contract with Stephen Gerber ("Gerber") using language of assignment, not work-for-hire); Ex. 54 at 2021MARVEL-0070259 (Marvel President Galton correspondence to Thomas dated February 24, 1978 stating "it was our intent that all copyrights be assigned to Marvel, I assume this is acceptable to you ... I would appreciate your signing ... to confirm that all right to claim renewal and extension of copyrights are assigned to Marvel").; *compare* Ex. 47 ¶ 6 (unsigned Lancer Books contract with Don Rico dated December 15, 1966 with provision stating Lancer "shall be deemed the Author of the Work ... in view of the fact that [Rico was Lancer's] employee for hire").

> **RESPONSE:  Disputed in part**, but **immaterial**.  MCI **disputes** Defendant's suggestion
>
> that Ditko "sold" work "on spec" to Marvel, which is not only an issue of law but also
>
> inaccurate.  To the contrary, freelance contributors, including Ditko, contributed to
>
> Marvel's comic books pursuant to assignments from Lee, who directed the creation of the
>
> Works, and they were compensated by Marvel on an agreed per-page basis for completed
>
> assignments. *See supra* Response No. 13, *citing* Lens Decl., Ex. 2 152:1-154:7; Lens
>
> Decl., Ex. 12 56:12-15, 57:25-58:9, 58:14-23; Lens Decl., Ex. 7 217:13-21; Lens Decl.,
>
> Ex. 13 41:20-42:9; Lens Decl., Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21; Lens Decl.,
>
> Ex. 48 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2 27:19-
>
> 28:7, 56:2-57:7, 148:22-151:25, 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens
>
> Decl., Ex. 12 56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens
>
> Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13
>
> 14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-

10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl., Ex. 2

17:8-18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13

44:4-17; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-9, 93:23-94:5; Lens Decl.,

Ex. 2 80:24-81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13

97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex.

55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15; Lens Decl., Ex. 4

125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens Decl., Ex. 13 30:11-14,

58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 68A-G; Lens

Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens Decl., Ex. 6 40:14-20; Lens

Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7, 226:7-11, 249:7-

9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.

     That said, MCI **does not dispute** that the Marvel contracts cited by Defendant

contain assignment language, do not use the term "work for hire," and do not identify

Marvel as "author" of any works. MCI **disputes**, however, that it was "the norm" for

publishers to include the term "work for hire" or identify the publisher as "author" of

works in written contracts during the relevant time period, and Defendant cites no

admissible evidence to the contrary.

     Additionally, Toberoff Exhibit 9 **does not support** the contention, because over a

decade ago, when Mr. Steranko was retained as an expert witness for Defendant's

counsel, he testified that "[w]hen [he] worked at Marvel, [he] was on a work for hire

basis." Lens Opp. Decl., Ex. 89 82:3-23. As Mr. Steranko explained, he understood this

based on his "experience at Marvel," as Marvel "provided him with [a] description of the

character," gave him "treatment[s] [or] synops[e]s of the material that they were looking

for," "supervis[ed]" him, and "stamped [his checks] work for hire." *Id*. And after Marvel "editted [*sic*] some of [his] work" and "changed certain things that [he] didn't feel should be changed," Steranko, like Ditko, who "faced the same frustrations," left Marvel. Lens Opp. Decl., Ex. 95 at 4-5. Exhibits 8, 9, 11, 14, 17, 43, 44, 47, 52, 53 similarly **do not support** the contention, because none of the contracts at issue are between Marvel and Ditko and all are outside the relevant time period. Ditko himself signed an agreement with Marvel in 1979, acknowledging that his prior work for Marvel was done on a work-made-for-hire basis. Lens Decl., Ex. 23A at 2 (agreement between Marvel and Ditko whereby Ditko "acknowledges, agrees and confirms that any and all work, writing, art work material or services (the 'Work') which have been or are in the future created, prepared or performed by [him] for the Marvel Comics Group have been and will be specially ordered or commissioned for use as a contribution to a collective work and that as such Work was and is expressly agreed to be considered a work made for hire.").

Regardless, this contention is **immaterial** because it refers to events outside the relevant time period and, in any event, has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 777 F. Supp. 2d at 748 (rejecting evidence from outside "the relevant time period" as "not admissible evidence of anything"); *Kirby*, 726 F.3d at 141-142 (rejecting the Kirbys' argument that "the 'right to supervise' referred to in our case law requires a legal, presumably contractual, right" because there is "no hint of this requirement in our case law applying the instance and expense test"—"Marvel's active involvement in the creative process, coupled with its power to reject pages and request that they be redone" suffices).

MCI also **objects** to Toberoff Exhibits 8, 9, 11, 14, 43, 44, 47, 52, 53, and 54. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [11], [12], [14], [17], [44], [45], [47], [49], [50], & [51].

23. **The "work for hire" doctrine became the focus of attention when the 1976 Copyright Act established an explicit "work for hire" regime under which work by an independent contractor could be "made for hire," under certain conditions.** *See* Toberoff Decl. Ex. 15 at 25 (Expert Report of Paul Levitz ("Levitz Rep.") explaining that, once the 1976 Copyright Act was enacted, it was then that comic book publishers began using the term "work made for hire"); Ex. 20 at 160:8-162:14 (Evanier testifying that Cadence attempted to fit pre- 1978 works into the work-for-hire provision of the 1976 Copyright Act); Ex. 24 at 106:16-107:21 (Levitz testifying that people in the comic book industry began to talk about "work for hire" in the mid-1970s, as the Copyright Act of 1976 was coming into existence).

> **RESPONSE:   Disputed in part**, but **immaterial**.  MCI **disputes** this contention to the extent it states a legal conclusion and purports to generally characterize the manner and reasons for which the work for hire doctrine "became the focus of attention," neither of which constitute a statement of undisputed fact.  MCI further **disputes** that the concept that works commissioned by a publisher and created at the commissioning party's instance and expense was not the "focus of attention" prior to adoption of the 1976 Copyright Act.  *See, e.g., Brattleboro Pub. Co. v. Winmill Pub. Corp.*, 369 F.2d 565, 567 (2d Cir. 1966); *Lin–Brook Builders Hardware v. Gertler*, 352 F.2d 298, 300 (9th Cir.1965); Lens Opp. Decl., Ex. 91 at 4-5 (Goodman attesting under oath in 1966 dispute over Captain America that he believed the character was "created for and on their behalf of [Marvel's] predecessors" because it was "created at the suggestion and upon request of the Goodmans," "to their specifications and requirements," "under and subject to their general supervision and direction" and with the assistance of "writing, layout, penciling and, shading, editing, lettering, inking and coloring . . . paid [for] by the Goodmans").
>
> Even if the phrase "work for hire" was not common parlance prior to the 1976 Copyright Act, the instance and expense test turns on the *relationship* between the

parties—not the name they ascribed to it.  *See Kirby*, 777 F. Supp. 2d at 741 ("[I]n

deciding whether the 'instance' prong is satisfied, courts focus on the 'actual relationship

between the parties[.]") (quoting *Aldon Accessories Ltd. v. Spiegel, Inc.*, 738 F.2d 548,

552–53 (2d Cir. 1984)).  Marvel freelancers, including Steve Ditko, contributed to

Marvel's comic books pursuant to assignments from Lee, who directed the creation of the

Works, and they were compensated by Marvel on an agreed per-page basis for completed

assignments.  *See supra* Response No. 13, *citing* Lens Decl., Ex. 2 152:1-154:7; Lens

Decl., Ex. 12 56:12-15, 57:25-58:9, 58:14-23; Lens Decl., Ex. 7 217:13-21; Lens Decl.,

Ex. 13 41:20-42:9; Lens Decl., Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21; Lens Decl.,

Ex. 48 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2 27:19-

28:7, 56:2-57:7, 148:22-151:25, 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens

Decl., Ex. 12 56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens

Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13

14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-

10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl., Ex. 2

17:8-18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13

44:4-17; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-9, 93:23-94:5; Lens Decl.,

Ex. 2 80:24-81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13

97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex.

55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15; Lens Decl., Ex. 4

125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens Decl., Ex. 13 30:11-14,

58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 68A-G; Lens

Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens Decl., Ex. 6 40:14-20; Lens

Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7, 226:7-11, 249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.

Moreover, Jim Steranko—one of Defendant's witnesses—testified over a decade ago when he was retained as an expert by Defendant's counsel that "[w]hen [he] worked at Marvel, [he] was on a work for hire basis."  Lens Opp. Decl., Ex. 89 82:3-23. As Mr. Steranko explained, he understood this based on his "experience at Marvel," as Marvel "provided him with [a] description of the character," gave him "treatment[s] [or] synops[e]s of the material that they were looking for," "supervis[ed]" him, and "stamped [his checks] work for hire."  *Id*.  And after Marvel "edited [*sic*] some of [his] work" and "changed certain things that [he] didn't feel should be changed," Steranko, like Ditko, who "faced the same frustrations," left Marvel.  Lens Opp. Decl., Ex. 95 at 4-5.

Regardless, this contention is **immaterial** because when the doctrine became "the focus of attention" has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).

MCI also **objects** to Toberoff Exhibit 20.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection No. [19].

24. **Commencing in the late 1970s, Marvel/Cadence attempted to re-label the freelance material Marvel's predecessors had purchased and published decades earlier as "work for hire," even though such purchased material had theretofore not been treated or viewed as such by Marvel or the freelancers.** *See* Toberoff Decl. Ex. 1 at 17 (Evanier Rep. explaining Cadence's practices of trying to fit prior freelance work purchased by Marvel into the "work-for-hire" provisions of the Copyright Act of 1976); Ex. 5 at 371:3-25 (Lee testifying that Marvel "would only buy what [it] needed"); Ex. 15 at 25 (Levitz Rep. explaining that, once the 1976 Copyright Act was enacted, it was only then that publishers began using the term "work made for hire"); Ex. 13 ¶ 15 (Adams attesting that Marvel started forcing freelancers to sign retroactive "work for hire" releases and other contracts in the late 1970s); Ex. 20 at 160:8-162:14 (Evanier

testifying that Cadence tried to fit pre-1978 works into the work-for-hire provision of the 1976 Copyright Act); Ex. 39 (purported retroactive work-for-hire contract dated January 26, 1979 allegedly signed by Ditko); Ex. 48 at (Certificate of Registration of a Claim for Copyright dated August 31, 1964 for *Amazing Spider-Man Annual* Vol. 1, No. 1 filed by Magazine Management and identifying Lee as the "Author" and Non-Pareil as the "Copyright Claimant." Compared to the Certificate of Renewal Registration for *Amazing Spider-Man Annual* Vol. 1, No. 1 filed by Cadence's purported successor, Marvel Entertainment Group, dated December 15, 1992 and now claiming Lee as an "Employee for Hire of Non-Pareil"); Ex. 64 at 245 n.80 (Nimmer explaining in 1963 "that 17 U.S.C. Sec. 26 expressly renders an employer for hire an 'author' but makes no comparable provision with respect to commissioned works").

**RESPONSE:  Disputed**.  MCI **disputes** Defendant's characterization of Marvel's conduct as "attempt[ing] to re-label" prior Marvel freelance work as work for hire and **disputes** Defendant's suggestion that Marvel "purchased" work "on spec," which is not only an issue of law but also inaccurate.  To the contrary, freelance contributors, including Ditko, contributed to Marvel's comic books pursuant to assignments from Lee, who directed the creation of the Works, and they were compensated by Marvel on an agreed per-page basis for completed assignments.  *See supra* Response No. 13, *citing* Lens Decl., Ex. 2 152:1-154:7; Lens Decl., Ex. 12 56:12-15, 57:25-58:9, 58:14-23; Lens Decl., Ex. 7 217:13-21; Lens Decl., Ex. 13 41:20-42:9; Lens Decl., Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21; Lens Decl., Ex. 48 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2 27:19-28:7, 56:2-57:7, 148:22-151:25, 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens Decl., Ex. 12 56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13 14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl., Ex. 2 17:8-18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 44:4-17; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-9, 93:23-94:5; Lens Decl., Ex. 2 80:24-81:12; 125:18-126:1; Lens Decl., Ex. 7

219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18;

Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2

141:25-142:15; Lens Decl., Ex. 4 125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-

333:4; Lens Decl., Ex. 13 30:11-14, 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57

at 3; Lens Decl., Ex. 68A-G; Lens Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10;

Lens Decl., Ex. 6 40:14-20; Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8,

152:25-153:10, 175:7, 226:7-11, 249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl.

¶ 20.

     MCI also **disputes** that, prior to the 1970s, Marvel and Marvel freelancers did

not "treat" or "view" the Works as works for hire.  The evidence establishes that Marvel

viewed the Works as works made for hire and itself as the author, and that freelancers,

including Steve Ditko, understood their work for Marvel during the relevant time period

was done on a work for hire basis.  *See supra* Response No. 18, *citing* Lens Decl., Ex.

24A-E; Lens Decl., Ex. 2 40:24-41:8, 48:11-49:4, 60:19-61:6; Lens Decl., Ex. 13 at

26:22-28:6,100:25-101:17; Lens Decl., Ex. 20 at 2; Lens Decl., Ex. 19 at 2; Lens Decl.,

Ex. 23A-E; Lens Decl., Ex. 7 355:18-23; Lens Opp. Decl., Ex. 88 120:3-9; Lens Opp.

Decl., Ex. 87 109:19-25; Lens Decl., Ex. 23A at 2; Lens Decl., Ex. 57 at 3; Lens Decl.,

Ex. 52 at 3; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 50 at 3; Lens Decl., Ex. 56 at 2, Lens

Decl., Ex. 61 at 3; Lens Decl., Ex. 49 at 2; Lens Decl., Ex. 60 at 3; Lens Decl., Ex. 51 at

3; Lens Decl., Ex. 61 at 2; Lens Decl., Ex. 44 at 4.

     Additionally, Toberoff Exhibit 5 **does not support** this contention, as the cited

material refers to the late 1940s, not the relevant time period.  Toberoff Exhibit 48 **does**

**not support** any "re-label[ing]" because Lee repeatedly testified that he was an employee

for hire of Marvel.  Lens Opp. Decl., Ex. 88 120:3-9 (Lee testifying that he "did [Marvel characters] as a work for hire."); Lens Opp. Decl., Ex. 87 109:19-25 (Lee testifying that "[a]t Marvel I was an employee, a writer for hire.  No one who worked for a comics company back then owned anything they created.") Lens Decl., Ex. 13 26:22-28:6 (Lee testifying that "it was typical in the industry for comic book publishers to own the rights to the materials that were created for them for publication" during the relevant time period); Lens Decl., Ex. 13 100:25-101:17 (Lee testifying that he "always felt the company" owned the characters he created or co-created).  Toberoff Exhibit 64 **cannot** provide factual support, as the cited material is a treatise purportedly summarizing the law, not a fact.

      MCI also **objects** to Toberoff Exhibits 1, 13, 20 and 64.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [16], [19], & [58].

**25. In the late 1970s, Marvel began insisting that freelancers sign contracts or acknowledgements that retroactively re-characterized as "work for hire," decades after creation, all of the freelance material Marvel's predecessors had purchased.** *See* Toberoff Decl. Ex. 11 ¶ 14 (Colan attesting that in 1978, he was forced to sign a contract stating that everything he had ever created and submitted to Marvel was done as "work made for hire"); Ex. 13 ¶ 15 (Adams attesting that Marvel started forcing freelancers to sign retroactive "work for hire" releases and other contracts in the late 1970s); Ex. 15 at 25 (Levitz Rep. explaining that, starting in 1977 or 1978, Marvel began to have freelancers sign "work made for hire" releases stating that all prior work had been submitted on a "work made for hire" basis); Ex. 20 at 160:8-162:14 (Evanier testifying that Cadence tried to fit pre-1978 works into the work-for-hire provision of the 1976 Copyright Act); Ex. 39 (retroactive work-for-hire contract dated January 26, 1979 allegedly signed by Ditko); Ex. 64 at 245 n.80 (Nimmer explaining in 1963 "that 17 U.S.C. Sec. 26 expressly renders an employer for hire an 'author' but makes no comparable provision with respect to commissioned works").

    **RESPONSE:  Disputed**, but **immaterial**.  MCI **disputes** Defendant's suggestion that Marvel "purchased" work "on spec," which is not only an issue of law but also inaccurate.  To the contrary, freelance contributors, including Ditko, contributed to Marvel's comic books pursuant to assignments from Lee, who directed the creation of the

Works, and they were compensated by Marvel on an agreed per-page basis for completed assignments.  *See supra* Response No. 13, *citing* Lens Decl., Ex. 2 152:1-154:7; Lens Decl., Ex. 12 56:12-15, 57:25-58:9, 58:14-23; Lens Decl., Ex. 7 217:13-21; Lens Decl., Ex. 13 41:20-42:9; Lens Decl., Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21; Lens Decl., Ex. 48 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2 27:19-28:7, 56:2-57:7, 148:22-151:25, 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens Decl., Ex. 12 56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13 14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl., Ex. 2 17:8-18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 44:4-17; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-9, 93:23-94:5; Lens Decl., Ex. 2 80:24-81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15; Lens Decl., Ex. 4 125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens Decl., Ex. 13 30:11-14, 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 68A-G; Lens Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens Decl., Ex. 6 40:14-20; Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7, 226:7-11, 249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.

　　While MCI does not dispute that many freelancers, including Steve Ditko, signed contracts acknowledging that the work they had performed for Marvel in prior years, including Ditko's contributions to the Works, was done on a work-made-for-hire

basis, MCI **disputes** Defendant's assertion that Marvel "insist[ed]" that freelancers sign
any agreements concerning the nature of their work as well as Defendant's assertion that
the agreements "retroactively re-characterize[]" work as "work for hire."  Instead, the
agreements merely affirmed, in the precise nomenclature of the 1976 Copyright Act,
what was already understood.  Lens Decl., Ex. 7 355:18-23 (Thomas testifying that the
popularization of "the term 'work-for-hire'" in the mid-1970s only formalized "the same
general situation that had already existed"); Lens Opp. Decl., Ex. 88 120:3-9 (Lee
testifying that he "did [Marvel characters] as a work for hire."); Lens Opp. Decl., Ex. 87
109:19-25 (Lee testifying that "[a]t Marvel I was an employee, a writer for hire.  No one
who worked for a comics company back then owned anything they created."); Lens
Decl., Ex. 20 at 2 (Marvel artist Gene Colan writing that "[p]ages were stamped on the
back 'work for hire' . . . In the narrow field of comic art, one either worked 'for hire' or
didn't work!"); Lens Decl., Ex. 19 at 2 (agreement between Marvel and Colan that his
contributions to Marvel's comic books "were created as works made for hire"); Lens
Decl., Ex. 23A-E (documentation reflecting hundreds of freelancers' "express[]
agree[ment]" that their work would "be considered a work made for hire.").  And
Toberoff Exhibit 64 **cannot provide factual support**, as the cited material is a treatise
purportedly summarizing the law, not a fact.

   Regardless, this contention is **immaterial** because a written agreement
characterizing the work as "work for hire" has no bearing on the Court's application of
the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the
*Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 777 F. Supp. 2d at 748
(rejecting evidence from outside "the relevant time period" as "not admissible evidence

of anything"); *Kirby*, 726 F.3d at 141-142 (rejecting the Kirbys' argument that "the 'right to supervise' referred to in our case law requires a legal, presumably contractual, right" because there is "no hint of this requirement in our case law applying the instance and expense test"—"Marvel's active involvement in the creative process, coupled with its power to reject pages and request that they be redone" suffices).

MCI also **objects** to Toberoff Exhibits 11, 13, 20, and 64.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [14], [16], [19], & [58].

26. **In the late 1970s and 1980s, after Marvel's competitor, DC Comics, began returning to freelancers their physical art (as opposed to the copyrights therein) so the freelancers could improve their uncertain and unstable financial situations by selling autographed art to fans, Marvel was under pressure to do the same.** *See* Toberoff Decl. Ex. 1 at 23 (Evanier Rep. describing DC Comics and other publishers' practice of returning artwork to the freelancers who created it); Ex. 6 at 82:2-12 (Thomas testifying that Marvel returned artwork to give artists extra income and to enhance goodwill); Ex. 9 ¶¶ 15-16 (Steranko attesting that Marvel began to return artwork to freelancers to avoid paying sales taxes on its purchase of such material and that freelancers welcomed the extra source of income); Ex. 10 ¶ 15 (Ayers attesting that he signed artwork releases because he needed the extra income).

> **RESPONSE:** **Disputed**, but **immaterial**.  While MCI does not dispute that DC Comics returning physical artwork was a factor that led Marvel to do the same, MCI **disputes** Defendant's suggestion that Marvel freelancers had an "uncertain and unstable financial situation," which is unsupported by the cited evidence.  *See* Lens Decl., Ex. 10 376:16-22 (Lee testifying that "[a]ny artists that drew anything that I had asked him or her to draw at my behest, I paid them for it. If it wasn't good, we wouldn't use it. But I asked them to draw it, so I did pay them."); Lens Decl., Ex. 7 225:17-226:20 (Thomas testifying that he was "typically paid before the issue hit the stands" and he and other Marvel freelancers were paid "the same page rate regardless of whether the issue they worked on ultimately sold well or not" as Marvel had a "straight page rate system"); Lens Decl., Ex. 13 42:21-43:2 (Lee testifying that Marvel freelance artists "g[o]t paid whether or not a particular

book or comic was successful" as "[t]hey were paid when they delivered the artwork");
Lens Decl., Ex. 6 34:22-35:7 (Lee testifying that "[i]t wasn't [Marvel's] policy" and he
"can't think of any case" where any compensation was "dependent on the success of the
sales of the comic book"); Lens Decl., Ex. 2 140:21-141:3 (Thomas confirming that he
was paid his same "per page" rate "whether the comic was a hit or a flop" and that "if a
comic that [he] worked on lost money from Marvel, Marvel didn't take that out of [his]
paychecks").

   Regardless, this contention is **immaterial** because it refers to events outside the
relevant time period and, in any event, has no bearing on the Court's application of the
work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the
*Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 777 F. Supp. 2d at 748
(rejecting evidence from outside "the relevant time period" as "not admissible evidence
of anything"); *Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense
test).

   MCI also **objects** to Toberoff Exhibits 1, 9, and 10.  *See* MTE Evanier [Dkt.
77]; MCI's Evidentiary Objection Nos. [1], [12], & [13].

27. **But Marvel withheld the art and conditioned its return on the freelancers signing
purported retroactive releases and acknowledgements that the freelance art they had
created decades earlier was all "work made for hire."** *See* Toberoff Decl. Ex. 1 at 24 (Evanier
Rep. describing Marvel's practice of returning artwork to the freelancers who created it on
condition that freelancers sign "work-for-hire" releases); Ex. 9 ¶ 16 (Steranko attesting that
Marvel returned artwork, but made freelancers sign releases recharacterizing their work as "work
made for hire"); Ex. 13 ¶ 15 (Adams attesting that Marvel started forcing freelancers to sign
retroactive "work for hire" releases and other contracts in the late 1970s); Ex. 20 at 160:8-162:14
(Evanier testifying that Cadence tried to fit pre-1978 works into the work-for-hire provision of
the 1976 Copyright Act); Ex. 37 at 2021MARVEL-0054634-005636 (sample 1979-1980 artwork
releases retroactively claiming the returned artwork was done by Marv Wolfman as an
"employee-for-hire").

**RESPONSE:**  **Disputed in part**, and **immaterial**.  While MCI does not dispute that many freelancers, including Steve Ditko, signed contracts acknowledging that the work they had performed for Marvel in prior years, including Ditko's contributions to the Works, was done on a work-made-for-hire basis, MCI **disputes** Defendant's assertion that Marvel "conditioned its return" of artwork on freelancers signing any agreements concerning the nature of their work, as well as Defendant's suggestion that the agreements as "retroactive[ly]" re-characterized Marvel freelancers' work as "work made for hire."  Instead, the agreements merely affirmed, in the precise nomenclature of the 1976 Copyright Act, what was already understood.  Lens Decl., Ex. 7 355:18-23 (Thomas testifying that the popularization of "the term 'work-for-hire'" in the mid-1970s only formalized "the same general situation that had already existed"); Lens Opp. Decl., Ex. 88 120:3-9 (Lee testifying that he "did [Marvel characters] as a work for hire."); Lens Opp. Decl., Ex. 87 109:19-25 (Lee testifying that "[a]t Marvel I was an employee, a writer for hire.  No one who worked for a comics company back then owned anything they created."); Lens Decl., Ex. 20 at 2 (Marvel artist Gene Colan writing that "[p]ages were stamped on the back 'work for hire' . . . In the narrow field of comic art, one either worked 'for hire' or didn't work!"); Lens Decl., Ex. 19 at 2 (agreement between Marvel and Colan that his contributions to Marvel's comic books "were created as works made for hire"); Lens Decl., Ex. 23A-E (documentation reflecting hundreds of freelancers' "express[] agree[ment]" that their work would "be considered a work made for hire.").

Additionally, Toberoff Exhibit 9 **does not support** this contention, because over a decade ago, when Mr. Steranko was retained as an expert witness for Defendant's counsel, he testified that "[w]hen [he] worked at Marvel, [he] was on a work for hire

basis." Lens Opp. Decl., Ex. 89 82:3-23.  As Mr. Steranko explained, he understood this

based on his "experience at Marvel," as Marvel "provided him with [a] description of the

character," gave him "treatment[s] [or] synops[e]s of the material that they were looking

for," "supervis[ed]" him, and "stamped [his checks] work for hire."  *Id.*  And after

Marvel "editted [*sic*] some of [his] work" and "changed certain things that [he] didn't feel

should be changed," Steranko, like Ditko, who "faced the same frustrations," left Marvel.

Lens Opp. Decl., Ex. 95 at 4-5.

      Regardless, this contention is **immaterial** because it refers to events outside the

relevant time period and, in any event, a written agreement characterizing the work as

"work for hire" has no bearing on the Court's application of the work-made-for-hire test,

as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by

Second Circuit, confirms.  *See Kirby*, 777 F. Supp. 2d at 748 (rejecting evidence from

outside "the relevant time period" as "not admissible evidence of anything"); *Kirby*, 726

F.3d at 141-142 (rejecting the Kirbys' argument that "the 'right to supervise' referred to

in our case law requires a legal, presumably contractual, right" because there is "no hint

of this requirement in our case law applying the instance and expense test"—"Marvel's

active involvement in the creative process, coupled with its power to reject pages and

request that they be redone" suffices).

      MCI also **objects** to the evidence cited in support of this contention.  *See* MTE

Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [12], [16], [19], & [42].

28. **In the early 1980s, Marvel ran a competition for aspiring artists and writers, open to the public.** *See* Toberoff Decl. Ex. 1 at 17 (Evanier Rep. describing Marvel's practice of running competitions to discover new, aspiring artist and writers); Ex. 34 at 1 (Randy Schueller ("Schueller") interview explaining that Marvel ran a competition for aspiring writers and artists in the early 1980s).

**RESPONSE:  Undisputed**, but **immaterial** because this paragraph refers to events outside the relevant time period and, in any event, has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 777 F. Supp. 2d at 748 (rejecting evidence from outside "the relevant time period" as "not admissible evidence of anything"); *Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).

MCI, however, **objects** to the evidence cited in support of this contention.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1] & [40].

**29. One entrant, Randy Schueller, an amateur and previously unknown writer/artist, submitted a story wherein Spider-Man had a stealthy black costume instead of his usual red, black, and blue.** *See* Toberoff Decl. Ex. 1 at 17 (Evanier Rep. describing Schueller's unique Spider-Man submission and his amateur status); Ex. 31 at 2 (Walter Durajlija ("Durajlija") writing that young fan Schueller won an ideas contest Marvel was having in 1982 with his idea for a black Spider-Man costume); Ex. 34 at 2 (Schueller interview explaining that he came up with, and submitted to Marvel, a story featuring a black-costume Spider-Man).

**RESPONSE:  Undisputed**, but **immaterial** because this paragraph refers to events outside the relevant time period and, in any event, has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 777 F. Supp. 2d at 748 (rejecting evidence from outside "the relevant time period" as "not admissible evidence of anything"); *Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).

MCI, however, **objects** to the evidence cited in support of this contention.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [37], & [40].

**30. A few months after Schueller's submission, then Marvel editor, Jim Shooter ("Shooter"), wrote to Schueller on August 3, 1982, offering to buy the story for $220 and told him to sign a "Work-made-for-hire Agreement."** *See* Toberoff Decl. Ex. 17 at 59:2-10

(Thomas testifying that Jim Shooter was editor-in-chief at Marvel in the 1980s); Ex. 31 at 2 (Durajlija writing that Marvel editor Shooter liked the costume idea and bought it from Schueller for $220); Ex. 32 (Shooter letter dated August 3, 1982 offering to buy Schueller's black-costume *Spider-Man* story submission for $220 and telling Schueller to sign the attached "Work-madefor-hire Agreement"); Ex. 34 at 2 (Schueller interview explaining that, a few months after he submitted his black-costume *Spider-Man* story, Shooter wrote to him offering to buy it for $220); Ex. 38 (retroactive work-for-hire agreement signed by Schueller dated August 9, 1982).

> **RESPONSE:  Disputed**, but **immaterial**.  MCI **disputes** this contention insofar as
>
> Defendant suggests that the work-made-for-hire agreement was signed after the work was
>
> completed.  Indeed, in Toberoff Exhibit 32, which Defendant omits from this contention,
>
> Jim Shooter states that he "want[ed] changes made" and that he would "fill [Schueller] in
>
> on [the changes] after [he] return[ed] the work-made-for-hire form."
>
> Regardless, this contention is **immaterial** because it refers to events outside the
>
> relevant time period and, in any event, has no bearing on the Court's application of the
>
> work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the
>
> *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 777 F. Supp. 2d at 748
>
> (rejecting evidence from outside "the relevant time period" as "not admissible evidence
>
> of anything"); *Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense
>
> test).
>
> MCI also **objects** to Toberoff Exhibits 31, 32, 34, and 38.  *See* MCI's
>
> Evidentiary Objection Nos. [37], [38], [40], & [43].

31. **Schueller signed the agreement on August 9, 1982, which is the same form agreement Marvel had other freelancers sign in and around 1978.** *See* Toberoff Decl. Ex. 1 at 17 (Evanier Rep. identifying Schueller's August 9, 1982 contract as being the same as those Marvel forced freelancers to sign in the late 1970s); Ex. 38 (retroactive work-for-hire agreement signed by Schueller dated August 9, 1982); Ex. 39 (retroactive work-for-hire contract dated January 26, 1979 allegedly signed by Ditko).

> **RESPONSE:  Undisputed**, but **immaterial** because this paragraph refers to events
>
> outside the relevant time period and, in any event, has no bearing on the Court's

application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 777 F. Supp. 2d at 748 (rejecting evidence from outside "the relevant time period" as "not admissible evidence of anything"); *Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).

MCI, however, **objects** to Toberoff Exhibits 1 and 38.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1] & [43].

**32. Schueller's "agreement" retroactively provided that "all work … which have been or are in the future created … [were] to be considered a work made for hire."** *See* Toberoff Decl. Ex. 38 (purported retroactive work-for-hire agreement signed by Schueller dated August 9, 1982).

**RESPONSE:  Disputed**, but **immaterial**.  While MCI does not dispute the quoted terms of the agreement, MCI **disputes** Defendant's characterization of them as "retroactive." Indeed, in Toberoff Exhibit 32, which Defendant omits to cite in this contention, Jim Shooter states that he "want[ed] changes made" and that he would "fill [Schueller] in on [the changes] after [he] return[ed] the work-made-for-hire form."

Regardless, this contention is **immaterial** because it refers to events outside the relevant time period and, in any event, has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 777 F. Supp. 2d at 748 (rejecting evidence from outside "the relevant time period" as "not admissible evidence of anything"); *Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).

MCI also **objects** to the evidence cited in support of this contention.  *See* MCI's Evidentiary Objection No. [43].

33. **Ditko was a prolific comic book creator and illustrator who revolutionized the artform, and created or co-created, in the Period, some of Marvel's most enduring and profitable superheroes including, without limitation, Spider-Man and Dr. Strange.** *See* Toberoff Decl. Ex. 17 at 17:8-23 (Thomas testifying that Ditko and others revolutionized comics with their characters and style); Ex. 25 at DITKO-0308 (Ditko explaining that Dr. Strange was his creation and at one point, he was doing all the stories, writing, and art for it); Ex. 30 at 2021MARVEL-0050281 (Lee writing that Dr. Strange "'twas Steve[] [Ditko's] idea," in a letter dated January 9, 1963); Ex. 28 (Lee writing that Ditko was co-creator of Spider-Man and that Ditko did most of the story plotting of *Spider-Man*).

> **RESPONSE:  Disputed**, but **immaterial**.  While MCI does not dispute that Ditko, like
>
> Kirby, was a prolific comic book illustrator who contributed to a number of Marvel's key
>
> Super Heroes, MCI **disputes** that Ditko "created" any Marvel Super Heroes to the extent
>
> Defendant is suggesting that Ditko's contributions were not done on a work-made-for-
>
> hire basis.  Additionally, Toberoff Exhibits 17, and 30 **do not support** the contention that
>
> Ditko "created" any Marvel characters.
>
> Regardless, this contention is **immaterial** because it has no bearing on the
>
> Court's application of the work-made-for-hire test, as this Court's grant of summary
>
> judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See*
>
> *Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).  Indeed,
>
> as *Kirby* held, "[q]uestions of who created the characters are mostly beside the point," but
>
> what matters is the hiring parties' "inducement, right to supervise, exercise of that right,
>
> and creative contribution with respect to" the works.  *Kirby*, 726 F.3d at 142.
>
> MCI also **objects** to Toberoff Exhibit 25.  *See* MCI's Evidentiary Objection No.
>
> [34].

34. **Unlike most freelancers in the Period who worked from home, Ditko worked out of a separate art studio he rented at his own expense.** *See* Toberoff Decl. Ex. 1 at 13 (Evanier Rep. explaining the custom and practice of freelancers creating their material from home and noting that Ditko was unique in renting and paying for a separate studio); Ex. 2 at 76:4-24 (Lieber testifying that he created his freelance work from home and used his own supplies); Ex. 3 at 16:22-24, 194:14-195:3, 209:16-210:7 (Romita testifying that he purchased his own materials and worked from home); Ex. 4 at 33:25-34:2 (Lee testifying that freelancers mostly worked from

home); Ex. 6 at 30:21-24 (Thomas testifying that he did his freelance writing from home); Ex. 8 ¶ 9 (Sinnott attesting that he worked from home and paid for his own materials); Ex. 9 ¶ 10 (Steranko attesting that he worked from home and paid for his own materials, for which Marvel never reimbursed him); Ex. 10 ¶ 10 (Ayers attesting that he worked from home and paid for his own materials); Ex. 11 ¶ 8 (Colan attesting that he created his freelance art from home and paid for his own materials); Ex. 13 ¶ 7 (Adams attesting that he worked from home and paid for his own materials); Ex. 16 at 117:15-16 (Nanci Solo ("Solo") testifying that Colan worked from home); Ex. 17 at 24:5-25:4 (Thomas testifying that artists worked from home as freelancers and rarely, if ever, came into the office); Ex. 22 at 286:17-287:19 (Lieber testifying that he worked from home and paid for his own typewriter); Ex. 24 at 123:18-21 (Levitz testifying that Ditko created work from his own studio).

> **RESPONSE:** **Undisputed**, but **immaterial**.  MCI notes that Ditko could afford his own studio undermines Defendant's portrayal of him in later contentions as a starving artist. And Toberoff Exhibit 13 **does not support** this paragraph, as it refers to a period of time beginning in late 1960s, not the relevant time period.
>
> Regardless, this paragraph is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F.3d at 142-143 (holding that even though Marvel "did not pay for Kirby's supplies or provide him with office space . . . Marvel's payment of a flat rate and its contribution of both creative and production value, in light of the parties' relationship as a whole, is enough to satisfy the expense requirement").
>
> MCI, however, **objects** to Toberoff Exhibits 1, 8, 9, 10, 11, 13, and 16.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [11], [12], [13], [14], [16], & [18].

35. **Ditko also paid for all his own materials and instruments, including paper, pens, pencils, erasers, brushes and ink.** *See* Toberoff Decl. Ex. 1 at 13 (Evanier Rep. explaining that it was the custom and practice in the comic book industry, and at Marvel, in the 1960s for freelancers to pay for their own materials including paper, pencils, ink, pens, brushes); Ex. 2 at 76:4-24 (Lieber testifying that he created his freelance work from home and used his own supplies); Ex. 3 at 16:22-24, 194:14-195:3, 209:16-210:7 (Romita testifying that he purchased his own materials and worked from home); Ex. 8 ¶ 9 (Sinnott attesting that he worked from

home and paid for his own materials); Ex. 9 ¶ 10 (Steranko attesting that he worked from home and paid for his own materials, for which Marvel never reimbursed him); Ex. 10 ¶ 10 (Ayers attesting that he worked from home and paid for his own materials); Ex. 11 ¶ 8 (Colan attesting that he created his freelance art from home and paid for his own materials); Ex. 13 ¶ 7 (Adams attesting that he worked from home and paid for his own materials); Ex. 17 at 294:6- 295:3 (Thomas testifying that freelancers paid for their own materials, paper, typewriter, and work from home); Ex. 21 at 97:3-23 (Steranko testifying that he paid for his own materials); Ex. 22 at 286:17-287:19 (Lieber testifying that he worked from home and paid for his own typewriter).

> **RESPONSE:  Undisputed**, but **immaterial**.  However, Toberoff Exhibit 13 **does not support** the stated fact in this paragraph, as it refers to a period of time beginning in late 1960s, not the relevant time period.
>
> Regardless, this paragraph is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F. 3d at 142-143 (holding that even though Marvel "did not pay for Kirby's supplies or provide him with office space . . . Marvel's payment of a flat rate and its contribution of both creative and production value, in light of the parties' relationship as a whole, is enough to satisfy the expense requirement").
>
> MCI, however, **objects** to Toberoff Exhibits 1, 8, 9, 10, 11, 13, and 21.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [11], [12], [13], [14], [16], & [23].

36. **Ditko created his freelance artwork solely as an independent contractor on his own time, and at his own volition with the intention and hope of selling his material to Magazine Management, Charlton Comics, or other publishers.** *See* Toberoff Decl. Ex. 1 at 13 (Evanier Rep. explaining that it was the custom and practice in the comic book industry, and at Marvel, in the 1960s for freelancers to create their material as independent contractors and to set their own hours and choose their own working conditions); Ex. 12 ¶ 18 (Evanier attesting that Ditko was submitting freelance *Spider-Man* material to Marvel but was also selling work to Charlton Comics at the same time); Ex. 23 at 160:2-8 (Mark Ditko testifying that his uncle Ditko was selling work to both Marvel and Charlton Comics in the 1960s); Ex. 35 at DITKO-0199 (Ditko writing about his work at Charlton Comics in the 1960s); Ex. 57 at 2 (Ditko writing about creating material for Charlton Comics and DC Comics).

**RESPONSE: Disputed**.  MCI **disputes** Defendant's suggestion that Ditko worked "at his own volition with the intention and hope of selling" to Marvel "on spec," which is not only an issue of law but also inaccurate.  To the contrary, freelance contributors, including Ditko, contributed to Marvel's comic books pursuant to assignments from Lee, who directed the creation of the Works, and they were compensated by Marvel on an agreed per-page basis for completed assignments.  *See supra* Response No. 13, *citing* Lens Decl., Ex. 2 152:1-154:7; Lens Decl., Ex. 12 56:12-15, 57:25-58:9, 58:14-23; Lens Decl., Ex. 7 217:13-21; Lens Decl., Ex. 13 41:20-42:9; Lens Decl., Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21; Lens Decl., Ex. 48 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2 27:19-28:7, 56:2-57:7, 148:22-151:25, 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens Decl., Ex. 12 56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13 14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl., Ex. 2 17:8-18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 44:4-17; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-9, 93:23-94:5; Lens Decl., Ex. 2 80:24-81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15; Lens Decl., Ex. 4 125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens Decl., Ex. 13 30:11-14, 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 68A-G; Lens Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens Decl., Ex. 6 40:14-20; Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8,

152:25-153:10, 175:7, 226:7-11, 249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.

Defendant's evidence also **does not support** this contention because no evidence indicates that Ditko's work for Marvel (*e.g.*, Spider-Man, Doctor Strange, or any other Works) was done with anyone but Marvel in mind—just the opposite, they were done based on ongoing assignments for Marvel, in collaboration with Marvel's editor Lee, and always subject to Marvel's ultimate authority. *See* Thomas Decl. ¶¶ 16-17 ("I understood that Steve Ditko was performing most, if not all, of this work for Marvel"); Lens Decl., Ex. 25 (reflecting Ditko's work for Marvel from the 1950s to 1990s); Lens Decl., Ex. 15 19:1-10 (Lee testifying that "there were a few artists that [he] worked with more than others," including Ditko); Lens Decl., Ex. 2 144:22-145:22 (Thomas testifying as to Lee's practice of "keep[ing] [freelancers] busy" so that they "always had work at hand and didn't have much downtime where they weren't making any money"); Lens Decl., Ex. 2 316:1-10 (Thomas testifying that Lee employed the Marvel Method to "keep [artists] busy by giving them a plot . . . that way the artist didn't have the downtime and lose money"); Lens Decl., Ex. 72 at 4 (recalling Ditko toiling at his artist's desk in the early 1960s "tortured by [] deadlines"); Lens Decl., Ex. 73 at 3 (Ditko noting that Kirby was "buried under work" and needed to work fast "to keep up with the assignments Lee was throwing at him"); Lens Decl., Ex. 48 at 2 (Ditko writing that "Stan provided the plot ideas.  There would be a discussion to clear up anything, consider plot options and so forth.  I would then do the panel/page breakdowns, pencil the visual story continuity, and, on a separate paper, provide a very rough panel dialogue, merely as a guide for Stan.  We would go over the penciled story/art pages and I would

explain any deviations, changes, and additions, noting anything to be corrected before or during the inking."); Lens Decl., Ex. 4 124:3-18 (Lee testifying about his collaboration with Ditko on *Amazing Fantasy*); Lens Decl., Ex. 2 17:8-18:13 (Thomas testifying that "subject to the publisher, [Lee] was in charge of everything. He oversaw the writing, he oversaw the artists and the art that came in. You know, everything went through him with the help of the production manager in particular."); Lens Decl., Ex. 2 37:10-39:6 (Thomas testifying that when he became editor-in-chief, he was "in charge of, you know, all the artists, the writers, the colorists, the letterers and so forth"); Lens Decl., Ex. 12 67:16-68:6 (Thomas testifying that Lee "decided which artist would do a cover for a particular issue[,] . . . they were reviewed by Stan, . . . then they were all reviewed eventually by Martin Goodman as publisher"); Lens Decl., Ex. 13 16:3-19 (Lee testifying that he would "give instructions to the artists as to how [he] wanted the story to go" and "oversaw . . . creative editorial aspects of the comic books that were created, . . . because [he] had to answer to the publisher, Martin Goodman, and he had to be happy with what I was doing"); Lens Decl., Ex. 2 80:24-81:12 (Thomas testifying that "[s]ubject to the publisher, [Lee had] complete authority" over artwork in Marvel comics); Lens Decl., Ex. 2 125:18-126:1 (Thomas testifying that Lee "was always the ultimate authority unless Martin Goodman stepped in, and that was mostly on covers"); Lens Decl., Ex. 7 219:11-220:11 (Thomas testifying that "the ultimate say, as far as I know, was the publisher, . . . Martin Goodman"); Lens Decl., Ex. 13 97:8-11 (Lee testifying that he "couldn't do any book unless Martin approved of it"); Lens Decl., Ex. 4 124:19-125:4 (Lee testifying that "[i]t was always [Goodman's] decision" as to what to publish, and "he exercised the authority ultimately to publish the last edition of 'Amazing Fantasy'"); Lens Decl., Ex. 4

124:3-18 (Lee testifying that he "loved" the "Amazing Fantasy" books but "Mr.

Goodman decided to cancel them because they weren't selling"); Thomas Decl. ¶¶ 7-8

("As part of [Marvel's] established framework [for creating comics in the 1960s], Stan

Lee supervised and directed Marvel's comic book-creation process subject only to Martin

Goodman"); *see also* Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3.

MCI also **objects** to the evidence cited in support of this contention.  *See* MTE

Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [15], [32], [41], & [52].

37. **None of Ditko's expenses in creating his works were paid for or reimbursed, whether by Magazine Management, or by the shell companies that copyrighted the comic books publishing Ditko's works.** *See* Toberoff Decl. Ex. 1 at 13 (Evanier Rep. explaining that it was the custom and practice in the comic book industry, and at Marvel, in the 1960s for freelancers to pay for their own materials including paper, pencils, ink, pens, brushes); Ex. 2 at 76:4-24 (Lieber testifying that he created his freelance work from home and used his own supplies); Ex. 3 at 16:22-24, 194:14-195:3, 209:16-210:7 (Romita testifying that he purchased his own materials and worked from home); Ex. 8 ¶ 9 (Sinnott attesting that he worked from home and paid for his own material); Ex. 9 ¶ 10 (Steranko attesting that he worked from home and paid for his own materials, for which Marvel never reimbursed); Ex. 10 ¶ 10 (Ayers attesting that he worked from home and paid for his own materials); Ex. 11 ¶ 8 (Colan attesting that he created his freelance art from home and paid for his own materials); Ex. 13 ¶ 7 (Adams attesting that he worked from home and paid for his own materials); Ex. 17 at 320:10-322:14 (Thomas testifying that no one knew what Vista, Atlas, or Non-Pareil did and that Thomas did not receive any money from them, does not know anyone who did, does not know "of [them] having any existence" whatsoever); Ex. 21 at 97:3-23 (Steranko testifying that he worked out of his own studio and paid for his own materials); Ex. 22 at 286:17-287:19 (Lieber testifying that he worked from home and paid for his own typewriter); Ex. 50 at DETTWILER-0044-0058 (Don Heck's payment records identifying "Magazine Management" as the entity that paid him for his freelance pages in the Period).

RESPONSE:  **Disputed**, but **immaterial**.  MCI **disputes** Defendant's characterization of

such companies as "shell companies."  As relevant here, Goodman's various comic book

entities conducted business as "Marvel" or "Marvel Comics Group" and engaged with

Magazine Management Company for administrative services, including payments to

those providing services to Marvel.  *See supra* Response No. 7, *citing* Bard Decl. ¶ 2;

Bard Decl., Ex. 5 at 2-3; Bard Decl., Ex. 7 at 5; Bard Decl., Ex. 10 at 2; Lens Decl., Ex.

18 72:25-73:11; Lens Opp. Decl., Ex. 90 5:11-19; Bard Decl., Ex. 8 at 5-6; Lens Decl.,

Ex. 75; Lens Decl., Ex. 76; Lens Opp. Decl., Ex. 93 at 4-5; Lens Opp. Decl., Ex. 92 at 3-

8; Bard Decl., Ex. 6 at 3; Bard Decl., Ex. 5 at 3; Lens Decl., Ex. 68A-G.

   Further, Marvel **disputes** that "[n]one of Ditko's expenses in creating the Works

were paid for," as the per-page rate Marvel paid freelancers, particularly the generous one

paid to Ditko, accounted for expenses incurred in contributing to the Works.  *See supra*

Response No. 2, *citing* Lens Opp. Decl., Ex. 83 72:25-73:7, 207:24-208:1; Lens Opp.

Decl., Ex. 94 at 3.  And Toberoff Exhibit 13 **does not support** this contention, as it refers

to a period of time beginning in late 1960s, not the relevant time period.

   Regardless, this contention is **immaterial** because it has no bearing on the

Court's work-made-for-hire test, as this Court's grant of summary judgment for Marvel

in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F. 3d at 142-

143 (holding that even though Marvel "did not pay for Kirby's supplies or provide him

with office space . . . Marvel's payment of a flat rate and its contribution of both creative

and production value, in light of the parties' relationship as a whole, is enough to satisfy

the expense requirement").

   MCI also **objects** to Toberoff Exhibits 1, 8, 9, 10, 11, 13, and 21.  *See* MTE

Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [11], [12], [13], [14], [16], &

[23].

38. **Ditko kept a large chart in his studio, mapping out the future development of his
characters so he could plant narrative seeds and introduce elements in current comic book
issues whose importance would be revealed and come to fruition much later in issues many
months down the line.** *See* Toberoff Decl. Ex. 1 at 12 (Evanier Rep. describing Ditko's regular
practice of maintaining a chart mapping out the future development of a character so he could
introduce elements into current issues and then use those elements in issues many months down
the line); Ex. 35 at DITKO-0193 (Ditko writing that he planted seeds of subplots in stories that
would work their way through the issues until it was time for those sub-stories to play an active

role later when the time was right); Ex. 58 at 3 (Ditko writing when he took over the *Spider-Man* stories he "knew in advance the [*Spider-Man*] story line like the best (worst) time for Aunt May to have a heart attack").

> **RESPONSE:**  **Disputed**, but **immaterial**.  Because Defendant fails to provide any time
>
> period in this contention, it is unclear as written.  While MCI does not dispute that Steve
>
> Ditko did some plotting for some Spider-Man and Doctor Strange stories, he only did so
>
> when Lee, using his editorial discretion, permitted, subject to Marvel's ultimate authority.
>
> *See*  Toberoff Ex. 19 at 3-4 (although Lee "was willing to go along with a lot of what
>
> Steve wanted to do," "Stan had the authority" and used it "when he felt he had to use it"
>
> because an explanation that "the artist wanted to do it that way" "would not have been a
>
> sufficient excuse for Martin Goodman."); Lens Decl., Ex. 15 19:1-10 (Lee testifying that
>
> "there were a few artists that [he] worked with more than others," including Ditko); Lens
>
> Decl., Ex. 45 at 4 (Ditko explaining in 1965 that he was "*allowed* to drift" from his
>
> assigned scripts) (emphasis added); Lens Decl., Ex. 25 (reflecting Ditko's work for
>
> Marvel from the 1950s to 1990s); Lens Decl., Ex. 48 at 2 (Ditko explaining how *Amazing
>
> Adventures* "came about because of the 5-page twist-ending stories we [Lee and Ditko]
>
> had done as back-ups in *Strange Tales*" and others); Lens Decl., Ex. 2 307:25-308:3
>
> (Thomas testifying that *Amazing Fantasy* was comprised of little short stories by –
>
> written by Lee and drawn by Ditko entirely); Lens Decl., Ex. 4 124:3-18 (Lee testifying
>
> about his collaboration with Ditko on *Amazing Fantasy*); Lens Decl., Ex. 13 54:16-56:9
>
> (Lee testifying that it "was part of what [an artist's] assignment was" to "introduce . . .
>
> new characters in the stories"); Lens Decl., Ex. 13 72:21- 73:23 (Lee testifying that "[t]he
>
> artist in every strip always creates new characters to flesh out the strip and to make the
>
> characters living in the real world," although such additions were subject to the approval
>
> of Lee and Goodman); Lens Decl., Ex. 13 79:3-19 (Lee testifying that it would be the

responsibility of "the Editor or the Publisher" to "make the decision to take [a new, minor] character and make him or her a separate character for a new comic"); Lens Decl., Ex. 12 55:4-15 (Thomas confirming that artists would sometimes "come up with ideas for new characters," and that it was indeed "part of the artist's assignment . . . to introduce new characters into a comic book series" if it "would further the plot"); *see also* Lens Decl., Ex. 12 65:13-66:7.  MCI thus **disputes** that any plotting by Ditko is an indicium that the works were not works made for hire.

Further, Toberoff Exhibits 35 and 58 **do not support** this contention because they say nothing about Ditko having a chart in his studio to map out story ideas.  MCI also **disputes** Defendant's characterization of Toberoff Exhibit 58.  While Defendant implies Ditko "knew in advance" the Spider-Man story line because *Ditko* came up with it, Toberoff Exhibit 58 supports that Lee provided Ditko with such storylines in advance, or that they developed them together—consistent with Ditko's description of his working relationship with Lee as a "collaboration".  *See* Lens Decl., Ex. 48 at 2 (Ditko writing that "Stan provided the plot ideas.  There would be a discussion to clear up anything, consider plot options and so forth.  I would then do the panel/page breakdowns, pencil the visual story continuity, and, on a separate paper, provide a very rough panel dialogue, merely as a guide for Stan.  We would go over the penciled story/art pages and I would explain any deviations, changes, and additions, noting anything to be corrected before or during the inking."); Lens Decl., Ex. 4 124:3-18 (Lee testifying about his collaboration with Ditko on *Amazing Fantasy*).

Regardless, this contention is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary

judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test). To the extent Defendant is referring to when Ditko began plotting Marvel stories, a period of time well after the major characters were introduced, when Lee, using his editorial discretion, afforded Ditko greater creative input, the fact—if true—that Ditko thought about the development of Marvel's characters would simply be one of the reasons that Marvel hired him in the first place. *See Kirby*, 726 F.3d at 142 ("[T]he hired party's ingenuity and acumen are a substantial reason for the hiring party to have enlisted him[, and] [i]t makes little sense to foreclose a finding that work is made for hire because the hired artist indeed put his exceptional gifts to work for the party that contracted for their benefit."). And, of course, Lee always retained editorial discretion, and could reject any "narrative" put forth by Ditko. *See* Toberoff Ex. 19 at 3-4 (although Lee "was willing to go along with a lot of what Steve wanted to do," "Stan had the authority" and used it "when he felt he had to use it" because an explanation that "the artist wanted to do it that way" "would not have been a sufficient excuse for Martin Goodman.").

MCI also **objects** to the evidence cited in support of this contention. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [41], & [53].

39. **When submitting his artwork to Lee, Ditko would often write extensive notes, including suggested captions and dialogue, so that when Lee, or later, Thomas, dialogued Ditko's story, they would know what story points Ditko intended in each panel and what the characters would likely say consistent with the story Ditko had plotted.** *See* Toberoff Decl. Ex. 14 at 7 (Evanier Rebuttal Rep. explaining Ditko's practice of submitting detailed notes with his freelance material to assist Lee in dialoguing the stories); Ex. 7 at 223:18-225:20 (Thomas testifying that Ditko refused to speak to Lee while working on *Spider-Man* and *Dr. Strange* so all plotting on the stories was done by Ditko, and further, that Ditko would provide margin notes to indicate what he intended to happen in the story to guide Lee when Lee dialogued the story); *id.* at 262:4-264:19 (Thomas testifying that when he began to dialogue *Dr. Strange* stories instead of Lee, Ditko would type his suggested captions and dialogue on a separate page, not in the margins, and then give them to Thomas to fill in the dialogue balloons); Ex. 17 at 84:18-90:9

(Thomas testifying that Ditko wrote extensive margin notes describing the plot and what was happening so that when Lee/Thomas dialogued the story, they could do so in a way that corresponded with what Ditko had intended); Ex. 18 (1965 example of Ditko's *Dr. Strange* margin notes for Thomas); Ex. 26 at 83 (Lee writing that Ditko came up with the *Dr. Strange* plots and illustrated the story and Lee only added the dialogue [in the balloons]); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script).

> **RESPONSE:**  **Disputed**, but **immaterial**.  Because Defendant fails to provide any time period in this contention, it is unclear as written.  MCI does not dispute that Ditko would sometimes write "margin notes" that helped explain his penciled artwork, but MCI **disputes** that the margin notes were "extensive" or that they generally included captions or dialogue.  *See* Lens Opp. Decl., Ex. 84 87:11-90:4 (Thomas testifying that Ditko would include just "a couple of words" so Thomas "knew what was going on" since Ditko would draw "very, very rough pencil" art at this stage); Toberoff Ex. 18 at 3-8 (sample Ditko notes such as "Found Place to hide—must move fast" and "They're on the roof now"); Toberoff Ex. 19 at 4-5 (Thomas explaining that "Stan wanted the artists to tell what was going on," as early artwork was "sketchy" with "very loose" pencils, but noting that "Stan would take what he wanted from that, and felt no obligation to take any more").  Certainly, nothing about the fact that Ditko would sometimes provide margin notes indicates that the Works were done "on spec", as Defendant contends.  To the contrary, Lee and Thomas were free to, and often did, disregard such margin notes.  *See* Toberoff Ex. 19 at 4-5 (Thomas explaining that "Stan wanted the artists to tell what was going on," as early artwork was "sketchy" with "very loose" pencils, but noting that "Stan would take what he wanted from that, and felt no obligation to take any more").  Moreover, Toberoff Exhibit 26 **does not support** this contention, as it references only Ditko's work on *Spider-Man Annual #2*, a one-off special annual issue otherwise unconnected to the Spider-Man or Doctor Strange stories Ditko and Lee worked on.

Further, Toberoff Exhibit 17 **does not support** this contention because it states that

Ditko's work was a "switch on the Marvel method" when Ditko began plotting Spider-

Man later in his Marvel career, in contrast to his earlier working method with Lee.

To the extent Ditko was illustrating from Lee's plots, any such notes were

derivative of Lee's own ideas.  To the extent Defendant is referring to when Ditko began

plotting Marvel stories, a period of time well after the major characters were introduced,

when Lee, using his editorial discretion, afforded Ditko greater creative input, subject to

Marvel's ultimate authority, the fact—if true—that Ditko thought about the development

of Marvel's characters would simply be one of the reasons that Marvel hired him in the

first place.  *See Kirby*, 726 F.3d at 142 ("[T]he hired party's ingenuity and acumen are a

substantial reason for the hiring party to have enlisted him[, and] [i]t makes little sense to

foreclose a finding that work is made for hire because the hired artist indeed put his

exceptional gifts to work for the party that contracted for their benefit.").

Regardless, this contention is **immaterial** because it has no bearing on the

Court's application of the work-made-for-hire test, as this Court's grant of summary

judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See*

*Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).

MCI also **objects** to Toberoff Exhibits 14 and 27.  *See* MTE Evanier [Dkt. 77];

MCI's Evidentiary Objection Nos. [17]  & [35].

40. **Ditko, in essence, acted as both a co-writer/plotter and the artist of his stories. Lee, or
later sometimes, staff writer Thomas, would then dialogue the balloons and add some
captions based on Ditko's illustrated story, notes, and suggestions.** *See* Toberoff Decl. Ex. 7
at 223:18-225:20, 277:11-13 (Thomas testifying that Ditko did all the plotting on *Spider-Man*
and *Dr. Strange* stories while he and Lee were not speaking and that Ditko never received any
plots from Thomas when Thomas was doing the dialoguing on *Dr. Strange*); *id*. at 262:4-264:19
(Thomas testifying that, when Thomas began to dialogue *Dr. Strange* stories instead of Lee,
Ditko would type his suggested captions and dialogue on a separate page, not in the margins, and

then give them to Thomas to fill in the dialogue balloons); Ex. 17 at 311:18-312:25 (Thomas testifying that Ditko, on his own, plotted and drew *Spider-Man* for more than one year before he left in 1966, did not work pursuant to the Marvel Method, and that Lee would not even know anything about the story until it was penciled and submitted by Ditko); *id*. at 84:18-90:9 (Thomas testifying that Ditko wrote extensive margin notes describing the plot and what was happening so that when Lee/Thomas dialogued the story, they could do so in a way that corresponded with what Ditko had intended); Ex. 18 (1965 example of Ditko's *Dr. Strange* margin notes for Thomas); Ex. 19 at 6-8 (Thomas interview explaining that Ditko and Lee were not speaking in 1965 and Ditko was plotting both *Spider-Man* and *Dr. Strange* and would only come to the office to drop work off with Brodsky); Ex. 26 at 83 (Lee writing that Ditko came up with the *Dr. Strange* plots and illustrated the story and Lee only added the dialogue); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script); Ex. 28 (Lee writing that Ditko was the co-creator of Spider-Man and that Ditko did most of the plotting of *Spider-Man* and just left Lee to do the dialogue and some captions).

> **RESPONSE:  Disputed**, but **immaterial**.  Because Defendant fails to provide any time period in this fact, it is unclear as written.  MCI **disputes** that Ditko would act as the co-writer/plotter and the artist of the Works in general, particularly early in his working relationship with Marvel.  To the contrary, Ditko did not begin plotting Marvel stories until well after the major characters were introduced and Lee, using his editorial discretion, afforded Ditko greater creative input, subject to Marvel's ultimate authority.  *See supra* Response No. 38, *citing* Toberoff Ex. 19 at 3-4; Lens Decl., Ex. 15 19:1-10; Lens Decl., Ex. 45 at 4; Lens Decl., Ex. 25; Lens Decl., Ex. 48 at 2; Lens Decl., Ex. 2 307:25-308:3; Lens Decl., Ex. 4 124:3-18; Lens Decl., Ex. 13 54:16-56:9, 72:21- 73:23, 79:3-19; Lens Decl., Ex. 12 55:4-15, 65:13-66:7.  MCI further disputes Defendant's suggestion that because Ditko would sometimes provide "notes[] and suggestions," the Works were done "on spec."  To the contrary, Lee and Thomas were free to, and often did, disregard such margin notes.  *See* Toberoff Ex. 19 at 4-5 (Thomas explaining that "Stan wanted the artists to tell what was going on," as early artwork was "sketchy" with "very loose" pencils, but noting that "Stan would take what he wanted from that, and felt no obligation to take any more").  Further, even if Ditko plotted some Works (and

received credit for doing so), Ditko was not a "co-writer," as writing was Lee or Thomas's responsibility.  *See* Lens Decl., Ex. 50 at 3 (Ditko admitting "I'm not a writer."); Lens Decl., Ex. 15 27:13-28:18 (Lee testifying about "the division of labor between the artist and a writer of a comic book"); Lens Decl., Ex. 31D at 24 –31H (*Strange Tales* comics, beginning with Doctor Strange's first appearance, bearing writing credits for Lee, Thomas, Don Rico, and Dennis O'Neil); Toberoff Ex. 28 at 2 (Lee explaining that when Ditko "eventually did most of the plotting" on Spider-Man Lee "of course, continued to provide the dialogue and captions").

To the extent Ditko was illustrating from Lee's plots, any such notes were derivative of Lee's own ideas.  And to the extent Defendant is referring to when Ditko began plotting Marvel stories, a period of time well after the major characters were introduced, when Lee, using his editorial discretion, afforded Ditko greater creative input, subject to Marvel's ultimate authority, the fact—if true—that Ditko thought about the development of Marvel's characters would simply be one of the reasons that Marvel hired him in the first place.  *See Kirby*, 726 F.3d at 142 ("[T]he hired party's ingenuity and acumen are a substantial reason for the hiring party to have enlisted him[, and] [i]t makes little sense to foreclose a finding that work is made for hire because the hired artist indeed put his exceptional gifts to work for the party that contracted for their benefit.").

Additionally, Toberoff Exhibit 17 **does not support** this contention, as it states that Ditko's work was a "switch on the Marvel method" when Ditko began plotting Spider-Man later in his Marvel career.  Toberoff Exhibit 19 also **does not support** this contention, as it concerns Ditko and Lee's strained working relationship in 1965—just before Ditko quit working for Marvel.  In any event, Defendant omits to note that

Thomas explains in this exhibit that that even though Ditko may have suggested some margin notes, "Stan wanted them[] . . . to avoid misinterpretation" when *he* dialogued Ditko's "very loose" pencil art and only "would take what he wanted from that, and felt no obligation to take any more."  Toberoff Exhibit 28 also **does not support** this contention, as it concerns the latter period of Ditko and Lee's working relationship on Spider-Man when Ditko "*eventually* did most of the plotting."

Regardless, this contention is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F.3d at (explaining that "[i]t [wa]s beyond dispute … that Kirby made many of the creative contributions, often thinking up and drawing characters on his own, influencing plotting, or pitching fresh ideas," but still finding that Kirby's work for Marvel was made for hire); *id.* at 139-40 (relevant principles of the instance-and-expense test).

MCI also **objects** to Toberoff Exhibit 27.  *See* MCI's Evidentiary Objection No. [35].

**41. In the Period, Ditko was paid neither a fixed wage nor for his services, but was paid only for that material Magazine Management chose to purchase subsequent to its creation.** *See* Toberoff Decl. Ex. 1 at 15 (Evanier Rep. describing the comic book industry and Marvel's custom and practice of purchasing freelance work by the page, and not paying freelancers fixed wages or for their services or time); Ex. 14 at 3 (Evanier Rebuttal Rep. explaining the custom and practice of comic book publishers in the Period, including at Marvel, to pay for only those pages they chose to accept and purchase, and to not pay for a freelancer's time or services); Ex. 5 at 371:3-25 (Lee testifying that Marvel "would only buy what [it] needed"); Ex. 8 ¶ 11 (Sinnott attesting that Marvel only paid him for the pages it accepted); Ex. 9 ¶ 14 (Steranko attesting that he was only paid for the pages Marvel accepted); Ex. 10 ¶ 11 (Ayers attesting that he was paid per page for freelance material which Marvel accepted); Ex. 13 ¶¶ 9-11 (Adams attesting that Marvel only paid him for pages which it accepted); Ex. 17 at 292:24- 293:15 (Thomas testifying that freelancers were only paid for the final, accepted page); Ex. 43 ¶ 3(a) (Marvel's contract with Colan dated March 22, 1975 providing that Colan would be paid only for those pages which

Marvel accepted and requiring Colan to make changes to his work without any additional compensation); Ex. 44 ¶ 3(a) (Marvel's contract with Thomas dated September 1, 1974 providing that Thomas would be paid only for those pages which Marvel accepted and requiring Thomas to make changes to his work without any additional compensation); Ex. 53 ¶ 3(a) (Marvel's contract with Thomas dated August 27, 1976 with same provision); Ex. 52 ¶ 3(a) (Marvel's October 7, 1977 contract with Gerber providing Gerber would be paid only for those pages Marvel accepted and that Gerber "will make all changes and rework all Material … without charge").

> **RESPONSE:  Disputed**, but **immaterial**.  MCI **disputes** Defendant's suggestion that
>
> Marvel "purchase[d]" work "on spec," which is not only an issue of law but also
>
> inaccurate.  To the contrary, freelance contributors, including Ditko, contributed to
>
> Marvel's comic books pursuant to assignments from Lee, who directed the creation of the
>
> Works, and they were compensated by Marvel on an agreed per-page basis for completed
>
> assignments.  *See supra* Response No. 13, *citing* Lens Decl., Ex. 2 152:1-154:7; Lens
>
> Decl., Ex. 12 56:12-15, 57:25-58:9, 58:14-23; Lens Decl., Ex. 7 217:13-21; Lens Decl.,
>
> Ex. 13 41:20-42:9; Lens Decl., Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21; Lens Decl.,
>
> Ex. 48 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2 27:19-
>
> 28:7, 56:2-57:7, 148:22-151:25, 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens
>
> Decl., Ex. 12 56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens
>
> Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13
>
> 14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-
>
> 10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl., Ex. 2
>
> 17:8-18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13
>
> 44:4-17; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-9, 93:23-94:5; Lens Decl.,
>
> Ex. 2 80:24-81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13
>
> 97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex.
>
> 55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15; Lens Decl., Ex. 4

125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens Decl., Ex. 13 30:11-14, 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 68A-G; Lens Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens Decl., Ex. 6 40:14-20; Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7, 226:7-11, 249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.

Further, while MCI does not dispute that Steve Ditko was not paid a fixed salary or hourly wage, MCI **disputes** that Ditko was not paid for his services; to the contrary, Ditko was paid his agreed per-page rate for his completed assignments during the relevant time period.  *See* Lens Decl., Ex. 57 at 3 (Ditko writing "What I did with Spider-man, I was paid for. Marvel's property."); Lens Decl., Ex. 13 18:6-16 (Lee testifying that "[e]ven if we didn't publish – if an artist drew a 10-page story, and the artist rate was $20 a page, I would put in a voucher for $200 for that artist. Now, if – and this happened rarely – but if we decided not to use that story, the artist would still keep the money because he had done the work. It wasn't his fault. . . . Everybody was paid per page."); Lens Decl., Ex. 10 376:16-22 (Lee testifying that "[a]ny artists that drew anything that I had asked him or her to draw at my behest, I paid them for it. If it wasn't good, we wouldn't use it. But I asked them to draw it, so I did pay them."); Lens Decl., Ex. 9 30:10-12 (Lieber testifying that he "g[o]t paid for all the work [he] did for Marvel"); Lens Decl., Ex. 68A-G (reflecting number of pages and payment amount for work on various Marvel series); *compare* Lens Decl., Ex. 35 at 9 (Thomas noting that Gil Kane was assigned to and did pencil and ink the cover of Avengers #37), *with* Lens Decl., Ex. 68D at 10 (reflecting payment to Don Heck for "Avengers #37 P&I cover"); Lens Decl., Ex. 35 at 12 ("The Avengers #37 unused cover art by Don Heck"); *see also* Lens Decl.,

Ex. 2 158:17-20 (Thomas testifying that he recalled "a few instances" where "Marvel

paid an artist their per-page rate for their artwork but decided not to publish it"); Lens

Decl., Ex. 2 297:14-20 (Thomas testifying that Marvel would pay out its per-page rates

"if a new page came in that they accepted"); Lens Decl., Ex. 12 68:24-69:6 (Thomas

testifying that "if an artist's work required that changes be made, [] the artist have been

paid for the original work that they submitted"); Lens Decl., Ex. 12 74:19-25 (Thomas

testifying that he was still paid for "any materials that [he] submitted in [his] freelance

capacity that were modified by Stan").  Indeed, Defendant cites no evidence (because

there is none) that Ditko was not paid for completed assignments for Marvel—even if

Marvel "rejected" such artwork for publication.  Additionally, Toberoff Exhibits 5, 13,

43, 44, 52, and 53 **do not support** this contention, as the cited materials refers to times

periods outside the relevant time period.

Regardless, this contention is **immaterial** because it has no bearing on the

Court's application of the work-made-for-hire test, as this Court's grant of summary

judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See*

*Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).

MCI also **objects** to Toberoff Exhibits 1, 8, 9, 10, 13, 14, 43, 44, 52, and 53.

*See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [11], [12], [13], [16],

[17], [44], [45], [49], & [50].

42. **If work was rejected, Ditko was not compensated, and personally took the loss for his time, materials and associated overhead in creating the work.** *See* Toberoff Decl. Ex. 1 at 15 (Evanier Rep. describing the comic book industry and Marvel's custom and practice of not paying freelancers for material they rejected); Ex. 14 at 3, 7 (Evanier Rebuttal Rep. explaining the custom and practice in the comic book industry in the Period, including at Marvel, to not pay for any freelance material rejected by the publishers); Ex. 2 at 100:3-101:9 (Lieber testifying about a time he witnessed Kirby's work being rejected and Kirby tearing up and throwing away the rejected pages); Ex. 10 ¶ 11 (Ayers attesting that was not paid for rejected material or for

having to redo material); Ex. 11 ¶ 9 (Colan attesting that Marvel only paid for the pages it
accepted); Ex. 13 ¶¶ 8, 10-11 (Adams attesting that he bore the risk of creation because there was
no guarantee his work would be purchased by Marvel); Ex. 15 at 22-23 (Levitz Rep. explaining
that it was the custom and practice for comic book publishers to have the right to reject work
submitted by freelancers and to pay only for the pages which were accepted); Ex. 16at 117:6-
121:4 (Solo testifying that Colan was not paid for rejected work and that her father was so upset
by this periodic waste of his efforts that he would commonly use the rejected, unpaid-for pages
of artwork to pick up their family dog's feces); Ex. 17 at 295:8-296:8, 297:1-20 (Thomas
testifying that Marvel could accept or reject submitted freelance material in its sole discretion);
Ex. 20 at 73:14-74:24 (Evanier testifying that Marvel had asked Evanier to submit some work in
the 1970s prior to 1978, for a new magazine, but that after he did the work, Marvel declined to
buy it or pay for it since it decided not to publish the magazine after all); Ex. 21 at 29:9-30:17
(Steranko testifying that Lee sometimes rejected the work Steranko submitted on spec); Ex. 22 at
155:17-156:4, 259:5-16, 267:5-269:21 (Lieber testifying that he was only paid for work that was
accepted by Marvel and recalls at least one instance where he submitted a plot which Marvel
rejected and did not pay for); Ex. 24 at 14:12-19, 104:16-105:11 (Levitz testifying that Marvel
had the right to reject material and not pay for it); Ex. 43 ¶ 3(a) (Marvel's contract with Colan
dated March 22, 1975 providing that Colan would be paid only for those pages which Marvel
accepted and requiring Colan to make changes to his work without any additional
compensation); Ex. 44 ¶ 3(a) (Marvel's contract with Thomas dated September 1, 1974
providing that Thomas would be paid only for those pages which Marvel accepted and requiring
Thomas to make changes to his work without any additional compensation); Ex. 53 ¶ 3(a)
(Marvel's contract with Thomas dated August 27, 1976 with same provision); Ex. 52 ¶ 3(a)
(Marvel's October 7, 1977 contract with Gerber providing Gerber would be paid only for those
pages Marvel accepted and that Gerber "will make all changes and rework all Material ... without
charge").

> **RESPONSE: Disputed**, but **immaterial**. It is unclear what Defendant means by
>
> "rejected." To the extent Defendant is referring to work that Marvel assigned Ditko but
>
> due to it being in an unmarketable condition (*i.e.*, failing to conform to the assignment),
>
> Marvel refused to accept and pay for, Defendant has no evidence of that happening to any
>
> of Ditko's work for Marvel. Further, as was Marvel's policy, Ditko was paid his agreed
>
> per-page rate for his completed assignments during the relevant time period, even if
>
> Marvel decided not to publish such pages. *See supra* Response No. 41, *citing* Lens Decl.,
>
> Ex. 57 at 3; Lens Decl., Ex. 13 18:6-16; Lens Decl., Ex. 10 376:16-22; Lens Decl., Ex. 9
>
> 30:10-12; Lens Decl., Ex. 68A-G; Lens Decl., Ex. 35 at 9, 12; Lens Decl., Ex. 68D at 10;
>
> Lens Decl., Ex. 2 158:17-20, 297:14-20; Lens Decl., Ex. 12 68:24-69:6, 74:19-25.

Further, Marvel disputes that Ditko "personally took the loss for his time, materials and associated overhead," as the per-page rate Marvel paid freelancers, particularly the generous one paid to Ditko, accounted for expenses incurred in contributing to the Works.  S*ee supra* Response No. 2, *citing* Lens Opp. Decl., Ex. 83 72:25-73:7, 207:24-208:1; Lens Opp. Decl., Ex. 94 at 3.

Additionally, Exhibit 2 **does not support** this contention as the cited material about an single instance in which Jack Kirby purportedly was upset, tore up pages, and threw them in the trash says nothing about Marvel not paying for pages that were "rejected.". Toberoff Exhibit 17 **does not support** this contention as while Thomas testifies that Marvel was free to accept or reject work, Defendant omits Thomas's testimony that "Marvel paid an artist their per-page rate for their artwork [even if they] decided not to publish it." *See* Lens Decl., Ex. 2 158:17-20. Toberoff Exhibit 22 **does not support** this contention as it post-dates the relevant time period and is unrelated to Lieber's work under Lee or on Marvel's Super Hero comics. Toberoff Exhibits 13, 43, 44, 52, and 53 **do not support** this contention, as they post-date the relevant time period. Toberoff Exhibit 24 **does not support** this contention as Levitz testified that any risk of "hav[ing] an assignment completely rejected and not [] paid . . . was only true at the very, very beginning of people's working relationship with any specific company," and Ditko had worked for Marvel for several years prior to the creation of the Works. *See* Toberoff Ex. 24 105:2-11. Toberoff Exhibit 21 also **does not establish** this contention, because over a decade ago, when Mr. Steranko was retained as an expert witness for Defendant's counsel, he testified that "[w]hen [he] worked at Marvel, [he] was on a work for hire basis." Lens Opp. Decl., Ex. 89 82:3-23. As Mr. Steranko explained, he understood this based on his "experience at Marvel," as Marvel "provided him with [a] description of the character," gave him "treatment[s] [or] synops[e]s of the material that they were looking for,"

"supervis[ed]" him, and "stamped [his checks] work for hire." *Id*. And after Marvel "edited [*sic*] some of [his] work" and "changed certain things that [he] didn't feel should be changed," Steranko, like Ditko, who "faced the same frustrations," left Marvel. Lens Opp. Decl., Ex. 95 at 4-5.

Regardless, this contention is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test). Indeed, the *Kirby* court already held that the risk that certain pages would not be paid did not defeat a finding that the works were made at Marvel's expense where, as here, the hiring party has a close and continuous relationship with the artist during the relevant time period. *See Kirby*, 726 F.3d at 143 ("[T]he record suggests that both parties took on risks with respect to the works' success—Kirby that he might occasionally not be paid for the labor and materials for certain pages, and Marvel that the pages it did pay for might not result in a successful comic book. But we think that Marvel's payment of a flat rate and its contribution of both creative and production value, in light of the parties' relationship as a whole, is enough to satisfy the expense requirement.").

MCI also **objects** to Toberoff Exhibits 1, 2, 10, 11, 13, 14, 16, 20, 21, 22, 43, 44, 52, and 53. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [3], [13], [14], [16], [17], [18], [19], [20], [24], [25], [44], [45], [49], & [50].

43. **If Ditko was asked to redraw a page(s), he was not compensated for the extra labor or materials, necessary to make such changes, but was paid only for the final, completed page(s) Magazine Management decided to buy.** *See* Toberoff Decl. Ex. 1 at 15 (Evanier Rep. describing the comic book industry and Marvel's custom and practice of not paying freelancers to revise or redraw a page, as freelancers were only paid for the final pages the publisher decided to accept and purchase); Ex. 14 at 7 (Evanier Rebuttal Rep. explaining the custom and practice in the comic book industry, including at Marvel, for publishers to not pay for rejected material, or to pay a freelancer to make revisions to his material); Ex. 2 at 102:15-105:17 (Lieber testifying he was not paid for redoing work and that he was only paid for the final pages Marvel accepted); Ex. 8 ¶ 13 (Sinnott attesting that Marvel only paid for the final pages that were sold to Marvel,

not for any changes or rejected work); Ex. 9 ¶ 14 (Steranko attesting he was not compensated for
having to redo any work); Ex. 10 ¶ 11 (Ayers attesting that he was not paid for rejected material
or for having to redo material); Ex. 11 ¶¶ 9, 11 (Colan attesting that Marvel did not pay him for
redoing work); Ex. 13 ¶¶ 10-11 (Adams attesting that he was only paid for pages Marvel
accepted); Ex. 17 at 142:21-143:15, 296:10-25 (Thomas testifying that freelancers were not paid
for having to redo or revise pages and that they would only be paid for the final, accepted page);
Ex. 43 ¶ 3(a) (Marvel's contract with Colan dated March 22, 1975 providing that Colan would be
paid only for those pages which Marvel accepted and requiring Colan to make changes to his
work without any additional compensation); Ex. 44 ¶ 3(a) (Marvel's contract with Thomas dated
September 1, 1974 providing that Thomas would be paid only for those pages which Marvel
accepted and requiring Thomas to make changes to his work without any additional
compensation); Ex. 53 ¶ 3(a) (Marvel's contract with Thomas dated August 27, 1976 with same
provision); Ex. 52 ¶ 3(a) (Marvel's October 7, 1977 contract with Gerber providing Gerber
would be paid only for those pages Marvel accepted and that Gerber "will make all changes and
rework all Material … without charge").

> **RESPONSE:  Disputed in part**, but **immaterial**.  While MCI does not dispute that the
> per-page-rate included the right to request revisions, MCI **disputes** Defendant's
> suggestion that Marvel was "buy[ing]" work "on spec," which is not only an issue of law
> but also inaccurate.  To the contrary, freelance contributors, including Ditko, contributed
> to Marvel's comic books pursuant to assignments from Lee, who directed the creation of
> the Works, and they were compensated by Marvel on an agreed per-page basis for
> completed assignments.  *See supra* Response No. 13, *citing* Lens Decl., Ex. 2 152:1-
> 154:7; Lens Decl., Ex. 12 56:12-15, 57:25-58:9, 58:14-23; Lens Decl., Ex. 7 217:13-21;
> Lens Decl., Ex. 13 41:20-42:9; Lens Decl., Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21;
> Lens Decl., Ex. 48 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex.
> 2 27:19-28:7, 56:2-57:7, 148:22-151:25, 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9;
> Lens Decl., Ex. 12 56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24;
> Lens Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl.,
> Ex. 13 14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2, 140:8-11,
> 224:5-10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl.,
> Ex. 2 17:8-18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex.

13 44:4-17; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-9, 93:23-94:5; Lens

Decl., Ex. 2 80:24-81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-220:11; Lens Decl.,

Ex. 13 97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18; Thomas Decl. ¶¶ 7-8; Lens

Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15; Lens Decl.,

Ex. 4 125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens Decl., Ex. 13

30:11-14, 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens Decl., Ex.

68A-G; Lens Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens Decl., Ex. 6

40:14-20; Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7,

226:7-11, 249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.

Additionally, Toberoff Exhibits 13, 43, 44, 52, and 53 **do not support** this

contention, as they post-date the relevant time period.  Toberoff Exhibit 9 similarly **does**

**not support** this contention, because over a decade ago, when Mr. Steranko was retained

as an expert witness for Defendant's counsel, he testified that "[w]hen [he] worked at

Marvel, [he] was on a work for hire basis."  Lens Opp. Decl., Ex. 89 82:3-23.  As Mr.

Steranko explained, he understood this based on his "experience at Marvel," as Marvel

"provided him with [a] description of the character," gave him "treatment[s] [or]

synops[e]s of the material that they were looking for," "supervis[ed]" him, and "stamped

[his checks] work for hire."  *Id*.  And after Marvel "edited [*sic*] some of [his] work" and

"changed certain things that [he] didn't feel should be changed," Steranko, like Ditko,

who "faced the same frustrations," left Marvel.  Lens Opp. Decl., Ex. 95 at 4-5.

Regardless, this contention is **immaterial** because it has no bearing on the

Court's application of the work-made-for-hire test, as this Court's grant of summary

judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See*

*Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).  Indeed,

the *Kirby* court already held that the risk that certain pages would not be paid did not

defeat a finding that the works were made at Marvel's expense where, as here, the hiring

party has a close and continuous relationship with the artist during the relevant time

period.  *See Kirby*, 726 F.3d at 143  ("[T]he record suggests that both parties took on

risks with respect to the works' success—Kirby that he might occasionally not be paid for

the labor and materials for certain pages, and Marvel that the pages it did pay for might

not result in a successful comic book.  But we think that Marvel's payment of a flat rate

and its contribution of both creative and production value, in light of the parties'

relationship as a whole, is enough to satisfy the expense requirement.").

   MCI also **objects** to Toberoff Exhibits 1, 8, 9, 10, 11, 13, 14, 43, 44, 52, and 53.

*See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [11], [12], [13], [14],

[16], [17], [44], [45], [49], & [50].

44. **Ditko often refused to make changes to his work outright, and in that event, any changes Lee wanted were either ignored, or had to be made by a production assistant after Ditko had sold his work to Magazine Management.** *See* Toberoff Decl. Ex. 14 at 7 (Evanier Rebuttal Rep. explaining Ditko's practice of refusing to make changes and in such case, Marvel's custom of having staff make such changes after the work had been submitted to and purchased by Marvel); Ex. 3 at 75:18-20, 243:13-244:23, 246:5-9 (Romita testifying that he, or someone else Lee could find in the Marvel office, would be asked to make changes to other artists' work after it had been submitted and would not be paid any extra for making these changes and noting specifically that when Lee did not like something on a Ditko cover, he asked Kirby to change it); Ex. 19 at 6, "Legends at Loggerheads!" (Thomas explaining example of when Lee incorrectly dialogued a *Spider-Man* story in a way Ditko had not intended, Ditko refused to accede to Lee's chosen direction); Ex. 21 at 41:7-18 (Steranko testifying that Marvel had production assistants to make changes to work after it had been submitted by artists); Ex. 35 at DITKO-0193 (Ditko writing that he ignored comments from Lee and Brodsky and only made changes to stories when he agreed with them).

   **RESPONSE:**  **Disputed**.  MCI **disputes** Defendant's suggestion that Ditko "sold" work

"on spec," which is not only an issue of law but also inaccurate.  To the contrary,

freelance contributors, including Ditko, contributed to Marvel's comic books pursuant to

assignments from Lee, who directed the creation of the Works, and they were compensated by Marvel on an agreed per-page basis for completed assignments. *See supra* Response No. 13, *citing* Lens Decl., Ex. 2 152:1-154:7; Lens Decl., Ex. 12 56:12-15, 57:25-58:9, 58:14-23; Lens Decl., Ex. 7 217:13-21; Lens Decl., Ex. 13 41:20-42:9; Lens Decl., Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21; Lens Decl., Ex. 48 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2 27:19-28:7, 56:2-57:7, 148:22-151:25, 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens Decl., Ex. 12 56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13 14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl., Ex. 2 17:8-18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 44:4-17; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-9, 93:23-94:5; Lens Decl., Ex. 2 80:24-81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15; Lens Decl., Ex. 4 125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens Decl., Ex. 13 30:11-14, 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 68A-G; Lens Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens Decl., Ex. 6 40:14-20; Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7, 226:7-11, 249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.

MCI also **disputes** that Ditko "often refused to make changes to his work outright." To the contrary, for the majority of the time Ditko worked for Marvel, Ditko

described his working relationship with Lee as a "collaboration" that involved meetings to discuss assignments, "plotting conferences" to discuss the stories he was drawing, and further meetings to go over draft artwork, with Ditko "noting anything to be corrected." *See supra* Response No. 36, *citing* Lens Decl., Ex. 48 at 2; Lens Decl., Ex. 4 124:3-18.

Additionally, Toberoff Exhibits 3 and 21 **do not support** this contention, as they simply establish that Marvel had production assistants capable of making changes. Toberoff Exhibit 3 **does not support** this contention because Mr. Romita's testimony that he purportedly was not paid for making corrections to work submitted by other Marvel freelancers has no bearing on this contention.  Toberoff Exhibit 19 also **does not support** this contention, because it concerns Ditko and Lee's strained working relationship in 1965—just before Ditko quit working for Marvel.  Moreover, as Toberoff Exhibit 19 makes clear, although Lee "was willing to go along with a lot of what Steve wanted to do," "Stan had the authority" and used it "when he felt he had to use it" because an explanation that "the artist wanted to do it that way" "would not have been a sufficient excuse for Martin Goodman."  *See* Toberoff Ex. 19 at 3-4.

MCI also **objects** to Toberoff Exhibits 3, 14 and 35.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [8], [17], & [41].

45. **Magazine Management did not withhold any taxes, nor provide Ditko with any security or employment benefits.** *See* Toberoff Decl. Ex. 1 at 12 (Evanier Rep. describing the comic book industry and Marvel's custom and practice of publishers not withholding payroll taxes, nor providing health insurance or employment benefits to freelancers in the Period); Ex. 2 at 79:5-80:9 (Lieber testifying that Marvel did not withhold any taxes or pay for any health benefits for freelancers); Ex. 9 ¶ 10 (Steranko attesting that Marvel did not withhold any taxes or provide any employment benefits to him from 1966 to 1973); Ex. 13 ¶ 10 (Adams attesting that Marvel did not withhold any taxes or provide him with any employment benefits).

**RESPONSE:**  Undisputed, but **immaterial** because this paragraph does not mean that Ditko did not work for Marvel on a work-made-for-hire basis, as confirmed by the *Kirby*

court.  *See Kirby*, 777 F. Supp. 2d at 741-43 (finding that "the expense factor favors

Marvel's work-for-hire claim" even though "Kirby provided his own tools, worked his

own hours, paid his own taxes and benefits, and used his own art supplies"); *see also*

*Kirby*, 726 F.3d at 143  ("Marvel's payment of a flat rate and its contribution of both

creative and production value, in light of the parties' relationship as a whole, is enough to

satisfy the expense requirement."); *Kirby*, 726 F.3d at 139-40 (relevant principles of the

instance-and-expense test).  And Toberoff Exhibit 13 **does not support** this paragraph, as

it refers to a period of time beginning in late 1960s, not the relevant time period.

MCI, however, **objects** to Toberoff Exhibits 1, 9, and 13.  *See* MTE Evanier

[Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [12], & [16].

46. **Ditko, as an independent artist, was free to sell, and did sell, work to other publishers, like Charlton Comics, while also selling his work to Magazine Management.** *See* Toberoff Decl. Ex. 1 at 10 (Evanier Rep. describing the common practice of freelancers selling material to more than one publisher, including Marvel, DC Comics, and Charlton Comics); Ex. 3 at 207:12-22 (Romita testifying that freelancers were free to sell work to other publishers); Ex. 9 ¶ 11 (Steranko attesting that Marvel had no contract with Steranko and so he was free to sell work to other publishers); Ex. 13 ¶¶ 5-6 (Adams attesting that he sold work to both Marvel and DC Comics during the 1960s and 1970s); Ex. 17 at 298:8-14, 301:14-303:7 (Thomas testifying that Marvel did not have contracts with freelancers prohibiting them from selling work to other publishers); Ex. 23 at 160:2-8 (Mark Ditko testifying that Ditko was selling work to both Marvel and Charlton Comics in the 1960s); Ex. 35 at DITKO-0199 (Ditko writing about his work at Charlton Comics in the 1960s); Ex. 57 at 2 (Ditko writing about creating material for Charlton Comics and DC Comics).

RESPONSE:  **Disputed**, but **immaterial**.  While MCI does not dispute that Ditko was

free to work for other publishers while working for Marvel (provided it did not draw

upon Marvel's pre-existing intellectual property), MCI **disputes** Defendant's suggestion

that Ditko was "selling" work to Marvel "on spec," which is not only an issue of law but

also inaccurate.  To the contrary, freelance contributors, including Ditko, contributed to

Marvel's comic books pursuant to assignments from Lee, who directed the creation of the

Works, and they were compensated by Marvel on an agreed per-page basis for completed

assignments.  *See supra* Response No. 13, *citing* Lens Decl., Ex. 2 152:1-154:7; Lens Decl., Ex. 12 56:12-15, 57:25-58:9, 58:14-23; Lens Decl., Ex. 7 217:13-21; Lens Decl., Ex. 13 41:20-42:9; Lens Decl., Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21; Lens Decl., Ex. 48 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2 27:19-28:7, 56:2-57:7, 148:22-151:25, 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens Decl., Ex. 12 56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13 14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl., Ex. 2 17:8-18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 44:4-17; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-9, 93:23-94:5; Lens Decl., Ex. 2 80:24-81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15; Lens Decl., Ex. 4 125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens Decl., Ex. 13 30:11-14, 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 68A-G; Lens Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens Decl., Ex. 6 40:14-20; Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7, 226:7-11, 249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.

Further, Toberoff Exhibit 13 **does not support** this contention, as it refers to a period of time beginning in late 1960s, not the relevant time period.  Moreover, none of the cited evidence indicates that Ditko actually sold work to other publishers during the relevant time period.

Regardless, this contention is **immaterial** because it does not change that Ditko

had a close and continuous working relationship with Marvel, precisely as Kirby did. *See*

*Kirby*, 726 F.3d at 126 (explaining that "Kirby and Marvel were closely affiliated during

the relevant time period . . . Although  . . . [Kirby] could and did produce and sell work to

other publishers . . . the vast majority of his published works in that time frame was

published by Marvel"); *id*. at 141 ("Kirby's works during this period were hardly self-

directed projects in which he hoped Marvel, as one of several potential publishers, might

have an interest; rather, he created the relevant works pursuant to Marvel's assignment or

with Marvel specifically in mind.  Kirby's ongoing partnership with Marvel . . . is

therefore what induced Kirby's creation of the works."); *see also id*. at 139-40 (relevant

principles of the instance-and-expense test).

MCI also **objects** to Toberoff Exhibits 1, 9, 13, 23, 35, and 57.  *See* MTE

Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [12], [16], [32], [41], & [52].

**47. On the occasions when Ditko and Lee would exchange story ideas, Ditko was free to incorporate ideas from the exchange or to reject them altogether.** *See* Toberoff Decl. Ex. 14 at 11, 13 (Evanier Rebuttal Rep. explaining the custom and practice of comic book publishers to reserve the right to purchase or not purchase freelancers' submitted material, and that freelancers were free to decline to make changes to their work); Ex. 35 at DITKO-0192, DITKO-0207-0210, DITKO-0215-0218 (Ditko writing that he rejected several of Lee's *Spider-Man* story ideas and characters such as, for instance, Lee's idea for a Spider-Woman character, or Lee's idea of making Aunt May more glamorous); Ex. 58 at 4 (Ditko writing that he "refused to do a drunken Iron Man splash page—someone else had to draw [and] ink it").

**RESPONSE:  Disputed**.  Because Defendant fails to provide any time period in this fact,

it is unclear as written.  While MCI does not dispute that Lee, within his editorial

discretion, sometimes allowed Ditko more creative freedom (eventually allowing him to

plot stories), MCI disputes the suggestion that Ditko worked for Marvel on "spec," as

Defendant suggests.  To the contrary, Defendant has no evidence that Ditko's freedoms

were not a by-product of Lee's editorial discretion.  *See* Toberoff Ex. 19 at 3-4 (although

Lee "was willing to go along with a lot of what Steve wanted to do," "Stan had the authority" and used it "when he felt he had to use it" because an explanation that "the artist wanted to do it that way" "would not have been a sufficient excuse for Martin Goodman.").  Moreover, for the majority of the time Ditko worked for Marvel, Ditko described his working relationship with Lee as a "collaboration" that involved meetings to discuss assignments, "plotting conferences" to discuss the stories he was drawing, and further meetings to go over draft artwork, with Ditko "noting anything to be corrected." *See supra* Response No. 36 *citing* Lens Decl., Ex. 48 at 2; Lens Decl., Ex. 4 124:3-18.

MCI further **disputes** this contention because Ditko often lamented that he disagreed with Lee's creative decisions but was bound by them.  Lens Decl., Ex. 59 at 2 (Ditko complaining that "Stan's dialogue was too much his personal writing style with heroes/villains. He had his formula to handle all the hero/villains material."); Lens Decl., Ex. 58 at 3 (Ditko writing that "I believe Stan loved writing those corny captions, etc. It added to reading appeal, but undercut a more serious growth of a teenagers [sic] in a heroic role"); Lens Decl., Ex. 52 at 4 (Ditko writing that "Stan's 'humor' dialogue undercut Peter Parker, S[pider]-M[an] as a teen-ager growing up to become a professional hero like Captain America"); Lens Decl., Ex. 54 at 4 (Ditko commenting that "Stan's writing style was completely wrong for SM [Spider-Man]" and that he "treated teen-age P. Parker as a seasoned veteran with his nonsensical comic dialogue exchanges between a 'Hero' and 'villains'"); Lens Decl., Ex. 60 at 3 (Ditko remarking that "[e]ven some poor plots by Stan, others, incompetent inkers didn't sink my basic ideas for Doctor Strange"); Lens Decl., Ex. 57 at 4 (Ditko noting that it was "a mystery to [him] why no Doctor Strange covers"); Lens Decl., Ex. 53 at 3 (Ditko writing that it was

"hard to understand, explain Stan's motives with his likes, dislikes . . . . In a cover, I had S[pider]-M[an] leaping toward the Molten Man. S[pider]-M[an] was changed to leaping across the Molton Man and off the cover. What pleases an editor? They all have their likes and dislikes."); Lens Decl., Ex. 54 at 4 (Ditko describing Marvel as having "picky editors" who adopted the creed that "[t]he editor is always right"); Lens Decl., Ex. 45 at 3 (Ditko explaining that, if he had the choice, he would do both drawing and inking, rather than having "other people . . . ink [his] pencils"); Lens Decl., Ex. 2 at 57:13-58:11 (Thomas testifying that every single artist at Marvel was "subject to the editorial discretion of the editor-in-chief" and that, during Lee's tenure, all freelancers worked "subject to Stan Lee's supervision and discretion"); Lens Decl., Ex. 13 16:8-19 (Lee confirming that he would "give instructions to the artists as to how [he] wanted the story to go" and that it was his "responsibility" to oversee "the creative editorial aspects of the comic books that were created"); *see also* Lens Decl., Ex. 61 at 4.

Additionally, Toberoff Exhibit 58 **does not support** this contention, as it has nothing to do with Ditko's working relationship with Lee, but instead concerns Ditko's working relationship with a different Marvel editor post-dating the relevant time period by many years.

Regardless, this contention is **immaterial** because that Ditko "enjoyed more creative discretion than most [Marvel] artists," just as Jack "Kirby undoubtedly" did, that does not change that "Marvel also played at least some creative role with respect to the works," that Ditko "worked within the scope of Marvel's assignments and titles," and that "Marvel had the power to reject [Ditko's] pages and require him to redo them, or to

alter them, a power it exercised from time to time." *Kirby*, 726 F.3d at 141; *see also id.*

at 139-40 (relevant principles of the instance-and-expense test).

        MCI also **objects** to the evidence cited in support of this contention.  *See* MTE

Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [17], [41], & [53].

48. **If Ditko did not wish to work on a project offered to him by "Marvel," he was free to decline it without consequence.** *See* Toberoff Decl. Ex. 14 at 11, 13 (Evanier Rebuttal Rep. explaining the custom and practice of comic book publishers to reserve the right to purchase or not purchase freelancers' submitted material and for freelancers to be free to sell work to comic book publishers if they so chose); Ex. 3 at 219:12-24 (Romita testifying that he turned down Lee's offer to submit material to Marvel and preferred to sell freelance work to DC Comics); Ex. 21 at 29:9-30:17 (Steranko testifying that he was not given "assignments," but rather, he had the option to work on some books or to not if he chose not to); Ex. 24 at 89:2-11 (Levitz testifying that freelancers were free to decline "assignments"); Ex. 58 at 4 (Ditko writing that, after he stopped selling his material to Marvel in 1966, he later started working with Marvel again, but refused to do any *Spider-Man* or *Dr. Strange* stories and recounting that when other writers tried to sneak in *Spider-Man* panels for Ditko to work on, he "left [them] blank for someone else to fill in"); *id.* (Ditko writing that he "refused to do a drunken Iron Man splash page—someone else had to draw [and] ink it").

        **RESPONSE:**  **Disputed in part**, but **immaterial**.  While MCI does not dispute that

Ditko could turn down assignments, MCI **disputes** that any decision by Ditko to decline

assignments was "without consequence."  If Ditko turned down an assignment, he (1)

would give up the compensation associated with such work; and, more importantly, (2)

could jeopardize future Marvel assignments.  Lens Decl., Ex. 12 56:16-18 (Thomas

confirming that it was Lee who "decided which writer and artist would work on a

particular comic book or issue"); Lens Decl., Ex. 2 148:22-151:25 (Thomas testifying

why freelancers might be removed from certain comic books, including for "lateness,

undependability," or the editor's decision that "they just weren't doing the right job, or

even if  they were okay . . . [that] a little bit of musical chairs might get us a better

arrangement of people"); Lens Decl., Ex. 12 58:24-59:5 (Thomas testifying that in the

1950s and 1960s Lee could, and did, make the decision to have freelancers "taken off a

comic book issue for an ongoing series"). *See also supra* Response No. 13, *citing* Lens Decl., Ex. 2 141:25-142:15; Lens Decl., Ex. 4 125:15-18; Lens Decl., Ex. 2 292:18-293:4; Lens Decl., Ex. 2 332:23-333:4; Lens Decl., Ex. 13 30:11-14; Lens Decl., Ex. 13 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 68A-G; Lens Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens Decl., Ex. 6 40:14-20; Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7, 226:7-11, 249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.

Additionally, Toberoff Exhibit 3 **does not support** this contention, as Romita merely testified that he would not accept assignments from Marvel during 1958 to 1965 period—when he was steadily working at DC Comics and performing no work for Marvel.  Toberoff Exhibit 24 **does not support** this contention as Levitz testified that "freelancers very rarely [declined assignments] because that's how they made a living, and assignments were the necessary life blood."  *See* Toberoff Ex. 24 at 89:9-11. Toberoff Exhibit 21 also **does not support** this contention, because over a decade ago, when Mr. Steranko was retained as an expert witness for Defendant's counsel, he testified that "[w]hen [he] worked at Marvel, [he] was on a work for hire basis."  Lens Opp. Decl., Ex. 89 82:3-23.  As Mr. Steranko explained, he understood this based on his "experience at Marvel," as Marvel "provided him with [a] description of the character," gave him "treatment[s] [or] synops[e]s of the material that they were looking for," "supervis[ed]" him, and "stamped [his checks] work for hire."  *Id*.  And after Marvel "editted [*sic*] some of [his] work" and "changed certain things that [he] didn't feel should be changed," Steranko, like Ditko, who "faced the same frustrations," left Marvel.  Lens Opp. Decl., Ex. 95 at 4-5.  Toberoff Exhibit 58 **does not support** this contention either,

because Ditko admits that he worked on assignment, and merely identifies a narrow subset of work he refused to do, which was unrelated to the Works, outside the relevant time period, and for a different Marvel editor.

Regardless, this contention is **immaterial** because that Ditko had the right to decline assignments from Marvel does not speak to whether the assignments that Ditko accepted from Marvel during their close and continuous relationship in the relevant time period were done on a work-made-for-hire basis.  *See Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).  Indeed, as with Kirby, "most of [Ditko's] work during this period was published by Marvel and for established Marvel titles."  *Id*. at 141.  When "[u]nderstood as products of this overarching relationship, [Ditko's] works during this period were hardly self-directed projects in which he hoped Marvel, as one of several potential publishers, might have an interest; rather, he created the relevant works pursuant to Marvel's assignment or with Marvel specifically in mind.  [Ditko's] ongoing partnership with Marvel … is therefore what induced [his] creation of the works."  *Id*. at 141.

MCI also **objects** to Toberoff Exhibits 3, 14, 21, and 58.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [7], [17], [20], & [53].

49. **Ditko, an extremely independent-minded artist, supervised himself, edited his own work, and created the Works after little or no discussion with Lee.** *See* Toberoff Decl. Ex. 1 at 13 (Evanier Rep. describing the common practice of independent freelancers supervising themselves and editing their own work prior to submission); Ex. 7 at 223:18-225:20, 277:11-13 (Thomas testifying that Ditko did all the plotting on *Spider-Man* and *Dr. Strange* stories while he and Lee were not speaking and that Ditko never received any plots from Thomas when Thomas was doing the dialoguing on *Dr. Strange*); Ex. 17 at 311:18-312:25 (Thomas testifying that Ditko plotted and drew *Spider-Man* stories completely on his own for more than one year before he left in 1966); Ex. 25 at DITKO-0308 (Ditko explaining that Dr. Strange was his creation and at one point, he was doing all the stories, writing, and art for it); Ex. 26 at 83 (Lee writing that Ditko came up with the *Dr. Strange* plots and illustrated the story and Lee only added the dialogue [in the balloons]); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and that he plotted

and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script).

> **RESPONSE:  Disputed**.  For the majority of the time Ditko worked for Marvel, Ditko
>
> described his working relationship with Lee as a "collaboration" that involved meetings
>
> to discuss assignments, "plotting conferences" to discuss the stories he was drawing, and
>
> further meetings to go over draft artwork, with Ditko "noting anything to be corrected."
>
> *See supra* Response No. 36 *citing* Lens Decl., Ex. 48 at 2; Lens Decl., Ex. 4 124:3-18.
>
> Further, while MCI does not dispute that later in Ditko's career at Marvel he was
>
> sometimes afforded certain creative freedoms, MCI **disputes** that this is any indication
>
> that Ditko did not work for Marvel on a work-made-for-hire basis.  To the contrary, Lee
>
> exercised his editorial discretion to sometimes afford Ditko greater creative input, subject
>
> to Marvel's ultimate authority.  *See supra* Response No. 38, *citing* Toberoff Ex. 19 at 3-
>
> 4; Lens Decl., Ex. 15 19:1-10; Lens Decl., Ex. 45 at 4; Lens Decl., Ex. 25; Lens Decl.,
>
> Ex. 48 at 2; Lens Decl., Ex. 2 307:25-308:3; Lens Decl., Ex. 4 124:3-18; Lens Decl., Ex.
>
> 13 54:16-56:9, 72:21- 73:23, 79:3-19; Lens Decl., Ex. 12 55:4-15, 65:13-66:7.  But even
>
> then, Lee assigned Ditko to the stories and could remove him at any time, could request
>
> or make changes to his work, or otherwise elect not to publish it.  *See supra* Response
>
> No. 13, *citing* Lens Decl., Ex. 2 152:1-154:7; Lens Decl., Ex. 12 56:12-15, 57:25-58:9,
>
> 58:14-23; Lens Decl., Ex. 7 217:13-21; Lens Decl., Ex. 13 41:20-42:9; Lens Decl., Ex.
>
> 10 383:18-21; Lens Decl., Ex. 6 38:8-21; Lens Decl., Ex. 48 at 3; Lens Decl., Ex. 51 at 3;
>
> Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2 27:19-28:7, 56:2-57:7, 148:22-151:25, 88:17-
>
> 89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens Decl., Ex. 12 56:16-18, 58:10-13, 58:24-
>
> 59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15 16:8-19; Lens Decl., Ex.
>
> 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13 14:5-8, 23:18-21; Lens Decl., Ex. 3

119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24.  *See also* Lens Decl., Ex. 48 at 2 (Ditko explaining that he and Lee "would go over the penciled story/art pages" together and discuss changes, additions, or corrections to them"); Lens Decl., Ex. 53 at 3 (Ditko writing about a Spider-Man cover in which he "had S[pider]-M[an] leaping toward the Molten Man" but "S[pider]-M[an] was changed to leaping across the Molton Man and off the cover"); Lens Decl., Ex. 54 at 4 (Ditko complaining about Marvel's "picky editors" and their "corrections"); Lens Decl., Ex. 29 (original art for *Amazing Fantasy* #15 showing editorial comments in the margins from Lee to Ditko on Spider-Man panels); Lens Decl., Ex. 2 44:22-45:5 (Thomas testifying that he "observe[d]" Marvel editors "actually making changes to work that had been done by freelance writers and artists," in terms of "both . . . lettering and artwork"); Lens Decl., Ex. 2 127:17-20 (Thomas confirming that "Stan Lee ha[d] the ability to just have changes made to artwork without the artist's involvement"); Lens Decl., Ex. 2 133:11-13 (similar); Lens Decl., Ex. 2 24:17-23 (Thomas testifying how Marvel production manager Sol Brodsky "would call a freelancer in, a letterer or an artist to come in . . . simply because they had something that had to be corrected or changed and they needed more work than just the one production person could do"); Lens Decl., Ex. 2 41:16-20 (Thomas confirming that he understood Marvel could "request that [he], for example, do rewrites or revisions to work that you had done"); Lens Decl., Ex. 13 16:20-17:4 (Lee confirming that it "was [his] job" to "not only make assignments but also to edit and change things that other writers or artists did," and that, "[i]f, for example, I saw some art work, and I felt there wasn't enough action on a page, or it was confusing, the reader might not know what it was, or in a script if I felt

there was too much dialogue or too little dialogue, . . . it was up to me to make the stories as good as I could make them"); Lens Decl., Ex. 3 128:23-129:2 (Lieber testifying that "of course" Lee "had the right [to] make the changes to [Lieber's] scripts"); Lens Decl., Ex. 3 133:14-134:5) (Lieber testifying that, when Lee went over his work, he would explain to Lieber, "'Oh, you could have said this. You could have done that,' and he'd make some little corrections" but "as time went on, he had fewer to make"); Lens Decl., Ex. 54 at 4 (Ditko remarking that he "got more out of working for" Charlton Comics than for Marvel because of its "picky editors, 'corrections' etc."); Lens Decl., Ex. 48 at 5 (Ditko discussing Marvel's rejection of his Spider-Man cover and reassignment of the task to Kirby); Lens Decl., Ex. 47 at 2 (same); Lens Decl., Ex. 30 at 2 ("*Amazing Fantasy #15 unused cover art by Steve Ditko*"); Lens Decl., Ex. 13 22:11-23:19 (Lee confirming that he "always maintain[ed] the ability to edit and make changes or reject what the other writers or artists had created"); Lens Decl., Ex. 2 286:15-23 (Thomas testifying that Goodman's "main concern was the covers" and that he was known to scrutinize them); Lens Decl., Ex. 12 67:16-68:6 (Thomas testifying that Lee would review the covers before publication, and then "they were all reviewed eventually by Martin Goodman as publisher"); *see also* Lens Decl., Ex. 2 161:8-20; Lens Decl., Ex. 13 44:4-17; Lens Decl., Ex. 41 at 4; Lens Decl., Ex. 49 at 3; Lens Decl., Ex. 52 at 4; Lens Decl., Ex. 2 42:24-44:18, 333:18-334:5; Lens Decl., Ex. 12 113:18-114:11; Lens Decl., Ex. 3 137:11-20, 138:2-5; Lens Decl., Ex. 13 18:17-19:17, 22:11-14, 33:25-34:7; Thomas Decl. ¶¶ 20-21. Additionally, Toberoff Exhibit 26 **does not support** this contention, as it references only Ditko's work on *Spider-Man Annual #2*, a one-off special annual issue otherwise unconnected to the Spider-Man or Doctor Strange stories Ditko and Lee worked on.

MCI also **objects** to Toberoff Exhibits 1, 25, and 27.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [34], & [35].

50. **In 1964, Ditko and Lee had a falling out over the future direction of the *Spider-Man* stories and they refused to speak anymore.** *See* Toberoff Decl. Ex. 7 at 223:18-224:13 (Thomas testifying that Ditko did all the plotting on *Spider-Man* and *Dr. Strange* stories while he and Lee were not speaking); Ex. 17 at 311:2-17 (Thomas testifying that, by the time he started at Marvel in mid-1965, Ditko and Lee were not speaking anymore because they had been fighting over the direction of the *Spider-Man* series); Ex. 24 at 124:5-24 (Levitz testifying that Ditko and Lee stopped speaking in the last year of Ditko's time with Marvel because Ditko was not getting proper credit for his contributions to the stories); Ex. 35 at DITKO-0193 (Ditko writing that he and Lee stopped speaking around 1964); Ex. 58 at 3 (Ditko writing that he took over all plotting of the *Spider-Man* stories).

> **RESPONSE:  Disputed**.  While MCI does not dispute that Ditko and Lee had a falling out and stopped speaking, MCI **disputes** Defendant's suggestion that means Ditko's work stopped being done on a work-made-for-hire basis for Marvel as a result.  Indeed, after Lee and Ditko's falling out, Ditko received his assignments from Marvel's production manager, Sol Brodsky, who gave them on Stan's behalf.  *See* Toberoff Ex. 19 at 3 (Thomas discussing Ditko's working relationship with Lee when they "weren't speaking to each other," explaining how Marvel production manager Sol Brodsky served as Lee's intermediary on assignments); Lens Opp. Decl., Ex. 84 30:17-31:1 (Thomas testifying that "a lot of it went through the production manager, Sol Brodsky" who "was speaking for [Lee]"); Lens Opp. Decl., Ex. 84 335:2-5 (Thomas testifying that Lee would "give directions through Sol Brodsky"); *see also* Toberoff Ex. 19 at 3-4 (although Lee "was willing to go along with a lot of what Steve wanted to do," "Stan had the authority" and used it "when he felt he had to use it" because an explanation that "the artist wanted to do it that way" "would not have been a sufficient excuse for Martin Goodman.").  Likewise, Stan still reviewed Ditko's work and had ultimate authority over it, regardless of whether he communicated directly with Ditko.  *See supra* Response No. 36, *citing*

Lens Decl., Ex. 2 17:8-18:13, 37:10-39:6, 80:24-81:12, 125:18-126:1; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:3-125:4; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3.  In addition, Defendant cites no evidence that the falling out occurred in 1964 or that it was about the "future of the *Spider-Man* stories."  Toberoff Exhibit 35 **does not support** this contention, as Ditko merely states in the cited material that he and Lee stopped talking "at some point before issue #25" of *The Amazing Spider-Man*, which was published with a cover date of June 1965.  Toberoff Exhibit 17 **does not support** this contention, as the cited material does not state or imply that "Ditko and Lee were not speaking anymore because they had been fighting over the direction of the Spider-Man series."  Toberoff Exhibit 24 **does not support** this contention, as the cited material does not state or imply that Ditko and Lee stopped speaking "because Ditko was not getting proper credit for his contributions to the stories," but instead states that it was due to "discomfort between the two on their working process and the allocation of credit work."

MCI also **objects** to Toberoff Exhibits 35 and 58.  *See* MCI's Evidentiary Objection Nos. [41] & [53].

51. **From that point until Ditko stopped selling his work to Marvel in early 1966, Ditko was in complete creative control over how he plotted and drew his stories, leaving Lee (and Magazine Management) with little or no control over the stories, aside from Lee's dialoguing the balloons.** *See* Toberoff Decl. Ex. 7 at 223:18-224:13 (Thomas testifying that Ditko did all the plotting on *Spider-Man* and *Dr. Strange* stories while he and Lee were not speaking); Ex. 17 at 29:19-30:8, 83:13-18 (Thomas testifying that by the time Thomas began at Marvel in mid-1965, Ditko was plotting and penciling *Dr. Strange* stories, which Thomas would dialogue); *id*. at 92:9-20 (Thomas testifying that Ditko stopped working with Marvel around Christmas 1965); Ex. 25 at DITKO-0308 (Ditko explaining that Dr. Strange was his creation and soon he was doing all the stories, writing, and art for it); Ex. 26 at 83 (Lee writing that Ditko came up with the *Dr. Strange* plots and illustrated the story and Lee only added the dialogue to the balloons); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and that he plotted

and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script); Ex. 35 at DITKO-0189 (Ditko writing that he left Marvel in 1966); *id*. at DITKO-0193 (Ditko writing that he and Lee stopped speaking around 1964 and thus from then on, Ditko had complete creative control of the *Spider-Man* and *Dr. Strange* stories, which he was plotting and penciling until he left in 1966).

> **RESPONSE:  Disputed**.  While MCI does not dispute that Ditko and Lee had a falling out, MCI **disputes** that Ditko was "in complete creative control" over his work for Marvel.  To the contrary, even when Ditko and Lee were not on speaking terms, Lee, within his editorial discretion, assigned Ditko to the stories (through Marvel production manager Sol Brodsky) and could remove him at any time, could request or make changes to his work, or otherwise elect not to publish it.  *See supra* Response Nos. 52 and 38*, citing* Toberoff Ex. 19 at 3-4; Lens Opp. Decl., Ex. 84 30:17-31:1, 335:2-5; Lens Decl., Ex. 2 17:8-18:13, 37:10-39:6, 80:24-81:12, 125:18-126:1; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:3-125:4; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3.

> Moreover, Defendant disputes that Ditko left Marvel in 1966, as opposed to sometime before December 1965.  *See* Lens Opp. Decl., Ex. 84 311:13 (Thomas testifying that "Steve walked in and quit near the end of the year [1965]"); Toberoff Ex. 17 92:9-20 (Thomas testifying that Ditko stopped working with Marvel around Christmas 1965); Lens Decl., Ex. 39 at 5 (Thomas recounting that the day Ditko quit Marvel, noting that Marvel production manager Sol Brodsky "had a memo on his desk for a $5 a page raise for Steve, which was fairly substantial for 1965").  None of Defendant's evidence establishes when Ditko left—let alone that he left in 1966.

> Additionally, Toberoff Exhibit 26 **does not support** this contention, as it references only Ditko's work on *Spider-Man Annual #2*, a one-off special annual issue

otherwise unconnected to the Spider-Man or Doctor Strange stories Ditko and Lee worked on.  And Toberoff Exhibit 17 **does not support** this contention as Thomas never states or suggests that Ditko "was in complete creative control."  *See* Lens Decl., Ex. 2 80:24-81:12 (Thomas testifying that "[s]ubject to the publisher, [Lee had] complete authority" over artwork in Marvel comics); Lens Decl., Ex. 2 125:18-126:1 (Thomas testifying that Lee "was always the ultimate authority unless Martin Goodman stepped in, and that was mostly on covers"); Toberoff Ex. 19 at 3-4 (although Lee "was willing to go along with a lot of what Steve wanted to do," "Stan had the authority" and used it "when he felt he had to use it" because an explanation that "the artist wanted to do it that way" "would not have been a sufficient excuse for Martin Goodman.").

MCI also **objects** to Toberoff Exhibits 25, 27, and 35.  *See* MCI's Evidentiary Objection Nos. [34], [35], & [41].

**52.** **Ditko had no employment or other contract during the Period with Magazine Management or any other alleged Marvel predecessor.** *See* Toberoff Decl. Ex. 36 at 7 (Marvel admitting it had no written contract with Ditko in the 1960s); Ex. 17 at 298:8-14 (Thomas testifying that freelancers did not have contracts with Marvel until Thomas's in 1974, which was the first); Ex. 64 at 245 n.80 (Nimmer explaining in 1963 "that 17 U.S.C. Sec. 26 expressly renders an employer for hire an 'author' but makes no comparable provision with respect to commissioned works").

**RESPONSE:**  **Disputed**, but **immaterial**.  While MCI does not dispute that Ditko had no written employment agreement or other written contract with Marvel during the relevant time period, MCI **disputes** that he had no contract whatsoever with Marvel. Ditko, like other Marvel freelance artists, contributed to Marvel's comic books pursuant to assignments from Lee, who directed the creation of the Works, and he was compensated by Marvel on an agreed per-page basis for his completed assignments. *See supra* Response No. 13, *citing* Lens Decl., Ex. 2 152:1-154:7; Lens Decl., Ex. 12 56:12-15, 57:25-58:9, 58:14-23; Lens Decl., Ex. 7 217:13-21; Lens Decl., Ex. 13 41:20-42:9; Lens

Decl., Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21; Lens Decl., Ex. 48 at 3; Lens Decl.,

Ex. 51 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2 27:19-28:7, 56:2-57:7, 148:22-

151:25, 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens Decl., Ex. 12 56:16-18,

58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15 16:8-19;

Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13 14:5-8, 23:18-21;

Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-10, 224:15-23,

241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl., Ex. 2 17:8-18:13,

24:17-23, 37:10-39:6; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 44:4-17; Lens

Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-9, 93:23-94:5; Lens Decl., Ex. 2 80:24-

81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens

Decl., Ex. 4 124:19-125:4,124:3-18; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens

Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15; Lens Decl., Ex. 4 125:15-18; Lens

Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens Decl., Ex. 13 30:11-14, 58:13-21; Lens

Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 68A-G; Lens Decl., Ex. 2 137:

8-16; Lens Decl., Ex. 10 396:1-10; Lens Decl., Ex. 6 40:14-20; Lens Decl., Ex. 2 276:7-

23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7, 226:7-11, 249:7-9, 258:12-17,

290:2-5, 290:18-22; Thomas Decl. ¶ 20.

Further, Toberoff Exhibit 64 **cannot provide factual support**, as the cited

material is a treatise purportedly summarizing the law, not a fact. Moreover, Marvel's

course of dealing with freelance artists involved oral or implied-in-fact contracts. *Cf.*

*Kirby*, 777 F. Supp. 2d at 741 ("[T]he fact that there was no written contract does not, as

a matter of law, mean there was no contractual relationship. 'We agree that, if you draw a

picture, I will pay you' creates a contract, whether the agreement is reduced to writing or not.").

Regardless, this contention is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 726 F.3d at 141-142 (rejecting the Kirbys' argument that "the 'right to supervise' referred to in our case law requires a legal, presumably contractual, right" because there is "no hint of this requirement in our case law applying the instance and expense test"—"Marvel's active involvement in the creative process, coupled with its power to reject pages and request that they be redone" suffices).

MCI also **objects** to Toberoff Exhibit 64. *See* MCI's Evidentiary Objection No. [58].

53. **Ditko had no contact or relationship with any one of the shell companies (i.e., Vista, Atlas, Non-Pareil) which purported to copyright the comic book magazines in which Ditko's works appeared.** *See* Toberoff Decl. Ex. 14 at 4-5 (Evanier Rebuttal Rep. providing historical context and explaining that the shell companies had no employees, offices, or business activities, and had no contact with any freelancer); Ex. 17 at 320:10-322:14 (Thomas testifying that no one knew what Vista, Atlas, or Non-Pareil did and that he did not receive any money from them, does not know anyone who did, does not know if they had any employees or any offices, or "of [them] having any existence" whatsoever); Ex. 22 at 252:23-254:24, 303:15-19 (Lieber testifying that he never heard of Vista or other shell companies, did not know if they had any employees and that he was paid by, and believed he was working with, Magazine Management); Ex. 50 at DETTWILER-0044-0058 (Don Heck's payment records identifying "Magazine Management" as the only entity that paid him for his freelance material in the Period).

> **RESPONSE:** **Disputed**, but **immaterial**. MCI **disputes** Defendant's characterization of such companies as "shell companies." As relevant here, Goodman's various comic book entities conducted business as "Marvel" or "Marvel Comics Group" and engaged with Magazine Management Company for administrative services, including payments to those providing services to Marvel. *See supra* Response No. 7, *citing* Bard Decl. ¶ 2; Bard Decl., Ex. 5 at 2-3; Bard Decl., Ex. 7 at 5; Bard Decl., Ex. 10 at 2; Lens Decl., Ex. 18 72:25-73:11; Lens Opp. Decl., Ex. 90 5:11-19; Bard Decl., Ex. 8 at 5-6; Lens Decl.,

Ex. 75; Lens Decl., Ex. 76; Lens Opp. Decl., Ex. 93 at 4-5; Lens Opp. Decl., Ex. 92 at 3-8; Bard Decl., Ex. 6 at 3; Bard Decl., Ex. 5 at 3; Lens Decl., Ex. 68A-G.

Moreover, while MCI does not dispute that Ditko had no "contact" with Vista, Atlas, or Non-Pareil—which are business entities (and not people)—during the relevant time period, MCI **disputes** that he had no "relationship" with them.  Ditko, like other Marvel freelance artists, contributed to Marvel's comic books pursuant to assignments from Lee, who directed the creation of the Works, and he was compensated by Marvel on an agreed per-page basis for completed assignments. *See supra* Response No. 13, *citing* Lens Decl., Ex. 2 152:1-154:7; Lens Decl., Ex. 12 56:12-15, 57:25-58:9, 58:14-23; Lens Decl., Ex. 7 217:13-21; Lens Decl., Ex. 13 41:20-42:9; Lens Decl., Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21; Lens Decl., Ex. 48 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2 27:19-28:7, 56:2-57:7, 148:22-151:25, 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens Decl., Ex. 12 56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13 14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl., Ex. 2 17:8-18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 44:4-17; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-9, 93:23-94:5; Lens Decl., Ex. 2 80:24-81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15; Lens Decl., Ex. 4 125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens Decl., Ex. 13 30:11-14, 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57

at 3; Lens Decl., Ex. 68A-G; Lens Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10;

Lens Decl., Ex. 6 40:14-20; Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8,

152:25-153:10, 175:7, 226:7-11, 249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl.

¶ 20.  Lee's editorial work, in turn, was performed for and on behalf of Marvel's

publisher Goodman.  As such, Ditko, through Lee and Goodman, provided services to

Vista, Atlas, or Non-Pareil.

      In addition, Vista, Atlas, and Non-Pareil are listed on the inside cover of all

comic books as the publishing entities—something that would have been obvious to

Ditko.  *See, e.g.*, Lens Decl., Ex. 31A at 3 ("AMAZING FANTASY is published by

ATLAS MAGAZINES, INC."); Lens Decl., Ex. 31A at 5 ("AMAZING SPIDER-MAN

is published by NON-PAREIL PUBLISHING CORP"); Lens Decl., Ex. 31D at 25

("STRANGE TALES is published by VISTA PUBLICATIONS INC.").

      Regardless, this contention is **immaterial** because it will not "affect the

outcome of the suit under the governing law."  *Kinsella*, 320 F.3d 309 at 311.  Indeed,

this was equally true with respect to the various works at issue in *Kirby*, when this Court

granted summary judgment for Marvel, as upheld by Second Circuit.  *See Kirby*, 726

F.3d at 126, 141 (discussing Kirby's "close and continuous" working relationship "with

Marvel" despite noting that "Atlas Comics, as part of Marvel Comics Group"—one such

Goodman publishing entity—published most of the relevant works).

      MCI also **objects** to Toberoff Exhibits 14 and 22.  *See* MTE Evanier [Dkt. 77];

MCI's Evidentiary Objection Nos. [17], [26], & [31].

**54. Ditko received no direction or communication from any of the shell companies (i.e.,
Vista, Atlas, Non-Pareil) or any employee of theirs, as these entities had none, nor was
Ditko ever paid by any of the shell companies.** *See* Toberoff Decl. Ex. 14 at 4-5 (Evanier
Rebuttal Rep. providing historical context and explaining that the shell companies had no

employees, offices, or business activities, and had no contact with any freelancer); Ex. 17 at 138:3-139:2 (Thomas testifying that Magazine Management was the only payor of staff/freelancer checks); *id*. at 320:10-322:14 (Thomas testifying that no one knew what Vista, Atlas, or Non-Pareil did and that Thomas did not receive any money from them, does not know anyone who did, does not know if they had any employees or any offices, or "of [them] having any existence" whatsoever); Ex. 22 at 252:23-254:24, 303:15-19 (Lieber testifying that he never heard of Vista or other shell companies, did not know if they had any employees and that he was paid by, and believed he was working with, Magazine Management); Ex. 50 at DETTWILER-0044-0058 (Don Heck's payment records identifying "Magazine Management" as the only entity that paid him for his freelance material in the Period).

      **RESPONSE:  Disputed**, but **immaterial**.  MCI **disputes** Defendant's characterization of such companies as "shell companies."  As relevant here, Goodman's various comic book entities conducted business as "Marvel" or "Marvel Comics Group" and engaged with Magazine Management Company for administrative services, including payments to those providing services to Marvel.  *See supra* Response No. 7, *citing* Bard Decl. ¶ 2; Bard Decl., Ex. 5 at 2-3; Bard Decl., Ex. 7 at 5; Bard Decl., Ex. 10 at 2; Lens Decl., Ex. 18 72:25-73:11; Lens Opp. Decl., Ex. 90 5:11-19; Bard Decl., Ex. 8 at 5-6; Lens Decl., Ex. 75; Lens Decl., Ex. 76; Lens Opp. Decl., Ex. 93 at 4-5; Lens Opp. Decl., Ex. 92 at 3-8; Bard Decl., Ex. 6 at 3; Bard Decl., Ex. 5 at 3; Lens Decl., Ex. 68A-G.  Ditko, like other Marvel freelance artists, contributed to Marvel's comic books pursuant to assignments from Lee, who directed the creation of the Works, and he was compensated by Marvel on an agreed per-page basis for completed assignments.  *See supra* Response No. 13, *citing* Lens Decl., Ex. 2 152:1-154:7; Lens Decl., Ex. 12 56:12-15, 57:25-58:9, 58:14-23; Lens Decl., Ex. 7 217:13-21; Lens Decl., Ex. 13 41:20-42:9; Lens Decl., Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21; Lens Decl., Ex. 48 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2 27:19-28:7, 56:2-57:7, 148:22-151:25, 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens Decl., Ex. 12 56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at 6; Lens

Decl., Ex. 53 at 2; Lens Decl., Ex. 13 14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11,

138:18-24, 139:17-140:2, 140:8-11, 224:5-10, 224:15-23, 241:25-242:14; Lens Decl., Ex.

9 14:5-8, 110:21-24; Lens Decl., Ex. 2 17:8-18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex.

12 67:16-68:6; Lens Decl., Ex. 13 44:4-17; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4

97:7-9, 93:23-94:5; Lens Decl., Ex. 2 80:24-81:12; 125:18-126:1; Lens Decl., Ex. 7

219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18;

Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2

141:25-142:15; Lens Decl., Ex. 4 125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-

333:4; Lens Decl., Ex. 13 30:11-14, 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57

at 3; Lens Decl., Ex. 68A-G; Lens Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10;

Lens Decl., Ex. 6 40:14-20; Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8,

152:25-153:10, 175:7, 226:7-11, 249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl.

¶ 20. Lee's editorial work, in turn, was performed for and on behalf of Marvel's

publisher Goodman. As such, Ditko, through Lee and Goodman, provided services to

Vista, Atlas, or Non-Pareil.

  In addition, Vista, Atlas, and Non-Pareil are listed on the inside cover of all

comics books as the publishing entities—something that would have been obvious to

Ditko. *See, e.g.*, Lens Decl., Ex. 31A at 3 ("AMAZING FANTASY is published by

ATLAS MAGAZINES, INC."); Lens Decl., Ex. 31A at 5 ("AMAZING SPIDER-MAN

is published by NON-PAREIL PUBLISHING CORP"); Lens Decl., Ex. 31D at 25

("STRANGE TALES is published by VISTA PUBLICATIONS INC.").

  Regardless, this contention is **immaterial** because it will not "affect the

outcome of the suit under the governing law." *Kinsella*, 320 F.3d 309 at 311. Indeed,

this was equally true with respect to the various works at issue in *Kirby*, when this Court

granted summary judgment for Marvel, as upheld by Second Circuit.  *See Kirby*, 726

F.3d at 126, 141 (discussing Kirby's "close and continuous" working relationship "with

Marvel" despite noting that "Atlas Comics, as part of Marvel Comics Group"—one such

Goodman publishing entity—published most of the relevant works).

   MCI also **objects** to Toberoff Exhibits 14 and 22.  *See* MTE Evanier [Dkt. 77];

MCI's Evidentiary Objection Nos. [17], [26], & [31].

55. **When Lee composed the final captions and dialogue he too did so as a freelancer, not as Marvel's editor, as writing was not part of his editorial function.** *See* Toberoff Decl. Ex. 1 at 13 (Evanier Rep. describing Lee's common practice of composing dialogue as a freelancer, not as Marvel's editor and doing his freelancing from home two of the five workdays per week, for which he was paid on a per-page basis as a freelancer); Ex. 3 at 41:19-42:2 (Romita testifying that Lee would stay home several days per week to write); Ex. 4 at 17:17-25 (Lee testifying that he was paid as a freelancer for his writing and was on salary for his work as an editor); Ex. 17 at 27:2-18, 30:9-13, 31:22-32:7, 276:2-14 (Thomas testifying that he was a staff writer/assistant editor in the 1960s and got a salary for that work, but separately freelanced when writing stories and was paid at a per-page rate on a separate check like other freelancers); Ex. 22 at 255:10-256:6 (Lieber testifying that Lee wrote stories and scripts as a writer, not as an editor, because writing is "not what an Editor does"); Ex. 55 at 62:18-63:18 (Lee testifying that he got paid a salary as editor and separately for his writing); Ex. 56 at 91:20-92:6 (Lee testifying that he got paid a salary as editor and separately as a freelancer pre page for his writing); *id*. at 94:6-95:18 (Lee testifying that there was very little editing of his own freelance written material).

   **RESPONSE:  Undisputed**, but **immaterial** because this has no bearing on the Court's

application of the work-made-for-hire test, as this Court's grant of summary judgment for

Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F.3d at

125 (detailing Lee's deposition testimony regarding his roles at Marvel and affirming

district court's finding that Kirby's works were made for hire); *id*. at 139-40 (relevant

principles of the instance-and-expense test).

   MCI, however, **objects** to Toberoff Exhibits 1 and 22.  *See* MTE Evanier [Dkt.

77]; MCI's Evidentiary Objection Nos. [1] & [27].

56. **Lee did his writing at home and his editor's salary did not cover his writing, for which was paid by the page on a freelance basis.** *See* Toberoff Decl. Ex. 1 at 13 (Evanier Rep. describing Lee's common practice of composing dialogue as a freelancer, not as Marvel's editor and doing his freelancing from home two of the five workdays per week, for which he was paid on a per-page basis as a freelancer); Ex. 4 at 17:17-25 (Lee testifying that he was paid as a freelancer for his writing and was on salary for his work as an editor); Ex. 6 at 30:21-31:9 (Thomas testifying that Lee did his freelance writing from home); Ex. 17 at 289:7-291:5 (Thomas testifying that he and Lee each did their writing in a freelance capacity from home in the 1960s and would come to the office only to do their editorial work); Ex. 22 at 256:7-257:12 (Lieber testifying that Lee wrote scripts from home); Ex. 55 at 62:18-63:18 (Lee testifying that he got paid a salary as editor and separately for his writing); Ex. 56 at 91:20-92:6 (Lee testifying that he got paid a salary as editor and separately as a freelancer pre page for his writing).

> **RESPONSE:  Undisputed**, but **immaterial** because this has no bearing on the Court's
>
> application of the work-made-for-hire test, as this Court's grant of summary judgment for
>
> Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F.3d at
>
> 125 (detailing Lee's deposition testimony regarding his roles at Marvel and affirming
>
> district court's finding that Kirby's works were made for hire); *id*. at 139-40 (relevant
>
> principles of the instance-and-expense test).
>
> MCI, however, **objects** to Toberoff Exhibit 1.  *See* MTE Evanier [Dkt. 77];
>
> MCI's Evidentiary Objection No. [1].

57. **During the Period, it was Magazine Management's policy that those employed in editorial or production roles, who also created material as artists or writers, did the latter on a freelance basis, on their own time, usually at home, and were paid only for those pages the publisher chose to buy and not paid for rejected pages, all in the publisher's sole discretion.** *See* Toberoff Decl. Ex. 1 at 13 (Evanier Rep. describing Lee's common practice of composing dialogue as a freelancer, not as Marvel's editor and doing his freelance writing from home two of the five workdays per week, and was paid on a per-page basis as a freelancer); Ex. 17 at 289:7-291:5 (Thomas testifying that he and Lee each did their freelance writing from home in the 1960s and would come to the office only to do their editorial work); *id*. at 27:2-18, 30:9-13, 31:22-32:7, 276:2-14 (Thomas testifying that he was a staff writer/assistant editor in the 1960s and got a salary for that work, but separately freelanced when writing stories and was paid at a per-page rate with a separate check like other freelancers); Ex. 44 ¶ 3(a) (Marvel's contract with Thomas dated September 1, 1974 providing that Thomas would be paid only for those pages which Marvel accepted and requiring Thomas to make changes to his work without any additional compensation).

**RESPONSE:  Disputed in part**, but **immaterial**.  MCI **disputes** Defendant's suggestion that Marvel was "buy[ing]" work "on spec," which is not only an issue of law but also inaccurate.  To the contrary, freelance contributors, even those in editorial or production roles, contributed to Marvel's comic books pursuant to assignments from Lee, who directed the creation of the Works, and they were compensated by Marvel on an agreed per-page basis for completed assignments.  *See supra* Response No. 13, *citing* Lens Decl., Ex. 2 152:1-154:7; Lens Decl., Ex. 12 56:12-15, 57:25-58:9, 58:14-23; Lens Decl., Ex. 7 217:13-21; Lens Decl., Ex. 13 41:20-42:9; Lens Decl., Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21; Lens Decl., Ex. 48 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2 27:19-28:7, 56:2-57:7, 148:22-151:25, 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens Decl., Ex. 12 56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13 14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl., Ex. 2 17:8-18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 44:4-17; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-9, 93:23-94:5; Lens Decl., Ex. 2 80:24-81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15; Lens Decl., Ex. 4 125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens Decl., Ex. 13 30:11-14, 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 68A-G; Lens Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens Decl., Ex. 6 40:14-20; Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8,

152:25-153:10, 175:7, 226:7-11, 249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.

Further, while MCI does not dispute that freelancers, including those in editorial or production roles, worked for Marvel on a freelance basis, Toberoff Exhibit 44 **does not support** this contention, as the cited material post-dates the relevant time period.

Regardless, this contention is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 726 F.3d at 125 (detailing Lee's testimony regarding his roles at Marvel and affirming district court's finding that Kirby's works were made for hire).; *id*. at 139-40 (relevant principles of the instance-and-expense test).

MCI also **objects** to Toberoff Exhibits 1 and 44.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1] & [45].

**58. Lee went into Magazine Management's office to serve as editor only two or three of the five workdays each week, so he could do his freelance writing at his home.** *See* Toberoff Decl. Ex. 1 at 13 (Evanier Rep. describing Lee's common practice of composing dialogue as a freelancer, not as Marvel's editor and doing his freelancing from home 2 of the 5 workdays per week, and was paid on a per-page basis as a freelancer); Ex. 3 at 41:19-42:2 (Romita testifying that Lee would stay home several days per week to write); Ex. 17 at 289:7-291:5 (Thomas testifying that he and Lee each freelance wrote from home in the 1960s and would come to the office to do their editorial work); Ex. 22 at 256:7-257:12 (Lieber testifying that Lee would do his writing from home).

**RESPONSE:  Undisputed**, but **immaterial** because this has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F.3d at 125 (detailing Lee's testimony regarding his roles at Marvel and affirming district court's finding that Kirby's works were made for hire).; *id*. at 139-40 (relevant principles of the instance-and-expense test).

MCI, however, **objects** to Toberoff Exhibit 1.  *See* MTE Evanier [Dkt. 77];

MCI's Evidentiary Objection No. [1].

59. **Magazine Management was the only entity that bought work from freelance writers/artists or employed editors like Lee in the Period.** *See* Toberoff Decl. Ex. 17 at 272:23-275:2 (Thomas testifying that he was paid and employed by Magazine Management/ Marvel Comics, and then Perfect Film/Cadence); *id*. at 320:10-322:14 (Thomas testifying that no one knew what Vista, Atlas, or Non-Pareil did and that Thomas did not receive any money from them, does not know anyone who did, does not know if they had any employees or any offices, or "of [them] having any existence" whatsoever); Ex. 22 at 252:23-254:24, 303:15-19 (Lieber testifying that he never heard of Vista or other shell companies, did not know if they had any employees and that he was paid by, and believed he was working with, Magazine Management); Ex. 50 at DETTWILER-0044-0058 (Don Heck's payment records identifying "Magazine Management" as the only entity that paid him for his freelance material in the Period).

> **RESPONSE:  Disputed**, but **immaterial**.  Ditko, like other Marvel freelance artists, contributed to Marvel's comic books pursuant to assignments from Lee, who directed the creation of the Works, and they were compensated by Marvel on an agreed per-page basis for completed assignments.  *See supra* Response No. 13, *citing* Lens Decl., Ex. 2 152:1-154:7; Lens Decl., Ex. 12 56:12-15, 57:25-58:9, 58:14-23; Lens Decl., Ex. 7 217:13-21; Lens Decl., Ex. 13 41:20-42:9; Lens Decl., Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21; Lens Decl., Ex. 48 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2 27:19-28:7, 56:2-57:7, 148:22-151:25, 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens Decl., Ex. 12 56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13 14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl., Ex. 2 17:8-18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 44:4-17; Lens Decl., Ex. 16 16:3-19; Lens Decl., Ex. 4 97:7-9, 93:23-94:5; Lens Decl., Ex. 2 80:24-81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18; Thomas Decl. ¶¶

7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15;

Lens Decl., Ex. 4 125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens Decl.,

Ex. 13 30:11-14, 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens Decl.,

Ex. 68A-G; Lens Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens Decl., Ex. 6

40:14-20; Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7,

226:7-11, 249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.

Moreover, Lee's editorial work was performed for and on behalf of Marvel's

publisher Goodman, whose various comic book entities conducted business as "Marvel"

or "Marvel Comics Group" and engaged with Magazine Management Company for

administrative services, including payments to those providing services to Marvel.  *See*

*supra* Response No. 7, *citing* Bard Decl. ¶ 2; Bard Decl., Ex. 5 at 2-3; Bard Decl., Ex. 7

at 5; Bard Decl., Ex. 10 at 2; Lens Decl., Ex. 18 72:25-73:11; Lens Opp. Decl., Ex. 90

5:11-19; Bard Decl., Ex. 8 at 5-6; Lens Decl., Ex. 75; Lens Decl., Ex. 76; Lens Opp.

Decl., Ex. 93 at 4-5; Lens Opp. Decl., Ex. 92 at 3-8; Bard Decl., Ex. 6 at 3; Bard Decl.,

Ex. 5 at 3; Lens Decl., Ex. 68A-G.  Lee provided services to these various entities, even

though his actual paycheck likely was drawn on a Magazine Management account.

Regardless, this contention is **immaterial** because it has no bearing on the

Court's application of the work-made-for-hire test, as this Court's grant of summary

judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See*

*Kirby*, 726 F.3d at 126, 141 (discussing Kirby's "close and continuous" working

relationship "with Marvel" despite noting that "Atlas Comics, as part of Marvel Comics

Group"—one such Goodman publishing entity—published most of the relevant works);

*id*. at 139-40 (relevant principles of the instance-and-expense test).

MCI also **objects** to Toberoff Exhibit 22.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [26] & [31].

60. **The shell companies (e.g., Vista, Atlas, Non-Pareil) had no legal or corporate affiliation to one another or to Magazine Management.** *See* Toberoff Decl. Ex. 46 at 1-3 (list of Goodman's shell companies dated October 4, 1967 showing no legal or corporate relationship to one another or Magazine Management); Ex. 17 at 320:10-322:14 (Thomas testifying that no one knew what Vista, Atlas, or Non-Pareil did and that Thomas did not receive any money from them, does not know anyone who did, does not know if they had any employees or any offices, or "of [them] having any existence" whatsoever); Ex. 22 at 252:23-254:24, 303:15-19 (Lieber testifying that he never heard of Vista or other shell companies, did not know if they had any employees and that he was paid by, and believed he was working with, Magazine Management).; Lens Decl., Ex. 18 72:25-73:11 (Goodman discussing his publishing entities, explaining that "each corporation st[ood] on its own").

 **RESPONSE:  Disputed**, but **immaterial**.  MCI **disputes** Defendant's characterization of such companies as "shell companies." As relevant here, Goodman's various comic book entities conducted business as "Marvel" or "Marvel Comics Group" and engaged with Magazine Management Company for administrative services, including payments to those providing services to Marvel. *See supra* Response No. 7, *citing* Bard Decl. ¶ 2; Bard Decl., Ex. 5 at 2-3; Bard Decl., Ex. 7 at 5; Bard Decl., Ex. 10 at 2; Lens Decl., Ex. 18 72:25-73:11; Lens Opp. Decl., Ex. 90 5:11-19; Bard Decl., Ex. 8 at 5-6; Lens Decl., Ex. 75; Lens Decl., Ex. 76; Lens Opp. Decl., Ex. 93 at 4-5; Lens Opp. Decl., Ex. 92 at 3-8; Bard Decl., Ex. 6 at 3; Bard Decl., Ex. 5 at 3; Lens Decl., Ex. 68A-G. Further, Toberoff Exhibit 46 **does not support** this contention, as it shows that all entities were wholly owned directly or indirectly by "MG" (Martin Goodman) or "MG & JG" (Martin Goodman and Jean Goodman), and that all entities were "Martin Goodman's Corporations," serviced together by Magazine Management Company, the "Servicing Partnership."  Further, Lens Exhibit 18 **does not support** Defendant's contention as when Goodman testified that "each corporation stands on his own," he was not saying

that they had "no legal or corporate affiliation" but was simply explaining that while the companies were not all owned together by the Magazine Management Company partnership, he "own[ed] them either completely or [his] wife may [have] own[ed] stock in some of them." *See* Lens Decl., Ex 18 at 73:4-11.

Regardless, this contention is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 726 F.3d at 126, 141 (discussing Kirby's "close and continuous" working relationship "with Marvel" despite noting that "Atlas Comics, as part of Marvel Comics Group"—one such Goodman publishing entity—published most of the relevant works); *id*. at 139-40 (relevant principles of the instance-and-expense test).

MCI also **objects** to Toberoff Exhibit 22. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [26] & [31].

61. **These shell companies—which Marvel later represented in the copyright renewal registrations of its comic books (featuring Ditko's works) were the "authors" of the material as "works made for hire"—made no payments to, and had no interaction whatsoever with the freelance writers/artists, including Ditko, who created the original material in comic books.** *See* Toberoff Decl. Ex. 14 at 4-5 (Evanier Rebuttal Rep. providing historical context and explaining that the shell companies had no employees, actual offices, or business activities, and had no contact with any freelancer); Ex. 6 at 200:2-24 (Thomas testifying that he was hired by Magazine Management in 1965); Ex. 17 at 272:23-275:2 (Thomas testifying that he was paid and employed by Magazine Management/Marvel Comics, and then Perfect Film/Cadence); *id*. at 320:10-322:14 (Thomas testifying that no one knew what Vista, Atlas, or Non-Pareil did and that Thomas did not receive any money from them, does not know anyone who did, does not know if they had any employees or any offices, or "of [them] having any existence" whatsoever); Ex. 22 at 252:23-254:24, 303:15-19 (Lieber testifying that he never heard of Vista or other shell companies, did not know if they had any employees and that he was paid by, and believed he was working with, Magazine Management); Ex. 40 at 2021MARVEL-0005845 (Certificate of Renewal Registration of *Amazing Fantasy* Vol. 1, No. 15, the issue in which Spider-Man originally appeared, dated November 20, 1990, claiming "Atlas Magazines, Inc." as the original author and copyright claimant); Ex. 41 at 2021MARVEL-0005849 (Certificate of Renewal Registration of *Amazing Spider-Man* Vol. 1, No. 1 dated November 20, 1990, claiming "Non-Pareil Publishing Corporation" as the original author and copyright

claimant); Ex. 42 (Certificate of Renewal Registration of *Strange Tales* Vol. 1, No. 110, the issue in which Dr. Strange first appeared, dated December 27, 1991, claiming "Vista Publications, Inc." as the original author and copyright claimant); Ex. 50 at DETTWILER-0044-0058 (Don Heck's payment records identifying "Magazine Management" as the only entity that paid him for his freelance material in the Period).

> **RESPONSE:   Disputed in part**, but **immaterial**.   While MCI does not dispute that
>
> Marvel's renewal registrations accurately reflect the work-made-for-hire nature of the
>
> Works, MCI **disputes** Defendant's characterization of such companies as "shell
>
> companies."   Lee's editorial work was performed for and on behalf of Marvel's publisher
>
> Goodman, whose various comic book entities conducted business as "Marvel" or
>
> "Marvel Comics Group" and engaged with Magazine Management Company for
>
> administrative services, including payments to those providing services to Marvel.   *See*
>
> *supra* Response No. 7, *citing* Bard Decl. ¶ 2; Bard Decl., Ex. 5 at 2-3; Bard Decl., Ex. 7
>
> at 5; Bard Decl., Ex. 10 at 2; Lens Decl., Ex. 18 72:25-73:11; Lens Opp. Decl., Ex. 90
>
> 5:11-19; Bard Decl., Ex. 8 at 5-6; Lens Decl., Ex. 75; Lens Decl., Ex. 76; Lens Opp.
>
> Decl., Ex. 93 at 4-5; Lens Opp. Decl., Ex. 92 at 3-8; Bard Decl., Ex. 6 at 3; Bard Decl.,
>
> Ex. 5 at 3; Lens Decl., Ex. 68A-G.   Ditko, like other Marvel freelance artists, contributed
>
> to Marvel's comic books pursuant to assignments from Lee, who directed the creation of
>
> the Works, and he was compensated by Marvel on an agreed per-page basis for
>
> completed assignments.   *See supra* Response No. 13, *citing* Lens Decl., Ex. 2 152:1-
>
> 154:7; Lens Decl., Ex. 12 56:12-15, 57:25-58:9, 58:14-23; Lens Decl., Ex. 7 217:13-21;
>
> Lens Decl., Ex. 13 41:20-42:9; Lens Decl., Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21;
>
> Lens Decl., Ex. 48 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex.
>
> 2 27:19-28:7, 56:2-57:7, 148:22-151:25, 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9;
>
> Lens Decl., Ex. 12 56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24;
>
> Lens Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl.,

Ex. 13 14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl., Ex. 2 17:8-18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 44:4-17; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-9, 93:23-94:5; Lens Decl., Ex. 2 80:24-81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15; Lens Decl., Ex. 4 125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens Decl., Ex. 13 30:11-14, 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 68A-G; Lens Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens Decl., Ex. 6 40:14-20; Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7, 226:7-11, 249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.  As such, Ditko, through Lee and Goodman, provided services to Vista, Atlas, or Non-Pareil.

Regardless, this contention is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F.3d at 126, 141 (discussing Kirby's "close and continuous" working relationship "with Marvel" despite noting that "Atlas Comics, as part of Marvel Comics Group"—one such Goodman publishing entity—published most of the relevant works); *id*. at 139-40 (relevant principles of the instance-and-expense test).

MCI also **objects** to Toberoff Exhibits 14 and 22.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [17], [26], & [31].

62. **Lee was only ever paid by Magazine Management for his editorial services and by the page for his freelance writing.** *See* Toberoff Decl. Ex. 17 at 138:3-139:2 (Thomas testifying

that Magazine Management was the only payor of staff salaries and freelancer checks); *id.* at 320:10-322:14 (Thomas testifying that no one knew what Vista, Atlas, or Non-Pareil did and that Thomas did not receive any money from them, does not know anyone who did, does not know if they had any employees or any offices, or "of [them] having any existence" whatsoever); Ex. 22 at 252:23-254:24, 303:15-19 (Lieber testifying that he never heard of Vista or other shell companies, did not know if they had any employees and that he was paid by, and believed he was working with, Magazine Management); Ex. 50 at DETTWILER-0044-0058 (Don Heck's payment records identifying "Magazine Management" as the only entity that paid him for his freelance material in the Period).

> **RESPONSE:  Undisputed** that from 1962 to 1965 Lee was likely paid with checks
>
> drawn on Magazine Management accounts, though no checks from relevant time period
>
> exist, but **immaterial** because it has no bearing on the Court's application of the work-
>
> made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby*
>
> case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F.3d at 126, 141 (discussing
>
> Kirby's "close and continuous" working relationship "with Marvel" despite noting that
>
> "Atlas Comics, as part of Marvel Comics Group"—one such Goodman publishing
>
> entity—published most of the relevant works)*; id.* at 139-40 (relevant principles of the
>
> instance-and-expense test); *Kirby*, 777 F. Supp. 2d at 747 (discussing Magazine
>
> Management Company checks but ultimately finding they were immaterial).
>
> MCI, however, **objects** to Toberoff Exhibit 22.  *See* MCI's Evidentiary
>
> Objection Nos. [26] & [31].

63. **Ditko was not employed by, did not work for, nor did he have any contact with any of the shell companies.** *See* Toberoff Decl. Ex. 17 at 272:23-275:2 (Thomas testifying that he was paid and employed by Magazine Management/Marvel Comics, and then Perfect Film/Cadence); *id.* at 320:10-322:14 (Thomas testifying that no one knew what Vista, Atlas, or Non-Pareil did and that Thomas did not receive any money from them, does not know anyone who did, does not know if they had any employees or any offices, or "of [them] having any existence" whatsoever); Ex. 22 at 252:23-254:24, 303:15-19 (Lieber testifying that he never heard of Vista or other shell companies, did not know if they had any employees and that he was paid by, and believed he was working with, Magazine Management).

> **RESPONSE:  Disputed**, but **immaterial**.  While MCI does not dispute that Ditko had no
>
> written employment agreement with any of Goodman's publishing entities, MCI **disputes**

that Ditko had "did not work for[] nor ha[d] any contact" with them.  Lee's editorial work
was performed for and on behalf of Marvel's publisher Goodman, whose various comic
book entities conducted business as "Marvel" or "Marvel Comics Group" and engaged
with Magazine Management Company for administrative services, including payments to
those providing services to Marvel.  *See supra* Response No. 7, *citing* Bard Decl. ¶ 2;
Bard Decl., Ex. 5 at 2-3; Bard Decl., Ex. 7 at 5; Bard Decl., Ex. 10 at 2; Lens Decl., Ex.
18 72:25-73:11; Lens Opp. Decl., Ex. 90 5:11-19; Bard Decl., Ex. 8 at 5-6; Lens Decl.,
Ex. 75; Lens Decl., Ex. 76; Lens Opp. Decl., Ex. 93 at 4-5; Lens Opp. Decl., Ex. 92 at 3-
8; Bard Decl., Ex. 6 at 3; Bard Decl., Ex. 5 at 3; Lens Decl., Ex. 68A-G.  Ditko, like
other Marvel freelance artists, contributed to Marvel's comic books pursuant to
assignments from Lee, who directed the creation of the Works, and he was compensated
by Marvel on an agreed per-page basis for completed assignments.  *See supra* Response
No. 13, *citing* Lens Decl., Ex. 2 152:1-154:7; Lens Decl., Ex. 12 56:12-15, 57:25-58:9,
58:14-23; Lens Decl., Ex. 7 217:13-21; Lens Decl., Ex. 13 41:20-42:9; Lens Decl., Ex.
10 383:18-21; Lens Decl., Ex. 6 38:8-21; Lens Decl., Ex. 48 at 3; Lens Decl., Ex. 51 at 3;
Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2 27:19-28:7, 56:2-57:7, 148:22-151:25, 88:17-
89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens Decl., Ex. 12 56:16-18, 58:10-13, 58:24-
59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15 16:8-19; Lens Decl., Ex.
42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13 14:5-8, 23:18-21; Lens Decl., Ex. 3
119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-10, 224:15-23, 241:25-242:14; Lens
Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl., Ex. 2 17:8-18:13, 24:17-23, 37:10-39:6; Lens
Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 44:4-17; Lens Decl., Ex. 13 16:3-19; Lens
Decl., Ex. 4 97:7-9, 93:23-94:5; Lens Decl., Ex. 2 80:24-81:12; 125:18-126:1; Lens

Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15; Lens Decl., Ex. 4 125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens Decl., Ex. 13 30:11-14, 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 68A-G; Lens Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens Decl., Ex. 6 40:14-20; Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7, 226:7-11, 249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.   As such, Ditko, through Lee and Goodman, provided services to Vista, Atlas, or Non-Pareil.

Regardless, this contention is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F.3d at 126, 141 (discussing Kirby's "close and continuous" working relationship "with Marvel" despite noting that "Atlas Comics, as part of Marvel Comics Group"—one such Goodman publishing entity—published most of the relevant works); *id*. at 139-40 (relevant principles of the instance-and-expense test).

MCI also **objects** to Toberoff Exhibit 22.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [26] & [31].

**64. Freelancers in the Period were paid with a Magazine Management check for those freelance pages the publisher chose to purchase in its sole discretion.** *See* Toberoff Decl. Ex. 2 at 100:3-101:9 (Lieber testifying that he was paid for his freelance material by checks stamped with a legend that used assignment-type language); Ex. 5 at 371:3-25 (Lee testifying that Marvel "would only buy what [it] needed"); Ex. 17 at 295:8-296:8, 297:1-20 (Thomas testifying that Marvel could accept or reject submitted material in its sole discretion); Ex. 22 at 303:15-19 (Lieber testifying he thought the name on the checks was Marvel or Magazine Management); Ex. 43 ¶ 3(a) (Marvel's contract with Colan dated March 22, 1975 providing that Colan would be paid only for those pages which Marvel accepted and requiring Colan to make changes to his work without any additional compensation); Ex. 44 ¶ 3(a) (Marvel's contract with Thomas dated

September 1, 1974 providing that Thomas would be paid only for those pages which Marvel accepted and requiring Thomas to make changes to his work without any additional compensation); Ex. 53 ¶ 3(a) (Marvel's contract with Thomas dated August 27, 1976 with same provision); Ex. 52 ¶ 3(a) (Marvel's October 7, 1977 contract with Gerber providing Gerber would be paid only for those pages Marvel accepted and that Gerber "will make all changes and rework all Material … without charge"); Ex. 45 at KIRBY-4142-4154, KIRBY-4158-4164 (Marvel freelance checks made payable to Ayers dated from February 1, 1974 to July 4, 1975); Ex. 50 at DETTWILER-0044-0058 (Don Heck's payment records identifying "Magazine Management" as the only entity that paid him for his freelance material in the Period); Ex. 51 (Marvel freelance checks made payable to Gerber dated June 1, 1973, expressly acknowledging Gerber's "assignment to [Marvel] of any copyright, trademark and any other rights in or related to the material, including [his] assignment of any rights to renewal copyright").

> **RESPONSE:**  **Disputed in part**, but **immaterial**.  While MCI does not dispute that
>
> Magazine Management was the entity that Marvel paid freelancers, including Ditko, via
>
> check for their freelance work for Marvel, MCI **disputes** that their work was
>
> "purchase[d]" by Marvel "on spec."  Lee's editorial work was performed for and on
>
> behalf of Marvel's publisher Goodman, whose various comic book entities conducted
>
> business as "Marvel" or "Marvel Comics Group" and engaged with Magazine
>
> Management Company for administrative services, including payments to those
>
> providing services to Marvel.  *See supra* Response No. 7, *citing* Bard Decl. ¶ 2; Bard
>
> Decl., Ex. 5 at 2-3; Bard Decl., Ex. 7 at 5; Bard Decl., Ex. 10 at 2; Lens Decl., Ex. 18
>
> 72:25-73:11; Lens Opp. Decl., Ex. 90 5:11-19; Bard Decl., Ex. 8 at 5-6; Lens Decl., Ex.
>
> 75; Lens Decl., Ex. 76; Lens Opp. Decl., Ex. 93 at 4-5; Lens Opp. Decl., Ex. 92 at 3-8;
>
> Bard Decl., Ex. 6 at 3; Bard Decl., Ex. 5 at 3; Lens Decl., Ex. 68A-G.  Ditko, like other
>
> Marvel freelance artists, contributed to Marvel's comic books pursuant to assignments
>
> from Lee, who directed the creation of the Works, and he was compensated by Marvel on
>
> an agreed per-page basis for completed assignments.  *See supra* Response No. 13, *citing*
>
> Lens Decl., Ex. 2 152:1-154:7; Lens Decl., Ex. 12 56:12-15, 57:25-58:9, 58:14-23; Lens
>
> Decl., Ex. 7 217:13-21; Lens Decl., Ex. 13 41:20-42:9; Lens Decl., Ex. 10 383:18-21;

Lens Decl., Ex. 6 38:8-21; Lens Decl., Ex. 48 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2 27:19-28:7, 56:2-57:7, 148:22-151:25, 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens Decl., Ex. 12 56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13 14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl., Ex. 2 17:8-18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 44:4-17; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-9, 93:23-94:5; Lens Decl., Ex. 2 80:24-81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15; Lens Decl., Ex. 4 125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens Decl., Ex. 13 30:11-14, 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 68A-G; Lens Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens Decl., Ex. 6 40:14-20; Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7, 226:7-11, 249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.

Additionally, Toberoff Exhibits 5, 43, 44, 52, and 53 **do not support** this contention, as the cited material either pre- or post-dates the relevant time period. Toberoff Exhibits 45 and 51 likewise **do not support** this contention, as they post-date the relevant time period and do not list Magazine Management Company as the payor.

Regardless, this contention is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary

judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See*

*Kirby*, 726 F.3d at 126, 141 (discussing Kirby's "close and continuous" working

relationship "with Marvel" despite noting that "Atlas Comics, as part of Marvel Comics

Group"—one such Goodman publishing entity—published most of the relevant works)*;

id.* at 139-40 (relevant principles of the instance-and-expense test); *Kirby*, 777 F. Supp.

2d at 747 (discussing Magazine Management Company checks but ultimately finding

they were immaterial).

       MCI also **objects** to Toberoff Exhibits 2, 22, 43, 44, 45, 51, 52, and 53.  *See*

MCI's Evidentiary Objection Nos. [3], [31], [44], [45], [46], [48], [49], & [50].

65. **Magazine Management stamped endorsement legends on the back of its checks, forcing freelancers to sign under the legend to cash them.** *See* Toberoff Decl. Ex. 1 at 16 (Evanier Rep. describing the comic book industry and Marvel's custom and practice of stamping legends on the backs of checks to freelancers in the Period, thereby forcing freelancers to sign the legend to cash the check); Ex. 2 at 100:3-101:9 (Lieber testifying that he was paid for his freelance material by checks stamped with a legend that used assignment-type language); Ex. 8 ¶ 13 (Sinnott attesting that Marvel paid him with checks that had an assignment legend on the back); Ex. 21 at 63:10-64:17, 91:11-93:19 (Steranko testifying that would cross out the legend on the backs of the Marvel checks because he thought it was bad business to add an after-the-fact condition to payment on work that had been submitted a week or two prior); Ex. 45 at KIRBY-4142-4154, KIRBY-4158-4164 (Marvel freelance checks made payable to Ayers dated from February 1, 1974 to July 4, 1975, with assignment legends stamped on the backs of the checks); Ex. 51 (Marvel freelance checks made payable to Gerber dated June 1, 1973, expressly acknowledging Gerber's "assignment to [Marvel] of any copyright, trademark and any other rights in or related to the material, including [his] assignment of any rights to renewal copyright").

       **RESPONSE:  Disputed**, but **immaterial**.  Because Defendant fails to provide any time

period in this fact, it is unclear as written.  To the extent MCI is referring to Magazine

Management checks during the relevant time period, MCI does not dispute that there

were stamped legends on the backs of the checks, but **disputes** Defendant's suggestion

that Marvel "forced" freelancers to sign under the legends.  Freelancers had the freedom

to sign or not sign their checks—and indeed sometimes freelancers struck out the

language before cashing their checks.  *See* Toberoff Ex. 21 at 64:8-21 (Steranko testifying that he would cross out the legend on the backs of the Marvel checks but was still paid regardless); Lens Opp. Decl., Ex. 89 82:17-21 (Steranko testifying that there was "[a] little stamp on the opposite side I think said work for hire, which I often just crossed off just to see what would happen with it, and the check was cashed and I got paid anyway").  Additionally, Toberoff Exhibits 45 and 51 **do not support** this contention, as the cited checks post-date the relevant time period and do not list Magazine Management Company as the payor.

Regardless, this contention is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F.3d at 126, 141 (discussing Kirby's "close and continuous" working relationship "with Marvel" despite noting that "Atlas Comics, as part of Marvel Comics Group"—one such Goodman publishing entity—published most of the relevant works)*; id.* at 139-40 (relevant principles of the instance-and-expense test); *Kirby*, 777 F. Supp. 2d at 747 (discussing Magazine Management Company checks but ultimately finding they were immaterial).

MCI also **objects** to the evidence cited in support of this contention.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [3], [11], [21], [22], [46], & [48].

66. **Magazine Management's check legends acknowledged the freelancer's contemporaneous "assignment to it of any copyright, trademark and any other rights in or related to the material, including [his] assignment of any rights to renewal copyright."** *See* Toberoff Decl. Ex. 2 at 100:3-101:9 (Lieber testifying that he was paid for his freelance material by checks stamped with a legend that used assignment-type language); Ex. 8 ¶ 13 (Sinnott attesting that Marvel paid him with checks that had an assignment legend on the back); Ex. 9 ¶

13 (Steranko attesting that legends on the backs of Marvel's checks to him used assignment, not work-for-hire, language); Ex. 10 ¶ 14 (Ayers attesting that Marvel's check legends used assignment language); Ex. 11 ¶ 12 (Colan attesting that the legends on the backs of Marvel's checks used assignment, not work-for-hire, language); Ex. 13 ¶ 14 (Adams attesting that Marvel's check legends used assignment language only); Ex. 21 at 61:23-62:3, 91:11-93:19 (Steranko testifying that in the 1960s, Marvel's check legends did not say "work for hire," but indicated that Steranko "gave them the rights to the work, sold them the rights to the work"); Ex. 22 at 269:24-271:20 (Lieber testifying that the check legends used assignment, not work-for-hire language); Ex. 45 at 4142-4154, 4158-4164 (Marvel freelance checks made payable to Ayers dated from February 1, 1974 to July 4, 1975, expressly acknowledging Ayers' "assignment to [Marvel] of any copyright, trademark and any other rights in or related to the material, including [his] assignment of any rights to renewal copyright"); Ex. 51 (Marvel freelance checks made payable to Gerber dated June 1, 1973, expressly acknowledging Gerber's "assignment to [Marvel] of any copyright, trademark and any other rights in or related to the material, including [his] assignment of any rights to renewal copyright").

> **RESPONSE:  Disputed**, but **immaterial**.  Because Defendant fails to provide any time period in this fact, it is unclear as written.  To the extent MCI is referring to Magazine Management checks during the relevant time period, MCI does not dispute that there were stamped legends on the backs of the checks, but **disputes** that the legends contained the language quoted by Defendant.  No checks from the relevant time period were produced and no witness was able to identify the language contained in the legends.
>
> In addition, Toberoff Exhibits 45 and 51 **do not support** this contention, as the cited checks post-date the relevant time period and do not list Magazine Management Company as the payor.  Toberoff Exhibit 13 also **does not support** this contention, as the cited material refers to a period of time beginning in the late 1960s, not the relevant time period.  Toberoff Exhibits 2 and 22 **do not support** this contention, because Mr. Lieber only testified regarding his "understanding" of the effect of the purported language.  Toberoff Exhibit 9 **does not support** this contention, as the cited material merely states that the freelancer was paid a per-page rate.  Toberoff Exhibits 9 and 21 further **do not support** this contention, because over a decade ago, when Mr. Steranko was retained as an expert witness for Defendant's counsel, he testified that the paychecks he received

from Marvel were "stamped work for hire[,] [a] little stamp on the opposite side I think said work for hire."  Lens Opp. Decl., Ex. 89 82:3-23.  As Mr. Steranko explained, "[w]hen [he] worked at Marvel, [he] was on a work for hire basis," which he understood based on his "experience at Marvel," as Marvel "provided him with [a] description of the character," gave him "treatment[s] [or] synops[e]s of the material that they were looking for," "supervis[ed]" him, and "stamped [his checks] work for hire."  *Id*.  And after Marvel "editted [*sic*] some of [his] work" and "changed certain things that [he] didn't feel should be changed," Steranko, like Ditko, who "faced the same frustrations," left Marvel. Lens Opp. Decl., Ex. 95 at 4-5.

Regardless, this contention is **immaterial** because the existence or non-existence of check legends has no bearing on the Court's application of the work-made-for-hire test,  as the Second Circuit already held with respect to this same evidence. *Kirby*, 726 F.3d at 143 ("[W]e decline to infer from Marvel's suspenders that it had agreed to give Kirby its belt."); *see also id*. at 139-40 (the relevant principles of the instance-and-expense test).

MCI objects to all evidence cited in support of this fact under the best evidence rule, given that Defendant is attempting to establish the terms of a writing without having produced the writing or a copy thereof (and without establishing a reasonably diligent search).  *See* MCI's Evidentiary Objection Nos. [3], [11], [12], [13], [14], [16], [21], [29], [46], & [48].

67. **As late as 1975, the legends on "Marvel's" checks contained such express "assignment" of "copyright" language and no "work for hire" language whatsoever.** *See* Toberoff Decl. Ex. 2 at 100:3-101:9 (Lieber testifying that he was paid for his freelance material by check stamped with a legend that used assignment-type language); Ex. 9 ¶ 13 (Steranko attesting that legends on the backs of Marvel's checks to him until at least 1973 used assignment, not work-for-hire, language); Ex. 21 at 61:23-62:3, 91:11-93:19 (Steranko testifying that in the 1960s,

Marvel's check legends did not say "work for hire"); Ex. 45 at KIRBY-4142-4154, KIRBY-4158-4164 (Marvel freelance checks made payable to Ayers dated from February 1, 1974 to July 4, 1975, acknowledging Ayers' "assignment to [Marvel] of any copyright, trademark and any other rights in or related to the material, including [his] assignment of any rights to renewal copyright"); Ex. 51 (Marvel freelance checks made payable to Gerber dated June 1, 1973, expressly acknowledging Gerber's "assignment to [Marvel] of any copyright, trademark and any other rights in or related to the material, including [his] assignment of any rights to renewal copyright").

**RESPONSE:  Disputed**, but **immaterial**.  MCI **disputes** this contention as stating a legal conclusion and not a statement of undisputed fact.  While MCI does not dispute that there were stamped legends on the backs of Marvel checks as late as 1975, MCI **disputes** that the legends contained only "assignment" language or that this language was "express," as no checks from the relevant time period were produced, no witness was able to identify the precise language contained in the legends, and the two post-relevant time period checks proffered by Defendant do not establish the nature of any legends during the relevant time period.

Additionally, Toberoff Exhibit 9 **does not support** this contention, as the cited material merely states that the freelancer was paid a per-page rate.  Toberoff Exhibit 2 **does not support** this contention, because Mr. Lieber only testified regarding his "understanding" of the effect of the purported language.

Further, Toberoff Exhibits 9 and 21 **do not establish** this contention, because over a decade ago, when Mr. Steranko was retained as an expert witness for Defendant's counsel, he testified that the paychecks he received from Marvel were "stamped work for hire[,] [a] little stamp on the opposite side I think said work for hire."  Lens Opp. Decl., Ex. 89 82:3-23.  As Mr. Steranko explained, "[w]hen [he] worked at Marvel, [he] was on a work for hire basis," which he understood based on his "experience at Marvel," as Marvel "provided him with [a] description of the character," gave him "treatment[s] [or]

295

synops[e]s of the material that they were looking for," "supervis[ed]" him, and "stamped [his checks] work for hire." *Id*. And after Marvel "editted [*sic*] some of [his] work" and "changed certain things that [he] didn't feel should be changed," Steranko, like Ditko, who "faced the same frustrations," left Marvel. Lens Opp. Decl., Ex. 95 at 4-5.

Regardless, this contention is **immaterial** because the existence or non-existence of check legends has no bearing on the Court's application of the work-made-for-hire test, as the Second Circuit already held with respect to this same evidence. *See Kirby*, 777 F. Supp. 2d at 748 (rejecting evidence from outside "the relevant time period" as "not admissible evidence of anything"); *Kirby*, 726 F.3d at 143 ("[W]e decline to infer from Marvel's suspenders that it had agreed to give Kirby its belt."); *see also id*. at 139-40 (relevant principles of the instance-and-expense test).

MCI objects to all evidence cited in support of this fact under the best evidence rule, given that Defendant is attempting to establish the terms of a writing without having produced the writing or a copy thereof (and without establishing a reasonably diligent search). *See* MCI's Evidentiary Objection Nos. [3], [12], [21], [46], & [48].

68. **The earliest checks Marvel could produce with an endorsement legend mentioning "work for hire" are from 1986.** *See* Toberoff Decl. Ex. 98.

**RESPONSE:  Undisputed**, but **immaterial**, as no checks to Steve Ditko were produced by either party. Moreover, the cited checks are outside the relevant time period. As this Court has already found, "the checks were not issued to Kirby [or Ditko] and are not from the relevant time period . . . [O]ne cannot infer what might have been written on a check issued in 1958 [(or 1962-1965, for that matter)] from what was written on an analogous check fifteen years later. For that reason alone, the[se] 1973 and 1974 checks do not raise any genuine issue of fact that tends to contradict the work-for-hire

presumption." *Kirby*, 777 F. Supp. 2d at 748; *see also id*. at 143 ("[W]e decline to infer

from Marvel's suspenders that it had agreed to give Kirby its belt."); *see also id*. at 139-

40 (the relevant principles of the instance-and-expense test).

MCI also **objects** to the evidence cited in support of this contention.  *See* MCI's

Evidentiary Objection No. [75].

69. **In early 1966, Ditko, frustrated with Lee/Magazine Management's failure to credit and
pay him for his enormous role in the *Spider-Man* and *Dr. Strange* stories, refused to sell any
more material to the company.** *See* Toberoff Decl. Ex. 3 at 44:22-46:12 (Romita testifying that
Ditko quit *Spider-Man* because he had personal and professional conflicts with Lee); Ex. 20 at
57:13-59:3 (Evanier testifying that Ditko told him he had been promised additional
compensation if his characters were used in other media); Ex. 24 at 124:5-24 (Levitz testifying
that Ditko and Lee stopped speaking in the last year of Ditko's time with Marvel because Ditko
was not getting proper credit for his contributions).

**RESPONSE:  Disputed**, but **immaterial**.  MCI **disputes** Defendant's suggestion that

Ditko was "sell[ing]" work "on spec," which is not only an issue of law but also

inaccurate.  To the contrary, freelance contributors, including Ditko, contributed to

Marvel's comic books pursuant to assignments from Lee, who directed the creation of the

Works, and they were compensated by Marvel on an agreed per-page basis for completed

assignments.  *See supra* Response No. 13, *citing* Lens Decl., Ex. 2 152:1-154:7; Lens

Decl., Ex. 12 56:12-15, 57:25-58:9, 58:14-23; Lens Decl., Ex. 7 217:13-21; Lens Decl.,

Ex. 13 41:20-42:9; Lens Decl., Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21; Lens Decl.,

Ex. 48 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2 27:19-

28:7, 56:2-57:7, 148:22-151:25, 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens

Decl., Ex. 12 56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens

Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13

14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-

10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl., Ex. 2

17:8-18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13

44:4-17; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-9, 93:23-94:5; Lens Decl.,

Ex. 2 80:24-81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13

97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex.

55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15; Lens Decl., Ex. 4

125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens Decl., Ex. 13 30:11-14,

58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 68A-G; Lens

Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens Decl., Ex. 6 40:14-20; Lens

Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7, 226:7-11, 249:7-

9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.

   Further, while MCI does not dispute that Ditko no longer worked at Marvel in

1966, and while **immaterial**, MCI **disputes** that he quit doing work for Marvel in 1966,

as Defendant cites no evidence to definitively support that date, and the evidence instead

suggests Ditko quit in late 1965.  *See supra* Response No. 51, *citing* Lens Opp. Decl., Ex.

84 311:13; Toberoff Ex. 17 92:9-20; Lens Decl., Ex. 39 at 5.

   MCI also **disputes** that Ditko left because of Marvel's "failure to credit and pay

him for his enormous role" on Spider-Man and Doctor Strange comics.  Defendant's

evidence **does not support** this contention.  Specifically, Toberoff Exhibits 3, 20, and 24

**do not support** this contention, as each proffers a *different* reason for why Ditko left:

Toberoff Exhibit 3 suggests that Ditko left due to personal and political differences

between Lee and Ditko, Toberoff Exhibit 24 suggests that Ditko left due to "discomfort

between the two on their working process and the allocation of credit work," and

Toberoff Exhibit 20 suggests that Ditko left due an alleged broken promise by Goodman

to pay additional money for derivative uses of the characters at issue.

MCI also **objects** to Toberoff Exhibits 3 and 20. *See* MTE Evanier [Dkt. 77];

MCI's Evidentiary Objection Nos. [5] & [19].

70. **In 1963, Ditko created, plotted, and drew the first story of his celebrated character, the supernatural magician, Dr. Strange, published in *Strange Tales* No. 110.** *See* Toberoff Decl. Ex. 1 at 21 (Evanier Rep. providing historical context of the first publication of Ditko's Dr. Strange character in *Strange Tales* No. 110); Ex. 25 at DITKO-0308 (Ditko explaining that Dr. Strange was his creation and at one point, he was doing all the stories, writing, and art for it); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script); Ex. 30 at 2021MARVEL-0050281 (Lee writing that Dr. Strange "'twas [Ditko's] idea," in a contemporaneous letter dated January 9, 1963); Ex. 49 at 1 (first published appearance of Dr. Strange in *Strange Tales* No. 110).

> **RESPONSE:  Disputed in part**, but **immaterial**.  While MCI does not dispute that the
>
> initial "idea" for the character that became Doctor Strange may have been Ditko's, MCI
>
> **disputes** that Ditko "created … the first [Doctor Strange] story" or that Ditko created the
>
> work "on spec."  Defendant has no admissible evidence to support this contention.
>
> Rather, the evidence establishes that Doctor Strange grew out of Ditko's longstanding
>
> relationship with Marvel.
>
> The first Doctor Strange story came about as a five-page "back-up" in *Strange*
>
> *Tales*, a Marvel comic book that Ditko was assigned by Lee to contribute to, and which
>
> he had assigned by Lee to contribute to dating back to 1956.  Lens Decl., Ex. 60 at 3
>
> (Ditko remarking that "Dr. Strange started out as a 5 page backup"); Lens Decl., Ex. 57 at
>
> 4 (Ditko noting that it was "a mystery to [him] why no Doctor Strange covers"); Lens
>
> Decl., Ex. 27 at 3 (Lee teasing Doctor Strange as "just a 5-page filler"); Lens Decl., Ex.
>
> 33 at 3 ("It is a great pleasure and privilege for the editors of STRANGE TALES to
>
> present, quietly and without fanfare, the first of a new series, based upon a DIFFERENT

kind of super-hero - - - DR. STRANGE MASTER OF BLACK MAGIC! Story: Stan
Lee[;] Art: Steve Ditko[;] Lettering: Terry Szenics"); Lens Decl., Ex. 14 at 8, 11 (Lee
attesting that he "(together with numerous artists) created or co-created hundreds of
characters and introduced them into the story lines to be published by [Marvel] . . . .
[including] . . . Doctor Strange"); Thomas Decl. ¶ 12 ("Ditko was a regular contributor to
the [*Strange Tal*es] series in 1959 beginning with issue 67 (cover-dated February
1959)."); *see also* Thomas Decl. ¶ 13; Lens Decl., Ex. 10 335:10-336:1; Lens Decl., Ex.
71 at 20:17-23:23; Lens Decl., Ex. 25 at 25-28; Lens Decl., Ex. 63 at 18-19.  Ditko
consistently did the five-page "back-up" stories in *Strange Tales*, including for years
leading up to Doctor Strange's first appearance in 1963.  Lens Decl., Ex. 80 (Lee and
Ditko's five-page stories in *Strange Tales* Vol. 1, Nos. 102-109); Lens Decl., Ex. 48 at 2
(Ditko reflecting on his work for Marvel back-up features in *Strange Tales* and noting
that "[t]he back-up features (5-pagers) were drawn by Don Heck, Paul Reinman and
me"); Thomas Decl. ¶ 12 ("Ditko was a regular contributor to the [*Strange Tal*es] series
in 1959 beginning with issue 67 (cover-dated February 1959)."); Thomas Decl. ¶ 13
(explaining "*Strange Tales* comics featured five-page 'back-up' features written by Stan
Lee and drawn by Steve Ditko").

       Lee named the character Doctor Strange—"Strange" because the story was
published in Marvel's Strange Tales series; "Doctor" to avoid confusion with "Mr.
Fantastic," another Marvel superhero.  Lens Decl., Ex. 27 at 3 (Lee writing that he
"[o]riginally decided to call him MR. STRANGE, but thought the MR. bit too similar to
MR. FANTASTIC—now however, I just remember we had a villain called DR.
STRANGE just [ ] recently in one of our mags—hope it won't be too confusing!"); Lens

Decl., Ex. 41 at 5 (Lee recounting that "I gave him the name Doctor Strange—I think
Stephen Strange; something like that. And Steve was the fellow who drew it.").

Lee also wrote the dialogue for the first Doctor Strange story—and he or
another Marvel writer wrote the dialogue for all subsequent Doctor Strange stories.  Lens
Decl., Ex. 33 at 3 ("DR. STRANGE MASTER OF BLACK MAGIC! Story: Stan
Lee[;]"); Ex. 2 83:13-18 (Thomas testifying that he "dialogue[d] two Doctor Strange
stories"); Lens Decl., Ex. 31D at 24 –31H (*Strange Tales* comics, beginning with Doctor
Strange's first appearance, bearing writing credits for Lee, Thomas, Don Rico, and
Dennis O'Neil).

While Doctor Strange did not have a backstory when originally published,
Marvel gave Doctor Strange a fleshed out personality and origin story in *Strange Tales*
Vol. 1, No. 115 drawing upon Lee's earlier work with Ditko on the "Dr. Droom"
character in *Amazing Adventures* Vol. 1, No. 1.  Lens Decl., Ex. 34 at 3 (story belatedly
laying out "The ORIGIN of Doctor Strange" in response to "a flood of letters" from
fans); Lens Decl., Ex. 37 at 5 (Thomas explaining that, "when Lee and Ditko gave Doctor
Strange an origin in *Strange Tales* No. 115, it bore a distinct similarity to that of Lee and
Kirby's Dr. Droom in *Amazing Adventures* No. 1, two years earlier"); Lens Decl., Ex. 37
at 8 (Thomas remarking that, "[s]ince the 1920s American movies, radio, comics, and the
pulps had seated the Orient as the center of mysticism, and Marvel was no exception,
with its first two sorcerers Strange and D[r]oom"); Lens Decl., Ex. 2 304:24-305:6
(Thomas discussing the large number of "comic book magicians" that "were all imitating
the comic strip character Mandrake," and noting that "[a]lmost every company had a
couple of magicians, many of them with mustaches and capes"); Thomas Decl. ¶ 13 (first

appearance of Dr. Strange "was published without a backstory"); *see also* Thomas Decl. ¶ 15.

Both Dr. Droom and Doctor Strange are doctors who undergo a series of tests in Tibet and develop mystical abilities to combat magical forces. Lens Decl., Ex. 26 at 3-7; Lens Decl., Ex. 40 at 5-8; Lens Decl., Ex. 25 at 3; Lens Decl., Ex. 36 at 2; Lens Decl., Ex. 41 at 5 (Lee recounting how before Doctor Strange, Marvel had "a character some years ago—I think we called him Dr. Droom, or something—who had been a magician"); Thomas Decl. ¶ 15 (explaining "when Lee and Ditko gave Dr. Strange an origin in *Strange Tales* No. 115, it bore a distinct similarity to that of Lee and Kirby's Dr. Droom in *Amazing Adventures* No. 1, two years earlier" in that "[b]oth characters were magicians sharing the same backstory: doctors that travel to Tibet, undergo a series of tests, and develop mystical abilities to combat magical forces").

Regardless, this contention is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test). Indeed, as *Kirby* held, "[q]uestions of who created the characters are mostly beside the point," but what matters is the hiring parties' "inducement, right to supervise, exercise of that right, and creative contribution with respect to" the works. *Id*. at 142.

MCI also **objects** to Toberoff Exhibits 1, 25, and 27. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [34], & [35].

71. **Ditko independently originated the character in 1946 more than a decade before he met Lee and began selling his work to Magazine Management.** *See* Toberoff Decl. Ex. 25 at DITKO-0308 (Ditko explaining that Dr. Strange was his creation and at one point, he was doing all the stories, writing, and art for it); Ex. 33 (Ditko's letter post-marked August 6, 1946 to his

brother Patrick Ditko enclosing an initial sketch of Dr. Strange); Ex. 59 at 61:15-65:14 (Patrick
Ditko, being shown composite Ex. 33 and testifying that his brother, Steve Ditko, sent him this
letter in 1946, while Ditko was in military service abroad, enclosing Ditko's early sketch of Dr.
Strange (Ex. 33) and that he had found Ex. 33 at his home amongst letters he had kept from his
brother); Ex. 23 at 166:5-168:8 (Mark Ditko testifying that his father lived in Johnstown, PA at
the address written on the letter envelope of composite Ex. 33, and that in 1946 (postmarked on
the letter envelope), his uncle Ditko was in the military, stationed abroad in Germany).

**RESPONSE:  Disputed**, but **immaterial**.  Defendant has no admissible evidence

establishing that Ditko "originated the [Doctor Strange] character in 1946."  MCI further

**disputes** Defendant's suggestion that Ditko was "selling" his work to Marvel, which is

not only an issue of law but also inaccurate.  To the contrary, freelance contributors,

including Ditko, contributed to Marvel's comic books, including *Strange Tales*, pursuant

to assignments from Lee, who directed the creation of the Works, and they were

compensated by Marvel on an agreed per-page basis for completed assignments.  *See

supra* Response No. 13, *citing* Lens Decl., Ex. 2 152:1-154:7; Lens Decl., Ex. 12 56:12-

15, 57:25-58:9, 58:14-23; Lens Decl., Ex. 7 217:13-21; Lens Decl., Ex. 13 41:20-42:9;

Lens Decl., Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21; Lens Decl., Ex. 48 at 3; Lens

Decl., Ex. 51 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2 27:19-28:7, 56:2-57:7,

148:22-151:25, 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens Decl., Ex. 12

56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15

16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13 14:5-8,

23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-10,

224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl., Ex. 2 17:8-

18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 44:4-17;

Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-9, 93:23-94:5; Lens Decl., Ex. 2

80:24-81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-

11; Lens Decl., Ex. 4 124:19-125:4,124:3-18; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15; Lens Decl., Ex. 4 125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens Decl., Ex. 13 30:11-14, 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 68A-G; Lens Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens Decl., Ex. 6 40:14-20; Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7, 226:7-11, 249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.

Further, in particular here, this contention ignores the circumstances in which the actual Doctor Strange character first appears in Marvel's *Strange Tales*. *See supra* Response No. 70 *citing* Lens Decl., Ex. 60 at 3; Lens Decl., Ex. 57 at 4; Lens Decl., Ex. 27 at 3; Lens Decl., Ex. 33 at 3; Lens Decl., Ex. 14 at 8, 11; Thomas Decl. ¶¶ 12-13; Lens Decl., Ex. 10 335:10-336:1; Lens Decl., Ex. 71 at 20:17-23:23; Lens Decl., Ex. 2 304:24-305:6; Lens Decl., Ex. 25 at 25-28; Lens Decl., Ex. 63 at 18-19; Lens Decl., Ex. 80; Lens Decl., Ex. 48 at 2; Lens Decl., Ex. 27 at 3; Lens Decl., Ex. 41 at 5; Lens Decl., Ex. 33 at 3; Lens Decl., 83:13-18; Lens Decl., Ex. 31D at 24 –31H; Lens Decl., Ex. 34 at 3; Lens Decl., Ex. 37 at 5, 8; Thomas Decl. ¶ 15; Lens Decl., Ex. 26 at 3-7; Lens Decl., Ex. 40 at 5-8; Lens Decl., Ex. 25 at 3; Lens Decl., Ex. 36 at 2.

Defendant's proffered evidence additionally does not support this contention. Toberoff Exhibit 33 **does not suppor**t this contention, as there is no evidence that the sketch of a man from the chest up contained therein is the Marvel character Doctor Strange.  The only connection between the sketch and Doctor Strange is Defendant's belief that it depicts the same character.  *See* Toberoff Ex. 59 62:7-12.  But Defendant admits that Ditko never told him the sketch was supposed to be the Doctor Strange

character; Defendant simply "assumed it." *Id.* 62:3-10.  As Roy Thomas observed, the

sketch "looks like any number of comic book magicians over the years imitating

Mandrake going back to the '40s," adding that "any character [Ditko] drew in a cloak and

mustache would have a resemblance to Doctor Strange and also to Mandrake the

Magician and 100 other comic book magicians that existed between 1940 and 1960."

Lens Opp. Decl., Ex. 84 303:14-304:19; *see also id.* at 305:5-6 ("Almost every [comic

book] company had a couple of magicians, many of them with mustaches and capes.").

      Regardless, this contention is **immaterial** because it has no bearing on the

Court's application of the work-made-for-hire test, as this Court's grant of summary

judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See*

*Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).  Indeed,

as *Kirby* held, "[q]uestions of who created the characters are mostly beside the point," but

what matters is the hiring parties' "inducement, right to supervise, exercise of that right,

and creative contribution with respect to" the works.  *Kirby*, 726 F.3d at 142.

      MCI also **objects** to the evidence cited in support of this contention.  *See*  MCI's

Evidentiary Objection Nos. [33], [34], [39], & [54].

**72. Lee acknowledged that Ditko was the originator of the character, which flowed from concepts Ditko had been playing with for years.** *See* Toberoff Decl. Ex. 1 at 121 (Evanier Rep. providing historical context of Lee's admission that Ditko originated the idea and story for the Dr. Strange character); Ex. 25 at DITKO-0308 (Ditko explaining that Dr. Strange was his creation and at one point, he was doing all the stories, writing, and art for it); Ex. 30 at 2021MARVEL-0050281 (Lee writing that Dr. Strange "'twas [Ditko's] idea," in a contemporaneous letter dated January 9, 1963).

    **RESPONSE:  Disputed**, but **immaterial**.  While MCI does not dispute that Lee wrote

that Doctor Strange "'twas Steve's idea," MCI **disputes** that Doctor Strange "flowed

from concepts Ditko had been playing with for years," which is unsupported by any

evidence.

Further, in particular here, this contention ignores the circumstances in which the actual Doctor Strange character first appears in Marvel's *Strange Tales*.  *See supra* Response No. 70 *citing* Lens Decl., Ex. 60 at 3; Lens Decl., Ex. 57 at 4; Lens Decl., Ex. 27 at 3; Lens Decl., Ex. 33 at 3; Lens Decl., Ex. 14 at 8, 11; Thomas Decl. ¶¶ 12-13; Lens Decl., Ex. 10 335:10-336:1; Lens Decl., Ex. 71 at 20:17-23:23; Lens Decl., Ex. 2 304:24-305:6; Lens Decl., Ex. 25 at 25-28; Lens Decl., Ex. 63 at 18-19; Lens Decl., Ex. 80; Lens Decl., Ex. 48 at 2; Lens Decl., Ex. 27 at 3; Lens Decl., Ex. 41 at 5; Lens Decl., Ex. 33 at 3; Lens Decl., 83:13-18; Lens Decl., Ex. 31D at 24 –31H; Lens Decl., Ex. 34 at 3; Lens Decl., Ex. 37 at 5, 8; Thomas Decl. ¶ 15; Lens Decl., Ex. 26 at 3-7; Lens Decl., Ex. 40 at 5-8; Lens Decl., Ex. 25 at 3; Lens Decl., Ex. 36 at 2.

Regardless, this contention is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).  Indeed, as *Kirby* held, "[q]uestions of who created the characters are mostly beside the point," but what matters is the hiring parties' "inducement, right to supervise, exercise of that right, and creative contribution with respect to" the works.  *Kirby*, 726 F.3d at 142.

MCI also **objects** to Toberoff Exhibits 1 and 25.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1] & [34].

73. **Ditko's 1946 sketch depicts Ditko's early conception of his original Dr. Strange character long before the Period.** *See* Toberoff Decl. Ex. 33 (Ditko's letter post-marked August 6, 1946 to his brother Patrick Ditko enclosing an early sketch of Dr. Strange); Ex. 49 at 1 (first published appearance of Dr. Strange in *Strange Tales* No. 110); Ex. 59 at 61:1565:14 (Patrick Ditko, being shown composite Ex. 33 and testifying that his brother, Steve Ditko, sent him this letter in 1946, while Ditko was in military service abroad, enclosing Ditko's early sketch of Dr. Strange (Ex. 33) and that he had found Ex. 33 at his home amongst letters he had kept from his brother); Ex. 23 at 166:5-168:8 (Mark Ditko testifying that his father lived at the

address written on the letter envelope of composite Ex. 33, and that, in 1946 (postmarked on the letter envelope), his uncle Ditko was in the military, stationed abroad in Germany); Ex. 30 at 2021MARVEL-0050281 (Lee writing that Dr. Strange "'twas [Ditko's] idea," in a contemporaneous letter dated January 9, 1963).

> **RESPONSE:**  **Disputed**, but **immaterial**. Defendant has no admissible evidence establishing that the sketch in Toberoff Exhibit 33 depicts the Marvel character Doctor Strange or was "Ditko's early conception" of "his" Doctor Strange. In particular here, this contention ignores the circumstances in which the actual Doctor Strange character first appears in Marvel's *Strange Tales*. *See supra* Response No. 70 *citing* Lens Decl., Ex. 60 at 3; Lens Decl., Ex. 57 at 4; Lens Decl., Ex. 27 at 3; Lens Decl., Ex. 33 at 3; Lens Decl., Ex. 14 at 8, 11; Thomas Decl. ¶¶ 12-13; Lens Decl., Ex. 10 335:10-336:1; Lens Decl., Ex. 71 at 20:17-23:23; Lens Decl., Ex. 2 304:24-305:6; Lens Decl., Ex. 25 at 25-28; Lens Decl., Ex. 63 at 18-19; Lens Decl., Ex. 80; Lens Decl., Ex. 48 at 2; Lens Decl., Ex. 27 at 3; Lens Decl., Ex. 41 at 5; Lens Decl., Ex. 33 at 3; Lens Decl., 83:13-18; Lens Decl., Ex. 31D at 24 –31H; Lens Decl., Ex. 34 at 3; Lens Decl., Ex. 37 at 5, 8; Thomas Decl. ¶ 15; Lens Decl., Ex. 26 at 3-7; Lens Decl., Ex. 40 at 5-8; Lens Decl., Ex. 25 at 3; Lens Decl., Ex. 36 at 2.
>
> Regardless, this contention is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test). Indeed, as *Kirby* held, "[q]uestions of who created the characters are mostly beside the point," but what matters is the hiring parties' "inducement, right to supervise, exercise of that right, and creative contribution with respect to" the works. *Kirby*, 726 F.3d at 142.

MCI also **objects** to Toberoff Exhibits 23, 33, and 59. *See* MCI's Evidentiary

Objection Nos. [33], [39], & [54].

74. **Ditko's Dr. Strange character, as he appeared in *Strange Tales* No. 110 (1963) and later issues, was a meticulously crafted synthesis of various characters and narrative elements Ditko had been tinkering with in earlier years.** *See* Toberoff Decl. Ex. 62 at 4-5 (Dr. Strange used his hands to cast teleportation and other spells in *Strange Tales* No. 139 (1965)); Ex. 63 at 2 (same in *Strange Tales* No. 126 (1964)); Ex. 70 at 8-9 (same in *Strange Tales* No. 129 (1965)); *compare* Ex. 61 at 3 (Ditko's character used his hands to cast spells in 1959 in Charlton Comics' *Space Adventures* No. 27); *see also* Ex. 66 at 10 (in *Strange Tales* No. 137 (1965), Dr. Strange used a device—the Eye of Agamotto—to transport through space and time); *compare* Ex. 65 at 4-5 (In Charlton Comics' *Out of this World* No. 7 (1958), Ditko's character used similar artifact to transport characters in a swirl of visual effects through space and time); *see also* Ex. 68 at 4-5 (in *Strange Tales* No. 122 (1964), Dr. Strange traversed through different dimensions and journeyed through alternate planes of existence); Ex. 69 at 1 (same in *Strange Tales* No. 134 (1965)); *compare* Ex. 67 at Cover, 4-5 (Ditko used same effect in Charlton Comics' *Strange Suspense* No. 32 (1957)); Ex. 33 (Ditko's letter post-marked August 6, 1946 to his brother Patrick Ditko enclosing an early sketch of Dr. Strange); Ex. 59 at 61:15-65:14 (Patrick Ditko, being shown composite Ex. 33 and testifying that his brother, Steve Ditko, sent him this letter in 1946, while Ditko was in military service abroad, enclosing Ditko's early sketch of Dr. Strange (Ex. 33) and that he had found Ex. 33 at his home amongst letters he had kept from his brother); Ex. 23 at 166:5-168:8 (Mark Ditko testifying that his father lived at the address written on the letter envelope of composite Ex. 33, and that, in 1946 (postmarked on the letter envelope), his uncle Ditko was in the military, stationed abroad in Germany).

> **RESPONSE:  Disputed**, but **immaterial**.  MCI **disputes** that Doctor Strange, as he
>
> appeared in *Strange Tales* No. 110 (1963) and later issues, was "a meticulously crafted
>
> synthesis of various characters and narrative elements Ditko had been tinkering with in
>
> earlier years."  As an initial matter, none of the evidence cited by Defendant supports that
>
> Doctor Strange "was a meticulously crafted synthesis " of Ditko's prior work, including
>
> his work for Charlton, which Ditko himself conceded was quite different from his work
>
> for Marvel.  *See* Lens Decl., Ex. 54 at 4 ("Charlton Comics [was] low paying, but I got
>
> more out of working for them in developing my own art style, etc. that I got at Marvel,
>
> DC with their picky editors 'corrections,' etc."); Lens Decl., Ex. 59 at 3 ("I had a lot
>
> more freedom with Charlton Press [than Marvel].").  Defendant simply *asserts* (without
>
> any basis) that certain character actions or narrative elements allegedly drawn by Ditko

were "similar" to or the "same" as those in Doctor Strange stories.  But this is unfounded and unsupported speculation.  Further, in particular here, this contention ignores the circumstances in which Doctor Strange first appears in Marvel's *Strange Tales*.  *See supra* Response No. 70, *citing* Lens Decl., Ex. 60 at 3; Lens Decl., Ex. 57 at 4; Lens Decl., Ex. 27 at 3; Lens Decl., Ex. 33 at 3; Lens Decl., Ex. 14 at 8, 11; Thomas Decl. ¶¶ 12-13; Lens Decl., Ex. 10 335:10-336:1; Lens Decl., Ex. 71 at 20:17-23:23; Lens Decl., Ex. 2 304:24-305:6; Lens Decl., Ex. 25 at 25-28; Lens Decl., Ex. 63 at 18-19; Lens Decl., Ex. 80; Lens Decl., Ex. 48 at 2; Lens Decl., Ex. 27 at 3; Lens Decl., Ex. 41 at 5; Lens Decl., Ex. 33 at 3; Lens Decl., 83:13-18; Lens Decl., Ex. 31D at 24 –31H; Lens Decl., Ex. 34 at 3; Lens Decl., Ex. 37 at 5, 8; Thomas Decl. ¶ 15; Lens Decl., Ex. 26 at 3-7; Lens Decl., Ex. 40 at 5-8; Lens Decl., Ex. 25 at 3; Lens Decl., Ex. 36 at 2.

Additionally, Toberoff Exhibit 61 **does not support** this contention, as nothing in it indicates that a character using "his hands to cast spells" is the "same" as or "similar" to the way Doctor Strange cast spells.  Toberoff Exhibit 65 **does not support** this contention, as nothing in it indicates that an "artifact transport[ing] characters in a swirl of visual effects" is "similar" to the "Eye of Agamotto" in Doctor Strange stories. Toberoff Exhibit 67 **does not support** this contention, as nothing in it indicates that any "effect" therein was the "same" as effects in Doctor Strange stories.  Further, Toberoff Exhibits 61 and 67 do not support this contention because there is no evidence those stories were drawn by Ditko.  Toberoff Exhibits 62, 63, 70, 66, 68, and 69 also **do not support** this contention, as they are simply copies of selected Marvel comics—none supports an inference that any actions or narrative elements therein were the "same" as or "similar" to any earlier Ditko artwork.  Finally, Toberoff Exhibits 33 and 23 **do not**

**support** this contention as they relate to a purported 1946 sketch of a man from the chest

up, and Defendant does not cite any evidence suggesting that these were the "same" as or

"similar" to the Doctor Strange character, as explained *supra* in Response No. 71.

Regardless, this contention is **immaterial** because it has no bearing on the Court's

application of the work-made-for-hire test, as this Court's grant of summary judgment for

Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 726 F.3d at

139-40 (relevant principles of the instance-and-expense test). Indeed, as *Kirby* held,

"[q]uestions of who created the characters are mostly beside the point," because "the

hired party's ingenuity and acumen are a substantial reason for the hiring party to have

enlisted him." *Kirby*, 726 F.3d at 142.  What matters is the hiring parties' "inducement,

right to supervise, exercise of that right, and creative contribution with respect to" the

works.  *Id.*

MCI also **objects** to Toberoff Exhibits 23, 33, 59, 61, 65, and 67.  *See* MCI's

Evidentiary Objection Nos. {33], [39], [54], [55], [57], & [58].

75. **Ditko conceived, plotted and drew completely "on spec" a five-page story introducing Dr. Strange, which he presented to Lee, after which Magazine Management purchased the story.** *See* Toberoff Decl. Ex. 1 at 21 (Evanier Rep. providing historical context of the first publication of Ditko's Dr. Strange character which began as a five-page story Ditko wrote and drew on spec introducing the character which he presented to Lee); Ex. 25 at DITKO-0308 (Ditko explaining that Dr. Strange was his creation and at one point, he was doing all the stories, writing, and art for it); *id*. at DITKO-0307 (Ditko explaining that Dr. Strange was a unique character who was a contradiction to Marvel's other superheroes and that the story started out as a five-page filler story); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script); Ex. 30 at 2021MARVEL-0050281 (Lee writing that Dr. Strange "'twas [Ditko's] idea," in a contemporaneous letter dated January 9, 1963 and noting the story was a "5-page filler"); Ex. 42 (Certificate of Renewal Registration of *Strange Tales* Vol. 1, No. 110, the issue in which Dr. Strange first appeared, dated December 27, 1991, claiming "Vista Publications, Inc." as the original author and copyright claimant); Ex. 50 at DETTWILER-0044-0058 (Don Heck's payment records identifying "Magazine Management" as the only entity that paid him for his freelance material in the Period); Ex. 57 at 2 (Ditko writing that Dr. Strange started out as a "5-page filler," which was a great opportunity to try out all kinds of ideas like Dr.

Strange, which "never fit in to Marvel's world of heroes"); Ex. 33 (Ditko's letter post-marked August 6, 1946 to his brother Patrick Ditko enclosing an early sketch of Dr. Strange); Ex. 59 at 61:15-65:14 (Patrick Ditko, being shown composite Ex. 33 and testifying that his brother, Steve Ditko, sent him this letter in 1946, while Ditko was in military service abroad, enclosing Ditko's early sketch of Dr. Strange (Ex. 33) and that he had found Ex. 33 at his home amongst letters he had kept from his brother); Ex. 23 at 166:5-168:8 (Mark Ditko testifying that his father lived at the address written on the letter envelope of composite Ex. 33, and that, in 1946 (postmarked on the letter envelope), his uncle Ditko was in the military, stationed abroad in Germany).

**RESPONSE:  Disputed**.  MCI **disputes** that Ditko "conceived, plotted and drew" the first Doctor Strange story "on spec."  MCI further **disputes** Defendant's contention that Marvel "bought" Ditko's work, which is not only an issue of law but also inaccurate.  To the contrary, freelance contributors, including Ditko, contributed to Marvel's comic books, including *Strange Tales*, pursuant to assignments from Lee, who directed the creation of the Works, and they were compensated by Marvel on an agreed per-page basis for completed assignments.  *See supra* Response No. 13, *citing* Lens Decl., Ex. 2 152:1-154:7; Lens Decl., Ex. 12 56:12-15, 57:25-58:9, 58:14-23; Lens Decl., Ex. 7 217:13-21; Lens Decl., Ex. 13 41:20-42:9; Lens Decl., Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21; Lens Decl., Ex. 48 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2 27:19-28:7, 56:2-57:7, 148:22-151:25, 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens Decl., Ex. 12 56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13 14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl., Ex. 2 17:8-18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 44:4-17; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-9, 93:23-94:5; Lens Decl., Ex. 2 80:24-81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18; Thomas Decl. ¶¶

7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15; Lens Decl., Ex. 4 125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens Decl., Ex. 13 30:11-14, 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 68A-G; Lens Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens Decl., Ex. 6 40:14-20; Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7, 226:7-11, 249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.

Further, in particular here, this contention ignores the circumstances in which the actual Doctor Strange character first appears in Marvel's *Strange Tales*. *See supra* Response No. 70 *citing* Lens Decl., Ex. 60 at 3; Lens Decl., Ex. 57 at 4; Lens Decl., Ex. 27 at 3; Lens Decl., Ex. 33 at 3; Lens Decl., Ex. 14 at 8, 11; Thomas Decl. ¶¶ 12-13; Lens Decl., Ex. 10 335:10-336:1; Lens Decl., Ex. 71 at 20:17-23:23; Lens Decl., Ex. 2 304:24-305:6; Lens Decl., Ex. 25 at 25-28; Lens Decl., Ex. 63 at 18-19; Lens Decl., Ex. 80; Lens Decl., Ex. 48 at 2; Lens Decl., Ex. 27 at 3; Lens Decl., Ex. 41 at 5; Lens Decl., Ex. 33 at 3; Lens Decl., 83:13-18; Lens Decl., Ex. 31D at 24 –31H; Lens Decl., Ex. 34 at 3; Lens Decl., Ex. 37 at 5, 8; Thomas Decl. ¶ 15; Lens Decl., Ex. 26 at 3-7; Lens Decl., Ex. 40 at 5-8; Lens Decl., Ex. 25 at 3; Lens Decl., Ex. 36 at 2.

Further, MCI **disputes** Defendant's contention that the first Doctor Strange story was "purportedly 'published' by Vista"—there is no dispute that the story was published by Vista Publications, and Defendant cites no evidence to support this contention. *See* Lens Decl., Ex. 31D at 25 ("STRANGE TALES is published by VISTA PUBLICATIONS INC. OFFICE OF PUBLICATION: 655 MADISON AVENUE, NEW YORK, N.Y. SECOND CLASS POSTAGE PAID AT NEW YORK, N.Y. and at

MERIDEN, CONN. Published monthly. Copyright 1963 by VISTA PUBLICATIONS,

INC. 655 Madison Avenue, New York, N.Y. Vol. 1, No. 110, July 1963 issue").

    MCI also **objects** to Toberoff Exhibits 1, 23, 25, 27, 33, 57, and 59.  *See* MTE

Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [33], [34], [35], [39], [52], &

[54].

76. **The world of Dr. Strange was strikingly different from other "Marvel" series of the time but Lee liked it and bought it and many more tales of Ditko's Dr. Strange followed.** *See* Toberoff Decl. Ex. 1 at 21 (Evanier Rep. providing historical context of Dr. Strange as a character very different than any other character Marvel was publishing at the time); Ex. 25 at DITKO-0307 (Ditko explaining that Dr. Strange was a unique character who was a contradiction to Marvel's other superheroes); Ex. 30 at 2021MARVEL-0050281 (Lee writing that Dr. Strange "'twas [Ditko's] idea, and I figgered [sic] we'd give it a chance" in a letter dated January 9, 1963); Ex. 57 at 2 (Ditko writing that Dr. Strange started out as a "5-page filler," which was a great opportunity to try out all kinds of ideas like Dr. Strange, which "never fit in to Marvel's world of heroes").

    **RESPONSE:  Disputed**, but **immaterial**.  While MCI does not dispute that Lee liked

Ditko's work on Doctor Strange, resulting in more assignments for Ditko from Lee to

develop the character in *Strange Tales*, MCI **disputes** Defendant's suggestion that

Marvel "bought" work "on spec," which is not only an issue of law but also inaccurate.

To the contrary, Ditko contributed to Marvel's comic books, including *Strange Tales*,

pursuant to assignments from Lee, who directed the creation of the Works, he was

compensated by Marvel on an agreed per-page basis for completed assignments.  *See*

*supra* Response No. 13, *citing* Lens Decl., Ex. 2 152:1-154:7; Lens Decl., Ex. 12 56:12-

15, 57:25-58:9, 58:14-23; Lens Decl., Ex. 7 217:13-21; Lens Decl., Ex. 13 41:20-42:9;

Lens Decl., Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21; Lens Decl., Ex. 48 at 3; Lens

Decl., Ex. 51 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2 27:19-28:7, 56:2-57:7,

148:22-151:25, 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens Decl., Ex. 12

56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15

16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13 14:5-8,

23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-10,

224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl., Ex. 2 17:8-

18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 44:4-17;

Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-9, 93:23-94:5; Lens Decl., Ex. 2

80:24-81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-

11; Lens Decl., Ex. 4 124:19-125:4,124:3-18; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at

4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15; Lens Decl., Ex. 4 125:15-18;

Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens Decl., Ex. 13 30:11-14, 58:13-21;

Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 68A-G; Lens Decl., Ex.

2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens Decl., Ex. 6 40:14-20; Lens Decl., Ex. 2

276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7, 226:7-11, 249:7-9, 258:12-

17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.

   Further, in particular here, this contention ignores the circumstances in which

the actual Doctor Strange character first appears in Marvel's *Strange Tales*.  *See supra*

Response No. 70 *citing* Lens Decl., Ex. 60 at 3; Lens Decl., Ex. 57 at 4; Lens Decl., Ex.

27 at 3; Lens Decl., Ex. 33 at 3; Lens Decl., Ex. 14 at 8, 11; Thomas Decl. ¶¶ 12-13; Lens

Decl., Ex. 10 335:10-336:1; Lens Decl., Ex. 71 at 20:17-23:23; Lens Decl., Ex. 2 304:24-

305:6; Lens Decl., Ex. 25 at 25-28; Lens Decl., Ex. 63 at 18-19; Lens Decl., Ex. 80; Lens

Decl., Ex. 48 at 2; Lens Decl., Ex. 27 at 3; Lens Decl., Ex. 41 at 5; Lens Decl., Ex. 33 at

3; Lens Decl., 83:13-18; Lens Decl., Ex. 31D at 24 –31H; Lens Decl., Ex. 34 at 3; Lens

Decl., Ex. 37 at 5, 8; Thomas Decl. ¶ 15; Lens Decl., Ex. 26 at 3-7; Lens Decl., Ex. 40 at

5-8; Lens Decl., Ex. 25 at 3; Lens Decl., Ex. 36 at 2.

Additionally, Defendant has **no admissible evidence** to support the contention that Doctor Strange was "strikingly different" than other Marvel comics at the time. Indeed, Defendant ignores that magicians, like Doctor Strange, were common to comics at the time.  *See* Lens Decl., Ex. 2 304:24-305:6 (Thomas discussing the large number of "comic book magicians" that "were all imitating the comic strip character Mandrake," and noting that "[a]lmost every company had a couple of magicians, many of them with mustaches and capes"); Lens Decl., Ex. 37 at 8 (Thomas remarking that, "[s]ince the 1920s American movies, radio, comics, and the pulps had seated the Orient as the center of mysticism, and Marvel was no exception, with its first two sorcerers Strange and D[r]oom").

Regardless, this contention is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).  Indeed, as *Kirby* held, "[q]uestions of who created the characters are mostly beside the point," but what matters is the hiring parties' "inducement, right to supervise, exercise of that right, and creative contribution with respect to" the works.  *Kirby*, 726 F.3d at 142.

MCI also **objects** to Toberoff Exhibits 1, 25, and 57.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [34] & [52].

**77. Ditko was selling work to other publishers, including Charlton Comics, at the same time as selling to Marvel.** *See* Toberoff Decl. Ex. 1 at 21 (Evanier Rep. describing Ditko's common practice of selling freelance work to various publishers during the Period); Ex. 12 ¶ 18 (Evanier attesting that Ditko was submitting freelance *Spider-Man* material to Marvel but was also selling work to Charlton Comics at the same time); Ex. 23 at 160:2-8 (Mark Ditko testifying that Ditko was selling work to both Marvel and Charlton Comics in the 1960s); Ex. 35 at DITKO-0199 (Ditko writing about his work at Charlton Comics in the 1960s); Ex. 57 at 2 (Ditko

writing about creating material for Charlton Comics and DC Comics); Exs. 103-107 (examples of Ditko's stories published by Charlton Comics in 1962-1966).

> **RESPONSE:** **Disputed**, but **immaterial**. MCI **disputes** Defendant's suggestion that Ditko
>
> was "selling" work "on spec" to Marvel, which is not only an issue of law but also
>
> inaccurate. To the contrary, Ditko contributed to Marvel's comic books pursuant to
>
> assignments from Lee, who directed the creation of the Works, and he was compensated by
>
> Marvel on an agreed per-page basis for completed assignments. *See supra* Response No. 13,
>
> *citing* Lens Decl., Ex. 2 152:1-154:7; Lens Decl., Ex. 12 56:12-15, 57:25-58:9, 58:14-23;
>
> Lens Decl., Ex. 7 217:13-21; Lens Decl., Ex. 13 41:20-42:9; Lens Decl., Ex. 10 383:18-21;
>
> Lens Decl., Ex. 6 38:8-21; Lens Decl., Ex. 48 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex.
>
> 54 at 4; Lens Decl., Ex. 2 27:19-28:7, 56:2-57:7, 148:22-151:25, 88:17-89:13, 131:8-19,
>
> 145:23-148:20, 164:3-9; Lens Decl., Ex. 12 56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens
>
> Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex.
>
> 53 at 2; Lens Decl., Ex. 13 14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-
>
> 140:2, 140:8-11, 224:5-10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24;
>
> Lens Decl., Ex. 2 17:8-18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12 67:16-68:6; Lens
>
> Decl., Ex. 13 44:4-17; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-9, 93:23-94:5;
>
> Lens Decl., Ex. 2 80:24-81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-220:11; Lens Decl.,
>
> Ex. 13 97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18; Thomas Decl. ¶¶ 7-8; Lens Decl.,
>
> Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15; Lens Decl., Ex. 4
>
> 125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens Decl., Ex. 13 30:11-14,
>
> 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 68A-G; Lens
>
> Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens Decl., Ex. 6 40:14-20; Lens Decl.,
>
> Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7, 226:7-11, 249:7-9, 258:12-
>
> 17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.

Further, this contention ignores that during the relevant time period Ditko worked nearly exclusively for Marvel. *See supra* Response No. 36, *citing* Thomas Decl. ¶¶ 16-17; Lens Decl., Ex. 25; Lens Decl., Ex. 15 19:1-10; Lens Decl., Ex. 2 144:22-145:22; Lens Decl., Ex. 2 316:1-10; Lens Decl., Ex. 72 at 4; Lens Decl., Ex. 73 at 3.

That said, MCI does not dispute that Ditko was able to work for other publishers while working for Marvel (provided it did not draw upon Marvel's pre-existing intellectual property). Indeed, at times, Ditko chose to work for Wally Wood's "Witzend" magazine, as Witzend was different from Marvel in that Ditko would be considered the copyright author of his work. *See supra* Response No. 6, *citing* Lens Decl., Ex. 23A at 2; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 52 at 3; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 50 at 3; Lens Decl. Ex. 56 at 2; Lens Decl., Ex. 61 at 3; Lens Decl., Ex. 49 at 2; Lens Decl., Ex. 60 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex. 61 at 2; Lens Decl., Ex. 44 at 4.

Further, Toberoff Exhibits 103 to 107 **do not support** this contention because there is no evidence those stories were drawn by Ditko or were published between the years 1962 to 1965, *i.e.* the relevant time period.

Regardless, this contention is **immaterial** because it does not change that Ditko had a close and continuous working relationship with Marvel, precisely as Kirby did. *See Kirby*, 726 F.3d at 126 (explaining that "Kirby and Marvel were closely affiliated during the relevant time period . . . Although . . . [Kirby] could and did produce and sell work to other publishers . . . the vast majority of his published works in that time frame was published by Marvel"); *id*. at 141 ("Kirby's works during this period were hardly self-directed projects in which he hoped Marvel, as one of several potential publishers, might have an interest; rather, he created the relevant works pursuant to Marvel's assignment or with Marvel specifically in mind. Kirby's ongoing partnership with Marvel . . . is therefore what induced Kirby's

creation of the works."); *see also id*. at 139-40 (relevant principles of the instance-and-

expense test).

MCI also **objects** to the evidence cited in support of this contention. *See* MTE

Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [15], [32], [41] & [52].

78. **Ditko thereafter created a host of supporting characters and an entire mythology of Dr. Strange before he stopped selling his works to Magazine Management in 1966.** *See* Toberoff Decl. Ex. 1 at 21 (Evanier Rep. providing historical context of Dr. Strange and Ditko's role in creating numerous supporting characters before he stopped selling work to Marvel in 1966); Ex. 25 at DITKO-0308 (Ditko explaining that Dr. Strange was his creation and at one point, he was doing all the stories, writing, and art for it); Ex. 26 at 83 (Lee writing concerning Dr. Strange: "Steve Ditko is one of the best plot men in the biz. When it comes to dreaming up story ideas, putting them together intricately, panel by panel, and utilizing the best of cinematic techniques, the guy's a whiz. Thus, the spectacular saga that is about to knock you out was basically concocted by our own Mr. D[itko]"); *id*. (Lee writing concerning *Dr. Strange*: "After [Ditko] did the hard part—after he dreamed up the story and illustrated it in his own unique style—I then got to the fun part … the dialog balloons and captions").

> **RESPONSE:  Disputed**, but **immaterial**.  While MCI does not dispute that Ditko helped
>
> create the mythology and supporting characters for Doctor Strange, as it was his job to
>
> do, MCI **disputes** Defendant's suggestion that Ditko alone created the mythology and
>
> supporting characters and that Ditko was "selling" the Works to Marvel "on spec."  To
>
> the contrary, Ditko contributed to Marvel's comic books, including *Strange Tales*,
>
> pursuant to assignments from Lee, who directed the creation of the Works, and he was
>
> compensated by Marvel on an agreed per-page basis for completed assignments.  *See*
>
> *supra* Response No. 13, *citing* Lens Decl., Ex. 2 152:1-154:7; Lens Decl., Ex. 12 56:12-
>
> 15, 57:25-58:9, 58:14-23; Lens Decl., Ex. 7 217:13-21; Lens Decl., Ex. 13 41:20-42:9;
>
> Lens Decl., Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21; Lens Decl., Ex. 48 at 3; Lens
>
> Decl., Ex. 51 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2 27:19-28:7, 56:2-57:7,
>
> 148:22-151:25, 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens Decl., Ex. 12
>
> 56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15

16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13 14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl., Ex. 2 17:8-18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 44:4-17; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-9, 93:23-94:5; Lens Decl., Ex. 2 80:24-81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15; Lens Decl., Ex. 4 125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens Decl., Ex. 13 30:11-14, 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 68A-G; Lens Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens Decl., Ex. 6 40:14-20; Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7, 226:7-11, 249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.

Further, in particular here, this contention ignores the circumstances in which the actual Doctor Strange character first appears in Marvel's *Strange Tales*. *See supra* Response No. 70 *citing* Lens Decl., Ex. 60 at 3; Lens Decl., Ex. 57 at 4; Lens Decl., Ex. 27 at 3; Lens Decl., Ex. 33 at 3; Lens Decl., Ex. 14 at 8, 11; Thomas Decl. ¶¶ 12-13; Lens Decl., Ex. 10 335:10-336:1; Lens Decl., Ex. 71 at 20:17-23:23; Lens Decl., Ex. 2 304:24-305:6; Lens Decl., Ex. 25 at 25-28; Lens Decl., Ex. 63 at 18-19; Lens Decl., Ex. 80; Lens Decl., Ex. 48 at 2; Lens Decl., Ex. 27 at 3; Lens Decl., Ex. 41 at 5; Lens Decl., Ex. 33 at 3; Lens Decl., 83:13-18; Lens Decl., Ex. 31D at 24 –31H; Lens Decl., Ex. 34 at 3; Lens Decl., Ex. 37 at 5, 8; Thomas Decl. ¶ 15; Lens Decl., Ex. 26 at 3-7; Lens Decl., Ex. 40 at 5-8; Lens Decl., Ex. 25 at 3; Lens Decl., Ex. 36 at 2.

Further, this contention ignores that it was part of an artist's assignment to populate stories with supporting characters, subject to Marvel's ultimate authority. *See supra* Response No. 36, *citing* Lens Decl., Ex. 13 54:16-56:9, 72:21- 73:23, 79:3-19; Lens Decl., Ex. 12 55:4-15, 65:13-66:7.

Additionally, Toberoff Exhibit 26 **does not support** this contention, as it specifically references only Ditko's work on *Spider-Man Annual #2*, a one-off special annual issue otherwise unconnected to the Spider-Man or Doctor Strange stories Ditko and Lee worked on.

Further, while the date itself is **immaterial** because it will not "affect the outcome of the suit under the governing law," *Kinsella*, 320 F.3d 309 at 311, MCI **disputes** that Ditko left Marvel in 1966 rather than late 1965, and Defendant's evidence is ambiguous, at best, regarding the relevant date. *See supra* Response No. 51, *citing* Lens Opp. Decl., Ex. 84 311:13; Toberoff Ex. 17 92:9-20; Lens Decl., Ex. 39 at 5.

Regardless, this contention is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test). Indeed, as *Kirby* held, "[q]uestions of who created the characters are mostly beside the point," but what matters is the hiring parties' "inducement, right to supervise, exercise of that right, and creative contribution with respect to" the works. *Kirby*, 726 F.3d at 142.

MCI also **objects** to Toberoff Exhibits 1 and 25. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1] & [34].

**79. In 1962, as Magazine Management cast about for new superheroes, Jack Kirby and Lee worked on a character named "Spider-Man," which Kirby said was based on an idea that**

**he had developed with Joe Simon in the mid-1950s.** *See* Toberoff Decl. Ex. 1 at 20 (Evanier Rep. providing historical context of Spider-Man's creation and describing Kirby and Lee's initial work on a character named "Spider-Man" that was based on an idea developed by Joe Simon in the mid-1950s); Ex. 3 at 112:7-113:7 (Romita testifying that Kirby did some initial Spider-Man drawings but Lee did not like them and went with Ditko's version of the character); Ex. 4 at 37:3-19 (Lee testifying that he did not like Kirby's version of Spider-Man, he liked Ditko's); Ex. 29 at 33-34 (Ditko writing that the Spider-Man character that Lee and Kirby had originally worked up was a version of "The Fly" character created by Joe Simon).

> **RESPONSE:** **Disputed**, but **immaterial** in part.  While MCI does not dispute that Lee initially assigned Kirby to do artwork for Spider-Man in 1962, MCI **disputes** that the character was based on a 1950s idea by Kirby and Joe Simon.  *See* Lens Decl., Ex. 48 at 5 (Ditko writing that "[t]he first complete Spider-Man adventure, containing the legend and story, was published in Amazing Fantasy #15, from Stan's synopsis"); Lens Decl., Ex. 46 at 3 (Ditko recounting that Lee "create[d] the Spider-Man name" and provided him with a "1 or 2 page synopsis" for the first story); Lens Decl., Ex. 13 74:6-75:5 (Lee testifying about "dreaming up" the idea for Spider-Man and his superpower); Lens Decl., Ex. 10 335:10-336:11 (Lee testifying that he "came up with Spider-Man," among other "main characters" that featured in Marvel's comics, and that he would tell artists "how [he] wanted them done"); Lens Decl., Ex. 71 at 3:25-6:09 (Lee explaining how Marvel's basic "formula" was to "mix fantasy with realism," creating characters that "are a little different . . . sort of like continuing soap operas"); Lens Decl., Ex. 71 at 3:25-6:09 (Lee explaining how Spider-Man, like other Marvel characters, "juxtapos[ed] . . . bigger-than-life problem[s]" with "the very simple home life and family life"); Lens Decl., Ex. 28; *see also* Lens Decl., Ex. 14 at 8, 15.
>
> Regardless, this contention is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See*

*Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).  Indeed,

the *Kirby* court held that Kirby's contributions to Spider-Man were done on a work-

made-for-hire basis, like all his other work for Marvel.  *See Kirby*, 726 F.3d at 143

("[T]he district court made no error, in our view, in determining as a matter of law that

the works [(including Kirby's alleged contributions to Spider-Man)] were made at

Marvel's instance and expense").

      MCI also **objects** to Toberoff Exhibits 1, 3, and 29.  *See* MTE Evanier [Dkt.

77]; MCI's Evidentiary Objection No. [1], [6], & [36].

80. **At some point, it was decided to toss their early development of a character by that name and start over in a brand-new direction.** *See* Toberoff Decl. Ex. 1 at 20 (Evanier Rep. providing historical context of Spider-Man's creation and describing the decision to go in a direction with the character different from Kirby and Lee's initial character based on the one developed by Joe Simon in the mid-1950s); Ex. 3 at 112:7-113:7 (Romita testifying that Kirby did some initial Spider-Man drawings but Lee did not like them and went with Ditko's version of the character); Ex. 4 at 37:3-19 (Lee testifying that he did not like Kirby's version of Spider-Man, he liked Ditko's); Ex. 29 at 34-35 (Ditko writing that the initial Kirby Spider-Man idea was tossed and Ditko created a brand new Spider-Man).

      <u>**RESPONSE**</u>:  **Disputed**, but **immaterial**.  While MCI does not dispute that Lee

exercised his editorial discretion to reassign the Spider-Man assignment from Kirby to

Ditko, MCI **disputes** that the character went in a "brand-new direction."  *See* Lens Decl.,

Ex. 13 37:3-38:3 (Lee testifying that he initially "wanted Jack [Kirby] to do" the Spider-

Man comic and "gave it to him" with the admonition that he "d[id]n't want this guy to be

too heroic-looking"—but Kirby's penciled drawings "looked still a bit too heroic" for

Lee "even though [Kirby] tried to nerd him up," so he "gave it to Steve Ditko" instead

whose "style was really more really what Spider-Man should have been"); Lens Decl.,

Ex. 13 334:14-18 (Lee testifying that "it was me who said, 'I want to do a strip called

Spider-Man,' and I hired Jack, and I didn't like it, and then I hired Ditko."); Lens Decl.,

Ex. 48 at 5 (Ditko writing that he "penciled and inked the first [Spider-Man] cover after [he] inked first story" but that "Stan rejected [his] cover" and "had Jack pencil a second, replacement cover" that "became the first published cover"); Lens Decl., Ex. 47 at 2 (Ditko admitting that "it became *publicly known and shown* that I had *previously* penciled and inked a *first* S[pider]-m[an] cover that Stan rejected"); Lens Decl., Ex. 30 at 2 ("*Amazing Fantasy* #15 unused cover art by Steve Ditko"); *see also* Lens Decl., Ex. 10 376:3-15; Lens Decl., Ex. 48 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 28; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 61 at 4; Lens Decl., Ex. 49 at 3; Thomas Decl. ¶ 21.

Regardless, this contention is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test). Indeed, the *Kirby* court held that Kirby's contributions to Spider-Man were done on a work-made-for-hire basis, like all his other work for Marvel. *See Kirby*, 726 F.3d at 143 ("[T]he district court made no error, in our view, in determining as a matter of law that the works [(including Kirby's alleged contributions to Spider-Man)] were made at Marvel's instance and expense").

MCI also **objects** to Toberoff Exhibits 1 and 3. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1] & [6].

81. **Kirby insisted he was never paid for the pages he had drawn of that first version that was rejected by "Marvel."** *See* Toberoff Decl. Ex. 1 at 20 (Evanier Rep. providing historical context of Spider-Man's creation and noting Kirby's insistence that he was not paid for his initial work on Spider-Man).

**RESPONSE:** **Disputed**, but **immaterial**. Defendant has no admissible evidence establishing this contention. Consistent with Marvel's established practices, Kirby would

have been paid his agreed per-page rate for his completed assignments for Marvel, even if the pages were not used for publication. *See supra* Response No. 41, *citing* Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 13 18:6-16; Lens Decl., Ex. 10 376:16-22; Lens Decl., Ex. 9 30:10-12; Lens Decl., Ex. 68A-G; Lens Decl., Ex. 35 at 9, 12; Lens Decl., Ex. 68D at 10; Lens Decl., Ex. 2 158:17-20, 297:14-20; Lens Decl., Ex. 12 68:24-69:6, 74:19-25.

Regardless, this contention is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test). Indeed, the *Kirby* court held that Kirby's contributions to Spider-Man were done on a work-made-for-hire basis, like all his other work for Marvel. *See Kirby*, 726 F.3d at 143 ("[T]he district court made no error, in our view, in determining as a matter of law that the works [(including Kirby's alleged contributions to Spider-Man)] were made at Marvel's instance and expense").

MCI also **objects** to the evidence cited in support of this contention. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection No. [1].

82. **Ditko then devised an entirely new look and costume, and a new direction was charted for a very different Spider-Man character.** *See* Toberoff Decl. Ex. 1 at 20 (Evanier Rep. providing historical context of Spider-Man's creation and describing Ditko's creation of a very different costume and direction for the character); Ex. 3 at 112:7-113:7 (Romita testifying that Kirby did some initial Spider-Man drawings but Lee did not like them and went with Ditko's version of the Spider-Man character); Ex. 4 at 37:3-19 (Lee testifying that he did not like Kirby's version of Spider-Man, he liked Ditko's); Ex. 28 (Lee writing that Ditko was the co-creator of Spider-Man); Ex. 29 at 34-35 (Ditko writing that the initial Kirby Spider-Man idea was tossed and Ditko created a brand new Spider-Man); Ex. 29 at 34 (Ditko comparison depiction of Kirby's and Ditko's versions of the Spider-Man character).

RESPONSE:  **Disputed**, but **immaterial**. While MCI does not dispute that Lee asked Ditko to draw a Spider-Man that differed in some respects from that which Kirby had

drawn, MCI **disputes** the characterization of them as being "very different" and that a "new direction was charted for a very different Spider-Man character." *See supra* Response No. 80, *citing* Lens Decl., Ex. 13 37:3-38:3, 334:14-18; Lens Decl., Ex. 48 at 3, 5; Lens Decl., Ex. 47 at 2; Lens Decl., Ex. 30 at 2; Lens Decl., Ex. 10 376:3-15; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 28; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 61 at 4; Lens Decl., Ex. 49 at 3; Thomas Decl. ¶ 21.

Regardless, this contention is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test). Indeed, as *Kirby* held, "[q]uestions of who created the characters are mostly beside the point," because "the hired party's ingenuity and acumen are a substantial reason for the hiring party to have enlisted him." *Kirby*, 726 F.3d at 142. What matters is the hiring parties' "inducement, right to supervise, exercise of that right, and creative contribution with respect to" the works. *Id*. Moreover, the *Kirby* court held that Kirby's contributions to Spider-Man were done on a work-made-for-hire basis, like all his other work for Marvel. *See Kirby*, 726 F.3d at 143 ("[T]he district court made no error, in our view, in determining as a matter of law that the works [(including Kirby's alleged contributions to Spider-Man)] were made at Marvel's instance and expense").

MCI also **objects** to Toberoff Exhibits 1, 3, and 29. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [3], & [36].

83. **Ditko's conception of the Spider-Man character and Kirby's were very different.** *See* Toberoff Decl. Ex. 3 at 112:7-113:7 (Romita testifying that Kirby did some initial Spider-Man drawings but Lee did not like them and went with Ditko's version of the character); Ex. 4 at 37:3-19 (Lee testifying that he did not like Kirby's version of Spider-Man, he liked Ditko's); Ex.

29 at 34 (Ditko comparison depiction of Kirby's and Ditko's versions of the Spider-Man character).

> **RESPONSE:  Disputed**, but **immaterial**.  While MCI does not dispute that Ditko and Kirby each drew the Spider-Man character differently in certain aspects, MCI **disputes** Defendants' characterization of them as being "very different."  *See supra* Response No. 80, *citing* Lens Decl., Ex. 13 37:3-38:3, 334:14-18; Lens Decl., Ex. 48 at 3, 5; Lens Decl., Ex. 47 at 2; Lens Decl., Ex. 30 at 2; Lens Decl., Ex. 10 376:3-15; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 28; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 61 at 4; Lens Decl., Ex. 49 at 3; Thomas Decl. ¶ 21.
>
> Regardless, this contention is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).  Indeed, as *Kirby* held, "[q]uestions of who created the characters are mostly beside the point," because "the hired party's ingenuity and acumen are a substantial reason for the hiring party to have enlisted him."  *Kirby*, 726 F.3d at 142.  What matters is the hiring parties' "inducement, right to supervise, exercise of that right, and creative contribution with respect to" the works.  *Id*.  Moreover, the *Kirby* court held that Kirby's contributions to Spider-Man were done on a work-made-for-hire basis, like all his other work for Marvel.  *See Kirby*, 726 F.3d at 143 ("[T]he district court made no error, in our view, in determining as a matter of law that the works [(including Kirby's alleged contributions to Spider-Man)] were made at Marvel's instance and expense").
>
> MCI also **objects** to Toberoff Exhibits 3 and 29.  *See* MCI's Evidentiary Objection Nos. [6] & [36].

84. **Ditko wrote on several occasions that the character and stories were all worked out without Lee ever writing an actual script.** *See* Toberoff Decl. Ex. 1 at 20 (Evanier Rep. providing historical context of Spider-Man's creation and describing Ditko's insistence that the character was worked out with Lee ever writing a script); Ex. 28 (Lee writing that Ditko was co-creator of Spider-Man and that Ditko did most of the story plotting of *Spider-Man* and just left Lee to do the dialogue and captions).

> **RESPONSE:  Disputed**, but **immaterial**.  While MCI does not dispute that Lee did not
>
> provide Ditko with full written scripts of Spider-Man stories from which to draw, MCI
>
> **disputes** this contention to the extent that Defendant is suggesting that Ditko did not
>
> work on Spider-Man pursuant to assignments from Lee.  To the contrary, Ditko
>
> contributed to Marvel's comic books, including *Amazing Fantasy* and *Amazing Spider-*
>
> *Man*, pursuant to assignments from Lee, who directed the creation of the Works, and he
>
> was compensated by Marvel on an agreed per-page basis for completed assignments.  *See*
>
> *supra* Response No. 13, *citing* Lens Decl., Ex. 2 152:1-154:7; Lens Decl., Ex. 12 56:12-
>
> 15, 57:25-58:9, 58:14-23; Lens Decl., Ex. 7 217:13-21; Lens Decl., Ex. 13 41:20-42:9;
>
> Lens Decl., Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21; Lens Decl., Ex. 48 at 3; Lens
>
> Decl., Ex. 51 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2 27:19-28:7, 56:2-57:7,
>
> 148:22-151:25, 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens Decl., Ex. 12
>
> 56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15
>
> 16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13 14:5-8,
>
> 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-10,
>
> 224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl., Ex. 2 17:8-
>
> 18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 44:4-17;
>
> Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-9, 93:23-94:5; Lens Decl., Ex. 2
>
> 80:24-81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-
>
> 11; Lens Decl., Ex. 4 124:19-125:4,124:3-18; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at

4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15; Lens Decl., Ex. 4 125:15-18;

Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens Decl., Ex. 13 30:11-14, 58:13-21;

Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 68A-G; Lens Decl., Ex.

2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens Decl., Ex. 6 40:14-20; Lens Decl., Ex. 2

276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7, 226:7-11, 249:7-9, 258:12-

17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.

       Further, in particular here, this contention ignores the circumstances in which

Spider-Man first appears in *Amazing Fantasy* No. 15.  *See supra* Response No. 80, *citing*

Lens Decl., Ex. 13 37:3-38:3, 334:14-18; Lens Decl., Ex. 48 at 3, 5; Lens Decl., Ex. 47 at

2; Lens Decl., Ex. 30 at 2; Lens Decl., Ex. 10 376:3-15; Lens Decl., Ex. 54 at 4; Lens

Decl., Ex. 28; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 61 at 4; Lens Decl., Ex. 49 at 3;

Thomas Decl. ¶ 21.   Additionally, Toberoff Exhibit 28 **does not support** this contention,

as it refers to Lee crediting Ditko for "*eventually* d[oing] most of the plotting . . . as the

strip continued to increase in popularity," when Lee, using his editorial discretion,

afforded Ditko greater creative input on the Spider-Man comics, subject to Marvel's

ultimate authority.

       Regardless, this contention is **immaterial** because it has no bearing on the

Court's application of the work-made-for-hire test, as this Court's grant of summary

judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See*

*Kirby*, 726 F.3d at 126 (quoting Lee's testimony that "Lee would provide the artist with a

'brief outline' or 'synopsis' of an issue; sometimes he would 'just talk ... with the artist'

about ideas … and [t]he artist would then 'draw it any way they wanted to'" and

nevertheless affirming grant of summary judgment in Marvel's favor).  Moreover, the

*Kirby* court held that Kirby's contributions to Spider-Man were done on a work-made-for-hire basis, like all his other work for Marvel.  *See Kirby*, 726 F.3d at 143 ("[T]he district court made no error, in our view, in determining as a matter of law that the works [(including Kirby's alleged contributions to Spider-Man)] were made at Marvel's instance and expense").

MCI also **objects** to Toberoff Exhibit 1.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection No. [1].

85.  **That first *Spider-Man* story introduced not only Peter Parker (aka Spider-Man) but also his Aunt May and a rival at school, Flash Thompson—the first two members of what would eventually grow into a large supporting cast of friends and foes.** *See* Toberoff Decl. Ex. 1 at 20 (Evanier Rep. providing historical context of Spider-Man's creation and identifying the characters introduced in the first several dozen issues of the *Spider-Man* story done by Ditko); Ex. 60 (*Amazing Fantasy* No. 15 introducing Spider-Man, Aunt May, and Flash Thompson).

**RESPONSE:  Undisputed**, but **immaterial**.  Further, this paragraph ignores that it was part of an artist's assignment from Marvel to populate stories with supporting characters, subject to Marvel's ultimate authority.  *See supra* Response No. 36, *citing* Lens Decl., Ex. 13 54:16-56:9, 72:21- 73:23, 79:3-19; Lens Decl., Ex. 12 55:4-15, 65:13-66:7.

Regardless, this paragraph is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test). Moreover, the *Kirby* court held that Kirby's contributions to Spider-Man were done on a work-made-for-hire basis, like all his other work for Marvel.  *See Kirby*, 726 F.3d at 143 ("[T]he district court made no error, in our view, in determining as a matter of law that

the works [(including Kirby's alleged contributions to Spider-Man)] were made at

Marvel's instance and expense").

      MCI, however, **objects** to Toberoff Exhibit 1.  *See* MTE Evanier [Dkt. 77];

MCI's Evidentiary Objection No. [1].

86. **Lee admitted that Goodman did not think the new character would sell and thus forbade Lee to continue with it.** *See* Toberoff Decl. Ex. 1 at 20 (Evanier Rep. providing historical context of Spider-Man's creation and explaining Goodman's dislike of the character); Ex. 4 at 75:24-78:2, 130:21-134:6 (Lee testifying that Goodman hated the idea of Spider-Man, but Lee published the story anyway); Ex. 17 at 307:12-310:9 (Thomas testifying that Goodman hated the idea of *Spider-Man*, but Lee published it anyway); Ex. 56 at 89:8-90:11 (Lee testifying that Goodman hated the idea of the Spider-Man character but Lee published the story anyway, without Goodman's permission).

      **RESPONSE**:  **Disputed**, but **immaterial**.  While MCI does not dispute that Goodman

did not think that Spider-Man would sell well, MCI **disputes** that Goodman forbade Lee

to continue with it.  Toberoff Exhibits 4, 17, and 56 **do not support** this contention, as

Lee's testimony in each exhibit makes clear that even though Goodman was not a fan of

the Spider-Man idea at first, because the *Amazing Fantasy* title was set to end anyway,

Goodman "didn't care what went into the last issue."

      Regardless, this contention is **immaterial** because it has no bearing on the

Court's application of the work-made-for-hire test, as this Court's grant of summary

judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See*

*Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).  Indeed,

while Goodman, as publisher, had the ultimate authority as to what Marvel would

publish, Lee was otherwise in charge of making creative decisions for Marvel.  *See supra*

Response No. 36, *citing* Lens Decl., Ex. 2 17:8-18:13, 37:10-39:6, 80:24-81:12, 125:18-

126:1; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 7

219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:3-125:4; Thomas Decl.

¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3.  And even assuming that Lee

ignored Goodman's instruction not to publish Spider-Man, Lee still induced and

supervised the creation of *Amazing Fantasy* No. 15, and there is no dispute Ditko was

paid his per-page rate for his pages, meaning it was created at Marvel's instance and

expense.  *See Kirby*, 726 F.3d at 142 (explaining that, for purposes of work-made-for-hire

test, what matters is the hiring parties' "inducement, right to supervise, exercise of that

right, and creative contribution with respect to" the works).  Moreover, the *Kirby* court

held that Kirby's contributions to Spider-Man were done on a work-made-for-hire basis,

like all his other work for Marvel.  *See Kirby*, 726 F.3d at 143 ("[T]he district court made

no error, in our view, in determining as a matter of law that the works [(including Kirby's

alleged contributions to Spider-Man)] were made at Marvel's instance and expense").

MCI also **objects** to Toberoff Exhibit 1.  *See* MTE Evanier [Dkt. 77]; MCI's

Evidentiary Objection No. [1].

87. **Lee, enthusiastic about Ditko's Spider-Man, flouted Goodman's authority and published the story in *Amazing Fantasy* No. 15, anyway.** *See* Toberoff Decl. Ex. 4 at 75:24-78:2, 130:21-134:6 (Lee testifying that Goodman hated the idea of Spider-Man, but Lee published the story anyway); Ex. 17 at 307:12-310:9 (Thomas testifying that Goodman hated the idea of *Spider-Man*, but Lee published it anyway); Ex. 56 at 89:8-90:11 (Lee testifying that Goodman hated the idea of the Spider-Man character but Lee published the story anyway, without Goodman's permission).

RESPONSE:  **Disputed**, but **immaterial**.  MCI **disputes** that Lee "flouted Goodman's

authority" when he published the first Spider-Man story.  Additionally, Toberoff Exhibits

4, 17, and 56 **do not support** this contention, as Lee's testimony in each exhibit makes

clear that even though Goodman was not a fan of the Spider-Man idea at first, because

the *Amazing Fantasy* title was set to end anyway, Goodman "didn't care what went into

the last issue."

Regardless, this contention is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test). Indeed, while Goodman, as publisher, had the ultimate authority as to what Marvel would publish, Lee was otherwise in charge of making creative decisions for Marvel. *See supra* Response No. 36, *citing* Lens Decl., Ex. 2 17:8-18:13, 37:10-39:6, 80:24-81:12, 125:18-126:1; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:3-125:4; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3. And even assuming that Lee ignored Goodman's instruction not to publish Spider-Man, Lee still induced and supervised the creation of *Amazing Fantasy* No. 15, and there is no dispute Ditko was paid his per-page rate for his pages, meaning it was created at Marvel's instance and expense. *See Kirby*, 726 F.3d at 142 (explaining that, for purposes of work-made-for-hire test, what matters is the hiring parties' "inducement, right to supervise, exercise of that right, and creative contribution with respect to" the works).

88. **Months later, after its success became known, Spider-Man got its own title and an** *Amazing Spider-Man* **comic was launched.** *See* Toberoff Decl. Ex. 1 at 21 (Evanier Rep. providing historical context of Spider-Man's creation and explaining that after initial sales figures came in for the first *Spider-Man* story showing it was a success, Spider-Man got its own series); Ex. 56 at 89:8-90:11 (Lee testifying that *Spider-Man* got its own series after the first story was a success).

 **RESPONSE:  Undisputed**.

 MCI, however, **objects** to Toberoff Exhibit 1. *See* MTE Evanier [Dkt. 77];

MCI's Evidentiary Objection No. [1].

89. **In short order, the cast swelled with supporting characters in the life of Peter Parker like J. Jonah Jameson and Mary Jane Watson, and Spider-Man foes like Dr. Octopus, The**

**Sandman, The Green Goblin, Kraven the Hunter, The Vulture, The Scorpion and many, many more.** *See* Toberoff Decl. Ex. 1 at 21 (Evanier Rep. providing historical context of Spider-Man's creation and identifying the characters introduced in the first several dozen issues of Ditko's *Spider-Man* stories).

> **RESPONSE:  Undisputed**, but **immaterial**.  Further, this paragraph ignores that it was part of an artist's assignment to populate stories with supporting characters, subject to Marvel's ultimate authority.  *See supra* Response No. 36, *citing* Lens Decl., Ex. 13 54:16-56:9, 72:21- 73:23, 79:3-19; Lens Decl., Ex. 12 55:4-15, 65:13-66:7.
>
> Regardless, this paragraph is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).
>
> MCI, however, **objects** to Toberoff Exhibit 1.  *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection No. [1].

90. **All these characters and many others were created or co-created by Ditko, and firmly established well before Ditko left the comic, and stopped selling work to "Marvel" in early 1966.** *See* Toberoff Decl. Ex. 1 at 21 (Evanier Rep. providing historical context of Spider-Man's creation and identifying the characters introduced in the first several dozen issues of the *Spider-Man* story done by Ditko); Ex. 7 at 223:18-225:20, 277:11-13 (Thomas testifying that Ditko did all the plotting on *Spider-Man* stories while Ditko and Lee were not speaking); Ex. 17 at 311:18-312:25 (Thomas testifying that Ditko, on his own, plotted and drew *Spider-Man* for more than one year before he left in 1966, did not work pursuant to the "Marvel Method," and that Lee would not even know anything about the story until it was penciled and submitted by Ditko); Ex. 28 (Lee writing that Ditko was co-creator of Spider-Man and that Ditko did most of the plotting of *Spider-Man* and just left Lee to do the dialogue and captions).

> **RESPONSE:  Disputed**, but **immaterial**.  MCI **disputes** this contention to the extent that Defendant is suggesting that Ditko did not work on Spider-Man pursuant to assignments from Lee.  To the contrary, Ditko contributed to Marvel's comic books pursuant to assignments from Lee, who directed the creation of the Works, and he was compensated by Marvel on an agreed per-page basis for completed assignments.  *See*

*supra* Response No. 13, *citing* Lens Decl., Ex. 2 152:1-154:7; Lens Decl., Ex. 12 56:12-15, 57:25-58:9, 58:14-23; Lens Decl., Ex. 7 217:13-21; Lens Decl., Ex. 13 41:20-42:9; Lens Decl., Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21; Lens Decl., Ex. 48 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2 27:19-28:7, 56:2-57:7, 148:22-151:25, 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens Decl., Ex. 12 56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13 14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl., Ex. 2 17:8-18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 44:4-17; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-9, 93:23-94:5; Lens Decl., Ex. 2 80:24-81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15; Lens Decl., Ex. 4 125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens Decl., Ex. 13 30:11-14, 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 68A-G; Lens Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens Decl., Ex. 6 40:14-20; Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7, 226:7-11, 249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20.

Further, in particular here, this contention ignores the circumstances in which Spider-Man first appears in *Amazing Fantasy* No. 15.  *See supra* Response No. 80, *citing* Lens Decl., Ex. 13 37:3-38:3, 334:14-18; Lens Decl., Ex. 48 at 3, 5; Lens Decl., Ex. 47 at 2; Lens Decl., Ex. 30 at 2; Lens Decl., Ex. 10 376:3-15; Lens Decl., Ex. 54 at 4; Lens

Decl., Ex. 28; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 61 at 4; Lens Decl., Ex. 49 at 3;

Thomas Decl. ¶ 21.  Additionally, Toberoff Exhibits 17 and 28 **do not support** this

contention.  Exhibit 28 refers to Lee crediting Ditko for "*eventually* d[oing] most of the

plotting . . . as the strip continued to increase in popularity," when Lee, using his editorial

discretion, afforded Ditko greater creative input on the Spider-Man comics, subject to

Marvel's ultimate authority.  Toberoff Exhibit 17 similarly states that Ditko's work was a

"switch on the Marvel method" when Ditko began plotting Spider-Man later in his

Marvel career.

Further, while the date itself is **immaterial** because it will not "affect the

outcome of the suit under the governing law," *Kinsella*, 320 F.3d 309 at 311, MCI

**disputes** that Ditko left Marvel in 1966 rather than late 1965, and Defendant's evidence

is, at best, ambiguous as to date.  Regardless, this contention is **immaterial** because it has

no bearing on the Court's application of the work-made-for-hire test, as this Court's grant

of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit,

confirms.  *See Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense

test).  Indeed, as *Kirby* held, "[q]uestions of who created the characters are mostly beside

the point," because "the hired party's ingenuity and acumen are a substantial reason for

the hiring party to have enlisted him."  *Kirby*, 726 F.3d at 142.  What matters is the hiring

parties' "inducement, right to supervise, exercise of that right, and creative contribution

with respect to" the works.  *Id*.

MCI also **objects** to Toberoff Exhibit 1.  *See* MTE Evanier [Dkt. 77]; MCI's

Evidentiary Objection No. [1].

**91. Many characters who appear in the *Spider-Man* stories (e.g., Aunt May, Norman Osborn, Electro, the Chameleon) actually sprouted from the tales Ditko had previously**

**crafted and sold to Charlton Comics years earlier.** *See* Toberoff Decl. Ex. 73 at 6 (Norman Osborn's first appearance in the *Spider-Man* series in 1965); Ex. 74 at 10 (Norman Osborn's identity revealed to readers in *Amazing Spider-Man* No. 37 (1966)); *compare* Ex. 75 at 1-2 (Norman Osborn's precursor—including corporate villainy and distinct curled hairstyle—in 1957 in Charlton Comics' *Strange Suspense Stories* No. 33, *Director of the Board*); *see also* Ex. 60 at 2, 8 (*Amazing Fantasy* No. 15 (1962), the issue in which Spider-Man and Ditko's Aunt May character first appeared) *compare* Ex. 79, "All Those Eyes" at 1-3 (Aunt May's forerunner character appeared in Ditko's story in Charlton Comics' *Out of this World* No. 6 (1957)); *see also* Ex. 76 at 1, 4 (Ditko's Electro character in *Amazing Spider-Man* No. 9 (1964)); *compare* Ex. 77 at 1, 4-5 (Ditko's electrically powered man, the predecessor of Electro, first appeared in Charlton Comics' *Strange Suspense Stories* No. 48 (1960)); *see also* Ex. 78 at 1, 5-6, 8-9 (Ditko introduces the Chameleon—a character who used various masks to carry out his villainy—in *Amazing Spider-Man* No. 1 (1963)); *compare* Ex. 79, "All Those Eyes" at 2-3 (Chameleon precursor—a spy character who used various masks in his espionage with a similar back story as the Chameleon—appeared in Ditko's "All Those Eyes" story he sold to Charlton Comics in 1957); Ex. 86 (photos of spiderweb-patterned wood blocks created by Ditko in high school).

> **RESPONSE:  Disputed**, but **immaterial**.  MCI **disputes** that any *Spider-Man*
>
> characters "actually sprouted" from Ditko's work for "Charlton Comics years
>
> earlier."  As an initial matter, none of the evidence cited by Defendant establishes that
>
> any Marvel characters "sprouted" from Ditko's prior work for Charlton, which Ditko
>
> himself conceded was quite different from his work for Marvel.  *See* Lens Decl., Ex.
>
> 54 at 4 ("Charlton Comics [was] low paying, but I got more out of working for them
>
> in developing my own art style, etc. that I got at Marvel, DC with their picky editors
>
> 'corrections,' etc."); Lens Decl., Ex. 59 at 3 ("I had a lot more freedom with Charlton
>
> Press [than Marvel].").  Defendant simply *asserts* (without any basis) that certain
>
> characters allegedly drawn by Ditko for Charlton were precursors or predecessors to
>
> later Marvel supporting characters.  *See* Toberoff Decl. Ex. 75; Toberoff Decl. Ex.
>
> 77; Toberoff Decl. Ex. 79.
>
> Further, in particular here, this contention ignores the circumstances in which
>
> these supporting characters first appeared in Marvel's *Amazing Fantasy* No. 15
>
> (1962) or *Amazing Spider-Man* (1963-1965).  As with all freelancers' work for

Marvel, Ditko's contributions to all of the supporting characters Defendant identifies, *e.g.*, Aunt May, Norman Osborn, Electro, and the Chameleon, were made pursuant to assignments from Lee, who directed the creation of the Works, and he was compensated by Marvel on an agreed per-page basis for completed assignments. *See supra* Response No. 13, *citing* Lens Decl., Ex. 2 152:1-154:7; Lens Decl., Ex. 12 56:12-15, 57:25-58:9, 58:14-23; Lens Decl., Ex. 7 217:13-21; Lens Decl., Ex. 13 41:20-42:9; Lens Decl., Ex. 10 383:18-21; Lens Decl., Ex. 6 38:8-21; Lens Decl., Ex. 48 at 3; Lens Decl., Ex. 51 at 3; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 2 27:19-28:7, 56:2-57:7, 148:22-151:25, 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens Decl., Ex. 12 56:16-18, 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13 14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24; Lens Decl., Ex. 2 17:8-18:13, 24:17-23, 37:10-39:6; Lens Decl., Ex. 12 67:16-68:6; Lens Decl., Ex. 13 44:4-17; Lens Decl., Ex. 13 16:3-19; Lens Decl., Ex. 4 97:7-9, 93:23-94:5; Lens Decl., Ex. 2 80:24-81:12; 125:18-126:1; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 13 97:8-11; Lens Decl., Ex. 4 124:19-125:4,124:3-18; Thomas Decl. ¶¶ 7-8; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 2 141:25-142:15; Lens Decl., Ex. 4 125:15-18; Lens Decl., Ex. 2 292:18-293:4, 332:23-333:4; Lens Decl., Ex. 13 30:11-14, 58:13-21; Lens Decl., Ex. 39 at 5; Lens Decl., Ex. 57 at 3; Lens Decl., Ex. 68A-G; Lens Decl., Ex. 2 137: 8-16; Lens Decl., Ex. 10 396:1-10; Lens Decl., Ex. 6 40:14-20; Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7, 226:7-11, 249:7-9, 258:12-17, 290:2-5, 290:18-

22; Thomas Decl. ¶ 20. Further, this contention ignores that it was part of an artist's assignment from Marvel to populate stories with supporting characters, subject to Marvel's ultimate authority.  *See supra* Response No. 38, *citing* Toberoff Ex. 19 at 3-4; Lens Decl., Ex. 15 19:1-10; Lens Decl., Ex. 45 at 4; Lens Decl., Ex. 25; Lens Decl., Ex. 48 at 2; Lens Decl., Ex. 2 307:25-308:3; Lens Decl., Ex. 4 124:3-18; Lens Decl., Ex. 13 54:16-56:9, 72:21- 73:23, 79:3-19; Lens Decl., Ex. 12 55:4-15, 65:13-66:7.

This contention also ignores the circumstances in which the titular Spider-Man character first appeared in *Amazing Fantasy* No. 15. *See supra* Response No. 80, *citing* Lens Decl., Ex. 13 37:3-38:3, 334:14-18; Lens Decl., Ex. 48 at 3, 5; Lens Decl., Ex. 47 at 2; Lens Decl., Ex. 30 at 2; Lens Decl., Ex. 10 376:3-15; Lens Decl., Ex. 54 at 4; Lens Decl., Ex. 28; Lens Decl., Ex. 59 at 3; Lens Decl., Ex. 61 at 4; Lens Decl., Ex. 49 at 3; Thomas Decl. ¶ 21.

Finally, this contention ignores that each of these characters was first introduced before Lee and Ditko's working relationship evolved in 1965, well after the major characters were introduced and Lee, using his editorial discretion, afforded Ditko greater creative input, subject to Marvel's ultimate authority.  *See* Toberoff Ex. 60 (Aunt May's debut in 1962), Toberoff Ex. 78 (The Chameleon's debut in 1963), Toberoff Ex. 76 (Electro's debut in 1964), Toberoff Ex. 73 (Norman Osborn's debut in 1965); *see also infra* Response No. 92, *citing* Toberoff Ex. 82; Toberoff Ex. 26; Toberoff Ex. 19 at 3-4; Lens Decl., Ex. 71 at 3:25-6:09; Lens Decl., Ex. 15 19:1-10; Lens Decl., Ex. 45 at 4; Lens Decl., Ex. 25; Lens Decl., Ex. 48 at 2; Lens Decl., Ex. 2

307:25-308:3; Lens Decl., Ex. 4 124:3-18; Lens Decl., Ex. 13 54:16-56:9, 72:21-73:23, 79:3-19; Lens Decl., Ex. 12 55:4-15, 65:13-66:7.

Additionally, Toberoff Exhibit 75 **does not support** this contention, as nothing in it indicates that it contains "Norman Osborn's precursor," nor indicates that "corporate villainy" and "curled hairstyle" are "distinct" to Norman Osborn. Toberoff Exhibit 77 **does not support** this contention, as nothing in it indicates that the character was "the predecessor of Electro," a supervillain who had the power to absorb and control electricity and use it against his enemies. Toberoff Exhibit 79 **does not support** this contention, as nothing in it indicates that the elderly woman with white hair in the comic is "Aunt May's forerunner character." Toberoff Exhibit 79 also **does not support** this contention, as nothing in that exhibit indicates that the villain using different masks is "Chameleon['s] precursor." Toberoff Exhibit 86 **does not support** this contention, as they are simply pictures of "spiderweb-patterned wood blocks." Further, Toberoff Exhibits 75, 77, and 79 **do not support t**his contention because there is no evidence those characters were drawn by Ditko or, if so, that they were drawn prior to Ditko's contributions to Aunt May, Norman Osborn, Electro, the Chameleon, or any other Marvel character. Finally, Toberoff Exhibits 60, 76, and 78 **do not support** this contention, as they are simply copies of selected Marvel comics—none supports an inference that any characters therein "sprouted" from any earlier Ditko artwork.

Regardless, this contention is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See*

*Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).

Indeed, as *Kirby* held, "[q]uestions of who created the characters are mostly beside

the point," because "the hired party's ingenuity and acumen are a substantial reason

for the hiring party to have enlisted him." *Kirby*, 726 F.3d at 142.  What matters is

the hiring parties' "inducement, right to supervise, exercise of that right, and creative

contribution with respect to" the works.  *Id.*

   MCI also **objects** to Toberoff Exhibits 75, 77, 79, and 86.  *See* MCI's

Evidentiary Objection Nos. [59], [60], [61], & [65].

92. **Starting in at least early 1965 with the *Amazing Spider-Man* # 25 and *Strange Tales* # 135, respectively, and each issue thereafter until Ditko left in 1966, Ditko is publicly credited by Lee as originating and creating the plots of all the Spider-Man and Dr. Strange stories.** *See* Toberoff Decl. Ex. 71 at 159 (*Amazing Spider-Man* No. 25: "Sturdy Stevey Ditko dreamed up the plot of this tantalizing tale, and it's full of unexpected surprises!"); Ex. 72 at 225 (*Strange Tales* No. 135: "Plotted and Illustrated by Fandom's Favorite Fiend: Steve Ditko"); Ex. 82 (Lee explaining in January 9, 1966 published interview: "**I don't plot Spider-Man any more. Steve Ditko, the artist, has been doing the stories.** I guess I'll leave him alone until sales start to slip. Since Spidey got so popular, Ditko thinks he's the genius of the world. We were arguing so much over plot lines I told him to start making up his own stories. **He won't let anybody else ink his drawings either. He just drops off the finished pages with notes at the margins and I fill in the dialogue. I never know what he'll come up with next**, but it's interesting to work that way.") (emphasis added); Ex. 83 at 7 (same).

   **RESPONSE:  Disputed in part**, but **immaterial**.  MCI does not dispute that as

Defendant concedes in this paragraph, Stan Lee assigned Ditko to plot and illustrate

Spider-Man and Doctor Strange comics at some point in 1965 until Ditko left Marvel

sometime later that year.  However, MCI **disputes** Defendant's suggestion that, as a

result of Ditko's increased creative input, he "originat[ed] and create[ed] all the

plots."  As the evidence shows, Lee afforded Ditko greater creative input on Spider-

Man and Doctor Strange comics subject to Marvel's ultimate authority, after the

storylines and major characters were well-established, and at a time when such plots

arose out of and built upon preexisting Spider-Man and Doctor Strange stories.  *See* Toberoff Ex. 82 (Lee explaining in 1966 interview that "Since Spidey got so popular, Ditko thinks he's the genius of the world. We were arguing so much over plot lines I told him to start making up his own stories."); Toberoff Ex. 26 (Lee discussing Ditko's work on the *Amazing Spider-Man Annual* #2, a one-off special annual issue cover-dated October 1965, where "[t]o make it even more special," Lee "let Daring Ditko himself dream up the plot" as "Ditko was illustrating both Dr. Strange and Spidey" at the time."); Toberoff Ex. 19 at 3-4 (although Lee "was willing to go along with a lot of what Steve wanted to do," "Stan had the authority" and used it "when he felt he had to use it" because an explanation that "the artist wanted to do it that way" "would not have been a sufficient excuse for Martin Goodman."); Lens Decl., Ex. 71 at 3:25-6:09 (Lee explaining how Marvel's basic "formula" was to "mix fantasy with realism," creating characters that "are a little different . . . sort of like continuing soap operas"); *see also supra* Response No. 38, *citing* Lens Decl., Ex. 15 19:1-10; Lens Decl., Ex. 45 at 4; Lens Decl., Ex. 25; Lens Decl., Ex. 48 at 2; Lens Decl., Ex. 2 307:25-308:3; Lens Decl., Ex. 4 124:3-18; Lens Decl., Ex. 13 54:16-56:9, 72:21-73:23, 79:3-19; Lens Decl., Ex. 12 55:4-15, 65:13-66:7.

Regardless, this paragraph is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).  As Defendant concedes, this contention refers to when Ditko began plotting Marvel stories at some point in 1965, a period of time well after the major characters were

introduced, when Lee, using his editorial discretion, afforded Ditko greater creative

input.  The fact—if true—that Ditko thought about the development of Marvel's

characters and plots would simply be one of the reasons that Marvel hired him in the

first place. *See Kirby*, 726 F.3d at 142 ("[T]he hired party's ingenuity and acumen are

a substantial reason for the hiring party to have enlisted him[, and] [i]t makes little

sense to foreclose a finding that work is made for hire because the hired artist indeed

put his exceptional gifts to work for the party that contracted for their benefit."). And,

of course, Lee always retained editorial discretion, and could reject any "narrative"

put forth by Ditko. *See* Toberoff Ex. 19 at 3-4.

**93. Ditko plotted, penciled, and inked dozens of *Amazing Spider-Man* stories and *Dr. Strange* stories in *Strange Tales*, as evidenced by Marvels hundreds of reprint payments to Ditko.** *See* Toberoff Decl. Ex. 80 (Marvel reprint payments to Ditko for penciling, inking, and plotting *Amazing Spider-Man* and *Dr. Strange* stories); Ex. 81 (hundreds of reprint payments to Ditko for his plotting, penciling, and inking of *Strange Tales* (abbreviated "ST") *Dr. Strange* ("DRS") and *Amazing Spider-Man* ( "ASM") stories.

> **<u>RESPONSE</u>:  Undisputed**, except MCI **disputes** Defendant's suggestion that Ditko
>
> plotted "dozens" of Spider-Man stories and "dozens" of Strange Tales stories to the
>
> extent it ignores the timing and context in which Lee afforded Ditko greater creative
>
> input.
>
> As an initial matter, MCI notes that this paragraph underscores Ditko's close
>
> and continuous relationship with Marvel in the relevant time period, which suggests
>
> that the Works were done on a work-made-for-hire basis.  Indeed, as with Jack Kirby's
>
> work for Marvel, "most of [Ditko's] work during this period was published by Marvel
>
> and for established Marvel titles." *See Kirby*, 726 F.3d at 141.  When "[u]nderstood as
>
> products of this overarching relationship, [Ditko's] works during this period were
>
> hardly self-directed projects in which he hoped Marvel, as one of several potential

publishers, might have an interest; rather, he created the relevant works pursuant to Marvel's assignment or with Marvel specifically in mind."  *Id*. at 141.

Further, this contention ignores that while Ditko is credited with plotting 14 *Amazing Spider-Man* stories and 7 *Strange Tales* stories during part of 1965, this occurred after the storylines and major characters were well-established, and at a time when such plots arose out of and built upon preexisting Spider-Man and Doctor Strange stories.  *See supra* Response No. 92, *citing* Toberoff Ex. 82; Toberoff Ex. 26; Toberoff Ex. 19 at 3-4; Lens Decl., Ex. 71 at 3:25-6:09; Lens Decl., Ex. 15 19:1-10; Lens Decl., Ex. 45 at 4; Lens Decl., Ex. 25; Lens Decl., Ex. 48 at 2; Lens Decl., Ex. 2 307:25-308:3; Lens Decl., Ex. 4 124:3-18; Lens Decl., Ex. 13 54:16-56:9, 72:21-73:23, 79:3-19; Lens Decl., Ex. 12 55:4-15, 65:13-66:7.

This contention also ignores that Ditko admitted that he did not ink many of the Marvel stories he penciled, though he would have liked to.  *See* Lens Decl., Ex. 60 at 3 (Ditko remarking that "[e]ven some poor plots by Stan, others, incompetent inkers didn't sink my basic ideas for Doctor Strange"); Lens Decl., Ex. 45 at 3 (Ditko explaining that, if he had the choice, he would do both drawing and inking, rather than having "other people . . . ink [his] pencils"); Lens Decl., Ex. 59 at 3 (Ditko lamenting about "losing a consistent look having someone else ink Dr. Strange"); Lens Decl., Ex. 55 at 3 (Ditko writing that "Stan at one point wanted to drop Dr. Strange . . . I don't know why he had other artists ink him.  It may be he had inkers he wanted to keep and had to give them some work."); Lens Decl., Ex. 54 at 4 (Ditko complaining that "Stan had <u>others</u> ink some of my Dr. Strange stories.").

Regardless, this paragraph is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).  As Defendant concedes in paragraph 92, this contention refers to when Ditko began plotting Marvel stories at some point in 1965, a period of time well after the major characters were introduced, when Lee, using his editorial discretion, afforded Ditko greater creative input.  The fact—if true—that Ditko thought about the development of Marvel's characters and plots would simply be one of the reasons that Marvel hired him in the first place.  *See Kirby*, 726 F.3d at 142 ("[T]he hired party's ingenuity and acumen are a substantial reason for the hiring party to have enlisted him[, and] [i]t makes little sense to foreclose a finding that work is made for hire because the hired artist indeed put his exceptional gifts to work for the party that contracted for their benefit."). And, of course, Lee always retained editorial discretion, and could reject any "narrative" put forth by Ditko. *See* Toberoff Ex. 19 at 3-4.

MCI also **objects** to the evidence cited in support of this contention.  *See* MCI's Evidentiary Objection Nos. [62] & [63].

**94. Lee admitted and was open about the fact that Ditko had taken over the plotting, penciling, and inking of the stories, leaving Lee merely to input the dialogue based on Ditko's notes.** *See* Toberoff Decl. Ex. 82 (Lee explaining in January 9, 1966 published interview: "**I don't plot Spider-Man any more. Steve Ditko, the artist, has been doing the stories.** I guess I'll leave him alone until sales start to slip. Since Spidey got so popular, Ditko thinks he's the genius of the world. We were arguing so much over plot lines I told him to start making up his own stories. **He won't let anybody else ink his drawings either. He just drops off the finished pages with notes at the margins and I fill in the dialogue. I never know what he'll come up with next**, but it's interesting to work that way.") (emphasis added); Ex. 83 at 7 (same).

**RESPONSE:  Disputed in part,** but **immaterial**.  MCI does not dispute that as
Defendant concedes in paragraph 92, Stan Lee assigned Ditko to plot and illustrate
the Spider-Man and Doctor Strange comics at some point in 1965 until Ditko left
Marvel sometime later that year, subject to Marvel's ultimate authority.  *See supra*
Response No. 92, *citing* Toberoff Ex. 82; Toberoff Ex. 26; Toberoff Ex. 19 at 3-4;
Lens Decl., Ex. 71 at 3:25-6:09; Lens Decl., Ex. 15 19:1-10; Lens Decl., Ex. 45 at 4;
Lens Decl., Ex. 25; Lens Decl., Ex. 48 at 2; Lens Decl., Ex. 2 307:25-308:3; Lens
Decl., Ex. 4 124:3-18; Lens Decl., Ex. 13 54:16-56:9, 72:21- 73:23, 79:3-19; Lens
Decl., Ex. 12 55:4-15, 65:13-66:7.

However, MCI **disputes** Defendants' suggestion that Lee was left "merely to
input the dialogue based on Ditko's notes."  Although Ditko would sometimes write
"margin notes" that helped explain his penciled artwork, Marvel's editors Stan Lee
and Roy Thomas were free to, and often did, disregard such margin notes, which
were often highly conclusory in any event.  *See* Toberoff Ex. 19 at 4-5 (Thomas
explaining that "Stan wanted the artists to tell what was going on," as early artwork
was "sketchy" with "very loose" pencils, but noting that "Stan would take what he
wanted from that, and felt no obligation to take any more"); Lens Opp. Decl., Ex. 84
87:11-90:4 (Thomas testifying that Ditko would include just "a couple of words" so
Thomas "knew what was going on" since Ditko would draw "very, very rough
pencil" art at this stage); Toberoff Ex. 18 at 3-8 (sample Ditko notes such as "Found
Place to hide—must move fast" and "They're on the roof now").

MCI also **disputes** Defendant's suggestion that, after Lee assigned Ditko to
plot Spider-Man and Doctor Strange comics, Ditko's work for Marvel was not

subject to Marvel's ultimate authority.  *See supra* Response No. 92, *citing* Toberoff Ex. 82; Toberoff Ex. 26; Toberoff Ex. 19 at 3-4; Lens Decl., Ex. 71 at 3:25-6:09; Lens Decl., Ex. 15 19:1-10; Lens Decl., Ex. 45 at 4; Lens Decl., Ex. 25; Lens Decl., Ex. 48 at 2; Lens Decl., Ex. 2 307:25-308:3; Lens Decl., Ex. 4 124:3-18; Lens Decl., Ex. 13 54:16-56:9, 72:21- 73:23, 79:3-19; Lens Decl., Ex. 12 55:4-15, 65:13-66:7. MCI thus **disputes** that any plotting by Ditko is an indicium that the works were not works made for hire.

Regardless, this paragraph is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).  To the extent Defendant is referring to when Ditko began plotting Marvel stories, a period of time well after the major characters were introduced, when Lee, using his editorial discretion, afforded Ditko greater creative input, the fact—if true—that Ditko thought about the development of Marvel's characters and plots would simply be one of the reasons that Marvel hired him in the first place. *See Kirby*, 726 F.3d at 142 ("[T]he hired party's ingenuity and acumen are a substantial reason for the hiring party to have enlisted him[, and] [i]t makes little sense to foreclose a finding that work is made for hire because the hired artist indeed put his exceptional gifts to work for the party that contracted for their benefit."). And, of course, Lee always retained editorial discretion, and could reject any "narrative" put forth by Ditko. *See* Toberoff Ex. 19 at 3-4 (although Lee "was willing to go along with a lot of what Steve wanted to do," "Stan had the authority" and used it "when he felt he had to use it" because an

explanation that "the artist wanted to do it that way" "would not have been a sufficient excuse for Martin Goodman.").

95. **Lee also acknowledged that he would "take any credit that isn't nailed down."** *See* Toberoff Decl. Ex. 87 ("Stan writes in 'Stan Lee's Soapbox' 'You know me, I'll take any credit that isn't nailed down'").

> **<u>RESPONSE</u>:  Disputed**, but **immaterial**.  MCI **disputes** this contention, and Defendant cites no admissible evidence supporting it.  Throughout the relevant time period, Lee credited Ditko for his work on Spider-Man, Doctor Strange, and other stories in *Strange Tales*.  *See* Lens Decl., Exs. 31A-H (reflecting credits for Ditko's contributions to the Works); Toberoff Ex. 71 at 159; Toberoff Ex. 72 at 225; Toberoff Ex. 82; Toberoff Ex. 83 at 7.
>
> Regardless, this contention is **immaterial** as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms "general attacks on Lee's honesty or credibility, without more, are insufficient to raise a genuine issue of fact—especially since many matters about which Lee testified are corroborated by testimony from other freelance artists and writers."  *See Kirby*, 777 F. Supp. 2d at 736; *see also Island Software*, 413 F.3d at 261 ("Broad, conclusory attacks on the credibility of a witness will not, by themselves, present questions of material fact" for trial); *Britton*, 523 U.S. at 600 (where, like here, "the [movant] has made a properly supported [summary judgment] motion, the plaintiff may not respond simply with general attacks upon the [witness's] credibility, but rather must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden").
>
> This contention is also **immaterial** because it refers at least in part to events outside the relevant time period and, in any event, has no bearing on the Court's

application of the work-made-for-hire test, as this Court's grant of summary

judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See*

*Kirby*, 777 F. Supp. 2d at 748 (rejecting evidence from outside "the relevant time

period" as "not admissible evidence of anything"); *Kirby*, 726 F.3d at 139-40

(relevant principles of the instance-and-expense test).

MCI also **objects** to the evidence cited in support of this contention.  *See*

MCI's Evidentiary Objection No. [66].

**96. Lee and Colan published a comic story exemplifying a Lee "plotting conference" in which Lee had essentially no story ideas.** *See* Toberoff Decl. Ex. 97 at 3.

**RESPONSE:  Disputed**, but **immaterial**.  MCI **disputes** that this plainly satirical

two-page comic book story "exemplifies a Lee 'plotting conference' in which Lee

had essentially no story ideas" or otherwise accurately represents Stan Lee's plotting

conferences with Marvel artists, including Colan and Ditko.  Instead, Toberoff

Exhibit 97 is just one of several satirical pieces poking fun at Marvel's jovial working

environment.  *See, e.g.*, Lens Reply Decl., Ex. 115 at 5-6 (transcription of the 1965

recording of "The Voices of Marvel," a satirical recording of Marvel's bullpen in

which Lee jokes that Ditko did not appear because he had "mike fright" and leapt

"[o]ut the window again" to avoid speaking.)

Moreover, as the evidence shows, Lee and Colan's plotting conferences—like

Lee and Ditko's—were detailed and "collaborative."  *See* Lens Reply Decl., Ex. 108

at 121:6-20 (Colan testifying that Lee would provide plots comprised of " a few

paragraphs," including "a beginning, a middle, and an end"); Lens Reply Decl., Ex.

111 at 4 (Lee explaining, "In the case of Gene Colan, I'll write maybe a page of notes

from myself, including all of the things I want to discuss. Then I will phone Gene and he puts his tape recorder against the phone and I discuss the story with him"); Lens Reply Decl., Ex. 112 at 5 (Colan discussing how he'd record plotting sessions with Stan Lee); Lens Decl., Ex. 20 at 2 ("Stan would call every month for more than 18 years to briefly outline a plot over the phone."); Lens Reply Decl., Ex. 101 at 112:20-114:19 (Thomas recounting Stan Lee's telephonic plotting sessions with Gene Colan); Lens Decl., Ex. 48 at 2 (Ditko writing that "Stan provided the plot ideas. There would be a discussion to clear up anything, consider plot options and so forth. I would then do the panel/page breakdowns, pencil the visual story continuity, and, on a separate paper, provide a very rough panel dialogue, merely as a guide for Stan. We would go over the penciled story/art pages and I would explain any deviations, changes, and additions, noting anything to be corrected before or during the inking."); Lens Decl., Ex. 4 124:3-18 (Lee testifying about his collaboration with Ditko on Amazing Fantasy).

MCI also **disputes** that "Lee and Colan published a comic story." Indeed, the record reflects that the cited material was—like the Works—published by one of Martin Goodman's various comic book entities, Olympia Publications, Inc., which conducted business as "Marvel" or "Marvel Comics Group."  *See* Lens Reply Decl., Ex. 114 at 3 ("DAREDEVIL is published by OLYMPIA PUBLICATIONS, INC . . . Martin Goodman, Publisher."); *see also* Lens Decl., Ex. 75 (Goodman certifying as president of Olympia Publications, Inc. that it did business as "Marvel"); Lens Decl., Ex. 76 (same for "Marvel Comics Group").

Regardless, this contention is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test). Indeed, while Lee almost always provided plot synopses to artists, doing so is not necessary to satisfy the instance and expense test. *Id*.

MCI also **objects** to the evidence cited in support of this contention. *See* MCI's Evidentiary Objection No. [74].

**97. Lee established POW! in 2001 to produce films and television, and POW! has had a "first look" deal with Disney since 2006.** *See* Toberoff Decl. Ex. 5 at 213:14-17; 228:7- 12; Ex. 88; Ex. 89.

<u>**RESPONSE:**</u>  **Disputed**, but **immaterial**.  MCI **disputes** Defendant's contention that Lee established POW! in 2001, as none of Defendant's evidence supports that contention, and Lee testified that POW! was established "about six years ago" during his December 7, 2010 deposition in *Kirby*, which suggests POW! may have be formed in or around 2004.  *See* Lens Reply Decl., Ex. 104 at 211:14-17.  In any event, Lee testified that he "d[id]n't read" any POW! contracts.  *See* Lens Reply Decl., Ex. 104 at 212:21-213:2.

Moreover, Lee has testified consistently in several Marvel cases over the past few decades, including before POW! had any purported "'first look' deal" with "Disney."  Indeed, in a 2003 contractual dispute against Marvel, Lee testified that as editor, he (with Martin Goodman) determined what Marvel would publish, hired the individuals that would contribute to its publications, provided direction on how to develop a story "the way [he] wanted," and otherwise supervised freelancers to "make sure that the work was as good as it could be."  *See* Lens Reply Decl., Ex. 106

13:4-14:20, 16:3-19.  Lee also testified about how he employed the Marvel Method and how he worked with certain artists "more than others," including Ditko.   Lens Reply Decl., Ex. 106 27:13-28:18, 19:1-10.  And Lee further testified that he, like all freelancers, was paid a set per-page rate for his written work and generally understood that he didn't "own" his work for Marvel.  *See* Lens Reply Decl., Ex. 106 17:2-8, 26:16-27:12.  Moreover, Lee later affirmed his 2003 testimony during his May 13, 2010 *Kirby* deposition (at which Defendant's Counsel was present), testifying that it was "truthful testimony" that was "consistent with his current recollection" and reaffirming that he "always felt the company did" "own[] the characters."  *See* Lens Reply Decl., Ex. 105 at 100:25-102:24.

MCI also **disputes** that this contention is proper, as Defendant violated the protective order by publicly quoting and/or summarizing in this contention agreements and testimony designated "Confidential" by MCI.  *See* Dkt. 34 ¶¶ 2.14, 3, 12.3 (restricting the use of "excerpts" and "summaries" of material "designated as 'CONFIDENTIAL," which should be "file[d] under seal").  And Defendant certainly understood this:  Defendant filed the underlying agreements and testimony regarding the terms of those confidential agreements under seal but then improperly proceeded to quote or otherwise summarize the contents of this same Confidential material in this contention.

Further still, this contention is **immaterial** because the relationship between POW! and Disney (if one were established with evidence) could only be relevant to suggesting that Stan Lee lacks credibility, but "general attacks on Lee's honesty or credibility, without more, are insufficient to raise a genuine issue of fact—especially

since many matters about which Lee testified are corroborated by testimony from other freelance artists and writers." *See Kirby*, 777 F. Supp. 2d at 736; *see also Island Software*, 413 F.3d at 261 ("Broad, conclusory attacks on the credibility of a witness will not, by themselves, present questions of material fact" for trial); *Britton*, 523 U.S. at 600 (where, like here, "the [movant] has made a properly supported [summary judgment] motion, the plaintiff may not respond simply with general attacks upon the [witness's] credibility, but rather must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden.").

This contention is also **immaterial** because it refers at least in part to events outside the relevant time period and, in any event, has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 777 F. Supp. 2d at 748 (rejecting evidence from outside "the relevant time period" as "not admissible evidence of anything"); *Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).

MCI also objects to Toberoff Exhibits 88 and 89. *See* MCI's Evidentiary Objection Nos. [67] & [68].

98. **POW! can hardly be viewed as successful. In a decade it did not produce a single theatrical film or scripted live-action TV show, only a small animated show.** *See* Toberoff Decl. Ex. 5 at 230:14-232:2.

> **RESPONSE:  Disputed**, but **immaterial**.  MCI **disputes** the suggestion that in "a decade" POW! "did not produce a single theatrical film or scripted live-action TV show, only an animated show," as none of the evidence Defendant cites supports that conclusion.  At the time of his December 7, 2010 deposition in *Kirby*, POW!, when it likely existed for approximately 6 years, Lee testified POW! was "in the process now

of having scripts written for theatrical motion" pictures, which is "a slow process." *See* Toberoff Ex. 5 230:9-13.  By the end of 2010, Lee also testified that POW! had already produced a theatrically released a motion picture in Japan, which Lee expected "w[ould] come over here [to the United States] pretty soon." *Id*. at 231:12-20.  On top of that, Lee explained that POW! was "developing two other[]" motion pictures.  *Id*. at 231:12-20.  POW! also produced a "cross between a comic book and an animated cartoon" consisting of "around ten" episodes, which it "intend[ed] eventually to turn into a movie" and "a video game."  *Id*. at 232:6-233:25.

Moreover, Lee has testified consistently in several Marvel cases over the past few decades, including before POW! had any purported "'first look' deal" with "Disney."  Indeed, in a 2003 contractual dispute against Marvel, long POW! had any purported "'first look' deal with "Disney," Lee testified that as editor, he (with Martin Goodman) determined what Marvel would publish, hired the individuals that would contribute to its publications, provided direction on how to develop a story "the way [he] wanted," and otherwise supervised freelancers to "make sure that the work was as good as it could be."  *See* Lens Reply Decl., Ex. 106 13:4-14:20, 16:3-19.  Lee also testified about how he employed the Marvel Method and how he worked with certain artists "more than others," including Ditko.  Lens Reply Decl., Ex. 106  27:13-28:18, 19:1-10.  And Lee further testified that he, like all freelancers, was paid a set per-page rate for his written work and generally understood that he didn't "own" his work for Marvel.  *See* Lens Reply Decl., Ex. 106 17:2-8, 26:16-27:12.  Moreover, Lee later affirmed his 2003 testimony during his May 13, 2010 *Kirby* deposition (at which Defendant's Counsel was present), testifying that it was "truthful testimony" that was

"consistent with his current recollection" and reaffirming that he "always felt the company did" "own[] the characters."  *See* Lens Reply Decl., Ex. 105 at 100:25-102:24.

MCI further **disputes** this contention because it improperly lifts legal argument verbatim from Defendant's opposition brief.  *See All. Sec. Prod., Inc. v. Fleming Co.*, 471 F. Supp. 2d 452, 454 (S.D.N.Y. 2007) (Kaplan, J.) ("[L]egal arguments, which are plentiful in plaintiff's counter-statement, belong in briefs, not Rule 56.1 statements, and so are disregarded in determining whether there are genuine issues of material fact."); *Goldstick v. The Hartford, Inc.*, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (Kaplan, J.) ("Rule 56.1 statements are not argument.  They should not contain conclusions, and they should be neither the source nor the result of 'cut-and-paste' efforts with the memorandum of law.").

MCI also **disputes** that this contention is proper, as Defendant violated the protective order by publicly quoting and/or summarizing in this contention testimony designated "Confidential" by MCI.  *See* Dkt. 34 ¶¶ 2.14, 3, 12.3 (restricting the use of "excerpts" and "summaries" of material "designated as 'CONFIDENTIAL,;" which should be "file[d] under seal").  And Defendant certainly understood this:  Defendant filed the testimony under seal but then improperly proceeded to quote or otherwise summarize the contents of this same Confidential material in this contention.

Further still, this contention is **immaterial** because the relationship between POW! and Disney (if one were established with evidence) could only be relevant to suggesting that Stan Lee lacks credibility, but "general attacks on Lee's honesty or credibility, without more, are insufficient to raise a genuine issue of fact—especially

since many matters about which Lee testified are corroborated by testimony from other freelance artists and writers." *See Kirby*, 777 F. Supp. 2d at 736; *see also Island Software*, 413 F.3d at 261 ("Broad, conclusory attacks on the credibility of a witness will not, by themselves, present questions of material fact" for trial); *Britton*, 523 U.S. at 600 (where, like here, "the [movant] has made a properly supported [summary judgment] motion, the plaintiff may not respond simply with general attacks upon the [witness's] credibility, but rather must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden.").

This contention is also **immaterial** because it refers at least in part to events outside the relevant time period and, in any event, has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 777 F. Supp. 2d at 748 (rejecting evidence from outside "the relevant time period" as "not admissible evidence of anything"); *Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).

99. **On December 31, 2009, shortly after the Kirby family served notices of termination and just before Marvel filed its lawsuit against them, Disney bought a 10% stake in POW! for $2,500,000.** *See* Toberoff Decl. Ex 90 at 1.

> **RESPONSE:  Disputed in part,** but **immaterial**.  MCI **disputes** this contention in part, as Defendant cites no evidence to support it.  Toberoff Exhibit 90 **does not support** this contention as it shows only that an entity called "Catalyst Investments, LLC," whose sole member is The Walt Disney Company, purchased 13,172,153 shares of POW! but mentions nothing about the percentage share of the company Catalyst purchased.

MCI further **disputes** Defendant's suggestion that "Disney" buying stock in POW! was at all related to "the Kirby family serv[ing] notices of termination" and "Marvel fil[ing] its lawsuit against them," for which there is no evidentiary support. Indeed, Defendant ignores that on December 31, 2009—the same day that Catalyst Investments, LLC purchased a stake in POW!—The Walt Disney Company completed its purchase of Marvel.  Moreover, Lee has testified consistently in several Marvel cases over the past few decades, including before "Disney bought a 10% stake in POW!"  Indeed, in a 2003 contractual dispute against Marvel, Lee testified that as editor, he (with Martin Goodman) determined what Marvel would publish, hired the individuals that would contribute to its publications, provided direction on how to develop a story "the way [he] wanted," and otherwise supervised freelancers to "make sure that the work was as good as it could be."  *See* Lens Reply Decl., Ex. 106 13:4-14:20, 16:3-19.  Lee also testified about how he employed the Marvel Method and how he worked with certain artists "more than others," including Ditko. Lens Reply Decl., Ex. 106 27:13-28:18, 19:1-10.  And Lee further testified that he, like all freelancers, was paid a set per-page rate for his written work and generally understood that he didn't "own" his work for Marvel.  *See* Lens Reply Decl., Ex. 106 17:2-8, 26:16-27:12.  Moreover, Lee later affirmed his 2003 testimony during his May 13, 2010 *Kirby* deposition (at which Defendant's Counsel was present), testifying that it was "truthful testimony" that was "consistent with his current recollection" and reaffirming that he "always felt the company did" "own[] the characters."  *See* Lens Reply Decl., Ex. 105 at 100:25-102:24.

MCI also **disputes** that this contention is proper, as Defendant violated the protective order by publicly quoting and/or summarizing in this contention an agreement designated "Confidential" by MCI.  *See* Dkt. 34 ¶¶ 2.14, 3, 12.3 (restricting the use of "excerpts" and "summaries" of material "designated as 'CONFIDENTIAL," which should be "file[d] under seal").  And Defendant certainly understood this:  Defendant filed the underlying agreement under seal but then improperly proceeded to quote or otherwise summarize the contents of this same Confidential material in this contention.

Further still, this contention is **immaterial** because the relationship between POW! and Disney (if one were established with evidence) could only be relevant to suggesting that Stan Lee lacks credibility, but "general attacks on Lee's honesty or credibility, without more, are insufficient to raise a genuine issue of fact—especially since many matters about which Lee testified are corroborated by testimony from other freelance artists and writers."  *See Kirby*, 777 F. Supp. 2d at 736; *see also Island Software*, 413 F.3d at 261 ("Broad, conclusory attacks on the credibility of a witness will not, by themselves, present questions of material fact" for trial); *Britton*, 523 U.S. at 600 (where, like here, "the [movant] has made a properly supported [summary judgment] motion, the plaintiff may not respond simply with general attacks upon the [witness's] credibility, but rather must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden.").

This contention is also **immaterial** because it refers at least in part to events outside the relevant time period and, in any event, has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary

judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See*

*Kirby*, 777 F. Supp. 2d at 748 (rejecting evidence from outside "the relevant time

period" as "not admissible evidence of anything"); *Kirby*, 726 F.3d at 139-40

(relevant principles of the instance-and-expense test).

     MCI also **objects** to the evidence cited in support of this contention. *See*

MCI's Evidentiary Objection No. [69].

**100. On December 18, 2009, Disney also gratuitously extended Lee's deal to January 1, 2015, even though it had just been extended the year before and was not due to expire, and Disney quadrupled POW's compensation.** *See* Toberoff Decl. Ex. 89; Ex. 91 ¶ 2.

     <u>**RESPONSE:**</u>  **Disputed**, but **immaterial**.  MCI **disputes** this contention, as

Defendant cites no evidence to support it.  Toberoff Exhibit 89 **does not support** this

contention because it provides that Lee's contract was set to expire in less than six

months, so the extension was not "gratuitous" but rather timely, and it did not

increase POW!'s "compensation" but rather provided additional "overhead

allowance" for project development.  *See* Toberoff Ex. 89 ¶ 2 & Ex. 91 ¶ 5.

     Moreover, Lee has testified consistently in several Marvel cases over the past

few decades, including before "Disney [] gratuitously extended Lee's deal."  Indeed,

in a 2003 contractual dispute against Marvel, Lee testified that as editor, he (with

Martin Goodman) determined what Marvel would publish, hired the individuals that

would contribute to its publications, provided direction on how to develop a story

"the way [he] wanted," and otherwise supervised freelancers to "make sure that the

work was as good as it could be."  *See* Lens Reply Decl., Ex. 106 13:4-14:20, 16:3-

19.  Lee also testified about how he employed the Marvel Method and how he

worked with certain artists "more than others," including Ditko.  Lens Reply Decl.,

Ex. 106 27:13-28:18, 19:1-10.  And Lee further testified that he, like all freelancers,

was paid a set per-page rate for his written work and generally understood that he

didn't "own" his work for Marvel.  *See* Lens Reply Decl., Ex. 106 17:2-8, 26:16-

27:12.  Moreover, Lee later affirmed his 2003 testimony during his May 13, 2010

*Kirby* deposition (at which Defendant's Counsel was present), testifying that it was

"truthful testimony" that was "consistent with his current recollection" and

reaffirming that he "always felt the company did" "own[] the characters."  *See* Lens

Reply Decl., Ex. 105 at 100:25-102:24.

MCI also **disputes** this contention because it improperly lifts legal argument

verbatim from Defendant's opposition brief.  *See All. Sec. Prod., Inc. v. Fleming Co.*,

471 F. Supp. 2d 452, 454 (S.D.N.Y. 2007) (Kaplan, J.) ("[L]egal arguments, which

are plentiful in plaintiff's counter-statement, belong in briefs, not Rule 56.1

statements, and so are disregarded in determining whether there are genuine issues of

material fact."); *Goldstick v. The Hartford, Inc.*, 2002 WL 1906029, at *1 (S.D.N.Y.

Aug. 19, 2002) (Kaplan, J.) ("Rule 56.1 statements are not argument.  They should

not contain conclusions, and they should be neither the source nor the result of 'cut-

and-paste' efforts with the memorandum of law.").

MCI also **disputes** that this contention is proper, as Defendant violated the

protective order by publicly quoting and/or summarizing in this contention

agreements designated "Confidential" by MCI.  *See* Dkt. 34 ¶¶ 2.14, 3, 12.3

(restricting the use of "excerpts" and "summaries" of material "designated as

'CONFIDENTIAL," which should be "file[d] under seal").  And Defendant certainly

understood this:  Defendant filed the underlying agreements under seal but then

improperly proceeded to quote or otherwise summarize the contents of this same Confidential material in this contention.

Regardless, this contention is **immaterial** because the relationship between POW! and Disney (if one were established with evidence) could only be relevant to suggesting that Stan Lee lacks credibility, but "general attacks on Lee's honesty or credibility, without more, are insufficient to raise a genuine issue of fact—especially since many matters about which Lee testified are corroborated by testimony from other freelance artists and writers." *See Kirby*, 777 F. Supp. 2d at 736; *see also Island Software*, 413 F.3d at 261 ("Broad, conclusory attacks on the credibility of a witness will not, by themselves, present questions of material fact" for trial); *Britton*, 523 U.S. at 600 (where, like here, "the [movant] has made a properly supported [summary judgment] motion, the plaintiff may not respond simply with general attacks upon the [witness's] credibility, but rather must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden.").

This contention is also **immaterial** because it refers at least in part to events outside the relevant time period and, in any event, has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 777 F. Supp. 2d at 748 (rejecting evidence from outside "the relevant time period" as "not admissible evidence of anything"); *Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).

MCI also **objects** to the evidence cited in support of this contention. *See* MCI's Evidentiary Objection Nos. [68] & [70].

101. **Under this 2009 amendment, POW! is to receive a minimum of $11,000,000 over five years, even if it produces no films or television shows.** *See* Toberoff Decl. Ex. 91 ¶¶ 2, 5-6, 8.

> **RESPONSE:  Disputed**, but **immaterial**.  MCI **disputes** Defendant's contention that under the 2009 amendment "POW! is to receive a minimum of $11,000,000 over five years, even if it produces no films of television shows," as the 2009 amendment does not guarantee receipt of those amounts—especially if POW! does not produce no films or televisions shows.  The 2009 amendment guarantees POW! $2,200,000 over five years, and provides for additional amounts only if Stan Lee is available to render consulting services and/or "overhead expenses" are actually "incurred" in connection with developing media under the amended agreement.  *See* Toberoff Decl. Ex. 91 ¶¶ 5-6.
>
> Moreover, Lee has testified consistently in several Marvel cases over the past few decades, including before this "2009 amendment."  Indeed, in a 2003 contractual dispute against Marvel, Lee testified that as editor, he (with Martin Goodman) determined what Marvel would publish, hired the individuals that would contribute to its publications, provided direction on how to develop a story "the way [he] wanted," and otherwise supervised freelancers to "make sure that the work was as good as it could be."  *See* Lens Reply Decl., Ex. 106 13:4-14:20, 16:3-19.  Lee also testified about how he employed the Marvel Method and how he worked with certain artists "more than others," including Ditko.   Lens Reply Decl., Ex. 106 27:13-28:18, 19:1-10.  And Lee further testified that he, like all freelancers, was paid a set per-page rate for his written work and generally understood that he didn't "own" his work for Marvel.  *See* Lens Reply Decl., Ex. 106 17:2-8, 26:16-27:12.  Moreover, Lee later affirmed his 2003 testimony during his May 13, 2010 *Kirby* deposition (at which

Defendant's Counsel was present), testifying that it was "truthful testimony" that was "consistent with his current recollection" and reaffirming that he "always felt the company did" "own[] the characters."  *See* Lens Reply Decl., Ex. 105 at 100:25-102:24.

MCI also **disputes** that this contention is proper, as Defendant violated the protective order by publicly quoting and/or summarizing in this contention an agreement designated "Confidential" by MCI.  *See* Dkt. 34 ¶¶ 2.14, 3, 12.3 (restricting the use of "excerpts" and "summaries" of material "designated as 'CONFIDENTIAL,'" which should be "file[d] under seal").  And Defendant certainly understood this:  Defendant filed the underlying agreement under seal but then improperly proceeded to quote or otherwise summarize the contents of this same Confidential material in this contention.

Regardless, this contention is **immaterial** because the relationship between POW! and Disney (if one were established with evidence) could only be relevant to suggesting that Stan Lee lacks credibility, but "general attacks on Lee's honesty or credibility, without more, are insufficient to raise a genuine issue of fact—especially since many matters about which Lee testified are corroborated by testimony from other freelance artists and writers."  *See Kirby*, 777 F. Supp. 2d at 736; *see also Island Software*, 413 F.3d at 261 ("Broad, conclusory attacks on the credibility of a witness will not, by themselves, present questions of material fact" for trial); *Britton*, 523 U.S. at 600 (where, like here, "the [movant] has made a properly supported [summary judgment] motion, the plaintiff may not respond simply with general

attacks upon the [witness's] credibility, but rather must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden.").

This contention is also **immaterial** because it refers at least in part to events outside the relevant time period and, in any event, has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 777 F. Supp. 2d at 748 (rejecting evidence from outside "the relevant time period" as "not admissible evidence of anything"); *Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).

MCI also **objects** to the evidence cited in support of this contention. *See* MCI's Evidentiary Objection No. [70].

**102. Lee testified on direct examination that Marvel's checks always had "work for hire" language on the back and on June 11, 2007 Lee signed under oath an affidavit for Marvel stating: "I received checks from Timely and its successors that bore a legend acknowledging that the payment was for 'works for hire'" for works published in the 1950s and 1960s, and that he "can recall no checks that [he] received that did not bear this legend."** *See* Toberoff Decl. Ex. 4 at 28:20-29:11; Ex. 92 ¶ 13; Ex. 93 ¶ 2.

**RESPONSE:** **Disputed in part**, but **immaterial**. While MCI does not dispute that Lee testified in his *Kirby* deposition that he received checks from Marvel with "work for hire" language on the back, MCI **disputes** the contention that Lee testified that such checks "always" had this language on the back. Rather, consistent with what Lee stated in his June 11, 2007 affidavit, Lee testified that he "[f]or years" received checks bearing such a legend. *See* Toberoff Ex. 4 at 28:20-29:3.

This contention is also **immaterial** because the existence or non-existence of check legends has no bearing on the Court's application of the work-made-for-hire test, as the Second Circuit already held with respect to this same evidence. *See Kirby*, 777 F.

Supp. 2d at 748 (rejecting evidence from outside "the relevant time period" as "not admissible evidence of anything"); *Kirby*, 726 F.3d at 143 ("[W]e decline to infer from Marvel's suspenders that it had agreed to give Kirby its belt.").

103. **Lee's testimony contradicts all the record evidence.** *See* Toberoff Decl. Ex. 45; Ex. 94 at Ex. C; Ex. 8 ¶¶ 13-14; Ex. 11 ¶ 12; Ex. 10 ¶ 14; Ex. 9 ¶ 12; Ex. 13 ¶¶ 14-15.

> <u>**RESPONSE:**</u>  **Disputed**, but **immaterial**.  MCI **disputes** Defendant's contention that Lee's testimony contradicts "all the record evidence," as there is no "record evidence."  No checks from the relevant time period were produced, no witness was able to identify the precise language contained in the legends, and the two post-relevant time period checks proffered by Defendant do not establish the nature of any legends during the relevant time period.  Indeed, Defendant's own witness testified over a decade ago that the paychecks he received from Marvel were "stamped work for hire[,] [a] little stamp on the opposite side I think said work for hire." Lens Opp. Decl., Ex. 89 82:3-23.  As Mr. Steranko explained, "[w]hen [he] worked at Marvel, [he] was on a work for hire basis," which he understood based on his "experience at Marvel," as Marvel "provided him with [a] description of the character," gave him "treatment[s] [or] synops[e]s of the material that they were looking for," "supervis[ed]" him, and "stamped [his checks] work for hire." *Id*.  Accordingly, Toberoff Exhibit 9 **does not support** this contention, because as explained above, Mr. Steranko testified that his checks were stamped with work-for-hire language when he was retained as an expert witness for Defendant's counsel.  And after Marvel "editted [sic] some of [his] work" and "changed certain things that [he] didn't feel should be changed," Steranko, like Ditko, who "faced the same frustrations," left Marvel.  Lens Opp. Decl., Ex. 95 at 4-5.  Toberoff Exhibit 13 also **does not support**

this contention, as it pertains to a period of time beginning in the late 1960s.  And Toberoff Exhibits 45 and 94 **do not support** this contention, as the checks post-date the relevant time period.

MCI also **disputes** this contention because it improperly lifts legal argument verbatim from Defendant's opposition brief.  *See All. Sec. Prod., Inc. v. Fleming Co.*, 471 F. Supp. 2d 452, 454 (S.D.N.Y. 2007) (Kaplan, J.) ("[L]egal arguments, which are plentiful in plaintiff's counter-statement, belong in briefs, not Rule 56.1 statements, and so are disregarded in determining whether there are genuine issues of material fact."); *Goldstick v. The Hartford, Inc.*, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (Kaplan, J.) ("Rule 56.1 statements are not argument.  They should not contain conclusions, and they should be neither the source nor the result of 'cut-and-paste' efforts with the memorandum of law.").

This contention is also **immaterial** because the existence or non-existence of check legends has no bearing on the Court's application of the work-made-for-hire test, as the Second Circuit already held with respect to this same evidence.  *See Kirby*, 777 F. Supp. 2d at 748 (rejecting evidence from outside "the relevant time period" as "not admissible evidence of anything," and holding that "one cannot infer what might have been written on a check issued in 1958 from what was written on an analogous check fifteen years later.  For that reason alone, the 1973 and 1974 checks do not raise any genuine issue of fact that tends to contradict the work-for-hire presumption."); *Kirby*, 726 F.3d at 143 ("[W]e decline to infer from  Marvel's suspenders that it had agreed to give Kirby its belt."); *see also id.* at 139-40 (relevant principles of the instance-and-expense test).

MCI also **objects** to the evidence cited in support of this contention.  *See* MCI's

Evidentiary Objection Nos. [11], [12], [13], [14], [16], [46] & [71].

104. **On cross, Lee was forced to admit that, as late as 1974, Marvel's checks contained "assignment" language, _not_ "work for hire" language and that he did not know when the "work for hire" legend first appeared.** *See* Toberoff Decl. Ex. 5 at 276:12-278:1; 280:21-281:12; Ex. 95 at 141:9-142:21.

> <u>**RESPONSE:**</u>  **Disputed**, but **immaterial**.  While MCI does not dispute that, after
>
> being shown a 1974 check from Marvel to Richard B. Ayers at his December 7, 2010
>
> *Kirby* deposition, Lee testified that the check did not contain "work for hire"
>
> language, MCI **disputes** Defendant's argumentative characterization that "Lee was
>
> forced to admit" that Marvel checks contained assignment language.  Toberoff
>
> Exhibit 95 **does not support** this contention, as Evanier is simply opining on Lee's
>
> credibility, which is not admissible evidence of anything.  *See Kirby*, 777 F. Supp. 2d
>
> at 730 (rejecting the very same testimony as in "purporting to opine on the credibility
>
> of Lee's testimony, Evanier has improperly usurped the role of the jury.").  Moreover,
>
> "general attacks on Lee's honesty or credibility, without more, are insufficient to
>
> raise a genuine issue of fact—especially since many matters about which Lee testified
>
> are corroborated by testimony from other freelance artists and writers."  *See Kirby*,
>
> 777 F. Supp. 2d at 736; *see also Island Software*, 413 F.3d at 261 ("Broad,
>
> conclusory attacks on the credibility of a witness will not, by themselves, present
>
> questions of material fact" for trial); *Britton*, 523 U.S. at 600 (where, like here, "the
>
> [movant] has made a properly supported [summary judgment] motion, the plaintiff
>
> may not respond simply with general attacks upon the [witness's] credibility, but
>
> rather must identify affirmative evidence from which a jury could find that the
>
> plaintiff has carried his or her burden.").

MCI also **disputes** this contention because it improperly lifts legal argument verbatim from Defendant's opposition brief.  *See All. Sec. Prod., Inc. v. Fleming Co.*, 471 F. Supp. 2d 452, 454 (S.D.N.Y. 2007) (Kaplan, J.) ("[L]egal arguments, which are plentiful in plaintiff's counter-statement, belong in briefs, not Rule 56.1 statements, and so are disregarded in determining whether there are genuine issues of material fact."); *Goldstick v. The Hartford, Inc.*, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (Kaplan, J.) ("Rule 56.1 statements are not argument.  They should not contain conclusions, and they should be neither the source nor the result of 'cut-and-paste' efforts with the memorandum of law.").

This contention is also **immaterial** because the existence or non-existence of check legends has no bearing on the Court's application of the work-made-for-hire test, as the Second Circuit already held with respect to this same evidence.  *See Kirby*, 777 F. Supp. 2d at 748 (rejecting evidence from outside "the relevant time period" as "not admissible evidence of anything," and holding that "one cannot infer what might have been written on a check issued in 1958 from what was written on an analogous check fifteen years later.  For that reason alone, the 1973 and 1974 checks do not raise any genuine issue of fact that tends to contradict the work-for-hire presumption."); *Kirby*, 726 F.3d at 143 ("[W]e decline to infer from  Marvel's suspenders that it had agreed to give Kirby its belt.").

MCI also **objects** to Toberoff Exhibit 95.  *See Kirby*, 777 F. Supp. 2d at 728-30 (excluding Evanier's "expert" testimony, reattached here as Toberoff Exhibit 95); *Kirby*, 726 F.3d at 135-36 (affirming district court's exclusion of this evidence as "simply [] a

conduit for introducing hearsay") (internal citation and quotation omitted); MCI's

Evidentiary Objection No. [72].

105. **Lee has repeatedly acknowledged in numerous authenticated statements that he has a very poor memory.** *See* Toberoff Decl. Ex. 96 at JA1955; Ex. 5 at 284:10-18.

> **RESPONSE:  Disputed**, but **immaterial**.  MCI **disputes** the contention that Lee
>
> acknowledged in "numerous authenticated statements" that "he has a very poor
>
> memory," as when Defendant's counsel attempted to impeach Lee in *Kirby* using the
>
> same evidence and more, Lee testified at length that while he has a bad memory for
>
> "dates" and "amounts of monies or things like that, he "ha[s] a good memory for
>
> other things."  Lens Reply Decl., Ex. 104 289:12-21.  Lee further testified, "[My
>
> memory] was something that I joked about, I've written about.  And when I've
>
> lectured, I've joked with the audience about and they joke back with me about it.  It's
>
> like a standing joke with me and lot of my fans, my bad memory . . . [A]nything that
>
> provides a little humor in this sordid world of ours, I think is a good thing."  *Id*. at
>
> 290:4-13.
>
> Regardless, this contention is **immaterial** because "general attacks on Lee's
>
> honesty or credibility, without more, are insufficient to raise a genuine issue of fact—
>
> especially since many matters about which Lee testified are corroborated by
>
> testimony from other freelance artists and writers."  *See Kirby*, 777 F. Supp. 2d at
>
> 736; *see also Island Software*, 413 F.3d at 261 ("Broad, conclusory attacks on the
>
> credibility of a witness will not, by themselves, present questions of material fact" for
>
> trial); *Britton*, 523 U.S. at 600 (where, like here, "the [movant] has made a properly
>
> supported [summary judgment] motion, the plaintiff may not respond simply with
>
> general attacks upon the [witness's] credibility, but rather must identify affirmative

evidence from which a jury could find that the plaintiff has carried his or her burden.").

This contention is also **immaterial** because it refers at least in part to events outside the relevant time period and, in any event, has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 777 F. Supp. 2d at 748 (rejecting evidence from outside "the relevant time period" as "not admissible evidence of anything"); *Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).

MCI also **objects** to Toberoff Exhibit 96. *See* MCI's Evidentiary Objection No. [73].

**106. Lieber has worked on Lee's syndicated *Spider-Man* strip for 23 years.** *See* Toberoff Decl. Ex. 2 at 7:18-23.

> **RESPONSE: Disputed**, but **immaterial**.  While MCI does not dispute that Lieber worked on the *Spider-Man* strip for at least 23 years, MCI **disputes** that the suggestion that Lee (who passed away in 2018) is still publishing a syndicated Spider-Man strip or that Lieber is still working on any syndicated Spider-Man strip— a byproduct of Defendant's counsel copying-and-pasting from his *Kirby* opposition brief.  *See* Lens Opp. Decl., Ex. 98 at 15.  MCI also **disputes** that Lieber's work on the *Spider-Man* comic strip has any connection to his work for Marvel, as it was a daily syndicated newspaper strip otherwise unrelated to Lieber's comic book work for Marvel.  *See* Lens Reply Decl., Ex. 103 at 7:17-23, 65:3-8.
>
> Further still, this contention is **immaterial** because it has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary

judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 777 F. Supp. 2d at 739 ("Moreover, the testimony of witnesses with first-hand knowledge, such as . . . Lieber, establishes that the Marvel works were created at Marvel's instance."); *id*. at 736 ("[G]eneral attacks on [a witness's] honesty or credibility, without more, are insufficient to raise a genuine issue of fact—especially since many matters about which [witness] testified are corroborated by testimony from other freelance artists and writers."); *see also Island Software*, 413 F.3d at 261 ("Broad, conclusory attacks on the credibility of a witness will not, by themselves, present questions of material fact" for trial); *Britton*, 523 U.S. at 600 (where, like here, "the [movant] has made a properly supported [summary judgment] motion, the plaintiff may not respond simply with general attacks upon the [witness's] credibility, but rather must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden.").

This contention is also **immaterial** because it refers at least in part to events outside the relevant time period and, in any event, has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 777 F. Supp. 2d at 748 (rejecting evidence from outside "the relevant time period" as "not admissible evidence of anything"); *Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).

107. **This was Lieber's sole livelihood, for which his brother Lee paid him a small salary each year.** *See* Toberoff Decl. Ex. 2 at 59:2-19.

RESPONSE: **Disputed**, but **immaterial**. Because Defendant fails to provide any time period or identify when Lieber's work on the *Spider-Man* strip was his "sole

livelihood," it is unclear as written.  While MCI does not dispute that Lieber testified

his work on the *Spider-Man* strip was his sole livelihood at the time of his *Kirby*

deposition, MCI **disputes** Defendant's suggestion that Lee paid Lieber a "small

salary" each year for his work on the strip, which is unsupported by any evidence.

 Further still, this contention is **immaterial** because it has no bearing on the

Court's application of the work-made-for-hire test, as this Court's grant of summary

judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See*

*Kirby*, 777 F. Supp. 2d at 739 ("Moreover, the testimony of witnesses with first-hand

knowledge, such as . . . Lieber, establishes that the Marvel works were created at

Marvel's instance."); *id*. at 736 ("[G]eneral attacks on [a witness's] honesty or

credibility, without more, are insufficient to raise a genuine issue of fact—especially

since many matters about which [witness] testified are corroborated by testimony

from other freelance artists and writers."); *see also Island Software*, 413 F.3d at 261

("Broad, conclusory attacks on the credibility of a witness will not, by themselves,

present questions of material fact" for trial); *Britton*, 523 U.S. at 600 (where, like

here, "the [movant] has made a properly supported [summary judgment] motion, the

plaintiff may not respond simply with general attacks upon the [witness's] credibility,

but rather must identify affirmative evidence from which a jury could find that the

plaintiff has carried his or her burden.").

 This contention is also **immaterial** because it refers at least in part to events

outside the relevant time period and, in any event, has no bearing on the Court's

application of the work-made-for-hire test, as this Court's grant of summary

judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See*

*Kirby*, 777 F. Supp. 2d at 748 (rejecting evidence from outside "the relevant time

period" as "not admissible evidence of anything"); *Kirby*, 726 F.3d at 139-40

(relevant principles of the instance-and-expense test).

108. **To recruit witnesses after the Kirby family served copyright notices of termination, Marvel invited Lieber to a "reunion of old-timers," but Lieber declined.**
*See* Toberoff Decl. Ex. 2 at 51:20-52:23.

> <u>**RESPONSE:**</u>  **Disputed** but **immaterial**.  While MCI does not dispute that Marvel
>
> invited Lieber to a Marvel reunion event and that Lieber declined, MCI **disputes**
>
> Defendant's suggestion that Marvel was "recruit[ing] witnesses after the Kirby family
>
> served copyright notices of termination," as Defendant cites no evidence to support it.
>
> Toberoff Exhibit 2 **does not support** that contention, as Lieber merely testified to his
>
> belief that he was contacted by Marvel "to discuss the past."  Further, Defendant cites
>
> no evidence that Lieber was not invited to "old-timer" reunions *before* the Kirby
>
> family served termination notices.
>
> MCI also **disputes** this contention because it improperly lifts legal argument
>
> verbatim from Defendant's opposition brief.  *See All. Sec. Prod., Inc. v. Fleming Co.*,
>
> 471 F. Supp. 2d 452, 454 (S.D.N.Y. 2007) (Kaplan, J.) ("[L]egal arguments, which
>
> are plentiful in plaintiff's counter-statement, belong in briefs, not Rule 56.1
>
> statements, and so are disregarded in determining whether there are genuine issues of
>
> material fact."); *Goldstick v. The Hartford, Inc.*, 2002 WL 1906029, at *1 (S.D.N.Y.
>
> Aug. 19, 2002) (Kaplan, J.) ("Rule 56.1 statements are not argument.  They should
>
> not contain conclusions, and they should be neither the source nor the result of 'cut-
>
> and-paste' efforts with the memorandum of law.").
>
> Further still, this contention is **immaterial** because it has no bearing on the
>
> Court's application of the work-made-for-hire test, as this Court's grant of summary

judgment for Marvel in the Kirby case, as upheld by Second Circuit, confirms. *See Kirby*, 777 F. Supp. 2d at 739 ("Moreover, the testimony of witnesses with first-hand knowledge, such as . . . Lieber, establishes that the Marvel works were created at Marvel's instance."); *id*. at 736 ("[G]eneral attacks on [a witness's] honesty or credibility, without more, are insufficient to raise a genuine issue of fact—especially since many matters about which [witness] testified are corroborated by testimony from other freelance artists and writers."); *see also Island Software*, 413 F.3d at 261 ("Broad, conclusory attacks on the credibility of a witness will not, by themselves, present questions of material fact" for trial); *Britton*, 523 U.S. at 600 (where, like here, "the [movant] has made a properly supported [summary judgment] motion, the plaintiff may not respond simply with general attacks upon the [witness's] credibility, but rather must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden.").

This contention is also **immaterial** because it refers at least in part to events outside the relevant time period and, in any event, has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 777 F. Supp. 2d at 748 (rejecting evidence from outside "the relevant time period" as "not admissible evidence of anything"); *Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).

109. **Thereafter, Stan Lee leaned on his brother.** *See* Toberoff Decl. Ex. 2 at 58:19- 59:19 (Lieber: "He didn't tell I shouldn't, but he sort of said, 'Well I hope you don't lose the [*Spider-Man*] strip because of it or something.'").

> **RESPONSE:  Disputed** but **immaterial**.  MCI **disputes** the contention that Lee "leaned on his brother," as Defendant cites no evidence to support it. Toberoff

Exhibit 2 **does not support** this contention, and Defendant's citation omits the remainder of Lieber's testimony regarding his interactions with Lee about his participation in the *Kirby* case, which demonstrates that precisely the opposite occurred.  Lieber testified that no one "at Marvel ever [told him] that if [he] didn't speak with their lawyers, [he] would lose the strip."  Lens Reply Decl., Ex. 103 at 109:23-110:2.  Lieber further testified that no one "at Marvel ever promise[d] him more work or more money or anything if [he] gave a deposition or testified."  *Id*. at 110:3-6.  And Lieber testified that when he "told [Lee] [he] was nervous about [talking to Marvel lawyers], [Lee] said not to be, just tell the truth and don't worry about anything.  He was reassuring, or tried to be."  *Id*. at 60:4-9.  And Lieber continued to testify that his "only intention [was] to go down and tell the truth as [he] kn[e]w it."  *Id*. at 63:24-25.  Moreover, to the extent Defendant had concerns regarding the credibility of Lieber's testimony in *Kirby*, he had an adequate opportunity to explore these unfound concerns during Lieber's deposition in this case.  After all, Defendant's counsel represented Lieber in previously consolidated litigation.

Yet when Lieber testified in this case, he repeatedly affirmed the statements made in his *Kirby* testimony.  *See* Lens Reply Decl., Ex. 102 25:15-26:7 ("I tried to be as neutral and fair as possible.  I remember I even found something in a book and that might have been of value for learning the truth.  I called Marvel's lawyers . . . and said I was going to call Mr. Toberoff and give him the same information because . . . I wanted to be fair in this thing.  All I knew is that they wanted me to come down and testify and be truthful about the matter.  So, I gave it both parties."); *id*. at 26:12-

20 (Q: "And you were truthful in your deposition in the Kirby case; right?"  A:

"Yes." . . . Q: "You're not aware of anything that you said in the Kirby case that was

not truthful; correct?"  A: "No.").  There is no reason to doubt the veracity of Lieber's

testimony.

MCI also **disputes** this contention because it improperly lifts legal argument

verbatim from Defendant's opposition brief.  *See All. Sec. Prod., Inc. v. Fleming Co.*,

471 F. Supp. 2d 452, 454 (S.D.N.Y. 2007) (Kaplan, J.) ("[L]egal arguments, which

are plentiful in plaintiff's counter-statement, belong in briefs, not Rule 56.1

statements, and so are disregarded in determining whether there are genuine issues of

material fact."); *Goldstick v. The Hartford, Inc.*, 2002 WL 1906029, at *1 (S.D.N.Y.

Aug. 19, 2002) (Kaplan, J.) ("Rule 56.1 statements are not argument.  They should

not contain conclusions, and they should be neither the source nor the result of 'cut-

and-paste' efforts with the memorandum of law.").

Regardless, this contention is **immaterial** because it has no bearing on the

Court's application of the work-made-for-hire test, as this Court's grant of summary

judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms.  *See*

*Kirby*, 777 F. Supp. 2d at 739 ("Moreover, the testimony of witnesses with first-hand

knowledge, such as . . . Lieber, establishes that the Marvel works were created at

Marvel's instance."); *id*. at 736 ("[G]eneral attacks on [a witness's] honesty or

credibility, without more, are insufficient to raise a genuine issue of fact—especially

since many matters about which [witness] testified are corroborated by testimony

from other freelance artists and writers."); *see also Island Software*, 413 F.3d at 261

("Broad, conclusory attacks on the credibility of a witness will not, by themselves,

present questions of material fact" for trial); *Britton*, 523 U.S. at 600 (where, like here, "the [movant] has made a properly supported [summary judgment] motion, the plaintiff may not respond simply with general attacks upon the [witness's] credibility, but rather must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden.").

This contention is also **immaterial** because it refers at least in part to events outside the relevant time period and, in any event, has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 777 F. Supp. 2d at 748 (rejecting evidence from outside "the relevant time period" as "not admissible evidence of anything"); *Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).

110. **At the time of Thomas's deposition in this case, he was contractually bound by Marvel to not "support, directly or indirectly, on behalf of [himself] or any other person or entity, any action, claim, litigation, filing, statement, or demand, in any court … challenging Marvel's ownership" or characters or stories.** *See* Toberoff Decl. Ex. 99 ¶ 2(d).

**RESPONSE:  Disputed**, but **immaterial**.  Defendant's citation omits the remainder of the quoted clause which narrows the scope of Thomas's agreement.  The complete clause states that Thomas agreed to not "challeng[e] Marvel's ownership or use of ***the Materials or Preexisting Materials***," defined to be materials "already produced or to be produced ***by [Thomas]*** for Marvel," including those "derivative of preexisting material supplied by or previously published or released by Marvel."  *See* Toberoff Ex. 99 ¶ 2(a), (c).  Moreover, as Thomas testified, this agreement "has no connection to anything" relating to this or any other lawsuit.  *See* Lens Reply Decl., Ex. 101 at 330:18-25.  Thomas has testified consistently in several Marvel cases over the past

few decades, including before he signed this agreement.  Indeed, in 1999 litigation involving former Marvel writer Marv Wolfman, Thomas testified that Marvel's editors, including Lee and Thomas, would come up with plot ideas, assign artists and writers to particular stories, and had ultimate authority over freelance work.  And Thomas further testified that all freelancers were paid a set per-page rate and understood that their work was done on a work for hire basis.  *See* Lens Reply Decl., Ex. 107 at 27:15-29:2 (Thomas testifying about "Marvel['s] process for determining how a particular writer, artist, penciller and colorist are assigned to a series"); *Id*. at 24:11-25:3 (Thomas testifying how "Stan increasingly, sometimes myself, would come with an idea for a comic" and then "we would set these things in motion."); *Id*. at 37:13-39:7 (Thomas testifying that "The final authority was Stan" and "[t]here wasn't any doubt that Stan or I could make any change that we needed to have in a story or anything else, subject only to the fact that we had to have the book out of there on some kind of schedule.  But Stan or I could do that.  No one else had the authority to make changes. . . ."); *Id*. at 42:6-18 (Thomas testifying that he never "g[a]ve complete control over a story line or character to [any] writer); *Id*. at 9:14-16 (Thomas testifying that he was "paid by the page" for his freelance writing); *Id*. at 18:7-18 (same); *Id*. at 47:17-50:22 (Thomas testifying that  Marvel "certainly had a policy that Marvel owned full rights to whatever we did for them . . . Marvel owned all rights to whatever we wrote" and that he "assumed" that "Marvel's policy generally [was] understood by other freelance writers in the industry").

Regardless, this contention is **immaterial** because "general attacks on [a witness's] honesty or credibility, without more, are insufficient to raise a genuine

issue of fact—especially since many matters about which [witness] testified are corroborated by testimony from other freelance artists and writers." *See Kirby*, 777 F. Supp. 2d at 736; *see also Island Software*, 413 F.3d at 261 ("Broad, conclusory attacks on the credibility of a witness will not, by themselves, present questions of material fact" for trial); *Britton*, 523 U.S. at 600 (where, like here, "the [movant] has made a properly supported [summary judgment] motion, the plaintiff may not respond simply with general attacks upon the [witness's] credibility, but rather must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden.").

This contention is also **immaterial** because it refers at least in part to events outside the relevant time period and, in any event, has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 777 F. Supp. 2d at 748 (rejecting evidence from outside "the relevant time period" as "not admissible evidence of anything"); *Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).

MCI also **objects** to the evidence cited in support of this contention. *See* MCI's Evidentiary Objection No. [76].

**111. At least one third of Thomas's income is made up of "incentive payments" paid to him by Marvel, at Marvel's sole discretion.** *See* Toberoff Decl. Ex. 17 at 239:2-241:16.

<u>**RESPONSE**</u>:  **Disputed**, but **immaterial**.  MCI **disputes** that "at least one third of Thomas's income is made up of 'incentive payments' paid to him by Marvel."  Defendant's citation omits the remainder of Thomas's testimony, in which he clarifies that reprints are the "***majority of*** about one-third of [his] income that [he]

get[s] from Marvel" (*i.e.*, about one-third of Thomas's income comes from Marvel, and the majority of his Marvel income is incentive payments).  *See* Toberoff Ex. 17 at 240:14-21.  Moreover, as Thomas testified, these incentive payments under recent agreements have no connection to this or any other lawsuit and have "[n]ot even the slightest . . . hint" of an impact on his testimony in this case or any other cases involving Marvel.  *See* Lens Reply Decl., Ex. 101 at 329:9-330:14.  Thomas has testified consistently in several Marvel cases over the past few decades, including before he was eligible to receive any incentive payments under the agreements Defendant cites.  Indeed, in 1999 litigation involving former Marvel writer Marv Wolfman, Thomas testified that Marvel's editors, including Lee and Thomas, would come up with plot ideas, assign artists and writers to particular stories, and had ultimate authority over freelance work.  And Thomas further testified that all freelancers were paid a set per-page rate and understood that their work was done on a work for hire basis.  *See supra* Response No. 110, *citing* Lens Reply Decl., Ex. 107 27:15-29:2, 24:11-25:3, 37:13-39:7, 42:6-18, 9:14-16, 18:7-18, 47:17-50:22.

Regardless, this contention is **immaterial** because "general attacks on [a witness's] honesty or credibility, without more, are insufficient to raise a genuine issue of fact—especially since many matters about which [witness] testified are corroborated by testimony from other freelance artists and writers."  *See Kirby*, 777 F. Supp. 2d at 736; *see also Island Software*, 413 F.3d at 261 ("Broad, conclusory attacks on the credibility of a witness will not, by themselves, present questions of material fact" for trial); *Britton*, 523 U.S. at 600 (where, like here, "the [movant] has made a properly supported [summary judgment] motion, the plaintiff may not

respond simply with general attacks upon the [witness's] credibility, but rather must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden.").

This contention is also **immaterial** because it refers at least in part to events outside the relevant time period and, in any event, has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 777 F. Supp. 2d at 748 (rejecting evidence from outside "the relevant time period" as "not admissible evidence of anything"); *Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).

112. **Thomas admitted that, because he started at Magazine Management in July 1965, he essentially has no direct knowledge of how Ditko created his characters and stories during almost the entire Period.** *See* Toberoff Decl. Ex. 17 at 248:25-265:4.

<u>**RESPONSE:**</u>  **Disputed**, but **immaterial**.  MCI **disputes** Defendant's contention that Thomas "admitted" that he "has no direct knowledge of how Ditko created his characters and stories."  While Thomas testified that he was not "a personal witness to the conditions under which . . . the [Works] were created," he did not testify that he lacked "direct knowledge" thereof.  To the contrary, Thomas testified that after he joined Marvel in July 1965, while Ditko was still working for Marvel, Thomas worked on two Doctor Strange stories with Ditko himself.  *See* Toberoff Ex. 17 at 263:6-265:4.  And Thomas, who covered comic news in his *Alter Ego* comic fanzine prior to joining Marvel in July 1965, testified that when he joined Marvel, the "system for creating comics" was "still the same" with "mostly the same people, even" as to Marvel's system of creating comics from 1962-1965.  *See* Lens Reply Decl., Ex. 101 at 331:1-334:5; Toberoff Decl. ¶¶ 3, 7 ("When I joined Marvel

in July of 1965, I understood that Marvel had an established framework that everyone worked within dating back at least as far as 1961 with the dawn of the "Marvel Age of Comics."  I am aware of this both through my own study of Marvel with *Alter Ego* prior to joining Marvel, through conversations at Marvel after joining, by the established method of creating comics at Marvel when I joined, and through retrospective interviews for publication in the revival *Alter Ego*.").  MCI also **disputes** Defendant's characterization of "[Ditko's] characters and stories" to the extent they attribute creatorship or ownership of any Marvel characters or stories to Ditko.

Regardless, this contention is **immaterial** because "general attacks on [a witness's] honesty or credibility, without more, are insufficient to raise a genuine issue of fact—especially since many matters about which [witness] testified are corroborated by testimony from other freelance artists and writers."  *See Kirby*, 777 F. Supp. 2d at 736; *see also Island Software*, 413 F.3d at 261 ("Broad, conclusory attacks on the credibility of a witness will not, by themselves, present questions of material fact" for trial); *Britton*, 523 U.S. at 600 (where, like here, "the [movant] has made a properly supported [summary judgment] motion, the plaintiff may not respond simply with general attacks upon the [witness's] credibility, but rather must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden.").

This contention is also **immaterial** because it refers at least in part to events outside the relevant time period and, in any event, has no bearing on the Court's application of the work-made-for-hire test, as this Court's grant of summary

judgment for Marvel in the *Kirby* case, as upheld by Second Circuit, confirms. *See Kirby*, 777 F. Supp. 2d at 748 (rejecting evidence from outside "the relevant time period" as "not admissible evidence of anything"); *Kirby*, 726 F.3d at 139-40 (relevant principles of the instance-and-expense test).

Dated: July 28, 2023
      New York, New York

**O'MELVENY & MYERS LLP**

By: */s/ Daniel M. Petrocelli*
      Daniel M. Petrocelli

Daniel M. Petrocelli*
dpetrocelli@omm.com
Molly M. Lens
mlens@omm.com
Matthew Kaiser*
mkaiser@omm.com
1999 Avenue of the Stars, 8th Floor
Los Angeles, California 90067
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

Allen Burton
aburton@omm.com
Danielle Feuer
dfeuer@omm.com
Times Square Tower
7 Times Square
New York, NY 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061

* Admitted *pro hac vice*

*Attorneys for Marvel Characters, Inc.*