# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARVEL CHARACTERS, INC., | Case No.: 1:21-cv-07957-LAK |
| Plaintiff, | |
| v. | Hon. Lewis A. Kaplan |
| PATRICK S. DITKO, in his capacity as Administrator of the Estate of Stephen J. Ditko, | **PATRICK S. DITKO'S RESPONSE TO MARVEL CHARACTER INC'S REPLY RE: ITS LOCAL RULE 56.1 STATEMENT (CORRECTED)** |
| Defendant. | |

PATRICK S. DITKO, in his capacity as
Administrator of the Estate of Stephen J.
Ditko,

               Counterclaimant,

    v.

MARVEL CHARACTERS, INC. and DOES
1-10, inclusive,

               Counterclaim-Defendants.

Defendant and Counterclaimant Patrick S. Ditko, as Administrator of the Estate of Stephen J. Ditko (the "Counterclaimant") respectfully submits the following responses ("Response(s)") to Plaintiff and Counterclaim-Defendant Marvel Characters, Inc.'s ("MCI" or "Plaintiff") Reply regarding MCI's Rule 56.1 Statement of purported material facts, pursuant to the Court's Memo Endorsement dated August 31, 2023 (Dkt. 110). To avoid burdening the Court with repeating the same Responses in the numbered entries below, Counterclaimant offers the following response ("Preliminary Statement") applicable to most of his numbered Responses below, to be considered as incorporated by reference in such numbered Responses:

Plaintiff's Reply mischaracterizes the evidence, ignores relevant record evidence and reflects unsupported legal assertions or conclusions—all in an attempt to prove, as it must, that Stephen J. Ditko ("Ditko") created his subjects works in 1962-1965 (the "Period") at the "instance" and "expense" of the empty shell companies, Vista Publications, Inc., Atlas Magazines, Inc., and Non-Pareil Publishing Corporation ("Shell Company(ies)"), respectively. The copyrights relevant to this case were registered with the Copyright Office in the name of the respective Shell Companies as "Copyright Claimant" and 28 years later, Plaintiff expressly represented to the Copyright Office in its copyright renewal registrations that the relevant publications were all "work for hire" and that, indeed, ***the Shell Companies were the statutory "authors" of such "works for hire" at issue herein***. *See* Dkts. 71-28 to 71-32.

Plaintiff relied on these very copyright registrations in its Complaint, alleging it "complied in all relevant respects with all laws governing copyright" (Dkt. 1 ¶¶ 4, 14), chief among which is the requirement that a registrant truthfully state whether a work is "for hire" and if so, for whom. 17 U.S.C. § 409(4). And Plaintiff continues to rely on such copyright registrations throughout this case. *See e.g.*, Dkt. 104 at 202 (relying on such registrations

attached as Ex. 24A-E to Lens Decl. and describing them as "contemporaneous copyright registrations [] listing each respective [Shell Company] as 'Copyright Claimant' and renewal registrations [] listing each such [Shell Company] as 'author.'"). Plaintiff also asserted emphatically that "Marvel clearly paid attention to copyright issues as it registered copyrights in its comics". *See* Dkt. 93 at 11. Plaintiff is "bound throughout the course of the proceeding" by its above "judicial admissions", *Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand*, 322 F.3d 147, 167 (2d Cir. 2003) and by the doctrine of statutory estoppel, *Technicon Med. Info. v. Green Bay Packaging*, 687 F.2d 1032, 1035 (7th Cir. 1982), and is otherwise estopped from back-pedaling, after receiving the benefit of these explicit copyright registrations for decades. **On summary judgment, Plaintiff was therefore required to adduce admissible evidence that Ditko created his works at issue at the "instance" and "expense" of the respective Shell Companies. As shown below, Plaintiff has failed to do so—it is not even close.**

**Importantly, the dispositive Shell Company issue was not before the Second Circuit or adjudicated in *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119 (2d Cir. 2013) on which Plaintiff almost exclusively relies.**

That Plaintiff has not come forth with the necessary evidence is unsurprising as Martin Goodman's ("Goodman") myriad shell entities existed only on paper, without actual employees or operations and the record evidence demonstrates none. Plaintiff, which has produced such minutia as Goodman's advertising rate cards going back to 1947 (Lens Opp. Decl., Ex. 92), has presented *no evidence* that any of the Shell Companies ever had any employees, and no agreements or correspondence by the Shell Companies with Magazine Management Co. ("MMC"), Stan Lee or anyone else for that matter. Plaintiff does not contest and effectively

admits that the Shell Companies had no employees. See Pl.'s Resp. to Def.'s Stmt. of Additional

Material Facts ("AMF") ¶ 8 (Dkt. 104 at 187-88) (Plaintiff does not contest the Statement that

the Shell Companies had "no employees."). Plaintiff's assertion of "instance" relies almost

entirely on Lee as an Editor and freelance "writer," but Lee was employed as Editor of MMC

(and paid for his freelance "writing" by MMC, not by any of the Shell Companies. *See* Def.'s

AMF (Dkt. 89) ¶¶ 59, 61-63). Similarly, Marvel's assertion of "expense" relies entirely on

MMC's payments to freelancers like Ditko for each page MMC decided to purchase, *after*

creation, in its sole discretion. *Id.*

**Although MMC and the Shell Companies were separate juridical entities, *by design*,**
**Marvel tries to credit the Shell Companies with MMC's alleged actions under intentionally**
**vague legal theories unsupported by the equally vague or immaterial "evidence" it proffers,**
**as shown below.** In the abstract, the closest Marvel comes to a potentially cognizable legal

argument is to assert that the Shell Companies, as principals, supposedly directed and paid for

Ditko's work through its agent—MMC. However, Marvel provides absolutely no evidence of

any one of the three elements, all of which are legally required to prove the existence of an

agency relationship. *See Cleveland v. Caplaw Enters.*, 448 F.3d 518, 522 (2d Cir. 2006).[1]

For its agency argument, Plaintiff purports to rely on just three record documents (Dkt.

70 ("Bard Decl."), Exs. 5-7).[1] Exhibit 5 is a *1951* Dun & Bradstreet Report on MMC's

creditworthiness. Its author repeatedly notes a lack of information. *Id.* at 1 ("financial details"

"not made available"); 2 (attempts to contact MMC "proved unsuccessful"). It mentions twelve

companies in which Goodman was "active," but notes "*there are no inter-company relations*

---

[1] The requisite "three elements" are: (1) a "manifestation by the principal that the agent shall act for him," (2) the
agent's "acceptance of the undertaking" "*and*," (3) evidence of the parties' "understanding … that the principal is to
be in control of the undertaking." *Id.*

*such as loans, advances of guarantees reported*." (*Id.* at 3; emphasis added). Marvel never explains what this document is supposed to prove.

Exhibit 6 is a print-out of *Gayle v. Magazine Management Co*., 153 F. Supp. 861, 864 (D. Ala. 1957); Bard Decl., Ex. 6. It is dubious to even call this evidence. *Gayle* concerns a very different issue (*in personam* jurisdiction for a libel suit) and it makes no adjudicated "findings" about the relationship between the Shell Companies and MMC. Even if one credited the uncontested background facts in *Gayle* as "judicial findings," such "are inadmissible hearsay" when proffered as evidence in another case. *Blue Cross and Blue Shield v. Philip Morris*, 141 F. Supp. 2d 320, 323 (E.D.N.Y. 2001). As background, *Gayle* states that MMC "renders administrative services to and exercises the over-all control of the other defendants." But this does not prove MMC acted as the Shell Companies' agent. If true, it would tend to support the opposite—that MMC acted as a principal. *But see* Goodman's sworn testimony, Toberoff Reply Decl., Ex. 67, Dkt. 99 ("Q: These companies are owned and controlled by you …doing business as Magazine Management Company? A [Goodman]: "No, each corporation stands on its own.") Furthermore, Lee's writing and purported creative direction of Ditko repeatedly alleged by Plaintiff as "instance" could hardly be called an "*administrative* service."

Plaintiff's last document is a 1962 FTC complaint against Goodman's questionable publishing practices. Bard Decl., Ex. 7. Two of the Shell Companies (Atlas and Vista) are respondents as are MMC and Goodman. But the complaint says nothing about the *relationship* between the shells and MMC. It just says in passing that "Marvel Comics Group" was an unincorporated association comprised of seven entities, but Atlas was not one of them, and *neither was Magazine Management*. *Id.* at 5. Whatever that means, the FTC complaint does not say that MMC acted as the agent of any of the other respondents; rather, it says MMC was *one*

vehicle by which Goodman "controls and operates approximately forty-eight [unnamed] corporations," contrary to Marvel's assertion that MMC acted as the *shell's* agent. *Id.*

Although, not cited for its agency argument, Marvel has relied elsewhere on just five more documents regarding the Shell Company issue. Bard Decl., Exs. 2, 8; Lens Decl., Ex. 75; Lens Opp. Decl., Exs. 92, 93.  Exhibit 2 is a 1967 letter returning an unelaborated "list of Martin Goodman's Corporations"—with no details but their ownership, fiscal year net worth and net profits. Bard Decl., Ex. 2. One entry just says "Magazine Management Co. (Servicing Partnership)," but neither this list, nor any other record evidence describes, at all, what "servicing partnership" means, or e.g., for whom, when, its terms, or anything else. *Id.* It is literally a bare entry on a list.

Exhibit 8 is a copy of a 1978 decision in *Cadence Industries Corp. and Magazine Management Co., Inc. v. Barbara Ringer.* Again, it is questionable to even call this evidence. It concerns a different issue (whether the Register of Copyright must renew certain composite works by "salaried employees" from the late 1940s). Bard Decl., Ex. 8 at 6. It is expressly based "upon a Joint Stipulation of Facts." *Id.* at 2. It neither purports to make adjudicated findings about nor concerns the relationship between MMC and the Shell Companies. It is nonetheless repeatedly cited by Marvel for a stipulated background statement that "[b]eginning in 1940, the predecessors of the plaintiffs a group of commonly owned and controlled corporations collectively known as Marvel Comic Group … published various periodicals[.]" Again, even if one called this stipulated statement a "judicial finding," it would be "inadmissible hearsay" in this case. *Blue Cross and Blue Shield,* 141 F. Supp. 2d at 323. "Marvel Comics Group" is not shown to be a legal entity; rather it appears to be some sort of marketing or dba name used

sporadically by Goodman at different times beginning in the 1940s.[2] Plaintiff never explains why this matters or how this or its other random exhibits are evidence that Ditko created his works at the Shell Companies "instance and expense" so as to render the Shell Companies the statutory "authors" upon creation of the relevant works as registered by Marvel and pled by Plaintiff.

Plaintiff's vague, unarticulated legal theory regarding "Marvel Comics Group" falls apart even under its own "evidence."  See Lens Decl., Ex. 75 (March 8, 1967 dba certification by Goodman stating that *37* entities use the "assumed name" "Marvel Comics Group" (to facilitate Goodman's 1968 sale to publicly-traded Perfect Film & Chemical Corp.), *but conspicuously absent from Goodman's own dba list is Magazine Management Co*. (MMC).)

As Plaintiff has adduced no evidence whatsoever to show that MMC acted as the Shell Companies' *agent*, it reverts to Goodman's common ownership and control of the Shell Companies to argue that Ditko's works were at "Goodman's instance and expense." Dkt. 92 at 35. In other words, Plaintiff suggests that when an artist works with publishers that are legal entities, the owners, officers and/or partners of such entities are the "statutory authors." None of this is legally cognizable. For one thing, "[a] basic tenet of American corporate law is that the corporation and its shareholders are distinct entities." *Dole Food Co. v. Patrickson,* 538 U.S. 468, 474, 123 S.Ct. 1655 (2003). *See Hutson v. Notorious B.I.G.,* 2015 WL 9450623, at *5-6 (S.D.N.Y. Dec. 22, 2015) (owner of company which registered copyright has no interest therein). "Corporate form matters. Here, there were distinct legal entities [MMC and Shell Companies], whose separate nature cannot simply be ignored when inconvenient." *Clarex Ltd. v. Natixis Sec. Am. LLC*, 2012 WL 4849146, at *6 (S.D.N.Y. Oct. 12, 2012). "[P]eople cannot use a corporate

---

[2] *See* Lens Opp. Decl., Ex. 92 (1947 ad rates card for "Marvel Comic [singular] Group") and Ex. 93 (1967 letter with "Marvel Comics [plural] Group" in header, enclosing 1967-68 ad rates card for "Marvel Comic [singular] Group") relied upon by Plaintiff.

structure for some purposes" and "disavow it for others." *See Waite v. UMG Recordings, Inc.*,
450 F. Supp. 3d 430, 441-42 (S.D.N.Y. 2020) (Kaplan, J.) (regarding copyright termination).
*Martha Graham School v. Martha Graham Center*, 380 F.3d 624, 640-41 (2d Cir. 2004)
(refusing to disregard Graham's own Foundation as her "employer"). The same applies here.

| Document | Statement and Responses |
|---|---|
| | **Statement No. 1** |
| **MCI's Statement** | The companies now known as "Marvel" were preceded by numerous predecessors-in-interest doing business as the Marvel Comics Group, including: Martin and Jean Goodman, their Magazine Management Company partnership, and their wholly-owned entities Atlas Magazines, Inc., Canam Publisher Sales Corp., Non-Pareil Publishing Corp., Vista Publications, Inc., and Magazine Management Company, Inc. (New York); Perfect Film & Chemical Corp. ("Perfect") (later renamed as Cadence Industries Corp. ("Cadence")); Magazine Management Company, Inc. (Delaware); and Marvel Entertainment Group, Inc. (collectively, "Marvel"). *See* Declaration of Eli Bard ("Bard Decl.") ¶ 2; Bard Decl., Ex. 1 (reflecting incorporation and later dissolution of Marvel entities in existence during the early 1960s and their common ownership by Martin Goodman); Bard Decl., Ex. 2 (showing Martin and Jean Goodman's ownership of Marvel); Bard Decl., Ex. 4 (same); Bard Decl., Ex. 3 (listing various "active corporations and magazines"); Bard Decl., Ex. 5 at 2-3 (reporting on Magazine Management Company, a "[p]artnership formed 1942" that acts as "the managing organization for the various publishing corporations in which Martin Goodman is a principal or a stockholder"); Bard Decl., Ex. 6 at 3 ("Magazine Management Company . . . renders administrative services to and exercises the over-all control over" other Goodman-owned publishing corporations); Bard Decl., Ex. 7 at 5 ("Martin Goodman . . . formulates, directs and controls the acts and practices of each corporate respondent either directly or through the partnership, Magazine Management Company…"); Bard Decl., Ex. 8 at 5-6 (A "group of commonly owned and controlled corporations collectively known as the Marvel Comics Group" published comic books "frequently includ[ing] material concerning characters featured in other publications of the Group"); Bard Decl., Ex. 10 at 2, 9 (June 28, 1968 agreement for sale of the Goodmans' Marvel Comics business to Perfect, providing that all then-existing copyrights be assigned to Perfect (the "June 28, 1968 Sale")); Bard Decl., Ex. 11 at 3 (December 7, 1978 acknowledgment of assignment between Martin and Jean Goodman and Perfect's successor-in-interest, |

<table>
<tr><td></td><td>

Cadence, affirming, pursuant to the June 28, 1968 Sale, assignment of all "copyrights and renewals and extensions of copyrights," including all publications listed on Schedule B annexed thereto (including those listed in the termination notices (the "Works"))); Bard Decl., Ex. 9 at 2 ("Cadence Industries Corporation admits that its Marvel Comics Group division is engaged in the business of magazine publishing…"); Bard Decl., Ex. 12 at 2-3 (January 1, 1972 assignment from Cadence's wholly owned subsidiary, Magazine Management Co., Inc. (Delaware) to Cadence of all copyrights relating to "its Marvel Comics Group Division or the comics business"); Bard Decl., Ex. 13 at 2-3 (December 29, 1986 assignment from Cadence to MEG of all "copyrights relating to [Cadence's] Marvel Comics Group business," including all publications listed on Schedule A annexed thereto (including the Works)); Bard Decl., Ex. 14 (November 20, 1986 purchase agreement between Cadence Industries Corporation and New World Pictures, Ltd.); Bard Decl., Ex. 15 (November 4, 1988 acquisition agreement between New World Entertainment, Ltd. and Andrews Group Incorporated relating to MEG); Bard Decl., Ex. 16 (September 1, 1995 assignment from MEG to MCI of all copyrights "in its comics books and comic book-related works," including all publications listed on Schedule A annexed thereto (including the Works)); Declaration of Molly M. Lens ("Lens Decl."), Ex. 75 (Goodman certifying as president of various publishing corporations that he, Jean Goodman, and said corporations conducted business as "Marvel"); Lens Decl., Ex. 76 (Goodman certifying as president of various publishing corporations that he, Jean Goodman, and said corporations conducted business as "Marvel Comics Group"); Lens Decl., Ex. 18 72:25-73:11 (Goodman discussing his publishing entities, explaining that "each corporation st[ood] on its own" but he "own[ed] them either completely or [his] wife may [have] own[ed] some stock in some of them"); Lens Decl., Ex. 13 11:24-12:3 ("It had many different names over the years, and it finally became Marvel."); Lens Decl., Ex. 6 9:6-10:1 ("As far as I know, Marvel Comics Group did the comic books and Magazine Management was the overall company that did all the other magazines. They had all different kinds of magazines."); Lens Decl., Ex. 6 6:13-25 ("[Marvel was] bought by a company called Perfect Film and Chemical which later became Cadence Industries and that was later sold to New World and then it ended up with where it is now."); *see also* Lens Decl., Ex. 8 16:11-20; Lens Decl., Ex. 8 17:16-25; Lens Decl., Ex. 4 83:10-13; Lens Decl., Ex. 8 15:2-8; Lens Decl., Ex. 17 3:18-4:9.

</td></tr>
<tr><td>

**Counterclaimant's Response**

</td><td>

**Counterclaimant admits that the companies it lists are Marvel's alleged predecessors but denies the above statement to the extent it implies that in the relevant Period there was any corporate relationship or other legal relationship between Goodmans'**

</td></tr>
</table>

| | |
|---|---|
| | **independent shell companies, Atlas Magazines, Inc., Canam Publisher Sales Corp., Non-Pareil Publishing Corp., Vista Publications, Inc. (each dissolved in 1968) and the Goodmans' partnership Magazine Management Company ("Magazine Management"), other than common ownership. Counterclaimant further disputes this statement to the extent it implies that "Marvel Comics Group" had any corporate or legal status or significance in the Period because it was not a legal entity in the Period and was merely a name Magazine Management sometimes placed on the cover of some of the comic books it published. In 1973, well after the Period, Perfect Film and Chemical (which in 1968 had purchased all of the publishing assets of Magazine Management and Goodman's numerous shell companies) renamed itself Cadence Industries and renamed Magazine Management's publishing business the Marvel Comics Group.** *See* Lens Decl., Ex. 18 72:25-73:11 (Goodman discussing his publishing entities, explaining that "each corporation st[ood] on its own"); Declaration of Marc Toberoff ("Toberoff Decl."), Ex. 46 (1966-67 list Goodman's myriad entities with no mention of "Marvel Comics Group"); Bard Decl., Ex. 10 (June 28, 1968 sales agreement of Magazine Management and the shell companies' assets to Perfect); Bard Decl., Ex. 1 (reflecting dissolution of the shell companies Atlas Magazines, Inc., Canam Publisher Sales Corp., Non-Pareil Publishing Corp., Vista Publications, Inc. ); Toberoff Decl., Ex. 43 (March 22, 1975 Agreement between Marvel Comics Group and Gene Colan); Bard Decl., Ex. 13 at 2-3 (December 29, 1986 Cadence agreement "relating to [Cadence's] Marvel Comics Group business."). |
| **MCI's Reply** | **This fact remains undisputed.** <br><br> Defendant admits that the list is comprised of Marvel's predecessors, but contests that there was any "corporate relationship or other legal relationship . . . other than common ownership" between Goodman's entities, which is incorrect and turns on improper legal argument. As the evidence cited in support of this fact demonstrates, Goodman's various comic book entities conducted business as "Marvel" or "Marvel Comics Group" and engaged with Magazine Management Company for administrative services, including payments to those providing services to Marvel. *See* MCI's Evidence in Support of Undisputed Facts 1 and 49. <br><br> Further, Defendant's contention that "Marvel Comics Group" had no "corporate or legal status or significance" and "was merely a name," is likewise incorrect and turns on improper legal argument. As the evidence cited in support of this fact establishes, these entities long did business as Marvel. *See, e.g.*, Bard Decl., Ex. 8 at 5-6 ("Beginning in 1940, the |

9

| | |
|---|---|
| | predecessors of the plaintiffs, a group of commonly owned and controlled corporations collectively known as the Marvel Comics Group" published comic books); *see also* June 30, 2023 Molly M. Lens Declaration (Dkt. 94, "Lens Opp. Decl."), Ex. 93 at 4-5 (1966 advertising rate card for Marvel Comics Group soliciting advertisements across its magazines, reflecting that Marvel Comics Group "consists principally of the following magazines . . . [including] *Amazing Spider-Man* and *Strange Tales*"); Lens Opp. Decl., Ex. 92 at 3-8 (1947 advertising rate card for Marvel Comics Group). And Ditko himself surely understood this, writing in 1965 that he "did 1st work for Stan Lee and Marvel" in 1955 and in 1958 "Stan Lee asked [him] to do some work, [and he] returned to Marvel." *See* Lens Decl., Ex. 45 at 3.<br><br>MCI also **objects** to Toberoff Exhibit 43. *See* MCI's Evidentiary Objection No. [44]. |
| **Counterclaimant's Response to Reply** | In its initial Response, Counterclaimant admitted only that "the companies it [MCI] lists are [MCI]'s alleged predecessors." Counterclaimant respectfully incorporates by reference its above Preliminary Statement with respect to Marvel's immaterial statements regarding the name "Marvel Comics Group" or containing a colloquial reference to "Marvel" and its misplaced reliance on Bard Decl., Exs. 2, 5-8. **Plaintiff does not and cannot explain how the quoted language in these and its handful of other random documents support its defense that Ditko created his works at the "instance" or "expense" of the Shell Companies registered by Marvel as the statutory "authors" of the alleged "work for hire" at issue.** *See* Dkt. 1 (Complaint) ¶¶ 4, 14; Dkts. 71-28 to 71-32.<br><br>Defendant also **objects** to Bard Decl., Exs. 1-9; Lens Decl., Exs. 2-4, 6, 8, 10, 13, 17, 18, 39, 45, 68A-G, 75, 76. *See* Defendant's Evidentiary Objections (Dkts. 100, 108) Nos. [1], [2], [3], [4], [5], [6], [7], [8], [9], [11], [12], [13], [15], [17], [19], [22], [26], [27], [37], [41], [43], [46], [53], & [54]. |
| | **Statement No. 2** |
| **MCI's Statement** | Steven J. Ditko ("Ditko") was an artist who worked for Marvel from approximately 1955 to 1965, including a period from 1963 to 1965 where Ditko worked nearly exclusively at Marvel, before working again for Marvel from 1979 into the 1990s. Lens Decl., Ex. 45 at 3; Lens Decl., Ex. 44 at 3; Lens Decl., Ex. 25; Lens Decl., Ex. 15 19:1-10; Lens Decl., Ex. 39 |

| | |
|---|---|
| | at 5; Lens Decl., Ex. 2 92:11-20; Declaration of Roy Thomas ("Thomas Decl.") ¶ 19. |
| **Counterclaimant's Response** | **Counterclaimant disputes Marvel's use of the phrase "worked *for* Marvel" (emphasis added) to the extent it implies Steve Ditko ("Ditko") was employed or hired by any "Marvel" entity. Diko was an independent artist, who had no employment contract with, nor was he employed by, any "Marvel" entity, nor did Ditko and "Marvel" share the bilateral rights and obligations that hiring entails during the relevant 1962-1965 period (the "Period").** Marvel has not produced any contemporaneous agreement with Ditko from the Period for his creative services, nor any other evidence reflecting any bilateral rights and obligations between Ditko and Magazine Management (nor any other alleged Marvel predecessor) in the Period, nor has Marvel alleged that any such agreement or bilateral legal rights and obligations existed between such parties in the Period. *See* Toberoff Decl. Ex. 1 at 10, 13 (Supplemented Expert Report of Mark Evanier ("Evanier Rep.") providing historical context giving rise to Marvel's use of freelance creators and explaining that, when Magazine Management ran out of surplus artwork to publish, it began to purchase artwork and scripts from freelancers at a low page rate and that freelancers did not have written contracts with Magazine Management during the 1950s or 1960s and describing the common practice of freelancers selling material to more than one publisher, including Marvel, DC Comics, and Charlton Comics); Ex. 14 at 10-11 (Rebuttal Expert Report of Mark Evanier ("Evanier Rebuttal Rep.") explaining that it was not the custom and practice of Marvel or other publishers in the comic book industry to have written contracts with freelance creators during the Period); Ex. 2 at 71:17-74:5 (Larry Lieber ("Lieber") testifying that he sold freelance work to Marvel in the 1950s and 1960s, had no contract with Marvel, and that Marvel was not obligated to buy his submitted freelance material); Ex. 3 at 159:24-160:4, 194:11-195:3, 207:12-22, 211:7-212:3 (John V. Romita ("Romita") testifying that he did not have a contract with Marvel as a freelancer and that freelancers were free to sell work to other publishers); Ex. 5 at 371:3-25 (Stan Lee ("Lee") testifying that Marvel "would only buy what [it] needed"); Ex. 6 at 36:17-21, 202:2-20 (Roy Thomas ("Thomas") testifying that he had no contract with Marvel until 1974); Ex. 8 ¶ 10 (Joe Sinnott ("Sinnott") attesting that he had no contract with Marvel and Marvel was very small and disorganized in the 1950s and 1960s); Ex. 8 ¶ 11 (Sinnott attesting that Marvel had no obligation to buy pages of his work and that Marvel paid only for the pages it wanted); Ex. 9 ¶ 8 (James Steranko ("Steranko") Steranko attesting that Marvel had no contract with Steranko and so he was free to sell work to other publishers); Ex. 10 ¶ 12 (Richard Ayers ("Ayers") attesting that he had no contract with Marvel from 1959 to |

1975); Ex. 11 ¶ 9 (Gene Colan ("Colan") attesting that he had no contract with Marvel until 1975); Ex. 13 ¶ 5-7 (Neal Adams ("Adams") attesting that he had no contract with Marvel in the 1960s or 1970s and that he sold work to both Marvel and DC Comics during the 1960s and 1970s); Ex. 17 at 39:25-40:4, 51:20-52:4, 298:8-14, 301:14-303:7 (Thomas testifying that he had no written contract from 1965 to 1974 and that Marvel did not have contracts with freelancers prohibiting them from selling work to other publishers); Ex. 22 at 287:22-288:12 (Lieber testifying that he had no contract with Marvel in the 1950s or 1960s); Ex. 24 at 79:2-8 (Paul Levitz ("Levitz") testifying that Marvel did not have contracts with any freelancer until the mid-1970s); Ex. 23 at 160:2-8 (Mark Ditko testifying that Ditko was selling work to both Marvel and Charlton Comics in the 1960s); Ex. 35 at DITKO-0199 (Ditko writing about his work at Charlton Comics in the 1960s); Ex. 57 at 2 (Ditko writing about creating material for Charlton Comics and DC Comics).

**Counterclaimant further disputes the use of the term "Marvel," as Ditko was only ever paid by Magazine Management Company ("Magazine Management"), and not by any of the shell companies (e.g., Vista Publications, Inc. ("Vista"), Atlas Magazines, Inc. ("Atlas"), Non-Pareil Publishing Corp. ("Non-Pareil"))—which Marvel claims were its predecessors-in-interest and the legal "authors" of Ditko's creative material as the shell companies' "works made for hire"—Ditko also had no contract with any of them and, as the shell companies had no employees, he had no contact with any employee of the shell companies.** *See* Dkt. 1 (Marvel's Complaint), ¶ 4 (alleging Marvel owns "the copyrights in the famous Marvel characters and comics on which Ditko worked" "as evidenced by the relevant copyright registration notices themselves"), ¶ 14 (again relying on Marvel's relevant copyright registrations and documenting them as Exhibit 1 to its Complaint); Ex. 1 (reflecting alleged recordation of copyright registrations with the United States Copyright Office); Dkt. 71 (Declaration of Molly Lens) ¶ 25 (attaching as composite Exhibit 24 the copyright registrations and renewal registrations relevant to Ditko's works (Dkt. 71-20 to 71-32) wherein Marvel's renewal registrations represent to the United States Copyright Office that the respective shell companies were the legal "authors" of the works as "works made for hire." *See also* Toberoff Decl., Ex. 14 at 4-5 (Evanier Rebuttal Rep. providing historical context and explaining that Martin Goodman ("Goodman") registered the copyright to comic books under the names of various different shell corporations that were unrelated to each other and had no employees, offices, or business activities, and had no contact with any freelancer); Ex. 6 at 200:2-24 (Thomas testifying that he was hired by Magazine Management in 1965); Ex. 17 at 317:18-318:18 (Thomas testifying that Goodman ran "Marvel" as a bunch of small companies rather than just as a unified Magazine Management for some unknown business or legal

reasons); *id*. at 244:15-23, 278:20-279:20 (Thomas testifying that the door to "Marvel's" office in 1965 only said "Magazine Management" and that "Marvel's" employees worked in Magazine Management's offices); *id*. at 318:4-322:14 (Thomas testifying that Vista, Atlas, Non-Pareil, and others were just used as names on the comic book cover copyright indicia, but other than the indicia, no one knew what those entities did); *id*. at 320:10-322:14 (Thomas testifying that no one knew what Vista, Atlas, or Non-Pareil did and that Thomas did not receive any money from them, does not know anyone who did, does not know if they had any employees or any offices, or "of [them] having any existence" whatsoever); Ex. 20 at 196:1-12 (Evanier testifying that Sol Brodsky ("Brodsky") described Goodman's shell companies as "shell companies"); Ex. 24 at 49:21-50:22, 51:19-52:2 (Levitz testifying that Vista was one of Goodman's shell companies and that the shell companies had no actual offices and that only Magazine Management had offices); Ex. 46 at 1-3 (list of Goodman's shell companies dated October 4, 1967 showing no legal or corporate relationship to one another or to Magazine Management); Ex. 22 at 252:23-254:24, 303:15-19 (Lieber testifying that he never heard of Vista or other shell companies, did not know if they had any employees and that he was paid by, and believed he was working with, Magazine Management); Ex. 50 at DETTWILER-0044-0058 (Don Heck's payment records identifying "Magazine Management" as the only entity that paid him for his freelance material from 1962 to 1966 (the "Period")); Ex. 22 at 252:23-254:24, 303:15-19 (Lieber testifying that he never heard of Vista or the other shell companies, did not know if they had any employees and that he was paid by, and believed he was working with, Magazine Management).

**Ditko in the Period sold his freelance material to Magazine Management and thereby significantly contributed to its comic books, but Ditko was also selling and contributing his freelance material to other publishers, including Charlton Comics, at the same time, as was his right.** *See* Toberoff Decl. Ex. 1 at 21 (Evanier Rep. describing Ditko's common practice of selling freelance work to various publishers during the Period); Ex. 12 ¶ 18 (Evanier attesting that Ditko was submitting freelance *Spider-Man* material to Marvel but was also selling work to Charlton Comics at the same time); Ex. 23 at 160:2-8 (Mark Ditko testifying that Ditko was selling work to both Marvel and Charlton Comics in the 1960s); Ex. 35 at DITKO-0199 (Ditko writing about his work at Charlton Comics in the 1960s); Ex. 57 at 2 (Ditko writing about creating material for Charlton Comics and DC Comics); Ex. 61 (Ditko contributes to Charlton Comics' *Space Adventures* No. 27 (1959)); Ex. 65 (Ditko contributes to Charlton Comics' *Out of this World* No. 7 (1958)); Ex. 67 (Ditko contributes to Charlton Comics' *Strange Suspense* No. 32 (1957)); Ex. 75 (Ditko contributes to Charlton Comics' *Strange Suspense Stories* No. 33, *Director of the Board* (1957)); Ex. 77 (Ditko contributes to Charlton

| | |
|---|---|
| | Comics' *Strange Suspense Stories* No. 48 (1960)); Ex. 79, "All Those Eyes" at 1-3 (Ditko contributes to Charlton Comics' *Out of this World* No. 6 (1957)) |
| **MCI's Reply** | **This fact remains undisputed**.<br><br>Defendant does not address the substance of this fact, much less dispute it. Instead, Defendant suggests that Ditko did not work for Marvel because Ditko lacked a written employment agreement, which is incorrect, turns on improper legal argument, and—in any event—is immaterial, as the Second Circuit's decision in *Kirby* confirms. *See Kirby*, 726 F.3d at 141-42 (rejecting the Kirbys' argument that "the 'right to supervise' referred to in our case law requires a legal, presumably contractual, right" because there is "no hint of this requirement in our case law applying the instance and expense test"—"Marvel's active involvement in the creative process, coupled with its power to reject pages and request that they be redone" suffices); *Kirby*, 777 F. Supp. 2d at 741-42 (rejecting the Kirbys' "entirely unpersuasive" argument that the lack of a written contract with Marvel meant it "lacked the legal right to control Kirby's work").<br><br>Defendant's argument that Ditko did not work for "Marvel" because he was paid and the Works were published by various Goodman comic book publishing entities is likewise incorrect and it too turns on improper legal argument. As the evidence demonstrates, Goodman's various comic book entities conducted business as "Marvel" or "Marvel Comics Group" and engaged with Magazine Management Company for administrative services, including payments to those providing services to Marvel. *See* MCI's Evidence in Support of Undisputed Facts 1 and 49.<br><br>Finally, Defendant's evidence **does not controvert** the fact that Ditko worked for Marvel from 1955 to 1965, including a period from 1963 to 1965 where Ditko worked nearly exclusively for Marvel. And, critically, none of Defendant's contentions change the fact that Ditko had a close and continuous working relationship with Marvel, precisely as Jack Kirby did. *See Kirby*, 726 F.3d at 126 (explaining that "Kirby and Marvel were closely affiliated during the relevant time period . . . Although . . . [Kirby] could and did produce and sell work to other publishers"); *id*. at 141 ("Kirby's works during this period were hardly self-directed projects in which he hoped Marvel, as one of several potential publishers, might have an interest; rather, he created the relevant works pursuant to Marvel's assignment or with Marvel specifically in mind. Kirby's ongoing partnership with Marvel . . . is therefore what induced Kirby's creation of the works."). |

|  | Toberoff Exhibit 9 further **does not support** this contention, because over a decade ago, when Mr. Steranko was retained as an expert witness for Defendant's counsel, he testified that the paychecks he received from Marvel were "stamped work for hire[,] [a] little stamp on the opposite side I think said work for hire." Lens Opp. Decl., Ex. 89 82:3-23. As Mr. Steranko explained, "[w]hen [he] worked at Marvel, [he] was on a work for hire basis," which he understood based on his "experience at Marvel," as Marvel "provided him with [a] description of the character," gave him "treatment[s] [or] synops[e]s of the material that they were looking for," "supervis[ed]" him, and "stamped [his checks] work for hire." *Id*. And after Marvel "editted [*sic*] some of [his] work" and "changed certain things that [he] didn't feel should be changed," Steranko, like Ditko, who "faced the same frustrations," left Marvel. Lens Opp. Decl., Ex. 95 at 4-5.<br><br>MCI also **objects** to Toberoff Exhibits 1, 2, 3, 8, 9, 10, 11, 12, 13, 14, 20, 22, 23, 35, 57, 61, 65, 67, 75, 77, and 79. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [2], [9], [11], [12], [13], [14], [15], [16], [17], [19], [25], [26], [31], [32], [41], [52], [55], [57],[58], [59], [60], & [61]. |
| **Counterclaimant's Response to Reply** | In its initial Response, Counterclaimant expressly **disputed** that Ditko "worked for" Marvel or "worked at Marvel," as Plaintiff repeatedly uses such phrasing to connote an employment relationship between Ditko and MMC (or another Goodman entity). The same dispute pertains to Plaintiff's *repeated* use of other malleable terms like "assignments" to give the illusion of employment when none existed. Employment, whether of a traditional employee or of an independent contractor, like Ditko, obviously involves bilateral legally enforceable *obligations*: for the rendition of conforming services, on the one hand, and guaranteed payment for such conforming services, on the other. In the 1940s through the mid-1950's, Goodman's company(ies) had such obligations to comic book writers and artists which it employed. *See* Evidence Supp. Def.'s SUF (Dkt. 78) ¶¶ 8, 15, 17; Evidence Supp. Def.'s AMF (Dkt. 89) ¶¶ 13, 15). *See also* Pls. Resp. to Def.'s AMF (Dkt. 104) ¶ 48 (Plaintiff effectively admits that Ditko was free to reject Lee's so-called "assignments"). In the late-1950s, when comic book publishing was in rapid decline, Goodman unceremoniously fired all these writers and artists for self-evident reasons: to reduce and limit his legally enforceable financial *obligations*. *See* Evidence Supp. Def's SUF ¶¶ 15-19; Evidence Supp. Def.'s AMF ¶¶ 15-19; *see also* Dkt. 104 (Def.'s Resp to Statement No. 9). These writers and artists were left to work on their steam, without financial guarantees, and conversely Goodman and MMC/Lee no longer had any right to direct or assign work to such freelancers—all they had in the relevant Period (1962-1965) was buying power. *See* Pl.'s Resp. to |

| | |
|---|---|
| | Def.'s AMF (Dkt. 104) ¶ 17 (Plaintiff does not contest and effectively admits that MMC had no written agreements with freelancers in the 1960s).<br><br>In the Period, freelancers like Ditko thus assumed the financial risk of creating material which, *subsequent to its creation*, MMC was free to purchase or not purchase, in its sole unfettered discretion. *See* Evidence Supp. Def.'s SUF ¶¶ 43-45; Evidence Supp. Def.'s AMF ¶¶ 41-43; Dkt.104 (Def.'s Resp to Statement No. 15). MMC, under its Editor Lee, essentially sought to "have its cake and eat it too" by its using economic power and the freelancer's lack of options to reap benefits similar to that in an employment scenario (without the attendant overhead, obligations or responsibilities) but there was no employment of Ditko or other such freelancers in the Period. Whether Ditko sold his completed work to Marvel more or less often is *immaterial* to the parties' legal relationship and whether Ditko created his work during the Period as "work for hire" (for Goodman's Shell Companies, no less).<br><br>Defendant also **objects** to Bard Decl., Exs. 1-9; Lens Decl., Exs. 2-4, 6, 8, 10, 13, 17, 18, 39, 68A-G, 75, 76, 89, 95. *See* Defendant's Evidentiary Objection Nos. [1], [2], [3], [4], [5], [6], [7], [8], [9], [11], [12], [13], [15], [17], [19], [22], [26], [27], [37], [46], [53], [54], [65], & [69] |
| | **Statement No. 3** |
| **MCI's Statement** | Between 1962 and 1965 (the "Time Period"),[1] Ditko contributed to the creation of many comic book stories and characters appearing in Marvel comic books published during the Time Period, including the Works. Lens Decl., Ex. 63.[3] |
| **Counterclaimant's Response** | **Counterclaimant disputes the use of the phrase "*Marvel* comic books" (emphasis added) as Ditko was only ever paid by Magazine Management and the comic book stories to which Ditko contributed were published by various corporately unrelated shell companies (e.g., Vista, Atlas, Non-Pareil), and were not published nor paid for by "Marvel" and the copyrights to the comic books were registered in the United States Copyright Office in the name of such independent shell companies and thereafter renewed in the United States Copyright Office as "works made for hire" of the respective shell companies.** *See* Dkt. 71 (Declaration of Molly Lens) ¶ 25 (attaching as composite Exhibit |

---

[3] Unless otherwise stated, all factual statements herein relate to the Time Period only. Note that due to a lag between when contributions were made and when a comic book was ultimately published, some Works were published in 1966 even though Ditko stopped working for Marvel in late 1965. *See* Thomas Decl. ¶ 18.]

24 the copyright registrations and renewal registrations relevant to Ditko's works (Dkt. 71-20 to 71-32) wherein Marvel's renewal registrations represent to the United States Copyright Office that the respective shell companies were the legal "authors" of the works as "works made for hire."; Toberoff Decl., Ex. 14 at 4-5 (Evanier Rebuttal Rep. providing historical context and explaining that Goodman registered the copyright to comic books under the names of various shell corporations that were unrelated to each other and that the shell companies had no employees, offices, or business activities, and had no contact with any freelancer); Ex. 17 at 317:18-318:18 (Thomas testifying that Goodman ran "Marvel" as a bunch of small companies rather than just as a unified Magazine Management for some unknown business or legal reasons); *id.* at 244:15-23, 278:20-279:20 (Thomas testifying that the door to "Marvel's" office in 1965 only said "Magazine Management" and "Marvel's" employees worked in Magazine Management's offices); *id.* at 318:4-322:14 (Thomas testifying that Vista, Atlas, Non-Pareil, and others were just used as names on the comic book cover copyright indicia, but other than the indicia, no one knew what those entities did); *id.* at 320:10-322:14 (Thomas testifying that no one knew what Vista, Atlas, or Non-Pareil did and that Thomas did not receive any money from them, does not know anyone who did, does not know if they had any employees or any offices, or "of [them] having any existence" whatsoever); *id.* at 138:3-139:2 (Thomas testifying that Magazine Management was the only payor of staff/freelancer checks); Ex. 20 at 196:1-12 (Evanier testifying that Brodsky described Goodman's shell companies as "shell companies"); Ex. 24 at 49:21-50:22, 51:19-52:2 (Levitz testifying that Vista was one of Goodman's shell companies and that Goodman's shell companies had no actual offices and that only Magazine Management had offices); Ex. 46 at 1-3 (list of Goodman's shell companies dated October 4, 1967 showing no legal or corporate relationship to one another or Magazine Management); Ex. 22 at 252:23-254:24, 303:15-19 (Lieber testifying that he never heard of Vista or other shell companies, did not know if they had any employees and that he was paid by, and believed he was working with, Magazine Management); Ex. 50 at DETTWILER-0044-0058 (Don Heck's payment records identifying "Magazine Management" as the only entity that paid him for his freelance material from 1962 to 1966); Ex. 22 at 252:23-254:24, 303:15-19 (Lieber testifying that he never heard of Vista or other shell companies, did not know if they had any employees and that he was paid by, and believed he was working with, Magazine Management and that he thought the name on the checks was Marvel or Magazine Management); Ex. 6 at 200:2-24 (Thomas testifying that he was hired by Magazine Management in 1965); Ex. 40 at 2021MARVEL-0005845 (Certificate of Renewal Registration of *Amazing Fantasy* Vol. 1, No. 15, the issue in which Spider-Man originally appeared, dated November 20, 1990, claiming "Atlas Magazines, Inc." as the original author and copyright claimant); Ex. 41 at 2021MARVEL-0005849 (Certificate of Renewal Registration of *Amazing Spider-Man*

Vol. 1, No. 1 dated November 20, 1990, claiming "Non-Pareil Publishing Corporation" as the original author and copyright claimant); Ex. 42 (Certificate of Renewal Registration of *Strange Tales* Vol. 1, No. 110, the issue in which Dr. Strange first appeared, dated December 27, 1991, claiming "Vista Publications, Inc." as the original author and copyright claimant).

**Counterclaimant further disputes that Ditko merely "*contributed* to the creation of many … characters" (emphasis added), as, for example, and without limitation, Ditko solely originated the Dr. Strange character as early as 1946 and created the first five-page Dr. Strange story "on spec" which he then sold to Magazine Management and it was published in *Strange Tales* No. 110 (1963). In addition to co-creating Spider-Man, Ditko created a host of key supporting characters like the Chameleon, Electro, Aunt May, and Norman Osborn (the alter ego of the Green Goblin). Moreover, Ditko took over sole plotting and penciling both *Spider-Man* and *Dr. Strange* stories when Lee stopped speaking with Ditko later in the Period, and therefore solely originated and created—and did not merely "contribute[] to"—the new characters and new elements appearing in the stories he created during that time.** *See* Toberoff Decl. Ex. 1 at 21 (Evanier Rep. providing historical context of the first publication of Ditko's Dr. Strange character in *Strange Tales* No. 110 (1963) and Lee's admission that Ditko originated the idea and story for the Dr. Strange character); Ex. 25 (Ditko: "Dr. Strange has always been a contradiction to Marvel heroes … He is my creation, and at one point I took over all stories, writing, [and] art."); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script); Ex. 30 at 2021MARVEL-0050281 (Lee writing that Dr. Strange "'twas [Ditko's] idea, and I figgered [sic] we'd give it a chance'" in a contemporaneous letter dated January 9, 1963); Ex. 49 at 1 (first published appearance of Dr. Strange in *Strange Tales* No. 110); Ex. 33 (Ditko's letter post-marked August 6, 1946 to his brother Patrick Ditko enclosing an initial sketch of Dr. Strange); Ex. 59 at 61:15-65:14 (Patrick Ditko, being shown composite Ex. 33 and testifying that his brother, Steve Ditko, sent him this letter in 1946, while Ditko was in military service abroad, enclosing Ditko's early sketch of Dr. Strange (Ex. 33) and that he had found Ex. 33 at his home amongst letters he had kept from his brother); Ex. 23 at 166:5-168:8 (Mark Ditko testifying that his father lived in Johnstown, PA at the address written on the letter envelope of composite Ex. 33, and that in 1946 (postmarked on the letter envelope), his uncle Ditko was in the military, stationed abroad in Germany); Ex. 71 at 159 (*Amazing Spider-Man* No. 25: "Sturdy Stevey Ditko dreamed up the plot of this tantalizing tale, and it's full of unexpected surprises!"); Ex. 72 at 225 (*Strange Tales* No. 135: "Plotted and Illustrated by Fandom's Favorite

Fiend: Steve Ditko"); Ex. 7 at 223:18-224:13 (Thomas testifying that
Ditko did all the plotting on *Spider-Man* and *Dr. Strange* stories while
Ditko and Lee were no longer speaking to each other in the Period); Ex. 17
at 29:19-30:8, 83:13-18 (Thomas testifying that by the time Thomas began
at Marvel in mid-1965, Ditko was plotting and penciling *Dr. Strange*
stories, which Thomas would dialogue); *id.* at 92:9-20 (Thomas testifying
that Ditko stopped working with Marvel around Christmas 1965); Ex. 26
at 83 (Lee writing that Ditko came up with the *Dr. Strange* plots and
illustrated the story and Lee only added the dialogue to the balloons); Ex.
35 at DITKO-0193 (Ditko writing that he and Lee stopped speaking
around 1964 and thus from then on, Ditko had complete creative control of
the *Spider-Man* and *Dr. Strange* stories, which he was plotting and
penciling until he left in 1966); Ex. 62 at 4-5 (Dr. Strange used his hands
to cast teleportation and other spells in *Strange Tales* No. 139 (1965)); Ex.
63 at 2 (same in *Strange Tales* No. 126 (1964)); Ex. 70 at 8-9 (same in
*Strange Tales* No. 129 (1965)); *compare* Ex. 61 at 3 (Ditko's character
used his hands to cast spells in 1959 in Charlton Comics' *Space
Adventures* No. 27); *see also* Ex. 66 at 10 (in *Strange Tales* No. 137
(1965), Dr. Strange used a device—the Eye of Agamotto—to transport
through space and time); *compare* Ex. 65 at 4-5 (In Charlton Comics' *Out
of this World* No. 7 (1958), Ditko's character used similar artifact to
transport characters in a swirl of visual effects through space and time);
*see also* Ex. 68 at 4-5 (in *Strange Tales* No. 122 (1964), Dr. Strange
traversed through different dimensions and journeyed through alternate
planes of existence); Ex. 69 at 1 (same in *Strange Tales* No. 134 (1965));
*compare* Ex. 67 at Cover, 4-5 (Ditko used same effect in Charlton Comics'
*Strange Suspense* No. 32 (1957)); *see also* Ex. 73 at 6 (Norman Osborn's
first appearance in the *Spider-Man* series in 1965); Ex. 74 at 10 (Norman
Osborn's identity revealed to readers in *Amazing Spider-Man* No. 37
(1966)); *compare* Ex. 75 at 1-2 (Norman Osborn's precursor—including
corporate villainy and distinct curled hairstyle—in 1957 in Ditko's story
published in Charlton Comics' *Strange Suspense Stories* No. 33, *Director
of the Board*); *see also* Ex. 60 at 2, 8 (*Amazing Fantasy* No. 15 (1962), the
issue in which Spider-Man and Ditko's Aunt May character first appeared)
*compare* Ex. 79, "All Those Eyes" at 1-3 (Aunt May's forerunner
character appeared in Ditko's story in Charlton Comics' *Out of this World*
No. 6 (1957)); *see also* Ex. 76 at 1, 4 (Ditko's Electro character in
*Amazing Spider-Man* No. 9 (1964)); *compare* Ex. 77 at 1, 4-5 (Ditko's
electrically powered man, the predecessor of Electro, first appeared in
Ditko's story published in Charlton Comics' *Strange Suspense Stories* No.
48 (1960)); *see also* Ex. 78 at 1, 5-6, 8-9 (Ditko introduces the
Chameleon—a character who used various masks to carry out his
villainy—in *Amazing Spider-Man* No. 1 (1963)); *compare* Ex. 79, "All
Those Eyes" at 2-3 (Chameleon precursor—a spy character who used
various masks in his espionage with a similar back story as the
Chameleon—appeared in Ditko's "All Those Eyes" story he sold to

| | |
|---|---|
| | Charlton Comics in 1957); Ex. 82 (Lee explaining in January 9, 1966 published interview: "**I don't plot Spider-Man any more. Steve Ditko, the artist, has been doing the stories.** I guess I'll leave him alone until sales start to slip. Since Spidey got so popular, Ditko thinks he's the genius of the world. We were arguing so much over plot lines I told him to start making up his own stories. **He won't let anybody else ink his drawings either. He just drops off the finished pages with notes at the margins and I fill in the dialogue. I never know what he'll come up with next**, but it's interesting to work that way.") (emphasis added); Ex. 83 at 7 (same). *See* Toberoff Decl. Ex. 21 at 30: 10 -16 (Steranko testifying: "Stan and I never worked in that manner. Stan never provided me with plot ideas, character ideas, story ideas. I was strictly on my own. So that's why I wouldn't call my work there real assignments. I was doing that --I would say--on speculation and there were times that Stan rejected the work."); 62:13-24 (Steranko's response reflects some confusion about Marvel check legends and "work for hire"); 63:25-64:5 (Steranko: "I never had a Marvel contract. We never even had an agreement. We never even had a discussion about the work, particularly about work for hire. I did all of my Marvel stories on my own cognizance."), 91:10 - 92:13 (Steranko better recalls caption on the back of Marvel checks regarding the purchase and sale of rights in his work); Ex. 9 ¶ 12 (Steranko attestiing that "[o]n the backs of many of the checks I received from Marvel in the 1960s and 1970's was a stamped legend which stated that by endorsing the check, I was assigning to the publisher all rights in the work, including the copyright. Nowhere did the phrase 'work-for-hire' or 'work-made-for-hire' appear."); Ex. 9, ¶ 9 (Steranko attesting "[a]t that time, I understood and the people l dealt with at Marvel appeared to understand simply that I was selling and the publisher was purchasing my freelance work.) |
| **MCI's Reply** | **This fact remains undisputed.**<br><br>Defendant does not address the substance of this fact, much less dispute it. Instead, Defendant contends that Ditko did not contribute to "Marvel comic books" because he was paid by and the works were published by entities with names other than "Marvel," which is incorrect and turns on improper legal argument. As the evidence demonstrates, Goodman's various comic book entities conducted business as "Marvel" or "Marvel Comics Group" and engaged with Magazine Management Company for administrative services, including payments to those providing services to Marvel. *See* MCI's Evidence in Support of Undisputed Facts 1 and 49. The evidence further demonstrates that freelance contributors, including Ditko, contributed to Marvel's comic books pursuant to assignments from Lee, who directed the creation of the Works, and they were compensated by Marvel on an agreed per-page basis for completed assignments. *See* |

MCI's Evidence in Support of Undisputed Facts 22, 23, and 49. Lee, in turn, answered to Goodman, who not only owned the various entities that conducted business as "Marvel" or "Marvel Comics Group," but served as Marvel's publisher during the Time Period. *See* MCI's Evidence in Support of Undisputed Facts 1 and 9.

Further, Defendant's contention that Ditko did not "*merely* contribute[]" to the creation of many Marvel characters, but "originated" them "on spec" is incorrect and improper legal argument. As the evidence shows, for the majority of the time Ditko worked for Marvel, Ditko worked under the Marvel Method and described his working relationship with Lee as a "collaboration" that involved meetings to discuss assignments, "plotting conferences" to discuss the stories he was drawing, and further meetings to go over draft artwork, with Ditko "noting anything to be corrected." *See* MCI's Evidence in Support of Undisputed Facts 39 and 47. According to Ditko "Stan provided the plot ideas." Lens Decl., Ex. 48 at 2. Indeed, Ditko's explanation of how he worked with Lee mirrors the Second Circuit's description of how Jack Kirby worked with Lee during approximately the same time period. *Compare* Lens Decl., Ex. 48 at 2 ("Stan provided the plot ideas. There would be a discussion to clear up anything, consider plot options and so forth . . . We would go over the penciled story/art pages and I would explain any deviations, changes, and additions, noting anything to be corrected before or during the inking."), *with Kirby*, 726 F.3d at 126 ("The first step was for Lee to meet with an artist at a 'plotting conference' … Lee would provide the artist with a 'brief outline' or 'synopsis' of an issue; sometimes he would 'just talk ... with the artist' about ideas …. [and t]he artist would then 'draw it any way they wanted to.'"). And here, as in *Kirby*, the fact that Ditko "had a freer hand within this framework than did comparable artists" is immaterial to whether Ditko worked at Marvel's instance and expense. *Id.*

Further, while Lee eventually exercised his editorial discretion to afford Ditko greater creative input, subject to Marvel's ultimate authority, this did not occur until sometime in 1965, late in Ditko's Marvel career, a period of time well after the major characters were introduced. *See* MCI's Evidence in Support of Undisputed Facts 25 and 47. But even then, Lee still assigned Ditko to the stories and could remove him at any time, could request or make changes to his work, or otherwise elect not to publish it. *See* MCI's Evidence in Support of Undisputed Facts 23, 27, 28, and 48. Indeed, Toberoff Exhibit 82 makes clear that after their falling out, Lee assigned Ditko "to start making up his own stories." Ditko continued to received his assignments from Marvel's production manager, Sol Brodsky, who gave them on Lee's behalf. *See* Toberoff Ex. 19 at 3 (Thomas discussing Ditko's working relationship with Lee when they "weren't speaking to each other," explaining how Marvel production manager Sol Brodsky served as Lee's intermediary on assignments); Lens Opp. Decl.,

| | |
|---|---|
| | Ex. 84 30:17-31:1 (Thomas testifying that "a lot of it went through the production manager, Sol Brodsky" who "was speaking for [Lee]"); Lens Opp. Decl., Ex. 84 335:2-5 (Thomas testifying that Lee would "give directions through Sol Brodsky"). Likewise, Lee still reviewed Ditko's work and had ultimate authority over it, regardless of whether he communicated directly with Ditko. Toberoff Ex. 19 at 3-4 (although Lee "was willing to go along with a lot of what Steve wanted to do," "Stan had the authority" and used it "when he felt he had to use it" because an explanation that "the artist wanted to do it that way" "would not have been a sufficient excuse for Martin Goodman."); *see also* Evidence in Support of Undisputed Fact 22.<br><br>Additionally, Defendant's evidence **does not support** his contention that Ditko created any of the characters in the Works "on spec." Indeed, Defendant's evidence consists of prior (unproduced) comic books and a naked sketch allegedly drawn by Ditko that Defendant simply speculates include "precursors" to characters Ditko would later contribute to Marvel comic books. Such "evidence" cannot controvert this fact. And all of the other evidence Defendant cites relates to the period in 1965, at the very end of the Time Period, when Lee, using his editorial discretion, afforded Ditko greater creative input on the Spider-Man comics, including assigning him to plot the stories, subject to Marvel's ultimate authority. *See* MCI's Evidence in Support of Undisputed Facts 25 and 47.<br><br>MCI also **objects** to Toberoff Exhibits 1, 14, 20, 22, 23, 25, 27, 33, 35, 59, 61, 65, 67, 75, 77, and 79. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [17], [19], [26], [31], [33], [34], [35], [39], [41], [54], [55], [57], [58], [59], [60], & [61]. |
| **Counterclaimant's Response to Reply** | Counterclaimant admits **only** that Ditko created or co-created illustrated comic book stories published by Shell Companies that were distinct and separate juridical entities from any other entity owned by Goodman. The comic book magazines containing the stories were both registered for copyright in the name of the Shell Companies, respectively, and renewed 28 years later by Marvel, representing to the Copyright Office in the renewal registrations that the works were "works for hire" and that the respective Shell Company was the statutory "author" of such works. *See* Dkt. 1, ¶¶ 4, 14; Dkts. 71-28 to 71-32. Counterclaimant respectfully incorporates by reference its above Preliminary Statement with respect to Goodman's sporadic, immaterial use of the name "Marvel Comics Group" or colloquial references to "Marvel" cited by Plaintiff and Plaintiff's mis-reliance on Bard Decl., Exs. 2, 5-8. Plaintiff never explains how the language it cherry-picks in these and other random documents support its defense that Ditko created his works at the "instance" or "expense" of the |

<table>
<tr><td></td><td>Shell Companies registered as its statutory "authors.". Dkts. 71-28 to 71-32. To argue "instance," Plaintiff relies almost exclusively on the alleged creative input of Lee—which itself is strongly disputed (along with Lee's credibility, <i>see</i> Evidence Supp. AMF ¶¶ 97-105)—and famously, the subject of much historical debate). But, more to the point, Lee, as Editor, was employed by MMC. See Pl.'s Reply (Dkt. 104) at 31 ("admitting that Lee's "actual paycheck likely was drawn on a Magazine Management account."). Further, Lee, like Ditko, was paid by MMC (by the page) as a freelancer for his creative and writing contributions (not an editorial function). <i>Id.</i>, <i>citing</i> Lens Decl. Ex. 68A-G (freelancer Don Heck's payment ledger reflecting extensive payment entries on per-page basis each from "Magazine Management" from 1952 until 1975 (where the payor entry "Marvel" first appears)). Just as Plaintiff has proffered no evidence of any relationship between Ditko and any of the Shell Companies, Plaintiff has adduced no evidence (<i>e.g</i>, not a single communication) of any relationship between Lee and <i>any</i> of the Shell Companies. Accordingly, any alleged input by Lee can hardly be attributed to the Shell Companies, registered as, and claimed by Plaintiff to be, the statutory "authors."

Defendant also <b>objects</b> to Bard Decl., Exs. 1-9; Lens Decl., Exs. 2-4, 6-10, 12, 13, 15, 17, 18, 39, 41, 42, 45, 48, 68A-G, 75, 76, 84. <i>See</i> Defendant's Evidentiary Objection Nos. [1], [2], [3], [4], [5], [6], [7], [8], [9], [11], [12], [13], [15], [16], [17], [18], [19], [21], [22], [24], [26], [27], [37], [39], [40], [43], [44], [46], [53], [54], & [60].</td></tr>
<tr><td colspan="2" align="center"><b><u>Statement No. 5</u></b></td></tr>
<tr><td><b>MCI's Statement</b></td><td>Marvel filed copyright registrations for each of the Works with the U.S. Copyright Office in the name of the Marvel entity that published the work. Lens Decl., Ex. 24A-E.</td></tr>
<tr><td><b>Counterclaimant's Response</b></td><td><b>Admitted that copyright registrations were filed with the U.S. Copyright Office for the published comic books containing Ditko's works, but disputing that "Marvel" filed these copyright registrations in the Period and noting that the copyrights registrations were filed in the name of independent shell corporations.</b> <i>See</i> Toberoff Decl. Ex. 40 at 2021MARVEL-0005848; Ex 41 at 2021MARVEL-0005852; Ex. 42 at 2021MARVEL-0006420; Dkt. 71 (Declaration of Molly Lens) ¶ 25 (attaching as composite Exhibit 24 the copyright registrations and renewal registrations relevant to Ditko's works (Dkt. 71-20 to 71-32).</td></tr>
</table>

| | |
|---|---|
| **MCI's Reply** | **This fact remains undisputed.**<br><br>Defendant admits that, as the evidence shows, the copyright registrations for the Works were filed in the name of the Marvel entity that published each respective Work, but disputes that "Marvel" filed the copyright registrations. As already explained, that is incorrect and turns on improper legal argument about the association between Goodman's publishing entities. *See* MCI's Evidence in Support of Undisputed Facts 1 and 49. Defendant cites no evidence disputing that the Works were copyrighted in the name of a Goodman publishing entity, and the copyright registrations for the Works confirm Magazine Management Company's connection, as they list Magazine Management Company and its address, as the location for the Copyright Office to "[s]end certificate to." *See, e.g.,* Lens Decl., Ex. 24 at 7. |
| **Counterclaimant's Response to Reply** | Plaintiff once again relies on Goodman's ownership of both MMC and the Shell Companies he expressly set up and exploited as distinct corporate entities, to argue that Ditko's creations were the Shell Companies' "work for hire," as registered and relied upon herein by Plaintiff. But as shown in Counterclaimant's Preliminary Statement, *supra.* incorporated herein by reference, Plaintiff never articulates a cognizable legal theory to support any of this. *See Dole Food Co. v. Patrickson,* 538 U.S. 468, 474, 123 S.Ct. 1655 (2003)("A basic tenet of American corporate law is that the corporation and its shareholders are distinct entities."); *Hutson v. Notorious B.I.G.,* 2015 WL 9450623, at \*5-6 (S.D.N.Y. Dec. 22, 2015) (owner of company which registered copyright has no interest therein). "Corporate form matters. Here, there were distinct legal entities [MMC and Shell Companies], whose separate nature cannot simply be ignored when inconvenient." *Clarex Ltd. v. Natixis Sec. Am. LLC*, 2012 WL 4849146, at \*6 (S.D.N.Y. Oct. 12, 2012).<br><br>As in its Complaint (Dkt. 1, ¶¶ 4, 14), Plaintiff relies on the copyright registrations of the subject copyrights as the Shell Companies' copyrights as a material fact underlying Plaintiff's summary judgment motion, but Plaintiff has adduced zero record evidence that Ditko created his works at the "instance" *and* "expense" of the Shell Companies. *See* Counterclaimant's Preliminary Statement.<br><br>Defendant also **objects** to Bard Decl., Exs. 1-9; Lens Decl., Exs. 2-4, 6, 8, 10, 13, 17, 18, 39, 68A-G, 75, 76. *See* Defendant's Evidentiary Objection Nos. [1], [2], [3], [4], [5], [6], [7], [8], [9], [11], [12], [13], [15], [17], [19], [22], [26], [27], [37], [46], [53], & [54]. |

| | **Statement No. 6** |
|---|---|
| **MCI's Statement** | Marvel subsequently filed renewal copyright registrations for each of the Works, with each such renewal listing a Marvel entity as the renewal claimant and proprietor of the copyright in the subject work as a work made for hire. Lens Decl., Ex. 24A-E. |
| **Counterclaimant's Response** | **Admitted that copyright renewal registrations were filed with the U.S. Copyright Office listed Marvel Entertainment Group, Inc. as the renewal claimant regarding the published comic books containing Ditko's works, but disputing with respect to Ditko's works Marvel's retroactive mischaracterization in the renewal registrations that the comic books were "work made for hire" for various shell companies and listing such shell companies as the legal "authors" thereof.** *See* Dkt. 71 (Declaration of Molly Lens) ¶ 25 (attaching as composite Exhibit 24 the copyright registrations and renewal registrations relevant to Ditko's works (Dkt. 71-20 to 71-32) wherein Marvel's renewal registrations represent to the United States Copyright Office that the respective shell companies were the legal "authors" of the works as "works made for hire."; Toberoff Decl., Ex. 14 at 4-5 (Evanier Rebuttal Rep. providing historical context and explaining that Goodman registered the copyright to comic books under the names of various shell corporations that were unrelated to each other and that the shell companies had no employees, offices, or business activities, and had no contact with any freelancer); Ex. 17 at 317:18-318:18 (Thomas testifying that Goodman ran "Marvel" as a bunch of small companies rather than just as a unified Magazine Management for some unknown business or legal reasons); *id*. at 244:15-23, 278:20-279:20 (Thomas testifying that the door to "Marvel's" office in 1965 only said "Magazine Management" and "Marvel's" employees worked in Magazine Management's offices); *id*. at 318:4-322:14 (Thomas testifying that Vista, Atlas, Non-Pareil, and others were just used as names on the comic book cover copyright indicia, but other than the indicia, no one knew what those entities did); *id*. at 320:10-322:14 (Thomas testifying that no one knew what Vista, Atlas, or Non-Pareil did and that Thomas did not receive any money from them, does not know anyone who did, does not know if they had any employees or any offices, or "of [them] having any existence" whatsoever); *id*. at 138:3-139:2 (Thomas testifying that Magazine Management was the only payor of staff/freelancer checks); Ex. 20 at 196:1-12 (Evanier testifying that Brodsky described Goodman's shell companies as "shell companies"); Ex. 24 at 49:21-50:22, 51:19-52:2 (Levitz testifying that Vista was one of Goodman's shell companies and that Goodman's shell companies had no actual offices and that only Magazine Management had offices); Ex. 46 at 1-3 (list of Goodman's shell |

| | |
|---|---|
| | companies dated October 4, 1967 showing no legal or corporate relationship to one another or Magazine Management); Ex. 22 at 252:23-254:24, 303:15-19 (Lieber testifying that he never heard of Vista or other shell companies, did not know if they had any employees and that he was paid by, and believed he was working with, Magazine Management); Ex. 50 at DETTWILER-0044-0058 (Don Heck's payment records identifying "Magazine Management" as the only entity that paid him for his freelance material from 1962 to 1966); Ex. 22 at 252:23-254:24, 303:15-19 (Lieber testifying that he never heard of Vista or other shell companies, did not know if they had any employees and that he was paid by, and believed he was working with, Magazine Management and that he thought the name on the checks was Marvel or Magazine Management); Ex. 6 at 200:2-24 (Thomas testifying that he was hired by Magazine Management in 1965); Ex. 40 at 2021MARVEL-0005845 (Certificate of Renewal Registration of *Amazing Fantasy* Vol. 1, No. 15, the issue in which Spider-Man originally appeared, dated November 20, 1990, claiming "Atlas Magazines, Inc." as the original author and copyright claimant); Ex. 41 at 2021MARVEL-0005849 (Certificate of Renewal Registration of *Amazing Spider-Man* Vol. 1, No. 1 dated November 20, 1990, claiming "Non-Pareil Publishing Corporation" as the original author and copyright claimant); Ex. 42 (Certificate of Renewal Registration of *Strange Tales* Vol. 1, No. 110, the issue in which Dr. Strange first appeared, dated December 27, 1991, claiming "Vista Publications, Inc." as the original author and copyright claimant). |
| **MCI's Reply** | **This fact remains undisputed.**<br><br>Defendant admits that Marvel filed renewal copyright registrations with the U.S. Copyright Office, and cites nothing disputing that such copyright renewals *list* a Marvel entity as the renewal claimant and copyright proprietor. Instead, Defendant non-responsively and incorrectly argues that the renewals contain "retroactive mischaracterization[s]" insofar as they list Marvel publishing entities as authors. This is misleading. At the time Marvel filed the initial registrations, Form B (the form applicable to the Works here) did not include a field for the author or statement of claim. It was not until the Works were eligible for copyright renewal that Form B was updated to include these fields, thus allowing a renewal registrant to indicate that the work was a work for hire. In any event, since this fact only concerns the existence of the renewals and what is listed therein, none of Defendant's arguments is responsive, and this fact is deemed admitted in its entirety. *See* Local Rule 56.1(b)-(d); *see also Parks Real Estate, Purchasing Group v. St. Paul Fire and Marine Ins. Co.*, 472 F.3d 33, 41 |

<table>
<tr><td></td><td>(2d Cir. 2006); <em>Giannullo v. City of N.Y.</em>, 322 F.3d 139, 140 (2d Cir. 2003).<br><br>In any event, as explained above, the evidence demonstrates that Ditko, like other Marvel freelance contributors, had an ongoing relationship with Marvel pursuant to which Ditko contributed to Marvel comics books on assignment, subject to Lee's and (and ultimately Goodman's direction, supervision, and authority, and was compensated by Marvel on an agreed per-page basis for completed assignments. <em>See</em> MCI's Evidence in Support of Undisputed Facts 22, 23, and 49. And the evidence further demonstrates that Marvel freelancers, including Steve Ditko, understood their work for Marvel during the relevant time period was done on a work for hire basis. <em>See</em> MCI's Evidence in Support of Undisputed Facts 5, 6, 53, 54, and 55.<br><br>MCI also <strong>objects</strong> to Toberoff Exhibits 14, 20, and 22. <em>See</em> MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [17], [19], [26], & [31].</td></tr>
<tr><td><strong>Counterclaimant's Response to Reply</strong></td><td>Just like in Plaintiff's Complaint (Dkt. 1, ¶¶ 4, 14), Plaintiff relies on its copyright <em>renewal</em> registrations (representing <em>the Shell Companies</em> as the "statutory authors" of the alleged "works for hire" at issue) as a material fact underlying Plaintiff's summary judgment motion. However, Plaintiff has adduced zero record evidence that Ditko created his works at the "instance" <em>and</em> "expense" of the Shell Companies. <em>See</em> Counterclaimant's Preliminary Statement, <em>supra</em>, incorporated herein by reference.<br><br>Defendant also <strong>objects</strong> to Lens Decl., Exs. 2-4, 6, 7, 9, 10, 12, 13, 15, 19, 20, 23, 39, 42, 44, 48, 68A-G. <em>See</em> Defendant's Evidentiary Objection Nos. [11], [12], [13], [15], [16], [18], [19], [21], [22], [24], [28], [29], [32], [37], [40], [42], [44], & [46].</td></tr>
<tr><td colspan="2" align="center"><strong><u>Statement No. 9</u></strong></td></tr>
<tr><td><strong>MCI's Statement</strong></td><td>Martin Goodman was Marvel's publisher from 1939 until 1972. Bard Decl., Ex. 7 at 5; Lens Decl., Ex. 2 18:10-13; Lens Decl., Ex. 2 81:10-12; Lens Decl., Ex. 7 219:11-220:11; Lens Decl., Ex. 12 60:22-61:4; Lens Decl., Ex. 13 11:18-23; Lens Decl., Ex. 13 16:14-19; Lens Decl., Ex. 15 12:19-21; Lens Decl., Ex. 4 99:6-10; Lens Decl., Ex. 2 32:8-12.</td></tr>
<tr><td><strong>Counterclaimant's Response</strong></td><td><strong>Counterclaimant disputes that Goodman was "Marvel's" publisher from 1939 until 1972 but admits that Goodman was the publisher of Timely Comics, and then, during the Period, of Magazine Management. There is no evidence that Goodman served as the</strong></td></tr>
</table>

| | |
|---|---|
| | **publisher for any of the shell companies, including Vista, Atlas, and Non-Pareil, which existed only on paper and had no actual publishing or other business operations.** *See* Toberoff Decl., Ex. 1 at 8 (Evanier Rep. providing historical context and describing Goodman's founding of Timely); Ex. 4 at 11:24-12:3 (Lee testifying that Timely changed names many times); Ex. 56 at 82:23-83:13 (Lee testifying he started working at Timely, which was somehow related to Magazine Management); Ex. 11 ¶ 4 (Colan attesting that he was originally hired in 1946 as a staff artist for Timely, which became Atlas); Ex. 17 at 34:21-35:25 (Thomas testifying that Goodman kept changing names of his companies and the public was confused as to what the name of "Marvel" actually was. The company started as "Timely," but that "Atlas," which was Goodman's distributing company, had its name on the magazines, which made the public think the company's name was "Atlas." Finally, "Marvel" began being sporadically used sometime between 1961 to 1963.); Ex. 14 at 4 (Evanier Rebuttal Rep. providing historical context and explaining that Goodman registered the copyright to comic books under the names of various shell corporations that were unrelated to each other); Ex. 17 at 317:18-318:18 (Thomas testifying that Goodman ran "Marvel" as a bunch of small companies rather than just as a unified Magazine Management for some unknown business or legal reasons); Ex. 20 at 196:1-12 (Evanier testifying that Brodsky described Goodman's shell companies as "shell companies"); Ex. 24 at 49:21-50:22 (Levitz testifying that Vista was one of Goodman's shell companies); Ex. 46 at 1-3 (list of Goodman's shell companies dated October 4, 1967 showing no legal or corporate relationship to one another or to Magazine Management). |
| **MCI's Reply** | **This fact remains undisputed.**<br><br>Defendant admits that Goodman was the publisher of Timely Comics, Marvel's predecessor, and of Magazine Management Company, but argues there is "no evidence" Goodman was the publisher of Vista, Atlas, or Non-Pareil. That is incorrect. The undisputed evidence demonstrates that Goodman was not only the owner, but also the publisher of Vista, Atlas, and Non-Pareil. *See* MCI's Evidence in Support of Undisputed Fact 1; *see also, e.g.*, Lens Decl., Ex. 31A at 18 ("AMAZING SPIDER-MAN is published by NON-PAREIL PUBLISHING CORP . . . Martin Goodman, Publisher"); Lens Decl., Ex. 31E at 9 ("STRANGE TALES is published by VISTA PUBLICATIONS INC . . . Martin Goodman, Publisher"); July 28, 2023 Molly M. Lens Declaration ("Lens Reply Decl."), Ex. 113 at 3 ("JOURNEY INTO MYSTERY is published by ATLAS MAGAZINES, INC. . . Martin Goodman, Publisher."). |

| | |
|---|---|
| | MCI also **objects** to Toberoff Exhibits 1, 11, 14, and 20. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [14], [17], & [19]. |
| **Counterclaimant's Response to Reply** | Goodman credited himself as "Publisher" on three comic books selected and cited by Plaintiff, purportedly "published" by the Shell Companies. But Plaintiff has completely failed to adduce any evidence that the Shell Companies had any employees or actual operations. Numerous other comic books purportedly "published" by the Shell Companies do not list Goodman as the Publisher. Regardless, this purported fact and "evidence" is immaterial, and thus Plaintiff never explains why it matters. Defendant also **objects** to Bard Decl., Exs. 1-9; Lens Decl., Exs. 4, 6, 8, 13, 17, 18, 75, 76, 113. *See* Defendant's Evidentiary Objection Nos. [1], [2], [3], [4], [5], [6], [7], [8], [9], [13], [15], [17], [22], [26], [27], [53], [54], & [85]. |
| | **Statement No. 10** |
| **MCI's Statement** | Stan Lee was Marvel's editor (a/k/a editor-in-chief) from approximately 1942 until 1972—when he was promoted to president and publisher of Marvel. Lee also wrote stories for Marvel on a freelance basis, including during the Time Period. Lens Decl., Ex. 13 14:2-17; Lens Decl., Ex. 6 7:18-8:10; Lens Decl., Ex. 6 12:1-4; Lens Decl., Ex. 15 11:21-13:10; Lens Decl., Ex. 2 32:8-12; Lens Decl., Ex. 6 40:14-20; Lens Decl., Ex. 15 17:2-8; Lens Decl., Ex. 5 63:1-18; Lens Decl., Ex. 2 290:17-291:5; *see also* Lens Decl., Ex. 22 at 3; Lens Decl., Ex. 74 at 3. |
| **Counterclaimant's Response** | **Counterclaimant disputes that Lee was editor of "Marvel" from 1942 to 1972, as Lee originally worked for Timely and then, in the Period, was employed as an editor by Magazine Management.** *See* Toberoff Decl. Ex. 1 at 9 (Evanier Rep. describing Lee's role as an office boy at Timely); Ex. 4 at 10:23-11:17 (Lee testifying that he got hired at Timely in 1939 or 1940); Ex. 56 at 82:13-22 (Lee testifying he started at Timely around 1940 when he was 17 years old). **Counterclaimant disputes that Lee wrote stories for "Marvel." In the Period, Lee principally wrote the dialogue and captions for comic book stories in a freelance capacity and was paid by the page for such freelance material by Magazine Management in the Period.** *See* Toberoff Decl. Ex. 1 at 13 (Evanier Rep. describing Lee's common practice of composing dialogue as a freelancer, not as Marvel's editor and doing his freelancing from home two of the five workdays per week, for |

29

| | |
|---|---|
| | which he was paid on a per-page basis as a freelancer); Ex. 4 at 17:17-25 (Lee testifying that he was paid as a freelancer for his writing and was on salary for his work as an editor); Ex. 55 at 62:18-63:18 (Lee testifying that he got paid a salary as editor and was paid separately for his writing); Ex. 56 at 91:20-92:6 (Lee testifying that he got paid a salary as editor and separately as a freelancer pre page for his writing); Ex. 17 at 138:3-139:2 (Thomas testifying that Magazine Management was the only payor of staff salaries and freelancer checks); Ex. 22 at 252:23-254:24, 303:15-19 (Lieber testifying that he never heard of Vista or other shell companies, did not know if they had any employees and that he was paid by, and believed he was working with, Magazine Management); Ex. 50 at DETTWILER-0044-0058 (Don Heck's payment records identifying "Magazine Management" as the only entity that paid him for his freelance material in the Period). |
| **MCI's Reply** | **This fact remains undisputed.**<br><br>Defendant admits that Lee was employed as an editor for "Timely" and "Magazine Management," but disputes that he was editor of "Marvel," which is incorrect and turns on improper legal argument. As the evidence demonstrates, Lee's work—both in his capacity as editor and freelancer writer—was performed for and on behalf of Marvel's publisher Goodman, whose various comic book entities conducted business as "Marvel" or "Marvel Comics Group" and engaged with Magazine Management Company for administrative services, including payments to those providing services to Marvel. *See* MCI's Evidence in Support of Undisputed Facts 1 and 49. Lee provided these services to Marvel (or, at a minimum, to Goodman, who controlled and was publisher of the entities that published the Works), even though his actual paycheck likely was drawn on a Magazine Management account. *See* Lens Decl., Ex. 68A-G (freelance writer Don Heck's payment ledger reflecting extensive entries on per-page basis for his work for "Mag. Management," "Maga. Management," "Magazine Management," and "Marvel" from 1954 to 1972 and intermittently until 1994, when all entries end); *see also* MCI's Evidence in Support of Undisputed Facts 1, 9, and 10.<br><br>MCI also **objects** to Toberoff Exhibits 1 and 22. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [26], & [31]. |
| **Counterclaimant's Response to Reply** | Plaintiff admits in its Reply that Stan Lee worked as an Editor for Timely and thereafter MMC (not any of the Shell Companies), that MMC paid his Editor's salary and that MMC paid on a per-page basis for Lee's creative contributions as a freelance writer, which was not an editorial function. |

See MCI Reply (Dkt. 104) at 31 ("admitting that Lee's "actual paycheck likely was drawn on a Magazine Management account."). **Just as Plaintiff has provided no evidence of any relationship between Ditko and any of the Shell Companies, Plaintiff has adduced no evidence of any connection between Lee and any of the Shell Companies. Accordingly, any alleged input by Lee can hardly be attributed to the Shell Companies, registered as and claimed by Plaintiff to be the statutory "authors" of the works at issue.** Plaintiff erroneously can only argue that Lee, nonetheless, provided his services to "Marvel" which was not a legal entity "or, at a minimum, to Goodman who controlled [the Shell Companies]" underscoring the weakness of its position.

Goodman specifically incorporated the independent Shell Companies along with scores of other shell corporations, presumably for tax and asset protection benefits and accordingly, these entities had no (and were intended by Goodman to have no) legal connection to one another. *See* Toberoff Reply Decl., Ex. 67, Dkt. 99 (Transcript of Goodman's sworn testimony: "Q: These companies are owned and controlled by you …doing business as Magazine Management Company? A [Goodman]: "No, each corporation stands on its own."); *id.*, Ex. 46 at 1-3 (1967 list of Goodman's numerous entities reflecting no legal or corporate relationship to one another or to MMC); Ex. 24 at 49:21-50:22 (Plaintiff's own expert Paul Levitz testifying that Vista was just one of Goodman's shell companies). *See also* Lens Decl., Ex. 75 (Goodman's official March 8, 1967 dba certification listing *37* entities as using the "assumed name" "Marvel Comics Group" *but MMC is conspicuously absent from Goodman's list*); Bard Decl., Ex. 7 (1962 FTC Complaint) at 5 (noting that Goodman has "approximately forty-eight corporations," Ex. 2 at 2-3 (listing Shell Companies Non-Pareil and Vista as coincidentally having the *exact same net worth and profits* for different fiscal years); Ex. 5 (Dun & Bradstreet Report on MMC) at 3 (noting with respect to Goodman's numerous entities that "there are no inter-company relations such as loans, advances of guarantees reported.").

Goodman obviously benefitted from this elaborate corporate structure and adhered to the corporate formalities. After Marvel publicly registered the subject copyrights as the Shell Companies' "work for hire" and relying on such copyright registrations, Plaintiff erroneously now suggests that simply by calling these distinct corporate entities "Marvel," it can erase all that. However, "people cannot use a corporate structure for some purposes" and benefit from it, and thereafter "disavow it for others" when convenient. *Waite,* 450 F. Supp. 3d at 441-42 (copyright termination case); *see also Martha Graham School, 3*80 F.3d at 640-41 (refusing to disregard Graham's own charitable Foundation as her "employer" of "works for hire"). Nor does Goodman's ownership of both MMC and the Shell Companies make a difference or support any of Plaintiff's intentionally

| | |
|---|---|
| | vague legal theories. *See* Preliminary Statement incorporated herein by reference.<br><br>Defendant also **objects** to Bard Decl., Exs. 1-9; Lens Decl., Exs. 2-8, 10, 12, 13, 15, 17, 18, 22, 39, 68A-G, 74-76. *See* Defendant's Evidentiary Objection Nos. [1], [2], [3], [4], [5], [6], [7], [8], [9], [11], [12], [13], [14], [15], [16], [17], [19], [21], [22], [24], [26], [27], [31], [37], [46], [52], [53], & [54]. |
| | **Statement No. 11** |
| **MCI's Statement** | Roy Thomas joined Marvel in 1965 as a staff writer, quickly transitioned to working as an editorial assistant to Stan Lee, was promoted to assistant editor in approximately 1967, and was promoted to editor-in-chief from 1972 to 1974. Thomas also wrote stories for Marvel on a freelance basis, including during the Time Period. Lens Decl., Ex. 2 271:11-272:19; Lens Decl., Ex. 16 99:6-11; Lens Decl., Ex. 2 26:11-27:22; Lens Decl., Ex. 2 61:7-15; Lens Decl., Ex. 2 64:17-25; Lens Decl., Ex. 21. |
| **Counterclaimant's Response** | **Admitted, except that Roy Thomas was employed by Magazine Management in 1965 at the tail end of the relevant Period and, though on a staff salary, wrote and sold stories to Magazine Management by the page on a purely freelance basis.** *See* Toberoff Decl. Ex. 6 at 200:2-24 (Thomas testifying that he was hired by Magazine Management in 1965); Ex. 17 at 138:3-139:2 (Thomas testifying that Magazine Management was the only payor of staff salaries and freelance checks); *id*. at 244:15-23, 278:20-279:20 (Thomas testifying that the door to "Marvel's" office in 1965 only said "Magazine Management"); Ex. 44 ¶ 3(a) (Marvel's contract with Thomas dated September 1, 1974 providing that any writing Thomas did would be on a purely freelance basis for which he would be paid for only for those pages which Marvel accepted in its sole discretion and requiring Thomas to make changes to his freelance work for no additional compensation); Ex. 53 ¶ 3(a) (Marvel's contract with Thomas dated August 27, 1976 with same provision). |
| **MCI's Reply** | **This fact remains undisputed.**<br><br>Defendant admits that Thomas was employed as a staff writer, editorial assistant, assistant editor, and editor, but disputes that he was employed by "Marvel," which is incorrect and turns on improper legal argument. Just as it does with Stan Lee, the evidence demonstrates that Thomas's work— both in his capacity as editor and freelancer writer—was performed for |

| | |
|---|---|
| | and on behalf of Marvel's publisher Goodman, whose various comic book entities conducted business as "Marvel" or "Marvel Comics Group" and engaged with Magazine Management Company for administrative services, including payments to those providing services to Marvel. *See* MCI's Evidence in Support of Undisputed Facts 1 and 49. Thomas provided these services to Marvel (or, at a minimum, to Goodman, who controlled and was publisher of the entities that published the Works), even though his actual paycheck likely was drawn on a Magazine Management account. *See* Lens Decl., Ex. 68A-G (freelance writer Don Heck's payment ledger reflecting extensive entries on per-page basis for his work for "Mag. Management," "Maga. Management," "Magazine Management," and "Marvel" from 1954 to 1972 and intermittently until 1994, when all entries end); *see also* MCI's Evidence in Support of Undisputed Facts 1, 9, and 11.<br><br>MCI also **objects** to Toberoff Exhibits 44 and 53. *See* MCI's Evidentiary Objection Nos. [45] & [50]. |
| **Counterclaimant's Response to Reply** | Plaintiff **admits** that Roy Thomas was a salaried employee of MMC commencing in 1965 at the end of the Period (substantially limiting his status as an alleged percipient witness) and that he was paid by MMC by the page on a freelance basis for any writing he did on the side.  However, Counterclaimant **disputes** Plaintiff's vague use of "Marvel," "Marvel Comics Group," and Goodman's ownership to support its erroneous claim that Ditko created his works at the "instance and expense" of the Shell Companies. Counterclaimant incorporates by reference his Response to Plaintiff's Statement No. 10 as well as his Preliminary Statement.<br><br>Defendant also **objects** to Bard Decl., Exs. 1-9; Lens Decl., Exs. 2-4, 6-8, 10, 12, 13, 15-18, 21, 39, 68A-G, 75, 76. *See* Defendant's Evidentiary Objection Nos. [1], [2], [3], [4], [5], [6], [7], [8], [9], [11], [12], [13], [15], [16], [17], [19], [21], [22], [24], [25], [26], [27], [30], [37], [46], [53], & [54]. |
| | **Statement No. 12** |
| **MCI's Statement** | During Stan Lee's tenure as editor, Marvel developed what became known as the Marvel Method for creating comic book stories. Lens Decl., Ex. 13 20:11-21:25; Lens Decl., Ex. 11 218:14-219:16; Lens Decl., Ex. 9 at 47:20-48:8. |

| Counterclaimant's Response | **Counterclaimant admits that Lee often utilized what he called the "Marvel Method," wherein the artist would create and plot the comic book stories, to which Lee would later add dialogue, but denies that Ditko created his material pursuant to the "Marvel's" or Lee's "method," as Ditko was extremely independent and often took control of his stories that he sold to Marvel.** *See* Toberoff Decl. Ex. 7 at 223:18-225:20, 277:11-13 (Thomas testifying that Ditko did all the plotting on *Spider-Man* and *Dr. Strange* stories while he and Lee were not speaking and that Ditko never received any plots from Thomas when Thomas was doing the dialoguing on *Dr. Strange*); *id*. at 262:4-264:19 (Thomas testifying that, when Thomas began to dialogue *Dr. Strange* stories instead of Lee, Ditko would type his suggested captions and dialogue on a separate page, not in the margins, and then give them to Thomas to fill in the dialogue balloons); Ex. 17 at 311:18-312:25 (Thomas testifying that Ditko, on his own, plotted and drew *Spider-Man* for more than one year before he left in 1966, did not work pursuant to the Marvel Method, and that Lee would not even know anything about the story until it was penciled and submitted by Ditko); *id*. at 84:18-90:9 (Thomas testifying that Ditko wrote extensive margin notes describing the plot and what was happening so that when Lee/Thomas dialogued the story, they could do so in a way that corresponded with what Ditko had intended); Ex. 71 at 159 (*Amazing Spider-Man* No. 25: "Sturdy Stevey Ditko dreamed up the plot of this tantalizing tale, and it's full of unexpected surprises!"); Ex. 72 at 225 (*Strange Tales* No. 135: "Plotted and Illustrated by Fandom's Favorite Fiend: Steve Ditko"); Ex. 18 (1965 example of Ditko's *Dr. Strange* margin notes for Thomas); Ex. 19 at 6-8 (Thomas interview explaining that Ditko and Lee were not speaking in 1965 and Ditko was plotting both *Spider-Man* and *Dr. Strange* and would only come to the office to drop work off with Brodsky); Ex. 26 at 83 (Lee writing that Ditko came up with the *Dr. Strange* plots and illustrated the story and Lee only added the dialogue); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script); Ex. 28 (Lee writing that Ditko was the co-creator of Spider-Man and that Ditko did most of the plotting of *Spider-Man* and just left Lee to do the dialogue and some captions). |
| MCI's Reply | **This fact remains undisputed.**<br><br>As an initial matter, this fact concerns the Marvel Method generally, and hence Defendant's admission that Lee "often utilized" the Marvel Method renders this fact undisputed. |

|  | Regardless, Defendant's contention that Ditko was "extremely independent and often took control of his stories" is non-responsive and incorrect for the reasons stated in MCI's Reply in Support of Undisputed Fact 3.<br><br>MCI also **objects** to Toberoff Exhibit 27. *See* MCI's Evidentiary Objection No. [35]. |
| --- | --- |
| **Counterclaimant's Response to Reply** | Lee's "Marvel Method" is immaterial to whether the Shell Companies were the statutory "authors" of the relevant copyrights as registered by Marvel and relied upon by Plaintiff, and Counterclaimant incorporates by reference his Preliminary Statement with respect thereto. Notwithstanding this, as comic books are a visual medium, the "Marvel Method," in reality, allowed Lee to dispense with him having to write scripts and instead have artists like Ditko *plot* (i..e., originate) the stories in pictorial form, after which Lee could simply fill in the dialogue balloons, finalize the captions and pocket the entire per-page freelance "writer's" compensation himself (in addition to his MMC Editor's salary). *See* Response to Statement 25, *infra*, incorporated by reference.  Plaintiff, like Lee, supports the vague notion that it was all Lee's "ideas", but this, like Lee's credibility, is sharply disputed by most comic book historians and contradicted by Lee's own statements. *See* Evidence Supp. AMF ¶¶ 97-105.<br><br>Defendant also **objects** to Bard Decl., Exs. 1-9; Lens Decl., Exs. 2-4, 6-10, 12, 13, 15, 17, 18, 39, 41, 42, 45, 48, 68A-G, 75, 76, and 84. *See* Defendant's Evidentiary Objection Nos. [1], [2], [3], [4], [5], [6], [7], [8], [9], [11], [13], [15], [16], [17], [18], [19], [21], [22], [24], [26], [27], [37], [39], [40], [43], [44], [46], [53], [54], & [60]. |
| | **<u>Statement No. 13</u>** |
| **MCI's Statement** | Under the Marvel Method, Stan Lee generally originated characters and plot ideas for Marvel comics. Lens Decl., Ex. 48 at 2 (Ditko admitting that "Stan provided the plot ideas"); Lens Decl., Ex. 2 48:2-22 (Thomas affirming prior statements that "Stan was really the guy who generated the ideas" and that he did not "push[] us to come up with new characters in the early days, except for villains"); Lens Decl., Ex. 3 97:8-98:25 (Marvel writer Larry Lieber (and defendant in consolidated action) testifying that "Stan would give me a one-page plot outline for a story, I would write the |

|  | script, [and] return it Stan"); Lens Decl., Ex. 9 13:22-14:4 (Lieber confirming that Stan Lee "came up with the ideas for the characters that would be in the story"); Lens Decl., Ex. 9 12:19-13:5 (Lieber testifying that "my brother [Stan Lee] made up the plot and gave me a synopsis" and that "all" story ideas "came from Stan Lee"); Lens Decl., Ex. 13 35:5-10 (Lee confirming that his "role" was "to come up with the idea" for new comic books or stories); Lens Decl., Ex. 13 35:23-36:6 (Lee testifying that "[i]n the 60s, the ideas for the new characters originated with [him] because that was [his] responsibility."); Lens Decl., Ex. 71 at 3:25-6:09 (Lee explaining how Marvel's basic "formula" was to "mix fantasy with realism" with characters that "are a little different, . . . sort of like continuing soap operas"); Lens Decl., Ex. 71 at 3:25-6:09 (Lee explaining how Marvel "juxtapos[ed] . . . bigger-than-life problem[s]" with "the very simple home life and family life"); Lens Decl., Ex. 71 at 20:17-23:23 (Lee explaining how Marvel "juxtapos[ed] [] the supernatural with the very mundane, every day type of existence"); *see also* Lens Decl., Ex. 10 335:10-336:11; Lens Decl., Ex. 38 at 5; Lens Decl., Ex. 43 at 2. |
|---|---|
| **Counterclaimant's Response** | **Counterclaimant admits that Lee often utilized what he called the "Marvel Method," wherein the artist would create and plot the comic book stories, to which Lee would later add dialogue, but disputes that Lee "generally originated the characters and plot ideas" and denies that Ditko created his material pursuant to the "Marvel's" or Lee's "method," as Ditko was extremely independent and often took control of his stories that he sold to Marvel.** *See* Toberoff Decl. Ex. 7 at 223:18-225:20, 277:11-13 (Thomas testifying that Ditko did all the plotting on *Spider-Man* and *Dr. Strange* stories while he and Lee were not speaking and that Ditko never received any plots from Thomas when Thomas was doing the dialoguing on *Dr. Strange*); *id.* at 262:4-264:19 (Thomas testifying that, when Thomas began to dialogue *Dr. Strange* stories instead of Lee, Ditko would type his suggested captions and dialogue on a separate page, not in the margins, and then give them to Thomas to fill in the dialogue balloons); Ex. 17 at 311:18-312:25 (Thomas testifying that Ditko, on his own, plotted and drew *Spider-Man* for more than one year before he left in 1966, did not work pursuant to the Marvel Method, and that Lee would not even know anything about the story until it was penciled and submitted by Ditko); *id.* at 84:18-90:9 (Thomas testifying that Ditko wrote extensive margin notes describing the plot and what was happening so that when Lee/Thomas dialogued the story, they could do so in a way that corresponded with what Ditko had intended); Ex. 18 (1965 example of Ditko's *Dr. Strange* margin notes for Thomas); Ex. 19 at 6-8 (Thomas interview explaining that Ditko and Lee were not speaking in 1965 and Ditko was plotting both *Spider-Man* and *Dr. Strange* and would only come to the office to drop work off with Brodsky); Ex. 26 at 83 (Lee |

| | writing that Ditko came up with the *Dr. Strange* plots and illustrated the story and Lee only added the dialogue); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script); Ex. 28 (Lee writing that Ditko was the co-creator of Spider-Man and that Ditko did most of the plotting of *Spider-Man* and just left Lee to do the dialogue and some captions); Ex. 71 at 159 (*Amazing Spider-Man* No. 25: "Sturdy Stevey Ditko dreamed up the plot of this tantalizing tale, and it's full of unexpected surprises!"); Ex. 72 at 225 (*Strange Tales* No. 135: "Plotted and Illustrated by Fandom's Favorite Fiend: Steve Ditko"); Ex. 35 at DITKO-0192, DITKO-0207-0210, DITKO-0215-0218 (Ditko writing that he rejected several of Lee's *Spider-Man* story ideas and characters such as, for instance, Lee's idea for a Spider-Woman character, or Lee's idea of making Aunt May more glamorous); Ex. 58 at 4 (Ditko writing that he "refused to do a drunken Iron Man splash page—someone else had to draw [and] ink it"). |
|---|---|
| **MCI's Reply** | **This fact remains undisputed.**<br><br>As an initial matter, this fact concerns the Marvel Method generally, and hence Defendant's admission that Lee "often utilized" the Marvel Method renders this fact undisputed.<br><br>Regardless, Defendant's suggestion that Lee did not generally originate characters and plot ideas for the Works because Ditko "often took control of his stories" is non-responsive, incorrect, and unsupported by Defendant's evidence for the reasons set forth above in MCI's Reply in Support of Undisputed Fact 3.<br><br>MCI, however, **objects** to Toberoff Exhibits 27, 35, and 58. *See* MCI's Evidentiary Objection Nos. [35], [41], and [53]. |
| **Counterclaimant's Response to Reply** | This purported fact remains **disputed**. It is also immaterial to whether the Shell Companies were the "statutory authors" of the relevant work and copyrights as registered by Marvel and relied upon by Plaintiff, and Counterclaimant incorporates by reference his Response to Plaintiff's Statement No. 12 and Counterclaimant's Preliminary Statement.<br><br>Defendant also **objects** to Bard Decl., Exs. 1-9; Lens Decl., Exs. 2-4, 6-10, 12, 13, 15, 17, 18, 39, 41, 42, 45, 48, 68A-G, 75, 76, 84. *See* Defendant's Evidentiary Objection Nos. [1], [2], [3], [4], [5], [6], [7], [8], [9], [11], |

| | |
|---|---|
| | [12], [13], [15], [16], [17], [18], [19], [21], [22], [24], [26], [27], [37], [39], [40], [43], [44], [46], [53], [54], & [60]. |
| | **Statement No. 14** |
| **MCI's Statement** | After Lee conceived of a story idea, Lee then assigned a pencil artist ("penciller") to the comic and generally provided a "plot" or "synopsis" outlining the key elements of the story he wanted the penciller to draw. Lens Decl., Ex. 48 at 2 (Ditko admitting that "Stan provided the plot ideas"); Lens Decl., Ex. 46 at 3 (Ditko explaining that Stan Lee "create[ed]" the "Spider-Man" name and wrote the original "synopsis for the artist [(*i.e.*, Ditko)]"); Lens Decl., Ex. 13 20:11-21:25 (Lee testifying about the Marvel Method and, using Ditko as an example, explaining that he might say: "Look, Steve, I don't have time to write your script for you, but this is the idea for the story. I'd like this fill in, and I'd like this to happen, and in the end the hero ends by doing this. You go ahead and draw it any way you want to, as long as you keep to that main theme.… And when you finish drawing this one, I will put in all the dialogue and the captions."); Lens Decl., Ex. 11 218:14-219:16 (Thomas testifying that, under the Marvel Method, Stan Lee "would come up with the idea for the plots… [a]nd he simply would give those plots to the artists, who would then draw the story, break them down into pictures, expanding them, whatever needed to be done to break them down into pictures"); *see also* Lens Decl., Ex. 2 28:8-21; Lens Decl., Ex. 9 at 47:20-48:8; Lens Decl., Ex. 69; Lens Decl., Ex. 70. |
| **Counterclaimant's Response** | **Counterclaimant admits that Lee often utilized what he called the "Marvel Method," wherein the artist would create and plot the comic book stories, to which Lee would later add dialogue, but denies that Ditko created his material pursuant to the "Marvel's" or Lee's "method," as Ditko was extremely independent and often took control of his stories, rejecting any of Lee's "ideas" he did not like.** *See* Toberoff Decl. Ex. 7 at 223:18-225:20, 277:11-13 (Thomas testifying that Ditko did all the plotting on *Spider-Man* and *Dr. Strange* stories while he and Lee were not speaking and that Ditko never received any plots from Thomas when Thomas was doing the dialoguing on *Dr. Strange*); *id.* at 262:4-264:19 (Thomas testifying that, when Thomas began to dialogue *Dr. Strange* stories instead of Lee, Ditko would type his suggested captions and dialogue on a separate page, not in the margins, and then give them to Thomas to fill in the dialogue balloons); Ex. 17 at 311:18-312:25 (Thomas testifying that Ditko, on his own, plotted and drew *Spider-Man* for more than one year before he left in 1966, did not work pursuant to the Marvel Method, and that Lee would not even know anything about the story until |

it was penciled and submitted by Ditko); *id*. at 84:18-90:9 (Thomas testifying that Ditko wrote extensive margin notes describing the plot and what was happening so that when Lee/Thomas dialogued the story, they could do so in a way that corresponded with what Ditko had intended); Ex. 18 (1965 example of Ditko's *Dr. Strange* margin notes for Thomas); Ex. 19 at 6-8 (Thomas interview explaining that Ditko and Lee were not speaking in 1965 and Ditko was plotting both *Spider-Man* and *Dr. Strange* and would only come to the office to drop work off with Brodsky); Ex. 26 at 83 (Lee writing that Ditko came up with the *Dr. Strange* plots and illustrated the story and Lee only added the dialogue); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script); Ex. 28 (Lee writing that Ditko was the co-creator of Spider-Man and that Ditko did most of the plotting of *Spider-Man* and just left Lee to do the dialogue and some captions); Ex. 71 at 159 (*Amazing Spider-Man* No. 25: "Sturdy Stevey Ditko dreamed up the plot of this tantalizing tale, and it's full of unexpected surprises!"); Ex. 72 at 225 (*Strange Tales* No. 135: "Plotted and Illustrated by Fandom's Favorite Fiend: Steve Ditko"); Ex. 35 at DITKO-0192, DITKO-0207-0210, DITKO-0215-0218 (Ditko writing that he rejected several of Lee's *Spider-Man* story ideas and characters such as, for instance, Lee's idea for a Spider-Woman character, or Lee's idea of making Aunt May more glamorous); Ex. 58 at 4 (Ditko writing that he "refused to do a drunken Iron Man splash page—someone else had to draw [and] ink it");. Ex. 1 at 12 (Evanier Rep. describing Ditko's regular practice of maintaining a chart mapping out the future development of a character so he could introduce elements into current issues and then use those elements in issues many months down the line); Ex. 35 at DITKO-0193 (Ditko writing that he planted seeds of subplots in stories that would work their way through the issues until it was time for those sub-stories to play an active role later when the time was right); Ex. 58 at 3 (Ditko writing when he took over the *Spider-Man* stories he "knew in advance the [*Spider-Man*] story line like the best (worst) time for Aunt May to have a heart attack"); Ex. 82 (Lee explaining in January 9, 1966 published interview: "**I don't plot Spider-Man any more. Steve Ditko, the artist, has been doing the stories.** I guess I'll leave him alone until sales start to slip. Since Spidey got so popular, Ditko thinks he's the genius of the world. We were arguing so much over plot lines I told him to start making up his own stories. **He won't let anybody else ink his drawings either. He just drops off the finished pages with notes at the margins and I fill in the dialogue. I never know what he'll come up with next**, but it's interesting to work that way.") (emphasis added); Ex. 83 at 7 (same).

**Counterclaimant also denies that Lee "assigned" Ditko tasks to the extent this connotes that Ditko was under any legal obligation to perform work or to do what Lee or Magazine Management proposed.**

**Ditko was not employed or hired by Magazine Management (or by any other alleged Marvel predecessor), Ditko was not under contract with any such entities and there were no bilateral legal obligations between Ditko and any such entities; thus Lee could not "assign" Ditko to perform anything in any legal or employment sense.** Marvel has not produced any contemporaneous agreement with Ditko from the Period for his creative services, nor any other evidence reflecting any bilateral rights and obligations between Ditko and Magazine Management (nor any other alleged Marvel predecessor) in the Period, nor has Marvel alleged that any such agreement or bilateral legal rights and obligations existed between such parties in the Period. *See* Toberoff Decl. Ex. 1 at 10, 13 (Supplemented Expert Report of Mark Evanier ("Evanier Rep.") providing historical context giving rise to Marvel's use of freelance creators and explaining that, when Magazine Management ran out of surplus artwork to publish, it began to purchase artwork and scripts from freelancers at a low page rate and that freelancers did not have written contracts with Magazine Management during the 1950s or 1960s and describing the common practice of freelancers selling material to more than one publisher, including Marvel, DC Comics, and Charlton Comics); Ex. 14 at 10-11 (Rebuttal Expert Report of Mark Evanier ("Evanier Rebuttal Rep.") explaining that it was not the custom and practice of Marvel or other publishers in the comic book industry to have written contracts with freelance creators during the Period); Ex. 2 at 71:17-74:5 (Larry Lieber ("Lieber") testifying that he sold freelance work to Marvel in the 1950s and 1960s, had no contract with Marvel, and that Marvel was not obligated to buy his submitted freelance material); Ex. 3 at 159:24-160:4, 194:11-195:3, 207:12-22, 211:7-212:3 (John V. Romita ("Romita") testifying that he did not have a contract with Marvel as a freelancer and that freelancers were free to sell work to other publishers); Ex. 5 at 371:3-25 (Stan Lee ("Lee") testifying that Marvel "would only buy what [it] needed"); Ex. 6 at 36:17-21, 202:2-20 (Roy Thomas ("Thomas") testifying that he had no contract with Marvel until 1974); Ex. 8 ¶ 10 (Joe Sinnott ("Sinnott") attesting that he had no contract with Marvel and Marvel was very small and disorganized in the 1950s and 1960s); Ex. 8 ¶ 11 (Sinnott attesting that Marvel had no obligation to buy pages of his work and that Marvel paid only for the pages it wanted); Ex. 9 ¶ 8 (James Steranko ("Steranko") Steranko attesting that Marvel had no contract with Steranko and so he was free to sell work to other publishers); Ex. 10 ¶ 12 (Richard Ayers ("Ayers") attesting that he had no contract with Marvel from 1959 to 1975); Ex. 11 ¶ 9 (Gene Colan ("Colan") attesting that he had no contract with Marvel until 1975); Ex. 13 ¶ 5-7 (Neal Adams ("Adams") attesting that he had no contract with Marvel in the 1960s or 1970s and that he sold work to both Marvel and DC Comics during the 1960s and 1970s); Ex. 17 at 39:25-40:4, 51:20-52:4, 298:8-14, 301:14-303:7 (Thomas testifying that he had no written contract from 1965 to 1974 and that Marvel did not have contracts with freelancers prohibiting them from

| | |
|---|---|
| | selling work to other publishers); Ex. 22 at 287:22-288:12 (Lieber testifying that he had no contract with Marvel in the 1950s or 1960s); Ex. 24 at 79:2-8 (Paul Levitz ("Levitz") testifying that Marvel did not have contracts with any freelancer until the mid-1970s); Ex. 23 at 160:2-8 (Mark Ditko testifying that Ditko was selling work to both Marvel and Charlton Comics in the 1960s); Ex. 35 at DITKO-0199 (Ditko writing about his work at Charlton Comics in the 1960s); Ex. 57 at 2 (Ditko writing about creating material for Charlton Comics and DC Comics). |
| **MCI's Reply** | **This fact remains undisputed.**<br><br>As an initial matter, this fact concerns the Marvel Method generally, and hence Defendant's admission that Lee "often utilized" the Marvel Method renders this fact undisputed.<br><br>Regardless, Defendant's suggestion that Lee did not assign Marvel artists to pencil and/or ink Marvel comics and that Ditko did not work pursuant to the Marvel Method because he was "extremely independent" and "often took control of his stories" is non-responsive, incorrect, and unsupported by Defendant's evidence for the reasons set forth above in MCI's Reply in Support of Undisputed Fact 3.<br><br>Further, Defendant's suggestion that Lee did not assign Ditko to work on Marvel comic books because Ditko lacked a written employment agreement is incorrect, turns on an improper legal argument, and—in any event—is immaterial, as the Second Circuit's decision in *Kirby* confirms. *See* MCI's Reply in Support of Undisputed Fact 2.<br><br>MCI also **objects** to Toberoff Exhibits 1, 2, 3, 8, 9, 10, 11, 13, 14, 22, 23, 27, 35, 57, and 58. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos.[1], [2], [9], [11], [12], [13], [14], [16], [17], [25], [32], [35], [41], [52], & [53]. |
| **Counterclaimant's Response to Reply** | These purported facts remain **disputed**, particularly as to Ditko's creative process. Lee's purported "assignments" were, in reality, suggestions. Plaintiff has adduced no evidence that Ditko was hired by MMC because Goodman sought to avoid the legal obligations arising from the actual employment of even an independent contractor. Consequently, Plaintiff has no evidence that Lee had any *legal "right"* to assign Ditko work. Plaintiff admits this. *See* Pl.'s Resp. to AMF No. 48 (Dkt. 104) (**admitting Ditko was free to reject Lee's so-called "assignments"**). Just as MMC, by design, had no legal rights or obligations with respect to Ditko's work, Ditko had no obligation to perform or accept Lee's suggestions. All |

MMC/Lee had was purchasing power. And **the power to buy material does not support "work for hire" which is fundamentally based on the actual hiring of an employee or independent contractor to perform services**. *See Martha Graham*, 380 F.3d at 635 (the "instance" prong turns on whether "the hiring party … has the right to direct and supervise the manner in which the work is carried out"; "The <u>right</u> … need never be exercised.")(emphasis in original). Counterclaimant incorporates by reference his Response to Plaintiff's Statement No. 12 as to the so-called "Marvel Method."  Notwithstanding the above, **Plaintiff's Statement No. 14 is also immaterial to whether the Shell Companies were the statutory "authors"** of the relevant work and copyrights, as registered by Marvel and relied upon by Plaintiff, and with respect to this Counterclaimant incorporates by reference his Preliminary Statement.

Defendant also **objects** to Bard Decl., Exs. 1-9; Lens Decl., Exs. 2-4, 6-10, 12, 13, 15, 17, 18, 39, 41, 42, 45, 48, 68A-G, 75, 76, 84, 89, 95. *See* Defendant's Evidentiary Objection Nos. [1], [2], [3], [4], [5], [6], [7], [8], [9], [11], [12], [13], [15], [16], [17], [18], [19], [21], [22], [24], [26], [27], [37], [39], [40], [43], [44], [46], [53], [54], [60], [65], & [69].

| | |
|---|---|
| | **<u>Statement No. 15</u>** |
| **MCI's Statement** | Once the penciller turned in his work, Lee would review the artwork and consider any changes, additions, or corrections. Lens Decl., Ex. 48 at 2 (Ditko describing the process of Stan Lee reviewing his work); Lens Decl., Ex. 13 20:11-21:25 (Lee testifying about the Marvel Method); Lens Decl., Ex. 11 218:14-219:16 (Thomas explaining the Marvel Method). |
| **Counterclaimant's Response** | **Counterclaimant admits that Lee would often review artwork submitted by freelancers prior to Magazine Management deciding whether to purchasing it by the page, and at times would request changes to pages as a condition to purchasing such pages. Counterclaimant denies that Ditko would make such changes, as Ditko often refused to alter his work, and in that event, any changes Lee wanted were either ignored, or had to be made by a production assistant after Ditko had sold his work to the company.** *See* Toberoff Decl. Ex. 14 at 7 (Evanier Rebuttal Rep. explaining Ditko's practice of refusing to make changes and in such case, Marvel's custom of having staff make such changes after the work had been submitted to and purchased by Marvel); Ex. 3 at 75:18-20, 243:13-244:23, 246:5-9 (Romita testifying that he, or someone else Lee could find in the Marvel office, would be asked to make changes to other artists' work after it had been submitted and would not be paid any extra for making these changes and |

noting specifically that when Lee did not like something on a Ditko cover,
he asked Kirby to change it); Ex. 19 at 6, "Legends at Loggerheads!"
(Thomas explaining example of when Lee incorrectly dialogued a *Spider-
Man* story in a way Ditko had not intended, Ditko refused to accede to
Lee's chosen direction); Ex. 35 at DITKO-0193 (Ditko writing that he
ignored comments from Lee and Brodsky and only made changes to
stories when he agreed with them); Ex. 21 at 41:7-18 (Steranko testifying
that Marvel had production assistants to make changes to work after it had
been submitted by artists).

**Counterclaimant further denies that Magazine Management would
pay for any such changes requested (as a condition to purchasing the
freelance pages in question), as it only paid for the final page it
decided to purchase from a freelancer in its sole discretion.** *See*
Toberoff Decl. Ex. 1 at 15 (Evanier Rep. describing the comic book
industry and Marvel's custom and practice of not paying freelancers to
revise or redraw a page, as freelancers were only paid for the final pages
the publisher decided to accept and purchase); Ex. 14 at 7 (Evanier
Rebuttal Rep. explaining the custom and practice in the comic book
industry, including at Marvel, for publishers to not pay for rejected
material, or to pay a freelancer to make revisions to his material); Ex. 2 at
102:15-105:17 (Lieber testifying he was not paid for redoing work and that
he was only paid for the final pages Marvel accepted); Ex. 8 ¶ 13 (Sinnott
attesting that Marvel only paid for the final pages that were sold to Marvel,
not for any changes or rejected work); Ex. 9 ¶ 14 (Steranko attesting he
was not compensated for having to redo any work); Ex. 10 ¶ 11 (Ayers
attesting that he was not paid for rejected material or for having to redo
material); Ex. 11 ¶¶ 9, 11 (Colan attesting that Marvel did not pay him for
redoing work); Ex. 13 ¶¶ 10-11 (Adams attesting that he was only paid for
pages Marvel accepted); Ex. 17 at 142:21-143:15, 296:10-25 (Thomas
testifying that freelancers were not paid for having to redo or revise pages
and that they would only be paid for the final, accepted page); Ex. 43 ¶
3(a) (Marvel's contract with Colan dated March 22, 1975 providing that
Colan would be paid only for those pages which Marvel accepted and
requiring Colan to make changes to his work without any additional
compensation); Ex. 44 ¶ 3(a) (Marvel's contract with Thomas dated
September 1, 1974 providing that Thomas would be paid only for those
pages which Marvel accepted and requiring Thomas to make changes to
his work without any additional compensation); Ex. 53 ¶ 3(a) (Marvel's
contract with Thomas dated August 27, 1976 with same provision); Ex. 52
¶ 3(a) (Marvel's October 7, 1977 contract with Gerber providing Gerber
would be paid only for those pages Marvel accepted and that Gerber "will
make all changes and rework all Material … without charge"); *compare*
Ex. 47 ¶ 6 (unsigned Lancer Books contract with Don Rico dated
December 15, 1966 with provision stating Lancer "shall be deemed the

43

| | |
|---|---|
| | Author of the Work … in view of the fact that [Rico was Lancer's] employee for hire"). |
| **MCI's Reply** | **This fact remains undisputed.**<br><br>As an initial matter, this fact concerns the Marvel Method generally, and hence Defendant's admission that Lee "often utilized" the Marvel Method renders this fact undisputed.<br><br>Regardless, Defendant's suggestion that Ditko would ignore Lee's changes or any such changes had to be made by a production assistant is incorrect and unsupported by any admissible evidence. And, as explained above in MCI's Reply in Support of Undisputed Fact 3, Ditko's explanation of how he worked with Lee mirrors the Second Circuit's description of how Jack Kirby worked with Lee during approximately the same time period.<br><br>Further, Defendant cites no admissible evidence establishing that Ditko regularly refused to make Lee's revisions (which would run contrary to Ditko's self-described practice of "noting anything to be corrected" following his meetings with Lee). And Toberoff Exhibit 19, the only admissible evidence that Defendant cites, **does not controvert** this fact. It shows only that in 1965, when all major characters had been well established, and just months before Ditko left Marvel, Ditko did not make a change Lee requested, so Lee responded by having another artist redraw the panel as Lee requested. *See* Toberoff Ex. 19 at 3. That shows supervision and control—not a lack thereof. Indeed, as Toberoff Exhibit 19 makes clear, although Lee "was willing to go along with a lot of what Steve wanted to do," "Stan had the authority" and used it "when he felt he had to use it" because an explanation that "the artist wanted to do it that way" "would not have been a sufficient excuse for Martin Goodman." *See* Toberoff Ex. 19 at 3-4. Additionally, Toberoff Exhibits 3 and 21 **do not support** this contention, as they simply establish that Marvel had production assistants capable of making changes. Toberoff Exhibits 9 and 21 further **do not support** this contention, as explained in MCI's Reply in Support of Undisputed Fact 2.<br><br>Finally, Defendant's contention that Marvel would not pay for changes it requested—apart from implying (correctly) that Ditko did, in fact, make changes requested by Marvel—is also non-responsive and incorrect. The per-page rate that Marvel paid freelancers, particularly the generous one paid to Ditko, accounted for the right to request revisions. *See* MCI's Evidence in Support of Undisputed Facts 49-50.<br><br>MCI also **objects** to Toberoff Exhibits 1, 2, 3, 8, 9, 10, 11, 13, 14, 35, 43, 44, 47, 52, and 53. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary |

| | |
|---|---|
| | Objection Nos. [1], [4], [8], [11], [12], [13], [14], [16], [17], [41], [44], [45], [47], [49], & [50]. |
| **Counterclaimant's Response to Reply** | These purported facts remain **disputed**, particularly as to Ditko's creative process. In addition, Plaintiff admits that MMC did not pay Ditko for pages it rejected outright and/or rejected (and sought revisions).  This renders its "work for hire" theory unworkable as a matter of copyright. It is axiomatic that "authorship" is determined at the moment a work is fixed in a tangible form of expression.  *See Est. of Burne Hogarth v. Edgar Rice Burroughs*, 342 F.3d 149, 162 (2d Cir. 2003) ("copyright ownership [and authorship] … [is] with the employer automatically upon the employee's creation of the work."). In the Period, however, "authorship" (and satisfaction of the "expense" prong) was, according to Plaintiff's factual admissions here, contingent on events subsequent to creation, i.e., MMC's acceptance or rejection of Ditko's pages, in its sole discretion. Whether Ditko's pages were accepted more-often-than-not is irrelevant to the implications of Marvel's admissions. Counterclaimant also incorporates by reference his Response to Plaintiff's Statement No. 12 as to Lee's so-called "Marvel Method."  Notwithstanding the above, Plaintiff's Statement No. 15 is immaterial to whether the Shell Companies were the "statutory authors" of the relevant work and copyrights as registered by Marvel and relied upon by Plaintiff, and with respect to this Counterclaimant incorporates by reference his Preliminary Statement.

Defendant also **objects** to Bard Decl., Exs. 1-9; Lens Decl., Exs. 2-4, 6-10, 12, 13, 15, 17, 18, 35, 39, 41, 42, 45, 48, 68A-G, 75, 76, 84, 89, 95. *See* Defendant's Evidentiary Objection Nos. [1], [2], [3], [4], [5], [6], [7], [8], [9], [11], [12], [13], [15], [16], [17], [18], [19], [21], [22], [24], [26], [27], [33], [37], [39], [40], [43], [44], [46], [53], [54], [60], [65], & [69]. |
| | **Statement No. 16** |
| **MCI's Statement** | Lee and the other Marvel editors would then direct the pages through the office, beginning with the addition of the writer's dialogue and captions (typically written by Lee or Thomas). Lens Decl., Ex. 7 201:24-203:16 (Thomas testifying about the process of "trafficking [pages] through the office" at Marvel); Lens Decl., Ex. 2 135:8-14, 125:9-17 (similar); Lens Decl., Ex. 11 218:14-219:16 (Thomas testifying that, after artists turned in their penciled pages, Lee "would dialogue it, which means [adding] the |

| | |
|---|---|
| | dialogue and captions"); Lens Decl., Ex. 13 20:11-21:25 (Lee testifying to the same). |
| **Counterclaimant's Response** | **Counterclaimant admits that Lee or Thomas (after he commenced working at Magazine Management in 1965) would dialogue the balloons after Magazine Management had purchased Ditko's pages, but denies that Lee (or later, Thomas) were the sole originators/writers of the dialogue, as Ditko would often write extensive margin notes, including suggested dialogue and captions, so that when Lee (or later, Thomas), dialogued Ditko's story, they would know what story points Ditko intended in each panel and what the characters would likely say consistent with the story Ditko had plotted.** *See* Toberoff Decl. Ex. 14 at 7 (Evanier Rebuttal Rep. explaining Ditko's practice of submitting detailed notes with his freelance material to assist Lee in dialoguing the stories); Ex. 7 at 223:18-225:20 (Thomas testifying that Ditko refused to speak to Lee while working on *Spider-Man* and *Dr. Strange* so all plotting on the stories was done by Ditko, and further, that Ditko would provide margin notes to indicate what he intended to happen in the story to guide Lee when Lee dialogued the story); *id.* at 262:4-264:19 (Thomas testifying that when he began to dialogue *Dr. Strange* stories instead of Lee, Ditko would type his suggested captions and dialogue on a separate page, not in the margins, and then give them to Thomas to fill in the dialogue balloons); Ex. 17 at 84:18-90:9 (Thomas testifying that Ditko wrote extensive margin notes describing the plot and what was happening so that when Lee/Thomas dialogued the story, they could do so in a way that corresponded with what Ditko had intended); Ex. 18 (1965 example of Ditko's *Dr. Strange* margin notes for Thomas); Ex. 26 at 83 (Lee writing that Ditko came up with the *Dr. Strange* plots and illustrated the story and Lee only added the dialogue [in the balloons]); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script); Ex. 71 at 159 (*Amazing Spider-Man* No. 25: "Sturdy Stevey Ditko dreamed up the plot of this tantalizing tale, and it's full of unexpected surprises!"); Ex. 72 at 225 (*Strange Tales* No. 135: "Plotted and Illustrated by Fandom's Favorite Fiend: Steve Ditko"). |
| **MCI's Reply** | **This fact remains undisputed.**<br><br>Defendant's contention that Lee and later Thomas were not "the sole originators/writers of the dialogue" is non-responsive and incorrect. The evidence demonstrates that while Ditko would sometimes write "margin notes" intended to help explain his penciled artwork, these notes were |

<table>
<tr>
<td></td>
<td>

quite simplistic, consisting of only a few words like "Found Place to hide—must move fast" or "They're on the roof now," which fall considerably short of constituting dialogue or captions. *See* Toberoff Ex. 18 at 3-8 (sample Ditko notes); Lens Opp. Decl., Ex. 84 87:11-90:4 (Thomas testifying that Ditko would include just "a couple of words" so Thomas "knew what was going on" since Ditko would draw "very, very rough pencil" art at this stage). And Lee and Thomas were free to, and often did, disregard such margin notes. *See* Toberoff Ex. 19 at 4-5 (Thomas explaining that "Stan wanted the artists to tell what was going on," as early artwork was "sketchy" with "very loose" pencils, but noting that "Stan would take what he wanted from that, and felt no obligation to take any more").

MCI also **objects** to Toberoff Exhibits 14 and 27. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [17] & [35].

</td>
</tr>
<tr>
<td>

**Counterclaimant's Response to Reply**

</td>
<td>

Lee's dialoguing of the balloons *after* Ditko's work had been created and purchased by MMC is immaterial to whether Ditko created his material as "work for hire." A comic book story comprised of artwork by one author (Ditko) and text by another (Lee) is a classic joint work in which its co-authors (including any statutory "author") would own an undivided interest. *See Shapiro, Bernstein & Co. v. Jerry Vogel Music Co., Inc.*, 161 F.2d 406, 409 (2d Cir. 1947). Upon termination under 17 U.S.C. § 304(c), Ditko's undivided co-author share in those joint works revert to his Estate. The copyright status of *Ditko's* contributions is not dependent on the status of Lee's creative contributions. The status of Lee's freelance writing contributions (or his failure to exercise termination rights) does <u>not</u> render Ditko's contributions "work for hire." *See Siegel v. Time Warner Inc.*, 496 F. Supp. 2d 1111, 1144 (C.D. Cal. 2007) (As to [Siegel/Shuster's] joint work, [DC] would own half of the copyright [] as the author of Shuster's alleged work for hire or … given his [] failure to … terminat[e].").  Notwithstanding this, Plaintiff's Statement No. 16 is also immaterial to whether the Shell Companies were the "statutory authors" of the relevant work and copyrights as registered by Marvel and relied upon by Plaintiff, and, with respect to this, Counterclaimant incorporates by reference his Preliminary Statement.

Defendant also **objects** to Lens Decl., Ex. 84. *See* Defendant's Evidentiary Objection No. 60.

</td>
</tr>
</table>

| | **Statement No. 17** |
|---|---|
| **MCI's Statement** | Marvel would send the pages to an inker, who would go over the penciled drawings in ink, and to a letterer, who would add the dialogue balloons and captions in ink. Lens Decl., Ex. 2 129:10-132:8; Lens Decl., Ex. 13 31:23-33:12. |
| **Counterclaimant's Response** | **Admitted but Counterclaimant denies that this is relevant to the issue of whether Ditko created his material as "work made for hire" because these things transpired well after Ditko had created and submitted his material and after Ditko's work was accepted for publication and purchased by Magazine Management. Magazine Management's subsequent physical production, assemblage and publication of the resulting comic books is not what this case is about nor is it relevant to the "work for hire" issue here which focuses on** *Ditko's* **creation of** *his material* **only.** |
| **MCI's Reply** | **Defendant admits this fact is undisputed, and only "disputes" the legal effect of the fact, which is improper.** <br><br> Because Defendant does not set forth any specific facts or evidence to dispute this fact as required by Local Rule 56.1(c) and (d), this fact is deemed admitted in its entirety. *See* Local Rule 56.1(b)-(d); *see also Parks Real Estate*, 472 F.3d at 41; *Giannullo*, 322 F.3d at 140. |
| **Counterclaimant's Response to Reply** | MMC's production processes *after* Ditko's work had been created by him and purchased by MMC is **immaterial**. Like Plaintiff's many other Statements, MMC's comic book production processes are also immaterial to whether the Shell Companies, which had no employees or operations, were the statutory "authors" of Ditko's work and relevant copyrights as registered by Marvel and relied upon by Plaintiff, and with respect to this Counterclaimant incorporates by reference his Preliminary Statement. |
| | **Statement No. 18** |
| **MCI's Statement** | After the lettering was finished, Marvel would proofread the pages and then provide them to a colorist to add color to the pages. Lens Decl., Ex. 2 |

| | |
|---|---|
| | 132:9-133:10; Lens Decl., Ex. 2 134:9-135:7; Lens Decl., Ex. 13 31:23-33:12. |
| **Counterclaimant's Response** | **Admitted but Counterclaimant denies that this is relevant to the issue of whether Ditko created his material as "work made for hire" because these things transpired well after Ditko had created and submitted his material and after Ditko's work was accepted for publication and purchased by Magazine Management. Magazine Management's subsequent physical production, assemblage and publication of the resulting comic books is not what this case is about nor is it relevant to the "work for hire" issue here which focuses on *Ditko's* creation of *his material* only.** |
| **MCI's Reply** | **Defendant admits this fact is undisputed, and only "disputes" the legal effect of the fact, which is improper.**<br><br>Because Defendant does not set forth any specific facts or evidence to dispute this fact as required by Local Rule 56.1(c) and (d), this fact is deemed admitted in its entirety. *See* Local Rule 56.1(b)-(d); *see also Parks Real Estate*, 472 F.3d at 41; *Giannullo*, 322 F.3d at 140. |
| **Counterclaimant's Response to Reply** | MMC's production processes *after* Ditko's work had been created by him and purchased by MMC is immaterial. Like Plaintiff's many other Statements, MMC's comic book production processes are also immaterial to whether the Shell Companies, which had no employees or operations, were the statutory "authors" of Ditko's work and relevant copyrights as registered by Marvel and relied upon by Plaintiff, and with respect to this Counterclaimant incorporates by reference his Preliminary Statement. |
| **Statement No. 19** | |
| **MCI's Statement** | Once the pages were colored, Marvel would send them to the printer to be printed for publication. Lens Decl., Ex. 13 31:23-33:12; Lens Decl., Ex. 10 384:22-385:11; Lens Decl., Ex. 13 42:10-20. |
| **Counterclaimant's Response** | **Admitted, but Counterclaimant denies that this is relevant to the issue of whether Ditko created his material as "work made for hire" because these things transpired well after Ditko had created and** |

| | |
|---|---|
| | submitted his material and after Ditko's work was accepted for publication and purchased by Magazine Management. Magazine Management's subsequent physical production, assemblage and publication of the resulting comic books is not what this case is about nor is it relevant to the "work for hire" issue here which focuses on *Ditko's* creation of *his material* only. |
| **MCI's Reply** | **Defendant admits this fact is undisputed, and only "disputes" the legal effect of the fact, which is improper.** <br><br> Because Defendant does not set forth any specific facts or evidence to dispute this fact as required by Local Rule 56.1(c) and (d), this fact is deemed admitted in its entirety. *See* Local Rule 56.1(b)-(d); *see also Parks Real Estate*, 472 F.3d at 41; *Giannullo*, 322 F.3d at 140. |
| **Counterclaimant's Response to Reply** | MMC's printing/publishing processes *after* Ditko's work had been created by him and purchased by MMC is immaterial. Like Plaintiff's many other Statements, MMC's processes are also immaterial to whether the Shell Companies, which had no employees or operations, were the "statutory authors" of the relevant Ditko work and relevant copyrights as registered by Marvel and relied upon by Plaintiff, and Counterclaimant incorporates by reference his Preliminary Statement, *supra*, with respect thereto. |
| | **Statement No. 20** |
| **MCI's Statement** | Marvel freelancers typically had no contact with other freelancers working on the same comic book, as it was Lee and other Marvel staff that coordinated this process, not the freelancers. Lens Decl., Ex. 57 at 3-4 (Ditko writing that "[o]nce I turned in the inked pages, I never knew who edited them or what, how anything was changed, added—sound effects, etc. Who, why changes, different cover, etc. Once I did the job, turned it in, got paid, my involvement ended. It was all ancient history."); Lens Decl., Ex. 3 141:8-13 (Lieber testifying that he could not recall "ever hav[ing] contact" with other contributors to a work after submitting his script); Lens Decl., Ex. 3 299:13-23 (Lieber explaining that he did not get to select the artists, letterers, or colorists for his scripts); Lens Decl., Ex. 3 300:4-18 (Lieber confirming that, after he turned in his work, he did not have "further communication or contact with anybody except, perhaps, with Stan" and that "[t]he next time [he] . . . knew anything about it is when it came out, you know, in the comic book form"); Lens Decl., Ex. 9 17:13-19 (Lieber testifying that he did not "have any contact with the story |

| | |
|---|---|
| | after [he] turned it in" and never "ha[d] discussions with the artists about the stories"). |
| **Counterclaimant's Response** | **Counterclaimant disputes specifically, that Ditko "typically had no contact with other freelancers working on the same comic book," as Ditko would typically plot and draw the *Spider-Man* and *Dr. Strange* stories, and in addition, Ditko would provide detailed story notes as to what was happening on each page and suggest dialogue and captions, either in the margins or often written out separately, and then deliver those artwork pages and story notes to Lee (or later, Thomas) who, as *freelancers*, would dialogue and caption the stories Ditko had given them. In many instances, Ditko would then get the stories back from Lee (or later, Thomas), and ink his stories as well, correcting any of Lee's dialoguing mistakes that did not align with Ditko's story.** *See* Toberoff Decl. Ex. 14 at 7 (Evanier Rebuttal Rep. explaining Ditko's practice of submitting detailed notes with his freelance material to assist Lee in dialoguing the stories); Ex. 7 at 223:18-225:20 (Thomas testifying that Ditko refused to speak to Lee while working on *Spider-Man* and *Dr. Strange* so all plotting on the stories was done by Ditko, and further, that Ditko would provide margin notes to indicate what he intended to happen in the story to guide Lee when Lee dialogued the story); *id.* at 262:4-264:19 (Thomas testifying that when he began to dialogue *Dr. Strange* stories instead of Lee, Ditko would type his suggested captions and dialogue on a separate page, not in the margins, and then give them to Thomas to fill in the dialogue balloons); Ex. 17 at 84:18-90:9 (Thomas testifying that Ditko wrote extensive margin notes describing the plot and what was happening so that when Lee/Thomas dialogued the story, they could do so in a way that corresponded with what Ditko had intended); Ex. 18 (1965 example of Ditko's *Dr. Strange* margin notes for Thomas); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script); Ex. 7 at 262:4-264:19 (Thomas testifying that, when Thomas began to dialogue *Dr. Strange* stories instead of Lee, Ditko would type his suggested captions and dialogue on a separate page, not in the margins, and then give them to Thomas to fill in the dialogue balloons); Ex. 19 at 6, "Legends at Loggerheads!" (Thomas explaining example of when Lee incorrectly dialogued a *Spider-Man* story in a way Ditko had not intended, Ditko refused to accede to Lee's chosen direction, and corrected Lee's mistake when Ditko received the work to ink it); Ex. 71 at 159 (*Amazing Spider-Man* No. 25: "Sturdy Stevey Ditko dreamed up the plot of this tantalizing tale, and it's full of unexpected surprises!"); Ex. 72 at 225 (*Strange Tales* No. 135: "Plotted and Illustrated by Fandom's Favorite Fiend: Steve Ditko"); Ex. 80 (Marvel paying Ditko for reprints of numerous comic |

| | |
|---|---|
| | book stories noting that the payments were for pencil (i.e., drawing the story panel by panel), plot (i.e., the story plot) and ink (i.e., inking the "pencilled" panels); 81 (same). |
| **MCI's Reply** | **This fact remains undisputed**. <br><br> Defendant's contention that Ditko had contact with other freelancers working on the same comic book because he would "provide detailed story notes" in margins or on a separate paper is non-responsive and, in any event, incorrect. As explained above in MCI's Reply in Support of Undisputed Fact 16, the evidence shows that while Ditko would sometimes write "margin notes" intended to help explain his penciled artwork, these notes were quite simplistic, and Lee and Thomas were free to, and often did, disregard such margin notes. <br><br> Further, Defendant's suggestion that Ditko would "correct[] any of Lee's dialoguing mistakes that did not align with Ditko's story" when inking his work is unsupported by any evidence. To the contrary, the evidence shows that Ditko frequently lamented about Lee's "corny dialogue" in Spider-Man comics that "undercut [] more serious [character] growth" or Lee's "haunted house" Doctor Strange plots. *See* Lens Decl., Ex. 58 at 3; Lens Decl., Ex. 52 at 4; Lens Decl., Ex. 59 at 2 (Ditko complaining that "Stan's dialogue was too much his personal writing style with heroes/villains."); Lens Decl., Ex. 54 at 4 (Ditko commenting that "Stan's writing style was completely wrong for SM [Spider-Man]"); *see also* Lens Decl., Ex. 60 at 3; Lens Decl., Ex. 45 at 3. Ditko recognized, however, that in the comic business the "[t]he editor is always right." *See* MCI's Evidence in Support of Undisputed Fact 29. <br><br> MCI also **objects** to Toberoff Exhibits 17, 35, and 62. *See* MCI's Evidentiary Objection Nos. [17], [35[, & [62]. |
| **Counterclaimant's Response to Reply** | Plaintiff's Statement is remains **disputed** based on significant record evidence cited by Counterclaimant, and Plaintiff's limited, vague citations in Reply. Notwithstanding this, Plaintiff's Statement No. 20 is also immaterial to whether the Shell Companies were the "statutory authors" of the relevant Ditko work and copyrights as registered by Marvel and relied upon by Plaintiff, and with respect thereto Counterclaimant incorporates by reference his Preliminary Statement. <br><br> Defendant also **objects** to Lens Decl., Exs. 2, 13, 45, 84. *See* Defendant's Evidentiary Objection Nos. [11], [22], [43], & [60]. |

| | **Statement No. 21** |
|---|---|
| **MCI's Statement** | To keep comic book production on schedule, Marvel imposed deadlines on its freelance writers and artists. Lens Decl., Ex. 13 42:10-20 (Lee testifying that "[e]very strip had a deadline, because these books had to go out every month. And it was very important that the deadline be met. Because if a book was late, we had already paid the printer for that press time. And if the book wasn't delivered in time, we still had to pay the printer. So it was a total loss to us. So the deadlines were very important. And the artists always knew this has to be delivered by thus-and-such a date."); Lens Decl., Ex. 10 384:22-385:11 (Lee testifying that it was part of his job as editor-in-chief to set deadlines for the artists); Lens Decl., Ex. 72 at 4 (recalling Ditko toiling at his artist's desk in the early 1960s "tortured by [] deadlines"); Lens Decl., Ex. 73 at 3 (Ditko noting that Kirby was "buried under work" and needed to work fast "to keep up with the assignments Lee was throwing at him"); *see also* Lens Decl., Ex. 4 94:6-21; Lens Decl., Ex. 2 154:9-155:25; Lens Decl., Ex. 2 333:8-16; Lens Decl., Ex. 12 59:22-60:21; Lens Decl., Ex. 7 218:2-16; Lens Decl., Ex. 3 266:11-12; Lens Decl., Ex. 3 125:5-13; Lens Decl., Ex. 9 14:9-25. |
| **Counterclaimant's Response** | **Admitted that Magazine Management set deadlines in connection with the production of its comic books but denied that it could impose deadlines on Ditko in any legal or employment sense because the company intentionally did not employ or place Ditko under contract. The parties thus had no bilateral obligations to one another and, as such, neither Magazine Management nor its editors could "impose deadlines" on Ditko.** Marvel has not produced any contemporaneous agreement with Ditko from the Period for his creative services, nor any other evidence reflecting any bilateral rights and obligations between Ditko and Magazine Management (nor any other alleged Marvel predecessor) in the Period, nor has Marvel alleged that any such agreement or bilateral legal rights and obligations existed between such parties in the Period. *See* Toberoff Decl. Ex. 1 at 10, 13 (Supplemented Expert Report of Mark Evanier ("Evanier Rep.") providing historical context giving rise to Marvel's use of freelance creators and explaining that, when Magazine Management ran out of surplus artwork to publish, it began to purchase artwork and scripts from freelancers at a low page rate and that freelancers did not have written contracts with Magazine Management during the 1950s or 1960s and describing the common practice of freelancers selling material to more than one publisher, including Marvel, DC Comics, and Charlton Comics); Ex. 14 at 10-11 (Rebuttal Expert Report of Mark Evanier ("Evanier Rebuttal Rep.") explaining that it was not the custom and practice of Marvel or other publishers in the comic book industry to |

| | |
|---|---|
| | have written contracts with freelance creators during the Period); Ex. 2 at 71:17-74:5 (Larry Lieber ("Lieber") testifying that he sold freelance work to Marvel in the 1950s and 1960s, had no contract with Marvel, and that Marvel was not obligated to buy his submitted freelance material); Ex. 3 at 159:24-160:4, 194:11-195:3, 207:12-22, 211:7-212:3 (John V. Romita ("Romita") testifying that he did not have a contract with Marvel as a freelancer and that freelancers were free to sell work to other publishers); Ex. 5 at 371:3-25 (Stan Lee ("Lee") testifying that Marvel "would only buy what [it] needed"); Ex. 6 at 36:17-21, 202:2-20 (Roy Thomas ("Thomas") testifying that he had no contract with Marvel until 1974); Ex. 8 ¶ 10 (Joe Sinnott ("Sinnott") attesting that he had no contract with Marvel and Marvel was very small and disorganized in the 1950s and 1960s); Ex. 8 ¶ 11 (Sinnott attesting that Marvel had no obligation to buy pages of his work and that Marvel paid only for the pages it wanted); Ex. 9 ¶ 8 (James Steranko ("Steranko") Steranko attesting that Marvel had no contract with Steranko and so he was free to sell work to other publishers); Ex. 10 ¶ 12 (Richard Ayers ("Ayers") attesting that he had no contract with Marvel from 1959 to 1975); Ex. 11 ¶ 9 (Gene Colan ("Colan") attesting that he had no contract with Marvel until 1975); Ex. 13 ¶ 5-7 (Neal Adams ("Adams") attesting that he had no contract with Marvel in the 1960s or 1970s and that he sold work to both Marvel and DC Comics during the 1960s and 1970s); Ex. 17 at 39:25-40:4, 51:20-52:4, 298:8-14, 301:14-303:7 (Thomas testifying that he had no written contract from 1965 to 1974 and that Marvel did not have contracts with freelancers prohibiting them from selling work to other publishers); Ex. 22 at 287:22-288:12 (Lieber testifying that he had no contract with Marvel in the 1950s or 1960s); Ex. 24 at 79:2-8 (Paul Levitz ("Levitz") testifying that Marvel did not have contracts with any freelancer until the mid-1970s). |
| **MCI's Reply** | **Defendant admits this fact is undisputed, and only "disputes" the legal effect of the fact, which is improper.**<br><br>Defendant admits that Marvel set deadlines yet somehow suggests that Marvel could not "impose deadlines on Ditko in any legal or employment sense" because Ditko lacked a written employment agreement, which is incorrect, turns on improper legal argument, and—in any event—is immaterial as the Second Circuit's decision in *Kirby* confirms. *See* MCI's Reply in Support of Undisputed Fact 2.<br><br>MCI also **objects** to Toberoff Exhibits 1, 2, 3, 8, 9, 10, 11, 13, 14, and 22. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [2], [9], [11], [12], [13], [14], [16], [17], & [25]. |

| | |
|---|---|
| **Counterclaimant's Response to Reply** | Plaintiff's Statement remains **disputed**. MMC could not "impose deadlines" as an employer or hiring party as Goodman/MMC intentionally did not hire Ditko. Again, Plaintiff repeatedly uses such phrases to foster the illusion of employment of Ditko as an independent contractor when, by design, none existed.  This was not simply because no engagement agreement existed (as admitted by Plaintiff) but because Goodman, who previously had employed and thereafter fired his comic book artists and writers, transparently sought to limit his financial and other exposure. *See* Evidence Supp. SUF ¶¶ 8, 15, 17; Evidence Supp. AMF ¶¶ 13, 15. Now Plaintiff seeks all benefits of an employment relationship, whereas in the Period (when it mattered), Goodman/MMC/Lee shirked these obligations and responsibilities, relying solely on their power to purchase or not purchase submitted freelance work in their sole discretion. *See* Evidence Supp. ¶¶ 15-19; Evidence Supp. AMF ¶¶ 15-19; Responses to Statement Nos. 2, 9. Notwithstanding this, Plaintiff's Statement No. 21 is also immaterial to whether the Shell Companies were the statutory "authors" of the relevant Ditko work and relevant copyrights as registered by Marvel and relied upon by Plaintiff, and with respect to this Counterclaimant incorporates by reference his Preliminary Statement.<br><br>Defendant also **objects** to Bard Decl., Exs. 1-9; Lens Decl., Exs. 2-4, 6, 8, 10, 13, 17, 18, 39, 68A-G, 75, 76, 89, 95. *See* Defendant's Evidentiary Objection Nos. [1], [2], [3], [4], [5], [6], [7], [8], [9], [11], [12], [13], [15], [17], [19], [22], [26], [27], [37], [46], [53], [54], [65], & [69]. |
| | **Statement No. 22** |
| **MCI's Statement** | Marvel's editors, including Stan Lee and Roy Thomas, supervised the creation of Marvel's comics subject only to Martin Goodman, who had ultimate authority to supervise and direct the creation of all Marvel comic books. Lens Decl., Ex. 2 17:8-18:13 (Thomas testifying that "subject to the publisher, [Lee] was in charge of everything. He oversaw the writing, he oversaw the artists and the art that came in. You know, everything went through him with the help of the production manager in particular."); Lens Decl., Ex. 2 24:17-23 (Thomas testifying how Marvel production manager Sol Brodsky "would call a freelancer in . . . to keep an eye on him to make sure he finished the job on deadline or . . . had something that had to be corrected or changed"); Lens Decl., Ex. 2 37:10-39:6 (Thomas testifying that when he became editor-in-chief, he was "in charge of, you know, all the artists, the writers, the colorists, the letterers and so forth"); Lens Decl., Ex. 13 16:8-19 (Lee confirming that he would "give instructions to the artists as to how [he] wanted the story to go" and that it was his "responsibility" to oversee "the creative editorial aspects of the comic books that were created"); Lens Decl., Ex. 12 67:16-68:6 (Thomas |

| | |
|---|---|
| | testifying that Lee "decided which artist would do a cover for a particular issue[,] . . . they were reviewed by Stan, . . . then they were all reviewed eventually by Martin Goodman as publisher"); Lens Decl., Ex. 13 44:4-17 (Lee testifying that because "we considered the covers the most important part of the book," he "spent a lot of time on" their look and layout); Lens Decl., Ex. 13 16:3-19 (Lee testifying that he would "give instructions to the artists as to how [he] wanted the story to go" and "oversaw . . . creative editorial aspects of the comic books that were created, . . . because [he] had to answer to the publisher, Martin Goodman, and he had to be happy with what I was doing"); Lens Decl., Ex. 4 97:7-9 (Lee testifying that comic book production "was [his] responsibility, the whole thing"); Lens Decl., Ex. 4 93:23-94:5 (Lee testifying that he supervised Marvel's writers and artists); Lens Decl., Ex. 2 80:24-81:12 (Thomas testifying that "[s]ubject to the publisher, [Lee had] complete authority" over artwork in Marvel comics); Lens Decl., Ex. 2 125:18-126:1 (Thomas testifying that Lee "was always the ultimate authority unless Martin Goodman stepped in, and that was mostly on covers"); Lens Decl., Ex. 7 219:11-220:11 (Thomas testifying that "the ultimate say, as far as I know, was the publisher, . . . Martin Goodman"); Lens Decl., Ex. 13 97:8-11 (Lee testifying that he "couldn't do any book unless Martin approved of it"); Lens Decl., Ex. 4 124:19-125:4 (Lee testifying that "[i]t was always [Goodman's] decision" as to what to publish, and "he exercised the authority ultimately to publish the last edition of 'Amazing Fantasy'"); Lens Decl., Ex. 4 124:3-18 (Lee testifying that he "loved" the "Amazing Fantasy" books but "Mr. Goodman decided to cancel them because they weren't selling"); Thomas Decl. ¶¶ 7-8 ("As part of [Marvel's] established framework [for creating comics in the 1960s], Stan Lee supervised and directed Marvel's comic book-creation process subject only to Martin Goodman"); *see also* Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3. |
| **Counterclaimant's Response** | **Counterclaimant disputes that "Marvel," Lee, or Thomas directed or supervised Ditko's creative process regarding his works. Ditko created his material from his own studio, on his own time, pursuant to character and story charts that he created on his own volition, and often refused to make any changes to his work.** *See* Toberoff Decl. Ex. 1 at 12-13 (Evanier Rep. explaining the custom and practice of freelancers creating their material from home and noting that Ditko was unique in renting and paying for a separate studio and that it was Ditko's regular practice to maintain a chart mapping out the future development of stories and characters so as to introduce elements into current stories and then use those elements in stories many months down the line); Ex. 24 at 123:18-21 (Levitz testifying that Ditko created work from his own studio); Ex. 35 at DITKO-0193 (Ditko writing that he planted seeds of subplots in stories that would work their way through the issues until it was time for those |

sub-stories to play an active role later when the time was right); Ex. 58 at 3 (Ditko writing when he took over the *Spider-Man* stories he "knew in advance the [*Spider-Man*] story line like the best (worst) time for Aunt May to have a heart attack"); Ex. 14 at 7 (Evanier Rebuttal Rep. explaining Ditko's practice of refusing to make changes and in such case, Marvel's custom of having staff make such changes after the work had been submitted to and purchased by Marvel); Ex. 3 at 75:18-20, 243:13-244:23, 246:5-9 (Romita testifying that he, or someone else Lee could find in the Marvel office, would be asked to make changes to other artists' work after it had been submitted and would not be paid any extra for making these changes and noting specifically that when Lee did not like something on a Ditko cover, he asked Kirby to change it); Ex. 19 at 6, "Legends at Loggerheads!" (Thomas explaining example of when Lee incorrectly dialogued a *Spider-Man* story in a way Ditko had not intended, Ditko refused to accede to Lee's chosen direction); Ex. 21 at 41:7-18 (Steranko testifying that Marvel had production assistants to make changes to work after it had been submitted by artists); Ex. 35 at DITKO-0193 (Ditko writing that he ignored comments from Lee and Brodsky and only made changes to stories when he agreed with them); Ex. 82 (Lee explaining in January 9, 1966 published interview: "**I don't plot Spider-Man any more. Steve Ditko, the artist, has been doing the stories.** I guess I'll leave him alone until sales start to slip. Since Spidey got so popular, Ditko thinks he's the genius of the world. We were arguing so much over plot lines I told him to start making up his own stories. **He won't let anybody else ink his drawings either. He just drops off the finished pages with notes at the margins and I fill in the dialogue. I never know what he'll come up with next**, but it's interesting to work that way.") (emphasis added); Ex. 83 at 7 (same); Ex. 4 at 33:25-34:2 (Lee testifying that freelancers mostly worked from home); Ex. 17 at 24:5-25:4 (Thomas testifying that artists worked from home as freelancers and rarely, if ever, came into the office); Ex. 2 at 76:4-24 (Lieber testifying that he created his freelance work from home and used his own supplies); Ex. 3 at 16:22-24, 194:14-195:3, 209:16-210:7 (Romita testifying that he purchased his own materials and worked from home); Ex. 6 at 30:21-24 (Thomas testifying that he did his freelance writing from home); Ex. 8 ¶ 9 (Sinnott attesting that he worked from home with his own materials); Ex. 9 ¶ 10 (Steranko attesting that he worked from home and supplied his own materials, for which Marvel never reimbursed him); Ex. 10 ¶ 10 (Ayers attesting that he worked from home and paid for his own materials); Ex. 11 ¶ 8 (Colan attesting that he created his freelance art from home and paid for his own materials); Ex. 13 ¶ 7 (Adams attesting that he worked from home and paid for his own materials); Ex. 16 at 117:15-16 (Nanci Solo ("Solo") testifying that Colan worked from home); Ex. 22 at 286:17-287:19 (Lieber testifying that he worked from home and paid for his own typewriter);

**Counterclaimant further disputes that Ditko created his works under "Marvel" /Lee/ Thomas's direction or supervision, as Ditko created many of his works in question when Lee and he were no longer communicating, and thus, Lee would not know anything about the *Spider-Man* or *Dr. Strange* stories Ditko was creating until Ditko dropped off his finished pages.** *See* Toberoff Decl. Ex. 7 at 223:18-225:20, 277:11-13 (Thomas testifying that Ditko did all the plotting on *Spider-Man* and *Dr. Strange* stories while he and Lee were not speaking and that Ditko never received any plots from Thomas when Thomas was doing the dialoguing on *Dr. Strange*); Ex. 17 at 311:2-17 (Thomas testifying that, by the time he started at Marvel in mid-1965, Ditko and Lee were not speaking anymore because they had been fighting over the direction of the *Spider-Man* series); *id*. at 29:19-30:8, 83:13-18 (Thomas testifying that by the time Thomas began at Marvel in mid-1965, Ditko was plotting and penciling *Dr. Strange* stories, which Thomas would dialogue); *id*. at 311:18-312:25 (Thomas testifying that Ditko plotted and drew *Spider-Man* stories completely on his own for more than one year before he left in 1966). Ex. 24 at 124:5-24 (Levitz testifying that Ditko and Lee stopped speaking in the last year of Ditko's time with Marvel because Ditko was not getting proper credit for his contributions to the stories); Ex. 35 at DITKO-0193 (Ditko writing that he and Lee stopped speaking around 1964 and thus from then on, Ditko had complete creative control of the *Spider-Man* and *Dr. Strange* stories, which he was plotting and penciling until he left in 1966); Ex. 58 at 3 (Ditko writing that he took over all plotting of the *Spider-Man* stories); Ex. 71 at 159 (*Amazing Spider-Man* No. 25: "Sturdy Stevey Ditko dreamed up the plot of this tantalizing tale, and it's full of unexpected surprises!"); Ex. 72 at 225 (*Strange Tales* No. 135: "Plotted and Illustrated by Fandom's Favorite Fiend: Steve Ditko"); Ex. 25 (Ditko: "Dr. Strange has always been a contradiction to Marvel heroes … He is my creation, and at one point I took over all stories, writing, [and] art."); Ex. 26 at 83 (Lee writing that Ditko came up with the *Dr. Strange* plots and illustrated the story and Lee only added the dialogue to the balloons); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script); Ex. 1 at 13 (Evanier Rep. describing the common practice of independent freelancers supervising themselves and editing their own work prior to submission); Ex. 82 (Lee explaining in January 9, 1966 published interview: "**I don't plot Spider-Man any more. Steve Ditko, the artist, has been doing the stories.** I guess I'll leave him alone until sales start to slip. Since Spidey got so popular, Ditko thinks he's the genius of the world. We were arguing so much over plot lines I told him to start making up his own stories. **He won't let anybody else ink his drawings either. He just drops off the finished pages with notes at the margins and I fill**

**in the dialogue. I never know what he'll come up with next**, but it's interesting to work that way.") (emphasis added); Ex. 83 at 7 (same).

**Counterclaimant further disputes that Ditko created Dr. Strange pursuant to "Marvel" /Lee/ Thomas's direction or supervision, as Ditko wrote and drew the first *Dr. Strange* story completely "on spec" based on a character he was toying with since 1946.** *See* Toberoff Decl. Ex. 1 at 21 (Evanier Rep. providing historical context of the first publication of Ditko's Dr. Strange character which began as a five-page story Ditko wrote and drew on spec introducing the character which he presented to Lee); Ex. 25 (Ditko: "Dr. Strange has always been a contradiction to Marvel heroes … He is my creation, and at one point I took over all stories, writing, [and] art."); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script); Ex. 30 at 2021MARVEL-0050281 (Lee writing that Dr. Strange "'twas [Ditko's] idea, and I figgered we'd give it a chance" in a contemporaneous letter dated January 9, 1963 and noting the story was a "5-page filler"); Ex. 57 at 2 (Ditko writing that Dr. Strange was a great opportunity for him to try out all kinds of ideas, which "never fit in to Marvel's world of heroes"); Ex. 33 (Ditko's letter post-marked August 6, 1946 to his brother Patrick Ditko enclosing an early sketch of Dr. Strange); Ex. 59 at 61:15-65:14 (Patrick Ditko, being shown composite Ex. 33 and testifying that his brother, Steve Ditko, sent him this letter in 1946, while Ditko was in military service abroad, enclosing Ditko's early sketch of Dr. Strange (Ex. 33) and that he had found Ex. 33 at his home amongst letters he had kept from his brother); Ex. 23 at 166:5-168:8 (Mark Ditko testifying that his father lived at the address written on the letter envelope of composite Ex. 33, and that, in 1946 (postmarked on the letter envelope), his uncle Ditko was in the military, stationed abroad in Germany).

| | |
|---|---|
| **MCI's Reply** | **This fact remains undisputed**.

Defendant's suggestion that Lee and Thomas did not supervise the creation of Marvel comics because Ditko worked from home, used "story charts," or refused to make changes is non-responsive and incorrect for the reasons stated in MCI's Reply in Support of Undisputed Fact 3.

Further, Defendant's suggestion that Ditko's work for Marvel was not done on a work-for-hire basis because Ditko and Lee had a falling out and stopped speaking in 1965, at the very end of the relevant time period, is incorrect for the reasons stated in MCI's Reply in Support of Undisputed Fact 3. |

Moreover, Defendant's contention that Ditko "created . . . the first *Dr. Strange* story completely 'on spec' based on a character he was toying with since 1946" is non-responsive and incorrect. The evidence demonstrates that Doctor Strange grew out of Ditko's longstanding relationship with Marvel and was not created by Ditko "on spec." The first Doctor Strange story came about as a five-page "back-up" in *Strange Tales*, a Marvel comic book that Ditko was assigned by Lee to contribute to, and which he had been assigned by Lee to contribute to dating back to 1956. *See* MCI's Evidence in Support of Undisputed Facts 31 and 33. Ditko consistently did the five-page "back-up" stories in *Strange Tales*, including for years leading up to Doctor Strange's first appearance in 1963. *See* MCI's Evidence in Support of Undisputed Fact 32. Lee named the character Doctor Strange—"Strange" because the story was published in Marvel's *Strange Tales* series; "Doctor" to avoid confusion with "Mr. Fantastic," another Marvel superhero. *See* MCI's Evidence in Support of Undisputed Fact 34. Lee also wrote the dialogue for the first Doctor Strange story—and he or another Marvel writer wrote the dialogue for all subsequent Doctor Strange stories. *See* MCI's Evidence in Support of Undisputed Fact 33. While Doctor Strange did not have a backstory when originally published, Marvel gave Doctor Strange a fleshed out personality and origin story in *Strange Tales* Vol. 1, No. 115 drawing upon Lee's earlier work with Ditko on the "Dr. Droom" character in *Amazing Adventures* Vol. 1, No. 1. *See* MCI's Evidence in Support of Undisputed Fact 35. Both Dr. Droom and Dr. Strange are doctors who undergo a series of tests in Tibet and develop mystical abilities to combat magical forces. *See* MCI's Evidence in Support of Undisputed Fact 36. Together, the evidence demonstrates that Doctor Strange—like other works by Ditko, Kirby, and other freelancers during the relevant time period—was not created and sold "on spec."

Finally, in any event, Defendant's contentions regarding "creation" are immaterial, as the Second Circuit's decision in *Kirby* confirms. *See Kirby*, 726 F.3d at 142 ("Questions of who created the characters are mostly beside the point," but what matters is the hiring parties' "inducement, right to supervise, exercise of that right, and creative contribution with respect to" the works.").

MCI also **objects** to Toberoff Exhibits 1, 3, 8, 9, 10, 11, 13, 14, 16, 23, 25, 27, 33, 35, 57, 58, and 59. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [8], [11], [12], [13], [14], [16], [17], [18], [33], [34], [35], [39], [41], [52], [53] & [54].

| | |
|---|---|
| **Counterclaimant's Response to Reply** | This Statement clearly remains **disputed** pursuant to the record evidence cited by Counterclaimant. In addition, and without limitation, whereas Roy Thomas's ("Thomas") testimony is extensively relied upon by Plaintiff through its summary judgment motion and its 56.1 Statement, Thomas's import as a percipient witness and input as an MMC employee or freelance writer is extremely limited as Thomas did not start working for Marvel (as a mere editorial assistant) until 1965, at the end of the relevant Period. *See* Lens Decl., Ex. 6 at 200:2-24; Evidence Supp. AMF ¶¶ 57, 61, 110-12; Evidence Supp. Resp. to Statement 22 directly above. Furthermore, the credibility of Lee's and Thomas's rehearsed testimony (Plaintiff's principal evidence in this case) is disputed, and for good reason. *See* Evidence Supp. AMF ¶¶ 11, 57, 61, 97-105, 110-12.  Notwithstanding this, Plaintiff's Statement No. 22 is also immaterial to whether the Shell Companies were the "statutory authors" of the relevant Ditko work and relevant copyrights as registered by Marvel and relied upon by Plaintiff, and Counterclaimant incorporates by reference his Preliminary Statement, *supra*, with respect thereto.

Defendant also **objects** to Bard Decl., Exs. 1-9; Lens Decl., Exs. 2-4, 6-10, 12-15, 17, 18, 36, 37, 39-42, 45, 48, 68A-G, 71, 75, 76, 84. *See* Defendant's Evidentiary Objection Nos. [1], [2], [3], [4], [5], [6], [7], [8], [9], [11], [12], [13], [15], [16], [17], [18], [19], [21], [22], [23], [24], [26], [27], [34], [35], [37], [38], [39], [40], [43], [44], [46], [49], [53], [54], & [60]. |
| | **Statement No. 23** |
| **MCI's Statement** | Marvel assigned Ditko, like other freelancers, to contribute to specific Marvel comic books and could reassign him to different comics when it deemed it necessary or appropriate to do so. Lens Decl., Ex. 48 at 3 (Ditko admitting that he "was given the job of drawing Spider-Man" but could not speak to "[w]hy, exactly"); Lens Decl., Ex. 51 at 3 (Ditko explaining that, "[a]s a freelancer, [his] focus had to be on what is next, what has to be done," as "[t]he last job is history"); Lens Decl., Ex. 54 at 4 (Ditko acknowledging that, "[s]ince [he] was a freelancer, Stan Lee could have taken [him] off S[pider]-M[an] anytime he wanted— he did it for a S[pider]-M[an] story pencilled by Jack Kirby"); Lens Decl., Ex. 2 27:19-28:7 (Thomas testifying that his "responsibilities as a freelance writer" were "[j]ust to write whatever Stan told [him] to write"); Lens Decl., Ex. 2 56:2-57:7 (Thomas testifying that Marvel artists did not "have the ability to select which comics they were going to work on" or "the ability to select which artists, letterers, or colorists they were going to be working with" during the Time Period); Lens Decl., Ex. 12 56:16-18 (Thomas confirming that it was Stan Lee who "decided which writer and artist |

| | |
|---|---|
| | would work on a particular comic book or issue"); Lens Decl., Ex. 2 148:22-151:25 (Thomas testifying about why freelancers might be removed from certain comic books, including for "lateness, undependability," or the editor's decision that "they just weren't doing the right job, or even if they were okay . . . [that] a little bit of musical chairs might get us a better arrangement of people"); *see also* Lens Decl., Ex. 2 88:17-89:13, 131:8-19, 145:23-148:20, 164:3-9; Lens Decl., Ex. 12 58:10-13, 58:24-59:5, 59:6-21; Lens Decl., Ex. 6 41:14-24; Lens Decl., Ex. 15 16:8-19; Lens Decl., Ex. 42 at 6; Lens Decl., Ex. 53 at 2; Lens Decl., Ex. 13 14:5-8, 23:18-21; Lens Decl., Ex. 3 119:5-11, 138:18-24, 139:17-140:2, 140:8-11, 224:5-10, 224:15-23, 241:25-242:14; Lens Decl., Ex. 9 14:5-8, 110:21-24. |
| **Counterclaimant's Response** | **Counterclaimant disputes that Ditko was "assigned" to contribute to comic books, as Marvel had no contract or other legal authority to "assign" Ditko to do anything. Ditko was an independent artist and was free to accept any proposal by Lee that Ditko contribute to a particular story or to reject such proposal without consequence.** Marvel has not produced any contemporaneous agreement with Ditko from the Period for his creative services, nor any other evidence reflecting any bilateral rights and obligations between Ditko and Magazine Management (nor any other alleged Marvel predecessor) in the Period, nor has Marvel alleged that any such agreement or bilateral legal rights and obligations existed between such parties in the Period. *See* Toberoff Decl. Ex. 17 at 298:8-14 (Thomas testifying that freelancers did not have contracts with Marvel until Thomas's in 1974, which was the first); Ex. 36 at 7 (Marvel admitting it had no written contract with Ditko in the 1960s); Ex. 1 at 10 (Evanier Rep. describing the common practice of freelancers selling material to more than one publisher, including Marvel, DC Comics, and Charlton Comics); Ex. 3 at 207:12-22 (Romita testifying that freelancers were free to sell work to other publishers); Ex. 9 ¶ 11 (Steranko attesting that Marvel had no contract with Steranko and so he was free to sell work to other publishers); Ex. 13 ¶¶ 5-6 (Adams attesting that he sold work to both Marvel and DC Comics during the 1960s and 1970s); Ex. 23 at 160:2-8 (Mark Ditko testifying that Ditko was selling work to both Marvel and Charlton Comics in the 1960s); Ex. 35 at DITKO-0199 (Ditko writing about his work at Charlton Comics in the 1960s); Ex. 57 at 2 (Ditko writing about creating material for Charlton Comics and DC Comics); Ex. 35 at DITKO-0192, DITKO-0207-0210, DITKO-0215-0218 (Ditko writing that he rejected several of Lee's *Spider-Man* story ideas and characters such as, for instance, Lee's idea for a Spider-Woman character, or Lee's idea of making Aunt May more glamorous); Ex. 3 at 219:12-24 (Romita testifying that he turned down Lee's offer to submit material to Marvel and preferred to sell freelance |

work to DC Comics); Ex. 21 at 29:9-30:17 (Steranko testifying that he was not given "assignments," but rather, he had the option to work on some books or to not if he chose not to); Ex. 24 at 89:2-11 (Levitz testifying that freelancers were free to decline "assignments"); Ex. 58 at 4 (Ditko writing that, after he stopped selling his material to Marvel in 1966, he later started working with Marvel again, but refused to do any *Spider-Man* or *Dr. Strange* stories and recounting that when other writers tried to sneak in *Spider-Man* panels for Ditko to work on, he "left [them] blank for someone else to fill in"); *id*. (Ditko writing that he "refused to do a drunken Iron Man splash page—someone else had to draw [and] ink it").

**In addition, Ditko often took control over the characters he created and indeed, plotted and drew each *Spider-Man* and *Dr. Strange* story from its inception, until he stopped submitting and selling his stories to Marvel in early 1966.** *See* Toberoff Decl. Ex. 1 at 21 (Evanier Rep. providing historical context of Spider-Man and Dr. Strange and Ditko's role in creating numerous supporting characters before he stopped selling work to Marvel in 1966); Ex. 25 (Ditko: "Dr. Strange has always been a contradiction to Marvel heroes … He is my creation, and at one point I took over all stories, writing, [and] art."); Ex. 26 at 83 (Lee writing concerning Dr. Strange: "Steve Ditko is one of the best plot men in the biz. When it comes to dreaming up story ideas, putting them together intricately, panel by panel, and utilizing the best of cinematic techniques, the guy's a whiz. Thus, the spectacular saga that is about to knock you out was basically concocted by our own Mr. D[itko]"); *id*. (Lee writing concerning *Dr. Strange*, "After [Ditko] did the hard part—after he dreamed up the story and illustrated it in his own unique style—I then got to the fun part. I wrote the squiggly little words: the dialog balloons and captions"). Ex. 7 at 223:18-225:20, 277:11-13 (Thomas testifying that Ditko did all the plotting on *Spider-Man* stories while Ditko and Lee were not speaking); Ex. 17 at 311:18-312:25 (Thomas testifying that Ditko, on his own, plotted and drew *Spider-Man* for more than one year before he left in 1966, did not work pursuant to the "Marvel Method," and that Lee would not even know anything about the story until it was penciled and submitted by Ditko); Ex. 28 (Lee writing that Ditko was co-creator of Spider-Man and that Ditko did most of the plotting of *Spider-Man* and just left Lee to do the dialogue and captions); Ex. 71 at 159 (*Amazing Spider-Man* No. 25: "Sturdy Stevey Ditko dreamed up the plot of this tantalizing tale, and it's full of unexpected surprises!"); Ex. 72 at 225 (*Strange Tales* No. 135: "Plotted and Illustrated by Fandom's Favorite Fiend: Steve Ditko"); Ex. 82 (Lee explaining in January 9, 1966 published interview: "**I don't plot Spider-Man any more. Steve Ditko, the artist, has been doing the stories.** I guess I'll leave him alone until sales start to slip. Since Spidey got so popular, Ditko thinks he's the genius of the world. We were arguing so much over plot lines I told him to start making up his own stories. **He won't let anybody else ink his drawings either. He just**

| | |
|---|---|
| | **drops off the finished pages with notes at the margins and I fill in the dialogue. I never know what he'll come up with next**, but it's interesting to work that way.") (emphasis added); Ex. 83 at 7 (same). |
| **MCI's Reply** | **This fact remains undisputed**.<br><br>Defendant does not address this fact, much less dispute it. Defendant's suggestion that Lee did not assign Ditko to work on Marvel comic books because Ditko was not contractually bound to accept every assignment that Lee provided is incorrect, turns on an improper legal argument, and—in any event—is immaterial, as the Second Circuit's decision in *Kirby* confirms. *See* MCI's Reply in Support of Undisputed Fact 2.<br><br>This argument also ignores that Ditko did, in fact, consistently accept assignments from Lee. Indeed, the vast majority of Ditko's work during the 1962-1965 relevant time period was published by Marvel as detailed in MCI's Reply in Support of Undisputed Fact 2.<br><br>MCI also **objects** to Toberoff Exhibits 1, 3, 9, 13, 21, 23, 25, 35, 57, and 58. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [7], [12], [16], [20], [32], [34], [41], [52], & [53]. |
| **Counterclaimant's Response to Reply** | This Statement remains **disputed**.  Once again, Plaintiff vaguely uses "Marvel", a non-entity in the Period, to mask that Ditko did not work at the "instance and expense" of the Shell Companies and that Plaintiff has not come forth with any evidence of this, as required. In addition, Lee's purported "assignments" were in legal terms, suggestions. Plaintiff has adduced no evidence that Ditko was hired by MMC because Goodman sought to avoid such legal obligations. Plaintiff conflates attributes of MMC/Goodman/Lee's purchasing power with the actual hiring of an employee or independent contractor to perform services on which the "work for hire" doctrine is fundamentally based. Consequently, Plaintiff has no evidence that Lee had any *legal "right"* to assign Ditko work. Conversely, just as MMC, by design, had no legal rights or obligations with respect to Ditko's services, Ditko was not obligated to perform or accept Lee's suggestions. *See Martha Graham*, 380 F.3d at 635 (the "instance" prong turns on whether "the hiring party … has the right to direct and supervise the manner in which the work is carried out"; "The <u>right</u> … need never be exercised.")(emphasis in original). Counterclaimant also incorporates by reference his Response to Plaintiff's Statement No. 12, *supra*, as to the so-called "Marvel Method."  Notwithstanding the above, Plaintiff's Statement No. 14 is also immaterial to whether the Shell Companies were the "statutory authors" of the relevant work and |

|  | copyrights as registered by Marvel and relied upon by Plaintiff, and with respect to this Counterclaimant incorporates by reference his Preliminary Statement.<br><br>Defendant also **objects** to Bard Decl., Exs. 1-9; Lens Decl., Exs. 2-4, 6, 8, 10, 13, 17, 18, 39, 68A-G, 75, 76, 89, 95. *See* Defendant's Evidentiary Objection Nos. [1], [2], [3], [4], [5], [6], [7], [8], [9], [11], [12], [13], [15], [17], [19], [22], [26], [27], [37], [46], [53], [54], [65], & [69]. |
|---|---|
| | **Statement No. 24** |
| **MCI's Statement** | Marvel generally provided Ditko, like other freelancers, with a plot or synopsis, which could be written or oral, that outlined the key elements of the story it wanted penciled. Lens Decl., Ex. 48 at 2 (Ditko admitting that "Stan provided the plot ideas"); Lens Decl., Ex. 46 at 3 (Ditko explaining that Stan Lee "create[ed]" the "Spider-Man" name and then wrote the original "synopsis for the artist [(i.e., Ditko)]"); Lens Decl., Ex. 2 28:8-21 (Thomas describing the plotting process); Lens Decl., Ex. 13 20:11-21:25 (Lee testifying about the same); Lens Decl., Ex. 9 at 47:20-48:8 (Lieber testifying that Stan Lee "would discuss a story or a plot with the artist and the artist . . . would lay it out and draw it with enough knowledge about what the story is and leave room for dialogue to come later"); Lens Decl., Ex. 69; Lens Decl., Ex. 70; Lens Decl., Ex. 71 at 3:25-6:09 (Lee explaining how Marvel comics were "sort of like continuing soap operas"); *see also* Lens Decl., Ex. 11 218:14-219:16; Lens Decl., Ex. 3 113:21-114:17, 118:24-119:4, 123:11-124:8, 124:16-125:4, 222:16-23; Lens Decl., Ex. 9 12:19-13:5. |
| **Counterclaimant's Response** | **Counterclaimant disputes that "Marvel" provided Ditko with plots or synopses, given that Lee did his writing and made his story contributions not as an editor but as an independent freelancer for which he was paid by the page by Magazine Management, and that the shell companies which registered the relevant copyrights had no business operations or employees, no contact with Ditko, did not acquire Lee's freelance writing contributions and therefore could not, and did not, supply Ditko with anything.** *See* Toberoff Decl. Ex. 1 at 13 (Evanier Rep. describing Lee's common practice of composing dialogue as a freelancer, not as Marvel's editor and doing his freelancing from home two of the five workdays per week, for which he was paid on a per-page basis as a freelancer); Ex. 3 at 41:19-42:2 (Romita testifying that Lee would stay home several days per week to write); Ex. 4 at 17:17-25 (Lee testifying that he was paid as a freelancer for his writing and was on salary for his work as an editor); Ex. 17 at 27:2-18, 30:9-13, 31:22-32:7, 276:2- |

14 (Thomas testifying that he was a staff writer/assistant editor in the 1960s and got a salary for that work, but separately freelanced when writing stories and was paid at a per-page rate on a separate check like other freelancers); Ex. 22 at 255:10-256:6 (Lieber testifying that Lee wrote stories and scripts as a writer, not as an editor, because writing is "not what an Editor does"); Ex. 55 at 62:18-63:18 (Lee testifying that he got paid a salary as editor and separately for his writing); Ex. 56 at 91:20-92:6 (Lee testifying that he got paid a salary as editor and separately as a freelancer pre page for his writing); Ex. 14 at 4-5 (Evanier Rebuttal Rep. providing historical context and explaining that the shell companies had no employees, actual offices, or business activities, and had no contact with any freelancer); Ex. 6 at 200:2-24 (Thomas testifying that he was hired by Magazine Management in 1965); Ex. 17 at 272:23-275:2 (Thomas testifying that he was paid and employed by Magazine Management/Marvel Comics, and then Perfect Film/Cadence); *id*. at 320:10-322:14 (Thomas testifying that no one knew what Vista, Atlas, or Non-Pareil did and that Thomas did not receive any money from them, does not know anyone who did, does not know if they had any employees or any offices, or "of [them] having any existence" whatsoever); Ex. 22 at 252:23-254:24, 303:15-19 (Lieber testifying that he never heard of Vista or other shell companies, did not know if they had any employees and that he was paid by, and believed he was working with, Magazine Management); Ex. 50 at DETTWILER-0044-0058 (Don Heck's payment records identifying "Magazine Management" as the only entity that paid him for his freelance material in the Period).

**Counterclaimant further disputes that Lee "generally" provided a plot or synopsis to Lee as Ditko was well-known to be extremely independent when it came to the creation of his stories and characters because of this Lee stopped communicating with Lee in the Period.** *See* Toberoff Decl. Ex. 1 at 13 (Evanier Rep. describing the common practice of independent freelancers supervising themselves and editing their own work prior to submission); *id*. at 12 (Evanier Rep. describing Ditko's regular practice of maintaining a chart mapping out the future development of a character so he could introduce elements into current issues and then use those elements in issues many months down the line); Ex. 35 at DITKO-0193 (Ditko writing that he planted seeds of subplots in stories that would work their way through the issues until it was time for those sub-stories to play an active role later when the time was right); Ex. 58 at 3 (Ditko writing when he took over the *Spider-Man* stories he "knew in advance the [*Spider-Man*] story line like the best (worst) time for Aunt May to have a heart attack"); Ex. 7 at 223:18-225:20, 277:11-13 (Thomas testifying that Ditko did all the plotting on *Spider-Man* and *Dr. Strange* stories while he and Lee were not speaking and that Ditko never received any plots from Thomas when Thomas was doing the dialoguing on *Dr. Strange*); Ex. 17 at 311:18-312:25 (Thomas testifying that Ditko plotted

and drew *Spider-Man* stories completely on his own for more than one year before he left in 1966); Ex. 25 (Ditko: "Dr. Strange has always been a contradiction to Marvel heroes … He is my creation, and at one point I took over all stories, writing, [and] art."); Ex. 26 at 83 (Lee writing that Ditko came up with the *Dr. Strange* plots and illustrated the story and Lee only added the dialogue [in the balloons]); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script); Ex. 58 at 4 (Ditko writing that, after he stopped selling his material to Marvel in 1966, he later started working with Marvel again, but refused to do any *Spider-Man* or *Dr. Strange* stories and recounting that when other writers tried to sneak in *Spider-Man* panels for Ditko to work on, he "left [them] blank for someone else to fill in"); *id.* (Ditko writing that he "refused to do a drunken Iron Man splash page—someone else had to draw [and] ink it"); Ex. 35 at DITKO-0192, DITKO-0207-0210, DITKO-0215-0218 (Ditko writing that he rejected several of Lee's *Spider-Man* story ideas and characters such as, for instance, Lee's idea for a Spider-Woman character, or Lee's idea of making Aunt May more glamorous); Ex. 71 at 159 (*Amazing Spider-Man* No. 25: "Sturdy Stevey Ditko dreamed up the plot of this tantalizing tale, and it's full of unexpected surprises!"); Ex. 72 at 225 (*Strange Tales* No. 135: "Plotted and Illustrated by Fandom's Favorite Fiend: Steve Ditko"); Ex. 82 (Lee explaining in January 9, 1966 published interview: "**I don't plot Spider-Man any more. Steve Ditko, the artist, has been doing the stories.** I guess I'll leave him alone until sales start to slip. Since Spidey got so popular, Ditko thinks he's the genius of the world. We were arguing so much over plot lines I told him to start making up his own stories. **He won't let anybody else ink his drawings either. He just drops off the finished pages with notes at the margins and I fill in the dialogue. I never know what he'll come up with next**, but it's interesting to work that way.") (emphasis added); Ex. 83 at 7 (same).

**Counterclaimant further disputes that Ditko was provided any plot or synopsis for the first *Dr. Strange* story, as Ditko created that story on his own, utilizing a character he had been playing with since 1946 well before he met Marvel or Lee. Ditko also often repurposed characters and character elements (which drove his story plots) that Ditko had created years prior and included them into stories he sold to Magazine Management, evidencing that Lee/Marvel were not "generally" providing Ditko with story plots.** *See* Toberoff Decl. Ex. 1 at 21 (Evanier Rep. providing historical context of the first publication of Ditko's Dr. Strange character which began as a five-page story Ditko wrote and drew on spec introducing the character which he presented to Lee); Ex. 25 (Ditko: "Dr. Strange has always been a contradiction to Marvel heroes … He is my creation, and at one point I took over all stories, writing, [and] art."); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and

that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script); Ex. 30 at 2021MARVEL-0050281 (Lee writing that Dr. Strange "'twas [Ditko's] idea, and I figgered we'd give it a chance" in a contemporaneous letter dated January 9, 1963); Ex. 33 (Ditko's letter post-marked August 6, 1946 to his brother Patrick Ditko enclosing an initial sketch of Dr. Strange); Ex. 59 at 61:15-65:14 (Patrick Ditko, being shown composite Ex. 33 and testifying that his brother, Steve Ditko, sent him this letter in 1946, while Ditko was in military service abroad, enclosing Ditko's early sketch of Dr. Strange (Ex. 33) and that he had found Ex. 33 at his home amongst letters he had kept from his brother); Ex. 23 at 166:5-168:8 (Mark Ditko testifying that his father lived in Johnstown, PA at the address written on the letter envelope of composite Ex. 33, and that in 1946 (postmarked on the letter envelope), his uncle Ditko was in the military, stationed abroad in Germany); Ex. 57 at 2 (Ditko writing that Dr. Strange started out as a "5-page filler," which was a great opportunity to try out all kinds of ideas like Dr. Strange, which "never fit in to Marvel's world of heroes"); Ex. 62 at 4-5 (Dr. Strange used his hands to cast teleportation and other spells in *Strange Tales* No. 139 (1965); Ex. 63 at 2 (same in *Strange Tales* No. 126 (1964)); Ex. 70 at 8-9 (same in *Strange Tales* No. 129 (1965)); *compare* Ex. 61 at 3 (Ditko's character used his hands to cast spells in 1959 in Charlton Comics' *Space Adventures* No. 27); *see also* Ex. 66 at 10 (in *Strange Tales* No. 137 (1965), Dr. Strange used a device—the Eye of Agamotto—to transport through space and time); *compare* Ex. 65 at 4-5 (In Charlton Comics' *Out of this World* No. 7 (1958), Ditko's character used similar artifact to transport characters in a swirl of visual effects through space and time); *see also* Ex. 68 at 4-5 (in *Strange Tales* No. 122 (1964), Dr. Strange traversed through different dimensions and journeyed through alternate planes of existence); Ex. 69 at 1 (same in *Strange Tales* No. 134 (1965)); *compare* Ex. 67 at Cover, 4-5 (Ditko used same effect in Charlton Comics' *Strange Suspense* No. 32 (1957)); *see also* Ex. 73 at 6 (Norman Osborn's first appearance in the *Spider-Man* series in 1965); Ex. 74 at 10 (Norman Osborn's identity revealed to readers in *Amazing Spider-Man* No. 37 (1966)); *compare* Ex. 75 at 1-2 (Norman Osborn's precursor—including corporate villainy and distinct curled hairstyle—in 1957 in Charlton Comics' *Strange Suspense Stories* No. 33, *Director of the Board*); *see also* Ex. 60 at 2, 8 (*Amazing Fantasy* No. 15 (1962), the issue in which Spider-Man and Ditko's Aunt May character first appeared) *compare* Ex. 79, "All Those Eyes" at 1-3 (Aunt May's forerunner character appeared in Ditko's story in Charlton Comics' *Out of this World* No. 6 (1957)); *see also* Ex. 76 at 1, 4 (Ditko's Electro character in *Amazing Spider-Man* No. 9 (1964)); *compare* Ex. 77 at 1, 4-5 (Ditko's electrically powered man, the predecessor of Electro, first appeared in Charlton Comics' *Strange Suspense Stories* No. 48 (1960)); *see also* Ex. 78 at 1, 5-6, 8-9 (Ditko introduces the Chameleon—a character who used various masks to carry out his villainy—in *Amazing Spider-Man* No. 1

|  | (1963)); *compare* Ex. 79, "All Those Eyes" at 2-3 (Chameleon precursor—a spy character who used various masks in his espionage with a similar back story as the Chameleon—appeared in Ditko's "All Those Eyes" story he sold to Charlton Comics in 1957). |
|---|---|
| **MCI's Reply** | **This fact remains undisputed**.<br><br>Defendant contends that even if Lee provided Ditko with plots or synopses, Lee was not providing those plots or synopses on behalf of Marvel. As explained in MCI's Reply in Support of Undisputed Facts 3 and 35, that contention is factually and legally incorrect.<br><br>Further, while Defendant suggests that Lee did not provide Ditko with a plot or synopsis, the evidence demonstrates precisely the opposite, as explained in MCI's Reply in Support of Undisputed Fact 3.<br><br>MCI also **objects** to Toberoff Exhibits 1, 14, 22, 23, 25, 27, 33, 35, 57, 58, 59, 61, 65, 67, 75, 77, and 79. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [17], [26], [27], [31], [33], [34], [35], [39], [41], [52], [53], [54], [55], [57], [58], [59], [60], & [61]. |
| **Counterclaimant's Response to Reply** | This Statement remains **disputed**. Again, Plaintiff vaguely refers to "Marvel", a non-entity in the Period, to mask that Ditko did no work at the "instance and expense" of the Shell Companies and that Plaintiff has failed to provide any evidence of this, as required. Furthermore, Ditko often took control over the characters he created and indeed, plotted and drew many *Spider-Man* and *Dr. Strange* stories from their inception, until he stopped submitting and selling his stories to Marvel in early 1966. *See* Toberoff Decl. Ex. 1 at 21 (Evanier Rep. providing historical context of Spider-Man and Dr. Strange and Ditko's role in creating numerous supporting characters before he stopped selling work to Marvel in 1966); Ex. 25 (Ditko: "Dr. Strange has always been a contradiction to Marvel heroes ... He is my creation, and at one point I took over all stories, writing, [and] art."); Ex. 26 at 83 (Lee writing concerning Dr. Strange: "Steve Ditko is one of the best plot men in the biz. When it comes to dreaming up story ideas, putting them together intricately, panel by panel, and utilizing the best of cinematic techniques, the guy's a whiz. Thus, the spectacular saga that is about to knock you out was basically concocted by our own Mr. D[itko]"); *id*. (Lee writing concerning *Dr. Strange*, "After [Ditko] did the hard part—after he dreamed up the story and illustrated it in his own unique style—I then got to the fun part. I wrote the squiggly little words: the dialog balloons and captions"). Ex. 7 at 223:18-225:20, 277:11-13 (Thomas testifying that Ditko did all the plotting on *Spider-Man* stories |

while Ditko and Lee were not speaking); Ex. 17 at 311:18- 312:25 (Thomas testifying that Ditko, on his own, plotted and drew *Spider-Man* for more than one year before he left in 1966, did not work pursuant to the "Marvel Method," and that Lee would not even know anything about the story until it was penciled and submitted by Ditko); Ex. 28 (Lee writing that Ditko was co-creator of Spider-Man and that Ditko did most of the plotting of *Spider-Man* and just left Lee to do the dialogue and captions); Ex. 71 at 159 (*Amazing Spider-Man* No. 25: "Sturdy Stevey Ditko dreamed up the plot of this tantalizing tale, and it's full of unexpected surprises!"); Ex. 72 at 225(*Strange Tales* No. 135: "Plotted and Illustrated by Fandom's Favorite Fiend: Steve Ditko"); Ex. 82 (Lee explaining in January 9, 1966 published interview: "I don't plot Spider-Man any more. Steve Ditko, the artist, has been doing the stories. I guess I'll leave him alone until sales start to slip. Since Spidey got so popular, Ditko thinks he's the genius of the world. We were arguing so much over plot lines I told him to start making up his own stories. He won't let anybody else ink his drawings either. He just drops off the finished pages with notes at the margins and I fill in the dialogue. I never know what he'll come up with next, but it's interesting to work that way.") (emphasis added); Ex. 83 at 7 (same).

In addition, like most of Plaintiff's statements and alleged evidence, Plaintiff's Statement No. 24 and the purported evidence it cites here is **immaterial** to whether Ditko created his work at the "instance and expense" of the Shell Companies registered, represented and relied upon herein as the statutory "authors" of the purported "work for hire" alleged by Plaintiff, but as to which Plaintiff has adduced no admissible evidence. Unsurprisingly then, Plaintiff has presented no evidence of any relationship or even a single communication between the Shell Companies and MMC or between the Shell Companies and Lee, on whom Plaintiff principally relies. Counterclaimant incorporates by reference its Preliminary Statement.

Defendant also **objects** to Bard Decl., Exs. 1-9; Lens Decl., Exs. 2-4, 6-10, 12, 13, 15, 17, 18, 39, 41, 42, 45, 48, 68A-G, 75, 76, 84, 87, 88. *See* Defendant's Evidentiary Objection Nos. [1], [2], [3], [4], [5], [6], [7], [8], [9], [11], [12], [13], [15], [16], [17], [18], [19], [21], [22], [24], [26], [27], [37], [39], [40], [43], [44], [46], [53], [54], [60], [63], & [64].

| | |
|---|---|
| | **Statement No. 25** |
| **MCI's Statement** | Marvel tasked Ditko, like other freelancers, with proposing new characters as part of his assignment, subject to the ultimate discretion of Marvel. Lens Decl., Ex. 13 54:16-56:9 (Lee testifying that it "was part of what [an artist's] assignment was" to "introduce . . . new characters in the stories"); |

|  | Lens Decl., Ex. 13 72:21-73:23 (Lee testifying that "[t]he artist in every strip always creates new characters to flesh out the strip and to make the characters living in the real world," although such additions were subject to the approval of Lee and publisher Martin Goodman); Lens Decl., Ex. 13 79:3-19 (Lee testifying that it would be the responsibility of "the Editor or the Publisher" to "make the decision to take [a new, minor] character and make him or her a separate character for a new comic"); Lens Decl., Ex. 12 55:4-15 (Thomas confirming that artists would sometimes "come up with ideas for new characters," and that it was indeed "part of the artist's assignment . . . to introduce new characters into a comic book series" if it "would further the plot"); *see also* Lens Decl., Ex. 12 65:13-66:7. |
|---|---|
| **Counterclaimant's Response** | **Counterclaimant disputes that "Marvel tasked Ditko" with proposing new characters as part of his "assignment[s]," as Ditko and Magazine Management had no legal obligations to one another such that "Marvel" could "task" or "assign" Ditko to do anything. Ditko thus plotted and drew his stories the way he wished, and freely rejecting any of Lee's ideas Ditko did not like or agree with.** *See* Toberoff Decl. Ex. 14 at 11, 13 (Evanier Rebuttal Rep. explaining the custom and practice that comic book freelancers were free to decline work or to make changes to their work); Ex. 35 at DITKO-0192, DITKO-0207-0210, DITKO-0215-0218 (Ditko writing that he rejected several of Lee's *Spider-Man* story ideas and characters such as, for instance, Lee's idea for a Spider-Woman character, or Lee's idea of making Aunt May more glamorous); Ex. 58 at 4 (Ditko writing that he "refused to do a drunken Iron Man splash page— someone else had to draw [and] ink it"); Ex. 21 at 29:9-30:17 (Steranko testifying that he was not given "assignments," but rather, he had the option to work on some books or to not as he chose to); Ex. 24 at 89:2-11 (Levitz testifying that freelancers were free to decline "assignments"); Ex. 58 at 4 (Ditko writing that, after he stopped selling his material to Marvel in 1966, he much later started working with Marvel again, but refused to do any more *Spider-Man* or *Dr. Strange* stories and recounting that when other writers tried to sneak in *Spider-Man* panels for Ditko to work on, he "left [them] blank for someone else to fill in"); Ex. 82 (Lee explaining in January 9, 1966 published interview: "**I don't plot Spider-Man any more. Steve Ditko, the artist, has been doing the stories.** I guess I'll leave him alone until sales start to slip. Since Spidey got so popular, Ditko thinks he's the genius of the world. We were arguing so much over plot lines I told him to start making up his own stories. **He won't let anybody else ink his drawings either. He just drops off the finished pages with notes at the margins and I fill in the dialogue. I never know what he'll come up with next**, but it's interesting to work that way.") (emphasis added); Ex. 83 at 7 (same). |

<table>
<tr><td></td><td><b>Counterclaimant further disputes that Ditko was "tasked" with creating the Dr. Strange character, as Ditko created that story on his own, utilizing a character he had been playing with since 1946 well before he met Marvel or Lee.</b> <i>See</i> Toberoff Decl. Ex. 25 (Ditko: "Dr. Strange has always been a contradiction to Marvel heroes … He is my creation, and at one point I took over all stories, writing, [and] art."); Ex. 27 (Ditko writing that he created the first <i>Dr. Strange</i> story and that he plotted and penciled most of the rest of the <i>Dr. Strange</i> stories and left Lee to dialogue them from Ditko's rough script); Ex. 30 at 2021MARVEL-0050281 (Lee writing that Dr. Strange "'twas [Ditko's] idea, and I figgered we'd give it a chance," in a contemporaneous letter dated January 9, 1963); Ex. 1 at 21 (Evanier Rep. providing historical context of the first publication of Ditko's Dr. Strange character which began as a five-page story Ditko wrote and drew on his own introducing the character which he presented to Lee); Ex. 49 at 1 (first published appearance of Dr. Strange in <i>Strange Tales</i> No. 110); Ex. 33 (Ditko's letter post-marked August 6, 1946 to his brother Patrick Ditko enclosing an initial sketch of Dr. Strange); Ex. 59 at 61:15-65:14 (Patrick Ditko, being shown composite Ex. 33 and testifying that his brother, Steve Ditko, sent him this letter in 1946, while Ditko was in military service abroad, enclosing Ditko's early sketch of Dr. Strange (Ex. 33) and that he had found Ex. 33 at his home amongst letters he had kept from his brother); Ex. 23 at 166:5-168:8 (Mark Ditko testifying that his father lived in Johnstown, PA at the address written on the letter envelope of composite Ex. 33, and that in 1946 (postmarked on the letter envelope), his uncle Ditko was in the military, stationed abroad in Germany); Ex. 57 at 2 (Ditko writing that Dr. Strange started out as his 5-page story and that Dr. Strange was a great opportunity to try out all kinds of ideas which "never fit in to Marvel's world of heroes").</td></tr>
<tr><td><b>MCI's Reply</b></td><td><b>This fact remains undisputed.</b><br><br>Defendant's suggestion that Marvel did not task Ditko with proposing new characters in Marvel comic stories because Ditko had no written employment agreement with Marvel is incorrect, turns on improper legal argument, and—in any event—is immaterial, as the Second Circuit's decision in <i>Kirby</i> confirms. <i>See</i> MCI's Reply in Support of Undisputed Fact 2.<br><br>Further, the evidence demonstrates that Ditko was not "free[]" to "plot[] and dr[a]w" Marvel comics "the way he wished," because Marvel exercised supervision and control over his contributions, as explained in MCI's Reply in Support of Undisputed Fact 3.</td></tr>
</table>

| | |
|---|---|
| | MCI also **objects** to Toberoff Exhibits 1, 14, 21, 23, 25, 27, 33, 35, 57, 58, and 59. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [17], [20], [33], [34], [35], [39], [41], [52], [53], & [54]. |
| **Counterclaimant's Response to Reply** | This Statement obviously remains **disputed** pursuant to the evidence cited by Counterclaimant in its initial Response. Again, Plaintiff vaguely uses the name "Marvel"—a non-entity in the Period— to mask and evade that Ditko did no work at the "instance and expense" of the Shell Companies and that Plaintiff has failed to adduce any evidence of this as required. Plaintiff once again uses words like "tasked," to create the illusion of Ditko's employment when there was none. *See* Counterclaimant's Response to Statement No. 25, incorporated by reference.  As it is incontrovertible that Ditko originated the character Dr. Strange and many of the leading characters in the Spiderman comics books, which Plaintiff here effectively *admits*, Plaintiff resorts to arguing that this was just because "Marvel" "tasked" Ditko or permitted him to do that.  Plaintiff's Statement No. 25 and the purported evidence it cites here is also **immaterial** to whether Ditko created his work at the "instance and expense" of the Shell Companies—registered, represented, and relied upon as the "statutory authors" of the purported "work for hire" alleged by Plaintiff, but as to which Plaintiff has adduced no admissible evidence. Plaintiff has adduced no admissible evidence that the Shell Companies were the principals and that the actions of MMC and its employee Lee were taken as the agent of the Shell Companies. In this regard, Counterclaimant incorporates by reference its Preliminary Statement.<br><br>Defendant also **objects** to Bard Decl., Exs. 1-9; Lens Decl., Exs. 2-4, 6-10, 12, 13, 15, 17, 18, 39, 41, 42, 45, 48, 68A-G, 75, 76, 84, 89, 95. *See* Defendant's Evidentiary Objection Nos. [1], [2], [3], [4], [5], [6], [7], [8], [9], [11], [12], [13], [15], [16], [17], [18], [19], [21], [22], [24], [26], [27], [37], [39], [40], [43], [44], [46], [53], [54], [60], [65], & [69]. |
| | **Statement No. 26** |
| **MCI's Statement** | After Ditko submitted his assignment, a Marvel editor would review the penciled pages and, as appropriate, discuss changes, additions, or corrections— like Marvel did with other freelancers. Lens Decl., Ex. 48 at 2 (Ditko explaining that he and Stan Lee "would go over the penciled story/art pages" together and discuss changes, additions, or corrections to them); Lens Decl., Ex. 29 (original art for *Amazing Fantasy* #15 showing editorial comments in the margins from Lee to Ditko on Spider-Man panels); Lens Decl., Ex. 2 126:2-127:12 (Thomas testifying that Lee would review the artwork pages submitted by assigned artists and that, as editor, |

| | |
|---|---|
| | "it was his job to supervise"—"[i]f something went wrong, the publisher wasn't going to blame . . . the artist, he was going to go to Stan Lee"); Lens Decl., Ex. 12 67:16-68:6 (Thomas testifying that Lee, and then Goodman, would review all covers before they were finalized); Lens Decl., Ex. 3 170:18-21 (Lieber testifying that Lee "had to approve the plot and the artwork and the other things and – before it went to the engraver"); Lens Decl., Ex. 6 39:2-24 (Lee testifying about the supervisorial role of Marvel's art director and editor, including that it was the art director's role to "look[] over the artwork and sa[y], 'Gee, I think that ought to be a closeup instead of a long shot or it is a little hard to understand what he is doing, can you clarify that panel,'" and generally "discuss the artwork with the artist"); *see also* Lens Decl., Ex. 13 20:11-21:25; Lens Decl., Ex. 11 218:14-219:16; Lens Decl., Ex. 9 16:20-17:4. |
| **Counterclaimant's Response** | **While Counterclaimant admits someone at Magazine Management would generally review Ditko's submitted material prior to its publication and may from time to time desire changes or corrections to such material, as that is a normal part of the publishing process, Counterclaimant disputes that Ditko was required to make any requested changes and Ditko often refused to make changes to his work. Once Magazine Management purchased and Ditko assigned ownership of his material to Magazine Management, it could make any revisions or corrections it wanted and had production staff on hand to do so.** *See* Toberoff Decl. Ex. 35 at DITKO-0193 (Ditko writing that he ignored comments from Lee and Brodsky and only made changes to stories when he agreed with them); Ex. 14 at 7 (Evanier Rebuttal Rep. explaining Ditko's practice of refusing to make changes and in such case, Marvel's customary practice of having staff make such changes after the work had been submitted to and purchased by Marvel); Ex. 3 at 75:18-20, 243:13-244:23, 246:5-9 (Romita testifying that he, or someone else Lee could find in the Marvel office, would be asked to make changes to other artists' work after it had been submitted and would not be paid any extra for making these changes and noting specifically that when Lee did not like something on a Ditko cover, he asked Kirby to change it); Ex. 19 at 6, "Legends at Loggerheads!" (Thomas explaining example of when Lee incorrectly dialogued a *Spider-Man* story in a way Ditko had not intended, Ditko refused to accede to Lee's chosen direction); Ex. 21 at 41:7-18 (Steranko testifying that Marvel had production assistants to make changes to work after it had been submitted by and purchased from artists). |
| **MCI's Reply** | **This fact remains undisputed.** |

| | |
|---|---|
| | Defendant admits that Lee reviewed Ditko's submitted artwork and would at times request changes, but disputes that Ditko was "required" to make changes and contends that he often refused to do so. Defendant's suggestion that Ditko was not "required" to make changes appears to be based on the incorrect legal argument that because Ditko had no written employment agreement with Marvel, Marvel could not request changes or otherwise control his work. *See* MCI's Reply in Support of Undisputed Fact 2.<br><br>Regardless, Ditko did make changes requested by Marvel, "noting" them after going over his work with Stan Lee, as discussed in more detail in MCI's Reply in Support of Undisputed Fact 3. And while Defendant suggests that Ditko "often" refused to make requested changes, the evidence **does not support** that contention, as explained in MCI's Reply in Support of Undisputed Fact 15.<br><br>MCI also **objects** to Toberoff Exhibits 3, 14, and 35. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [8], [17], and [41]. |
| **Counterclaimant's Response to Reply** | This Statement is **disputed**. Plaintiff's vague continued use of the name "Marvel"—a non-entity in the Period—is a façade, to hide the fact that MMC was the only entity doing anything in the Period, and that Plaintiff has adduced *no evidence* that Ditko worked at the "instance and expense" of the Shell Companies, as required. Further, in the Period, MMC's comic book business was tiny, consisting primarily of Lee. *See* Evidence Supp. AMF ¶¶ 9-10, 15.  In 1965, at the tail-end of the Period, MMC employed Thomas as an editorial assistant. See MCI Statement No. 11 and Counterclaimant's Response. All publishers review material and make suggestions prior to publishing it and, as such, this does nothing to differentiate "work for hire."  Notwithstanding this, Plaintiff's Statement No. 26 and the purported evidence it cites here is **immaterial** to whether Ditko created his work at the "instance and expense" of the Shell Companies—registered, represented, and relied upon as the "statutory authors" of the purported "work for hire" alleged by Plaintiff, but as to which Plaintiff has adduced no admissible evidence. Plaintiff has adduced no admissible evidence that the Shell Companies were the principals and that the actions of MMC and its employee Lee were done as the agent of any of the Shell Companies. In this regard, Counterclaimant incorporates by reference its Preliminary Statement.<br><br>Defendant also **objects** to Bard Decl., Exs. 1-9; Lens Decl., Exs. 2-4, 6-10, 12, 13, 15, 17, 18, 35, 39, 41, 42, 45, 48, 68A-G, 75, 76, 84, 89, 95. *See* Defendant's Evidentiary Objection Nos. [1], [2], [3], [4], [5], [6], [7], [8], |

|  | [9], [11], [12], [13], [15], [16], [17], [18], [19], [21], [22], [24], [26], [27], [33], [37], [39], [40], [43], [44], [46], [53], [54], [60], [65], & [69]. |
|---|---|
|  | **<u>Statement No. 27</u>** |
| **MCI's Statement** | Marvel could decide to not publish material that it had assigned to Ditko or other freelancers, but, to the extent it did, typically did so only in connection with comic book covers (a top priority for Marvel's publisher Martin Goodman), not interior pages. Lens Decl., Ex. 54 at 4 (Ditko remarking that he "got more out of working for" Charlton Comics than for Marvel because of its "picky editors, 'corrections' etc."); Lens Decl., Ex. 48 at 5 (Ditko discussing Marvel's rejection of his Spider-Man cover and reassignment of the task to Jack Kirby); Lens Decl., Ex. 47 at 2 (same); Lens Decl., Ex. 30 at 2 ("*Amazing Fantasy* #15 unused cover art by Steve Ditko"); Lens Decl., Ex. 13 22:11-23:19 (Lee confirming that he "always maintain[ed] the ability to edit and make changes or reject what the other writers or artists had created"); Lens Decl., Ex. 2 286:15-23 (Thomas testifying that Goodman's "main concern was the covers" and that he was known to scrutinize them); Lens Decl., Ex. 12 67:16-68:6 (Thomas testifying that Stan Lee would review the covers before publication, and then "they were all reviewed eventually by Martin Goodman as publisher"); *see also* Lens Decl., Ex. 2 161:8-20; Lens Decl., Ex. 13 44:4-17; Lens Decl., Ex. 41 at 4; Lens Decl., Ex. 49 at 3; Thomas Decl. ¶¶ 20-21. |
| **Counterclaimant's Response** | **Counterclaimant admits that Magazine Management, like all other publishers, could choose what it published, but once again denies that Marvel could "assign" Ditko to do anything in any legal employment sense as Marvel had no contract with Ditko or other legal authority over him. Ditko was an independent artist and was free to accept or reject any proposal by Magazine Management or Lee without consequence.** Marvel has not produced any contemporaneous agreement with Ditko from the Period for his creative services, nor any other evidence reflecting any bilateral rights and obligations between Ditko and Magazine Management (nor any other alleged Marvel predecessor) in the Period, nor has Marvel alleged that any such agreement or bilateral legal rights and obligations existed between such parties in the Period. *See* Toberoff Decl. Ex. 17 at 298:8-14 (Thomas testifying that freelancers did not have contracts with Marvel until Thomas's in 1974, which was the first); Ex. 36 at 7 (Marvel admitting it had no written contract with Ditko in the 1960s); Ex. 1 at 10 (Evanier Rep. describing the common practice of freelancers selling material to more than one publisher, including Marvel, DC Comics, and Charlton Comics); Ex. 3 at 207:12-22 (Romita testifying |

| | |
|---|---|
| | that freelancers were free to sell work to other publishers); Ex. 9 ¶ 11 (Steranko attesting that Marvel had no contract with Steranko and so he was free to sell work to other publishers); Ex. 13 ¶¶ 5-6 (Adams attesting that he sold work to both Marvel and DC Comics during the 1960s and 1970s); Ex. 23 at 160:2-8 (Mark Ditko testifying that Ditko was selling work to both Marvel and Charlton Comics in the 1960s); Ex. 35 at DITKO-0199 (Ditko writing about his work at Charlton Comics in the 1960s); Ex. 57 at 2 (Ditko writing about creating material for Charlton Comics and DC Comics); Ex. 35 at DITKO-0192, DITKO-0207-0210, DITKO-0215-0218 (Ditko writing that he rejected several of Lee's *Spider-Man* story ideas and characters such as, for instance, Lee's idea for a Spider-Woman character, or Lee's idea of making Aunt May more glamorous); Ex. 3 at 219:12-24 (Romita testifying that he turned down Lee's offer to submit material to Marvel and preferred to sell freelance work to DC Comics); Ex. 21 at 29:9-30:17 (Steranko testifying that he was not given "assignments," but rather, he had the option to work on some books or to not if he chose not to); Ex. 24 at 89:2-11 (Levitz testifying that freelancers were free to decline "assignments"); Ex. 58 at 4 (Ditko writing that, after he stopped selling his material to Marvel in 1966, he later started working with Marvel again, but refused to do any *Spider-Man* or *Dr. Strange* stories and recounting that when other writers tried to sneak in *Spider-Man* panels for Ditko to work on, he "left [them] blank for someone else to fill in"); *id*. (Ditko writing that he "refused to do a drunken Iron Man splash page—someone else had to draw [and] ink it"). |
| **MCI's Reply** | **This fact remains undisputed.**<br><br>Defendant admits that Marvel could choose what it published, but denies that Marvel could "assign" Ditko to do anything because Marvel had no written employment contract with Marvel. That is incorrect, turns on improper legal argument, and—in any event—is immaterial, the Second Circuit's decision in *Kirby* confirms. *See* MCI's Reply in Support of Undisputed Fact 2.<br><br>This argument also ignores that Ditko did, in fact, consistently accept assignments from Lee. Indeed, the vast majority of Ditko's work during the 1962-1965 relevant time period was published by Marvel, as detailed in MCI's Reply in Support of Undisputed Fact 2.<br><br>MCI also **objects** to Toberoff Exhibits 1, 3, 9, 13, 21, 23, 35, 57 and 58. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [7], [12], [16], [20], [32], [41], [52], & [53]. |

| | |
|---|---|
| **Counterclaimant's Response to Reply** | This Statement remains **disputed**. Plaintiff's vague use of the name "Marvel"—a non-entity in the Period—is a façade to cover up the fact that MMC was the only entity doing anything in the Period; that Ditko did not work at the "instance and expense" of the Shell Companies and that Plaintiff has failed to adduce any evidence of this as required. MMC/Lee had no right to "assign" Ditko to do anything as Goodman/MMC/Lee specifically chose not to employ or hire Ditko and the bilateral obligations hiring entails. See Plaintiff's Response to Statement Nos. 2 & 23, *supra*, incorporated by reference. Notwithstanding this, Plaintiff's Statement No. 27 and the purported evidence it cites is **immaterial** to whether Ditko created his work at the "instance and expense" of the Shell Companies—registered, represented and relied upon as the "statutory authors" of the purported "work for hire" alleged by Plaintiff, but as to which Plaintiff has adduced no admissible evidence. Plaintiff has adduced no admissible evidence that the Shell Companies were the principal and that the actions of MMC and its employee Lee were done as the agent of any of the Shell Companies. In this regard, Counterclaimant also incorporates by reference its Preliminary Statement.<br><br>Defendant also **objects** to Bard Decl., Exs. 1-9; Lens Decl., Exs. 2-4, 6, 8, 10, 13, 17, 18, 39, 68A-G, 75, 76, 89, 95. *See* Defendant's Evidentiary Objection Nos. [1], [2], [3], [4], [5], [6], [7], [8], [9], [11], [12], [13], [15], [17], [19], [22], [26], [27], [37], [46], [53], [54], [65], & [69]. |
| | **<u>Statement No. 28</u>** |
| **MCI's Statement** | Marvel could require Ditko, like other freelancers, to make changes to his work (or could make the changes directly), and sometimes did so. Lens Decl., Ex. 48 at 2 (Ditko explaining that he and Stan Lee "would go over the penciled story/art pages" together and discuss changes, additions, or corrections to them"); Lens Decl., Ex. 53 at 3 (Ditko writing about a Spider-Man cover in which he "had S[pider]-M[an] leaping toward the Molten Man" but "S[pider]-M[an] was changed to leaping <u>across</u> the Molton Man and <u>off</u> the cover"); Lens Decl., Ex. 54 at 4 (Ditko complaining about Marvel's "picky editors" and their "corrections"); Lens Decl., Ex. 29 (original art for *Amazing Fantasy* #15 showing editorial comments in the margins from Lee to Ditko on Spider-Man panels); Lens Decl., Ex. 2 44:22-45:5 (Thomas testifying that he "observe[d]" Marvel editors "actually making changes to work that had been done by freelance writers and artists," in terms of "both . . . lettering and artwork"); Lens Decl., Ex. 2 127:17-20 (Thomas confirming that "Stan Lee ha[d] the ability to just have changes made to artwork without the artist's involvement"); Lens Decl., Ex. 2 133:11-13 (similar); Lens Decl., Ex. 2 24:17-23 (Thomas testifying how Marvel production manager Sol Brodsky |

"would call a freelancer in, a letterer or an artist to come in . . . simply because they had something that had to be corrected or changed and they needed more work than just the one production person could do"); Lens Decl., Ex. 2 41:16-20 (Thomas confirming that he understood Marvel could "request that [he], for example, do rewrites or revisions to work that you had done"); Lens Decl., Ex. 13 16:20-17:4 (Lee confirming that it "was [his] job" to "not only make assignments but also to edit and change things that other writers or artists did," and that, "[i]f, for example, I saw some art work, and I felt there wasn't enough action on a page, or it was confusing, the reader might not know what it was, or in a script if I felt there was too much dialogue or too little dialogue, . . . it was up to me to make the stories as good as I could make them"); Lens Decl., Ex. 3 128:23-129:2 (Lieber testifying that "of course" Stan Lee "had the right [to] make the changes to [Lieber's] scripts"); Lens Decl., Ex. 3 133:14-134:5) (Lieber testifying that, when Lee went over his work, he would explain to Lieber, "'Oh, you could have said this. You could have done that,' and he'd make some little corrections" but "as time went on, he had fewer to make"); *see also* Lens Decl., Ex. 52 at 4; Lens Decl., Ex. 2 42:24-44:18, 333:18-334:5; Lens Decl., Ex. 12 113:18-114:11; Lens Decl., Ex. 3 137:11-20, 138:2-5; Lens Decl., Ex. 13 18:17-19:17, 22:11-14, 33:25-34:7; Thomas Decl. ¶ 20.

| | |
|---|---|
| **Counterclaimant's Response** | **Counterclaimant disputes that "Marvel" could "require" Ditko to make any requested changes to his material, as he had no contract with any Marvel entity during the Period and was free to accept or decline "Marvel's" suggestions. Magazine Management had production staff on hand and was free to make changes to Ditko's material only** *after* **Ditko had created, sold and assigned it to Magazine Management.** *See* Counterclaimant's Response to Marvel Statement No. 27, *supra*, incorporated herein by reference. *See also* Toberoff Decl. Ex. 14 at 7 (Evanier Rebuttal Rep. explaining Ditko's practice of refusing to make changes and in such case, Marvel's custom of having staff make such changes after the work had been submitted to and purchased by Marvel); *id.* at 11, 13 (Evanier Rebuttal Rep. explaining the custom and practice of comic book publishers to reserve the right to purchase or not purchase freelancers' submitted material, and that freelancers were free to decline to make changes to their work); Ex. 3 at 75:18-20, 243:13-244:23, 246:5-9 (Romita testifying that he, or someone else Lee could find in the Marvel office, would be asked to make changes to other artists' work after it had been submitted and would not be paid any extra for making these changes and noting specifically that when Lee did not like something on a Ditko cover, he asked Kirby to change it); Ex. 19 at 6, "Legends at Loggerheads!" (Thomas explaining example of when Lee incorrectly dialogued a *Spider-Man* story in a way Ditko had not |

<table>
<tr>
<td></td>
<td>intended, Ditko refused to accede to Lee's chosen direction); Ex. 21 at 41:7-18 (Steranko testifying that Marvel had production assistants to make changes to work after it had been submitted by artists); Ex. 35 at DITKO-0193 (Ditko writing that he ignored comments from Lee and Brodsky and only made changes to stories when he agreed with them); <i>id</i>. at DITKO-0192, DITKO-0207-0210, DITKO-0215-0218 (Ditko writing that he rejected several of Lee's <i>Spider-Man</i> story ideas and characters such as, for instance, Lee's idea for a Spider-Woman character, or Lee's idea of making Aunt May more glamorous); Ex. 17 at 298:8-14 (Thomas testifying that freelancers did not have contracts with Marvel until Thomas's in 1974, which was the first); Ex. 36 at 7 (Marvel admitting it had no written contract with Ditko in the 1960s); Ex. 58 at 4 (Ditko writing that he "refused to do a drunken Iron Man splash page—someone else had to draw [and] ink it").</td>
</tr>
<tr>
<td><b>MCI's Reply</b></td>
<td><b>This fact remains undisputed</b>.

Defendant admits that Lee reviewed Ditko's submitted artwork and would at times request changes, but disputes that Ditko was "required" to make changes and contends that he often refused to do so. Defendant's suggestion that Ditko was not "required" to make changes appears to be based on the incorrect legal argument that because Ditko had no written employment agreement with Marvel, Marvel could not request changes or otherwise control his work. <i>See</i> MCI's Reply in Support of Undisputed Fact 2.

Regardless, Ditko did make changes requested by Marvel, "noting" them after going over his work with Stan Lee, as discussed in more detail in MCI's Reply in Support of Undisputed Fact 3. And while Defendant suggests that Ditko "often" refused to make requested changes, the evidence <b>does not support</b> that contention, as explained in MCI's Reply in Support of Undisputed Fact 15.

MCI also <b>objects</b> to Toberoff Exhibits 3, 14, 35, and 58. <i>See</i> MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [8], [17], [41] & [53].</td>
</tr>
<tr>
<td><b>Counterclaimant's Response to Reply</b></td>
<td>This Statement remains <b>disputed</b> as stated. In addition, Plaintiff's vague use of the name "Marvel"—a non-entity in the Period—is a façade to obscure the fact that MMC was the only entity doing anything in the Period; and that Plaintiff has failed to adduce any evidence that Ditko worked at the "instance and expense" of the Shell Companies, as required. Plaintiff's Statement No. 28 and the purported evidence it cites is <b>immaterial</b> to whether Ditko created his work at the "instance and</td>
</tr>
</table>

| | |
|---|---|
| | expense" of the Shell Companies—registered, represented and relied upon as the statutory "authors" of the purported "work for hire" alleged by Plaintiff, but as to which Plaintiff has adduced no admissible evidence. Plaintiff has adduced no admissible evidence that the Shell Companies were the principal and that the actions of MMC and its employee Lee were done as the agent of any of the Shell Companies. In this regard, Counterclaimant also incorporates by reference its Preliminary Statement.

Defendant also **objects** to Bard Decl., Exs. 1-9; Lens Decl., Exs. 2-4, 6-10, 12, 13, 15, 17, 18, 35, 39, 41, 42, 45, 48, 68A-G, 75, 76, 84, 89, 95. *See* Defendant's Evidentiary Objection Nos. [1], [2], [3], [4], [5], [6], [7], [8], [9], [11], [12], [13], [15], [16], [17], [18], [19], [21], [22], [24], [26], [27], [33], [37], [39], [40], [44], [46], [53], [54], [60], [65], & [69]. |
| | **Statement No. 29** |
| **MCI's Statement** | Ditko, like other freelancers, did not always agree with Stan Lee's choices, but Lee, as editor, had editorial control. Lens Decl., Ex. 59 at 2 (Ditko complaining that "Stan's dialogue was too much his personal writing style with heroes/villains. He had his formula to handle all the hero/villains material."); Lens Decl., Ex. 58 at 3 (Ditko writing that "I believe Stan loved writing those corny captions, etc. It added to reading appeal, but undercut a more serious growth of a teenagers [sic] in a heroic role"); Lens Decl., Ex. 52 at 4 (Ditko writing that "Stan's 'humor' dialogue undercut Peter Parker, S[pider]-M[an] as a teen-ager growing up to become a professional hero like Captain America"); Lens Decl., Ex. 54 at 4 (Ditko commenting that "Stan's writing style was completely wrong for SM [Spider-Man]" and that he "treated teen-age P. Parker as a seasoned veteran with his nonsensical comic dialogue exchanges between a 'Hero' and 'villains'"); Lens Decl., Ex. 60 at 3 (Ditko remarking that "[e]ven some poor plots by Stan, others, incompetent inkers didn't sink my basic ideas for Doctor Strange"); Lens Decl., Ex. 57 at 4 (Ditko noting that it was "a mystery to [him] why no Doctor Strange covers"); Lens Decl., Ex. 53 at 3 (Ditko writing that it was "hard to understand, explain Stan's motives with his likes, dislikes . . . In a cover, I had S[pider]-M[an] leaping toward the Molten Man. S[pider]-M[an] was changed to leaping across the Molton Man and off the cover. What pleases an editor? They all have their likes and dislikes."); Lens Decl., Ex. 54 at 4 (Ditko describing Marvel as having "picky editors" who adopted the creed that "[t]he editor is always right"); Lens Decl., Ex. 45 at 3 (Ditko explaining that, if he had the choice, he would do both drawing and inking, rather than having "other people . . . ink [his] pencils"); Lens Decl., Ex. 2 at 57:13-58:11 (Thomas testifying that every single artist at Marvel was "subject to the editorial discretion of the editor-in-chief" and that, during Lee's tenure, all |

| | |
|---|---|
| | freelancers worked "subject to Stan Lee's supervision and discretion"); Lens Decl., Ex. 13 16:8-19 (Lee confirming that he would "give instructions to the artists as to how [he] wanted the story to go" and that it was his "responsibility" to oversee "the creative editorial aspects of the comic books that were created"); *see also* Lens Decl., Ex. 61 at 4. |
| **Counterclaimant's Response** | **Counterclaimant notes that all publishers control what they chose to publish and have editors to oversee what they publish. Counterclaimant disputes that Lee's literary and writing contributions to the Works, if any, were done as Magazine Management's "editor," as creating stories and writing dialogue are not editorial functions, but the functions of a writer, which Lee did strictly as a freelancer, outside of Magazine Management's offices and outside his editorial duties. Counterclaimant further notes that Lee dialogued the balloons and added captions to Ditko's stories only *after* Ditko had already created, sold and assigned his works to Magazine Management.** *See* Toberoff Decl. Ex. 1 at 13 (Evanier Rep. describing Lee's common practice of composing dialogue as a freelancer, not as Marvel's editor and doing his freelancing from home two of the five workdays per week, for which he was paid on a per-page basis as a freelancer); Ex. 3 at 41:19-42:2 (Romita testifying that Lee would stay home several days per week to write); Ex. 4 at 17:17-25 (Lee testifying that he was paid as a freelancer for his writing and was on salary for his work as an editor); Ex. 17 at 27:2-18, 30:9-13, 31:22-32:7, 276:2-14 (Thomas testifying that he was a staff writer/assistant editor in the 1960s and got a salary for that work, but separately freelanced when writing stories and was paid at a per-page rate on a separate check like other freelancers); *id*. at 289:7-291:5 (Thomas testifying that he and Lee each did their writing in a freelance capacity from home in the 1960s and would come to the office only to do their editorial work); Ex. 22 at 255:10-256:6 (Lieber testifying that Lee wrote stories and scripts as a writer, not as an editor, because writing is "not what an Editor does"); *id*. at 256:7-257:12 (Lieber testifying that Lee wrote scripts from home); Ex. 55 at 62:18-63:18 (Lee testifying that he got paid a salary as editor and separately for his writing); Ex. 56 at 91:20-92:6 (Lee testifying that he got paid a salary as editor and separately as a freelancer pre page for his writing); *id*. at 94:6-95:18 (Lee testifying that there was very little editing of his own freelance written material). <br><br> **Counterclaimant further disputes that Lee could control Ditko's creation of his material, as Ditko was extremely independent-minded, and told the stories his way based on a chart he created mapping out the macro-level plot and elements of his stories, and often declined to make changes to his material and to incorporate Lee's ideas, if any.** |

*See* Toberoff Decl. Ex. 35 at DITKO-0193 (Ditko writing that he planted seeds of subplots in stories that would work their way through the issues until it was time for those sub-stories to play an active role later when the time was right); Ex. 58 at 3 (Ditko writing when he took over the *Spider-Man* stories he "knew in advance the [*Spider-Man*] story line like the best (worst) time for Aunt May to have a heart attack"); Ex. 1 at 13 (Evanier Rep. describing the common practice of independent freelancers supervising themselves and editing their own work prior to submission); *id*. at 12 (Evanier Rep. describing Ditko's regular practice of maintaining a chart mapping out the future development of stories and characters so he could introduce elements into current issues and then use those elements in issues many months down the line); Ex. 7 at 223:18-225:20, 277:11-13 (Thomas testifying that Ditko did all the plotting on *Spider-Man* and *Dr. Strange* stories while he and Lee were not speaking and that Ditko never received any plots from Thomas when Thomas was doing the dialoguing on *Dr. Strange*); Ex. 17 at 311:18-312:25 (Thomas testifying that Ditko plotted and drew *Spider-Man* stories completely on his own for more than one year before he left in 1966); Ex. 25 (Ditko: "Dr. Strange has always been a contradiction to Marvel heroes … He is my creation, and at one point I took over all stories, writing, [and] art."); Ex. 26 at 83 (Lee writing that Ditko came up with the *Dr. Strange* plots and illustrated the story and Lee only added the dialogue [in the balloons]); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script); Ex. 58 at 4 (Ditko writing that, after he stopped selling his material to Marvel in 1966, he later started working with Marvel again, but refused to do any *Spider-Man* or *Dr. Strange* stories and recounting that when other writers tried to sneak in *Spider-Man* panels for Ditko to work on, he "left [them] blank for someone else to fill in"); *id*. (Ditko writing that he "refused to do a drunken Iron Man splash page—someone else had to draw [and] ink it"); Ex. 35 at DITKO-0192, DITKO-0207-0210, DITKO-0215-0218 (Ditko writing that he rejected several of Lee's *Spider-Man* story ideas and characters such as, for instance, Lee's idea for a Spider-Woman character, or Lee's idea of making Aunt May more glamorous); Ex. 71 at 159 (*Amazing Spider-Man* No. 25: "Sturdy Stevey Ditko dreamed up the plot of this tantalizing tale, and it's full of unexpected surprises!"); Ex. 72 at 225 (*Strange Tales* No. 135: "Plotted and Illustrated by Fandom's Favorite Fiend: Steve Ditko"); Ex. 82 (Lee explaining in January 9, 1966 published interview: "**I don't plot Spider-Man any more. Steve Ditko, the artist, has been doing the stories.** I guess I'll leave him alone until sales start to slip. Since Spidey got so popular, Ditko thinks he's the genius of the world. We were arguing so much over plot lines I told him to start making up his own stories. **He won't let anybody else ink his drawings either. He just drops off the finished pages with notes at the margins and I fill in the dialogue. I**

| | |
|---|---|
| | **never know what he'll come up with next**, but it's interesting to work that way.") (emphasis added); Ex. 83 at 7 (same). |
| **MCI's Reply** | **This fact remains undisputed.**<br><br>Defendant admits that Marvel's publisher could choose what it published and that Lee (as Marvel's editor) oversaw what was published, but argues non-responsively that Lee's "writing" contributions were made in a freelance capacity as opposed to in an editorial capacity.<br><br>Further, Defendant's contention that Lee could not control Ditko's work on Marvel assignments is incorrect, as explained in MCI's Reply in Support of Undisputed Fact 3.<br><br>MCI also **objects** to Toberoff Exhibits 1, 22, 25, 27, 35, and 58. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [27], [34], [35], [41], & [53]. |
| **Counterclaimant's Response to Reply** | This Statement remains **disputed** as stated. Plaintiff's Statement No. 29 and the purported evidence it cites is also immaterial to whether Ditko created his work at the "instance and expense" of the Shell Companies—registered, represented and relied upon as the "statutory authors" of the purported "work for hire" alleged by Plaintiff, but as to which Plaintiff has adduced no admissible evidence. Plaintiff has adduced no admissible evidence that the Shell Companies were the principal and that the actions of MMC and its employee Lee were done as the agent of any of the respective Shell Companies. In this regard, Counterclaimant incorporates by reference its Preliminary Statement.<br><br>Defendant also **objects** to Bard Decl., Exs. 1-9; Lens Decl., Exs. 2-4, 6-10, 12, 13, 15, 17, 18, 39, 41, 42, 45, 48, 68A-G, 75, 76, 84. *See* Defendant's Evidentiary Objection Nos. [1], [2], [3], [4], [5], [6], [7], [8], [9], [11], [12], [13], [15], [16], [17], [18], [19], [21], [22], [24], [26], [27], [37], [39], [40], [43], [44], [46], [53], [54], & [60]. |
| | **Statement No. 30** |
| **MCI's Statement** | Marvel had final authority on the artwork, plot, and dialogue. Lens Decl., Ex. 2 18:3-13 (Thomas testifying that all decisions were "subject to the publisher" who "was in charge of everything"—"he oversaw the writing, he oversaw the artists and the art that came in," and "everything went through him"); Lens Decl., Ex. 2 80:12-21 (Thomas testifying that Lee |

| | |
|---|---|
| | "had complete authority over" dialogue, "so – to edit it, have it rewritten or whatever"); Lens Decl., Ex. 2 80:24-81:12 (Thomas testifying that Stan Lee had "complete authority" over artwork—that is, "[s]ubject to the publisher"); Lens Decl., Ex. 2 125:18-126:1 (Thomas testifying that Lee "was always the ultimate authority unless Martin Goodman stepped in, and that was mostly on covers"); *see also* Lens Decl., Ex. 12 66:13-67:2, 117:11-22; Lens Decl., Ex. 16 37:13-39:7, 42:6-18; Lens Decl., Ex. 13 16:8-13, 51:17-52:5; Lens Decl., Ex. 55 at 4; Lens Decl., Ex. 59 at 3; Thomas Decl. ¶¶ 7-8. |
| **Counterclaimant's Response** | **Counterclaimant admits that Marvel had authority over what it chose to purchase and what it would publish, like any publisher, but disputes that it had any legal authority over what Ditko chose to work on or his creative process. Ditko was an extremely independent-minded freelance artist with whom Marvel conspicuously avoided any contractual relationship in the Period.** Marvel has not produced any contemporaneous agreement with Ditko from the Period for his creative services, nor any other evidence reflecting any bilateral rights and obligations between Ditko and Magazine Management (nor any other alleged Marvel predecessor) in the Period, nor has Marvel alleged that any such agreement or bilateral legal rights and obligations existed between such parties in the Period. *See* Toberoff Decl. Ex. 36 at 7 (Marvel admitting it had no written contract with Ditko in the 1960s); Ex. 5 at 371:3-25 (Stan Lee testifying that Marvel "would only buy what [it] needed"); Ex. 1 at 10, 13 (Supplemented Expert Report of Mark Evanier ("Evanier Rep.") providing historical context giving rise to Marvel's use of freelance creators and explaining that, when Magazine Management ran out of surplus artwork to publish, it began to purchase artwork and scripts from freelancers at a low page rate and that freelancers did not have written contracts with Magazine Management during the 1950s or 1960s and describing the common practice of freelancers selling material to more than one publisher, including Marvel, DC Comics, and Charlton Comics); Ex. 14 at 10-11 (Rebuttal Expert Report of Mark Evanier ("Evanier Rebuttal Rep.") explaining that it was not the custom and practice of Marvel or other publishers in the comic book industry to have written contracts with freelance creators during the Period); Ex. 2 at 71:17-74:5 (Larry Lieber ("Lieber") testifying that he sold freelance work to Marvel in the 1950s and 1960s, had no contract with Marvel, and that Marvel was not obligated to buy his submitted freelance material); Ex. 3 at 159:24-160:4, 194:11-195:3, 207:12-22, 211:7-212:3 (John V. Romita ("Romita") testifying that he did not have a contract with Marvel as a freelancer and that freelancers were free to sell work to other publishers); Ex. 17 at 39:25-40:4, 51:20-52:4, 298:8-14, 301:14-303:7 (Thomas testifying that he had no written contract from 1965 to 1974 and that Marvel did not have |

contracts with freelancers prohibiting them from selling work to other publishers); Ex. 6 at 36:17-21, 202:2-20 (Thomas testifying that he had no contract with Marvel until 1974); Ex. 8 ¶ 10 (Sinnott attesting that he had no contract with Marvel and Marvel was very small and disorganized in the 1950s and 1960s); Ex. 8 ¶ 11 (Sinnott attesting that Marvel had no obligation to buy pages of his work and that Marvel paid only for the pages it wanted); Ex. 9 ¶ 8 (Steranko attesting that Marvel had no contract with Steranko and so he was free to sell work to other publishers); Ex. 10 ¶ 12 (Ayers attesting that he had no contract with Marvel from 1959 to 1975); Ex. 11 ¶ 9 (Colan attesting that he had no contract with Marvel until 1975); Ex. 13 ¶ 5-7 (Adams attesting that he had no contract with Marvel in the 1960s or 1970s and that he sold work to both Marvel and DC Comics during the 1960s and 1970s); Ex. 22 at 287:22-288:12 (Lieber testifying that he had no contract with Marvel in the 1950s or 1960s); Ex. 24 at 79:2-8 (Levitz testifying that Marvel did not have contracts with any freelancer until the mid-1970s); Ex. 23 at 160:2-8 (Mark Ditko testifying that Ditko was selling work to both Marvel and Charlton Comics in the 1960s); Ex. 35 at DITKO-0199 (Ditko writing about his work at Charlton Comics in the 1960s); Ex. 57 at 2 (Ditko writing about creating material for Charlton Comics and DC Comics); Ex. 1 at 10 (Evanier Rep. describing the common practice of freelancers selling material to more than one publisher, including Marvel, DC Comics, and Charlton Comics); *id*. at 13 (Evanier Rep. describing the common practice of independent freelancers supervising themselves and editing their own work prior to submission); Ex. 35 at DITKO-0192, DITKO-0207-0210, DITKO-0215-0218 (Ditko writing that he rejected several of Lee's *Spider-Man* story ideas and characters such as, for instance, Lee's idea for a Spider-Woman character, or Lee's idea of making Aunt May more glamorous); Ex. 58 at 4 (Ditko writing that he "refused to do a drunken Iron Man splash page—someone else had to draw [and] ink it"); Ex. 3 at 219:12-24 (Romita testifying that he turned down Lee's offer to submit material to Marvel and preferred to sell freelance work to DC Comics); Ex. 21 at 29:9-30:17 (Steranko testifying that he was not given "assignments," but rather, he had the option to work on some books or to not if he chose not to); Ex. 24 at 89:2-11 (Levitz testifying that freelancers were free to decline "assignments"); Ex. 7 at 223:18-225:20, 277:11-13 (Thomas testifying that Ditko did all the plotting on *Spider-Man* and *Dr. Strange* stories while he and Lee were not speaking and that Ditko never received any plots from Thomas when Thomas was doing the dialoguing on *Dr. Strange*); Ex. 17 at 311:18-312:25 (Thomas testifying that Ditko plotted and drew *Spider-Man* stories completely on his own for more than one year before he left in 1966); Ex. 25 (Ditko: "Dr. Strange has always been a contradiction to Marvel heroes … He is my creation, and at one point I took over all stories, writing, [and] art."); Ex. 26 at 83 (Lee writing that Ditko came up with the *Dr. Strange* plots and illustrated the story and Lee only added the dialogue [in the balloons]); Ex. 27 (Ditko writing that he created the first

| | |
|---|---|
| | *Dr. Strange* story and that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script); Ex. 82 (Lee explaining in January 9, 1966 published interview: "**I don't plot Spider-Man any more. Steve Ditko, the artist, has been doing the stories.** I guess I'll leave him alone until sales start to slip. Since Spidey got so popular, Ditko thinks he's the genius of the world. We were arguing so much over plot lines I told him to start making up his own stories. **He won't let anybody else ink his drawings either. He just drops off the finished pages with notes at the margins and I fill in the dialogue. I never know what he'll come up with next,** but it's interesting to work that way.") (emphasis added); Ex. 83 at 7 (same). |
| **MCI's Reply** | **Defendant admits this fact is undisputed, and only "disputes" extraneous facts, which is improper.** |
| | Defendant admits that Marvel had final authority over any artwork, plot, or dialogue, but disputes that Marvel had "any legal authority over what Ditko chose to work on or his creative process" because he lacked a written employment agreement. That is incorrect, turns on improper legal argument, and—in any event—is immaterial, as the Second Circuit's decision in *Kirby* confirms. *See* MCI's Reply in Support of Undisputed Fact 2. |
| | MCI also **objects** to Toberoff Exhibits 1, 2, 3, 8, 9, 10, 11, 13, 14, 21, 22, 23, 25, 27, 35, 57, and 58. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [2], [7], [9], [11], [12], [13], [14], [16], [17], [20], [25], [32], [34], [35], [41], [52], & [53]. |
| **Counterclaimant's Response to Reply** | This Statement remains **disputed** as stated. In addition, Plaintiff's vague use of the name "Marvel"—a non-entity in the Period—is a façade to obscure the fact that MMC was the only entity doing anything in the Period; and that Plaintiff has failed to adduce any evidence that Ditko worked at the "instance and expense" of the Shell Companies, as required. Plaintiff's Statement No. 30 and the purported evidence it cites is **immaterial** to whether Ditko created his work at the "instance and expense" of the Shell Companies—registered, represented and relied upon as the statutory "authors" of the purported "work for hire" alleged by Plaintiff, but as to which Plaintiff has adduced no admissible evidence. Plaintiff has also adduced no admissible evidence that the Shell Companies were the principals and that the actions of MMC and its employee Lee were taken as the agent of the respective Shell Companies. |

| | In this regard, Counterclaimant incorporates by reference its Preliminary Statement.<br><br>Defendant also **objects** to Bard Decl., Exs. 1-9; Lens Decl., Exs. 2-4, 6, 8, 10, 13, 17, 18, 39, 68A-G, 75, 76, 89, 95. *See* Defendant's Evidentiary Objection Nos. [1], [2], [3], [4], [5], [6], [7], [8], [9], [11], [12], [13], [15], [17], [19], [22], [26], [27], [37], [46], [53], [54], [65], & [69]. |
|---|---|
| | **Statement No. 31** |
| **MCI's Statement** | Beginning in 1956, Marvel regularly assigned Ditko to contribute to the Marvel series entitled *Strange Tales*; he ultimately contributed to all 79 issues from February 1959 (*Strange Tales* Vol. 1, No. 67) to July 1966 (*Strange Tales* Vol. 1, No. 146), with Lee as the credited editor and writer. Lens Decl., Ex. 25 at 25-28; Lens Decl., Ex. 63 at 18-19; Thomas Decl. ¶ 12 ("Ditko was a regular contributor to the [*Strange Tale*s] series in 1959 beginning with issue 67 (cover-dated February 1959).""). |
| **Counterclaimant's Response** | **Counterclaimant disputes that Ditko was "assigned" to create his works, as he had no contract with any "Marvel" entity and was free to decline any "assignment" without consequence.** *See* Response to Marvel's Statement 30, *supra*, incorporated herein by reference. *See also* Toberoff Decl. Ex. 3 at 219:12-24 (Romita testifying that he turned down Lee's offer to submit material to Marvel and preferred to sell freelance work to DC Comics); Ex. 21 at 29:9-30:17 (Steranko testifying that he was not given "assignments," but rather, he had the option to work on some books or to not if he chose not to); Ex. 24 at 89:2-11 (Levitz testifying that freelancers were free to decline "assignments"); Ex. 58 at 4 (Ditko writing that, after he stopped selling his material to Marvel in 1966, he later started working with Marvel again, but refused to do any *Spider-Man* or *Dr. Strange* stories and recounting that when other writers tried to sneak in *Spider-Man* panels for Ditko to work on, he "left [them] blank for someone else to fill in"); *id.* (Ditko writing that he "refused to do a drunken Iron Man splash page—someone else had to draw [and] ink it"); Ex. 17 at 298:8-14 (Thomas testifying that freelancers did not have contracts with Marvel until Thomas's in 1974, which was the first); Ex. 36 at 7 (Marvel admitting it had no written contract with Ditko in the 1960s). |
| **MCI's Reply** | **This fact remains undisputed**.<br><br>Defendant's suggestion that Marvel did not regularly assign Ditko to work on Marvel comic books because Ditko lacked a written employment |

| | |
|---|---|
| | agreement with Marvel is incorrect, turns on improper legal argument, and—in any event—is immaterial, as the Second Circuit's decision in *Kirby* confirms. *See* MCI's Reply in Support of Undisputed Fact 2.<br><br>This argument also ignores that Ditko did, in fact, consistently accept assignments from Lee. Indeed, the vast majority of Ditko's work during the 1962-1965 relevant time period was published by Marvel, as detailed in MCI's Reply in Support of Undisputed Fact 2.<br><br>MCI also **objects** to Toberoff Exhibits 3, 21, and 58. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [7], [20], & [53]. |
| **Counterclaimant's Response to Reply** | This Statement remains **disputed** pursuant to the evidence cited. In addition, Plaintiff's vague use of the name "Marvel"—a non-entity in the Period—is a façade to obscure the fact that MMC was the only entity doing anything in the Period; and that Plaintiff has failed to adduce any evidence that Ditko worked at the "instance and expense" of the Shell Companies, as required. As to Plaintiff's repeated and disputed use of the term "assigned Ditko," Plaintiff incorporates its response to Statement Nos. 2, 14, 23, 31, 39 & 41. Plaintiff's use here of "assigned" is particularly pernicious, as it is meant to suggest that Ditko's documented independent creation of Dr. Strange (as far back as 1946) was pursuant to some "assignment" by "Marvel," when the record evidence squarely contradicts that. *See* Counterclaimant's Response to Statement No. 32, *infra*, incorporated by reference. Notwithstanding this, Plaintiff's Statement No. 31 and the purported evidence it cites is **immaterial** to whether Ditko created his work at the "instance and expense" of the Shell Companies—registered, represented and relied upon as the "statutory authors" of the purported "work for hire" alleged by Plaintiff, but as to which Plaintiff has adduced no admissible evidence. In this regard, Counterclaimant also incorporates by reference its Preliminary Statement.<br><br>Defendant also **objects** to Bard Decl., Exs. 1-9; Lens Decl., Exs. 2-4, 6, 8, 10, 13, 17, 18, 39, 68A-G, 75, 76, 89, 95. *See* Defendant's Evidentiary Objection Nos. [1], [2], [3], [4], [5], [6], [7], [8], [9], [11], [12], [13], [15], [17], [19], [22], [26], [27], [37], [46], [53], [54], [65], & [69]. |
| | **Statement No. 32** |
| **MCI's Statement** | Ditko's contributions to the *Strange Tales* series— particularly in 1962 and 1963—generally consisted of penciling and inking discrete five-page comics that appeared at the end of the comic book—commonly referred to as "back-ups." Lens Decl., Ex. 80 (Lee and Ditko's five-page stories in |

|  | *Strange Tales* Vol. 1, Nos. 102-109); Lens Decl., Ex. 48 at 2 (Ditko reflecting on his work for Marvel back-up features in *Strange Tales* and noting that "[t]he back-up features (5-pagers) were drawn by Don Heck, Paul Reinman and me"); Thomas Decl. ¶ 12 ("Ditko was a regular contributor to the [*Strange Tale*s] series in 1959 beginning with issue 67 (cover-dated February 1959)."); Thomas Decl. ¶ 13 (explaining "*Strange Tales* comics featured five-page 'back-up' features written by Stan Lee and drawn by Steve Ditko"). |
|---|---|
| **Counterclaimant's Response** | **Counterclaimant admits only that Ditko created, plotted, penciled, and inked five-page stories in the *Strange Tales* series in the Period, but denies Marvel's intended inference that Ditko's origination and creation of Dr. Strange which Ditko had been conceived long before he ever met Lee or Magazine Management was somehow at "Marvel's" suggestion or direction.** *See* Toberoff Decl. Ex. 1 at 21 (Evanier Rep. providing historical context of the first publication of Ditko's Dr. Strange character which began as a five-page story Ditko wrote and drew on spec introducing the character which he presented to Lee); Ex. 25 (Ditko: "Dr. Strange has always been a contradiction to Marvel heroes … He is my creation, and at one point I took over all stories, writing, [and] art."); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script); Ex. 30 at 2021MARVEL-0050281 (Lee writing that Dr. Strange "'twas [Ditko's] idea, and I figgered we'd give it a chance," in a contemporaneous letter dated January 9, 1963); Ex. 49 at 1 (first published appearance of Dr. Strange in *Strange Tales* No. 110); Ex. 33 (Ditko's letter post-marked August 6, 1946 to his brother Patrick Ditko enclosing an initial sketch of Dr. Strange); Ex. 59 at 61:15-65:14 (Patrick Ditko, being shown composite Ex. 33 and testifying that his brother, Steve Ditko, sent him this letter in 1946, while Ditko was in military service abroad, enclosing Ditko's early sketch of Dr. Strange (Ex. 33) and that he had found Ex. 33 at his home amongst letters he had kept from his brother); Ex. 23 at 166:5-168:8 (Mark Ditko testifying that his father lived in Johnstown, PA at the address written on the letter envelope of composite Ex. 33, and that in 1946 (postmarked on the letter envelope), his uncle Ditko was in the military, stationed abroad in Germany); Ex. 57 at 2 (Ditko writing that Dr. Strange started out as a "5-page filler," which was a great opportunity to try out all kinds of ideas like Dr. Strange, which "never fit in to Marvel's world of heroes"). |

| | |
|---|---|
| **MCI's Reply** | **Defendant admits this fact is undisputed, and only disputes "Marvel's intended inference," which is improper.** |
| | Defendant admits that Ditko contributed to five-page "back up" stories in Marvel's *Strange Tales* throughout the relevant time period, but "denies" any inference that such fact means Doctor Strange was created at Marvel's "suggestion or direction." That improper response turns on an incorrect legal argument, as confirmed by the Second Circuit's decision in *Kirby*. *See Kirby*, 726 F.3d at 141 ("Kirby's works during this period were hardly self-directed projects in which he hoped Marvel, as one of several potential publishers, might have an interest; rather, he created the relevant works pursuant to Marvel's assignment or with Marvel specifically in mind. Kirby's ongoing partnership with Marvel . . . is therefore what induced Kirby's creation of the works."). |
| | Further, Defendant's contention that Doctor Strange "had been conceived [by Ditko] long before he ever met Lee" is unsupported by any evidence. Toberoff Exhibit 33 **does not support** this contention, as there is no evidence that the sketch of a man from the chest up contained therein is the Marvel character Doctor Strange. The only connection between the sketch and Doctor Strange is Defendant's belief that it depicts the same character. *See* Toberoff Ex. 59 62:7-12. But Defendant admits that Ditko never told him the sketch was supposed to be the Doctor Strange character; Defendant simply "assumed it." *Id*. 62:3-10. As Roy Thomas observed, the sketch "looks like any number of comic book magicians over the years imitating Mandrake going back to the '40s," adding that "any character [Ditko] drew in a cloak and mustache would have a resemblance to Doctor Strange and also to Mandrake the Magician and 100 other comic book magicians that existed between 1940 and 1960." Lens Opp. Decl., Ex. 84 303:14-304:19; *see also id*. at 305:5-6 ("Almost every [comic book] company had a couple of magicians, many of them with mustaches and capes."). |
| | Regardless, when Ditko allegedly conceived of Doctor Strange is immaterial because it has no bearing on the Court's application of the work-made-for-hire test, as the Second Circuit's decision in *Kirby* confirms. *See* MCI's Reply in Support of Undisputed Fact 22. |
| | MCI also **objects** to Toberoff Exhibits 1, 23, 25, 27, 33, and 57. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [33], [34], [35], [39], & [52]. |

| | |
|---|---|
| **Counterclaimant's Response to Reply** | This Statement remains **disputed** pursuant to the evidence cited. Like its reference to Strange Tales "assignments" in Statement No. 32, Plaintiff cleverly uses "five-page" stories (a common comic book format) to create yet another word-play illusion, that Ditko's independent origination of Dr. Strange was somehow at "Marvel's" instance, contrary to all the record evidence. *See* Evidence Supp. Def.'s Initial Resp. to this Statement No. 32, above. Notwithstanding this, Plaintiff's Statement No. 32 and the purported evidence it cites is **immaterial** to whether Ditko created his Dr. Strange character and stories at the "instance and expense" of the Shell Companies—registered, represented and relied upon as the "statutory authors" of the purported "work for hire" alleged by Plaintiff, but as to which Plaintiff has adduced no admissible evidence. In this regard, Counterclaimant also incorporates by reference its Preliminary Statement. |
| | Defendant also **objects** to Bard Decl., Exs. 1-9; Lens Decl., Exs. 2-4, 6-10, 12-15, 17, 18, 36, 37, 39-42, 45, 48, 68A-G, 71, 75, 76, 84. *See* Defendant's Evidentiary Objection Nos. [1], [2], [3], [4], [5], [6], [7], [8], [9], [11], [12], [13], [15], [16], [17], [18], [19], [21], [22], [23], [24], [26], [27], [34], [35], [37], [38], [39], [40], [43], [44], [46], [49], [53], [54], & [60]. |
| | **<u>Statement No. 33</u>** |
| **MCI's Statement** | As part of his ongoing work on the *Strange Tales* series and for Marvel Comics more generally, and with Lee as the credited editor and writer, Ditko penciled and inked a five-page back-up for *Strange Tales* Vol. 1, No. 110, the issue in which Doctor Strange first appears. Lens Decl., Ex. 60 at 3 (Ditko remarking that "Dr. Strange started out as a 5 page backup"); Lens Decl., Ex. 57 at 4 (Ditko noting that it was "a mystery to [him] why no Doctor Strange covers"); Lens Decl., Ex. 27 at 3 (Lee teasing Doctor Strange as "just a 5-page filler"); Lens Decl., Ex. 33 at 3 ("It is a great pleasure and privilege for the editors of STRANGE TALES to present, quietly and without fanfare, the first of a new series, based upon a DIFFERENT kind of super-hero ---DR. STRANGE MASTER OF BLACK MAGIC! Story: Stan Lee[;] Art: Steve Ditko[;] Lettering: Terry Szenics"); Lens Decl., Ex. 14 at 8, 11 (Lee attesting that he "(together with numerous artists) created or co-created hundreds of characters and introduced them into the story lines to be published by [Marvel] . . . . [including] . . . Doctor Strange"); *see also* Thomas Decl. ¶ 13; Lens Decl., Ex. 10 335:10-336:1; Lens Decl., Ex. 71 at 20:17-23:23; Lens Decl., Ex. 2 304:24-305:6. |

| | |
|---|---|
| **Counterclaimant's Response** | **Counterclaimant disputes that Ditko merely "penciled and inked" the first Dr. Strange story, as the evidence shows that Ditko on his initiative wrote, plotted, penciled, and inked the first story featuring the Dr. Strange character he had been playing with since at least 1946. Further, Lee admitted that the _Dr. Strange_ story was solely Ditko's original conception. Counterclaimant further denies that Ditko "work[ed] … for Marvel."** (*See* Counterclaimant's Response to Marvel Statement No. 30, *supra*, incorporated herein by reference). *See* also Toberoff Decl. Ex. 1 at 21 (Evanier Rep. providing historical context of the first publication of Ditko's Dr. Strange character which began as a five-page story Ditko wrote and drew on spec introducing the character which he presented to Lee); Ex. 25 (Ditko: "Dr. Strange has always been a contradiction to Marvel heroes … He is my creation, and at one point I took over all stories, writing, [and] art."); Ex. 27 (Ditko writing that he created the first _Dr. Strange_ story and that he plotted and penciled most of the rest of the _Dr. Strange_ stories and left Lee to dialogue them from Ditko's rough script); Ex. 30 at 2021MARVEL-0050281 (Lee writing that Dr. Strange "'twas [Ditko's] idea, and I figgered we'd give it a chance," in a contemporaneous letter dated January 9, 1963); Ex. 49 at 1 (first published appearance of Dr. Strange in _Strange Tales_ No. 110); Ex. 33 (Ditko's letter post-marked August 6, 1946 to his brother Patrick Ditko enclosing an initial sketch of Dr. Strange); Ex. 59 at 61:15-65:14 (Patrick Ditko, being shown composite Ex. 33 and testifying that his brother, Steve Ditko, sent him this letter in 1946, while Ditko was in military service abroad, enclosing Ditko's early sketch of Dr. Strange (Ex. 33) and that he had found Ex. 33 at his home amongst letters he had kept from his brother); Ex. 23 at 166:5-168:8 (Mark Ditko testifying that his father lived in Johnstown, PA at the address written on the letter envelope of composite Ex. 33, and that in 1946 (postmarked on the letter envelope), his uncle Ditko was in the military, stationed abroad in Germany); Ex. 57 at 2 (Ditko writing that Dr. Strange started out as a "5-page filler," which was a great opportunity to try out all kinds of ideas like Dr. Strange, which "never fit in to Marvel's world of heroes"). |
| **MCI's Reply** | **Defendant admits this fact is undisputed, and only "disputes" extraneous facts, which is improper.**<br><br>Defendant disputes that Ditko "merely penciled and inked" the first Dr. Strange story, but does not contend and cites no evidence disputing this fact, which is therefore undisputed. *See* Local Rule 56.1(b)-(d); *see also Parks Real Estate*, 472 F.3d at 4; *Giannullo*, 322 F.3d at 140. |

| | |
|---|---|
| | Further, although Defendant non-responsively contends that Lee "admitted" that Doctor Strange was "solely Ditko's original conception," the evidence he cites **does not support** that contention. Indeed, Lee states that Doctor Strange was "Steve's idea," but does not suggest that the final character, as published, was "solely Ditko's original conception." *See* Toberoff Exhibit 30.

Regardless, Defendant's contention about who "created" Doctor Strange is immaterial, as the Second Circuit's decision in *Kirby* confirms. *See* MCI's Reply in Support of Undisputed Fact 22. And even still, Toberoff Exhibit 30 **does not support** the contention that Ditko "created" any Marvel characters.

MCI, however, **objects** to Toberoff Exhibits 1, 23, 25, 27, 33, 57, and 59. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [33], [34], [35], [39], [52], & [54]. |
| **Counterclaimant's Response to Reply** | This Statement remains **disputed** pursuant to the evidence cited. Like its reference to Strange Tales "assignments" in Statement No. 32, Plaintiff cleverly uses "five-page" stories (a common comic book format) to create yet another word-play illusion, that Ditko's independent origination of Dr. Strange was somehow at "Marvel's" instance, contrary to all the record evidence. *See* Evidence Supp. Def.'s Initial Resp. to this Statement No. 32, above. Notwithstanding this, Plaintiff's Statement No. 32 and the purported evidence it cites is **immaterial** to whether Ditko created his Dr. Strange character and stories at the "instance and expense" of the Shell Companies—registered, represented and relied upon as the "statutory authors" of the purported "work for hire" alleged by Plaintiff, but as to which Plaintiff has adduced no admissible evidence. In this regard, Counterclaimant also incorporates by reference its Preliminary Statement.

Defendant also **objects** to Bard Decl., Exs. 1-9; Lens Decl., Exs. 2-4, 6-10, 12-15, 17, 18, 36, 37, 39-42, 45, 48, 68A-G, 71, 75, 76, 84. *See* Defendant's Evidentiary Objection Nos. [1], [2], [3], [4], [5], [6], [7], [8], [9], [11], [12], [13], [15], [16], [17], [18], [19], [21], [22], [23], [24], [26], [27], [34], [35], [37], [38], [39], [40], [43], [44], [46], [49], [53], [54], & [60]. |
| | **Statement No. 34** |
| **MCI's Statement** | Lee named the character Doctor Strange—"Strange" because the story was published in Marvel's *Strange Tales* series; "Doctor" to avoid confusion with "Mr. Fantastic," another Marvel superhero. Lens Decl., Ex. 27 at 3 |

|  | (Lee writing that he "[o]riginally decided to call him MR. STRANGE, but thought the MR. bit too similar to MR. FANTASTIC—now however, I just remember we had a <u>villain</u> called DR. STRANGE just [ ] recently in one of our mags—hope it won't be too confusing!"); Lens Decl., Ex. 41 at 5 (Lee recounting that "I gave him the name Doctor Strange—I think Stephen Strange; something like that. And Steve was the fellow who drew it."). |
|---|---|
| **Counterclaimant's Response** | **Admitted that Lee chose the name Doctor Strange because the original story Ditko created on spec, which Lee liked and Magazine Management purchased, would be published in its *Strange Tales* magazine.** *See also* Toberoff Decl. Ex. 1 at 21 (Evanier Rep. providing historical context of the first publication of Ditko's Dr. Strange character which began as a five-page story Ditko wrote and drew on spec introducing the character which he presented to Lee); Ex. 25 (Ditko: "Dr. Strange has always been a contradiction to Marvel heroes … He is my creation, and at one point I took over all stories, writing, [and] art."); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script); Ex. 30 at 2021MARVEL-0050281 (Lee writing that Dr. Strange "'twas [Ditko's] idea, and I figgered we'd give it a chance," in a contemporaneous letter dated January 9, 1963); Ex. 49 at 1 (first published appearance of Dr. Strange in *Strange Tales* No. 110); Ex. 33 (Ditko's letter post-marked August 6, 1946 to his brother Patrick Ditko enclosing an initial sketch of Dr. Strange); Ex. 59 at 61:15-65:14 (Patrick Ditko, being shown composite Ex. 33 and testifying that his brother, Steve Ditko, sent him this letter in 1946, while Ditko was in military service abroad, enclosing Ditko's early sketch of Dr. Strange (Ex. 33) and that he had found Ex. 33 at his home amongst letters he had kept from his brother); Ex. 23 at 166:5-168:8 (Mark Ditko testifying that his father lived in Johnstown, PA at the address written on the letter envelope of composite Ex. 33, and that in 1946 (postmarked on the letter envelope), his uncle Ditko was in the military, stationed abroad in Germany); Ex. 57 at 2 (Ditko writing that Dr. Strange started out as his five page story and was a great opportunity to try out all kinds of ideas which "never fit in to Marvel's world of heroes"). |
| **MCI's Reply** | **Defendant admits this fact is undisputed, but interposes additional extraneous facts, which is improper.**<br><br>Defendant admits that Lee chose the name "Doctor Strange," but interposes an incorrect contention that the first Doctor Strange story was purchased "on spec." As discussed in MCI's Reply in Support of |

| | |
|---|---|
| | Undisputed Facts 22 and 32, that is incorrect and unsupported by any evidence, because Ditko's work on *Strange Tales* No. 110, in which Doctor Strange first appears, was done pursuant to assignment, subject to Marvel's supervision and control, and done with Marvel specifically in mind.<br><br>MCI also **objects** to Toberoff Exhibits 1, 23, 25, 27, 33, 57, and 59. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [33], [34], [35], [39], [52] & [54]. |
| **Counterclaimant's Response to Reply** | This is immaterial, including without limitation because names and titles are not the subject of copyright. *See e.g., Nimmer on Copyright* § 2.01[B][3]; 37 C.F.R. § 202.1(a). Notwithstanding this, Plaintiff's Statement No. 34 and the purported evidence it cites is also **immaterial** as to whether Ditko created his Dr. Strange character and stories at the "instance and expense" of the Shell Companies—registered, represented and relied upon as the statutory "authors" of the purported "work for hire" alleged by Plaintiff, but as to which Plaintiff has adduced no admissible evidence. In this regard, Counterclaimant also incorporates by reference its Preliminary Statement.<br><br>Defendant also **objects** to Bard Decl., Exs. 1-9; Lens Decl., Exs. 2-4, 6-10, 12-15, 17, 18, 36, 37, 39-42, 45, 48, 68A-G, 71, 75, 76, 84. *See* Defendant's Evidentiary Objection Nos. [1], [2], [3], [4], [5], [6], [7], [8], [9], [11], [12], [13], [15], [16], [17], [18], [19], [21], [22], [23], [24], [26], [27], [34], [35], [37], [38], [39], [40], [43], [44], [46], [49], [53], [54], & [60]. |
| | **<u>Statement No. 35</u>** |
| **MCI's Statement** | While Doctor Strange did not have a backstory when originally published, Marvel gave Doctor Strange a fleshed out personality and origin story, a doctor who undergoes a series of tests in Tibet and develops mystical abilities to combat magical forces in *Strange Tales* Vol. 1, No. 115. Lens Decl., Ex. 34 at 3 (story belatedly laying out "The ORIGIN of Doctor Strange" in response to "a flood of letters" from fans); Lens Decl., Ex. 37 at 5 (Thomas explaining that, "when Lee and Ditko gave Doctor Strange an origin in *Strange Tales* No. 115, it bore a distinct similarity to that of Lee and Kirby's Dr. Droom in *Amazing Adventures* No. 1, two years earlier"); Lens Decl., Ex. 37 at 8 (Thomas remarking that, "[s]ince the 1920s American movies, radio, comics, and the pulps had seated the Orient as the center of mysticism, and Marvel was no exception, with its first two sorcerers Strange and D[r]oom"); Lens Decl., Ex. 2 304:24-305:6 |

| | |
|---|---|
| | (Thomas discussing the large number of "comic book magicians" that "were all imitating the comic strip character Mandrake," and noting that "[a]lmost every company had a couple of magicians, many of them with mustaches and capes"); Thomas Decl. ¶ 13 (first appearance of Dr. Strange "was published without a backstory"); *see also* Thomas Decl. ¶ 15. |
| **Counterclaimant's Response** | **Counterclaimant disputes that Dr. Strange "did not have a backstory when originally published," because, while the character's backstory was not published in *Strange Tales* No. 110, Ditko often charted out his stories well in advance in order to organize the larger narrative and plot points he would include in his stories later down the line, and so, not all of a character's story was told in its first appearance.** *See* Toberoff Decl. Ex. 1 at 12 (Evanier Rep. describing Ditko's regular practice of maintaining a chart mapping out the future development of a character so he could introduce elements into current issues and then use those elements in issues many months down the line); Ex. 35 at DITKO-0193 (Ditko writing that he planted seeds of subplots in stories that would work their way through the issues until it was time for those sub-stories to play an active role later when the time was right); Ex. 58 at 3 (Ditko writing when he took over the *Spider-Man* stories he "knew in advance the [*Spider-Man*] story line like the best (worst) time for Aunt May to have a heart attack"). |
| | **Counterclaimant further denies that "Marvel gave Doctor Strange a fleshed out [*sic*] personality and origin story, a doctor who undergoes a series of tests in Tibet and develops mystical abilities to combat magical forces in *Strange Tales* Vol. 1, No. 115." "Marvel" did not give Dr. Strange anything. This story was co-authored by Ditko and Lee, in his capacity as a freelancer and purchased by Magazine Management by the page like the other stories it published. In addition, the doctor in *Strange Tales* Vol. 1, No. 115 does not undergo a series of tests nor develops mystical abilities to combat magical forces, he resigns himself to become a student of the mystical arts.** *See* Lens Decl., Ex. 34 (*Strange Tales* Vol. 1, No. 115); Counterclaimant's Response to Marvel Statement No. 30, *supra*, incorporated herein by reference; Toberoff Decl. Ex. 1 at 13 (Evanier Rep. describing Lee's common practice of composing dialogue as a freelancer, not as Marvel's editor and doing his freelance writing from home two of the five workdays per week, for which he was paid on a per-page basis as a freelancer); Ex. 3 at 41:19-42:2 (Romita testifying that Lee would stay home several days per week to write); Ex. 4 at 17:17-25 (Lee testifying that he was paid as a freelancer for his writing and was on salary for his work as an editor); Ex. 17 at 27:2-18, 30:9-13, 31:22-32:7, 276:2-14 (Thomas testifying that he was a staff writer/assistant editor in the 1960s and got a salary for that work, but |

|  | separately freelanced when writing stories and was paid at a per-page rate on a separate check like other freelancers); *id*. at 289:7-291:5 (Thomas testifying that he and Lee each did their writing in a freelance capacity from home in the 1960s and would come to the office only to do their editorial work); Ex. 22 at 255:10-256:6 (Lieber testifying that Lee wrote stories and scripts as a writer, not as an editor, because writing is "not what an Editor does"); *id*. at 256:7-257:12 (Lieber testifying that Lee wrote scripts from home); Ex. 55 at 62:18-63:18 (Lee testifying that he got paid a salary as editor and separately for his writing); Ex. 56 at 91:20-92:6 (Lee testifying that he got paid a salary as editor and separately as a freelancer pre page for his writing); *id*. at 94:6-95:18 (Lee testifying that there was very little editing of his own freelance written material). |
|---|---|
| **MCI's Reply** | **This fact remains undisputed.** |
|  | Defendant cites no admissible evidence establishing that Ditko "charted out" any of his Doctor Strange work, let alone prior to 1965, when Lee assigned him to plot Spider-Man and Doctor Strange stories. Defendant simply invites rank speculation, which is improper. |
|  | Further, Defendant's contention that Lee's freelance contributions were not contributions by Marvel is an incorrect legal argument. Unlike Defendant's improper assertion that Ditko did not work for Marvel, Lee never questioned that he worked for Marvel and that his freelance contributions were done on a work-made-for-hire basis. *See* Lens Decl., Ex. 13 100:25-101:17 (Lee testifying that he "always felt the company" owned the characters he created or co-created); Lens Decl., Ex. 13 26:22-28:6 (Lee testifying that "it was typical in the industry for comic book publishers to own the rights to the materials that were created for them for publication" during the relevant time period); Lens Opp. Decl., Ex. 88 120:3-9 (Lee testifying that he "did [Marvel characters] as a work for hire."); Lens Opp. Decl., Ex. 87 109:19-25 (Lee testifying that "[a]t Marvel I was an employee, a writer for hire. No one who worked for a comics company back then owned anything they created."). |
|  | Finally, Defendant's contention that Doctor Strange "does not undergo a series of tests nor develops mystical abilities to combat magical forces" is incorrect. As the evidence shows, Doctor Strange appears before the Ancient One, who explains that before he is healed with "the power of [his] magic," Doctor Strange "must prove [he] is worthy!" Doctor Strange is forced to endure difficult visions of his past before being "be[ing] tested, and . . . pass[ing] [his] baptism of fire." *See* Lens Decl., Ex. 34 at 2-10. |

| | |
|---|---|
| | MCI also **objects** to Toberoff Exhibits 1, 22, 35, and 58. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [27], [41] & [53]. |
| **Counterclaimant's Response to Reply** | This Statement remains **disputed** based on the contrary evidence cited. In addition, Lee has repeatedly admitted that Ditko created Dr. Strange on his own. *See e.g.,* Toberoff Decl.,Ex. 30 at 2021MARVEL-0050281 (Lee writing that Dr. Strange "'twas [Ditko's] idea, and I figgered we'd give it a chance," in a contemporaneous letter dated January 9, 1963), Ex. 25 (Ditko: "Dr. Strange has always been a contradiction to Marvel heroes … He is my creation, and at one point I took over all stories, writing, [and] art."); and Counterclaimant's Response to Statement No. 34.  In addition, Plaintiff's Statement No. 35 and the purported evidence it cites is also **immaterial** as to whether Ditko created his Dr. Strange character and stories at the "instance and expense" of the Shell Companies—registered, represented and relied upon as the statutory "authors" of the purported "work for hire" alleged by Plaintiff, but as to which Plaintiff has adduced no admissible evidence. In this regard, Counterclaimant also incorporates by reference its Preliminary Statement.<br><br>Defendant also **objects** to Lens Decl., Exs. 13, 87, 88. *See* Defendant's Evidentiary Objection Nos. [22], [63], & [64]. |
| | **Statement No. 36** |
| **MCI's Statement** | The first issue of *Amazing Adventures*, published in June 1961, featured a five-page story entitled "I Am The Fantastic Dr. Droom," inked by Ditko. Dr. Droom was a doctor who, just like Doctor Strange, undergoes a series of tests in Tibet and develops mystical abilities to combat magical forces. Lens Decl., Ex. 26 at 3-7; Lens Decl., Ex. 40 at 5-8; Lens Decl., Ex. 25 at 3; Lens Decl., Ex. 36 at 2; Lens Decl., Ex. 41 at 5 (Lee recounting how before Doctor Strange, Marvel had "a character some years ago—I think we called him Dr. Droom, or something—who had been a magician"); Thomas Decl. ¶ 15 (explaining "when Lee and Ditko gave Dr. Strange an origin in *Strange Tales* No. 115, it bore a distinct similarity to that of Lee and Kirby's Dr. Droom in *Amazing Adventures* No. 1, two years earlier" in that "[b]oth characters were magicians sharing the same backstory: doctors that travel to Tibet, undergo a series of tests, and develop mystical abilities to combat magical forces"). |
| **Counterclaimant's Response** | **Counterclaimant admits that many artists and musicians of the 1960s were captivated by the mystique of the East, including India and Tibet** |

**(e.g., The Beatles, Rolling Stones, Allen Ginsburg) but disputes any implication that Dr. Strange found its roots in Dr. Droom (1961). The evidence shows that Ditko's Dr. Strange was based on a character he had conceived as early as 1946. Moreover, Ditko's Dr. Strange character, as he appeared in *Strange Tales* No. 110 and later issues, was a meticulously crafted synthesis of various characters and narrative elements Ditko had been tinkering with in stories he sold to Charlton Comics in the 1950s.** *See* Toberoff Decl. Ex. 62 at 4-5 (Dr. Strange used his hands to cast teleportation and other spells in *Strange Tales* No. 139 (1965)); Ex. 63 at 2 (same in *Strange Tales* No. 126 (1964)); Ex. 70 at 8-9 (same in *Strange Tales* No. 129 (1965); *compare* Ex. 61 at 3 (Ditko's character used his hands to cast spells in 1959 in Charlton Comics' *Space Adventures* No. 27); *see also* Ex. 66 at 10 (in *Strange Tales* No. 137 (1965), Dr. Strange used a device—the Eye of Agamotto—to transport through space and time); *compare* Ex. 65 at 4-5 (In Charlton Comics' *Out of this World* No. 7 (1958), Ditko's character used similar artifact to transport characters in a swirl of visual effects through space and time); *see also* Ex. 68 at 4-5 (in *Strange Tales* No. 122 (1964), Dr. Strange traversed through different dimensions and journeyed through alternate planes of existence); Ex. 69 at 1 (same in *Strange Tales* No. 134 (1965)); *compare* Ex. 67 at Cover, 4-5 (Ditko used same effect in Charlton Comics' *Strange Suspense* No. 32 (1957)); Ex. 33 (Ditko's letter post-marked August 6, 1946 to his brother Patrick Ditko enclosing an early sketch of Dr. Strange); Ex. 59 at 61:15-65:14 (Patrick Ditko, being shown composite Ex. 33 and testifying that his brother, Steve Ditko, sent him this letter in 1946, while Ditko was in military service abroad, enclosing Ditko's early sketch of Dr. Strange (Ex. 33) and that he had found Ex. 33 at his home amongst letters he had kept from his brother); Ex. 23 at 166:5-168:8 (Mark Ditko testifying that his father lived at the address written on the letter envelope of composite Ex. 33, and that, in 1946 (postmarked on the letter envelope), his uncle Ditko was in the military, stationed abroad in Germany).

**Counterclaimant further denies that Dr. Droom is similar to Dr. Strange. Whereas Dr. Droom gets mystical powers at the touch of a mystic's hand, Dr. Strange becomes a serious student of mystical powers in his origin story. Marvel's claim is easily refuted by the comic books themselves. Other than being doctors the two characters are completely different (e.g., Dr. Doom turns from Caucasian to Oriental).** *Compare* Lens Decl., Ex. 26 (Dr. Droom) *to* Lens Decl., Ex. 34 (Ditko's Dr. Strange in *Strange Tales* Vol. 1, No. 115).

| | |
|---|---|
| **MCI's Reply** | **This fact remains undisputed.** |

| | |
|---|---|
| | Defendant does not respond to this fact, let alone cite evidence disputing it. Instead, he says nothing about the striking similarity of Doctor Strange's backstory and the backstory of Dr. Droom, and contends that Doctor Strange was "conceived" of by Ditko in 1946. As discussed in MCI's Reply in Support of Undisputed Fact 32, Defendant cites no evidence that supports that contention.<br><br>MCI also **objects** to Toberoff Exhibits 23, 33, 34, 59, 61, 65, and 67. *See* MCI's Evidentiary Objection Nos. [33], [39], [40], [54], [55], [57], & [58]. |
| **Counterclaimant's Response to Reply** | This Statement remains **disputed** based on the contrary evidence cited. In addition, Plaintiff's Statement No. 36 and the purported evidence it cites is also **immaterial** as to whether Ditko created his Dr. Strange character and stories at the "instance and expense" of the Shell Companies—registered, represented and relied upon as the statutory "authors" of the purported "work for hire" alleged by Plaintiff, but as to which Plaintiff has adduced no admissible evidence. In this regard, Counterclaimant also incorporates by reference its Preliminary Statement.<br><br>Defendant also **objects** to Bard Decl., Exs. 1-9; Lens Decl., Exs. 2-4, 6-10, 12-15, 17, 18, 36, 37, 39-42, 45, 48, 68A-G, 71, 75, 76, 84. *See* Defendant's Evidentiary Objection Nos. [1], [2], [3], [4], [5], [6], [7], [8], [9], [11], [12], [13], [15], [16], [17], [18], [19], [21], [22], [23], [24], [26], [27], [34], [35], [37], [38], [39], [40], [43], [44], [46], [49], [53], [54], & [60]. |
| | **Statement No. 37** |
| **MCI's Statement** | After Doctor Strange was fleshed out and given a backstory in *Strange Tales* Vol. 1, No. 115, Marvel decided to feature the character as a regular in *Strange Tales* and more broadly across other Marvel publications, with Doctor Strange appearing alongside already-established Marvel Super Heroes and villains such as Thor and Loki. Lens Decl., Ex. 32 (Thor and Loki guest-starring in *Strange Tales* Vol. 1, No. 123 with Doctor Strange); Lens Decl., Ex. 71 at 20:17-23:23 (Lee explaining how Doctor Strange was given "dramatic" expressions and characteristics like his cape and mustache but set in Greenwich Village with real-world problems, like fears of being mugged walking down the street, "juxtapos[ing] [] the supernatural with the very mundane, every day type of existence" that Marvel characters were famous for"); Lens Decl., Ex. 71 at 3:25-6:09 (Lee explaining how Marvel's basic "formula" was to "mix fantasy with realism" with characters that "are a little different . . . sort of like continuing soap operas"); Lens Decl., Ex. 59 at 3 (Ditko writing that Lee |

| | |
|---|---|
| | had "some formula approach for everything . . . [as] seen with Dr. Strange's early Stan plots, stories"). |
| **Counterclaimant's Response** | **While Counterclaimant does not believe this is relevant to the issues in this case, Counterclaimants admits that Lee liked the Dr. Strange character and that Magazine Management continued to purchase and feature Ditko's *Dr. Strange* stories in its publications. Counterclaimants denies Marvel attempt to inferentially co-opt Ditko's Dr. Strange character with its citation to irrelevancies.** *See* Toberoff Decl. Ex. 1 at 21 (Evanier Rep. providing historical context of Dr. Strange as a character very different than any other character Marvel was publishing at the time); Ex. 25 at DITKO-0307 (Ditko explaining that Dr. Strange was a unique character who was a contradiction to Marvel's other superheroes); Ex. 30 at 2021MARVEL-0050281 (Lee writing that Dr. Strange "'twas Steve[] [Ditko's] idea," in a letter dated January 9, 1963); Ex. 57 at 2 (Ditko writing that Dr. Strange started out as a 5-page story of his and was a great opportunity to try out all kinds of ideas which "never fit in to Marvel's world of heroes"); Ex. 62 at 4-5 (Dr. Strange used his hands to cast teleportation and other spells in *Strange Tales* No. 139 (1965)); Ex. 63 at 2 (same in *Strange Tales* No. 126 (1964)); Ex. 70 at 8-9 (same in *Strange Tales* No. 129 (1965)); *compare* Ex. 61 at 3 (Ditko's character used his hands to cast spells in 1959 in Charlton Comics' *Space Adventures* No. 27); *see also* Ex. 66 at 10 (in *Strange Tales* No. 137 (1965), Dr. Strange used a device—the Eye of Agamotto—to transport through space and time); *compare* Ex. 65 at 4-5 (In Charlton Comics' *Out of this World* No. 7 (1958), Ditko's character used similar artifact to transport characters in a swirl of visual effects through space and time); *see also* Ex. 68 at 4-5 (in *Strange Tales* No. 122 (1964), Dr. Strange traversed through different dimensions and journeyed through alternate planes of existence); Ex. 69 at 1 (same in *Strange Tales* No. 134 (1965)); *compare* Ex. 67 at Cover, 4-5 (Ditko used same effect in Charlton Comics' *Strange Suspense* No. 32 (1957)); Ex. 33 (Ditko's letter post-marked August 6, 1946 to his brother Patrick Ditko enclosing an early sketch of Dr. Strange); Ex. 59 at 61:15-65:14 (Patrick Ditko, being shown composite Ex. 33 and testifying that his brother, Steve Ditko, sent him this letter in 1946, while Ditko was in military service abroad, enclosing Ditko's early sketch of Dr. Strange (Ex. 33) and that he had found Ex. 33 at his home amongst letters he had kept from his brother); Ex. 23 at 166:5-168:8 (Mark Ditko testifying that his father lived at the address written on the letter envelope of composite Ex. 33, and that, in 1946 (postmarked on the letter envelope), his uncle Ditko was in the military, stationed abroad in Germany). |

| | |
|---|---|
| **MCI's Reply** | **Defendant admits this fact is undisputed, and only "disputes" purported "inferen[ces]" from the fact, which is improper.**<br><br>Defendant does not address this fact, much less dispute it. Instead, Defendant offers confusing and non-responsive argument about "Marvel['s] attempt to inferentially co-opt Ditko's Dr. Strange character with its citation to irrelevancies," which is improper.<br><br>Because Defendant does not set forth any specific facts or evidence to dispute this fact as required by Local Rule 56.1(c) and (d), this fact is deemed admitted in its entirety. *See* Local Rule 56.1(b)-(d); *see also Parks Real Estate*, 472 F.3d at 41; *Giannullo*, 322 F.3d at 140.<br><br>MCI also **objects** to Toberoff Exhibits 1, 23, 25, 33, 57, 59, 61, 65, and 67. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [33], [34], [39], [52], [54], [55], [57] & [58]. |
| **Counterclaimant's Response to Reply** | This Statement remains **disputed** based on the contrary evidence cited. In addition, Plaintiff's Statement No. 37 and the purported evidence it cites is also immaterial as to whether Ditko created his Dr. Strange character and stories at the "instance and expense" of the Shell Companies—registered, represented and relied upon as the statutory "authors" of the purported "work for hire" alleged by Plaintiff, but as to which Plaintiff has adduced no admissible evidence. In this regard, Counterclaimant also incorporates by reference its Preliminary Statement. |
| | **Statement No. 38** |
| **MCI's Statement** | Marvel never assigned Ditko to do a Doctor Strange cover and frequently had other artists ink Doctor Strange comics. Lens Decl., Ex. 53 at 3 (Ditko recounting that he "was never asked to do a Dr. Strange cover"); Lens Decl., Ex. 57 at 4 (Ditko noting that it was "a mystery to [him]" why no Doctor Strange covers"); Lens Decl., Ex. 60 at 3 (Ditko criticizing the "incompetent inkers" who inked his penciled drawings for Doctor Strange); Lens Decl., Ex. 59 at 3 (Ditko lamenting that there was a "los[s] of a consistent look" for Dr. Strange because of Lee "having someone else ink" him); Lens Decl., Ex. 2 131:1-132:8 (Thomas testifying that at Marvel the inker "usually was not the same pencil," and citing Ditko's work as an example of the penciller and inker "not [being] the same person"); Lens Decl., Ex. 45 at 3 (Ditko explaining that, if he had the choice "to draw and ink or . . . [for] other people to ink [his] pencils, he |

| | |
|---|---|
| | would "[r]ather do it all [him]self"); *see also* Lens Decl., Ex. 44 at 3; Decl., Ex. 55 at 4. |
| **Counterclaimant's Response** | **Counterclaimant only admits that Ditko did not draw Dr. Strange covers but disputes that Magazine Management "frequently had other artists ink Doctor Strange comics." Ditko usually insisted on inking and inked his own stories, as Marvel's reprint payments to Ditko show that Ditko plotted, penciled, and inked many *Dr. Strange* stories.** *See* Toberoff Decl. Ex. 19 at 6, "Legends at Loggerheads!" (Thomas explaining example of when Lee incorrectly dialogued a *Spider-Man* story in a way Ditko had not intended, Ditko refused to accede to Lee's chosen direction when he got the story back to ink it); Ex. 80 (Marvel paying Ditko for reprints of numerous issues he penciled and inked); Ex. 81 (same). |
| **MCI's Reply** | **This fact remains undisputed.**<br><br>Defendant admits that Marvel did not assign Ditko to provide cover art for *Strange Tales* comics featuring Doctor Strange, but contends that Ditko "usually insisted on inking and inked" his work for Marvel. That is incorrect and unsupported by any evidence. To the contrary, the evidence shows that Ditko frequently lamented that Marvel would have others ink his work. *See* MCI's Evidence in Support of Undisputed Fact 29; *see also* Lens Decl., Ex. 55 at 3 ("Stan had <u>others</u> ink some of my Dr. Strange stories."); Ex. 54 at 4 ("I don't know why he had other artists ink [Dr. Strange]. It may be he had inkers he wanted to keep and had to give them some work.").<br><br>Toberoff Exhibits 80 and 81 **do not support** Defendant's contention that Ditko usually inked his work for Marvel. Exhibit 80 merely lists payments to Ditko, without any reference to which particular comic book or books the payments correspond to, and thus says nothing about the *number* of Marvel comics that Ditko inked. And Toberoff Exhibit 81 actually forecloses Defendant's contention. While it lists some payments to Ditko for inking some Marvel comics, it shows no inking payments for many of the Doctor Strange comics that are among the Works.<br><br>MCI also **objects** to Toberoff Exhibits 80 and 81. *See* MCI's Evidentiary Objection Nos. [62] & [63]. |

| | |
|---|---|
| **Counterclaimant's Response to Reply** | This Statement remains **disputed**. In addition, Plaintiff's Statement No. 38 and the purported evidence it cites is also immaterial as to whether Ditko created his Dr. Strange character and stories at the "instance and expense" of the Shell Companies—registered, represented and relied upon as the statutory "authors" of the purported "work for hire" alleged by Plaintiff, but as to which Plaintiff has adduced no admissible evidence. In this regard, Counterclaimant also incorporates by reference its Preliminary Statement.<br><br>Defendant also **objects** to Lens Decl., Exs. 2, 13, 45. *See* Defendant's Evidentiary Objection Nos. [11], [22], & [43]. |
| | **Statement No. 39** |
| **MCI's Statement** | Marvel regularly assigned Ditko to contribute to the Marvel comic book series *Amazing Fantasy*[3] from issue No. 1 through No. 15. Lens Decl., Ex. 4 124:3-18 (Lee describing *Amazing Fantasy* as "a book I worked on with an artist called Steve Ditko"); *see also* Lens Decl., Ex. 48 at 2; Lens Decl., Ex. 25 at 2-3.[4] |
| **Counterclaimant's Response** | **Counterclaimant disputes that Ditko was "assigned" to create his Works, as he had no contract with any "Marvel" entity and was free to decline any "assignment" without consequence.** Marvel has not produced any contemporaneous agreement with Ditko from the Period for his creative services, nor any other evidence reflecting any bilateral rights and obligations between Ditko and Magazine Management (nor any other alleged Marvel predecessor) in the Period, nor has Marvel alleged that any such agreement or bilateral legal rights and obligations existed between such parties in the Period. *See* Toberoff Decl. Ex. 36 at 7 (Marvel admitting it had no written contract with Ditko in the 1960s); Ex. 17 at 298:8-14 (Thomas testifying that freelancers did not have contracts with Marvel until Thomas's in 1974, which was the first); Ex. 1 at 10 (Evanier Rep. describing the common practice of freelancers selling material to more than one publisher, including Marvel, DC Comics, and Charlton Comics); Ex. 3 at 207:12-22 (Romita testifying that freelancers were free to sell work to other publishers); Ex. 9 ¶ 11 (Steranko attesting that Marvel had no contract with Steranko and so he was free to sell work to other publishers); Ex. 13 ¶¶ 5-6 (Adams attesting that he sold work to both Marvel and DC Comics during the 1960s and 1970s); Ex. 23 at 160:2-8 |

---

[4] The series began as *Amazing Adventures* but was renamed twice, first as *Amazing Adult Fantasy* then again as *Amazing Fantasy*.

(Mark Ditko testifying that Ditko was selling work to both Marvel and Charlton Comics in the 1960s); Ex. 35 at DITKO-0199 (Ditko writing about his work at Charlton Comics in the 1960s); Ex. 57 at 2 (Ditko writing about creating material for Charlton Comics and DC Comics); Ex. 35 at DITKO-0192, DITKO-0207-0210, DITKO-0215-0218 (Ditko writing that he rejected several of Lee's *Spider-Man* story ideas and characters such as, for instance, Lee's idea for a Spider-Woman character, or Lee's idea of making Aunt May more glamorous); Ex. 3 at 219:12-24 (Romita testifying that he turned down Lee's offer to submit material to Marvel and preferred to sell freelance work to DC Comics); Ex. 21 at 29:9-30:17 (Steranko testifying that he was not given "assignments," but rather, he had the option to work on some books or to not if he chose not to); Ex. 24 at 89:2-11 (Levitz testifying that freelancers were free to decline "assignments"); Ex. 58 at 4 (Ditko writing that, after he stopped selling his material to Marvel in 1966, he later started working with Marvel again, but refused to do any *Spider-Man* or *Dr. Strange* stories and recounting that when other writers tried to sneak in *Spider-Man* panels for Ditko to work on, he "left [them] blank for someone else to fill in"); *id.* (Ditko writing that he "refused to do a drunken Iron Man splash page— someone else had to draw [and] ink it").

| | |
|---|---|
| **MCI's Reply** | **This fact remains undisputed**.<br><br>Defendant's suggestion that Lee did not assign Ditko to work on Marvel comic books because Ditko lacked a written employment agreement is incorrect, turns on improper legal argument, and—in any event—is immaterial, as the Second Circuit's decision in *Kirby* confirms. *See* MCI's Reply in Support of Undisputed Fact 2.<br><br>This argument also ignores that Ditko did, in fact, consistently accept assignments from Lee. Indeed, the vast majority of Ditko's work during the 1962-1965 relevant time period was published by Marvel as detailed in MCI's Reply in Support of Undisputed Fact 2.<br><br>MCI also **objects** to Toberoff Exhibits 1, 3, 9, 13, 21, 23, 35, 57, and 58. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [7], [12], [16], [20], [32], [41], [52] & [53]. |
| **Counterclaimant's Response to Reply** | This Statement remains **disputed**. As to Plaintiff's continued misuse of "assigned" to connote employment of Ditko when none existed, Counterclaimant incorporates by reference its Response to Statement Nos. 2, 14, 23, 31, 39 & 41, *supra*. In addition, Plaintiff's Statement No. 39 and the purported evidence it cites is also **immaterial** as to whether Ditko co- |

authored the Spiderman character, stories, and key supporting characters published in *Amazing Fantasy* magazines at the "instance and expense" of the Shell Companies—registered, represented and relied upon as the statutory "authors" of the purported "work for hire" alleged by Plaintiff, but as to which Plaintiff has adduced no admissible evidence. In this regard, Counterclaimant also incorporates by reference its Preliminary Statement.

Defendant also **objects** to Bard Decl., Exs. 1-9; Lens Decl., Exs. 2-4, 6, 8, 10, 13, 17, 18, 39, 68A-G, 75, 76, 89, 95. *See* Defendant's Evidentiary Objection Nos. [1], [2], [3], [4], [5], [6], [7], [8], [9], [11], [12], [13], [15], [17], [19], [22], [26], [27], [37], [46], [53], [54], [65], & [69].

| | |
|---|---|
| | **Statement No. 40** |
| **MCI's Statement** | Lee conceived of the idea for a new character named Spider-Man and devised the plot for Spider-Man's first appearance in *Amazing Fantasy* Vol. 1, No. 15. Lens Decl., Ex. 48 at 5 (Ditko writing that "[t]he first complete Spider-Man adventure, containing the legend and story, was published in *Amazing Fantasy* #15, from Stan's synopsis"); Lens Decl., Ex. 46 at 3 (Ditko recounting that Stan Lee "create[ed] the Spider-Man name" and provided him with a "1 or 2 page synopsis" for the first story); Lens Decl., Ex. 13 74:6-75:5 (Lee testifying about "dreaming up" the idea for Spider-Man and his superpower); Lens Decl., Ex. 10 335:10-336:11 (Lee testifying that he "came up with Spider-Man," among other "main characters" that featured in Marvel's comics, and that he would tell artists "how [he] wanted them done"); Lens Decl., Ex. 71 at 3:25-6:09 (Lee explaining how Marvel's basic "formula" was to "mix fantasy with realism," creating characters that "are a little different . . . sort of like continuing soap operas"); Lens Decl., Ex. 71 at 3:25-6:09 (Lee explaining how Spider-Man, like other Marvel characters, "juxtapos[ed] . . . bigger-than-life problem[s]" with "the very simple home life and family life"); Lens Decl., Ex. 28; *see also* Lens Decl., Ex. 14 at 8, 15. |
| **Counterclaimant's Response** | **Counterclaimant disputes that "Lee conceived of the idea for a new character named Spider-Man" as Lee's initial "idea" for Spider-Man was based on a character Jack Kirby and Joe Simon had created in the mid-1950s and the stark differences between Kirby's rendition of Spider-Man and Ditko's Spider-Man charcter underscores how little was actually supplied by Lee.** *See* Toberoff Decl. Ex. 1 at 20 (Evanier Rep. providing historical context of Spider-Man's creation and describing Kirby and Lee's initial work on a character named "Spider-Man" that was based on an idea developed by Joe Simon in the mid-1950s); Ex. 29 at 33- |

| | |
|---|---|
| | 34 (Ditko writing that the Spider-Man character that Lee and Kirby had originally worked up was a version of "The Fly" character created by Joe Simon); Ex. 3 at 112:7-113:7 (Romita testifying that Kirby did some initial Spider-Man drawings but Lee did not like them and went with Ditko's version of the Spider-Man character); Ex. 4 at 37:3-19 (Lee testifying that he did not like Kirby's version of Spider-Man, he liked Ditko's); Ex. 29 at 34-35 (Ditko writing that the initial Kirby Spider-Man idea was tossed whereupon Ditko created a brand-new Spider-Man); Ex. 29 at 34 (Ditko comparison depiction of Kirby's and Ditko's versions of the Spider-Man character); Ex. 28 (Lee writing that Ditko was the co-creator of Spider-Man); Ex. 3 at 112:7-113:7 (Romita testifying that Kirby did some initial Spider-Man drawings but Lee did not like them and went with Ditko's version of the Spider-Man character); Ex. 7 at 223:18-225:20, 277:11-13 (Thomas testifying that Ditko did all the plotting on *Spider-Man* stories while Ditko and Lee were not speaking); Ex. 28 (Lee writing that Ditko was co-creator of Spider-Man and that Ditko did most of the plotting of *Spider-Man* and just left Lee to do the dialogue and captions). Ex. 7 at 223:18-225:20, 277:11-13 (Thomas testifying that Ditko did all the plotting on *Spider-Man* stories while Ditko and Lee were not speaking); Ex. 28 (Lee writing that Ditko was co-creator of Spider-Man and that Ditko did most of the plotting of *Spider-Man* and just left Lee to do the dialogue and captions). |
| **MCI's Reply** | **This fact remains undisputed.** |
| | Defendant's contentions about how Spider-Man "was based on a character Jack Kirby and Joe Simon had created in the 1950s" and how there are purported "stark differences" between the characters drawn by Kirby and Ditko are incorrect and legally unavailing. *See* MCI's Reply in Support of Undisputed Fact 22. |
| | Indeed, the *Kirby* court held that Kirby's contributions to Spider-Man were done on a work-made-for-hire basis, like all his other work for Marvel. *See Kirby*, 726 F.3d at 143 ("[T]he district court made no error, in our view, in determining as a matter of law that the works [(including Kirby's alleged contributions to Spider-Man)] were made at Marvel's instance and expense"). |
| | Further, Defendant's contention about "how little was actually supplied by Lee" to the Spider-Man character is incorrect. As the Ditko himself admitted, Lee provided Ditko with a "1 or 2 page synopsis" and "create[ed] the Spider-Man name." And Defendant further ignores the circumstances in which Spider-Man first appears in *Amazing Fantasy* No. 15. *See* MCI's Evidence in Support of Undisputed Facts 40 and 41. |

| | |
|---|---|
| | Additionally, Toberoff Exhibit 28 **does not support** Defendant's response. Exhibit 28 refers to Lee crediting Ditko for "eventually d[oing] most of the plotting [when] the strip continued to increase in popularity," when Lee, using his editorial discretion, afforded Ditko greater creative input on the Spider-Man comics, subject to Marvel's ultimate authority. Toberoff Exhibit 17 similarly states that Ditko's work was a "switch on the Marvel method" when Ditko began plotting Spider-Man later in his Marvel career.

MCI also **objects** to Toberoff Exhibits 1, 3, and 29. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [6], & [36]. |
| **Counterclaimant's Response to Reply** | This Statement remains disputed.  In addition, Plaintiff's Statement No. 40 and the purported evidence it cites is also immaterial as to whether Ditko co-authored the Spiderman character, stories, and key supporting characters at the "instance and expense" of the Shell Companies—registered, represented and relied upon as the "statutory authors" of the purported "work for hire" alleged by Plaintiff, but as to which Plaintiff has adduced no admissible evidence. In this regard, Counterclaimant also incorporates by reference its Preliminary Statement, *supra*.

Defendant also **objects** to Bard Decl., Exs. 1-9; Lens Decl., Exs. 2-4, 6-10, 12-15, 17, 18, 36, 37, 39-42, 45, 48, 68A-G, 71, 75, 76, 84. *See* Defendant's Evidentiary Objection Nos. [1], [2], [3], [4], [5], [6], [7], [8], [9], [11], [12], [13], [15], [16], [17], [18], [19], [21], [22], [23], [24], [26], [27], [34], [35], [37], [38], [39], [40], [43], [44], [46], [49], [53], [54], & [60]. |
| | **Statement No. 41** |
| **MCI's Statement** | Stan Lee initially assigned Jack Kirby to pencil the artwork for Spider-Man's first appearance in *Amazing Fantasy* Vol. 1, No. 15, but because Lee was dissatisfied with Kirby's Spider-Man drawings, Lee took Kirby off the project and assigned Ditko to pencil the interior artwork and cover for *Amazing Fantasy* Vol. 1, No. 15. Lens Decl., Ex. 13 37:3-38:3 (Lee testifying that he initially "wanted Jack [Kirby] to do" the Spider-Man comic and "gave it to him" with the admonition that he "d[id]n't want this guy to be too heroic-looking"—but Kirby's penciled drawings "looked still a bit too heroic" for Lee "even though [Kirby] tried to nerd him up," so he "gave it to Steve Ditko" instead whose "style was really more really what Spider-Man should have been"); Lens Decl., Ex. 13 334:14-18 (Lee testifying that "it was me who said, 'I want to do a strip called Spider-Man,' and I hired Jack, and I didn't like it, and then I hired Ditko."); *see* |

| | |
|---|---|
| | *also* Lens Decl., Ex. 10 376:3-15; Lens Decl., Ex. 48 at 3; Lens Decl., Ex. 54 at 4. |
| **Counterclaimant's Response** | **Counterclaimant disputes that Ditko was "assigned" to work on Spider-Man, as he had no contract with nor was employed by any "Marvel" entity and was free to decline any proposal by Lee without consequence.** Marvel has not produced any contemporaneous agreement with Ditko from the Period for his creative services, nor any other evidence reflecting any bilateral rights and obligations between Ditko and Magazine Management (nor any other alleged Marvel predecessor) in the Period, nor has Marvel alleged that any such agreement or bilateral legal rights and obligations existed between such parties in the Period. *See* Toberoff Decl. Ex. 36 at 7 (Marvel admitting it had no written contract with Ditko in the 1960s); Ex. 17 at 298:8-14 (Thomas testifying that freelancers did not have contracts with Marvel until Thomas's in 1974, which was the first); Ex. 3 at 219:12-24 (Romita testifying that he turned down Lee's offer to submit material to Marvel and preferred to sell freelance work to DC Comics); Ex. 21 at 29:9-30:17 (Steranko testifying that he was not given "assignments," but rather, he had the option to work on some books or to not if he chose not to); Ex. 24 at 89:2-11 (Levitz testifying that freelancers were free to decline "assignments"); Ex. 58 at 4 (Ditko writing that, after he stopped selling his material to Marvel in 1966, he later started working with Marvel again, but refused to do any *Spider-Man* or *Dr. Strange* stories and recounting that when other writers tried to sneak in *Spider-Man* panels for Ditko to work on, he "left [them] blank for someone else to fill in"); *id.* (Ditko writing that he "refused to do a drunken Iron Man splash page—someone else had to draw [and] ink it"). <br><br> **Counterclaimant further disputes that Ditko merely "pencil[ed]" the interior pages, as Lee has acknowledged that Ditko was a "co-creator" of the Spider-Man character and Ditko completely originated the look, aesthetic, and gimmicks of the Spider-Man character and the *Spider-Man* stories.** *See* Toberoff Decl. Ex. 1 at 20 (Evanier Rep. providing historical context of Spider-Man's creation and describing Ditko's creation of a very different costume and direction for the character); Ex. 3 at 112:7-113:7 (Romita testifying that Kirby did some initial Spider-Man drawings but Lee did not like them and went with Ditko's version of the Spider-Man character); Ex. 4 at 37:3-19 (Lee testifying that he did not like Kirby's version of Spider-Man, he liked Ditko's); Ex. 28 (Lee writing that Ditko was the co-creator of Spider-Man); Ex. 29 at 34-35 (Ditko writing that the initial Kirby Spider-Man idea was tossed and Ditko created a brand new Spider-Man); Ex. 29 at 34 (Ditko comparison depiction of Kirby's and Ditko's versions of the Spider-Man character); Ex. 7 at 223:18-225:20, 277:11-13 (Thomas |

| | |
|---|---|
| | testifying that Ditko did all the plotting on *Spider-Man* stories while Ditko and Lee were not speaking); Ex. 28 (Lee writing that Ditko was co-creator of Spider-Man and that Ditko did most of the plotting of *Spider-Man* and just left Lee to do the dialogue and captions). |
| **MCI's Reply** | **This fact remains undisputed**.<br><br>Defendant does not address this fact, much less dispute it. Defendant's suggestion that Lee did not assign Ditko to work on Marvel comic books because Ditko was not contractually bound to accept every assignment that Lee provided is incorrect and turns on an improper legal argument, as the Second Circuit's decision in *Kirby* confirms. *See* MCI's Reply in Support of Undisputed Fact 2.<br><br>This argument also ignores that Ditko did, in fact, consistently accept assignments from Lee. Indeed, the vast majority of Ditko's work during the 1962-1965 relevant time period was published by Marvel as detailed in MCI's Reply in Support of Undisputed Fact 2.<br><br>Defendant's contention regarding Ditko's "co-creat[ion]" of characters is also non-responsive and immaterial, as the Second Circuit's decision in *Kirby* confirms. *See* MCI's Reply in Support of Undisputed Fact 22.<br><br>MCI also **objects** to Toberoff Exhibits 1, 3, 21, 29, and 58. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [6], [7], [20], [36] & [53]. |
| **Counterclaimant's Response to Reply** | This Statement remains **disputed**.  As to Plaintiff's misuse of "assigned" to connote employment of Ditko when none existed, Counterclaimant incorporates by reference its Response to Statement Nos. 2, 14, 23, 31, 39 & 41. In addition, Plaintiff's Statement No. 41 and the purported evidence it cites is also **immaterial** as to whether Ditko co-authored the Spiderman character, stories, and key supporting characters at the "instance and expense" of the Shell Companies—registered, represented and relied upon as the statutory "authors" of the purported "work for hire" alleged by Plaintiff, but as to which Plaintiff has adduced no admissible evidence. In this regard, Counterclaimant also incorporates by reference its Preliminary Statement.<br><br>Defendant also **objects** to Bard Decl., Exs. 1-9; Lens Decl., Exs. 2-4, 6-10, 12-15, 17, 18, 36, 37, 39-42, 45, 48, 68A-G, 71, 75, 76, 84, 89, 95. *See* Defendant's Evidentiary Objection Nos. [1], [2], [3], [4], [5], [6], [7], [8], [9], [11], [12], [13], [15], [16], [17], [18], [19], [21], [22], [23], [24], [26], |

|  | [27], [34], [35], [37], [38], [39], [40], [43], [44], [46], [49], [53], [54], [60], [65], & [69]. |
|---|---|
|  | **Statement No. 43** |
| **MCI's Statement** | After Spider-Man's first appearance in *Amazing Fantasy* Vol. 1, No. 15, Marvel decided to give the character his own series—*The Amazing Spider-Man*—and feature him alongside already-established Marvel Super Heroes and villains, such as the Fantastic Four, the Human Torch, and the Incredible Hulk. Lens Decl., Exs. 31A at 4-5, 20-21 & 31B at 2-4 (The Fantastic Four, the Human Torch, and the Incredible Hulk guest-starring alongside Spider-Man in *The Amazing Spider-Man* Vol. 1, Nos. 1, 8, and 14); *see also* Lens Decl., Ex. 71 at 3:25-6:09 (Lee explaining how Marvel's basic "formula" was to "mix fantasy with realism," creating characters that "are a little different . . . sort of like continuing soap operas"). |
| **Counterclaimant's Response** | **Counterclaimant admits that Spider-Man got his own series, but disputes that he was merely featured alongside "already-established Marvel Super Heroes and villains," as Spider-Man famously had his own comic book *The Amazing Spider-Man* published throughout the Sixties and decades thereafter (1963-1998). The evidence shows that in the Period Ditko was largely in charge of plotting (i.e., writing) the stories, and that Ditko often introduced into his *Spider-Man* stories he created character elements Ditko had created years earlier in stories he sold to Charlton Comics.** *See* Toberoff Decl. Ex. 82 (Lee explaining in January 9, 1966 published interview: "**I don't plot Spider-Man any more. Steve Ditko, the artist, has been doing the stories.** I guess I'll leave him alone until sales start to slip. Since Spidey got so popular, Ditko thinks he's the genius of the world. We were arguing so much over plot lines I told him to start making up his own stories. **He won't let anybody else ink his drawings either. He just drops off the finished pages with notes at the margins and I fill in the dialogue. I never know what he'll come up with next**, but it's interesting to work that way.") (emphasis added); Ex. 83 at 7 (same); Ex. 28 (Lee writing that Ditko was co-creator of Spider-Man and that Ditko did most of the plotting of *Spider-Man* and just left Lee to do the dialogue and captions); Ex. 7 at 223:18-225:20, 277:11-13 (Thomas testifying that Ditko did all the plotting on *Spider-Man* stories while Ditko and Lee were not speaking); Ex. 73 at 6 (Norman Osborn's first appearance in the *Spider-Man* series in 1965); Ex. 74 at 10 (Norman Osborn's identity revealed to readers in *Amazing Spider-Man* No. 37 (1966)); *compare* Ex. 75 at 1-2 (Norman Osborn's precursor— including corporate villain and distinct curled hairstyle—in 1957 in |

Charlton Comics' *Strange Suspense Stories* No. 33, *Director of the Board*); *see also* Ex. 60 at 2, 8 (*Amazing Fantasy* No. 15 (1962), the issue in which Spider-Man and Ditko's Aunt May character first appeared) *compare* Ex. 79, "All Those Eyes" at 1-3 (Aunt May's forerunner character appeared in Ditko's story in Charlton Comics' *Out of this World* No. 6 (1957)); *see also* Ex. 76 at 1, 4 (Ditko's Electro character in *Amazing Spider-Man* No. 9 (1964)); *compare* Ex. 77 at 1, 4-5 (Ditko's electrically powered man, the predecessor of Electro, first appeared in Charlton Comics' *Strange Suspense Stories* No. 48 (1960)); *see also* Ex. 78 at 1, 5-6, 8-9 (Ditko introduces the Chameleon—a character who used various masks to carry out his villainy—in *Amazing Spider-Man* No. 1 (1963)); *compare* Ex. 79, "All Those Eyes" at 2-3 (Chameleon precursor—a spy character who used various masks in his espionage with a similar back story as the Chameleon—appeared in Ditko's "All Those Eyes" story he sold to Charlton Comics in 1957).

| | |
|---|---|
| **MCI's Reply** | **This fact remains undisputed.**<br><br>Defendant admits that Marvel gave Spider-Man his own series, and cites nothing to dispute that Spider-Man was featured alongside already-established Marvel Super Heroes and villains. Thus, this fact remains undisputed. Because Defendant does not set forth any specific facts or evidence to dispute this fact as required by Local Rule 56.1(c) and (d), this fact is deemed admitted in its entirety. *See* Local Rule 56.1(b)-(d); *see also Parks Real Estate*, 472 F.3d at 41; *Giannullo*, 322 F.3d at 140.<br><br>Defendant's non-responsive argument concerning Ditko's allegedly being "largely in charge of plotting" is incorrect as explained in MCI's Reply in Support of Undisputed Fact 3.<br><br>Further, Defendant's contention that Ditko "often introduced into his *Spider-Man* stories he created character elements Ditko had created years earlier" is likewise non-responsive and incorrect. Defendant cites no evidence to support this contention and, instead, ignores the circumstances in which these supporting characters first appeared in Marvel's *Amazing Fantasy* No. 15 (1962) or *Amazing Spider-Man* (1963-1965). All of the supporting characters Defendant identifies, *e.g.*, Aunt May, Norman Osborn, Electro, and the Chameleon, were published in Marvel comic books plotted and edited by Stan Lee. Indeed, each of the supporting characters Defendant identifies was first introduced *before* Lee and Ditko's working relationship evolved in 1965. And, as with all freelancer's work for Marvel, Ditko's contributions to those supporting characters were made pursuant to assignments from Lee, who directed the creation of the Works, and he was compensated by Marvel on an agreed per-page basis |

| | |
|---|---|
| | for completed assignments. *See* MCI's Reply In Support of Undisputed Facts 22, 23, and 49.<br><br>MCI also **objects** to Toberoff Exhibits 75, 77, and 79. *See* MCI's Evidentiary Objection Nos. [59], [60], & [61]. |
| **Counterclaimant's Response to Reply** | This Statement remains **disputed**. As to Plaintiff's continued misuse of the name "Marvel" so as to somehow attribute the independent actions of MMC to the corporately distinct Shell Companies *see* Counterclaimant's Response to Statement Nos. 2-3 & 6 incorporated by reference. Plaintiff's Statement No. 43 and the purported evidence it cites is also **immaterial** as to whether Ditko co-authored the Spiderman character, stories, and key supporting characters at the "instance and expense" of the respective Shell Companies—registered, represented and relied upon as the statutory "authors" of the purported "work for hire" alleged by Plaintiff, but as to which Plaintiff has adduced no admissible evidence. In this regard, Counterclaimant also incorporates by reference its Preliminary Statement.<br><br>Defendant also **objects** to Bard Decl., Exs. 1-9; Lens Decl., Exs. 2-4, 6-10, 12-15, 17, 18, 36, 37, 39-42, 45, 48, 68A-G, 71, 75, 76, 84, 89, 95. *See* Defendant's Evidentiary Objection Nos. [1], [2], [3], [4], [5], [6], [7], [8], [9], [11], [12], [13], [15], [16], [17], [18], [19], [21], [22], [23], [24], [26], [27], [34], [35], [37], [38], [39], [40], [43], [44], [46], [49], [53], [54], [60], [65], & [69]. |
| | **Statement No. 44** |
| **MCI's Statement** | With Stan Lee as the editor and writer, Ditko penciled every issue of *The Amazing Spider-Man* during the Time Period. Lens Decl., Ex. 25 at 3-7; Lens Decl., Exs. 31A at 4-31, 31B at 2-36, & 31C at 2-17 (comic books bearing credits reflecting Ditko as the artist and Lee as the writer and editor for all issues of *The Amazing Spider-Man*). |
| **Counterclaimant's Response** | **Counterclaimant admits that Ditko drew every issue of *The Amazing Spider-Man* during the Period, but disputes that Lee was actually the "writer" on every issue of *The Amazing Spider-Man* in the Period. For instance, Ditko and Lee were not speaking for much of the Period relevant to Spider-Man (between first publication of *The Amazing Spiderman* (March 1963) and the end of 1965 when Ditko stopped selling to Magazine Management). During this critical Period Ditko was completely in charge of writing and drawing (penciling) the *Spider-Man* stories (and the *Dr. Strange* stories), with Lee left merely** |

to dialogue the balloons and finalize captions based on Ditko's notes and directions. *See* Toberoff Decl. Ex. 82 (Lee explaining in January 9, 1966 published interview: "**I don't plot Spider-Man any more. Steve Ditko, the artist, has been doing the stories.** I guess I'll leave him alone until sales start to slip. Since Spidey got so popular, Ditko thinks he's the genius of the world. We were arguing so much over plot lines I told him to start making up his own stories. **He won't let anybody else ink his drawings either. He just drops off the finished pages with notes at the margins and I fill in the dialogue. I never know what he'll come up with next**, but it's interesting to work that way.") (emphasis added); Ex. 83 at 7 (same); Ex. 14 at 7 (Evanier Rebuttal Rep. explaining Ditko's practice of submitting detailed notes with his freelance material to assist Lee in dialoguing the stories); Ex. 7 at 223:18-225:20 (Thomas testifying that Ditko refused to speak to Lee while working on *Spider-Man* and *Dr. Strange* so all plotting on the stories was done by Ditko, and further, that Ditko would provide margin notes to indicate what he intended to happen in the story to guide Lee when Lee dialogued the story); *id.* at 262:4-264:19 (Thomas testifying that when he began to dialogue *Dr. Strange* stories instead of Lee, Ditko would type his suggested captions and dialogue on a separate page, not in the margins, and then give them to Thomas to fill in the dialogue balloons); Ex. 17 at 84:18-90:9 (Thomas testifying that Ditko wrote extensive margin notes describing the plot and what was happening so that when Lee/Thomas dialogued the story, they could do so in a way that corresponded with what Ditko had intended); *id.* at 311:18-312:25 (Thomas testifying that Ditko, on his own, plotted and drew *Spider-Man* for more than one year before he left in 1966, did not work pursuant to the Marvel Method, and that Lee would not even know anything about the story until it was penciled and submitted by Ditko); Ex. 18 (1965 example of Ditko's *Dr. Strange* margin notes for Thomas); Ex. 26 at 83 (Lee writing that Ditko came up with the *Dr. Strange* plots and illustrated the story and Lee only added the dialogue [in the balloons]); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script); Ex. 19 at 6-8 (Thomas interview explaining that Ditko and Lee were not speaking in 1965 and Ditko was plotting both *Spider-Man* and *Dr. Strange* and would only come to the office to drop work off with Brodsky); Ex. 28 (Lee writing that Ditko was the co-creator of Spider-Man and that Ditko did most of the plotting of *Spider-Man* and just left Lee to do the dialogue and some captions); Ex. 24 at 124:5-24 (Levitz testifying that Ditko and Lee stopped speaking in the last year of Ditko's time with Marvel because Ditko was not getting proper credit for his contributions to the stories); Ex. 35 at DITKO-0193 (Ditko writing that he and Lee stopped speaking around 1964); Ex. 58 at 3 (Ditko writing that he took over all plotting of the *Spider-Man* stories).

**Counterclaimant further disputes that Ditko merely "penciled" the *Spider-Man* stories, when in fact, Ditko often created and always plotted the stories which is a literary function. The evidence reflected that Ditko also created numerous supporting characters and repurposed character types in the *Spider-Man* stories that he had created years prior in stories Ditko sold to Charlton Comics like Aunt May, Electro, Norman Osborn, and the Chameleon.** *See* Toberoff Decl. Ex. 73 at 6 (Norman Osborn's first appearance in the *Spider-Man* series in 1965); Ex. 74 at 10 (Norman Osborn's identity revealed to readers in *Amazing Spider-Man* No. 37 (1966)); *compare* Ex. 75 at 1-2 (Norman Osborn's precursor—including corporate villainy and distinct curled hairstyle—in 1957 in Charlton Comics' *Strange Suspense Stories* No. 33, *Director of the Board*); *see also* Ex. 60 at 2, 8 (*Amazing Fantasy* No. 15 (1962), the issue in which Spider-Man and Ditko's Aunt May character first appeared) *compare* Ex. 79, "All Those Eyes" at 1-3 (Aunt May's forerunner character appeared in Ditko's story in Charlton Comics' *Out of this World* No. 6 (1957)); *see also* Ex. 76 at 1, 4 (Ditko's Electro character in *Amazing Spider-Man* No. 9 (1964)); *compare* Ex. 77 at 1, 4-5 (Ditko's electrically powered man, the predecessor of Electro, first appeared in Charlton Comics' *Strange Suspense Stories* No. 48 (1960)); *see also* Ex. 78 at 1, 5-6, 8-9 (Ditko introduces the Chameleon—a character who used various masks to carry out his villainy—in *Amazing Spider-Man* No. 1 (1963)); *compare* Ex. 79, "All Those Eyes" at 2-3 (Chameleon precursor—a spy character who used various masks in his espionage with a similar back story as the Chameleon—appeared in Ditko's "All Those Eyes" story he sold to Charlton Comics in 1957); Ex. 82 (Lee explaining in January 9, 1966 published interview: "**I don't plot Spider-Man any more. Steve Ditko, the artist, has been doing the stories.** I guess I'll leave him alone until sales start to slip. Since Spidey got so popular, Ditko thinks he's the genius of the world. We were arguing so much over plot lines I told him to start making up his own stories. **He won't let anybody else ink his drawings either. He just drops off the finished pages with notes at the margins and I fill in the dialogue. I never know what he'll come up with next,** but it's interesting to work that way.") (emphasis added); Ex. 83 at 7 (same).

**Lee, who was in charge of inserting credits on the comic book covers, publicly and contemporaneously credited Ditko with taking over plotting of the *Spider-Man* and *Dr. Strange* stories beginning at least with issues *Amazing Spider-Man # 25* and *Strange Tales # 135*, respectively.** *See* Toberoff Decl. Ex. 82 (Lee explaining in January 9, 1966 published interview: "**I don't plot Spider-Man any more. Steve Ditko, the artist, has been doing the stories.** I guess I'll leave him alone until sales start to slip. Since Spidey got so popular, Ditko thinks he's the genius of the world. We were arguing so much over plot lines I told him to start making up his own stories. **He won't let anybody else ink his**

| | |
|---|---|
| | **drawings either. He just drops off the finished pages with notes at the margins and I fill in the dialogue. I never know what he'll come up with next**, but it's interesting to work that way.") (emphasis added); Ex. 83 at 7 (same); Ex. 71 at 159 (*Amazing Spider-Man* No. 25: "Sturdy Stevey Ditko dreamed up the plot of this tantalizing tale, and it's full of unexpected surprises!"); Ex. 72 at 225 (*Strange Tales* No. 135: "Plotted and Illustrated by Fandom's Favorite Fiend: Steve Ditko"). |
| **MCI's Reply** | **This fact remains undisputed**.<br><br>Defendant admits that Ditko drew every issue of *Spider-Man* during the relevant time period, but "disputes" that Lee was the writer of every issue of *The Amazing Spider-Man* during the Time Period. However, he cites no evidence supporting this contention and instead cites evidence indicating that at some point in 1965, near the end of the Time Period, Lee assigned Ditko to *plot* Spider-Man stories due to the state of Ditko and Lee's personal relationship. *See* Toberoff Ex. 82 (Lee explaining in 1966 interview that "Since Spidey got so popular, Ditko thinks he's the genius of the world. We were arguing so much over plot lines I told him to start making up his own stories."); Toberoff Ex. 26 (Lee discussing Ditko's work on the *Amazing Spider-Man Annual* #2, a one-off special annual issue cover-dated October 1965, where "[t]o make it even more special," Lee "let Daring Ditko himself dream up the plot" as "Ditko was illustrating both Dr. Strange and Spidey" at the time."). Lee continued to act as writer, and continued to maintain editorial control over the Works, as explained in more detail in MCI's Evidence in Support of Undisputed Fact 22. *See also* Toberoff Ex. 28 at 2 (Lee explaining that when Ditko "eventually did most of the plotting" on Spider-Man Lee "of course, continued to provide the dialogue and captions").<br><br>MCI also **objects** to Toberoff Exhibits 14, 27, 35, 58, 75, 77, and 79. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [17], [35], [41], [53], [59], [60] & [61]. |
| **Counterclaimant's Response to Reply** | This Statement remains **disputed**. Without limitation, Plaintiff adopts Lee's ironic use of the term "plot" stories to somehow differentiate "plotting" from the writing of stories (for which Lee habitually paid himself the per-page writer's share of the compensation). But the "plotting" of a story is obviously an important, if not the most critical of writing functions. And it is arguably more important than Lee's filling in the dialogue balloons pursuant to the stories told and plotted in *Ditko's* artwork (and *Ditko's* margin notes). *See* Response to Statement No. 12; Evidence Supp. AMF ¶¶ 39, 40, 75, 94, 96. In addition, Plaintiff's |

Statement No. 44 and the purported evidence it cites is also **immaterial** as to whether Ditko co-authored the Spiderman character, stories, and key supporting characters at the "instance and expense" of the Shell Companies—registered, represented and relied upon as the statutory "authors" of the purported "work for hire" alleged by Plaintiff, but as to which Plaintiff has adduced no admissible evidence. In this regard, Counterclaimant also incorporates by reference its Preliminary Statement.

Defendant also **objects** to Lens Decl., Exs. 2, 4, 7, 12, 13. *See* Defendant's Evidentiary Objection Nos. [11], [13], [16], [21], & [22].

| | |
|---|---|
| | **Statement No. 45** |
| **MCI's Statement** | Marvel during the Time Period. Lens Decl., Ex. 25 (reflecting Ditko's work for Marvel from the 1950s to 1990s); Lens Decl., Ex. 15 19:1-10 (Lee testifying that "there were a few artists that [he] worked with more than others," including Ditko); Lens Decl., Ex. 2 144:22-145:22 (Thomas testifying as to Lee's practice of "keep[ing] [freelancers] busy" so that they "always had work at hand and didn't have much downtime where they weren't making any money"); Lens Decl., Ex. 2 316:1-10 (Thomas testifying that Lee employed the Marvel Method to "keep [artists] busy by giving them a plot . . . that way the artist didn't have the downtime and lose money"); *see also* Lens Decl., Ex. 72 at 4 (recalling Ditko toiling at his artist's desk in the early 1960s "tortured by [] deadlines"); Lens Decl., Ex. 73 at 3 (Ditko noting that Kirby was "buried under work" and needed to work fast "to keep up with the assignments Lee was throwing at him"); Thomas Decl. ¶¶ 16-17 ("I understood that Steve Ditko was performing most, if not all, of this work for Marvel"). |
| **Counterclaimant's Response** | **Counterclaimant admits that Ditko regularly submitted freelance material to Magazine Management in the Period, but notes that Ditko was regularly submitting material to other publishers, including Charlton Comics as well.** *See* Toberoff Decl. Ex. 1 at 21 (Evanier Rep. describing Ditko's common practice of selling freelance work to various publishers during the Period); Ex. 12 ¶ 18 (Evanier attesting that Ditko was submitting freelance *Spider-Man* material to Marvel but was also selling work to Charlton Comics at the same time); Ex. 23 at 160:2-8 (Mark Ditko testifying that Ditko was selling work to both Marvel and Charlton Comics in the 1960s); Ex. 35 at DITKO-0199 (Ditko writing about his work at Charlton Comics in the 1960s; Ex. 57 at 2 (Ditko writing about creating material for Charlton Comics and DC Comics); Ex. 35 at DITKO-0199 (Ditko writing about his work at Charlton Comics in the 1960s); Ex. 57 at 2 (Ditko writing about creating material for Charlton |

|  | Comics and DC Comics); Ex. 3 at 207:12-22 (Romita testifying that freelancers were free to sell work to other publishers); Ex. 9 ¶ 11 (Steranko attesting that Marvel had no contract with Steranko and so he was free to sell work to other publishers); Ex. 13 ¶¶ 5-6 (Adams attesting that he sold work to both Marvel and DC Comics during the 1960s and 1970s); Ex. 17 at 298:8-14, 301:14-303:7 (Thomas testifying that Marvel did not have contracts with freelancers prohibiting them from selling work to other publishers). |
|---|---|
| **MCI's Reply** | **This fact remains undisputed**.<br><br>Defendant admits that Ditko regularly did work for Marvel, but suggests that Ditko was also "regularly submitting material to other publishers" in the Time Period. However, he cites no admissible evidence demonstrating that most of Ditko's comic work during the Time Period was not done for Marvel. This fact is therefore undisputed. *See* Local Rule 56.1(b)-(d); *see also Parks Real Estate*, 472 F.3d at 41; *Giannullo*, 322 F.3d at 140.<br><br>MCI also **objects** to Toberoff Exhibits 1, 9, 12, 13, 23, 35, and 57. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [12], [13], [15], [32], [41], & [52]. |
| **Counterclaimant's Response to Reply** | This Statement remains **disputed**.  As to Plaintiff's continued misuse of the name "Marvel" so as to somehow attribute the independent actions of MMC to the wholly distinct Shell Companies *see* Counterclaimant's Response to Statement Nos. 2-3 & 6 incorporated herein by reference. Plaintiff's Statement No. 45 and the purported evidence it cites is also immaterial as to whether Ditko co-authored the Spiderman character, stories, and key supporting characters at the "instance and expense" of the Shell Companies—registered, represented and relied upon as the "statutory authors" of the purported "work for hire" alleged by Plaintiff, but as to which Plaintiff has adduced no admissible evidence. In this regard, Counterclaimant also incorporates by reference its Preliminary Statement, *supra*. |
| | **Statement No. 46** |
| **MCI's Statement** | Ditko performed his work for Marvel primarily under the "Marvel Method." Lens Decl., Ex. 48 at 2 (Ditko describing his working method with Stan Lee on *Amazing Adult Fantasy* in 1961); Lens Decl., Ex. 52 at 4 (Ditko writing that he "had an issue/monthly sheet"); Lens Decl., Ex. 46 at 3 (Ditko explaining that Stan Lee "create[ed]" the "Spider-Man" name and |

| | |
|---|---|
| | then wrote the original "synopsis for the artist [(i.e., Ditko)]"); Lens Decl., Ex. 2 312:1-5 ("Stan and Steve had worked in the usual way. They would get together, talk over the story. And then whatever Stan finally approved that Steve should do, Steve would go home and start drawing."); Lens Decl., Ex. 2 314:10-12 (Thomas testifying that Ditko's work with Lee was "a version of the Marvel method"); Lens Decl., Ex. 9 18:9-13 (Lieber testifying that "there was usually one story for Ditko in the books and Stan liked to write that himself, so he made it up and he worked with Ditko"); Lens Decl., Ex. 13 20:7-21:25 (Lee testifying about the Marvel Method, using Ditko as an example). |
| **Counterclaimant's Response** | **Counterclaimant disputes that Ditko submitted material under any purported Marvel "method" as Ditko was fiercely independent, rejected Lee's input, refused to make changes to his work. In fact, that is why Lee stopped communicating with Ditko for much of the Period, and when Ditko was in complete control over his stories. Moreover, Ditko originated the** *Dr. Strange* **character completely on spec, and others like Aunt May, Norman Osborn, Electro, and the Chameleon on his own years prior, and not pursuant to any trumpeted "Marvel Method."** *See* Toberoff Decl. Ex. 82 (Lee explaining in January 9, 1966 published interview: "**I don't plot Spider-Man any more. Steve Ditko, the artist, has been doing the stories.** I guess I'll leave him alone until sales start to slip. Since Spidey got so popular, Ditko thinks he's the genius of the world. We were arguing so much over plot lines I told him to start making up his own stories. **He won't let anybody else ink his drawings either. He just drops off the finished pages with notes at the margins and I fill in the dialogue. I never know what he'll come up with next**, but it's interesting to work that way.") (emphasis added); Ex. 83 at 7 (same); Ex. 7 at 223:18-225:20, 277:11-13 (Thomas testifying that Ditko did all the plotting on *Spider-Man* and *Dr. Strange* stories while he and Lee were not speaking and that Ditko never received any plots from Thomas when Thomas was doing the dialoguing on *Dr. Strange*); *id*. at 262:4-264:19 (Thomas testifying that, when Thomas began to dialogue *Dr. Strange* stories instead of Lee, Ditko would type his suggested captions and dialogue on a separate page, not in the margins, and then give them to Thomas to fill in the dialogue balloons); Ex. 71 at 159 (*Amazing Spider-Man* No. 25: "Sturdy Stevey Ditko dreamed up the plot of this tantalizing tale, and it's full of unexpected surprises!"); Ex. 72 at 225 (*Strange Tales* No. 135: "Plotted and Illustrated by Fandom's Favorite Fiend: Steve Ditko"); Ex. 17 at 311:18-312:25 (Thomas testifying that Ditko, on his own, plotted and drew *Spider-Man* for more than one year before he left in 1966, did not work pursuant to the Marvel Method, and that Lee would not even know anything about the story until it was penciled and submitted by Ditko); *id*. at 84:18-90:9 (Thomas testifying that Ditko wrote extensive |

margin notes describing the plot and what was happening so that when Lee/Thomas dialogued the story, they could do so in a way that corresponded with what Ditko had intended); Ex. 19 at 6-8 (Thomas interview explaining that Ditko and Lee were not speaking in 1965 and Ditko was plotting both *Spider-Man* and *Dr. Strange* and would only come to the office to drop work off with Brodsky); Ex. 26 at 83 (Lee writing that Ditko came up with the *Dr. Strange* plots and illustrated the story and Lee only added the dialogue); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script); Ex. 28 (Lee writing that Ditko was the co-creator of Spider-Man and that Ditko did most of the plotting of *Spider-Man* and just left Lee to do the dialogue and some captions); Ex. 14 at 7 (Evanier Rebuttal Rep. explaining Ditko's practice of refusing to make changes and in such case, Marvel's custom of having staff make such changes after the work had been submitted to and purchased by Marvel); *id*. at 11, 13 (Evanier Rebuttal Rep. explaining the custom and practice of comic book publishers to reserve the right to purchase or not purchase freelancers' submitted material, and that freelancers were free to decline to make changes to their work); Ex. 3 at 75:18-20, 243:13-244:23, 246:5-9 (Romita testifying that he, or someone else Lee could find in the Marvel office, would be asked to make changes to other artists' work after it had been submitted and would not be paid any extra for making these changes and noting specifically that when Lee did not like something on a Ditko cover, he asked Kirby to change it); Ex. 19 at 6, "Legends at Loggerheads!" (Thomas explaining example of when Lee incorrectly dialogued a *Spider-Man* story in a way Ditko had not intended, Ditko refused to accede to Lee's chosen direction); Ex. 21 at 41:7-18 (Steranko testifying that Marvel had production assistants to make changes to work after it had been submitted by artists); Ex. 35 at DITKO-0193 (Ditko writing that he ignored comments from Lee and Brodsky and only made changes to stories when he agreed with them); Ex. 35 at DITKO-0192, DITKO-0207-0210, DITKO-0215-0218 (Ditko writing that he rejected several of Lee's *Spider-Man* story ideas and characters such as, for instance, Lee's idea for a Spider-Woman character, or Lee's idea of making Aunt May more glamorous); Ex. 58 at 4 (Ditko writing that he "refused to do a drunken Iron Man splash page— someone else had to draw [and] ink it"); Ex. 25 (Ditko: "Dr. Strange has always been a contradiction to Marvel heroes … He is my creation, and at one point I took over all stories, writing, [and] art."); Ex. 26 at 83 (Lee writing that Ditko came up with the *Dr. Strange* plots and illustrated the story and Lee only added the dialogue to the balloons); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script); Ex. 35 at DITKO-0189 (Ditko writing that he left Marvel in 1966); *id*. at DITKO-0193 (Ditko writing that he and Lee stopped speaking around 1964 and

thus from then on, Ditko had complete creative control of the *Spider-Man* and *Dr. Strange* stories, which he was plotting and penciling until he left in 1966); Ex. 30 at 2021MARVEL-0050281 (Lee writing that Dr. Strange "'twas [Ditko's] idea," in a contemporaneous letter dated January 9, 1963 and noting the story was a "5-page filler"); Ex. 33 (Ditko's letter post-marked August 6, 1946 to his brother Patrick Ditko enclosing an early sketch of Dr. Strange); Ex. 59 at 61:15-65:14 (Patrick Ditko, being shown composite Ex. 33 and testifying that his brother, Steve Ditko, sent him this letter in 1946, while Ditko was in military service abroad, enclosing Ditko's early sketch of Dr. Strange (Ex. 33) and that he had found Ex. 33 at his home amongst letters he had kept from his brother); Ex. 23 at 166:5-168:8 (Mark Ditko testifying that his father lived at the address written on the letter envelope of composite Ex. 33, and that, in 1946 (postmarked on the letter envelope), his uncle Ditko was in the military, stationed abroad in Germany); Ex. 62 at 4-5 (Dr. Strange used his hands to cast teleportation and other spells in *Strange Tales* No. 139 (1965)); Ex. 63 at 2 (same in *Strange Tales* No. 126 (1964)); Ex. 70 at 8-9 (same in *Strange Tales* No. 129 (1965)); *compare* Ex. 61 at 3 (Ditko's character used his hands to cast spells in 1959 in Charlton Comics' *Space Adventures* No. 27); *see also* Ex. 66 at 10 (in *Strange Tales* No. 137 (1965), Dr. Strange used a device—the Eye of Agamotto—to transport through space and time); *compare* Ex. 65 at 4-5 (In Charlton Comics' *Out of this World* No. 7 (1958), Ditko's character used similar artifact to transport characters in a swirl of visual effects through space and time); *see also* Ex. 68 at 4-5 (in *Strange Tales* No. 122 (1964), Dr. Strange traversed through different dimensions and journeyed through alternate planes of existence); Ex. 69 at 1 (same in *Strange Tales* No. 134 (1965)); *compare* Ex. 67 at Cover, 4-5 (Ditko used same effect in Charlton Comics' *Strange Suspense* No. 32 (1957)); *see also* Ex. 73 at 6 (Norman Osborn's first appearance in the *Spider-Man* series in 1965); Ex. 74 at 10 (Norman Osborn's identity revealed to readers in *Amazing Spider-Man* No. 37 (1966)); *compare* Ex. 75 at 1-2 (Norman Osborn's precursor—including corporate villainy and distinct curled hairstyle—in 1957 in Charlton Comics' *Strange Suspense Stories* No. 33, *Director of the Board*); *see also* Ex. 60 at 2, 8 (*Amazing Fantasy* No. 15 (1962), the issue in which Spider-Man and Ditko's Aunt May character first appeared) *compare* Ex. 79, "All Those Eyes" at 1-3 (Aunt May's forerunner character appeared in Ditko's story in Charlton Comics' *Out of this World* No. 6 (1957)); *see also* Ex. 76 at 1, 4 (Ditko's Electro character in *Amazing Spider-Man* No. 9 (1964)); *compare* Ex. 77 at 1, 4-5 (Ditko's electrically powered man, the predecessor of Electro, first appeared in Charlton Comics' *Strange Suspense Stories* No. 48 (1960)); *see also* Ex. 78 at 1, 5-6, 8-9 (Ditko introduces the Chameleon—a character who used various masks to carry out his villainy—in *Amazing Spider-Man* No. 1 (1963)); *compare* Ex. 79, "All Those Eyes" at 2-3 (Chameleon precursor—a spy character who used various masks in his

| | |
|---|---|
| | espionage with a similar back story as the Chameleon—appeared in Ditko's "All Those Eyes" story he sold to Charlton Comics in 1957). |
| **MCI's Reply** | **This fact remains undisputed.**<br><br>That Ditko may have been difficult to work with proves nothing.<br><br>As explained in MCI's Reply in Support of Undisputed Fact 3, Ditko worked pursuant to the Marvel Method until sometime in 1965, at the end of the Time Period. *Compare* Lens Decl., Ex. 48 at 2 ("Stan provided the plot ideas. There would be a discussion to clear up anything, consider plot options and so forth . . . We would go over the penciled story/art pages and I would explain any deviations, changes, and additions, noting anything to be corrected before or during the inking."), *with Kirby*, 726 F.3d at 126 ("The first step was for Lee to meet with an artist at a 'plotting conference' … Lee would provide the artist with a 'brief outline' or 'synopsis' of an issue; sometimes he would 'just talk ... with the artist' about ideas …. [and t]he artist would then 'draw it any way they wanted to.'"). And here, as in *Kirby*, the fact that Ditko "had a freer hand within this framework than did comparable artists" is immaterial to whether Ditko worked at Marvel's instance and expense. *Id*.<br><br>Further, contrary to Defendant's contention, Ditko did not "originate" Doctor Strange or any other character he contributed to the Works "on spec," as explained in MCI's Reply in Support of Undisputed Facts 22 and 32. And, in any event, Defendant's contentions regarding character "creation" are immaterial, as the Second Circuit's decision in *Kirby* confirms. *See* MCI's Reply in Support of Undisputed Fact 22.<br><br>MCI also **objects** to Toberoff Exhibits 3, 14, 23, 25, 27, 33, 35, 58, 59, 61, 65, 67, 75, 77, and 79. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [8], [17], [33], [34], [35], [39], [41], [53], [54], [55], [57], [58], [59], [60], & [61]. |
| **Counterclaimant's Response to Reply** | This Statement remains **disputed**. As to Plaintiff's continued misuse of the name "Marvel" so as to somehow attribute the independent actions of MMC to the corporately distinct Shell Companies *see* Counterclaimant's Response to Statement Nos. 2-3 & 6. As to Plaintiff's mis-reliance on the so-called "Marvel Method" *see* Counterclaimant's' Response to Statement Nos. 12-14 & 46. Plaintiff's Statement No. 46 and the purported evidence it cites is **immaterial** as to whether Ditko co-authored the Spiderman character, stories, and key supporting characters at the "instance and expense" of the Shell Companies—registered, represented and relied upon |

as the statutory "authors" of the purported "work for hire" alleged by Plaintiff, but as to which Plaintiff has adduced no admissible evidence. In this regard, Counterclaimant also incorporates by reference its Preliminary Statement. **This dispositive Shell Company issue was not before the Second Circuit or adjudicated in *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119 (2d Cir. 2013).**

Defendant also **objects** to Bard Decl., Exs. 1-9; Lens Decl., Exs. 2-4, 6-10, 12-15, 17, 18, 36, 37, 39-42, 45, 48, 68A-G, 71, 75, 76, 84. *See* Defendant's Evidentiary Objection Nos. [1], [2], [3], [4], [5], [6], [7], [8], [9], [11], [12], [13], [15], [16], [17], [18], [19], [21], [22], [23], [24], [26], [27], [34], [35], [37], [38], [39], [40], [43], [44], [46], [49], [53], [54], & [60].

|  | **Statement No. 47** |
|---|---|
| **MCI's Statement** | After gaining experience working with Marvel, Marvel afforded Ditko (like Jack Kirby) more artistic discretion, subject always to Marvel's (*i.e.*, Goodman's and Lee's) ultimate authority. Lens Decl., Ex. 15 19:1-10 (Lee testifying that "there were a few artists that [he] worked with more than others," including Ditko); Lens Decl., Ex. 45 at 4 (Ditko explaining in 1965 that he was "*allowed* to drift" from his assigned scripts) (emphasis added); Lens Decl., Ex. 25 (reflecting Ditko's work for Marvel from the 1950s to 1990s); Lens Decl., Ex. 48 at 2 (Ditko explaining how *Amazing Adventures* "came about because of the 5-page twist-ending stories we [Lee and Ditko] had done as back-ups in *Strange Tales*" and others); Lens Decl., Ex. 2 307:25-308:3 (Thomas testifying that *Amazing Fantasy* was comprised of little short stories by – written by Stan Lee and drawn by Steve Ditko entirely"); Lens Decl., Ex. 4 124:3-18 (Lee testifying about his collaboration with Ditko on *Amazing Fantasy*); *see also* Lens Decl., Ex. 45 at 4 |
| **Counterclaimant's Response** | **Counterclaimant admits that Magazine Management had authority over what it would purchase and what it would publish, as does any publisher, but disputes that it had any "authority" over Ditko, as Ditko was an independent freelance artist with whom "Marvel" specifically avoided any contractual relationship.** Marvel has not produced any contemporaneous agreement with Ditko from the Period for his creative services, nor any other evidence reflecting any bilateral rights and obligations between Ditko and Magazine Management (nor any other alleged Marvel predecessor) in the Period, nor has Marvel alleged that any such agreement or bilateral legal rights and obligations existed between such parties in the Period. *See* Toberoff Decl. Ex. 17 at 298:8-14 (Thomas |

testifying that freelancers did not have contracts with Marvel until Thomas's in 1974, which was the first); Ex. 36 at 7 (Marvel admitting it had no written contract with Ditko in the 1960s); Ex. 24 at 89:2-11 (Levitz testifying that freelancers were free to decline "assignments"); Ex. 1 at 10 (Evanier Rep. describing the common practice of freelancers selling material to more than one publisher, including Marvel, DC Comics, and Charlton Comics); Ex. 3 at 207:12-22 (Romita testifying that freelancers were free to sell work to other publishers); Ex. 9 ¶ 11 (Steranko attesting that Marvel had no contract with Steranko and so he was free to sell work to other publishers); Ex. 13 ¶¶ 5-6 (Adams attesting that he sold work to both Marvel and DC Comics during the 1960s and 1970s); Ex. 23 at 160:2-8 (Mark Ditko testifying that Ditko was selling work to both Marvel and Charlton Comics in the 1960s); Ex. 35 at DITKO-0199 (Ditko writing about his work at Charlton Comics in the 1960s); Ex. 57 at 2 (Ditko writing about creating material for Charlton Comics and DC Comics); Ex. 35 at DITKO-0192, DITKO-0207-0210, DITKO-0215-0218 (Ditko writing that he rejected several of Lee's *Spider-Man* story ideas and characters such as, for instance, Lee's idea for a Spider-Woman character, or Lee's idea of making Aunt May more glamorous); Ex. 3 at 219:12-24 (Romita testifying that he turned down Lee's offer to submit material to Marvel and preferred to sell freelance work to DC Comics); Ex. 21 at 29:9-30:17 (Steranko testifying that he was not given "assignments," but rather, he had the option to work on some books or to not if he chose not to); Ex. 58 at 4 (Ditko writing that, after he stopped selling his material to Marvel in 1966, he later started working with Marvel again, but refused to do any *Spider-Man* or *Dr. Strange* stories and recounting that when other writers tried to sneak in *Spider-Man* panels for Ditko to work on, he "left [them] blank for someone else to fill in"); *id.* (Ditko writing that he "refused to do a drunken Iron Man splash page—someone else had to draw [and] ink it"); Ex. 82 (Lee explaining in January 9, 1966 published interview: "**I don't plot Spider-Man any more. Steve Ditko, the artist, has been doing the stories.** I guess I'll leave him alone until sales start to slip. Since Spidey got so popular, Ditko thinks he's the genius of the world. We were arguing so much over plot lines I told him to start making up his own stories. **He won't let anybody else ink his drawings either. He just drops off the finished pages with notes at the margins and I fill in the dialogue. I never know what he'll come up with next**, but it's interesting to work that way.") (emphasis added); Ex. 83 at 7 (same); Ex. 1 at 10 (Evanier Rep. describing the common practice of freelancers selling material to more than one publisher, including Marvel, DC Comics, and Charlton Comics); Ex. 3 at 207:12-22 (Romita testifying that freelancers were free to sell work to other publishers); Ex. 9 ¶ 11 (Steranko attesting that Marvel had no contract with Steranko and so he was free to sell work to other publishers); Ex. 13 ¶¶ 5-6 (Adams attesting that he sold work to both Marvel and DC Comics during the 1960s and 1970s); Ex. 17 at 298:8-14, 301:14-303:7 (Thomas testifying that Marvel did not have

|  | contracts with freelancers prohibiting them from selling work to other publishers); Ex. 35 at DITKO-0192, DITKO-0207-0210, DITKO-0215-0218 (Ditko writing that he rejected several of Lee's *Spider-Man* story ideas and characters such as, for instance, Lee's idea for a Spider-Woman character, or Lee's idea of making Aunt May more glamorous); Ex. 58 at 4 (Ditko writing that he "refused to do a drunken Iron Man splash page—someone else had to draw [and] ink it"); Ex. 17 at 311:18-312:25 (Thomas testifying that Ditko plotted and drew *Spider-Man* stories completely on his own for more than one year before he left in 1966); Ex. 25 (Ditko: "Dr. Strange has always been a contradiction to Marvel heroes … He is my creation, and at one point I took over all stories, writing, [and] art."); Ex. 26 at 83 (Lee writing that Ditko came up with the *Dr. Strange* plots and illustrated the story and Lee only added the dialogue [in the balloons]); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script); Ex. 71 at 159 (*Amazing Spider-Man* No. 25: "Sturdy Stevey Ditko dreamed up the plot of this tantalizing tale, and it's full of unexpected surprises!"); Ex. 72 at 225 (*Strange Tales* No. 135: "Plotted and Illustrated by Fandom's Favorite Fiend: Steve Ditko"). |
| **MCI's Reply** | **This fact remains undisputed.**<br><br>Defendant's suggestion that Marvel did not have ultimate authority over Ditko's contributions to Marvel comics because Ditko had no written employment agreement with Marvel incorrect, turns on improper legal argument, and—in any event—is immaterial, as the Second Circuit's decision in *Kirby* confirms. *See* MCI's Reply in Support of Undisputed Fact 2.<br><br>Further, the evidence demonstrates that Ditko worked pursuant to assignments fom Marvel, subject to Marvel's supervision and control, and that Ditko's contributions to the Works were made with Marvel in mind, as explained in MCI's Reply in Support of Undisputed Fact 3.<br><br>MCI also **objects** to Toberoff Exhibits 1, 3, 9, 13, 21, 23, 25, 27, 35, 57, and 58. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [7], [12], [16], [20], [32], [34], [35], [41], [52], & [53]. |
| **Counterclaimant's Response to Reply** | This Statement remains **disputed**.  Without limitation, Counterclaimant disputes that Ditko's famously fierce independence as a creator was all pursuant to MMC's direction and Lee's largesse, as argued here by Plaintiff, when, in fact, it was the reason Ditko and Lee stopped |

|  | communicating regarding Ditko's Dr. Strange and Spiderman stories. Plaintiff's reliance on Thomas's rehearsed testimony that Lee simply communicated via an MMC production manager instead is contrary to Lee's own repeated statements. *See* Evidence Supp. AMF ¶¶ 49-52. As to Plaintiff's continued misuse of the name "Marvel" to somehow attribute the actions of MMC to the corporately distinct Shell Companies *see* Counterclaimant's Response to Statement Nos. 2-3 and 6. The dispositive Shell Company issue was not before the Second Circuit or adjudicated in *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119 (2d Cir. 2013) on which Plaintiff relies.  Plaintiff's Statement No. 47 and the purported evidence it cites is **immaterial** as to whether Ditko co-authored the Spiderman character, stories, and key supporting characters at the "instance and expense" of the Shell Companies—registered, represented and relied upon as the "statutory authors" of the purported "work for hire" alleged by Plaintiff, but as to which Plaintiff has adduced no admissible evidence. In this regard, Counterclaimant also incorporates by reference its Preliminary Statement.<br><br>Defendant also **objects** to Bard Decl., Exs. 1-9; Lens Decl., Exs. 2-4, 6-10, 12, 13, 15, 17, 18, 39, 41, 42, 45, 48, 68A-G, 75, 76, 84, 89, 95. *See* Defendant's Evidentiary Objection Nos. [1], [2], [3], [4], [5], [6], [7], [8], [9], [11], [12], [13], [15], [16], [17], [18], [19], [21], [22], [24], [26], [27], [37], [39], [40], [43], [44], [46], [53], [54], [60], [65], & [69]. |
|---|---|
|  | **Statement No. 48** |
| **MCI's Statement** | During the relevant period, Marvel did not purchase any work "on spec" from Ditko or any other freelancer. Lens Decl., Ex. 2 152:1-154:7 (Thomas testifying that he could not "think of any instances" in which "artists start[ed] working on pages for a comic before discussing the plot or synopsis with Stan or the writer," or, more specifically, in which Ditko "submitted artwork to Marvel for an existing comic book series that he hadn't been assigned to," or otherwise sold plots, synopses, scripts, dialogue, artwork, or characters "on spec" to Marvel); Lens Decl., Ex. 12 56:12-15 (Thomas testifying that artists did not "start working on pages before discussing the plot or synopsis with Stan or the writer"); Lens Decl., Ex. 12 57:25-58:9 (Thomas confirming that he was not "aware of any instance where a writer came in and actually started working on a new series before Stan said: Go ahead and write the series," nor was he "aware of any instances where an artist began work on a comic book issue before getting the assignment to do the issue from Stan"); Lens Decl., Ex. 12 58:14-23 (Thomas confirming that, during the relevant period, Marvel did not "ever buy any work created on spec by freelance artists"); Lens Decl., Ex. 7 217:13-21 (same); Lens Decl., Ex. 13 41:20-42:9 (Lee testifying that |

| | |
|---|---|
| | he could not recall "Marvel ever buy[ing] work that was created by one of the writers or freelancers on spec as opposed to having the material being part of an assignment that [Lee] would give him" during the Time Period); Lens Decl., Ex. 10 383:18-21 (Lee confirming that Jack Kirby did not "ever begin work on a book published by Marvel before [Lee] had assigned him that work"); Lens Decl., Ex. 6 38:8-21 (Lee confirming that he could not "recall any comic book that Marvel published prior to 1972 . . . that was created other than pursuant to a specific assignment by an editor to a writer and an artist"—at least, in Marvel's "regular comics"). |
| **Counterclaimant's Response** | **Counterclaimant disputes that Marvel did not purchase any freelance material "on spec," as, for example, Ditko created the first Dr. Strange story "on spec" and more generally, Marvel reserved the right to reject and not pay for submitted freelance material (and not pay for redrawing) after Ditko had invested significant time and resources, and thus, by definition, Ditko created his freelance material with no contractual or financial guarantee—and thus, "on spec." Whether Ditko was paid for his pages more often than not is unknown but, in any event, irrelevant to the legal reality of the circumstances under which he created his material.** *See* Toberoff Decl. Ex. 1 at 21 (Evanier Rep. providing historical context of the first publication of Ditko's Dr. Strange character which began as a five-page story Ditko wrote and drew on spec introducing the character which he presented to Lee); Ex. 25 (Ditko: "Dr. Strange has always been a contradiction to Marvel heroes… He is my creation, and at one point I took over all stories, writing, [and] art."); Ex. 27 (Ditko writing that he created the first *Dr. Strange* story and that he plotted and penciled most of the rest of the *Dr. Strange* stories and left Lee to dialogue them from Ditko's rough script); Ex. 30 at 2021MARVEL-0050281 (Lee writing that Dr. Strange "'twas [Ditko's] idea," in a contemporaneous letter dated January 9, 1963 and noting the story was a "5-page filler"); Ex. 57 at 2 (Ditko writing that Dr. Strange started out as a "5-page filler," which was a great opportunity to try out all kinds of ideas like Dr. Strange, which "never fit in to Marvel's world of heroes"); Ex. 33 (Ditko's letter post-marked August 6, 1946 to his brother Patrick Ditko enclosing an early sketch of Dr. Strange); Ex. 59 at 61:15-65:14 (Patrick Ditko, being shown composite Ex. 33 and testifying that his brother, Steve Ditko, sent him this letter in 1946, while Ditko was in military service abroad, enclosing Ditko's early sketch of Dr. Strange (Ex. 33) and that he had found Ex. 33 at his home amongst letters he had kept from his brother); Ex. 23 at 166:5-168:8 (Mark Ditko testifying that his father lived at the address written on the letter envelope of composite Ex. 33, and that, in 1946 (postmarked on the letter envelope), his uncle Ditko was in the military, stationed abroad in Germany); Ex. 17 at 295:8-296:8, 297:1-20 (Thomas testifying that Marvel could accept or |

reject submitted freelance material in its sole discretion); Ex. 15 at 22-23
(Levitz Rep. explaining that it was the custom and practice for comic book
publishers to have the right to reject work submitted by freelancers and to
pay only for the pages which were accepted); Ex. 1 at 15 (Evanier Rep.
describing the comic book industry and Marvel's custom and practice of
not paying freelancers for material they rejected); Ex. 14 at 3, 7 (Evanier
Rebuttal Rep. explaining the custom and practice in the comic book
industry in the Period, including at Marvel, to not pay for any freelance
material rejected by the publishers); Ex. 10 ¶ 11 (Ayers attesting that was
not paid for rejected material or for having to redo material); Ex. 11 ¶ 9
(Colan attesting that Marvel only paid for the pages it accepted); Ex. 13 ¶¶
8, 10-11 (Adams attesting that he bore the risk of creation because there
was no guarantee his work would be purchased by Marvel); Ex. 16 at
117:6-121:4 (Solo testifying that Colan was not paid for rejected work and
that her father was so upset by this periodic waste of his efforts that he
would commonly use the rejected, unpaid-for pages of artwork to pick up
their family dog's feces); Ex. 20 at 73:14-74:24 (Evanier testifying that
Marvel had asked Evanier to submit some work in the 1970s prior to 1978,
for a new magazine, but that after he did the work, Marvel declined to buy
it or pay for it since it decided not to publish the magazine after all); Ex.
21 at 29:9-30:17 (Steranko testifying that Lee sometimes rejected the work
Steranko submitted on spec); Ex. 2 at 100:3-101:9 (Lieber testifying about
a time he witnessed Kirby's work being rejected and Kirby tearing up and
throwing away the rejected pages); Ex. 22 at 155:17-156:4, 259:5-16,
267:5-269:21 (Lieber testifying that he was only paid for work that was
accepted by Marvel and recalls at least one instance where he submitted a
plot which Marvel rejected and did not pay for); Ex. 24 at 14:12-19,
104:16-105:11 (Levitz testifying that Marvel had the right to reject
material and not pay for it); Ex. 43 ¶ 3(a) (Marvel's contract with Colan
dated March 22, 1975 providing that Colan would be paid only for those
pages which Marvel accepted and requiring Colan to make changes to his
work without any additional compensation); Ex. 44 ¶ 3(a) (Marvel's
contract with Thomas dated September 1, 1974 providing that Thomas
would be paid only for those pages which Marvel accepted and requiring
Thomas to make changes to his work without any additional
compensation); Ex. 53 ¶ 3(a) (Marvel's contract with Thomas dated
August 27, 1976 with same provision); Ex. 52 ¶ 3(a) (Marvel's October 7,
1977 contract with Gerber providing Gerber would be paid only for those
pages Marvel accepted and that Gerber "will make all changes and rework
all Material … without charge").

| | |
|---|---|
| **MCI's Reply** | **This fact remains undisputed.** |
| | Defendant's suggestion that Ditko created Doctor Strange "on spec" and "sold" him to Marvel is incorrect and improper legal argument. As with all freelancer's work for Marvel, Ditko's contributions to Doctor Strange were made pursuant to assignments from Lee, who directed and supervised the creation of the Works, which Ditko contributed to with Marvel in mind, and Ditko was compensated by Marvel on an agreed per-page basis for completed assignments. *See* MCI's Reply in Support of Facts 22, 32, and 49. |
| | Further, Defendant's contention that Marvel could reject or request revisions to Ditko's work demonstrates that such work was done on a work-for-hire basis—*not* "on spec." *Kirby*, 726 F.3d at 141 (holding Jack Kirby "did not work on 'spec' (speculation)" because "he worked within the scope of Marvel's assignments and titles" and Marvel "had the power to reject Kirby's pages and require him to redo them, or to alter them, a power it exercised from time to time"). |
| | Finally, Defendant's suggestion that Ditko worked on Marvel comic books "on spec" because Ditko lacked a written employment agreement is incorrect, turns on improper legal argument, and—in any event—is immaterial, as the Second Circuit's decision in *Kirby* confirms. *See* MCI's Reply in Support of Undisputed Fact 2. |
| | MCI also **objects** to Toberoff Exhibits 1, 2, 10, 11, 13, 14, 16, 20, 21, 22, 23, 25, 27, 33, 43, 44, 52, 53, 57, and 59. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [3], [13], [14], [16], [17], [18], [19], [20], [24], [25], [33], [34], [35], [39], [44], [45], [49], [50], [52], & [54]. |
| **Counterclaimant's Response to Reply** | This Statement remains **disputed**. Without limitation, Counterclaimant disputes Plaintiff's alleged definition of "on spec" as meaning an author's entirely independent creation of a work. "On spec" is short for "on speculation" as to whether one will be financially compensated for one's work. Here, as admitted by Plaintiff, MMC/Lee could reject and not pay Ditko for his work, *in their sole unfettered discretion*. As compensation for Ditko's services was not guaranteed, and Ditko had no legal recourse (just as Goodman intended) for the rejection of his work or any MMC request that it be redone, it was, by definition, speculative in any legal sense. Plaintiff's unproven argument that Ditko was ultimately paid for his completed creations, more-often-than-not, does not change the parties' legal relationship. As to Plaintiff's continued misuse of the name "Marvel" so as to somehow attribute the actions of MMC to the corporately distinct |

Shell Companies *see* Counterclaimant's Response to Statement Nos. 2-3 & 6. The dispositive Shell Company issue was not before the Second Circuit or adjudicated in *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119 (2d Cir. 2013) on which Plaintiff relies.  Plaintiff's Statement No. 46 and the purported evidence it cites is **immaterial** as to whether Ditko co-authored the Spiderman character, stories, and key supporting characters at the "instance and expense" of the Shell Companies—registered, represented and relied upon as the "statutory authors" of the purported "work for hire" alleged by Plaintiff, but as to which Plaintiff has adduced no admissible evidence. In this regard, Counterclaimant also incorporates by reference its Preliminary Statement.

Defendant also **objects** to Bard Decl., Exs. 1-9; Lens Decl., Exs. 2-4, 6-10, 12, 13, 15, 17, 18, 39, 41, 42, 45, 48, 68A-G, 75, 76, 84, 89, 95. *See* Defendant's Evidentiary Objection Nos. [1], [2], [3], [4], [5], [6], [7], [8], [9], [11], [12], [13], [15], [16], [17], [18], [19], [21], [22], [24], [26], [27], [37], [39], [40], [43], [44], [46], [53], [54], [60], [65], & [69].

|  | **Statement No. 49** |
|---|---|
| **MCI's Statement** | Marvel paid a flat, per-page rate to Ditko for his work on Marvel assignments, as it did with other freelancers. Lens Decl., Ex. 2 141:25-142:15 (Thomas testifying that freelance writers, artists, pencilers, inkers, letterers, and colorists all were paid by Marvel on a per-page rate); Lens Decl., Ex. 4 125:15-18 (Lee confirming that, to his recollection, Ditko was paid a per-page rate "for his contribution to . . . Spider-Man"); Lens Decl., Ex. 2 292:18-293:4 (Thomas explaining Marvel's per-page rate system, in that compensation "was based entirely on the page, whether it took ten minutes to write or an hour to write or five hours to write"); Lens Decl., Ex. 2 332:23-333:4 (Thomas testifying that he understood that Marvel had "always" used "a page rate kind of system for writers and for artists" during the Time Period); Lens Decl., Ex. 13 30:11-14 (Lee confirming that freelancers "were paid on a per page rate" during the Time Period); Lens Decl., Ex. 13 58:13-21 (same as to Jack Kirby); Lens Decl., Ex. 39 at 5 (Thomas recounting that the day Ditko quit Marvel, noting that Marvel production manager Sol Brodsky "had a memo on his desk for a $5 a page raise for Steve, which was fairly substantial for 1965"); Lens Decl., Ex. 57 at 3 (Ditko writing "What I did with Spider-man, I was paid for. Marvel's property."); Lens Decl., Ex. 68A-G (freelance writer Don Heck's payment ledger reflecting extensive entries on per-page basis for his work for "Mag. Management," "Maga. Management," "Magazine Management," and "Marvel" from 1954 to 1972 and intermittently until 1994, when all entries end); Lens Decl., Ex. 2 137: 8-16 (Thomas testifying that he was "paid on a per-page basis for [his] freelance writing assignments from |

| | |
|---|---|
| | Marvel"); Lens Decl., Ex. 10 396:1-10 (Lee testifying that for his work as a writer, he "was paid on a freelance basis, like any freelancer writer . . . paid by the page"); Lens Decl., Ex. 6 40:14-20 (Lee testifying that as a writer he was paid"[p]er page on a freelancer basis like all the other writers."); *see also* Lens Decl., Ex. 2 276:7-23; Lens Decl., Ex. 3 152:5-8, 152:25-153:10, 175:7, 226:7-11, 249:7-9, 258:12-17, 290:2-5, 290:18-22; Thomas Decl. ¶ 20. |
| **Counterclaimant's Response** | **Counterclaimant disputes Marvel's use of the term "assignments," and further notes that Marvel *purchased* material from Ditko.** *See* Counterclaimant's Response to Marvel's Statement 47 incorporated herein by reference. *See also* Toberoff Decl. Ex. 5 at 371:3-25 (Lee testifying that Marvel "would only buy what [it] needed"); Ex. 1 at 15 (Evanier Rep. describing the comic book industry and Marvel's custom and practice of purchasing freelance work by the page, and not paying freelancers fixed wages or for their services or time); Ex. 14 at 3 (Evanier Rebuttal Rep. explaining the custom and practice of comic book publishers in the Period, including at Marvel, to pay for only those pages they chose to accept and purchase, and to not pay for a freelancer's time or services); Ex. 8 ¶ 11 (Sinnott attesting that Marvel only paid him for the pages it accepted); Ex. 9 ¶ 14 (Steranko attesting that he was only paid for the pages Marvel accepted); Ex. 10 ¶ 11 (Ayers attesting that he was paid per page for freelance material which Marvel accepted); Ex. 13 ¶¶ 9-11 (Adams attesting that Marvel only paid him for pages which it accepted); Ex. 17 at 292:24-293:15 (Thomas testifying that freelancers were only paid for the final, accepted page); Ex. 43 ¶ 3(a) (Marvel's contract with Colan dated March 22, 1975 providing that Colan would be paid only for those pages which Marvel accepted and requiring Colan to make changes to his work without any additional compensation); Ex. 44 ¶ 3(a) (Marvel's contract with Thomas dated September 1, 1974 providing that Thomas would be paid only for those pages which Marvel accepted and requiring Thomas to make changes to his work without any additional compensation); Ex. 53 ¶ 3(a) (Marvel's contract with Thomas dated August 27, 1976 with same provision); Ex. 52 ¶ 3(a) (Marvel's October 7, 1977 contract with Gerber providing Gerber would be paid only for those pages Marvel accepted and that Gerber "will make all changes and rework all Material … without charge"). |
| **MCI's Reply** | **This fact remains undisputed**.<br><br>Defendant does not dispute that Marvel paid Ditko a flat, per-page rate for artwork it accepted. Indeed, there is **no evidence** that Marvel ever did not pay Ditko for a page. Defendant instead **disputes** that Ditko did |

| | |
|---|---|
| | "assignments" for Marvel, which is incorrect and unsupported by any evidence. As explained in MCI's Reply in Support of Undisputed Fact 3, Marvel assigned Ditko, like other freelancers, to contribute to specific Marvel comic books and could reassign him to different comics when it deemed it necessary or appropriate to do so.<br><br>Further, Defendant's semantic argument over whether Marvel "purchased" material as opposed to the contributor being "paid" for their is immaterial. *See Kirby*, 726 F.3d at 142 (noting that "Marvel and Kirby had a standing engagement whereby Kirby would produce drawings designed to fit within specific Marvel universes that his *previously purchased pages* had helped to define") (emphasis added). What matters is that Marvel paid for or "purchased" pages from Ditko that he contributed to pursuant to an assignment from Marvel, subject to Marvel's supervision and control, and with Marvel specifically in mind. *See id.* at 141 ("Kirby's works during this period were hardly self-directed projects in which he hoped Marvel, as one of several potential publishers, might have an interest; rather, he created the relevant works pursuant to Marvel's assignment or with Marvel specifically in mind. Kirby's ongoing partnership with Marvel, however unbalanced and under-remunerative to the artist, is therefore what induced Kirby's creation of the works.").<br><br>MCI also **objects** to Toberoff Exhibits 1, 8, 9, 10, 13, 14, 43, 44, 52, and 53. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [11], [12], [13], [16], [17], [44], [45], [49], & [50]. |
| **Counterclaimant's Response to Reply** | This Statement remains **disputed**. Without limitation, the discretionary purchase of Ditko's pages by MMC, after creation, and Ditko's express or implied assignment of his copyright therein upon his acceptance of such purchase is by no means semantical. It is the antithesis of "work-made-for-hire"—owned at inception by the putative employer. *See Est. of Burne Hogarth, supra,* 342 F.3d at 162. As to Plaintiff's continued misuse of the name "Marvel" so as to somehow attribute the actions of MMC to the corporately distinct Shell Companies *see* Counterclaimant's Response to Statement Nos. 2-3 & 6. The dispositive Shell Company issue was not before the Second Circuit or adjudicated in *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119 (2d Cir. 2013) on which Plaintiff relies. Plaintiff's Statement No. 46 and the purported evidence it cites is immaterial as to whether Ditko co-authored the Spiderman character, stories, and key supporting characters at the "instance and expense" of the Shell Companies—registered, represented and relied upon as the statutory "authors" of the purported "work for hire" alleged by Plaintiff, but as to |

133

<table>
<tr><td></td><td>which Plaintiff has adduced no admissible evidence. In this regard, Counterclaimant also incorporates by reference its Preliminary Statement.

Defendant also **objects** to Bard Decl., Exs. 1-9; Lens Decl., Exs. 2-4, 6-10, 12, 13, 15, 17, 18, 39, 41, 42, 45, 48, 68A-G, 75, 76, 84. *See* Defendant's Evidentiary Objection Nos. [1], [2], [3], [4], [5], [6], [7], [8], [9], [11], [12], [13], [15], [16], [17], [18], [19], [21], [22], [24], [26], [27], [37], [39], [40], [43], [44], [46], [53], [54], & [60].</td></tr>
<tr><td colspan="2" align="center">**Statement No. 50**</td></tr>
<tr><td>**MCI's Statement**</td><td>Marvel paid Ditko, like other freelancers, his per-page rate for his work even if Marvel required changes or did not ultimately publish the pages. Lens Decl., Ex. 2 142:21-143:15 (Thomas testifying that Marvel paid "a flat rate" and "didn't generally pay extra for revisions."); Lens Decl., Ex. 2 158:17-20 (Thomas testifying that he recalled "a few instances" where "Marvel paid an artist their per-page rate for their artwork but decided not to publish it"); Lens Decl., Ex. 2 297:14-20 (Thomas testifying that Marvel would pay out its per-page rates "if a new page came in that they accepted"); Lens Decl., Ex. 12 68:24-69:6 (Thomas testifying that "if an artist's work required that changes be made, [] the artist have been paid for the original work that they submitted"); Lens Decl., Ex. 12 74:19-25 (Thomas testifying that he was still paid for "any materials that [he] submitted in [his] freelance capacity that were modified by Stan"); Lens Decl., Ex. 13 18:6-16 (Lee testifying that "[e]ven if we didn't publish – if an artist drew a 10-page story, and the artist rate was $20 a page, I would put in a voucher for $200 for that artist. Now, if – and this happened rarely – but if we decided not to use that story, the artist would still keep the money because he had done the work. It wasn't his fault . . . Everybody was paid per page."); Lens Decl., Ex. 10 376:16-22 (Lee testifying that "[a]ny artists that drew anything that I had asked him or her to draw at my behest, I paid them for it. If it wasn't good, we wouldn't use it. But I asked them to draw it, so I did pay them."); Lens Decl., Ex. 9 30:10-12 (Lieber testifying that he "g[o]t paid for all the work [he] did for Marvel"); Lens Decl., Ex. 68A-G (reflecting number of pages and payment amount for work on various Marvel series); *compare* Lens Decl., Ex. 35 at 9 (Thomas noting that Gil Kane was assigned to and did pencil and ink the cover of *Avengers* #37), *with* Lens Decl., Ex. 68D at 10 (reflecting payment to Don Heck for "Avengers #37 P&I cover"); Lens Decl., Ex. 35 at 12 ("*The Avengers* #37 unused cover art by Don Heck").</td></tr>
</table>

| | |
|---|---|
| **Counterclaimant's Response** | **Counterclaimant admits that Magazine Management would only pay for the final page of submitted freelance material it decided to purchase, and that it would not pay for any requested changes or do-overs and would not pay for pages it rejected. There may be instances where Magazine Management accepted and purchased freelance pages for publication but thereafter decided not to publish those pages, but the publisher was crystal clear that it would not pay for material it rejected or for material it wanted to be redone, all in its sole discretion.** *See* Toberoff Decl. Ex. 5 at 371:3-25 (Lee testifying that Marvel "would only buy what [it] needed"); Ex. 15 at 22-23 (Levitz Rep. explaining that it was the custom and practice for comic book publishers to have the right to reject work submitted by freelancers and to pay only for the pages which were accepted); Ex. 1 at 15 (Evanier Rep. describing the comic book industry and Marvel's custom and practice of purchasing freelance work by the page, and not paying freelancers fixed wages or for their services or time); Ex. 14 at 3 (Evanier Rebuttal Rep. explaining the custom and practice of comic book publishers in the Period, including at Marvel, to pay for only those pages they chose to accept and purchase, and to not pay for a freelancer's time or services); Ex. 8 ¶ 11 (Sinnott attesting that Marvel only paid him for the pages it accepted); Ex. 9 ¶ 14 (Steranko attesting that he was only paid for the pages Marvel accepted); Ex. 10 ¶ 11 (Ayers attesting that he was paid per page for freelance material which Marvel accepted); Ex. 13 ¶¶ 9-11 (Adams attesting that Marvel only paid him for pages which it accepted); Ex. 17 at 292:24-293:15 (Thomas testifying that freelancers were only paid for the final, accepted page); Ex. 43 ¶ 3(a) (Marvel's contract with Colan dated March 22, 1975 providing that Colan would be paid only for those pages which Marvel accepted and requiring Colan to make changes to his work without any additional compensation); Ex. 44 ¶ 3(a) (Marvel's contract with Thomas dated September 1, 1974 providing that Thomas would be paid only for those pages which Marvel accepted and requiring Thomas to make changes to his work without any additional compensation); Ex. 53 ¶ 3(a) (Marvel's contract with Thomas dated August 27, 1976 with same provision); Ex. 52 ¶ 3(a) (Marvel's October 7, 1977 contract with Gerber providing Gerber would be paid only for those pages Marvel accepted and that Gerber "will make all changes and rework all Material … without charge"); Ex. 1 at 15 (Evanier Rep. describing the comic book industry and Marvel's custom and practice of not paying freelancers for material they rejected); Ex. 14 at 3, 7 (Evanier Rebuttal Rep. explaining the custom and practice in the Period, including at Marvel, to not pay for any freelance material rejected by the publishers); Ex. 2 at 100:3-101:9 (Lieber testifying about a time he witnessed Kirby's work being rejected and Kirby tearing up and throwing away the rejected pages); Ex. 10 ¶ 11 (Ayers attesting that was not paid for rejected material or for having to redo material); Ex. 11 ¶ 9 (Colan attesting that Marvel only paid for the |

pages it accepted); Ex. 13 ¶¶ 8, 10-11 (Adams attesting that he bore the risk of creation because there was no guarantee his work would be purchased by Marvel); Ex. 16 at 117:6-121:4 (Solo testifying that Colan was not paid for rejected work and that her father was so upset by this periodic waste of his efforts that he would commonly use the rejected, unpaid-for pages of artwork to pick up their family dog's feces); Ex. 17 at 295:8-296:8, 297:1-20 (Thomas testifying that Marvel could accept or reject submitted freelance material in its sole discretion); Ex. 20 at 73:14-74:24 (Evanier testifying that Marvel had asked Evanier to submit some work in the 1970s prior to 1978, for a new magazine, but that after he did the work, Marvel declined to buy it or pay for it since it decided not to publish the magazine after all); Ex. 21 at 29:9-30:17 (Steranko testifying that Lee sometimes rejected the work Steranko submitted on spec); Ex. 22 at 155:17-156:4, 259:5-16, 267:5-269:21 (Lieber testifying that he was only paid for work that was accepted by Marvel and recalls at least one instance where he submitted a plot which Marvel rejected and did not pay for); Ex. 24 at 14:12-19, 104:16-105:11 (Levitz testifying that Marvel had the right to reject material and not pay for it); Ex. 43 ¶ 3(a) (Marvel's contract with Colan dated March 22, 1975 providing that Colan would be paid only for those pages which Marvel accepted and requiring Colan to make changes to his work without any additional compensation); Ex. 44 ¶ 3(a) (Marvel's contract with Thomas dated September 1, 1974 providing that Thomas would be paid only for those pages which Marvel accepted and requiring Thomas to make changes to his work without any additional compensation); Ex. 53 ¶ 3(a) (Marvel's contract with Thomas dated August 27, 1976 with same provision); Ex. 52 ¶ 3(a) (Marvel's October 7, 1977 contract with Gerber providing Gerber would be paid only for those pages Marvel accepted and that Gerber "will make all changes and rework all Material … without charge"); Ex. 1 at 15 (Evanier Rep. describing the comic book industry and Marvel's custom and practice of not paying freelancers to revise or redraw a page, as freelancers were only paid for the final pages the publisher decided to accept and purchase); Ex. 14 at 7 (Evanier Rebuttal Rep. explaining the custom and practice in the comic book industry, including at Marvel, for publishers to not pay for rejected material, or to pay a freelancer to make revisions to his material); Ex. 2 at 102:15-105:17 (Lieber testifying he was not paid for redoing work and that he was only paid for the final pages Marvel accepted); Ex. 8 ¶ 13 (Sinnott attesting that Marvel only paid for the final pages that were sold to Marvel, not for any changes or rejected work); Ex. 9 ¶ 14 (Steranko attesting he was not compensated for having to redo any work); Ex. 10 ¶ 11 (Ayers attesting that he was not paid for rejected material or for having to redo material); Ex. 11 ¶¶ 9, 11 (Colan attesting that Marvel did not pay him for redoing work); Ex. 13 ¶¶ 10-11 (Adams attesting that he was only paid for pages Marvel accepted); Ex. 17 at 142:21-143:15, 296:10-25 (Thomas

| | |
|---|---|
| | testifying that freelancers were not paid for having to redo or revise pages and that they would only be paid for the final, accepted page). |
| **MCI's Reply** | **This fact remains undisputed.**<br><br>Defendant admits that Marvel would pay Ditko and other freelancers their per-page rate for all accepted work, even if Marvel elected not to publish it, but Defendant's arguments about revisions and rejections are non-responsive and incorrect. While it is true that Marvel would not pay artists *twice* for a page that it requested revisions to, once the page met Marvel's specifications and was accepted the artist was paid his per-page rate. Defendant also vaguely refers to alleged instances where Marvel "rejected" pages, but it is not clear what Defendant means. Defendant appears to be referring to a situation where Marvel assigned work to a freelancer but due to it being in an unmarketable condition (*i.e.*, failing to conform to the assignment), Marvel refused to accept and therefore refused to pay for it. While such a scenario may have happened in rare instances at Marvel, there is **no evidence** of that happening to *any* of Ditko's work for Marvel. And according to former editor-in-chief Roy Thomas, it would be extremely unlikely for Marvel to outright reject pages from a veteran artist like Ditko. *See* Lens Reply Decl., Ex. 101 at 108:17-109:14 (Thomas testifying about fellow Marvel veteran artist Gene Colan, explaining "[b]y the time [freelancers] got to the status that Gene was at, you know, you knew their work, and . . . you basically knew what you were going to get from Gene, except for an occasional drawing or an occasional page . . . I have no memory of ever, you know, rejecting or trying to get Stan to reject, you know, a page of his.").<br><br>MCI also **objects** to Toberoff Exhibits 1, 2, 8, 9, 10, 13, 14, 20, 21, 22, 43, 44, 52, and 53. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [3], [4], [11], [12], [13], [16], [17], [19], [20], [24], [25], [44], [45], [49], & [50]. |
| **Counterclaimant's Response to Reply** | This Statement remains **disputed**. Without limitation, Goodman/MMC intentionally did not hire Ditko or guarantee him compensation for his creative services to limit Goodman/MMC's overhead and financial exposure. Instead, by design, MMC/Lee were free, in their sole discretion to buy or reject Ditko submissions, subsequent to his creation of the work. MMC/Lee's insistence on changes as *a condition to its purchase* of submitted material is merely an extension of this, and of its purchasing power. As a practical and legal matter this naturally extended to even conforming work and services by Ditko, as that would purely be a matter of Lee's subjective opinion, unfettered by any enforceable engagement |

agreement, employment obligations or guidelines. The frequency with which MMC rejected and did not pay for Ditko's submissions or redoing of his work is largely immaterial to the legal implications of the above. Plaintiff's argument that this was all inconsequential is further undercut by the fact that Goodman/MMC repeatedly insisted on it. *See e.g.*, Toberoff Decl., Ex. 43 ¶ 3(a) (contract with freelance artist Gene Colan providing that Colan would be paid only for those pages that were accepted and requiring Colan to make changes to his work without any additional compensation); Ex. 44 ¶ 3(a) (same provision in contract with freelancer Steve Gerber); Ex. 53 ¶ 3(a) (same provision in subsequent contract with Thomas for freelance writing).

As to Plaintiff's continued misuse of the name "Marvel" to somehow attribute the actions of MMC to the corporately distinct Shell Companies *see* Counterclaimant's Response to Statement Nos. 2-3 & 6. The dispositive Shell Company issue was not before the Second Circuit or adjudicated in *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119 (2d Cir. 2013) on which Plaintiff repeatedly relies. Plaintiff's Statement No. 46 and the purported evidence it cites is also **immaterial** as to whether Ditko co-authored the Spiderman character, stories, and key supporting characters at the "instance and expense" of the Shell Companies— registered, represented and relied upon as the statutory "authors" of the purported "work for hire" alleged by Plaintiff, but as to which Plaintiff has adduced no admissible evidence. In this regard, Counterclaimant also incorporates by reference its Preliminary Statement.

Defendant also **objects** to Lens Reply Decl., Ex. 101. *See* Defendant's Evidentiary Objection No. [75].

|  | **Statement No. 51** |
|---|---|
| **MCI's Statement** | As with other freelancers, Marvel did not pay royalties or provide profit participation to Ditko. Lens Decl., Ex. 2 139:24-140:20 (Thomas testifying that he did not "receive royalties" or "profit participati[on]" for his Marvel work in the 1960s and 1970s); Lens Decl., Ex. 2 142:16-20 (Thomas testifying that he "was not aware" of any 1960s Marvel freelancers "receiving royalties or profit participation"); Lens Decl., Ex. 7 225:17-226:20 (Thomas testifying that he was "typically paid before the issue hit the stands" and he and other Marvel freelancers were paid "the same page rate regardless of whether the issue they worked on ultimately sold well or not" as Marvel had a "straight page rate system"); Lens Decl., Ex. 13 42:21-43:2 (Lee testifying that Marvel freelance artists "g[o]t paid whether or not a particular book or comic was successful" as "[t]hey were paid when they delivered the artwork"); Lens Decl., Ex. 13 45:4-9 (Lee testifying that he "d[id]'t remember any royalties"); Lens Decl., Ex. 6 |

| | |
|---|---|
| | 34:22-35:7 (Lee testifying that "[i]t wasn't [Marvel's] policy" and he "can't think of any case" where any compensation was "dependent on the success of the sales of the comic book"). |
| **Counterclaimant's Response** | **Counterclaimant admits that Marvel did not pay royalties or profit participation to Ditko, but disputes that Marvel did not owe Ditko payment for reprints or use of his creations in other media, which is part of the reason Ditko refused to sell any further work to Marvel at the end of the Period.** *See* Toberoff Decl. Ex. 3 at 44:22-46:12 (Romita testifying that Ditko quit *Spider-Man* because he had personal and professional conflicts with Lee); Ex. 20 at 57:13-59:3 (Evanier testifying that Ditko told him he had been promised by Marvel management additional compensation if his characters were used in other media); Ex. 24 at 124:5-24 (Levitz testifying that Ditko and Lee stopped speaking in the last year of Ditko's time with Marvel because Ditko was not getting proper credit for his contributions). |
| **MCI's Reply** | **Defendant admits this fact is undisputed, and only "disputes" extraneous facts, which is improper.** |
| | Defendant admits this fact, as framed by MCI, and it is therefore undisputed. *See* Local Rule 56.1(b)-(d); *see also Parks Real Estate*, 472 F.3d at 41; *Giannullo*, 322 F.3d at 140. |
| | Regardless, Defendant's suggestion that Marvel somehow "owe[d] Ditko payment for reprints" and use of his contributions "in other media" is not only non-responsive but also unsupported by any admissible evidence. Specifically, Toberoff Exhibits 3 and 24 **do not support** this contention, as each proffers a *different* reason for why Ditko left: Toberoff Exhibit 3 suggests that Ditko left due to personal and political differences between Lee and Ditko, and Toberoff Exhibit 24 suggests that Ditko left due to "discomfort between the two on their working process and the allocation of credit work." |
| | MCI also **objects** to Toberoff Exhibits 3 and 20. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [5] & [19]. |
| **Counterclaimant's Response to Reply** | This Statement's intended implications and use by Plaintiff remains **disputed**. The obvious rationale for compensation by a "sum certain" to support and conversely for a "royalty" to not support "work for hire," is that the former is *guaranteed*, whereas the latter is *contingent* in nature. |

| | |
|---|---|
| | *See Martha Graham*, 380 F.3d at 641; *see generally* Opp'n to Mot. Summ. J. (Dkt. 88) at 44-45. Here, even though MMC established a per-page *rate*, whether MMC, *in its sole discretion*, ultimately accepted and paid for a Ditko submission (subsequent to creation) or rejected his pages (or rejected and wanted his pages redrawn as a condition to purchase) was, at MMC's insistence and by definition, ***contingent***. As to Plaintiff's continued misuse of the name "Marvel" to somehow attribute the actions of MMC to the corporately distinct Shell Companies *see* Counterclaimant's Response to Statement Nos. 2-3 and 6. Plaintiff's Statement No. 46 and the purported evidence it cites is **immaterial** as to whether Ditko co-authored the Spiderman character, stories, and key supporting characters at the "instance and expense" of the Shell Companies—registered, represented and relied upon as the statutory "authors" of the purported "work for hire" alleged by Plaintiff, but as to which Plaintiff has adduced no admissible evidence. In this regard, Counterclaimant also incorporates by reference its Preliminary Statement. |
| | **Statement No. 52** |
| **MCI's Statement** | If a comic book did not sell well or lost money, Marvel (*i.e.*, Goodman) would ultimately bear the loss, not Ditko or other freelancers. Lens Decl., Ex. 2 140:21-141:3 (Thomas confirming that he was paid his same "per page" rate "whether the comic was a hit or a flop" and that "if a comic that [he] worked on lost money from Marvel, Marvel didn't take that out of [his] paychecks"); Lens Decl., Ex. 57 at 4 (Ditko acknowledging that "[p]ublishing comic book titles is a risky, competitive business and with monthly titles and with no guarantees"); Lens Decl., Ex. 13 43:3-44:2 (Lee explaining publisher Martin Goodman's perspective that he had "no guarantee" that Marvel's comic books would sell, faced months-long stretches in which he was "losing money where the books don't sell" but would not "cut [artists'] rate," and was the one "taking all the risk"); *see also* Lens Decl., Ex. 54 at 3; Lens Decl., Ex. 13 58:13-21; Lens Decl., Ex. 6 33:16-34:1; Lens Decl., Ex. 7 178:15-23, 224:24-225:15; Lens Decl., Ex. 4 129:24-130:4; Lens Decl., Ex. 3 155:12-23, 226:12-15; Lens Decl., Ex. 79 at 4. |
| **Counterclaimant's Response** | **Counterclaimant disputes that if a book did not sell well, Ditko would not bear any loss, because, if a book were discontinued by Marvel, it would not purchase any more stories from Ditko for such discontinued book, and therefore, Ditko too bore the risk that a book might not sell well. Counterclaimant further disputes the relevance of this statement to the legal issues in this case as any publisher bears the risk that the works it published might not sell well.** *See* |

| | |
|---|---|
| | Counterclaimant's Response to Marvel's Statement 50, *supra*, incorporated herein by reference. *See also* Toberoff Decl. Ex. 20 at 73:14-74:24 (Evanier testifying that Marvel had asked Evanier to submit some work in the 1970s prior to 1978, for a new magazine, but that after he did the work, Marvel declined to buy it or pay for it since it decided not to publish the magazine after all). |
| **MCI's Reply** | **This fact remains undisputed**.<br><br>Defendant does not dispute that if a comic book did not sell well or lost money, Marvel, like "any publisher," would bear the risk of loss associated with the work's publication. Defendant contends, however, that Ditko would also bear a loss in the sense that if Marvel discontinued a comic book, Ditko would no longer have the ability to make money contributing to it. But Ditko was paid for his contributions regardless of how well they sold, and thus he had no risk of *out of pocket losses.* Marvel, as publisher, on the other hand, had to shoulder the risk of all the overhead expenses associated with publishing and distributing its comic books with no guarantee they would sell. *See Kirby*, 726 F.3d at 143 ("[T]he record suggests that both parties took on risks with respect to the works' success—Kirby that he might occasionally not be paid for the labor and materials for certain pages, and Marvel that the pages it did pay for might not result in a successful comic book. But we think that Marvel's payment of a flat rate and its contribution of both creative and production value, in light of the parties' relationship as a whole, is enough to satisfy the expense requirement."). And, if anything, Defendant's contention that Ditko had an interest in Marvel's comic books doing well evidences that Ditko had a close and continuous relationship with Marvel and that their "ongoing partnership … is therefore what induced [Ditko's] creation of the works." *Kirby*, 726 F.3d at 141.<br><br>Further, Defendant cites no admissible evidence to support this contention. Toberoff Ex. 50 **does not support** Defendant's contention, as it relates to a wholly distinct situation, involving a speculative publication (not existing comics like those at issue here).<br><br>MCI also **objects** to the evidence cited in support of this contention. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection No. [19]. |
| **Counterclaimant's Response to Reply** | This Statement's intended implications and use by Plaintiff remains **disputed**. The "expense" prong focuses on who bore the financial risk associated with Ditko's creation of his work at issue, not Marvel's subsequent production, publishing and/or marketing of the comic books |

containing Ditko's work.  *See* Nimmer § 5.03[B][2][d] at n.171 ("Plainly, it is the expense of creation, rather than publication, that is relevant."). That is a risk all publishers bear, regardless of whether a work was purchased and assigned or "work for hire." *Id*. ("[I]f funding publication could convert a manuscript into a work for hire, then the category would soon subsume all published material—given the universal custom of publishers to fund printing, distribution, advertising, etc. of their wares."). It is undisputed that (i) MMC did not advance Ditko any money to cover his work; (ii) Ditko rented his own art studio, paid the associated overhead (maintenance, utilities), paid for his own materials (paper, ink) and instrumentalities (pens, pencils, brushes, erasers, drafting tables, lights, magnifiers) used to create his artwork; and (iii) MMC neither reimbursed nor was obligated to reimburse these expenses. *See* Counterclaimant's AMF ¶¶ 34-37, 41-42. *See* Pls. Resp. to AMF, ¶ 34 (Plaintiff *admits* that "[u]nlike most freelancers in the Period who worked from home, Ditko worked out of a separate art studio he rented at his expense); ¶ 35 (Plaintiff *admits* that Ditkoo also paid for all his own materials and instruments, including paper, pencils, erasers, brushes and ink."). See *Urbont*, 831 F.3d at 90 (finding that artist's provisions of "his own tools and resources in[] a recording studio he rented … supports an inference that [he] b[ore] the risk with respect to the work's success.") (quotation marks and citations omitted). It is further undisputed that *after* Ditko created his artwork, MMC had no legal obligation to accept it for publication, could reject any of it at will, and in that event, *Ditko* bore the loss of his labor and expenses. AMF ¶¶ 43-44. Whether Marvel did this often or seldom is immaterial to its legal effect. Plaintiff now portrays itself as the "hiring party," but in the Period, when it counted, Marvel specifically avoided the financial obligations, overhead and *risk* that "hiring" entails. *Id*. ¶ 8, 13, 35-37, 41-43, 45, 59, 63.

As to Plaintiff's continued misuse of the name "Marvel" so as to somehow attribute the actions of MMC to the corporately distinct Shell Companies *see* Counterclaimant's Response to Statement Nos. 2-3 and 6. Plaintiff's Statement No. 52 and the purported evidence it cites is also **immaterial** as to whether Ditko created his works at the "instance and expense" of the Shell Companies—registered, represented and relied upon as the "statutory authors" of the purported "work for hire" alleged by Plaintiff, but as to which Plaintiff has adduced no admissible evidence. In this regard, Counterclaimant also incorporates by reference its Preliminary Statement.

| | |
|---|---|
| | <u>**Statement No. 53**</u> |
| **MCI's Statement** | Ditko, like other freelancers, confirmed his understanding that he worked for Marvel on a work-made-for-hire basis. Lens Decl., Ex. 23A at 2 |

| | |
|---|---|
| | (agreement between Marvel and Ditko whereby Ditko "acknowledges, agrees and confirms that any and all work, writing, art work material or services (the 'Work') which have been or are in the future created, prepared or performed by [him] for the Marvel Comics Group have been and will be specially ordered or commissioned for use as a contribution to a collective work and that as such Work was and is expressly agreed to be considered a work made for hire."); Lens Decl., Ex. 64 at 9 (Defendant acknowledging the above agreement); Lens Decl., Ex. 2 40:24-41:8 (Thomas testifying that "I understood when I came into the company that Marvel . . . would own the characters, the stories, the writing, whatever I was doing, and that was also made clear by the statement on the back of the check from the earliest days"); Lens Decl., Ex. 2 48:11-49:4 (Thomas testifying that he "didn't like creating many characters for Marvel, because [he] knew [he] wouldn't own them"); Lens Decl., Ex. 2 60:19-61:6 (Thomas agreeing that, "for the entire tenure that [he] worked with Marvel," he understood "that Marvel would have all of the rights, including copyrights and anything that [he] worked on at Marvel"); Lens Decl., Ex. 13 at 26:22-28:6 (Lee testifying that "it was typical in the industry for comic book publishers to own the rights to the materials that were created for them for publication" during the Time Period); Lens Decl., Ex. 13 at 100:25-101:17 (Lee testifying that he "always felt the company" owned the characters he created or co-created); Lens Decl., Ex. 20 at 2 (Marvel artist Gene Colan writing that "[p]ages were stamped on the back 'work for hire' . . . In the narrow field of comic art, one either worked 'for hire' or didn't work!"); Lens Decl., Ex. 19 at 2 (agreement between Marvel and Colan that his contributions to Marvel's comic books "were created as works made for hire"); Lens Decl., Ex. 23A-E (documentation reflecting hundreds of freelancers' "express[] agree[ment]" that their work would "be considered a work made for hire."); Lens Decl., Ex. 7 355:18-23 (Thomas testifying that the popularization of "the term 'work-for-hire'" in the mid-1970s only formalized "the same general situation that had already existed"). |
| **Counterclaimant's Response** | **Counterclaimant disputes that Ditko "confirmed his understanding that he worked for Marvel on a work-made-for-hire basis," as Marvel required him to sign a self-serving retroactive work-for-hire release, e.g., identical to the one signed by Randy Schueller, who created a black costumed Spider-Man completely "on spec." This retroactive "work for hire" whitewash was a common practice at Marvel in the years after the 1976 Copyright Act took effect and only serves to underscore its pervasive insecurity as to this issue and revisionist practices since that time. Such Marvel incantations have been specifically held to be unenforceable by the Second Circuit, particularly in the copyright termination context. *See Marvel*** |

***Characters, Inc. v. Simon*, 310 F.3d 280, 292 (2d Cir. 2002) ("[W]e hold that an agreement made subsequent to a work's creation which retroactively deems it a 'work for hire' constitutes an [unenforceable] 'agreement to the contrary' under § 304(c)(5) of the 1976 Act. "). Much of Marvel's cited "evidence" also concerns "ownership," not authorship and is therefore consistent with ownership via the purchase and assignment of freelance material (Magazine Management's simple business practice in the Period) and not "work for hire."** *See* Toberoff Decl. Ex. 1 at 17 (Evanier Rep. describing Marvel's practice of running competitions to discover new, aspiring artist and writers); Ex. 34 at 1 (Randy Schueller ("Schueller") interview explaining that Marvel ran a competition for aspiring writers and artists in the early 1980s); Ex. 1 at 17 (Evanier Rep. describing Schueller's unique Spider-Man submission and his amateur status); Ex. 31 at 2 (Walter Durajlija ("Durajlija") writing that young fan Schueller won an ideas contest Marvel was having in 1982 with his idea for a black Spider-Man costume); *id*. at 2 (Durajlija writing that Marvel editor Shooter liked the costume idea and bought it from Schueller for $220); Ex. 34 at 2 (Schueller interview explaining that he came up with, and submitted to Marvel, a story featuring a black-costume Spider-Man); *id*. at 2 (Schueller interview explaining that, a few months after he submitted his black-costume *Spider-Man* story, Shooter wrote to him offering to buy it for $220); Ex. 17 at 59:2-10 (Thomas testifying that Jim Shooter was editor-in-chief at Marvel in the 1980s); Ex. 32 (Shooter letter dated August 3, 1982 offering to buy Schueller's black-costume *Spider-Man* story submission for $220 and telling Schueller to sign the attached "Work-made-for-hire Agreement"); Ex. 37 at 2021MARVEL-0054634-005636 (sample 1979-1980 artwork releases retroactively claiming the returned artwork was done by Marv Wolfman as an "employee-for-hire"); Ex. 38 (retroactive work-for-hire agreement signed by Schueller dated August 9, 1982); Ex. 1 at 17 (Evanier Rep. identifying Schueller's August 9, 1982 contract as being the same as those Marvel forced freelancers to sign in the late 1970s); Ex. 39 (retroactive work-for-hire contract dated January 26, 1979 allegedly signed by Ditko); Ex. 48 at (Certificate of Registration of a Claim for Copyright dated August 31, 1964 for *Amazing Spider-Man Annual* Vol. 1, No. 1 filed by Magazine Management and identifying Lee as the "Author" and Non-Pareil as the "Copyright Claimant." Compared to the Certificate of Renewal Registration for *Amazing Spider-Man Annual* Vol. 1, No. 1 filed by Cadence's purported successor, Marvel Entertainment Group, dated December 15, 1992 and now claiming Lee as an "Employee for Hire of Non-Pareil").

| | |
|---|---|
| **MCI's Reply** | **This fact remains undisputed.**<br><br>Defendant's contention that "Marvel required [Ditko] to sign a self-serving retroactive work-for-hire release" is entirely unsupported by any evidence. Because Defendant cites no evidence disputing that Ditko, in fact, signed Exhibit 23A, this fact is undisputed.<br><br>Further, Defendant's characterization of the agreement as "retroactive … whitewash[ing]" is incorrect and again unsupported by any evidence. The agreement merely affirmed, in the precise nomenclature of the 1976 Copyright Act, what was already understood, *i.e.* that his work for Marvel was done on a work for hire basis.<br><br>Further, Defendant's analogy to the work for hire status of another freelancer, Randy Schueller, is inaccurate. As an initial matter, Defendant ignores that Marvel's editor Jim Shooter told Schueller he "want[ed] changes made" and that he would "fill [Schueller] in on [the changes] after [he] return[ed] the work-made-for-hire form." *See* Toberoff Ex. 32. In other words, Defendant's suggestion that Schueller's contributions were *not* made on a work-for-hire basis is unsupported by the evidence. (Nor did Schueller attempt to terminate any supposed grant of copyright to Marvel, and his window to do so has now closed, further suggesting that Schueller believed he worked for hire.)<br><br>In any event, that event significantly post-dates the relevant time period, and implicates different copyright laws, and is therefore immaterial. *See Kirby*, 777 F. Supp. 2d at 748 (rejecting evidence from outside "the relevant time period" as "not admissible evidence of anything").<br><br>MCI also **objects** to Toberoff Exhibits 1, 31, 32, 34, 37, and 38. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [37], [38], [40], [42], & [43]. |
| **Counterclaimant's Response to Reply** | This Statement remains **disputed**. Plaintiff improperly relies on purported legal conclusions regarding "work for hire" by lay witnesses. It is further well-known that long after the Period, after Goodman had sold his comic-book business in 1968 to a publicly-traded company, Perfect Film & Chemical Corp. (renamed Cadence Industries) and after the 1976 Copyright Act had been enacted with new, specific "work for hire" definitions, Plaintiff's predecessor insisted that freelance artists, including Ditko, sign self-serving and purportedly retroactive statements that everything they had created previously or created in the future was "work for hire" as a pre-condition to (a) the return of their physical "artwork" (so they might supplement their meager income by selling autographed pages) |

and/or (b) the publication of any of their new material. Aside from obvious contractual issues (e.g., pertaining to coercion and/or adhesion contracts), the Second Circuit has specifically held such purportedly retroactive "work for hire" provisions to be void, and of no force or effect in the statutory termination context. *See Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 292 (2d Cir. 2002) (as to a "work for hire" acknowledgement in Marvel settlement agreement with the co-creator of Captain America: "we hold that an agreement made subsequent to a work's creation which retroactively deems it a 'work for hire' constitutes an [unenforceable] 'agreement to the contrary' under § 304(c)(5) [termination provision] of the 1976 Act.").

Plaintiff's rationalization that these purportedly retroactive revisionist statements "merely affirmed, in the precise nomenclature of the 1976 Copyright Act, what was already understood" makes no sense because the 1976 Act did not apply to works created prior to January 1, 1978, including the relevant works Ditko's created in the 1962-65 Period, governed by the 1909 Copyright Act.  Plaintiff's emphasis on what Ditko and MMC "understood" and intended in the Period is belied by (i) for nearly six decades prior to 1966, *including in the Period*, "work for hire" under the 1909 Act exclusively applied to traditional hierarchical employment not to work by independent contractors like Ditko; (ii) there, accordingly, is no contemporaneous record evidence from the Period referring to freelance work as "work for hire"; and (iii) well after the Period, MMC and its successors continued to expressly refer to freelance work in terms of a purchase and the freelancer's "assign[ment]" of the "copyright" and "renewal copyright" to his work, with no mention whatsoever of "work for hire."  *See* Evidence Supp. Resp. Statement Nos. 56, 57; SUF ¶¶ 66-67; AMF ¶¶ 18, 21-22, 41, 67, 104.

Furthermore, much of Plaintiff's purported evidence simply refers to MMC's "ownership" which Plaintiff incorrectly conflates with "work for hire." This is erroneous because "ownership" is equally consistent with the purchase by MMC and assignment to MMC of freelance work asserted by Counterclaimant.  Termination under the Copyright Act, 17 U.S.C. §304(c), assumes *ownership* by the publisher of the copyright or rights under copyright, pursuant to an express or implied transfer or license.

Plaintiff's Statement No. 53 and the purported evidence it cites is also **immaterial** as to whether Ditko created his works in the Period at the "instance and expense" of the Shell Companies—registered, represented and relied upon as the statutory "authors" of the purported "work for hire" alleged by Plaintiff, but as to which Plaintiff has adduced no admissible evidence. In this regard, Counterclaimant also incorporates by reference its Preliminary Statement.

<table>
<tr><td></td><td>Defendant also **objects** to Lens Decl., Ex. 23. *See* Defendant's Evidentiary Objection No. [32].</td></tr>
<tr><td></td><td style="text-align:center">**Statement No. 54**</td></tr>
<tr><td>**MCI's Statement**</td><td>Ditko acknowledged that he did not own legal rights to characters he worked on for Marvel. Lens Decl., Ex. 57 at 3 (letter from Ditko stating that he "never claimed creating Spider-Man" and that Marvel "own[s] the art pages, the published material"); Lens Decl., Ex. 52 at 3 (Ditko voicing dismay with the movie depiction of Doctor Strange but agreeing that "whoever has the rights can add and subtract from the original any way he chooses"); Lens Decl., Ex. 59 at 3 (Ditko critiquing Marvel's editorial choices, but acknowledging that, even if certain "ideas" were his, he "had no real right to them when published"); *see also* Lens Decl., Ex. 50 at 3.</td></tr>
<tr><td>**Counterclaimant's Response**</td><td>**Counterclaimant admits that it was understood that Marvel *owned* all rights to the Ditko works that Magazine Management decided to purchase and pay for, but disputes that Ditko and/or Magazine Management in the Period viewed or intended Ditko's creations as "work made for hire" owned by Magazine Management (or Goodman's shell companies) at the moment of creation as the "author" of such works.** *See* Toberoff Decl. Ex. 8 ¶¶ 14-15 (Sinnott attesting that in the 1950s and 1960s, he did not consider his freelance work submitted to Marvel to be done as "work made for hire"); Ex. 9 ¶ 8 (Steranko attesting that no one at Marvel ever informed him that his work was being created as "work made for hire" from 1966 to 1973); Ex. 10 ¶ 13 (Ayers attesting that he thought Marvel owned his work because it bought the material he submitted, but that he never heard the term "work for hire" and did not think his work was created as "work made for hire"); Ex. 11 ¶ 12 (Colan attesting that he believed Marvel owned the work it purchased from him, but that he never heard the term "work for hire"); Ex. 13 ¶¶ 12-13 (Adams attesting that he did not consider the work he submitted to Marvel to be done as "work made for hire"); Ex. 21 at 97:3-23 (Steranko testifying that he believed that when he walked into Marvel to deliver his freelance material, he still owned the work and that his work belonged to him until he cashed the check Marvel wrote to him); Ex. 22 at 266:13-267:2 (Lieber testifying that he believed he owned his freelance material until Marvel bought it from him); Ex. 54 at 2021MARVEL-0070259 (Marvel President James Galton ("Galton") correspondence to Thomas dated February 24, 1978 stating "it was our intent that all copyrights be assigned to Marvel, I assume this is acceptable to you … I would appreciate your signing … to confirm that all right to claim renewal and extension of copyrights are assigned to Marvel"); Ex. 64 at 245 n.80</td></tr>
</table>

(Nimmer explaining *in 1963* "that 17 U.S.C. Sec. 26 expressly renders an employer for hire an 'author' but makes no comparable provision with respect to commissioned works"); Ex. 2 at 100:3-101:9 (Lieber testifying that he was paid for his freelance material by checks stamped with a legend that used assignment-type language); Ex. 5 at 371:3-25 (Lee testifying that Marvel "would only buy what [it] needed"); Ex. 17 at 295:8-296:8, 297:1-20 (Thomas testifying that Marvel could accept or reject submitted material in its sole discretion); Ex. 22 at 303:15-19 (Lieber testifying he thought the name on the checks was Marvel or Magazine Management); Ex. 45 at 4142-4154, 4158-4164 (Marvel freelance checks made payable to Ayers dated from February 1, 1974 to July 4, 1975); Ex. 51 (Marvel freelance checks made payable to Gerber dated June 1, 1973, expressly acknowledging Gerber's "assignment to [Marvel] of any copyright, trademark and any other rights in or related to the material, including [his] assignment of any rights to renewal copyright"); Ex. 1 at 16 (Evanier Rep. describing the comic book industry and Marvel's custom and practice of stamping legends on the backs of checks to freelancers in the Period, thereby forcing freelancers to sign the legend to cash the check); Ex. 8 ¶ 13 (Sinnott attesting that Marvel paid him with checks that had an assignment legend on the back); Ex. 21 at 63:10-64:17, 91:11-93:19 (Steranko testifying that he would cross out the legend on the backs of the Marvel checks because he thought it was bad business to add an after-the-fact condition to payment on work that had been submitted a week or two prior); Ex. 45 at 4142-4154, 4158-4164 (Marvel freelance checks made payable to Ayers dated from February 1, 1974 to July 4, 1975, with assignment legends stamped on the backs of the checks); Ex. 51 (Marvel freelance checks made payable to Gerber dated June 1, 1973, expressly acknowledging Gerber's "assignment to [Marvel] of any copyright, trademark and any other rights in or related to the material, including [his] assignment of any rights to renewal copyright"); Ex. 9 ¶ 13 (Steranko attesting that legends on the backs of Marvel's checks to him used assignment, not work-for-hire, language); Ex. 10 ¶ 14 (Ayers attesting that Marvel's check legends used assignment language); Ex. 11 ¶ 12 (Colan attesting that the legends on the backs of Marvel's checks used assignment, not work-for-hire, language); Ex. 13 ¶ 14 (Adams attesting that Marvel's check legends used assignment language only); Ex. 21 at 61:23-62:3, 91:11-93:19 (Steranko testifying that in the 1960s, Marvel's check legends did not say "work for hire," but indicated that Steranko "gave them the rights to the work, sold them the rights to the work").

| | |
|---|---|
| **MCI's Reply** | **This fact remains undisputed.**<br><br>Defendant admits that it was understood that Marvel owned all rights to the Ditko works, but incorrectly and non-responsively argues about whether Marvel or Ditko "viewed or intended Ditko's creations as 'work made for hire' . . . at the moment of creation." The evidence establishes that Marvel viewed the Works as works made for hire and itself as the author, and freelancers, including Steve Ditko, understood their work for Marvel during the relevant time period was done on a work-for-hire basis. *See* MCI's Evidence in Support of Undisputed Fact 53.<br><br>Defendant cites no evidence suggesting that Ditko viewed himself as the copyright author of the Works or that he did not believe his work for Marvel was done on a work-for-hire basis. Toberoff Exhibits 8, 9, 11, and 17 **do not support** the contention, because none of the contracts at issue are between Marvel and Ditko and all are outside the relevant time period. And Ditko himself signed an agreement with Marvel in 1979, acknowledging that his prior work for Marvel was done on a work-made-for-hire basis. Lens Decl., Ex. 23A at 2 (agreement between Marvel and Ditko whereby Ditko "acknowledges, agrees and confirms that any and all work, writing, art work material or services (the 'Work') which have been or are in the future created, prepared or performed by [him] for the Marvel Comics Group have been and will be specially ordered or commissioned for use as a contribution to a collective work and that as such Work was and is expressly agreed to be considered a work made for hire."). Toberoff Exhibits 9 and 21 further **do not support** this contention, as explained in MCI's Reply in Support of Undisputed Fact 2. Further, Toberoff Exhibit 64 **cannot provide factual support**, as the cited material is a treatise purportedly summarizing the law, not a fact.<br><br>MCI also **objects** to Toberoff Exhibits 1, 2, 8, 9, 10, 11, 13, 21, 22, 45, 51, 54, and 64. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [3], [11], [12], [13], [14], [16], [21], [22], [23], [28], [31], [46], [48], [51] & [56]. |
| **Counterclaimant's Response to Reply** | This Statement's intended use and implications remain **disputed**. Plaintiff's purported evidence simply refers to MMC's "ownership" which Plaintiff incorrectly conflates with "work for hire." This is erroneous because "ownership" is equally consistent with the purchase by MMC and assignment to MMC of freelance work asserted by Counterclaimant. Termination under the Copyright Act, 17 U.S.C. §304(c), assumes *ownership* by the publisher of the copyright or rights under copyright, pursuant to an express or implied transfer or license. Contrary to Plaintiff's glib assertion, there is tellingly *no contemporaneous evidence whatsoever* |

that that Ditko's works were viewed, considered or treated in the Period as "works made for hire" by MMC or Goodman. And for good reason. *See* Def.'s Initial Response to Statement No. 54. Furthermore, it is Plaintiff, not Defendant-Counterclaimant, who bears the burden of proof on its alleged "work for hire" defense, including because it is a statutory exemption. 17 U.S.C. §304(c).

As to Plaintiff's continued misuse of the name "Marvel" to somehow attribute the actions of MMC to the corporately distinct Shell Companies *see* Counterclaimant's Response to Statement Nos. 2-3 and 6. Plaintiff's Statement No. 54 and the purported evidence it cites is also **immaterial** as to whether Ditko created his works in the Period at the "instance and expense" of the Shell Companies—registered, represented and relied upon as the statutory "authors" of the purported "work for hire" alleged by Plaintiff, but as to which Plaintiff has adduced no admissible evidence. In this regard, Counterclaimant also incorporates by reference its Preliminary Statement.

Defendant also **objects** to Bard Decl., Exs. 1-9; Lens Decl., Exs. 2-4, 6-8, 10, 13, 17-20, 23A-E, 39, 68A-G, 75, 76, 89, 95. *See* Defendant's Evidentiary Objection Nos. [1], [2], [3], [4], [5], [6], [7], [8], [9], [11], [12], [13], [15], [16], [17], [19], [22], [26], [27], [28], [29], [32], [37], [46], [53], [54], [65], & [69].

|  | **Statement No. 55** |
|---|---|
| **MCI's Statement** | Ditko acknowledged that he did not own copyrights in his work for Marvel, in contrast to his work with Wally Wood's "witzend" magazine. *Compare* Lens Decl., Ex. 56 at 2 (Ditko writing that "Wally Wood's Witzend [] gave writers, artists the opportunity to <u>copyright</u> their original ideas, created material when published"), Lens Decl., Ex. 61 at 3 (Ditko describing Wally Wood as "a stand-out in many ways" including that "[h]e published witzend—where one could copyright his own ideas, creations— I took advantage of it, my Mr. A, etc."), *and* Lens Decl., Ex. 61 at 2 (Ditko writing that "Mr. A is <u>my</u> copyrighted <u>PROPERTY</u>" and that "NO ONE, but me, has any right" to it), *with* Lens Decl., Ex. 44 at 4 (Ditko acknowledging that "Spider-Man & Doctor Strange are copyrighted by the Magazine Management company"); *see also* Lens Decl., Ex. 49 at 2 (Ditko writing that the "[m]ost important" thing about "Witzend" "was that one could copyright, own one's creative ideas, work"); Lens Decl., Ex. 60 at 3 (Ditko writing that "Wally Wood did an astounding thing for writers and artists, an opportunity to create and copyright what one creates, protecting and able to cash in on it at any future time"); Lens Decl., Ex. 51 |

<table>
<tr><td></td><td>at 3 (Ditko writing that "Wally Wood who created WITZEND wanted a publication for creators to copyright their ideas, creations").</td></tr>
<tr><td><strong>Counterclaimant's Response</strong></td><td><strong>Counterclaimant admits that it was understood that Marvel <em>owned</em> all rights to the Ditko works that Magazine Management decided to purchase and pay for, but disputes that Ditko and/or Magazine Management in the Period viewed or intended Ditko's creations as "work made for hire" owned by Magazine Management (or Goodman's shell companies) at the moment of creation as the "author" of such works.</strong> <em>See</em> Toberoff Decl. Ex. 8 ¶¶ 14-15 (Sinnott attesting that in the 1950s and 1960s, he did not consider his freelance work submitted to Marvel to be done as "work made for hire"); Ex. 9 ¶ 8 (Steranko attesting that no one at Marvel ever informed him that his work was being created as "work made for hire" from 1966 to 1973); Ex. 10 ¶ 13 (Ayers attesting that he thought Marvel owned his work because it bought the material he submitted, but that he never heard the term "work for hire" and did not think his work was created as "work made for hire"); Ex. 11 ¶ 12 (Colan attesting that he believed Marvel owned the work it purchased from him, but that he never heard the term "work for hire"); Ex. 13 ¶¶ 12-13 (Adams attesting that he did not consider the work he submitted to Marvel to be done as "work made for hire"); Ex. 21 at 97:3-23 (Steranko testifying that he believed that when he walked into Marvel to deliver his freelance material, he still owned the work and that his work belonged to him until he cashed the check Marvel wrote to him); Ex. 22 at 266:13-267:2 (Lieber testifying that he believed he owned his freelance material until Marvel bought it from him); Ex. 54 at 2021MARVEL-0070259 (Marvel President James Galton ("Galton") correspondence to Thomas dated February 24, 1978 stating "it was our intent that all copyrights be assigned to Marvel, I assume this is acceptable to you … I would appreciate your signing … to confirm that all right to claim renewal and extension of copyrights are assigned to Marvel"); Ex. 64 at 245 n.80 (Nimmer explaining <em>in 1963</em> "that 17 U.S.C. Sec. 26 expressly renders an employer for hire an 'author' but makes no comparable provision with respect to commissioned works"); Ex. 2 at 100:3-101:9 (Lieber testifying that he was paid for his freelance material by checks stamped with a legend that used assignment-type language); Ex. 5 at 371:3-25 (Lee testifying that Marvel "would only buy what [it] needed"); Ex. 17 at 295:8-296:8, 297:1-20 (Thomas testifying that Marvel could accept or reject submitted material in its sole discretion); Ex. 22 at 303:15-19 (Lieber testifying he thought the name on the checks was Marvel or Magazine Management); Ex. 45 at 4142-4154, 4158-4164 (Marvel freelance checks made payable to Ayers dated from February 1, 1974 to July 4, 1975); Ex. 51 (Marvel freelance checks made payable to Gerber dated June 1, 1973, expressly acknowledging Gerber's "assignment to</td></tr>
</table>

| | [Marvel] of any copyright, trademark and any other rights in or related to the material, including [his] assignment of any rights to renewal copyright"); Ex. 1 at 16 (Evanier Rep. describing the comic book industry and Marvel's custom and practice of stamping legends on the backs of checks to freelancers in the Period, thereby forcing freelancers to sign the legend to cash the check); Ex. 8 ¶ 13 (Sinnott attesting that Marvel paid him with checks that had an assignment legend on the back); Ex. 21 at 63:10-64:17, 91:11-93:19 (Steranko testifying that he would cross out the legend on the backs of the Marvel checks because he thought it was bad business to add an after-the-fact condition to payment on work that had been submitted a week or two prior); Ex. 45 at 4142-4154, 4158-4164 (Marvel freelance checks made payable to Ayers dated from February 1, 1974 to July 4, 1975, with assignment legends stamped on the backs of the checks); Ex. 51 (Marvel freelance checks made payable to Gerber dated June 1, 1973, expressly acknowledging Gerber's "assignment to [Marvel] of any copyright, trademark and any other rights in or related to the material, including [his] assignment of any rights to renewal copyright"); Ex. 9 ¶ 13 (Steranko attesting that legends on the backs of Marvel's checks to him used assignment, not work-for-hire, language); Ex. 10 ¶ 14 (Ayers attesting that Marvel's check legends used assignment language); Ex. 11 ¶ 12 (Colan attesting that the legends on the backs of Marvel's checks used assignment, not work-for-hire, language); Ex. 13 ¶ 14 (Adams attesting that Marvel's check legends used assignment language only); Ex. 21 at 61:23-62:3, 91:11-93:19 (Steranko testifying that in the 1960s, Marvel's check legends did not say "work for hire," but indicated that Steranko "gave them the rights to the work, sold them the rights to the work"). |
|---|---|
| **MCI's Reply** | **This fact remains undisputed.**<br><br>Defendant admits that it was understood that Marvel owned all rights to the Ditko works, but incorrectly and non-responsively argues about whether Marvel or Ditko "viewed or intended Ditko's creations as 'work made for hire' . . . at the moment of creation." The evidence establishes that Marvel viewed the Works as works made for hire and itself as the author, and freelancers, including Steve Ditko, understood their work for Marvel during the relevant time period was done on a work-for-hire basis. *See* MCI's Evidence in Support of Undisputed Fact 53.<br><br>Defendant cites no evidence suggesting that Ditko viewed himself as the copyright author of the Works or that he did not believe his work for Marvel was done on a work-for-hire basis. Toberoff Exhibits 8, 9, 11, and 17 **do not support** the contention, because none of the contracts at issue are between Marvel and Ditko and all are outside the relevant time period. And Ditko himself signed an agreement with Marvel in 1979, |

| | |
|---|---|
| | acknowledging that his prior work for Marvel was done on a work-made-for-hire basis. Lens Decl., Ex. 23A at 2 (agreement between Marvel and Ditko whereby Ditko "acknowledges, agrees and confirms that any and all work, writing, art work material or services (the 'Work') which have been or are in the future created, prepared or performed by [him] for the Marvel Comics Group have been and will be specially ordered or commissioned for use as a contribution to a collective work and that as such Work was and is expressly agreed to be considered a work made for hire."). Toberoff Exhibits 9 and 21 further **do not support** this contention, as explained in MCI's Reply in Support of Undisputed Fact 2. Further, Toberoff Exhibit 64 **cannot provide factual support**, as the cited material is a treatise purportedly summarizing the law, not a fact. |
| | MCI also **objects** to Toberoff Exhibits 1, 2, 8, 9, 10, 11, 13, 21, 22, 45, 51, 54, and 64. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [3], [11], [12], [13], [14], [16], [21], [22], [23], [28], [31], [46], [48], [51], & [56]. |
| **Counterclaimant's Response to Reply** | This Statement's intended use and implications remain **disputed**. Plaintiff improperly relies on cherry-picked musings and purported *legal* conclusions of a lay witness regarding copyright, well after the Period— "work for hire" is a complicated legal doctrine even for attorneys and jurists. Much of Plaintiff's purported evidence references MMC's "ownership" which Plaintiff incorrectly conflates with "work for hire." Termination under the Copyright Act, 17 U.S.C. §304(c) assumes ownership by the publisher pursuant to an express or implied transfer or license. *See* Counterclaimant's Response to Plaintiff's Statement No. 54. |
| | Plaintiff's Statement No. 55 and the purported evidence it cites is also **immaterial** as to whether Ditko created his works in the Period at the "instance and expense" of the Shell Companies—registered, represented and relied upon as the "statutory authors" of the purported "work for hire" alleged by Plaintiff, but as to which Plaintiff has adduced no admissible evidence. In this regard, Counterclaimant also incorporates by reference its Preliminary Statement. |
| | Defendant also **objects** to Bard Decl., Exs. 1-9; Lens Decl., Exs. 2-4, 6-8, 10, 13, 17-20, 23A-E, 39, 68A-G, 75, 76, 89, 95. *See* Defendant's Evidentiary Objection Nos. [1], [2], [3], [4], [5], [6], [7], [8], [9], [11], [12], [13], [15], [16], [17], [19], [22], [26], [27], [28], [29], [32], [37], [46], [53], [54], [65], & [69]. |

| | **Statement No. 56** |
|---|---|
| **MCI's Statement** | Defendant seeks to terminate purported grants and/or transfers of copyright allegedly stamped on the back of checks between Marvel, on the one hand, and Ditko, on the other. *See, e.g.*, Lens Decl., Ex. 63 at 4-5, 8-9, 15, 19-20. |
| **Counterclaimant's Response** | **Counterclaimant admits that it seeks to terminate grants of copyright from Ditko to Magazine Management in the Period, whether those grants took place via an implied assignment at the point of sale of Ditko's pages to Magazine Management, or via the explicit "assignment[s]" of "copyright" including "the renewal copyright" memorialized in the endorsement legends Magazine Management placed on the back of its checks to freelancers for the purchase of their material.** *See* Toberoff Decl. Ex. 2 at 100:3-101:9 (Lieber testifying that he was paid for his freelance material by checks stamped with a legend that used assignment-type language); Ex. 5 at 371:3-25 (Lee testifying that Marvel "would only buy what [it] needed"); Ex. 17 at 295:8-296:8, 297:1-20 (Thomas testifying that Marvel could accept or reject submitted material in its sole discretion); Ex. 22 at 303:15-19 (Lieber testifying he thought the name on the checks was Marvel or Magazine Management); Ex. 51 (Marvel freelance checks made payable to Gerber dated June 1, 1973, expressly acknowledging Gerber's "assignment to [Marvel] of any copyright, trademark and any other rights in or related to the material, including [his] assignment of any rights to renewal copyright" and no mention of "work made for hire" whatsoever); Ex. 45 at 4142-4154, 4158-4164 (Marvel freelance checks made payable to Ayers dated from February 1, 1974 to July 4, 1975 containing explicit "assignment" of "copyright" language and no mention of "work for hire" whatsoever); Ex. 1 at 16 (Evanier Rep. describing the comic book industry and Marvel's custom and practice of stamping such legends on the backs of checks to freelancers in the Period, thereby forcing freelancers to sign the legend to cash the check); Ex. 8 ¶ 13 (Sinnott attesting that Marvel paid him with checks that had an explicit assignment legend on the back); Ex. 21 at 63:10-64:17, 91:11-93:19 (Steranko testifying that he would cross out the legend on the backs of the Marvel checks because he thought it was bad business to add an after-the-fact condition to payment on work that had been submitted a week or two prior); Ex. 9 ¶ 13 (Steranko attesting that legends on the backs of Marvel's checks to him used assignment, not work-for-hire, language); Ex. 10 ¶ 14 (Ayers attesting that Marvel's check legends used assignment language); Ex. 11 ¶ 12 (Colan attesting that the legends on the backs of Marvel's checks used assignment, not work-for-hire, language); Ex. 13 ¶ 14 (Adams attesting that Marvel's check legends |

| | |
|---|---|
| | used assignment language only); Ex. 21 at 61:23-62:3, 91:11-93:19 (Steranko testifying that in the 1960s, Marvel's check legends did not say "work for hire," but indicated that Steranko "gave them the rights to the work, sold them the rights to the work"). *See also* Lens Decl., Ex. 63 (Counterclaimant's Notices of Termination each stating at 3 n.3: "This Notice of Termination also applies to each and every grant or alleged grant by Stephen J. Ditko of rights under copyright in and to the Work that falls within the applicable termination time window (defined by 17 U.S.C. § 304(c) and the effective date of this Notice of Termination"); Ex. 64 at 10 (Counterclaimant referring, alternatively, to Ditko's "implied assignment … due to Steve Diko's acceptance of payment from Marvel for his material and Marvel's subsequent known exploitation of his material."). |
| **MCI's Reply** | **This fact remains undisputed.**<br><br>Defendant admits that he seeks to terminate purported grants and/or transfers of copyright allegedly stamped on the back of checks between Marvel, on the one hand, and Ditko, on the other. And while Defendant suggests that he might also be seeking to terminate grants that occurred "via an implied assignment," that is an invalid legal contention, given that "[u]nder section 28 of the 1909 Copyright Act, which governs grants of copyrights executed before 1978, an assignment must be made by an 'instrument in writing signed by the proprietor of the copyright.'" *Guardian Music Corp. v. James W. Guercio Enterprises, Inc.*, 459 F. Supp. 2d 216, 222 (S.D.N.Y. 2006), *aff'd*, 271 F. App'x 119 (2d Cir. 2008); *accord Magnuson v. Video Yesteryear*, 85 F.3d 1424, 1428 (9th Cir. 1996) ("the Copyright Act of 1909 provided that assignment of a copyright had to be made in writing").<br><br>MCI also **objects** to Toberoff Exhibits 1, 2, 8, 9, 10, 11, 13, 21, 22, 45, and 51. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [3], [11], [12], [13], [14], [16], [21], [22], [31], [46] & [48]. |
| **Counterclaimant's Response to Reply** | Plaintiff's Statement remains **disputed**. Contrary to Plaintiff's argument, "Section 304(c) of the Copyright Act confers upon authors and their statutory successors the right to terminate 'the exclusive or nonexclusive grant of a transfer *or license* of the renewal copyright or any right under it, executed before January 1, 1978.'" *Atticus LLC v. Dramatic Publ'g Co.*, No. 22 Civ. 10147, 2023 WL 3135745 (S.D.N.Y. Apr. 27, 2023) (brackets omitted, emphasis added) (citing 17 U.S.C. § 304(c)). "Whereas under the 1909 Act, only an assignment of statutory copyright had to be in writing, while any license of such copyright could be oral or implied, under the current [1976] Act, exclusive licenses as well as assignments must be in |

writing." Melville B. Nimmer & David Nimmer, 3 *Nimmer on Copyright* § 10.02[B][5]] (Aug. 2021 rev. ed). Furthermore, as explained in Defendant's summary judgment briefing (*See* Dkts. 92 at 20-21; 98 at 12-13), Ditko held a common-law copyright in his unpublished work which became statutory upon publication, and "[c]ourts have generally upheld both oral and implied transfers of common law copyrights." *See e.g., Siegel v. Warner Bros. Ent'mt Inc.*, 658 F. Supp. 2d 1036 at 1084-91 (C.D. Cal. 2009) (confirming termination under 17 U.S.C. § 304(c) of transfer of common law copyright (statutory upon publication) to Superman strips); *Nimmer on Copyright* § 10.03[B][1]; *TCA Television Corp. v. McCollum*, 151 F. Supp. 3d 419, 428 (S.D.N.Y. 2015) ("courts in this Circuit have ruled that assignments of common law copyright need not be in writing."). "[S]uch an assignment could be oral or could be implied from the parties' conduct." *McCollum*, 151 F.Supp.3d at 438 (citing *Siegel,* 658 F.Supp.2d at 1086.) The same is also "true under the 1909 Act of both exclusive and nonexclusive licenses." *Nimmer on Copyright* § 10.03[B]. Defendant put forth competent evidence from which a reasonable jury may find an express or implied copyright transfer or license, all of which are equally terminable under 17 U.S.C. § 304(c). *See e.g., Siegel v. Warner Bros. Ent'mt Inc.*, 658 F. Supp. 2d 1036 at 1084-91 (C.D. Cal. 2009) (confirming § 304(c) termination of transfer of common law copyright (statutory upon publication) to Superman strips); *Fred Fisher Music Co. v. M. Witmark & Sons* , 318 U.S. 643, 657, 63 S.Ct. 773 (1943) (holding such grants enforceable); *Magnuson v. Video Yesteryear*, 85 F.3d 1424, 1428 (9th Cir. 1996).

Finally, Plaintiff's ironic argument that there is no express or implied transfer or license to terminate is not only contrary to law, it negates Plaintiff's interests.  It would mean that if its revisionist work-for-hire (for the Shell Companies) defense fails, as it must, Plaintiff has no rights to Ditko's material, whereas under Defendant's statutory notices of termination, Plaintiff retains non-exclusive U.S. rights, rights in all foreign territories, and worldwide rights to continue to exploit all prior derivative works. *See* Def.'s Mem. Supp. Mot. Summ. J. (Dkt. 76) at 9 n.1, 14-15.

Plaintiff's Statement No. 56 and the purported evidence it cites is also **immaterial** as to whether Ditko created his works in the Period at the "instance and expense" of the Shell Companies—registered, represented and relied upon as the "statutory authors" of the purported "work for hire" alleged by Plaintiff, but as to which Plaintiff has adduced no admissible evidence. In this regard, Counterclaimant also incorporates by reference its Preliminary Statement, *supra*.

| | **Statement No. 57** |
|---|---|
| **MCI's Statement** | Defendant does not have any checks from Marvel to Ditko during the Time Period and cannot attest to the language on the backs of the checks. Lens Decl., Ex. 1 28:12-23 (Defendant conceding that he had not "seen any checks from Marvel to Steve Ditko from the 1960s" or "seen the backs of any checks from Marvel to Steve Ditko from the 1960s"); Lens Decl., Ex. 64 at 9 (Defendant identifying the purported grants as check legends "contain[ing] express purchase and assignment language," but failing to identify any specific language). |
| **Counterclaimant's Response** | **Counterclaimant admits that it does not possess checks from Magazine Management to Ditko in the Period because Ditko naturally deposited the checks he received from Magazine Management, but Counterclaimant notes that the record consists of numerous checks to other freelancers, all of which have explicit "assignment" of "copyright" language and no mention of "work for hire" in the legends Magazine Management put on the backs of its checks to such freelancers. Additionally, there is significant sworn testimony from freelancers from the Period concerning the explicit "assignment" of copyright language in the endorsement legends on the back of Magazine Management's checks.** *See* Lens Decl., Ex. 63 (Counterclaimant's Notices of Termination each stating at 3 n.3: "This Notice of Termination also applies to each and every grant or alleged grant by Stephen J. Ditko of rights under copyright in and to the Work that falls within the applicable termination time window (defined by 17 U.S.C. § 304(c) and the effective date of this Notice of Termination"); Ex. 64 at 10 (Counterclaimant referring, alternatively, to Ditko's "implied assignment … due to Steve Diko's acceptance of payment from Marvel for his material and Marvel's subsequent known exploitation of his material."). *See also* Toberoff Decl. Ex. 2 at 100:3-101:9 (Lieber testifying that he was paid for his freelance material by checks stamped with a legend that used assignment-type language); Ex. 5 at 371:3-25 (Lee testifying that Marvel "would only buy what [it] needed"); Ex. 45 at KIRBY-4142-4154, KIRBY-4158-4164 (Marvel freelance checks made payable to Ayers dated from February 1, 1974 to July 4, 1975); Ex. 51 (Marvel freelance checks made payable to Gerber dated June 1, 1973, expressly acknowledging Gerber's "assignment to [Marvel] of any copyright, trademark and any other rights in or related to the material, including [his] assignment of any rights to renewal copyright"); Ex. 1 at 16 (Evanier Rep. describing the comic book industry and Marvel's custom and practice of stamping legends on the backs of checks to freelancers in the Period, thereby forcing freelancers to sign the legend to cash the check); Ex. 2 at 100:3-101:9 |

|  | (Lieber testifying that he was paid for his freelance material by checks stamped with a legend that used assignment-type language); Ex. 8 ¶ 13 (Sinnott attesting that Marvel paid him with checks that had an assignment legend on the back); Ex. 21 at 63:10-64:17, 91:11-93:19 (Steranko testifying that he would cross out the legend on the backs of the Marvel checks because he thought it was bad business to add an after-the-fact condition to payment on work that had been submitted a week or two prior); Ex. 9 ¶ 13 (Steranko attesting that legends on the backs of Marvel's checks to him used assignment, not work-for-hire, language); Ex. 10 ¶ 14 (Ayers attesting that Marvel's check legends used assignment language); Ex. 11 ¶ 12 (Colan attesting that the legends on the backs of Marvel's checks used assignment, not work-for-hire, language); Ex. 13 ¶ 14 (Adams attesting that Marvel's check legends used assignment language only); Ex. 21 at 61:23-62:3, 91:11-93:19 (Steranko testifying that in the 1960s, Marvel's check legends did not say "work for hire," but indicated that Steranko "gave them the rights to the work, sold them the rights to the work"); Ex. 22 at 269:24-271:20 (Lieber testifying that the check legends used assignment, not work-for-hire language). |
|---|---|
| **MCI's Reply** | **This fact remains undisputed.**<br><br>Defendant admits that he does not have checks from Marvel to Ditko during the relevant time period, but non-responsively refers to the existence of checks to other freelancers approximately a decade outside the Time Period. As this Court has already found, "the checks were not issued to Kirby [or Ditko] and are not from the relevant time period . . . [O]ne cannot infer what might have been written on a check issued in 1958 [(or 1962-1965, for that matter)] from what was written on an analogous check fifteen years later. For that reason alone, the[se] 1973 and 1974 checks do not raise any genuine issue of fact that tends to contradict the work-for-hire presumption." *Kirby*, 777 F. Supp. 2d at 748. Thus, Toberoff Exhibits 45 and 51 do not support this contention.<br><br>Further, to the extent Defendant relies upon past testimony about what check legends may have said, that evidence is inadmissible under the best evidence rule, given that Defendant is attempting to establish the terms of a writing without having produced the writing or a copy thereof (and without establishing a reasonably diligent search). And in any event, no admissible testimony supports Defendant's contention about "assignment" language on the back of checks. Toberoff Exhibits 2 and 22 do not support this contention, because Mr. Lieber testified "I don't really know" when asked when legends first appeared on Marvel checks. See Toberoff Decl., Ex. 2 at 100:13-20. And Mr. Lieber only testified regarding his "understanding" of the effect of the purported language, which, in any |

| | |
|---|---|
| | event, is an (incorrect) legal conclusion. See In re Rezulin Prod. Liab. Litig., 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004) (explaining that such testimony "usurp[s] ... the role of the trial judge in instructing the jury as to the applicable law [and] the role of the jury in applying that law to the facts before it"). Toberoff Exhibits 9 and 21 further do not support this contention, as explained in MCI's Reply in Support of Undisputed Fact 2.<br><br>In any event, the existence or non-existence of check legends is immaterial to the Court's application of the work-made-for-hire test, as the Second Circuit already held with respect to this same evidence. *Kirby*, 726 F.3d at 143 ("[W]e decline to infer from Marvel's suspenders that it had agreed to give Kirby its belt.").<br><br>MCI also **objects** to Toberoff Exhibits 1, 2, 8, 9, 10, 11, 13, 21, 22, 45, and 48. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [3], [11], [12], [13], [14], [16], [21], [22], [29], [45], & [48]. |
| **Counterclaimant's Response to Reply** | This Statement's intended use and implications remain **disputed**. Plaintiff tries to sidestep a multitude of record evidence from which legitimate inferences can be drawn that Ditko expressly assigned the "copyright" and "renewal copyright" in his work via endorsement of the explicit assignment legends MMC placed on the back of its checks. S*ee* Def.'s Initial Resp. to Pl.'s 56.1 Statement ¶¶ 2-6, 53-58. In so doing, Plaintiff ignores that "cases under the 1909 Act h[o]ld that if all written copies of the instrument of transfer have been lost, oral evidence as to the fact of a written conveyance will be admissible." Paul Goldstein, *Copyright* § 5.2.1.2 (3d ed. 2023 Supp.); *see also Nimmer on Copyright* § 10.03[A]; *Filtron Mfg. v. Fil-Coil Co.*, 215 U.S.P.Q. 866, 869 (E.D.N.Y. 1981) (A putative owner who fails to show acknowledgment of an instrument of transfer can prove the transfer through appropriate testimony and documentary evidence.) Plaintiff's best evidence objection is therefore without merit. As explained more fully in Defendant's Initial Response to Plaintiff's Local Rule 56.1 Statement, Ditko cashed the checks which can no longer be obtained as Plaintiff failed to produce any such checks as requested, claiming it has none. *See* Def.'s Resp. to Pl.'s 56.1 Statement ¶ 56; *see also* Pl.'s Resp. to Def.'s 56.1 Statement (Dkt. 93) ("**Undisputed** that from 1962 to 1965 Lee was likely paid with checks drawn on Magazine Management accounts, though no checks from relevant time period exist") (emphasis in original). Defendant respectfully submits that it has satisfied its burden under Fed. R. Evid. 1004, and that the weight and sufficiency of its secondary evidence of MMC's check legends to freelancers like Ditko, containing explicit "copyright" and "renewal copyright" assignment language, is for the trier of fact to decide. |

Plaintiff's Statement No. 57 and the purported evidence it cites is also **immaterial** as to whether Ditko created his works in the Period at the "instance and expense" of the Shell Companies—registered, represented and relied upon as the "statutory authors" of the purported "work for hire" alleged by Plaintiff, but as to which Plaintiff has adduced no admissible evidence. In this regard, Counterclaimant also incorporates by reference its Preliminary Statement.

Defendant also **objects** to Bard Decl., Exs. 1-9; Lens Decl., Exs. 2-4, 6, 8, 10, 13, 17, 18, 39, 68A-G, 75, 76, 89, 95. *See* Defendant's Evidentiary Objection Nos. [1], [2], [3], [4], [5], [6], [7], [8], [9], [11], [12], [13], [15], [17], [19], [22], [26], [27], [37], [46], [53], [54], [65], & [69].

|  | **Statement No. 58** |
|---|---|
| **MCI's Statement** | Marvel does not have checks from Marvel to Ditko during the Time Period and cannot attest to what they said. Bard Decl. ¶ 3; Lens Decl., Ex. 65 at 4; Lens Decl., Ex. 2 139:3-23; Lens Decl., Ex. 12 71:25-72:19; Lens Decl., Ex. 3 153:2-154:21, 296:3-6, 297:7-13; Lens Decl., Ex. 9 31:17-32:5, 32:17-33:5. |
| **Counterclaimant's Response** | **Admitted only that Marvel alleges that it does not have in its possession, custody or control checks from Magazine Management (or any other alleged "Marvel" entity) to Ditko during the relevant Period, or to any other freelancers during the Period however, reasonable inferences can be drawn from the Magazine Management checks to freelancers from the early to mid-1970's that Magazine Management's checks to Ditko in the Period for the purchase of his material bore the same assignment of copyright endorsement legends on the back. Additionally, there is significant sworn testimony from freelancers from the Period concerning the explicit "assignment" of copyright language in the endorsement legends on the back of Magazine Management's checks.** *See* Toberoff Decl. Ex. 2 at 100:3-101:9 (Lieber testifying that he was paid for his freelance material by checks stamped with a legend that used assignment-type language); Ex. 5 at 371:3-25 (Lee testifying that Marvel "would only buy what [it] needed"); Ex. 45 at 4142-4154, 4158-4164 (Marvel freelance checks made payable to Ayers dated from February 1, 1974 to July 4, 1975); Ex. 51 (Marvel freelance checks made payable to Gerber dated June 1, 1973, expressly acknowledging Gerber's "assignment to [Marvel] of any copyright, trademark and any other rights in or related to the material, including [his] assignment of any rights to renewal copyright"); Ex. 1 at 16 (Evanier Rep. describing the comic book industry and Marvel's custom |

| | |
|---|---|
| | and practice of stamping legends on the backs of checks to freelancers in the Period, thereby forcing freelancers to sign the legend to cash the check); Ex. 2 at 100:3-101:9 (Lieber testifying that he was paid for his freelance material by checks stamped with a legend that used assignment-type language); Ex. 8 ¶ 13 (Sinnott attesting that Marvel paid him with checks that had an assignment legend on the back); Ex. 21 at 63:10-64:17, 91:11-93:19 (Steranko testifying that he would cross out the legend on the backs of the Marvel checks because he thought it was bad business to add an after-the-fact condition to payment on work that had been submitted a week or two prior); Ex. 9 ¶ 13 (Steranko attesting that legends on the backs of Marvel's checks to him used assignment, not work-for-hire, language); Ex. 10 ¶ 14 (Ayers attesting that Marvel's check legends used assignment language); Ex. 11 ¶ 12 (Colan attesting that the legends on the backs of Marvel's checks used assignment, not work-for-hire, language); Ex. 13 ¶ 14 (Adams attesting that Marvel's check legends used assignment language only); Ex. 21 at 61:23-62:3, 91:11-93:19 (Steranko testifying that in the 1960s, Marvel's check legends did not say "work for hire," but indicated that Steranko "gave them the rights to the work, sold them the rights to the work"); Ex. 22 at 269:24-271:20 (Lieber testifying that the check legends used assignment, not work-for-hire language). |
| **MCI's Reply** | **This fact remains undisputed.**<br><br>Defendant admits that he does not have checks from Marvel to Ditko during the relevant time period, but non-responsively refers to the existence of checks to other freelancers approximately a decade outside the Time Period. That is non-responsive, turns on an incorrect legal argument, and is immaterial for the responses detailed above in MCI's Reply in Support of Undisputed Fact 57.<br><br>MCI also **objects** to Toberoff Exhibits 1, 2, 8, 9, 10, 11, 13, 21, 22, 45, and 48. *See* MTE Evanier [Dkt. 77]; MCI's Evidentiary Objection Nos. [1], [3], [11], [12], [13], [14], [16], [21], [22], [29], [46] & [48]. |
| **Counterclaimant's Response to Reply** | This Statement remains **disputed**. Without limitation, legitimate inferences can be drawn from Marvel's failure to produce any copies of its checks or check endorsement legends or any documents relating to same from the Period, or anytime in the 1960s, and no checks to Ditko, all of which would naturally be in its predecessors' possession not in the possession of the freelancers who deposited or cashed the checks. This glaring deficiency pervades not only this lawsuit, but numerous lawsuits between Marvel and freelance creators going back to the 1960s. In fact, Plaintiff produced the front and back of just a handful of checks from the |

early to mid-1970s. Legitimate inferences can be drawn from Plaintiff's possession and production of such mundane minutia as Goodman's ad rate cards from 1947 (Lens Opp. Decl., Ex. 92), while saying it has no checks or other documentation of any payments to Ditko or any other freelancers or to Lee from the 1960s, when nearly all of its most famous superheroes were created and soon became valuable.

Notwithstanding this, Counterclaimant has provided the sworn attestations of five well-known freelancers (whose work MMC purchased in or around the Period) that MMC's checks bore endorsement legends with purchase and assignment of copyright language, and no mention whatsoever of "work for hire." In addition to this and Plaintiff's failure to provide *any contemporaneous* evidence from the Period referring to Ditko's or other freelancer's creations as "for hire," further legitimate inferences negative to Plaintiff's revisionist "work for hire" claim can be drawn from the fact that even MCI's checks from the 1970's continue to contain the purchase and assignment of copyright legends, again with no mention of "work for hire," as specifically recalled and testified to by the aforementioned five creators selling their freelance work to MMC in the 1960s. *See* Evidence Supp. Def.'s Resp. Statement Nos. 56, 57. This is further supported by the fact that once "Marvel" finally began entering into *agreements* for freelance work, it *again* used language of purchase and assignment of copyright with no mention whatsoever of "work for hire." *Id.* No. 58. Finally, further inferences negative to Plaintiff's position can be drawn from the fact that the first check legend it produced containing any "work for hire" language was from 1986 and it was to a traditional employee no less. *See* AMF, ¶ 68; Toberoff Opp. Decl., Ex. 98.

Plaintiff's Statement No. 58 and the purported evidence it cites is also **immaterial** to whether Ditko created his works in the Period at the "instance and expense" of the Shell Companies—registered, represented and relied upon as the statutory "authors" of the purported "work for hire" alleged by Plaintiff, but as to which Plaintiff has adduced no admissible evidence. In this regard, Counterclaimant also incorporates by reference its Preliminary Statement.

Defendant also **objects** to Bard Decl., Exs. 1-9; Lens Decl., Exs. 2-4, 6, 8, 10, 13, 17, 18, 39, 68A-G, 75, 76, 89, 95. *See* Defendant's Evidentiary Objection Nos. [1], [2], [3], [4], [5], [6], [7], [8], [9], [11], [12], [13], [15], [17], [19], [22], [26], [27], [37], [46], [53], [54], [65], & [69].

Date: September 8, 2023                    Respectfully submitted,

By:  ___*/s/ Marc Toberoff*___
                  Marc Toberoff

TOBEROFF & ASSOCIATES, P.C.
*mtoberoff@toberoffandassociates.com*
23823 Malibu Road, Suite 50-363
Malibu, CA 90265

*Attorneys for Patrick S. Ditko*